Deposition of:     LaCrisha D. Wise     April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Vol. I, Pgs. 1-175

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 04-CV-30091-MAP

```
--------------------------
                          )
WISE, ET AL.,             )
          Plaintiffs      )
                          )
vs.                       )
                          )
PATRIOT RESORTS CORP., )
ET AL.                    )
          Defendant       )
                          )
--------------------------
```

DEPOSITION OF LACRISHA D. WISE

Tuesday, April 26, 2005

9:30 a.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144


- - - - - - Sandra A. Deschaine, RPR - - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 2

```
 1  APPEARANCES:
 2  SKOLER, ABBOTT & PRESSER, P.C.
 3     Marylou Fabbo, Esquire
 4     One Monarch Place, Suite 2000
 5     Springfield, Massachusetts 01144
 6     (413) 737-4753  Fax (413) 787-1941
 7     on behalf of the Defendants
 8  HEISLER, FELDMAN & MCCORMICK, P.C.
 9     Suzanne Garrow, Esquire
10     1145 Main Street
11     Springfield, Massachusetts  01103
12     (413) 788-7988  Fax (413) 788-7996
13     on behalf of the Plaintiffs
14
15  Also Present: Faith Lippert
16          Kimberly Klimczuk
17          Becky Foster
18          Mary Goddard
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2  -----------------------------------------------
    WITNESSES:                    PAGE
 3  -----------------------------------------------
 4  LaCrisha Wise
 5     By Ms. Fabbo              4
 6  -----------------------------------------------
    EXHIBITS:    DESCRIPTION     PAGE
 7  -----------------------------------------------
 8  Exhibit 1  Application for Employment    80
 9  Exhibit 2  Memo dated August 4, 2001    94
10  Exhibit 3  Memo dated February 8, 2002    127
11  Exhibit 4  Employment Agreement    130
12  Exhibit 5  Calendar notes    153
13  Exhibit 6  Memo dated May 11, 2003    160
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          LACRISHA D. WISE, Deponent, having first
 2  been satisfactorily identified by the production
 3  of her driver's license and duly sworn by the
 4  Notary Public, was examined and testified as
 5  follows:
 6
 7  EXAMINATION BY MS. FABBO:
 8
 9      Q.   Could you please state your name for
10  the record?
11      A.   LaCrisha Denise Wise.
12      Q.   My name is Marylou Fabbo, and I
13  represent the defendants in the lawsuit that
14  you've brought against your former employer.
15          Have you ever had your deposition
16  taken before?
17      A.   Not that I recall.
18      Q.   Well, the procedure is that the court
19  reporter will be taking down everything you say,
20  so you need to remember to answer verbally rather
21  than shaking your head or nodding.  If at any time
22  you want to take a break, as long as it's not in
23  the middle of my question or I'm waiting for an
24  answer, that's fine, let me know and you can take
```

Page 5

```
 1  a break.  Try to let me finish my question before
 2  you start answering, because she needs to take
 3  down everything we say, and if we're both talking,
 4  it makes it difficult.
 5          Have you ever given testimony under
 6  oath before?
 7      A.   Yes.
 8      Q.   When was that?
 9      A.   I don't recall.
10      Q.   In connection with what?
11      A.   A motor vehicle accident.
12      Q.   And where did you give that
13  testimony?
14      A.   At my attorney's office.
15      Q.   Was it in a situation similar to
16  this?
17      A.   No.
18      Q.   Who was present?
19      A.   Attorney and myself.
20      Q.   Who's your attorney?
21      A.   John Rodent.
22      Q.   And when you say -- when I asked you
23  if it was under oath, what led you to the
24  conclusion it was under oath?
```

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA    01115    (413) 786-7233    FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 6

1    MS. GARROW: And I'm just going to
2  object, and to the extent you had any
3  communications with your lawyer, you're advised
4  not to give that information, but you can answer
5  what led you to the conclusion it was under oath,
6  as long as it was not as a result of a privileged
7  communication.
8    A.    Could you rephrase that question for
9  me?
10    Q.    I had asked you if you had given
11  testimony under oath and you said yes. And I'm
12  asking you what made you think it was under oath,
13  or why did you believe it was under oath?
14    MS. GARROW: Same objection here, and
15  you can answer given the limitations I've given
16  you.
17    A.    I was sworn in, as I just was.
18    Q.    Your attorney swore you in or someone
19  else did?
20    A.    Someone else did.
21    Q.    Was there anyone else present when
22  you were giving this testimony, other than you and
23  your attorney?
24    MS. GARROW: Objection. Go ahead.

Page 7

1  You need to give an audible answer.
2    A.    No.
3    Q.    So it was you and your attorney,
4  someone came in and swore you in and they left?
5    A.    No, they were present.
6    Q.    Who was that person?
7    A.    I don't recall their name.
8    Q.    Was it someone who worked at your
9  attorney's office?
10    A.    No.
11    Q.    Male or female?
12    A.    Male.
13    Q.    Do you know what year this was?
14    A.    I don't recall.
15    Q.    Do you know whether it was the last
16  five years?
17    A.    I don't recall.
18    Q.    When were you in an automobile
19  accident or were you in an automobile accident?
20    A.    Yes, I was.
21    Q.    Was that related to this testimony
22  you gave?
23    A.    Yes.
24    Q.    When was the accident?

Page 8

1    A.    I don't recall.
2    Q.    You don't recall the year or
3  anything?
4    A.    No.
5    Q.    Was it when you were employed with
6  the defendants?
7    A.    No.
8    Q.    Before that?
9    A.    Yes.
10    Q.    Are you currently employed?
11    A.    Yes.
12    Q.    Other than that time that you told me
13  about, have you ever given testimony under oath in
14  any other circumstances?
15    A.    Not that I recall.
16    Q.    Have you ever given testimony in
17  court?
18    A.    Not that I recall.
19    Q.    Where are you employed?
20    A.    Inn Seasons Report.
21    Q.    Where is that?
22    A.    Agawam, Mass.
23    Q.    How long have you been employed at
24  Inn Seasons?

Page 9

1    A.    Since January, 2005.
2    Q.    What's your position?
3    A.    Sales associate.
4    Q.    And what do you sell?
5    A.    Vacation ownership.
6    Q.    Is it a time-share type of sale?
7    A.    Yes.
8    Q.    Where are the properties that you're
9  selling ownership in?
10    A.    Throughout Maine, Cape Cod and New
11  Hampshire, as well as other affiliated resorts all
12  over the world.
13    Q.    Do you earn a salary there?
14    A.    Yes.
15    Q.    What is your salary?
16    A.    $60 per day.
17    Q.    Are you also paid any other form of
18  compensation?
19    A.    Yes.
20    Q.    What is that?
21    A.    Commission and bonus, as well as
22  S.P.I.F.
23    Q.    Could you explain how that works,
24  please?

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA    01115    (413) 786-7233    FAX (413) 786-0299
10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

| Page 10 | Page 12 |
|---|---|
| 1      A.  My commission is paid based on each | 1  the past? |
| 2  sale that is made by me to the customer.  Bonus is | 2      A.  Yes, all total, $6,000 from January. |
| 3  based on the volume of my sales for the month, and | 3      Q.  Has it been $2,000 per month or has |
| 4  S.P.I.Fs are daily and random, and they're based, | 4  it varied? |
| 5  whole or in part, on the volume of the sale. | 5      A.  It's varied. |
| 6      Q.  For a particular day? | 6      Q.  And what about the S.P.I.F, what have |
| 7      A.  Every day. | 7  you received? |
| 8      Q.  And you're saying S.P.I.F.? | 8      MS. GARROW:  Objection.  You can |
| 9      A.  Special Performance Incentive Fund. | 9  answer. |
| 10      Q.  What is the percentage of commission | 10      A.  Roughly $2200. |
| 11  you receive? | 11      Q.  How did you become employed at this |
| 12      A.  Seven. | 12  employer? |
| 13      Q.  Seven percent? | 13      MS. GARROW:  Objection.  You can |
| 14      A.  Yes. | 14  answer. |
| 15      Q.  And does the purchaser have to make | 15      MS. FABBO:  What's your objection? |
| 16  payments to ensure that you get commission or is | 16  You're distracting me. |
| 17  that based on what the sale amount is? | 17      MS. GARROW:  I'm objecting because |
| 18      MS. GARROW:  Objection. | 18  she doesn't know how she became employed.  I mean |
| 19      Q.  Are there any conditions, other than | 19  that's -- |
| 20  you have to make a sale, do they actually have to | 20      MS. FABBO:  To the form of the |
| 21  pay for the item, the property, before you receive | 21  question. |
| 22  a commission? | 22      MS. GARROW:  Right, to the form. |
| 23      A.  The customer puts a deposit down. | 23      Q.  Do you understand what I'm asking |
| 24      Q.  And you get paid when the deposit is | 24  you? |

| Page 11 | Page 13 |
|---|---|
| 1  made? | 1      A.  No. |
| 2      A.  No, I'm paid three weeks later. | 2      Q.  You don't know how you got employed |
| 3      Q.  And there's nothing else that needs | 3  there?  Do you remember? |
| 4  to happen other than the customer putting a | 4      MS. GARROW:  It's a very vague |
| 5  deposit down? | 5  question.  I mean it's the form of the question. |
| 6      A.  Their paperwork needs to be | 6      MS. FABBO:  Fine. |
| 7  processed, which includes their credit application | 7      Q.  Did you go for an interview there? |
| 8  and that's it. | 8      A.  No, I didn't.  I was -- I received a |
| 9      Q.  And if the credit application isn't | 9  phone call from a colleague that I worked with |
| 10  processed or they're denied credit, does that | 10  prior to inviting me to work with him, and he gave |
| 11  affect your commission? | 11  me a phone number, and I began the next day. |
| 12      MS. GARROW:  Objection.  You can | 12      Q.  And who was the colleague? |
| 13  answer. | 13      A.  Duane Johnson. |
| 14      A.  There is no denial of credit.  All | 14      Q.  And he's -- Mr. Johnson is employed |
| 15  credit is guaranteed.  The financing, rather, is | 15  with the same employer? |
| 16  guaranteed. | 16      A.  Yes. |
| 17      Q.  And what have the range of your | 17      Q.  In a sales position? |
| 18  bonuses been? | 18      A.  Mr. Johnson, he's just been moved |
| 19      MS. GARROW:  Objection.  You can | 19  into management. |
| 20  answer. | 20      Q.  Do you have any other benefits at |
| 21      Q.  If you've gotten any. | 21  that employment? |
| 22      A.  Absolutely.  I just received one | 22      A.  No. |
| 23  yesterday for $2,000. | 23      Q.  Are you currently married? |
| 24      Q.  Have you received any other ones in | 24      A.  I beg your pardon. |

4 (Pages 10 to 13)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  Q.  Are you married?
2  A.  Yes.
3  Q.  And how long have you been married?
4  A.  I was married July 19th, 2003.
5  Q.  And what is your husband's name?
6  A.  Michael Johnson.
7  Q.  What's your current address?
8  A.  109 Dunmoreland Street.
9  Q.  Could you spell that, please?
10  A.  D-U-N-M-O-R-E-L-A-N-D, all one word,
11  Street. It's here in Springfield. Zip code is
12  01109-3261.
13  Q.  Is that a property that you own or
14  rent?
15  A.  Rent.
16  Q.  How long have you been living there?
17  A.  A year.
18  Q.  And who else lives with you at that
19  address?
20  A.  My husband and our three children.
21  Q.  And how old are your children?
22  A.  Fifteen, eleven and five.
23  Q.  And what are their names, starting
24  with the fifteen --

**Page 15**

1  A.  Asia, J'Mayee, and Michael.
2  Q.  Do they share your last name?
3  A.  My daughters do.
4  Q.  And what's your son's last name?
5  A.  Johnson. Correction. They share my
6  maiden name.
7  Q.  So when you said your full name
8  was -- I think you did answer Wise. Have you
9  changed your name?
10  A.  No, I haven't, as of yet.
11  Q.  But you plan on doing that?
12  A.  Yes.
13  Q.  Has anyone else ever lived with you
14  at that address, other than the people you've
15  already told me about?
16  A.  Yes.
17  Q.  Who's that?
18  A.  Lisa Johnson.
19  Q.  Anyone else?
20  A.  No.
21  Q.  And who's Ms. Johnson?
22  A.  My stepdaughter.
23  Q.  How old is she?
24  A.  Twenty-five.

**Page 16**

1  Q.  When did she live with you there?
2  A.  I don't recall the dates.
3  Q.  Do you remember what time of year it
4  was?
5  A.  No, I don't.
6  Q.  Prior to living at your current
7  address, where did you live?
8  A.  28 Gladstone Street.
9  Q.  In Springfield?
10  A.  Yes.
11  Q.  How long did you live there?
12  A.  I believe I moved into 28 Gladstone
13  on December 30th of 2000.
14  Q.  Okay. And did you remain at that
15  address until you moved into 109 Dunmoreland
16  Street?
17  A.  Yes.
18  Q.  And did you rent there as well?
19  A.  Yes.
20  Q.  And who lived with you at that
21  address?
22  A.  My children, my then fiancT.
23  Q.  Anyone else?
24  A.  Latonya Wise.

**Page 17**

1  Q.  Who's that?
2  A.  My sister.
3  Q.  Anyone else?
4  A.  Shagaun Wise.
5  Q.  Is that also a sister?
6  A.  My nephew.
7  Q.  Anyone else?
8  A.  Lisa Johnson.
9  Q.  Who's she?
10  A.  She's my stepdaughter.
11  Q.  Okay.
12  A.  And Charlene Wheeler.
13  Q.  Who is Ms. Wheeler?
14  A.  A friend.
15  Q.  So when you say your children lived
16  there, was your son Michael already born?
17  A.  Yes.
18  Q.  And your fiancT, that was
19  Mr. Johnson?
20  A.  Yes.
21  Q.  How long did Ms. Wheeler live with
22  you, approximately?
23  A.  I'm not sure how long she lived with
24  us.

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA    01115    (413) 786-7233   FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:   LaCrisha D. Wise   April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 18

1    Q.  Are you currently taking any
2  medications?
3    A.  Yes.
4    Q.  What medications are those?
5    A.  I take birth control.
6    Q.  Anything else?
7    A.  Which is low estrogen.  I take Mobic.
8    Q.  What is that?
9    A.  Muscle relaxers.
10   Q.  Anything else?
11   A.  Percocet.
12   Q.  Anything else?
13   A.  No.
14   Q.  And do you know the dose of -- is it
15  Mobic?
16   A.  I believe it's twenty-five
17  milligrams.
18   Q.  What about Percocet?
19   A.  Five milligrams.
20   Q.  Did you take those both today?
21   A.  Yes.
22   Q.  Anything else you can think of?  No?
23   A.  I took all of my medication today.
24   Q.  Did you consume any alcohol today?

Page 19

1    A.  No.
2    Q.  Does the Percocet or the muscle
3  relaxer in any way affect your ability to testify
4  honestly here today, as far as you know?
5    A.  No.
6    Q.  Does it affect your cognitive
7  abilities in any manner, that you know?
8    A.  No.
9    Q.  How long have you been taking the
10  muscle relaxer?
11       MS. GARROW:  I'm going to object and
12  I'm going to instruct you not to answer regarding
13  medication or any communications relating to any
14  doctors.
15       MS. FABBO:  Why?
16       MS. GARROW:  Because it is unrelated
17  to anything that we're here for today.
18       MS. FABBO:  That's your conclusion.
19       MS. GARROW:  Well, I'm sorry, I'm
20  happy to go before a Judge on this one, because
21  any treatment is completely unrelated.  She's not
22  claiming any treatment here, so.
23       Q.  Are you claiming that you've suffered
24  emotional distress damages as a result of your

Page 20

1  employment?
2    A.  Yes.
3        MS. FABBO:  And you're instructing
4  her not to answer?
5        MS. GARROW:  As to medications she's
6  on, yes.
7        MS. FABBO:  On what grounds?
8        MS. GARROW:  On privileged in terms
9  of any communications relating to those
10  medications and when they were prescribed.  I can
11  tell you right now we're not going to be relying
12  on any of it for her emotional distress damages.
13   Q.  When did you begin taking Percocet?
14   A.  Somewhere in the late fall of last
15  year.
16   Q.  What prompted that?
17       MS. GARROW:  Objection.  You can
18  answer that.
19   A.  Lower back discomfort.
20   Q.  Were you involved in any accidents
21  that caused you to have back pain or discomfort,
22  or was this something that kind of arose over
23  time?
24       MS. GARROW:  I'm going to object.

Page 21

1  You can answer.
2    A.  Could you rephrase your question?
3    Q.  Sure.  Did you suddenly develop this
4  lower back pain or had you been involved in any
5  incident that might have caused the lower back
6  pain?
7        MS. GARROW:  Objection.  You can
8  answer.
9    A.  I was involved in an incident, slip
10  and fall.
11   Q.  When was that?
12   A.  I believe in October of 2004.  Yes.
13   Q.  Where did that occur?
14   A.  In my house.
15   Q.  In your house, did you say?
16   A.  Yes.
17   Q.  Did you need any hospitalization as a
18  result of that injury?
19   A.  No.
20   Q.  Did you -- were you employed at that
21  time?
22   A.  Yes.
23   Q.  Did you miss any work because of your
24  injury?

6 (Pages 18 to 21)

Deposition of:      LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 22

1    A.  I don't recall.
2    Q.  Could you tell me, beginning with the
3  time that you were no longer employed at Vacation
4  Village, where you've been employed since then?
5    A.  Margaret & Company.
6    Q.  If it's easier for you to list them
7  all first, then I can ask follow-up questions, I
8  can do it that way.
9    A.  I believe I listed them in
10  Interrogatories.
11   Q.  Can you tell me what you remember?
12   A.  Margaret & Company, B&D Petroleum.
13   Q.  What was that?
14   A.  B&D Petroleum, Oak 'N Spruce Resort,
15  Blue Planet Enterprise, Nationwide Liquidators,
16  LIA Auto Group.
17   Q.  What was that?
18   A.  LIA Auto Group.
19   Q.  Could you spell that?
20   A.  L-I-A.
21   Q.  Anywhere else?
22   A.  Not that I remember at this time.
23   Q.  Did you ever do any waitressing since
24  you left Vacation Village?

Page 23

1    A.  I don't recall that.
2    Q.  You don't recall?
3    A.  No.
4    Q.  Have you ever done waitressing?
5    A.  Yes.
6    Q.  Where?
7    A.  Friendly's.
8    Q.  Anywhere else?
9    A.  Not that I recall at this time.
10   Q.  Did you ever work at Ground Round?
11   A.  No.
12   Q.  What was your position at Margaret &
13  Co?
14   A.  Sales associate.
15   Q.  What did you sell?
16   A.  Automobiles.
17   Q.  Where are they located?
18   A.  On State Street in Springfield.
19   Q.  And how long were you employed there?
20   A.  I worked per diem there.
21   Q.  What does that mean?
22   A.  As needed.
23   Q.  How frequently did you work there?
24   A.  It varied, so I can't be specific.

Page 24

1    Q.  Did there come a time where you no
2  longer were a per diem employee of that company?
3    A.  No.
4    Q.  You're still there on a per diem
5  basis?
6    A.  Yes.
7    Q.  When was the last time you've
8  worked at --
9    A.  I don't recall at this time.
10   Q.  Are you paid on commission at that
11  job?
12   A.  I'm paid both salary and commission.
13   Q.  What's the salary?
14   A.  $12 an hour.
15   Q.  And what commission?
16   A.  Twenty-five percent.
17   Q.  Is that of the sale price?
18   A.  That's the net price.
19   Q.  Did you respond to an ad for an
20  opening at that company?
21   A.  No.
22   Q.  How did you learn about the
23  possibility that you could be employed there?
24   A.  As a customer.

Page 25

1    Q.  You're a customer there?
2    A.  Yes, I was.
3    Q.  And when were you employed by B&D
4  Petroleum?
5    A.  I don't remember the dates.
6    Q.  What did you do there?
7    A.  Customer service.
8    Q.  How did you obtain that position?
9    A.  Job search.
10   Q.  Job search on-line or just?
11   A.  I don't recall whether it was
12  on-line.
13   Q.  Who's your supervisor at B&D
14  Petroleum?
15   A.  C.J.
16   Q.  Do you know his last name?
17   A.  No.
18   Q.  What did you earn at that job?
19   A.  I don't remember.
20   Q.  And are you still employed there in
21  any capacity?
22   A.  No.
23   Q.  Why are you not employed there
24  anymore?

7 (Pages 22 to 25)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 26

1  A.  I accepted a better position.
2  Q.  Where was that?
3  A.  I'm not sure.
4  Q.  Did you ever, other than -- strike
5  that.
6      Excluding Margaret & Company, where
7  you said you work per diem still, did you ever
8  work two jobs at the same time or be employed by
9  two companies at the same time?
10  A.  Yes.
11  Q.  And what two companies were those?
12  A.  Actually, you asked me earlier places
13  that I had worked since my separation with
14  Vacation Village, and that includes the Italian
15  Pavilion.
16  Q.  Was that one of the two places that
17  you worked when you said you worked two -- or you
18  had two jobs at the same time?
19  A.  Yes.
20  Q.  And you worked there and where else
21  at the same time or were you employed at the same
22  time?
23  A.  I worked there and Vacation Village.
24  I've worked there and at the Oak 'N Spruce Resort.

---

Page 27

1  I've worked there as well as Filene's.
2  Q.  That was prior to your separation
3  from employment?
4  A.  Yes, as a matter of fact, it was.
5  Q.  Filene's was?
6  A.  Yes.
7  Q.  Any other dual employments you held?
8  A.  Not that I recall.  The Italian
9  Pavilion, it's an establishment at the Eastern
10  States Exposition which runs for three weeks
11  throughout the late summer, early fall, and I've
12  been with them for several years, and I don't
13  remember any other specific times when I was at
14  that place.
15  Q.  What do you do there?
16  A.  I bartend.
17  Q.  Is that an organization that's only
18  opened when the Big E is running or does it have
19  another location for the rest of the year?
20  A.  I don't know.
21  Q.  How did you come about being a
22  bartender at the Italian Pavilion?
23  A.  I do job search.
24  Q.  And you said that you've done that

---

Page 28

1  for several years; is that correct?
2  A.  Yes.
3  Q.  Does that include 2004?
4  A.  No.
5  Q.  When is last time you did it?
6  A.  I don't recall.
7  Q.  So how many hours per week were you
8  working at that position, at the Italian Pavilion,
9  would you say?  Each year when the Big E is open,
10  do you get there all day, do you work just certain
11  days at the Big E?
12      MS. GARROW:  Objection.  You can
13  answer.
14  A.  Part-time, roughly, four hours.  No,
15  correction.  Roughly twenty-two hours.
16  Q.  Per week?
17  A.  Yes.
18  Q.  And you would do that each week at
19  the Big E?
20  A.  Yes.
21  Q.  Were those daytime hours or evening
22  hours, if you remember?
23  A.  A couple of them were evening hours
24  only.  The others were on my days off from my

---

Page 29

1  other employer.
2  Q.  And how were you paid at that job?
3  A.  Hourly wage, plus tips and bonus.
4  Q.  Bonus you said?
5  A.  Yes.
6  Q.  What was your bonus based on?
7  A.  Based on performance, customer
8  service, volume, and choosing to go back and
9  accept a position for the season.
10  Q.  So the next year that the Big E came,
11  you had the opportunity to go back?
12  A.  No, when I did choose to go back,
13  they would pay me a bonus for coming back.
14  Q.  Okay.  And can you give me a rough
15  estimate of what you would earn during the --
16  A.  Roughly $2400.
17  Q.  When was it that you worked at
18  Friendly's?
19  A.  I don't recall.
20  Q.  But that was after your employment
21  from --
22  A.  No.
23  Q.  I thought you had said that it was.
24  It was before your employment or during your

---

8 (Pages 26 to 29)

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

| Page 30 | Page 32 |
|---|---|

**Page 30**

1  employment with Vacation Village?
2     A.   Prior to.
3     Q.   When were you employed by the LIA
4  Auto Group?
5     A.   On or around October, 2004.
6     Q.   What was your position there?
7     A.   Sales associate.
8     Q.   Were you also employed by Margaret &
9  Company at the time?
10    A.   Yes.
11    Q.   How long were you employed by LIA
12  Auto Group?
13    A.   I believe Margaret called me in early
14  October.
15    Q.   Margaret did you say?
16    A.   Yes, from Margaret & Company.
17    Q.   Right.  Okay.
18    A.   It's an extension of her -- of our
19  job duties there.
20    Q.   So LIA Auto Group was affiliated with
21  Margaret & Company?
22        MS. GARROW:  Objection.
23  BY MS. FABBO:
24    Q.   Is that what you're saying?

**Page 31**

1     A.   Actually, Nationwide Liquidators --
2  Margaret & Company was a partner with Nationwide
3  Liquidators, who she contracts -- one of our
4  contracts is with the LIA Auto Group, which, for
5  that we do their giant four-day blowout sales, and
6  preparation and closings of those four-day sales.
7     Q.   Their automobile sales?
8     A.   Yes.
9     Q.   And is Nationwide Liquidators
10  different from LIA Auto Group?
11    A.   Yes, it is.
12    Q.   But they were both part of this
13  partnership with LIA Auto Group and Margaret &
14  Company?
15        MS. GARROW:  Objection.
16    A.   Nationwide Liquidators -- Margaret &
17  Company is a partner with Nationwide Liquidators
18  who subcontracts to the LIA Auto Group.
19    Q.   To do the sales that you've
20  described?
21    A.   Yes.
22    Q.   Okay.  And so you were involved --
23  you say you were involved in some of those blowout
24  sales?

**Page 32**

1     A.   Yes.
2     Q.   Was it one series of them or
3  multiple?
4     A.   It was more than one.
5     Q.   Do you know how many?
6     A.   I don't recall how many.
7     Q.   Were you paid differently when you
8  were involved with the LIA Auto Group than when
9  you worked for Margaret & Co?
10    A.   Yes.
11    Q.   How were you paid?
12    A.   I was paid an hourly wage but a
13  higher commission, and I was also paid travel
14  expenses, meals, things of that nature.
15    Q.   Where were you traveling to?
16    A.   I traveled to Connecticut, to Upstate
17  New York, around Albany.  I think that's it.
18  That's all I can recall at this time.
19    Q.   Is this Margaret that you've
20  referenced a person that's employed there?
21    A.   She is my boss.
22    Q.   And what's her last name?
23    A.   Drollette.
24    Q.   Could you spell that?

**Page 33**

1     A.   D-R-O-L-L-E-T-T-E.
2     Q.   So just correct me if I'm wrong, I
3  just want to make sure I understand.  Margaret &
4  Company was partners with Nationwide Liquidators,
5  and would you go to different auto dealerships and
6  do these sales for them?
7     A.   No.  Margaret, who is the owner of
8  Margaret & Company, independently has a
9  partnership with Nationwide Liquidators, who
10  subcontracts with different large automobile
11  groups, such as LIA, who then go and do their
12  blowout sales for them.
13    Q.   And you did the blowout sales solely
14  for LIA Auto Group?
15    A.   No, Margaret.
16    Q.   You listed LIA as one of your
17  employers, who you had mentioned who you were
18  employed by, are you saying through Margaret
19  you --
20    A.   Yes.
21    Q.   And what were some of the other auto
22  groups or dealers that you went to in connection
23  with these sales, the blowout sales?
24    A.   Just LIA.

9 (Pages 30 to 33)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 34

1    Q.   And they were located in locations
2   that you've just told me you traveled to?
3    A.   Yes.
4    Q.   What's Blue Planet Enterprises, what
5   do they do?
6    A.   Clothing, cell phones, women and
7   men's apparel, as well as cell phones and pagers.
8    Q.   When were you employed there?
9    A.   I don't remember the dates.
10   Q.   How were you paid at that position?
11   A.   Salary, again, plus commission.
12   Q.   What was your job?
13   A.   Sales associate.
14   Q.   And what was your salary?
15   A.   It was an hourly wage.
16   Q.   What was it?
17   A.   I don't remember.
18   Q.   What did you receive commission on?
19   A.   The volume.
20   Q.   Of everything, including clothing?
21   A.   No.  Cell phones and -- cell phones,
22  pagers and pagers and special orders.
23   Q.   Who was your direct supervisor?
24   A.   Kahari.

Page 35

1    Q.   Who?
2    A.   Kahari.
3    Q.   Can you spell that?
4    A.   K-A-H-A-R-I.
5    Q.   Is that a man or woman?
6    A.   Man.
7    Q.   Last name?
8    A.   Don't know.
9    Q.   And why are you no longer employed by
10  them?
11   A.   It was only a temporary position.
12   Q.   What was your understanding as to the
13  length of the position?
14   A.   Just that it was temporary.
15   Q.   Were you filling in a vacancy; do you
16  know?
17   A.   I don't remember.
18   Q.   Lori Donuts, did you work there as
19  well?
20   A.   Yes.
21   Q.   Where is that?
22   A.   On May Street.  I don't remember
23  whether it's Longmeadow or East Longmeadow, but it
24  is here in Massachusetts.

Page 36

1    Q.   When did you work there?
2    A.   I don't remember the dates.
3    Q.   For how long?
4    A.   I don't remember that either.
5    Q.   What was your position?
6    A.   Customer service.
7    Q.   What did that involve?  What were
8   your job duties?
9    A.   Servicing the customers, stocking and
10  preparing different things to Dunkin Donuts.
11   Q.   Why did you end up leaving that
12  position?
13   A.   I don't remember.
14   Q.   Were you ever terminated from
15  employment other than at Vacation Village?
16   A.   Yes.
17   Q.   Where?
18   A.   Oak & Spruce.
19   Q.   Were you terminated -- do you
20  remember when that was, approximately?
21   A.   I don't remember.
22   Q.   Is Oak 'N Spruce affiliated or a part
23  of, do you know, Silver Leaf Resort?
24   A.   Yes.

Page 37

1    Q.   What's the connection, that you're
2   aware of?
3    A.   The connection that I'm aware of is
4   Silver Leaf Resorts is their parent company,
5   Oak 'N Spruce is the name of that particular
6   resort.
7    Q.   When you were employed at Vacation
8   Village, other than the position you told me about
9   at the Big E, the Italian Pavilion, did you ever
10  work anywhere else at the same time?
11   A.   Yes, Margaret & Company.
12   Q.   At the same time you were at Vacation
13  Village?
14   A.   Yes.
15   Q.   Anywhere else?
16   A.   Not that I remember at this time.
17   Q.   Have you ever been self-employed?
18   A.   Yes.
19   Q.   And what was the nature of the
20  business that you were self-employed in?
21   A.   Beauty consultant through Mary Kay,
22  wedding planning.
23   Q.   Is that something separate?
24   A.   Yes.

10 (Pages 34 to 37)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 38

1    Q.   Anything else?
2    A.   Prepaid legal services.
3    Q.   Anything else?
4    A.   Not that I remember.
5    Q.   Did you have any of these businesses
6    that you described or you just listed, the three
7    businesses, were you self-employed in them at any
8    time you were at Vacation Village, you were also
9    employed by Vacation Village?
10   A.   I don't remember.
11   Q.   When were you a beauty consultant
12   with Mary Kay?
13   A.   Roughly a year, within the last year.
14   Q.   Within the last year?
15   A.   Yes.
16   Q.   And how long did you do that for?
17   A.   It's still open.
18   Q.   So you got involved, you think,
19   within the last year and you're still ongoing?
20   A.   Or within the last eighteen months.
21   Q.   Can you describe to me what you do?
22   A.   As beauty consultant?
23   Q.   Yes.
24   A.   I schedule skin care classes and

Page 39

1    makeovers, as well as preparation for weddings
2    with the bridal group.  I have skin care classes
3    and call in orders, that's about it.
4    Q.   Do you hold any home parties,
5    anything like that?
6    A.   At my house?
7    Q.   Or anywhere, where you go to
8    someone's house and make a presentation.
9    A.   Yes.
10   Q.   How are you compensated in this
11   business?
12   A.   Commission.
13   Q.   And is it a percentage -- what's the
14   commission based on?
15   A.   Sales.
16   Q.   Sales of what?
17   A.   Products.
18   Q.   The product?
19   A.   And there is an hourly wage that I'm
20   paid, and any other helpers are paid as well.
21   Q.   I'm sorry.  What was that?
22   A.   There's an hourly wage that any other
23   assistants, if needed, are paid, as well as fifty
24   percent commission of the sales.

Page 40

1    Q.   And how much have you earned in that
2    business?
3    A.   I'm not sure.
4    Q.   Do you declare the income from that
5    on your taxes?
6    A.   No.  I have a director, and it's done
7    through her and she does that.
8    Q.   Do you file income tax returns?
9    A.   Yes.
10   Q.   So you're saying that would not be
11   something that's on your income tax?
12   A.   I'm independent sales -- an
13   independent beauty consultant that works under a
14   director.
15   Q.   Who's your director?
16   A.   I don't remember her name.
17   Q.   Where is she located?
18   A.   Georgia.
19   Q.   What's your hourly wage?
20   A.   It's seven dollars, while holding
21   classes.
22   Q.   Have you ever been in contact with
23   anyone that's been employed by Vacation Village in
24   connection with your beauty consulting business?

Page 41

1    A.   Could you rephrase that?  What do you
2    mean?
3    Q.   Any former employees or current
4    employees that you contacted them about your
5    business or tried to get them to go to one of your
6    parties, or host a party, anything like that?
7    A.   No.
8    Q.   Is the wedding planning business that
9    you mentioned something separate and apart from
10   the Mary Kay beauty consulting?
11   A.   Yes.
12   Q.   What is the wedding planning business
13   that you either had or have, could you describe
14   it?
15   A.   I help brides on their big day be a
16   lot less stressed by helping them formulate a list
17   through guidelines and finding out what it is that
18   they're looking for on their big day, and I gather
19   up the list of the things that they want and that
20   they're looking for, as well as the price range
21   that they're looking to spend, and then I contact
22   different florists and actual wedding coordinators
23   limousine services and get that list together
24   for them so that they can -- and the baker, so

11 (Pages 38 to 41)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

| Page 42 |
|---|
| 1  they can -- just call the baker, limousine |
| 2  company, the wedding coordinator and anyone else, |
| 3  florist or whoever else that they need to contact. |
| 4      Q.   Is this something you're currently |
| 5  involved in? |
| 6      A.   It's a per diem thing, so it's a |
| 7  position that I do not so much on a regular basis, |
| 8  as much as when I'm called on, you know, or asked |
| 9  to come and do that. |
| 10     Q.   How did you get involved in this |
| 11 wedding planning business? |
| 12     A.   I had a phenomenal wedding. |
| 13     Q.   So you created the business after |
| 14 your wedding or before? |
| 15     A.   I was asked for help from other |
| 16 brides-to-be after my wedding. |
| 17     Q.   And you charged a fee for this |
| 18 service? |
| 19     A.   No. |
| 20     Q.   So this is a free service you |
| 21 provide? |
| 22     A.   Yes. |
| 23     Q.   And you don't have any income from |
| 24 it? |

| Page 43 |
|---|
| 1      A.   No.  The wedding party, or the bride |
| 2  and groom rather, any monetary -- anything that |
| 3  they like to give or that they give monetarily, I |
| 4  just ask them to donate it to a church or |
| 5  foundation or something. |
| 6      Q.   And I think the third area or |
| 7  business you described is prepaid legal services; |
| 8  is that correct? |
| 9      A.   Yes. |
| 10     Q.   When was the time frame that you were |
| 11 involved in that business? |
| 12     A.   It was for a very short time and I'm |
| 13 no longer with them, but that was, again, sometime |
| 14 within -- sometime within the fall of 2004. |
| 15     Q.   And what did you do in that business? |
| 16     A.   I really didn't do anything.  I chose |
| 17 not to accept the job and position and I opted to |
| 18 cancel out of my contract as an associate with |
| 19 them. |
| 20     Q.   How did you become aware of this |
| 21 opportunity to have a prepaid legal services |
| 22 business? |
| 23     A.   When I used to live at 28 Gladstone |
| 24 Street, my neighbor. |

| Page 44 |
|---|
| 1      Q.   Was it a male or female? |
| 2      A.   Female. |
| 3      Q.   So was this female involved in the |
| 4  business? |
| 5      A.   Yes. |
| 6      Q.   And did you have any initial |
| 7  investment? |
| 8      A.   Yes. |
| 9      Q.   What was that? |
| 10     A.   $49. |
| 11     Q.   And did you ever become involved at |
| 12 all in providing prepaid legal services? |
| 13     A.   No. |
| 14     Q.   Did you have any investment in your |
| 15 Mary Kay business? |
| 16     A.   Yes. |
| 17     Q.   What was that? |
| 18     A.   Roughly a hundred dollars. |
| 19     Q.   What about, did you have any earnings |
| 20 from the prepaid legal services business at all? |
| 21     A.   No. |
| 22     Q.   Any other areas of self-employment |
| 23 that you can think of? |
| 24     A.   No, not that I can think of. |

| Page 45 |
|---|
| 1      Q.   Have you ever been involved in any |
| 2  other lawsuits regarding your employment? |
| 3      A.   I beg your pardon. |
| 4      Q.   Have you ever been involved in any |
| 5  other lawsuits regarding your employment? |
| 6      A.   No. |
| 7      Q.   Have you ever filed a claim against |
| 8  any other employer? |
| 9      A.   No. |
| 10     Q.   Have you, other than at Vacation |
| 11 Village, asserted or believed that you've been |
| 12 discriminated against based on your race or color? |
| 13     A.   No. |
| 14     Q.   Are you a high school graduate? |
| 15     A.   No. |
| 16     Q.   Did you get your GED? |
| 17     A.   Yes. |
| 18     Q.   When did you get your GED? |
| 19     A.   Around 1990. |
| 20     Q.   Did you attend any other education |
| 21 after getting your GED. |
| 22     A.   Yes. |
| 23     Q.   What did you attend? |
| 24     A.   I attended medical courses to become |

12 (Pages 42 to 45)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 46

1  certified as a nursing assistant. I was also
2  certified as a -- certified in dementia, certified
3  phlebotomist, home health care provider. I don't
4  remember what else. It was just medical --
5     Q.   So you're --
6     A.   -- based.
7     Q.   So you're a certified nurse's
8  assistant, certified in dementia and you're a
9  certified phlebotomist; is that correct?
10    A.   Yes, as well as physical therapy, I'm
11 sorry.
12    Q.   What's your -- is it a certification
13 in physical therapy or is it some sort of other
14 degree?
15    A.   Certification.
16    Q.   And where did you get this
17 certification through?
18    A.   MCDI, caregivers.
19    Q.   Were you ever employed in the health
20 care field?
21    A.   Yes.
22    Q.   Have you ever had any other special
23 training, besides what you've already listed, in
24 any other area?

Page 47

1     A.   Not that I remember.
2     Q.   What was the last year of high school
3  you finished?
4     A.   Ninth.
5     Q.   Do you know what year you would have
6  graduated?
7     A.   No.
8     Q.   What's your date of birth?
9     A.   February 11, 1974.
10    Q.   Where did you work immediately prior
11 to working at Vacation Village?
12    A.   I don't remember.
13    Q.   Had you ever sold time-shares prior
14 to Vacation Village?
15    A.   Yes.
16    Q.   Where?
17    A.   Oak 'N Spruce Resort.
18    Q.   You were employed at Oak 'N Spruce
19 twice; is that right?
20    A.   Yes.
21    Q.   When was your first employment there?
22    A.   1998.
23    Q.   To when?
24    A.   I'm not sure.

Page 48

1     Q.   Did you leave there to go to Vacation
2  Village?
3     A.   No.
4     Q.   Why did you leave that position?
5     A.   I didn't.
6     Q.   Were you terminated from that
7  position?
8     A.   Yes.
9     Q.   For what reason?
10       MS. GARROW:  Objection. If you know.
11    A.   I don't remember the exact situation.
12    Q.   Do you remember anything about your
13 departure or the reason for your departure?
14    A.   Yes.
15    Q.   What do you remember?
16    A.   I remember it having something to do
17 with -- I had been with Oak 'N Spruce Resort for a
18 while. I was considered a Pioneer because Silver
19 Leaf Resorts had just purchased that property
20 shortly before my employment with them; and as an
21 experienced time-share sales associate, I would
22 often assist other sales associates with closing
23 their sales and doing preparation for contract
24 paperwork, as well as guests relations and holding

Page 49

1  mass presentations, things of that nature, and I
2  was still a sales associate.
3        And I remember one of the managers --
4  I'm not sure. I remember -- I'm not sure what
5  happened. I just remember him telling me not to
6  come back in to work, and I then remember someone
7  higher up on the management level, a private
8  director, in fact, calling me up and asking me why
9  I wasn't at work and invited me to come back in
10 and I opted not to.
11    Q.   And who was the manager that told you
12 not to come back?
13    A.   Runback.
14    Q.   What was the last name?
15    A.   Runback.
16    Q.   Do you know how to spell that?
17    A.   R-U-N-B-A-C-K.
18    Q.   And who was the one who invited you
19 back?
20    A.   Robert Crawford.
21    Q.   And you have no recollection as to
22 why Mr. runback told you not to come back?
23    A.   No.
24    Q.   Were you shocked?

13 (Pages 46 to 49)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 50

1     A.   No.  I just don't remember the exact
2  situation that jarred him to tell me not to come
3  back.
4     Q.   There was more than one situation?
5     A.   I don't understand what you mean.
6     Q.   Did you have any problems with your
7  employment there?
8          MS. GARROW:  Objection.  You can
9  answer.
10    A.   Not that I recall.  I'm not sure.
11    Q.   So one day Mr. Runback just said
12  don't come back; is that correct?
13         MS. GARROW:  Objection.  You can
14  answer.
15    A.   I'm not sure what you're asking.
16    Q.   So you have no recollection as to
17  what happened that resulted in your termination?
18         MS. GARROW:  Objection.  You can
19  answer.
20  BY MS. FABBO:
21    Q.   I'm just verifying that the only
22  thing you remember is that he told you not to come
23  back?
24         MS. GARROW:  Objection.

Page 51

1     A.   Yeah, I don't remember the specifics.
2     Q.   Do you remember anything in general?
3          MS. GARROW:  Objection.  You can
4  answer.
5     A.   In relation to?
6     Q.   Your termination.
7          MS. GARROW:  Same objection.
8     A.   I'm not sure.
9     Q.   Did you ever receive any disciplinary
10  action, other than termination at Oak & Spruce,
11  during your first employment?
12    A.   I'm not sure.
13    Q.   Did anyone ever bring to your
14  attention any complaints that had been made about
15  you?
16         MS. GARROW:  Objection.
17    A.   Yes.
18    Q.   What was the complaint or complaints,
19  the nature of them?
20    A.   A customer felt like they had been
21  pressured.
22    Q.   Pressured to buy?
23    A.   Yes.
24    Q.   Any other complaints?

Page 52

1     A.   None that I remember at this time.
2     Q.   Was that just one customer complaint?
3  When you said the customer felt pressured, that
4  was one customer?
5     A.   I don't know.  I just know that that
6  occurred.
7     Q.   Who brought that to your attention?
8     A.   I don't remember.
9     Q.   And did you do anything as a result
10  of that complaint?
11    A.   There was nothing to be done.
12    Q.   Did you think it had any validity?
13    A.   It's something that's not uncommon in
14  the business.
15    Q.   What is not uncommon?
16    A.   For customers to leave and call up
17  and say they felt pressured or that they were
18  upset with marketing or things of that nature, or
19  they didn't like their gift or how long they were
20  on tour, that wasn't something that was uncommon.
21    Q.   So did you feel there was any
22  validity to the complaint?
23         MS. GARROW:  Objection.  You can
24  answer.

Page 53

1     A.   I don't remember what I felt.
2     Q.   Were you upset about the complaint?
3     A.   No, not that I remember.
4     Q.   How were you compensated during your
5  first employment at Oak & Spruce?
6     A.   Could you rephrase that?
7     Q.   Were you paid a salary?
8     A.   No.
9     Q.   An hourly wage?
10    A.   At Oak 'N Spruce Resort, we were paid
11  minimum wage for the time we were actually on
12  tour, as well as commission, bonus and S.P.I.F.
13    Q.   That was also true during your second
14  employment though?
15    A.   Yes.
16    Q.   Strike that.
17         How did you obtain the first
18  employment at Oak & Spruce?
19    A.   Through a friend.
20    Q.   Who was the friend?
21    A.   His name is Sam.  I don't remember
22  the last name.
23    Q.   How did you know Sam?
24    A.   He was part of my support team.

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 54

| | | |
|---|---|---|
| 1 | Q. | Your support team where? |
| 2 | A. | Just in general. |
| 3 | Q. | Like a friendship? |
| 4 | A. | Yes. |
| 5 | Q. | How did you meet him; do you recall? |
| 6 | A. | How I met Sam? |
| 7 | Q. | Yes. |
| 8 | A. | I met him at a support group. |
| 9 | Q. | Where was this support group? |
| 10 | A. | At the Urban League on State Street |

11 in Springfield.
12    Q.   And was it for any typical -- for any
13 particular type of issue that you were there?
14    A.   No, it was a twelve-step fellowship.
15    Q.   What?
16    A.   It was a meeting for a twelve-step
17 fellowship.
18    Q.   How long did you attend these
19 meetings?
20    A.   I still do.
21    Q.   How frequently?
22    A.   It varies.
23    Q.   More than once a week?
24    A.   Yes.

Page 55

1    Q.   And when did you begin attending
2 them?
3    A.   June 6th, 1997.
4    Q.   And was Sam part of the group when
5 you started going?
6    A.   Yes.
7    Q.   Did Sam work at Oak & Spruce?
8    A.   Yes.
9    Q.   Have you ever attended any other type
10 of support meetings?
11        MS. GARROW: Objection.
12    A.   Could you rephrase the question?
13    Q.   Sure. Have you ever gone to any
14 other organized group meetings?
15        MS. GARROW: Objection.
16    A.   I still don't understand what you're
17 asking me.
18    Q.   Have you gone to any group meetings?
19 Do you understand that?
20        MS. GARROW: Objection.
21    A.   In relation to what?
22    Q.   Anything.
23        MS. GARROW: Objection. I mean, I
24 can tell you why she's having trouble, but if you

Page 56

1 want to keep asking the same question, that's
2 fine.
3    Q.   Do you understand the question?
4    A.   No. It's pretty vague.
5    Q.   Would you consider your support team
6 meetings part of a group session, would you
7 consider that --
8    A.   No.
9    Q.   And so is there a group president at
10 those meetings?
11        MS. GARROW: Objection.
12    A.   No.
13    Q.   Who attends?
14    A.   People.
15    Q.   Is it different people all the time?
16    A.   I'm sure.
17    Q.   Are they set at any established time,
18 these meetings?
19    A.   Yes.
20    Q.   And what time are the meetings that
21 you go to?
22    A.   Some are at noontime, some are at
23 seven o'clock in the evening, some are 7:30 in the
24 evening, some are at 9:30 in the mornings on

Page 57

1 Saturdays.
2    Q.   Are they held at all different times?
3    A.   Yes.
4    Q.   And do they last -- how long do they
5 last?
6    A.   Some last an hour, some last an hour
7 and fifteen minutes, others last an hour and a
8 half, some last four or five hours.
9    Q.   What prompted you to start going to
10 these meetings?
11    A.   A change in my spiritual well-being.
12    Q.   Can you explain what you mean by
13 that?
14    A.   Spiritually, I wasn't at a place
15 where I wanted to be.
16    Q.   Did you ever attend any similar types
17 of meetings at any place other than the Urban
18 League?
19    A.   Yes.
20    Q.   And were they in connection with the
21 meetings you went to at the Urban League?
22    A.   No.
23    Q.   And where were the other meetings?
24    A.   All around the country.

15 (Pages 54 to 57)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

| Page 58 |
| --- |

1    Q.   And what are the purposes of those
2  meetings?
3         MS. GARROW: Objection.
4    A.   They're twelve step.  It's a
5  twelve-step fellowship.
6    Q.   Can you explain what that is, a
7  twelve-step fellowship?
8    A.   I cannot.
9    Q.   You can't?
10    A.   No.
11    Q.   You don't know what it is?
12    A.   I do, but it's against the traditions
13  of that group for me to do so.
14    Q.   To discuss the twelve-step
15  fellowship?
16    A.   Yes.
17    Q.   Is it in connection with a religion?
18    A.   No.
19    Q.   Can you tell me what the twelve steps
20  are?
21    A.   No.
22    Q.   And when you said it's against that
23  group, what group are you referring to?
24    A.   That particular twelve-step group

| Page 59 |
| --- |

1  organization.
2    Q.   And does that group or organization
3  have a name?
4    A.   None that I can disclose.
5    Q.   Are these meetings in connection with
6  any substance abuse problem?
7    A.   No.
8    Q.   Alcohol problems?
9    A.   Not directly, no.
10    Q.   Have you ever felt that you had a
11  problem with drugs or alcohol?
12         MS. GARROW: Objection.
13    A.   No.
14    Q.   Do you attend any of these meetings
15  for the purposes of obtaining, you said, from
16  obtaining support from the team in connection with
17  any distress you've suffered from your employment
18  or separation of employment with Vacation Village?
19    A.   Yes, everything.
20    Q.   And so you just -- do you discuss
21  your emotional state as part of these meetings?
22    A.   Everything, yes.
23    Q.   What's the address of this group?
24    A.   There isn't a particular address.

| Page 60 |
| --- |

1  The locations vary.
2    Q.   Who are members?
3    A.   I beg your pardon.
4    Q.   Who are the members?
5    A.   That's private information.
6         MS. FABBO: If she's going to --
7  she's sharing her emotional distress with these
8  people, I have a right to get this information.  I
9  don't know what privilege she's asserting here.
10         MS. GARROW: I have no -- I mean you
11  can ask her questions, you're asking her whatever
12  she --
13         MS. FABBO: I'm asking you to
14  instruct her to answer the questions or we're
15  going to come back.  This is all clearly related
16  to emotional distress.
17         MS. GARROW: You can certainly
18  continue to ask her questions, and I will think
19  about it and decide what we can do, when you give
20  us a break, but you're welcome to ask her
21  questions.
22         MS. FABBO: Why don't we take a break
23  right now then.
24         (Recess taken at 11:02 a.m. to 11:24

| Page 61 |
| --- |

1    a.m.)
2         (Record read by the court reporter.)
3    Q.   Can you answer that?
4    A.   Yes.
5    Q.   Who are the members?
6    A.   The members of my support group are
7  Michael Johnson, Mona Johnson.
8    Q.   Can you speak a little louder?
9  There's some humming right here.
10    A.   Okay.  I'm sorry, and Charlene
11  Wheeler.
12    Q.   And that's your support group or
13  support team?
14    A.   Yes.
15    Q.   And are these the people that you
16  would normally or frequently attend those meetings
17  with that you referred to?
18    A.   Yes.
19    Q.   And does anyone else ever attend from
20  time to time?
21         MS. GARROW: Objection.
22    A.   Attend what?
23    Q.   The meetings.
24    A.   My support group?

16 (Pages 58 to 61)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 62

1  Q.  Yes.
2  A.  No, not that I recall.
3  Q.  Who organizes these support group
4  meetings?
5  A.  We do, ourselves, individually.
6  Q.  The members?
7  A.  Yes.
8  Q.  Is there one particular member that
9  would organize it more frequently than others?
10  A.  No, actually.  I apologize.  Yes, I
11  would.
12  Q.  Is Mona Johnson a relative of yours
13  or your husband's?
14  A.  No.
15  Q.  Do you know her from any other way
16  than the support group or support team?
17  A.  Yes, she's an old friend of the
18  family.
19  Q.  What occurs at the meetings?
20  MS. GARROW:  Objection.
21  A.  The support groups?
22  Q.  Yes.
23  A.  We discuss whatever is going on with
24  us at the time.  We may do scripture readings,

Page 63

1  things of that nature, we pray, we meditate, and
2  we try to offer any experience, strength and hope
3  that we have available to each other.
4  Q.  Do you have to be a certain age to be
5  a member of the group?
6  A.  No.
7  Q.  Can you tell me what the twelve steps
8  are?
9  MS. GARROW:  I'm going to object, but
10  you can, generally, if you want.
11  A.  I don't really know them -- I don't
12  really have them memorized.
13  Q.  Can you tell me, generally, what they
14  are?
15  A.  Making a decision to turn our will --
16  Q.  What?
17  A.  Making a decision to turn our will
18  and our lives over to the care of God as we
19  understand him; seeking through prayer and
20  meditation to improve or conscious contact with
21  God as we understand him, praying only for
22  knowledge of his will for us and the power to
23  carry that out; making a searching and fearless
24  moral inventory of ourselves; continuing to make a

Page 64

1  searching and fearless moral inventory of
2  ourselves and when we were wrong promptly admitted
3  it; making a list of all people we had harmed and
4  become willing to make amends to them all; and
5  those are the only ones that I can remember right
6  now.
7  Q.  Is the twelve-step fellowship a
8  process whereby you complete one step and go on to
9  the next step?
10  A.  Yes.
11  Q.  And have you completed a certain
12  number of steps?
13  A.  Yes.
14  Q.  How many?
15  A.  All of them.
16  Q.  Are they written anywhere?
17  A.  Yes.
18  Q.  Where is that?
19  A.  In books.
20  Q.  What type of books?
21  A.  The twelve step guides.
22  Q.  Who are these books published by?
23  A.  World Service Office, and others, the
24  Old or New King James Version of the Bible.

Page 65

1  Q.  When did you begin -- I'm sorry.
2  Strike that.
3  Going back a minute, we were talking
4  a little while ago about your first employment at
5  Oak & Spruce.  Do you recall where you worked
6  immediately after that position?
7  MS. GARROW:  Go ahead.
8  A.  I don't recall.
9  MS. GARROW:  May I just interject,
10  Ms. Wise wanted to add something to her testimony
11  from before.
12  MS. FABBO:  Sure.  Go ahead.
13  MS. GARROW:  About Oak & Spruce.
14  A.  Oh, some of the particulars of the
15  separation were based on inventory.
16  Q.  Are you talking about your
17  termination?
18  A.  Yes.
19  Q.  I'm sorry.  Go ahead.
20  A.  I was assisting other sales
21  associates with closing out their deals and Rick
22  and I were both working on the same inventory, and
23  there was only one unit to have been sold, and we
24  conflicted in that manner, and he got upset and

17 (Pages 62 to 65)

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 66

1  said you're not even a manager, and you're not
2  supposed to be here and, oh my goodness, and just
3  leave and don't come back.
4      Q.   Anything else you can remember from
5  that incident you just described?
6          MS. GARROW: Objection. Other than
7  what she's already testified to; is that what
8  you're asking her?
9      A.   Not off the top of my head, no, I do
10 not recall.
11     Q.   Did you make any notes of that
12 situation at the time that it occurred or around
13 the time that it occurred?
14     A.   No, not that I remember.
15     Q.   Did you ever protest your termination
16 to anyone at Oak & Spruce?
17     A.   I don't understand what you mean.
18     Q.   Did you ever complain about the fact
19 that you had been terminated?
20     A.   No.
21     Q.   And approximately how long had you
22 worked there prior to the termination?
23     A.   Approximately three years.
24     Q.   Had you ever sold time-shares prior

Page 67

1  to Oak & Spruce?
2      A.   No.
3      Q.   And other than Oak 'N Spruce and
4  Vacation Village, have you ever sold time-shares
5  anywhere else or for any other company?
6      A.   I'm currently employed at the -- I'm
7  currently employed at a time-share resort.
8      Q.   I forgot, I'm sorry. So you had a
9  second employment at Oak & Spruce; is that
10 correct?
11     A.   Yes.
12     Q.   And --
13     A.   Towards fall of 2003.
14     Q.   Were you a time-share salesperson
15 there as well?
16     A.   Yes.
17     Q.   And how did you come to be employed a
18 second time at this resort?
19     A.   I just called them up.
20     Q.   Who did you call?
21     A.   Robert Crawford.
22     Q.   And what is Mr. Crawford's position?
23     A.   Project director.
24     Q.   And was that his position at the

Page 68

1  time?
2      A.   Yes.
3      Q.   Was he project director when you had
4  worked there the first time?
5      A.   Yes.
6      Q.   Did Mr. Crawford offer you a
7  position?
8      A.   Yes.
9      Q.   Did you interview with anyone else
10 prior to being offered that position?
11     A.   Could you rephrase? I don't know
12 whether you're talking about the first or second
13 time.
14     Q.   I'm talking about now the second
15 time, and you said you started in about the fall
16 of 2003. After you called up Mr. Crawford, did
17 you meet with him about employment at Oak &
18 Spruce?
19     A.   No.
20     Q.   So you just had a telephone
21 conversation or was it more than one phone
22 conversation?
23     A.   Just a telephone conversation.
24     Q.   And did you speak with anyone else at

Page 69

1  Oak 'N Spruce prior to returning there?
2      A.   Not that I recall.
3      Q.   Had you kept contact with anyone that
4  you worked with the first time at Oak & Spruce?
5          MS. GARROW: Objection. You can
6  answer it.
7      A.   Duane Johnson and Sam.
8      Q.   Sam from your support team?
9      A.   Yes.
10     Q.   And he's no longer in your support
11 team?
12     A.   No.
13     Q.   What was your compensation
14 structure -- I'm sorry, was it the same -- was
15 your compensation structure the same when you
16 returned to Oak 'N Spruce as it had been when you
17 first worked there?
18     A.   Roughly, yes.
19     Q.   Could you tell me what it was most
20 recently?
21     A.   I don't remember.
22     Q.   Were you paid a salary or an hourly
23 rate?
24     A.   Yes, an hourly rate. I was paid an

18 (Pages 66 to 69)

Deposition of:      LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 70

1  hourly wage while on tour, as well as commission,
2  bonus and S.P.I.F.
3      Q.   What was the hourly rate?
4      A.   I don't remember.
5      Q.   Would you have an approximate idea?
6      A.   No.
7      Q.   And what was the commission?
8      A.   I don't remember.
9      Q.   Did it vary, the percentage, the
10 percentage of commission?
11     A.   Yes.
12     Q.   Based on what?
13     A.   Whether I closed my own deal or not.
14     Q.   Would you receive a higher percentage
15 if you closed your own deal?
16     A.   Yes.
17     Q.   And what was your bonus based upon?
18 And again, I'm talking about the time that you
19 were employed there for the second time.
20     A.   The same as the first, it was based
21 on volume, volume of tours taken and the
22 minimum -- there's a minimum tour qualification.
23     Q.   And this S.P.I.F., is that paid on a
24 daily basis, did you say?

Page 71

1      A.   No, it's earned on a daily basis.
2      Q.   How is it paid out?
3      A.   Cash.
4      Q.   How frequently?
5      A.   As often as it's earned.
6      Q.   Is that cash amount an amount that
7  you would include in your income taxes?
8      A.   Yes.
9      Q.   Could you tell me approximately how
10 much you earned at Oak 'N Spruce during your
11 second employment there?
12     A.   I don't remember at this time.
13     Q.   Since your separation from Vacation
14 Village, did you ever receive unemployment
15 compensation?
16     A.   Yes.
17     Q.   Do you know for how long?
18     A.   I don't. I don't recall.
19     Q.   Do you know the amount?
20     A.   I don't remember.
21     Q.   How did your second employment or why
22 did your second employment at Oak 'N Spruce end?
23     A.   I chose not to return.
24     Q.   Can you tell me the factors that led

Page 72

1  you to make that choice?
2      A.   I just wasn't ready to work.
3      Q.   I'm sorry.
4      A.   I wasn't ready to be back in that
5  work environment. I was having anxiety attacks,
6  and I was really paranoid and uncomfortable and
7  very uncomfortable in the sales pit, which is
8  where all the sales are being done at. It's an
9  emotional job and emotionally I wasn't prepared to
10 be back in that type of environment.
11     Q.   So you quit that employment?
12     A.   Yes.
13     Q.   Who was your supervisor there the
14 second time you worked there?
15     A.   Laura Wood Johnson.
16     Q.   When you were employed at
17 Oak 'N Spruce in the fall of 2003, did anyone
18 bring to your attention any problems with your
19 performance?
20     A.   I don't recall.
21     Q.   Did anyone inform you that there had
22 been any complaints made about you by employees or
23 potential customers?
24     A.   I don't remember any of that.

Page 73

1      Q.   Did you receive any disciplinary
2  action during your second employment?
3      A.   Not that I remember.
4      Q.   How long did you work there before
5  you came to the conclusion that you weren't ready
6  to return?
7      A.   Roughly two months.
8      Q.   When did you begin employment with
9  Vacation Village?
10     A.   On or around February 8th of 2002.
11     Q.   Do you know when you were terminated?
12     A.   On or around June 6th of 2003.
13     Q.   How did you learn of an employment
14 opportunity at Vacation Village?
15     A.   Duane Johnson.
16     Q.   How did he communicate that to you?
17     A.   He came to my house.
18     Q.   What did he say?
19     A.   I beg your pardon.
20     Q.   What did he say when he came to your
21 house?
22     A.   He said that he had been looking for
23 me, because I had moved, and trying to find out
24 where I had lived at, and he said that there was a

19 (Pages 70 to 73)

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 74

1  resort that he was working for, Vacation Village,
2  up in the Berkshires. He told me it was a little
3  further than Oak 'N Spruce and that he was trying
4  to establish his team action and he would love it
5  if I would come and work for him.
6      Q.   Is there anything else he told you
7  about the position?
8      A.   Just a couple things I can remember
9  were, like, the commission rate, how the
10 management lineup worked, because it differed, and
11 it differed from Oak & Spruce, and that's all that
12 I can remember.
13     Q.   And how long would you say your
14 discussion was with Mr. Johnson about potential
15 employment at Vacation Village during the time he
16 came to your house?
17     A.   Roughly an hour or so.
18     Q.   Was anyone else present during that
19 discussion?
20     A.   Yes.
21     Q.   Who?
22     A.   My husband and my children.
23     Q.   All three children?
24     A.   Yes.

Page 75

1      Q.   Anyone else?
2      A.   Not that I remember.
3      Q.   Your husband was also employed by
4  Vacation Village; is that correct?
5      A.   Yes.
6      Q.   When did he become employed?
7      A.   Sometime in July of 2003. I'm sorry,
8  of 2002.
9      Q.   After this meeting with Mr. Johnson
10 at your house, did you speak to him again
11 regarding employment at Vacation Village, prior to
12 the time you started there?
13     A.   I accepted his position that evening.
14     Q.   So is that no?
15     A.   Could you ask the question again?
16     Q.   Sure. Did you have any other
17 conversations with Mr. Johnson about coming to
18 work at Vacation Village prior to the time you
19 actually started there?
20     A.   No.
21     Q.   Could you tell me how long of a time
22 span there was between the time he came to your
23 house and the time you started employment?
24     A.   The next day.

Page 76

1      Q.   Were you employed at the time?
2      A.   No, not that I remember.
3      Q.   Self-employed?
4      A.   Not that I remember.
5      Q.   Other than Mr. Johnson, did you speak
6  to anyone else who was employed by Vacation
7  Village prior to the time you started there?
8      A.   No.
9      Q.   What about the Berkley Group, did you
10 speak to anyone at the Berkley Group prior to the
11 time you began at Vacation Village?
12     A.   No.
13     Q.   During your employment with Vacation
14 Village, did you ever speak to anyone who was
15 employed by the Berkley Group, to your knowledge?
16         MS. GARROW: Objection. You can
17 answer.
18     A.   Could you rephrase your question?
19     Q.   Sure. When you were at Vacation
20 Village working there, did you ever speak to
21 anyone who you believed to be employed by the
22 Berkley Group?
23     A.   My colleagues.
24     Q.   You believe them all to be employed

Page 77

1  by the Berkley Group?
2      A.   Yes.
3      Q.   And what led you to that conclusion?
4      A.   I understood that we were all
5  employed by the Berkley Group.
6      Q.   And what factors contributed to that
7  understanding?
8      A.   The morning meetings, information and
9  updates on the company, the parent company and
10 affiliate companies that were given by management,
11 as well as information contained in the -- and
12 paperwork that we were given as associates.
13     Q.   Anything else?
14     A.   Not that I remember at this time.
15     Q.   You said the morning meetings, is
16 there something that occurred at the morning
17 meetings that contributed to this belief? Can you
18 tell me what it was that happened at the morning
19 meetings that contributed to your belief that you
20 were employed or these other people were employed
21 by the Berkley Group?
22         MS. GARROW: Objection, asked and
23 answered. You can go ahead.
24     A.   We were just told that Vacation

20 (Pages 74 to 77)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 78

1  Village was owned by Patriot Resort, who was owned
2  by Berkley Group in the company history.
3      Q.   When you refer to the parent company,
4  regarding the updates on the parent company, you
5  said -- that was Berkley you're referring to or
6  Patriot Resorts?
7      A.   I don't understand your question.
8      Q.   You said that you had received
9  information and updates on the parent company and
10  the affiliates, and I'm questioning who you meant
11  by parent company.
12      A.   Parent company being the Berkley
13  Group.
14      Q.   And the paperwork that you stated you
15  were given as an associate, how did that indicate
16  to you that the Berkley Group employed your
17  co-workers?
18      A.   I don't remember at this time.
19      Q.   Did you receive a paycheck from the
20  Berkley Group?
21      A.   I don't remember.
22      Q.   Did you ever meet Rebecca Foster?
23      A.   Don't remember.
24      Q.   Prior to the time that you were

Page 79

1  employed at Vacation Village, other than
2  Mr. Johnson, did you know anybody else who was
3  employed there?
4      A.   Could you ask the question again?
5      Q.   Sure.  You said that Mr. Johnson came
6  to your home and he was employed at Vacation
7  Village.  I'm asking if there was anyone else you
8  knew who worked there before you started?
9      A.   No.
10      Q.   Did you fill out any paperwork
11  related to your employment at Vacation Village,
12  prior to your first day?
13      A.   Not that I recall.
14      Q.   Did you have any discussions with
15  anyone on your first day regarding the method that
16  you would be compensated?
17      A.   I don't understand what you mean.
18      Q.   Sure.  You mentioned that -- did you
19  say Mr. Johnson explained to you the method of
20  compensation?
21      A.   Yes.
22      Q.   And when you got there on the first
23  day, did anyone else further discuss this with
24  you?

Page 80

1      A.   Not that I remember.  I don't
2  remember.
3      Q.   Who did you meet with when you -- on
4  your first day of employment?
5      A.   Duane Johnson.
6      Q.   Anyone else?
7      A.   Not that I recall.
8      Q.   And what did you actually do on that
9  first day?
10      A.   I sat in with the meeting; I tagged
11  along with someone on tour, and -- I don't
12  remember what else my day consisted of.
13      Q.   Do you remember who you tagged along
14  with on tour?
15      A.   I don't remember at this time.
16      Q.   Can you tell me if this is -- there's
17  two copies here in your writing on that
18  Application for Employment?
19      A.   Yes.
20          MS. FABBO:  Could you mark that,
21  please?
22          (Wise Exhibit 1, Marked for
23          identification.)
24      Q.   The document that's been marked

Page 81

1  Exhibit 1, did you fill that out on your first day
2  of employment?
3      A.   I don't know if it was the first day
4  or not.
5      Q.   Do you remember if it was around the
6  beginning of your employment of Vacation Village?
7      A.   Yes.
8      Q.   And I've noticed that it asks for
9  your driver's license number.  Do you know why
10  that's left blank?
11      A.   Yes.
12      Q.   Why is that?
13      A.   A copy of it was given.
14      Q.   A copy of your driver's license?
15      A.   Yes.
16      Q.   Did you have a valid driver's license
17  at that time?
18      A.   Yes.
19      Q.   Do you remember who presented you
20  with this application to complete?
21      A.   I don't.
22      Q.   And you've answered that you either
23  pled guilty or no contest or were convicted of a
24  crime.  Can you tell me which it was?

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA   01115    (413) 786-7233   FAX (413) 786-0299
10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 82

1   A.  I was convicted of a crime.
2   Q.  What was the crime?
3   A.  Assault and battery, if I'm not
4  mistaken.
5   Q.  Do you know when that was?
6   A.  I don't remember the date.
7   Q.  Did you have a trial on that?
8   A.  I don't think so.
9   Q.  Could you tell me the circumstances
10  that resulted in the assault and battery, either
11  filing of a complaint, in that situation?
12      MS. GARROW: I'm going to object but
13  you can answer.
14      A.  A few friends gathered for some kind
15  of wrestling match or tournament that was going on
16  that evening, and we were drinking, had been
17  drinking, and things got out of hand, and we all
18  got into a big, kind of, bar brawl and the police
19  showed up and everyone was arrested.
20      Q.  Did you say a bar brawl?
21      A.  Yes.
22      Q.  Did this happen at a bar?
23      A.  Well, right next door.
24      Q.  And where was this?

---

Page 83

1   A.  Forest Park in Springfield.
2   Q.  And you said other people were
3  involved and arrested?
4   A.  Yes.
5   Q.  Do you know who those other people
6  were?
7   A.  Offhand -- Raymond Fischer, Larry
8  Wise, Joe Wise and there were several other
9  people. I don't remember their names.
10      Q.  And you believe everyone was
11  arrested?
12      A.  Yes, if I'm not mistaken.
13      Q.  Do you have any knowledge of whether
14  anyone else was convicted, other than yourself?
15      A.  Yes.
16      Q.  Who was convicted?
17      A.  I don't remember. I know that others
18  were. I know that Larry was, Larry Wise was,
19  Raymond Fischer was, and the others I don't know.
20      Q.  Were you actually involved in the
21  fight?
22      A.  Yes.
23      Q.  And who were you fighting with?
24      A.  There was a group of us that were

---

Page 84

1  fighting.
2   Q.  Are they all people that went out
3  together?
4   A.  No.
5   Q.  How did the fight get started?
6   A.  I really don't remember.
7   Q.  Did you have an attorney in
8  connection with that situation?
9   A.  Yes.
10      Q.  Who was that?
11      A.  I don't remember his name.
12      Q.  Was it one appointed by the state or
13  did you have a private attorney?
14      A.  It was a private attorney.
15      Q.  Where were the charges filed, what
16  town? Springfield?
17      A.  Yes.
18      Q.  Have you ever been arrested other
19  than that one time?
20      A.  Yes.
21      Q.  How many times?
22      MS. GARROW: I'm going to object to
23  this line here. I mean convictions are fair game,
24  but beyond that, the rest are not.

---

Page 85

1      MS. FABBO: I have a right to ask her
2  these questions. What's the grounds of your
3  objection?
4      MS. GARROW: There's no way this
5  could lead to admissible evidence. It's so far
6  afield of what could possibly lead to be
7  admissible at trial.
8      MS. FABBO: You reserved your
9  objections at the time of trial.
10      MS. GARROW: We are getting so far
11  afield. I realize you disagree, that's your
12  position.
13      MS. FABBO: Are you instructing her
14  not to answer?
15      MS. GARROW: You can go ahead and
16  answer at this point, but I'm going to keep it
17  narrow and at some point I will instruct her not
18  to answer.
19      A.  Yes, one, that I remember.
20  BY MS. FABBO:
21      Q.  I'm sorry. One?
22      A.  Yes, one that I remember.
23      Q.  When was that?
24      A.  That I don't remember at this time.

22 (Pages 82 to 85)

Deposition of:     LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 86

1   Q.   What was the situation that resulted
2   in your arrest?
3   A.   I honestly don't remember that.
4   Q.   Was it an assault and battery type of
5   incident or something completely different?
6   A.   I don't remember what it was.
7   Q.   You have no recollection?
8   A.   No, I do not.
9   Q.   Do you remember what town it occurred
10  in?
11  A.   Springfield.
12  Q.   Did you ever have to attend any court
13  proceedings regarding that arrest?
14  A.   Yes.
15  Q.   Do you know who filed charges against
16  you?
17  A.   No, I don't recall.
18  Q.   What about in connection with your
19  conviction, do you know who filed the charges?
20  A.   I don't know.
21  Q.   Did anyone ever bring you to small
22  claims court?
23  A.   Yes.
24  Q.   Were you successful in defending

Page 87

1   yourself, or did the other party win?
2   A.   I don't remember what happened.
3   Q.   Could you tell me the circumstances
4   surrounding this small claims action?
5   A.   I beg your pardon.
6   Q.   What facts were alleged against you
7   in connection with that small claims matter?
8   A.   It was a debtor and I was in the
9   middle of a bankruptcy, so I don't remember what
10  happened or anything like that.
11  Q.   Who was the debtor?
12  A.   In small claims court?
13  Q.   Yes.
14  A.   Lisa Seymour.
15  Q.   How did you know Ms. Seymour?
16  A.   Through a mutual friend of my
17  husband's.
18  Q.   And how much did you owe her?
19  A.   Alleged?
20  MS. GARROW:  Objection.
21  A.   I'm not sure what the amount was.
22  Q.   Did you owe her anything, in your
23  opinion?
24  A.   No.

Page 88

1   Q.   You had completely paid her?
2   MS. GARROW:  Objection.
3   A.   That wasn't the issue.
4   Q.   Did you represent to her, or did she
5   allege, to your knowledge, that you represented to
6   her that you could get her a deal on a time-share
7   at Vacation Village or a vacation at Vacation
8   Village?
9   A.   No.
10  Q.   Was there any reference to Vacation
11  Village at all in connection with that small
12  claims action?
13  A.   Not at all, not to my recollection.
14  Q.   What was the nature of the debt she
15  claimed you owed her?
16  A.   It was in reference to a personal
17  vacation.
18  Q.   Could you elaborate on that, please?
19  A.   In terms of?
20  Q.   Did she take you on a vacation?  Did
21  she give you money for a vacation?
22  A.   No, she wanted to go on a vacation.
23  Q.   And where did she want to go?
24  A.   To Cancun, Mexico, or someplace in

Page 89

1   Mexico.
2   Q.   So did she allege that she gave you
3   money for a vacation?
4   A.   Yes.
5   Q.   Did she give you money for a
6   vacation?
7   A.   Yes.
8   Q.   How much money was it?
9   A.   I don't recall.
10  Q.   Did you pay that money back to her?
11  A.   It wasn't refundable.
12  Q.   What did you do with the money for
13  the vacation?
14  A.   She had cancelled her vacation just a
15  few days before departure, so there was no money
16  to be refunded to her.  There was no insurance,
17  vacation insurance purchased, so it was either go
18  on your vacation or not go and be out at a
19  financial loss.
20  Q.   Were you to go on this vacation with
21  her?
22  A.   No.
23  Q.   How did it come about that you were
24  going to be receiving money for vacations for

23 (Pages 86 to 89)