Deposition of:      LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

**Page 90**

1 another person?
2     MS. GARROW: Objection. You can
3 answer.
4     A.   A mutual friend, her friend, her
5 friend's husband worked with my husband, and we
6 had been traveling and they just -- she just
7 asked, a mutual friend asked if I knew the travel
8 company, or something, where they could go on a
9 vacation.
10     Q.   Did you book a trip with a travel
11 company?
12     A.   Yes, I did.
13     Q.   What company was that?
14     A.   I believe it was a travel store.
15     Q.   How long had you known Ms. Seymour
16 prior to the time she gave you money for a
17 vacation?
18     A.   A short time.
19     Q.   Did you ever book any vacations for
20 any other people?
21     A.   Yes.
22     Q.   Other than your immediate family?
23     A.   Friends.
24     Q.   Who?

---

**Page 91**

1     A.   I don't recall their names.
2     Q.   What?
3     A.   I don't recall their names.
4     Q.   No one? How many times would you say
5 you booked vacations for other people? How about,
6 let's narrow it even further, have you ever booked
7 any vacations for other people where they've given
8 you a deposit to put on the vacation for them?
9     A.   I don't understand the question and I
10 don't recall any -- I don't recall.
11     Q.   Was Mr. Seymour going on a vacation
12 with anyone else?
13     A.   Yes.
14     Q.   Who were the other persons?
15     A.   There was five other people.
16     Q.   Do you know who they were?
17     A.   Vicki, I do not know her last name,
18 and I do not know the names of her other guests.
19     Q.   Did you book a vacation for everyone?
20     A.   Yes.
21     Q.   Did anyone go on the trip?
22     A.   No.
23     Q.   Do you know why no one went on the
24 trip?

---

**Page 92**

1     A.   Yes.
2     Q.   Why was that?
3     A.   There was loss of employment and one
4 of the other couples didn't come up with their
5 share of the money.
6     Q.   Did anyone other than Lisa give you
7 money to book this vacation?
8     A.   It actually wasn't given by Lisa. It
9 was given by Vicki.
10     Q.   I'm sorry. But Lisa is the one who
11 brought you to small claims?
12     A.   Yes.
13     Q.   So Vicki gave you the money?
14     A.   Yes.
15     Q.   And was that to be on behalf of all
16 the guests, except for the one that obviously
17 didn't pay?
18     MS. GARROW: Objection. You can
19 answer.
20     A.   Yes.
21     Q.   Was Vicki involved in the small
22 claims action at all?
23     MS. GARROW: Objection.
24     A.   Meaning?

---

**Page 93**

1     Q.   Was she a party to the small claims
2 action?
3     A.   Are you asking me did she bring me to
4 small claims court?
5     Q.   Right. Was she one of the people?
6     A.   No, it was just Lisa.
7     Q.   Did you know Vicki prior to the time
8 she gave you the money?
9     A.   Yes, her husband and my husband
10 worked together.
11     Q.   The time you became employed at
12 Vacation Village, did you have car insurance?
13     A.   Yes.
14     Q.   And was it in your own name?
15     MS. GARROW: Objection. You can
16 answer.
17     A.   I don't remember whether it was
18 independently or jointly.
19     Q.   What was -- did you own a vehicle at
20 that time?
21     A.   Yes.
22     Q.   What was the vehicle when you began
23 employment?
24     A.   I don't remember.

---

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA    01115    (413) 786-7233   FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 94

1    Q.   Just to clarify, you believe that you
2  had car insurance that was in your name, and you
3  don't know whether it was individually or jointly
4  with someone else; is that what you're saying?
5    A.   Correct.
6    Q.   But you did have a policy that was at
7  least partially in your name?
8    A.   Yes.
9    Q.   Is this one of the documents that you
10 signed around the time you began employment with
11 Vacation Village?
12        (Witness reviewing document.)
13    A.   Yes.
14        MS. FABBO:  Could you mark that,
15 please?
16        (Wise Exhibit 2, Marked for
17        identification.)
18 BY MS. FABBO:
19    Q.   Did anyone explain to you this
20 document?
21        MS. GARROW:  Objection.
22    A.   Not that I recall.
23    Q.   Who gave you the car insurance
24 policy?

Page 95

1    A.   I beg your pardon.
2    Q.   Who gave it to you?
3    A.   The paper?
4    Q.   Yes.
5    A.   I'm not sure.
6    Q.   Did you read it before you signed it?
7    A.   Yes.
8    Q.   Did you have any questions about the
9  policy prior to signing it?
10    A.   Yes.
11    Q.   Did you ask any questions?
12    A.   Yes, I did.
13    Q.   Who did you ask questions to?
14    A.   I'm not sure.
15    Q.   What were your questions?
16    A.   My questions were in reference to the
17 amount of coverages and, most importantly, having
18 listed Patriot Resorts Corporation on the policy.
19    Q.   As an additional insured?
20    A.   Yes.
21    Q.   And what were your questions about
22 coverage?
23    A.   I don't remember.
24    Q.   Did you have the amount set forth as

Page 96

1  required coverage on your car already at that
2  time?
3    A.   I remember that I had full coverage
4  insurance. I don't know what the coverages were.
5    Q.   When you say "full coverage," are you
6  saying coverage in compliance with Massachusetts
7  laws; is that what you mean?
8    A.   Yes.
9    Q.   And what did you ask about Patriot
10 Resorts being an insured?
11    A.   You just asked me that. I don't
12 remember.
13    Q.   I was asking you first about the
14 dollar amounts.
15    A.   I don't remember.
16    Q.   You don't remember. Okay. Did you
17 go to your insurance company and -- or did you
18 contact your insurance company at any time and add
19 Patriot Resorts to the policy?
20    A.   I contacted them, yes.
21    Q.   And what insurance company was that?
22    A.   I don't recall at the time.
23    Q.   Did the insurance company add Patriot
24 Resorts as an insurer?

Page 97

1    A.   It couldn't.
2    Q.   What makes you say they couldn't?
3    A.   Because they told me they couldn't,
4  and they said that if they needed something to
5  verify that they couldn't add them on, then they
6  would gladly send it over to them.
7    Q.   Did they tell you why they could not?
8    A.   Not that I recall.
9    Q.   Did you ask?
10    A.   No, not that I remember.
11    Q.   Did you obtain that verification
12 document that they offered?
13    A.   Yes, I did.
14    Q.   And do you have a copy of it?
15    A.   No, I do not.
16    Q.   What did you do with it?
17    A.   It wasn't needed because there were
18 several insurance companies that had given back
19 the same response, so it was then told to us that
20 it was optional because a lot of insurance
21 companies weren't allowing that to transpire, so
22 make the effort, if you can get it, then please
23 get it and provide the information. If you can't,
24 just please make sure that the -- that you have a

25 (Pages 94 to 97)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

**Page 98**

1  car with a driver's license and some insurance.
2      Q.   And did you ever verify whether you
3  had the correct dollar amount of the property and
4  personal injury coverage or bodily injury
5  coverage?
6      A.   I don't remember. I remember that I
7  had what Massachusetts state require that I have.
8      Q.   What was the cost to you of your car
9  insurance?
10     A.   I don't remember.
11     Q.   Did anyone at Vacation Village ever
12 raise the issue with you or ask you or suggest
13 that you didn't have adequate coverage, car
14 insurance coverage?
15     A.   Yes.
16     Q.   Who was that?
17     A.   Rod Lewis.
18     Q.   Anyone else?
19     A.   Yes, but I'm not sure at this time
20 who it was.
21     Q.   Do you have any documents that would
22 refresh your recollection as to who else might
23 have brought this up with you?
24     A.   I don't think so.

---

**Page 99**

1      Q.   What did Mr. Lewis say to you about
2  the car insurance coverage?
3      A.   He said that unless I could give him
4  a copy of the policy with proof of the coverages,
5  I, one, wasn't getting paid, two, wasn't being
6  sent on tour and three, was being sent home
7  immediately.
8      Q.   And when was this conversation?
9      A.   I don't recall the date.
10     Q.   Was it just one conversation you just
11 referred to?
12     A.   That was one single conversation,
13 yes.
14     Q.   Did you ever discuss this with
15 Mr. Lewis again?
16     A.   I know there was another conversation
17 that we had, and I'm not sure that it was with
18 Mr. Lewis, but it was in reference to car
19 insurance, automobile insurance policy that was
20 transferred to another insurance agency.
21     Q.   So that's two conversations that
22 you're talking about so far?
23     A.   Yes.
24     Q.   Any other conversations on that

---

**Page 100**

1  topic, that you can think of?
2      A.   Yes. There was another conversation
3  with Rod Lewis and my then manager Jon Borden. My
4  automobile was in the shop getting repaired, and I
5  was driving my father's car, and Rod noticed that
6  I was driving a car that was different from the
7  car that I normally drive, and he pulled myself
8  and John aside and asked me to prove insurance on
9  that vehicle, asked whose vehicle it was, and I
10 told him it was my father's vehicle.
11         And he asked was I -- what was my
12 father's coverages. He asked what my father's
13 coverages were. He also asked if I was listed on
14 my father's insurance as a driver, and if I had
15 brought in a copy of the insurance policy for him.
16 I told him that I hadn't, that I -- I told him
17 that I hadn't brought in a copy of the insurance
18 policy, but I did know that the car was fully
19 covered and had met Massachusetts requirements for
20 insurance, that I was not -- that I was not listed
21 on his insurance policy, and because I don't live
22 with my father and I don't use his car frequently,
23 the Massachusetts state says that I don't have to
24 be listed on his policy. And he disagreed and he

---

**Page 101**

1  said that --
2      Q.   Is "he" Mr. Lewis?
3      A.   Yes. Rod Lewis disagreed, and he
4  said that we need to provide him with proof of
5  that. It was on a Saturday, Jon Borden and myself
6  and Mr. Lewis were in a cubicle and he told me to
7  call my insurance company. And I called my
8  father, and I asked him what his insurance company
9  was, and he told me and I called the insurance
10 company and they were closed.
11         Mr. Lewis said unless I could provide
12 that proof or documentation, that I needed to
13 leave immediately, and I asked him was I the only
14 one, because I see other representatives standing
15 right here who are on tour who don't even have a
16 car, and they're using other people's car, never
17 mind insurance. He said don't worry about it,
18 just worry about yourself and get the verification
19 or you need to go home.
20         So I then called my father back and I
21 asked him if he had or could pull out the
22 insurance policy, because one of my options was to
23 either just go home, or go home, get the policy
24 and then drive all the way back and bring the

---

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 102

1 policy and then maybe get a tour. And my father
2 said that he would check, to give him a call back.
3         In the meantime, Mr. Lewis had called
4 up his wife's insurance agent at home to find out
5 whether, in fact, I did need to be listed with my
6 father's, as a driver, insurance company, which he
7 then found I did not. In the meantime, I had
8 called my father back and he said that the
9 insurance policy was in the car. At that point,
10 Jon Borden and myself went to the car. We got the
11 insurance policy, which showed the coverages on
12 it, and I was then assigned a tour.
13     Q.   Is that everything you remember about
14 that conversation?
15     A.   Yes.
16     Q.   Did you make any notes regarding that
17 situation?
18     A.   I don't recall whether I did or not.
19     Q.   When did that occur, other than a
20 Friday? Do you remember the approximate time
21 frame?
22     A.   I don't remember.
23     Q.   Did Mr. Borden say anything during
24 that conversation?

Page 103

1     A.   Yes.
2     Q.   What did Mr. Borden say?
3     A.   Mr. Borden was really upset, and he
4 said that he had told Mr. Lewis that in the State
5 of Massachusetts, that I did not have to be listed
6 on their -- on my father's insurance policy in
7 order to be a covered driver because we don't live
8 at the same residence and I'm not a frequent
9 driver of his vehicle.
10         And he also said that it was bullshit
11 that -- and he named other -- several other white
12 employees who, again, had no vehicles, no driver's
13 license, no cars, who were taking tours right
14 there as we stood. And then further said, it's
15 Saturday. How in the heck is she going to provide
16 something for you right now, on a Saturday and get
17 this stuff for you, and why do you have her in
18 here when she could be out there making money.
19     Q.   Was Jon Borden your line director at
20 the time?
21     A.   He was my boss at the time.
22     Q.   And was Mr. Lewis new to the
23 organization at that time?
24     A.   I beg your pardon.

Page 104

1     Q.   Was he new to Vacation Village?
2         MS. GARROW: Objection.
3     A.   I don't remember the time, so I don't
4 remember the date of that particular incident, so
5 I'm not sure.
6     Q.   Who else was your line manager at
7 Vacation Village?
8     A.   My managers, my immediate bosses were
9 Duane Johnson, Ken Flanders, Jon Borden, and there
10 were others I don't remember.
11     Q.   Do you know what order?
12     A.   Duane was first. I think that is the
13 order.
14     Q.   And then Ken and then John?
15     A.   Yes, and if there were any others, I
16 don't remember.
17     Q.   Who were the employees that
18 Mr. Borden listed as having no vehicle, no
19 driver's license or no cars?
20         MS. GARROW: Objection. You can
21 answer.
22     A.   Sam Barnes.
23     Q.   Anyone else?
24     A.   Ron Ferreria, Andrew Goodness, David

Page 105

1 McCurio.
2     Q.   What's the last name?
3     A.   McCurio. There were a few others,
4 but I don't remember their names at this time.
5     Q.   Those are the people he listed or all
6 the people that you're including yourself?
7     A.   Those are the people that I remember
8 him stating.
9     Q.   Did you have any means of verifying
10 whether his information was accurate?
11     A.   I don't understand your question.
12     Q.   Well, you stated that these people,
13 what, didn't have insurance; is that what you're
14 saying?
15     A.   They didn't have insurance, cars or
16 licenses or suspended license.
17     Q.   Who had a suspended license?
18     A.   Sam Barnes.
19     Q.   What was his position?
20     A.   Sales associate, sold time-shares.
21     Q.   So he was driving with a suspended
22 license; is that what you're saying?
23     A.   Well, he would get picked up from
24 home by either a colleague or someone from

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA    01115    (413) 786-7233    FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:     LaCrisha D. Wise     April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 106

1  management, and he would drive their cars for
2  tour.
3      Q.   So he went on tour when he had a
4  suspended license; is that what you're claiming?
5      A.   Yes.
6      Q.   Did you ever see any documentation
7  supporting that contention that he had a suspended
8  license?
9      A.   No, I saw a court paper that he had
10 and paperwork that he had about fines that he had
11 to pay and the DUI classes that he had to take to
12 gain back -- just things that were in relation to
13 the process of him getting back his driver's
14 license.
15     Q.   And what about Mr. Ferreria, what was
16 his situation?  Was it no insurance, no car?  What
17 was it?
18         MS. GARROW:  Objection.  You can
19 answer.
20     A.   No car and no insurance.
21     Q.   Did he ever have a car when you were
22 employed there?
23     A.   Yes.
24     Q.   And do you know how he came about not

---

Page 107

1  having a car anymore?
2      A.   It broke down.
3      Q.   So was it being repaired or did he
4  not have a car at all?
5      A.   He didn't have a car at all.
6      Q.   And he was a sales associate as well?
7      A.   Yes.
8      Q.   And what makes you say that he went
9  on tours with no car?  How did he do that?
10     A.   He used other people's cars as well,
11 other colleagues and management.
12     Q.   Whose?
13     A.   Any other sales associate who wasn't
14 using their car at the time, or Paul's car or
15 Dave's mini van, anyone who was available.
16     Q.   Did he have a valid driver's license,
17 to your knowledge?
18     A.   I'm not sure.
19     Q.   Did he have insurance coverage, to
20 your knowledge?
21     A.   No, he didn't, not to my knowledge.
22     Q.   Did he ever get a car again when you
23 were employed there?
24     A.   No.

---

Page 108

1      Q.   What about Mr. Goodness, what was the
2  circumstance with him?
3      A.   No car, no insurance.
4      Q.   Did he ever have a car?
5      A.   No.
6      Q.   Did he have a driver's license?
7      A.   I'm not sure.
8      Q.   How did he do his tours?
9      A.   Anyone's vehicle who was available.
10     Q.   What were you having done on your car
11 at the time that you had this meeting with
12 Mr. Borden and Mr. Lewis?
13     A.   I'm not sure what it was.
14     Q.   Had you been in an accident?
15     A.   No, it wasn't related to an accident.
16 It was just repair work.
17     Q.   Where do you have your repair work
18 done?
19     A.   Pat's Auto Sales in West Springfield.
20     Q.   Do you know where in West
21 Springfield?
22     A.   I don't know the address.
23     Q.   How long were you without your
24 vehicle in connection with that repair work?

---

Page 109

1      A.   One workday.
2      Q.   David McCurio, what was the situation
3  with David, as far as not having his car
4  insurance?
5          MS. GARROW:  Objection.  You can
6  answer.
7      A.   David had moved here from out of
8  state, and when he moved here, he didn't, to my
9  knowledge, he didn't transfer over anything.  His
10 inspection sticker was expired, his plates were
11 expired, and he would make comment to be careful
12 in his vehicle because it's not right.
13     Q.   It's not what?
14     A.   He said to be careful in his vehicle
15 because it wasn't right.
16     Q.   And what state did he come from?
17     A.   I believe it to be Virginia.  I'm not
18 sure if that's correct.
19     Q.   Do you know whether he was ever
20 spoken to about this situation, not having
21 up-to-date stickers, and not transferring his car
22 information to Massachusetts?
23     A.   Not to my knowledge, no.
24     Q.   Would you be present at those

---

28 (Pages 106 to 109)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 110

1 conversations?
2      MS. GARROW: Objection. You can
3 answer.
4      A.   Not necessarily.
5      Q.   What about Mr. Ferreria, were you
6 ever present when he was spoken to about not
7 having a car or no insurance?
8      A.   I don't remember Mr. Ferreria ever
9 being spoken to about this situation.
10      Q.   Did you ever ask him if he was ever
11 spoken to?
12      A.   Yes, I did.
13      Q.   Did you ever sit in on any
14 disciplinary meetings involving any other
15 employee, other than yourself?
16      A.   Generally, during the morning
17 meeting, what issues or concerns that there were
18 within the team, they would be brought about
19 within the team, within that meeting. Anything
20 aside from that, I have no idea.
21      Q.   Did you ever look at any of the
22 employees' personnel files?
23      A.   No.
24      MS. FABBO: Why don't we break for

Page 111

1 lunch now.
2      MS. GARROW: Okay. How long?
3      MS. FABBO: 1:30.
4      MS. GARROW: Okay.
5      (Recess taken at 12:38 p.m. to 1:35
6      p.m.)
7 BY MS. FABBO:
8      Q.   Do you know that you're still under
9 oath?
10      A.   Yes.
11      Q.   Can you tell me what the exit
12 department is when you were at Vacation Village?
13      A.   Exit department is, like, guests
14 relations, it's the customer's final opportunity
15 to get involved on some level in the program and
16 where they also receive their gifts.
17      Q.   Do people who purchase or indicate
18 that they're going to purchase a time-share go to
19 guests relations as well -- exit department as
20 well as people who have indicated they don't want
21 to purchase? Does everyone go through there after
22 their tour?
23      MS. GARROW: Objection. You can
24 answer.

Page 112

1      A.   No.
2      Q.   Who would be going through that
3 department?
4      MS. GARROW: Objection. You can
5 answer.
6      A.   As I sit here today, I recall folks
7 who didn't get involved with us, with a regular
8 time-share vacation ownership.
9      Q.   When you say "didn't get involved,"
10 do you mean didn't purchase?
11      A.   Didn't purchase.
12      Q.   They would then go to this exit
13 department?
14      A.   Yes.
15      Q.   And at that exit department, would
16 there be another, if you know, attempt to have
17 them purchase?
18      A.   Yes.
19      Q.   The people who worked in the exit
20 department, did they bring these people on tours
21 at all?
22      MS. GARROW: Objection.
23      A.   They wouldn't bring them on tour.
24 They would bring them, sometimes if it was

Page 113

1 necessary, based on, you know, their presentation
2 or something that they wanted to point out to them
3 in particular.
4      Q.   So if they wanted to see some aspect
5 of the tour that they had already went on?
6      A.   Yes.
7      Q.   Okay. The people that you listed
8 before the break, Mr. Barnes, what is his race and
9 color?
10      A.   Caucasian male.
11      Q.   Mr. Ferreria?
12      A.   Caucasian male.
13      Q.   Mr. Goodness?
14      A.   Caucasian male. Actually,
15 Mr. Goodness -- yeah, Caucasian male.
16      Q.   And Mr. McCurio?
17      A.   Caucasian male. And there was also
18 another one, Brenda Durant.
19      Q.   What made you hesitate when you were
20 answering Mr. Goodness?
21      A.   Because he told me that, just in
22 conversation, he told me he was -- that he was
23 biracial, but I don't remember what the -- what
24 his other race was.

29 (Pages 110 to 113)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 114

1    Q.    He's a white man, as far as you know?
2    A.    Yes.
3    Q.    And the last person that you
4    mentioned was Brenda Durant?
5    A.    Yes, Brenda Durant.
6    Q.    Did she have a driver's license, to
7    your knowledge?
8    A.    Yes.
9    Q.    Did she have a car?
10    A.    For a period and then she didn't.
11    Q.    What happened to her car, if you
12    know?
13    A.    I don't know.
14    Q.    Did she ever get a car back?
15        MS. GARROW: Objection. You can
16    answer.
17    A.    I can't recall.
18    Q.    And was she a sales associate?
19    A.    Yes.
20    Q.    And do you contend that she was
21    driving someone else's vehicle to do her tours?
22    A.    I beg your pardon.
23    Q.    Was she doing her tours even when she
24    didn't have a car?

Page 115

1    A.    Yes, absolutely.
2    Q.    Was she using someone else's vehicle?
3    A.    Yes.
4    Q.    Whose vehicle was that?
5    A.    Whoever had a vehicle that was
6    available. She's even used my car, and there was
7    a period of time where she was using her
8    grandmother's car to commute to work, but it
9    wasn't something that she was comfortable taking
10    her tours in, so she would just, you know, use one
11    of our cars or something.
12    Q.    Do you know whether she had
13    insurance?
14    A.    I know while she didn't have a car,
15    she didn't have insurance.
16    Q.    She didn't own a car or was it being
17    repaired?
18    A.    She didn't have the car anymore.
19    Q.    How do you know?
20    A.    She told me.
21    Q.    Did she tell you why she didn't have
22    a car anymore?
23    A.    Monetary reasons.
24    Q.    She couldn't afford it?

Page 116

1    A.    I just remember that it was related
2    to monetary.
3    Q.    Do you know what she did with the
4    car?
5    A.    I don't recall.
6    Q.    Did you say you don't remember
7    whether she got a car again, did you say that?
8    I'm sorry. I don't remember what you said.
9    A.    I don't know whether she got that car
10    back or whatever. I apologize. Again, Mickie
11    Pleu, Caucasian female, no car, no insurance.
12        MS. GARROW: Can you spell the last
13    name?
14    A.    P-L-E-U. And -- I forget her
15    fiance's name, sorry. I don't remember his name
16    at this time.
17    Q.    And what was Mickie's position?
18    A.    Sales associate.
19    Q.    Did she ever have a car, to your
20    knowledge?
21    A.    No.
22    Q.    Do you know whether anyone at
23    Vacation Village ever had a conversation with her
24    about not having a car or insurance?

Page 117

1    A.    I didn't hear any conversations.
2    Q.    Any of these people that you've
3    listed as either not having a car or not having
4    insurance or driver's license -- strike that.
5        You stated that you had another
6    conversation with Mr. Lewis about being sent home
7    and not being paid unless you, was it, sign a copy
8    of a policy; is that right?
9    A.    No, to produce a copy.
10    Q.    Produce a copy. And who was present
11    during that conversation?
12    A.    Myself, Mr. Lewis and Jon Borden.
13    Q.    This is a different conversation than
14    the one we're talking about -- we talked about
15    before the break, or the same conversation?
16    A.    This is a different conversation.
17    Q.    Okay. So Mr. Borden was present in
18    that conversation as well?
19    A.    Yes. And Michael Johnson as well.
20    Q.    And where did this take place?
21    A.    Again, in one of the cubicles in the
22    sales center.
23    Q.    Did Mr. Lewis approach you to discuss
24    this?

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA    01115    (413) 786-7233    FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise        April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

| Page 118 |
| --- |

1    A.   No, actually, he didn't.
2    Q.   How did you come about meeting in the
3  cubicle over this issue?
4    A.   Michael Johnson, my husband, went to
5  go and get our paychecks and he came back and he
6  said, We can't get our paychecks.
7        And I said, Why not.
8        And he said, Rod is saying that
9  either we give him a copy of our insurance policy
10  now or we're not getting our checks.
11        So I went into the office, and before
12  I went into the office I asked Jon, I said, Jon,
13  Rod said he's not giving us our paychecks, wasn't
14  giving us our paychecks unless we gave him a copy
15  of our insurance policies today.
16        And Jon said, Oh, bull crap, threw
17  his cigarette out and came on in with us and we
18  discussed why I -- why we weren't able to get our
19  checks.
20    Q.   How did you end up in the cubicle and
21  how did Mr. Lewis end up in the conversation?
22    A.   Mr. Lewis was passing out the
23  paychecks, was handing out the paychecks.  In
24  order to get your paycheck, you would go in the

| Page 119 |
| --- |

1  cubicle, get your paycheck, sign for it and leave
2  out of the cubicle.
3    Q.   Okay.  So you went and got
4  Mr. Borden?
5    A.   Yes.
6    Q.   And then you went -- you saw
7  Mr. Lewis or something?
8    A.   We went back in the cubicle.
9    Q.   And then what was said during that
10  conversation, when the four of you were in the
11  cubicle?
12    A.   He said that we were not going to get
13  our paychecks unless we gave him copies of our
14  insurance policies.
15    Q.   And when was this?
16    A.   I don't recall when it was.
17    Q.   Did you end up getting a paycheck
18  that day?
19    A.   Yes, I did.
20    Q.   And how did that come about?
21    A.   I called my attorney.
22    Q.   And who was your attorney at the
23  time?
24    A.   John Rodent.

| Page 120 |
| --- |

1    Q.   What's the last name?
2    A.   Rodent, R-O-D-E-N-T.
3    Q.   And where is he located?
4    A.   State Street, Springfield.
5    Q.   And you said you called your
6  attorney.  How did that translate into you getting
7  a paycheck?
8        MS. GARROW:  I'm going to object and
9  advise you not to divulge any discussions with
10  your lawyer, but otherwise you can answer.
11    A.   Could you rephrase your question?
12    Q.   Yeah.  You said you got your paycheck
13  because you called your attorney.  Did you then
14  say something to Mr. Lewis or did your attorney
15  speak with Mr. Lewis?
16    A.   I said something to Mr. Lewis.
17    Q.   What did you say?
18    A.   I told him that it seems to be
19  against the law for him to withhold my paycheck
20  and completely unfair, and I wanted my paycheck.
21    Q.   Did he say anything in response?
22    A.   Well, I had my attorney on the phone,
23  so I told him that my attorney would speak with
24  him if he needed to, but otherwise could I please

| Page 121 |
| --- |

1  have my check so I could leave.
2    Q.   Did Mr. Johnson say anything during
3  this conversation?
4    A.   Yes.  Michael said that he told
5  him -- he said, Mr. Lewis, it's late in the day.
6  If you want the insurance policy or a copy of the
7  policy, we'll gladly bring it in for you, you
8  know, when we come in, because it was the end of
9  our work week, so when we come back in, I will
10  gladly bring it in for you then, but to stand here
11  and withhold our checks, he said, We have a family
12  and we have responsibility and bills, could you
13  kindly pay us our checks?  If that's what you
14  need, fine, we'll get them, but what's the point
15  of a policy at the end of the workday, we're not
16  going on another tour, and I'll gladly give it to
17  you before we make another tour when we come back
18  to work from my weekend.
19    Q.   Did Mr. Lewis say anything in
20  response to Mr. Johnson?
21    A.   No.
22    Q.   Did Mr. Johnson say anything else
23  during that conversation?
24    A.   Not that I recall.

31 (Pages 118 to 121)

Deposition of:      LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 122

1    Q.  What about Mr. Borden did he say
2  anything during that conversation?
3    A.  Yes.
4    Q.  What did he say?
5    A.  He told Mr. Lewis to stop messing
6  with us and to give us our checks because it was
7  bull crap, and he was getting pretty sick of the
8  doggone bull crap and then he exited out and
9  slammed the door that led to outside, which is
10 right from the cubicle, there's the men's rest
11 room and then the back door.
12           And at that point, Mr. Lewis gave us
13 our checks, and I informed my attorney that he
14 gave us our checks and we hung up the phone,
15 signed off on the payroll sheet and left.
16    Q.  What vehicle were you driving at that
17 time?
18    A.  I don't recall at this time.
19    Q.  How many different vehicles did you
20 own during your employment at Vacation Village?
21    A.  Roughly six.
22    Q.  Did you own them individually or in
23 conjunction with anyone else?
24    A.  Both.

Page 123

1    Q.  And can you tell me what types of
2  vehicles they were?
3    A.  Nissan Maxima, Cadillac, there were
4  actually a couple Cadillacs, an Expedition, a
5  Pathfinder.  That's all that I can remember at
6  this time.
7    Q.  Those five.  Which ones did you own
8  jointly with another person or more than one
9  person?
10    A.  I don't remember at this time.
11    Q.  Do you remember any that you are
12 certain you owned individually or fairly certain?
13       MS. GARROW:  I'm going to object to
14 the "fairly certain" part of that but you can
15 answer, if you know.
16    A.  I don't remember at this time.
17    Q.  And who, if you don't remember which
18 ones, can you at least tell me who co-owned these
19 vehicle with you, potentially?
20    A.  It was either my husband or my father
21 or my mom.  And one of them was my sister, I
22 think.
23    Q.  What's your sister's name?
24    A.  I'm not certain on that.  Latonya

Page 124

1  Wise.
2    Q.  And your mother's name?
3    A.  Lucille Wise.
4    Q.  And your father is Joe; is that
5  correct?
6    A.  Yes.
7    Q.  So it was co-ownership, you believe,
8  not that they owned the vehicle; is that correct?
9    A.  Correct.
10    Q.  And when you went from owning one
11 vehicle to a different vehicle, did you update
12 your insurance and title information with Vacation
13 Village?
14    A.  As I sit here today, I remember
15 frequently being asked for it, so whether it was a
16 vehicle purchasing, I just went out and out into
17 the office and volunteered it, it was always
18 given, so they always had something, including the
19 rental cars, any rental cars that we had during
20 that time.
21    Q.  So you believe -- are you saying you
22 believe you updated your information in connection
23 with all these vehicles?
24    A.  Absolutely, I believe so.

Page 125

1    Q.  When you say "they," who are you
2  referring to?  Who were you giving this
3  information to at Vacation Village?
4    A.  It would have either been given to
5  Jon Borden or given to Faith Lippert, and I'm not
6  sure if there was anyone else.
7    Q.  Did you ever have any discussions
8  with anyone else, that you can recall, regarding
9  your auto insurance, anyone at Vacation Village?
10    A.  Such as?
11    Q.  Any member of management?
12    A.  I don't really understand your
13 question, what you're referring to.
14    Q.  You mentioned that you had
15 conversations, two conversations with Mr. Lewis
16 where Mr. Borden was also present.  I'm asking if
17 there were any other conversations with anyone, in
18 management?
19    A.  I'm not sure.
20    Q.  Did you make any notes of the
21 incident regarding Mr. Lewis's refusal to give you
22 your paycheck that you just described to me around
23 the time of that incident?
24    A.  Did I make any notes?

32  (Pages 122 to 125)

Deposition of:     LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 126

1    Q.   Right.
2    A.   I'm not sure.
3    Q.   How many rental cars did you utilize
4    when you were employed at Vacation Village?
5    A.   I don't remember that at this time.
6    Q.   More than five?
7    A.   I don't remember.
8    Q.   You have no recollection whatsoever?
9    A.   No.
10   Q.   Do you have any documents that would
11   refresh your recollection?
12   A.   Not to my knowledge.
13   Q.   Do you recall signing this document
14   during -- around the time you were hired?
15        (Witness reviewing document.)
16   A.   This is my signature.  I do recall
17   signing it.
18   Q.   Do you have any reason to believe
19   that you didn't sign it on the date that it's
20   dated, February 8th, 2002?
21   A.   I'm not sure that that was the actual
22   date that it was signed.
23   Q.   The date next to your signature on
24   the bottom, is that your writing?

---

Page 127

1    A.   Yes, it is.
2        MS. FABBO:  Could you mark that,
3    please?
4        (Wise Exhibit 3, Marked for
5        identification.)
6    BY MS. FABBO:
7    Q.   Can you tell me, does Exhibit 3
8    accurately represent what you understood from
9    Mr. Duane Johnson that your payment structure
10   would be prior to the time you started employment
11   at Vacation Village?
12   A.   I'm sorry.  Are you talking to this
13   sheet right here, as Exhibit 3?
14   Q.   Yes.
15   A.   Is this the one you're referring to?
16   Q.   Yes.
17   A.   In part, yes.
18   Q.   And what part?
19   A.   The commission rate, bonus and the
20   $1500, it was referred to as a $1500 sign-on
21   bonus, which was to be -- $300 to be paid over
22   five weeks.
23       MS. GARROW:  You have to keep your
24   voice up so she can hear you.

---

Page 128

1    Q.   So Mr. Johnson told you about which
2    commission, the six percent or eight percent?
3    A.   He actually told me about both of
4    them.
5    Q.   So I'm just trying to clarify.  How
6    is this different from what he told you?
7    A.   He also mentioned a S.P.I.F., and what
8    the potential opportunities were to earn higher
9    commissions and just broke down the bonus
10   structure and gave me an idea of, you know, what
11   the product was and what kind of money there was
12   that I could earn.
13   Q.   And did you ever receive a S.P.I.F.
14   when employed at Vacation Village?
15   A.   Yes, I believe so.
16   Q.   And when was that?
17   A.   I don't remember.
18   Q.   Do you remember the amount?
19   A.   I do not.
20   Q.   Could you speak louder, please?
21   A.   I do not remember.
22   Q.   And it says, "Plus bonus."  Do you
23   know what that bonus is referring to?
24       MS. GARROW:  I'm going to object

---

Page 129

1    because there's two.
2        MS. FABBO:  Either.
3    Q.   Either one, they say "Plus bonus."
4    A.   I don't know what exactly that "Plus
5    bonus" specifically was for.
6    Q.   Did you ever receive a bonus?
7    A.   I don't remember.
8    Q.   And were you, in fact, paid in
9    accordance with the schedules as set out in
10   Exhibit 3?
11       MS. GARROW:  I'm going to object.
12   You can answer.
13   A.   To the best of my knowledge, yes.
14   Q.   Did you discuss this document with
15   anyone before you signed it?
16   A.   I don't recall whether I did or not.
17   Q.   Do you recall whether you had any
18   questions about what was set forth in the
19   document, prior to the time you signed it?
20   A.   I don't recall.
21   Q.   Could you tell me if this is a true
22   and accurate copy of your Employment Agreement as
23   a sales representative for Vacation Village?
24       (Witness marking document.)

---

33 (Pages 126 to 129)

Deposition of:      LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 130

1    A.  This is a packet that looks familiar.
2  However, it doesn't look complete.  I know that
3  when I signed this Employment Agreement, that
4  there were a couple things that I had concerns and
5  questions about when I signed it, and I stated
6  such next to whatever it was that I had a concern
7  with.
8    Q.  And what were those things?
9    A.  I don't remember.  I just remember
10  that I did have some concerns with whatever part
11  of it that it may have been and that I signed --
12  that I put right next to the article that I have
13  concerns with them, but after signing it,
14  nonetheless, initialed it and continued down.
15    MS. FABBO:  Could you --
16    A.  And I don't see it in there.
17    MS. FABBO:  Could you mark that,
18  please?
19    (Wise Exhibit 4, Marked for
20    identification.)
21    Q.  Do you have a copy of the document
22  that you're referring to with the comments on it
23  that you wrote?
24    A.  No, we're not allowed to have copies.

Page 131

1    Q.  And why do you say that?
2    A.  Because they were given to us and
3  they asked us to sign them right away, basically
4  sign here, sign here, sign here, and I said, Well
5  before I sign anything like that, I need to read
6  it over, so, in fact, it took me a couple days to
7  turn this in, and when I did, I made the notations
8  about it, about the questions and concerns that I
9  had and then turned it in.
10    Q.  And you didn't -- did you take it
11  home with you?
12    A.  No, I had left it in my briefcase at
13  the office.
14    Q.  You left your briefcase at the
15  office?
16    A.  Yes.
17    Q.  Where would you leave it?
18    A.  At the table that I would use.
19    Q.  Did you ever bring your briefcase
20  home?
21    A.  Yes.
22    Q.  And did someone tell you, you
23  couldn't have a copy of it?
24    A.  I was told that this -- it just

Page 132

1  needed to be signed, it was standard and turned
2  back in immediately so it wouldn't hold up
3  payroll.
4    Q.  Did you consult with anyone, other
5  than an attorney, about this agreement before you
6  signed it and those days that you took to look at
7  it, before returning it?
8    A.  I don't recall having said that I
9  consulted with an attorney on it.
10    Q.  No, I didn't suggest you did.  If you
11  did, I don't expect you to tell me what your
12  conversations are, so I'm excluding that from my
13  question.  If you talked to anyone other than an
14  attorney, I'd like to know.
15    A.  Yes, other sales associates.
16    Q.  And who were the sales associates you
17  spoke to about it?
18    A.  Other than Mr. Johnson, I don't
19  remember who they were at the time.
20    Q.  Do you remember what your
21  conversations were?
22    A.  I don't remember.
23    Q.  And take your time, if you would, and
24  go through the document and let me know what, if

Page 133

1  anything, you recall having some comment about?
2    (Witness reviewing document.)
3    A.  On the third page from Question
4  Number 2, on the second page in "Compensation" and
5  Section 6, it says, "Earned Commissions - A
6  commission which will be deemed earned upon the
7  Closing of a sale, except that commissions on
8  Financed Sales shall not be deemed earned until
9  the purchaser has made three timely and
10  consecutive monthly payments in accordance with
11  the terms of the purchase money note and
12  mortgage."  I don't remember that at all.
13    MS. GARROW:  Do you remember what the
14  question was?
15    THE WITNESS:  What my question was?
16    MS. GARROW:  What her question was.
17    A.  I believe her question was, her
18  comment and question was for me to review this and
19  make note of anything in here that I would have
20  made comments or had a concern about or would have
21  signed something reflecting that I did next to it.
22  Is that correct?
23    Q.  That sounds about correct.
24    (Witness reviewing document.)

34  (Pages 130 to 133)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 134

1    A.   Page -- if the pages are numbered
2  correctly, it's on Page 5, it's Number 5, that I
3  believe I recall being concerned, because in here
4  it talks about not being able to work at another
5  business similar to this one for a certain amount
6  of time, within a certain amount of, you know, a
7  certain amount of mile radius, and that I had a
8  concern with, to the best of my knowledge, I can
9  definitely remember that.
10    Q.   Anything else?
11    A.   Again, there's a section in here that
12  I completely don't even remember being in here,
13  and that was on Page 3, the "Earned Commissions -
14  A commission will be deemed earned upon the
15  Closing of a sale, except that commissions on
16  Financed Sales shall not be deemed earned until
17  the purchaser has made three timely and
18  consecutive monthly payments in accordance with
19  the terms of the purchased money note and
20  mortgage," which is under the "Compensation," if
21  I'm not mistaken.  It is.
22    Q.   Do you recall how commissions were
23  earned on financed sales?
24        MS. GARROW:  Objection.  You can

---

Page 135

1  answer.
2    A.   I can recall how they were supposed
3  to be paid.
4    Q.   And when you say "supposed to be
5  paid," do you mean in accordance with some sort of
6  policy?
7    A.   In accordance with -- within the
8  twenty-one day policy that's in here, within this
9  actual employee handbook, in here, it states
10  that -- that the commission works as such, once a
11  customer -- if a customer pays for their time
12  sharing in its entirety in cash, then my
13  understanding was there wasn't a three-week wait
14  because it was paid for in cash.  You would get
15  paid sooner.
16    Q.   How much sooner?
17    A.   I don't remember.  A contract that
18  was financed, let's say ten percent of the deposit
19  was made and their rescission period had passed,
20  well, once their deposit was made, it was a
21  minimum of ten percent, within twenty-one days of
22  that, which included the rescission time, we would
23  be paid on it at that point, whatever the
24  commission is that we were -- we would have

---

Page 136

1  earned.  But that wasn't, in fact, how we were
2  paid.
3    Q.   How were you paid?
4    A.   It would be six to seven weeks
5  sometimes before an actual -- before I actually
6  received commissions on contracts that were
7  deposited, done and cleared, some maybe even with
8  a larger deposit down, it would -- it would be
9  every -- from four to seven weeks before I had
10  gotten paid.
11    Q.   Did it make a difference, if you
12  recall, whether you received PAC, preauthorized
13  checking, or you didn't receive preauthorized
14  checking?
15    A.   Preauthorized checking wasn't
16  something that was in effect throughout the entire
17  time of my employment with Vacation Village.
18    Q.   Okay.  And was it in effect for part
19  of it?
20    A.   Yes.
21    Q.   And did that -- during the time
22  period when it was in effect, did it affect the
23  time period in which you would get your
24  commission, in one way or another?

---

Page 137

1    A.   As I sit here today, I can recall
2  that if a customer didn't leave some form of a way
3  that we could automatically take their payments
4  out of their account, at that point we would
5  either need to get it immediately or then we need
6  have to wait for them to make three timely
7  payments in order to be paid on it.
8    Q.   And is that only on financed sales or
9  would that be on -- that would be on just financed
10  sales?
11    A.   Yeah, because cash sales are paid
12  for.
13    Q.   Did you discuss the concern that you
14  had or you referenced regarding Paragraph 5 on
15  Page 5 with anyone at Vacation Village, prior to
16  the time you signed this document?
17    A.   I do recall having questioned how
18  that worked and why that would work like that.  I
19  do not recall who I spoke with about it.  I do
20  recall the response being that there wouldn't --
21  there shouldn't be a problem with me going to work
22  across the street at Canyon Resort, or anywhere
23  else in the business for that matter, where I
24  would have to wait a certain amount of time.

---

35 (Pages 134 to 137)

Deposition of:        LaCrisha D. Wise        April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 138

1  Q.  Do you know whose signature is on
2  Page 10 on behalf of Patriot Resorts?
3      A.  I didn't get that far.  I'm on Page
4  6.  I don't.
5      Q.  You didn't read through the whole
6  document yet?
7      A.  No, I didn't.
8      Q.  Take your time and see if there is
9  any other section that you had comments it.
10     (Witness reviewing document.)
11     A.  On Page 7, Section C.
12     Q.  Yes.
13     A.  On Page 7, Section C.
14     Q.  What was the concern you had with
15  that?
16     A.  Well, my concern was if -- in the
17  time-share business, a lot of the associates would
18  flip-flop from one resort to another, which
19  included a resort that was directly across the
20  street, and the Oak 'N Spruce Resort and there
21  wasn't a time frame that one had to wait to go and
22  work at another place or to come back and work
23  with us at Vacation Village, so the going to work
24  within another place in a 200 mile radius, and

Page 139

1  that nature, shouldn't have been a problem.  Then
2  Section C seemed to be, I understand, irrelevant
3  to that as well.
4      Q.  And what did you write on the
5  document?
6      A.  I don't recall exactly what I wrote.
7  I just know that I wrote something that reflected
8  that I disagree with it and initialed it.
9      Q.  Anything else?
10     (Witness reviewing document.)
11     A.  I don't recall at this time anything
12  else through here that I may have had any
13  questions or concerns with them.  I'm not familiar
14  with some of the terminology that's used in here.
15     Q.  When was the first time that you felt
16  that you were discriminated against at Vacation
17  Village?
18     A.  As I sit here today, I can remember
19  feeling like something wasn't really right, like,
20  towards maybe like the beginning of the fall of
21  2002, and then certainly as things transpired.  I
22  mean I'm only thirty-one years old today, but as
23  different circumstances and situations further
24  came about, then at that point I began to sit back

Page 140

1  and be even more so observant and take notes and
2  discuss and ask, with my husband and my support
3  team.  Like telling them like --
4      MS. GARROW:  I'm going to stop you.
5  If this is conversations you had contemporaneous,
6  that's okay, you weren't married.  You shouldn't
7  discuss any conversations you had with your
8  husband since he's been your husband.  But if that
9  is contemporaneous, that's fine.
10     A.  Fall of 2002.
11     Q.  And what led you to that feeling that
12  something wasn't right, what factors?
13     A.  I remember consistently watching some
14  of the other sales associate, like Sam Barnes and
15  other representatives that still didn't have a
16  vehicle, continue to take tours, and didn't hear
17  of any -- and I didn't hear of any discipline or
18  disciplinary actions.
19         I could remember myself and Michael
20  Johnson being asked to sign some papers that said
21  that we wouldn't be tardy or miss a day of work
22  anymore at all in the future or we were to be
23  terminated without any future benefits or
24  anything, from that point forward.  And I recall

Page 141

1  having asked was everyone signing those papers or
2  just us, and I expressed a concern but this was
3  somewhere towards the winter season.
4         And Vacation Village is in the
5  Berkshires and we live in Springfield, so the
6  commute there involves driving a lot, especially
7  with the winter, so I felt like it wasn't anything
8  in my best interest to sign because I can't
9  predict what the weather is going to be, how the
10  roads are going to be or anything of that nature.
11        And once I asked was there anyone
12  else who was being asked to sign that paper, I was
13  told no.  I said I'm not signing it either, and
14  Michael agreed and he didn't sign it either.
15     Q.  And this was during the fall of 2002?
16     A.  Yeah, it was like the late fall,
17  early part of the winter.
18     Q.  Or early winter '03?
19     A.  No, we're talking fall '02, so we're
20  talking, like, late December-ish.
21     Q.  Okay.  Who did you have -- who asked
22  you to sign these papers?
23     A.  Paul Stensland.
24     Q.  Had you been tardy prior to him

36 (Pages 138 to 141)

Deposition of:     LaCrisha D. Wise     April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 142

1    asking you to sign those papers?
2        A.    Yes.
3        Q.    How many times?
4        A.    I don't recall.
5        Q.    More than five?
6        A.    I believe so, yes.
7        Q.    Did you commute to work with
8    Mr. Johnson?
9        A.    Most of the time, yes, I did.
10       Q.    Who was his supervisor?
11          MS. GARROW: Object. You can answer.
12       A.    William Steele. If there were any
13   others, I don't remember who they may have been.
14       Q.    Was anyone present during this
15   conversation with Mr. Stensland, other than you
16   and Mr. Johnson?
17       A.    There was, but I don't recall who,
18   who they all were.
19       Q.    Where did this conversation take
20   place?
21       A.    In the sales center, right in the
22   section that's right before the end of the
23   building, the last door, or first door if you're
24   coming from the guests reception area.

---

Page 143

1        Q.    And were there other sales people
2    present?
3        A.    Yes.
4        Q.    Was it during the morning meeting?
5        A.    I'm not sure what time of day it was.
6        Q.    Did anyone else say anything during
7    that conversation, other than what you've already
8    told me that Mr. Stensland said, and you and
9    Mr. Johnson said?
10       A.    I don't recall at this time.
11       Q.    Can you think of anyone who was
12   present? You said there was more than one person.
13       A.    There were several people around the
14   sales center. I just don't recall, at this time,
15   who they were.
16       Q.    Did you complain about that incident
17   shortly after it happened to anyone?
18       A.    Yes.
19       Q.    Who did you complain to?
20       A.    I believe it was Jon Borden, and I
21   believe I also spoke with Ken Flanders about it.
22       Q.    Who?
23       A.    Ken Flanders.
24       Q.    Who is Mr. Flanders?

---

Page 144

1        A.    He was, at one point, one of my
2    bosses.
3        Q.    Anyone else you complained to around
4    the time of the incident?
5        A.    I don't remember.
6        Q.    And what did you say to Mr. Borden in
7    your complaint?
8        A.    I don't remember the exact nature of
9    our complaint. I just know that I had said
10   something to him about feeling continuously picked
11   on and that I wasn't signing it. And I asked him,
12   Did you guys prepare them for everybody or was it
13   just us, and it was just us, and I told him
14   there's no way.
15          And I said could you -- I asked him
16   could he either get something for me or do
17   whatever he needed to do to relay the message of,
18   like, stop picking on me.
19       Q.    Anything else that you said during
20   that conversation?
21       A.    If so, I don't remember what it was
22   right now.
23       Q.    Did you make any notes of that
24   conversation?

---

Page 145

1        A.    I don't recall whether I did or not.
2        Q.    Was anyone else present, other than
3    you and Mr. Borden?
4        A.    Again, there was, but at this time I
5    don't recall who was all present.
6        Q.    Where did it take place?
7        A.    Again, in the sales center.
8        Q.    Was it the same day that
9    Mr. Stensland had asked you to sign the document?
10       A.    I'm sorry, I thought this was what we
11   were all talking about.
12       Q.    Right. Was it on the same day? Was
13   it the next day?
14       A.    The same day.
15       Q.    And from what you said, I gather that
16   Mr. Borden knew about it, the document, prior to
17   the time you brought it to his attention; is that
18   correct?
19       A.    That's not what I said. What I said
20   was I'd discuss it with him afterwards.
21       Q.    Right. But when you were talking
22   with him, if you formed an impression one way or
23   the other, that he knew you were going to be given
24   this document?

---

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA    01115      (413) 786-7233   FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 146

1    A.   I asked him if they had prepared
2 letters similar to that for any other employees or
3 whether they were just for us.
4    Q.   Do you know -- did he tell you
5 whether they were prepared just for you and
6 Mr. Johnson because you had had quite a bit of
7 tardiness?
8    A.   No, he said that it was just more
9 bullshit and don't worry about it, go out, have a
10 tour, have a great day and go make some money. He
11 tried to be upbeat about it, because we were given
12 the ultimatum of either signing the papers or be
13 unemployed if we didn't. And I recall stating
14 that unless I saw others, unless I saw everyone or
15 at least those who were in similarly situated
16 situations signing the paper, I wasn't signing
17 anything. So if that meant that we were
18 unemployed, then we were unemployed.
19    Q.   So were you terminated at that time?
20    A.   No. We were top producers. They
21 didn't want to lose us.
22    Q.   Was Mr. Johnson terminated at that
23 time?
24    A.   No.

Page 147

1    Q.   Who were the others that you would
2 consider to be similarly situated? Actually, can
3 you take a minute to think about that. They need
4 to leave.
5       MS. GARROW.  Okay.
6       (Recess taken at 3:05 p.m. to 3:30
7       p.m.)
8    Q.   You also stated that you complained
9 to Mr. Flanders in relation to being asked to sign
10 the papers by Mr. Stensland. Could you tell me
11 when you made that complaint?
12    A.   I believe it was either, again, the
13 same day, if not, like, the next opportunity,
14 whether it had been the next business day or what
15 have you, but it was immediately following.
16    Q.   And why did you complain to
17 Mr. Flanders?
18    A.   Because he was also part of our team.
19    Q.   What was his role on your team?
20    A.   Well, he had been my manager prior to
21 Jon Borden.
22    Q.   And what was his current role at the
23 time?
24    A.   He was still a manager. I just

Page 148

1 wasn't on his team, directly.
2    Q.   Did you complain to him before or
3 after Mr. Borden?
4    A.   After.
5    Q.   Anyone else you complained to in
6 regard to this incident?
7    A.   I'm sure I did. I just don't
8 remember right now who it was.
9    Q.   You had stated also that you felt
10 that something was not right because you had been
11 consistently watching other sales associates take
12 tours. Do you recall saying that?
13    A.   Yes.
14    Q.   Without cars or licenses or
15 insurances. Is that the -- strike that.
16       Were those the people you told me
17 about previously? We went through them earlier.
18    A.   Yes. For the most part, yes.
19    Q.   Is there anyone else that would be
20 included on that list?
21    A.   Again, Mickie Pleu's fiancT, but I
22 don't recall his full name. It's one of those
23 sentences at the tip of my tongue.
24    Q.   Do you remember a part of his name?

Page 149

1    A.   Rob.
2    Q.   Were any of the people that you
3 mentioned, people that worked in the exit
4 department?
5    A.   Not to my knowledge. We were all
6 sales associates, based on our experience, and
7 sometime when they ran short, we would assist with
8 other -- in other areas, and specific, to my
9 knowledge, we were, at that time, we were all
10 definitely sales associates.
11    Q.   Was anyone working only in the exit
12 department and not sales associate, to your
13 knowledge?
14    A.   Not anyone that we discussed.
15    Q.   Anyone at all?
16    A.   Yes.
17    Q.   And who were those people?
18    A.   Ron Ferreria's wife, I believe her
19 name is Camilla.
20    Q.   Anyone other than Ron's wife?
21    A.   Yes, I can't remember his name right
22 now.
23    Q.   If it comes to you.
24    A.   Okay.

38  (Pages 146 to 149)

Deposition of:      LaCrisha D. Wise      April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 150

1    Q.   Did you ever work in the exit
2  department?
3    A.   No.
4    Q.   You said that you believed other
5  people who were similarly situated weren't asked
6  to sign papers.  Who were those people that you
7  considered to be similarly situated?
8    A.   All the other sales associates.
9    Q.   And how were they similarly situated?
10   A.   They were all time-shares sales
11 associates.
12   Q.   Did anyone have the same number of
13 tardies as you did?
14      MS. GARROW:  Objection.  You can
15 answer.
16   A.   Yes, to my knowledge, Lisa Ferreria,
17 Sam Barnes, Alex Headsackus (phonetic).
18   Q.   Anyone else?
19   A.   Will Steele, peggy Jeffers, Mickie
20 Pleu, Brenda Durant.
21   Q.   And we're talking about the fall of
22 2002, correct?
23   A.   Correct.  There were a few others.  I
24 just can't remember their names.

---

Page 151

1    Q.   If you didn't know how many tardies
2  you had, how is it that you knew how many tardies
3  other people had?
4       MS. GARROW:  Objection.  You can
5  answer.
6    A.   We had a wheel, or a rotation that we
7  would sign in, once we got to work, and if you
8  weren't in your normal place in line, you were at
9  the bottom of the wheel, then there was only one
10 reason to be at the bottom, one of two reasons to
11 be at the bottom of the wheel and outside of that
12 we would discuss it.
13   Q.   So, in other words, you would discuss
14 the number of tardies with your co-workers?
15   A.   Basically, yeah.  Not so much the
16 number as much as, like, the complaints of the
17 different times and the times that the sheets were
18 pulled and, you know, different conflicts with the
19 sheet being pulled and how that all operated and
20 worked, or didn't work.
21   Q.   And so is it your contention that you
22 did not have more tardies than other people in the
23 fall of 2002?
24   A.   I'm not sure.

---

Page 152

1    Q.   Is it possible you did have more?
2       MS. GARROW:  Objection.  That calls
3  for speculation.  Anything is possible.
4    A.   I don't know.
5       MS. GARROW:  You can answer if you
6  know.
7    A.   I'm not sure.
8    Q.   You're not sure one way or the other?
9    A.   Unt-unh.
10   Q.   Did you keep any record of what time
11 you arrived at work, other than the sign-in that
12 you referred to, did you keep any permanent
13 records?
14   A.   Yes, I made some notes.
15   Q.   Beginning when?
16   A.   They were just random.
17   Q.   Do you still have those?
18      MS. GARROW:  Keep your voice up.
19   A.   No, I don't.  Everything that I had
20 in reference to that that wasn't discarded was
21 given to my attorney.
22   Q.   Are these the notes that you're
23 talking about?
24   A.   Yes.

---

Page 153

1    Q.   Take a minute and look at them.
2       (Witness reviewing document.)
3    Q.   Are you able to identify them as the
4  notes?
5    A.   Yes.
6    Q.   Do you believe there's any other
7  notes, because these are all that I got?
8    A.   I'm not sure if there are any more or
9  not.  I don't think that there are.
10      MS. FABBO:  Could you mark that,
11 please?
12      (Wise Exhibit 5, Marked for
13      identification.)
14   A.   Another similarly situated
15 representative was Nancy Shepherd, in reference to
16 the absences or tardiness.
17   Q.   I only asked about the tardiness so
18 as far, so I want to make sure that's what you
19 responded to.
20   A.   Yes.
21   Q.   She was tardy as well?
22   A.   Yes.
23   Q.   And do you believe it was the same
24 amount of times you were tardy?

---

39 (Pages 150 to 153)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 154

1    A.   I'm not sure how many times it was.
2 I just know that there were several times.
3    Q.   Were there any other African American
4 employees on your team or line, however you refer
5 to it?
6    A.   Michael Johnson and at one point
7 Charles Harrigan, Duane Johnson, again, when I
8 first -- when he first hired me.
9    Q.   Did you say Charles something?
10    A.   Charles Harrigan.
11    Q.   Anyone else?
12    A.   Duane Johnson, Michael Johnson,
13 Charles Harrigan, myself.  That was it, throughout
14 my employment there at Vacation Village.
15    Q.   They were all under the same
16 management as you were?
17    A.   Under the same line.
18    Q.   Were there any other African
19 Americans on the other line?  There was one line
20 or --
21    A.   Yes.
22    Q.   Were there any on that line?
23    A.   No.
24    Q.   After the incident that we were

Page 155

1 talking about where Mr. Stensland asked you to
2 sign a document that you didn't want to sign, what
3 was the next thing that comes to mind where you
4 felt you were being discriminated against?
5         MS. GARROW:  I'm going to object to
6 the form but you can answer.
7    A.   I can't tell you what was next.
8 There was a lot.  I can't tell you what was next.
9    Q.   And so what's another incident you
10 can think of, if you can't put it in any order?
11    A.   Dress code.  I was -- the weather was
12 beautiful out.  I had just went and purchased a
13 beautiful orange long sun dress with spaghetti
14 strap across the back, and it was beautiful, and I
15 received a lot of compliments from my colleagues
16 on it.  And then we signed a dress code, a dress
17 code paper maybe a week or so after that.
18         And I was on the phone, I was on the
19 telephone with -- I actually had a conference call
20 going on, my father was on the line, Michael was
21 on the line and my daughter was on the phone.  I
22 was on the phone with them, and Paul came up --
23 Paul Stensland came up to me and when he asked me
24 to -- when he gave me the papers to sign, he said,

Page 156

1 you know, don't worry about it, because I asked
2 him about the hats, about the spaghetti straps, or
3 what have you, and the sleeveless tops.  I asked
4 him about the open toe shoes or sandals, and he
5 said not to worry about it, because I'm one of the
6 best dressed people that are there, and I've never
7 dressed inappropriately, so, you know, just be
8 aware that that's, you know, that I haven't worn
9 anything inappropriately yet, and so I did.
10         And then just like a week later or so
11 I wore the same dress again and now this time I
12 either had to drive back to Springfield to change
13 my clothes, wear someone's old, dirty sweater that
14 was left behind from cold weather or go to the
15 mall and buy a new outfit because that exact dress
16 was no longer acceptable.  However, Lisa Ferreria,
17 Tishana Wright, Chelsea Wright, and Hannah Blais
18 were -- those are the names that I can think of
19 off the top of my head.
20         Those are also women who wore
21 spaghetti straps and spaghetti strap dresses and
22 shirts and things of that nature, on a regular
23 basis, without any reprimand or any disciplinary
24 actions.

Page 157

1         And I remember Sam Barnes, Ron
2 Ferreria, and several of my other colleagues, when
3 I ended up being sent home, being pretty upset
4 about it.  I found out about it the next day,
5 because it was an hour and a half drive home.
6 They said go home, and I went home and when I went
7 in the next day, they were really upset about it
8 and they said she wore this two weeks ago and now
9 she wears it again and you send her home and make
10 her wear her old clothes, I'm listening, you keep
11 picking on her every day and every other day this
12 and that.  Gosh, I didn't want to ask that, but
13 you know what, you're right, what's the gig, so
14 that helped me more to establish that, you know
15 what, there is something going on.
16    Q.   You don't know whether anyone else
17 was disciplined in any way, though, do you?
18    A.   Yes, I do.  I spoke with them.
19    Q.   And they denied it?
20    A.   They told my exactly, some of the
21 notes are right in here, on the dates that I spoke
22 with them, that when they've told me that, no one
23 has ever said anything to them or -- in one case,
24 Tishana, she had worn -- this was after I'd been

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA   01115    (413) 786-7233   FAX (413) 786-0299
10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 158

1  terminated from employment, I had gone up to pick
2  up my ring and I spoke with her and she told me
3  that she had worn spaghetti straps for a whole
4  week before anybody said anything to her, and she
5  still wears them, and Lisa Ferreria also wears
6  spaghetti strap shirts.
7      Q.   Did anyone ever tell you whether they
8  were able to -- or they were asked to put on a
9  sweater, as you were?
10     A.   No, not at all.
11     Q.   No one was ever asked to?
12     A.   Not to my knowledge. I spoke with
13  them and those young ladies didn't say anything to
14  me about them having to alter the way that they
15  were addressed at all.
16     Q.   Do you still own the orange dress
17  that you described?
18     A.   Yes, I do.
19     Q.   Can you describe -- you said there
20  were spaghetti straps in the back?
21     A.   Yes. It covered -- it actually came
22  up higher than this. It came up about here, so
23  any long necklace you couldn't -- you couldn't see
24  because it would go under the dress.

Page 159

1      MS. GARROW: Since she can't see
2  "here," her cleavage is covered.
3      A.   Cleavage is covered, goes up just
4  below the neckline and then it makes a
5  crisscross right across the back, and the back
6  isn't all completely out. It's only out -- it's
7  out to the point where you can comfortably wear
8  any type of strapless bra or what have you.
9      Q.   So the back -- is it open till your
10  bra strap line?
11     A.   A little higher than that.
12     Q.   And is it short sleeve, long sleeve?
13     A.   It's --
14     Q.   Cap sleeve?
15     A.   It's got the -- well, it goes into
16  the spaghetti straps, so in there it's a dress, so
17  it cuts right up into the strap, across the back,
18  so it doesn't have any sleeves.
19     Q.   Is it spaghetti straps at the top of
20  the chest?
21     A.   Starts right about up here. Right
22  around the ear line, right around here.
23     MS. GARROW: You mean the **Nape of
24  the neck?

Page 160

1      MS. FABBO: She said hairline.
2      MS. GARROW: I thought she said the
3  ear line.
4      THE WITNESS: I did say ear line.
5      MS. FABBO: You did.
6      MS. GARROW: Yes, that's why I'm
7  trying to clarify.
8  BY MS. FABBO:
9      Q.   Is this the dress code policy that
10  you're referring to?
11     A.   Yes, I believe it is.
12     MS. FABBO: Could you mark that,
13  please?
14     (Wise Exhibit 6, Marked for
15      identification.)
16     Q.   What was the dress code policy, if
17  you know, prior to May 11, 2003?
18     A.   It was the same.
19     Q.   And do you know what prompted this
20  memorandum? Did anyone tell you that?
21     A.   They were just updating because of --
22  the weather was starting to get nice again, so
23  they were kind of reiterating, reminding people
24  how to and how not to dress.

Page 161

1      Q.   The notes that were marked as
2  Exhibit 5, they're written or they appear to be
3  written on a 2002 calendar, actually. Is there
4  some reason -- did these events occur in 2002?
5      A.   No, not all of them. Some of them
6  did, I believe, and the others were into 2003.
7      Q.   Was there some reason you kept this
8  on a 2002 calendar, these notes?
9      A.   It was just a planner I was using at
10  the time.
11     Q.   Mr. Stensland, did you say he told
12  you that your dresses were acceptable prior to the
13  issuance of this memo?
14     A.   Yes.
15     Q.   And in your notes on the second page
16  that's stamped in the bottom 814, it says that,
17  and correct me if I'm wrong, I'm looking at where
18  it says, "27 Monday, Paul Stensland said around
19  5/11/03 that my dresses were fine." Does that
20  reference the conversation you told me you had
21  with him?
22     A.   I'm sorry, where are you looking?
23     Q.   Next page, May 27.
24     A.   Oh, that's the right page. I'm

41 (Pages 158 to 161)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 162

1  sorry. Yes.
2      Q.   And you had this conversation when
3  you were on a conference call; is that what you
4  said?
5      A.   Well, I was on my cell phone when he
6  came over. It was nice outside, we were all
7  outside, and I was on my cell phone when he came
8  over and had that discussion.
9      Q.   And Mr. Johnson was not at work that
10 day?
11     A.   No, he was one of the people that was
12 on the phone.
13     Q.   And did anyone else, to your
14 knowledge, overhear the conversation?
15     A.   My oldest daughter Asia, as well as
16 my father.
17     Q.   Were you on a break at work? How did
18 it come to be that you were outside on the
19 telephone?
20     A.   There weren't any tours there at the
21 time, none available anyway, so we were waiting
22 for tours.
23     Q.   Could you tell me what your -- if
24 there is such a thing as a normal workday, what

---

Page 163

1  your typical workday at Vacation Village would
2  consist of? For example, what time you got there,
3  what you did when you got there?
4      A.   As I sit here today, I think that our
5  workday began at nine o'clock, so at nine o'clock
6  we would all gather with our line directors and we
7  would have our beginning of the day sales meeting
8  that we would -- for any sales that were made the
9  day prior to, we would get the worksheets on
10 those, any issues or concerns that they may have
11 had within our lineup.
12          If someone needed to, you know, hand
13 in anything or get anything, whether it be on a
14 personal level, like driver's license, insurance,
15 whatever, that would be brought to their
16 attention, to our attention, as well as missing
17 paperwork or documents from a client's file or
18 something like that, like a paycheck or credit
19 card or something.
20     Q.   How long would that meeting take
21 place?
22     A.   Roughly fifteen, twenty minutes.
23     Q.   Would you sign in when you arrived at
24 work every day?

---

Page 164

1      A.   Yes.
2      Q.   Was that required?
3      A.   Yes.
4      Q.   Did you have to sign in by a certain
5  time?
6      A.   Yes.
7      Q.   What was the time you were supposed
8  to sign in by?
9      A.   Nine o'clock.
10     Q.   Where did you sign in?
11     A.   Originally in the reception, the
12 reception area and then in the sales center
13 itself.
14     Q.   And are those two areas in the same
15 building?
16     A.   Yes. They were divided by a wall,
17 where you had to go out one door and into the
18 other to get into it, but with some construction
19 that door was removed, so then it would be just
20 randomly on a table in the sales center.
21     Q.   And what would you sign in on?
22     A.   Just a regular -- a regular piece of
23 paper, you'd sign in.
24     Q.   You'd sign your name or initials?

---

Page 165

1      A.   I believe at one point it was --
2  we've done both, signing our names and then at one
3  point it was just an initial next to your name.
4      Q.   Was it someone who had custody of
5  this piece of paper that you signed in on or was
6  it just a piece of paper on a table?
7      A.   It was just a piece of paper on a
8  table that was taken -- that had been gained
9  custody by one of the reception people.
10     Q.   And who are they?
11     A.   Like Bonnie Gardner, and I don't
12 remember right now who else was over in the
13 reception area at this time.
14     Q.   So she didn't have the document, you
15 didn't go to her; is that what you're saying?
16     A.   Correct.
17     Q.   She picked it up at some point in
18 time?
19     A.   Correct.
20     Q.   Do you know what time she picked it
21 up?
22     A.   It varied. It would be anywhere from
23 ten minutes to nine to five after nine.
24     Q.   So you think sometime she picked it

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA   01115      (413) 786-7233   FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e

Deposition of:        LaCrisha D. Wise        April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

Page 166

1  up before nine?
2      A.  Yes, absolutely.
3      Q.  And if you arrived before nine but
4  after she picked up the paper, what would you do?
5      A.  In terms of what?
6      Q.  How would you sign in, she had
7  already picked up the paper?
8      A.  You'd have to go over to that
9  building and sign in.
10     Q.  What building are you referring to?
11     A.  Well, it was then the new reception
12 area.
13     Q.  And after the morning meeting, then
14 what would you do?
15     A.  Prepare for the day, you'd sit around
16 and wait for tours.
17     Q.  What did you do to prepare for the
18 day?
19     A.  Just gathered -- got mentally
20 prepared, for me that was praying, meditating.  I
21 would get different forms or papers that I would
22 need for a specific tour together, have my table
23 set up and that would be it.
24     Q.  So you said forms for a specific

---

Page 167

1  tour.  Could you elaborate on that?
2      A.  There's like a survey, there's a rent
3  versus own sheet that we use.  There's a
4  comparable sheet that we use.  There's a T sheet,
5  which have the time off or special promotional
6  offers.
7      Q.  So those are forms you needed in
8  connection with the tours you'd be going over?
9      A.  Yes.
10     Q.  When you said you had your table set
11 up, where was your table?
12     A.  It was in the back, right by the
13 women's bathroom.
14     Q.  And how would you set that up?
15     A.  With me looking outward and the
16 customers sitting, facing where they could only
17 see me and not the rest of the room.
18     Q.  Is that where you would meet with the
19 customers at some point?
20     A.  That's where I would bring them to.
21     Q.  After the tour?
22     A.  Throughout the tour, that's where the
23 presentation was done.
24     Q.  Okay.  So did you -- I'll come back

---

Page 168

1  to that.  Is this area that you're describing,
2  where the table was, different from what's
3  referred to as the pit or the lounge?
4      A.  It is the pit.
5          MS. GARROW:  Speak up.
6      Q.  So at what point in the sales
7  presentation would you bring people to the pit?
8      A.  About twenty, twenty-five minutes.
9      Q.  Into the presentation?
10     A.  Yes.
11     Q.  How did you know what tours would be
12 yours?
13     A.  We're on the lineup.
14     Q.  Is that the wheel?
15     A.  Yep.  So whenever it was my turn for
16 a tour, they'd just pass me the sheet or call me
17 over to the reception area to come and pick up my
18 sheet, which had people's name on it and that was
19 it.
20     Q.  And what time was the first tour in
21 the morning?
22         MS. GARROW:  I'm going to object to
23 that.
24     A.  I don't remember what time the first

---

Page 169

1  wave was.
2      Q.  Did you have waves in the morning?
3      A.  Yes.
4      Q.  Okay.  And you have no recollection
5  whatsoever what time the first wave was?
6      A.  No.
7      Q.  And did that wave time change?
8      A.  I'm not sure.
9      Q.  Was there more than one wave
10 throughout the day?
11     A.  Yes.
12     Q.  How many waves were there?
13         MS. GARROW:  Objection.  You can
14 answer.
15     A.  I'm not sure how many there were.
16     Q.  Did it vary?
17     A.  Yes.
18     Q.  Were the wave times posted anywhere
19 for the particular day?
20     A.  No.
21     Q.  Do you have any way of refreshing
22 your recollection as to what time the waves were?
23     A.  None that I can think of, because it
24 changed.

---

43 (Pages 166 to 169)

Deposition of:     LaCrisha D. Wise        April 26, 2005
         Wise, et al. vs. Patriot Resorts, Corp., et al.

Page 170

1    Q.  Do you know how frequently it would
2  change?  Was it monthly, seasonal, daily?
3    A.  I don't know.
4    Q.  You don't remember?
5    A.  I don't know.  I don't recall how
6  often they would change.  It was based on either
7  folks that came up and spent overnight that we
8  knew would be in for a presentation, because
9  otherwise it would cost them to stay in the
10  accommodations, and just a telemarketing call, in
11  which case a lot of people say yes just to get the
12  marketer off the phone but never show up, so we
13  had time where they were scheduled but a wave
14  didn't -- like we began our day in the morning, so
15  there had to be some wave in the morning and stay
16  until late in the day, so, you know, with that
17  respect, it definitely varied.
18    Q.  And when you say "wave," can you
19  explain what that means?
20    A.  That's when the tours come?
21    Q.  Is it a group of tours or is one tour
22  considered a wave?
23    A.  A wave is a time that tours are
24  scheduled to come in.

Page 171

1    Q.  Were there typically more than one
2  tour scheduled at a time?
3    A.  Yes, typically.
4    Q.  You had stated, I think, before, with
5  respect to yourself and Mr. Johnson, that you
6  were, these are not your exact words, excellent
7  sales people or something to that effect.  Do you
8  recall that?
9    A.  Yes.
10    Q.  Did that result in you being at the
11  top of the wheel?
12    A.  Yes, it fluctuated.
13    Q.  Did your sales performance affect
14  where you were on the wheel?
15    A.  Yes.
16    Q.  And what other things, other than --
17  strike that.
18        How frequently would you say you were
19  at or near the top of the wheel, as a result of
20  your sales?
21    A.  Most often then not, that I remember.
22    Q.  And being higher up on the wheel, did
23  that indicate -- that was the order in which
24  people would go out, start from the top, they'd

Page 172

1  get the tours first?
2    A.  Yes.
3    Q.  So the people at the bottom would get
4  the last of the tours; is that how --
5    A.  Yes.
6        MS. FABBO:  Why don't we break here?
7        MS. GARROW:  Okay.
8        (The deposition suspended at 4:06 p.m.)

Page 173

1  COMMONWEALTH OF MASSACHUSETTS
   Hampden SS.
2
        I, Sandra A. Deschaine, Registered
3  Professional Reporter and Notary Public within and
   for the Commonwealth of Massachusetts at large, do
4  hereby certify that the deposition of LACRISHA D.
   WISE, in the matter of Wise, et al. vs. Patriot
5  Resorts Corp., et al., at the Offices of Skoler,
   Abbott & Presser, One Monarch Place, Springfield,
6  Massachusetts, on April 26, was taken and
   transcribed by me; that the witness provided
7  satisfactory evidence of identification as
   prescribed by Executive Order 455 (03-13) issued
8  by the Governor of the Commonwealth of
   Massachusetts; that the transcript produced by me
9  is a true record of the proceedings to the best of
   my ability; that I am neither counsel for, related
10  to, nor employed by any of the parties to the
   action in which this deposition was taken, and
11  further that I am not a relative or employee of
   any attorney or counsel employed by the parties
12  thereto, nor financially or otherwise interested
   in the outcome of the action.
13

14  _____
   Sandra A. Deschaine          DATE
15
   Registered Professional Reporter
16
   My Commission Expires:
17  July 9, 2010
18
19
20
21
22
23
24

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA   01115    (413) 786-7233   FAX (413) 786-0299

10444ae9-c404-413b-af63-5799964c3e8e