# EXHIBIT 2

Case 3:04-cv-30091-MAP   Document 58-3   Filed 06/20/2005   Page 2 of 16

Deposition of: Roger Martin    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

```
                                        Vol. I, Pgs. 232
            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
                    Docket No. 04-CV-30091-MAP
    ----------------------------
                                 )
                                 )
    WISE ET AL,                  )
              Plaintiffs         )
                                 )
    vs.                          )
                                 )
    PATRIOT RESORTS CORP.,       )
    ET AL.                       )
              Defendant          )
                                 )
    ----------------------------


              DEPOSITION OF ROGER MARTIN
                Tuesday, April 5, 2005
                      9:10 a.m.
            SKOLER, ABBOTT & PRESSER, P.C.
                   One Monarch Place
            Springfield, Massachusetts  01144
    - - - - - - Sandra A. Deschaine, RPR - - - - - -
               COURT REPORTING SERVICES
                   P.O. BOX 15272
            Springfield, Massachusetts  01115
            (413) 786-7233  FAX (413) 786-0299
```

Deposition of: Roger Martin
Wise et al. vs. Patriot Resorts Corp., et al
April 5, 2005

Page 6

1  A. Michelle.
2  Q. Last name?
3  A. Bissette.
4  Q. And your son's name?
5  A. Nicholas.
6  Q. Does he share your last name?
7  A. Yes.
8  Q. How old is he?
9  A. Eight.
10 Q. Is your fiancTe currently employed?
11 A. Yes.
12 Q. Where is she employed?
13 A. Berkshire Health Services.
14 Q. What does she do there?
15 A. She's a supervisor.
16 Q. How long has your fiancTe been living
17 at that address with you?
18 A. As long as we've been there.
19 Q. Approximately how long is that?
20 A. Ten years.
21 Q. And how long has your son been living
22 there?
23 A. Since he was born.
24 Q. Has anyone else resided with you at

Page 7

1  that address since 2001?
2  A. No.
3  Q. So you've been there ten years?
4  A. Yes.
5  Q. Have you ever been involved as a
6  party or a witness in any other lawsuits involving
7  employment?
8  A. No.
9  Q. Has your fiancTe ever been involved,
10 to your knowledge, in any other lawsuits involving
11 employment?
12 A. Not to my knowledge.
13 Q. What's your date of birth?
14 A. 5/5/65.
15 Q. Are you currently employed?
16 A. Yes.
17 Q. Where is that?
18 A. I worked for Marriott Vacation Club
19 International.
20 Q. What do you do there?
21 A. Sell time-shares.
22 Q. Where are the time-shares that you're
23 selling?
24 A. Hilton Head.

Page 8

1  Q. Do you travel to Hilton Head?
2  A. As of right now I'm living there
3  temporarily.
4  Q. That's in South Carolina; is that
5  correct?
6  A. That's correct.
7  Q. How long have you been living there?
8  A. About 2 1/2 months.
9  Q. Where are you living when you're
10 there?
11 A. I stay at an Extended Stay Suite.
12 Q. At the Marriott?
13 A. No, it's called Suburban Extended
14 Stay.
15 Q. Is that something the company pays
16 for?
17 A. No.
18 Q. When did you begin working for the
19 Marriott?
20 A. About five weeks ago.
21 Q. How did you obtain that position?
22 A. Applied for it.
23 Q. Did you see an opening?
24 A. Actually, I just put my numbers in

Page 9

1  there and they called me about 2 1/2 months later.
2  Q. You put -- when you say you put your
3  numbers in there, what are you referring to?
4  A. My sales number, what I did in
5  volume.
6  Q. At?
7  A. At Vacation Village.
8  Q. And where did you actually submit
9  these numbers to, what?
10 A. It's called the Barony Beach Club.
11 Q. Where is that?
12 A. Hilton Head.
13 Q. Is there anything in particular that
14 attracted you to the Hilton Head area?
15 A. No.
16 Q. Had you been there before?
17 A. No.
18 Q. Did you travel to Hilton Head and
19 become aware of this opening or how did you become
20 aware --
21 A. Traveled to Hilton Head and became
22 aware of the opening.
23 Q. On vacation or pleasure?
24 A. Neither.

3 (Pages 6 to 9)

Case 3:04-cv-30091-MAP   Document 58-3   Filed 06/20/2005   Page 4 of 16

Deposition of: Roger Martin   April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

Page 10

1 Q. What was the reason you traveled to
2 Hilton Head for?
3 A. Looking for work.
4 Q. You said you're staying there
5 temporarily; is that correct?
6 A. Absolutely correct.
7 Q. And how much longer do you think
8 you'll be staying there?
9 A. Depends on the job.
10 Q. Are you going to -- is it your
11 understanding that you'll need to live there the
12 entire time that you're employed by Marriott?
13 A. I couldn't tell you. We haven't gone
14 that far ahead. I haven't decided what I'm going
15 to do.
16 Q. Have they requested that you
17 relocate?
18 A. No.
19 Q. How frequently do you travel to
20 Massachusetts?
21 A. About once every five, six weeks.
22 Q. Does your fiancTe or son travel there
23 to visit you?
24 A. Absolutely.

Page 11

1 Q. How frequently is that?
2 A. About the same amount of time. We
3 rotate around.
4 Q. Are you currently earning a salary?
5 A. No. They pay you an hourly wage, not
6 a salary. They take it back out of the
7 commission.
8 Q. What's your hourly wage?
9 A. Minimum wage, minimum for the hour.
10 Q. What's that?
11 A. I have no clue. Whatever it is.
12 Whatever hourly wage is nowadays.
13 Q. Can you tell me what your
14 compensation structure is, how you're paid by your
15 current job?
16 A. I don't think I can without getting a
17 waiver from Marriott, something to release the
18 information to you. I believe that's
19 confidential.
20 Q. But you said generally you're paid a
21 minimum?
22 A. You are paid an hourly wage due to
23 the federal law, they have to pay you an hourly
24 wage while you're on site.

Page 12

1 Q. Can you let me finish my question
2 before you respond, please? It's hard for her
3 take down what we're both saying. And then you're
4 paid commission, obviously, based on your sales;
5 is that correct?
6 A. Correct.
7 Q. And then you're saying that the
8 amount that you were paid an hourly wage is
9 deducted from those commissions?
10 A. To my understanding, yes.
11 Q. Have you made any sales?
12 A. I just got finished with their
13 training program. No.
14 Q. How long was the training program?
15 A. Five weeks.
16 Q. And where did it take place?
17 A. In Hilton Head.
18 Q. Could you have taken the training in
19 Massachusetts?
20 A. No.
21 Q. Are you, as part of your current
22 position, going to be, as far as your
23 understanding, showing potential customers the
24 properties that you could be selling on a

Page 13

1 time-share basis?
2 A. Yes.
3 Q. And would you also be bringing people
4 on tours of the Hilton Head area?
5 A. No.
6 Q. Can you just tell me, generally, what
7 you expect that your day is going to be like in
8 this position, what you'll be doing in your
9 workday?
10 A. Consisting of giving at least three
11 tours a day, is my understanding.
12 Q. And what is a tour?
13 A. Where the company brings in somebody
14 looking at a vacation ownership property, and you
15 take them around the property and show them the
16 benefits of owning a vacation ownership versus
17 what they're doing.
18 Q. And when you say the company brings
19 in a person, where are they bringing them to?
20 A. As far as I know, right onto the
21 property.
22 Q. Where is that property?
23 A. Hilton Head.
24 Q. Where?

Case 3:04-cv-30091-MAP    Document 58-3    Filed 06/20/2005    Page 5 of 16

Deposition of: Roger Martin    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

14

```
1    A.  It's the Barony Beach Club.
2    Q.  Which one, I'm sorry?
3    A.  The Barony.
4    Q.  Can you spell that?
5    A.  Barony Beach Club.
6    Q.  Are all the time -- are the
7  time-shares that you'll be selling located at that
8  property?
9    A.  No.
10   Q.  I'm just trying to make sure I follow
11 you. So as far as you understand, the Marriott
12 will be responsible for bringing people to the
13 Barony Beach Club and then you will show them
14 properties at Barony Beach Club or you will show
15 them other properties as well?
16   A.  We show them an off-site property, a
17 virtual tour of Surf Watch, is what I'll be
18 selling.
19   Q.  Where is Surf Watch located?
20   A.  Hilton Head.
21   Q.  Where at Hilton Head?
22   A.  Hilton Head, South Carolina.
23   Q.  Is it one of the plantations there?
24   A.  No.
```

15

```
1    Q.  Is it a Barony Beach Club?
2    A.  No.
3    Q.  Do you know the address?
4    A.  No.
5    Q.  And is that just one location, Surf
6  Watch?
7    A.  That's one location.
8    Q.  And that's all you'll be responsible
9  for?
10   A.  I could technically sell outside if
11 there was somebody that was interested in another
12 property but the main is Surf Watch.
13   Q.  And off-site, do you mean another
14 Marriott property?
15   A.  Yes.
16   Q.  And you just give a virtually tour.
17 And how do you do that?
18   A.  We take them through Marriott's
19 gallery.
20   Q.  And that's at Barony Beach Club?
21   A.  Yes.
22   Q.  Does anyone take the potential
23 customer to the actual Surf --
24   A.  No.
```

16

```
1    Q.  -- Watch location?
2    A.  No.
3        MS. GARROW: Let her finish the
4  question.
5    Q.  When do you anticipate beginning your
6  sales duties?
7    A.  When I get back from this week off
8  here.
9    Q.  Just sometime next week?
10   A.  Absolutely, yes.
11   Q.  Do you have any benefits in that
12 position?
13   A.  Yes.
14   Q.  What are they?
15   A.  Health, life, vision, dental, profit
16 sharing.
17   Q.  Anything else?
18   A.  No.
19   Q.  What about vacation days or holidays?
20   A.  Actually, as I understand it, not
21 right now, no.
22   Q.  Do you get them after a certain
23 period of time?
24   A.  I believe so.
```

17

```
1    Q.  Do you know when?
2    A.  No.
3    Q.  Do you know how much vacation time or
4  holiday time?
5    A.  No.
6    Q.  Do you get any personal days?
7    A.  I don't know.
8    Q.  What about sick time?
9    A.  I don't know.
10   Q.  And does the company have a 401K?
11   A.  Not that I'm aware of.
12   Q.  Is it your understanding that after
13 you're there for a certain period of time, you're
14 going to get additional benefits, either in
15 vacation or holidays, or something else?
16   A.  I'm not sure.
17   Q.  Did you ever get a company handbook?
18   A.  Yes.
19   Q.  Prior to being employed with
20 Marriott, what was the last place you worked
21 before that?
22   A.  Coral Resorts.
23   Q.  And when did you work there?
24   A.  When did I work there?
```

Case 3:04-cv-30091-MAP   Document 58-3   Filed 06/20/2005   Page 6 of 16

Deposition of: Roger Martin
Wise et al. vs. Patriot Resorts Corp., et al
April 5, 2005

**Page 18**

1  Q. Yes.
2  A. December and part of January.
3  Q. Of this year?
4  A. Yes.
5  Q. And where was that located?
6  A. Hilton Head.
7  Q. And what was your position there?
8  A. Selling time-shares.
9  Q. Why did you leave that job?
10 A. Take the employment with Marriott.
11 Q. So your separation was voluntary?
12 A. Absolutely.
13 Q. And were you paid on an hourly basis at Coral Resorts?
14
15 A. No.
16 Q. How were you paid?
17 A. Straight commission.
18 Q. How did you learn about the job at Coral Resorts?
19
20 A. Internet.
21 Q. So were you working at Coral Resorts when you learned that you might have an opportunity at Marriott?
22
23
24 A. Yes.

**Page 19**

1  Q. Did you make any sales when you were at Coral Resorts?
2
3  A. Yes.
4  Q. Did you have any benefits in that position?
5
6  A. No.
7  Q. Any vacation or holiday time?
8  A. No.
9  Q. Who was your supervisor at Coral Resorts?
10
11 A. Tori Bigall.
12 Q. Is that a female?
13 A. No, it's a guy. It's a gentleman.
14 Q. Was it Tori?
15 A. Tori.
16 Q. Do you have the address for Coral Resorts; do you know --
17
18 A. No, I don't.
19 Q. Do you know where it's located?
20 A. No.
21    MS. GARROW: Let her finish the question.
22
23 Q. Prior to working at Coral Resorts, did you know anyone who was employed there?
24

**Page 20**

1  A. No.
2  Q. Where were the time-shares that you were selling? Were they at this property called Coral Resorts?
3
4
5  A. No.
6  Q. Where were they?
7  A. They were about six miles up the road.
8
9  Q. And could you tell me, generally, what you did in that job, how your day went?
10
11 A. You pick up the person and bring them into a room and explain what they were there for, to look at a time-share, then you take them up to the property and show them the property.
12
13
14
15 Q. And the property was at a different location?
16
17 A. Six miles up the road.
18 Q. When you were working for Coral Resorts, were you also living in Hilton Head?
19
20 A. Yes.
21 Q. Where were you living at that time?
22 A. The Suburban.
23 Q. Has anyone ever lived with you at your location, the Suburban Hilton Head?
24

**Page 21**

1  A. No.
2  Q. And prior to Coral Resorts, what was the place that you worked before that, the last place?
3
4
5  A. Vacation Village.
6  Q. What was your last day at Vacation Village?
7
8  A. I'm not sure.
9  Q. Approximately?
10 A. I'm not sure.
11 Q. No idea?
12 A. No idea.
13 Q. You have no idea of the year?
14 A. 2004.
15 Q. Do you remember if it was -- what season it was?
16
17 A. I believe it was late fall.
18 Q. Can you tell me the -- well, actually, before you -- after you left Vacation Village, did you collect unemployment for any period of time?
19
20
21
22 A. Yes.
23 Q. How long?
24 A. A few months.

Case 3:04-cv-30091-MAP    Document 58-3    Filed 06/20/2005    Page 7 of 16

Deposition of: Roger Martin                                    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

**Page 38**

1. Q. Did the other individual get cited as
2. well, as far as you know?
3. A. No.
4. Q. Was your employer aware of this
5. incident?
6. A. No.
7. Q. Were you driving your own car?
8. A. Yes.
9. Q. What year was this?
10. A. Best of my recollection, I believe
11. '97.
12. Q. So you said you were working for ABC
13. Nissan; is that correct?
14. MS. GARROW: I'm going -- I just want
15. to interject here because we went from mental
16. health issues to anger management and now we're on
17. employment issues, and to the extent that these
18. are related to anger management, I want to make
19. sure that my objections are continued to be
20. renewed in relation to this. You can keep going
21. and you can answer the question.
22. A. Can you repeat the question?
23. Q. What were you doing when you were
24. employed at ABC Nissan, what was your job there?

**Page 39**

1. A. Car salesman.
2. Q. Where was that located?
3. A. Phoenix, Arizona.
4. Q. And you were living there; is that
5. correct?
6. A. Correct.
7. Q. What were the years you lived in
8. Arizona?
9. A. '97, '98, part of '99.
10. Q. What was the outcome of your court
11. proceedings?
12. A. Adjudicated not guilty, as long as I
13. completed sixteen weeks of anger management.
14. Q. Did you complete the sixteen weeks of
15. anger --
16. A. Yes, I did.
17. Q. Where did you attend those classes?
18. A. Phoenix, Arizona.
19. Q. Do you know where in Phoenix, what
20. kind of institution it was?
21. A. No.
22. Q. Was it affiliated with the court
23. system or the police department?
24. A. The court system.

**Page 40**

1. Q. Other than what you've told me so
2. far, have you ever had any other anger management
3. courses or instruction, counsel?
4. A. No.
5. Q. And no other mental health treatment,
6. other than what you've already told me?
7. A. Not that I'm aware of, no.
8. Q. Did you feel the anger management
9. classes were helpful to you in any way?
10. A. Yes.
11. Q. Prior to attending those classes, had
12. anyone ever brought to your attention issues with
13. your anger management or your temperament?
14. MS. GARROW: I'm going to object.
15. You can answer.
16. A. I would say yes, probably.
17. Q. Do you know the years you worked at
18. ABC Nissan?
19. A. '97. I worked for the Vanta Group,
20. so that's '97, '98, until I moved in '99.
21. Q. What prompted you to leave Arizona
22. and relocate?
23. A. The better half of me, my fiancTe.
24. Q. Was she also living with you in

**Page 41**

1. Arizona?
2. A. Yes.
3. Q. Did she wish to relocate to this
4. area; is that what you're saying?
5. A. She wanted to come back home. She's
6. from the area.
7. Q. And so you voluntarily left your
8. employment at Nissan to relocate?
9. A. Yes.
10. Q. And is that when you moved into the
11. address you gave me earlier?
12. A. Yes.
13. Q. When you came to Massachusetts, where
14. did you work? What was your initial employment?
15. A. I want to say Haddad.
16. Q. What is that?
17. A. It's a car dealership.
18. Q. Where is that located or where was it
19. located?
20. A. Lenox, Massachusetts.
21. Q. Were you a salesperson?
22. A. Yes.
23. Q. When were you employed there?
24. A. From the time I got back,

Case 3:04-cv-30091-MAP   Document 58-3   Filed 06/20/2005   Page 8 of 16

Deposition of: Roger Martin                     April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

**Page 42**

1  roughly, '99 till about 2000.
2      Q. Why did you leave that position?
3      A. The construction. When they had
4  Route 7 going on, the construction was just a
5  business killer.
6      Q. So due to the construction, it was
7  diverting business from the dealership?
8      A. Correct, they had the road closed
9  down in front of it.
10     Q. Who was your supervisor there?
11     A. I can't recall.
12     Q. Did the car dealership close?
13     A. No.
14     Q. Is it still open, as far as you know?
15     A. Still open.
16     Q. And when you left Haddad, where did
17 you go to work next?
18     A. Falcon, Chevrolet.
19     Q. Falcon?
20     A. Falcon.
21     Q. Where is that located or where was it
22 located?
23     A. Pittsfield.
24     Q. When did you begin work there?

**Page 43**

1      A. Right -- just about when I left
2  Haddad.
3      Q. Did you have alternate employment
4  before you left Haddad?
5      A. I can't recall.
6      Q. How long did you work at Falcon?
7      A. About six months.
8      Q. Who was your supervisor there?
9      A. I want to say John Day. I'm not sure
10 but I think it was him.
11     Q. And what prompted you to leave Falcon
12 Chevrolet?
13     A. The business closed.
14     Q. Do you know where it was located in
15 Pittsfield?
16     A. West Street.
17     Q. And the next place you were employed?
18     A. I want to say Vacation Village.
19     Q. Prior to becoming employed at
20 Vacation Village, did you do any work as an
21 independent contractor or work any side jobs?
22     A. No.
23     Q. Self-employed at all? And I'm
24 talking about the time period from when you left

**Page 44**

1  Arizona till when you came to Vacation Village.
2      A. No.
3      Q. How did you come to be employed at
4  Vacation Village?
5      A. A friend of mine heard that they were
6  building a resort in town and that I should check
7  into it.
8      Q. How long were you unemployed before
9  going to work at Vacation Village?
10     A. Probably two or three months.
11     Q. Did you collect unemployment during
12 that time period?
13     A. No.
14     Q. Why not?
15     A. Just never filed for it.
16     Q. Who was this friend that told you?
17     A. I can't recall his name, John
18 somebody or other.
19     Q. Is he someone that went for a job at
20 Vacation Village?
21     A. No.
22     Q. Where did you go to apply?
23     A. Actually, we went to their place of
24 business from -- we were working at Bentley Brook,

**Page 45**

1  that's right, we were working at Bentley Brook
2  for -- I was working for Bentley Brook before
3  that, for about six months.
4      Q. What's Bentley Brook?
5      A. Bentley Brook is a time-share
6  organization. It was owned by Aquavest at the
7  time, I believe it is.
8      Q. Aquavest?
9      A. I believe that was the parent
10 company.
11     Q. Where was that located?
12     A. Hancock.
13     Q. Massachusetts?
14     A. Yes.
15     Q. Do you know the address?
16     A. No.
17     Q. And when you say "we went," who are
18 you talking about?
19     A. Thirteen sales people that were
20 working at Bentley Brook all met with Vacation
21 Village representatives on site.
22     Q. When you say "on site," where are you
23 referring to?
24     A. 20 Old Williamstown Road,

Case 3:04-cv-30091-MAP    Document 58-3    Filed 06/20/2005    Page 9 of 16

Deposition of: Roger Martin    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

Page 46

1  Lansborough, Massachusetts.
2     Q.  When you were -- so you said you were
3  employed at Bentley Brook for about six months?
4     A.  Roughly, yes.
5     Q.  How did you end up at Bentley Brook?
6     A.  By that guy John, he told me.
7     Q.  How did you know John?
8     A.  Just through mutual friends.
9     Q.  Did he also work at Bentley Brook?
10    A.  No.
11    Q.  Do you know what he did?
12    A.  No.
13    Q.  Were you paid on commission or hourly
14 wage at Bentley Brook?
15    A.  Commission.
16    Q.  A hundred percent commission?
17    A.  Actually, I can't recall. I'm not
18 positive.
19    Q.  Where were the time-shares that you
20 sold at Bentley Brook location?
21    A.  The base of Jiminy Peak.
22    Q.  Did you travel to Jiminy Peak to show
23 people the time-shares?
24    A.  Are you asking me if I drove to work?

Page 47

1     Q.  Yeah, I'm asking you, I guess,
2  whether you showed them the time-shares on the
3  location or whether they looked at brochures?
4     A.  No, we showed them on location.
5     Q.  So you said about thirteen of you
6  went to Vacation Village. Is there something that
7  prompted this mass exodus to go over to Vacation
8  Village?
9     A.  Yes.
10    Q.  And what was that?
11    A.  The director of sales was looking at
12 interviewing for their company, and Vacation
13 Village, assuming, wanted a ready-made line, and
14 he was going to bring the whole line with him.
15    Q.  Who was the director of sales?
16    A.  I can't recall his name.
17    Q.  Did he go to Vacation Village?
18    A.  No, he didn't.
19    Q.  Did anyone else, other than yourself
20 and this group of thirteen people, go to Vacation
21 Village?
22    A.  Just the thirteen.
23    Q.  All thirteen of you went?
24    A.  Yes.

Page 48

1     Q.  Do you know who they were?
2     A.  Off the top of my head, I can't
3  recall.
4     Q.  Do you remember any of them?
5     A.  Mike Massaconi.
6     Q.  Anyone else?
7     A.  Rebecca, I can't remember her last
8  name.
9     Q.  Who else?
10    A.  I can't recall off the top of my
11 head.
12    Q.  Any other individuals involved in
13 this lawsuit that are named, Mr. Wise, Mr. Corbin?
14    A.  Just Mr. Massaconi.
15    Q.  So you said thirteen sales people met
16 with Vacation Village; is that correct?
17    A.  Roughly, thirteen.
18    Q.  About, okay. And you met with them
19 on site?
20    A.  On site.
21    Q.  Who did you meet with?
22    A.  Bruce Polanski, Larry somebody or
23 other, and I believe J.P. Ottino, I believe, I'm
24 not sure if that's how you pronounce his last

Page 49

1  name.
2     Q.  Was this one meeting?
3     A.  Yes.
4     Q.  What occurred at this meeting?
5     A.  They told us that, you know, they
6  wanted us to come work for them. They were going
7  to pay us $300 a week for ten weeks and ten
8  percent commission.
9     Q.  When you say "they told us," who told
10 you?
11    A.  Bruce Polanski, Larry, J.P.
12    Q.  All three of them?
13    A.  Yes.
14    Q.  Anything else that you remember from
15 that meeting?
16    A.  No.
17    Q.  Did you submit an application?
18    A.  I believe. I'm not positive, but I
19 think we did at that point.
20    Q.  Were you questioned at all about your
21 qualifications and your employment history?
22    A.  No.
23    Q.  Were you told anything else about the
24 job, other than what you were going to be

Case 3:04-cv-30091-MAP   Document 58-3   Filed 06/20/2005   Page 10 of 16

Deposition of: Roger Martin — April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

**Page 50**

1  compensated?
2      A.  That it was just preconstruction,
3  preconstruction sales.
4      Q.  And when was the construction to take
5  place?
6      A.  Excuse me.
7      Q.  When was the construction to take
8  place or had it already been ongoing?
9      A.  It was already ongoing.
10     Q.  So why did you leave your job and go
11 to Vacation Village?
12     A.  At the time, it seemed like a better
13 advancement.
14     Q.  After this meeting with these three
15 individuals that you just described, did you meet
16 with anyone else from Vacation Village or at
17 Vacation Village prior to the time you started
18 employment?
19     A.  I can't recall.
20     Q.  Do you recall any conversations you
21 had with anyone, prior to starting employment, who
22 was employed by Vacation Village?
23     A.  I can't recall.
24     Q.  Do you recall going to

**Page 51**

1  any interviews?
2      A.  Just what we went through.
3      Q.  Nothing else?
4      A.  No.
5      Q.  So how much time between that one
6  meeting you described and your start date?
7      A.  I believe, I'm not sure, but I think
8  it was about a month, month and a half.
9      Q.  Did you have a non-compete with your
10 prior employer?
11     A.  No.
12     Q.  Any kind of salesperson agreement?
13     A.  My recollection, no.
14     Q.  Is it your recollection that every
15 one that attended that meeting ultimately went to
16 Vacation Village?
17     A.  I don't think so, no.
18     Q.  Approximately how many people would
19 you say went?
20     A.  I can't be sure off the top of my
21 head.
22     Q.  You have no approximation?
23     A.  I don't want to speculate on that.
24     Q.  What was your start date at Vacation

**Page 52**

1  Village?
2      A.  I'm not positive.
3      Q.  Do you remember when you received
4  this agreement that's dated the 6th of August,
5  2001, Exhibit 1?
6      A.  That was probably real close to the
7  start date of my employment with Vacation Village,
8  when I received that.
9      Q.  Do you remember whether you received
10 it before or after you started employment?
11     A.  I'm not sure.
12     Q.  Do you remember whether you received
13 any documents prior to starting employment, from
14 the company?
15     A.  I'm not sure.
16     Q.  Do you have any records that would
17 refresh your recollection as to whether you did
18 receive any documents?
19     A.  Not that I can recall.
20     Q.  Did the other employees who left your
21 prior employer and went to Vacation Village also
22 start the same day as you?
23     A.  To the best of my knowledge, yes.
24     Q.  And what happened on your first day

**Page 53**

1  of employment?
2      A.  I believe we did a lot of paperwork
3  that day.
4      Q.  What kind of paperwork?
5      A.  I believe what we're talking about
6  right here.
7      Q.  Exhibit 1?
8      A.  And others.  I think we filled out
9  the application, I think we did all of that,
10 signed our compensation letter.
11     Q.  Did you review the employment
12 agreement before you signed it?
13     A.  Yeah.  To the best of my
14 recollection, yes, I did.
15     Q.  Who did you meet with on your first
16 day of employment from the company?
17     A.  I want to say Gordon Leete and Bill
18 Rauer.
19     Q.  Who's Gordon?
20     A.  I believe he's a director of sales.
21 I don't know his actual title.  I believe that's
22 what they were calling him.
23     Q.  And Bill, what's his position?
24     A.  I believe he's a vice president.  I'm

# EXHIBIT
# 3

```
                                    Vol. I, Pgs. 109
            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
                  Docket No. 04-CV-30091-MAP
------------------------
                                  )
WISE ET AL,                       )
              Plaintiffs          )
                                  )
vs.                               )
                                  )
PATRIOT RESORTS CORP.,            )
ET AL.                            )
              Defendant           )
                                  )
------------------------


              DEPOSITION OF PETER CORBIN
                Tuesday, May 24, 2005
                      9:30 a.m.
            SKOLER, ABBOTT & PRESSER, P.C.
                  One Monarch Place
            Springfield, Massachusetts  01144


- - - - - Sandra A. Deschaine, RPR - - - - -
              COURT REPORTING SERVICES
                   P.O. BOX 15272
            Springfield, Massachusetts  01115
             (413) 786-7233  FAX (413) 786-0299
```

Case 3:04-cv-30091-MAP    Document 58-3    Filed 06/20/2005    Page 13 of 16

Deposition of: Peter Corbin                    Volume I                          May 24, 2005
                            Wise, Et al. vs. Patriot Resorts Corp.

Page 2

1  APPEARANCES:
2  SKOLER, ABBOTT & PRESSER, P.C.
3     Kimberly Klimczuk, Esquire
4     Marylou Fabbo, Esquire
5     One Monarch Place, Suite 2000
6     Springfield, Massachusetts 01144
7     (413) 737-4753  Fax (413) 787-1941
8     on behalf of the Defendants
9
10 HEISLER, FELDMAN & MCCORMICK, P.C.
11    Joel Feldman, Esquire
12    1145 Main Street
13    Springfield, Massachusetts  01103
14    (413) 788-7988  Fax (413) 788-7996
15    on behalf of the Plaintiffs
16
17 Also Present: Faith Lippert

Page 4

1       PETER CORBIN, Deponent, having first
2  been satisfactorily identified by the
3  production of his driver's license and duly
4  sworn by the Notary Public, was examined and
5  testified as follows:
6
7  EXAMINATION BY MS. KLIMZCUK:
8
9       Q.  Hi, Mr. Corbin.  I'm Kimberly
10 Klimczuk.  I represent the defendants in an
11 action you brought against your former
12 employer.  Have you ever had your deposition
13 taken before?
14      A.  For this?
15      Q.  For anything.
16      A.  I believe so, yeah.
17      Q.  What was that in regards to?
18      A.  I was a state's witness in a case
19 with the state about 1979.
20      Q.  What was that case about?
21      A.  Arson, extortion, et cetera.
22      Q.  Why were you deposed in that
23 case?
24      A.  Half a day.

Page 3

            INDEX
---------------------------------
WITNESSES:              PAGE
---------------------------------
Peter Corbin
   By Ms. Klimczuk       4
---------------------------------
EXHIBITS:  DESCRIPTION  PAGE
---------------------------------
(Exhibits retained by Attorney Klimczuk.)
Exhibit 1              21
Exhibit 2              26
Exhibit 3              42
Exhibit 4              77

Page 5

1       Q.  Why?
2       A.  Because I was the state's
3  witness, and the arson and extortion was
4  against me.
5       Q.  What was the outcome of that
6  case?
7            MR. FELDMAN:  Objection.  If
8  she's asking you about convictions or
9  anything like that.
10           THE WITNESS:  I wasn't on trial.
11           MR. FELDMAN:  You weren't.  I
12 thought it was against you.
13      A.  I was the plaintiff, or I was
14 the -- it was coming at me, so I decided to
15 put some people in jail, which I did.
16      Q.  How many people were involved?
17      A.  Fifteen.
18      Q.  They were all involved in the
19 arson?
20      A.  No, it was just a convoluted
21 situation, but they were all involved in the
22 case?
23      Q.  What was the situation?
24      A.  I was getting extorted by a

Case 3:04-cv-30091-MAP   Document 58-3   Filed 06/20/2005   Page 14 of 16

Deposition of: Peter Corbin          Volume I                May 24, 2005
                    Wise, Et al. vs. Patriot Resorts Corp.

Page 6

1  partner. He didn't like our contract. He
2  threatened me. He sent some people out to
3  do me and my family and business some harm,
4  so I went to the State Police, District
5  Attorney, and put him in jail. It took
6  three years.
7      Q. So the partner was the one who
8  was convicted of arson?
9      A. Attempted. It was back in 1979.
10     Q. Right. This was a business
11 partner?
12     A. Yes.
13     Q. What kind of business was it?
14     A. Disco tech.
15     Q. Did you run a disco tech?
16     A. Yes.
17     Q. We should probably go through the
18 ground rules?
19     A. Got you.
20     Q. Just to make sure that you answer
21 verbally, so the court reporter can take
22 down everything you say, so answer yes or no
23 instead of auh-huh or ung-ung or shaking
24 your head yes or no.

Page 7

1      A. I understand.
2      Q. If you don't understand something
3  I'm asking you, then be sure to tell me you
4  don't understand, otherwise I'm going to
5  understand that you understood the question
6  as I ask it.
7      A. Okay.
8      Q. Also, I'll ask you to let me
9  finish my questions before you start your
10 answer, and I'll let you finish your answer
11 before I start the question, and that's,
12 again, so the court reporter can take what
13 we're saying, since she can't take down what
14 two people are saying at once, it's very
15 difficult.
16     A. That's fine.
17     Q. If at any time you feel like you
18 want to take a break, that's fine. If
19 there's a question pending, finish your
20 answer to the question before you take a
21 break.
22     A. All right.
23     Q. So back to the disco tech. So
24 you owned a disco tech?

Page 8

1      A. I did.
2      Q. Where was that?
3      A. Williamstown, Massachusetts.
4      Q. What was the name of it?
5      A. Rollos.
6      Q. Does it still exist in any form?
7      A. No.
8      Q. When did that end?
9      A. September, give or take.
10     Q. Of 1979?
11     A. '79.
12     Q. How long did you operate the
13 disco tech?
14     A. Not long. About half a year.
15     Q. Can you state your name?
16     A. Peter Charles Corbin.
17     Q. What's your date of birth?
18     A. 1/18/49.
19     Q. What's your current address?
20     A. 1201 Green River Road,
21 Williamstown, Massachusetts 01267.
22     Q. How long have you been at that
23 address?
24     A. Eight years.

Page 9

1      Q. Does anyone live with you?
2      A. No.
3      Q. Are you married?
4      A. No.
5      Q. Do you have any children?
6      A. No.
7      Q. Where did you live before this
8  address?
9      A. Williamstown, 166 South Street.
10     Q. How long did you live there?
11     A. Nineteen years, give or take.
12     Q. Are you currently employed?
13     A. Yes.
14     Q. Where are you employed?
15     A. I'm sorry.
16     Q. Where are you employed?
17     A. I work for a company called
18 Fairfield Resorts. The address is known as
19 Bentley Brook, 1 Corey Road, Hancock,
20 Massachusetts. I don't know the zip.
21     Q. What do you do at Fairfield
22 Resorts?
23     A. I'm a time-share salesperson.
24     Q. When did you start working there?

Case 3:04-cv-30091-MAP    Document 58-3    Filed 06/20/2005    Page 15 of 16

Deposition of: Peter Corbin            Volume I                May 24, 2005
              Wise, Et al. vs. Patriot Resorts Corp.

Page 10

```
1      A.  December of last year.
2      Q.  So December 2004?
3      A.  Yes, I'm sorry, 2004.
4      Q.  And how did you come to obtain
5   that position?
6      A.  Heard about it, applied for it
7   and got it.
8      Q.  How did you hear about it?
9      A.  Through a friend.
10     Q.  What friend?
11     A.  Larry Colt.
12     Q.  Where did you know him from?
13     A.  Previous employment.
14     Q.  Where?
15     A.  Vacation Village, Lanesborough,
16  Massachusetts.
17     Q.  How did you apply for that job?
18     A.  Made a phone call, went for an
19  interview, talked to the woman in charge,
20  and that was it.
21     Q.  Whom did you call?
22     A.  Pardon me.
23     Q.  Whom did you call when you say
24  you made a phone call?
```

Page 11

```
1      A.  I called a woman named Denney
2   Kent.
3      Q.  What was her position?
4      A.  She was a manager.
5      Q.  Do you know what kind of manager?
6      A.  Pardon.
7      Q.  Do you know what kind of manager?
8   Was she a sales manager?
9      A.  Sales manager.
10     Q.  And with whom did you interview?
11     A.  Her and -- probably just her.
12     Q.  How many times did you interview
13  with her?
14     A.  Once.
15     Q.  What did you talk about in your
16  interview?
17     A.  Time-share life, the past, the
18  future. I don't know.
19     Q.  How long after you interviewed
20  were you hired?
21     A.  Oh, ten days, approximately.
22     Q.  And when you said you spoke to
23  the woman in charge, that was Denney Kent?
24     A.  Yes, in charge of my division.
```

Page 12

```
1   She wasn't in charge of the corporation.
2      Q.  What was your division?
3      A.  Sales. It's known as front-line
4   sales, if that helps.
5      Q.  So what are your job duties as
6   Fairfield Resorts?
7      A.  I simply sell time-share. The
8   scenario is such that you go there in the
9   morning, you sign in, you take a tour, you
10  meet and greet the people, you show them
11  what you have, and hopefully you can sell
12  them a time-share.
13     Q.  When you say you take a tour --
14     A.  That's what it's known as, when
15  you meet a person who is a potential
16  customer.
17     Q.  And where do these potential
18  customers come from?
19     A.  All over New England.
20     Q.  How do they become potential
21  customers?
22     A.  Through marketing. We market to
23  people. We invite people up to the resort.
24     Q.  What sort of marketing did you
```

Page 13

```
1   do?
2      A.  Do I do?
3      Q.  Does the company do?
4      A.  Cold calls, letters, referrals
5   and invitations, which would cover it all.
6      Q.  Do you do any marketing
7   personally?
8      A.  No.
9      Q.  So what happens when you take
10  your tour at Fairfield?
11     A.  What happens?
12     Q.  What's the process?
13     A.  It all depends. The process is,
14  as I said, you meet with the individual or
15  individuals, introduce yourself, welcome
16  them to the resort, take them upstairs, put
17  them at ease, get them some refreshments, if
18  they wish, talk to them about their
19  vacation, how they vacation, if they
20  vacation, talk to them about life.
21         Basically, you have a
22  conversation about them and their vacation
23  attitudes, and you show them your program
24  and various other things, like other travel
```

Deposition of: Peter Corbin    Volume I    May 24, 2005
Wise, Et al. vs. Patriot Resorts Corp.

Page 14

1  opportunities, which are part of the
2  program, then you would get up from your
3  table after half an hour, forty-five
4  minutes, give or take, walk them around the
5  resort, show them the amenities, show them
6  the condominium that they would be using,
7  put them through an eight-minute movie about
8  Fairfield and about what we do and who we
9  are. Bring them back into the sales office,
10 show them a program that you feel would
11 match their vacation lifestyle and hopefully
12 sell it to them, which doesn't happen all
13 the time.
14     Q. So do the tours take place at the
15 same place where you meet and greet the
16 potential customers?
17     A. In the building, yeah, on the
18 property.
19     Q. How are you compensated at
20 Fairfield Resorts?
21     A. Through commission upon a sale
22 and through what's known as a draw upon no
23 sale.
24     Q. What does that mean?

Page 15

1      A. I.e., we get a minimum wage or we
2  get -- if we don't make a, sale we get $275
3  a week. We're paid every second week. If
4  we make a sale within that time frame and we
5  received a pay, they take it back out. It's
6  known as a draw in the business, but to
7  answer your question, basically commission
8  sales.
9      Q. Who's your supervisor at
10 Fairfield Resorts?
11     A. My supervisor is a man named Lee
12 Landers.
13     Q. Do you get any benefits there?
14     A. Such as insurance, et cetera?
15     Q. Yes.
16     A. Yes.
17     Q. What do you get for benefits?
18     A. I couldn't tell you. We get a
19 very good insurance plan. I just didn't
20 sign up for it yet.
21     Q. So you're not currently receiving
22 it?
23     A. No.
24     Q. Do you expect to be soon?

Page 16

1      A. If I sign up for it, yeah.
2      Q. Are you planning on signing up
3  for it?
4      A. Yeah.
5      Q. Is there a reason why you haven't
6  yet?
7      A. Well, you have times of the year
8  in which you have to sign up by. I started
9  in December. I missed my first opportunity.
10 I won't get another one until, I believe,
11 August, possibly July, because it falls in
12 segments of the year, if you will, so next
13 time it comes around I probably will sign up
14 for it, yes.
15     Q. Why did you miss your first
16 opportunity?
17     A. I didn't pay attention. I missed
18 the time frame.
19     Q. Are you currently earning income
20 from any other source?
21     A. A little bit.
22     Q. From what?
23     A. I buy and sell antiques.
24     Q. What kind of antiques?

Page 17

1      A. That's a big question.
2  Furniture, prints, glass, China, silver, the
3  whole gamut, pretty much.
4      Q. When did you start doing that?
5      A. Thirty years ago.
6      Q. Where do you buy and sell your
7  antiques?
8      A. Mostly in New York State, but all
9  over.
10     Q. How did you get started doing
11 that?
12     A. Grew up with antiques. My family
13 is from Europe, so I was surrounded by
14 antiques all my life.
15     Q. Where in Europe is your family
16 from?
17     A. England.
18     Q. Have you worked anywhere else
19 besides Fairfield Resorts since Patriot
20 Resorts?
21     A. Since Patriot Resorts, no.
22     Q. When were you first employed at
23 Patriot Resorts?
24     A. December of '01, I think.

5 (Pages 14 to 17)

COURT REPORTING SERVICES
(413) 786-7233  FAX: 786-0299