UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO.  04-cv-30091-MAP

|  |  |  |
|---|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated, | : : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR AUTHORIZATION TO SEND NOTICE AND FOR CLASS CERTIFICATION |
| PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU,  J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT, | : : : : : | |
| Defendants. | : : | |

## I.     INTRODUCTION

The plaintiffs, Lacrisha Wise, Michael Massaconi, Roger Martin and Peter Corbin, commenced this class action and "collective action" lawsuit against the defendants for violations of the state and federal wage laws, in addition to other individual claims of retaliation and race discrimination.  The plaintiffs have brought their wage claims on behalf of themselves and others similarly situated, and, at this point in the litigation, they seek acknowledgement, and an order from this court, that they are similarly situated with former and current  sales representatives and managers of the defendants.

The plaintiffs move this court to obtain two separate orders concerning their status as "similarly situated" to active and former sales personnel of the defendants at Vacation Village in the Berkshires. First, under the plaintiffs' federal claims of failure to pay minimum wage and overtime payments, the plaintiffs request that the court authorize them to send notice of the pending suit to former and active sales representatives and managers of the defendants.[1] This notice will allow active sales personnel to "opt in" to this collective action by consenting to join the suit under 29 U.S.C. § 216 (b).[2] The authorization to send notice will allow this case to conditionally proceed as a "collective action" under the reasoning of *Kane v. Gage Merchandising Services, Inc.*, 138 F. Supp. 2d 212 (D. Mass. 2001).

Second, under their plaintiffs' state law claims of failure to pay minimum wage and overtime payments, the plaintiffs seek to have this court certify a class of sales representatives and managers, between 2001 and the present, who were not paid minimum wage or overtime payments.[3]

## II.    STATEMENT OF FACTS

### A.    STRUCTURE OF COMPENSATION PAID TO SALESPEOPLE

The plaintiffs all worked for defendant Patriot Resorts Corporation ("Patriot") between 2001 and 2004. *See*, Affidavits of LaCrisha Wise, Peter Corbin, Michael Massaconi and Roger Martin (hereinafter "Affidavit of named plaintiffs"). Patriot was and is a seller of time share interests ("time shares") in what they refer to as "resort

---

[1] To date, the defendants have taken the position that the plaintiffs' counsel may initiate contacts with active employees through the defendants' counsel. Affidavit of Joel Feldman, Exhibit 1, Defendants Answers to Plaintiffs' First Set of Interrogatories, Answer 4.

[2] Approximately fifty other active and ex-employees of the defendants have independently "opted in" to this case by submitting "consents to join" the case, thus far.

[3] The plaintiffs do not move for class certification of any sort on their individual claims, denominated as such in their Second Amended Complaint

recreational properties."   Affidavit of Joel Feldman, Exhibit 1, Defendants Answers to

Plaintiffs' First Set of Interrogatories, Answer 7.  One of Patriot's holdings is a property

known as Vacation Village in the Berkshires.   *Id*., Answer 6.  The plaintiffs were all

employed by Patriot to sell time shares at Vacation Village.  *Id.*, at Answer 3 and at

Exhibit A to Defendants Answers to Plaintiffs' First Set of Interrogatories.   Ms. Wise,

Mr. Martin and Mr. Corbin were sales people; Mr. Massaconi was a sales person and

sales manager.  Affidavits of named plaintiffs.

        During the course of their employment, the plaintiffs were all subject to the same

policies concerning the payment of wages.  After a multi-week introductory period where

the defendants paid some salary to sales personnel, sales representatives and managers

were paid commissions on sales made, and were paid no hourly or weekly wages other

than commissions.  See, e.g., Affidavit of Peter Corbin, Exhibit 1; Affidavit of Roger

Martin, Exhibit 1; Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca

Foster Campagna, pp. 39, 183.  As of June 1, 2005, many months after the filing of this

lawsuit, the defendants changed their policy and began paying a salary of $400 per week

and a six percent commission to sales representatives and sales manager.  Affidavit of

Joel Feldman, Exhibit 3, Deposition transcript of Rod Lewis, p. 96.

                        B.      UNTIMELY PAYMENT OF WAGES

        In general, the commissions paid by Patriot were considered earned by the sales

person upon the "Closing" of a sale.[4] An exception to this rule was that commissions on

financed sales were **not** earned "until the purchaser…made three (3) timely and

consecutive monthly payments in accordance with the terms of the purchase money note

---

[4] A cash sale was "closed" when the full purchase price was paid, the funds had been cleared and statutory
rescission periods had expired, among other conditions.  A financed sale was "closed" when the deposit
was paid, funds cleared, statutory rescission periods expired, and interest began accruing.

and mortgage." See, e.g., Affidavit of Peter Corbin, Exhibit 2; Affidavit of Michael

Massaconi, Exhibit 2.  In other words, a sales representative was not actually paid a

commission on a "closed" financed sale *if the purchaser did not make three consecutive*

*and timely payments*.  If a purchaser made two timely and consecutive payments, but was

late on the third payment, the commission would not yet be paid by the defendants.  In a

circumstance where *untimely* payments were consistently made, although the defendants

would receive all of the money owed by the customer, the sales person would not be paid

commissions.  Affidavit of Joel Feldman, Exhibit 4, Deposition transcript of William

Rauer, pp.  29-30. Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca

Foster Campagna, pp.80-84.

As a result of this policy, the four named plaintiffs, and many other employees,

were not paid some commissions on "closed" sales for months, or even years after the

closing.  Affidavits of named plaintiffs; *see also*, Affidavit of Joel Feldman, Exhibit 2,

Deposition transcript of Rebecca Foster Campagna, pp. 80-86.  *See also*,  Affidavit of

Joel Feldman, Exhibit 5, sample payment of commissions for named plaintiffs.  For

example, named plaintiff Roger Martin made a sale to a purchaser for $10,900, yielding a

commission of $872.00.  *Id.*, payment of commission of Roger Martin. The contract was

signed on August 20, 2002 (the "contract date" in the Exhibit), but the commission was

only "earned", according to the Exhibit, on February 21, 2003, six months after the sale.

*Id.*  The payment of commissions months after the closing of a deal was not limited to the

named plaintiffs, but occurred regularly to other sales personnel.  See, e.g., Affidavit of

Joel Feldman, Exhibit 6, sample payment of commissions for Mary Birch, Edward

Abbott, Jr. Gary Campagna and Robert Campagna, employees of the defendants.

On occasion, where the customer did make timely consecutive payments three times in a row, the defendants would "advance" a commission to an employee. This "advance" was then subject to "charge-back", or garnishment, from a future commission earned by the sales representative or manager. Affidavit of Joel Feldman, Exhibit 4, Deposition transcript of William Rauer, pp. 30-31. A charge-back could occur months after a sale had been made if a purchaser was or became consistently late in his/her payments on a time-share. Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna, pp. 80-86. Under defendants' policy, if a customer stopped making payments at any time or cancelled a contract, the sales person could be "charged back" a commission through a deduction from the sales person's pay check. Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna, p 86. For example, on October 18, 2004, plaintiff Martin was "charged-back" a commission on a deal he had closed on November 24, 2001. Affidavit of Joel Feldman, Exhibit 7, charge back records of named plaintiffs.

C.    WORK HOURS AND RULES OF THE WORK SITE

Initially, when Vacation Village in the Berkshires opened, sales representatives were required to appear for work at 9:00 a.m. at the Vacation Village work site, 20 Williamstown Road, Lanesboro, Massachusetts. Affidavit of Joel Feldman, Exhibit 3, Deposition transcript of Rod Lewis, p. 14. Towards the end of that year, sales representatives were required to report for work at 8:30 a.m., and sales managers were made to appear at 8:20 p.m. at the work site. *Id.*, Deposition transcript of Rod Lewis, p. 45. Sales representatives were required to remain on-site during the day when waiting for a tour, and were not supposed to leave the work site. Affidavit of Joel Feldman,

5

Exhibit 4, Deposition transcript of William Rauer, pp. 19-21.  Anyone who left the work

site without permission, except to conduct tours, would be subject to discipline.  *Id*.

Management communicated this policy of the defendants to the sales staff.  *Id*.,

Deposition transcript of William Rauer, at p. 24.  Employees were released from work

only when the line was "cut" by Patriot's Welcome Center, after a determination each

day of whether tours were still coming in to the Center that afternoon/evening.  *Id.*,

Deposition transcript of William Rauer,  p. 18.

During the day, sales personnel would give tours to prospective time share

purchasers, and attempt to "close" sales of time shares to those whom they gave tours.

Affidavit of Joel Feldman, Exhibit 1, Defendants Answers to Plaintiffs' First Set of

Interrogatories, Answer 6.  In order to determine which sales personnel took customers

out on tour first, all sales employees were put on a rotation list that was ordered from

number one to a number usually in the twenties or thirties.  Personnel who had made a

sale the day before were placed at the top of the tour rotation and would be the first to

give a tour.  Those with lower "tour to sales" ratios,[5] and those who had not made recent

sales, were placed lower on the list. Affidavit of Joel Feldman, Exhibit 4, Deposition

transcript of William Rauer,  pp. 55-56.  Affidavit of Joel Feldman, Exhibit 3, Deposition

transcript of Rod Lewis,  p. 26.

At the bottom of the rotation list were those who were on "overage", as the

company called it. Affidavit of Joel Feldman, Exhibit 4, Deposition transcript of William

Rauer,  p. 54.  Patriot Resorts placed sales employees on "overage" as a disciplinary

measure for a variety of violations of work site rules, such as if the employees were late

---

[5] The sales ratios of Patriot were determined by dividing the number of tours per week by the number of sales made.  For example, if a sales person took nine tours and made one sale out of the nine tours, the sales person had a ratio of nine (9/1).

to work, or if they left work without permission for any errand. *Id.*, Deposition transcript of William Rauer, pp. 18-21.

Once on overage, the employee would be the last sales representative to be called for a tour that day. *Id.*, Deposition transcript of William Rauer, p. 55. Because the employee was on the bottom of the tour list, that employee would often take fewer customers on tour than other employees higher on the list. Despite this fact, Patriot Resorts still required the employee to remain all day in the employee's lounge, known as "the pit", without leaving any earlier than any other employee. *Id.*, Deposition transcript of William Rauer, p. 58; Affidavit of Joel Feldman, Exhibit 3, Deposition transcript of Rod Lewis, p. 30. If the employee did leave early, the employee would again be subject to "overage", according to company policy.

D.     TIME RECORDS, MINIMUM WAGE PAYMENTS AND OVERTIME

The defendants kept no regular time records at all for sales employees of Patriot at the Vacation Village in the Berkshires work site. Affidavit of Joel Feldman, Exhibit 8, Defendant's Response to Request for Admissions, Responses 4, 8, 9, 22. Employees did sign in at the time of their arrival, before 8:30 a.m.. Affidavit of Joel Feldman, Exhibit 3, Deposition transcript of Rod Lewis, p. 14.[6] They signed out of the work site only when they gave a tour of the Vacation Village site to a prospective purchaser, and their return time was recorded, at times. Affidavit of Joel Feldman, Exhibit 4, Deposition transcript of William Rauer, p. 45. Other than the records of 8:30 a.m. arrival and the "sign-outs" for individual tours, the defendants have no way of proving the hours worked by any

---

[6] An employee who came to the work site after the required time of 8:30 a.m. would be considered late and would be on "overage" for that day. Affidavit of Joel Feldman, Exhibit 3, Deposition transcript of Rod Lewis, p. 72.

sales employee.    Affidavit of Joel Feldman, Exhibit 8, Defendant's Response to Request

for Admissions, Responses 4, 8, 9, 22.

Despite their failure to keep time records, the defendants provided each employee

with a payment record showing that that employee had worked forty hours during a

typical work week.  Although the defendants noted that sales staff worked forty hour

weeks, the named plaintiffs were at times paid less than $5.25 per hour for the forty

hours, and during other weeks, the named plaintiffs were paid less than $6.75 per hour.

As an example, for the week ending October 13, 2003, Peter Corbin was paid $50.00

although he is noted as working forty hours.  Affidavit of Joel Feldman, Exhibit 9,

payment records for named plaintiffs.  Similarly, the week of February 3, 2003, Ms. Wise

was paid $50.00 for a forty hour work week; the week of December 2, 2002, Michael

Massaconi was paid $50.00 for a forty hour work week and Roger Martin was paid

$50.00 for a forty hour work week for the week of November 4, 2002.  *Id.*

The defendants do not and cannot deny that they failed to pay minimum wages to

the named plaintiffs or other employees of the company.  Affidavit of Joel Feldman,

Exhibit 8, Defendant's Response to Request for Admissions, Responses 4, 5.   One of the

directors of the sales staff ("line director"), Gordon Leete, received constant complaints

that employees were not being paid minimum wage. Affidavit of Joel Feldman, Exhibit

10, Deposition transcript of Gordon Leete,  pp. 11-20.  In response, Bill Rauer, the

project director for Vacation Village, told Mr. Leete that the company had been paying

employees this way for a while and "that's the way it is". *Id.*  Beyond the named

plaintiffs,   additional sales employees were routinely paid $50.00 for a week's worth of

work, despite  payroll stubs showing that the employees worked forty hours.  *See,*

*e.g.*,Affidavit of Joel Feldman, Exhibit 11, payment records for Seth Alden, Stephen Alibozek, Raymond Barnes, Joel Hecht and Melissa McGovern.  On at least one occasion, an employee, Jayne Engleheart was paid $25.00 one week for a forty hour work week.  *Id.*  The failure to pay minimum wage was company policy, as noted above by Mr. Leete, since sales personnel were paid commission only and no salary.   All sales employees were subject to the "no minimum wage"  policy when they failed to make a sale during a particular week.

The named plaintiffs also worked more than forty hours a week at times.   On at least one occasion, each signed in after returning from tours after 4:30 p.m., a time when eight hours of work would have passed, given the 8:30 a.m. start time for sales representatives.[7] Affidavit of Joel Feldman, Exhibit 12, tour time sheets of named plaintiffs.[8]  Mr. Massaconi's sign in sheets show "sign-ins" beyond 7:30 p.m. on occasion; Mr. Corbin worked past 6:00 p.m. on more than one occasion.  Each of the named plaintiffs worked in excess of forty hours a week, during certain weeks.  See, Affidavits of named plaintiffs.  The defendants failed to keep time records and cannot refute that the named plaintiffs, or other employees, worked more than forty hours a week.  However, no sales employee was paid any overtime or premium payments for their work over forty hours per week.  *Id*.

The defendants readily admit that they "did not pay time share salespersons and sales managers' overtime compensation during the time period referenced." Affidavit of Joel Feldman, Exhibit 4, Defendant's Response to Request for Admissions, Responses 9.

---

[7] Sales personnel were given no lunch break.  Affidavit of Joel Feldman, Exhibit 3, Deposition transcript of Rod Lewis,  p. 85.

[8]Exhibit 12 is a collection of sign-in sheets showing that a named plaintiff appeared timely for work, along with a corresponding tour sign-in/sign out sheet that day showing that the employee worked beyond eight hours.

One of the "line directors" (supervisor of sales people and sales managers) of the defendants also admits that approximately 65 percent of sales persons and sales managers worked more than forty hours per week at some point.  Affidavit of Joel Feldman, Exhibit 10, Deposition transcript of Gordon Leete,  pp  69-72.

None of the named plaintiffs was ever paid over time wages or premium pay, nor was any other employee paid such wages, despite having worked over forty hours in a week.  *Id.*    This was the policy of the defendants.  The named plaintiffs, and other employees, were not paid minimum wage, because they were paid only commissions by the defendants, as admitted by the defendants, and were not paid minimum wage when commission sales were lower than what they would have received had the minimum wage been paid.   Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna,  p. 181-184.  And the named plaintiffs, and other employees at times did not receive timely payments for "closed sales" because the defendants would either not pay a commission until a customer made timely payments, or would "charge-back" commissions on closed sales if a customer simply failed to make payments, even if this occurred months after the closing. Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna,  p. 86.   These facts should lead to a finding that the plaintiffs are similarly situated to the other employees of Vacation Village, because of the common policies described above.

### III.    PROPOSED CLASS DEFINITIIONS

The named plaintiffs seek "collective action" status on their federal minimum wage and overtime claims, as well as their state untimely payment claim.  On their state

claims, that they were not paid minimum wage or overtime payments, they seek class certification under Federal Rule of Civil Procedure 23.

For purposes of the Rule 23 state-wide classes the plaintiffs wish to certify, the defendants engaged in the following class-wide practices:

1.    The defendants would not pay sales representatives or sales managers the state minimum wage for a forty hour work week where the sales persons did not earn commissions over the state minimum wage for a forty hour work week; and

2.    The defendants would not pay sales representatives or sales supervisors any overtime pay for time worked beyond forty hours per week;

These admitted policies, which were policies governing all sales personnel at Vacation Village in the Berkshires, are the basis for certifying two separate classes of sales personnel, under the state law claims mentioned:

(i) A class of all Vacation Village in the Berkshires sales representatives and sales supervisors, from July, 2001 to the present, who were paid commission only, and, at least once, were paid less than the state of Massachusetts' minimum wage;

(ii) A class of all Vacation Village in the Berkshires sales representatives and sales supervisors, from July, 2001 to the present, who were paid commission only, and, at least once, were not paid overtime compensation at rates not less than one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a work week.

These two classes, all brought pursuant to the state minimum wage and overtime claims of the plaintiffs, should be certified because they meet the requirements of

F.R.C.P. 23.  Additionally, this court should find that the plaintiffs are similarly situated to other sales personnel at Vacation Village in the Berkshires under the plaintiffs' federal claims and under the plaintiffs' state claims for untimely wages.

**IV.   THE PLAINTIFFS ARE SIMILARLY SITUATED TO POTENTIAL CLASS MEMBERS AND NOTICE SHOULD BE AUTHORIZED TO APPRISE CLASS MEMBERS OF THEIR OPPORTUNITY TO JOIN THE PLAINTIFFS' FEDERAL CLAIMS**

The plaintiffs raise two federal claims in the class action sections of their complaint, that they were not paid the federal minimum wage and that they were not paid premium pay for working over forty hours in a week.

Under the Fair Labor Standards Act, an action may be maintained against an employer by one or more employees "on behalf of himself…and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing…." to the court in which the action is filed. 29 U.S.C. § 216(b).   Potential additional plaintiffs must "opt-in" to the case, as any employee who wishes to join the collective action must affirmatively provide the court with notice giving his consent to join the case.  *Kane v. Gage Merchandising Services, Inc.*, 138 F. Supp. 2d.  212 (D. Mass. 2001).

The plaintiffs request that this Court provide a conditional certification of a representative class at this stage of the proceedings.   Under the rule enunciated in *Kane* and in *Reeves v. Alliant Techsystems, Inc.*, 77 F. Supp. 2d 242 (D.R.I. 1999), a court considering a collective action under the Fair Labor Standards Act should use a two-step approach.   First, the court should determine whether to authorize the plaintiffs to notify

other similarly situated individuals of the action.[9]  *Reeves*, 77 F. Supp. at 246; *Kane*, 138

F. Supp. 2d at 214.  To do this, the court determines, based upon the facts then discovered

in the case, whether the plaintiff has made "substantial allegations that the putative class

members were subject to a single decision, policy or plan that violated the law".  *Kane*,

138 F. Supp. at 214 *quoting Mooney v. Aramco Services Co*., 54 F. 3d. 1207, 1214 n. 8.

    After this determination, the parties complete discovery, and at the end of the

discovery period, the defendants may file a motion for decertification.  *Reeves*, 77 F.

Supp. 2d. at 247.  The court may then conclude that, in fact, the plaintiffs are not

similarly situated to putative class members, and "decertify" the class.   Should the court

deny the defendants' motion, the case will go to trial as a collective or "class action".

*Kane*,  138 F. Supp. at 214.

    This court should employ the two-step process of *Kane*, rather than employing the

full machinery of F.R.C.P. 23, to determine whether the named plaintiffs are "similarly

situated" to the putative class.  The FLSA specifically notes that employees must only be

"similarly situated" to class members, language missing from statutes which courts have

viewed as requiring a Rule 23 analysis.  Additionally, each plaintiff must provide

individual consent to join the case, a requirement that is nowhere found in the class action

procedural rules.

    Courts examining this structure, have variously found that Rule 23's requirements

are much more complicated than the single "similarly situated" requirement of 29 U.S.C.

---

[9] The plaintiffs have received communications from Patriot employees who wished to join this lawsuit, and many have done so, as evidenced by the consents to join filed by the plaintiffs in this case.  However, the plaintiff has not attempted to initiate communications with the employees as a whole because Patriot noted in its responses to Interrogatories that active employees could only be reached through Patriot's counsel. See, Affidavit of Joel Feldman, Exhibit 1, Defendants Answers to Plaintiffs' First Set of Interrogatories, Answer 4.

§ 216(b), *Grayson v. Kmart Corp*. 79 f. 3d 1086, 1106 (11th Cir. 1996), or flatly

irreconcilable with that statute, *Schmidt v. Fuller Brush Co*., 527 F. 2d 532, 536 (8th Cir.

1975).    Given that plaintiffs under 29 U.S.C. § 216(b) are not permitted to bring a "class

action", and must instead bring a collective action and obtain consents to join, they need

not meet the various requirements of Rule 23.  *Church v. Consolidated Freightways, Inc*.

137 F.R.D. 294, 306 (N.D. Cal. 1991).[10]

      Based upon this reasoning, and the reasoning of the courts in *Kane* and *Reeves*,

the plaintiffs request that this court use the "two-step analysis" and find that the four

plaintiffs are similarly situated to the putative class members and allow notice to be sent

to all employees of the defendants from July, 2001 until the present.   Under this analysis,

the plaintiffs must show that the class members were the "victim of a single decision,

policy or plan…"  *Sperling v. Hoffman-La Roche, Inc*., 118 F.R. D. 392, 399 (D.N.J.

1988).  Put another way, the plaintiffs must make only a "modest factual showing

sufficient to demonstrate that [plaintiffs] and potential plaintiffs together were the victims

of a common policy or plan that violate the law".  *Hoffman v. Sbarro, Inc*., 982 F. Supp.

249, 261 (S.D.N.Y. 1997).

    A.    THE COURT SHOULD AUTHORIZE NOTICE TO EMPLOYEES OF
              PATRIOT FOR FAILURE TO PAY MINIMUM WAGE

      The plaintiffs assert in their complaint, and assert through the facts in their

affidavits, that they were paid solely by commission and were never paid weekly wages.

See, Affidavits of named plaintiffs.  See also, Affidavit of Joel Feldman, Exhibit 2,

Deposition transcript of Rebecca Foster Campagna,  p. 181-184.  They have also

asserted, and provided this court with documentation, that they worked weeks in which

---

[10] As a practical matter, the plaintiffs will have proven the requirements of Rule 23 by bringing their state
claims, almost exactly similar to the federal claims, as a class action.

they received far less than the minimum wage for that week, along with other employees. See, e.g., Affidavit of Joel Feldman, Exhibit 9, payment records for named plaintiffs; Affidavit of Joel Feldman, Exhibit 11, payment records for Seth Alden, Stephen Alibozek, Raymond Barnes, Joel Hecht and Melissa McGover. Each plaintiff, and each other employee listed in the above Exhibit, received only $50.00 during at least one week while they worked for the defendants, rather than the $210 they should have received had they been paid the federal minimum wage.

The defendants admit that they paid commission only to the plaintiffs, and thereby did not pay the minimum wage.. Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna,  p. 181-184.  Affidavit of Joel Feldman, Exhibit 10, Deposition transcript of Gordon Letter, pp. 11-20 .  The payment records noted above show that sales personnel were repeatedly paid less than minimum wage.  These facts show that, as a matter of company policy, the defendants did not pay the minimum wage to sales personnel when their commissions added up to less than minimum wage for a particular week.  See, Affidavit of Joel Feldman, Exhibit 10, Deposition transcript of Gordon Leete, p. 18.

    B.    THE COURT SHOULD AUTHORIZE NOTICE TO EMPLOYEES OF
          PATRIOT FOR FAILURE TO PAY OVERTIME

The court should also authorize notice to employees of Patriot because of Patriot's failure to pay overtime.  The defendants admitted in their responses to the plaintiffs' Request for Admissions that they have never paid overtime compensation to a single sales representative.  Affidavit of Joel Feldman, Exhibit 8, Defendant's Response to Request for Admissions, Responses 9.  This is the "common policy" which was applied

to all sales personnel.  Regardless of hours worked, sales personnel were always paid regular commissions and never paid overtime compensation.

The named plaintiffs were subject to this policy, as they worked more than forty hours during some weeks but did not get paid for their overtime work.  Affidavits of named plaintiffs.   All employees were also subject to the "no overtime" policy, yet many worked more than forty hours in a week.  According to an ex-supervisor ("line director") of sales personnel of the defendants, 65% of the total number of sales persons and managers worked more than forty hours in a week.  Affidavit of Joel Feldman, Exhibit 10, Deposition transcript of Gordon Leete,  pp  69-72.    Mr. Leete testified that a majority of sales persons and managers worked over time and he estimated that any individual sales person might work over time two weeks out of the month.  *Id.*, Exhibit 10, Deposition transcript of Gordon Leete,  p.  70.   All employees were required to appear at 8:30 a.m. on a daily basis, and as Mr. Leete noted, if you had a customer on tour after employees were let go ("the line was cut"), there were times a sales person could return at "seven, eight, nine o'clock at night".  *Id.*, Exhibit 10, Deposition transcript of Gordon Leete,  p.  71.

While the employees noted above claim that they worked over forty hours in a week and were paid no overtime, the defendants have no time records to refute these claims.  The overall policy of the defendants, regardless of actual time worked by a sales representative, was not to pay overtime.  Affidavit of Joel Feldman, Exhibit 8, Defendant's Response to Request for Admissions, Responses 9. All employees of Patriot were subject to the "no overtime" rule, but worked more than forty hours in a week, and

as a result, the court should authorize the sending of the accompanying notice to all employees, based upon this "single policy".

## V.    THE COURT SHOULD ACKNOWLEDGE THE COLLECTIVE ACTION STATUS OF THE PLAINTIFFS' STATE CLAIM OF UNTIMELY PAYMENTS

State law provides, like the federal minimum wage and overtime statutes, that a plaintiff who brings a claim for untimely wage payments may do so, "on his own behalf, or for himself and others similarly situated."  M.G.L. c. 149 § 150.

As noted above, the language used in this statute is not the language of "class certification" under F.R.C.P. 23.  Instead, the Massachusetts legislature chose to allow individuals to prosecute wage claims for others who are simply "similarly situated", without regard to the exactitude required by Rule 23.  As a result, this court should view the timely payment claim of the plaintiffs under state law with the same lens used for the plaintiffs' claims under federal law.

Under that lens, at this stage of the proceedings, the plaintiffs need only show that they were subject to a "common plan or policy" of the defendants.  The defendants' policy when paying commission to its sales staff was that a commission was paid when a closing occurred, all rescission periods had passed and an additional twenty-one days had passed.  The plaintiffs allege that the defendants would not pay the commission, even when all other conditions were met, if (1) a customer failed to make three timely consecutive payments, or (2) a customer stopped paying on a loan months after the purchase, or even more egregiously, (3) a "charge-back" was imposed upon a sales person or manager because of the non-payment of the customer.  See, Affidavit of Joel

Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna,  p 86.  These
commissions, allege the plaintiffs, were untimely paid.

All employees were subject to the "untimely payment" policy.  Each named
plaintiff had at least one payment withheld for many months after a sale was closed.  The
named plaintiffs all had payments "charged-back", i.e., future wages garnished, when a
customer did not make timely, consecutive payments.  Employees subject to the payment
policy, other than the named plaintiffs, received payments months after a closing had
occurred.  See, e.g., Affidavit of Joel Feldman, Exhibit 6, sample payment of
commissions for Mary Birch, Edward Abbott, Jr. Gary Campagna and Robert Campagna,
employees of the defendants.

These facts derive from a common policy of the defendants:  no sales personnel
were paid already-earned commissions when a customer did not make consecutive timely
payments.  Affidavit of Joel Feldman, Exhibit 4, Deposition transcript of William Rauer,
pp.  29-31.  *See also*, Affidavits of named plaintiffs, Exhibit 2.   Mr. Rauer, project
director of the Lanesboro work site, stated in his deposition testimony that the sales force
would not be paid when late payments were made by customers.  Affidavit of Joel
Feldman, Exhibit 4, Deposition transcript of William Rauer, pp.  29-31.  Rebecca Foster
Campagna, the President of the Berkley Group which owns Patriot, also admitted that in
the absence of timely payments, even up to a year after closing, a sales person would not
be paid commissions, or would have the commissions taken back as a "charge back."
Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna,
pp.  79-81.

For purposes of this motion, this court should allow, and order that, this case move forward as a collective action on behalf of all employees who were not paid compensation due and owing to them in a timely manner.  See, e.g., *Kane and Reeves*,. supra.  Regardless of whether the policy was unlawful (an issue to be dealt with at the summary judgment or trial stage), the policy applied to all sales personnel was the same, a single policy prohibiting payments of commissions when timely payments by a customer were not made.  The facts show that a single policy existed this case should be permitted to proceed as a collective action.

VI.    **THE COURT SHOULD CERTIFY THE PLAINTIFFS' CLAIMS UNDER STATE LAW FOR FAILURE TO PAY OVERTIME AND FAILURE TO PAY MINIMUM WAGE**

In determining whether the plaintiffs' wage claims under state law should be certified as a class action, the merits of the case are not to be examined and the substantive allegations of a complaint are to be taken as true. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974); *Burstein v. Applied Extrusion Technologies, Inc.,* 153 F.R.D. 488, 489 (D. Mass 1994) ("where the issue is class certification, the Court may not intrude into the merits of a case"). Class certification requires an inquiry into whether the requirements of Rule 23 are met rather than whether the plaintiffs have stated a cause of action or will prevail on the merits. *Eisen,* at 178. District courts have broad discretion when determining whether to certify a class. *Priest v. Zayre Corp.,* 118 F.R.D. 552, 553 (D. Mass. 1998).

A.    THE CLASS MEETS ALL REQUIREMENTS OF RULE 23(A)

The court should certify the two classes noted above in this case, as the claims meet the four prerequisites of Rule 23(a) necessary to class certification: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a).

1.    *Numerosity*

Rule 23(a)(1) requires that "the class [be] so numerous the joinder of all members is impracticable." The standard of impracticability does not mean "impossibility" but only difficulty or inconvenience of joining all members of the class. *Gorsey v. I.M. Simon & Co.,* 121 F.R.D. 135, 138 (D. Mass. 1998). The issue is not the numerical size of the class, but, as explicitly stated in Rule 23(a)(1), that joinder is impracticable. *Hansberry v. Lee,* 311 U.S. 32, 41 (1941). The exact number of class members need to be predetermined to satisfy the numerosity requirement, rather, an undisputed estimate of the class size may be used for the numerosity inquiry. *Priest,* at 554.

Here, the classes consist of approximately 183 sales representatives and managers of Patriot, who worked for the company between 2001 and June 1, 2005.[11]  During the time relevant to this action, all 183 employees were subject to the overtime and minimum wage violations noted above.  No employee was ever paid overtime or premium payments, despite working over forty hours per week, as noted above.  No employee was paid minimum wage in the absence of a sale during a particular week, as shown by the numerous $50 payments made during various weeks in the Affidavits provided to this court.

---

[11] This number is the total number of active and former sales representatives and managers provided to the plaintiffs as Exhibit A to the responses of the defendants to the plaintiff's Interrogatories.  Affidavit of Joel Feldman, Exhibit 1, Defendants Answers to Plaintiffs' First Set of Interrogatories, Exhibit A.

Up to almost 200 employees were subject to these policies, and it is likely that over 100 were actually impacted by the policies, as noted by the percentage cited by Gordon Leete.  See, Affidavit of Joel Feldman, Exhibit 10, Deposition transcript of Gordon Leete,  pp  69-72.  A number over 100 is substantial enough to make joinder of all such employees impractical.  *See. e.g.*, *See Arkansas Educ. Ass'n*, 446 F.2d at 765-766 (approving class of twenty members); *accord Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1030 (6th Cir. 1977) (approving seven member class); *Afro American Patrolmen's League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974) (holding that class with thirty-five members sufficient); *Jack v. American Linen Supply Co*., 498 F.2d 122, 124 (5th Cir. 1974); *Bublitz*, 202 F.R.D. at 256 (holding that class of seventeen was sufficient to meet numerosity requirement); *Gaspar v. Linvatec Corp*., 167 F.R.D. 51,56 (N.D. Ill. 1996) (holding that proposed class of eighteen satisfied the numerosity requirement); *Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990) (noting that "[t]his Court may certify a class even if it is composed of as few as 14 members."); *see also Paxton*, 688 F.2d at 561 (the Eighth Circuit Court of Appeals cited with approval the decision in *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967), certifying class of eighteen members); *Bruce v. Christian*, 113 F.R.D. 554, 557 (S.D.N.Y. 1986) (numerosity found even though plaintiffs could identify only 16 class members in action brought by present and future tenants of housing authority where numerous individuals would be affected in the future); *Dale Elecs., Inc. v. R.C.L. Elecs.*, Inc., 53 F.R.D. 531 (D.N.H. 1971) (certifying class with thirteen members).

Based upon numbers of potential class members, and the impracticality of joining all of the class members at this point, the numerosity requirement is met.

2.      *Commonality*

Rule 23(a)(2) imposes a commonality requirement that the action contains questions of law or fact that are common to the class. Fed. R. Civ. P. 23(a)(2).  To satisfy the commonality requirement, the claims need not be identical, but only "common, and not in conflict." *Guckenberger,* 957 F. Supp. at 325. The commonality requirement is a "low hurdle" easily surmounted. *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 185 (N. D. Ill. 1992). Standardized, pattern practices satisfy the commonality test. *In re First Commodity Corp. of Boston Customer Accounts Litig.,* 119 F.R.D. 301, 309-10 (D. Mass. 1987).

The questions of law in this litigation are identical among the class members, namely, whether the defendants' failure to ever pay overtime, and to pay only commissions even where commissions would not equal minimum wage payments, were lawful policies.  More specifically, the common questions are: (1) whether the defendants could refuse to pay overtime compensation when a sales person or sales manager worked more than forty hours per week; and  (2) whether the defendants were permitted to pay employees less than the $6.75 per hour mandated by state law when a sales person's commissions were less than this figure for any given week.

These claims are based on the same factual and legal theories because the defendants openly admit never paying any sales person overtime payments, and have openly admitted paying commissions.  In essence, it was the policy of the defendants not to pay overtime and not to pay the minimum wage when employees made less than this amount in commissions.  As a result, the named plaintiffs' claims, and those of the class which they wish to represent are common.

3.      *Typicality*

The third prerequisite to class certification is that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class…". Fed. R. Civ. P. 23(a)(3).  To be typical within the meaning of the rule simply requires that the claims of the named plaintiffs arise from the same type of conduct which give rise to the class members' claims. *Adair v. Sorenson,* 134 F.R.D. 13, 17 (D. Mass. 1991), *quoting Tolan v. Computervision Corp.,* 696 F. Supp. 771, 777 (D. Mass. 1998). To satisfy the typicality requirement, "plaintiffs need not show substantial identity between their claims and those of absent class members, but need only show that their claims arise from the same course of conduct that gave rise to the claims of absent members." *Randle v. Spectran,* 129 F.R.D. 386, 391 (D. Mass. 1988) *quoting*, *Priest,* at 555.  In *M. Berenson Co., Inc. v. Faneuil Hall Marketplace,,* the Massachusetts District Court adopted the definition of the typicality requirement outlined in a New York District Court opinion:

> Typicality refers to the nature of the claim of the class representatives, and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other member of the class have the same or similar injury, whether the action is based on conduct, not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*M. Berenson Co., Inc. v. Faneuil Hall Marketplace,* 100 F.R.D. 468, 470 (D. Mass. 1984).

The claims of the name plaintiffs and the class arise from the same course of conduct and the same legal theories.  The named plaintiffs and all other employees were subject to the same failures to pay overtime and minimum wage, a blanket policy always

followed by the defendants. The legal theories on which the named plaintiffs base their claims go beyond being merely typical to those of the class members, they are identical; that the defendants' conduct violated the state wage and hours laws.

###### 4.    Adequacy Of Representation

The final requirement under Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This element is generally characterized as an inquiry into whether the attorneys, together with the named plaintiffs, will act diligently on behalf of the class. *Amchem,* 117 S. Ct. at 2251, n. 20. Such diligence involves two factors: (1) the plaintiffs' attorneys must be qualified, experienced, and generally able to conduct the proposed litigation; and (2) the plaintiff must not have interests antagonistic to those of the class. *Berenson,* at 470.

The named plaintiffs are willing to and capable of serving as class representatives. To date, all have been readily available for depositions and have kept abreast of developments in the case. The named plaintiffs sought counsel to redress the wrongs they challenge and have retained counsel experienced in class action litigation. *See*, Adequacy Affidavit of Joel Feldman and Affidavit of Suzanne Garrow.

The second relevant consideration under Rule 23(a)(4) is whether the interests of the named plaintiffs are coincident with the general interests of the class. In this case, the named plaintiffs, and all of the class members have failed to receive the overtime and minimum wage payments due them. Given the significant similarity of claims between the named plaintiffs and the class members, there is no potential for conflicting interests and there are no competing or inconsistent claims.

B.     THE CLASS MEETS ALL REQUIREMENTS OF RULE 23(B)(3)

In addition to meeting the Rule 23(a) requirements, courts will maintain a class action if it also satisfies the requirements of one of the subsections of Rule 23(b). *Adair,* at 17. Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3) is intended to be a less stringent requirement than Rule 23(b)(1) or (b)(2)." *Smilow v. Southwestern Bell Mobile Systems, Inc.,* 323 F.3d. 32, 41 (1st Cir. 2003). Certification of this class under Rule 23(b)(3) is appropriate.

*1.     Predominance*

To meet the predominance standard, common questions need not be the only questions that exist in the action, rather, the common questions must merely predominate over any individual questions. *Id.* at 39.  Courts have routinely found predominance of common questions where the claims relate to a common course of conduct. *Waste Mgt. Holdings, Inc. v. Mowbray,* 208 F.2d 288, 296 (1st Cir. 2000) (predominance requirement satisfied by "sufficient constellation of common issues [that] bind class members together" and "cannot be reduced to a mechanical, single-issue test"); *Tardiff v. Knox Co.,* 2004 WL 758407, *4 (1st Cir. 2004) (predominance requirement met where plaintiffs alleged common unlawful policies and conduct by defendants).

Cases dealing with the legality of standardized practices are generally appropriate for resolution by means of a class action because the pattern of conduct is the focal point of the analysis. *Halverson v. Convenient Food Mart, Inc.,* 69 F.R.D. 331 (N.D. Ill. 1974);

*Kleiner v. First Nat'l Bank of Atlanta,* 97 F.R.D. 683 (N.D. Ga. 1983). This is true even if the nature and amount of damages differ among the members of the class. *Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669 (N.D. Ill. 1989).

The common questions at issue in this case predominate over any individual ones. As described above, the factual allegations do not significantly vary between class members. All claims turn on the legality of the failure of the defendants to pay minimum wage and the failure of the defendants ever to pay overtime wages .

> 2.    *Superiority*

A class action is the superior method of resolving large scale claims if it will "achieve economies of time, effort and expense, and promote …uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Duhaime v. John Hancock Mutual Life Insurance Company,* 177 F.R.D. 54, 65 (D. Mass. 1997). Rule 23(b)(3) lists four factors a court must analyze in determining whether a class action is superior to individual litigation: (1) whether individuals have a strong interest in controlling potentially separate actions; (2) the class action's potential effect on competing litigation involving members of the class; (3) whether resolution of the case in a single forum is desirable; and (4) the potential difficulties that management of a class action presents. *Berenson,* at 471.

In this case the aggregate claims of the class are primarily comprised of limited actual damages which make it uneconomic for individuals to pursue these claims on their own. Violations of the minimum wage and overtime laws may yield hundreds, or perhaps into the low thousands, of dollars in this case.  It is thus unlikely that individual

employees would invest the time and expense necessary to seek relief through litigation. *See*, *Randle,* at 393.

Concentrating the class claims in this single forum also enhances the superiority of the class action device and resolves the issue of potentially competing actions. Furthermore, because the named plaintiffs believe that the defendants' wage policies and practices have resulted in the failure to pay many employees appropriate wages, classwide adjudication of the merits for all the class members' claims will provide a uniform rules and a speedy determination of the legality of this challenged conduct for all affected individuals. Classwide adjudication will save valuable time, effort, and resources for the parties and the court, and is therefore greatly superior to other available methods for the fair and efficient adjudication of the controversy. For these reasons, a class action is not simply superior, but the only realistic means of equitably resolving this controversy.

## VII.    <u>CONCLUSION</u>

The plaintiffs request that this court undertake the following actions.  First, the plaintiffs ask that, pursuant to the plaintiffs' federal class action claims, notice to active and ex-sales employees of the defendants be authorized to apprise class members of their opportunity to join this action.  Second, the plaintiffs ask that, pursuant to the plaintiffs' state claim for untimely wages, this court authorize the claim to proceed as a collective action.  Finally, the plaintiffs request that this court certify the classes requested in the order accompanying this Motion, pursuant to the plaintiffs' overtime and minimum wage claims under state law.

THE PLAINTIFFS
By their attorneys,

I hereby certify that a
true copy of the above
was served upon the
defendants by electronic
mail on

   \_/s/ Joel Feldman_____
Joel Feldman
BBO # 552963
Suzanne Garrow
BBO# 636548
Heisler, Feldman & McCormick,P.C.
1145 Main Street, Suite 508
\_\_September 22, 2005    Springfield MA  01103
(413)788-7988
  \_\_/s/Joel Feldman\_\_\_\_\_    (413)788-7996 (fax)

Dated: September 22, 2005