UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL
MASSACONI, ROGER MARTIN and
PETER CORBIN, on behalf of
themselves and on behalf of others
who are similarly situated,

    Plaintiffs,

v.

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO, III
REBECCA A FOSTER, and JAMES E.
LAMBERT,

    Defendants.

## AFFIDAVIT OF LACRISHA WISE

1. My name is Lacrisha Wise and I am one of the plaintiffs in this case.

2. From February 8, 2002 through June, 6, 2005, I worked for the named defendants in this case (the named defendants collectively will be referred to as "Patriot Resorts Corporation").

3. While I worked for Patriot Resorts Corporation, I was employed as a sales person, selling time shares at the resort known as Vacation Village in the Berkshires ("Vacation Village").

4. During my employment at Vacation Village, I was paid at a rate of 8% commissions. I was paid some weekly wages for my first few weeks and I was also paid an additional bonus. After that introductory period of wages and bonus pay, I was paid

8% commission on my "closed sales", and I was paid no weekly wages other than those commissions. See Exhibit 1.

5. While I worked at Vacation Village, I was generally required to appear at the Vacation Village work site in Lanesboro, Massachusetts at 8:30 a.m.

6. Patriot Resorts required all salespeople to sign an attendance list when we arrived in the morning, which I did when I first arrived at the work site.

7. Each day after signing in, Patriot Resorts required sales personnel to attend a morning meeting, which I did as well.

8. At the end of the morning meeting, I was required by the company to remain on the premises at the work site, unless I was on a tour, or unless I was given permission to take a short break off the work site, such as getting gas for my car.

9. When I went on a tour with a prospective customer, I was required by Patriot Resorts' general policy to sign a document giving the time I left the Lanesboro work site to begin my tour.

10. A tour was supposed to take at least one and a half hours, although sales persons were strongly encouraged to take longer than one and a half hours; the longer a sales person took to conduct a tour, the better, according to the management of Patriot Resorts.

11. During my tenure at Vacation Village, there were days when I left work after 4:30 p.m., more than eight hours after I had arrived at work, because I had not finished giving a prospective customer a tour.

12. Patriot Resorts told all salespersons to remain on the work site (other than for tours or for short errands with permission), without a scheduled lunch break, until the

2

sales force was allowed to leave the work site by a supervisor, a process called "cutting the line".

13.  During the entire time I was employed at Vacation Village, there were weeks when I worked over forty hours, because I returned to the work site with a prospective customer after 4:30 p.m. on at least one day, and I worked a full eight hours a day the other four days of the week.

14.  Although I worked over forty hours a week for the weeks in which I had tours return after 4:30 p.m., and although I worked over forty hours during other weeks, I was never paid any premium pay or "overtime" pay despite Patriot Resorts' knowledge of my work hours.

15.  During my employment with Vacation Village, there were weeks when I received less than $5.25 per hour for the hours worked during that week, and there were weeks I received less than $6.75 per hour, although I worked at least forty hours those weeks. See, Exhibit 2.

16.  During my employment with Vacation Village, I some times had no tours to take out on a day, and other times I took one to three tours with prospective customers.

17.  Ordinarily, during my employment with Vacation Village, I took out one or two prospective customers a day on a tour.

18.  According to my contract with Vacation Village, I was to be paid within 21 days of the "closing" of a purchase of a time share by one of my customers.

19.  A "closing" occurred in the case of financed sales, when a customer had made her/his deposit, the cancellation periods had passed, and the company began to have access to the customer's funds and interest.

20. Patriot Resorts had an exception to payment of commissions within 21 days of the closing of a time share a purchase by a customer—a commission for a salesperson was not considered "earned" until the customer had made three consecutive and timely payments after the closing.

21. This meant that a sales person would not be paid their commission when, for example, a customer made two timely payments, but missed the third, and continued making payments in this pattern (two timely payments, one untimely) for many months.

22. On some of my sales, I did not receive a commission from Patriot Resorts until many months after I had closed the sale of a time share with a customer, rather than the twenty-one (21) day delay I expected under the Patriot Resort policy.

23. Patriot Resorts has garnished my commissions during my employment, through a process they called a "charge-back".

24. A charge-back occurs when Patriot Resorts pays a commission after a deal is closed, but then, because supposedly a customer does not make all of their payments in a timely way in the future, Patriot takes back the commission.

25. During my employment with Patriot Resorts, I was "charged back" some times even though I had closed a deal with a purchaser of a time-share and twenty-one (21) days had passed, and I had not been notified of a customer payment problem.

26. When I was "charged back" I did not receive the "charged back" funds until a customer had made three regular timely payments, regardless of whether I had closed the purchase months or years before, which meant that I waited for months or even years to receive commissions on sales "closed" months or years before.

4

27. Patriot Resorts' policy allowed a "charge-back", or withholding of commissions, even where all payments had been made by a customer, if not all payments were "timely".

28. During a typical eight hour day when I was employed at Patriot Resorts, on many days I would spend the majority of my time in the sales person's lounge (called "the pit" by employees) rather than out providing tours, as I was required to remain on the premises at all times unless on tour or unless given permission for a short break, such as getting gas for my car.

29. There was a rotation sheet kept at the sales persons' work site, which provided the rotation order for sales persons to "tour" customers who arrived on the site.

30. The sales person who had made the most recent sale was placed first on the rotation sheet.

31. The next sales persons in line to go out on tours were those with the best "sales to tour ratios".

32. At the bottom of the rotation list, in general, were those sales persons who appeared after 8:30 a.m. on a work day, or who left the work site for some reason without permission.

33. Being placed at the bottom of the rotation sheet was known as "overage".

34. When a sales person was placed on overage, that sales person often would not lead a tour for an entire day, but was still required to remain at the Lanesboro work site.

35. Because of the corporate policies I have described above, I did not receive payments at or above the federal or state minimum wage for some work weeks, I did not receive premium pay or overtime payments for some work weeks in which I worked over forty hours, and I did not receive timely commission payments for months or years after I had "closed" a purchase of a time share with my customer.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS DAY

DATE: 9/19/05

LACRISHA WISE

1



# Vacation Village
## IN THE BERKSHIRES

Date: Feb. 8, 2002

To: LaCrisha D. Wise, Experienced Sales Representative

From: Bruce Polansky, Senior Vice-President, Sales
Subject: Vacation Village-Berkshires Commission Structure
Effective: 2-8-02

Your pay schedule at Vacation Village-Berkshires is as follows:

1.) Base pay = 6% commission for the first 5 weeks.
2.) $300.00 Salary for the first 5 weeks.
    Plus bonus

After 5 weeks:
   1.) Base pay = 8% commission
       Plus bonus.

Please see attached bonus plan for monthly bonus qualifications.

_LaCrisha D. Wise_    2-8-02
Signature             Date

_LaCrisha D. Wise_
Please Print Name

APPROVED: _____    W Raur
          (Signature)        (Print Name)

20 Williamstown Road • Lanesboro, Massachusetts 01237
Telephone: (413) 236-5885

2

0003092

# EMPLOYMENT AGREEMENT - SALES REPRESENTATIVE

AGREEMENT made this 8 day of February, 2002, by and between PATRIOT RESORTS CORPORATION, a Florida corporation, its successors, subsidiaries and assigns (hereinafter referred to as "the Company") and Jackson D. Work, residing at 20 Gladstone St., Spfld, MA 01107 (hereinafter referred to as "Employee").

## WITNESSETH:

WHEREAS, The Company is engaged in the business of developing, marketing and selling resort recreational properties, including time share interests therein; and may in the future become engaged in other businesses; and

WHEREAS, Employee is desirous of providing sales and marketing services to the Company as an employee upon the terms and conditions hereinafter set forth; and

WHEREAS, in performing [his/her] duties under this Agreement, Employee will be privy to certain confidential and/or proprietary information about the Company and it's business, projects, customers, sales, and marketing and promotion of it's products; and

WHEREAS, the parties hereto agree that, under the circumstances, certain protections restricting the unauthorized disclosure of confidential information, competition, and solicitation are necessary to protect the legitimate business interests of the Company.

NOW, THEREFORE, in consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Employment and Duties:**

   The Company hereby employs Employee and Employee hereby accepts employment upon the terms and conditions hereinafter set forth. (As used throughout this Agreement, "the Company" shall mean and include any and all of its present and future subsidiaries.) Employee warrants that Employee is free to enter into and fully perform this Agreement and is not subject to any employment, confidentiality, non-competition or other agreement that would restrict Employee's performance under this Agreement.

- 1 -

Employee shall devote Employee's full time to the performance of services as a sales representative or to such other services as may from time to time be designated by the Company. During the term of this Agreement, Employee's services shall be completely exclusive to the Company and Employee shall devote Employee's entire time, attention and energies to the business of the Company and the duties to which the Company shall assign him from time to time. Employee agrees to perform Employee's services well and faithfully and to the best of Employee's ability and to carry out the policies and directives of the Company. Employee agrees to take no action prejudicial to the interests of the Company during Employee's employment hereunder.

The Employee shall conduct [himself/herself] in a businesslike, professional and reputable manner and in full compliance with all applicable laws, rules, and regulations.

The Employee shall have no authority to bind the Company by any promise or representation, unless specifically authorized in a particular transaction.

The Employee shall maintain a valid Massachusetts drivers license.

The Employee may from time to time be required to use [his/her] personal automobile in connection with [his/her] employment without reimbursement from the Company for automobile transportation expense including automobile insurance. The Employee shall at all times maintain a policy or policies of automobile insurance with minimum limits of liability in the amount of $250,000.00 per person and $500,000.00 per accident for bodily injuries caused by Employee, or by an uninsured and/or underinsured motorist. The Employee shall provide, at the commencement of employment, and upon the renewal of said policy or policies, appropriate certificates of insurance evidencing said insurance. If said policy or policies are for any reason cancelled, amended or revoked, Employee shall immediately notify the Company.

The Employee has received a copy of and at all times shall comply with the Company's Employee Manual.

2. Compensation:

A. Definitions: For purposes of this Agreement, the following defined terms shall have the following meanings:

(i) Time Share Interest - An interest in a project that allows a purchaser to use a unit and the other facilities of a project for a predetermined time period each year.

(ii) Net Sales Price - Net Sales Price shall be the consideration paid or

to be paid for the purchase of any Time Share Interest, as set forth in the applicable purchase agreement, less any financing charges, fees, discounts, travel allowances, rebates, and the value of any other form of financial inducement given to a purchaser.

 (iii) Cash Sale – A sale in which the full amount of the purchase price, as specified in the purchase agreement, is paid in cash.

 (iv) Financed Sale – A sale in which the full amount of the deposit, as specified in the purchase agreement, is paid in cash and the balance of the purchase price is financed.

 (v) Closing - The Closing on a purchase of any Time Share Interest shall be deemed to have occurred:

  (a) In the case of a Cash Sale, when the Company has been provided with all documentation required by it to effectuate the transaction in proper form, the full amount of the purchase price has been paid to the Company, all funds have cleared and all statutory rescission periods have expired without cancellation, and the Company, under applicable law, has the unrestricted use of purchaser's funds.

  (b) In the case of a Financed Sale, when the Company has been provided with all documentation required by it to effectuate the transaction in proper form, the full amount of the deposit has been paid to the Company, all funds have cleared, and all statutory rescission periods have expired without cancellation, and the Company, under applicable law, has the unrestricted use of the purchaser's funds and interest on the transaction has started to accrue to the Company.

 (vi) Earned Commissions - A commission will be deemed earned upon the Closing of a sale, except that commissions on Financed Sales shall not be deemed earned until the purchaser has made three (3) timely and consecutive monthly payments in accordance with the terms of the purchase money note and mortgage.

B. <u>Commission Schedule</u>: The Company shall pay to Employee Earned Commissions based upon a percentage, as stated in the Company's Commission Schedule attached hereto as Exhibit A, of the Net Sales Price of Time Share Interests

- 3 -

sold by Employee. The Company reserves the right, in its sole discretion, to modify and amend the Commission Schedule upon advance notice to Employee.

C. <u>Date Commissions Payable</u>: Earned Commissions shall be due and payable by the Company within twenty-one (21) days of the date earned, except that the Company will advance to Employee, within twenty-one (21) days of the Closing and subject to charge-back pursuant to Section 2.E. hereof, anticipated commissions on Financed Sales.

D. <u>Rejection of Purchasers</u>: The Company shall have the right, without liability or recourse, to reject any potential purchasers, in its sole discretion.

E. <u>Commission Charge-Back</u>: It is acknowledged between the Company and Employee that the Company is, or may be from time to time, required to guaranty to it's lenders and/or investors that purchase money notes and mortgages executed in connection with Financed Sales are valid and free of default for three timely (3) monthly payments from the date the first payments are due (purchase money notes and mortgages that are not valid and free of default as stated aforesaid are hereinafter referred to as "Non-Performing Notes and Mortgages"). Any commissions paid or advanced to Employee for Financed Sales involving Non-Performing Notes and Mortgages are subject to charge-back hereunder. The Employee shall reimburse to the Company out of any future commissions that may become due and owing to Employee the full amount of commissions paid or advanced to Employee by reason of said Financed Sales. Said reimbursement shall be made immediately after the Company receives notice that a purchase money note and mortgage is a Non-Performing Note and Mortgage and the Employee does hereby authorize the Company to offset the appropriate amount from the next available commission due Employee.

3.  <u>Termination</u>:

Either party may terminate this Agreement at any time and for any reason, or for no reason at all, upon twenty-four (24) hours notice. Upon termination for any reason, Employee shall immediately return and/or transfer to the Company all property described in Sections 4 and 5 hereof. Commissions on Closings that occur subsequent to either party's receipt of notice of termination of this Agreement, and commissions on Financed Sales for which Closings occurred prior to notice of termination but for which commissions have not yet been earned, shall be deemed earned, in addition to the requirements of Section 2.A(v) and (vi), only upon the return of all property described in Sections 4 and 5 hereof, and provided there has been no breach, or threatened breach, by the Employee of Sections 5 through 7 hereof. Commissions on said Closings shall not be advanced as provided in Section 2.C. above and same shall be due and payable only when earned as provided in Section 2.A(vi) hereof.

4.  **All Business to Be the Property of the Company:**

    Employee agrees that any and all presently existing business of the Company and any business developed by Employee including without limitation all contracts, fees, commissions, compensation, books, records, manuals, documents, accounts, customer or client lists, customer worksheets, agreements, works of authorship (including computer program files, databases and other electronically stored information wherever stored and by whomsoever produced), and any other incident of any business developed, earned, created or carried on by Employee for the Company is and shall be the exclusive property of the Company, and (where applicable) shall be payable directly to the Company.

5.  **Confidentiality:**

    Except in performance of services for the Company, Employee shall hold in the strictest of confidence and shall not, either during the period of Employee's employment with the Company or thereafter, use for Employee's own benefit or disclose to or use for the benefit of any person or entity, any Confidential Information of the Company, whether Employee has such information in Employee's memory or embodied in writing or other tangible form. For purposes of this Agreement, "Confidential Information" shall include, without limitation: any of the materials listed in Section 4 hereof; any Company proprietary information, technical data, trade secrets or know how including, without limitation, market research information; planned products or projects; any plans, specifications, designs, drawings and engineering information related to existing or planned projects or products; services; customer lists, customer worksheets and customers (including customers of the Company with whom Employee became acquainted during the course of [his/her] employment); lenders, suppliers and vendors; markets; software and hardware configuration and other technology used by the Company; internal processes and procedures; financing techniques, information and strategies; sales and marketing techniques, information and strategies; costs; pricing; and finances or other business information disclosed to Employee by the Company either directly or indirectly in writing, orally or otherwise. Confidential Information shall not include any of the foregoing items that have become publicly known or made generally available through no fault of Employee. All originals and copies of any of the foregoing, however and whenever and by whomsoever produced, shall be the sole property of the Company, not to be removed from the premises or custody of the Company without in each instance first obtaining authorization of the Company, which authorization may be revoked by the Company at any time. Upon the termination of Employee's employment in any manner or for any reason, Employee shall promptly surrender to the Company all copies and originals of any of the foregoing, together with any documents, materials, data, information, keys and equipment belonging to the

Company or relating to the Company's business and in Employee's possession, custody or control, and Employee shall not thereafter retain or deliver to any other person any of the foregoing or any copy, duplicate, summary or memorandum thereof.

6. Non-Competition Covenants:

(THIS SECTION MAY AFFECT YOUR RIGHT TO ACCEPT EMPLOYMENT WITH OTHER COMPANIES SUBSEQUENT TO YOUR EMPLOYMENT WITH THE COMPANY)

Employee acknowledges that the Company's Confidential Information, and in particular the Company's list of clients and customers, is a valuable and unique business asset and that substantial Company resources have been expended to develop, protect and preserve same. Employee also acknowledges that, in the course of [his/her] employment, [he/she] will be privy to the Company's Confidential Information and will receive valuable training and experience in the marketing, promotion and direct sales of Time Share Interests that, if used in competition with the Company, could adversely affect the legitimate business interests of the Company.

Employee agrees that some restrictions on [his/her] activities during and after [his/her] employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company. Upon termination of employment, Employee is free to seek and accept new engagements or employment wherever Employee wishes, provided that:

A. During the term of employment and for a period of two (2) years after termination of such employment, Employee agrees not to engage or become interested in, directly or indirectly, as employee, owner, consultant, officer, director or partner, through stock ownership, investment of capital, lending of money or property, rendering of services or otherwise, either alone or in association with others in a competing or otherwise similar business to that conducted by the Company at any time during the term hereof within a two hundred (200) mile radius of any project in which the Company is involved.

B. During the term of employment and for a period of two (2) years after termination of such employment, Employee agrees not to engage or become interested in, directly or indirectly, as employee, owner, consultant, officer, director or partner, through stock ownership, investment of capital, lending of money or property, rendering of services or otherwise, either alone or in association with others, in any entity or business which sells or offers services or products, within a two hundred (200) mile radius of any project in which the Company is involved, competitive with or similar to those offered by the Company at any time during the term of this Agreement.

6

C. If Employee violates any of the covenants or agreements under this Section 6, The Company shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration, or other benefits that Employee directly or indirectly has realized and/or may realize as a result of, growing out of, or in connection with, any such violation. These remedies shall be in addition to, and not in limitation of, any other rights or remedies to which the Company is or may be entitled.

D. It being hereby intended that the restrictions in this Agreement shall be liberally construed in order to protect to the maximum degree the legitimate business interests of the Company, in the event a court of competent jurisdiction shall determine that the restrictions set forth in this Agreement are unreasonable or invalid either as to length of time or geographical area or for any reason, then the parties agree that what shall constitute a reasonable geographical area or reasonable time shall be determined by that court of competent jurisdiction and enforced accordingly.

E. Employee acknowledges that [he/she] has carefully read all the terms herein stated and agrees that the same are necessary for the reasonable and proper protection of the Company, and that the Company has been induced to enter into this Agreement upon the representation of Employee that [he/she] will abide by and be bound by the aforesaid non-competition covenants and restraints and that said covenants and restraints are reasonable with respect to such matters, as length of time, and geographical area described.

7.     <u>Non-Solicitation Agreement:</u>

Employee agrees and covenants that Employee will not, unless acting with the Company's express written consent, directly or indirectly, during the term of this Agreement or for a period of two (2) years thereafter, solicit, entice away or interfere with the Company's contractual relationships with any employee, officer, agent, customer, or client of the Company.

8.     <u>Equitable Relief:</u>

Employee acknowledges that any breach of Sections 3 through 7 of this Agreement may give rise to irreparable injury to the Company, which may not be adequately compensated by damages. Moreover, Employee acknowledges that to the extent that any breach of this Agreement may give rise to injury to the Company, which may be adequately compensated by damages, such damages may be difficult or impossible to calculate. Accordingly, in the event of a breach or threatened breach of any of Sections 3 through 7 of this Agreement, the Company shall be entitled in any proceedings, in addition to any remedies it may have at law, to an injunction or other

equitable relief to enforce the specific promises hereof and to restrain any further violations. The Company and Employee further agree that the order or injunction of any Court arising out of such proceedings shall, if applicable, extend the time during which Employee will not thereafter compete with the Company by the amount of time that the Employee had so engaged in competition with the Company in violation of the provisions of this Agreement. If in such proceedings Employee is found to have breached any of the terms hereof, Employee shall be liable to pay all of the Company's costs, expenses and reasonable attorney's fees incurred in connection with such proceedings and any appeals therefrom.

9.   Indemnity: Employee agrees to indemnify and save harmless the Company for any loss or damage, including the reasonable fees of an attorney, which the Company may suffer by reason of any false, fraudulent or misleading statements or omissions of material facts, or violations of State or Federal law made by Employee:

    A. Employee acknowledges that sales of Time Share Interests in the Commonwealth of Massachusetts are governed by the Massachusetts Real Estate Time-Share Act, Massachusetts General Laws Chapter 183B, Section 1,et seq, as same may be amended from time to time, as well as other laws and regulations.

    B. Employee acknowledges that Time Share Interests at Company projects are being sold in reliance upon exemption from registration under the Securities Laws of Massachusetts and under the Securities Act of 1933. This exemption is available because the Time Share Interests being sold are not structured as a security. Any statement by the Employee to the effect that the purchase of the timeshare interest is an "investment", "can be rented on behalf of the purchaser", or "can be repurchased from the purchaser" could result in the requirement that Time Share Interests be registered. In such event, the Employee will have engaged in a serious violation of federal law, and could be subjected to penalties or fines of $10,000.00 and imprisonment for five years for each offense in addition to civil penalties. Employee shall engage in no act in contravention of the foregoing laws.

    C. Employee acknowledges that Financed Sales of Time Share Interests are governed by certain banking laws and regulations promulgated by the Comptroller of Currency, Federal Reserve Board, FDIC and other agencies. Employee agrees that [he or she] will effect sales according to the representations set out in official project documents, will make no misrepresentations, directly or by omission, and will not change the terms and conditions of any sale orally or in writing.

    D. Employee acknowledges that Financed Sales of Time Share Interests are governed by the Federal Truth in Lending Simplification and Reform Act and rules adopted for its

implementation by the Federal Reserve Board under Regulation Z. Employee agrees to follow, and in no respect deviate from, the required disclosure information furnished by The Company.

E. Employee acknowledges that the project is exempt from registration under the Federal Interstate Land Sales Act. No representations other than those contained in the Time Share Instrument and/or Project Instrument filed pursuant to the Massachusetts Real Estate Time-Share Act shall be made by Employee to any purchaser. The promise to any purchaser of future amenities and services not set out in the Time Share Instrument and/or Project Instrument may constitute a violation of law and subject Employee and/or the Company to civil and or criminal penalties.

F. Employee acknowledges that under the various consumer protection acts, rules and regulations administered by the Federal Trade Commission (FTC) as well as under "Little FTC Acts" administered by other Federal administrative agencies, and under the Massachusetts Consumer Protection Act administered by the Attorney General of the Commonwealth of Massachusetts, consumers are protected from unfair, deceptive, fraudulent and/or "smart" business practices. Proscribed practices include false and misleading sales presentations, concealment of material facts, false advertising, oppressive or threatening sales techniques, and misrepresentation of rescission rights.

10.  Entire Agreement:

This agreement supersedes any and all other agreements, either oral or written, between the parties hereto with respect to the association between the Company and Employee and contains all of the covenants and agreements between the parties with respect to such association in any manner whatsoever. This Agreement may not be modified except in writing, such modification to be signed by all parties hereto.

11.  Law Governing:

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

12.  Indulgences:

In the event the Company shall fail to insist on the strict performance of any of the covenants herein contained and to be performed by the Employee, such failure shall not be construed as a waiver or relinquishment of the Company's right to enforce, at any time thereafter any such provision or condition and such right shall continue in full force and effect.

13. <u>Construction</u>:

The parties agree that any term, provision, covenant or condition of this Agreement that may be susceptible of two constructions, one of which would render it valid and the other of which would render it invalid or unenforceable, shall be construed in such manner as to render it valid and the invalidity or illegality of any clause or provision herein shall not affect the validity of the remainder of this Agreement which shall remain in full force and effect.

IN WITNESS WHEREOF the parties hereto have signed or caused to be signed, these presents, the day and year first above written.

Signed, Sealed and Delivered in the presence of:

EMPLOYEE

_[signature: LaTrisha D. Wise]_

Signed, Sealed and Delivered in the presence of:

PATRIOT RESORTS CORPORATION

By: _[signature]_