# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated,<br><br>　　　　　Plaintiffs,<br>v.<br><br>PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT,<br>　　　　　Defendants. | DOCKET NO. 04-CV-30091-MAP |

## AFFIDAVIT OF FAITH LIPPERT

I, Faith Lippert, being duly sworn, state as follows:

1. I am over 18 years old and believe in the obligation of an oath. I have personal knowledge of the facts set forth in this affidavit.

2. At all times relevant to the current litigation I have been the Human Resource Manager at Patriot Resorts Corp. I currently remain in that position.

3. Patriot owns and sells timeshare interests at Vacation Village in the Berkshires which is located in Hancock, Massachusetts ("Vacation Village").

4. The four named Plaintiffs are former Timeshare Salespeople who were headquartered out of Patriot's Lanesboro, Massachusetts offices.

5. In addition to having been a Timeshare Salesperson, Mr. Massaconi also held the position of Sales Manager during his employment with Patriot.

6. The Plaintiffs' dates of employment are as follows: Roger Martin, Salesperson from August 6, 2001 to May 13, 2003, and again, from

November 7, 2003 to September 21, 2004; Michael Massaconi, Salesperson from August 6, 2001 to July 19, 2002; Sales Manager from July 20, 2002 to October 29, 2004, and Salesperson again from October 30, 2004 to March 5, 2005; Peter Corbin November 24, 2001 – May 10, 2004; and Lacrisha Wise –February 8, 2002 – June 7, 2003.

7. If a customer who went on a tour with a timeshare Salesperson decides to purchase a timeshare week, the customer then works with a "Verification Officer," whose job duties include, *inter alia*, notarizing documents, explaining the purchase, helping owners with any questions, working with the owner should the owner fall behind in making (deposit) payments, closing contracts, and general customer service duties.

8. If a customer elects not to purchase after going on tour, the customer then goes to the Exit Department, where a Salesperson in that department, *inter alia*, would attempt to sell the customer a timeshare with less usage rights, and which, in turn, would be less costly. The Exit Department Salespersons' job duties were completely different than those of the Timeshare Salespeople who toured the locale and condominium with the potential customer, which they did not do.

9. If the timeshare Salesperson received a Preauthorized Checking ("PAC") check from a purchaser, for a financed deal, the three payment provision found in the Salespersons' contracts did not apply.

10. Salespersons selling timeshare weeks, including the Plaintiffs, earned substantial incomes in great excess of minimum wage. As examples, Plaintiff Martin grossed $48,012.53 in 2002; Plaintiff Corbin grossed $40,234.42 in 2003; and Plaintiff Massaconi grossed $60,890 in 2003.

11. Michael Castonguay worked as a Salesperson only in Patriot's Exit Department. Mr. Castonguay's daily activities were completely different than those of the representative Plaintiffs.

12. Others who worked in the Exit Department during part of their employment with Patriot, have filed Consents to Join and, thus have attempted to opt in, include Samuel A. Barnes, Knud Breckmann, Owen Broch, Ronald J. Ferreira, Kenneth L. Graf (who also was a Verification Officer), William A. Steele, Jr., Phillip Symonds, and Beth Torra.

13. Verification Officers include Bonne Ecklund, Bonnie Keough, Melissa McGruern, and Kathy Redmond.

14. Additionally, Samniang Geller, spent time employed with Patriot as an Administrative Assistant.

Signed under the pains and penalties of perjury this 24 day of October, 2005.

_Faith Lippert_

Sworn and Subscribed to before me this 24th day of October, 2005.

_Amanda Lee Hawkins_
Notary Public
My Commission Expires: 6-18-10



"Notary Public"
Amanda Lee Hawkins
Commonwealth of Massachusetts
My Commission Expires on June 18, 2010

# EXHIBIT
# 2

```
                                    Vol. I, 136 Pgs.

           UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

                         DOCKET NO. 04-CV-30091-MAP


--------------------------------------
LACRISHA WISE, MICHAEL MASSACONI,     )
ROGER MARTIN and PETER CORBIN, on     )
behalf of themselves and on behalf    )
of others who are similarly situated. )
              Plaintiffs              )
vs.                                   )
                                      )
PATRIOT RESORTS CORP., THE BERKLEY    )
GROUP, INC., MARC J. LANDAU, J.P.     )
OTTINO, III, REBECCA A. FOSTER, and   )
JAMES E. LAMBERT                      )
              Defendants              )
--------------------------------------


       DEPOSITION OF MICHAEL V. MASSACONI

              Friday, May 20, 2005

                    1:30 p.m.

        SKOLER, ABBOTT & PRESSER, P.C.

              One Monarch Place

        Springfield, Massachusetts 01144

   - - - Denise D. Harper-Forde, RPR, LCR - - -

             COURT REPORTING SERVICES

                 P.O. Box 15272

        Springfield, Massachusetts 01115

        (413) 786-7233  FAX (413) 786-0299
```

```
 1   APPEARANCES:

 2   HEISLER, FELDMAN & MCCORMICK, P,C.
          Joel Feldman, Esquire
 3        1145 Main Street
          Suite 508
 4        Springfield, Massachusetts   01103
          (413) 788-7988
 5        on behalf of Plaintiff

 6   SKOLER, ABBOTT & PRESSER, P.C.
          Marylou Fabbo, Esquire
 7        One Monarch Place
          Suite 2000
 8        Springfield, Massachusetts   01144
          (413) 737-4753
 9        on behalf of Defendants

10   ALSO PRESENT:   Faith Lippert

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1   Brook?
2       A.      Commissions.
3       Q.      100 percent commission?
4       A.      Yes.
5       Q.      And you were selling time shares
6   as well; is that correct?
7       A.      Yes.
8       Q.      And what was the time span
9   between when you would sell a time share, and
10  you would receive payment for that time share?
11      A.      From the time I sold it until the
12  time did I receive --
13      Q.      -- the commission?
14      A.      Commission?  At which place,
15  Bentley Brook?
16      Q.      At Bentley Brook?
17      A.      Two weeks to three weeks.
18      Q.      Okay.  What was your pay
19  structure when you began at Patriot Resorts?
20      A.      $300 a week, plus 10 percent.
21      Q.      10 percent commission?
22      A.      Yes.
23      Q.      And was there a point in time
24  when you became a Sales Manager at Patriot?

```
 1        A.      Yes.
 2        Q.      When was that?
 3        A.      I think it was April or -- May or
 4   June of 2002.
 5        Q.      Who was your supervisor when you
 6   were a sales person?
 7        A.      My immediate supervisor was
 8   Gordon Leete.
 9        Q.      What was his position?
10        A.      He was a Line Director.
11        Q.      Did anyone other than Mr. Leete
12   supervise you at any time?
13        A.      Mr. Leete supervised us for the
14   first I want to say 90 days.  Then Mr. William
15   Rauer came in, and we were told that he was
16   the Director.
17        Q.      And he supervised you?
18        A.      He supervised Gordon, and Gordon
19   supervised us.
20        Q.      When you say "us", are you
21   referring to those initial people?
22        A.      There were only 12 of us.  So we
23   were all in one group at that time.
24        Q.      Is the group referred to as "The
```

```
 1   Line"?
 2          A.     Yes.
 3          Q.     And were you in anyone else's
 4   line at any time?  And by that I mean, did you
 5   report --
 6          A.     -- underneath Gordon?
 7          Q.     Yes?
 8          A.     No, I was always under Gordon.
 9          Q.     Always under Gordon.  When was
10   your last day of the employment at Patriot?
11          A.     I want to say February 28, 2005.
12          Q.     Was the change in position from
13   Sales Representative to Sales Manager
14   considered a promotion in your view?
15          A.     Yes.
16          Q.     Okay.  And who made the decision,
17   if you know, to promote you?
18          A.     Bill Rauer.
19          Q.     Did Mr. Rauer speak to you prior
20   to promoting you to determine whether you were
21   interested in becoming a Sales Manager?
22          A.     Yes.
23          Q.     And do you remember what the
24   nature of that conversation was?
```

```
 1  Did that in fact happen?
 2       A.    Yes.
 3       Q.    And did you receive $300 per week
 4  for ten weeks as well?
 5       A.    Yes.
 6       Q.    Okay.  After that time, did you
 7  then only receive the base pay of eight
 8  percent commission?
 9       A.    That's correct.
10       Q.    Okay.  And did that change at any
11  time, prior to the time you became Sales
12  Manager?
13       A.    No.
14       Q.    When you became Sales Manager,
15  did your pay structure change again?
16       A.    Did if change again?
17       Q.    Yes?
18       A.    I received one and a half percent
19  more by sitting on tables and closing deals.
20       Q.    Tell me what you -- what the job
21  duties of a Sales Manager are.
22             MR. FELDMAN:  Objection.  Go
23        ahead.
24             THE WITNESS:  A Sales Manager was
```

```
 1                to train people.  To take them out
 2                and explain to them the area.
 3                Explain the ten steps, and get them
 4                graduated so that they could go out
 5                on their own.
 6                (BY MS. FABBO):
 7       Q.       How long does it typically take
 8  to graduate?  Does it depend on the person?
 9       A.       Yes.
10       Q.       What's the average, if there is
11  one?
12       A.       I would say three weeks to a
13  month.
14       Q.       Are there any other duties?
15       A.       Well, other duties are you know
16  we have to be aware of the customer's needs
17  and wants.  Explain the directions.  Deal with
18  complaints from customers.  Who to direct them
19  to.
20       Q.       Anything else?
21       A.       Take care of the needs of the
22  people that were under you.  Once you received
23  a team, train that group of people.
24       Q.       Any other duties?
```

1   A.   Check on deals, and make sure
2 people were being paid.
3   Q.   Anything else?
4   A.   Take concerns and issues of the
5 people to my supervisor, and sit down and try
6 to iron them out.
7   Q.   And who was your supervisor?
8   A.   At that time it was Gordon.
9   Q.   Anything else?
10   A.   To make sure that the sales
11 people were all on the same page, and doing
12 the exact same thing with the steps and with
13 the customers.
14   Q.   Okay. You mentioned the takeover
15 duties. Could you explain what that is?
16   A.   Take over duties?
17   Q.   The T.O.?
18   A.   As a sales person, my job is to
19 take the individual out and get them to want
20 the product. Once they are to a certain point
21 where they want it, a Manager is then called
22 upon to come in and explain the back end of
23 what is going to be presented.
24   Q.   Okay.

```
 1        A.      Meaning the money and the usage
 2   of the product.
 3        Q.      Okay.  Anything else?
 4        A.      And he's the one to ask if they
 5   want to be involved in the program or not.
 6   And then he explains how much money it would
 7   cost today, and what they could afford, and
 8   different payment programs.
 9        Q.      Anything else?
10        A.      Not off the top of my head.
11        Q.      As a Sales Manager, did you also
12   take people on tours?
13        A.      Yes, I did.
14        Q.      How much time would be spent
15   taking people on tours when you were a Sales
16   Manager?
17        A.      Two to four hours, sometimes
18   longer.
19        Q.      Per tour or per day?
20        A.      Per tour.
21        Q.      Did you have a team assigned to
22   you?
23        A.      Partial teams.
24        Q.      And who was on your team?
```

22

1  A. It varied at times. Jud Kuzia, Steve Alibozek, Beth Torra, John Rutherford, Owen Broch. That's just about all that I can remember right now. Oh, there were some that came and left as soon as they came like Will Spaulding, John Wills.

7  Q. Was there an average number of people on your team at any particular time?

9  A. I would say two, and then four.

10 Q. Two or four full-time people?

11 A. Yes.

12 Q. And when you said -- you said you oversaw your team or something to that effect. Can you tell me what types of things you would oversee?

16 A. Whatever my boss would tell me in the Manager's meeting, I would have to relate to the team. Pertaining to what they were looking for for that week or that day. In sales or in conduct and attitude.

21 Q. You stated that you were responsible for checking on deals. What does that mean?

24 A. If I or one of the people that

1  were working for me closed a deal today.  And
2  in 14 or 21 days later they do not receive a
3  paycheck, I would go see the young lady
4  sitting next to you?
5       Q.   Ms. Lippert?
6       A.   Yes.  And I would try to find out
7  why they weren't receiving their money.
8       Q.   And can you recall any employees
9  that you did that for?
10      A.   I would say Jud, Owen, Beth,
11 myself.  Almost everyone at one point in time.
12      Q.   And was Ms. Lippert able to
13 provide you with the information?  Or research
14 it and get back to you?
15      A.   At times.  Or the corporate
16 office was closed, because she was dealing
17 with the corporate office.  So we had to wait
18 until we get back to work.  Then she would
19 usually contact that individual herself.
20      Q.   What individual?
21      A.   Whoever I went to check on.
22      Q.   Okay.  So you would come on
23 behalf of one of your employees, and Ms.
24 Lippert would get back to the employee

```
 1        Q.      Did you have any other -- strike
 2   that.  Was Mr. Stenslind's, in your opinion,
 3   his method of management more laid back than
 4   Mr. Leete?
 5              MR. FELDMAN:  Objection.  Go
 6         ahead.
 7              THE WITNESS:  No.
 8              (BY MS. FABBO):
 9        Q.      Did Mr. Leete enforce the
10   attendance policy?
11        A.      Yes, he did.
12        Q.      Okay.  And Mr. Stenslind did not?
13        A.      That's correct.
14        Q.      Anything else Mr. Stenslind
15   allowed his employees maybe get around the
16   policy on that Mr. Leete did not?
17              MR. FELDMAN:  Objection.  Go
18         ahead.
19              THE WITNESS:  He would allow them
20         to leave the area, meaning the
21         grounds.  He would spiff them.
22              (BY MS. FABBO):
23        Q.      What is that?
24        A.      Spiffing them is when in his
```

 1   meeting he would tell people that the first
 2   one to make a sale today, I will give them 50
 3   bucks.  If you get two sales today, I will
 4   give you $100.
 5              In the beginning we were told we
 6   couldn't do that.  And then when we found out
 7   about it, they legalized it.
 8        Q.     Okay.  Anything else?
 9        A.     It made for bad feelings between
10   the two lines.  Because if you were out on a
11   sale and you knew you had a sale committed to
12   you that day.  You could go and get Paul to
13   come sit on your table, and Paul would give
14   you the money right afterwards.  Give you the
15   50 bucks or 100 bucks or whatever.  If he
16   called me to the table, I couldn't give them
17   anything but the ink and the pen.
18        Q.     Okay.  What was Mr. Stenslind's
19   position?
20        A.     He was Line Director.
21        Q.     And Mr. Leete was the other Line
22   Director?
23        A.     Yes.
24        Q.     And there were only two lines at