1    that time?

2         A.    Yes.

3         Q.    And you said that they were

4    allowed to leave the grounds.  What was the

5    rule on Mr. Leete's team?

6         A.    You couldn't leave the grounds.

7         Q.    At all?

8         A.    Those were the rules.

9         Q.    Were you allowed to leave if you

10   got permission from Mr. Leete?

11        A.    Yes.  In the beginning it was

12   from Mr. Leete, and then it went to Faith.

13   Then it went to Dennis.  It changed

14   periodically.

15              They had to know where you were,

16   and you had to know your position in the line.

17   Otherwise you went to the bottom of the line.

18        Q.    Okay.  And Mr. Stenslind, to your

19   knowledge, did not require people to tell him

20   where they were going to be?

21        A.    No.

22        Q.    He did not?

23        A.    No.  Anything else that was

24   different between Mr. Stenslind and Mr. Leete

1   that may have contributed to what you

2   described as bad feeling between the two

3   lines?

4              MR. FELDMAN:  Objection.  Go

5          ahead.

6              THE WITNESS:  Policies are

7          written to be guidelines.  When

8          people who work in the same group of

9          people don't abide by those

10         guidelines, there is chaos.  And

11         that's what took place 90 percent of

12         the time.

13             (BY MS. FABBO):

14   Q.     Okay.  Are you saying Mr.

15   Stenslind was loose on enforcing policy, and

16   Mr. Leete was not?

17   A.     That's correct.

18   Q.     Can you think of some of the

19   other policies other than the ones you've

20   mentioned where they differed?

21   A.       Tardiness, taking tours out.  Mr.

22   Stenslind would sign for them himself, and

23   give that person a free ride.  Or he would

24   sign his name on my sheets.

1          Q.      Who brought it to your attention?

2          A.      Mr. Leete and Mr. Ned Abbott.

3          Q.      I'm confused, because I thought

4    you had said that -- and please clarify.  That

5    you knew because of the different number of

6    tours in your book?

7          A.      Right.  But how they found out

8    about it was my signature is like this.

9    People would try to imitate it, and there

10   would be a slip that had to be turned into the

11   exit program.  And they compared signatures,

12   and I never sat on that individual's table nor

13   did I take a tour.

14         Q.      Did you ever come to learn

15   whether Mr. Stenslind wrote anyone else's

16   name?

17         A.      No, I did not.

18         Q.      You said that Mr. Stenslind

19   differed from Mr. Leete with respect to the

20   tardiness policy.  Could you tell me how they

21   differed?

22              MR. FELDMAN:  Objection.  Go

23         ahead.

24              THE WITNESS:  Mr. Stenslind would

1               usually make some type of excuse up,

2               but Gordon wouldn't.

3                    (BY MS. FABBO):

4          Q.     Would the excuse allow someone

5     not to go on overage?

6          A.     Yes.

7          Q.     And how did they vary with

8     respect to taking tours?

9                    MR. FELDMAN:  Objection.  Go

10              ahead.

11                   THE WITNESS:  Well, to my

12              knowledge neither was directed to

13              take tours.  If they decided not to,

14              they didn't have to.

15                   But if they went out and sold,

16              they got more money than all of us.

17              So it was to their benefit to take a

18              tour if they wished.

19                   (BY MS. FABBO):

20         Q.     And so Mr. Stenslind took tours?

21         A.     Mr. Stenslind took tours.  If we

22    had more tours than we had sales people, then

23    Mr. Leete would take a tour.  Some of the V.O.

24    officers would take tours.  The exit people

```
1   moment.

2        Q.      And Mr. Leete would require the

3   license, the car, and the insurance?

4        A.      Yes, Ma'am.

5        Q.      Did you ever have an occasion to

6   observe Mr. Leete and Mr. Stenslind

7   interacting?

8        A.      Could you repeat the question,

9   please.

10       Q.      Did you ever have an occasion to

11  observe Mr. Stenslind and Mr. Leete engaging

12  in any kind of interaction?

13       A.      Hyper interaction?

14       Q.      Just talking and speaking to

15  each other?

16       A.      Oh, yes.

17       Q.      What do you mean by hyper

18  interaction?

19       A.      Well, maybe their tone of voice

20  was higher than normal.

21       Q.      Did you see them arguing?

22       A.      Yes.

23       Q.      And on more than one occasion?

24       A.      Several.
```

1    Q.    Do you know what they were

2  arguing about on any of those occasions?

3    A.    Policies.

4    Q.    Any in particular?

5    A.    Not offhand.

6    Q.    Anything else they argued about?

7    A.    I would say steeling people from

8  one team to the other.

9    Q.    Anything else?

10    A.    Not at the present.

11    Q.    You mentioned that you received

12  one and a half percent more by sitting on

13  tables and closing deals; is that correct?

14    A.    If they were not on my team, yes

15  that's correct.

16    Q.    So can you tell me how that

17  works, if they were not on your team?

18    A.    Okay.  If I sat on Robert

19  Campagna's table, who was not on my team.  And

20  he sold a $10,990 deal.  I would get one and a

21  half percent of that money in an override is

22  what it's called.

23         It would be given to me when he

24  got paid.  If they were a member of my team

41

```
 1    and I had the opportunity to sit on their

 2    table, I would get three percent on whatever

 3    they sold.

 4         Q.     Okay.  And so did you usually --

 5    or how frequently did you get an override?

 6         A.     When I became a Manager for the

 7    first year and a half, every week for a year

 8    and a half.

 9         Q.     And then what happened?

10         A.     My team dwindled down.  Tours

11    stopped coming in.  And I was supervised for

12    not sitting on enough tables.  Only 19 tables

13    in a month.

14         Q.     Okay.

15         A.     And it's an open floor.  Meaning

16    that you can pick a Manager to sit on your

17    table.

18         Q.     So the sales person picks the

19    Manager?

20         A.     Yes, Ma'am.

21         Q.     And the first year and a half,

22    what were your overrides?  Was there an

23    average amount?

24         A.     I would want to say between 15
```

54

```
 1         Q.      What about Mark Lapine?

 2         A.      They were demoted on the same

 3   day.

 4         Q.      As you?

 5         A.      No, together.  The two of them.

 6   You asked who were the others that were

 7   demoted.

 8         Q.      And were they promoted after that

 9   back to Sales Manager?

10         A.      Yes.

11         Q.      Do you know by whom?

12         A.      Mr. Rauer and Mr. Stenslind.

13         Q.      Did Mr. Leete have any role to

14   your knowledge in your demotion?

15         A.      Mr. Leete wasn't there.

16         Q.      Who was your direct supervisor at

17   the time?

18         A.      It would have been Gary Campagna

19   and Dave Mercurio.

20         Q.      They were both Line Directors?

21         A.      Yes.  They shared the line.

22         Q.      And when did that start?

23         A.      The same day they fired Gordon.

24         Q.      And that was the same day you
```

1  were demoted?

2        A.    Yes.

3        Q.    Any other personnel changes that

4  day?

5        A.    Not that I can recall.

6        Q.    Do you know why Mr. Leete was

7  terminated?

8        A.    No, I do not.

9        Q.    Other than to Mr. Campagna, did

10 you complain about your demotion to anyone

11 else?

12       A.    Robert Campagna.

13       Q.    And what was his position at the

14 time?

15       A.    Manager.

16       Q.    Did you complain to him about it

17 hoping he would do something about it?

18       A.    No.

19       Q.    Did you complain to anyone in

20 Human Resources about the demotion?

21       A.    No.

22       Q.    Did you call anyone at the

23 Berkley Group about the demotion?

24       A.    No.

69

```
 1              A.      Yes, Ma'am.

 2              Q.      And what would you do during the

 3    day?

 4              A.      Sit down in the lounge or the pit

 5    as it's called or walk outside and walk back

 6    in.

 7              Q.      Did you ever leave to go get gas

 8    or do errands?

 9              A.      Once.

10              Q.      Only one time?

11              A.      Only one time.

12              Q.      Did others?

13              A.      I'm assuming they did.

14              Q.      Well, did you ever see anyone

15    leave and then come back before the next wave?

16              A.      I seen people leave, but I don't

17    know if they came back.

18              Q.      But did you say earlier that Mr.

19    Stenslind's team was allowed to leave?

20              A.      Mr. Stenslind's team does

21    anything they want.

22              Q.      Okay.  And Mr. Leete's team could

23    only leave with permission?

24              A.      That's correct.
```

```
 1          Q.      Fuck?

 2          A.      Yes.

 3          Q.      And you heard that twice you

 4    said?

 5          A.      The only two times I think I've

 6    seen him get mad.

 7          Q.      Do you know what prompted that

 8    language?

 9          A.      No, I do not.

10          Q.      When you were Sales Manager, what

11    part of your job was different from when you

12    were a sales person?  Your job duties?

13          A.      My job duties as a sales person

14    is to get the person to want it.

15          Q.      To want the time share?

16          A.      To want the time share.  As a

17    Sales Manager, your job is to go in and

18    solidify certain aspects of what the sales

19    person says.  Then show them the two programs

20    that are available, and the pricing.

21          Q.      Okay.  And then you also referred

22    to other responsibilities, and I just want to

23    understand whether you had any of these

24    responsibilities when you were also a sales
```

```
 1  person.
 2              You mentioned training and
 3  getting people through the graduating program.
 4  Was that something you only did as a Manager?
 5      A.    Yes.
 6      Q.    Bringing concerns of your
 7  subordinates I would guess was only when you
 8  were a Manager; is that correct?
 9      A.    Yes.
10      Q.    Anything else you did as a
11  Manager that you did not do as a sales person?
12      A.    Contact other departments.
13      Q.    Okay.  What about customer
14  complaints?  Was that something that you as a
15  Manager were responsible for?
16      A.    Customer complaints, I would tell
17  them where to go.  Direct them who to go to to
18  get a complaint form.  Or I would go get the
19  complaint form, and they would fill it out.
20  Then I would submit it to the person that it
21  was supposed to be submitted to.
22      Q.    And that was in your role as a
23  Manager only?
24      A.    Yes.
```

```
 1          Q.       When you were a sales person, did

 2   you ever check on your co-workers' deals to

 3   see if they closed?  Or did you just do that

 4   as a Sales Manager?

 5          A.       Just as a Sales Manager.

 6          Q.       Okay.  What did you -- I believe

 7   you said this, but if I'm wrong please correct

 8   me.  You said you spent two to four hours when

 9   you did a tour; is that correct?

10          A.       That's correct.

11          Q.       Okay.  What did you do during the

12   rest of the day when you were just a sales

13   person?

14          A.       Tours would come in at different

15   times of the day.  And you were scheduled to

16   be -- if you didn't go out, you were in this

17   room about the size of this.  Waiting for

18   someone to come through the door or say

19   Massaconi go out.

20               In the morning you had five

21   minutes to get the slip.  Go out and see a

22   customer.  Introduce yourself to the customer.

23   And in the afternoon you had ten minutes.

24               When we came back, usually during
```

1   exhibits or hunting licenses.  Or anything

2   that had to do with the outdoors.  I would

3   have to go and sit on tables at the end with

4   customers.  Or I would explain to the sales

5   people in the morning meeting where everything

6   was, and not to over exaggerate things.

7          Q.     Okay.  So you would have a

8   management meeting before?

9          A.     Before the regular meeting.

10         Q.     And what time did the management

11  meeting take place?

12         A.     We had to be to work for 8:20.

13  The meeting started at 8:30.

14         Q.     And who conducted them?

15         A.     Ron Lewis, most of them.  And

16  Paul Stenslind when Ron wasn't there.

17         Q.     What about Gordon, did he ever

18  conduct any?

19         A.     Gordon would step in when Paul

20  wasn't around.

21         Q.     And then what happened at the

22  regular daily meeting after that?

23         A.     The regular daily meeting would

24  go -- they usually start off the day well

129

1    the reception; whatever you call it.

2         Q.    I'm sorry.  What was that?

3         A.    I said we would have a company

4    dinner or a party to try to motivate the

5    people.  We would have parties that the

6    Managers would pay for out of our pocket.

7         Q.    And you have held some of those?

8         A.    We paid for them.

9         Q.    Who is "we"?

10        A.    The Managers.

11        Q.    And where did you have them?

12        A.    We tried to give them at

13   different locations.  One of the woman that

14   worked with us owns a place, and a couple of

15   times we have had it at her place.

16        Q.    Who is that?

17        A.    Mary Birch.

18        Q.    Is that her name?

19        A.    Yes.

20        Q.    Where is the place?

21        A.    The place would be over in

22   Canaan, New York off of 295.

23        Q.    What is the name of it?

24        A.    You had to ask me that question.

# EXHIBIT
## 3

Vol. I, Pgs. 232

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 04-CV-30091-MAP

```
- - - - - - - - - - - - - - - - - - - - - - - - - -
                                )
WISE ET AL,                     )
              Plaintiffs        )
                                )
vs.                             )
                                )
PATRIOT RESORTS CORP.,          )
ET AL.                          )
              Defendant         )
                                )
- - - - - - - - - - - - - - - - - - - - - - - - - -
```

DEPOSITION OF ROGER MARTIN

Tuesday, April 5, 2005

9:10 a.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144

- - - - - - Sandra A. Deschaine, RPR - - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

```
1     APPEARANCES:

2     SKOLER, ABBOTT & PRESSER, P.C.

3          Marylou Fabbo, Esquire

4          One Monarch Place, Suite 2000

5          Springfield, Massachusetts 01144

6          (413) 737-4753  Fax (413) 787-1941

7          on behalf of Defendants

8     HEISLER, FELDMAN & MCCORMICK, P.C.

9          Suzanne Garrow, Esquire

10         1145 Main Street

11         Springfield, Massachusetts  01103

12         (413) 788-7988  Fax (413) 788-7996

13         on behalf of the Plaintiffs

14

15    Also Present:  Faith Lippert

16                   Kimberly Klimczuk

17                   Becky Foster

18

19

20

21

22

23

24
```

60

```
 1              A.     Yes.

 2              Q.     Anything else that would be discussed

 3    at those meetings?

 4              A.     Not that I remember.

 5              Q.     Did you have an office or work space

 6    assigned to you?

 7              A.     No.

 8              Q.     Where did you work when you were in

 9    the office?

10              A.     We didn't work.  We all hung out in

11    what they called the pit.

12              Q.     What did you do after the morning

13    meeting?

14              A.     We all went to the pit.

15              Q.     Where was the pit?

16              A.     20 Old Williamstown Road, I believe.

17    It's a whole complex.

18              Q.     Is it in a room, in a basement?

19              A.     It was in a building.

20              Q.     What floor?

21              A.     First.

22              Q.     How many people attended the morning

23    meetings, approximately?

24              A.     I never counted, so I don't know.
```

1          Q.     And what would you do when you were

2     in that room?

3          A.     Basically hang out.

4          Q.     Was there any place to sit or any

5     tables?

6          A.     For some there was.

7          Q.     And can you describe what was in the

8     room?

9          A.     Couple of tables, a few chairs and a

10    TV and a water cooler, refrigerator.

11         Q.     Other than hang out, were you

12    required to do anything in the pit?

13         A.     Occasionally the managers would come

14    over and continue training.

15         Q.     And in the case of you, how

16    occasional was this training?

17         A.     It's mandatory that you would attend.

18         Q.     Right.  But you said occasionally

19    this would happen, so I'm wondering did this

20    happen once a week, twice a week?

21         A.     I couldn't tell you.

22         Q.     How long would this training take

23    place?

24         A.     Until you got your slip, until they

```
 1      in your mind, that was an initially high number of

 2      tours for a day?

 3              A.      Never.

 4              Q.      Unusually low?

 5              A.      Yes.

 6              Q.      How many would be unusually low, in

 7      your opinion?

 8              A.      Six.

 9              Q.      What types of things did you do when

10      you were in the pit, other than the training you

11      talked about?

12              A.      Hang out.

13              Q.      Did you socialize with your

14      co-workers?

15              A.      Absolutely.

16              Q.      Did you eat?

17              A.      No.

18              Q.      Did you drink coffee or any

19      beverages?

20              A.      No.

21              Q.      Did you watch TV?

22              A.      Very little.

23              Q.      Did you do any of your own work or

24      business or personal stuff?
```

```
 1              A.      No.
 2              Q.      Did you ever bring anything with you
 3     in the pit to read or do while you were there?
 4              A.      No.
 5              Q.      Was that prohibited?
 6              A.      Not that I can recall.
 7              Q.      Did anyone bring computers or laptops
 8     into the pit?
 9              A.      I'm not sure.
10              Q.      You don't recall seeing a computer or
11     not?
12              A.      I don't think so but I'm not sure.
13              Q.      Was that prohibited?
14              A.      Not that I can say for sure.
15              Q.      Was there any restrictions on what
16     you could do when you were in the pit?
17              A.      Not that I can recall.
18              Q.      Did you ever leave the pit during the
19     workday to go attend to personal business?
20              A.      Yes.
21              Q.      And when was that?
22              A.      If you didn't have a tour, you could
23     go off property, in between the waves.
24              Q.      In between what?
```

```
 1            Q.    Whose teams were you on?

 2            A.    I was on Gordon Leete's at first.

 3            Q.    Then who?

 4            A.    Then Paul Stensland.

 5            Q.    And those are the only two people?

 6            A.    Those are the only two.

 7            Q.    When were you on Gordon's?

 8            A.    At the very beginning and about half

 9     of my career with Vacation Village.

10            Q.    And then Paul the other half?

11            A.    Yes.

12            Q.    So when you got a slip that you had a

13     tour, you said you would go meet with the people

14     in the lobby, then what would you do?

15            A.    Put them in your car.

16            Q.    What else?

17            A.    Drive them to Greylock.

18            Q.    Can you just describe to me,

19     generally, what you did until you ended with a

20     tour?

21            A.    Brought them to Greylock, told them

22     why they were here, what was to be expected of the

23     tour, brought them back down to another building

24     from the one we picked them up, explained how
```

1    vacation ownership worked and the benefits of it,

2    and then took them -- put them back in your car,

3    took them back up to the Vacation Village

4    property, which was located in Hancock, and showed

5    them the condominium and the property.  When

6    you're completed up there, you bring them back and

7    show them the price, ask them to buy.

8        Q.    How long would this whole procedure

9    that you've described take?

10       A.    Anywhere from ninety minutes on.

11       Q.    There's no maximum time?

12       A.    No maximum.

13       Q.    Would you keep reports of how long

14    your tours were?

15       A.    No.

16       Q.    Did the company, to your knowledge?

17       A.    I don't know.

18       Q.    Did you report or sign in anywhere

19    when you left and came back?

20       A.    After you were finished with your

21    tour, you had to sign back in.

22       Q.    Would you sign in and out between the

23    wave periods?

24       A.    No.

```
1            Q.    How long would you -- how long would
2       it take you to get to Greylock?
3            A.    Roughly 3 1/2, four minutes.
4            Q.    And how long would you give the
5       conversation --
6            A.    As long as it needed to be.
7            Q.    When would you know that you had
8       spoken to them long enough?
9            A.    Until they were agreeing with you,
10      you had common ground with them.
11           Q.    And what was the range of time that
12      could take?
13           A.    Anywhere from fifteen minutes,
14      fifteen hours, based on how long you were up
15      there.
16           Q.    Did it ever take you fifteen hours?
17           A.    Never.
18           Q.    What was the longest time it took
19      you?
20           A.    Six.  Up there?  Not long.  Maybe a
21      half hour.
22           Q.    You stated that you then brought them
23      to another building, so you drove back to another
24      building on that same property?
```

1                    MS. FABBO:  We can stop right now and

2    take a break.

3                    (Recess taken from 10:50 a.m. to 11:02

4                    a.m.)

5        Q.    Did you ever have multiple tours on

6    one day?

7        A.    Yes.

8        Q.    How frequently was that?

9        A.    Not often.

10        Q.    More than once a week?

11        A.    Yes.

12        Q.    Would you say it was more than twice

13    a week?

14        A.    Yes.

15        Q.    Do you know, approximately, how many

16    times a week on average?

17        A.    No.

18        Q.    Would you ever refuse to take a

19    second tour in a day or a third tour?

20        A.    A third, yes.

21        Q.    Was that more than once or one

22    occasion?

23        A.    Probably more than once.

24        Q.    Was there any particular reason that

```
 1    you refused a third tour?

 2           A.     Yeah, when we were hired they told us

 3    we only had to take two.

 4           Q.     Approximately, how many times did you

 5    receive a third tour?

 6           A.     Maybe twice.

 7           Q.     Were third tours offered frequently?

 8           A.     No.

 9           Q.     Were they only during essential

10    seasons, business seasons?

11           A.     Yes.

12           Q.     What's the business season?

13           A.     I couldn't tell you.

14           Q.     You had no idea?

15           A.     I had no idea.

16           Q.     Was it most of the year that there

17    were only two tours per day?

18           A.     No.

19           Q.     Was it fifty/fifty?

20           A.     No.

21           Q.     Were there occasions where there was

22    only on one tour?

23           A.     Oh, yes.

24           Q.     And how frequently did that occur?
```

```
1              A.     Off the top of my head, I couldn't
2       tell.  I'm not sure.
3              Q.     Do you have any records that would
4       refresh your recollection?
5              A.     No.
6              Q.     Do you keep any records of the tours
7       you did?
8              A.     No.
9              Q.     After you viewed the property and the
10      model, then what happened in the whole process?
11             A.     Then you put them back in your car,
12      drive them back to 20 Old Williamstown Road.
13             Q.     Prior to returning to 20 Old
14      Williamstown Road, had you ever known that someone
15      was going to purchase a time-share, had anyone
16      ever given you that indication?
17             A.     Yes.
18             Q.     Did that happen infrequently?
19             A.     The way the company has it set up,
20      it's designed to happen frequently if you do your
21      job right.
22             Q.     So are you saying -- so through the
23      whole selling process or through the whole process
24      you explained to me, before going back to 20 Old
```

1    Williamstown Road, it was all aimed at kind of

2    having the deal made before you got back there?

3         A.    Correct.

4         Q.    Did that frequently happen to you?

5         A.    I would guess, yes.

6         Q.    So then what would happen when you

7    returned?

8         A.    You would sit them back down.

9         Q.    Okay.

10        A.    And show them the money, show them

11   what it would cost.

12        Q.    Was cost discussed at all prior to

13   the return?

14        A.    Never.

15        Q.    When you say you would sit them down,

16   are you talking about literally sit them down

17   somewhere?

18        A.    Literally.

19        Q.    And where would that be?

20        A.    On the sales floor, had a table on

21   the sales floor.

22        Q.    Was it a private area?

23        A.    No.

24        Q.    And how long would that sit-down

113

```
 1              A.    No.

 2              Q.    Did you ever communicate via e-mail?

 3              A.    I don't do that, no.

 4              Q.    You had stated, a little while ago,

 5     that initially you were happy with your

 6     employment.  When did that change?

 7              A.    When they started messing around with

 8     the pay.

 9              Q.    When was that?

10              A.    I can't recall.

11              Q.    How were they messing around with the

12     pay?

13              A.    They came up with all kinds of

14     pay-line structures, changed the dates when you

15     were getting paid, put a no pack, no pay clause

16     in.

17              Q.    What's a no pack, no pay?

18              A.    If you got all the money down and you

19     didn't get a check that they could take the money

20     directly from their account, you didn't get paid.

21              Q.    Ever?

22              A.    Ninety days or until they send in a

23     pack check.  If they didn't send in a pack check

24     within a certain amount of time, you still didn't
```

```
 1    get paid.

 2          Q.      Until when?

 3          A.      Until the deal cleared or what they

 4    considered the deal cleared.

 5          Q.      And when did they consider the deal

 6    cleared, when was that?

 7          A.      Whenever they figured there was

 8    nothing wrong with it.

 9          Q.      There was no parameters to that?

10          A.      There was no parameters.

11          Q.      You don't ever remember reading or

12    hearing that the purchaser had to make three

13    monthly payments?

14          A.      No, they changed the pay, pretty

15    much, indiscriminately.  We went from fourteen to

16    seventeen days, initially.

17          Q.      My question was, you never saw or

18    read anything or heard anything about three

19    monthly payments?

20          A.      No, not until they put it in that

21    pack, no pack, no pay.

22          Q.      And prior to that?

23          A.      No.

24          Q.      I'm questioning you because I looked
```