# EXHIBIT
4

Vol. I, Pgs. 1-175

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 04-CV-30091-MAP

```
----------------------------
                           )
WISE, ET AL.,              )
            Plaintiffs     )
                           )
vs.                        )
                           )
PATRIOT RESORTS CORP.,     )
ET AL.                     )
            Defendant      )
                           )
----------------------------
```

DEPOSITION OF LACRISHA D. WISE

Tuesday, April 26, 2005

9:30 a.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144


- - - - - - Sandra A. Deschaine, RPR - - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

Vol. II, Pgs. 176-235

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 04-CV-30091-MAP

- - - - - - - - - - - - - - - - - - - - - -
                         )

WISE ET AL.,           )
        Plaintiffs  )
                    )

vs.                 )
                    )

PATRIOT RESORTS, CORP., )
ET AL.,             )
        Defendants  )
                    )
- - - - - - - - - - - - - - - - - - - - - -


CONTINUED DEPOSITION OF LACRISHA WISE

Monday, June 6, 2005

10:00 a.m. - 11:15 a.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144

- - - - - Sandra A. Deschaine, RPR - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

```
 1    APPEARANCES:

 2    SKOLER, ABBOTT & PRESSER, P.C.

 3         Marylou Fabbo, Esquire

 4         One Monarch Place, Suite 2000

 5         Springfield, Massachusetts 01144

 6         (413) 737-4753  Fax (413) 787-1941

 7         on behalf of the Defendants

 8    HEISLER, FELDMAN & MCCORMICK, P.C.

 9         Suzanne Garrow, Esquire

10         1145 Main Street

11         Springfield, Massachusetts  01103

12         (413) 788-7988  Fax (413) 788-7996

13         on behalf of the Plaintiffs

14

15    Also Present:  Faith Lippert

16                   Kimberly Klimczuk

17                   Becky Foster

18                   Mary Goddard

19

20

21

22

23

24
```

COURT REPORTING SERVICES
(413) 786-7233  Fax (413) 786-0299

1          A.     I accepted a better position.

2          Q.     Where was that?

3          A.     I'm not sure.

4          Q.     Did you ever, other than -- strike

5     that.

6                 Excluding Margaret & Company, where

7     you said you work per diem still, did you ever

8     work two jobs at the same time or be employed by

9     two companies at the same time?

10         A.     Yes.

11         Q.     And what two companies were those?

12         A.     Actually, you asked me earlier places

13    that I had worked since my separation with

14    Vacation Village, and that includes the Italian

15    Pavilion.

16         Q.     Was that one of the two places that

17    you worked when you said you worked two -- or you

18    had two jobs at the same time?

19         A.     Yes.

20         Q.     And you worked there and where else

21    at the same time or were you employed at the same

22    time?

23         A.     I worked there and Vacation Village.

24    I've worked there and at the Oak 'N Spruce Resort.

1    I've worked there as well as Filene's.

2            Q.     That was prior to your separation

3    from employment?

4            A.     Yes, as a matter of fact, it was.

5            Q.     Filene's was?

6            A.     Yes.

7            Q.     Any other dual employments you held?

8            A.     Not that I recall.  The Italian

9    Pavilion, it's an establishment at the Eastern

10   States Exposition which runs for three weeks

11   throughout the late summer, early fall, and I've

12   been with them for several years, and I don't

13   remember any other specific times when I was at

14   that place.

15           Q.     What do you do there?

16           A.     I bartend.

17           Q.     Is that an organization that's only

18   opened when the Big E is running or does it have

19   another location for the rest of the year?

20           A.     I don't know.

21           Q.     How did you come about being a

22   bartender at the Italian Pavilion?

23           A.     I do job search.

24           Q.     And you said that you've done that

1          Q.      What's the connection, that you're
2     aware of?
3          A.      The connection that I'm aware of is
4     Silver Leaf Resorts is their parent company,
5     Oak 'N Spruce is the name of that particular
6     resort.
7          Q.      When you were employed at Vacation
8     Village, other than the position you told me about
9     at the Big E, the Italian Pavilion, did you ever
10    work anywhere else at the same time?
11         A.      Yes, Margaret & Company.
12         Q.      At the same time you were at Vacation
13    Village?
14         A.      Yes.
15         Q.      Anywhere else?
16         A.      Not that I remember at this time.
17         Q.      Have you ever been self-employed?
18         A.      Yes.
19         Q.      And what was the nature of the
20    business that you were self-employed in?
21         A.      Beauty consultant through Mary Kay,
22    wedding planning.
23         Q.      Is that something separate?
24         A.      Yes.

```
 1              A.    I was convicted of a crime.

 2              Q.    What was the crime?

 3              A.    Assault and battery, if I'm not

 4     mistaken.

 5              Q.    Do you know when that was?

 6              A.    I don't remember the date.

 7              Q.    Did you have a trial on that?

 8              A.    I don't think so.

 9              Q.    Could you tell me the circumstances

10     that resulted in the assault and battery, either

11     filing of a complaint, in that situation?

12              MS. GARROW:  I'm going to object but

13     you can answer.

14              A.    A few friends gathered for some kind

15     of wrestling match or tournament that was going on

16     that evening, and we were drinking, had been

17     drinking, and things got out of hand, and we all

18     got into a big, kind of, bar brawl and the police

19     showed up and everyone was arrested.

20              Q.    Did you say a bar brawl?

21              A.    Yes.

22              Q.    Did this happen at a bar?

23              A.    Well, right next door.

24              Q.    And where was this?
```

1          Q.    So Mr. Johnson told you about which

2     commission, the six percent or eight percent?

3          A.    He actually told me about both of

4     them.

5          Q.    So I'm just trying to clarify.  How

6     is this different from what he told you?

7          A.    He also mentioned S.P.I.F., and what

8     the potential opportunities were to earn higher

9     commissions and just broke down the bonus

10    structure and gave me an idea of, you know, what

11    the product was and what kind of money there was

12    that I could earn.

13         Q.    And did you ever receive a S.P.I.F.

14    when employed at Vacation Village?

15         A.    Yes, I believe so.

16         Q.    And when was that?

17         A.    I don't remember.

18         Q.    Do you remember the amount?

19         A.    I do not.

20         Q.    Could you speak louder, please?

21         A.    I do not remember.

22         Q.    And it says, "Plus bonus."  Do you

23    know what that bonus is referring to?

24                MS. GARROW:  I'm going to object

1    up before nine?

2        A.    Yes, absolutely.

3        Q.    And if you arrived before nine but

4    after she picked up the paper, what would you do?

5        A.    In terms of what?

6        Q.    How would you sign in, she had

7    already picked up the paper?

8        A.    You'd have to go over to that

9    building and sign in.

10       Q.    What building are you referring to?

11       A.    Well, it was then the new reception

12    area.

13       Q.    And after the morning meeting, then

14    what would you do?

15       A.    Prepare for the day, you'd sit around

16    and wait for tours.

17       Q.    What did you do to prepare for the

18    day?

19       A.    Just gathered -- got mentally

20    prepared, for me that was praying, meditating.  I

21    would get different forms or papers that I would

22    need for a specific tour together, have my table

23    set up and that would be it.

24       Q.    So you said forms for a specific

1    tour.  Could you elaborate on that?

2         A.    There's like a survey, there's a rent

3    versus own sheet that we use.  There's a

4    comparable sheet that we use.  There's a T sheet,

5    which has the time off or special promotional

6    offers.

7         Q.    So those are forms you needed in

8    connection with the tours you'd be going over?

9         A.    Yes.

10        Q.    When you said you had your table set

11   up, where was your table?

12        A.    It was in the back, right by the

13   women's bathroom.

14        Q.    And how would you set that up?

15        A.    With me looking outward and the

16   customers sitting, facing where they could only

17   see me and not the rest of the room.

18        Q.    Is that where you would meet with the

19   customers at some point?

20        A.    That's where I would bring them to.

21        Q.    After the tour?

22        A.    Throughout the tour, that's where the

23   presentation was done.

24        Q.    Okay.  So did you -- I'll come back

182

1          Q.    Anyone else?

2          A.    Ken Flanders.

3          Q.    Anyone else?

4          A.    Paul Stensland.

5          Q.    Who else?

6          A.    Michael Massaconi.

7          Q.    Anyone else?

8          A.    I don't recall anyone else at --

9    their specific name at this point.

10          Q.    When did you make these

11    complaints?

12          A.    I don't recall.

13          Q.    Were the people that you just

14    listed as -- as people to whom you

15    complained, people that were all sales

16    managers at the time you made the complaint?

17          A.    Paul Stensland was the line

18    director.

19          Q.    And what did Mr. Borden say about

20    your complaint or in response to your

21    complaint, if anything?

22          A.    As I sit here today, I recall us

23    all agreeing that there should be something

24    done about it, that it was an issue that was

1    just tell me what the process is till the

2    group is finished and leaving the premises.

3        A.    Until what group is finished?

4        Q.    The group that's assigned to you,

5    the tour.

6        A.    Excuse me.

7            MS. GARROW:  Objection.  She

8    obviously doesn't understand your question.

9        A.    Are you asking me to go through

10    the full tour process from the time --

11            MS. GARROW:  She's asking the

12    question.  Just re-clarify for her.

13            MS. FABBO:  I will clarify the

14    question.

15        Q.    Please ask me if you don't

16    understand the question.

17        A.    Okay.

18        Q.    So, yeah, someone notifies you

19    that or gives you the tour slip, then what

20    do you do?

21        A.    I go and prepare.

22        Q.    Can you explain to me what all

23    the steps are?  You go and prepare, I heard

24    that, the tour goes to Greylock or to the

1    condo.  I want to go through the whole

2    procedure, if you would.

3         A.    Okay.  I go and prepare; I'd get

4    my things; I go and get my car.  I'd make

5    sure that I had all the paperwork, including

6    credit applications and everything from

7    start to finish.  I pray and get mentally

8    prepared.  Then I would drive over or either

9    walk over to the building to greet the

10   family that I was touring.  If I walked

11   over, we would walk back over the bridge and

12   we'd be discussing their drive in, how they

13   like the Berkshires, things of that nature.

14            And I'd also be sharing with them

15   how the tour was going to go, where we were

16   going and what exactly we'd be doing.  And

17   we'd get into my car, and we'd take a ride

18   up to Mount Greylock and sometimes we would

19   get out of the car.  A lot of times we would

20   get out of the car, actually.  And I'd show

21   them the view and explain to them what the

22   view exactly was that they were looking at.

23            Oftentimes I had smokers, right

24   along, you know, and with myself, and they

1    would request, Can we get out of the car for

2    a minute, so they could smoke.  So we would

3    definitely be outside of the car discussing

4    that, as well as, you know, where we're

5    going from here, because there's so many

6    steps and places that we go throughout the

7    tour, that it's always nice and comforting

8    in knowing where you're going, especially

9    when you're in somebody else's car, a

10   stranger's car.

11       Q.    So they would know what to

12   expect, is that what you're saying?  You

13   would let them know ahead of time?

14       A.    Exactly.

15       Q.    After Greylock, where would you

16   go?

17       A.    After Greylock, I would go back

18   to the sales center, and I would sit down

19   and I would sit them down, offer them the

20   opportunity to use the lavatories or to get

21   any coffee or beverages that they need to

22   get.  Then I would sit them down and share

23   with them who Vacation Village was, what

24   their features and benefits were of what was

1    being offered to them, how it worked.

2                Basically, I would tell them

3    that -- I would tell them my intention.  I

4    would definitely let them know that

5    regardless of whether they chose to get

6    involved with us today or not, their gifts

7    wouldn't change, that they were guaranteed

8    to receive the gifts that they were offered

9    and told that they were going to receive by

10   the marketer.

11               I would apologize for any

12   inconveniences on behalf of marketing,

13   because there was a lot of them, directions

14   and things of that nature.  The length of

15   the tour time and things like that.

16       Q.    Could you explain that?  What

17   were the errors, as far as the length of the

18   tour time?  Were they told it was going to

19   be shorter, longer?

20       A.    They were told it was going to be

21   shorter.  They were told it was going to be

22   ninety minutes, when, in actuality, it's

23   more like three hours.  So I would clarify

24   that and then I'd simply begin to discuss

1   with them what their vacation habits were,

2   where they had gone, how they enjoyed their

3   trip, what was their most memorable

4   vacation.

5       Q.    This is still at the sales

6   center?

7       A.    Yep.  We would also discuss --

8   I'd ask if it was a husband, or wife, or a

9   couple, any type of a couple situation, I

10  would ask them individually, and I'd tell

11  them not to cheat, but I'd ask them

12  individually if they could take the other

13  person anyplace, if they could take the

14  other person anyplace in the world, money

15  not an option, where would they take them.

16          And I'd ask the other person the

17  same question.  And I'd also ask them to

18  tell me a couple places that they'd always

19  wanted to go and haven't gotten there yet,

20  and then we'd discuss their last vacation

21  financially, what did it cost for their

22  accommodations; where did they stay; how

23  were their accommodations; what did they

24  like most about their accommodations in the

1    place they were staying at; what did they

2    like the least about it; what would they

3    change, if anything, about the way that they

4    were vacationing like that.

5             I'd also ask them how they booked

6    their vacations, whether they went through a

7    travel agent or booked on-line or just what

8    their method was or just did a drive-in.

9    I'd also -- we'd also discuss -- just all

10   the pros and cons, which include the

11   activities that were offered at the places

12   that they stayed at and the conveniences or

13   inconveniences of having to go out to

14   breakfast, lunch and dinner, because of lack

15   of having a fully furnished kitchen right

16   there at their disposal.

17            I would then ask -- we would

18   discuss their vacation dollars, what they

19   spent on entertainment, the things that they

20   did, and just their whole vacation style

21   from their -- their whole vacation from

22   beginning to end, the airline tickets,

23   rent-a-cars, you know, various things like

24   that, theme park tickets, feeling they need

1    to -- parents waking up and feeling like

2    they're still at work because they have to

3    get up and take the children out to

4    entertain them because there's nothing there

5    for them to do, you know, as opposed to

6    staying at a place like the one they were

7    about to see, which a lot of them, the

8    opportunity to sleep in a little late and

9    wake up and have a cup coffee, sit out on

10   the patio and wait for the children to come

11   back from the activity center from doing

12   whatever activities that were going on.

13        Q.    Can I interrupt for one second?

14        A.    Yes.

15        Q.    You had said that you gave them

16   advanced information as to different sites

17   you would see.  I just wanted to clarify.

18           Now, did you take them to other

19   sites besides Mount Greylock before coming

20   to the sales center?

21        A.    No.

22        Q.    So that would be after you left

23   the sales center?

24        A.    The order was to pick them up, go

 1    to Mount Greylock and then come back to the

 2    sales center, leave the sales center and

 3    then, originally, it was going to Brody

 4    Mountain, then it was going over to Bentley

 5    Brook or Jiminy Peak, then it was going over

 6    to our property, or Vacation Village, and

 7    then it was coming back to the sales center.

 8         Q.    Thank you for clarifying.  Just

 9    one other question.  Are you familiar with

10    the ten steps?

11         A.    Absolutely.

12         Q.    Is that the procedure that you

13    generally adhere to when you were giving

14    your presentation?

15         A.    Yes.

16         Q.    Okay.  Go on.

17         A.    We have what's called a survey,

18    and this -- these questions that, and this

19    discussion that we're having, which are the

20    questions in the discussion that I've given

21    so far, that information, is all part of the

22    discovery, it's all part of the survey,

23    additional questions.

24              From the survey we would then go

1    on and I would share with them.  We'd do

2    what's called, like, a rent versus own.  We

3    do a comparison of -- we discuss, first off,

4    what they're spending on vacations.  So, for

5    example, I'd say, Mr. and Mrs. Smith, you

6    all shared with me earlier that you all

7    spent $150 per night for your hotel room,

8    and you also discussed with me that you'll

9    take two weeks a year for vacation or that

10   you take ten days, which equals, you know,

11   $1500 or such.

12              And I also would have asked them

13   if they plan to continue to vacation, all

14   during the survey, and, of course, they

15   would say yes, they plan to continue to

16   vacation, so I'd add their vacation dollars

17   up, over twenty years, times inflation, and

18   come up with whatever figure that I came up

19   with.

20              And then, on the flip side of it,

21   I would share with them simply that they

22   have the opportunity -- I said, you know, if

23   you had the opportunity to take that same

24   money that you're spending right now, having

1    a great time, and going on some really great

2    vacations, and doing some great things, and

3    taking it and investing it into a vacation

4    club or vacation plan, that you and your

5    family could use that would enhance the

6    quality of your vacations, and have the

7    aspect and allow you the opportunity to take

8    all your dream vacations and still have your

9    money working for you.  Does that make sense

10   to you?  Which one would you rather have?

11   Of course, they'd say that one.

12              And I'd share with them that

13   instead of staying in a hotel room that's

14   got a double bed with it, a television and

15   one bathroom and a remote control, bolted to

16   the nightstand with, maybe, a table and two

17   chairs, how they had -- and a pool by the

18   highway or something like that, if they had

19   an opportunity to stay at a beautiful luxury

20   condominium that was two bedrooms so the

21   children had their space, they had their

22   space.  They had at least two bathrooms, so

23   it wasn't a constant wait, I have to use the

24   bathroom.  We still laugh about that because

1    the children do that all the time.

2              And luxuries of having a jacuzzi

3    and a master bedroom, a living room,

4    multiple TV's, because my family doesn't

5    like to watch the same station or the same

6    television shows all the time, and they

7    would definitely agree that theirs don't

8    either.

9              And in addition to that, the

10   biggest benefits they had was owning it and

11   being deeded it, having a deed to it so

12   they'd own it forever and heirs, or assigns,

13   they would own it in perpetuity.  Meaning,

14   I'd ask them, or they already know, rather,

15   whether they own their home or not, based on

16   their survey, and, if they own their home,

17   then I'd ask them what were the benefits of

18   home ownership and why did they choose to

19   own a home rather than to continue to rent a

20   unit from someone else.  And they would tell

21   me it made financial sense at, you know, it

22   would save them money, if it was something

23   that it was there.  It's something they

24   could pass on to their children.

1          And I shared with them that this

2     is also part of the same benefits that you

3     receive as an owner with us today.  As an

4     owner with us today, you have a deed that

5     you own in perpetuity.  You could either use

6     it yourself, you can rent it out, you can

7     will it, you can share it with friends and

8     family, give it away as a gift.  You can do

9     anything that you'd like to do, of that

10    nature, with it.

11          The nicest part about it is,

12    unlike a regular time-share, you can

13    exchange it, through a company called RCI, I

14    believe.  We were doing RCI at that time.

15    I'm not exactly certain, but I believe it

16    was RCI.  And through RCI, they had

17    worldwide exchange opportunities, and I

18    would show them a color graph, it had red,

19    white and blue, I believe, different color

20    seasons.  I'm not sure on RCI, red, white

21    and blue.  Red, yellow, green, three

22    different color seasons, prime time,

23    mid-season and low season.  And I would

24    share with them the benefits of how owning

1    in Inn Seasons works.

2          Q.    At what point would you move on

3    to the next step?

4          A.    After showing them a couple

5    places, just a couple places that they've

6    been to.  Like I'd show them, maybe, one of

7    the places that they've been to where they

8    stayed in a hotel, like Disney World for

9    example, where they stayed in a motel or a

10   Holiday Inn, something like that, as opposed

11   to staying at a resort, I'd show them that.

12   And I'd show them one of the places that

13   they'd listed or that they told me they

14   really wanted to go to.

15         Q.    So you'd compare that?

16         A.    Absolutely.  And I would share

17   with them the cost involved with making the

18   exchange from their home-base resort to any

19   other place in the world.  There's a

20   difference in the fee from going domestic,

21   from going internationally, they're all very

22   small.  And, generally, based on what they

23   share with me in terms of how much they paid

24   for their accommodations per night, it was

```
 1    less to exchange and stay for a week in a
 2    beautiful condo, than it was to stay in a
 3    hotel room for the night, and they would
 4    agree with that.
 5              And then I'd tell them, I believe
 6    at this point I would tell them that -- I'd
 7    say, okay, anyone, again, allow them the
 8    opportunity to use the rest room, get any
 9    beverages and tell them I'm going to show
10    you around.
11        Q.    And then you would go through
12    those other items that you listed?
13        A.    Yep, then we get back in my car,
14    and the first thing I'd do is show them up
15    front, because we had -- there was a Par 4
16    area out there that had miniature golf, and
17    go-cart and things of that nature, and a
18    snack bar that they were going to receive
19    discounts off of, and then we'd drive right
20    over to Brody Mountain, show them the
21    activities, amenities there, as well as over
22    at Bentley Brook, and go over and show them
23    the condo and show them the condo at
24    Vacation Village.
```

1      Q.    Does anyone ever elect not to go

2   on any steps after you bring them to the

3   sales center, did anyone ever say, I'm not

4   interested, I don't want to go any further,

5   anything like that?

6      A.    As I sit here today, I really

7   don't recall.  The whole idea of a tour, no

8   one comes to purchase anything, and that

9   comes within my intent statement, that I

10   realize that they didn't wake up this

11   morning and say, Hey, let's go to the

12   Berkshires to Vacation Village and buy a

13   time-share, but I ask them to simply keep an

14   open mind.  If they like what they saw, use

15   it, if it makes sense.

16      Q.    So you don't recall anyone

17   ever --

18      A.    Not particularly, because that

19   was already -- that part was already

20   covered.

21      Q.    Did you ever refuse to take

22   anyone on tour at any point in the tour?  Or

23   refuse to continue with the group, I should

24   say?

```
 1            A.    I don't recall ever refusing to
 2      take anyone on a tour.
 3            Q.    Did you keep a record of how much
 4      time was spent in each of those steps of the
 5      tour that you described to me?
 6            A.    No, not that I recall.
 7            Q.    What did you do when your group
 8      was completed?
 9            A.    When my tour was completed?
10            Q.    Yes.
11            A.    I would go and sign back in at
12      the registration, the original place where
13      you pick up your tours.
14            Q.    In the reception center?
15            A.    Yep.
16            Q.    And then what would you do?
17            A.    Nothing.  Just hang around and
18      wait for another tour.
19            Q.    How many tours would you have per
20      day?
21            A.    It varied.
22            Q.    From what to what?
23            A.    It varied from none to maybe
24      three or four.
```

1      Paul Stensland to use his vehicle?

2             A.    Yes.

3             Q.    On more than one occasion?

4             A.    Yes.

5             Q.    Who was your manager at the time

6      of your termination?  I'm asking for the

7      sales manager, not the line director.  Was

8      that Mr. Borden?

9             A.    No.

10            Q.    Who was it?

11            A.    I believe it was Ken Flanders.

12            Q.    Who notified you that you were

13     being separated from employment?

14            A.    Paul Stensland.

15            Q.    How did he notify you?

16            A.    At my other job.

17            Q.    Where was your other job?

18            A.    Actually, they called my home

19     first and my children told them that I was

20     at work, and he called -- actually, I don't

21     remember if he called there or if I returned

22     his call, but that's how we connected and

23     that was actually, I believe, on or around

24     June 6th of 2003.

1          Q.    When you say your other job, what

2     are you referring to?

3          A.    I was working at Dunkin Donuts at

4     the time.

5          Q.    Was that Lori Donuts?

6          A.    Yes.

7          Q.    Do you have a recollection of

8     your telephone conversation with

9     Mr. Stensland regarding your termination?

10         A.    Not as I sit here today, I don't

11    recall what our conversation was.

12         Q.    You do recall that he terminated

13    you though, during that conversation?

14         A.    Yes.

15         Q.    But you don't remember anything

16    else that was said?

17         A.    I don't at this time, no.

18         Q.    Did you make any records of that

19    conversation?

20         A.    I don't understand your question.

21         Q.    Did you take any notes or write

22    down anywhere who said what during the

23    conversation or right after the

24    conversation?