204

```
 1          A.    I don't recall whether I did or
 2    not.
 3          Q.    Did you attempt to contact anyone
 4    at Patriot Resorts, after your termination,
 5    to get your job back?
 6          A.    Not that I recall.
 7          Q.    Do you recall what Mr. Stensland
 8    told you, if anything, the reason was for
 9    your termination?
10          MS. GARROW:  Objection.  You can
11    answer.
12          A.    The reason for my termination was
13    for attendance.
14          Q.    Is that what you remember he told
15    you?
16          A.    Yes.  That the rule was fifteen
17    days, and he said that I had reached that
18    fifteen days.
19          Q.    Do you recall saying anything in
20    response?
21          MS. GARROW:  Objection.  You can
22    answer.
23          A.    I don't recall right now what I
24    said.
```

1          Q.    Did you contact anyone at the
2    Berkley Group or corporate headquarters in
3    Florida regarding your termination?
4          A.    I don't recall.
5          Q.    Do you recall ever speaking to
6    anyone at corporate headquarters in Florida?
7    Do you know what I mean by corporate
8    headquarters?
9          A.    Yes, I do.
10         Q.    Corporate headquarters in
11   Florida, do you remember ever speaking to
12   anyone there?
13         A.    I do recall speaking to someone.
14   Who and of what nature, I do not recall, but
15   I do recall speaking to, or at least making
16   an attempt to speak with someone prior.  I
17   believe it was prior to my separation.
18         Q.    Do you recall what it was
19   regarding that you wished to speak to
20   someone about?
21         A.    I do not, not at this time.
22         Q.    When did you begin at Lori
23   Donuts?
24         A.    I don't recall the exact date.

1          Q.    You were working there when you

2    were working at Patriot Resorts?

3          A.    Yes.

4          Q.    What hours did you work at Lori

5    Donuts?

6          A.    I closed.

7          Q.    What hours are those, around,

8    about?

9          A.    I believe it's about, somewhere

10   around six o'clock, sometimes earlier.  I'd

11   work shifts on my days off, so I'd, of

12   course, be available earlier during those

13   days.

14         Q.    Can you give me an idea of how

15   many hours you worked per week at Lori

16   Donuts?

17         A.    I cannot.  I do not recall how

18   many hours I worked there a week.

19         Q.    What would -- did you spend time

20   in the sales lounge, or the also known as

21   the pit, in between your tours?

22         A.    Could you repeat that question,

23   please?

24         Q.    Sure.  In between the waves of

208

1   what you could and could not doing while you
2   were waiting in the pit?
3        A.    Could you rephrase that?  I don't
4   understand the question.
5        Q.    Sure.  Was there anything that
6   you were not allowed to do while you were
7   waiting in the pit?
8             MS. GARROW:  Objection.
9        A.    I still don't understand your
10  question.
11       Q.    What were you supposed to be
12  doing when you were waiting in the pit?
13       A.    I don't recall anything that we
14  were supposed to be doing.
15       Q.    Did you keep any records of any
16  activities that you engaged in while you
17  were in the pit?
18            MS. GARROW:  Objection.  You can
19  answer.
20       A.    Would you repeat that?
21       Q.    Sure.  Did you keep any records
22  of what you did while you were waiting in
23  the lounge or in the pit?
24            MS. GARROW:  Objection.  You can

1    about me again.

2            I'm going to get -- they're going

3    to discuss something else.  What is it, my

4    shirt?  Is it my shoes?  Is it, you know,

5    what is it today that, you know, that I'm

6    going to get reprimanded about?  Is it the

7    way that I sat in my chair?  Anxiety got to

8    be too much.

9        Q.    Did you ever get reprimanded for

10   the way you sat in your chair?

11       A.    I got reprimanded for several

12   things that were things that I just didn't

13   necessarily understand.  I'm not sure why.

14       Q.    Mr. Stensland testified at his

15   deposition that you owed him $1300.  Do you

16   believe that's correct?

17       A.    No, I do not.

18       Q.    Did you borrow money from

19   Mr. Stensland?

20       A.    Mr. Stensland gave me -- I don't

21   recall the amount, but he gave me a bonus

22   himself, for meeting a goal.

23       Q.    He stated that he had written a

24   check to a store or credit card to pay for

1      your children's Christmas presents.  Do you

2      recall that?

3            A.    Yes.

4            Q.    Is that something different from

5      the bonus you're referring to?

6            A.    No, it's the same thing.  I just

7      chose him to do it that way rather than to

8      give me the money, kill two birds with one

9      stone.

10           Q.    Did you ever receive money from

11     Mr. Stensland which you paid back?

12           A.    Yes.

13           Q.    And how much had you borrowed?

14           A.    I don't recall.

15           Q.    Do you believe that you paid all

16     of that money back?

17           A.    Absolutely, to my recollection, I

18     did, anything that was borrowed.

19           Q.    Did Mr. Stensland ever personally

20     wire you money in Florida because you had a

21     problem in Florida with your vehicle?

22           A.    Yes, I believe he did.

23           Q.    Did he ever pay any of your

24     credit card bills for you?

# EXHIBIT
## 5

Vol. I, Pgs. 109

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 04-CV-30091-MAP

-----------------------
                         )
WISE ET AL,              )
            Plaintiffs   )
                         )
vs.                      )
                         )
PATRIOT RESORTS CORP.,   )
ET AL.                   )
            Defendant    )
                         )
-----------------------


DEPOSITION OF PETER CORBIN

Tuesday, May 24, 2005

9:30 a.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144




- - - - - Sandra A. Deschaine, RPR - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

```
 1    APPEARANCES:

 2    SKOLER, ABBOTT & PRESSER, P.C.

 3        Kimberly Klimzcuk, Esquire

 4        Marylou Fabbo, Esquire

 5        One Monarch Place, Suite 2000

 6        Springfield, Massachusetts 01144

 7        (413) 737-4753  Fax (413) 787-1941

 8        on behalf of the Defendants

 9

10    HEISLER, FELDMAN & MCCORMICK, P.C.

11        Joel Feldman, Esquire

12        1145 Main Street

13        Springfield, Massachusetts  01103

14        (413) 788-7988  Fax (413) 788-7996

15        on behalf of the Plaintiffs

16

17    Also Present:  Faith Lippert

18

19

20

21

22

23

24
```

```
 1    the first five weeks?

 2          A.    Yes.

 3          Q.    Did you receive your bonus pay?

 4          A.    No.

 5          Q.    And then after five weeks, did

 6    you receive eight percent commission?

 7          A.    I believe I did.

 8          Q.    Did you receive any bonus pay

 9    after that?

10          A.    At times?

11          Q.    Yes, ever.

12          A.    Ever, yes.  Constantly, no.

13          Q.    Who's your supervisor at Patriot

14    Resorts?

15          A.    My immediate supervisor was a man

16    named Gordon Leete.

17          Q.    What's his position?

18          A.    His position was line director.

19          Q.    To your knowledge, was it

20    ever someone different at the time you were

21    there?

22          A.    To my knowledge, no.

23          Q.    Did you ever have another

24    supervisor there?
```

```
 1            A.    There was other supervisors
 2    there.  No, I was pretty much under his
 3    team, whatever, supervision.
 4            Q.    How many teams were there?
 5            A.    Two.
 6            Q.    Who supervised the other team?
 7            A.    A man named Paul Stensland.
 8            Q.    Was he also a line director?
 9            A.    Yes.
10            Q.    What were your job duties as
11    Patriot Resorts?
12            A.    Selling time-share, pretty much,
13    as I described prior.  Most companies in
14    time-share run the same way.
15            Q.    So can you take me through a
16    typical day at Patriot Resorts?
17                  MR. FELDMAN:  Objection.  Go
18    ahead.
19            A.    We would get there and sign in
20    before 8:30.
21            Q.    Where did you go when you say you
22    got there?
23            A.    To the site, to Lanesborough
24    Road, to the resort -- I'm sorry.  To the
```

```
 1          Q.    Did you ever miss a morning
 2   meeting?
 3          A.    No.
 4          Q.    So in which room did you
 5   congregate while waiting for the tours?
 6          A.    A room in the, shall we say, tour
 7   office, which was set aside for us.  It was
 8   known as the pit, affectionately.
 9          Q.    Was it called anything else?
10          A.    Probably.
11          Q.    But you don't know what?
12          A.    Nothing formally, no.
13          Q.    And you said you would wait for
14   your tours there?
15          A.    Yes.
16          Q.    What would you do while you were
17   waiting for your tours?
18          A.    Sometimes train, sometimes have a
19   training session, one-on-one, one-on-twenty,
20   sometimes read the paper, sometimes have a
21   cup of coffee.  It would all be general.
22          Q.    Who would conduct the training
23   sessions?
24          A.    Sometimes Paul Stensland,
```

# EXHIBIT
## 6

# Vacation Village
## IN THE BERKSHIRES



*Wise* EXHIBIT *7*
*6/6/05*

**DATE:**    3-Nov-02
**TO:**    All sales staff
**FROM:**    Rod Lewis
**RE:**    Company attendance policy

*************************************************************************************

Patriot Resorts Corporation's policy regarding absenteeism was established August 4, 2001.
It clearly states "Each salesperson is permitted 15 personal days off each year after 90 days of
employment. Personal days are defined as any day absent from your place of work, for any
reason, without exception. This includes vacation days, sick days, Dr. appointments,
emergencies, car problems, etc."

There has been question as to this policy. Any further questions should be directed to your
manager. This is the written company policy and it is to be followed.

Excessive absenteeism and excessive tardiness shall be subject to disciplinary action
including time off or termination.

A copy of The Company policy in attached.

Please sign this memo and return it to your Sales Director.

I have read and understand this company policy.

x _Latrisha D. Wise_
SIGNATURE

x _LaCrisha D. Wise_
PRINTED NAME

cc: Bruce Polansky
    Ned Abbott
    Gordon Leete
    Paul Stensland
    Bonnie Gardner
    Faith Lippert

**000911**

20 Williamstown Road • Lanesboro, Massachusetts 01237
Telephone: (413) 236-5885

# EXHIBIT
## 7

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
        Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
        Defendants

DEPOSITION OF REBECCA FOSTER CAMPAGNA

May 23, 2005, 10:10

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

2

### APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiffs


SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
     KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

41

```
1          A.    Yes, I believe we had a conversation
2    with our attorneys regarding the issue.
3          Q.    This was back in 2001?
4          A.    Thereabouts.  It may have been earlier
5    than 2001.
6          Q.    But as you were setting up the new
7    corporation and the new resort, is that fair to
8    say?
9          A.    That's correct.
10         Q.    What attorneys did you speak with?
11         A.    We spoke to our local attorneys in
12   Williamstown, and we also spoke with our counsel
13   in Virginia.
14         Q.    I'm not asking for the substance of
15   your discussions with counsel in Virginia, but
16   what was the purpose for you to, or for the board
17   to discuss wages with counsel in Virginia in
18   relation to Patriot Resorts?
19         A.    Because we had discussed the issue
20   with them previously.
21         Q.    Did you have any conversations with
22   any other attorneys at that time other than local
23   attorneys in Massachusetts and counsel in
24   Virginia?
```

```
1              MS. FABBO:  Objection.  You can
2         answer.
3              THE WITNESS:  We've spoken to our
4         attorneys in Nevada.
5         Q.   (By Ms. Garrow)  Just so I'm clear,
6    you spoke with your attorneys in Nevada in
7    relation to setting up, or in relation to the
8    hourly wage at Patriot Resorts; is that your
9    testimony?
10        A.   No, I'm sorry.  I thought your
11   question was in relation to wage and hour.
12        Q.   I'm sorry, let me be clearer.  When
13   you were beginning in 2001, Patriot Resorts was
14   up and running sometime in 2001, is that correct?
15        A.   That's correct.
16        Q.   And prior to Patriot Resorts having
17   employees, in particular salespeople and sales
18   managers, did you speak with anyone other than
19   your local Massachusetts attorneys with relation
20   to hourly wage for those salespeople or sales
21   managers at Patriot?
22        A.   We spoke with our Virginia counsel so
23   that they could share information with our
24   Massachusetts law firm.
```

43

1      Q.    Anyone else?

2      A.    No, not at that time.

3      Q.    Who were your local attorneys?

4      A.    In Massachusetts?

5      Q.    Yes, I'm sorry.

6      A.    Parese and Sabin.

7      Q.    And they're in the Berkshires, right?

8      A.    Williamstown, yes.

9      Q.    About how many times did you speak

10  with them in relation to hourly wages and wage

11  and hour issues at Patriot Resorts?

12      A.    I don't really recall how many times I

13  may have spoken with them about that.

14      Q.    Did you -- again, this is in the same

15  time frame, and actually, this would be any time

16  subsequent.  Did you ever obtain or seek an order

17  of a Massachusetts attorney general or the U.S.

18  Department of Labor relating to your wage and

19  hour practices at Patriot Resorts?

20      A.    Not for Patriot Resorts, no.

21      Q.    Did you receive an order or ruling for

22  some other location or some other corporation?

23      A.    Our Virginia attorneys requested -- I

24  believe it's an opinion from the Department of

```
 1    Labor; not directly, but they went through the
 2    American Resort Developers Association, which is
 3    an association of similar developers, time-share
 4    developers; and they requested it of the
 5    Department of Labor.
 6              Q.   The U.S. Department of Labor?
 7              A.   That is correct.
 8              Q.   Do you recall -- have you reviewed
 9    that opinion later?
10              A.   Not recently.
11              Q.   At some point you did?
12              A.   Yes, I did.
13              Q.   Do you recall what that opinion letter
14    said?
15              A.   Basically they did not make a
16    determination.  They felt that -- well, again, I
17    can't say what they said, but our attorney -- our
18    labor attorney --
19              Q.   Again, I'm not going to ask you what
20    your attorney said, but I want to know what the
21    AG said based on the opinion letter, that's all.
22              A.   Well, I don't recall the opinion
23    letter.  That was given to our attorneys.
24              Q.   So at no point -- you didn't review
```

45

1    the opinion letter or did you review it?

2         A.    I may have.

3         Q.    Did you ask to review it at some point

4    in relation to Patriot Resorts?

5         A.    Yes, I believe we had the attorneys

6    confer on that.

7         Q.    At some point, do you recall what the

8    general gist of that opinion was from the United

9    States Department of Labor?

10        A.    We did not have an obligation to pay

11   minimum wage.

12        Q.    Did you understand why?

13        A.    Again, I don't know the specifics.

14   That's between the attorneys.

15        Q.    Do you believe any statutory exemption

16   to payment of minimum wage applies in this

17   particular matter --

18                   MS. FABBO:  Objection.

19        Q.    (By Ms. Garrow)  -- in this particular

20   matter that you're here being deposed on today?

21                   MS. FABBO:  Objection.  Don't

22              answer as to any discussions with

23              counsel, but if you have any opinion

24              other than what you've learned from

```
 1                    your attorneys.
 2                         THE WITNESS:  I really don't have
 3                    an opinion other than what the
 4                    attorneys have said.
 5          Q.    (By Ms. Garrow)  I'm really not asking
 6     for an opinion.  What I'm asking for is if you're
 7     aware of any exemptions that you believe apply
 8     here, exemptions to pay minimum wage; not an
 9     opinion on that?
10          A.    I'm not really qualified to answer
11     that.
12          Q.    So is it your testimony, then, as you
13     sit here today, you're not personally aware of
14     any exemptions?
15                         MS. FABBO:  Objection.  You can
16                    answer.
17                         THE WITNESS:  Only as it's been
18                    related to me from our attorneys.
19          Q.    (By Ms. Garrow)  Do you recall what
20     those were?
21                         MS. FABBO:  Objection.  Don't
22                    answer to your conversations with
23                    counsel.
24          Q.    (By Ms. Garrow)  Do you have anything
```

1    independent of conversation of counsel?

2         A.    No, I don't.

3         Q.    Knowledge as to what those exemptions

4    are -- counsel in Virginia, let me just go back

5    here and look and see -- is Massanutten -- and

6    again, I apologize for not being able to grasp

7    this as quickly as I should -- but Massanutten,

8    is that your only Great Eastern Corporation and

9    Massanutten Resort, is that your only location in

10   Virginia -- there's a Williamsburg one as well,

11   right?

12        A.    Williamsburg Plantation, yes.

13        Q.    Those are the two Virginia locations?

14        A.    We do have a campground time-share in

15   Fredericksburg, Virginia.  When I say "we," we

16   have a sales and marketing contract at Wilderness

17   Resort.  That's a campground facility in

18   Fredericksburg, Virginia.  It is owned by

19   Presidential Resorts Corporation, I believe.

20        Q.    Is that another corporation that's

21   somehow affiliated with the Berkley Group?

22        A.    No, it is not.  Only through its

23   contract with Berkley.

24        Q.    I'm sure you probably told me who was

```
 1          A.    Only what I know from the attorneys,
 2     what they instruct us to do as far as pay is
 3     concerned.
 4          Q.    What about the requirements of
 5     employers to pay overtime compensation under the
 6     Massachusetts Wage and Hour Laws; do you have any
 7     knowledge in that regard?
 8          A.    Only the knowledge I've obtained from
 9     legal counsel.
10          Q.    And you just follow the advice of
11     counsel in that regard?
12          A.    That's correct.
13          Q.    What about the minimum wage
14     requirements under the Fair Labor Standards Act;
15     do you have any knowledge regarding the
16     requirements to pay minimum wage under the
17     Federal Fair Labor Standards Act?
18          A.    That would all be per our attorney's
19     instruction.
20          Q.    So just follow the advice of counsel?
21          A.    That's correct.
22          Q.    What about the requirements under
23     Massachusetts law to pay minimum wage under
24     Massachusetts law; any personal knowledge with
```

1    regard to payments of minimum wage in that

2    regard?

3         A.    Only as instructed by the attorneys.

4         Q.    What about timely payments of wages

5    under Massachusetts law; any personal knowledge

6    of the laws in that regard?

7         A.    Only as instructed by counsel.

8                   (Exhibit 8, Massaconi Paycheck

9                   Stub, marked for identification)

10        Q.    (By Ms. Garrow)  Showing you what's

11   marked as Plaintiff's 8.  Do you recognize those

12   documents?

13        A.    It appears to be a paycheck stub from

14   Patriot Resorts for Michael Massaconi.

15        Q.    Actually two, is that correct?

16        A.    Yes, two separate ones.

17        Q.    Have you seen paycheck stubs from

18   Patriot Resorts previously?

19        A.    Yes.

20        Q.    Does this look like the ones you've

21   seen in the past?

22        A.    Yes.

23        Q.    Can you just explain to me on that

24   first one -- because they are substantially the

```
 1   with relation to Mr. Lee?

 2        A.   I don't know his name; I'm not

 3   familiar with him.  I don't know if he was the

 4   one that was questioned before; I don't know.

 5        Q.   What does "unpaid" mean in this

 6   context?

 7        A.   I really don't know.

 8        Q.   Did Miss Lippert ever call you about

 9   Mr. Lee, to your knowledge?

10             MS. GARROW:  Off the record.

11             (Off record conference)

12             MS. GARROW:  Back on the record.

13             THE WITNESS:  I forgot it.

14        Q.   (By Ms. Garrow)  Did Miss Lippert ever

15   call you in relation to Mr. Lee?

16        A.   No.

17             MS. GARROW:  Off the record.

18             (A break was taken)

19             MS. GARROW:  Back on the record.

20             (Exhibit 14, Letter to ALDA from

21             ESA, marked for identification)

22        Q.   (By Ms. Garrow)  Showing you what's

23   marked as Exhibit 14, I believe we discussed this

24   earlier.  Do you recognize this document --
```

```
 1      actually, let me stop you.  You had said earlier

 2      that you relied on an opinion letter that you had

 3      received in relation to Virginia, is that

 4      correct?

 5            A.   Yes, I believe that the Virginia --

 6      our Virginia counsel are the ones that relied on

 7      this letter.  I'm not sure that I -- I may have

 8      seen this letter, but I don't remember it.  This

 9      was a long time ago.

10            Q.   Let me ask you this:  You had

11      testified before that there was no hourly wage

12      for the salespeople at Vacation Village, is that

13      true?

14            A.   That's correct.

15            Q.   And they were only paid by commission?

16            A.   That's correct.

17            Q.   And same with the sales managers?

18            A.   That's correct.

19            Q.   And you had mentioned that you were

20      aware that there was an opinion letter in

21      relation to that issue for Virginia, is that

22      correct?

23            A.   I think it was more than just

24      Virginia.
```

131

1          Q.    Would you review this document, and
2     I'm going to tell you that your lawyer who sent
3     this over apologized for the blurriness of it, so
4     I think this is the best we have.  Take a look at
5     this and tell me if this is the letter that you
6     relied on.  Take your time to review it.
7          A.    From what I can read, I understand
8     what it's saying, and this is probably the
9     letter.
10         Q.    Were there any other letters, to your
11    knowledge?
12         A.    The date is 1985.  I thought there was
13    one that was even more recent, but perhaps this
14    is the only one.  I really don't know.
15         Q.    We've requested all those letters.
16    Did you provide everything to your lawyer that
17    you had?
18         A.    Yes, we requested everything.
19         Q.    And did you provide everything that
20    was requested of you by your lawyer?
21         A.    Yes, yes.
22         Q.    You have nothing else that you held
23    back?
24         A.    Not that I'm aware of.

132

```
1            Q.    So you said this was a 1985 letter?

2            A.    Correct, this is 1985.

3            Q.    Were the Virginia locations -- was

4     Massanutten up and running at that time?

5            A.    Yes.

6            Q.    Was Williamsburg?

7            A.    No.

8            Q.    Obviously Patriot Resorts wasn't up

9     and running at that time, correct?

10           A.    No.

11           Q.    So can you show me the portions of

12    this letter -- can you point to the portions of

13    the letter that you relied on for your

14    determination that it was acceptable to pay your

15    salespeople and sales manager at Patriot Resorts

16    on a commission-only basis?

17                      MS. FABBO:  Objection.

18                      MS. GARROW:  You can answer.

19                      THE WITNESS:  I did not rely on

20                 this letter.  This letter went to our

21                 attorney, and our attorney sent us an

22                 opinion letter after he received this

23                 from the Land Development Association.

24           Q.    (By Ms. Garrow)  So did you rely on
```

**REAL-TIME COURT REPORTING**
244 Bridge Street                    807 Main Street
Springfield, MA  01108        Worcester, MA  01610
413.732.1157                              508.612.3432