UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBI,<br><br>                Plaintiffs,<br><br>vs.<br><br>PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III, REBECCA A. FOSTER, and JAMES E. LAMBERT,<br><br>                Defendants. | CIVIL ACTION NO. 04-30091-MAP |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED REGARDING COUNT V – MARTIN'S INDIVIDUAL CLAIM FOR RELIEF: RETALIATION IN VIOLATION OF MASS. GEN LAWS CH. 149, § 148A**

1.  Defendant Patriot Resorts Corporation ("Patriot"), which is located in Lanesborough, Massachusetts, owns and sells timeshare interests at Vacation Village in the Berkshires ("Vacation Village"). Vacation Village is located in Hancock, Massachusetts (Affidavit of Faith Lippert ("Lippert Aff."), Exhibit ("Ex.") 1, ¶ 3).

2.  Faith Lippert is and has been the Office Manager and Human Resources Representative of Patriot and has worked at the Lanesborough location since the company opened in 2001.[1] (Lippert 8-9)

3.  Patriot is a wholly-owned subsidiary of the Defendant The Berkley Group, Inc. ("Berkley"), which is a foreign corporation headquartered in Fort Lauderdale, Florida. In addition to Patriot, Berkley has several other wholly-owned subsidiaries in different states. (Foster 10-12, 21)

---

[1] True and accurate copies of the deposition transcripts referenced herein are attached as follows: Ex. 2 – Faith Lippert; Ex. 3 - Rebecca A. Foster; Ex. 4 – Roger Martin; Ex. 5 – Rodney Lewis; Ex. 6 – Wiliam Rauer.

4. Defendant Rebecca A. Foster ("Foster") at all relevant times was President of both Patriot and Berkley. Foster at all relevant times has resided and worked for Berkley in Florida. Foster has been employed with Berkley for 32 years. (Foster 7, 28)

5. Defendant Marc J. Landau ("Landau"), at all relevant times was Treasurer of both Patriot and Berkley and was Chief Financial Officer of Berkley. Landau at all relevant times has resided and worked for Berkley in Florida. (Foster 13, 19, 28)

6. Defendant J.P. Ottino, III ("Ottino") at all relevant times was a Vice President – Corporate Acquisitions of Berkley and a Director and Vice President of Patriot. Ottino at all relevant times has resided and worked for Berkley in Florida. (Foster 13, 28)

7. Defendant James E. Lambert ("Lambert") at all relevant times was Chairman of the Board and CEO of Berkley, only. Lambert at all relevant times has resided in Florida and has worked on a part-time basis providing sales and marketing expertise to Berkley's Board of Directors. (Foster 13-14)

8. Plaintiff Roger Martin was a Timeshare Sales Representative for Patriot selling timeshare interests at Vacation Village in the Berkshires from August 6, 2001 to May 13, 2003, and again, from November 7, 2003 to September 21, 2004. (Lippert Aff. ¶ 4)

9. Martin was working for Bentley Brook selling time share units, on a commission basis, in Hancock, MA, when he, and about 12 others, were approached by Patriot to come work for it. (Martin 43-49)

10. Martin decided to leave Bentley Brook and go to work as a salesperson for Patriot because "it seemed like a better deal." (Martin 50)

11. Martin began his employment with Patriot around August 6, 2001. At that time, Martin signed an agreement with Patriot entitled, "Employment Agreement – Sales Representative," that established when commissions on timeshare interests he sold would be paid or advanced to him. Martin reviewed the Contract before he signed it. (Martin 52-53; *see* Employment Agreement – Sales Representative, Ex. 7, dated August 6, 2001)

12. Rod Lewis, Project Director, was the highest level of management at Patriot. (Lewis 7)

13. During Martin's employment with Patriot, there were two Line Directors, Gordon Leete and Paul Stensland, who reported to Lewis. Leete and Stensland oversaw groups of Sales Managers and the Sales Representatives

       who made more efforts to sell timeshare interests to potential customers. (Lippert Aff. ¶ 5)

14. Martin worked on both Leete and Stensland's Lines at different times during his employment with Patriot. Both Leete and Stensland stated that Martin was constantly complaining about something. (Lewis 144-45) Martin himself testified that he "protested everything [the] company did." (Martin 183)

15. Martin was able to track his own deals and when commissions were due by looking at the sales ledger he got every day. (Martin 206)

16. Martin called Lippert once or twice and inquired about payment for certain deals he had made. She said she would check on them and get back to him, which she did. Lippert said commissions were not yet due to be paid. Martin thought she was wrong, but he did not tell her that. (Martin 205; Lewis 143)

17. Martin believed that a "Massachusetts Commission Law" he located on the computer required that commissions be paid within seven working days in Massachusetts and within 10 working days in New York. He brought this issue to the attention of Lippert, Lewis and Stensland. Martin raised his voice to Lippert and was otherwise hostile to her when bringing perceived issues to her attention and was therefore asked not to go to her anymore. (Martin 173-174)

18. Martin sometimes scared Lippert. (Lippert 174)

19. Throughout his life, Martin has consulted with health care providers regarding mental health issues. (Martin 31)

20. Prior to his employment with Patriot, Martin attended anger management classes as the result of a traffic incident. He was cited by the police for creating a disturbance. He was adjudicated "not guilty" as long as he completed sixteen weeks of anger management classes, which he did. (Martin 35-40)

21. Prior to attending 16-weeks of anger management classes, people had brought to Martin's attention issues with his anger management and/or temperament. (Martin 40)

22. Prior to beginning employment with Patriot, Martin began consultation with a psychotherapist in Pittsfield, MA, because he had issues with his temperament. Martin thought he had a temper and wished to control it better. (Martin 29-31)

23. Sometimes when Martin was asked by a supervisor to take a third group of potential customers on tour and attempt to sell to them, he would "pitch a fit"

3

and "get upset" and would speak in an angry tone to the person making the request.  (Martin 124-127)

24. In or about October 2002, Martin took a potential customer on tour of the area and gave him a sales pitch.  Martin became upset when the man did not purchase a timeshare unit.  Martin believed the individual was a "liar," and when the potential customer wanted to shake Martin's hand, Martin said he did not shake hands with liars.  The customer wrote a letter to the company in response to the incident.  In the letter he described how Martin "lost it," when the potential customer told him he was not interested in purchasing.  The letter described Martin shouting at the man, calling him a liar, and cursing.  The letter also stated that the woman that was with the man, "retreated to the car badly shaken up."  The potential customer also wrote a letter to Martin himself asking him to get help and to think about his long-term girlfriend and of his (Martin's) son.  Other sales people intervened in the incident when Martin and the man were "toe to toe."  (Martin 128-13; see also true and accurate copies of complaint letters collectively attached hereto as Ex. 8.)

25. Martin had several meetings with management about his temper.  (Martin 142)

26. Martin met Foster one time during his employment with Patriot when he held an umbrella for her while she walked over to Lippert's office.  He never attempted to contact Foster with any of his concerns.  (Martin 180-81)

27. Martin called a co-worker a "bitch" during a 40-second argument with her on the front porch at work.  (Martin 209-210, 214)

28. During a meeting, Mark LaPine, a Sales Manger, said something to Martin when he was "having a whole, separate, different conversation" at the time a speaker was speaking.  LaPine did not like Martin trying to over speak the speaker so he said something to Martin.  In response, Martin said, "I've had it with your shit, Mark."  (Martin 214-16)

29. The following day, Lippert received an anonymous, handwritten complaint about Martin.  The complaining party, apparently another sales representative, complained about Martin calling a co-worker a bitch, his attitude and comments to LaPine and his general disrespect for everyone and vulgar language.  (Lippert Aff. ¶ 6)

30. Each day Martin and other Sales Representatives and Sales Managers were required to attend a morning meeting presented by his supervisor, Stensland, or Leete, or the Project Director, Rod Lewis.  At the meeting, the presenters would discuss steps to making sales and would identify who had sold time share interests the prior day.  Forty to fifty people would attend the meeting. (Martin 58-62)

4

31. On May 13, 2003, either at or after a morning meeting, Martin became upset when he learned that the company did not have enough potential purchasers for him to tour that day. He told Leete, and then Lewis, that the company was breaking the law and showed him "the laws they were breaking." Martin also said, "you do not want to fuck with me," to which Lewis responded, "you're fired." (Martin 185-89; *see also* Ex. 9, which is a true and accurate copy of Martin's notes regarding his termination.")

32. Martin understood that the company could discipline him for inappropriate behavior. (Martin 184-85)

33. After he was fired, Martin called the Office of the Attorney General. (Martin 185-89; Ex. 9)

34. William Rauer was Senior Project Director for Tower Resort Realty ("Tower"). He was not employed by Patriot. As Senior Project Director for Tower, he oversaw the sales operations and sales personnel of Vacation Village in the Berkshires. Lewis reported to Rauer. (Rauer 6-8)

35. Rauer believed that several times Martin had displayed improper and/or disruptive behavior and had refused a tour on at least one occasion. (Rauer 85-89)

36. Approximately six months after his termination from Patriot, Martin contacted Rauer about going back to work for Patriot. Rauer said that the company would love to have him back but that he could not have any emotional outbursts. Rauer did not tell Martin that anything had changed at the company since Martin's termination. (Martin 194-96; Rauer 88)

37. Martin returned to work at Patriot in or about February 2004 under the supervision of Stensland. (Martin 197-98)

38. In September 2004, Martin became upset at a morning meeting when the attendees were told not to use the back of a printed form as scrap paper. He threw a legal pad on the floor, stepped on it, and went home. (Martin 148-49)

39. On or about September 21, 2004, Stensland asked Martin to take potential customers on a tour and give them a sales pitch. Martin refused, and Stensland sent him home from work. (Martin 218-19)

40. Thereafter, Martin received a voicemail instructing him to call Stensland. When he called Stensland, Stensland told him to come in the following day to meet with Rauer. When Martin arrived, Stensland met him at his car and indicated that Martin was going to have to beg for his job. Martin said he was not going to do it and left. (Martin 221-22)

41. Stensland did not recommend Martin be terminated nor did he have any input in terminating Martin's employment. (Stensland 40-41)

42. Rauer was not aware that Martin had any conversations with anyone during his second period of employment in which he complained about wages. (Rauer 90)

Respectfully submitted,

/s/ Marylou Fabbo
Marylou Fabbo, Esq.
BBO No. 566613
Counsel for Defendants
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts 01144
Tel. (413) 737-4753/Fax: (413) 787-1941

Dated: April 16, 2007

### CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing *Defendants' Statement of Material Facts as to which there is no Genuine Issue to be Tried regarding Count V- Martin's Individual Claim for Relief: Retaliation in Violation of Mass. Gen. Laws Ch. 149, § 148A* was served upon the attorney of record for each other party electronically, on April 16, 2007.

/s/ Marylou Fabbo
Marylou Fabbo, Esq.