# EXHIBIT 1

Case 3:04-cv-30091-MAP  Document 137-16  Filed 04/16/2007  Page 1 of 20

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LACRISHA WISE, MICHAEL
MASSACONI, ROGER MARTIN and
PETER CORBIN, on behalf of
themselves and on behalf of others
who are similarly situated,

     Plaintiffs,

v.

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO, III
REBECCA A FOSTER. and JAMES E.
LAMBERT,

     Defendants.

DOCKET NO. 04-CV-30091-MAP

## AFFIDAVIT OF FAITH LIPPERT

I, Faith Lippert, being duly sworn, state as follows:

1. I am over 18 years old and believe in the obligation of an oath. I have personal knowledge of the facts set forth in this affidavit.

2. Since Patriot opened in 2001, I have been the Office Manager and Human Resources Representative of Patriot Resorts Corp. in Lanesborough, MA. I currently remain in that position.

3. Patriot owns and sells timeshare interests at Vacation Village in the Berkshires, which is located in Hancock, Massachusetts ("Vacation Village").

4. Plaintiff Roger Martin was a Timeshare Sales Representative for Patriot, who sold timeshare interests at Vacation Village in the Berkshires. He was employed by Patriot from August 6, 2001 to May 13, 2003 and, again, from November 7, 2003 to September 21, 2004.

5. During Martin's employment, Rod Lewis was the Patriot's Project Director and the highest level of management at Patriot. Gordon Leete and Paul Stensland, both Line Directors, reported to Lewis. Stensland and Leete

oversaw groups or "lines" of Sales Managers and Sales Representatives who sold timeshare interests.

6. In my role as Human Resource Representative and Office Manager, I received an anonymous, handwritten complaint about Martin calling a coworker a bitch, his attitude and comments to Mark LePine, a co-worker and his general disrespect for everyone and vulgar language. A true and accurate copy of that complaint letter is attached here to as Exhibit A.

Signed under the pains and penalties of perjury this 10TH day of April, 2007.

_____
Faith Lippert

Sworn and Subscribed to before me
this 10 day of April, 2007.

_____
Notary Public
My Commission Expires:

"Notary Public"
Carrie Ann M. Powrozek
Commonwealth of Massachusetts
My Commission Expires on Dec., 11, 2009

# EXHIBIT
# 2

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
     Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
     Defendants

DEPOSITION OF FAITH LIPPERT

May 17, 2005, 10:00

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA 01103
BY:  SUZANNE GARROW, ESQ.
   JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA 01103
BY:  MARYLOU FABBO, ESQ.
   KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

3

I N D E X

WITNESS:  FAITH LIPPERT

Direct Examination by Ms. Garrow  5

EXHIBITS

Exhibit 1, Good Business Dates 15
Exhibit 2, 5/24/03 Memo Polansky/Lippert 31
Exhibit 3, Payroll History of Corbin 41
Exhibit 4, Payroll History of Massaconi 47
Exhibit 5, Ten Steps to Success 57
Exhibit 6, Vacation Village Tour Times 80
Exhibit 7, 12/4/04 Memo to Lewis/Rauer 82
Exhibit 8, 12/21/01 Memo to Lippert/Arnold 87
Exhibit 9, Vacation Village Rotations 89
Exhibit 10, Corbin Employment Agreement 104
Exhibit 11, Martin Employment Agreement 105
Exhibit 12, Wise Employment Agreement 125
Exhibit 13, Patriot Employee Handbook 139
Exhibit 14, 5/11/03 Dress Code Memo 145
Exhibit 15, 12/22/04 Memo Re: New-Hires 148
Exhibit 16, 6/8/03 Memo to Faith from Paul 157
 (continued)

4

EXHIBITS (continued)

Exhibit 17, 6/9/03 Memo to Lippert/Foster 167
Exhibit 18, 5/18/03 Memo to Wise from
    Lippert/Lewis 180
Exhibit 19, Policy for Sales Managers
    Sales Performance 186
Exhibit 20, Wise 2002 Attendance Record 191
Exhibit 21, Handwritten Notes 204
Exhibit 22, 1/3/03-6/8/03 Typed Notes 215

Page 5

STIPULATION

It is agreed by and between the parties that all objections, except as to form of the question, are reserved until the time of trial.

It is further agreed by and between the parties that all motions to strike unresponsive answers are reserved until the time of trial.

It is further agreed by and between the parties that the sealing of the original deposition transcript is hereby waived.

It is further agreed by and between the parties that the notification to all parties of the receipt of the original deposition transcript is hereby waived.

Page 6

FAITH LIPPERT, Witness, identified via Massachusetts driver's license and having been duly sworn, states as follows:

DIRECT EXAMINATION BY MS. GARROW:

Q. Good morning.
A. Good morning.
Q. As you are already aware, my name is Suzanne Garrow, and I'm the lawyer for Miss Wise, Mr. Massaconi, Mr. Martin, and Peter Corbin, as well as the other individuals who are similarly situated to them, and we're here today to take your deposition.
A. Okay.
Q. That was a very good response. I'm going to ask you to give audible response -- "yes," "no," "okay"; not "uh-huh" or "um-hum," because there's a court reporter here who's going to take down all of your testimony. So you need to give an audible response. Do you understand that?
A. Yes, I do.
Q. I am going to try very hard not to speak over you, and I'm going to ask you to do

Page 7

the same, again because the court reporter is going to be taking down my questions and your answers, and she can't do that if you start speaking during the question or if I start speaking during your answer. Do you understand that?
A. Yes, I do.
Q. I'm going to ask you that if you don't understand a question that I've asked, that you ask me to either clarify or rephrase the question, okay?
A. Okay.
Q. If you don't do that, I'm going to assume that you understand the question as it's asked, so it's important that you understand the question that I'm asking, okay?
A. Okay.
Q. Have you taken any medications or any other substances that might impair your ability to testify truthfully and accurately as you sit here today?
A. No.
Q. Will you please state your full name and spell it for the record?

Page 8

A. Faith Lippert. F-A-I-T-H L-I-P-P-E-R-T.
Q. Are you currently employed, Miss Lippert?
A. Yes, I am.
Q. Where are you employed?
A. I'm employed in Lanesborough, Massachusetts.
Q. Who is your employer?
A. Patriot Resorts Corporation.
Q. How long have you been employed by Patriot Resorts Corporation?
A. Since June of 2001 -- July maybe, 2001.
Q. And what is your current position with Patriot Resorts?
A. Office Manager and Human Resources Director.
Q. You testified before that you work in Lanesborough. Are you office manager only as to Patriot Resorts' Lanesborough location?
A. Correct.
Q. Are you human resources director only as to Patriot Resorts' Lanesborough location?

9

1     A. Correct.
2     Q. Does that Resorts in Lanesborough have
3 any other names; does it go by any other names?
4     A. Vacation Village in the Berkshires.
5     Q. Do you know what the legal status of
6 Vacation Village in the Berkshires is; in other
7 words, is it a separate entity, to your
8 knowledge?
9     A. I'm not sure.
10    Q. Have you held any other positions
11 other than the positions you are currently
12 holding today for Patriot Resorts?
13    A. No.
14    Q. Have you ever worked in any other
15 location other than the Lanesborough location of
16 Patriot Resorts?
17    A. With Patriot Resorts?
18    Q. Yes.
19    A. No.
20    Q. Have you -- I'm sorry, I believe I
21 asked this, but I just want to clarify. Have you
22 been working at Patriot Resorts since June 2001;
23 has that been your employer?
24    A. Yes.

10

1     Q. What are your responsibilities as
2 office manager of the Lanesborough location?
3     A. I oversee the administration end of it
4 as far as contracts -- sales contracting,
5 payroll, accounts payable. I work with the
6 attorneys when we do fundings, and I work with
7 escrow.
8     Q. What do you mean by administer sales
9 contracting; what does that mean?
10    A. Administration. I oversee the staff,
11 the administration staff.
12    Q. What are the general categories of
13 employees of the administration staff?
14    A. The girls that type up contracts, the
15 reception area. I oversee it, but I don't manage
16 it. Basic secretarial work.
17    Q. So you oversee the individuals who do
18 basic secretarial work?
19    A. Yes.
20    Q. How many people do you oversee?
21    A. There's five in my office, which would
22 be doing the contracting, and there's three out
23 in the Reception Center.
24    Q. You testified that you did not manage

11

1 those three. Who does?
2     A. Dennis Clavette.
3     Q. Where is Mr. Clavette physically
4 located?
5     A. In Lanesborough in the Reception
6 Center.
7     Q. Do you happen to know what his job
8 title is?
9     A. He's the manager of the Reception
10 Center.
11    Q. That is his job title?
12    A. Yes.
13    Q. Does he have any other titles, like
14 you have two that you testified to?
15    A. No.
16    Q. Any other duties -- strike that. You
17 said that you do payroll. What do you do -- what
18 are your payroll functions?
19    A. I do the office staff payroll, which
20 are the contracting girls, their payroll; the
21 Reception Center payroll; and I do commissions
22 for the salespeople.
23    Q. When you say you do it, what do you
24 mean by you do it -- what are your duties?

12

1     A. I gather the information and I print
2 it out to the system and I submit it to Fort
3 Lauderdale, and that is where they issue checks.
4     Q. Is that the same duties as to the
5 office staff folks, the Reception Center people,
6 and the commissions -- in other words, do you do
7 the same things, those duties you just specified
8 -- do you do the same thing as to all three
9 categories of employees?
10    A. I'm not sure I get what you're saying.
11    Q. For the office staff, you gather
12 information relating to their hours worked, is
13 that correct?
14    A. Yes, they have -- prior to a few
15 months ago, they had a time sheet that they
16 signed in on, and now we have a time clock.
17    Q. When did you get your time clock?
18    A. Oh, gosh, I'm not real sure. I would
19 say maybe six months ago or so.
20    Q. Who punches the time clock, which
21 employees?
22    A. Just the office staff, the Reception
23 Center.
24    Q. Do you gather their hours and input

13

1   those into the system, the office staff and the
2   Reception Center staff?
3       A.   I don't put them in the system, no.
4       Q.   Who does?
5       A.   All of the information is sent to Fort
6   Lauderdale.
7       Q.   Directly from the time clock, is
8   that...
9       A.   Yes, I figure up the hours on the
10  cards and then I submit copies on a weekly basis
11  down to Fort Lauderdale.
12      Q.   What, if anything, do you do to gather
13  hours worked for sales personnel?
14      A.   I don't, personally do not.
15      Q.   Do you know if somebody does?
16      A.   When they come in in the morning, they
17  sign on a rotation, and that is done by Dennis or
18  his staff.
19      Q.   When you say that, you mean gathering
20  the hours worked?
21      A.   Not necessarily the hours worked; just
22  the rotation, the sign-in rotation.
23      Q.   Do you know who works for
24  Mr. Clavette?

14

1       A.   Emily Bates and Mallory Bonaville.
2       Q.   So you testified that you print
3   something into the system that's part of your
4   duties.  What do you mean by that -- you say you
5   print into the system?
6       A.   The Good Business Ledger.
7       Q.   Is that --
8       A.   That is what I pay commissions off of.
9       Q.   And that's for salespeople?
10      A.   Yes.
11      Q.   Are there different categories of
12  salespeople, to your knowledge?
13      A.   Yes.
14      Q.   What are the different categories?
15      A.   We have a project director, we have
16  line directors, we have sales managers, and sales
17  representatives.
18      Q.   Is that the complete list of the
19  categories of salespeople?
20      A.   Yes.
21      Q.   Do you have any other duties with
22  relation to payroll other than what you already
23  testified to?
24      A.   No.

15

1       Q.   You mentioned Good Business Ledger?
2       A.   Um-hum.
3       Q.   I'm going to show you a document.  Can
4   you tell me what that document is?
5       A.   This is a date schedule I go by to do
6   the Good Business Ledger.
7              (Exhibit 1, Good Business Dates,
8              marked for identification)
9       Q.   (By Ms. Garrow) I'm showing you
10  what's been marked as Exhibit 1.  Now, this is --
11  I understand is not a Good Business Ledger, but
12  can you explain what you use this document for?
13      A.   Yes.  I would take -- in order to do
14  up a Good Business Ledger, what I pay from, I
15  start with the -- it's a closed date begins, and
16  it ends on the sale date ends.  It's a week.
17      Q.   So I'm going to stop you there if you
18  don't mind.
19      A.   Sure.
20      Q.   This says "Sale DT Begins".  Is that
21  sales date begins?
22      A.   It should be closed date begins, not
23  sales date begins.
24      Q.   What does that mean?

16

1       A.   That means that any of the contracts
2   with the closed date that begins on the first
3   column date and closed date ends on this date,
4   the sales reps. would be paid on the last column
5   date.
6       Q.   The last column date being sales reps.
7   paid 9/3/2001, if we look at the first line of
8   Exhibit 1?
9       A.   Yes.
10      Q.   So let's go through this a little more
11  slowly just so we understand.  Close date begins,
12  so does that mean that a sale that is made
13  between 8/7/2001, if we look at the first line of
14  Exhibit 1, and 8/13/2001, if we look at the
15  second column of the first line of Exhibit 1?
16      A.   Yes.
17      Q.   Does that mean a sale that is made in
18  those dates?
19      A.   No, it means the close date, when the
20  actual contract was closed, when it became Good
21  Business, after rescission.
22      Q.   So explain to me what it means to have
23  a contract closed.
24      A.   The contract is written on a certain

17

1  day and comes out of rescission. Once it comes
2  out of rescission, all the monies are good and
3  then we go ahead and we close it.
4      Q.   It doesn't say "closed date" on here,
5  right, it says --
6      A.   That's correct, but since then I have
7  changed the more recent ones to "closed date
8  begins" because it was confusing everyone else
9  who saw it. In the beginning they did not see
10 it.
11     Q.   Who received this Good Business
12 listing or Good Business dates, what we are
13 calling Exhibit 1 -- who would you give this to?
14     A.   In the very beginning, nobody, and it
15 wasn't until probably maybe -- I want to say
16 around two years after one of the sales managers
17 -- line directors came to me and said, Well,
18 Faith, we've got to let these guys know when
19 they're going to be paid, and so I gave him a
20 copy of this and explained to him that any of the
21 deals that were closed from this date to this
22 date and here's the check date.
23     Q.   Who was that?
24     A.   That was Paul Stensland.

18

1      Q.   So I notice that on Page 3 of
2  Exhibit 1, Bates Stamp 3402, it's written below
3  Good Business, it says "closed dates". Do you
4  see that?
5      A.   Um-hum.
6      Q.   Is that your handwriting?
7      A.   Yes.
8      Q.   So was it at that point that you claim
9  that you changed what this column was entitled?
10     A.   Probably. I don't recall, you know,
11 the actual date that I put that up there, but it
12 was confusing to people that were not used to
13 seeing this, and basically nobody saw it but me.
14     Q.   Did you do anything differently,
15 change your procedures in any way as a result of
16 changing the name from "sale date" to "close
17 date"?
18     A.   Did I change any procedure or
19 anything?
20     Q.   Yes.
21     A.   No, ma'am.
22     Q.   So explain to me what the third column
23 is, then, if we look at Line 1.
24          MS. FABBO:  On Page 1?

19

1      Q.   (By Ms. Garrow) On Page 1, thank you.
2      A.   Those are the same dates as the closed
3  end date.
4      Q.   What's different about those two
5  columns, just so I understand?
6      A.   Nothing.
7      Q.   What about "Good Business Pulled,"
8  what does that mean -- do you see that? That's
9  the fourth column.
10     A.   Um-hum.  I'm not quite sure.
11     Q.   Did you prepare this document?
12     A.   No.
13     Q.   Who did?
14     A.   This was sent from Fort Lauderdale
15 when we first started out. This was a schedule
16 that I was using when I first started there.
17     Q.   Did you get instructions on what this
18 was -- what this document, Exhibit 1, was when
19 you got it?
20     A.   Yes -- yes.
21     Q.   From whom?
22     A.   Andrew Thompson from Fort Lauderdale
23 was the one that sent the schedule to me.
24     Q.   What is his position?

20

1      A.   I'm not sure what it is now. He's
2  moved. At the time he was doing commissions, but
3  he's not doing commissions now.
4      Q.   Is he still with the company?
5      A.   Yes.
6      Q.   Does he work for Patriot, to your
7  knowledge, or does he work for Berkley?
8      A.   I'm not sure who he works for, to tell
9  you the truth, but he works down in Fort
10 Lauderdale.
11     Q.   Is it your testimony -- let me strike
12 that. What's the fifth column, if we're looking
13 at the first line. Says "sales reps. paid"?
14     A.   Um-hum.
15     Q.   What does that mean?
16     A.   That would be the check date.
17     Q.   Just so I understand, is it your
18 testimony that if a sale closed between 8/7 and
19 8/13, a sales rep. was supposed to be paid on
20 9/3/2001?
21     A.   Correct.
22     Q.   Can you tell me reasons why if a sale
23 -- strike that. Are there any reasons why if a
24 sale closed between 8/7/2001 and 8/13/2001 that

21

1  the sales rep. would not have been paid?
2       A.   No.
3       Q.   I'm just going to ask you to flip to
4  -- let's go to the third page where we were
5  before, the page that on the first date is
6  1/7/2003. Do you see that?
7       A.   Um-hum.
8       Q.   Is there any reason why if a sale was
9  made between 1/7/2003 and 1/13/2003 that the
10 sales rep. would not have been paid on
11 February 3, 2003?
12      A.   I'm not sure of the exact date when we
13 started on holding checks, because they didn't
14 receive a PAC check with the contract. I'm not
15 quite sure of the date that they started that.
16      Q.   What is a PAC check?
17      A.   PAC check is a Pre-Authorized
18 Checking, and we get those from the customer,
19 from the owner -- the new owner -- and they void
20 out a check so that we can get like a sure pay, a
21 monthly sure pay for their mortgage payment.
22      Q.   Is it something --
23      A.   From directly out of their checking
24 account.

22

1       Q.   So it's something that gets drafted
2  out of their checking account monthly?
3       A.   Yes.
4       Q.   And when I say "they," I mean the
5  customer?
6       A.   Yes.
7       Q.   You mentioned at some point you
8  started adhering to that policy?
9       A.   Correct.
10      Q.   And you're not sure when it was, is
11 that your testimony?
12      A.   I'm not sure of the exact date.
13      Q.   Do you have a general idea?
14      A.   I wouldn't want to guess.
15      Q.   I'm definitely not asking you to
16 guess. Do you think it was before January of
17 2003?
18      A.   I believe so, um-hum.
19      Q.   Do you believe it was in the last half
20 of 2002, if you know?
21      A.   I don't recall.
22      Q.   So a salesperson at some point was
23 required to get a voided check from a customer,
24 is that correct?

23

1       A.   Yes.
2       Q.   What happened if the salesperson did
3  not do that?
4       A.   Then their earned commissions are due
5  after three consecutive timely monthly payments
6  are made.
7       Q.   How did you learn of that policy?
8       A.   It's in the sales agreement.
9       Q.   So is it your testimony that that was
10 the policy that was adhered to before Patriot
11 started taking PAC checks?
12      A.   It was in the handbook, yes, but they
13 did not follow through with the policy until
14 later.
15      Q.   When you say it was "in the handbook,"
16 what was in the handbook?
17      A.   About explaining the earned
18 commissions with the three consecutive timely
19 monthly payments.
20      Q.   You're saying that policy was not
21 followed at some point?
22      A.   In the very beginning when we first
23 started there.
24      Q.   For how long was that policy not

24

1  followed?
2       A.   I'm not quite sure. I believe it was
3  before 2003, but I'm not sure when they started
4  it.
5       Q.   Well, in looking at Exhibit 1, if we
6  follow any of the lines through, it would appear
7  that a sales rep. was supposed to be paid on a
8  sale within about a month's time of making that
9  sale, is that correct?
10      A.   Around a month.
11      Q.   And that hasn't changed?
12      A.   No.
13      Q.   In fact, we have a printout through
14 2005 and, it looks like that is the -- the dates
15 are the same, that it's about a month's time
16 throughout, is that correct?
17      A.   That's correct.
18      Q.   Are you aware of the hours worked each
19 day by sales representatives?
20      A.   I am aware not of total hours that
21 they work; I am aware that they take out tours.
22      Q.   Are you aware that at times a
23 salesperson could work more than forty hours per
24 week?

Page 25

1  A. I'm not aware of that, no.
2  Q. Are you aware that a sales manager
3  could work more than forty hours per week?
4  A. No, I'm not aware of that.
5  Q. Are you generally aware of a
6  salesperson's daily schedule?
7  A. Not necessarily. I know that they
8  come in and they take out a tour according to how
9  many tours are coming in.
10 Q. Are you aware if a salesperson's daily
11 schedule has changed over the last three years?
12 A. I don't understand what you're asking.
13 Q. Are you aware generally if salespeople
14 have had a change in what their required hours
15 are over the last three years?
16        MS. FABBO: Objection. You can
17        answer.
18        THE WITNESS: I'm still not sure
19        what you're asking, I'm sorry.
20 Q. (By Ms. Garrow) That's all right.
21 Are you aware if there is a particular pay period
22 which constitutes the work week for salespeople
23 at Patriot?
24 A. Yes, I follow the Good Business

Page 26

1  Ledger.
2  Q. So that would be the pay period?
3  A. Yes.
4  Q. What are charge-backs?
5  A. There would be a few different
6  charge-backs. Are you talking about commission
7  charge-backs?
8  Q. Well, why don't you tell me what the
9  types of charge-backs are?
10 A. I didn't know whether you meant like a
11 miscellaneous charge-back for sometimes, you
12 know, we give them RCI books and we have to
13 charge them for miscellaneous like $10 to get the
14 RCI book. Other than that, a commission
15 charge-back would happen if for some reason
16 somebody has gone Good Business and a check has
17 come in bad, so we'd have to temporarily
18 charge-back a sales rep. until we get that money
19 back. A charge-back can occur if people are not
20 making their payments.
21 Q. Could that happen at any time during
22 the life of the contract, to your knowledge?
23 A. If they haven't made three consecutive
24 timely monthly payments, yes.

Page 27

1  Q. At any time during the contract?
2  A. That's my understanding.
3  Q. Do you know what happens to the money
4  that has already been collected on that contract
5  if at some point, let's say a year after the
6  contract has been in force -- what happens to the
7  money that's already been collected?
8  A. No, I don't.
9  Q. Do you know who would know that?
10 A. In Fort Lauderdale. I don't know who.
11 Q. Do you get paid by commission at all?
12 A. Me?
13 Q. Yes.
14 A. No.
15 Q. How are you paid?
16 A. Salary.
17 Q. What is your salary?
18 A. 1,391 a week.
19 Q. That's your take-home?
20 A. No.
21 Q. So that's gross?
22 A. Yes.
23 Q. Is there an hourly wage for people who
24 are employed as salespeople at Patriot in

Page 28

1  Lanesborough?
2  A. No, ma'am.
3  Q. Is there an hourly wage for people who
4  are employed as sales managers by Patriot in
5  Lanesborough?
6  A. No.
7  Q. Are there any additional sums of money
8  paid to anybody employed as a salesperson other
9  than their commissions to salespeople at Patriot
10 in Lanesborough -- let me give you an example --
11 like vacation pay, sick pay?
12 A. Everyone is allowed fifteen days
13 personal time during the year, and that could be
14 any of those that you just mentioned.
15 Q. So those are fifteen paid days?
16 A. Um, well, they get their commissions
17 if one comes through to be paid, yes, but do we
18 pay like a salary, no.
19 Q. So there is no sick pay, is that fair
20 to say?
21 A. That's fair to say.
22 Q. Is there accrued vacation time at all,
23 vacation pay?
24 A. Not that I'm aware of, no.

Page 29

1    Q.   Are you aware of any order from the
2  Massachusetts Attorney General or the U.S.
3  Department of Labor relating to how salespeople
4  or sales managers are paid at Patriot in
5  Lanesborough?
6    A.   No.
7    Q.   Are you aware of any ruling or
8  guidance or interpretation that was issued by the
9  Massachusetts Attorney General or the United
10 States Department of Labor relating to how
11 salespeople or sales managers are paid at Patriot
12 in Lanesborough?
13   A.   No.
14   Q.   Do you understand that it is legal to
15 pay salespeople or sales managers at Patriot in
16 Lanesborough straight commission?
17         MS. FABBO:  Objection.
18         MS. GARROW:  You can answer.
19         THE WITNESS:  Can you repeat it,
20     I'm sorry.
21   Q.   (By Ms. Garrow)  Do you understand
22 that paying salespeople or sales managers
23 straight commission is a legal practice?
24         MS. FABBO:  Objection.

Page 30

1          THE WITNESS:  Did you say legal
2      or illegal?
3    Q.   (By Ms. Garrow)  I said legal.  Do you
4  understand that to be a legal practice?
5          MS. FABBO:  Objection.
6          THE WITNESS:  I'm not quite sure
7      what you're asking.
8    Q.   (By Ms. Garrow)  Do you believe that
9  it is acceptable under state and federal law to
10 pay a salesperson -- state law being
11 Massachusetts and -- and federal law, to pay a
12 salesperson straight commissions?
13   A.   I'm not aware, I don't know.
14   Q.   You don't know?
15   A.   I don't know.
16   Q.   Have you ever done any independent
17 research to make yourself aware of that?
18   A.   No.
19   Q.   Have you ever asked anybody in Fort
20 Lauderdale if that is a legal practice?
21   A.   No.
22   Q.   Other than your attorney, have you
23 consulted with anyone as to whether paying
24 straight commission is a legal practice?

Page 31

1    A.   No.
2    Q.   Have you sought any guidance from the
3  United States Department of Labor or the
4  Massachusetts Attorney General regarding the
5  practice of paying salespeople and sales managers
6  straight commission at Patriot in Lanesborough?
7          MS. FABBO:  Objection.  Go ahead.
8          THE WITNESS:  No.
9    Q.   (By Ms. Garrow)  Do you know if
10 anybody has?
11   A.   I do not know.
12           (Exhibit 2, 5/24/03 Memo to
13           Polansky from Lippert,
14           marked for identification)
15   Q.   (By Ms. Garrow)  I'm showing you
16 what's marked as Exhibit 2.  Do you recognize
17 that document -- do you recognize that?
18   A.   Yes.
19   Q.   What is this document?
20   A.   It's a fax letter that I sent to Bruce
21 Polansky.
22   Q.   A fax or an e-mail, is it?
23   A.   E-mail, sorry.
24   Q.   It looks like there was some

Page 32

1  highlighter put on this document.  Although it
2  looks very dark to you, it would be appear to be
3  highlighter?
4    A.   Yes.
5    Q.   Did you put that on here, the
6  highlighter?
7    A.   I don't remember.
8    Q.   So you don't know if you did or if you
9  didn't?
10   A.   Yes, I don't remember.
11   Q.   Under the highlighter, I'm going to
12 represent to you what it says, because I'm the
13 only one who has -- and I think I'm going to have
14 to mark this one as the exhibit.  This one is
15 somewhat legible, so I will read to you what it
16 says and maybe this will help.  It says,
17 "December 1 of last year was when the line was
18 told no PAC/no pay, three timely payments."  This
19 was dated May 24, 2003.  Does that refresh your
20 recollection --
21   A.   Possibly.
22   Q.   -- as to when you started the no
23 PAC/no pay policy?
24   A.   Possibly, um-hum.

**Page 33**

1  Q. It says here -- and again I will show
2  this to you if you would like, but that this is
3  being done at Massanutten, this no PAC/no pay.
4  What is Massanutten?
5  A. Massanutten is a resort in Virginia.
6  Q. In Virginia?
7  A. Yes.
8  Q. By the way, does Patriot have any
9  other locations in Massachusetts other than the
10 Lanesborough location?
11 A. No.
12 Q. Are all sales of Massachusetts -- let
13 me strike that. Are they selling Massachusetts
14 property at the Lanesborough location?
15 A. Yes.
16 Q. Are all sales of Massachusetts
17 property done through the Lanesborough location?
18 A. Yes.
19 Q. And those are sales of Patriot, of
20 course. Can you tell me why you sent this e-mail
21 to Bruce Polansky?
22 A. I don't recall off the top of my head.
23 Q. You want to take a minute to review it
24 and see if it refreshes your recollection?

**Page 34**

1       MS. FABBO: Can you mark that one
2           so she can look at it?
3       MS. GARROW: Yes.
4  A. Can you ask me the question again?
5  Q. Sure. Do you recall why you sent
6  this?
7  A. It appears -- I don't remember right
8  off the top, but it appears that I'm answering
9  Bruce's question as to why Joel didn't get his
10 commission on a particular deal, and then I went
11 ahead and I wrote this little note to him
12 explaining why I put a stamp on the worksheet so
13 that the guys would be aware that there was no
14 PAC, that they needed to get it in order to get,
15 you know, their commissions. That was just a
16 reminder for them.
17 Q. What was just a reminder?
18 A. The stamp that I put "no PAC/no pay,
19 three monthly payments". I put that on the
20 worksheet so when the guys received their copy of
21 the worksheets, the next morning after they had a
22 sale that day, it would remind them that they
23 needed to get a PAC check in order to not hold up
24 their commissions.

**Page 35**

1  Q. You say it was just a reminder, but
2  that, in fact, was the policy at that time, was
3  it not?
4  A. What was the policy?
5  Q. No PAC/no pay.
6  A. Correct.
7  Q. It says here they have at least three
8  weeks to get this PAC check in. Is that true?
9  A. Yes.
10 Q. So can you tell me what that means?
11 A. We will accept a PAC check up to
12 fifteen days prior to the first mortgage due
13 date.
14 Q. Is that still the policy today?
15 A. Yes.
16 Q. Has that been the policy as far as you
17 recall since this has been instituted?
18 A. Yes.
19 Q. Anyone ever charge on their credit
20 card the entire mortgage for one of these units?
21 A. Yes.
22 Q. Anybody ever pay cash for one of these
23 units?
24 A. Yes.

**Page 36**

1  Q. Anyone ever give you a check for one
2  of these units?
3  A. Yes.
4  Q. Give the salesperson a check?
5  A. Yes.
6  Q. What happens if -- when does a
7  salesperson get paid on a deal if somebody
8  charged the unit that they purchased?
9  A. It still goes by the closed date.
10 Q. What would be the closed date if it
11 was charged?
12 A. It all depends on where the purchaser
13 resided, whether it be Massachusetts,
14 Connecticut, New Jersey, or New York.
15 Q. I guess I don't understand. Can you
16 explain to me what the differential closed dates
17 would be -- if someone came and put a unit on
18 their Visa, when would the salesperson get paid?
19 A. It all depends on whether it's closed.
20 Q. What I don't understand is what the
21 difference is when was it closed, how do you know
22 when something was closed when somebody put it on
23 a charge card; how do you determine the closed
24 date?

**Page 37**

1  A.  We go by calendar. It depends on what
2  state, whether they're from Massachusetts,
3  Connecticut, New York, or New Jersey. They have
4  three days in rescission, or seven days New York,
5  New Jersey.
6  Q.  Well, walk me through. Let's say
7  somebody lived in Massachusetts who charged this
8  on their Visa card. Walk me through if I was the
9  salesperson when I would get paid. Explain that
10  to me.
11  A.  Massachusetts, Connecticut people have
12  three days' rescission, and after they're out of
13  rescission, then we close them. We don't -- we
14  don't close it the day that we receive the money.
15  We wait until they're out of the rescission
16  period.
17  Q.  And so that would be three days?
18  A.  Yes, in Massachusetts and Connecticut.
19  Q.  So it should close in three days?
20  A.  Yes.
21  Q.  Then when would the salesperson get
22  paid?
23  A.  The same here -- 21 days to a month.
24  Q.  What's the differential in New Jersey

**Page 38**

1  or New York, just a different rescission period?
2  A.  Yes, days -- seven.
3  Q.  They both are seven days?
4  A.  Yes.
5  Q.  Otherwise it's the same process?
6  A.  Yes.
7  Q.  What about if I came to Vacation
8  Village and I wrote a check for the entire amount
9  of a time-share there, when would that
10  salesperson get paid?
11  A.  The same, based on the closing date.
12  Q.  Also given the three-day rescission if
13  they're in Massachusetts or Connecticut or the
14  seven-day rescission in New Jersey or --
15  A.  New York.
16  Q.  -- New York?
17  A.  Um-hum.
18  Q.  And what about if the person who
19  purchased the time-share paid by cash?
20  A.  Same thing.
21  Q.  In this e-mail to Bruce Polansky. You
22  said that Joel -- that's Joel Hecht, right?
23  A.  Yes.
24  Q.  "He, to be nice, is a rebel"?

**Page 39**

1  A.  Yes.
2  Q.  What does that mean?
3  A.  He was, he is. He was pretty much
4  against any type of a policy. The one that
5  sticks out in my mind mostly is, albeit a small
6  policy, our smoking policy, and he would always
7  be throwing his cigarette butts down on the
8  ground. And he just got -- he would get really
9  offensive, you know -- defensive about people
10  trying to tell him, You can't do that, you need
11  to do this, you need to do that. He was always
12  against any type of authority, I would say.
13  Q.  So he violated the smoking policy?
14  A.  Yes.
15  Q.  And threw his cigarettes down on the
16  ground?
17  A.  Yes.
18  Q.  Did you ever discipline him for that?
19  A.  Yes, yes.
20  Q.  For the smoking policy?
21  A.  Yes.
22  Q.  Did you discipline him for anything
23  else?
24  A.  Off the top of my head, I can't think

**Page 40**

1  of any other reason that I talked to him in
2  person. I did talk with managers about him
3  parking over in the Reception Center area. Sales
4  representatives are not supposed to park over in
5  the reception area.
6  Q.  So he violated the parking policy?
7  A.  Always. Or a lot. I wouldn't say
8  always. A lot.
9  Q.  How often?
10  A.  Oh gosh, quite a bit.
11  Q.  At least once a week?
12  A.  Probably.
13  Q.  Maybe twice a week?
14  A.  Maybe.
15  Q.  What other policies that he did not
16  follow?
17  A.  Being to work on time. There would be
18  a few times that he would do that.
19  Q.  When you say "a few times," was it as
20  often as once a week that he came late?
21  A.  Possibly. I'm not quite sure off the
22  top of my head.
23  Q.  But you recall him being late to work
24  regularly?

41

1   A.   I don't personally recall.  I heard.
2   Q.   So you have knowledge of it?
3   A.   Yes.
4   Q.   Any other policies you know of that he
5   violated?
6   A.   Not that I can think of at this time.
7   Q.   Now, this e-mail that you sent was in
8   May of 2003.  Do you know how long Joel Hecht had
9   been working there when you sent this e-mail?
10  A.   No.
11  Q.   Any idea?
12  A.   No idea.
13          (Exhibit 3, Payroll History
14           of Peter Corbin, marked
15           for identification)
16  Q.   (By Ms. Garrow)  I'm showing you
17  what's been marked as Plaintiff's Exhibit 3.
18  We'll try and go through this as painlessly as
19  possible here.
20  A.   Okay.
21  Q.   Looks like 12/31/02, this looks like
22  -- why don't you tell me what it is?
23  A.   This appears to be the payroll history
24  of Peter Corbin.

42

1   Q.   And it looks like it was for the year
2   2002, is that fair to say, if you look up in the
3   upper right corner?
4   A.   Someone has written in 12/31/02, yes.
5   Q.   These are two consecutive pages, is
6   that correct?
7   A.   Yes.
8   Q.   I'm just going to call your attention
9   to the second quarter, which is on the first page
10  of Exhibit 3, and they have First Quarter Total,
11  and the first column says "check date, 4/15".  Do
12  you see that?
13  A.   4/15, $50?
14  Q.   Yes, do you see that?
15  A.   Um-hum.
16  Q.   That's got a check number, is that
17  correct, that's the next column?
18  A.   Yes.
19  Q.   Then what's that next line, the next
20  column?
21  A.   It shows 40 hours.
22  Q.   Is that the number of hours you
23  understood Mr. Corbin would have been at work?
24  A.   No.

43

1   Q.   How many hours do you think he was at
2   work that week?
3   A.   I wouldn't know.  I don't know.
4   Q.   What would you look to if you wanted
5   to see what hours he was there; how would you
6   know that?
7        MS. FABBO:  Objection.  Go ahead.
8        You can answer.
9        THE WITNESS:  I'm not sure if
10       they did it back then or not.  The
11       only time there's ever been any times
12       put on are what we refer to as a TO
13       slip, a little white slip, and the
14       times are written when the people go
15       out on a tour and then their times are
16       written when they come in.
17  Q.   (By Ms. Garrow)  So that's just time
18  for a tour, though, correct?
19  A.   Correct.
20  Q.   So other than times for a tour, would
21  you have any idea how many hours Mr. Corbin was
22  at the Lanesborough facility a day?
23  A.   No.
24  Q.   Or a week?

44

1   A.   No.
2   Q.   So let's go to the next column in
3   which there are numbers.  Do you see that -- I
4   think you mentioned it before, $50?
5   A.   Um-hum.
6   Q.   Is that what you understood
7   Mr. Corbin's check to have been for that -- looks
8   like two-week period, or one-week period?
9   A.   It was his check dated April 15.
10  Q.   So that would have been his check that
11  he received that week, correct?
12  A.   Correct.
13  Q.   Now, you'll have to bear with me
14  because these documents that were provided to us
15  are -- the first line is cut off, but if you look
16  behind the first two documents, there's a third
17  document that says Salesman Ledger Report.  Do
18  you see that?
19  A.   Yes.
20  Q.   Then the next document is a Customer
21  Directory.  Do you see that?
22  A.   Yes.
23  Q.   What we're going to need to do is get
24  better copies of these copies, but what I'm going

45

1   to do is I'm going to represent to you that the
2   first three pages are the Customer Directory for
3   2002 for Mr. Corbin -- I'm sorry, not the first
4   page, but the next three pages. Do you see that?
5       A.   Yes.
6       Q.   What are customer directories?
7       A.   That is a list of customers by the
8   date they came in, the date that they toured.
9       Q.   So if somebody actually toured on a
10  certain day or certain week, their name would
11  appear under that date on their customer
12  directory?
13      A.   Correct.
14      Q.   How long do tours generally last?
15      A.   An actual tour?
16      Q.   Yes.
17      A.   90 minutes to -- and it all depends on
18  what their interest would have been -- whether,
19  you know, how much longer it would be.
20      Q.   So 90 minutes --
21      A.   90 minutes is the qualified tour time.
22      Q.   Then it could be longer?
23      A.   It could be longer, depending on
24  interest of people.

46

1       Q.   And salespeople can take out more than
2   one tour a day?
3       A.   Yes.
4       Q.   Do they generally?
5       A.   It all depends on how many tours are
6   coming in.
7       Q.   How are tours -- how do you know how
8   many tours are coming in; how are the tours
9   brought in, I guess is a better question?
10      A.   Through the Marketing Department.
11      Q.   Not through the salespeople?
12      A.   No.
13      Q.   Do they have any responsibility for
14  bringing tours in?
15      A.   No.
16      Q.   What about sales managers, do they
17  have any responsibility for bringing tours in?
18      A.   No.
19      Q.   What is the Marketing Department?
20      A.   The only thing that I can tell you
21  about the Marketing Department is that they're
22  the ones responsible for bringing in our tours at
23  any given day.
24           MS. GARROW: Let's mark this.

47

1            (Exhibit 4, Payroll History
2            of Michael Massaconi,
3            marked for identification)
4       Q.   (By Ms. Garrow) I'm showing you
5   what's been marked as Plaintiff's 4. What is
6   this document?
7       A.   Payroll history for Michael Massaconi.
8       Q.   On the bottom right, it says "Through
9   check 12/31/02". Am I reading that correctly?
10      A.   That's correct.
11      Q.   I'll call your attention to the last
12  two lines of the fourth quarter, there's a check
13  on 12/23 and a check on 12/30. Those are weekly
14  checks to Mr. Massaconi, is that correct?
15           MS. FABBO: Objection.
16           THE WITNESS: As best to my
17           knowledge.
18      Q.   (By Ms. Garrow) can you tell if
19  Mr. Massaconi received any other payment that
20  week from Patriot Resorts?
21           MS. FABBO: Objection. Which
22           week are you talking about?
23      Q.   (By Ms. Garrow) Either of those weeks
24  -- 12/23 or 12/30.

48

1       A.   I can't tell by looking at this, no.
2       Q.   Where else would you look to see if he
3   received any other payment?
4       A.   I wouldn't look anywhere else.
5       Q.   So would that show all the payments
6   for Patriot Resorts for each of the weeks he
7   worked there?
8       A.   I would say so, yes.
9       Q.   What were Mr. Massaconi's gross
10  earnings for the week of 12/23/02?
11      A.   $50.
12      Q.   And what were his gross earnings the
13  week of 12/30/02, according to your payroll
14  ledger here?
15      A.   $60.
16      Q.   If you go to the next page in
17  Exhibit 4, again it's cut off, but I'll represent
18  to you it says here from 1/1/02 to 12/30/02. Do
19  you see that, customer directory?
20      A.   One -- yes, I guess that's a one up
21  there, right, and the 12/30, okay.
22      Q.   I'm going to ask you to just peruse
23  the first column here, and that looks like a date
24  column, is that correct?

**49**

         A.    That's correct.
         Q.    If I represent to you that the last seven entries are from December of 2002, does it appear that Mr. Massaconi had any tours at that time?
         A.    Yes.
         Q.    How can you tell that?
         A.    Under the column where it says "T" is, where the "Y" is, the "Y" stands for yes.
         Q.    So in other words, he took a tour?
         A.    He took a tour, yes.
         Q.    He took a tour at that time?
         A.    Um-hum.
         Q.    What is the other number before that, what is that?
         A.    That is a CAS number, which is a computer number. You can either bring up a tour name or a tour number. That's the tour number.
         Q.    But what does it denote, I guess is what I'm asking?
         A.    Nothing.
         Q.    Nothing?
         A.    No.
         Q.    Why is it there, do you know?

**50**

         A.    To identify the tour.
         Q.    So it's an identification number?
         A.    Yes.
         Q.    What about "ID," what is that?
         A.    That is what kind of program they came in under.
         Q.    What does that mean?
         A.    That's a marketing entry.
         Q.    So what does "OVNSY" -- do you know what that means?
         A.    I believe it's an overnight stay from New York.
         Q.    What about "OVNGR"?
         A.    Overnight from Grafton office.
         Q.    That's a marketing office in Grafton?
         A.    Yes.
         Q.    And New York is another marketing office?
         A.    I'm not sure.
         Q.    What is "CBOX," do you know -- I'm just asking if you know.
         A.    It's a Chesapeake box, I believe.
         Q.    What does that mean?
         A.    It's a marketing program.

**51**

         Q.    So these are all different marketing programs?
         A.    Yes, ma'am.
         Q.    What is -- what would be constituted in "Other"?
         A.    A walk-in, somebody that just walks in off the street, something like that.
         Q.    There are a few other entries here. If you know what they mean, please tell me.
         A.    "SDVGR," I'm not sure.
         Q.    "SDR"?
         A.    I'm not sure.
         Q.    How about "DAYDK"?
         A.    They're day drives through another marketing company.
         Q.    So it's another type of marketing service?
         A.    Correct.
         Q.    What about "nonother"?
         A.    I'm not sure what that is.
         Q.    Is there any way to tell in here if a sale was made?
         A.    Yes.
         Q.    How can we tell that?

**52**

         A.    Under the "TranKey Column," all of those that have numbers are sales.
         Q.    So if these are in December, on 12/22, Mr. Massaconi made a sale?
         A.    Yes.
         Q.    Who are your supervisors, if you have supervisors?
         A.    Rebecca Foster.
         Q.    Anybody else?
         A.    No.
         Q.    We talked a lot about your office manager duties. Are there any other office manager duties that you haven't told me about already that you perform?
         A.    No.
         Q.    What about as human resources director -- is that your title?
         A.    Yes.
         Q.    Can you tell me your duties as human resources director?
         A.    When we hire new people, I do the orientation with them. I go over all the paperwork.
         Q.    Do you have any responsibility for

Page 53

1  hiring people?
2      A.  Just in the office.
3      Q.  Just the administrative staff, or --
4      A.  Correct.
5      Q.  What about the reception staff?
6      A.  Yes, them, too. I consider them
7  administration, also.
8      Q.  So you can hire for those positions?
9      A.  Yes, ma'am.
10     Q.  Can you fire for those positions as
11 well?
12     A.  Yes.
13     Q.  Do you have any firing authority as to
14 any other positions other than those?
15     A.  I wouldn't say that I have the
16 authority. I have input.
17     Q.  How often are you consulted?
18     A.  Not often.
19     Q.  For input?
20     A.  Not often.
21     Q.  Do you ever independently give your
22 input relating to hiring or firing for sales
23 positions?
24     A.  The best of my recollection, the only

Page 54

1  time that I will say something is, let's say
2  somebody leaves and then wants to come back, and
3  if I see if there's a problem, then I would state
4  what that problem would be, my thoughts.
5      Q.  Other human resources duties that you
6  have?
7      A.  Making sure that their paperwork is in
8  order, making sure that their licenses are in
9  order, their insurances are in order -- or
10 insurance, I should say -- are in order. And
11 basically keeping up with them when they are due
12 to -- when they're eligible to receive benefits
13 as far as health insurance, dental insurance,
14 life insurance.
15     Q.  Are those insurance programs through
16 Fort Lauderdale, or do you have some input in
17 picking who --
18     A.  I don't have input in picking.
19 They're done through Fort Lauderdale.
20     Q.  What is Becky Foster's position?
21     A.  She is president of Patriot Resorts
22 Corporation.
23     Q.  Do you know how long she's been
24 president?

Page 55

1      A.  With Patriot?
2      Q.  Yes.
3      A.  I'm not sure when they were
4  incorporated, so no.
5      Q.  To your knowledge, has she always been
6  president during the time that you've reported to
7  her?
8      A.  Yes.
9      Q.  You mentioned that salespeople would
10 sign in and out when they take a tour, is that
11 correct?
12     A.  Yes.
13     Q.  Were there any other sign-in
14 procedures that you were aware of, other than
15 signing in and out for a tour, for salespeople?
16     A.  They would sign when they came in to
17 work on a rotation.
18     Q.  Is the same true for sales managers?
19     A.  Yes.
20     Q.  What about signing out; was there any
21 requirement to sign out for the day for
22 salespeople?
23     A.  No.
24     Q.  Sales representatives, no?

Page 56

1      A.  No.
2      Q.  What about sales managers?
3      A.  No.
4      Q.  Were employees required to be in at a
5  certain time -- sales employees required to be in
6  at a certain time in the morning?
7      A.  Yes.
8      Q.  Was it the same for salespeople and
9  sales managers?
10     A.  Yes.
11     Q.  What time was that?
12     A.  By 8:30.
13     Q.  Has that been for the entire time that
14 you have been with your position at Patriot?
15     A.  Yes.
16     Q.  Are you aware of the general duties
17 and responsibilities of salespeople?
18     A.  General, yes.
19     Q.  What happens when a salesperson comes
20 in in the morning -- what are they required to
21 do, if anything?
22     A.  First thing they need to do when they
23 come in in the morning is to sign in, and then
24 the next thing that happens is -- they do hold a

**Page 57**

1 meeting in the morning, and then from there, they
2 go in to take their tours.
3    Q.   Who holds a meeting?
4    A.   One of the line directors and whoever,
5 you know, they bring in to help them, or
6 periodically I think maybe they let one of the
7 managers hold a meeting. It all depends.
8    Q.   When you say one of the managers, you
9 mean a sales manager?
10    A.   Yes.
11    Q.   Are all salespeople and sales managers
12 required to be at this morning meeting?
13    A.   Yes.
14            (Exhibit 5, Ten Steps to Success,
15            marked for identification)
16    Q.   (By Ms. Garrow) Showing you what's
17 been marked as Plaintiff's Exhibit 5, Ten Steps
18 to Success. Have you seen this before?
19    A.   Yes.
20    Q.   What is it?
21    A.   The sales representatives follow ten
22 steps. They are trained with the ten steps, and
23 this is a basic breakdown of those ten steps.
24    Q.   So you mentioned the morning meeting.

**Page 58**

1 That's not on here, is that correct?
2    A.   That's correct.
3    Q.   So that's something in addition to
4 these Ten Steps to Success, the morning meeting,
5 is that correct?
6    A.   Correct.
7            MS. FABBO: Objection. Go ahead.
8    Q.   (By Ms. Garrow) And just so I'm
9 clear, the morning meeting happens every morning,
10 is that true?
11    A.   Yes.
12    Q.   So under Number 1, it talks about
13 pre-tour. Do you see that?
14    A.   Yes.
15    Q.   And what is "pitch book"?
16    A.   Their pitch book is usually a
17 three-ring binder, and they have miscellaneous,
18 like sales tools in there to help with what
19 they're doing. Can I let you know that I'm not
20 really all that familiar with the ten steps, so
21 I'll let you know that right up front so you
22 don't go through the whole thing.
23    Q.   That's fine. But let's get back to
24 the pitch book. That's a three-ring binder?

**Page 59**

1    A.   Generally a three-ring binder.
2    Q.   Is that something that is provided to
3 the salespeople by Patriot, or the salesperson is
4 required to bring in their own binder?
5    A.   The salesperson is required to bring
6 in their own binder.
7    Q.   You said generally a three-ring
8 binder. Do they have to bring that three-ring
9 binder?
10    A.   I don't really know what they're
11 required to do. You'd have to ask the managers
12 or the directors.
13    Q.   And "credit applications" and
14 "T-pitch," do you know what those are?
15    A.   I know what they are.
16    Q.   What are they?
17    A.   They are different documents that they
18 use during the day to help with their, hopefully,
19 sale.
20    Q.   It says "at your fingertips". Does
21 each salesperson have a specific location that
22 they work out of?
23    A.   No, all of these are located in a
24 bookcase within the Sales Center, and when they

**Page 60**

1 need them, they go and get them.
2    Q.   Do they have tables that they work
3 there from, the salespeople?
4    A.   There's tables, yes.
5    Q.   Do they have assigned tables, each
6 salesperson?
7    A.   No.
8    Q.   What about sales managers, do they
9 have assigned tables?
10    A.   They don't have assigned tables, but
11 there is a desk, you know, where the managers sit
12 during the day.
13    Q.   What about the salespeople, do they
14 sit somewhere during the day when they're not on
15 tour?
16    A.   They're in the lounge.
17    Q.   All of them, are they all there?
18    A.   It should be -- they should be.
19    Q.   Are they required to be in the lounge
20 if they're not taking a tour?
21    A.   I don't know.
22    Q.   Your testimony was that you're not
23 completely familiar with these ten steps?
24    A.   Right.

Page 61

1  Q.  But have you had an opportunity to
2  take a look at them?
3  A.  I haven't looked at this for a long
4  time.
5  Q.  Why don't you take a few minutes to
6  take a look at it.
7       MS. GARROW:  Why don't we go off
8       the record.
9       (A break was taken)
10      MS. GARROW:  Back on the record.
11 Q.  (By Ms. Garrow)  We're back on the
12 record.  Have you had an opportunity to review
13 Exhibit 5?
14 A.  Yes.
15 Q.  Does that generally conform to what
16 you understand the tour -- the flow of the tours
17 to be?
18 A.  Yes.
19 Q.  Is it your understanding that the tour
20 that's set forth here from Number 2, Meet and
21 Greet, that's meet and greet the customer who's
22 coming to view the time-shares, is that correct?
23 A.  Correct.
24 Q.  And it continues through, Show

Page 62

1  Vacation Home and Welcome Center and Customer
2  Send-off.  Do you see that?
3  A.  Yes.
4  Q.  Is it your understanding that this is
5  the tour that generally takes 90 minutes?
6  A.  Yes.
7  Q.  Are there any after-tour activities
8  that a salesperson is required to do on a regular
9  basis?
10 A.  On a regular basis?
11 Q.  Yes.
12 A.  Not that I'm aware of.
13 Q.  What about the paperwork; when does
14 the paperwork get filled out for a sale?
15 A.  Right after they sign the worksheet.
16 They bring it into the office, we send it out,
17 it's closed, and then the people go.
18 Q.  When you say it's 90 minutes for a
19 tour, is that including if there is a sale?
20 A.  No.
21 Q.  How long would it take if there was a
22 sale, to your knowledge?
23 A.  Sometimes I've seen them come in after
24 two hours, sometimes I've seen them five or six

Page 63

1  hours.
2  Q.  Why would it take five or six hours to
3  complete a sale?
4  A.  It would all depend on the
5  salesperson, how much time he wanted to put into
6  it.
7  Q.  Do certain salespeople generally take
8  longer than others?
9  A.  Some do.
10 Q.  Mr. Martin -- Roger Martin, was he
11 somebody who took longer than others?
12 A.  I don't believe so.
13 Q.  What about Mr. Massaconi?
14 A.  Mike, I would assume would be
15 thorough.  Possibly.  There again, I don't know.
16 Q.  He was a sales manager, so he would
17 also take tours even as a sales manager?
18 A.  Yes.
19 Q.  Would he also do what's called TO as
20 well?
21 A.  Yes.
22 Q.  What is TO?
23 A.  Take Over.
24 Q.  What does that mean?

Page 64

1  A.  To the best of my knowledge, there
2  again, I am not really involved in that aspect of
3  it.
4  Q.  Just to your knowledge.
5  A.  It would be when a sales rep. brings
6  their people in to sit at a table, and then the
7  managers come over and try and help with the
8  sale.  To what extent, I don't know, but it's a
9  help.
10 Q.  Would that happen on every tour, do
11 you know?
12 A.  Yes.
13 Q.  Where are these tables located; are
14 they in the Reception Center?
15 A.  No.
16 Q.  Where are they located?
17 A.  They're in the Sales Center.
18 Q.  Are there two separate buildings?
19 A.  Yes.
20 Q.  The Reception Center is the one where
21 you meet the tour, and then the Sales Center is a
22 separate building?
23 A.  Yes, correct.
24 Q.  And are they both located on the