Wise v. Patriot - Faith Lippert - 5/17/05

65

1   Lanesborough property?

2       A.   Yes.

3       Q.   How far apart are they?

4       A.   Feet.

5       Q.   It appears from the Ten Steps to

6   Success that salespeople, or anybody who takes

7   out tours, are required to take the customer --

8   the potential customer around to other locations

9   in the area, is that true?

10      A.   Correct.

11      Q.   In fact, there are specific

12  instructions here, you go to Greylock but you

13  don't get out of the car, right?

14      A.   Correct.

15      Q.   Do you know why that instruction is

16  there, not to get out of the car?

17      A.   I don't think legally they can, as far

18  as, you know -- they can't talk about selling

19  time-shares there.  I think it has something to

20  do with the state.  I don't know what the actual

21  law is, though.

22      Q.   But nonetheless, they take them around

23  to Brodie and to Jiminy Peak?

24      A.   Correct.

66

1       Q.   And that's expected of all the

2   salespeople or anybody who takes out a tour, is

3   that fair to say?

4       A.   Correct.

5       Q.   When a sales manager comes to do a TO,

6   are they generally seated at the desk that you

7   testified about before -- you said all the

8   managers sit at a desk.  Is that where they

9   generally are?

10      A.   Repeat that?

11      Q.   I apologize.  Where are the sales

12  managers located at the time when salespeople

13  come back -- sales representatives come back from

14  a tour; where are the sales managers?

15      A.   I'm not sure.

16      Q.   Where is your office?

17      A.   I'm in another building.

18      Q.   A third building?

19      A.   A fourth building.

20      Q.   So we have the Reception Center, we

21  have the Sales Center, your building -- does that

22  have a name?

23      A.   Contracting.

24      Q.   And what's the other building?

67

1       A.   Exit.

2       Q.   The Exit Building.  So when you said

3   you're in a fourth building, the first three are

4   all related to tours, is that correct?

5       A.   Yes.

6       Q.   If you can just walk me through where

7   a customer starts their tour.  I assume they

8   start it at the Reception Center, is that fair to

9   say?

10      A.   Yes.

11      Q.   Then what happens?

12      A.   They come into the Sales Center for a

13  short period of time.

14      Q.   Before they go on tour?

15      A.   Yes, just for a very short period of

16  time.

17      Q.   I apologize.  What do they do in that

18  short period of time, to your knowledge?

19      A.   I'm not sure.

20      Q.   Would that be the same if a sales

21  representative took the tour as well as a

22  salesperson manager?

23      A.   Yes.

24      Q.   Same procedure.  They'll spend a

68

1   little bit of time in the Sales Center, and then

2   what happens?

3       A.   They'll take them on their tour to

4   Greylock, various places.  I'm not really sure,

5   but they do go by Greylock and Jiminy Peak.

6       Q.   When you say "they," the sales manager

7   or person who is conducting the tour?

8       A.   Right.

9       Q.   Then what happens?

10      A.   They take them to our resort, they

11  show them the model.

12      Q.   Are they required to show them the

13  model?

14      A.   Yes.

15      Q.   Who requires that?

16      A.   The company.

17      Q.   Fort Lauderdale Patriot Property?

18      A.   Patriot.

19      Q.   What happens after the sales rep. or

20  person shows them the model?

21      A.   Then they come back to the center.

22      Q.   Where is the model?

23      A.   In Hancock across from Jiminy Peak.

24      Q.   How long do they spend there, do you

69

```
 1   know?
 2        A.   I don't know.
 3        Q.   It's a portion of the tour, is that
 4   fair to say?
 5        A.   Right, right.
 6        Q.   Then after viewing the model, you say
 7   they come back to Lanesborough?
 8        A.   Uh-huh, the Sales Center.
 9        Q.   Do you know what happens then?
10        A.   That's when everybody sits and talks.
11        Q.   Presumably whoever did the tour tries
12   to close the deal?
13        A.   Correct.
14        Q.   And I assume there are times when the
15   salesperson or sales manager who conducted the
16   tour does not close the deal, is that fair to
17   say?
18        A.   I'm not real keen on what happens at
19   that point.
20        Q.   What is the Exit Department?
21        A.   In the Sales Center when the people
22   first get back in, they come into the Sales
23   Center and they're trying to sell them an annual
24   ownership or a bi-yearly ownership.  And if the
```

70

```
 1   people decide for whatever reason that they don't
 2   want to purchase that, then they bring them out,
 3   bring the tour out to the Exit Department where
 4   they fill out a survey and they are talked into
 5   whether or not to try and buy a tri-yearly, and
 6   then they are gifted.
 7        Q.   Who works in the Exit Department?
 8        A.   They have a manager, and I think three
 9   representatives.
10        Q.   Are they sales representatives?
11        A.   Yes.
12        Q.   Are they people who regularly work on
13   the line, or are they different sales
14   representatives?
15        A.   No, they're different.
16        Q.   And do you have any oversight over the
17   Exit Department?
18        A.   No.
19        Q.   We were talking a bit before about
20   when a sales rep. or sales manager comes to work,
21   they go to their sales meeting and then they all
22   go to the Sales Center, is that correct, after --
23   after their morning meeting?
24        A.   Um-hum.
```

71

```
 1        Q.   Sales managers and sales
 2   representatives congregate at the Sales Center,
 3   is that correct?
 4        A.   I'm not really sure.  It's my
 5   understanding the sales representatives stay in
 6   the lounge area and the managers would be over in
 7   the Sales Center at that time.
 8        Q.   So the lounge area, is that in the
 9   Reception Center?
10        A.   Yes.
11        Q.   Is that where the morning meeting is
12   held -- do you know where the morning meeting is
13   held?
14        A.   No, I'm not sure.
15        Q.   Do you know where the sign-in rotation
16   sheet is located in the mornings?
17        A.   Yes.
18        Q.   Where is that?
19        A.   Sales Center.
20        Q.   So at some point, the sales
21   representatives are required to go to the Sales
22   Center in the morning, is that correct?
23        A.   That's correct.
24        Q.   Is the same true of the sales
```

72

```
 1   managers?
 2        A.   Yes.
 3        Q.   Have you ever been to the lounge area
 4   when sales representatives were waiting for
 5   tours?
 6        A.   No.
 7        Q.   Never seen a sales rep. waiting for a
 8   tour?
 9        A.   I've never gone over there in the
10   morning, no.
11        Q.   What about in the afternoon?  I
12   understand there are tours in the afternoon as
13   well.
14        A.   I've gone over there in the afternoon,
15   but not -- I don't hardly ever go into the lounge
16   area.  If I go over there, it's to speak with the
17   Reception Center employees up front at the
18   check-in counter.
19        Q.   Who are the Reception Center
20   employees?  I think you gave me the name of a
21   couple people -- Mallory and Emily?
22        A.   Yes.
23        Q.   And that's it?
24        A.   Yes.
```

73

```
1        Q.    Two girls?
2        A.    Two girls and Dennis.
3        Q.    Have you ever been consulted by a
4   sales representative or sales manager who wanted
5   to leave the Lanesborough premises during a day?
6        A.    As in what -- can you be more
7   specific?
8        Q.    Let me rephrase it.  Has a sales
9   representative or sales manager ever expressed an
10  interest to leave the Lanesborough facility
11  during the day when they weren't out on tour,
12  expressed that to you?
13       A.    Not that I can recall, no.
14       Q.    Has anyone ever asked you permission
15  to leave during the day for a period of time?
16       A.    Not that I can recall.
17       Q.    Again, I'm talking about sales
18  representatives or sales managers.
19       A.    Not that I can recall.
20       Q.    Do you have any knowledge -- strike
21  that.  Is there a policy as to what a sales
22  representative or sales manager must do if they
23  want to leave the lounge area other than to take
24  a tour?
```

74

```
1        A.    So far as I know, they are allowed to
2   do that, but they have to let somebody know what
3   they're doing.  Like if they leave to go get gas
4   or go to get something to eat, whatever, they
5   have to let somebody know that they're going.
6        Q.    So if somebody wants to go grab a
7   lunch, they would need to say, I'm going to grab
8   a lunch?
9        A.    Yes.
10       Q.    Do they generally eat in the lounge,
11  do you know?
12       A.    I'm not sure, but I know they're
13  allowed to.  There's things there that help them
14  to do -- there's a refrigerator and microwave,
15  things like that.
16       Q.    We were talking before about
17  instituting the no PAC/no pay policy, and I
18  believe you referred to Exhibit 2; that happened
19  sometime around December of 2002, according to
20  that exhibit.  Do you recall that now?
21            MS. FABBO:  Objection.  You can
22            answer.
23            THE WITNESS:  December 1 of last
24            year was when what came into...
```

75

```
1        Q.    (By Ms. Garrow)  The no PAC/no pay
2   policy in Lanesborough?
3        A.    That's what I've written here.  It
4   would appear that that would be the time, yes.
5        Q.    So if somebody -- if a customer gave a
6   PAC check at the time that they took a tour,
7   let's say on that day, when you expect that
8   customer -- once the no PAC/no pay policy was
9   instituted, when would you expect that sales
10  representative who made the sale to get paid?
11       A.    Anywhere from 21 days to a month
12  later.
13       Q.    And that was from the time the no PAC/
14  no pay policy was instituted, is that correct?
15       A.    Yes.
16       Q.    Was there any difference -- what was
17  the policy prior to that time?
18       A.    Whenever they hit Good Business,
19  whenever the deals hit Good Business, the
20  representatives would be paid.
21       Q.    And to hit Good Business?
22       A.    Out of rescission, close.
23       Q.    So in other words, if a sale was
24  written and the rescission period expired, then
```

76

```
1   that's when it closed for purposes of Good
2   Business?
3        A.    Correct.
4        Q.    Going back to Exhibit Number 1, you
5   had talked about the -- we had talked a little
6   about the columns.  What does "sale date begins"
7   mean?
8        A.    First of all, it was really closed
9   date, okay, and I changed it later on because
10  this was confusing.  The "closed date begins"
11  would be a Tuesday.
12       Q.    Every Tuesday?
13       A.    Every Tuesday.  Then the close date is
14  every Monday, so the Good Business week is
15  Tuesdays through Mondays.
16       Q.    Every week?
17       A.    Yes.
18       Q.    So prior to the no PAC/no pay rule, if
19  a salesperson wrote business on a Tuesday and the
20  rescission period was up in three days here in
21  Massachusetts, would it then fall within that
22  same week as being the sale date; or in other
23  words, was the closing date considered to be
24  within that week?
```

**77**

1  A.  Yes.  There's -- with Massachusetts,
2  Connecticut, I think it's like three days, but
3  they don't count weekends.  There's stipulations
4  there; I'm not sure really which they are.  I
5  think Jersey is the only one that has seven days.
6  Q.  Not business days, just seven straight
7  days?
8  A.  Yes.
9  Q.  But in my example, let's say the sale
10  is written on a Tuesday, so then it's Wednesday,
11  Thursday, Friday -- that date it would then
12  become Good Business?
13  A.  Right.  It would be Good Business on
14  that Saturday.
15  Q.  And so then at that point, when would
16  you expect the salesperson to get paid?
17  A.  I always go by whatever the schedule
18  is reading here.
19  Q.  So that was prior to the no PAC/no pay
20  rule, is that correct?
21  A.  Correct.
22  Q.  Then at that point, they were required
23  -- the salesperson was required to get a PAC
24  check in order to get paid on that same original

**78**

1  schedule, is that correct?
2  A.  Say that again, I'm sorry?
3  Q.  Let me ask it this way.  What then
4  changed when the no PAC/no pay rule came into
5  effect from the scenario we just discussed in
6  terms of the payment of the salesperson; how was
7  the salesperson's pay date affected by no PAC/no
8  pay?
9  A.  If they didn't have a PAC check, it
10  would hold up payment of their check.
11  Q.  Until three timely payments were made,
12  is that correct?
13  A.  Correct.
14  Q.  Just so I understand, if the customer
15  paid timely two months in a row, let's say they
16  bought a time-share in August and paid timely --
17  are they required to pay August, is that the
18  first timely payment, or are they required to pay
19  September first, do you know?
20  A.  Probably September 1 or 15.
21  Q.  So let's say they paid timely
22  September, paid timely October, and let's say
23  three days late in November payment.  What would
24  happen in terms of the sales representative's

**79**

1  compensation?
2  A.  I don't know how many dates -- how
3  many days they take into consideration late, like
4  their grace period or whatever, I'm not sure.
5  Q.  Is there a grace period?
6  A.  I'm not sure if there is or not.
7  Q.  So potentially if a customer was
8  several days late, that salesperson would not get
9  paid, is that your testimony?
10  A.  I'm not sure.  That's Fort Lauderdale.
11  Q.  Who would know about that?
12  A.  Lauren Powell.
13  Q.  Would you expect Miss Foster would
14  know about that as well?
15  A.  Possibly.
16  Q.  What is Lauren Powell's position?
17  A.  She is the manager of the Commission
18  Department.  I don't know what her title is.
19  Q.  And she's in Fort Lauderdale, you
20  said?
21  A.  Yes.
22  Q.  After the no PAC/no pay was
23  instituted, was there any change in when a sales
24  representative got paid if the deal was paid in

**80**

1  cash?
2  A.  If the deal is paid in cash the day of
3  sale, you mean?
4  Q.  Yes.
5  A.  No, it's always been the same.  It's
6  always been the 12 -- comes out of rescission,
7  21 days to a month, whatever the schedule reads
8  here.
9  Q.  So that hasn't changed at all since no
10  PAC/no pay?
11  A.  No.
12  Q.  What about if somebody charges on
13  their credit card -- if someone charges a deal on
14  their credit card on the day of the sale, has
15  that changed in any way?
16  A.  No.
17  Q.  Is the 21-day after rescission, is
18  that a legal policy?
19  A.  I don't know.
20  Q.  To pay at that time?
21  A.  I don't know.
22  (Exhibit 6, Vacation Village
23  Tour Times, marked
24  for identification)

Wise v. Patriot - Faith Lippert - 5/17/05

81

1    Q.   (By Ms. Garrow)  I'm showing you
2  what's been marked as Exhibit 6.  Do you know
3  what this document is?
4    A.   Yes.
5    Q.   Have you seen this document before
6  today?
7    A.   Yes.
8    Q.   What is it?
9    A.   This is a list of our tour times,
10  during certain months.
11    Q.   Do you know, has this been -- have
12  these been the tour times since you have been
13  employed at Patriot in Lanesborough?
14    A.   I'd have to look back.  I'm not sure
15  off the top of my head.  It looks correct, yes.
16    Q.   So at 9:00 in the morning, it says
17  "managers and referrals".  Do you know what that
18  means?
19    A.   No.
20    Q.   What about 10:00, "deal writers and
21  normal rotation".  What's normal rotation?
22    A.   I'm not real sure.
23    Q.   Do you understand that this is when
24  salespeople are required to be in the lounge

82

1  awaiting tours?
2    A.   Yes.
3    Q.   And normal rotation means that a
4  salesperson is waiting for their rotation?
5          MS. FABBO:  Objection.
6    Q.   (By Ms. Garrow)  Or waiting to be
7  called to do a tour, is that correct?
8    A.   I'm not real sure what his definitions
9  are here.
10    Q.   Who authorized this document, to your
11  knowledge?
12    A.   Dennis.
13    Q.   Do you know who received this
14  document, if anybody?
15    A.   I asked him to do this up so that we
16  could have it to give to our attorneys.
17    Q.   Do you know when this was prepared?
18    A.   I don't recall the date, no.
19    Q.   Do you know if this was prepared since
20  the lawsuit has been filed, this particular
21  lawsuit?
22    A.   Yes.
23          (Exhibit 7, 12/4/04 Memo to
24          Lewis, et al, from Rauer

83

1          marked for identification)
2    Q.   (By Ms. Garrow)  I'm showing you
3  what's marked Plaintiff's 7.  Have you seen this
4  document before?
5    A.   Yes.
6    Q.   What is this document?
7    A.   It's a memo from Bill Rauer to the
8  directors and the managers.
9    Q.   And you were copied on this document
10  at the time it was sent, is that true?
11    A.   Yes.
12    Q.   Who is Bill Rauer?
13    A.   I'm not sure what his official title
14  is.  He used to be the project director up here,
15  and now he has -- he's located down in Florida,
16  but he still has activity up here.
17    Q.   At some point, was Rod Lewis the
18  project director of Lanesborough?
19    A.   Rod Lewis is, yes.
20    Q.   Is he currently?
21    A.   Yes.
22    Q.   After Rod Lewis began as project
23  director, at some point was he for an interim not
24  the project director; in other words, after he

84

1  started as project director, was he ever demoted,
2  to your knowledge?
3    A.   No.  Rod Lewis?
4    Q.   Yes.
5    A.   No.
6    Q.   So he's always been project director
7  since he came to fill that position?
8    A.   Yes.
9    Q.   Do you recall when that was?
10    A.   No.
11    Q.   Do you know if Bill Rauer is Rod
12  Lewis' superior?
13    A.   Yes.
14    Q.   Does Rod Lewis report directly to Bill
15  Rauer, to your knowledge?
16    A.   Yes.
17    Q.   This memo is dated December 4, 2004?
18    A.   Um-hum.
19    Q.   I'm going to ask you to take a minute
20  to review it and see if these are new policies
21  that were instituted December 4, 2004, or if
22  these are policies that were already in
23  existence.
24    A.   To the best of my knowledge, this was

85

1  all done up in memo form from Bill because these
2  policies have always been in existence. It's
3  just that they've had problems with everybody
4  doing what they were asked to do -- or were
5  expected to do, I should say.
6      Q.  So to your knowledge, from the time
7  you were employed by Patriot in Lanesborough,
8  these were the policies?
9      A.  Yes.
10     Q.  That salespeople were supposed to
11 adhere to, is that correct?
12     A.  Yes.
13     Q.  Were there any specific problems
14 relating to these policies that you can think of
15 as you sit here today on or around the time this
16 memo was authored?
17         MS. FABBO:  Objection.  You can
18         answer.
19         THE WITNESS:  There are a couple
20         of representatives that -- sales
21         representatives that had a problem
22         with some of -- you know, doing some
23         of these things.
24     Q.  (By Ms. Garrow)  Was that around the

86

1  end of the year 2004 that you're talking about?
2      A.  No, I think -- it was an ongoing
3  thing.  It just basically came to a head at that
4  time, I believe.
5      Q.  What were the circumstances that
6  caused it to come to a head?
7      A.  They weren't doing these five things.
8      Q.  How do you know that?
9      A.  By conversations -- different
10 conversations that I've had.
11     Q.  Conversations with whom?
12     A.  Mostly Dennis.
13     Q.  So what did Dennis tell you
14 specifically that sales representatives weren't
15 doing?
16     A.  They weren't signing back in after
17 their first tour, they're leaving without letting
18 him know, they've gone for the day.  There's a
19 ten-minute rule between tours -- or not between
20 tours, but to pick up a tour.  A tour shouldn't
21 be there any more than ten minutes before they
22 are meet-and-greeted.
23     Q.  How is the sales representative
24 informed that there's a tour that they're

87

1  supposed to meet and greet over at the Reception
2  Center?
3      A.  I'm not sure of that policy.
4              (Exhibit 8, 12/21/01 Memo to
5              Lippert from Arnold,
6              marked for identification)
7      Q.  (By Ms. Garrow)  I'll show you what's
8  been marked as Plaintiff's 8.  What is this
9  document?
10     A.  This is a memo to me from Barbara
11 Arnold, who is the old manager at the Reception
12 Center, dated December 21 of 2001, in reference
13 to the rotation.
14     Q.  What is this policy?
15     A.  If a sales rep. or manager is out with
16 an excused absence, doctor's note or pre-approved
17 in writing vacation only, they'll be put out in
18 their regular rotation when they return to work.
19     Q.  What if they don't come in with a
20 doctor's note or pre-approved writing of
21 vacation; what's the policy then?
22     A.  They'll be put at the bottom of the
23 line.
24     Q.  This is dated December 21, 2001.  Is

88

1  this policy still in effect day?
2      A.  I'm not quite sure.
3      Q.  Was there any time that you became
4  aware that this policy was not in effect?
5      A.  No.
6      Q.  Why was Barbara telling you of the
7  policy?
8      A.  Because I was the office manager.
9      Q.  So as office manager, as you sit here
10 today, you don't know if this policy remains in
11 effect?
12     A.  I pretty much don't have anything to
13 do out there with the Reception Center other than
14 Dennis having contact with me in certain areas.
15 He runs that out there.
16     Q.  Has that changed any time; have you
17 had other responsibilities with relationship to
18 the reception area, or have your responsibilities
19 always been the same?
20     A.  No, I just oversee it, always been the
21 same.
22     Q.  Is it possible that somebody could
23 come into work on a day and not get a tour, a
24 sales representative; does that ever happen?

89

```
1        A.    Yes.
2        Q.    How often does that happen?
3        A.    I don't know.
4        Q.    Is it possible that a sales manager
5   could not get a tour for a day as well?
6        A.    I don't know.
7              (Exhibit 9, Vacation Village
8                    Rotations, marked for
9                    identification)
10       Q.    (By Ms. Garrow)  I'm showing you
11  what's marked as Plaintiff's 9.  What is that?
12       A.    This is a rotation explanation that
13  Dennis has also typed up.
14       Q.    What is that policy?
15       A.    It explains from the morning sign-in
16  sheet, where it's located, and I believe it
17  continues to explain how rotation is.
18       Q.    It says here "The morning sign-in is
19  picked up from the Sales Building at 8:33 by a
20  member of the reception staff."
21       A.    Right.
22       Q.    So does that mean that everyone is
23  supposed to be in by 8:33?
24       A.    Yes.
```

90

```
1        Q.    It looks like people can come in as
2   early as 8:15, according to this.  That's when
3   the rotation sheet is put out, is that correct?
4        A.    Correct.
5        Q.    Have you ever seen anybody there
6   before 8:15?
7        A.    Yes.
8        Q.    Have you seen sales representatives
9   there before 8:15?
10       A.    No, not the representatives, no.
11       Q.    Have you seen sales managers there
12  before 8:15?
13       A.    Yes.
14       Q.    What does a sales manager do before
15  8:15 in the morning?
16       A.    Drink coffee.
17       Q.    When they're over at work?
18       A.    I don't know.
19       Q.    Have you observed them doing anything
20  in particular?
21       A.    I have come over into the building and
22  they're just sitting there gabbing, drinking
23  coffee.
24       Q.    This is all before the morning
```

91

```
1   meeting, is that correct?
2        A.    Correct.
3        Q.    Do you know if the managers meet
4   before the morning meeting?
5        A.    The managers do have a meeting before.
6        Q.    Is that every morning?
7        A.    Yes.
8        Q.    It says "The rotation is then figured
9   by the managers going out by deals from the day
10  before, then by volume in that day's tour flow."
11  Do you know what that means?
12       A.    Whoever sold the day before, by
13  volume, the highest volume goes out first.
14       Q.    So if you didn't sell something the
15  day before, then you're at the bottom of the
16  rotation, is that the policy?
17       A.    It's not necessarily the bottom of the
18  rotation.  I believe it goes by closing ratio,
19  whatever your numbers are.
20       Q.    So if your closing ratio is low and
21  you didn't sell something the next day, chances
22  are you're going to be at the bottom of the
23  rotation, is that correct?
24       A.    Correct.
```

92

```
1        Q.    And you may not get a tour that day,
2   is that correct?
3        A.    Correct.
4        Q.    Do you know how long you're required
5   to be there, be on the premises?
6        A.    No.  Excuse me can I...
7        Q.    Yes.
8        A.    I believe they have to stay there
9   until the line cuts.  I don't know when they cut
10  the line, though.
11       Q.    What does "until the line cuts" mean?
12       A.    They let anybody go home that doesn't
13  need to be there.
14       Q.    Do you know what criteria are used to
15  cut the line?
16       A.    No.
17       Q.    Who cuts the line?
18       A.    I believe it's Dennis with instruction
19  from one of the directors.
20       Q.    When you say "directors," you mean
21  line directors?
22       A.    Yes.
23       Q.    Can a sales manager cut the line?
24       A.    No.
```

Wilson v. Patriot          Faith Lippert   5/17/05

---

93

1    Q.   Can a line director cut the line?

2    A.   I don't believe so.  I don't know, I'm

3  not sure.

4    Q.   So going back to Exhibit Number 6, the

5  fall through spring tour times and the summer

6  months' tour times, you said you directed Dennis

7  to prepare this?

8    A.   Correct.

9    Q.   What does a 2:00 afternoon rotation

10  mean.  What is that --

11    A.   I'm not sure.

12    Q.   So you didn't review this after Dennis

13  prepared it?

14    A.   No.

15    Q.   Have you observed, let's say this

16  month, May -- have you observed sales

17  representatives at the -- in the lounge area

18  after 3:00?

19    A.   No.

20        MS. FABBO:  Objection.

21        THE WITNESS:  I'm very rarely

22        over there.

23    Q.   (By Ms. Garrow)  So you just haven't

24  had occasion to observe it?

---

94

1    A.   No.

2    Q.   Have you observed any sales

3  representatives on your side of the office after

4  3:00?

5        MS. FABBO:  Objection.

6    Q.   (By Ms. Garrow)  In the month of May?

7    A.   No.

8    Q.   Would they have occasion to come over

9  to your office at 3:00 in the afternoon?

10    A.   No.

11    Q.   What do you know about the overage

12  policy -- let me ask it a different way.  Do you

13  know what the overage policy is?

14    A.   No.  I know what it is, but I can't

15  explain it to you.

16    Q.   Has the overage policy, to your

17  knowledge, been the same for the entire time

18  you've been working for Patriot in Lanesborough?

19    A.   Yes.

20    Q.   Is it a punishment?

21    A.   If you want to put it that way, I

22  would say, yes.

23    Q.   When is someone put on overage?

24    A.   I don't want to misstate anything, so

---

95

1  I'd rather not say.

2    Q.   Well, I'm not asking you to guess, but

3  if you know when somebody is put on overage -- I

4  mean, can you think of somebody who has been put

5  on overage specifically?

6    A.   The only thing that comes to my mind

7  is if somebody comes in late and misses his tour,

8  then he would have to go down to the bottom, or

9  --let me see if I can think of something else.

10  Or let's say they didn't sign back in from the

11  day before after their first tour -- they're

12  supposed to sign in.  If they didn't, then the

13  next day they come in, they would be put on

14  overage because they didn't do what they should

15  have done the day before.

16    Q.   Does overage mean being put on the

17  bottom of the list?

18    A.   No, the definition for overage I'm not

19  clear on, so...

20    Q.   Do you know if Joel Hecht was ever put

21  on overage for flicking his cigarette butts in

22  the wrong place?

23    A.   I don't know if it was for flicking

24  cigarettes in the wrong place.  I know he was put

---

96

1  on overage before, yes.

2    Q.   Do you know why?

3    A.   I believe with Joel it was because he

4  would just, you know, walk out, just leave.

5    Q.   Go ahead.

6    A.   He would just leave.  Any others, I

7  would have to look back to refresh my memory.

8    Q.   When you say he would just leave, he

9  would leave before the end of the day or leave

10  the reception area?

11    A.   He would leave whenever he wanted to.

12  If he got upset, he would leave; or then at the

13  end of the day if he didn't feel like signing in,

14  he would leave -- things like that.

15    Q.   So he would sort of come and go as he

16  pleased, something like that?

17    A.   Pretty much towards the end, prior to

18  him leaving, he was -- yes, he was pretty much

19  doing whatever he wanted to do.

20    Q.   And that wasn't allowed, just coming

21  and going as you pleased, correct?

22    A.   No.

23    Q.   You mentioned before that you had

24  disciplined Mr. Hecht at some point?

---

97

```
 1      A.   I said something to him about his
 2  cigarettes.  I generally don't go out and
 3  discipline representatives, no.
 4      Q.   So when you say discipline, you mean
 5  you talked to him?
 6      A.   Oh, about the cigarette thing?
 7      Q.   Yes.
 8      A.   What I recall, I said to him was, Oh
 9  -- because I saw him flick it, and I believe I
10  said something to him like, Oh, Joel, I think you
11  dropped your cigarette, or something like that to
12  that.  I mean, I was never poopy or anything, you
13  know.
14      Q.   Let me ask it this way -- you
15  testified that you disciplined him.  What were
16  you talking about when you said that?
17      A.   Did I say I disciplined him?
18      Q.   Earlier, yes, you did.
19      A.   Did I?
20      Q.   Yes.
21      A.   Well, I think I misstated.  That was
22  the only time I can ever remember, you know,
23  saying something to Joel, and I don't know -- I
24  don't believe I said it in a discipline way, you
```

98

```
 1  know what I'm saying -- not at all.
 2      Q.   So did you ever write him up?
 3      A.   Me personally, no.
 4      Q.   When I say "write him up," I mean some
 5  kind of written reprimand.
 6      A.   About the cigarette?
 7      Q.   Or about anything?
 8      A.   Oh, not me, no.
 9      Q.   Has anybody ever written Mr. Hecht up,
10  to your knowledge?
11      A.   Yes.
12      Q.   Who was that?
13      A.   Dennis.
14      Q.   Why was that?
15      A.   That was in reference to him leaving
16  the premises and refusing to take tours and
17  things like that.
18      Q.   Do you know approximately when that
19  was?
20      A.   Approximately within five months'
21  time.
22      Q.   Within the last five months' time?
23      A.   Yes.
24      Q.   Any other discipline of Mr. Hecht that
```

99

```
 1  you can think of?
 2      A.   Not off the top of my head.
 3      Q.   Was he ever disciplined for violating
 4  the attendance policy, to your knowledge?
 5      A.   Off the top of my head, I don't
 6  recall.
 7      Q.   Are you familiar with Alexander
 8  Hadsagus?
 9      A.   I know Alex, um-hum.
10      Q.   Do you know if he was ever disciplined
11  for violating the attendance policy?
12      A.   I don't recall, I don't recall.
13      Q.   You don't recall or you don't know?
14      A.   I don't know.
15      Q.   Did you ever discipline Alexander
16  Hadsagus for violating the attendance policy?
17      A.   Not that I remember, no.
18      Q.   Plaintiff's Exhibit 7, under Number
19  1,it says "All sales representatives need to sign
20  back in after each tour."  We've discussed that.
21  "Each rep. that has signed in will remain
22  available in the sales lounge for their next
23  tour.  Looking for sales representatives, calling
24  next door or cell phone, will not be done."  Do
```

100

```
 1  you know what Mr. Rauer meant by that?
 2      A.   To the best of my knowledge, it
 3  wouldn't be Dennis or the two girls out front --
 4  it's not their responsibility to go and find the
 5  sales rep.  The sales rep. should be aware of the
 6  time frame.  I mean, if it's a tour time, he
 7  should be there waiting for the tour to come in.
 8  Nobody has to go and search for them.
 9      Q.   Do you know what Mr. Rauer was
10  specifically referring to when he said "calling
11  next door"?
12      A.   Calling next door?
13      Q.   Yes.
14      A.   Calling from the Reception Center to
15  the Sales Center, to the managers' table where
16  the managers would sit, they have a phone there.
17      Q.   So there is a land line --
18      A.   Yes.
19      Q.   -- over at the managers' table?
20      A.   Yes.
21      Q.   And why would Dennis or the people in
22  reception have occasion to call the Sales Center
23  looking for representatives?
24      A.   Because they don't go back to the
```

101

1   lounge, and sometimes they skip out on their
2   tours, or try to.
3       Q.   It says that "Representatives will be
4   passed after ten minutes"?
5       A.   Um-hum.
6       Q.   That's been the policy throughout your
7   time at Patriot, is that correct?
8       A.   That's correct.
9       Q.   Anybody ever in the rest room and get
10  passed over -- did that ever happen?
11      A.   I don't know.
12      Q.   Just so I'm clear, after the
13  salesperson completes the tour, they're supposed
14  to take the customer to the Sales Center, is that
15  true?
16      A.   After they've been up and shown the
17  resort?
18      Q.   Yes.
19      A.   Then they come back into the Sales
20  Center.
21      Q.   That's what's expected?
22      A.   Yes.
23      Q.   If there is, in fact, a sale, where do
24  they do the paperwork?

102

1       A.   They do it in the Sales Center.
2       Q.   Where is the paperwork completed?
3       A.   Typed, you mean?
4       Q.   Signed off by the customer -- is that
5   in the Sales Center as well?
6       A.   Yes, yes.
7       Q.   Then what happens after it's signed by
8   the customer?
9       A.   Then as far as I know, they gift them
10  and, you know, send them away.  They're done.
11      Q.   Then what happens to the paperwork?
12      A.   The closing officer brings it back
13  into the contracting office.
14      Q.   What's a closing officer?
15      A.   Closing officer, the people that close
16  the deals, they're notaries.  They sit there and
17  they go over all the paperwork with the new
18  owners, make sure that they understand
19  everything.
20      Q.   Is that the Contract Department, is --
21      A.   No.
22      Q.   They're called closing officers?
23      A.   Closing officers.
24      Q.   Where do they sit?

103

1       A.   In the Sales Center.
2       Q.   So the salesperson schedules
3   themselves and then a closing officer comes and
4   reviews the paperwork?
5       A.   No, the Sales Center, like
6   three-quarters of it, let's say where the
7   representatives are sitting with their people,
8   and then the other quarter of the people have got
9   cubicles that the closing officers sit in; and
10  that's where they go in and close with their
11  paperwork.
12      Q.   What do they do, to your knowledge,
13  the closing officers?
14      A.   They close deals.
15      Q.   How do they do that?
16      A.   I'm not sure what you're asking.
17      Q.   What are their duties when they're
18  closing a deal; what are they supposed to do?
19      A.   They go over the documents with the
20  people, and if they have any questions, then they
21  help them, and they go ahead and they sign and
22  then they notarize or witness, whatever.
23      Q.   If there's no PAC check, do they try
24  to get a PAC check?

104

1       A.   Yes, ma'am.
2                (Exhibit 10, Employment Agreement
3                for Peter Corbin, marked
4                for identification)
5       Q.   (By Ms. Garrow)  I'm showing you
6   what's been marked as Plaintiff's Exhibit 10.  I
7   want you to take a minute to review it, or as
8   much time as you need to review it and let me
9   know.  Have you had an opportunity to review
10  that?
11      A.   Yes, I'm ready.
12      Q.   I'm actually going to show you another
13  one, and let me ask you this -- to your
14  knowledge, between August of 2001 and December of
15  2001, did the Employment Agreement for sales
16  representatives change at all?
17      A.   It did change, but I'm not sure of the
18  dates, when the new one came into...
19      Q.   Well, Exhibit 10 is Mr. Corbin's Sales
20  Agreement, is that correct?
21      A.   Yes.
22      Q.   Or Employment Agreement for Sales
23  Representative?
24      A.   Yes.

105

1    Q.   And in reviewing it, I assume you
2  notice that it's missing every other page, is
3  that correct?
4    A.   Some of them did, yes, I'm sorry.  I
5  didn't realize that at the time, because when I
6  made the copies I just put all of them in at
7  once.
8    Q.   So we're going to work off of
9  Mr. Martin's.
10         MS. GARROW:  We'll mark that as
11         number 11, please.
12         (Exhibit 11, Employment Agreement
13         for Roger Martin,
14         marked for identification)
15    Q.   (By Ms. Garrow)  I just want you to
16  review it and let me know if, to the best of your
17  recollection, they both signed the same
18  documents?
19    A.   Yes.
20    Q.   Again, looking at Exhibit 11, Page 9,
21  the last page, that is your signature, correct?
22    A.   Yes.
23    Q.   You were the individual from Patriot
24  who signed Mr. Martin's Sales Representative

106

1  Employment Agreement, is that correct?
2    A.   Correct.
3    Q.   Who are the witnesses, by the way?
4    A.   Gordon Leete is for Roger.
5    Q.   Is that the big "G" on top there?
6    A.   Yes.
7    Q.   And then who else?
8    A.   This one here is Bonnie Gardner.
9    Q.   On Roger's?
10    A.   On mine.
11    Q.   I see what you mean for Roger.  So in
12  other words, Gordon Leete witnessed Roger's
13  signature and Bonnie Gardner witnessed your
14  signature?
15    A.   Correct.
16    Q.   Who was Bonnie Gardner?
17    A.   Bonnie Gardner was the old Reception
18  Center manager before Dennis.
19    Q.   Did you review this Employment
20  Agreement before Mr. Martin signed it?
21    A.   No.  I have read it; but did I review
22  it, no.
23    Q.   You have read this Employment
24  Agreement before today?

107

1    A.   I have read it.
2    Q.   Did you ask any questions about it
3  when you first -- let me strike that.  Do you
4  recall when you first reviewed it?
5    A.   Back in 2001.
6    Q.   Was it prior to the first person
7  signing off on it?
8    A.   No, no.
9    Q.   So at some point in 2001?
10    A.   At some point, yes.
11    Q.   Did you ask any questions about it
12  when you reviewed it?
13    A.   No.
14    Q.   Did you call anybody in Fort
15  Lauderdale to inquire at all?
16    A.   No.
17    Q.   Did anybody make any representations
18  to you about this Employment Agreement on or
19  around the first time you reviewed it?
20    A.   What do you mean by "representations"
21  -- I'm not sure.
22    Q.   Anything at all.  How did you come to
23  receive the Employment Agreement for your review?
24    A.   It was one of the required bits of

108

1  paperwork that I had to go over with everybody,
2  or new-hires needed to sign.
3    Q.   At some point, though, you reviewed it
4  on your own, is that correct?
5    A.   I've read it on my own, yes.
6    Q.   What prompted you to do that?
7    A.   Probably when it became really sticky
8  about the PAC issue, I would say, but I don't
9  remember; I don't recall the time.
10    Q.   And did anybody from Fort Lauderdale
11  ever say to you or anybody ever say to you, Miss
12  Lippert, can you take a look at the Sales
13  Representative Employment Agreement -- anybody
14  ever direct you to take a look at it?
15    A.   Not that I recall.
16    Q.   Anybody ever direct you to review it
17  at any time?
18    A.   I think possibly after the new one
19  came out to read over the change.
20    Q.   Do you know why the new one came out;
21  do you have any knowledge?
22    A.   Off the top of my head, I'm thinking
23  that the second one explains the earned
24  commission and the PAC, whereas the first one I

109

1  don't think goes into any type of an explanation
2  about the PAC. I believe that's what it was.
3      Q.  Did the automobile insurance policy
4  change at all during the time --
5      A.  I don't believe so, no.
6      Q.  One of provisions of this Employment
7  Agreement on Page 2 says that "An employee shall
8  maintain a valid Massachusetts driver's license."
9  Is that a requirement of being an employee -- a
10 sales representative at Patriot Resorts in
11 Lanesborough?
12     A.  If they're a resident in
13 Massachusetts, yes, but we have representatives
14 that live in New York.
15     Q.  Are they allowed to have a New York
16 driver's license?
17     A.  Yes.
18     Q.  Are you aware of any sales
19 representatives who did not have a valid
20 Massachusetts or New York license during their
21 time as a sales representative at Patriot in
22 Lanesborough?
23     A.  Yes.
24     Q.  Who was that?

110

1      A.  Dave Macurio is one, and I think the
2  other one that comes to mind is Tom Codington,
3  C-O-D-I-N-G-T-O-N.
4      Q.  And anybody else?
5      A.  Not that I recall.
6      Q.  What happened to David Macurio; did he
7  start with a valid license?
8      A.  He had a valid license, yes.
9      Q.  And then at some point he did not have
10 a valid license?
11     A.  Not a Massachusetts license. He
12 always had a valid license.
13     Q.  Oh, he did?
14     A.  Oh, yes.
15     Q.  Are you saying these are the only two
16 people who did not have valid Massachusetts
17 licenses?
18     A.  Yes.
19     Q.  They had New York licenses?
20     A.  No, the New York we already know. The
21 others had, I believe, Hawaii.
22     Q.  Is that Tom Codington?
23     A.  Yes, and I believe Dave's is Virginia.
24 They were always active; they never expired.

111

1      Q.  Are you aware of anybody who had a
2  suspended license during the time they were a
3  representative at Vacation Village in the
4  Berkshires?
5      A.  Yes.
6      Q.  Who was that?
7      A.  One of them was, I believe, Ron
8  Ferrara had problem with his license, Sam Barnes
9  had a problem with his license. Trying to think
10 if anybody else. Those are the two that I
11 recall.
12     Q.  What was the problem with Ron
13 Ferrara's license?
14     A.  I'm not sure. I'm not sure. They
15 took him -- I'm not sure if he lost it or it
16 expired and he didn't have one. I'm not sure of
17 the particulars with Ron.
18     Q.  What happened to him as a result -- or
19 his position as a sales representative as a
20 result of him losing his license?
21     A.  They put him into the Exit Department.
22     Q.  So he was allowed to continue as an
23 employee?
24     A.  Yes.

112

1      Q.  What about Mr. Barnes, what happened
2  with him?
3      A.  Same with Sam.
4      Q.  Do you know what happened to his
5  license?
6      A.  No, I'm not sure of what happened. I
7  think he lost it with DUI's, to be perfectly
8  honest, but I didn't see any paperwork.
9      Q.  So you're not certain about that?
10     A.  Right.
11     Q.  But you believe that it was DUI's?
12     A.  No -- yes, I believe.
13     Q.  Do you know how many?
14     A.  A few.
15     Q.  Any more specific than a few?
16     A.  Three.
17     Q.  Three?
18     A.  Yes.
19     Q.  Maybe more?
20     A.  Maybe.
21     Q.  Then what happened to his position as
22 a sales representative?
23     A.  Sam went away for a while, but when he
24 came back, they put him in the Exit Department.

113

1    Q.   As an employee in the Exit Department,
2  do you have the same opportunities to make sales
3  as if you were a sales representative working on
4  the line?
5    A.   You sell, yes.  They offer the
6  tri-yearly ownership.
7    Q.   Is it the same commission, different
8  commission?
9    A.   It's the same commission, but they
10  don't take the tours out in their cars.
11    Q.   Are they required to be at sales
12  meetings, the sales meeting, the morning meeting?
13    A.   No.  They come in later in the
14  morning.
15    Q.   Do they stay later?
16    A.   Sometimes.
17    Q.   Other than the annual bi-yearly and
18  tri-yearly time-share interests, are there any
19  other products or services sold at Patriot in
20  Lanesborough?
21    A.   No.
22    Q.   I'm going to turn your attention to
23  Page 3.
24        MS. FABBO:  Of Exhibit 11?

114

1    Q.   (By Ms. Garrow)  Of Exhibit 11.  And
2  I'm going to ask you to explain to me in your own
3  words what you understand "(v) Closing" to mean.
4    A.   When the account comes out of
5  rescission and all of the paperwork is fine,
6  we've got all of the monies and everything is
7  clean.
8    Q.   When you say you've got all the
9  monies, how do you get all of the monies?
10    A.   Well, we either get them all that day;
11  or in the case of a pending contract, we'll only
12  get a portion of the payment the day of sale and
13  then they let them make payments for so much so
14  many months until they make a full down payment,
15  and then it goes into closing after rescission.
16    Q.   What is the down payment for an annual
17  sale, an annual time-share?
18    A.   Ten percent.
19    Q.   And is that the same for bi-yearly and
20  tri-yearly?
21    A.   Yes.
22    Q.   It's always ten percent?
23    A.   Yes.
24    Q.   Are the prices different?

115

1    A.   Yes.
2    Q.   Do you know the prices?
3    A.   Low end is 3,590 and high end is
4  22,990.
5    Q.   When you say "low end" and "high
6  end,"are there various grades within each of the
7  annual, bi-yearly, and tri-yearly?
8    A.   Yes.
9    Q.   How many grades within each?
10    A.   That would depend on the season.
11    Q.   So it's not based on the unit; it's
12  based on the week?
13    A.   Correct.
14    Q.   Is it also based on the unit?
15    A.   No.
16    Q.   Are all the units the same size?
17    A.   They're all the same.
18    Q.   I assume this is obvious, but the more
19  popular weeks are the more expensive time-share
20  prices that correspond?
21    A.   Summer weeks, holiday weeks, ski weeks
22  are more popular.
23    Q.   It sounds like from your testimony
24  that it's possible to pay your down payment over

116

1  time if you're a customer, is that true?
2    A.   Yes.
3    Q.   How much time do you give the owner to
4  pay their down payment?
5    A.   All depends who the sales rep. is.
6  Some they'll go a week, sometimes I've seen to
7  eight months.
8        MS. GARROW:  Off the record.
9        (A lunch break was taken)
10        MS. GARROW:  Back on the record.
11    Q.   (By Ms. Garrow)  I'm going to call
12  your attention back to Plaintiff's Exhibit 1, and
13  I'm just trying to get a handle on what this is.
14  And I guess I'm still not clear, so I'm going to
15  ask you to go through it one more time and maybe
16  I can visualize it better with a hypothetical
17  sale.  So presume -- again looking at the first
18  line of Exhibit 1 -- presume that sales
19  representative has an owner and they make a sale
20  on, let's say -- again, looking at the first
21  line, on August 8, 2001, they have the paperwork
22  signed and the sale is a -- let me ask you this.
23  Did you accept PAC checks at that time, in August
24  of 2001?

117

1    A.   I don't recall, I don't recall.  I'm
2  sure we did.
3    Q.   So let's say that this sale was --
4  forget that it's a PAC sale.  Let's say that this
5  sale was a sale that was closed on that date with
6  a full down payment, or a sale that was made on
7  that date with a full down payment, again on
8  August 8 of 2001.  So sale date begins.  What
9  would you do, looking at that, if that sale was
10 made or the paper was written on August 12?
11           MS. FABBO:  Objection.
12           MR. FELDMAN:  8.
13   Q.   (By Ms. Garrow)  August 8.
14   A.   First of all, it's not sale date
15 begins; it's closed date begins.
16   Q.   Okay.
17   A.   And there again, it's that week.
18   Q.   So again, I'm going to stop you.
19 Let's go slowly.  I understand your distinction
20 between closing and sale.  I'm not saying the
21 closing occurred on the 8th; I'm saying that the
22 contract was written on the 8th.
23   A.   Okay.
24   Q.   So then what happens?

118

1    A.   It would all depend on whether it was
2  Massachusetts, Connecticut, Jersey, or New York
3  as to when the rescission date would come up.
4    Q.   I'm going to stop you there.  Let's
5  presume Massachusetts.
6    A.   So it was the 8th.
7    Q.   Take me through on these dates here.
8    A.   Let's say the 8th was a Monday.
9    Q.   The 8th probably wasn't a Monday
10 because this is supposed to be a Tuesday, right
11 -- 8/7/2001?
12   A.   Okay.
13   Q.   So the 8th was a Wednesday.
14   A.   Okay.  Then Thursday, Friday, and then
15 Saturday.  So that would be the 9th, 10th, 11th,
16 so it would be good within that week.
17   Q.   When you say that, what are you
18 looking to to say that it would be good within
19 that week on this?
20   A.   The rescission date.
21   Q.   Are you looking to anything on this
22 document Exhibit 1 to determine that the sale
23 would be good that week?
24   A.   Yes, because it's between 8/7 and

119

1  8/13, so it would be on that Good Business Ledger
2  for that period of time -- closed date beginning
3  8/7, ending 8/13 would be a Good Business Ledger
4  week ending 8/13.
5    Q.   And that's where it says "Good
6  Business week ending date"?
7    A.   Correct.
8    Q.   So what's "Good Business pulled"?
9    A.   "Good business pulled" is the day that
10 we pull it, and then I work on it as far as
11 separating out the different packets that go to
12 the bank, to the attorney, to this one, that one.
13 Then there's a packet that goes to Fort
14 Lauderdale, and it is overnighted to Fort
15 Lauderdale, and then the representatives are paid
16 on this date here.  If you turn it over and look
17 at these, this is exactly what it really needs to
18 be.
19           MS. FABBO:  What page are you
20           referring to?
21   A.   I don't know.  3405.  Because it shows
22 you the Tuesday with the close date begins, close
23 date ends, sent to Fort Lauderdale, overnighted
24 to Fort Lauderdale on that date, and the reps..

120

1  are paid on that date.  That is what those
2  columns are all about.
3    Q.   So if the contract was written later
4  in the week, let's say, again, just looking at
5  this, the date I keep trying to say, the contract
6  was written on the 12th of August --
7           MS. FABBO:  Objection.
8    Q.   (By Ms. Garrow)  -- 2001, then
9  providing a three-day rescission, that would fall
10 into the following week for Good Business, is
11 that correct?
12   A.   That's correct.
13   Q.   Then the processes would be the same
14 thereafter?
15   A.   Correct.
16   Q.   Do you always do the overnight on a
17 Monday to Fort Lauderdale?
18   A.   Yes.
19   Q.   Is that every Monday?
20   A.   Every Monday.  There might have been a
21 couple of nights where the girls forgot to put it
22 up or something like that, but that would just be
23 a fluke.
24   Q.   Then what happens if they forget?

121

1    A.   If they forget, it goes out the next
2    night.
3         Q.   We were discussing before the three
4    timely payments policy, and that's three timely
5    payments plus a down payment in order to get
6    paid; is that true or not true?
7         A.   It all depends on how the deal was
8    written.  If it was -- the money all has to be
9    good; the down payment is part of that.  It's in
10   order for them to have the earned commissions,
11   it's three consecutive timely monthly payments.
12        Q.   What about the down payment, how does
13   that play into that; in other words, would they
14   have to have a full down payment as well to get
15   paid their commission?
16        A.   In order for -- yes, yes.
17        Q.   And that's in every instance?
18        A.   Yes.
19        Q.   If a sale was financed and there was a
20   full down payment and two timely payments were
21   made and the third payment was late -- let's
22   assume that it was after the grace period and it
23   was late -- when would the commission be paid on
24   that sale?

122

1         A.   As soon as three timely consecutive
2    monthly payments were made.
3         Q.   So if the next month the owner was
4    late, would the commission then be paid; in other
5    words, the fourth month?
6         A.   It would have to be three consecutive
7    timely monthly payments.
8         Q.   And if the owner was late past the
9    grace period every month for a year, when would
10   that commission get paid?
11        A.   I'm not sure, because it wouldn't be
12   earned until it's three consecutive timely
13   monthly payments, so I don't know the answer to
14   that.
15        Q.   Do you have any reason to believe that
16   it's --
17        A.   Any different?
18        Q.   Yes, any different?
19        A.   No.
20        Q.   Other than with your attorney, have
21   you had any conversations relating to not paying
22   a minimum wage to the sales representatives and
23   sales managers at Patriot?
24        A.   No.

123

1         Q.   Other than with your attorneys, have
2    you had a conversation relating to not paying
3    overtime to the sales representatives and sales
4    managers at Patriot?
5         A.   A conversation with anybody, no.
6         Q.   Anything other than a conversation?
7         A.   Oh, hold on a minute.  I don't recall
8    who I spoke with, but when this all started --
9    and I don't even know what time frame it was --
10   when anybody would say, You all aren't paying
11   right, or, You guys aren't paying right, my basic
12   answer back to them is, you know, you've signed
13   the Sales Agreement, okay, and you've signed the
14   handbook, but you've signed the Sales Agreement
15   that explains to you how you are to be paid, and
16   we have attorneys that have done this paperwork
17   for us.  I'm sure that if we're doing something
18   wrong, then that's a different issue, but as far
19   as I'm concerned, once you sign this, everything
20   is fine; we're going to put it in the attorneys'
21   hands and let them take care of it, type of
22   thing.  Pretty much to say, you know, worry about
23   sales, you know, instead of getting caught up in
24   the hubbub of what might be right and what might

124

1    be wrong type of thing, very general.
2         Q.   Who have you had that conversation
3    with?
4         A.   I think I mentioned that to LaCrisha,
5    was one, and just like general office staff.  I
6    can't recall anybody else specifically that I've
7    talked to about something like that.
8         Q.   Now, you just said general office
9    staff, but your testimony was you talked about
10   just worry about sales.  Is that the same
11   conversation you had with the office staff -- in
12   other words, they're not selling, so how did that
13   conversation arise?
14        A.   No, because they would overhear
15   something that was going on, and I wanted to, you
16   know, let them understand.  And it wasn't all of
17   the staff; it was probably just my assistant
18   because of the way the office is laid out.
19        Q.   Who is your assistants?
20        A.   Carrie Ann.
21        Q.   Carrie Ann?
22        A.   Um-hum.
23        Q.   What's her last name?
24        A.   Perozak.

125

1    Q.  If a sales representative is not on a
2  tour, what are they supposed to be doing?
3    A.  I don't really know.  I don't know the
4  answer to that.
5    Q.  If a sales manager is not on a tour,
6  what are they supposed to be doing?
7    A.  I don't know the answer to that.  Let
8  me go back.  The managers are out there probably
9  TO-ing a table, helping the others.
10   Q.  Okay.  Anything else?
11   A.  No.
12               (Exhibit 12, Employment Agreement
13               for LaCrisha Wise, marked
14               for identification)
15   Q.  (By Ms. Garrow)  Showing you what's
16  been marked as Plaintiff's Exhibit 12, do you
17  recognize this document?
18   A.  Yes.
19   Q.  You had mentioned that at some point,
20  the Employment Agreement for sales
21  representatives changed.  Is this the changed
22  Agreement, to your knowledge?
23   A.  I'm not sure.  I'd have to look at
24  them both to be absolutely sure.

126

1    Q.  Why don't you take a minute to do
2  that.
3    A.  Do you have one of the newer ones?
4    Q.  Let me ask you this.  This is
5  different than Exhibit 11, is that correct --
6  even just in the type, the type is different,
7  right, is that fair to say?
8    A.  Yes.
9    Q.  And this is dated February 8, 2002.Do
10  you think that there has been a subsequent --
11   A.  No, no, there hasn't been.  There's
12  only been one.
13   Q.  One change?
14   A.  Um-hum.  I don't believe this is the
15  new one.
16       MS. FABBO:  Referring to
17       Exhibit 12?
18       THE WITNESS:  Right.
19   Q.  (By Ms. Garrow)  Do you think Exhibit
20  11 is the new one?
21   A.  No.  I don't believe that this is the
22  new one.
23   Q.  Is there a day of the week that
24  employees' work week at Patriot in the Berkshires

127

1  begins; is there a particular day of the week
2  that's the beginning of the work week?
3    A.  We have Wednesday and Thursday off, so
4  we work from Fridays through Tuesdays.
5    Q.  So the work week begins on a Friday?
6    A.  Yes.
7    Q.  Is that true for sales
8  representatives?
9    A.  Yes.
10   Q.  Are there any documents, any records
11  kept to reflect the beginning of the work week
12  that reflect the day of the week in which the
13  employees' work week begins?
14   A.  I don't believe there's anything
15  written up other than the sign-in sheets that
16  they sign.
17   Q.  Are there any documents reflecting the
18  starting time and the length of an employee work
19  period?
20   A.  Not that I'm aware of.
21   Q.  Are there any documents that reflect
22  the starting time and length of the sales
23  representatives' work period as a sub-group of
24  employee?

128

1    A.  Not that I'm aware of.
2    Q.  I believe you already testified that
3  there's no regular hourly rate of pay for a sales
4  representative, is that true?
5    A.  That's true.
6    Q.  And no regular hourly rate of pay for
7  a sales manager, correct?
8    A.  Correct.
9    Q.  Is it fair to say that there are no
10  documents which reflect a regular hourly rate of
11  pay for either a sales representative or a sales
12  manager?
13   A.  Not that I'm aware of.
14   Q.  Well, you are the human resources
15  director, correct?
16   A.  Yes.
17   Q.  Other than the sign-in sheets and the
18  payroll registers that we've discussed as
19  Exhibits 4 and 3, are there any other documents
20  which reflect hours worked each work day or total
21  hours each work week for sales representatives?
22   A.  The TO slips that show when they have
23  a tour.  That's the only forms that I know that
24  have times written on them.

129

1    Q.    Same question for sales managers.
2    A.    Same.
3    Q.    Same answer?
4    A.    Yes.
5    Q.    What documents, if any, reflect daily
6  or weekly wages due for hours worked?
7    A.    None that I know of.
8    Q.    And that's for sales representatives?
9    A.    Yes.
10    Q.    And what about for sales managers?
11    A.    Same.
12    Q.    What documents reflect total premium
13  pay for overtime hours for sales representatives?
14    A.    Nothing.
15    Q.    What about for sales managers?
16    A.    Same.
17    Q.    Which documents, if any, reflect
18  additions or deductions from wages paid each pay
19  period?
20          MS. FABBO:  Objection.
21          THE WITNESS:  You have to be more
22          specific.  I don't know what you're
23          saying.
24    Q.    (By Ms. Garrow)  What documents, if

131

1          that, I'm not quite sure what you're
2          saying.  I see deductions here on the
3          Compu-pay, but I don't see these, so I
4          don't know what else you would be
5          looking for.
6    Q.    (Ms. Garrow)  Are you aware of any
7  other documents, then; or to your knowledge,
8  that's it?
9    A.    Yes, to my knowledge.
10    Q.    Any documents that you're aware of
11  that show total wages paid to sales
12  representatives each pay period?
13    A.    Total wages paid -- I print out a
14  summary from the Good Business Ledger and I
15  submit it to Fort Lauderdale, and then there are
16  commission sheets that are attached to their
17  paychecks, but I do not open them up and look at
18  them, no.
19    Q.    So is it your testimony that those
20  reflect total wages paid to each sales
21  representative or that you're not sure, those --
22    A.    Per week.
23    Q.    So those do reflect; you just don't
24  look at them?

130

1  any, show deductions from total pay for sales
2  representatives?
3    A.    What are you talking about as
4  deductions?
5    Q.    Let me ask it a different way.  Does
6  Patriot provide health insurance to some of its
7  employees?
8    A.    Yes.
9    Q.    If an employee elects -- if a sales
10  representative elects to carry health insurance
11  and has been there the appropriate amount of
12  time, is that something that Patriot would
13  provide for a sales representative?
14    A.    Yes.
15    Q.    And same answer for a sales manager.
16    A.    Yes.
17    Q.    What documents, if any, would show
18  those types of deductions or other types of
19  deductions from wages for sales representatives
20  or sales managers?
21          MS. FABBO:  Objection.  You can
22          answer.
23          THE WITNESS:  I would assume that
24          their pay stub shows it.  Other than

132

1    A.    Right.
2    Q.    Same with sales managers?
3    A.    Yes.
4    Q.    Have you been involved -- let me
5  strike that.  Other than the named plaintiffs in
6  this case, are you aware if any employees have
7  filed any complaints with the Attorney General
8  regarding wage and hour issues?
9    A.    I have heard, yes, that they did.
10    Q.    Have you been involved in
11  investigating any of those complaints?
12    A.    No.
13    Q.    Were you involved in responding to any
14  of those complaints?
15    A.    No.
16    Q.    Who have you heard have filed
17  complaints?
18    A.    Roger Martin.
19    Q.    I'm asking you other than the named
20  plaintiffs in this case?
21    A.    Oh, I'm sorry.  In believe Tracy Lanue
22  at one time did, and I believe Will Spalding did.
23  That's all I can remember.
24    Q.    You already said you weren't involved

133

1  in investigating those complaints?

2      A.   No.

3      Q.   Or responding to those complaints,

4  correct?

5      A.   Correct.

6      Q.   Have you reviewed those complaints?

7      A.   No.

8      Q.   Are you aware of the substance of

9  either of those complaints?

10     A.   I'm aware of Tracy's a·long, long time

11 ago.  She had left her employ and wanted to get

12 her commissions.

13     Q.   So was she alleging she was not paid

14 certain commissions when she left?

15     A.   Right.

16     Q.   Vacation Village?

17     A.   Correct.

18     Q.   Do you know if she was paid?

19     A.   I'm not quite sure if she was or not.

20 I don't recall, and you know what -- in Tracy's I

21 did give our attorneys up in Williamstown

22 information for Tracy's now that I'm recalling

23 that.

24     Q.   So you spoke with the attorneys up in

134

1  Williamstown?

2      A.   Correct.

3      Q.   Do you remember how many times?

4      A.   No.

5      Q.   Do you remember when?

6      A.   It was a long time ago.  No, I don't

7  remember when, what the date was, but it was a

8  while ago.

9      Q.   Are those the only complaints you

10 remember as you sit here today?

11     A.   Those are the only ones that I

12 remember.

13     Q.   Do you have any reason to believe that

14 Patriot in the Berkshires is not subject to the

15 record-keeping requirements of the Fair Labor

16 Standards Act?

17     A.   I don't know anything about those

18 things.  I don't know.

19     Q.   Have you ever received any training on

20 wage and hour issues?

21     A.   No.

22     Q.   Have you ever heard any conversations

23 -- again, excluding with your attorney -- in the

24 workplace relating to this lawsuit?

135

1      A.   This -- I have had short discussions

2  with a couple of people, but nothing extensive.

3  I've never told anybody who is on the lawsuit or

4  anything.  I don't discuss it with people.

5      Q.   You said you had short discussions.

6  With whom have you had short discussions?

7      A.   Like with Rod Lewis, the project

8  director; Bill Rauer I would discuss things with.

9  Like today, I'm in a deposition so I would let my

10 assistant know that I was going so-and-so and

11 what for.  Other than that, I wouldn't discuss

12 something like that with them, no.

13     Q.   With whom?

14     A.   Sales representatives, sales managers,

15 my office staff.

16     Q.   How many discussions did you have with

17 Rod Lewis?

18     A.   Oh gosh, a few.

19     Q.   And when?

20     A.   I don't recall when.

21     Q.   Approximately?

22     A.   Over the past -- well, since we were

23 served with papers, approximately maybe half a

24 dozen times or so.

136

1      Q.   When you say since you were served

2  with papers, are you specifically referring to

3  the federal lawsuit, or are you talking about the

4  initial MCAD complaint by Miss Wise?

5      A.   The initial.

6      Q.   So you've had about six conversations

7  since -- you believe -- since you were first

8  served with Miss Wise's MCAD complaint, with Rod

9  Lewis, is that fair to say?

10     A.   With Rod.

11     Q.   Tell me all you remember of the

12 substance of those conversations.

13     A.   Um...

14     Q.   Do you remember the first

15 conversation?

16     A.   I don't remember the first

17 conversation.  Pretty much, Can you believe it,

18 you know, type of stuff.  Where is this coming

19 from, you know, the not understanding.

20     Q.   Who didn't understand, you or

21 Mr. Lewis?

22     A.   Well, I didn't understand certainly.

23 I don't think that Rod understood, either.

24     Q.   What makes you say that?

137

```
1       A.   Because he would bob his head when I'm
2   talking to him, like in agreement with me.  I
3   never dove into a deep conversation with anybody
4   about this other than I just don't understand it.
5       Q.   Do you remember anything else about
6   the first conversation?
7       A.   No.  No, it was very short.  Any time
8   I ever spoke with Rod was very short, you know,
9   in reference to it.
10      Q.   You said there were about half a
11  dozen.  Do you remember the next time you talked
12  to Mr. Lewis about the allegations?
13      A.   Pretty much on the same wave.  I
14  didn't want him to know who was on the suit
15  because I didn't want him to form an opinion, you
16  know, about anybody; so as far as I know, he
17  doesn't know who is on the suit.  It was just
18  basically the same type of conversations, not
19  believing, or he might ask me did you have to go
20  to a deposition or something like that, and then
21  I would answer him; but never any great length to
22  discuss what is going on, no.
23      Q.   Do you believe you're the only person
24  at the Lanesborough location who knows who has
```

139

```
1            (A break was taken)
2            MS. GARROW:  Back on the record.
3       Q.   (By Ms. Garrow)  You testified that
4   you had conversations with Bill Rauer.  Do you
5   recall the substance of any of those
6   conversations?
7       A.   Pretty much the same as I did with
8   Rod, you know -- I can't believe it, what's going
9   on?
10      Q.   Anything else, anything else that you
11  remember?
12      A.   No.
13           (Exhibit 13, Patriot Resorts
14           Employee Handbook,
15           marked for identification)
16      Q.   (By Ms. Garrow)  I'm showing you
17  what's marked as Plaintiff's 13.  What is this
18  document?
19      A.   It's our employee handbook.
20      Q.   I notice it's dated June 2004?
21      A.   Yes.
22      Q.   Did you have an employee handbook
23  prior to June 2004?
24      A.   Yes.
```

138

```
1   joined this lawsuit?
2       A.   No.
3       Q.   Who else knows?
4       A.   Who else knows?
5       Q.   Yes.
6       A.   I'm sure quite a few of them do,
7   because they've all discussed -- I don't know
8   that for a fact, no.
9       Q.   Do you know if for a fact Mr. Lewis
10  knows who has joined the lawsuit or not?
11      A.   No, I don't know.
12      Q.   Anything else you can remember about
13  any conversations with Mr. Lewis?
14      A.   Not that I can recall right now.
15      Q.   Did he ever tell you that if he finds
16  out who is taking part in the suit, he would
17  retaliate against them?
18      A.   No.
19      Q.   Anybody at all say that to you -- any
20  of the managers, line directors, ever say that
21  they would retaliate against somebody who would
22  join the lawsuit?
23      A.   No.
24           MS. GARROW:  Off the record.
```

140

```
1       Q.   Was it substantially changed?
2       A.   There weren't a lot of changes made,
3   no.  We have a list of what the changes were.
4   No, there wasn't a lot of changes, no.
5       Q.   What is that, a document that is a
6   list of the changes?
7       A.   When the new handbooks came out, there
8   was a list of the changes that were made from the
9   first one so that our old representatives didn't
10  need to re-sign the new book; all they had to do
11  was sign the list of what the changes were in the
12  new handbook.
13      Q.   So that should be in somebody's
14  personnel file; is that where you maintained
15  those?
16      A.   Correct.  Or I might even have them
17  lumped together.  I'd have to look.
18      Q.   To your knowledge, if you go to Page
19  3of the handbook, 2126 Bates stamp, did the
20  insurance requirement change?
21      A.   It has always been what we needed up
22  here in Massachusetts.
23      Q.   Is that a no, the insurance
24  requirement did not change, to the best of your
```

141

1    recollection?

2        A.    No, it didn't.

3        Q.    Was there any sales representative or

4    sales manager who did not have the coverages

5    enumerated in this insurance requirement?

6        A.    Yes.

7        Q.    Who were they?

8        A.    I know LaCrisha was one, Sam Barnes, I

9    believe Ron Ferrara.  I'd have to look back on my

10   other records.  I don't recall off the top of my

11   head any others.

12       Q.    What was the problem with LaCrisha's

13   insurance?

14       A.    LaCrisha a lot of times didn't have

15   enough coverage or it wasn't her insurance policy

16   or she was never listed as a driver on somebody

17   else's policy.

18       Q.    What did you do as a result of those?

19       A.    Bring it to the attention of the

20   directors.

21       Q.    Do you know what they did?

22       A.    I don't know -- no, I don't know what

23   they did.

24       Q.    What about Sam Barnes; what was the

142

1    problem with his insurance?

2        A.    I don't recall what it was with his.

3        Q.    Do you know how long he was out -- how

4    long he did not meet the insurance requirement?

5        A.    No, and he had left there for a while,

6    too, so I don't know, I'd have to look back.

7        Q.    Do you recall what you did as a result

8    of finding out that he did not meet the insurance

9    requirement?

10       A.    Yes, when he came back to work for us,

11   he went to the Exit Department where he didn't

12   have to have a license or take people outside in

13   the car; so therefore, he didn't have to have

14   insurance.

15       Q.    Was this when his license was

16   suspended?

17       A.    To the best of my knowledge.  I don't

18   recall; I'd have to look back.

19       Q.    What about Ron Ferrara; what was the

20   problem with his not meeting the insurance

21   requirements?

22       A.    I'd have to look back on Ron's.  I

23   don't know whether it was because he didn't have

24   the insurance or he didn't have the correct

143

1    amount.  I'd have to look back in the records.

2        Q.    What would happen with him as a result

3    of not meeting the insurance requirements?

4        A.    He also went to the Exit Department.

5        Q.    Was Miss Wise, to your knowledge, ever

6    in the Exit Department?

7        A.    Not to my knowledge, no.

8        Q.    In this June 2004 handbook, there is a

9    dress code.  Is that the same as the dress code

10   that was issued on May 11, 2003?

11       A.    It's not exactly the same, I don't

12   believe, but this is one of the changes that was

13   made.  In the original handbook this was not in

14   there.

15       Q.    There was no dress code in the

16   original handbook?

17       A.    Right.  It was all on that sheet of

18   paper.

19       Q.    So is this the first time there was a

20   dress code issued, on May 11, 2003, to your

21   knowledge?

22       A.    There was always a dress code.  It was

23   always just voiced pretty much or a written dress

24   code, that's when I typed one up.

144

1        Q.    Did you personally voice the dress

2    code to anybody?

3        A.    No.

4        Q.    Ever?

5        A.    Not that I recall.

6        Q.    How do you know that there was a

7    voiced, as you said, dress code?

8        A.    Just by, you know, talking, I believe.

9    It was a part of like their managers' meetings

10   and general meetings in the morning and stuff

11   like that, and there was maybe a couple of times

12   that somebody would wear something inappropriate.

13       Q.    So were you present at those meetings

14   where the dress code was spoken?

15       A.    No.

16       Q.    So --

17       A.    I heard about them.

18       Q.    So you heard that somebody spoke the

19   dress code at a meeting?

20       A.    About the dress code at a meeting.

21       Q.    Who did you hear that from?

22       A.    Off the top of my head, I would have

23   to say it would have been one of the directors,

24   either Gordon Leete or Paul Stensland.  I don't

145

1   recall any discussions with anybody in
2   particular.
3       Q.   Do you know who voiced dress codes at
4   the meetings?
5       A.   No.
6       Q.   Do you know how often it was voiced
7   before May 11, 2003?
8       A.   No, I don't.
9       Q.   Do you know for sure it was voiced
10  before May 11, 2003?
11      A.   No, I don't.
12               (Exhibit 14, 5/11/03 Dress Code
13               Memo, marked for identification)
14      Q.   (By Ms. Garrow)  The May 11, 2003
15  dress code that's marked as Exhibit 14 -- am I
16  characterizing that correctly?
17      A.   Yes.
18      Q.   What is the difference between that
19  and the dress code that's in the June 2004
20  handbook?
21      A.   It's pretty much the same thing.
22      Q.   Just so I'm clear, June 2004 is the
23  first time the dress code appeared in any
24  employee handbook relating to Patriot Resorts in

146

1   the Berkshires, is that correct?
2       A.   Written, yes.
3       Q.   This June 2004 handbook says Patriot
4   Resorts Corporation.  Do you know if this
5   handbook was used in other Patriot locations, or
6   was it just particular to Vacation Village in the
7   Berkshires?
8       A.   Vacation Village in the Berkshires.
9       Q.   Is there a corporate employee
10  handbook?
11      A.   These came from corporate.
12      Q.   But you're saying that this was only
13  used in your location; this is not used in other
14  Patriot resorts?
15      A.   Patriot Resorts is Massachusetts only.
16      Q.   I see -- it's a Massachusetts only
17  company?
18      A.   Correct.
19      Q.   Do you know if it's used in other
20  Berkley group locations?
21      A.   No.
22      Q.   No, you don't know?
23      A.   No, I don't know.
24      Q.   So you received this from Fort

147

1   Lauderdale?
2       A.   Yes.
3       Q.   Do you know who drafted the employee
4   handbook?
5       A.   I know Vickie Dockery Ruiz, R-U-I-Z,
6   was instrumental.  Other than that, I don't know
7   who.
8       Q.   What was her position?
9       A.   She is the corporate human resource
10  director.
11      Q.   Do you report to her as well as Miss
12  Foster?
13      A.   I don't report to Vickie, but she -- I
14  call her if I have questions.
15      Q.   Questions about what?
16      A.   Human resource questions.
17      Q.   Have you ever consulted with her
18  regarding any of the allegations in this lawsuit?
19           MS. FABBO:  Objection.  You can
20           answer.
21           THE WITNESS:  I don't recall if
22           I've ever talked with Vickie
23           specifically on this subject, no.
24      Q.   (By Ms. Garrow)  Have you sent her an

148

1   e-mail on any allegations in this lawsuit?
2       A.   I don't believe I have.  Not that I
3   recall.
4       Q.   On Page 5 of the employee handbook,
5   there's a personal leave policy.  My
6   understanding is that sales representatives and
7   sales managers get fifteen unpaid days to use for
8   any reason.  Is that a true statement of the
9   leave policy?
10      A.   Yes.
11      Q.   Did that change at any time during
12  your employment by Patriot?
13      A.   No.
14      Q.   Was this one of the changes in the
15  employee policy -- or policy handbook, or was
16  that always a part of the handbook?
17      A.   I don't recall.
18               (Exhibit 15, 12/22/04 Memo
19               Re:  New-Hires, marked for
20               identification)
21      Q.   (By Ms. Garrow)  I'm going to show you
22  what is Exhibit 15.  Have you seen this document
23  before?
24      A.   Yes.