149

1    Q.   It's a memo to you, isn't it, human
2  resource directors?
3    A.   Yes.
4    Q.   It's from Becky Foster and Bruce
5  Polansky?
6    A.   Yes.
7    Q.   Do you understand them to be employed
8  by the Berkley Group, Becky and --
9    A.   Becky and Bruce?
10   Q.   Becky and Bruce.
11   A.   Yes.
12   Q.   What about Vickie Ruiz; is she also
13  employed by the Berkley Group?
14   A.   To my knowledge.
15   Q.   Are you employed by the Berkley Group?
16   A.   No.
17   Q.   What about Lauren Powell?
18   A.   I believe she is.
19   Q.   She is what?
20   A.   Employed by the Berkley Group.
21   Q.   This policy here says "Effective
22  January 1, 2005, all new-hires must meet the
23  following criteria in order to work for any of
24  the Berkley development subsidiaries:  A car

150

1  suitable for touring our customers, and auto
2  insurance that meets the company requirements."
3  Am I reading that correctly?
4    A.   Yes.
5    Q.   To your knowledge, was this a change
6  in policy that was -- does this memo reflect a
7  change in policy?
8    A.   I'm not sure.  To my knowledge, it
9  should have been done the whole time.
10   Q.   Did you understand this policy to
11  apply to Patriot Resorts' Lanesborough location?
12   A.   Yes.
13   Q.   And to your knowledge, this policy was
14  already in place, is that a fair statement?
15   A.   It's fair.
16   Q.   On the Personal Leave Policy back on
17  Exhibit 13, it says "Failure to sign in on the
18  attendance sheet will result in the employee
19  being documented with a personal day off, whether
20  or not the employee was present that day."  Are
21  you aware if that happened at Patriot in the
22  Berkshires?
23   A.   It might have.  I'm not sure whether
24  it did or not; I don't know.

151

1    Q.   You have no personal knowledge whether
2  that ever occurred?
3    A.   No.
4    Q.   On Page 6, there's the Safety Policy.
5  Starts off that employees are expected to wear
6  shoes at all times and not lift heavy objects and
7  not use chairs or desks as ladders.  Are you
8  aware that employees used chairs or desks as
9  ladders?
10   A.   I have never seen any of them.  Nobody
11  has ever told me that they have, no.
12   Q.   Inserting metal objects into toasters.
13  Did you ever hear that anybody has done that?
14   A.   No.
15   Q.   It says employees are not to do that?
16   A.   No.
17   Q.   Were there toasters and microwaves
18  on-site?
19   A.   I don't know if there is a toaster
20  over there or not, but there was a microwave.
21   Q.   When you say "over there," in the
22  Sales Center?
23   A.   In the lounge.
24   Q.   In the lounge?

152

1    A.   Um-hum.
2    Q.   Says "All electrical equipment must be
3  turned off when leaving work."  Were any of these
4  printers, computer terminals, radios, adding
5  machines -- were any of those over in the Sales
6  Center?
7    A.   They have a copier over there, but
8  they don't have computers.
9    Q.   Adding machines?
10   A.   Cordless.
11   Q.   Like a calculator?
12   A.   Right.
13   Q.   Those provided by the company?
14   A.   Yes, unless somebody decides to bring
15  in their own.
16   Q.   But there are some over there that the
17  sales representatives and sales managers can use?
18   A.   Right.
19   Q.   All the paperwork that they need to
20  complete a sale, that's all kept over at the
21  Sales Center?
22   A.   The worksheets and the T-pitches and
23  things like that are over there.  All of the
24  documents that go into a contract are in our

153

```
 1  offices.
 2      Q.    And the worksheets, are those, to your
 3  knowledge, what employees or sales
 4  representatives will use when presenting a sale
 5  to a potential owner?
 6      A.    Yes.
 7      Q.    So that's all they really need to
 8  write on to show the numbers and the
 9  calculations?
10      A.    Yes.
11      Q.    What about pens, pencils, general
12  office supplies -- is that kept over in the Sales
13  Center, or are there some in the Reception
14  Center, or where are those kept?
15      A.    We have pencils or pens on top of the
16  check-in counter for our guests to sign in.  As
17  far as representatives, they are responsible for
18  their own tools for the day.
19      Q.    What do you mean?
20      A.    Pens, pencils, whatever they use, and
21  they should be bringing in their own legal pads,
22  also, to do notes on.
23      Q.    But oftentimes they'll just take notes
24  right on the worksheets, right?
```

154

```
 1      A.    Yes.
 2      Q.    Do you understand there to be ongoing
 3  training for sales representatives?
 4      A.    That's my understanding.
 5      Q.    Daily?
 6      A.    I don't know how often.
 7      Q.    Fair to say regular?
 8      A.    I would say regularly.
 9      Q.    Who does those trainings?
10      A.    Directors or managers.
11      Q.    Is it done on-site?
12      A.    Yes, ma'am.
13      Q.    Ever off-site?
14      A.    I'm not aware of that.
15      Q.    Do you know if it's mandatory
16  training?
17      A.    I believe that there's been times when
18  it has been.
19      Q.    Do they have a fax machine over at the
20  Sales Center?
21      A.    No.
22      Q.    Do they have any reason to use a fax
23  machine, to your knowledge?
24      A.    No.
```

155

```
 1      Q.    Page 18 is an Employee Acknowledgment
 2  Form, is that correct?
 3      A.    Yes.
 4      Q.    Other than -- I think you testified
 5  that the sales representatives and managers who
 6  had been on for a while had already signed an
 7  acknowledgement for a previous handbook?
 8      A.    Correct.
 9      Q.    And they just had to do what -- what
10  did you do with those people to acknowledge this?
11      A.    There was a sheet that came in with
12  all the changes that had been made to the
13  original handbook.
14      Q.    And they signed off on that sheet?
15      A.    Yes.
16      Q.    And the folks who came in after this
17  employee handbook had been published, did they
18  sign this Page 18, Employee Acknowledgement Form?
19      A.    Yes.
20      Q.    Was everybody required to do so?
21      A.    Yes.
22      Q.    Sales representatives?
23      A.    Yes.
24      Q.    Sales managers?
```

156

```
 1      A.    Anybody coming in new, yes.
 2      Q.    People in your department as well?
 3      A.    We have a different handbook.  We have
 4  an office handbook.
 5      Q.    Is it called Employee Handbook?
 6      A.    Yes.
 7      Q.    Instead of "sales personnel," it says
 8  "office personnel"?
 9      A.    Yes.  Sales office personnel.
10      Q.    Sales office personnel?
11      A.    Yes.
12      Q.    Were you involved in the decision --
13  let me strike that.  Are you aware that LaCrisha
14  Wise was terminated from her employment with
15  Vacation Village?
16      A.    Yes.
17      Q.    Were you in any way a part of that
18  decision to terminate her employment?
19      A.    No.
20      Q.    Do you know who was?
21      A.    Gordon Leete, Paul Stensland, and Rod
22  Lewis.
23      Q.    How do you know that?
24      A.    They're the directors.
```

157

1    Q.   So that's your only basis?

2    A.   They're the directors and they

3    instructed me that they were letting her go.

4              (Exhibit 16, 6/8/03 Memo to Faith

5              from Paul, marked for

6              identification)

7    Q.   (By Ms. Garrow)  Have you seen this

8    document before?

9    A.   Yes.

10   Q.   What is Plaintiff's 16?

11   A.   When I knew that they had let LaCrisha

12   go, I had typed up on this sheet "to" and "from"

13   "in reference to LaCrisha," and I wanted them to

14   write their decision down below so that we could

15   make it a part of her employee file.

16   Q.   Whose writing is this, if you know?

17   A.   Rod Lewis'.

18   Q.   Had he communicated to you that he

19   intended to terminate or he had terminated

20   LaCrisha employment before writing this document?

21   A.   I believe she was let go prior to

22   that, I believe.  It was either before that or

23   the same day; I don't recall when she was let go.

24   On June 7.

158

1    Q.   So you believe that's the day she was

2    actually let go, June 7?

3    A.   I think so.

4              MS. FABBO:  Is that a yes?

5              THE WITNESS:  Yes.

6    Q.   (By Ms. Garrow)  From your testimony,

7    it sounds like you directed Mr. Lewis --

8    essentially, you had asked him to write this?

9    A.   I didn't ask Rod to write it.  I think

10   I wanted it to come from Paul because Paul was

11   her line director, and I think once it got out on

12   the floor, probably Rod wrote it down, maybe Paul

13   left for the day.  I don't know why Rod wrote it

14   up, I don't know.

15   Q.   What did you do when you received

16   this?

17   A.   I put it in her file.

18   Q.   Anything else?

19   A.   I don't believe so.

20   Q.   Do you recall communicating with Miss

21   Foster that Miss Wise was let go from Patriot?

22   A.   I don't recall telling her, but I'm

23   sure I did.  I don't recall right off the top of

24   my head what the conversation was, but I'm sure

159

1    that I did notify her, yes.

2    Q.   Why are you sure that you notified

3    her?

4    A.   Because I pretty much tell Becky

5    everything.

6    Q.   Has anybody been terminated that you

7    haven't told Miss Foster?

8    A.   Has there been...

9    Q.   Has there been an occasion where

10   somebody's been terminated that you haven't

11   communicated that fact to Miss Foster?

12   A.   I'm sure there has, sure.

13   Q.   Is it more often than not that you

14   tell Miss Foster or less often than not that you

15   tell Miss Foster that someone's been terminated?

16   A.   Fort Lauderdale is notified of

17   everybody who is let go, quit, terminates for any

18   reason.

19   Q.   They're notified through paperwork, I

20   assume?

21   A.   Correct.

22   Q.   How often do you have occasion to

23   communicate with the president --

24   A.   Periodically.

160

1    Q.   Let me finish the question.  How often

2    do you have occasion to communicate with the

3    president of the company that somebody's been

4    terminated?

5    A.   Periodically.

6    Q.   What does that mean?

7    A.   Every so often.

8    Q.   Do you speak with her quarterly and

9    tell her who's been terminated or...

10   A.   No, no, just periodically.

11   Q.   Is there any particular reason why you

12   might tell her that somebody's been terminated

13   -- "her" being Miss Foster?

14   A.   The people that I decide to talk to

15   Becky about would be generally people who have,

16   for one reason or another, been -- I don't know

17   what the word is I'm looking for -- possible

18   problems.

19   Q.   Did you communicate with Miss Foster

20   when Mr. Martin was terminated this -- most

21   recently?

22   A.   I'm sure, yes, I did so.

23   Q.   Did you send her an e-mail?

24   A.   I'm not sure whether I did.

161

1    Q.   Is it your normal practice to call her
2  or to e-mail her?
3    A.   Either/or.
4    Q.   It could be one or the other?
5    A.   Exactly.
6    Q.   You don't have a specific practice one
7  way or the other?
8    A.   No.
9    Q.   What about when Mr. Massaconi was
10 terminated; did you communicate with Miss Foster
11 that he had been terminated?
12   A.   Yes.
13   Q.   What did you tell her?
14   A.   Just that he had been terminated.
15   Q.   What did she say?
16   A.   You know what -- I'm going to rephrase
17 that, because I didn't notify her that Mike was
18 let go.
19   Q.   Putting aside that you may not have
20 notified her, did you have a conversation with
21 her about Mr. Massaconi being let go?
22   A.   Not right when it happened.  After the
23 fact I did.
24   Q.   What was that conversation?

162

1    A.   The best that I can recall, I was
2  letting her know how everybody was feeling a lot
3  better now because the negativity that was going
4  on was no longer there.  There was a few times
5  that people wouldn't -- sales representatives
6  would not want to go into the lounge because
7  certain people would be in there being negative.
8  So they would filter out into the lobby area and
9  things like that.  So the whole -- I want to say
10 the sales representatives' demeanors are
11 different now.  Everybody is more relaxed.
12 They're not walking on eggshells, and I expressed
13 to her that it was nice to see.
14   Q.   And this was as a result of
15 Mr. Massaconi being let go, is that what you're
16 saying?
17   A.   No, it was not just Mike Massaconi,
18 okay; it was after Roger had left, okay; it was
19 after Massaconi was gone; it was after Joel Hecht
20 was gone.  All of the negative vibes that
21 happened around there just lifted.
22   Q.   What sort of negative vibes; what was
23 the negativity?
24   A.   From what I'm understanding from a few

163

1  different representatives, it was everything was
2  just negative.  Everything was negative.
3  Everything that we were trying to do there was
4  wrong for whatever reason, I don't know.
5    Q.   Well, Mr. Martin was claiming he
6  wasn't getting paid, correct?
7    A.   That's what he's saying.
8    Q.   And Mr. Massaconi was claiming that
9  there were some violations of the wage and hour
10 status, is that correct?
11       MS. FABBO:  Objection.
12       THE WITNESS:  He didn't say
13       anything to me.  If he was voicing
14       that out and about in the lounge,
15       that's not what was coming back to me.
16       They were upset about not getting paid
17       the commissions and the PAC check and
18       things like that.
19   Q.   (By Ms. Garrow)  And you were aware of
20 that?
21   A.   Yes.
22   Q.   You were aware that they were upset
23 about that?
24   A.   Yes.

164

1    Q.   And Mr. Rauer, to your knowledge was
2  he aware of those complaints as well?
3    A.   So far as I know.
4    Q.   What about Mr. Lewis; was he aware of
5  those as well?
6    A.   I don't know.
7    Q.   The line directors, were they aware of
8  those complaints about the PAC checks and not
9  getting timely paid?
10   A.   Yes.
11   Q.   Again, these are complaints by
12 Mr. Martin, you said, Mr. Massaconi, is that
13 correct?
14   A.   Well, that's what you were saying they
15 were complaining about.  I don't know really
16 basically what they were complaining about.  They
17 were unhappy about not getting their commissions
18 on the PACs, yes.
19   Q.   How did you know that?
20   A.   Just by hearing.
21   Q.   Hearing from them?
22   A.   Well, I heard -- well, a couple of
23 times from Mike, and Mike kept saying, I'm not
24 getting paid, you owe me money, you owe me money.

---

**165**

1 And I said to him, I said, Well, you have to give

2 me some names so that I can research them for

3 you. And he did and I researched them, and most

4 of the ones that he had felt that he wasn't paid

5 on hadn't made three consecutive timely monthly

6 payments or -- and they still had no PAC or there

7 were times when he had already gotten paid on

8 things, even though he would say that he wasn't.

9 Then I'd have to turn around and show him where

10 he had been paid.

11     Q.    How do you research that?

12     A.    I go through Fort Lauderdale and I

13 basically ask the question did Mike get paid on

14 Mr. Jones.

15     Q.    So you use the customer name to

16 track --

17     A.    Right.

18     Q.    -- where the payments have been?

19     A.    Right.

20     Q.    And how payments are made or if

21 payments have been made, is that correct?

22     A.    Right.

23     Q.    Any other way to track that, to your

24 knowledge?

---

**166**

1     A.    No.

2     Q.    What about when Mr. Corbin was let go?

3          MS. FABBO:  Objection.

4     Q.    (By Ms. Garrow)  Did you hear anything

5 about Mr. Corbin being let go or if he was

6 complaining about not getting paid?

7     A.    I haven't heard anything about Peter.

8 I didn't even know why he left, okay; and right

9 now I couldn't tell you why he left.

10     Q.    So is it your testimony that you don't

11 know if he was terminated or if he left

12 voluntarily?

13     A.    I'd have to look back, I'd have to

14 look back.

15     Q.    So nobody ever said to you, We're

16 terminating Mr. Corbin, to your recollection?

17     A.    No, I don't recall that.

18     Q.    Do you know who maintains the sign-in

19 sheet for the sales representatives and sales

20 managers -- who maintains them?

21     A.    Dennis.

22     Q.    Where are they maintained?

23     A.    Out in the Reception Center, or

24 they're in storage upstairs in the contracting

---

**167**

1 office.

2     Q.    Do you know how long he maintains

3 those documents for, any idea?

4     A.    I believe they go back to 2001; I'm

5 not real sure.

6     Q.    Since the place opened?

7     A.    Yes.

8     Q.    I'm sorry if I asked you this, but I

9 just want to make sure that I did. Exhibit 16,

10 did you have any discussions with either

11 Mr. Stensland or Mr. Lewis as a result of

12 receiving this document?

13     A.    I would think that I did, but I don't

14 recall exactly what the conversation was.

15     Q.    But you think you did?

16     A.    Possibly.

17          (Exhibit 17, 6/9/03 Memo to

18          Lippert from Foster,

19          marked for identification)

20     Q.    (By Ms. Garrow)  I'm showing you

21 what's marked as Plaintiff's 17. Do you

22 recognize that document?

23     A.    Yes.

24     Q.    What is this document?

---

**168**

1     A.    It was an e-mail to Becky in reference

2 to LaCrisha being let go.

3     Q.    Does Miss Foster work on Sundays, to

4 your knowledge?

5     A.    No.

6     Q.    That's probably one of your regular

7 workdays, though, right?

8     A.    Yes.

9     Q.    What information did you gather to

10 forward to Miss Foster that you reference in this

11 e-mail?

12     A.    I'm sorry, ask that again.

13     Q.    You said that you were gathering up as

14 much written information you can on her and

15 forwarding it to Miss Foster. What did you send

16 to Miss Foster?

17     A.    I can't remember exactly what I sent.

18 It was a while ago, this was a while ago.

19     Q.    What do you remember as you sit here

20 today?

21     A.    I know that I had asked Bonnie, who is

22 the manager in the Reception Center -- I had

23 asked her to keep up with information on anybody

24 that was having problems out there.

---

169

1    Q.    That's not what it says here, though,
2  right -- it says, "I asked Bonnie to keep a log
3  of problems and comments she says."  So you
4  specifically asked her to keep a log on Miss
5  Wise, is that correct?
6          MS. FABBO:  Objection.
7          MS. GARROW:  You can answer that.
8          THE WITNESS:  Obviously I did.  I
9          don't recall, you know, exactly what
10         it was.
11   Q.    (By Ms. Garrow)  Did you have a chance
12  to review that log that you referred to?
13   A.    I read it, I believe it was during the
14  other deposition I did.
15   Q.    Do you recall if it was typed or
16  written?
17   A.    I believe it was typed.
18   Q.    So is it your testimony that you
19  didn't review the log before you sent it to Miss
20  Foster?
21   A.    I don't recall whether I did or not.
22  Just don't recall.
23   Q.    Do you remember sending the log to
24  Miss Foster?

170

1    A.    No.
2    Q.    Do you remember what else you sent to
3  her?
4    A.    No.
5    Q.    If anything?
6    A.    No, I don't remember.
7    Q.    You also say that you spoke to Miss
8  Foster previous to this e-mail about Miss Wise's
9  anger problem?
10   A.    Correct.
11   Q.    Do you remember that conversation?
12   A.    I don't remember the exact
13  conversation I had with her, no.
14   Q.    Do you remember how many
15  conversations?
16   A.    No.
17   Q.    Do you remember generally what you
18  said?
19   A.    I don't remember the specifics of what
20  I said.
21   Q.    Do you remember -- I'm asking you
22  generally.  Do you remember generally?
23   A.    Generally, you know, probably just the
24  way LaCrisha came across.  She was a very angry

171

1  young woman, I believe.
2    Q.    That's your own opinion?
3    A.    That's my own opinion.
4    Q.    You discussed that with Miss Foster,
5  the president of the company, according to this?
6    A.    Well, possibly, but I'm not really
7  sure whether I went into any great detail about,
8  you know, the way I was feeling.  The reason why
9  I was feeling these things is because of things
10  that I had heard.
11   Q.    So you're not sure how you felt, but
12  you know it's because of something you heard?
13   A.    Yes.
14   Q.    From whom?
15   A.    I don't recall who exactly, you know,
16  said, but just in general conversation.  I don't
17  remember who with.  Different things that the
18  girl would do.
19   Q.    Like what?
20   A.    Like she would say that, you know, if
21  Michael -- her boyfriend was going to leave her,
22  that she would make sure that he would -- or she
23  would claim child molestation against him and
24  things like that.  Just basic things, and just

172

1  the way LaCrisha carried herself.  It's hard to
2  explain.  I can't explain it.
3    Q.    Where did you hear this allegation
4  about her claiming child molestation?
5    A.    Where did I hear it?
6    Q.    Yes, from whom?
7    A.    I heard it from out on the sales line.
8  I don't know whether it was the managers or who
9  it was, to tell you the truth.  I don't even
10  remember who said it.  It was just, Oh, Lord, I
11  can't believe that -- you know, that type of
12  thing.
13   Q.    Did you believe she said that?
14   A.    Did I believe she said it?
15   Q.    Yes.
16   A.    I don't recall whether I believed she
17  said it or not.  Would I put it past her?  No, I
18  wouldn't.
19   Q.    Why do you say that?
20   A.    Just my gut feeling that I have about
21  her.
22   Q.    What is that gut feeling?
23   A.    Um, she was a very intimidating woman.
24  She was very -- I don't know -- now I'm talking

173

1  about towards the end.  I wasn't around her out
2  and about, you know, on the sales floor.  Very
3  demanding.  She -- I felt threatened with her
4  personally.
5       Q.  Did she ever personally threaten you?
6       A.  Outright?
7       Q.  Yes.
8       A.  No, no.
9       Q.  But she scared you?
10      A.  Very -- yes, very much so.
11      Q.  She made you nervous?
12      A.  Very much so.
13      Q.  She made you uncomfortable?
14      A.  Very much so.
15      Q.  You say that was more towards the end
16  or that had been building throughout the time she
17  was there?
18      A.  I don't know if that was even after
19  she had gone, because during the time that she
20  was with our employ, I hardly ever saw the woman
21  because of where I was, you know, because I'm in
22  this building over here and she was basically in
23  the other two buildings, you know; so very rarely
24  would I see her.

174

1       Q.  Did her boyfriend make you nervous or
2  uncomfortable?
3       A.  No, not at all.
4       Q.  Just Miss Wise?
5       A.  Just Miss Wise, yes.
6       Q.  Anybody else make you nervous or
7  uncomfortable, anybody you worked with?
8       A.  Every once in a while, Roger would
9  scare me.
10      Q.  Did he threaten you?
11      A.  I don't believe Roger ever threatened
12  me, no, no, not that I recall.  I can't think of
13  anybody else that I felt threatened by or -- oh,
14  yes, there was one.  Bruce Zesserman was this
15  guy's name -- very much so.
16      Q.  When did he work there?
17      A.  I don't know.  I don't recall.
18      Q.  Did he work there for a while?
19      A.  Not for a while, no.  Maybe tops three
20  months, four months.
21      Q.  Was he a sales representative?
22      A.  Yes.
23      Q.  You mention in your e-mail here to
24  Miss Foster that "She was the one" -- meaning

175

1  Miss Wise -- "was the one I spoke to you recently
2  about the dress code problem."  Do you recall
3  that conversation between you and Miss Foster
4  about Miss Wise's dress code problem, according
5  to your words?
6       A.  I believe this is the time when I got
7  a phone call for me to come over to the Sales
8  Center because LaCrisha was wearing spaghetti
9  straps.
10      Q.  So then you called Miss Foster to tell
11  her that?
12      A.  I'm not sure if I called her or how it
13  came up.
14      Q.  But you spoke to her about it,
15  nonetheless?
16      A.  Right, right.
17      Q.  Did you speak to her about the time
18  that Lisa Ferrara wore spaghetti straps?
19          MS. FABBO:  Objection.
20          THE WITNESS:  I don't know.
21      Q.  (By Ms. Garrow)  Do you recall that
22  Lisa wore spaghetti straps?
23      A.  I don't know if she did or not.  Lisa
24  is not one that comes to mind when the dress code

176

1  is being talked about.
2       Q.  Were there any other women who wore
3  dresses with spaghetti straps?
4       A.  I'm not sure about the spaghetti
5  straps.  Nobody said anything to me about it.
6       Q.  So that was not called to your
7  attention?
8       A.  No.
9       Q.  But Miss Wise was?
10      A.  I don't know if anybody else was
11  wearing spaghetti straps or not.
12      Q.  But Miss Wise wearing spaghetti
13  straps --
14      A.  I got a phone call from --
15      Q.  -- was brought to your attention,
16  correct?
17      A.  Yes.
18      Q.  Who brought that to your attention?
19      A.  Gordon Leete.
20      Q.  Just so I'm clear, was anybody else --
21  the wearing of spaghetti straps by any other
22  women ever called to your attention?
23      A.  I know that there was a few times that
24  we have asked people to put sweaters on, but I

177

1  don't recall whether it was spaghetti straps or
2  whether it was cleavage or exactly what the
3  problem was.  There were girls that did button
4  up, there were girls that put sweaters on, there
5  was one that left and went and bought an outfit
6  because of what she was wearing; but I don't
7  recall what they were --
8      Q.  Do you remember --
9      A.  -- specifics were.
10     Q.  Do you remember who the individuals
11 were?
12     A.  One was Tashama Wright.  I believe she
13 was the one that went and got an outfit.  One, I
14 believe, was Debbie Bianci, and I think she was
15 -- I don't know what she was wearing, but I think
16 she was one that was asked to, you know, button
17 up.  I don't recall Lisa.  I don't recall Lisa,
18 and I think there was the other one, Tina Wells
19 comes to mind.  I don't recall specifics, so -- I
20 don't know, but I'm sure that she was one.
21     Q.  Do you know what happened to them as a
22 result of their wearing inappropriate things
23 based on the dress code other than going out and
24 buying outfits; did they get put on overage or

178

1  were they punished in any way?
2      A.  I don't know.
3      Q.  Do you know if they got disciplined in
4  any way?
5      A.  I don't know.
6      Q.  Did you discipline them in any way?
7      A.  No, because they either went and got
8  an outfit or they buttoned up or put a sweater on
9  or fixed the problem.
10     Q.  What is Molari, M-O-L-A-R-I?
11     A.  It's a temporary agency.
12     Q.  You refer to somebody black who you
13 hired in your e-mail from the temp. agency?
14     A.  Yes.
15     Q.  What did you hire her to do?
16     A.  To work eventually in the sales
17 contracting office.  Normally when I hire
18 somebody to work in the sales contracting office,
19 they work in the reception area first so that
20 they know the in's and out's of what happens out
21 there.
22     Q.  And you hired her as a temp.?
23     A.  Yes.
24     Q.  Did she become an employee?

179

1      A.  No.
2      Q.  Why not?
3      A.  She wasn't a good worker.
4      Q.  What was her name?
5      A.  Oh, Lord, I don't remember.  I don't
6  remember her name.
7      Q.  You referred to her in this June 8,
8  2003 memo.  Do you recall about how long she had
9  been working there when you wrote this e-mail?
10     A.  I don't recall how long she had been
11 there, no.
12     Q.  Any estimate?
13     A.  I wouldn't say long.
14     Q.  Month, two?
15     A.  If that.
16     Q.  How does hiring from that temp. agency
17 work, Molari; how do you find out about potential
18 employees or temp. employees -- do they send you
19 a list or...
20     A.  No.
21     Q.  Do you interview anybody?
22     A.  Yes.
23     Q.  How does it work?
24     A.  Or I just call and say send me

180

1  somebody -- either/or.
2      Q.  Is that what happened in this case?
3      A.  Yes.
4      Q.  And they just send somebody out and
5  they do the temp. work?
6      A.  Yes.
7              (Exhibit 18, 5/18/03 Memo to Wise
8               from Lippert/Lewis,
9               marked for identification)
10     Q.  (By Ms. Garrow)  This is from you and
11 Mr. Lewis?
12     A.  Yes.
13     Q.  To Miss Wise?
14     A.  Yes.
15     Q.  Tell me -- did you type this?
16     A.  Yes, I did.
17     Q.  How did you come to type this?
18         MS. FABBO:  Objection.
19         MS. GARROW:  You can answer.
20     Q.  (By Ms. Garrow)  What were the
21 circumstances under which you typed this?
22     A.  I wanted it to be put in our file in
23 case it became a problem at any given time.
24     Q.  In case what became a problem?

181

1     A.   Her wearing a spaghetti-strap dress.
2     Q.   Did you show this to her?
3     A.   I'm not sure.  It's addressed to her;
4  I would assume, but I'm not sure.
5     Q.   You don't have a specific recollection
6  as you sit here today?
7     A.   No.
8     Q.   Did you ever have occasion to type up
9  a memo like this to any other employees relating
10 to the dress code?
11    A.   I'd have to look back in people's
12 files, but I can't.
13    Q.   As you sit here today --
14    A.   But I don't recall anybody refusing to
15 put on a top or to cover up or to go home or to
16 go and buy something.  LaCrisha is the only one
17 that comes to mind that totally refused to do
18 anything.  I don't know what she did after it was
19 brought to her attention, either; I don't recall.
20    Q.   So you don't know if after it was
21 brought to her attention if she actually did go
22 and cover up?
23    A.   No, she did not.
24    Q.   You know that?

182

1     A.   I don't believe she did, no.
2     Q.   Do you know that for sure?
3     A.   No, I don't know for sure because I
4  don't recall.
5     Q.   Do you know for sure she didn't go
6  home to Springfield from the Berkshires to
7  change?
8     A.   I don't know for sure, but I don't
9  think she did.
10    Q.   So when you said you didn't know what
11 she did after that, what were you referring to,
12 after?
13    A.   I didn't know whether she just left, I
14 don't know -- I don't know what she did.
15    Q.   Have you heard anything other than
16 from your attorneys relating to the termination
17 of Roger Martin that you haven't told me about
18 today?
19    A.   Have I heard anything?
20    Q.   From anybody relating to Roger
21 Martin's termination that you haven't testified
22 to today?
23    A.   No, I don't believe so.
24    Q.   Do you know who terminated him?

183

1     A.   I'm not sure.
2     Q.   So were you there when he was
3  terminated?
4     A.   I was there that day, yes.
5     Q.   Did you observe the termination?
6     A.   No.
7     Q.   Were you asked to observe the
8  termination?
9     A.   No.
10    Q.   Were are you asked to do anything in
11 relation to the termination?
12    A.   No, other than just to write it up,
13 the change form.
14    Q.   Did you do that?
15    A.   Yes.
16    Q.   Just the Change of Status form?
17    A.   Yes.
18    Q.   Anybody else add any comments to the
19 Change of Status form, to your recollection?
20    A.   I don't recall exactly what was put on
21 there.
22    Q.   What about Mr. Massaconi; did you have
23 any other knowledge relating to his termination
24 that you haven't already told me about?

184

1     A.   That his numbers were bad.
2     Q.   Who terminated him, do you know?
3     A.   I believe it was Bill Rauer.
4     Q.   Was he given any opportunity, to your
5  knowledge, to correct those numbers, to bring
6  them up?
7     A.   I understood that he was, yes.
8     Q.   How did you understand that, through
9  who?
10    A.   Through Bill Rauer.
11    Q.   Did you have any discussions with him?
12    A.   With Mike?
13    Q.   Excuse me, my mistake -- Mr. Rauer
14 relating to Mr. Massaconi's termination?
15    A.   Just that he was going to do it.
16    Q.   So he told you before he did it?
17    A.   Yes.
18    Q.   Did he ask you for advice?
19    A.   No.
20    Q.   Did he ask you for any input as to how
21 to do it, how to terminate him?
22    A.   Yes.
23    Q.   So he just told you he was going to
24 terminate him?

185

1    A.    Yes.

2    Q.    What did you say?

3    A.    I probably didn't say too much then.

4  I probably made a facial, you know, one of these

5  (indicating).

6    Q.    Just like a -- I don't even know how

7  to describe that for the record.

8    A.    Just a facial expression at the time.

9    Q.    Did you think it was odd?

10   A.    No, not at all.

11   Q.    Had there been other sales managers

12 terminated for bad numbers?

13   A.    I don't believe that any of the

14 managers were terminated because of bad numbers.

15 They were...

16   Q.    Was Mr. Massaconi a sales manager at

17 the time he was terminated?

18   A.    No.

19   Q.    At some point did he get demoted?

20   A.    Yes.

21   Q.    Do you know who demoted him?

22   A.    I'm not sure who really told him, no.

23   Q.    Do you know who made the decision to

24 demote him?

186

1    A.    I believe Bill Rauer.

2    Q.    Do you know that, or are you guessing?

3    A.    I'm guessing.

4    Q.    I'm not asking you to guess.

5    A.    Okay.

6    Q.    Do you have any personal knowledge as

7  to who demoted him?

8    A.    No.

9    Q.    Do you have any personal knowledge why

10 he was demoted?

11   A.    Because of his numbers.

12   Q.    Who told you that, or how did you come

13 to know that, I guess, is a better question?

14   A.    There's a procedure, a policy that

15 they go by when their numbers get to be so bad.

16   Q.    What is that policy?

17   A.    Oh, gosh, I'd have to look at it.  I

18 don't know it off the top of my head.  That's

19 it.

20              (Exhibit 19, Policy for Sales

21              Managers Sales Performance,

22              marked for identification)

23   Q.    (By Ms. Garrow)  I'm showing you what

24 is marked as Plaintiff's 19, and it's four pages

187

1  that are together here.  Have you seen these four

2  pages before?

3    A.    Yes.

4    Q.    What are they?

5    A.    It was a policy that was done up for

6  the sales managers because of their performance.

7    Q.    That was instituted on July 11, 2004?

8    A.    Yes.

9    Q.    According to this?

10   A.    Yes.

11   Q.    Had there ever been a policy for when

12 sales managers' ratios drop prior to that date,

13 to your knowledge?

14   A.    I'm sure there was, but it wasn't

15 written.

16   Q.    So this is the first written policy,

17 to your knowledge?

18   A.    So far as I know.

19   Q.    To your knowledge, were these all the

20 sales managers and line directors who signed this

21 as of -- let me strike that.  The people who

22 signed this, were these all the line directors

23 and sales managers as of July 11, 2004?

24   A.    Yes.

188

1    Q.    I'm going to ask you what the last two

2  pages are, because they're blank other than --

3  they're not signed, I should say; they're not

4  blank.  They're undated, there's no "To," and

5  they're unsigned.  What are these?

6    A.    Those are form letters.

7    Q.    If somebody were put on probation for

8  performance if they were a sales manager, would

9  you expect these to be in their file?

10   A.    Yes.

11   Q.    To your knowledge, was Mr. Massaconi

12 put on probation?

13   A.    Yes.

14   Q.    Before he was demoted?

15   A.    Yes.

16   Q.    Do you know when that was?

17   A.    No, I don't.  I don't remember.

18   Q.    Has anybody else -- any other sales

19 managers ever been put on probation?

20   A.    I believe so, yes.

21   Q.    I should say have they been given a

22 30-day warning -- to use the language here -- to

23 get your sales ratios --

24   A.    Yes.

189

1    Q.    Who was that?

2    A.    I believe Bill Lee was one, Jerry

3  Stimple, Bob Campagne, Mike Campagne. I believe

4  that's all that I can remember.

5    Q.    Mr. Lee, when was that, do you know?

6    A.    Don't remember.

7    Q.    You don't remember?

8    A.    No.

9    Q.    Do you remember if it was this year,

10  2005?

11    A.    I don't believe it was 2005.

12    Q.    Do you think it was after this policy

13  came into effect in 2004?

14    A.    I'm not even sure of that.

15    Q.    Who else did you say it was -- Bob

16  Campagne?

17    A.    Uh-huh.

18    Q.    Do you know when that was?

19    A.    No, ma'am.

20    Q.    Any idea?

21    A.    No.

22    Q.    Mike Campagne, any idea?

23    A.    No.

24    Q.    The fourth --

190

1    A.    Jerry Stimple.

2    Q.    Any idea when he was given a 30-day

3  warning?

4    A.    No.

5    Q.    On the next document, it says that,

6  "As of today's date, this is notification to you

7  that your numbers are above 8.99 or better and

8  that you are off probation." Do you know if any

9  of those individuals you just named were ever off

10  probation?

11    A.    I know Mike got one of these, and I'm

12  not quite sure about the others.

13    Q.    Do you know when Mike got one of

14  these?

15    A.    No.

16    Q.    And you don't know if the others did

17  or not?

18    A.    I'd have to look; I don't recall.

19    Q.    Were any of the others that you

20  testified to -- the Campagnes, Mr. Stimple, or

21  Mr. Lee -- demoted to sales representative from

22  sales manager?

23    A.    Yes.

24    Q.    Any knowledge when that was?

191

1    A.    No.

2    Q.    None at all?

3    A.    No, I don't remember.

4        MS. GARROW:  Off the record.

5        (A break was taken)

6        MS. GARROW:  Back on the record.

7        (Exhibit 20, LaCrisha Wise 2002

8        Attendance Record,

9        marked for identification)

10    Q.    (By Ms. Garrow)  I'm showing you

11  what's been marked as Plaintiff's 20. Have you

12  seen this document before?

13    A.    Yes.

14    Q.    What is this document?

15    A.    It's a list of -- it's LaCrisha Wise's

16  attendance for 2002.

17    Q.    Do you know who prepared this

18  document?

19    A.    I believe it was Bonnie Gardner.

20    Q.    Do you know why she prepared this

21  document?

22    A.    To show how many days LaCrisha was out

23  or sick or whatever.

24    Q.    In 2002?

192

1    A.    In 2002, I'm sorry.

2    Q.    Do you know why Bonnie prepared this

3  document?

4    A.    Right off the top, no. I would assume

5  that she was asked to do it so that we could show

6  how many days she had been out -- "she" being

7  LaCrisha.

8    Q.    Did you ask her to do it?

9    A.    Possibly. Do I recall asking her to

10  do it?

11    Q.    Yes.

12    A.    No, but is there a good chance that I

13  did, yes.

14    Q.    Why do you say that?

15    A.    Because I wanted to know how many days

16  that she was out because of the attendance --

17  15-day attendance.

18    Q.    Why were you only interested in -- I

19  guess you're not sure if you directed her to do

20  this; you just say you could have directed her,

21  is that correct?

22    A.    Yes, I could have.

23    Q.    Do you know why this is only for the

24  year 2002?

193

```
 1        A.    No.
 2        Q.    Do you have any other recollection
 3  about this document?
 4        A.    No.
 5        Q.    I'm sorry if I've asked you this
 6  before -- what is Bonnie Gardner's position?
 7        A.    Resort Center manager -- the Reception
 8  Center manager.
 9        Q.    Does she work for Dennis Clavette?
10        A.    No.
11        Q.    Does she work with him?
12        A.    No, Bonnie is no longer with us.
13  Dennis took Bonnie's place.
14        Q.    When did Dennis begin working with
15  you?
16        A.    In 2004, and I'm not quite sure of the
17  date.  I want to say it was May -- no, strike
18  that.  I want to say it was like April of 2004.
19        Q.    April 2004?
20        A.    Yes, for Dennis.
21        Q.    Do you think that's when the changes
22  occurred?
23        A.    That is not when the changes occurred;
24  that's when he started working for us, I believe.
```

194

```
 1        Q.    When did Bonnie start working for you?
 2        A.    I believe it was May 1, 2004.
 3        Q.    So there was an overlap?
 4        A.    An overlap.
 5        Q.    I'm sorry, when did you say
 6  Mr. Clavette started working?
 7        A.    In April.
 8        Q.    So he overlapped with Miss Gardner in
 9  her duties; in other words, she was still there
10  when he came on?
11        A.    Correct.
12        Q.    Was she supposed to be training him?
13        A.    No, he was going to be in the work
14  office with me.
15        Q.    And then what happened?
16        A.    Bonnie was let go and they needed a
17  manager out there and I liked what I saw in
18  Dennis, so I requested him if he wanted the
19  position.
20        Q.    Who let Bonnie go?
21        A.    I did.
22        Q.    Why?
23        A.    With instruction from Becky.
24        Q.    Why did she tell you she wanted Bonnie
```

195

```
 1  let go?
 2        A.    The reports that were coming in, I
 3  guess the marketing reports and stuff were always
 4  off, and Becky just told me it's time to go.
 5        Q.    Do you recall where Miss Gardner was
 6  living at the time she worked for Patriot, in
 7  what town she was living?
 8        A.    I think it was North Adams.
 9        Q.    You're pretty sure she was in
10  Massachusetts?
11        A.    Oh, yes.
12        Q.    Had she been working there since the
13  Resorts opened?
14        A.    Yes.
15        Q.    Did you let her go personally?
16        A.    Yes, I did.
17        Q.    Do you recall that conversation?
18        A.    Yes.
19        Q.    Can you tell me about it -- what did
20  you say, what did she say?
21        A.    It was very short, and I let her know
22  that, you know, Becky had said that she could no
23  longer work here.  And I believe Bonnie was, Can
24  you tell me why.  And I told her about the
```

196

```
 1  reports, and she just kind of grinned at me.  And
 2  then she said something to the effect of, Oh, I
 3  know how this happens, but I'm different.  And I
 4  didn't ask her what she meant at the time.
 5        Q.    Do you know now what she meant?
 6        A.    Yes, I do.
 7        Q.    What did she mean?
 8        A.    Bonnie stole money from us.
 9        Q.    How do you know?
10        A.    I was told.
11        Q.    By whom?
12        A.    Becky.  And nobody knows that, so --
13  nobody in the organization knows that, as far as
14  I know.
15        Q.    So you just let Becky -- you and Becky
16  know, as far as you know?
17        A.    Yes, and possibly a couple of people
18  in the Accounting Department down in Fort
19  Lauderdale.
20        Q.    Bill Rauer doesn't know?
21        A.    I believe Bill does know.
22        Q.    What about Rod Lewis; does he know?
23        A.    No.
24        Q.    Did she have any accomplices, as far
```

197

1  as you know?

2      A.   No.

3      Q.   When did Becky tell you that Miss

4  Gardner had been stealing money?

5      A.   I don't remember the date.

6      Q.   Approximately how long after Miss

7  Gardner was gone?

8      A.   Oh, no, I knew she had taken the

9  money.  I just don't recall from that period to

10 the period where she was let go, I don't recall.

11     Q.   So did you know that she was taking

12 money prior to the time she was let go?

13     A.   Did I know she took money, yes.

14     Q.   Yes?

15     A.   Yes.

16     Q.   Do you know how long she had been

17 taking money?

18     A.   One time.

19     Q.   Just once?

20     A.   Um-hum.

21     Q.   And then did her termination come

22 shortly thereafter?

23     A.   No, no, it was months.  It was months.

24 It was a while.

198

1      Q.   I'm sorry, your testimony is that you

2  knew at the time that she took the money that she

3  had taken it, or did you learn that after?

4      A.   I learned it after the fact.  I got

5  the phone call from Fort Lauderdale letting me

6  know.

7      Q.   So it was Miss Foster who told you

8  that Miss Gardner had been stealing money or

9  stole money?

10     A.   She did not come out and say, Becky

11 took the money; she brought it to my attention.

12     Q.   You don't mean Becky; you mean Bonnie?

13     A.   Becky brought it to my attention.  She

14 had been looking at a check that was supposed to

15 be issued for, I believe it was a TV, and it was

16 a thousand dollars more than what the check

17 should have been.  And I didn't put two and two

18 together because I had the utmost trust for

19 Bonnie, plus Bonnie and I were friends, and so

20 Becky never said anything to me of who she

21 thought it was, and she goes, Let me talk to

22 Bonnie, and they had a conversation.

23          And then Bonnie came in to me and sat

24 down and she was visibly shaken, and I said -- I

199

1  looked at her and I said, Did you talk to Becky,

2  and she's like, Yes.  And I says, Well, basically

3  what happened, you know, and I could -- I took

4  one look at her face and she started in crying

5  and upset, and I was -- I said, Bonnie, I said,

6  Tell me you didn't do that.  And she says, I

7  can't tell you that.  And she started crying and

8  getting loud, so I told her to shut up and I

9  said, Get out the back door, because I didn't

10 want everybody to hear.  And so she went out the

11 back way and I went outside and met her.

12     Q.   So this was when Miss Gardner was

13 still working for the organization, correct?

14     A.   This was when Bonnie was still working

15 with us, yes.

16     Q.   How long after that was she

17 terminated?

18     A.   I'm not quite sure.  It was months, it

19 was months.  I sure how many months it was.

20     Q.   Now, I'm assuming because you said

21 that nobody -- I'll let you try and count months.

22     A.   It might have been like seven or eight

23 months.

24     Q.   I'm assuming because you said you

200

1  don't think many people in the organization know,

2  that she was not prosecuted, is that correct?

3      A.   That's correct.  We tried to deal with

4  it, you know, in our company.

5      Q.   What did you do?

6      A.   I talked to her -- well, I talked to

7  Becky again and I stood up for Bonnie, and I told

8  Becky that she was going through a lot of

9  personal things.  And after I talked to Becky a

10 while, she says, Well, what do you think?  And I

11 said, Well, I think that, you know, we ought to

12 try and keep her.  And then Becky says, Well, she

13 says -- because I had gone into telling Becky why

14 she needed money and da-da-da-da-da.  She said,

15 Well, do you think that we should give her money

16 to help?  And I told her flat out, I said, That

17 would be a good thing, I think, to keep her,

18 because she was a good employee type of thing.

19          And so Becky gave her $1,200 out of

20 her own pocket to help her.  And I get very upset

21 when I talk about this because Bonnie was a very

22 good friend of mine, or I thought so.  So the

23 deal was I would have to take her to the bank and

24 have them issue the checks to the different

201

1  places that she needed the money the most, and we
2  did. And not only that, we had to found out
3  from Bonnie how much she wanted to repay Becky
4  and how she was going to repay the company.
5       And through my conversation with
6  Becky, Becky really didn't want it to be company
7  known, okay. So I'm banging my head trying to
8  figure out how we can get the money back from
9  Bonnie to replace what she had taken without
10 everybody knowing about it, because I didn't
11 want -- and neither did Becky -- Becky didn't
12 want anybody to know about it, either. So it was
13 Bonnie's choice to repay -- I told Becky, I said,
14 Becky, the way you could probably do it is we've
15 got this big old scanning project getting ready
16 to do. Why don't you pay her so much a contract
17 and then take it back from that thousand dollars.
18 And --
19      Q.  Can you explain to me what you mean,
20 how you -- what she was going to pay her and how
21 she was going to pay her back? I'm a little
22 confused.
23      A.  If she came in after hours and did the
24 scanning project.

202

1       Q.  A job that needed to be done for the
2  company?
3       A.  Right, right. Could you, you know,
4  take back that money and apply it towards the
5  thousand dollars that she owed, and she says,
6  Well, I like that idea.
7       Q.  So essentially working off the
8  thousand dollars that she stole?
9       A.  Right, working off the thousand
10 dollars that she stole. That way we didn't have
11 to do anything, you know. Bonnie first told me
12 she wanted to pay Becky $50 a week back, and I
13 said, Are you sure; that's a lot of money. She
14 goes, Well, 25. I said, Okay. I said, You're
15 sure? She says, yes. So that was that. And in
16 that however many months it was before -- and she
17 wasn't let go because of owing the money; it was
18 there were things that weren't going on out in
19 the reception area that should have been done.
20      Q.  Other than marketing reports?
21      A.  Marketing reports, the reports were
22 always something wrong with them and there was
23 never any changing, you know; nothing ever
24 changed. She was very well liked -- very well

203

1  liked, very nice girl.
2       Q.  And she wasn't let go for stealing
3  money?
4       A.  No, no, absolutely not. So during
5  that period of time, I think Bonnie did -- I want
6  to say -- 29 or 39 contracts.
7       Q.  The scanning job?
8       A.  Yes. To go towards the thousand
9  dollars. And I believe that she only paid back
10 Becky $50, so --
11      Q.  Is it because she didn't pay her back
12 or make restitution that she was let go, to your
13 knowledge?
14      A.  No. No, no, no. We tried to help
15 Bonnie. We really tried to help Bonnie. It was
16 a shame.
17      Q.  Anybody else that you're aware of that
18 Becky's ever told you who's stolen money from the
19 company, to your knowledge?
20      A.  Andy Goodness.
21      Q.  Was he let go for that?
22      A.  I'm not sure what Andy was let go for.
23 I'm sure that that was probably a good part of
24 it, if not the reason. I would, there again,

204

1  have to go back and look.
2       Q.  He was terminated?
3       A.  He was terminated, yes.
4       Q.  Was he the one who they allowed to say
5  he resigned even though he was terminated; is
6  that your recollection?
7       A.  I believe so, yes, yes.
8       Q.  Anybody else?
9       A.  Those are the only ones that I know
10 that took money. And again, I hope that you
11 don't say anything to the directors and stuff in
12 reference to Bonnie. They all just think I'm a
13 bitch.
14           (Exhibit 21, Handwritten Notes,
15           marked for identification)
16      Q.  (By Ms. Garrow)  I apologize -- it's
17 late in the day and I can't remember if we spoke
18 about this document before in the deposition at
19 the MCAD proceedings. Have you ever seen this
20 document before?
21      A.  Yes, it's a personal ledger that I
22 keep.
23      Q.  And this is your handwriting, correct?
24      A.  Yes.

205

1       Q.   This is only one page, it looks like,
2  or two-sided page, correct?
3       A.   Yes.
4       Q.   And these are your personal notes as
5  well as work-related notes?
6       A.   Yes.
7       Q.   2003, I guess is the first dated entry
8  -- 2/5/2003.  That's a personal note, I assume,
9  correct?
10      A.   Right.
11      Q.   2/10, "We let LaCrisha go.  Horrible
12  employee."  Am I reading that correctly?
13      A.   Yes.
14      Q.   And "Erica will be returning anyway."
15  These are just running notes that you made?
16      A.   Right.
17      Q.   Then 2/13, you make a note about the
18  rotation and Andy -- I assume that's Andy
19  Goodness?
20      A.   Yes.
21      Q.   Missing his tour, and then he was put
22  at the bottom of the line, is that correct?
23      A.   Yes.
24      Q.   3/15, it says, "M. Johnson" -- I

206

1  assume that's Michael Johnson.  Says "Fell,
2  joke."  What does that mean?
3       A.   At the time when I wrote it, I didn't
4  really know if it was believable or not that he
5  did fall.  This was a personal note for my home.
6  It has nothing --
7       Q.   You thought it was a joke?
8       A.   Well, I didn't really feel it was a
9  joke.  These are personal things from my home.
10  This has nothing to do with the company.
11      Q.   But that's not personal; that has to
12  do with the company, right, Michael Johnson --
13  you don't socialize with him?
14      A.   No.
15      Q.   He's not a social friend?
16      A.   No.
17      Q.   He wasn't telling you a joke?
18      A.   No.
19      Q.   So what did you mean by that entry?
20      A.   Because at the time when he fell, I
21  didn't know personally whether or not, you know,
22  it was a real fall.  I had people come around the
23  corner asking if it was true or not, and it was;
24  it was true.

207

1       Q.   That's all you meant by that; anything
2  else?
3       A.   No, no.
4       Q.   3/28, "Closing costs."  Is that
5  work-related?
6       A.   Yes.
7       Q.   "They went up" -- that's just a note
8  to yourself that they went up?
9       A.   Right.
10      Q.   3/18, looks like a personal note.  And
11  3/28, personal note?
12      A.   Yes.
13      Q.   Except for "Talked to Danielle about
14  her leaving during work hours."  Is that Danielle
15  Moran?
16      A.   No.
17      Q.   Which Danielle is that?
18      A.   What was her last name -- no, it
19  wasn't Danielle Moran.
20      Q.   Let me ask you this -- was it a sales
21  representative?
22      A.   No.
23      Q.   Somebody who worked for you?
24      A.   Yes.

208

1       Q.   And did she leave during work hours?
2       A.   Yes.
3       Q.   What did you do when -- did you --
4       A.   Didn't pay her.
5       Q.   She was an hourly employee?
6       A.   Yes.
7       Q.   Did you do anything other than speak
8  with her about it?
9       A.   I wouldn't pay her.
10      Q.   Did you make a note in her file?
11      A.   Possibly; I don't recall.
12      Q.   Is that the first time it happened?
13      A.   I don't know if it was the first time.
14  It happened a couple of times.  I don't know if
15  it was the first or not.
16      Q.   How about 4/1, "Spoke to Erica."  Is
17  that somebody who worked for you?
18      A.   Yes.
19      Q.   Do you remember what you spoke about?
20      A.   No.
21      Q.   4/3, somebody called, they wanted to
22  come back to work; is that correct?
23      A.   Yes.
24      Q.   Is that somebody who worked for you as

209

1   well, or is that a salesperson?

2       A.   For me.

3       Q.   5/4, "Spoke to Danielle about leaving

4   the office early night before, her work not

5   complete two files. Left with the closers. She

6   was late this a.m." What did you do as a result

7   of that, if anything?

8       A.   I don't recall, I don't recall.

9       Q.   Did you terminate her employment?

10      A.   Not at that time, no.

11      Q.   At some point you did?

12      A.   Yes.

13      Q.   Do you remember when?

14      A.   No, I don't.

15      Q.   Do you remember why?

16      A.   I don't think she was terminated; I

17  think she quit. I think so.

18      Q.   What was Bonnie Gardner's race?

19      A.   White.

20      Q.   What about Andy Goodness?

21      A.   He was black.

22      Q.   5/5, "David Mercurio gave his tour to

23  Ron. If Ron sold it, it was to go into Dave's

24  name." Is that something people did regularly?

210

1       A.   No, not that I was aware of.

2       Q.   Did you think this was an appropriate

3   practice?

4       A.   No.

5       Q.   Why did you make this note?

6       A.   I don't recall.

7       Q.   Do you know if David Mercurio did this

8   more than once?

9       A.   No, I don't know.

10      Q.   You just have no knowledge one way or

11  the other?

12      A.   No.

13      Q.   Could have, maybe not -- don't know?

14      A.   Could have, maybe not -- don't know.

15      Q.   5/10, you make a note about LaCrisha,

16  spaghetti strap, low-cut, short dress the day

17  before the dress code policy, included no hat in

18  policy?

19      A.   Yes.

20      Q.   You made that decision on 5/10; was

21  that your decision -- strike that because I just

22  asked you too many questions at once. Was it

23  your decision to include a "no hat" in the

24  policy?

211

1       A.   I'm not sure what that note means. I

2   believe it's in the policy, in one of them.

3   Maybe not for women, but it's in there, I think,

4   under the men. I'm not sure.

5       Q.   It says, "Prior to this, C.W. -- is

6   that Chelsea Wright?

7       A.   Um-hum.

8       Q.   -- "sent home because she was wearing

9   flip flops"?

10      A.   Yes.

11      Q.   What's the next word -- somebody sent

12  home, inappropriate dress?

13      A.   Erica.

14      Q.   Who is Erica?

15      A.   She worked in the front reception

16  area.

17      Q.   5/11, you made that note that the

18  dress code was issued, is that correct; is that

19  what that means?

20      A.   Possibly.

21      Q.   Do you have any recollection as you

22  sit here today?

23      A.   No, no, no.

24      Q.   5/18, "L.W." -- I assume that's

212

1   LaCrisha Wise?

2       A.   LaCrisha Wise.

3       Q.   "Halter, spaghetti strap dress. Asked

4   her to go home to change. Refused." Am I

5   reading that correctly?

6       A.   Yes.

7       Q.   I think you already testified to that?

8       A.   Yes.

9       Q.   When you say "asked," do you mean you

10  asked her?

11      A.   I believe I did. I don't recall if I

12  did, but I think I did. I don't recall whether I

13  actually did or not, to tell you the truth. This

14  reads that I did, though.

15      Q.   Then, "Asked her if she had a sweater

16  or a wrap," and she didn't according to this,

17  correct?

18      A.   Right.

19      Q.   Then "C.W." -- I guess Chelsea Wright

20  again -- "had low cut on. As soon as she was

21  asked, she buttoned up sweater." Am I reading

22  that correctly?

23      A.   Yes.

24      Q.   You said you believed that LaCrisha

213

1   Wise was on the phone?

2        A.    Yes.

3        Q.    And she was precise about what she

4   said and how she said it?

5        A.    Yes.

6        Q.    And that Paul said her dress was

7   appropriate and every day her dress was

8   appropriate.  She said that to you?

9        A.    She said that, yes.

10       Q.    Did you ever ask him about that?

11       A.    I don't recall whether I did or not.

12       Q.    You don't recall if you asked him, as

13  you sit here today?

14       A.    Yes, yes, I don't recall.

15       Q.    What's a "W. counter girls offering

16  sweater"?

17       A.    Welcome Center.

18       Q.    Got it.  What does that mean?

19       A.    Offered for her to wear their

20  sweaters, and she said no.

21       Q.    You didn't say that she said no?

22       A.    Up here I believe it said, "Said no"

23  up on the top.

24       Q.    That's if she had a sweater or wrap,

214

1   is that correct?

2        A.    Yes.

3        Q.    Do you have a specific recollection of

4   writing this?

5        A.    No, no.

6        Q.    5/19, "L. was late."  Is that

7   LaCrisha?

8        A.    Yes.

9        Q.    "She was late for work, threats about

10  if she wasn't put in her normal place her

11  attorney would be included."  What does that

12  mean?

13       A.    I guess she wanted to call her

14  attorney and that her attorney would be included

15  in on her not being able to go out in her normal

16  place on the rotation.

17       Q.    According to your notes here, that's

18  the first time, at least you noted down, that she

19  ever mentioned an attorney, correct -- according

20  to your notes?

21       A.    According to the note, yes.

22       Q.    There's nothing in here prior to that

23  time that has her talking about her attorney,

24  correct?

215

1        A.    No.

2        Q.    Here's the note 5/24, "Andy Goodness

3   was let go."  That just confirms that he was let

4   go because he stole money, is that correct?

5        A.    Yes.

6        Q.    But he was allowed to resign given the

7   circumstances?

8        A.    Yes.

9        Q.    Did you ever suggest to anybody that

10  LaCrisha be allowed to resign?

11       A.    No.  Nor did I Andy.

12       Q.    Hum?

13       A.    Nor did I Andy.

14       Q.    Who did?

15       A.    I don't know.

16                  (Exhibit 22, 1/3/03-6/8/03 Typed

17                  Notes, marked for identification)

18       Q.    (By Ms. Garrow)  I'm showing you

19  Plaintiff's 22, and I think we've talked about

20  these a little bit.  Whose notes are these?

21       A.    Bonnie's.

22       Q.    You directed her to -- did you direct

23  her to compile these notes?

24       A.    I believe the way it went was that

216

1   there were notes and I had probably asked her to

2   put them in, you know, date order; and that's

3   what she did, was list them out this way.

4        Q.    I guess I don't understand.  Is it

5   your testimony this is all based on notes

6   provided to the company?

7        A.    Notes or her remembering -- not to the

8   company.

9        Q.    "Her" being Bonnie?

10       A.    "Her" being Bonnie, yes.

11       Q.    So January 21, 2003, it says "out

12  sick" -- other than at your last deposition, have

13  you had occasion to review this?

14       A.    No.

15       Q.    I think your testimony was that you

16  took this and stuck it in Miss Wise's file?

17       A.    Yes.

18       Q.    When did you do that?

19       A.    I don't recall.

20       Q.    Let me just understand -- starting the

21  beginning of 2003, Bonnie Gardner began to

22  compile these notes, correct?

23       A.    I would assume so.

24       Q.    At any point prior to June 8, 2003,

217

1  according to this, the day that Miss Wise was let

2  go -- it was either the 7th or the 8th, depending

3  on which notes you're looking at -- at any point

4  did you ask Miss Gardner to print out the notes

5  that she already had gathered prior -- sometime

6  between January 3, 2003 --

7      A.   I don't believe I did, no.

8      Q.   -- and June 8, 2003?

9      A.   I don't believe so, no.

10     Q.   You never asked her to print it out?

11     A.   I don't recall whether I did or not.

12     Q.   You never asked to review them, or

13 you're not sure?

14     A.   I don't recall.  I don't recall

15 whether I did or not.

16     Q.   So is it that you don't believe that

17 you did, or you just don't recall one way or

18 another?

19     A.   I just don't recall one way or

20 another.

21     Q.   March 11, 2003, it says here, "Late,

22 LaCrisha said we were picking on her and claims

23 discrimination."  Do you recall if at that time,

24 on or around March 11, 2003, Bonnie came to you

218

1  and said Miss Wise was claiming discrimination?

2      A.   I don't recall that Bonnie ever did

3  that, no.

4      Q.   According to just reviewing Miss

5  Gardner's notes, that's the first time she makes

6  a note of that sort claiming discrimination or

7  that Miss Wise was claiming discrimination; is

8  that a fair description of what's on Exhibit 22?

9      A.   What is on these notes?

10     Q.   Yes.

11     A.   Yes.

12     Q.   You had testified before that based on

13 your e-mail to Miss Foster, you had said it was

14 later in Miss Wise's employment that you started

15 to have -- that she started to have issues -- is

16 that a fair statement of your testimony before?

17     A.   I don't know at what time, you know,

18 LaCrisha started with her claims of whatever, you

19 know, they were.  I don't recall.

20     Q.   Well, it would at least appear from

21 this note on Plaintiff's 22 that on January 14,

22 2003, according to Miss Gardner, Miss Wise said

23 that the company was picking on her, correct?

24     A.   It says that.

219

1      Q.   And February 1, 2003, Miss Gardner

2  made another note that "We are just picking on

3  her" again, is that fair to say?

4      A.   Yes.

5          MS. GARROW:  We had been seeking

6          documents -- I've had this discussion

7          with Attorney Klimczuk, customer names

8          on sales ledger reports and on

9          customer directors as a way to track

10         payment on contracts, and I had agreed

11         not to take those customer names

12         pending a resolution by the Court.  So

13         we may need Miss Lippert back based on

14         any resolution that we have as a

15         result of seeking the customer names.

16         So I'm going to suspend the deposition

17         at this point.

18             MS. FABBO:  Just for that

19         purpose?

20             MS. GARROW:  Yes, or, I mean,

21         depending on what that might lead to,

22         but certainly anything that flows from

23         that; but otherwise, I'm set.

24             (Deposition suspended at 4:10)

220

1

2  COMMONWEALTH OF MASSACHUSETTS

3  HAMPDEN, SS.

4          I, Ann A. Preston, a Notary Public in

5  and for the Commonwealth of Massachusetts, do

6  certify that there came before me on May 17,

7  2005, at the offices of Heisler, Feldman and

8  McCormick, PC, 1145 Main Street, Springfield,

9  Massachusetts, the following named person, to

10 wit:  FAITH LIPPERT, who was by me duly sworn to

11 testify to the truth and nothing but the truth as

12 to her knowledge concerning the matters in this

13 case; that she was examined upon her oath and her

14 examination reduced to writing by me; and that

15 the statement is a true record of the testimony

16 given by the witness, to the best of my knowledge

17 and ability.

18         I further certify that I am not a relative

19 or employee of counsel or attorney for any of the

20 parties, or a relative or employee of such

21 counsel or attorney, nor am I financially or

22 otherwise interested in the outcome of the

23 action.

24         WITNESS MY HAND this 17th day of June 2005.

_____

Ann A. Preston

My commission expires:
December 22, 2011

221

```
 1                          June 17, 2005
 2
 3    Marylou Fabbo, Esq.
      Skoler, Abbott and Presser, PC
 4    1414 Main Street
      Springfield, MA  01103
 5
 6    RE:  Wise v Patriot
 7    Dear Counselor:
 8          Enclosed is a copy of the deposition of
      Faith Lippert, taken on May 17, 2005 in the
      above-entitled action.
 9
10          According to Rule 30(e) of the
      Massachusetts Rules of Civil Procedure, the
11    deponent has thirty days to sign the deposition
      from the date of its submission to the deponent,
12    which is the above date.
13          Please have the deponent sign the enclosed
      Signature Page/Errata Sheet and return it to the
14    offices of Suzanne Garrow, Esq., whereupon it
      will be attached to the original deposition
15    transcript.
16          Thank you for your cooperation in this
      matter.
17    Sincerely,
18
19    Ann A. Preston
20    cc:  Suzanne Garrow, Esq.
21
22
23
24
```

222

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2    Wise v Patriot
      No. 04-CV-30091-MAP
 3
 4          I, FAITH LIPPERT, do hereby certify under
      the pains and penalties of perjury that the
 5    foregoing testimony is true and accurate to the
      best of my knowledge and belief, with the
 6    addition of the following changes/corrections:
 7
 8    Page  Line           Change/Correction
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18
19    Witness my hand this ___ day of _____, 2005.
20
21                         _____
                                 FAITH LIPPERT
22    orig:  Suzanne Garrow, Esq.
      cc:    Marylou Fabbo, Esq.
23
24
```

# EXHIBIT
3

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
          Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
          Defendants

DEPOSITION OF REBECCA FOSTER CAMPAGNA

May 23, 2005, 10:10

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
     KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

I N D E X

WITNESS:  REBECCA FOSTER CAMPAGNA

Direct Examination by Ms. Garrow

EXHIBITS

Exhibit 1,  Vacation Village Tour Times      51

Exhibit 2,  2004 Employee Handbook           56

Exhibit 3,  2001 Employee Handbook           61

Exhibit 4,  Employment Agreement             68

Exhibit 5,  Commission Structure Forms       84

Exhibit 6,  5/24/03 Memo Re: Hecht Comm.     86

Exhibit 7,  Corbin Commission Report         95

Exhibit 8,  Massaconi Check Stubs           112

Exhibit 9,  5/6/03 Memo Re: ESOP Procedures 125

Exhibit 10, Attendance Detail Report        126

Exhibit 11, 11/3/02 Memo Re: Attendance     127

Exhibit 12, Attendance Detail Report        127

Exhibit 13, Attendance Detail Report        129

Exhibit 14, Letter to ALDA from ESA         148

Exhibit 15, 12/22/04 Memo Re: New-Hires     150

Exhibit 16, 11/21/01 Memo Re: Policies      157

Exhibit 17, 12/21/01 Memo Re: Rotation      161

Exhibit 18, 6/9/03 Memos Re: Ms. Wise       167

---

4

 1          STIPULATION

 2

 3          It is agreed by and between the parties

 4     that all objections, except as to form of the

 5     question, are reserved until the time of trial.

 6

 7          It is further agreed by and between the

 8     parties that all motions to strike unresponsive

 9     answers are reserved until the time of trial.

10

11          It is further agreed by and between the

12     parties that the sealing of the original

13     deposition transcript is hereby waived.

14

15          It is further agreed by and between the

16     parties that the notification to all parties of

17     the receipt of the original deposition

18     transcript is hereby waived.

19

20

21

22

23

24