5

1       REBECCA FOSTER CAMPAGNA, Witness, identified

2   via Florida driver's license and having been duly

3   sworn, states as follows:

4

5       DIRECT EXAMINATION BY MS. GARROW:

6       Q.   Good morning, Miss Foster.  I know

7   you've been to a couple of the depositions in

8   this matter.  As you know, I'm Suzanne Garrow,

9   and I am the lawyer for LaCrisha Wise and Mr.

10  Massaconi and Mr. Martin and Mr. Corbin on behalf

11  of themselves and others who are similarly

12  situated.  As you know, they filed a complaint

13  against you and the corporation in federal court.

14  Are you aware of that?

15      A.   Yes, I am aware.

16      Q.   I'm going to take your deposition

17  today, and I'm going to ask you that when I ask

18  you questions, that you give an audible response.

19  If you shake your head or say "uh-uh" or

20  "um-hum," it's not going to look like anything on

21  the transcript.  I need you to give an audible

22  response, a "yes" or "no" or any explanation as

23  necessary.  Is that understood?

24      A.   I understand.

6

1       Q.   The other thing I'm ask you to do is

2   I'll ask you to let me finish my question and I

3   will try to let you do the same, let you finish

4   your answer, so we can have a clear record and so

5   the court reporter can get everything down that

6   you say and that I say, okay?

7       A.   Okay.

8       Q.   If you need a break of any kind, as

9   long as I'm not in the middle of a question or

10  you're not in the middle of an answer, I will

11  certainly accommodate you and you can tell me,

12  tell your lawyer, whatever is most comfortable to

13  you, okay?

14      A.   Okay.

15      Q.   I guess the other thing I'll ask you

16  to do is if you don't understand any question

17  that I've asked, I will ask you to ask me to

18  rephrase the question or to let me know that you

19  don't understand.  The reason for that is if you

20  answer the question, I'm going to assume that you

21  understand the question as I have asked it, and I

22  want to make you make sure that you know what I'm

23  speaking of so that you can give me the most

24  accurate answer to the question possible, okay?

7

1       A.   Okay.

2       Q.   Have you taken any medication or any

3   substance that might impair your ability to

4   testify truthfully or accurately as you sit here

5   today?

6       A.   No, I have not.

7       Q.   Would you please state and spell your

8   full name for the record?

9       A.   My full name is Rebecca, R-E-B-E-C-C-A

10  Foster, F-O-S-T-E-R, Campagna, C-A-M-P-A-G-N-A.

11      Q.   Do you go by Miss Foster or Miss

12  Campagna, just so I know in this context?

13      A.   I go by Becky, but Foster is the name

14  that I use in work situations.

15      Q.   I know there are some Campagnas who

16  work up here in Massachusetts.  Are you a

17  relation to any of those folks?

18      A.   No, I am not.

19      Q.   Who is your employer?

20      A.   Employed by the Berkley Group, Inc.

21      Q.   How long have you been worked for the

22  Berkley Group?

23      A.   Thirty-two years.

24      Q.   Can you give me sort of a general

8

1   summary -- I know thirty-two years is a very

2   solid career, so can you give me a general

3   summary of where you started with the Berkley

4   Group and your position as you sit here today?

5       A.   1973, I began working for a sales and

6   marketing company called Del Marketing -- that's

7   D-E-L Marketing.  They did sales and marketing at

8   a second-home development called Lake Monticello,

9   and that's out of Charlottesville, Virginia.

10      I worked as the number three typist in

11  the sales office and I worked in that position

12  for approximately a year, after which time I

13  traveled from Lake Monticello to other

14  development companies that Del Marketing had

15  sales and marketing contracts with.  And I would

16  set up the sales administrative office, train the

17  personnel; and I did that for probably three or

18  four years.

19      I later relocated with that company to

20  St. Petersburg, Florida under a sales and

21  marketing agreement that we had in St. Petersburg

22  with a hotel that was selling time-sharing.

23      Q.   Did you work -- did you still work for

24  Del Marketing at that time?

Wise v Patriot - R. Foster Campagna  5/23/05

9

1      A.   I worked for Del Marketing at that
2  time.
3      Q.   Were you working on-site at the hotel?
4      A.   Actually, I worked for a while at the
5  hotel to train the employees, and then I moved to
6  the corporate office there in St. Petersburg.
7      Q.   The corporate office of Del Marketing?
8      A.   Del Marketing.
9      Q.   How long did you do that?
10     A.   I stayed there until 1981; and in
11  1981, I moved to the east coast of Florida
12  because the owner of Del Marketing sold his
13  interest to his partner in Del Marketing and the
14  company became all -- all the assets of the Del
15  Marketing were sold -- all of the contracts were
16  sold to the remaining partner, who formed the
17  company Del Management.
18         At that time, the marketing contracts
19  became the property of Del Management, and other
20  marketing and sales contracts were procured under
21  Del Management's name.  I continued to work in
22  the corporate office as well as a sales office
23  that was located there in Hollywood, Florida.  I
24  continued to work there until 1986, when the name

10

1  of our company changed to the Berkley Group.
2      Q.   Do you happen to know why the name
3  changed in 1986?
4      A.   We moved our corporate headquarters to
5  an office building in Fort Lauderdale, Florida
6  that is called the Berkley South Condominium.
7  We occupy offices on the first floor, and we
8  decided that the -- we like the name, so we
9  adopted the name.  During the years from 1981
10  until 1994, I was the corporate secretary of the
11  company, and at some point in there, I became
12  vice president, but I don't remember the exact
13  year.
14     Q.   Who was the president when you became
15  vice president?
16     A.   James E. Lambert.
17     Q.   And who was the president when you
18  were corporate secretary?
19     A.   James E. Lambert.
20     Q.   And this is the Berkley Group which is
21  now called -- the Del Marketing which is now
22  called the Berkley Group at this time?
23     A.   Del Management, which was changed to
24  the Berkley Group.

11

1      Q.   I misspoke, thank you, great.
2      A.   In 1994, the president of the company
3  decided to retire, or semi-retire, at which time
4  he sold the company to its employees.  1993,
5  1994.
6      Q.   Approximately how many employees were
7  employed by the Berkley Group at that time?
8      A.   I couldn't say with any degree of
9  accuracy.
10     Q.   Do you think it was more than a
11  hundred?
12     A.   It could have been.
13     Q.   Did everybody have an opportunity to
14  purchase stock in the company at that time -- was
15  it a stock sale?
16     A.   The ESOP is a complicated transaction,
17  and I don't know all of the legalities of it.
18  The employees did not make a conscious
19  decision -- I mean, there was no vote taken among
20  the employees, but everyone was -- everyone's
21  status, of course, as employees did not change.
22  It was just the way that the accounting for the
23  company, the way the company's ownership was
24  structured.  It had to do with structure more

12

1  than anything.  And again, I'm not an expert on
2  that.
3      Q.   Do you know, did anything change with
4  your relationship to the company at that time?
5      A.   In January of 1994, I became the
6  president of the company.
7      Q.   Do you remain in that position today?
8      A.   Yes, I do.
9      Q.   Are you at the same location in the
10  Berkley -- is it Berkley Condominium?
11     A.   The Berkley South Condominiums, yes.
12     Q.   Have your offices grown in any way;
13  have you taken over more square footage or
14  anything, or have you remained in the same
15  location?
16     A.   We've remained in the same location.
17  We have, since the '80s -- we started occupying
18  that building in '86.  We have increased square
19  footage over that time period.
20     Q.   What is the most recent time?
21     A.   I really couldn't say.
22     Q.   Do you own the building?
23     A.   We own only the office suites that are
24  located on the first floor.

Wise v Patriot - R. Foster Campagna  5/23/05

---

13

1    Q.    You occupy the entire first floor?

2    A.    Not the entire.  There are some

3    offices that are owned by others.

4    Q.    So is it fair to say that you own all

5    those office suites which you occupy?

6    A.    That's correct.

7    Q.    Can you name all the corporate

8    officers currently in the Berkley Group?

9    A.    The corporate officers -- myself as

10   president; Bruce Polansky, P-O-L-A-N-S-K-Y, vice

11   president of sales; Larry Hierholzer,

12   H-I-E-R-H-O-L-Z-E-R, vice president of marketing;

13   initials J.P. Ottino, O-T-T-I-N-O, III, vice

14   president of corporate acquisitions; Marc,

15   M-A-R-C, Landau, L-A-N-D-A-U, vice president of

16   finance, or chief financial officer; James E.

17   Lambert is the chairman of the Board.  And that

18   should be six.

19   Q.    Yes.  And you said that Mr. Lambert --

20   on or around the time you assumed the position as

21   president of the company, Mr. Lambert

22   semi-retired.  What was he doing for the company

23   at that time, after semi-retirement?

24   A.    He continues to offer sales and

---

14

1    marketing expertise to the Board.

2    Q.    Is it your opinion that his position

3    has been relatively unchanged since you assumed

4    the position of president of the company?

5    A.    No, his position has changed since

6    1994.

7    Q.    What has been the change, and when did

8    it occur -- change or changes?

9    A.    Prior to 1994, Mr. Lambert was in

10   charge of the corporate office there in the

11   Berkley South building.  He made all of the daily

12   operational decisions.

13   Q.    I guess my question -- let me be a

14   little clearer.  Since 1994 -- strike that.

15   Those two duties that you just enumerated, I'm

16   assuming that those are part of your duties

17   currently, is that correct?

18   A.    That's correct.

19   Q.    After 1984 when you assumed the

20   position of president and Mr. Lambert assumed the

21   position, basically conceded that position, yet

22   continues to offer sales and marketing, I guess,

23   was your testimony?

24   A.    You said 1984?

---

15

1    Q.    I'm sorry, 1994.  Since 1994 to the

2    present, since you became president, has Mr.

3    Lambert's position changed in any way after you

4    became president; in other words, in that, let's

5    say, from '95 forward?

6    A.    Mr. Lambert's position diminished to

7    the point that he is only involved in sales and

8    marketing expertise.

9    Q.    Have you ever been deposed before?

10   A.    Yes, I have.

11   Q.    How many times?

12   A.    I don't know that I could give you an

13   accurate number.

14   Q.    Have you been deposed in any actions

15   relating to any -- brought by any employees of

16   the company, the Berkley Group?

17   A.    No.

18   Q.    Any employees of Patriot Resorts, have

19   you been deposed in connection with any claims?

20   A.    Not until today.

21   Q.    Have you been -- let me ask a more

22   general question.  Have you been deposed with

23   regard to any employment claims relating to

24   employment or brought by employees in any matter,

---

16

1    I guess?

2    A.    I was deposed in Virginia in relation

3    to a sales and marketing contract we have there.

4    One of the employees of Great Eastern Resort

5    Corporation brought an action against Great

6    Eastern.

7    Q.    Were you individually named in that

8    matter?

9    A.    No, I was not.

10   Q.    To the best of your recollection, what

11   was the substance of the claims that employee was

12   making?

13   A.    She was making a claim under A.D.A.

14   Q.    So a disability discrimination suit is

15   your recollection?

16   A.    It grew into an A.D.A. claim.  I'm not

17   sure in the beginning exactly how it was worded,

18   but it really didn't survive much after our

19   depositions.

20   Q.    When you say "it didn't survive," did

21   you resolve the matter or did it get resolved by

22   a judge in any way or a jury?

23   A.    No, it was not resolved by a judge or

24   a jury.  Both parties resolved the matter between

---

---

17

the two.

2  Q.  Is that a confidential settlement, to
3  your recollection?
4  A.  Yes, it is.
5  Q.  What court was that in -- let me ask
6  you this -- do you remember if it was state or
7  federal court?
8  A.  That's what I was trying to recall.  I
9  don't really recall.
10  Q.  Do you remember the name of the
11  employee who brought the matter?
12  A.  Shari Brown.
13  Q.  About how long ago was that?
14  A.  That was probably a year or so ago.
15  Q.  Where in Virginia?
16  A.  Harrisonburg, Virginia.
17  Q.  What's the resort -- was there a
18  resort that was the subject matter as well as the
19  lawsuit?
20  A.  Great Eastern Massanutten Resort.
21  Q.  Any other depositions in relation to
22  any employment matters at any of the resorts?
23  A.  There was a sexual harassment claim in
24  the '90's -- I don't remember what year -- at

---

18

1  Massanutten Resort.
2  Q.  It sounds like you have not been
3  deposed in relation to any employment matters at
4  the Vacation Village location, is that correct?
5  A.  Vacation Village...
6  Q.  In the Berkshires, I'm sorry.
7  A.  No, I have not.
8  Q.  What about other Vacation Village
9  locations?
10  A.  Not that I can recall.
11  Q.  Can you recall if there have been any
12  claims of violations of the wage and hours
13  status, either state or federal, at any of the
14  locations, any of the resorts that you are
15  responsible for?
16  A.  There have not been any that I am
17  aware of.
18  Q.  I've been trying to choose my words in
19  a certain way, but I'm going to ask you so I can
20  understand the relationship.  Now, your employer
21  is the Berkley Group, and who employs, for
22  instance, Bill Rauer; who is his employer, to
23  your knowledge?
24  A.  Bill Rauer works for Tower Resorts

---

19

1  Realty.
2  Q.  What about Rod Lewis?
3  A.  Rod Lewis works for Patriot Resorts
4  Corporation.
5  Q.  What about the other corporate
6  officers; everybody work for Berkley Group who
7  are -- I guess those are corporate officers of
8  the Berkley Group I asked, correct?
9  A.  That's correct.
10  Q.  Are they employed by any other entity?
11  A.  Mr. Polansky, because he has a sales
12  -- a Florida sales real estate license, may
13  receive some commission from Tower Resorts
14  Realty, but I don't know that for a fact.
15  Q.  Tower Resorts Realty -- what is Tower
16  Resorts Realty, their relationship to the Berkley
17  Group?
18  A.  Tower Resorts Realty is owned by the
19  Berkley Group.
20  Q.  Are there certain resorts that are run
21  by Tower Resorts Realty?
22  A.  Not really.  Tower Resorts Realty is
23  the brokerage that must employ licensed real
24  estate agents in the State of Florida.

---

20

1  Q.  Are all the people who sell -- let me
2  strike that.  Do the people who sell time-shares
3  in Florida, do they have real estate licenses?
4  A.  Most of them do.
5  Q.  Are they required to?
6  A.  They are not required to; they are
7  only required -- well, let me start over.  They
8  are required to have a real estate license in
9  order to transact time-share sales, yes.
10  Q.  To my understanding, that's not true
11  in Massachusetts, is that correct?
12  A.  As far as I know, it is not true.
13  Q.  What about the other locations; what
14  are the other states in which -- actually, let me
15  strike that.  Can you tell me the other companies
16  other than Tower Resorts Realty that are owned by
17  the Berkley Group?
18  A.  Berkley Vacation Resorts -- let me
19  make sure I understand your question.
20  Q.  Let me ask it this way.  You testified
21  that Tower Resorts Realty is owned by the Berkley
22  Group?
23  A.  Correct.
24  Q.  Is Patriot Resorts owned by the

---

Wise v Patriot - R. Foster Campagna  5/23/05

21

```
1    Berkley Group?
2         A.   That is correct.  It's a wholly owned
3    subsidiary.
4         Q.   Now, you made that distinction.  Is
5    the Tower Resorts Realty something other than a
6    wholly owned subsidiary?
7         A.   It is also a wholly owned subsidiary.
8         Q.   What other wholly owned subsidiaries
9    are owned by the Berkley Group?
10        A.   I gave you Berkley Vacation Resorts.
11   Lando Resort Corporation, Hollywood Resorts
12   Corporation, Shoreline Resorts Corporation -- or
13   actually I think that's incorporated.  Key Resort
14   Corporation, Williamsburg Plantation, Inc.,
15   Eldorado Resorts Corporation, East Coast Resorts
16   -- I'm sorry, East Ocean Resorts, Inc., South
17   Coast Resorts, Inc. or Corporation.  When I say
18   corporation, it could be incorporated; I don't
19   remember exactly.
20        Q.   Are these all corporations?
21        A.   They are all corporations.
22        Q.   Do they all, to your knowledge, have
23   the same corporate structure?
24        A.   I'm not sure what you mean by that
```

22

```
1    question.
2         Q.   Are any of them LLC's or LLP's, or do
3    they all follow the same -- are they
4    S-corporations; I mean, do you know what...
5         A.   I do not know -- I know there are no
6    LLC's that I have named.  I don't know whether
7    it's a sub-S.
8         Q.   South Coast Resorts was the last
9    wholly owned subsidiary that you named.  Can you
10   think of any others?
11        A.   I'm sure there are other small ones,
12   but I can't remember them right now, I'm sorry.
13   There's Lando Resorts Realty.
14        Q.   As opposed to Lando Resorts
15   Corporation?
16        A.   There's two Landos.
17        Q.   So what is the -- what does Tower
18   Resorts Realty do?
19        A.   Tower Resorts Realty is the brokerage
20   company whose salespeople conduct sales for
21   Berkley Vacation Resorts.
22        Q.   Are the salespeople employed by Tower
23   Resorts Realty?
24        A.   Yes, they are.
```

23

```
1         Q.   Do they have an employment agreement,
2    to your knowledge?
3         A.   Yes.
4         Q.   Are there any employees at Berkley
5    Vacation Resorts?
6         A.   There probably are.  I'm not sure how
7    many.
8         Q.   When you say that, are you -- what are
9    you thinking of; perhaps people who work in the
10   office, might they be employed by Berkley
11   Vacation Resorts?
12        A.   The office staff is generally employed
13   by the development company.
14        Q.   And is Berkley Vacation Resorts the
15   development company?
16        A.   Yes.
17        Q.   Who are the corporate officers of
18   Tower Resorts Realty?
19        A.   J P. Ottino, III, and Marc Landau.
20        Q.   What about Berkley Vacation Resorts?
21        A.   Myself and Marc Landau.
22        Q.   Is Tower Resorts Realty the entity
23   that is responsible for all time-share sales --
24   for your time-share sales in Florida?
```

24

```
1         A.   No.
2         Q.   Is it only a Florida corporation or --
3    let me strike that.  Are there only time-shares
4    in Florida that are being sold by the folks at
5    Tower Resorts?
6         A.   That's correct.
7         Q.   What locations do they sell?
8         A.   Vacation Village at Weston, Canada
9    House Resort, Hollywood Beach Tower Resort,
10   Golden Strand Resort.
11        Q.   Is that the --
12        A.   I believe that's all of them.
13        Q.   Is Berkley Vacation Resorts the
14   development company for all those locations?
15        A.   No.
16        Q.   Who is or -- let me ask it this way.
17   Berkley Vacation Resorts is the development
18   company for which of those, if any?
19        A.   Vacation Village at Weston.
20        Q.   Is that it?
21        A.   That's it.
22        Q.   Who is the development company for
23   Golden Strand?
24        A.   That would be South Coast Resorts.
```

Wise v Patriot - R. Foster Campagna   5/23/05

---

25

1    Q.    Does South Coast -- are they the
2  development company for any other locations?
3    A.    No.
4    Q.    How about the Hollywood Beach Resort;
5  what is the development company for Hollywood
6  Beach Resort?
7    A.    Hollywood Resorts is the development
8  company.  The resort is Hollywood Beach Tower.
9    Q.    So the resort is the development
10 company?
11   A.    No, the resort is the resort.  The
12 development company is the company who owns
13 inventory at that resort.
14   Q.    Is that Hollywood Resorts Corporation?
15   A.    At Hollywood Beach Tower, it is
16 Hollywood Resort, Inc. or Corporation -- I'm not
17 sure which.
18   Q.    I understand.  Does Hollywood Resorts
19 Corporation, are they the development company for
20 any other location?
21   A.    I believe they own some inventory at
22 Costa del Sol, C-O-S-T-A D-E-L S-O-L.
23   Q.    That was a name that you did not
24 mention.  Is that another --

---

26

1    A.    That is a resort.
2    Q.    So it's not a corporation; that is
3  simply a resort?
4    A.    That's the name of the resort where
5  the inventory is located.
6    Q.    Do you know who owns what corporation,
7  if any own Costa del Sol?
8    A.    The owners' association own the
9  property.
10   Q.    Do you know who is responsible for
11 sales at Costa del Sol?
12   A.    If it's -- if inventory is sold that
13 is owned by Hollywood Resorts Corporation, a
14 Tower Resorts Realty salesperson would sell it.
15   Q.    I believe you mentioned another
16 location, is it Canada House?
17   A.    Canada House Resort, Shoreline Resort
18 is the developer who owns inventory at Canada
19 House Resort.
20   Q.    Who would sell at Canada Resort?
21   A.    Employees of Tower Resorts Realty.
22   Q.    How many locations are there owned by
23 Patriot Resorts?
24   A.    There is one.

---

27

1    Q.    Is that -- is Patriot the development
2  company?
3    A.    Patriot Resorts owns Vacation Village
4  in the Berkshires.
5    Q.    Does Patriot Resorts have employees?
6    A.    Yes, it does.
7    Q.    Are those the salespeople and sales
8  managers who work at the location?
9    A.    As well as the administrative staff.
10   Q.    You mentioned Lando Resort Realty and
11 Lando Resort Corporation or Incorporated.  Lando
12 Resort Realty, is that a development company?
13   A.    Lando Resort Corporation is the
14 development company, Lando Resort Realty is the
15 real estate brokerage.
16   Q.    When you say "real estate brokerage,"
17 is that -- do they perform a similar function
18 than being the -- are there employees of Lando
19 Resort Realty?
20   A.    Yes.
21   Q.    Among those people are sales people,
22 is that correct?
23   A.    The licensed real estate agents, yes.
24   Q.    Do those licensed real estate agents

---

28

1  perform essentially the same function for Lando
2  Resorts Corporation as the licensed sales
3  representatives at Tower Resorts do for their
4  various companies, including Vacation Village at
5  Weston?
6    A.    That's correct.  Vacation village at
7  Weston is the resort.  The development company is
8  Berkley Vacation Resort.  And to clarify, Lando
9  Resort is L-A-N-D-O.
10   Q.    Lando Resort in both those instances,
11 realty and corporation?
12   A.    Yes.
13   Q.    Is there a board of directors at
14 Patriot Resorts?
15   A.    Yes, there is.
16   Q.    Who is on the board of Patriot?
17   A.    Myself, Marc Landau, and J.P. Ottino.
18   Q.    Anybody else?
19   A.    No.
20   Q.    What about Lando Resorts Realty; is
21 there a board of directors there?
22   A.    Yes, there is.
23   Q.    Who is on that board?
24   A.    Marc Lando and myself.

---

Wise v Patriot - R. Foster Campagna  5/23/05

---

29

1      Q.   Do the development companies also have
2  board of directors?
3      A.   I'm sorry?
4      Q.   Those are all corporations, the
5  development companies as well, as I think you
6  testified to, correct?
7      A.   Those were the development companies,
8  yes.
9      Q.   And the development companies have
10  boards of directors as well, is that correct?
11      A.   Yes.
12      Q.   So Lando Resort Corporation, who is on
13  the board of Lando Resort?
14      A.   Marc Landau and myself.
15      Q.   Hollywood Resort Corporation, I
16  believe you've already told me who was
17  responsible for sales over there -- that's Tower
18  Resort.  Who is on the board of Hollywood Resort?
19      A.   Myself and Marc Landau.
20      Q.   Shore Line Resort, what is their
21  function?
22      A.   Shore Line Resort owns inventory at
23  Canada House Resort.
24      Q.   And all those are sold by Tower

---

30

1  Resort, I believe was your testimony, is that
2  correct?
3      A.   That's correct.
4      Q.   Who is on the board at Shore Line?
5      A.   Marc Landau and myself; possibly J.P.,
6  I can't recall.
7      Q.   Key Resorts Corporation, who is on the
8  board there?
9      A.   Myself and Marc Landau.
10      Q.   What is the function of Key Resorts
11  Corporation?
12      A.   Key Resorts owns inventory at Dover
13  House Resorts.
14      Q.   Where is that?
15      A.   Del Ray Beach, Florida.
16      Q.   Who is the development company -- I'm
17  sorry, that is the development company -- Key
18  Resorts Corporation, correct?
19      A.   That's correct.
20      Q.   Who makes sales at Dover House?
21      A.   Tower Resorts Realty.
22      Q.   Dover House Resorts -- and
23  Williamsburg Plantation, is that correct?
24      A.   Correct.

---

31

1      Q.   Where is that?
2      A.   In Williamsburg, Virginia.
3      Q.   And that would be the development
4  company that owns locations in Williamsburg,
5  Virginia, is that fair to say?
6      A.   That's correct.
7      Q.   What is the location there?
8      A.   Williamsburg Plantation.
9      Q.   Who is on the board at Williamsburg
10  Plantation, Inc.?
11      A.   Myself and Marc Landau.
12      Q.   What corporation is responsible for
13  salespeople at Williamsburg Plantation, Inc.?
14      A.   Williamsburg Plantation, Inc.
15      Q.   So they have their own sales staff,
16  similar structure, would you say, to Patriot
17  Resorts?
18      A.   Yes, similar.
19      Q.   What are the similarities, to your
20  best recollection?
21      A.   There is no real estate license
22  requirement.
23      Q.   Eldorado Resort Corporation, what is
24  the function of that company?

---

32

1      A.   It's the development company that owns
2  the Cliffs at Peace Canyon and Grand View in Las
3  Vegas.
4      Q.   Is Peace Canyon in Las Vegas as well?
5      A.   It's on the outskirts of Las Vegas.
6      Q.   Does Eldorado Resort Corporation, are
7  they responsible -- sort of a free-standing unit
8  like the Williamsburg Plantation and Patriots
9  Resort; in other words, do they supply their own
10  salespeople?
11      A.   Yes, they supply their own
12  salespeople.
13      Q.   Is there any significant difference
14  between them in the corporate structure between
15  Eldorado and Williamsburg Patriot?
16      A.   They must have a time-share real
17  estate -- time-share license, not real estate.
18      Q.   It's a specific required program that
19  they have to go through?
20      A.   Yes.
21      Q.   And ultimately they get some sort of
22  license at the end of this program?
23      A.   That's correct.
24      Q.   That's everybody who sells there,

Wise v Patriot - R. Foster Campagna   5/23/05

33

```
 1   that's a requirement?
 2        A.   That's correct.
 3        Q.   East Ocean Resort, what is the
 4   function of that corporation?
 5        A.   East Ocean Resort owns property at
 6   Surf Sider Resort.
 7        Q.   Is that in Florida?
 8        A.   Yes.
 9        Q.   And who is responsible for making
10   sales there?
11        A.   Anyone who would make sales there
12   would be working for Tower Resort Realty.
13        Q.   Who is on the board of East Ocean
14   Resort?
15        A.   Myself and Marc Landau, I believe.
16        Q.   What about South Coast resort; what
17   does that corporation do?
18        A.   South coast owns inventory at the
19   Golden Strand Resort.
20        Q.   I believe you testified to that
21   already.  And the Golden Strand is sold by Tower
22   Resort, is that correct?
23        A.   That's correct.
24        Q.   Any other corporations that we --
```

35

```
 1        Q.   Do you happen to know -- Massanutten
 2   Resort, do you happen to know if it's a
 3   corporation?
 4        A.   Great Eastern Resort is a corporation.
 5        Q.   Who is on the board of that
 6   corporation?
 7        A.   C.D -- C as in cat, D as in dog --
 8   Hammer, H-A-M-M-E-R; James Lambert; and I'm not
 9   sure if there are other officers.  I just know
10   those two.
11        Q.   Have you ever served as a corporate
12   officer of Massanutten Resort?
13        A.   No, I have not.
14        Q.   Have you ever served in any other
15   capacity or had any other responsibilities for
16   Massanutten Resort?
17        A.   Yes.
18        Q.   How so?
19        A.   Administrative and operational for the
20   sales office that sells time-sharing.
21        Q.   So you actually worked on-site at some
22   point in Massanutten?
23        A.   Yes, I did.
24        Q.   For how long?
```

34

```
 1   those were wholly owned subsidiaries.  Any other
 2   wholly owned subsidiaries of the Berkley Group
 3   that you can recall at this time?
 4        A.   Not that I can recall.
 5        Q.   I've heard mention in some of these
 6   depositions of a location at Massanutten.  What
 7   is the resort at Massanutten?
 8        A.   What is the resort?
 9        Q.   Yes.  Well, what is the name?
10        A.   Massanutten Resort.
11        Q.   Is that owned by the Berkley Group?
12        A.   No, it is not.
13        Q.   What corporation, if it's a
14   corporation, owns Massanutten Resort?
15        A.   Great Eastern Resort Corporation.
16        Q.   So obviously from your testimony, it
17   would appear that Great Eastern is not a wholly
18   owned subsidiary of the Berkley Group, is that
19   correct?
20        A.   That's correct.
21        Q.   What is its corporate relationship, if
22   any, to the Berkley Group?
23        A.   The Berkley Group has a sales and
24   marketing contract with Great Eastern Resort.
```

36

```
 1        A.   Probably a year.
 2        Q.   Was that back in the '80's sometime?
 3        A.   Actually, that's prior to Berkley
 4   Group; that would have been as Del Marketing.
 5        Q.   So somewhat earlier in your career you
 6   worked on-site there?
 7        A.   Yes.
 8        Q.   And that's your only -- those were
 9   your only responsibilities as to Massanutten at
10   any time?
11        A.   Those responsibilities are ongoing.  I
12   oversee the sales office operation.
13        Q.   As you sit here today?
14        A.   With regard to the contract that we
15   have there, yes.
16        Q.   Pardon me.  As you sit here today, you
17   continue to do that?
18        A.   That's correct.
19        Q.   Other than those corporations we've
20   discussed so far, are there any other -- and the
21   resort that they either own or operate -- are
22   there any other resorts in any way affiliated
23   either by having an individual who works at the
24   Berkley Group have some responsibilities or in
```

Wise v Patriot - R. Foster Campagna   5/23/05

37

1    any other way affiliated with the Berkley Group?

2              MS. FABBO:  Objection.  You can

3          answer.

4              THE WITNESS:  There is a resort

5          in Gatlinburg, Tennessee called

6          Sunrise Ridge Resort, and the name of

7          the corporation is Unique Resort

8          Corporation.

9      Q.   (By Ms. Garrow)  Is Unique Resort the

10   development company?

11     A.   Yes, it owns inventory at that

12   property.

13     Q.   Who is responsible for making sales;

14   what corporation or entity would be responsible

15   for providing sales or salespeople to Gatlinburg

16   Sunrise Unique Resorts?

17     A.   Unique Resorts.

18     Q.   To your knowledge, does Berkley own or

19   have any affiliation with any other resort in

20   Tennessee?

21     A.   Unique Resorts owns some inventory at

22   a resort called Oakmont and at a resort called

23   Treetops.

24     Q.   What is the affiliation between either

38

1    Oakmont or Treetops -- let's take Oakmont first.

2    What is the affiliation between Oakmont and the

3    Berkley Group?

4      A.   There would be none.

5      Q.   Unique Resort Corporation, who is on

6    the board?

7      A.   Myself, Marc Landau, and I believe

8    Ottino.

9      Q.   When you say that there's no

10   affiliation, then, between Unique Resort -- I'm

11   sorry -- between the Berkley Group and Oakmont,

12   yourself, Marc Landau, and J.P. Ottino are on the

13   board of both Unique Resort and the Berkley

14   Group, so there is at least a personal

15   affiliation, is that fair to say?

16     A.   That's fair to say.

17     Q.   Any other locations with any

18   affiliation at all to the Berkley Group that we

19   haven't discussed yet -- resort locations?

20     A.   I can't recall any more at this time.

21     Q.   Approximately what are the yearly

22   sales at Patriot Resorts?

23     A.   I don't know that I can give that

24   figure with any accuracy.

39

1      Q.   More than a million?

2      A.   Volume of sales?

3      Q.   Yes.

4      A.   It would be more than a million.

5      Q.   More than ten million?

6      A.   That I couldn't say.

7      Q.   More than five million?

8      A.   I would be afraid to speculate.

9      Q.   Okay, that's fine.  But you can say

10   with some degree of certainty that it is greater

11   than a million?

12     A.   Yes.

13     Q.   Are you quite certain?

14     A.   Quite certain.

15     Q.   Thank you.  To your knowledge, is

16   there an hourly wage for salespeople who work for

17   Patriot Resorts?

18     A.   No.

19     Q.   There is no hourly wage?

20     A.   No.

21     Q.   How did -- who determined that there

22   would be no hourly wage at Patriot Resorts for

23   salespeople?

24     A.   It would have been determined by the

40

1    board of directors in conjunction with the sales

2    team.

3      Q.   Just so we're clear here, sales

4    managers of Patriot Resorts, is there an hourly

5    wage for them?

6      A.   No, there is not.

7      Q.   Do you recall discussions at board of

8    directors' meetings relating to hourly wage --

9    again, let me take you back in time.  This is not

10   since the pendency of this lawsuit; I'm talking

11   about before Berkley Resorts had any employees,

12   so -- I'm sorry, strike that.  Before Patriot

13   Resorts had employees in the 2001 time frame, do

14   you remember -- do you recall having any

15   discussions relating to hourly wages at board of

16   directors' meetings?

17     A.   I don't recall specific board of

18   directors meetings where it was discussed, but

19   any time there is a question of wage and hour, we

20   refer that to our attorneys.

21     Q.   Do you recall referring any questions

22   relating to wage and hour to your attorney

23   relating to paying hourly wages at Berkshires --

24   in the Berkshires of Patriot Resorts?

41

1    A.    Yes, I believe we had a conversation
2   with our attorneys regarding the issue.
3        Q.    This was back in 2001?
4        A.    Thereabouts.  It may have been earlier
5   than 2001.
6        Q.    But as you were setting up the new
7   corporation and the new resort, is that fair to
8   say?
9        A.    That's correct.
10       Q.    What attorneys did you speak with?
11       A.    We spoke to our local attorneys in
12  Williamstown, and we also spoke with our counsel
13  in Virginia.
14       Q.    I'm not asking for the substance of
15  your discussions with counsel in Virginia, but
16  what was the purpose for you to, or for the board
17  to discuss wages with counsel in Virginia in
18  relation to Patriot Resorts?
19       A.    Because we had discussed the issue
20  with them previously.
21       Q.    Did you have any conversations with
22  any other attorneys at that time other than local
23  attorneys in Massachusetts and counsel in
24  Virginia?

42

1              MS. FABBO:  Objection.  You can
2              answer.
3              THE WITNESS:  We've spoken to our
4              attorneys in Nevada.
5        Q.    (By Ms. Garrow)  Just so I'm clear,
6   you spoke with your attorneys in Nevada in
7   relation to setting up, or in relation to the
8   hourly wage at Patriot Resorts; is that your
9   testimony?
10       A.    No, I'm sorry.  I thought your
11  question was in relation to wage and hour.
12       Q.    I'm sorry, let me be clearer.  When
13  you were beginning in 2001, Patriot Resorts was
14  up and running sometime in 2001, is that correct?
15       A.    That's correct.
16       Q.    And prior to Patriot Resorts having
17  employees, in particular salespeople and sales
18  managers, did you speak with anyone other than
19  your local Massachusetts attorneys with relation
20  to hourly wage for those salespeople or sales
21  managers at Patriot?
22       A.    We spoke with our Virginia counsel so
23  that they could share information with our
24  Massachusetts law firm.

43

1        Q.    Anyone else?
2        A.    No, not at that time.
3        Q.    Who were your local attorneys?
4        A.    In Massachusetts?
5        Q.    Yes, I'm sorry.
6        A.    Parese and Sabin.
7        Q.    And they're in the Berkshires, right?
8        A.    Williamstown, yes.
9        Q.    About how many times did you speak
10  with them in relation to hourly wages and wage
11  and hour issues at Patriot Resorts?
12       A.    I don't really recall how many times I
13  may have spoken with them about that.
14       Q.    Did you -- again, this is in the same
15  time frame, and actually, this would be any time
16  subsequent.  Did you ever obtain or seek an order
17  of a Massachusetts attorney general or the U.S.
18  Department of Labor relating to your wage and
19  hour practices at Patriot Resorts?
20       A.    Not for Patriot Resorts, no.
21       Q.    Did you receive an order or ruling for
22  some other location or some other corporation?
23       A.    Our Virginia attorneys requested -- I
24  believe it's an opinion from the Department of

44

1   Labor; not directly, but they went through the
2   American Resort Developers Association, which is
3   an association of similar developers, time-share
4   developers; and they requested it of the
5   Department of Labor.
6        Q.    The U.S. Department of Labor?
7        A.    That is correct.
8        Q.    Do you recall -- have you reviewed
9   that opinion later?
10       A.    Not recently.
11       Q.    At some point you did?
12       A.    Yes, I did.
13       Q.    Do you recall what that opinion letter
14  said?
15       A.    Basically they did not make a
16  determination.  They felt that -- well, again, I
17  can't say what they said, but our attorney -- our
18  labor attorney --
19       Q.    Again, I'm not going to ask you what
20  your attorney said, but I want to know what the
21  AG said based on the opinion letter, that's all.
22       A.    Well, I don't recall the opinion
23  letter.  That was given to our attorneys.
24       Q.    So at no point -- you didn't review

45

1   the opinion letter or did you review it?
2       A.   I may have.
3       Q.   Did you ask to review it at some point
4   in relation to Patriot Resorts?
5       A.   Yes, I believe we had the attorneys
6   confer on that.
7       Q.   At some point, do you recall what the
8   general gist of that opinion was from the United
9   States Department of Labor?
10      A.   We did not have an obligation to pay
11  minimum wage.
12      Q.   Did you understand why?
13      A.   Again, I don't know the specifics.
14  That's between the attorneys.
15      Q.   Do you believe any statutory exemption
16  to payment of minimum wage applies in this
17  particular matter --
18           MS. FABBO:  Objection.
19      Q.   (By Ms. Garrow)  -- in this particular
20  matter that you're here being deposed on today?
21           MS. FABBO:  Objection.  Don't
22           answer as to any discussions with
23           counsel, but if you have any opinion
24           other than what you've learned from

46

1            your attorneys.
2            THE WITNESS:  I really don't have
3            an opinion other than what the
4            attorneys have said.
5       Q.   (By Ms. Garrow)  I'm really not asking
6   for an opinion.  What I'm asking for is if you're
7   aware of any exemptions that you believe apply
8   here, exemptions to pay minimum wage; not an
9   opinion on that?
10      A.   I'm not really qualified to answer
11  that.
12      Q.   So is it your testimony, then, as you
13  sit here today, you're not personally aware of
14  any exemptions?
15           MS. FABBO:  Objection.  You can
16           answer.
17           THE WITNESS:  Only as it's been
18           related to me from our attorneys.
19      Q.   (By Ms. Garrow)  Do you recall what
20  those were?
21           MS. FABBO:  Objection.  Don't
22           answer to your conversations with
23           counsel.
24      Q.   (By Ms. Garrow)  Do you have anything

47

1   independent of conversation of counsel?
2       A.   No, I don't.
3       Q.   Knowledge as to what those exemptions
4   are -- counsel in Virginia, let me just go back
5   here and look and see -- is Massanutten -- and
6   again, I apologize for not being able to grasp
7   this as quickly as I should -- but Massanutten,
8   is that your only Great Eastern Corporation and
9   Massanutten Resort, is that your only location in
10  Virginia -- there's a Williamsburg one as well,
11  right?
12      A.   Williamsburg Plantation, yes.
13      Q.   Those are the two Virginia locations?
14      A.   We do have a campground time-share in
15  Fredericksburg, Virginia.  When I say "we," we
16  have a sales and marketing contract at Wilderness
17  Resort.  That's a campground facility in
18  Fredericksburg, Virginia.  It is owned by
19  Presidential Resorts Corporation, I believe.
20      Q.   Is that another corporation that's
21  somehow affiliated with the Berkley Group?
22      A.   No, it is not.  Only through its
23  contract with Berkley.
24      Q.   I'm sure you probably told me who was

48

1   responsible for making sales at the Williamsburg
2   location, but if you wouldn't mind just telling
3   me again who was responsible for those sales?
4       A.   Williamsburg Plantation.
5       Q.   And then Massanutten is Great Eastern
6   Corporation?
7       A.   Great Eastern Resort Corporation.
8       Q.   Can you please describe Williamsburg
9   Plantation's -- the way in which sales are made
10  there; in other words, are the salespeople there
11  required to work any particular hours?
12      A.   I'm sorry, which resort did you ask?
13      Q.   Williamsburg Plantation.  Do they have
14  certain hours of work, to your knowledge?
15      A.   I'm not sure what time their day
16  begins.  They have a sales meeting in the
17  morning, and then they have customers scheduled
18  during the day.
19      Q.   Who makes those scheduled customer
20  appointments?
21      A.   Those come through the marketing
22  companies.
23      Q.   Is that several marketing companies
24  that might services Williamsburg Plantation?

Wise v Patriot - R. Foster Campagna  5/23/05

---

49

1      A.   Williamsburg Plantation generates some
2  of its own customers.  I believe they're
3  responsible for most all of their customers.
4      Q.   How do they do that?
5      A.   Either through dropbox locations where
6  they have people that are interested in
7  participating in a drawing for something, put a
8  -- fill a form out and put it in the box, and
9  then they're contacted by Williamsburg to see if
10  they would be interested in taking a tour.
11      Q.   So, for instance, you might go to a
12  fair or something and see a box, fill out your
13  name you can win something-or-other, and that's
14  where you get your leads from from the
15  Williamsburg location?
16      A.   Yes, Williamsburg gets leads in that
17  way.
18      Q.   Who is responsible for following up on
19  those leads that come through the drop boxes?
20      A.   It would be an office in Williamsburg
21  for Williamsburg Plantation.
22      Q.   Do you know if the salespeople are
23  required to make those calls?
24      A.   No, they are not.

---

50

1      Q.   There's an office on-site that makes
2  those calls?
3      A.   There is an office in the area.  I'm
4  not exactly sure which location.
5      Q.   Is it fair to say the people who work
6  at that office are employees of Williamsburg
7  Plantation?
8      A.   That's correct.
9      Q.   So we've heard described in other
10  depositions waves of tours.  Do those -- in other
11  words, that tours come at certain times of the
12  day and generally have an ebb and a flow.  Is
13  that a fair assessment of -- let me strike that.
14  We've heard about other tours that sort of ebb
15  and flow.  Would they ebb and flow in this
16  methodology as well, if you had a drop box lead
17  system?
18           MS. FABBO:  Objection.  You can
19           answer.
20           THE WITNESS:  They would have
21           customers at certain times of the day.
22      Q.   (By Ms. Garrow)  They generally
23  schedule tours at certain beginning times,
24  whether it's a 9:00 tour or 10:30 tour or

---

51

1  something along those lines, they generally have
2  a starting time that --
3      A.   Yes.
4      Q.   -- is adhered to?
5      A.   Yes, they generally start -- they come
6  in in and around the same time.
7      Q.   Is that at all locations, or are we
8  speaking -- I asked you about Williamsburg.  Is
9  that what you're addressing your answer to?
10      A.   Yes, I'm speaking of Williamsburg.
11           (Exhibit 1, Vacation Village
12           Tour Times, marked
13           for identification)
14      Q.   (By Ms. Garrow)  I'm showing you
15  what's been marked as Plaintiff's Exhibit 1.  I'm
16  just going to ask you to review that.  These are
17  what have been represented as tour times at
18  Vacation Village in the Berkshires.  I'm going to
19  ask you if this is different in any way from the
20  tour times at Williamsburg Plantation?
21      A.   I really don't know.  I have not seen
22  this before.
23      Q.   Do you want take a look at it and tell
24  me if you know after reviewing it?

---

52

1      A.   In a general sense, I would say yes.
2      Q.   Other than some office folks
3  generating leads at Williamsburg and the sales
4  folks taking tours -- I assume that salespeople
5  and sales managers take tours, is that correct?
6      A.   At some locations, yes.  Are you
7  speaking of...
8      Q.   In Williamsburg?
9      A.   At Williamsburg, not all of the
10  managers take a customer out.
11      Q.   But all the salespeople should be
12  taking customers out?
13      A.   Correct.
14      Q.   What else does a salesperson do during
15  their day at Williamsburg Plantation?
16      A.   They only tour -- you asked me sales
17  representative?
18      Q.   Yes.
19      A.   They only tour salespeople.  They
20  attend a morning meeting -- I'm sorry, they only
21  tour customers.
22      Q.   What do they do in between tours, to
23  your knowledge?
24      A.   Basically anything they want to.

Wise v Patriot - R. Foster Campagna  5/23/05

53

1    Q.    Like what?

2    A.    They could go and get gas in their

3    car, they could go to the drugstore, they could

4    go and have a meal.

5    Q.    How do they -- how do they get called

6    for tours, then, if they're off property?

7    A.    They understand where they are on the

8    rotation when they leave, and they can generally

9    have a very good idea of what time they need to

10   be back in order to take their next customer.

11   Q.    What happens if they happen to come

12   back ten minutes late?

13   A.    Then they'll miss their tour.

14   Q.    Is ten minutes given to them to make

15   it back?

16   A.    They allow a certain amount of time.

17   I'm not sure that I know what it is at

18   Williamsburg.

19   Q.    So your understanding that they can

20   leave the property as long as they come back

21   timely; they can leave and do whatever they want?

22   A.    That's correct.

23   Q.    Do they wear a beeper or anything?

24   A.    Most people have cell phones.

54

1    Q.    Do you know if at Williamsburg -- let

2    me ask you this:  Who is responsible for handing

3    out the tours at Williamsburg?

4    A.    The receptionist that checks in the

5    customers assign those customers to a

6    salesperson.

7    Q.    Do you know if the receptionist would

8    on occasion call a sales rep. that might be

9    coming up on the rotation if they're off property

10   at Williamsburg?

11   A.    I don't know specifically at

12   Williamsburg whether they call them or not.

13   Q.    What about Massanutten; do you know if

14   there's any difference in general policies or

15   procedures relating to the day of the sales

16   representative at Massanutten compared with

17   Williamsburg?

18   A.    They have customers -- they have a

19   morning meeting, they have customers come in.

20   The times may vary to what the times are in

21   Williamsburg, but they pretty much follow the

22   same routine.

23   Q.    Same routine for when they're not

24   touring customers as well?

55

1    A.    Correct.

2    Q.    Do you know any difference to that

3    routine at all?

4    A.    Not that I can think of.

5    Q.    Do you know if employees of the

6    Patriot Resorts ever work more than eight hours

7    in a day?

8    A.    Employees of Patriot Resorts?

9    Q.    Yes.

10   A.    The administrative staff very often

11   works more than eight hours a day.

12   Q.    What about salespeople; do you know if

13   they ever work more than eight hours a day?

14   A.    No, I don't.

15   Q.    No knowledge one way or another?

16   A.    It would be difficult for them to.

17   Q.    Why is that?

18   A.    If they have two customers a day, they

19   would be on tour probably maybe five to six

20   hours.

21   Q.    So your testimony is that a tour is

22   approximately two and a half to three hours per

23   day?

24   A.    That's a pretty extensive tour.

56

1    Q.    So what is the range of tour time?

2    A.    It could be anywhere from 90 minutes

3    to three hours, three and a half hours, depending

4    on if they got a sale.

5    Q.    That would be the range, you would

6    say?

7    A.    Yes, I would say.

8    Q.    Sometimes paperwork can take longer,

9    so they might be with a customer or owner longer

10   than three and a half hours, is that correct?

11   A.    It's possible.

12   Q.    Are you aware of that ever happening?

13   A.    No, I'm not personally aware, no.

14   Q.    Have you ever sold a time-share?

15   A.    No, I have not sold a time-share.

16   Q.    Do you know what time salespeople and

17   sales managers need to report to work at Patriot

18   Resorts?

19   A.    No, I don't know specifically --

20              (Exhibit 2, June 2004 Patriot

21              Resorts Employee Handbook,

22              marked for identification)

23   Q.    (By Ms. Garrow)  I'm showing you

24   what's been marked as Exhibit 2.  Do I recognize

57

```
1    Exhibit 2?
2         A.    Yes, I do.
3         Q.    Have you seen it before?
4         A.    It looks like the Patriot Resorts
5    Employee Handbook.
6         Q.    Have you seen that before?
7         A.    Yes, I have.
8         Q.    Did you have any involvement in
9    authoring this?
10              MS. FABBO:   Objection.  You can
11              answer if you understand it.
12              THE WITNESS:   I would have had
13              input, yes.
14        Q.    (By Ms. Garrow)  Do you remember --
15   input in certain policies, is that what it would
16   have been?
17        A.    Any general office type policies, yes.
18   Anything that is of a legal nature would have
19   been referred to the attorneys.
20        Q.    Do you recall what input you offered
21   to this particular publication of the handbook?
22        A.    I participated in the dress code.
23        Q.    When was that; when did you give your
24   input to the dress code?  This is marked June
```

58

```
1    2004.
2         A.    It would have been prior to June 2004.
3         Q.    Was it immediately prior to June 2004,
4    or was it sometime prior to that?
5         A.    I don't recall specifically.  I would
6    have participated in the safety policy, the
7    smoking policy, the cell phone policy, career
8    service, mail policy.
9         Q.    Anything else?
10        A.    I think that's pretty much...
11        Q.    What about attendance; did you have
12   any involvement in the attendance policy?
13        A.    No.
14        Q.    Who did?
15        A.    That would have been a recommendation
16   by Mr. Polansky.
17        Q.    A recommendation to you?
18        A.    Yes.
19        Q.    So did you approve his
20   recommendations?
21        A.    Well, when I say -- he would have told
22   me what to put in as attendance for Patriot
23   Resorts under our sales and marketing contracts.
24        Q.    So then you would have put it in?
```

59

```
1         A.    Correct.
2         Q.    So for instance, on Page 3 here where
3    it says "attendance policy," you would have put
4    in based on a recommendation by Mr. Polansky that
5    each employee is expected to report promptly on
6    each scheduled workday?
7         A.    Correct.
8         Q.    And the remainder of that policy would
9    have been set by Mr. Polansky, is that your
10   testimony?
11        A.    That is correct.
12        Q.    He refers there, or you refer there to
13   a starting time?
14        A.    That is correct.
15        Q.    Do you recall -- you named off a
16   number of different policies in which you had
17   input.  Do you remember what sort of input you
18   had into each?
19        A.    I would have gone over the policy,
20   read the policy, just generally checked it to
21   make sure that it was okay.
22        Q.    How different is the Patriot Resorts
23   policy from, let's say, the Williamsburg policy
24   handbook -- let me just ask you first, is there a
```

60

```
1    policy handbook at Williamsburg?
2              MS. FABBO:   Objection.  You can
3              answer.
4              THE WITNESS:   Yes, there is.
5         Q.    (By Ms. Garrow)  How different would
6    this be from that?
7         A.    A lot of the legal issues would be the
8    same.  Insurance requirements may be different.
9    I'm talking about group insurance or life
10   insurance would be different.
11        Q.    Are there different plans, different
12   insurance plans that might have been opted for in
13   the Massachusetts location versus the Virginia
14   locations?
15        A.    Yes, they're all different.
16        Q.    Who chooses those, by the way?
17        A.    It's generally handled by one of the
18   office people in the -- at Patriot Resorts, Faith
19   would actually talk with someone in the Berkley
20   office who would help her have input from an
21   agent there in Massachusetts.
22        Q.    So it would be in conjunction with
23   somebody from Berkley, but it would be done on
24   the local site?
```

Wise v Patriot - R. Foster Campagna  5/23/05

61

1    A.    Right, done for Patriot Resorts.

2    Q.    Anything else; any other input you can

3  think of that you offered?

4    A.    No, not at this time.

5              (Exhibit 3, July 2001 Patriot

6              Resorts Employee Handbook,

7              marked for identification)

8    Q.    (By Ms. Garrow)  I'm showing you

9  what's been marked as Exhibit 3.  Have you seen

10  that document before?

11    A.    Yes, I have.

12    Q.    What is that document?

13    A.    This appears to be the original

14  employee handbook that was authorized in July of

15  2001.

16    Q.    Did you have input into that document

17  as well?

18    A.    Yes.

19    Q.    Do you know if there are any

20  differences between the 2001 handbook and the

21  2004 handbook?

22    A.    I believe that there are.

23    Q.    Do you know what those are -- you can

24  take some time to review it if you'd like.

62

1    A.    The insurance requirement is more

2  detailed in the new version.  The dress code is

3  in the new version.

4    Q.    That was something new?

5    A.    It was something new for the handbook.

6    Q.    Was it -- it was issued independent of

7  the handbook to the sales personnel at Patriot

8  Resorts at some point, is that correct?

9    A.    I believe it may have been, but I

10  don't know that for a fact.  Personal leave seems

11  to be longer than -- the paragraph is longer.

12    Q.    What page are you on?

13    A.    Page 4.  Safety policy has been put

14  into the handbook.  Cell phone policy has been

15  put in the handbook.  The career service and the

16  mail policy was put in.  Harassment policy seems

17  to have been reworded and restructured.  I

18  believe that's it.

19    Q.    If we can go to Exhibit 2, one policy

20  you had mentioned was the personal leave policy.

21  I believe that's on Page 5?

22    A.    Yes.

23    Q.    And I think you testified that it

24  seems to be a longer paragraph.  I'm going to

63

1  have you look at Number 2 at this time and have

2  you answer questions about Number 2.

3    A.    Okay.

4    Q.    Is it your understanding that at the

5  beginning of every year, an employee gets fifteen

6  days essentially to use as sick time or vacation

7  time or any time off that they choose?

8    A.    That's correct.

9    Q.    And that would be fifteen normally

10  scheduled days, correct?

11    A.    Fifteen normally scheduled -- you mean

12  fifteen days that they would be normally

13  scheduled to work?

14    Q.    Yes, exactly.

15    A.    Correct.

16    Q.    Thank you.  That accrues at the

17  beginning of every year?

18    A.    Yes, it does.

19    Q.    Calendar year?

20    A.    Yes.

21    Q.    Do you know if the policy that's set

22  forth here that a failure to sign in on the

23  attendance sheet will result in an employee being

24  docked with a personal day off, do you know if

64

1  that was enforced at Patriot Resorts?

2    A.    If it was enforced at the time that

3  this handbook was distributed?

4    Q.    Yes, after this handbook was

5  distributed.

6    A.    Yes.

7    Q.    It was enforced -- what about before

8  this handbook was distributed?

9    A.    Yes.

10    Q.    When did they start enforcing that

11  policy?

12    A.    It would have been the policy from the

13  beginning of the work starting at Patriot

14  Resorts.

15    Q.    Was it enforced, as far as you know,

16  from the beginning?

17    A.    As far as I know it was.

18    Q.    Was it enforced equally as to

19  everybody, to your knowledge?

20    A.    As far as I know it was.

21    Q.    Were salespeople essentially treated

22  the same, in your opinion, at Patriot Resorts --

23  the same as to each other?

24    A.    Yes.

Wise v Patriot - R. Foster Campagna   5/23/05

65

1    Q.    What do you base that on?

2    A.    I base it on the philosophy of the

3    company.

4    Q.    Do you have any personal knowledge

5    that employees were treated the same as to the

6    policies -- do you have any personal knowledge

7    that people were treated the same as to policies?

8    A.    I don't have any knowledge that they

9    were not.

10   Q.    That was the same between the lines,

11   line directors; you expected them to treat

12   everybody the same and enforce the policies

13   equally?

14   A.    Enforce the policies equally, each

15   manager has his own management style.

16   Q.    What about jury duty, if somebody has

17   jury duty;  is that considered one of the fifteen

18   days at Patriot Resorts?

19   A.    At Patriot, I believe that jury duty

20   is considered time that they're not -- in other

21   words, they're considered that they work when

22   they're at jury duty.

23   Q.    So in other words, you couldn't dock

24   them a day, is that correct?

66

1    A.    Well, they weren't there to earn

2    commissions, but I believe they receive some type

3    of compensation if they are on jury duty.

4    Q.    From Patriot Resorts?

5    A.    I believe so.

6    Q.    Do you know that to be a fact?

7    A.    I believe we had one person who asked

8    for compensation for the day.

9    Q.    Asked you?

10   A.    No, he asked the office manager,

11   Faith.

12   Q.    What did she do at that time; did she

13   consult with you?

14   A.    She did not consult with me; she

15   consulted with the attorneys.

16   Q.    But to your knowledge at some point,

17   he got paid?

18   A.    Yes, he did.

19   Q.    Anybody else ever ask you for pay for

20   jury duty?

21   A.    No one has ever asked me, and I don't

22   know that anyone has asked Faith, but she would

23   know.

24   Q.    Do you know if anyone else ever got

67

1    paid for jury duty?

2    A.    I do not know.

3    Q.    Do you know if the jury duty day gets

4    marked as one of your fifteen days off out of

5    work for the year?

6         MS. FABBO:  Objection, asked and

7         answered.

8         MS. GARROW:  You can answer it.

9         THE WITNESS:  It's not counted

10        against them, no.

11   Q.    (By Ms. Garrow)  Is there a pay period

12   at Patriot Resorts, to your knowledge?

13   A.    I'm not sure what you mean by that.

14   Q.    In other words, is there a set period

15   in which checks are issued; are they issued

16   weekly or biweekly or...

17   A.    Checks are issued each week.

18   Q.    Who set that pay period?

19   A.    I would have set that in the

20   beginning.

21   Q.    Has that changed since the beginning?

22   A.    No, it hasn't.

23   Q.    How many times have you physically

24   been at the Patriot Resorts location since its

68

1    opening?

2    A.    Probably between five and ten times.

3         (Exhibit 4, Employment Agreement

4         - Sales Representative,

5         marked for identification)

6         MS. GARROW:  Off the record.

7         (A break was taken)

8         MS. GARROW:  Back on the record.

9    Q.    (By Ms. Garrow)  I'm showing you

10   what's been marked as Plaintiff's Exhibit 4, and

11   do you recognize this document?

12   A.    Yes.

13   Q.    What is this document?

14   A.    It's the employee agreement for sales

15   representatives at Patriot Resorts.

16   Q.    Is it currently in force?

17   A.    I'm sorry?

18   Q.    Is this the agreement that's currently

19   in force?

20   A.    Yes.

21   Q.    Is it used for all sales

22   representatives?

23   A.    Yes.

24   Q.    At Patriot Resorts?

Wise v Patriot - R. Foster Campagna  5/23/05

69

1    A.   As far as I know it is.

2    Q.   Has it been modified at any time?

3    A.   It may have been, but I don't recall.

4    Q.   So your testimony is you have no

5  knowledge of any modifications or...

6    A.   Actually, at the bottom of this it

7  shows it was modified by the attorneys on

8  June 13, '03.

9    Q.   So this was generated by his

10  attorneys; is that what you're saying?

11    A.   That's correct.

12    Q.   Is that Miss Fabbo's firm or the

13  Parisi?

14    A.   Parisi and Sabin.

15    Q.   I'd like to go through the sections

16  that start on Page 2, 3, and 4, generally the

17  commission payment schedules, the commission

18  payment terms, commission payment schedules.  Can

19  you describe for me, starting in or around June

20  or so of 2001, approximately when Patriot Resorts

21  started selling, what the commission plan was for

22  sales representatives at that time?

23    A.   They receive a commission on their

24  sales.  I'm not sure of the exact number.

70

1    Q.   How did that go; I mean, they made a

2  sale, and then when did they get paid?

3    A.   If they make a sale today and we

4  receive the full down payment on the transaction

5  today, then it takes ten days from today's date

6  in order for us to generally accept that the

7  payment we received is good; and at that date,

8  depending on what day of the week it is, it's put

9  on a pay ledger for that week ending Sunday.

10  That's transmitted to the pay office on Monday,

11  and they would be paid -- I believe at Patriot

12  Resorts they're paid on a Tuesday, so it would be

13  the Tuesday following.  Not the next day, but the

14  Tuesday a week from that.

15    Q.   Was that true in 2001?

16    A.   Yes, I believe so.

17    Q.   How can an owner pay a down payment;

18  how are they allowed to submit that?

19    A.   They may pay by personal check, they

20  may pay in cash, they may pay by Mastercard,

21  Visa, or American Express.

22    Q.   And that's the down payment; they can

23  pay the down payment?

24    A.   Correct.

71

1    Q.   What about -- what if they get

2  financing; how do they finance the sale -- can

3  they finance the sale?

4    A.   Yes, they can.

5    Q.   How could they do that -- is it an

6  internal financing company?

7    A.   Patriot Resorts will accept the

8  financing.  They have agreements with other banks

9  -- or with banks to extend Patriot Resorts the

10  money to finance those receivables.  And the

11  customer makes their payment on a monthly basis.

12    Q.   How can they make that payment, in

13  what form?

14    A.   They make it by preauthorized

15  checking.

16    Q.   That's the only way they are allowed

17  to pay?

18    A.   If they make a higher down payment;

19  the typical down payment amount is ten percent.

20  If they do a 20 percent or greater down payment,

21  then they are relieved of their obligation of

22  paying by preauthorized debit.

23    Q.   So is it your testimony that you will

24  not accept a sale for ten percent down or less

72

1  from a customer with any other form of payment

2  other than preauthorized check?

3    A.   We give them time to get those -- that

4  check in.  They are not issued a coupon book.

5  They are given time to get us that document to

6  put them on preauthorized checking.

7    Q.   I guess I'll ask the question again.

8  Is that the only way that somebody is able to pay

9  with a ten percent down payment or less --

10  preauthorized checking, sorry?

11    A.   There may be a time when they've done

12  it on a credit card.

13    Q.   I guess somebody could pay cash for a

14  unit; is that correct or not?

15    A.   We like for them to pay cash.

16    Q.   Doesn't happen often, does it?

17    A.   Not this day and age.

18    Q.   Let's say it was a cash sale.  When

19  would the salesperson get paid?

20    A.   We would go through the same procedure

21  -- wait for the check to clear the ten days, and

22  then on that pay cycle of the week ending Sunday,

23  submit it on Monday, paid Tuesday a week later.

24    Q.   So let me just understand.  Somebody

Wise v Patriot - R. Foster Campagna    5/23/05

---

73

1  gets full payment for a unit, and there's a
2  ten-day period for -- you assumed a check.  Have
3  you ever had a cash sale, somebody come in with
4  twenties?
5      A.   For the entire purchase?
6      Q.   Yes.
7      A.   No.
8      Q.   So it's most likely if they're going
9  to pay in full, they pay by check.  Have you had
10  that happen before?
11     A.   Yes.
12     Q.   So you wait ten days for the check to
13  clear, is that correct?
14     A.   That's correct.
15     Q.   And then if a sale was made, let's say
16  on Friday -- that's a relatively busy day, I
17  assume, is that correct?
18     A.   Friday could be a busy day, yes.
19     Q.   So a sale is made on a Friday, you
20  wait ten days, so that takes us into -- is that
21  Monday?
22     A.   Monday a week.
23     Q.   Right.  Not the following Monday, but
24  the next Monday?

---

74

1      A.   The next.
2      Q.   We'll say Friday was the 1st, and then
3  Monday would be the 10th.  And then what happens
4  on that Monday; does that automatically get sent
5  in that day on that Monday, or you have to wait
6  an additional week?
7      A.   No, that goes in on the week ending
8  Sunday's date.  So if Monday is the 10th --
9  Monday is the 10th, Sunday is the 16th.  That
10  would be week ending the 16th.  It's sent in for
11  payment on the 17th, and it would be paid.
12     Q.   Not the 18th, but...
13     A.   Not the 18th, but a week from the
14  18th, yes.
15     Q.   25th.  Was there at any time during
16  the course that Patriot Resorts has been selling
17  time-shares that a preauthorized check was not
18  required from a customer?
19     A.   My recollection is in the very
20  beginning, I would say the first few months they
21  did not require it, but they encouraged it and
22  tried to teach the salespeople how to get the
23  preauthorized checking -- authorization from the
24  customer.

---

75

1      Q.   Was that a Berkley policy that had
2  been in effect before 2001 when Patriot Resorts
3  was -- before Patriot Resorts came into
4  existence?
5      A.   It's a policy that is utilized at some
6  of the Berkley-owned development companies, yes.
7      Q.   Not all?
8      A.   I believe it's all, but I would not --
9  the development companies probably, yes.  I'm
10  thinking of one sales and marketing agreement
11  where it may not be.
12     Q.   Where is that?
13     A.   Wilderness Resort.
14     Q.   That's the campground?
15     A.   Yes.
16     Q.   Under Earned Commissions, that's on
17  Page 3, VI, "A commission is deemed earned upon
18  the closing of a sale," and then it talks about
19  his commission on financed sales and they'll "not
20  be deemed earned until the purchaser has made
21  three timely consecutive monthly payments"?
22     A.   Correct.
23     Q.   That's a policy at Patriot Resorts, is
24  that correct?

---

76

1      A.   That's correct.
2      Q.   And all the salespeople and sales
3  managers are required to abide by that, is that
4  correct?
5      A.   That's correct.
6      Q.   What about Berkley; is that a
7  Berkley-wide policy?
8          MS. FABBO:  Objection.  You can
9          answer.
10         THE WITNESS:  There is a policy
11         at most development companies where
12         there is a provision for chargeback of
13         commissions that are paid.  Whether it
14         is worded exactly this way or not
15         depends on the particular state and
16         the way that the particular attorney
17         drafted the contract.
18     Q.   (By Ms. Garrow)  What are chargebacks
19  -- commission charge-backs?
20     A.   If a sale is made and the customer
21  does not fulfill the minimum number of payments
22  required for -- according to the salesman's
23  contracts, then the company has the right to take
24  back that commission that was paid because the

---

77

1  sale was canceled.
2      Q.  Do the salespeople get taxed on the
3  commission that's paid to them through Patriot
4  Resorts?
5      A.  Yes, they do.
6      Q.  So -- and do they get the tax refunded
7  to them that they paid on those?
8      A.  That is calculated at the end of the
9  year, I believe.
10     Q.  Is that a yes or no?
11     A.  You're saying is it refunded.  We
12  don't refund them.  There are certain taxes that
13  are paid and there's no refund, but I do know
14  that that's something that's calculated at the
15  end of the year with regard to how much income
16  they received.
17     Q.  Well, at the time somebody would
18  receive a check, they have money deducted for
19  taxes based on the commission that they -- you
20  deem they earned during that period, is that
21  correct?
22     A.  Correct.
23     Q.  Then at the end of the year, you issue
24  a W-2 to all of the salespeople and sales

78

1  managers at Patriot Resorts, is that correct?
2      A.  That's correct.
3      Q.  So how do you reconcile money that has
4  already been deducted for tax purposes from the
5  individual salesperson's or sales manager's
6  paycheck for those commissions?
7      A.  I don't do commission -- the actual
8  computation, so I'm not sure -- that's an
9  accounting procedure, and I'm not exactly sure
10  how they do that.
11     Q.  Who would that be; who would I talk to
12  about that?
13     A.  I'm not sure who would -- it's a
14  procedure that's done.  Any salesperson's
15  paycheck would show how that's handled.
16     Q.  Any salesperson's paycheck at any
17  time, or under what circumstances -- I guess I
18  don't understand your answer.  Maybe you can
19  explain what you mean.
20     A.  If they had a chargeback in a
21  particular week and they had a payment of another
22  commission, that would show how that transaction
23  is handled.
24     Q.  Under the same provision, it says

79

1  "three timely consecutive monthly payments in
2  accordance with the terms of the purchase money
3  note and mortgage."  Am I reading that correctly?
4      A.  That's correct.
5      Q.  So let's assume -- assuming there is a
6  preauthorized check, but three months in a row
7  the check comes back insufficient funds -- or
8  actually, let me change that.  For the first six
9  months, no problem -- I'm sorry -- for the first
10  month, no problem; the second month, insufficient
11  funds; third month, no problem.  So in other
12  words, back and forth.  There's no three
13  consecutive timely payments for the first year.
14  What happens then?
15          MS. FABBO:  Objection.
16          MS. GARROW:  What's
17      objectionable?
18          MS. FABBO:  What happens then in
19      terms of what?
20          MS. GARROW:  I think I just asked
21      the question.  Do you understand the
22      question?
23          THE WITNESS:  I'm not sure.
24     Q.  (By Ms. Garrow)  If for the first year

80

1  of a contract, let's say the owner is
2  consistently late in their payments, yet they get
3  paid at some point, but they're consistently
4  late.  Does the salesperson's commission get
5  paid?
6      A.  If a customer has been habitually late
7  for twelve months, then the salesperson would not
8  be qualified to be paid under this contract, no.
9      Q.  And that's even if the money came in,
10  correct?
11     A.  That's correct.
12     Q.  Under what other circumstances -- is
13  that a circumstance where there would be a
14  commission chargeback?
15     A.  Yes.
16     Q.  But the commission never would have
17  actually been accredited?
18     A.  Well, it was not earned, so they would
19  have actually received it as an advance against
20  their commission earned, but it would be taken
21  back because it did not fall into the earned
22  category.
23     Q.  So you would expect that they would
24  have actually gotten paid commission at some

Wise v Patriot - R. Foster Campagna  5/23/05

81

1  point and then had it taken back?
2      A.  That's correct.
3      Q.  Is there a circumstance in what I just
4  described where they would never have been paid
5  commission on that transaction at all?
6      A.  If they did not receive the
7  preauthorized checking, they would not have been
8  paid.
9      Q.  Let's say they do receive a
10  preauthorized checking, and for the first twelve
11  months, no timely consecutive payments, although
12  Patriot Resorts gets paid each month, albeit
13  late.  Would that salesperson have ever had the
14  commission paid to them to begin with?
15      A.  As long as he had the preauthorized
16  check authorization and the payments were made by
17  preauthorized check, he would be subject to a
18  chargeback on that particular sale.  In your
19  example, you use twelve months that are
20  consistently late.  If we see a pattern like
21  that, there would probably be an exception made.
22      Q.  Have you made exceptions?
23      A.  I can't tell you specifically at
24  Patriot Resorts.

82

1      Q.  So that as you sit here today, you
2  don't know if any exceptions were made at Patriot
3  Resorts?
4      A.  I don't know for a fact, no.
5      Q.  When you say "exception," what are you
6  talking about; exception to what?
7      A.  To a provision for a chargeback.
8      Q.  I believe your testimony is if the
9  salesperson or sales manager failed to get a PAC
10  check, they never would get paid on that sale
11  until there were three consecutive timely
12  payments?
13      A.  That's correct.
14      Q.  Again, I do know I've asked this, but
15  I want to make sure the record is clear.  If they
16  do receive the preauthorized check -- and let's
17  take the twelve months out of the quotient.  If
18  the owner is consistently late and there were no
19  three consecutive timely payments, at some point
20  that salesperson would get charged back the
21  commission that was advanced to them, is that
22  correct?
23      A.  I believe that's correct.  May I
24  clarify something?

83

1      Q.  Certainly, certainly.
2      A.  If a sale is on preauthorized
3  checking, it would only be NSF, it would never be
4  late; but the only reason it would be late is
5  because it's non-sufficient funds.  We would not
6  have a customer go twelve months non-sufficient
7  funds.  The sale would be canceled because
8  effectively there's no money on the purchase.
9      Q.  My example is a little different,
10  though, because you're getting your money; you're
11  just getting it late.  It's presented
12  insufficient funds, and then it goes back and
13  you're getting your money.  So in that situation,
14  what would occur for the salesperson?
15      A.  In the case he had the preauthorized
16  debit, the preauthorized debit was going
17  non-sufficient funds, and then later the check
18  cleared.
19      Q.  And there's no three consecutive
20  timely payments?
21      A.  If a case like that were brought to my
22  attention for Patriot Resorts, the commission
23  would be paid; but I can't say that it's ever
24  happened at all at Patriot Resorts.

84

1      Q.  But what is the policy?  I'm not
2  asking what you would do.
3      A.  According to the policy, they are not
4  eligible for a commission; they would be charged
5  back their commission.
6      Q.  I was trying to get from you all the
7  different ways that the commission payments or
8  commission structures might have changed over the
9  life of Patriot Resorts.  Have you told me
10  everything about that, or have there been other
11  changes?
12      A.  None that I can recall.
13          (Exhibit 5, Commission Structure
14          Forms, marked for identification)
15      Q.  (By Ms. Garrow)  Showing you what's
16  marked as Plaintiff's 5 -- and it's actually two
17  pages put together, although they are two
18  separate documents, is that correct?
19      A.  Yes, these are two different
20  documents.
21      Q.  What is the first document, the one
22  marked 2028?
23      A.  It appears to be a form that's filled
24  out for experienced salespeople, giving them

Wise v Patriot - R. Foster Campagna  5/23/05

85

```
 1    their commission structure.
 2         Q.   Do you know when this was in effect,
 3    this commission structure?
 4         A.   No, I do not.
 5         Q.   Do you know if it's currently in
 6    effect?
 7         A.   I don't know, not for a fact.
 8         Q.   What about 2029, what's that?
 9         A.   That is a form for a nonexperienced
10    sales representative with the appropriate
11    commission structure.
12         Q.   Is that what you understand the
13    commission structure to be currently at Patriot
14    Resorts?
15         A.   I really don't know.  I did not review
16    that.
17         Q.   So you don't know if this is in effect
18    or not currently?
19         A.   No, I do not.
20         Q.   Or if at any point it was in effect at
21    Patriot Resorts?
22         A.   I'm not familiar with that paper.
23         Q.   Are there any other times when
24    charge-backs might occur other than what you've
```

86

```
 1    explained to me so far?
 2         A.   Any time a customer stops paying their
 3    payment at Patriot Resorts prior to the three
 4    payments being made for whatever reason, if they
 5    just stop making payments and say they don't want
 6    it anymore, they're cancelling their contract, it
 7    isn't what they thought it was, they don't want
 8    it, and Patriot Resorts agrees to cancel that
 9    purchase, then the salesperson would be charged
10    back.
11         Q.   Does that occur sometimes?
12         A.   It does occur sometimes, yes.
13         Q.   Anything else; any other times when
14    there might be a charge back?
15         A.   Not that I can think of.
16              (Exhibit 6, 5/24/03 Memo to
17               Polansky from Lippert,
18               marked for identification)
19         Q.   (By Ms. Garrow)  I'm going to mark
20    this, but I'm going to give this to you because
21    it's more legible, to just make sure that the
22    document that's Exhibit 2 from Faith Lippert's
23    deposition is the same one that I'm showing you
24    there.
```

87

```
 1         A.   Okay.
 2         Q.   Are you satisfied that those are the
 3    same document?
 4         A.   Yes.
 5         Q.   Although one is legible and one is
 6    not?
 7              MS. FABBO:  Excuse me, the top
 8              has some additional stuff on the one
 9              from Faith.
10              MS. GARROW:  Yes, that looks like
11              that came from the e-mail.
12              MS. FABBO:  Looks like it was
13              just cut off on this one.  But other
14              than those, I don't see anything.
15         Q.   (By Ms. Garrow)  Great.  So this is an
16    e-mail, is that correct?
17         A.   Yes.
18         Q.   It appears to be from Faith Lippert to
19    Bruce Polansky, is that correct?
20         A.   Yes.
21         Q.   It looks like you were cc'd on it?
22         A.   Yes.
23         Q.   Do you recall receiving this e-mail?
24         A.   I don't remember receiving it, but I
```

88

```
 1    probably did.
 2         Q.   It looks like there was -- it says
 3    here, "I understand that you would like me to ask
 4    Becky about paying commissions to Joel Hecht."
 5    Do you see that on the first line?
 6         A.   Okay, yes, I see it.
 7         Q.   And do you recall some issue about
 8    Mr. Hecht's commissions as you sit here today?
 9         A.   No, I'm sorry, I don't.
10         Q.   It looks like there was something
11    related to a timing on a PAC check.  Does that
12    refresh your memory?
13         A.   That seems to be what it's saying.
14         Q.   You don't have a recollection of that
15    as you sit here today?
16         A.   No, I'm sorry, I don't.
17         Q.   It says here under the highlighted
18    portion, "December 1st of last year was when the
19    line was told no PAC/no pay."  So that would have
20    been December 1, 2002.  Does that comport with
21    your memory?
22         A.   Of when the PAC...
23         Q.   The PAC checks were required?
24         A.   It could have been.  I don't really
```