89

```
 1    recall, but...
 2         Q.   Because you had said originally that
 3    you thought that the PAC check was not required
 4    in the first few months, is that correct?
 5         A.   It was not required for them to be
 6    subject to a "no pay" on it.  It was always a
 7    preference for the company to get preauthorized
 8    checking.  Statistics show that sales that have
 9    preauthorized checking are more likely to pay out
10    over the term of the loan; so therefore, we
11    encourage preauthorized checking.  Some
12    salespeople find it very easy to handle that in
13    their presentation; others have a struggle with
14    it.  So we gave them a time to get used to it
15    before we put the policy into effect where they
16    would not be paid commissions unless they got it.
17         Q.   Again, can you tell me, then, what the
18    change in policy was at that time?
19         A.   Prior to that, the salesperson was
20    receiving commissions on a deal that had no PAC.
21         Q.   And --
22         A.   The difference was in payment of
23    commissions.  It was not a difference in the
24    deal; it was a difference in payments of the
```

90

```
 1    commission on the deal.
 2         Q.   At what point did they get paid the
 3    commission on the deal prior to the no PAC/no pay
 4    rule?
 5         A.   They would have been paid in
 6    accordance with any other full down payment sale.
 7         Q.   At any time; in other words, was there
 8    the three timely consecutive payment requirement
 9    at that?
10         A.   The three timely consecutive payment
11    requirement is on every sale that a salesman
12    brings.
13         Q.   Starting from the day that Patriot
14    Resorts opened?
15         A.   Correct.  In accordance with their
16    contract.  In accordance with the contract that
17    they signed, the Employment Agreement that we
18    discussed earlier, it has a provision that no
19    commissions are earned until the sale has made
20    three timely monthly payments.
21         Q.   Although we don't know when that
22    particular contract -- the terms of that
23    particular contract came into effect, is that
24    correct?
```

91

```
 1         A.   This one had a modification, and I
 2    don't know that the commission part was what was
 3    modified or not, so I can't answer that.
 4         Q.   Okay.  And apparently this says here
 5    that there was a stamp made up stating "No PAC/no
 6    pay three monthly payments".  Were you aware of
 7    that?
 8         A.   I became aware of that, I believe, in
 9    a deposition that I attended.
10         Q.   Where was that deposition -- in this
11    matter, you mean?
12         A.   Yes.
13         Q.   And that was the first time you heard
14    of that?
15         A.   It was the first time I heard of the
16    stamp being used.
17         Q.   Did you know that the stamp was being
18    used at Massanutten?
19         A.   I believe I had heard about a stamp at
20    Massanutten.
21         Q.   And do you believe there is a stamp at
22    Massanutten?
23         A.   Yes, there is one at Massanutten.
24         Q.   Did you direct anyone to make that
```

92

```
 1    stamp?
 2         A.   No, I did not specifically.
 3         Q.   Do you know who did -- the one at
 4    Patriot Resorts?
 5         A.   I really don't know.
 6         Q.   Here it says Rod suggested that she
 7    have a stamp made -- "she" being Faith.  Does
 8    that jog your memory at all?
 9         A.   I still would not have known.  Other
10    than what's written on here, if that's what she
11    said, then it must be what happened.
12         Q.   What do you think of that stamp as a
13    policy?
14         A.   I don't really have a feeling about it
15    one way or the other.  I think it's an
16    administrative thing that's done so the
17    salespeople understand to take that particular
18    worksheet and set it aside and keep monitoring to
19    see whether you're going to get paid on it, or
20    call the customer and get the check or do
21    something to get it taken care of.  I think they
22    did it as a reminder.  From a sales standpoint,
23    it could be construed as being negative.
24         Q.   Do you think it was negative?
```

Wise v Patriot - R. Foster Campagna  5/23/05

93

```
 1        A.    Stamping things are a little -- it
 2   seems harsh to me, but I also understand from an
 3   administrative standpoint, it's probably a good
 4   thing, so...
 5        Q.    It said "no PAC/no pay" -- in other
 6   words, you did all of this work, you're not
 7   getting paid.  Is that something you would
 8   construe as being negative?
 9             MS. FABBO:  Objection.
10             MS. GARROW:  You can answer that.
11             THE WITNESS:  It's just my
12             personal opinion.
13        Q.    (By Ms. Garrow)  Did you ask any of
14   the salespeople or sales managers at Vacation
15   Village in the Berkshires what their opinion was
16   of it?
17        A.    No.
18        Q.    Never did?
19        A.    I wasn't even aware of it until, as I
20   told you, the deposition where I heard about it.
21        Q.    Did you ask them to stop using the
22   stamp since then?
23        A.    No, I have not asked anyone.  I would
24   not get involved in sales.
```

94

```
 1        Q.    Did you ask Bruce Polansky to stop
 2   them?
 3        A.    No, I did not.
 4        Q.    The next paragraph here, it says,
 5   "When Becky was here in April" -- I guess April
 6   2003 -- "and put a stop to me requesting
 7   commission be paid because we had received the
 8   PAC, I noticed that one of the very next
 9   commissions to be held was going to be for Joel."
10   Do you know what Faith meant by that?
11        A.    I'm really not sure.
12        Q.    When you read this, how did you
13   construe it?
14        A.    I'm really not sure what she means by
15   that.
16        Q.    At some point, did you direct Faith or
17   somebody else at Patriot Resorts to stop paying
18   people their commissions?
19        A.    Yes, that was the policy of the
20   company.
21        Q.    When did you do that -- the first
22   time, was that in April?
23        A.    I don't really recall what it is that
24   she's talking about, so I really can't speak to
```

95

```
 1   the issue, because I really am not familiar with
 2   it.
 3        Q.    You testified you do remember at some
 4   point directing people at Patriot Resorts not to
 5   pay commissions anymore?
 6        A.    Correct, but I don't know if this was
 7   the time frame or that was the circumstance.  I
 8   don't personally recall that.  I don't recall it
 9   happening in April when I was there.  That I
10   don't know.
11             (Exhibit 7, Corbin Commission
12             Report, marked for
13             identification)
14        Q.    (By Ms. Garrow)  I'm showing you
15   what's marked as Exhibit 7.  It's actually
16   several pages.  The first one is a separate page
17   from the other two.  Can you tell me what these
18   documents are?
19        A.    The top one is a commission report.
20   Appears to be for a period ending December 1,
21   '03.  Peter Corbin, and he earned a $50
22   commission.
23        Q.    That was during that week for the
24   period ending 12/1/03, is that correct?
```

96

```
 1        A.    Correct.
 2        Q.    I believe you did testify before that
 3   they get their checks weekly.  Is that what this
 4   is?
 5        A.    That's correct.
 6        Q.    How would you get a $50 commission at
 7   Patriot Resorts; what would you have to sell?
 8        A.    If someone sold -- if this customer
 9   named Bayer was Peter Corbin's customer and he
10   took them through the presentation and they
11   didn't purchase anything, and the exit line --
12   who is the last people that talk to the customer
13   -- did get a sale, I believe that Peter would be
14   eligible for a $50 commission.  Or I don't know
15   if Peter was ever a manager, because 1.25 percent
16   could be an override commission; but I don't have
17   enough information here to tell me.
18        Q.    What's an override commission?
19        A.    If he is a manager and he supervises
20   other salespeople, he would be eligible for a
21   percentage of a commission on their sales.
22        Q.    Then this looks like a stamp on here,
23   says "Gross pay, $50".  What is this, this stamp?
24        A.    Well, that came from the Commission
```

Wise v Patriot - R. Foster Campagna    5/23/05

**97**

1  Department. After this report is run and the
2  taxes are calculated, then the stamp is applied
3  to the report and it shows the breakdown of taxes
4  that were deducted from the $50 and what the
5  check number is that paid those commissions.
6      Q.   Would that be the only check that
7  would have been issued to Mr. Corbin that week?
8      A.   I don't know that because I don't know
9  if there's other -- I don't know if he would have
10  gotten any other type of commission. If this
11  were on an exit sale, then he may have only
12  received this report for the exit sale. He may
13  have another one for his own commissions on his
14  own sales or on other overrides that he received,
15  so I don't know that this is complete.
16      Q.   Now, this stamp here reflects a check
17  number?
18      A.   Correct.
19      Q.   Are there occasions when salespeople
20  at Patriot Resorts or sales managers at Patriot
21  Resorts get multiple checks per week; do you know
22  that to have ever happened?
23      A.   I don't know that it does not happen.
24  I don't know exactly.

**98**

1      Q.   Can you tell me on this next --
2  actually, let's start with this sheet, the first
3  page here. What is that number under "Purchase,"
4  "308A-20" -- what does that reflect?
5      A.   That is the unit and the week that the
6  purchaser purchased.
7      Q.   308A is the unit?
8      A.   Unit number, and 20 is the week
9  number.
10      Q.   Does that correspond -- what's the
11  first week of the year?
12      A.   At Patriot Resorts, it starts --
13  depending on what building they buy in, it's
14  either triggered by the first Saturday denotes
15  the first week of the year, or first Friday.
16  Depends whether it's a Friday to Friday or
17  Saturday to Saturday or Sunday to Sunday.
18  Whichever one the occupancy weekday is will
19  determine the beginning week number for the year,
20  depending on whether the first Friday actually
21  falls in the first or second week of the year.
22      Q.   How would I know which unit is
23  associated with which week; in other words, you
24  said by building?

**99**

1      A.   Buildings determine occupancy, and
2  that would be disclosed in the public offering
3  statement.
4      Q.   "Name" is self-explanatory here. What
5  is the next column?
6      A.   That's a "Contract Number".
7      Q.   An actual number on the purchase and
8  sale, or...
9      A.   Yes.
10      Q.   "Net Price" and Net D Price". What
11  difference, if any, between those two?
12      A.   If a purchaser purchases and they
13  already own time-sharing, they receive a
14  discount, in which case that discount is taken
15  off the net price to give you a net D price.
16      Q.   "PT," next column?
17      A.   I'm not sure I know what that is.
18      Q.   Date of contract, is that the date it
19  was?
20      A.   The contract was written.
21      Q.   Was actually written?
22      A.   Correct.
23      Q.   Current status, what is that?
24      A.   That means that on November 26, '03,

**100**

1  the total commission -- the commission has been
2  received, and that was the date that it was
3  closed in order to be in line for payment to the
4  salesperson.
5      Q.   So that's the closing date?
6      A.   The "C" in front of the 11/26/03
7  denotes closed.
8      Q.   I see. Can there be other letters
9  there?
10      A.   Yes.
11      Q.   Such as?
12      A.   "P" for "pending". "H" for "hold".
13      Q.   What does "hold" mean?
14      A.   Pending.
15      Q.   Hold means pending?
16      A.   Hold means pending, "P" means pending.
17  It depends on circumstances, depends on what
18  makes it pending. "S" would be sale that has not
19  closed, and "X" means canceled.
20      Q.   How often do these reports get
21  generated?
22      A.   Once a week.
23      Q.   Who gets them?
24      A.   These are -- actually, they're pulled

Wise v Patriot - R. Foster Campagna  5/23/05

101

1   electronically in the corporate office of Berkley
2   in Fort Lauderdale.
3        Q.   Would the salesperson get this weekly?
4        A.   It would come with his paycheck, yes.
5        Q.   Just so we finish up these columns
6   here, "Commission Pending," what does that mean?
7        A.   Where is that?
8        Q.   The next one after "Earned Date" --
9   I'm sorry, after "Commission Earned"?
10       A.   I don't believe that we use commission
11  pending -- commission chargeback and commission
12  chargeback date we would use, but I don't believe
13  we use those columns unless they're using it for
14  something I'm not aware of.
15       Q.   "Commission Charge-back" is what?
16       A.   If later on the sale were to cancel
17  before it made the three payments, then that
18  commission would be subject to chargeback.
19       Q.   And chargeback date, I assume is
20  self-explanatory?
21       A.   Correct, the date it was actually...
22       Q.   Taken back?
23       A.   Correct.
24       Q.   Just so I have a full understanding of

102

1   the next page, Salesmen Ledger Report -- I assume
2   those two are the same from both reports, is that
3   correct -- "Date Contract" and "Current Status"?
4        A.   Yes.
5        Q.   And "Name" is the same as "Purchaser,"
6   is that correct?
7        A.   Correct.
8        Q.   "Contract Number" would be the same?
9        A.   Yes.
10       Q.   What is "Status"?
11       A.   There are different letters that they
12  put in to denote different types of sales.  The
13  "U" means "upgrade".
14       Q.   And "P"?
15       A.   "P" would mean that there is no PAC
16  check on that.
17       Q.   And "PU"?
18       A.   It means there's no PAC check and it's
19  an upgrade.
20       Q.   So just the combination.
21       A.   I'm not sure, but I think it means
22  "incomplete".
23       Q.   But you're not sure?
24       A.   I'm not sure.

103

1        Q.   "Unit a Week" is self-explanatory.
2   "Occupancy Year," is that the first year of
3   occupancy?
4        A.   Yes, that's the first year that the
5   customer will use the time-share.
6        Q.   The "Net Deal Price," is that correct?
7        A.   Correct.
8        Q.   "Down Payment," that was given on the
9   day of, or would it be over time, or could it be
10  both?
11       A.   These are -- the total down payment
12  that was received at the time of the sale.
13       Q.   Then the "Amount Due" and the "Due
14  Date," I assume are self-explanatory?
15       A.   Yes.
16       Q.   "Customer Number"?
17       A.   "Customer Number" is the number that's
18  assigned to the customer when they check in at
19  the reception desk.
20       Q.   "Sales Manager," that would be --
21  would that be the closer -- I'm sorry, would that
22  be the TO person?
23       A.   Yes.
24       Q.   And then the "Closer," what is that?

104

1        A.   That would be the person that goes
2   over the documentation with the customer, goes
3   over all the legal documents.
4        Q.   What is "Program"?
5        A.   The type of program, the marketing
6   program that brought them to the property.
7        Q.   And "Sub-Program"?
8        A.   It's just a further distinction under
9   the main program; it just helps with determining
10  where the customer came from.
11       Q.   What is a sales ratio?
12       A.   A sales ratio?
13       Q.   Yes.
14       A.   I'm not familiar well that as a term.
15       Q.   Is there an hourly wage paid to any
16  salespeople or sales managers at any resort with
17  an affiliation to the Berkley Group?
18       A.   Can you say that one more time?
19       Q.   Do any resorts or development
20  companies with any sort of affiliation with
21  Berkley pay an hourly wage to their salespeople
22  or sales managers?
23       A.   No, unless they are unlicensed in the
24  State of Florida and they are in training, and

```
                                    105
1    they are paid a salary during that training time.
2         Q.   Is that only as to the Florida
3    locations; is that your testimony?
4         A.   That would be in Florida.
5         Q.   Do you know the requirements of
6    employers relating to the payment of overtime
7    compensation under the federal -- Fair Labor
8    Standards Act?
9         A.   I don't believe that I could quote it,
10   but I understand that employees who work over
11   forty hours in a week are eligible for overtime.
12        Q.   Do you understand anything else in
13   relation to payment of overtime under the Fair
14   Labor Standards Act?
15             MS. FABBO:  Objection.  You can
16             answer.
17             THE WITNESS:  Anything that I
18             would know with regard to that would
19             be dictated by our attorneys who tell
20             me what we have to pay and who we have
21             to pay it to.
22        Q.   (By Ms. Garrow)  So you have no
23   personal knowledge other than what you've
24   testified to?
```

```
                                    106
1         A.   Only what I know from the attorneys,
2    what they instruct us to do as far as pay is
3    concerned.
4         Q.   What about the requirements of
5    employers to pay overtime compensation under the
6    Massachusetts Wage and Hour Laws; do you have any
7    knowledge in that regard?
8         A.   Only the knowledge I've obtained from
9    legal counsel.
10        Q.   And you just follow the advice of
11   counsel in that regard?
12        A.   That's correct.
13        Q.   What about the minimum wage
14   requirements under the Fair Labor Standards Act;
15   do you have any knowledge regarding the
16   requirements to pay minimum wage under the
17   Federal Fair Labor Standards Act?
18        A.   That would all be per our attorney's
19   instruction.
20        Q.   So just follow the advice of counsel?
21        A.   That's correct.
22        Q.   What about the requirements under
23   Massachusetts law to pay minimum wage under
24   Massachusetts law; any personal knowledge with
```

```
                                    107
1    regard to payments of minimum wage in that
2    regard?
3         A.   Only as instructed by the attorneys.
4         Q.   What about timely payments of wages
5    under Massachusetts law; any personal knowledge
6    of the laws in that regard?
7         A.   Only as instructed by counsel.
8              (Exhibit 8, Massaconi Paycheck
9              Stub, marked for identification)
10        Q.   (By Ms. Garrow)  Showing you what's
11   marked as Plaintiff's 8.  Do you recognize those
12   documents?
13        A.   It appears to be a paycheck stub from
14   Patriot Resorts for Michael Massaconi.
15        Q.   Actually two, is that correct?
16        A.   Yes, two separate ones.
17        Q.   Have you seen paycheck stubs from
18   Patriot Resorts previously?
19        A.   Yes.
20        Q.   Does this look like the ones you've
21   seen in the past?
22        A.   Yes.
23        Q.   Can you just explain to me on that
24   first one -- because they are substantially the
```

```
                                    108
1    same, is that correct, in terms of their
2    deductions and notations?
3         A.   I see deductions made, yes.
4         Q.   If we look at the one on top, the net
5    pay is how much?
6         A.   The net pay is $39.17.
7         Q.   And what's the pay period indicated on
8    that check?
9         A.   The period ending is 10/14/02.
10        Q.   Again, your understanding is that that
11   would have been a weekly paycheck?
12        A.   It very well could be, or it could be
13   in conjunction with another check; I don't know.
14        Q.   According to this document, how many
15   hours did Mr. Massaconi work?
16        A.   Forty.
17        Q.   He received a commission that week,
18   according to this?
19        A.   That's correct.
20        Q.   How much was that?
21        A.   $45.
22        Q.   And other than that, it does not
23   appear that there's any additional payment on
24   this check, is that correct?
```

## Wise v Patriot - R. Foster Campagna  5/23/05

109

1    A.   No, not on this check, no.
2    Q.   If you can look at the other check, is
3  that for the same week or a different week?
4    A.   That is for period ending December 2,
5  '02.
6    Q.   So that would have been a different
7  week than the one on top?
8    A.   Correct.
9    Q.   Was there a commission paid that week?
10   A.   Yes.
11   Q.   How much was that?
12   A.   $50.
13   Q.   And the hours that are indicated that
14 he worked on that check?
15   A.   Well, let me clarify.  The hours does
16 not mean hours worked.  It's a figure that's
17 plugged into the machine in order to print a
18 check.  It can't be left blank.
19   Q.   So how do they keep hours worked at
20 Patriot Resorts; how do they keep track of those?
21   A.   They only record when they go out on a
22 tour and when they come back from tour.  Those
23 are the times that they're working.
24   Q.   Those are the times that are recorded,

110

1  correct?
2    A.   Correct.
3    Q.   What about signing in; do they have to
4  sign in in the morning?
5    A.   They sign in when they report to work
6  before their meeting, yes.
7    Q.   Is that sales managers and salesmen as
8  well -- salespeople?
9    A.   That's everyone, yes.
10   Q.   Do they sign out?
11   A.   They do not sign out.  They complete
12 their final tour, and that's the end of their
13 day.
14   Q.   Then is it your testimony they're
15 allowed to leave if it's their final tour, at the
16 end of their final tour?
17   A.   If there are no other tours expected
18 for that day, yes.
19   Q.   How would they know that?
20   A.   They know how many people are expected
21 generally on a day, whether it's going to be
22 thirty people or twenty people or ten.
23   Q.   There are occasions when a salesperson
24 takes a tour or a sales manager takes a tour and

111

1  comes back and then is required to wait for
2  another tour?
3    A.   If he is in line such that he would
4  be -- have the ability to take another tour, yes.
5  If there are three more people coming in and he's
6  the next person to get a tour, he would be
7  required to stay.
8    Q.   Do you know -- is that the policy that
9  you're testifying to?
10   A.   Yes.
11   Q.   Do you know when, in fact, salespeople
12 or sales managers are allowed to leave on a
13 normal -- a regular basis at Patriot Resorts?
14   A.   Are you asking a sales representative
15 or a sales manager?
16   Q.   Let's start with a sales
17 representative.  Do you have personal knowledge
18 of when a sales representative is allowed to
19 leave at the completion of a day?
20   A.   When there are no more customers that
21 are expected that he would be in line to take on
22 a tour.
23   Q.   Again, is that the policy or is that
24 personal knowledge you know that happens for a

112

1  fact?
2    A.   I know that that's the policy.
3    Q.   You've never been there and observed
4  that, or have you?
5    A.   I have certainly been there, but I
6  wasn't -- and I saw people leaving.  To know
7  whether they stayed for ten minutes after or they
8  left immediately after, I couldn't tell you that.
9  I never asked that question.
10   Q.   Or if somebody had been around for
11 several hours waiting for another tour that never
12 materialized, would you know if that happened?
13   A.   I don't recall seeing that.
14   Q.   Would you know if that happened?
15   A.   If I was there, I would know of it,
16 but I don't recall seeing that happen.
17   Q.   But you've only been there five or ten
18 times?
19   A.   Correct.
20            MS. GARROW:  Off the record.
21            (A lunch break was taken)
22            (Exhibit 9, 5/6/03 Memo to Sales
23            Personnel from Foster Re: ESOP,
24            marked for identification)

Wise v Patriot - R. Foster Campagna  5/23/05

113

1      Q.    (By Ms. Garrow)  I'm showing you
2    what's been marked as Exhibit Number 9.  Do you
3    recognize this document?
4      A.    Yes.
5      Q.    Can you describe this document?
6      A.    Something like that a memo that
7    addresses the attendance roster.  And we had had
8    some problems with people failing to sign in or
9    signing in for each other at various properties;
10   and since it was something that seemed to not be
11   clear, I put the memo out to all the properties
12   to let them know that they were to sign the
13   attendance roster; they were to sign only for
14   themselves and not for anyone else.
15     Q.    And the attendance roster, that's the
16   daily rotation sheet; is that what that is?
17     A.    Some resorts print out the rotation,
18   and they sign next to their name.  Others just
19   have a sheet that is like a blank sheet with
20   columns.  I'm not sure what Patriot Resorts uses.
21     Q.    What is your understanding of how it
22   relates to your ESOP program -- and when we say
23   "ESOP," do you know what that stands for?
24     A.    It stands for Employee Stock Ownership

114

1    Plan.
2      Q.    How does this relate to your ESOP
3    program, the signing of attendance sheets?
4      A.    The guidelines in the ESOP require
5    that in order for an employee to be eligible for
6    participation in the plan in any calendar year,
7    they must work a thousand hours in order to
8    qualify.  In the case of a salesperson, they are
9    given credit for 45 hours for any portion of a
10   week that is worked as it attributes to their
11   ESOP.  So we must have them sign the roster so we
12   know when they were there, and that's why I was
13   stressing the importance of it to the ESOP,
14   because, of course, that is their retirement
15   plan.
16     Q.    When do they invest in that ESOP, if
17   at all?
18     A.    They start investing 20 percent in
19   year three, 40 percent in year four, 60 percent
20   in year five, 80 percent in year six, and 100
21   percent in year seven.
22     Q.    That's true for sales -- people on the
23   sales line as well as sales manager?
24     A.    That's correct.

115

1      Q.    What about for any corporate
2    employees; is that the same, corporate employees
3    of the Berkley Group, since that is from where
4    this memo comes?
5      A.    Corporate employees, yes, everyone who
6    is an employee of the Berkley Group or any of its
7    wholly owned subsidiaries as part of the ESOP
8    plan.
9      Q.    And is there one ESOP plan?
10     A.    Yes.
11     Q.    Who administers the plan, to your
12   knowledge?
13     A.    It's administered by a company out of
14   Virginia.  I believe it's called Blueridge.  I
15   believe Blueridge is in the name; I'm not sure
16   exactly.
17     Q.    But it's a third-party administrator?
18     A.    Yes, it's a third-party administrator.
19     Q.    Do you have anybody outside that does
20   administration of the plan?
21     A.    The commission manager and the payroll
22   manager both submit reports from our payroll
23   service to the outside administrator, and they do
24   everything else.

116

1      Q.    You testified before that for any
2    portion of a week a sales salesperson works
3    there, they get credited for 45 hours?
4      A.    That's correct, as far as ESOP is
5    concerned.
6      Q.    Isn't it true if they had only signed
7    in one day of the week, then they'll still meet
8    the ESOP requirements as you stated them?
9      A.    Yes, that's true.
10     Q.    Is it your understanding that people
11   were signing other people's names to rosters?
12     A.    Yes.
13     Q.    Did that occur at Patriot Resorts, to
14   your knowledge?
15     A.    I believe I was told that they did.
16   I'm trying to think of the specific person.  I
17   don't have a recollection that clearly to say the
18   name.
19     Q.    That's okay.  Other than commissions,
20   are there any additional sums paid to any
21   salespeople or sales managers?
22     A.    There is usually a bonus -- monthly
23   bonus plan.
24     Q.    How do you qualify for a monthly bonus

Wise v Patriot - R. Foster Campagna  5/23/05

117

1  plan?

2      A.   It changes from time to time, and I am

3  not sure what is in effect at Patriot Resorts.

4      Q.   Do you have any information as to

5  what's been in effect at Patriot Resorts at any

6  time as you sit here today?

7      A.   I would be reluctant to say exactly

8  what plan they have utilized.

9      Q.   Do you have any role in overseeing the

10 payment of commissions?

11     A.   Yes.

12     Q.   What is your role?

13     A.   My signature is on every commission

14 check for Patriot Resorts, and I oversee the

15 manager of the Commissions Department, whose

16 department prepares those commissions.

17     Q.   Is the manager of the Commission

18 Department -- I'm sure you've told me their name,

19 but if you could tell me again, that would be

20 great.

21     A.   The manager in the corporate office,

22 her name is Lauren, L-A-U-R-E-N, Powell,

23 P-O-W-E-L-L.

24     Q.   And she's a Berkley Group employee?

118

1      A.   Yes.

2      Q.   Is she a direct report of yours?

3      A.   Yes, she is.

4      Q.   Who are your other direct reports?

5      A.   Vicky Dockery.

6      Q.   What is her position?

7      A.   She's the director of Human Resources.

8  Bill Burkert, B-U-R-K-E-R-T; he's in charge of

9  the Escrow Department.  Sue Patton, P-A-T-T-O-N;

10 she's in charge of the Mortgage Receivables

11 Department.  Jackie Williams is in charge of

12 Verification Department.  Carla Simon is in

13 charge of the Refinance Department.  Roger Gopall

14 is in charge of the IT Department.  I believe

15 that's everyone.

16     Q.   Does Bruce Polansky report to you?

17     A.   Ultimately, yes.

18     Q.   Are you not his direct supervisor?

19     A.   I prefer to say that we work together.

20     Q.   But when you say "ultimately," because

21 he's a vice president and you're the president,

22 ultimately you have the final say; is that fair

23 to say?

24     A.   Correct.

119

1      Q.   Vicky Dockery -- does Faith Lippert

2  report to her, or does she report to you?

3      A.   Faith reports to me.

4      Q.   Is that your general practice when you

5  have on-site Human Resources people, to have them

6  report directly to you?

7      A.   Faith Lippert is the office manager/

8  corporate representative for Patriot Resorts.

9  Therefore, she is a direct report to me.  If she

10 has a question with regard to a human resource

11 issue that she's not familiar with, she may

12 contact Vicky Dockery to find out who she should

13 consult.

14     Q.   Would you expect Miss Lippert, if she

15 had an issue or a problem that she could not

16 resolve herself at Patriot Resorts, to consult

17 about that with you?

18     A.   Generally she would, yes.  I left out

19 two direct reports.

20     Q.   Okay.

21     A.   Karen Johnson.

22     Q.   What is Miss Johnson's position?

23     A.   She's in charge of the Accounts

24 Payable Department.  And Joanie Harold,

120

1  H-A-R-O-L-D, payroll supervisor.

2      Q.   What is Bill Rauer's position?

3      A.   Bill Rauer is the project director at

4  Vacation Village at Weston and Vacation Village

5  in the Berkshires.

6      Q.   What about Rod Lewis; what is his

7  position?

8      A.   He's probably the -- they probably

9  refer to him as the general manager or the

10 on-site project manager.

11     Q.   At some point, was Rod Lewis's title

12 officially project director of Vacation Village

13 in the Berkshires?

14     A.   He may be referred to as project

15 director because he's there physically on-site.

16     Q.   Has his position changed at all during

17 his tenure at Vacation Village in the Berkshires?

18     A.   No.

19     Q.   Has he ever been reprimanded for any

20 management decisions that he's made at Vacation

21 Village, to your knowledge?

22     A.   Rod Lewis?

23     Q.   Yes.

24     A.   I'm not aware.  He may have, but I

Wise v Patriot - R. Foster Campagna  5/23/05

121

1    would not have reprimanded him.

2        Q.    Is Mr. Rauer his boss?

3        A.    Yes.

4        Q.    Who is Mr. Rauer's boss?

5        A.    Bruce Polansky.

6        Q.    Who was responsible for any job

7    description relating to sales managers; who would

8    have authored that for Patriot Resorts?

9        A.    It would either be Bill Rauer or Bruce

10   Polansky.  I'm not sure which would have done

11   that.

12       Q.    Did you have any input in job

13   descriptions for sales managers?

14       A.    No.

15       Q.    Did you have any input into job

16   descriptions for sales -- people on the sales

17   line, salespeople?

18       A.    No.

19       Q.    Did you have any input into the

20   organization of the tours at Patriot Resorts

21   Village?

22       A.    I'm not sure what you mean by that.

23       Q.    Let me ask it this way.  Did you have

24   any input into designing the tours from Patriot

122

1    Resorts Village?

2        A.    I don't design them myself, but I know

3    what they are and what the philosophy is of

4    putting those customers in and how we get them.

5    So, I mean, I don't physically do that job, but I

6    know what will be done and how they'll be

7    marketed into the resort.

8        Q.    How does that occur?

9        A.    They are -- the customers, very much

10   the same way as Williamsburg.  They may drop a

11   name in a box or they may be contacted through a

12   phone room from a list of people who live in the

13   area, the target area.

14       Q.    That's through the marketing

15   companies, correct?

16       A.    Correct.  And Patriot Resorts

17   contracts with those marketing companies to do

18   that for them.

19       Q.    Then do you have any knowledge of the

20   physical -- sort of the physical tour that

21   happens once they get there?

22       A.    I have some knowledge of it, yes.

23       Q.    Have you ever observed a tour going

24   on?

123

1        A.    I've not been in the car, no, but I

2    know what they generally do.

3        Q.    What do they generally do?

4        A.    They pick the customer up at the

5    reception center, they take them --

6        Q.    I am going to interrupt you.  "They"

7    being the salesperson?

8        A.    The sales representative.  Drives them

9    in his car to an area called Mount Greylock.

10   They spend some time there talking about

11   vacationing and get them involved in

12   understanding what the concept of time-sharing

13   is.  They drive them around the area.  I don't

14   know the exact route, but show them things of

15   interest in the area, and they bring them back to

16   the sales office, talk to them there briefly

17   about other benefits of the time-share plan.

18       Then they leave the property again and

19   go to the actual location of the resort, and

20   again they look at points of interest along the

21   way to the resort.  When they get to the resort,

22   they tour the model apartment and the clubhouse

23   area, and then they leave the property and come

24   back to the sales office.  And if there is a

124

1    sale, they transact the sale at the sales office.

2        Q.    And the sales office and reception

3    office are at the Lanesborough location, is that

4    correct?

5        A.    There are two different addresses.

6    They're on two different pieces of property.

7        Q.    But they are connected essentially, is

8    that fair to say?

9        A.    I believe you can get to one -- I

10   think you have to go by car to get from one to

11   the other, because I think there's water, there's

12   like a stream or some type of water in between

13   those two areas.

14       Q.    The Sales Center and the Reception

15   center?

16       A.    Correct.

17       Q.    Then there is the resorts that are in

18   Hancock, is that correct?

19       A.    Yes, they're located in Hancock.

20       Q.    But to your knowledge, the salespeople

21   meet folks for potential tours or tours at the

22   Reception Center in Lanesborough and also come

23   back to close the deal in Lanesborough, is that

24   correct?

Wise v Patriot - R. Foster Campagna  5/23/05

125

```
 1        A.    Correct.
 2              (Exhibit 10, Patriot Attendance
 3              Detail Report, marked for
 4              identification)
 5        Q.    (By Ms. Garrow)  Are you familiar with
 6   this document?
 7        A.    It's an attendance -- it appears to be
 8   an attendance record.
 9        Q.    That's Plaintiff's Exhibit 10 you're
10   looking at now?
11        A.    Yes.
12        Q.    Have you seen an attendance record
13   before for any employees?
14        A.    Yes, I have seen them before.
15        Q.    Does this look generally like the ones
16   you've seen in the past?
17        A.    It looks like a report we used to use,
18   yes.
19        Q.    You don't use this report anymore?
20        A.    No, the report has been changed.  We
21   got a different program.
22        Q.    But do you still keep the same data?
23        A.    Yes.
24        Q.    What is this data?
```

126

```
 1        A.    It's attendance.  It's any time that
 2   someone is on vacation or if they're out sick or
 3   if they're on any type of FMLA leave or any
 4   reason they're not there.
 5        Q.    Have you, in the past, input into the
 6   attendance policy?
 7        A.    Yes, I'm aware of what our policy is.
 8        Q.    What is your policy?
 9        A.    That salespeople are allowed to have
10   fifteen days of time off during the calendar
11   year.
12              (Exhibit 11, 11/3/02 Memo to
13              Sales Staff Re: Attendance
14              marked for identification)
15        Q.    (By Ms. Garrow)  If you look at
16   Exhibit 11, is that your policy -- let me ask you
17   this.  Was this the policy that you just spoke of
18   that was in effect on or around November 3, 2002?
19        A.    I'm sorry, what was the question?
20        Q.    Was that the policy that was in
21   effect, Plaintiff's Exhibit 11, on or around
22   November 3, 2002?
23        A.    Correct.
24        Q.    Has it changed at all?
```

127

```
 1        A.    Not that I'm aware of, no.
 2        Q.    Is that the policy as it exists today
 3   as well?
 4        A.    Yes.
 5              (Exhibit 12, Patriot
 6              Attendance Report,
 7              marked for identification)
 8              (Exhibit 13, Patriot
 9              Attendance Report,
10              marked for identification)
11        Q.    (By Ms. Garrow)  Showing you what's
12   Exhibit Number 12, if you look at Exhibit Number
13   12 and Exhibit Number 10, would you expect that
14   -- are those employees in compliance with the
15   policy based on these documents or in violation
16   of the policy?
17        A.    It would appear that they may not be,
18   but because of the reference to sick, I don't
19   know if they were afforded FMLA leave for that.
20        Q.    Assuming that they hadn't been on FMLA
21   leave, would they be in violation of the policy?
22        A.    Yes.
23        Q.    Has anyone ever talked to you about
24   either of these individuals being in violation of
```

128

```
 1   the policy?
 2        A.    I do not recognize Jane Engel-Hart's
 3   name at all.  I don't know who that is.  Will
 4   Steele's name is familiar to me, and I've had
 5   conversations about him, but not necessarily
 6   attendance, or attendance may have been one of
 7   them; but there have been conversations about
 8   him, so I recognize the name.
 9        Q.    I guess my question is a little more
10   directed.  Do you have a recollection whether
11   anybody brought his attendance to your attention?
12        A.    I don't recall attendance being an
13   issue.
14        Q.    We were talking before about jury duty
15   and jury duty in Massachusetts; and if you
16   notice, I've given you another attendance detail
17   report, is that correct?
18        A.    Correct.
19        Q.    If you go down about a third of the
20   way through the absence reason, it notes jury
21   duty?
22        A.    Yes.
23        Q.    It says that's unpaid.  Do you have
24   any recollection about the issue of jury duty
```

Wise v Patriot - R. Foster Campagna    5/23/05

---

129

1  with relation to Mr. Lee?

2      A.   I don't know his name; I'm not

3  familiar with him.  I don't know if he was the

4  one that was questioned before; I don't know.

5      Q.   What does "unpaid" mean in this

6  context?

7      A.   I really don't know.

8      Q.   Did Miss Lippert ever call you about

9  Mr. Lee, to your knowledge?

10             MS. GARROW:  Off the record.

11             (Off record conference)

12             MS. GARROW:  Back on the record.

13             THE WITNESS:  I forgot it.

14      Q.   (By Ms. Garrow)  Did Miss Lippert ever

15  call you in relation to Mr. Lee?

16      A.   No.

17             MS. GARROW:  Off the record.

18             (A break was taken)

19             MS. GARROW:  Back on the record.

20             (Exhibit 14, Letter to ALDA from

21             ESA, marked for identification)

22      Q.   (By Ms. Garrow)  Showing you what's

23  marked as Exhibit 14, I believe we discussed this

24  earlier.  Do you recognize this document --

---

130

1  actually, let me stop you.  You had said earlier

2  that you relied on an opinion letter that you had

3  received in relation to Virginia, is that

4  correct?

5      A.   Yes, I believe that the Virginia --

6  our Virginia counsel are the ones that relied on

7  this letter.  I'm not sure that I -- I may have

8  seen this letter, but I don't remember it.  This

9  was a long time ago.

10      Q.   Let me ask you this:  You had

11  testified before that there was no hourly wage

12  for the salespeople at Vacation Village, is that

13  true?

14      A.   That's correct.

15      Q.   And they were only paid by commission?

16      A.   That's correct.

17      Q.   And same with the sales managers?

18      A.   That's correct.

19      Q.   And you had mentioned that you were

20  aware that there was an opinion letter in

21  relation to that issue for Virginia, is that

22  correct?

23      A.   I think it was more than just

24  Virginia.

---

131

1      Q.   Would you review this document, and

2  I'm going to tell you that your lawyer who sent

3  this over apologized for the blurriness of it, so

4  I think this is the best we have.  Take a look at

5  this and tell me if this is the letter that you

6  relied on.  Take your time to review it.

7      A.   From what I can read, I understand

8  what it's saying, and this is probably the

9  letter.

10      Q.   Were there any other letters, to your

11  knowledge?

12      A.   The date is 1985.  I thought there was

13  one that was even more recent, but perhaps this

14  is the only one.  I really don't know.

15      Q.   We've requested all those letters.

16  Did you provide everything to your lawyer that

17  you had?

18      A.   Yes, we requested everything.

19      Q.   And did you provide everything that

20  was requested of you by your lawyer?

21      A.   Yes, yes.

22      Q.   You have nothing else that you held

23  back?

24      A.   Not that I'm aware of.

---

132

1      Q.   So you said this was a 1985 letter?

2      A.   Correct, this is 1985.

3      Q.   Were the Virginia locations -- was

4  Massanutten up and running at that time?

5      A.   Yes.

6      Q.   Was Williamsburg?

7      A.   No.

8      Q.   Obviously Patriot Resorts wasn't up

9  and running at that time, correct?

10      A.   No.

11      Q.   So can you show me the portions of

12  this letter -- can you point to the portions of

13  the letter that you relied on for your

14  determination that it was acceptable to pay your

15  salespeople and sales manager at Patriot Resorts

16  on a commission-only basis?

17             MS. FABBO:  Objection.

18             MS. GARROW:  You can answer.

19             THE WITNESS:  I did not rely on

20      this letter.  This letter went to our

21      attorney, and our attorney sent us an

22      opinion letter after he received this

23      from the Land Development Association.

24      Q.   (By Ms. Garrow)  So did you rely on

Wise v Patriot - R. Foster Campagna  5/23/05

133

```
1    the advice of your counsel?
2         A.   Yes, we did.
3         Q.   What was in that letter that your
4    lawyer told you that you relied on?
5              MS. FABBO:  Objection.  Don't
6              answer.
7              MS. GARROW:  Are you instructing
8              her not to answer?
9              MS. FABBO:  I said don't answer,
10             yes.
11        Q.   (By Ms. Garrow)  Did you have any
12   verbal communications with your lawyer that you
13   relied on for advice?
14             MS. FABBO:  Objection.  Don't
15             answer.
16             MS. GARROW:  First I just asked
17             her if she had any verbal
18             communications, and I believe you can
19             answer that question.
20             THE WITNESS:  With the attorney.
21        Q.   (By Ms. Garrow)  Just so we're clear,
22   you had an attorney that you got advice from and
23   made a determination based on reliance on that
24   advice, is that correct?
```

134

```
1         A.   Correct.
2         Q.   So that attorney, that's the lawyer
3    I'm talking about.  You want to tell me the name
4    of that attorney so we don't have to in --
5         A.   Peebles, P-E-E-B-L-E-S, Harrison.
6         Q.   That's the law firm or that's a
7    person?
8         A.   That's a person.
9         Q.   And his or her law firm -- it's a him,
10   right?
11        A.   It's a man.  His law firm is Gladden
12   -- let me see, I think he just changed partners,
13   so I'm not sure.  I believe it's Rose and
14   Harrison.
15        Q.   Gladden?
16        A.   I don't think it's Gladden anymore.  I
17   think it's just Rose and Harrison.
18        Q.   And where are they located?
19        A.   They are currently located in
20   Nagshead, North Carolina.
21        Q.   Did you have any verbal communications
22   with Peebles Harrison about your determination to
23   not pay salespeople or sales managers an hourly
24   rate and only pay them commission?
```

135

```
1         A.   I don't really recall what
2    conversations we had because it was a while ago.
3         Q.   Do you know if you did have any
4    conversations?
5         A.   I'm not sure whether we did or not.
6         Q.   So the only thing you can testify to
7    for certain is that he wrote you an opinion
8    letter, correct?
9         A.   That's correct.
10        Q.   And that you relied on that opinion
11   letter for the determination not to pay
12   commission -- or not to pay salespeople and sales
13   managers anything other than commission at
14   Patriot Resorts, is that true?
15        A.   That's correct.
16        Q.   Is there anything in this document
17   that I have before you today, Exhibit 14, that
18   would support that reliance?
19        A.   I couldn't answer that.
20        Q.   I want you to read it again, then, and
21   let me know where it says that.
22        A.   What do you mean?
23        Q.   Take another look at the document and
24   let me know where in this document it says that
```

136

```
1    it is acceptable to pay time-share salespeople
2    and sales managers on a commission-only basis.
3         A.   Well, when I read this, there's a lot
4    of sections and parts that are talked about that
5    I'm not familiar with.  I'm not an attorney.
6         Q.   Let me ask you again, then.  It says
7    here, "We agree with your statement" -- this is
8    on the page marked 3398 -- "that the primary
9    determination to be made is whether the
10   salesperson in question" -- "persons in question
11   are customarily and regularly engaged away from
12   their employer's place of business and not the
13   character of their sales activities."
14             Is there anything in that statement
15   that you relied on as you sit here today for a
16   determination not to pay your salespeople and
17   sales managers at Patriot Resorts anything other
18   than commission?
19             MS. FABBO:  Objection.  You can
20             answer if you understand.
21             THE WITNESS:  I didn't rely on
22             this.  I relied on the opinion of an
23             attorney.
24        Q.   (By Ms. Garrow)  Again, that was just
```

137

```
1    the letter from Mr. Harrison, correct?
2              MS. FABBO:  Objection.  She
3         already answered that fully this
4         morning.
5              MS. GARROW:  You can answer.
6              THE WITNESS:  It definitely is
7         the opinion letter.  I don't recall
8         conversations at that time.  I can't
9         recall them at this point.
10       Q.  (By Ms. Garrow)  Do you still have
11   that opinion letter in your possession?
12       A.  Yes.
13       Q.  You had said it was a long time ago
14   that you had these discussions with Mr. Harrison,
15   so perhaps contemporaneous or somewhere
16   contemporaneous near the letter that's
17   Exhibit 14, is that correct?
18       A.  I don't have conversations with Mr. Harrison
19   all the time, so it's hard for me to say what
20   time and place we discussed this particular
21   instance.
22       Q.  Let's talk about Patriot Resorts,
23   then.  Have you had any communications
24   specifically about Patriot Resorts with
```

138

```
1    Mr. Harrison about your decision not to pay the
2    people at Patriot Resorts other than a commission
3    -- the "people" being salespeople and sales
4    managers -- other than on a commission basis?
5        A.  Yes.
6        Q.  When were those discussions?
7        A.  As I said, they were a while back.  I
8    don't remember specifically when they were.
9        Q.  But they were discussions?
10       A.  We had discussions based on the
11   opinion letter that he had written and we had
12   discussions about Patriot Resorts.
13       Q.  Was the opinion letter directed to
14   Virginia or was it directed towards Patriot
15   Resorts specifically?
16       A.  It was directed towards Virginia.
17       Q.  So then you've had -- if I understand
18   you, you've had the general discussion after the
19   letter with Mr. Harrison specifically about
20   Patriot Resorts, correct?
21       A.  Correct.
22       Q.  And you're telling me you don't know
23   when those were, correct?
24       A.  No, I can't tell you a date.
```

139

```
1        Q.  Would they have been prior to opening
2    Patriot Resorts in the Berkshires?
3        A.  Yes.
4        Q.  Do you remember how many discussions
5    you had with him?
6        A.  No, I don't.
7        Q.  What were the substance of those
8    discussions?
9              MS. FABBO:  Objection.  Don't
10        answer.
11       Q.  (By Ms. Garrow)  Counsel is
12   instructing you not to answer.  And did you rely
13   on the advice of counsel, then, to make your
14   determinations as to whether you were going to
15   pay commissions only or pay an hourly wage, a
16   minimum wage or an hourly wage to the salespeople
17   or sales managers at Patriot Resorts?
18       A.  I don't understand your question.
19       Q.  Was it on reliance of advice of
20   counsel that you made the determination to pay
21   commission only to the salespeople and sales
22   managers?
23       A.  Yes, it was.
24       Q.  At Patriot Resorts?
```

140

```
1        A.  Yes.
2        Q.  You had testified earlier that you
3    didn't recall what exemptions you were relying on
4    to make that determination not to pay individuals
5    who were salespeople or sales managers at Patriot
6    Resorts other than only commission.  Do you
7    remember that you said you didn't remember what
8    exemption it was?
9        A.  Correct.
10       Q.  Does reading this letter refresh your
11   recollection?
12       A.  I read what this letter says, yes.
13       Q.  Does it refresh your recollection as
14   to what exemptions you were relying on in your
15   determination not to pay salespeople and sales
16   manager other than commission only at Patriot
17   Resorts?
18       A.  I would not venture a guess on that
19   because, as I said, I relied on the attorney
20   instructing me what to do.
21       Q.  And that was Mr. Harrison?
22       A.  Correct.
23       Q.  Do you recall if the opinion letter
24   contained other discussion -- discussion of other
```

---

141

1    exemptions other than the outside salesmen

2    exemption?

3          A.    No, I don't recall.

4          Q.    When I say "the opinion letter," I

5    don't mean this opinion letter that's sitting

6    before you; I mean the opinion letter of Mr.

7    Harrison -- do you know if he discussed any other

8    exemptions?

9          A.    No, I don't recall.

10         Q.    You don't recall if he did, or you

11   don't recall?

12         A.    I don't recall.

13         Q.    So other than the opinion letter of

14   counsel which your counsel here has instructed

15   you not to answer questions on, did you rely on

16   any other documents for making a determination

17   not to pay salespeople or sales managers at

18   Patriot Resorts anything other than commission?

19         A.    I did not rely on anything other than

20   the attorney's advice.

21         Q.    Did you know -- as you read here

22   today, you see that it says here in -- let's go

23   to the middle of 3398 where it says here, "We

24   note that the Department's regulations provide

---

142

1    that characteristically the outside salesman is

2    one who makes his sales at his customer's place

3    of business."  Is this something that you

4    remember hearing about previously, or is this

5    something that you really have no recollection

6    of?

7          A.    No, I don't remember this.

8          Q.    In this letter here, it says, "The

9    Department intends to publish an advance notice

10   of proposed rule-making regarding the regulations

11   in the federal register, referring specifically

12   to these regulations and the application of the

13   exemption being the outside sales exemption to

14   time-share salesperson."  And it says that's

15   among the issues that the Department intends to

16   consider in the rule-making process.  Are you

17   aware of that -- before today, were you aware of

18   that?

19         A.    I don't recall.  I'm not aware of

20   them -- are you saying have they done anything

21   or...

22         Q.    If you were aware that the Department

23   of Labor published or was going to publish an

24   advanced notice of proposed rule-making and

---

143

1    promulgate rules relating to the outside sales

2    exemption; are you aware of that?

3          A.    No, I'm not.

4          Q.    Your lawyer never told you that?

5          A.    He may or may not have; I don't

6    recall.

7          Q.    You just don't know if he did -- he

8    might have?

9          A.    He may have.  I don't remember.

10         Q.    Did you do anything to try and follow

11   the rules of the Department of Labor -- do

12   anything in relation to commenting on those rules

13   relating to time-share salespeople?

14         A.    I would not have.

15         Q.    Why not?

16         A.    Our attorney would have done that.

17         Q.    So that's something that you just were

18   not going to be involved in at all?

19         A.    That's correct.

20         Q.    You chose not to be involved in it?

21         A.    I'm not really qualified to be

22   involved in it.  It would require an attorney to

23   look at it and translate how that applies to our

24   business.

---

144

1          Q.    But you didn't take any affirmative

2    steps to see how it would apply to your business,

3    did you?

4          A.    Well, I can't say that because that

5    was years ago, so I don't really know.

6          Q.    Well, tell me what you did, then, if

7    anything?

8                MS. FABBO:  Objection.

9                MS. GARROW:  You can answer that.

10               THE WITNESS:  I can't tell you

11               what I may or may not have done at

12               that time because I don't remember.

13         Q.    (By Ms. Garrow)  What have you done

14   since -- first of all, you have already testified

15   you don't know when you read this, so we're not

16   talking about a specific time frame; but how

17   about recently, what have you done -- have you

18   checked on the rule-making process in the federal

19   register for time-share sales?

20         A.    I have not checked.

21         Q.    Have you done any research or asked

22   anyone to do any research since this time as to

23   the outside sales exemption and how it applies to

24   time-share salespeople?

---

Wise v Patriot - R. Foster Campagna  5/23/05

145

1      A.   I have not specifically asked anyone,
2  but I'm sure that our attorneys would notify us
3  if there was any change that would affect our
4  business.
5      Q.   But you never asked anybody to do
6  that, did you?
7      A.   We have attorneys on retainer that I
8  am sure would bring to our attention if there was
9  a change that would affect our business.
10     Q.   That's not my question, Miss Foster.
11 Please answer my question, which is have you ever
12 asked anyone to do that, as you sit her?
13     A.   I can't recall.  I'm sure there could
14 have been times and there may not have been
15 times.  I can't tell you specifically.  I can't
16 tell you yes or no specifically.
17     Q.   I want to know what you did after you
18 received the opinion letter of Peebles Harrison
19 to follow up on his letter.  What, if anything,
20 did you do?
21     A.   I can't tell you because I don't
22 recall.
23     Q.   As you sit here today, you have no
24 recollection of what you did when you received

146

1  his letter?
2      A.   I really don't.
3      Q.   What about after this lawsuit was
4  filed; did you ever look into it again -- and
5  when I say "it," I mean did you ever look into
6  the fact that people were concerned that they
7  were not getting paid an hourly wage and many
8  weeks made less than minimum wage; did that
9  concern you?
10     A.   I don't know of anyone complaining to
11 me about minimum wage.
12     Q.   Have you seen the lawsuit in this
13 matter?
14     A.   I saw the lawsuit.
15     Q.   You saw you were named defendant when
16 it was first filed, were you not?
17     A.   Yes, I did.
18     Q.   What did you do after that to try and
19 research or ask someone to research the FMLA
20 issue, minimum wage issue -- what did you do?
21     A.   We turned the lawsuit over to our
22 attorneys to handle it.
23     Q.   Did you do anything affirmatively; did
24 you do anything on your own?

147

1      A.   No.
2      Q.   Did you ask them for more opinion
3  letters at that point in time?
4      A.   I don't recall that I did.
5      Q.   Not since the lawsuit?
6      A.   Correct.
7      Q.   Did you do anything since this lawsuit
8  to see if the outside exemption applied or not to
9  the time-share salespeople at Patriot Resorts?
10     A.   I would not do that.  I would leave
11 that up to the attorneys.
12     Q.   So is that a no?
13     A.   I can't tell you whether I said
14 anything specific or not, so that it would be
15 hard to remember what was said.
16     Q.   Did you seek any additional advice at
17 that time relating to time-share sales and
18 salespeople in the outside sales exemption
19 application?
20     A.   No.  Outside of what our attorneys had
21 told us, no.
22     Q.   Did you have additional conversations
23 at that time?
24     A.   With our attorneys that are handling

148

1  the lawsuit.
2      Q.   Other than in relation to the
3  litigation, but about the outside sales
4  exemptions, did you seek specific advice as to
5  the outside salesperson exemption at that time?
6      A.   Not that I can recall at that time.
7      Q.   Is there daily training at Patriot
8  Resorts, to your knowledge?
9      A.   I don't know.
10     Q.   That would be something more in the
11 purview of Mr. Polansky?
12     A.   Mr. Polansky would know whether they
13 do or not.
14          (Exhibit 15, 12/22/04 Memo
15          Re:  New Hires, marked
16          for identification)
17     Q.   (By Ms. Garrow)  This is a memo to all
18 project directors and office managers.  Did this
19 go to Patriot Resorts, to your knowledge?
20     A.   Yes, it did.
21     Q.   And it says "To:  Office Managers/
22 Human Resource Directors.  Would this have gone
23 directly to Miss Lippert at Patriot Resorts?
24     A.   No.  It would have gone into that

Wise v Patriot - R. Foster Campagna  5/23/05

149

1  office.  I don't know that it would have gone to
2  Faith's attention.
3       Q.    Why don't you tell me what this is --
4  what is this?
5       A.    It's a reminder that anyone who goes
6  to work for our company needs to have a car
7  that's large enough to put customers in --
8  generally more than a two-seater car.  And
9  automobile insurance that meets company
10  requirements.
11      Q.    That was sort of left specifically
12  open, I would guess, because there are different
13  requirements per state, correct?
14      A.    That's correct.
15      Q.    You wanted somebody to have a car that
16  was bigger than a two-seater, presumably because
17  people would come with their family to look at
18  time-shares?
19      A.    Correct.
20      Q.    And that would be your expectation?
21      A.    Correct.
22      Q.    It says here "Effective January 1,
23  2005."  So what was the difference in this policy
24  and the older policy that was effective until

150

1  that date?
2       A.    Well, it wasn't really a new policy;
3  it was just reiterating, because it was the 1st
4  of the year, to remind everyone, because I guess
5  some salespeople in Orlando were buying sports
6  cars that were difficult to get customers in and
7  out of.  So that kind of generated the memo, just
8  to remind them that it was important.
9       Q.    That was the impetus for this memo at
10  that time?
11      A.    Correct.
12                (Exhibit 16, 11/21/01 Memo
13                Re: Policies, marked
14                for identification)
15      Q.    (By Ms. Garrow)  This is Exhibit 16,
16  and this is a memo from you, correct, a Berkley
17  Group memo?
18      A.    Yes.
19      Q.    And it's dated November 21, 2001, am I
20  correct on that?
21      A.    November 21, yes.
22      Q.    "Commissions payable after
23  termination" -- what is that policy, just so I
24  understand what you have written here?

151

1       A.    Once a salesperson leaves our employ,
2  any commissions that are due to be paid for him
3  are held in an accounts payable account to be
4  paid out after all risks of chargeback is
5  diminished.
6       Q.    What does that mean; how long --
7  what's the least amount of time you might hold
8  somebody's money, the shortest risk time?
9       A.    It would be -- the shortest would be
10  three months -- his most recent sale making three
11  timely monthly payments, which would probably be
12  90 days plus 45 days would be the soonest
13  commissions would be paid out, because it would
14  be the most recent sale.  He may have another
15  sale in the pipeline that might be two weeks
16  older than that, but because it's terminated, it
17  would be put in accounts payable.  So it could be
18  120 days before he would receive a check.
19      Q.    I think what you just testified to was
20  the shortest time was 135 days, because you said
21  45 and 90?
22      A.    Correct, so about 135.
23      Q.    So that would be the soonest they
24  could get their money?

152

1       A.    That could be the soonest, unless
2  someone, let's say he only had one commission to
3  be paid and the customer paid cash in full, he
4  would get his commission in thirty days.
5       Q.    So thirty days if cash, but if it was
6  commission, about 135 would be the soonest?
7       A.    I would say that's approximately the
8  soonest.
9       Q.    In the scenario, especially back then,
10  November 21, 2001, prerequirement of PAC check,
11  there would be a scenario possibly where there
12  wouldn't be three timely payments at any time,
13  correct?
14                MS. FABBO:  Objection.  You can
15           answer.
16      Q.    (By MS. Garrow)  Or three consecutive
17  timely payments at any time in the life of a
18  contract, is that fair to say?
19      A.    Well, that doesn't just have to do
20  with preauthorized checking.
21      Q.    I understand that, but let's take that
22  out of the mix here.  What's the longest period
23  of time that anyone has ever waited to get paid
24  post-termination on a sale?

---

153

1    A.   I couldn't tell you that.  That would
2  be too -- there are too many salespeople.  I
3  wouldn't be able to say how long.
4    Q.   How about talk specifics.  Peter
5  Corbin, who is a plaintiff in this matter -- he
6  just got paid on a sale -- he hadn't worked for
7  the company for a year plus.  He got paid on a
8  couple of sales, or actually several sales.  Why
9  would somebody wait a year plus after termination
10  for payment on a sale?
11    A.   I would have to look at the particular
12  sales and see what their pay history was in order
13  to tell you that.
14    Q.   How would you determine that?
15    A.   Look at a history of payments on the
16  particular accounts to see if they made their
17  payments every month as they were supposed to.
18    Q.   Would you do that by customer name, or
19  is there another way to identify those people?
20    A.   Customer name.
21    Q.   That's the only way you could do it?
22    A.   Well, a contract number or customer
23  name.
24    Q.   So there were contract numbers as well

---

154

1  for all of those?
2    A.   In most cases, yes, yes, yes -- yes.
3    Q.   Is there any time there wouldn't be
4  one?
5    A.   No, they would have to have a number
6  associated with their name, so either way you
7  could generate that information.
8    Q.   As the president of the company, I
9  guess I'm going to ask you this question again,
10  and maybe I'll try to phrase it a little
11  differently so you can answer it.  I want to know
12  the scenario that could occur that would enable
13  somebody to wait over a year for a full payment
14  once they're terminated -- just a list of
15  scenarios.
16    A.   If their customers did not make three
17  timely consecutive monthly payments.
18    Q.   That would be it; that would be the
19  whole list?
20    A.   It is possible -- and I can't say
21  specifically at Patriot Resorts -- but if a
22  customer came to us six months, eight months,
23  even a year after the sale and presented us with
24  some type of documentation that a salesperson

---

155

1  gave them that is contrary to the plan and would
2  be grounds for voiding of the contract, then that
3  would subject the salesperson to a chargeback.
4    Q.   What about what happened at Patriot
5  Resorts, as far as I understand -- and maybe you
6  can correct me if I'm wrong -- I understand there
7  was supposed to be a clubhouse and certain
8  amenities that never got built at Patriot
9  Resorts.  Is that true?
10    A.   That's incorrect.
11    Q.   Was there never supposed to be a
12  clubhouse, or did it get built?
13    A.   Everything that is in the public
14  offering statement and is in the offering
15  statement today has been built, and all amenities
16  are there.
17    Q.   Is there a clubhouse -- let me ask you
18  that question?
19    A.   Yes, there is.
20    Q.   When was that built?
21    A.   Several years ago.  I don't remember
22  the exact date.
23    Q.   So it's been around for a while?
24    A.   Yes.

---

156

1    Q.   But let's take the specific example
2  out of the mix here and just talk about it
3  generally.  Would that be the kind of thing, if
4  amenities were promised in the initial offering
5  or promised as part of a sales proposal that was
6  authorized by the company and the customer came
7  to you later and said these things never happened
8  -- would that be the basis for possibly
9  cancelling the sale?
10    A.   Anything that the company would have
11  promised by public offering statement would be a
12  matter of fact in the documents, and the
13  customers are not to rely on anything other than
14  those legal documentation.
15    Q.   How do they know that, the customers?
16    A.   It's on the notice -- it's on the
17  documentation that they sign before they leave
18  the property.
19    Q.   So it says it right there, everything
20  is listed in our public offering and those are
21  the documents on which you're supposed to rely?
22    A.   Correct, something along those lines.
23  I don't remember it specifically.
24    Q.   But that's the general gist of it?

Wise v Patriot - R. Foster Campagna  5/23/05

157

1    A.    Correct.

2    Q.    And that's what you understand it to

3  mean?

4    A.    Yes.

5    Q.    Let's go back to the three consecutive

6  timely payments.  If eighteen months have gone by

7  and there haven't been three consecutive timely

8  payments, is it possible that post-termination a

9  salesperson has not yet been paid?

10    A.    If they have not made those payments,

11  it is possible he has not been paid, yes.

12    Q.    What about somebody who is working for

13  the company; is it possible that person who is

14  still working for the company, if there have not

15  been three consecutive timely payments after

16  eighteen months, is it possible that person has

17  not gotten paid?

18    A.    It's possible, yes.

19    Q.    Have you ever spoken with Miss Lippert

20  or anybody else from Patriot Resorts about

21  somebody named Sam Barnes?

22    A.    The name is not familiar to me.

23         (Exhibit 17, 12/21/01 Memo

24         Re: Rotation, marked for

158

1         identification)

2    Q.    (By Ms. Garrow)  Showing you what's

3  been marked as Plaintiff's 17, this is from

4  Barbara Arnold.  Who is Barbara Arnold?

5    A.    Barbara was the original receptionist

6  that worked at Patriot Resorts.

7    Q.    This is something called a rotation

8  policy.  Are you familiar with this policy?

9    A.    It's not unheard of -- yes, I'm aware

10  that the rotation could be done that way.

11    Q.    It says this is a Berkley company

12  policy.  Do you understand this to be a Berkley

13  company policy?

14    A.    It has a policy that we have used from

15  time to time.

16    Q.    Do you understand it to still be the

17  policy at Patriot Resorts?

18    A.    I don't know that it is.  I'm not sure

19  what type of rotation they're running right now.

20    Q.    Who would know that?

21    A.    Bill Rauer.

22    Q.    Do you remember speaking with Faith on

23  occasion about LaCrisha Wise?

24    A.    Yes, I do.

159

1    Q.    About how many times did you talk to

2  her about LaCrisha Wise?

3    A.    Once or twice maybe.  I can remember

4  one in particular.  There may have been another.

5  I don't remember.

6    Q.    When was that -- you said you remember

7  one in particular?

8    A.    It was a conversation that had to do

9  with dress code.  I don't remember specifically

10  what date it was.

11    Q.    But to your knowledge, was it when she

12  was still working there, she was still employed?

13    A.    Yes, she was working there.

14    Q.    Who called whom; did Miss Lippert call

15  you?

16    A.    I don't remember if she called me or

17  if it was during the course of a conversation --

18  I don't remember.

19    Q.    What do you remember about the

20  conversation -- tell me everything that you

21  remember Miss Lippert said and everything that

22  you remember saying.

23    A.    Well, I just remember there was a

24  question that LaCrisha seemed to be concerned

160

1  about having been reprimanded in accordance with

2  the dress code; and I'm not sure who reprimanded

3  her or asked her to dress more appropriately,

4  but apparently she was not happy about it, and

5  Faith mentioned it to me.

6    Q.    And that's all she said; that's what

7  your recollection is?

8    A.    That's all I recall.

9    Q.    Do you remember if she talked to you

10  about discrimination, that LaCrisha thought it

11  was due to discrimination?

12    A.    No, I don't remember that.

13    Q.    Do you remember any discussions with

14  Miss Lippert about Miss Wise charging the company

15  with race discrimination while she was still

16  working there?

17    A.    No, not during her employment.

18    Q.    If somebody were to file a complaint

19  with a state agency -- for instance, in

20  Massachusetts we have Massachusetts Commission

21  Against Discrimination -- would you expect that

22  to be reported to you?

23    A.    Yes.

24    Q.    So whenever they had knowledge of

Wise v Patriot - R. Foster Campagna   5/23/05

161

1  that, that would be reported to you, or you would
2  expect that would be reported to you?
3      A.    Generally it would be, yes.
4      Q.    At some point, did you hear from Miss
5  Lippert that Miss Wise had charged the company
6  with race discrimination?
7      A.    I recall that, but I don't recall that
8  during her employ.  I recall that after her
9  termination; but again, I'm not sure.
10             (Exhibit 18, 6/8/03, 6/9/03
11             Memos Re: Ms. Wise,
12             marked for identification)
13     Q.    (By Ms. Garrow)  Showing you what's
14  marked as Plaintiff's 18, this appears to be an
15  e-mail from -- I guess it's a string of e-mails.
16  The first one is from Miss Lippert to you and the
17  second one is your response.  Do you recall
18  receiving this e-mail?
19     A.    I don't recall receiving it, but it's
20  the right format, so...
21     Q.    It appears here that Miss Lippert was
22  informing you that she thought that Miss Wise was
23  going to be trouble.  Did you ever have a
24  conversation with her as to what she meant by

162

1  that?
2      A.    I recall after LaCrisha left, she had
3  made some threatening remarks to Faith, and Faith
4  was a little intimidated and scared by her, and I
5  had Faith call local authorities to have an
6  off-duty police officer come and stay at the
7  resort until Faith felt comfortable that LaCrisha
8  was not going to come there and cause a problem
9  with her.
10     Q.    But this was the first thing the day
11  after she -- Miss Wise -- got terminated; so
12  she's not talking about that here, is she,
13  because you said it was after her termination?
14             MS. FABBO:  Objection.  You can
15             answer.
16             THE WITNESS:  I'm telling you
17             what I recall.
18     Q.    (By Ms. Garrow)  I'm asking you if you
19  recall having any conversations with her about
20  what she meant in this e-mail, "She is going to
21  be trouble."  If I understand your testimony,
22  these alleged threats happened after this e-mail
23  was written, so it couldn't have been that.
24     A.    Well, along with her termination, I

163

1  think she was there causing a problem.
2      Q.    What was that?
3      A.    I know she was loud and she was -- she
4  scared our employee.
5      Q.    You said when she was terminated that
6  happened?
7      A.    It was after her termination.  She was
8  terminated, I believe, at night, and then I
9  believe she came in -- I'm not sure whether it
10  was the next day, the next afternoon -- I'm not
11  sure when it was, but Faith's contact with her
12  was one that scared her, and that is -- I think
13  that, to my understanding, that is what Faith
14  meant as trouble, because she scared Faith and we
15  were afraid that she would come on the property
16  and create a disturbance.
17     Q.    When you say that she scared Faith,
18  are you relating what Faith told you?
19     A.    Faith was scared of the girl.
20     Q.    Did you ever observe her making
21  threats?
22     A.    No, I'm in Florida.
23     Q.    So this is only from what you
24  understood Faith told you; is that how you

164

1  understood this?
2      A.    Knowing Faith for thirty years, I know
3  when she's afraid, and she was scared of this
4  employee.  She was physically afraid of the
5  woman, and she said that to me on occasion on the
6  phone, that I am afraid of her.  And when you
7  asked me to read this and she said she is going
8  to be trouble, that tells me that Faith was
9  scared of her.
10     Q.    So had she related that she was afraid
11  of her prior to the termination?
12     A.    Faith had told me she was a very
13  intimidating woman.
14     Q.    That she made her nervous and --
15     A.    Yes.
16     Q.    -- and uncomfortable?
17     A.    Yes.
18     Q.    Did she tell you that about anybody
19  else?
20     A.    Roger Martin tended to become angry
21  over situations.
22     Q.    I'm not asking you if Mr. Martin
23  became angry over situations.  I'm asking you if
24  Faith told you anything about anybody other than

165

1   LaCrisha.

2       A.    Situations that were contrary to what
3   Faith may be telling him, if he did not like the
4   response Faith gave him, then he became angry at
5   Faith; and Faith, in turn, would tell me, He
6   makes me uncomfortable.

7       Q.    I'm going to break this down here.
8   You said that Mr. Martin would become angry at
9   Faith.  You don't know what Mr. Martin was
10  thinking, obviously; is that correct?

11      A.    Loud voice, angry appearance,
12  intimidating appearance, overbearing is what I
13  would define as anger in the workplace.

14      Q.    Did you ever observe that yourself of
15  Mr. Martin?

16      A.    No, I did not.

17      Q.    How did you hear about this?

18      A.    I didn't observe this with my eyes.  I
19  heard him over the telephone.

20      Q.    You heard him speaking loudly over the
21  phone?

22      A.    To Faith.

23      Q.    And other than that, have you heard or
24  seen anything else with relation to Mr. Martin?

166

1       A.    No, other than in his deposition.

2       Q.    Did you understand -- or did you
3   question, I should say -- Miss Lippert as to what
4   she meant in this e-mail when she said "She is
5   the girl I have spoken to you about with an anger
6   problem and everything" -- bold face -- "is done
7   to her because of discrimination."  Did you
8   question her about that; "her" being Miss
9   Lippert?

10      A.    Yes, and as I recall, LaCrisha had had
11  some problems, I think, with police situations;
12  and I guess she didn't say this to Faith, but she
13  said it to other people there in the workplace,
14  that it was because she was black that people
15  were discriminating against her.  Faith did not
16  indicate to me that it was because of something
17  we had done.  Everything that she seemed to be
18  involved in was because of the fact that if it
19  went negatively towards her, it's because people
20  were discriminating against her.

21      Q.    Who did you hear this from?

22      A.    I heard it from Faith.

23      Q.    But you heard it from Faith who heard
24  it from somebody else?

167

1       A.    Correct.

2       Q.    This says here, "Her boyfriend is
3   Michael Johnson, the one I understand is going to
4   sue us because he slipped and fell."  And she
5   says "Ho-ho-hum."  What did she mean by that?

6            MS. FABBO:  Objection.

7       Q.    (By Ms. Garrow)  Do you know what she
8   meant by that?

9       A.    Not really.

10      Q.    What did you mean by your response,
11  "Sounds like another day with the Berkley Group"?

12      A.    Well, anytime you have a lot of
13  employees, there's always gossip going around and
14  situations coming up.

15      Q.    So that's what this was, gossip and
16  situations; that's what you meant?

17      A.    Yes, because nothing here is really a
18  -- it's not a complaint; it's just things that
19  have been overheard and really gossip is what it
20  boils down to.

21      Q.    Had Miss Lippert conveyed to you that
22  Miss Wise had complained previously about
23  discrimination at the workplace?

24      A.    About discrimination by our company?

168

1       Q.    Yes.

2       A.    No.

3       Q.    Discrimination of Patriot Resorts?

4       A.    No.

5       Q.    She never reported that to you?

6       A.    No, she did not.

7       Q.    Not in March of 2003?

8       A.    Was that after her termination?

9       Q.    Before her termination.

10      A.    No.

11      Q.    Not in May of 2003, never reported
12  that to you?

13      A.    No.

14      Q.    Is that something you would expect her
15  to report to you if there was such a complaint?

16      A.    I would expect that we would be
17  notified in our offices, and the only thing I
18  recall, if I recall anything, is I recall the
19  lawsuit.  I don't recall anything from the MCAD.

20      Q.    So you never saw anything from the
21  MCAD?

22      A.    Not that I can recall.

23      Q.    Would you expect that somebody would
24  alert you that that happened, that there was a

Wise v Patriot - R. Foster Campagna  5/23/05

169

```
1    suit?
2         A.    I would expect I would remember if I
3    did.  I don't recall that I did.
4         Q.    But would you expect somebody who
5    worked for you to report to you that there's been
6    a complaint of discrimination filed at the MCAD?
7         A.    Correct, if the company knew about it.
8    That's why I would think I would know about it
9    before she would, because most anything is sent
10   to corporate headquarters in Florida.
11        Q.    I think you've already testified to
12   people signing in at the beginning of the day and
13   signing in and out on tours, correct?
14        A.    Correct.  They don't physically sign
15   in and out of tours.  They take tours and the
16   receptionist signs them out and in.
17        Q.    And that's on a document, a specific
18   tour sheet, correct?
19        A.    Correct.
20        Q.    Are there any documents which reflect
21   the starting time that you're aware of -- the
22   starting time and the length of each employee's
23   work period?
24        A.    I'm not -- the employee signs in prior
```

170

```
1    to attending the meeting and they are signed out
2    with a tour and back in with a tour.
3         Q.    But there's nothing that signs them on
4    it at the end of the day?
5         A.    Their last tour would show their last
6    time that they were on a tour.  Their last tour
7    time.  So if they came back, then two hours went
8    out again, there would be a new time out and a
9    new time in at the end of that.
10        Q.    So that's it; there's nothing other
11   than that?
12        A.    Not that I'm aware of.
13        Q.    You've already testified there is no
14   regular hour rate of payment.  Are there any
15   documents that show some rate of pay by which
16   overtime compensation would be figured?
17        A.    No.
18        Q.    What about any other ways of
19   determining -- any other documents which show how
20   overtime -- how much overtime compensation might
21   be due?
22        A.    No.
23        Q.    Any documents which show total daily
24   or weekly straight time earnings or wages due for
```

171

```
1    hours worked during the workday or workweek
2    exclusive of overtime?
3         A.    You're asking me are there any
4    documents?
5         Q.    Yes, do you keep any records of that?
6         A.    No.
7         Q.    How about any records of -- everything
8    we're talking about is for Patriot Resorts.
9    Total premium pay for overtime hours, any records
10   kept of that?
11        A.    No.
12        Q.    Do you keep a record of total
13   additions or deductions from wages paid each pay
14   period, including employee purchase orders --
15   employee wage assignments, anything like that;
16   any documents showing wage assignments?
17             MS. FABBO:  Objection.  You can
18        answer.
19             THE WITNESS:  I don't really know
20        what that means.
21        Q.    (By Ms. Garrow).  Let me ask you this
22   way.  Any individual employee records that show
23   the dates, amounts, and nature of additions or
24   deductions to each employee's pay -- these are
```

172

```
1    salespeople and sales managers actually at
2    Patriot Resorts.  Any documents?
3         A.    Any documents that show additions or
4    deductions from their pay?
5         Q.    Yes.
6         A.    You mean for insurance?
7         Q.    For anything.
8         A.    That's on their pay stub.
9         Q.    That would be on their pay stub?
10        A.    Correct.
11        Q.    Any other documents that would reflect
12   that?
13        A.    The pay sheet that accompanies their
14   check has a stamp on it, and that shows any
15   deduction for taxes.
16        Q.    Anything else?
17        A.    I can't think of anything.
18        Q.    What documents, if any, do you have
19   that show total wages paid each pay period?
20        A.    It would be those same documents, the
21   check stub and the backup for the commission.
22        Q.    When we talk about wages, again, we're
23   just talking about salespeople and sales managers
24   at Patriot Resorts, just commission, correct?
```