173

1    A.    Correct.

2    Q.    Any documents that show the date of

3  payment and the pay period covered by each

4  payment made for salespeople and sales managers

5  at Patriot Resorts?

6    A.    I'm sorry, could you repeat that?

7    Q.    Are there any documents which reflect

8  the date of payment and the pay period covered by

9  each payment made to salespeople or sales

10  managers at Patriot Resorts?

11    A.    The check stub shows the period of

12  time.

13    Q.    Anything else?

14    A.    I don't think so.  The backup sheet

15  does show the period of time, yes.

16    Q.    Do you maintain that the sales

17  managers and sales representatives at Patriot

18  Resorts work a fixed schedule, or do you believe

19  it's a variable schedule?

20    A.    By what definition?

21    Q.    I'll clarify.  I think you've already

22  testified that everybody has to come in at a

23  certain predetermined time every day, correct?

24    A.    Correct.

174

1    Q.    Is their schedule then fixed from that

2  point forward for the day, or is it variable?

3    A.    It could vary.

4    Q.    In what ways?

5    A.    If there are customers only to satisfy

6  ten salespeople and there are twenty salespeople,

7  ten may be told, You can go home; there's no need

8  to stay at all.

9    Q.    As you sit here today, do you have any

10  specific knowledge how often that happens at

11  Patriot Resorts?

12    A.    I couldn't tell you how often.

13    Q.    Or when that happens at Patriot

14  Resorts -- when that has happened at Patriot

15  Resorts?  Again, I mean specific knowledge as you

16  sit here; I'm not asking you to guess.

17    A.    There are slower seasons of the year

18  than others, so that's when it's most likely for

19  something like that to happen.

20    Q.    In those days or weeks where a sales

21  representative or sales manager might work less

22  than anticipated hours, are there any documents

23  that show the exact numbers they were there on

24  those days that they were cut early?

175

1    A.    They would still be shown on the

2  attendance record.

3    Q.    As coming to work?

4    A.    Correct.

5    Q.    Do you contend that any of the

6  defendants are not subject to the Fair Labor

7  Standards Act record-keeping requirements?

8    A.    I don't follow what you're asking me.

9    Q.    Is it your position that any of the

10  defendants are exempt from the record-keeping

11  requirements that are required by federal law?

12    A.    I wouldn't be able to answer that

13  question.

14    Q.    Why not?

15    A.    An attorney would have to answer that

16  for me.

17    Q.    Well, I'm asking you.

18    A.    If we don't keep the records that are

19  necessary, it's because we've been directed not

20  to.

21    Q.    So you've been directed by counsel?

22    A.    Yes.

23    Q.    Would that have been Mr. Harrison?

24    A.    Yes.

176

1    Q.    Any other lawyers tell you not to?

2        MS. FABBO:  Objection.

3        THE WITNESS:  I've never had one

4      tell me that I needed to.

5    Q.    (By Ms. Garrow)  Have you ever

6  inquired about record-keeping requirements under

7  the Federal Fair Labor Act?

8    A.    Any inquiry would be made at the time

9  of starting up a resort in a particular state,

10  and we would inquire of the attorneys who were

11  putting the documentation together to let us know

12  if there was anything we needed to be concerned

13  with.

14    Q.    So would that have been Parisi here in

15  Massachusetts?

16    A.    Yes.

17    Q.    Did you inquire of Attorney Parisi

18  or -- Sabin and --

19    A.    Parisi and Sabin.

20    Q.    Is it just the two of them, or is it a

21  bigger firm?

22    A.    I don't know if there's any other

23  attorneys.

24    Q.    Did you inquire of any attorney at

177

1  Parisi and Sabin as to what the record-keeping
2  requirements were to the Federal Fair Labor
3  Standards Act?
4      A.    We would have met with the attorneys
5  early on in the process and asked what we needed
6  to be concerned with in the State of
7  Massachusetts from any point of the law.
8      Q.    Federal or state compliance?
9      A.    Correct.
10     Q.    You have a recollection of doing that
11 with attorneys from Parisi and Sabin?
12     A.    That is our normal procedure, yes.
13     Q.    Did you ask for advice of counsel in
14 that regard?
15     A.    Yes.
16     Q.    Did you have communications with them
17 about that?
18     A.    We had discussions about it, yes.
19     Q.    What did you discuss?
20          MS. FABBO:  Objection.  You may
21          answer.
22     Q.    (By Ms. Garrow)  Counsel has
23 instructed you not to answer regarding advice of
24 counsel as to your Federal Fair Labor Standard

178

1  Act requirement.  I think you testified that
2  there were some discussions about Massachusetts
3  record-keeping requirements as well?
4          MS. FABBO:  Objection.  You can
5          answer if that was your testimony.
6          THE WITNESS:  Yes, that's what I
7          said earlier.
8      Q.    (By Ms. Garrow)  Did you have any
9  involvement in the termination of Mr. Massaconi?
10     A.    No, I did not.
11     Q.    Were you consulted about his
12 termination prior to his termination?
13     A.    Not that I recall.
14     Q.    Did you recommend his termination?
15     A.    No.
16     Q.    What about Mr. Martin; were you
17 consulted prior to his termination?
18     A.    No.
19     Q.    Did you recommend his termination at
20 any time?
21     A.    No, I did not.
22     Q.    What about Miss Wise; were you
23 consulted regarding her termination prior to her
24 termination?

179

1      A.    No.
2      Q.    The first you heard about it was that
3  e-mail, correct?
4      A.    Correct.
5      Q.    At any point did you recommend her
6  termination, Miss Wise's?
7      A.    No.
8          MS. GARROW:  Off the record.
9          (A break was taken)
10          MS. GARROW:  Back on the record.
11     Q.    (By Ms. Garrow)  Do you know if any
12 sales representatives or sales managers go to
13 potential owner's homes to try to sell them
14 time-shares at Patriot Resorts?
15     A.    Not that I'm aware of.
16     Q.    That's not the policy of Patriot
17 Resorts, is it?
18     A.    No, it isn't.
19     Q.    All the sales get done on the property
20 in Lanesborough, correct?
21     A.    Correct.  It's not unheard of that a
22 salesperson could follow a customer home, if they
23 live within a short distance, to get a check or
24 to get a credit card number or something like

180

1  that, but not to transact the sale.
2      Q.    Pretty much to grab some information,
3  grab the PAC check or something?
4      A.    Correct.
5      Q.    Because for some reason, they came to
6  buy a time-share without a check, correct?
7      A.    Correct, they didn't intend...
8      Q.    The same --
9      A.    Before we get started, can I clarify
10 something?
11     Q.    Sure.
12     A.    Because you asked me about the opinion
13 letter, and I think I was focusing more on that
14 time frame than I was your question; and after
15 the lawsuit was filed, I did, of course, talk to
16 Skoler Abbot law firm about the way we were
17 paying our salespeople.
18     Q.    So before you testified that you
19 retained them to pursue the lawsuit?
20     A.    Correct, but in conjunction with that,
21 of course we had to discuss our current situation
22 and what we were doing and what was their opinion
23 of the situation.
24     Q.    Did they give you an opinion?

181

1    A.    Yes.

2    Q.    What was that opinion?

3          MS. FABBO:  Don't answer.

4    Objection.

5    Q.    (By Ms. Garrow)  You relied on their

6    opinion, though, at that point to do what you

7    were doing; in other words, you didn't change

8    your policy at all, did you?

9    A.    No.

10   Q.    Since the filing of the lawsuit, you

11   still don't pay overtime to sales

12   representatives, correct?

13   A.    No.

14   Q.    You still don't pay them an hourly

15   wage, correct?

16   A.    No.

17   Q.    Is it your testimony that you relied

18   on the advice of counsel to continue or -- to

19   continue doing what you had previously been

20   doing?

21   A.    I will say that we have discussed some

22   type of a living allowance or allowance so that

23   salespeople could make -- meet their living

24   expenses, insurance requirements, gas for their

182

1    automobiles, that type of thing.

2    Q.    But you have not instituted it?

3    A.    We have not done anything at this

4    point.

5    Q.    Just so I'm clear, those discussions

6    that you just shared with me, those are

7    discussions you had internally at Patriot

8    Resorts, or are those discussions with counsel

9    that your --

10   A.    Discussions with counsel.

11   Q.    My question is a little different.

12   Are you relying on the advice of counsel

13   currently to maintain the practices and policies

14   that you currently have?

15         MS. FABBO:  Objection.  You can

16         answer.

17         THE WITNESS:  I'm not sure

18         that...

19   Q.    (By Ms. Garrow)  Let me ask it this

20   way.  You haven't changed your policies or

21   practices since Patriot Resorts was up and

22   running here in Massachusetts, correct, in terms

23   of minimum wage and overtime?

24   A.    No.

183

1    Q.    You never paid an hourly wage after

2    maybe the 300 -- I know there's $300 that people

3    get paid in the first few weeks; but after that,

4    you never paid an hourly wage to sales managers

5    or sales representatives?

6    A.    Correct.

7    Q.    And you still are not paying an hourly

8    wage, correct?

9    A.    No, we are not at this time.

10   Q.    Why not?

11   A.    Because we are relying on the opinion

12   that we got.

13   Q.    What specific factors did you consider

14   in making the determination not to pay hourly

15   wages to your salespeople and sales managers?

16   A.    Only opinions from legal counsel.

17   Q.    Did you rely on any specific facts of

18   the job?

19   A.    I would rely on advice from legal

20   counsel.

21   Q.    What about facts gathered; did you

22   gather or communicate any facts about Patriot

23   Resorts to counsel prior to getting a

24   determination that you were not required to pay

184

1    anything but commission to your sales

2    representatives and sales managers?

3          MS. FABBO:  Objection to the

4          extent any attorney asked you to

5          gather information, you wouldn't be

6          disclosing that.  You can answer if

7          you understand the question.

8    Q.    (By Ms. Garrow)  Did you communicate

9    any facts to your lawyer?

10   A.    We've communicated a lot of facts

11   during the course of this lawsuit.

12   Q.    I'm asking a very narrow question,

13   though.  Did you communicate any facts relating

14   to the jobs or anything done at Patriot Resorts

15   in order to get a determination that led you to

16   continue not to pay a minimum wage or overtime

17   wages to sales representatives and sales

18   managers?

19         MS. FABBO:  Objection.  You can

20         answer excluding anything that you

21         were asked by counsel to provide.

22         THE WITNESS:  Then there's really

23         nothing that I can add.

24   Q.    (By Ms. Garrow)  So you didn't

Wise v Patriot - R. Foster Campagna   5/23/05

185

1   independently offer any facts to counsel; is that
2   your testimony?
3       A.   Only in relation to responding to
4   questions asked.
5       Q.   Again, that was all seeking advice of
6   counsel at that time?
7       A.   That was during the course of the
8   lawsuit.
9       Q.   Were you seeking specific advice on
10  the legality of your practices at that time --
11  and when I say "your practices," of course I mean
12  not paying minimum wage, not paying overtime
13  wages?
14      A.   We were discussing information that
15  had to do with the lawsuit, in conjunction with
16  the lawsuit.
17      Q.   So were you independently seeking a
18  determination on the legality of your practices,
19  or was it all in conjunction with the lawsuit?
20      A.   Well, the lawsuit is about minimum
21  wage requirements, so yes.
22      Q.   Yes what?
23      A.   Yes, we were discussing the lawsuit,
24  and we were discussing minimum wage requirements.

186

1       Q.   Sorry to sound like I'm splitting
2   hairs here, but just so I'm clear.  On the advice
3   of counsel, you did not change your practices, is
4   that your testimony?
5           MS. FABBO:  Objection.
6           THE WITNESS:  I would say that we
7           have not determined what will be done
8           at this time.
9       Q.   (By Ms. Garrow)  When do you expect to
10  determine what will be done?
11      A.   Soon.
12      Q.   When you say "what will be done," if
13  you're going to start paying some kind of wage to
14  salespeople and sales representatives?
15      A.   Some type of a weekly expense or a per
16  diem.
17      Q.   How many marketing companies service
18  Patriot Resorts?
19      A.   I'm not sure.
20      Q.   But the salespeople don't go out and
21  solicit new business, right?
22      A.   No.
23      Q.   That's all solicited through the
24  marketing companies?

187

1       A.   They do not solicit new customers.
2   They may know somebody who is interested in
3   buying new time-shares and they may bring them to
4   the office, but that's unusual.
5       Q.   And that's not the customary manner of
6   how new customers are made referrals of Patriot
7   Resorts, correct?
8       A.   Correct.
9           MS. GARROW:  I think I have
10          nothing further here.  We had an issue
11          regarding some documents that were
12          provided to me that I understand have
13          customer identifications on them that
14          we may need at some point to question
15          regarding -- I know we're not getting
16          customer identification.
17          MS. FABBO:  You're not getting
18          the names, but you've got the contract
19          number.  I think -- did you say there
20          was a -- is the contract number the
21          number they get when they come in?
22          THE WITNESS:  There's a CAS
23          number, customer number when they come
24          in, then a customer number when they

188

1           purchase.
2           MS. GARROW:  That doesn't match
3           necessarily.  We may have to suspend
4           just based on those documents; but
5           otherwise, you are free to go.
6           MS. FABBO:  Maybe we can clarify.
7           Does the customer number -- could you
8           then identify the customer from the
9           customer number?
10          THE WITNESS:  Customer number can
11          identify the customer, yes.
12          MS. FABBO:  So what do you need
13          the specific name for?
14      Q.   (By Ms. Garrow)  I think we're talking
15  about different things here.  When somebody
16  basically comes in from the marketing companies,
17  they are assigned a number or not, when they're a
18  lead basically going on tour?
19      A.   They may have a number at that point,
20  but we don't use that number.  The number that's
21  assigned to them when they check in at the
22  resort, that's the customer identification
23  number.  Then if they purchase, then there's a
24  contract number; but there are many more customer

189

1  numbers than contract numbers.

2      Q.   There's a list at the beginning of the

3  day -- I think it goes daily rather than by

4  salesperson.  There's a list of people touring

5  the facility.  Do those people have any number

6  that then tracks them through the entire sales

7  process?

8      A.   Not that I'm aware of.

9           MS. FABBO:  So the people that

10          were touring the facility aren't the

11          people that check in?

12          THE WITNESS:  Yes, they are.  In

13          other words, the marketing company

14          sends a manifest that says there's

15          thirty-five or forty people expected

16          today; these are their names.  I don't

17          believe that there's a number.  Even

18          if there is a number, it's not in our

19          system.  Our system, the computer

20          automatically attaches a number to

21          that customer when they're registered.

22          MS. FABBO:  Why would you need

23          people that didn't register?  I don't

24          understand.

190

1           MS. GARROW:  We don't want the

2           name; we want the number to be able to

3           track somebody from Point A --

4           MS. FABBO:  Point A?

5           MS. GARROW:  Coming in on tour.

6           MS. FABBO:  As soon as they come

7           in, don't they get a number?

8      Q.   (By Ms. Garrow)  I've seen the number.

9  There's no -- correct me if I'm wrong --

10  identifies somebody from the tour status to a

11  contract; there's nothing that follows them along

12  all the way that doesn't have a name on it.

13      A.   The customer name is in the system

14  along with the contract number.  Those two

15  numbers, if they purchase, then the customer

16  number will be put into the file with the

17  contract.  The customer number and the contract

18  number will be on the same document; you'll have

19  both numbers to look at.

20      Q.   When do they get the customer number?

21      A.   When they come in the door.

22      Q.   Come in the door?

23      A.   At Patriot Resorts to come on tour.

24  When they were registered, typed into the

191

1  computer, the computer automatically types in a

2  number and puts it with their name.  Later on --

3  and they go by according to their customer number

4  -- that contract is attached to that customer and

5  that customer number.

6      Q.   Unfortunately, the new documents we

7  have here are not that first document, but maybe

8  we can do it from these documents.

9      A.   You had one there that had the

10  customer number and the contract number.

11      Q.   I see Exhibit Number 7, if you can

12  find something that tracks them all the way

13  through?

14      A.   Little, who is the purchaser contact

15  number 7895, but customer number over further to

16  the right, and you'll see those numbers are

17  almost in -- well, this a salesman ledger.  If we

18  looked at the numbers for all the customers of

19  the day, they would be a few digits off.  In

20  other words, 327 may be 329; 333, 336 -- a few

21  numbers apart, and all your customer numbers

22  would go in that order.  Then your contract

23  number over here would pretty much do the same

24  thing except a different range, but those two

192

1  would be attached to each other in the customer

2  file.

3      Q.   That's good.  One more question, then.

4  What if Peter Corbin or another salesperson took

5  somebody out on tour and that person didn't buy,

6  so they spent two, three hours with that person.

7  Where can I find identifying information on that

8  person; in other words, where can I find out that

9  Peter Corbin was on tour other than by looking at

10  what he sold?

11      A.   You would know that by -- it would be

12  a report similar to this.  I'm not sure what they

13  call it, but we run it by the salesmen's name and

14  a particular date, and it should run off all of

15  the customers.  I don't know what that is titled,

16  but that would be detailed to show if he had two

17  customers a day for ten days, there would be a

18  print out of twenty customers.

19      Q.   Is this one sheet, though; you think

20  there's a sheet that has a listing of all

21  customer numbers but -- so all tours taken by a

22  salesperson, whether they sold or not?

23      A.   I don't know that it's a report that

24  we run at this time, but the information is there

193

1   on the report.  Should be able to be generated.

2        Q.   Okay.  I mean, that's fine.  A number

3   suffices if there's some way to track all the

4   tours.

5                (Deposition suspended at 3:50)

---

195

1                                June 25, 2005

2

3   Marylou Fabbo, Esq.
    Skoler, Abbott and Presser, PC
4   1414 Main Street
    Springfield, MA  01103
5
    RE:  Wise v Patriot
6
    Dear Counselor:
7
          Enclosed is a copy of the deposition of
8   Rebecca Foster Campagna, taken on May 23, 2005 in
    the above-entitled action.
9
          According to Rule 30(e) of the
10  Massachusetts Rules of Civil Procedure, the
    deponent has thirty days to sign the deposition
11  from the date of its submission to the deponent,
    which is the above date.
12
          Please have the deponent sign the enclosed
13  Signature Page/Errata Sheet and return it to the
    offices of Suzanne Garrow, Esq., whereupon it
14  will be attached to the original deposition
    transcript.
15
          Thank you for your cooperation in this
16  matter.

17  Sincerely,

18

19  Ann A. Preston

20  cc:  Suzanne Garrow, Esq.

---

194

1

2   COMMONWEALTH OF MASSACHUSETTS

3   HAMPDEN, SS.

4            I, Ann A. Preston, a Notary Public in
5   and for the Commonwealth of Massachusetts, do
    certify that there came before me on May 23,
6   2005, at the offices of Heisler, Feldman and
    McCormick, PC, 1145 Main Street, Springfield,
7   Massachusetts, the following named person, to
    wit:  REBECCA FOSTER CAMPAGNA, who was by me duly
8   sworn to testify to the truth and nothing but the
    truth as to her knowledge concerning the matters
9   in this case; that she was examined upon her oath
    and her examination reduced to writing by me; and
10  that the statement is a true record of the
    testimony given by the witness, to the best of my
11  knowledge and ability.

12        I further certify that I am not a relative
    or employee of counsel or attorney for any of the
13  parties, or a relative or employee of such
    counsel or attorney, nor am I financially or
14  otherwise interested in the outcome of the
    action.
15
    WITNESS MY HAND this 25th day of June 2005.

16

17

18     _____
       Ann A. Preston
19
    My commission expires:
20  December 22, 2011

---

196

1                COMMONWEALTH OF MASSACHUSETTS

2   Wise v Patriot
    No. 04-CV-30091-MAP
3
4        I, REBECCA FOSTER CAMPAGNA, do hereby
5   certify under the pains and penalties of perjury
    that the foregoing testimony is true and accurate
6   to the best of my knowledge and belief, with the
    addition of the following changes/corrections:

7

8   Page  Line              Change/Correction

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18

19  Witness my hand this ___ day of _____, 2005.

20

21               _____
                 REBECCA FOSTER CAMPAGNA
    Orig:  Suzanne Garrow, Esq.
22  Copy:  Marylou Fabbo, Esq.

Wise v Patriot - R. Foster Campagna  5/23/05

197

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT
4

Case 3:04-cv-30091-MAP     Document 137-21     Filed 04/16/2007     Page 9 of 21

Deposition of:               Roger Martin                    April 5, 2005
                   Wise et al. vs. Patriot Resorts Corp., et al

                                      Vol. I, Pgs. 232

                   UNITED STATES DISTRICT COURT

                   DISTRICT OF MASSACHUSETTS

                              Docket No. 04-CV-30091-MAP

        - - - - - - - - - - - - - - - - - - - - - - - - -

                                        )

        WISE ET AL,                     )

                    Plaintiffs          )

                                        )

        vs.                             )

                                        )

        PATRIOT RESORTS CORP., )

        ET AL.                          )

                    Defendant           )

                                        )

        - - - - - - - - - - - - - - - - - - - - - - - - -


                   DEPOSITION OF ROGER MARTIN

                   Tuesday, April 5, 2005

                          9:10 a.m.

                SKOLER, ABBOTT & PRESSER, P.C.

                      One Monarch Place

              Springfield, Massachusetts  01144

        - - - - - - Sandra A. Deschaine, RPR - - - - - -

                   COURT REPORTING SERVICES

                      P.O. BOX 15272

              Springfield, Massachusetts  01115

              (413) 786-7233  FAX (413) 786-0299

Deposition of:                     **Roger Martin**                     April 5, 2005
**Wise et al. vs. Patriot Resorts Corp., et al**

---

2

1    APPEARANCES:
2    SKOLER, ABBOTT & PRESSER, P.C.
3        Marylou Fabbo, Esquire
4        One Monarch Place, Suite 2000
5        Springfield, Massachusetts 01144
6        (413) 737-4753  Fax (413) 787-1941
7        on behalf of Defendants
8    HEISLER, FELDMAN & MCCORMICK, P.C.
9        Suzanne Garrow, Esquire
10       1145 Main Street
11       Springfield, Massachusetts  01103
12       (413) 788-7988  Fax (413) 788-7996
13       on behalf of the Plaintiffs
14
15   Also Present:  Faith Lippert
16               Kimberly Klimczuk
17               Becky Foster
18
19
20
21
22
23
24

---

3

1                I N D E X
2    --------------------------------------------
     WITNESSES:                          PAGE
3    --------------------------------------------
4    Roger Martin
5        By Ms. Fabbo              4
6    --------------------------------------------
     EXHIBITS:      DESCRIPTION        PAGE
7    --------------------------------------------
8    Exhibit 1  Employment Agreement      25
9    Exhibit 2  Memo dated 8/6/01         99
10   Exhibit 3  Handwritten letter      128
11   Exhibit 4  Handwritten letter, 10/5/02    134
12   Exhibit 5  Handwritten letter, 10/11/02   138
13   Exhibit 6  Document dated 9/10/04   149
14   Exhibit 7  Document Bates #522-524    187
15   Exhibit 8  Harassment Complaint Procedure   198
16   Exhibit 9  Document dated 1/10/03    199
17   Exhibit 10 Memo dated 11/3/02       227
18
19
20
21
22
23
24

---

4

1        ROGER MARTIN, Deponent, having first been
2    satisfactorily identified by the production of his
3    driver's license and duly sworn by the Notary
4    Public, was examined and testified as follows:
5
6    EXAMINATION BY MS. FABBO:
7
8        Q.   Good morning, my name is Marylou
9    Fabbo.  I represent the defendants in the lawsuit
10   that you've brought against your former employer.
11            Have you ever had your deposition
12   taken before?
13       A.   No.
14       Q.   Could you state your name for the
15   record, please?
16       A.   Roger Martin.
17       Q.   And your current address?
18       A.   560 Mountain Road, Pittsfield, Mass.
19       Q.   Mr. Martin, the purpose of today is
20   so that I can find out what you know about the
21   facts alleged in your complaint.
22            A few preliminaries, you have to
23   remember to answer verbally rather than shaking
24   your head or nodding your head because the court

---

5

1    reporter is taking down what you say.  Okay?
2        A.   Yes.
3        Q.   I'm going to assume that you
4    understand my questions, and if you don't, could
5    you ask me to rephrase them?  Is that okay?
6        A.   Yes.
7        Q.   If you want to take a break at any
8    time, use the rest room, just to get up and
9    stretch, that's fine, I'm going to ask that you
10   wait until I finish my question and respond to the
11   question.  Okay?
12       A.   Okay.
13       Q.   Have you taken any medication today?
14       A.   No.
15       Q.   Nothing?
16       A.   No.
17       Q.   Consumed any alcohol?
18       A.   No.
19       Q.   Any drugs?
20       A.   No.
21       Q.   Who lives with you at your current
22   address?
23       A.   My fiancTe and my son.
24       Q.   What's your fiancTe's name?

---

2 (Pages 2 to 5)

6

1    A.    Michelle.
2    Q.    Last name?
3    A.    Bissette.
4    Q.    And your son's name?
5    A.    Nicholas.
6    Q.    Does he share your last name?
7    A.    Yes.
8    Q.    How old is he?
9    A.    Eight.
10   Q.    Is your fiancTe currently employed?
11   A.    Yes.
12   Q.    Where is she employed?
13   A.    Berkshire Health Services.
14   Q.    What does she do there?
15   A.    She's a supervisor.
16   Q.    How long has your fiancTe been living
17   at that address with you?
18   A.    As long as we've been there.
19   Q.    Approximately how long is that?
20   A.    Ten years.
21   Q.    And how long has your son been living
22   there?
23   A.    Since he was born.
24   Q.    Has anyone else resided with you at

7

1    that address since 2001?
2    A.    No.
3    Q.    So you've been there ten years?
4    A.    Yes.
5    Q.    Have you ever been involved as a
6    party or a witness in any other lawsuits involving
7    employment?
8    A.    No.
9    Q.    Has your fiancTe ever been involved,
10   to your knowledge, in any other lawsuits involving
11   employment?
12   A.    Not to my knowledge.
13   Q.    What's your date of birth?
14   A.    5/5/65.
15   Q.    Are you currently employed?
16   A.    Yes.
17   Q.    Where is that?
18   A.    I worked for Marriott Vacation Club
19   International.
20   Q.    What do you do there?
21   A.    Sell time-shares.
22   Q.    Where are the time-shares that you're
23   selling?
24   A.    Hilton Head.

8

1    Q.    Do you travel to Hilton Head?
2    A.    As of right now I'm living there
3    temporarily.
4    Q.    That's in South Carolina; is that
5    correct?
6    A.    That's correct.
7    Q.    How long have you been living there?
8    A.    About 2 1/2 months.
9    Q.    Where are you living when you're
10   there?
11   A.    I stay at an Extended Stay Suite.
12   Q.    At the Marriott?
13   A.    No, it's called Suburban Extended
14   Stay.
15   Q.    Is that something the company pays
16   for?
17   A.    No.
18   Q.    When did you begin working for the
19   Marriott?
20   A.    About five weeks ago.
21   Q.    How did you obtain that position?
22   A.    Applied for it.
23   Q.    Did you see an opening?
24   A.    Actually, I just put my numbers in

9

1    there and they called me about 2 1/2 months later.
2    Q.    You put -- when you say you put your
3    numbers in there, what are you referring to?
4    A.    My sales number, what I did in
5    volume.
6    Q.    At?
7    A.    At Vacation Village.
8    Q.    And where did you actually submit
9    these numbers to, what?
10   A.    It's called the Barony Beach Club.
11   Q.    Where is that?
12   A.    Hilton Head.
13   Q.    Is there anything in particular that
14   attracted you to the Hilton Head area?
15   A.    No.
16   Q.    Had you been there before?
17   A.    No.
18   Q.    Did you travel to Hilton Head and
19   become aware of this opening or how did you become
20   aware --
21   A.    Traveled to Hilton Head and became
22   aware of the opening.
23   Q.    On vacation or pleasure?
24   A.    Neither.

10

1    Q.    What was the reason you traveled to
2  Hilton Head for?
3    A.    Looking for work.
4    Q.    You said you're staying there
5  temporarily; is that correct?
6    A.    Absolutely correct.
7    Q.    And how much longer do you think
8  you'll be staying there?
9    A.    Depends on the job.
10   Q.    Are you going to -- is it your
11 understanding that you'll need to live there the
12 entire time that you're employed by Marriott?
13   A.    I couldn't tell you. We haven't gone
14 that far ahead. I haven't decided what I'm going
15 to do.
16   Q.    Have they requested that you
17 relocate?
18   A.    No.
19   Q.    How frequently do you travel to
20 Massachusetts?
21   A.    About once every five, six weeks.
22   Q.    Does your fiancTe or son travel there
23 to visit you?
24   A.    Absolutely.

11

1    Q.    How frequently is that?
2    A.    About the same amount of time. We
3  rotate around.
4    Q.    Are you currently earning a salary?
5    A.    No. They pay you an hourly wage, not
6  a salary. They take it back out of the
7  commission.
8    Q.    What's your hourly wage?
9    A.    Minimum wage, minimum for the hour.
10   Q.    What's that?
11   A.    I have no clue. Whatever it is.
12 Whatever hourly wage is nowadays.
13   Q.    Can you tell me what your
14 compensation structure is, how you're paid by your
15 current job?
16   A.    I don't think I can without getting a
17 waiver from Marriott, something to release the
18 information to you. I believe that's
19 confidential.
20   Q.    But you said generally you're paid a
21 minimum?
22   A.    You are paid an hourly wage due to
23 the federal law, they have to pay you an hourly
24 wage while you're on site.

12

1    Q.    Can you let me finish my question
2  before you respond, please? It's hard for her
3  take down what we're both saying. And then you're
4  paid commission, obviously, based on your sales;
5  is that correct?
6    A.    Correct.
7    Q.    And then you're saying that the
8  amount that you were paid an hourly wage is
9  deducted from those commissions?
10   A.    To my understanding, yes.
11   Q.    Have you made any sales?
12   A.    I just got finished with their
13 training program. No.
14   Q.    How long was the training program?
15   A.    Five weeks.
16   Q.    And where did it take place?
17   A.    In Hilton Head.
18   Q.    Could you have taken the training in
19 Massachusetts?
20   A.    No.
21   Q.    Are you, as part of your current
22 position, going to be, as far as your
23 understanding, showing potential customers the
24 properties that you could be selling on a

13

1  time-share basis?
2    A.    Yes.
3    Q.    And would you also be bringing people
4  on tours of the Hilton Head area?
5    A.    No.
6    Q.    Can you just tell me, generally, what
7  you expect that your day is going to be like in
8  this position, what you'll be doing in your
9  workday?
10   A.    Consisting of giving at least three
11 tours a day, is my understanding.
12   Q.    And what is a tour?
13   A.    Where the company brings in somebody
14 looking at a vacation ownership property, and you
15 take them around the property and show them the
16 benefits of owning a vacation ownership versus
17 what they're doing.
18   Q.    And when you say the company brings
19 in a person, where are they bringing them to?
20   A.    As far as I know, right onto the
21 property.
22   Q.    Where is that property?
23   A.    Hilton Head.
24   Q.    Where?

4 (Pages 10 to 13)

Deposition of:                 Roger Martin                 April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

14

1    A.   It's the Barony Beach Club.
2    Q.   Which one, I'm sorry?
3    A.   The Barony.
4    Q.   Can you spell that?
5    A.   Barony Beach Club.
6    Q.   Are all the time -- are the
7    time-shares that you'll be selling located at that
8    property?
9    A.   No.
10   Q.   I'm just trying to make sure I follow
11   you.  So as far as you understand, the Marriott
12   will be responsible for bringing people to the
13   Barony Beach Club and then you will show them
14   properties at Barony Beach Club or you will show
15   them other properties as well?
16       A.   We show them an off-site property, a
17   virtual tour of Surf Watch, is what I'll be
18   selling.
19   Q.   Where is Surf Watch located?
20   A.   Hilton Head.
21   Q.   Where at Hilton Head?
22   A.   Hilton Head, South Carolina.
23   Q.   Is it one of the plantations there?
24   A.   No.

15

1    Q.   Is it a Barony Beach Club?
2    A.   No.
3    Q.   Do you know the address?
4    A.   No.
5    Q.   And is that just one location, Surf
6    Watch?
7    A.   That's one location.
8    Q.   And that's all you'll be responsible
9    for?
10   A.   I could technically sell outside if
11   there was somebody that was interested in another
12   property but the main is Surf Watch.
13   Q.   And off-site, do you mean another
14   Marriott property?
15   A.   Yes.
16   Q.   And you just give a virtually tour.
17   And how do you do that?
18   A.   We take them through Marriott's
19   gallery.
20   Q.   And that's at Barony Beach Club?
21   A.   Yes.
22   Q.   Does anyone take the potential
23   customer to the actual Surf --
24   A.   No.

16

1    Q.   -- Watch location?
2    A.   No.
3        MS. GARROW:  Let her finish the
4    question.
5    Q.   When do you anticipate beginning your
6    sales duties?
7    A.   When I get back from this week off
8    here.
9    Q.   Just sometime next week?
10   A.   Absolutely, yes.
11   Q.   Do you have any benefits in that
12   position?
13   A.   Yes.
14   Q.   What are they?
15   A.   Health, life, vision, dental, profit
16   sharing.
17   Q.   Anything else?
18   A.   No.
19   Q.   What about vacation days or holidays?
20   A.   Actually, as I understand it, not
21   right now, no.
22   Q.   Do you get them after a certain
23   period of time?
24   A.   I believe so.

17

1    Q.   Do you know when?
2    A.   No.
3    Q.   Do you know how much vacation time or
4    holiday time?
5    A.   No.
6    Q.   Do you get any personal days?
7    A.   I don't know.
8    Q.   What about sick time?
9    A.   I don't know.
10   Q.   And does the company have a 401K?
11   A.   Not that I'm aware of.
12   Q.   Is it your understanding that after
13   you're there for a certain period of time, you're
14   going to get additional benefits, either in
15   vacation or holidays, or something else?
16   A.   I'm not sure.
17   Q.   Did you ever get a company handbook?
18   A.   Yes.
19   Q.   Prior to being employed with
20   Marriott, what was the last place you worked
21   before that?
22   A.   Coral Resorts.
23   Q.   And when did you work there?
24   A.   When did I work there?

5 (Pages 14 to 17)

Deposition of:                          **Roger Martin**                          April 5, 2005
**Wise et al. vs. Patriot Resorts Corp., et al**

---

**18**

1    Q.   Yes.
2    A.   December and part of January.
3    Q.   Of this year?
4    A.   Yes.
5    Q.   And where was that located?
6    A.   Hilton Head.
7    Q.   And what was your position there?
8    A.   Selling time-shares.
9    Q.   Why did you leave that job?
10   A.   Take the employment with Marriott.
11   Q.   So your separation was voluntary?
12   A.   Absolutely.
13   Q.   And were you paid on an hourly basis
14   at Coral Resorts?
15   A.   No.
16   Q.   How were you paid?
17   A.   Straight commission.
18   Q.   How did you learn about the job at
19   Coral Resorts?
20   A.   Internet.
21   Q.   So were you working at Coral Resorts
22   when you learned that you might have an
23   opportunity at Marriott?
24   A.   Yes.

**19**

1    Q.   Did you make any sales when you were
2    at Coral Resorts?
3    A.   Yes.
4    Q.   Did you have any benefits in that
5    position?
6    A.   No.
7    Q.   Any vacation or holiday time?
8    A.   No.
9    Q.   Who was your supervisor at Coral
10   Resorts?
11   A.   Tori Bigall.
12   Q.   Is that a female?
13   A.   No, it's a guy.  It's a gentleman.
14   Q.   Was it Tori?
15   A.   Tori.
16   Q.   Do you have the address for Coral
17   Resorts; do you know --
18   A.   No, I don't.
19   Q.   Do you know where it's located?
20   A.   No.
21   MS. GARROW:  Let her finish the
22   question.
23   Q.   Prior to working at Coral Resorts,
24   did you know anyone who was employed there?

**20**

1    A.   No.
2    Q.   Where were the time-shares that you
3    were selling?  Were they at this property called
4    Coral Resorts?
5    A.   No.
6    Q.   Where were they?
7    A.   They were about six miles up the
8    road.
9    Q.   And could you tell me, generally,
10   what you did in that job, how your day went?
11   A.   You pick up the person and bring them
12   into a room and explain what they were there for,
13   to look at a time-share, then you take them up to
14   the property and show them the property.
15   Q.   And the property was at a different
16   location?
17   A.   Six miles up the road.
18   Q.   When you were working for Coral
19   Resorts, were you also living in Hilton Head?
20   A.   Yes.
21   Q.   Where were you living at that time?
22   A.   The Suburban.
23   Q.   Has anyone ever lived with you at
24   your location, the Suburban Hilton Head?

**21**

1    A.   No.
2    Q.   And prior to Coral Resorts, what was
3    the place that you worked before that, the last
4    place?
5    A.   Vacation Village.
6    Q.   What was your last day at Vacation
7    Village?
8    A.   I'm not sure.
9    Q.   Approximately?
10   A.   I'm not sure.
11   Q.   No idea?
12   A.   No idea.
13   Q.   You have no idea of the year?
14   A.   2004.
15   Q.   Do you remember if it was -- what
16   season it was?
17   A.   I believe it was late fall.
18   Q.   Can you tell me the -- well,
19   actually, before you -- after you left Vacation
20   Village, did you collect unemployment for any
21   period of time?
22   A.   Yes.
23   Q.   How long?
24   A.   A few months.

---

6 (Pages 18 to 21)

**22**

1  Q.  Do you know how much?
2  A.  No.
3  Q.  Do you have any records that would
4  refresh your recollection?
5  A.  Not with me.
6  Q.  Do you have any anywhere?
7  A.  I don't think so.
8  Q.  Did you collect the maximum per week?
9  A.  No.
10  Q.  How much did you collect?
11  A.  About $125 a week, I believe.
12  Q.  And did you collect unemployment for
13  most of the time period from your separation from
14  Vacation Village till you began at Coral?
15  A.  No.
16  Q.  Did you have any other source of
17  income during that time period?
18  A.  No.
19  Q.  Do you know why you didn't collect
20  for that whole time?
21  A.  It wasn't worth it.  It wasn't worth
22  the . . .
23  Q.  What wasn't worth it?
24  A.  It wasn't worth doing the paperwork

**23**

1  for the $125.
2  Q.  What was the paperwork?
3  A.  Calling up, checking in.
4  Q.  What paperwork are you referring to?
5  A.  Just the phone stuff, electronic.
6  Q.  When you say "electronic," are you
7  referring to anything other than the telephone?
8  A.  No.
9  Q.  So you didn't want to call in or
10  check in?
11  A.  Correct.
12  Q.  How frequently were you required to
13  do that?
14  A.  Once a week.
15  Q.  Is that why you no longer got
16  unemployment during that time period?
17  A.  Correct.
18  Q.  Do you have any idea the approximate
19  number of weeks that you did collect unemployment?
20  A.  Maybe sixteen.  I can't recall.
21  Three months worth, something like that.
22  Q.  Did you work for anyone else as an
23  independent contractor during the time period
24  between your separation from Vacation Village and

**24**

1  the present?
2  A.  No.
3  Q.  Any other employers?
4  A.  No.
5  Q.  Were you self-employed at all?
6  A.  No.
7  Q.  Did you work under the table at all?
8  A.  No.
9  Q.  Were you disabled for any period
10  during that same time frame?
11  A.  No.
12  Q.  Was there any reason why you couldn't
13  have worked, other than not having a position to
14  go to?
15  A.  Yes.
16  Q.  What was that?
17  A.  The contract that Vacation Village
18  made you sign, you can't work within 250 miles of
19  said area.
20  Q.  Is this, and take your time and
21  please look at it, is this the contract that
22  you're referring to?
23  A.  I can't be sure but it looks like it.
24  MS. FABBO:  Could you mark that,

**25**

1  please?
2  (Martin Exhibit 1, Marked for
3  identification.)
4  Q.  Mr. Martin, is that your signature on
5  Page 9 of Exhibit 1, or a copy of your signature?
6  A.  Yes.
7  Q.  If I could please draw your attention
8  to Page 6.  Is this the restriction that you're
9  referring to at the top of Page 6, in the first
10  paragraph, which is not a full paragraph, and then
11  the second Paragraph, B?
12  A.  Yes.
13  Q.  Could you explain, in your own words,
14  what you understand that paragraph -- how that
15  paragraph or that language prohibited you from
16  working while you were -- after your separation
17  from Vacation Village and prior to your employment
18  at Coral?
19  A.  The way I understood it, is that you
20  can't work for two years around the area, within
21  200 miles.
22  Q.  Do you believe that you're in
23  compliance with that agreement now?
24  A.  I believe.

7 (Pages 22 to 25)

26

1    Q.   Do you know whether the company has
2  any projects within a 200 mile radius within where
3  you're working?
4    A.   Not that I'm aware of.
5    Q.   Any other reason that prevented you
6  from working since your separation from Vacation
7  Village?
8    A.   I don't understand the question.
9    Q.   You had said that one reason you
10 couldn't work is because of the non-competition
11 language in the agreement. Is there any other
12 reason?
13   A.   No.
14   Q.   Were you ever in the military?
15   A.   No.
16   Q.   Prior to your employment at Vacation
17 Village, had you ever consulted or treated with a
18 mental health care provider regarding any issues?
19   A.   Yes.
20   Q.   When was that?
21       MS. GARROW: I'm going to object.
22       MS. FABBO: On what grounds?
23       MS. GARROW: On the grounds that
24 we've already disclosed that there's been no

27

1  treatment in relation to this case, so this is not
2  an appropriate province here.
3        MS. FABBO: I don't think that's a
4  valid objection. If you want to state all your
5  objections for the record, that's fine. I'm
6  asking dates of treatment. I don't think there's
7  anything objectionable about that.
8        MS. GARROW: I'll let him answer
9  dates of treatment and we'll go from there.
10   A.   2000, I guess, is the year.
11   Q.   For what period of time?
12   A.   For about six months in 2000.
13   Q.   Who did you treat with?
14       MS. GARROW: I'm going to object. At
15 this point it's a violation of his privacy.
16 There's nothing relating to this matter, so.
17       MS. FABBO: If he's alleging
18 emotional distress damages, then we have a right
19 to determine whether emotional distress is caused
20 by this matter or some other condition.
21       MS. GARROW: However, he hasn't -- he
22 has disclosed that he hasn't treated in relation
23 to this matter.
24       MS. FABBO: Well, I'm not, generally,

28

1  going to have to take his word for it. That's
2  your conclusion. We have every right to see
3  whether he's treated for emotional distress.
4        MS. GARROW: He just testified to the
5  dates which is prior to his working at Vacation
6  Village.
7        MS. FABBO: Fine. But I need to know
8  the reasons why he treated. That could certainly
9  be a factor in his emotional stress damages in
10 this case.
11       MS. GARROW: I'm going to instruct
12 you that you answer and we reserve the right to
13 remove this portion of testimony. So you can go
14 ahead and answer.
15   A.   Can you repeat the question?
16   Q.   Treating physician or health care
17 provider?
18   A.   Patrick Latono.
19   Q.   And Mr. Latono, do you know what
20 his -- is he a physician or psychologist? Do you
21 know what his certification is?
22       MS. GARROW: Objection, and I'm going
23 to renew all the objections from the previous
24 question. You can answer.

29

1    A.   I believe he's a psychotherapist.
2  I'm not sure though.
3    Q.   Where is he located?
4    A.   I went to his residence.
5    Q.   Where is that?
6    A.   59 Strong Avenue, Pittsfield, Mass.
7    Q.   Did you say you met with him for
8  approximately six months?
9    A.   Yes.
10   Q.   And how frequently?
11       MS. GARROW: I'm going to object,
12 same, renew objections as to all this line of
13 questioning. You can answer.
14   A.   Once a week.
15   Q.   And what prompted you to go see
16 Mr. Latono?
17       MS. GARROW: Objection. Same
18 reasons. You can go ahead and answer.
19   A.   Just my own self.
20   Q.   Is there some issue that you were
21 having that you felt you needed to have a
22 psychotherapist?
23       MS. GARROW: Same objections. Go
24 ahead and answer.

Deposition of:                    Roger Martin                          April 5, 2005
                     Wise et al. vs. Patriot Resorts Corp., et al

---

30

1     A.   Yes.
2     Q.   And what were they?
3          MS. GARROW:  Objection.  You can
4     answer.
5     A.   I had issues with my temperament.
6          MS. FABBO:  Susan, I am comfortable,
7     if you want to just stipulate that your same
8     objection goes to this whole line of questioning.
9          MS. GARROW:  That's fine.  I'm
10    comfortable with that as well.
11         MS. FABBO:  We'll move along a little
12    quicker.
13    Q.   What was the issues with your
14    temperament, in your opinion?
15         MS. GARROW:  I'm going to object on
16    that grounds, that he can't render an opinion on
17    his temperament.  You can ask him what he was
18    experiencing, but you can't ask him what his
19    opinion was.
20    Q.   What did you consider you had?  You
21    said you had issues with your temperament.  Can
22    you explain what that means?
23    A.   I thought I could control my temper a
24    little better.

---

31

1     Q.   You feel you had a temper?
2     A.   Yes.
3     Q.   Had anything happened in particular
4     that led you to see this individual?
5     A.   No.
6     Q.   Had you ever met with any other
7     health care providers, prior to your employment
8     with Vacation Village, related to your mental
9     health?
10    A.   My whole life, I guess.
11    Q.   All related to mental health issues?
12    I just want to make sure that you understand my
13    question.  Is that a yes?
14    A.   I would assume, yes.
15    Q.   Has the issue, generally, been your
16    temperament?
17    A.   No.
18    Q.   Can you tell me what the other issues
19    have been?
20    A.   Alcoholic parents that put me in
21    group homes.
22    Q.   Anything else?
23    A.   No.
24    Q.   Were you raised in group homes?

---

32

1     A.   Pretty much.
2     Q.   Do you know what years you were
3     raised in group homes?
4     A.   From seven to seventeen.
5     Q.   Did you grow up in Massachusetts?
6     A.   Yes.
7     Q.   Are you saying that in connection
8     with this placement into groups homes, you
9     received some sort of counseling or treatment, or
10    are you talking about something different than
11    that?
12    A.   No.  Yes.
13    Q.   What are you talking about then?
14    A.   When you're in a group home, you have
15    to go through mandatory counseling, so I had to do
16    that.
17    Q.   Where were these group homes?
18    A.   Located in Pittsfield, Springfield,
19    Belchertown, Boston area, Cape Cod.
20    Q.   Did you move with any regular
21    frequency from one group home to the next?
22    A.   Yes, all the time, moved all the
23    time.
24    Q.   Was any of this movement, as far as

---

33

1     you know, due to your behavior in the group homes?
2     A.   No.
3     Q.   What caused all the movement, as far
4     as you know?
5          MS. GARROW:  Objection.  If you know.
6     A.   Yeah, one program shutting down, you
7     know, just the courts moving you from one to the
8     other.
9     Q.   And aside from the counseling that
10    you got in connection with your placement to group
11    homes, did you receive any other counseling?
12    A.   No.
13    Q.   So it would just be the group homes
14    and then Patrick Latono?
15    A.   Yes.
16    Q.   Were you prescribed any medication
17    for your mental health?
18    A.   Not since I was seven.
19    Q.   And what were you prescribed when you
20    were seven?
21    A.   Ritalin.
22    Q.   How long did you take Ritalin?
23    A.   I can't recall.
24    Q.   Did you discontinue it at some point?

---

9 (Pages 30 to 33)

**Deposition of:**        **Roger Martin**        **April 5, 2005**

**Wise et al. vs. Patriot Resorts Corp., et al**

---

**34**

1   A.   Yes.

2   Q.   Do you know who prescribed that for

3 you?

4   A.   No.

5   Q.   Why did you discontinue treatment

6 with Mr. Latono, am I saying that right?

7   A.   Latono.

8   Q.   Do you know how to spell that?

9   A.   No.

10   Q.   Why did you discontinue treatment?

11   A.   We feel we reached a -- where I

12 needed to be.

13   Q.   Did you feel your temper was more

14 under control at that time?

15   A.   Yes.

16   Q.   And have you, since then, treated

17 with anyone else for your mental health

18 conditions?

19   A.   No.

20   Q.   Did you ever go to anger management

21 classes?

22   A.   Yes.

23   Q.   When was that?

24   A.   I can't recall.

---

**35**

1   Q.   Was it during your employment at

2 Vacation Village?

3   A.   No.

4   Q.   After?

5   A.   No.

6   Q.   Prior? Is it prior to?

7   A.   Yes.

8   Q.   Where did you attend those classes?

9   A.   Phoenix, Arizona.

10   Q.   How did you end up going to Phoenix,

11 Arizona for anger management classes?

12   A.   I had a traffic altercation.

13   Q.   In Arizona?

14   A.   Yes.

15   Q.   Were you there on vacation?

16   A.   No.

17   Q.   Work?

18   A.   Yes.

19   Q.   Who were you working for at the time?

20   A.   ABC Nissan.

21   Q.   And what was the altercation? Can

22 you describe it to me, please?

23   A.   Just two guys at a red light having

24 an altercation, a verbal altercation.

---

**36**

1   Q.   What prompted the altercation?

2   A.   Heat.

3   Q.   Heat. Did someone run a red light?

4   A.   No.

5   Q.   Can you tell me what happened,

6 please?

7   A.   The guy kept beeping the horn.

8   Q.   Were you in front of him?

9   A.   Yes.

10   Q.   And you were at a red light?

11   A.   Yes.

12   Q.   Did you do something in response to

13 that?

14   A.   Yes.

15   Q.   What did you do?

16   A.   Got out of my car.

17   Q.   What did you do?

18   A.   Called him all kinds of names.

19   Q.   Was there any physical altercation?

20   A.   No.

21   Q.   How did the authorities get involved?

22   A.   Two motorcycle policemen pulled up as

23 I was yelling at him.

24   Q.   Were you alone in the car when this

---

**37**

1 started?

2   A.   Yes.

3   Q.   What about the other individual?

4   A.   No.

5   Q.   Who was he with?

6   A.   A female.

7   Q.   Young, his own age, approximately?

8   A.   I don't know.

9   Q.   A child or an adult?

10   A.   An adult.

11   Q.   Was he yelling back at you?

12   A.   Yes.

13   Q.   Were you standing outside his car

14 window?

15   A.   Yes.

16   Q.   And was the window up or down?

17   A.   Down.

18   Q.   And so what happened when the police

19 on motorcycles arrived?

20   A.   They pulled us to the side,

21 questioned me while I was yelling at him, cited me

22 for creating a disturbance.

23   Q.   Anything else?

24   A.   I had to go to court.

---

10 (Pages 34 to 37)

Deposition of:                          Roger Martin                          April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

---

**38**

1    Q.    Did the other individual get cited as
2    well, as far as you know?
3    A.    No.
4    Q.    Was your employer aware of this
5    incident?
6    A.    No.
7    Q.    Were you driving your own car?
8    A.    Yes.
9    Q.    What year was this?
10    A.    Best of my recollection, I believe
11    '97.
12    Q.    So you said you were working for ABC
13    Nissan; is that correct?
14    MS. GARROW:  I'm going -- I just want
15    to interject here because we went from mental
16    health issues to anger management and now we're on
17    employment issues, and to the extent that these
18    are related to anger management, I want to make
19    sure that my objections are continued to be
20    renewed in relation to this.  You can keep going
21    and you can answer the question.
22    A.    Can you repeat the question?
23    Q.    What were you doing when you were
24    employed at ABC Nissan, what was your job there?

---

**40**

1    Q.    Other than what you've told me so
2    far, have you ever had any other anger management
3    courses or instruction, counsel?
4    A.    No.
5    Q.    And no other mental health treatment,
6    other than what you've already told me?
7    A.    Not that I'm aware of, no.
8    Q.    Did you feel the anger management
9    classes were helpful to you in any way?
10    A.    Yes.
11    Q.    Prior to attending those classes, had
12    anyone ever brought to your attention issues with
13    your anger management or your temperament?
14    MS. GARROW:  I'm going to object.
15    You can answer.
16    A.    I would say yes, probably.
17    Q.    Do you know the years you worked at
18    ABC Nissan?
19    A.    □'97.  I worked for the Vanta Group,
20    so that's '97, '98, until I moved in '99.
21    Q.    What prompted you to leave Arizona
22    and relocate?
23    A.    The better half of me, my fiancTe.
24    Q.    Was she also living with you in

---

**39**

1    A.    Car salesman.
2    Q.    Where was that located?
3    A.    Phoenix, Arizona.
4    Q.    And you were living there; is that
5    correct?
6    A.    Correct.
7    Q.    What were the years you lived in
8    Arizona?
9    A.    '97, '98, part of '99.
10    Q.    What was the outcome of your court
11    proceedings?
12    A.    Adjudicated not guilty, as long as I
13    completed sixteen weeks of anger management.
14    Q.    Did you complete the sixteen weeks of
15    anger --
16    A.    Yes, I did.
17    Q.    Where did you attend those classes?
18    A.    Phoenix, Arizona.
19    Q.    Do you know where in Phoenix, what
20    kind of institution it was?
21    A.    No.
22    Q.    Was it affiliated with the court
23    system or the police department?
24    A.    The court system.

---

**41**

1    Arizona?
2    A.    Yes.
3    Q.    Did you wish to relocate to this
4    area; is that what you're saying?
5    A.    She wanted to come back home.  She's
6    from the area.
7    Q.    And so you voluntarily left your
8    employment at Nissan to relocate?
9    A.    Yes.
10    Q.    And is that when you moved into the
11    address you gave me earlier?
12    A.    Yes.
13    Q.    When you came to Massachusetts, where
14    did you work?  What was your initial employment?
15    A.    I want to say Haddad.
16    Q.    What is that?
17    A.    It's a car dealership.
18    Q.    Where is that located or where was it
19    located?
20    A.    Lenox, Massachusetts.
21    Q.    Were you a salesperson?
22    A.    Yes.
23    Q.    When were you employed there?
24    A.    From the time I got back,

---

11 (Pages 38 to 41)

**Deposition of:**                     **Roger Martin**                     **April 5, 2005**
**Wise et al. vs. Patriot Resorts Corp., et al**

---

42

1  roughly, '99 till about 2000.
2      Q.   Why did you leave that position?
3      A.   The construction. When they had
4  Route 7 going on, the construction was just a
5  business killer.
6      Q.   So due to the construction, it was
7  diverting business from the dealership?
8      A.   Correct, they had the road closed
9  down in front of it.
10     Q.   Who was your supervisor there?
11     A.   I can't recall.
12     Q.   Did the car dealership close?
13     A.   No.
14     Q.   Is it still open, as far as you know?
15     A.   Still open.
16     Q.   And when you left Haddad, where did
17  you go to work next?
18     A.   Falcon, Chevrolet.
19     Q.   Falcon?
20     A.   Falcon.
21     Q.   Where is that located or where was it
22  located?
23     A.   Pittsfield.
24     Q.   When did you begin work there?

43

1      A.   Right -- just about when I left
2  Haddad.
3      Q.   Did you have alternate employment
4  before you left Haddad?
5      A.   I can't recall.
6      Q.   How long did you work at Falcon?
7      A.   About six months.
8      Q.   Who was your supervisor there?
9      A.   I want to say John Day. I'm not sure
10  but I think it was him.
11     Q.   And what prompted you to leave Falcon
12  Chevrolet?
13     A.   The business closed.
14     Q.   Do you know where it was located in
15  Pittsfield?
16     A.   West Street.
17     Q.   And the next place you were employed?
18     A.   I want to say Vacation Village.
19     Q.   Prior to becoming employed at
20  Vacation Village, did you do any work as an
21  independent contractor or work any side jobs?
22     A.   No.
23     Q.   Self-employed at all? And I'm
24  talking about the time period from when you left

44

1  Arizona till when you came to Vacation Village.
2      A.   No.
3      Q.   How did you come to be employed at
4  Vacation Village?
5      A.   A friend of mine heard that they were
6  building a resort in town and that I should check
7  into it.
8      Q.   How long were you unemployed before
9  going to work at Vacation Village?
10     A.   Probably two or three months.
11     Q.   Did you collect unemployment during
12  that time period?
13     A.   No.
14     Q.   Why not?
15     A.   Just never filed for it.
16     Q.   Who was this friend that told you?
17     A.   I can't recall his name, John
18  somebody or other.
19     Q.   Is he someone that went for a job at
20  Vacation Village?
21     A.   No.
22     Q.   Where did you go to apply?
23     A.   Actually, we went to their place of
24  business from -- we were working at Bentley Brook,

45

1  that's right, we were working at Bentley Brook
2  for -- I was working for Bentley Brook before
3  that, for about six months.
4      Q.   What's Bentley Brook?
5      A.   Bentley Brook is a time-share
6  organization. It was owned by Aquavest at the
7  time, I believe it is.
8      Q.   Aquavest?
9      A.   I believe that was the parent
10  company.
11     Q.   Where was that located?
12     A.   Hancock.
13     Q.   Massachusetts?
14     A.   Yes.
15     Q.   Do you know the address?
16     A.   No.
17     Q.   And when you say "we went," who are
18  you talking about?
19     A.   Thirteen sales people that were
20  working at Bentley Brook all met with Vacation
21  Village representatives on site.
22     Q.   When you say "on site," where are you
23  referring to?
24     A.   20 Old Williamstown Road,

---

12 (Pages 42 to 45)

|  | 46 |
|---|---|
| 1 | Lansborough, Massachusetts. |
| 2 | Q. When you were -- so you said you were |
| 3 | employed at Bentley Brook for about six months? |
| 4 | A. Roughly, yes. |
| 5 | Q. How did you end up at Bentley Brook? |
| 6 | A. By that guy John, he told me. |
| 7 | Q. How did you know John? |
| 8 | A. Just through mutual friends. |
| 9 | Q. Did he also work at Bentley Brook? |
| 10 | A. No. |
| 11 | Q. Do you know what he did? |
| 12 | A. No. |
| 13 | Q. Were you paid on commission or hourly |
| 14 | wage at Bentley Brook? |
| 15 | A. Commission. |
| 16 | Q. A hundred percent commission? |
| 17 | A. Actually, I can't recall. I'm not |
| 18 | positive. |
| 19 | Q. Where were the time-shares that you |
| 20 | sold at Bentley Brook location? |
| 21 | A. The base of Jiminy Peak. |
| 22 | Q. Did you travel to Jiminy Peak to show |
| 23 | people the time-shares? |
| 24 | A. Are you asking me if I drove to work? |

|  | 47 |
|---|---|
| 1 | Q. Yeah, I'm asking you, I guess, |
| 2 | whether you showed them the time-shares on the |
| 3 | location or whether they looked at brochures? |
| 4 | A. No, we showed them on location. |
| 5 | Q. So you said about thirteen of you |
| 6 | went to Vacation Village. Is there something that |
| 7 | prompted this mass exodus to go over to Vacation |
| 8 | Village? |
| 9 | A. Yes. |
| 10 | Q. And what was that? |
| 11 | A. The director of sales was looking at |
| 12 | interviewing for their company, and Vacation |
| 13 | Village, assuming, wanted a ready-made line, and |
| 14 | he was going to bring the whole line with him. |
| 15 | Q. Who was the director of sales? |
| 16 | A. I can't recall his name. |
| 17 | Q. Did he go to Vacation Village? |
| 18 | A. No, he didn't. |
| 19 | Q. Did anyone else, other than yourself |
| 20 | and this group of thirteen people, go to Vacation |
| 21 | Village? |
| 22 | A. Just the thirteen. |
| 23 | Q. All thirteen of you went? |
| 24 | A. Yes. |

|  | 48 |
|---|---|
| 1 | Q. Do you know who they were? |
| 2 | A. Off the top of my head, I can't |
| 3 | recall. |
| 4 | Q. Do you remember any of them? |
| 5 | A. Mike Massaconi. |
| 6 | Q. Anyone else? |
| 7 | A. Rebecca, I can't remember her last |
| 8 | name. |
| 9 | Q. Who else? |
| 10 | A. I can't recall off the top of my |
| 11 | head. |
| 12 | Q. Any other individuals involved in |
| 13 | this lawsuit that are named, Mr. Wise, Mr. Corbin? |
| 14 | A. Just Mr. Massaconi. |
| 15 | Q. So you said thirteen sales people met |
| 16 | with Vacation Village; is that correct? |
| 17 | A. Roughly, thirteen. |
| 18 | Q. About, okay. And you met with them |
| 19 | on site? |
| 20 | A. On site. |
| 21 | Q. Who did you meet with? |
| 22 | A. Bruce Polanski, Larry somebody or |
| 23 | other, and I believe J.P. Ottino, I believe, I'm |
| 24 | not sure if that's how you pronounce his last |

|  | 49 |
|---|---|
| 1 | name. |
| 2 | Q. Was this one meeting? |
| 3 | A. Yes. |
| 4 | Q. What occurred at this meeting? |
| 5 | A. They told us that, you know, they |
| 6 | wanted us to come work for them. They were going |
| 7 | to pay us $300 a week for ten weeks and ten |
| 8 | percent commission. |
| 9 | Q. When you say "they told us," who told |
| 10 | you? |
| 11 | A. Bruce Polanski, Larry, J.P. |
| 12 | Q. All three of them? |
| 13 | A. Yes. |
| 14 | Q. Anything else that you remember from |
| 15 | that meeting? |
| 16 | A. No. |
| 17 | Q. Did you submit an application? |
| 18 | A. I believe. I'm not positive, but I |
| 19 | think we did at that point. |
| 20 | Q. Were you questioned at all about your |
| 21 | qualifications and your employment history? |
| 22 | A. No. |
| 23 | Q. Were you told anything else about the |
| 24 | job, other than what you were going to be |