**Deposition of:**                    **Roger Martin**                    **April 5, 2005**
**Wise et al. vs. Patriot Resorts Corp., et al**

---

50

1  compensated?
2      A.   That it was just preconstruction,
3  preconstruction sales.
4      Q.   And when was the construction to take
5  place?
6      A.   Excuse me.
7      Q.   When was the construction to take
8  place or had it already been ongoing?
9      A.   It was already ongoing.
10      Q.   So why did you leave your job and go
11  to Vacation Village?
12      A.   At the time, it seemed like a better
13  advancement.
14      Q.   After this meeting with these three
15  individuals that you just described, did you meet
16  with anyone else from Vacation Village or at
17  Vacation Village prior to the time you started
18  employment?
19      A.   I can't recall.
20      Q.   Do you recall any conversations you
21  had with anyone, prior to starting employment, who
22  was employed by Vacation Village?
23      A.   I can't recall.
24      Q.   Do you recall going to

---

51

1  any interviews?
2      A.   Just what we went through.
3      Q.   Nothing else?
4      A.   No.
5      Q.   So how much time between that one
6  meeting you described and your start date?
7      A.   I believe, I'm not sure, but I think
8  it was about a month, month and a half.
9      Q.   Did you have a non-compete with your
10  prior employer?
11      A.   No.
12      Q.   Any kind of salesperson agreement?
13      A.   My recollection, no.
14      Q.   Is it your recollection that every
15  one that attended that meeting ultimately went to
16  Vacation Village?
17      A.   I don't think so, no.
18      Q.   Approximately how many people would
19  you say went?
20      A.   I can't be sure off the top of my
21  head.
22      Q.   You have no approximation?
23      A.   I don't want to speculate on that.
24      Q.   What was your start date at Vacation

---

52

1  Village?
2      A.   I'm not positive.
3      Q.   Do you remember when you received
4  this agreement that's dated the 6th of August,
5  2001, Exhibit 1?
6      A.   That was probably real close to the
7  start date of my employment with Vacation Village,
8  when I received that.
9      Q.   Do you remember whether you received
10  it before or after you started employment?
11      A.   I'm not sure.
12      Q.   Do you remember whether you received
13  any documents prior to starting employment, from
14  the company?
15      A.   I'm not sure.
16      Q.   Do you have any records that would
17  refresh your recollection as to whether you did
18  receive any documents?
19      A.   Not that I can recall.
20      Q.   Did the other employees who left your
21  prior employer and went to Vacation Village also
22  start the same day as you?
23      A.   To the best of my knowledge, yes.
24      Q.   And what happened on your first day

---

53

1  of employment?
2      A.   I believe we did a lot of paperwork
3  that day.
4      Q.   What kind of paperwork?
5      A.   I believe what we're talking about
6  right here.
7      Q.   Exhibit 1?
8      A.   And others.  I think we filled out
9  the application, I think we did all of that,
10  signed our compensation letter.
11      Q.   Did you review the employment
12  agreement before you signed it?
13      A.   Yeah.  To the best of my
14  recollection, yes, I did.
15      Q.   Who did you meet with on your first
16  day of employment from the company?
17      A.   I want to say Gordon Leete and Bill
18  Rauer.
19      Q.   Who's Gordon?
20      A.   I believe he's a director of sales.
21  I don't know his actual title.  I believe that's
22  what they were calling him.
23      Q.   And Bill, what's his position?
24      A.   I believe he's a vice president.  I'm

---

14 (Pages 50 to 53)

**54**

1  not positive on that either.
2     Q.  Of what company?
3     A.  I'm not sure.
4     Q.  And was this one meeting with
5  Mr. Leete and Mr. Rauer or separate meetings?
6     A.  We met with him consistently the
7  first initial week or two.
8     Q.  Do you remember whether you met him
9  together or separately on your first day?
10     A.  I believe we all met together, best
11  of my recollection.
12     Q.  Did you receive any training on your
13  first day of orientation?
14     A.  Not to my recollection.
15     Q.  Did anyone instruct you what your job
16  duties were going to be prior to the time you were
17  hired?
18     A.  Yes.
19     Q.  What was your understanding, before
20  you were hired, what your duties were going to
21  include?
22     A.  To take -- to pick people up, put
23  them in your car and do a drive-and-tour
24  presentation of vacation ownership.

**55**

1     Q.  Did you ever see a job description?
2     A.  Not to my recollection.
3     Q.  And the duties that you described to
4  me, is that what you actually ended up doing?
5     A.  Yes.
6     Q.  Where did you graduate from high
7  school?
8     A.  I got my GED.
9     Q.  What year was that?
10     A.  I want to say -- I'm not real sure,
11  but I believe it was 1990, 1989, somewhere in
12  there.
13     Q.  And what was the last year of school
14  that you attended?
15     A.  Tenth grade.
16     Q.  Did you ever have any subsequent
17  formal training or education?  Let's stick with
18  education first.  Did you ever take any classes
19  anywhere?
20     A.  As in what?
21     Q.  At a college, community college,
22  anything to do with a job.
23     A.  No.
24     Q.  Did you ever get any licenses to do

**56**

1  anything connected with your employment?
2     A.  No.
3     Q.  What about on-the-job training at
4  Vacation Village, did you have any of that?
5     A.  Yes.
6     Q.  Can you describe it to me?
7     A.  Daily, every day.
8     Q.  And how would you be trained?
9     A.  You'd have Gordon up in front of the
10  sales team with a pad, following the steps to the
11  sale.  Vacation Village handed out a pamphlet of
12  the ten steps to the sale, and we reviewed those
13  every day.
14     Q.  Had you had any prior training in
15  sales?
16     A.  No.
17     Q.  Not even on the job?
18     A.  No.
19     Q.  Did your job duties change at all
20  during the course of your employment with Vacation
21  Village?
22     A.  My recollection, no.
23     Q.  What was your title there?
24     A.  Sales associate.

**57**

1     Q.  Which days of the week did you work?
2     A.  Every day but Wednesday and Thursday,
3  or Tuesday and Wednesday.  I'm not sure.  One of
4  those.  We had two days off during the week.  It
5  was either Tuesday or Wednesday or Wednesday and
6  Thursday.  The rest of the time we worked.
7     Q.  Did different people have different
8  days off?
9     A.  No.
10     Q.  You all had the same days off?
11     A.  In the sales department, yes.
12     Q.  Who was your supervisor?
13     A.  Paul Stensland.
14     Q.  What was Paul's title?
15     A.  I believe he's called the director of
16  sales.
17     Q.  Were you required to be at work at
18  any certain time on the days you had to work?
19     A.  Yes.
20     Q.  What time was that?
21     A.  I'm not sure, but I want to say eight
22  o'clock, by eight o'clock.
23     Q.  And what time were you allowed to
24  leave work?

Deposition of:                     **Roger Martin**                     April 5, 2005
                        **Wise et al. vs. Patriot Resorts Corp., et al**

58

1    A.    At the end of the day.
2    Q.    And being what time?
3    A.    Whenever they cut the line.
4    Q.    What does that mean?
5    A.    Whenever they said you can go home.
6    Q.    Was that a certain time each day?
7    A.    No. It's whenever they saw fit.
8    Q.    So what were your job duties when you
9    arrived at eight o'clock?
10   A.    Go to a morning meeting.
11   Q.    And what time was that held?
12   A.    Eight o'clock, I believe. Whatever
13   time we started the day.
14   Q.    Were you always on time for work?
15   A.    There was a couple times I was late,
16   yes.
17   Q.    And where was the morning meeting
18   held?
19   A.    In two different buildings.
20   Q.    Where is that?
21   A.    At 20 Old Williamstown Road,
22   Lanesborough, Mass.
23   Q.    Two buildings at that address?
24   A.    Correct.

59

1    Q.    Could it be at either building?
2    A.    Yes.
3    Q.    And who presented the morning
4    meetings?
5    A.    Paul Stensland and Gordon Leete, to
6    the best of my knowledge.
7    Q.    At the same time or different times?
8    A.    Same time.
9    Q.    And this occurred every day?
10   A.    Every day.
11   Q.    How long was the morning meeting?
12   A.    Usually a half hour.
13   Q.    And what types of things would be
14   discussed or presented at the morning meeting?
15   A.    The ten steps.
16   Q.    Anything else?
17   A.    And who wrote business the day
18   before.
19   Q.    What does that mean?
20   A.    They pass out who, you know, the
21   deals, who wrote a deal the day before. We all
22   went, (clapping) clapped.
23   Q.    You mean someone who sold a
24   time-share?

60

1    A.    Yes.
2    Q.    Anything else that would be discussed
3    at those meetings?
4    A.    Not that I remember.
5    Q.    Did you have an office or work space
6    assigned to you?
7    A.    No.
8    Q.    Where did you work when you were in
9    the office?
10   A.    We didn't work. We all hung out in
11   what they called the pit.
12   Q.    What did you do after the morning
13   meeting?
14   A.    We all went to the pit.
15   Q.    Where was the pit?
16   A.    20 Old Williamstown Road, I believe.
17   It's a whole complex.
18   Q.    Is it in a room, in a basement?
19   A.    It was in a building.
20   Q.    What floor?
21   A.    First.
22   Q.    How many people attended the morning
23   meetings, approximately?
24   A.    I never counted, so I don't know.

61

1    Q.    More than twenty?
2    A.    Yes.
3    Q.    More than forty?
4    A.    Whatever the line was. Whatever they
5    had as an employee, at that particular day in
6    time.
7    Q.    As a sales employee?
8    A.    Yes.
9    Q.    Including sales management or just
10   sales?
11   A.    Sales management too.
12   Q.    Is that who attended, sales
13   management?
14   A.    Sales management.
15   Q.    And sales associates?
16   A.    Yes.
17   Q.    Anyone else attend those meetings
18   other than Mr. Leete and Paul Stensland?
19   A.    Yes.
20   Q.    Who?
21   A.    Director, the project director.
22   Q.    Who was that?
23   A.    Rod Lewis.
24   Q.    Did he ever say anything?

16 (Pages 58 to 61)

Deposition of:                           Roger Martin                           April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

---

62

1  A.  Couple times, yes.
2  Q.  What kinds of things would Mr. Lewis
3  talk about?
4  A.  The ten steps.
5  Q.  Anything else?
6  A.  And deals.
7  Q.  Anyone else that attended that you
8  didn't mention yet?
9  A.  Bill Rauer.
10  Q.  Anyone else?
11  A.  Not that I can remember.
12  Q.  Can you describe this location that
13  you've called the pit?
14  A.  It's a building.  It's 25-by-40 and
15  we're stuck in one little corner of it.
16  Q.  A corner, you mean the corner of one
17  room?
18  A.  A room about this big.
19  Q.  And how many people would be in a
20  room about this big?
21  A.  Forty, fifty.
22  Q.  Would those have been the same people
23  that attended the morning meeting?
24  A.  Yes.

---

64

1  were tired of talking.
2  Q.  So it could be five minutes to two
3  hours?
4  A.  Correct.
5  Q.  Was it ever longer than two hours?
6  A.  I can't be sure.
7  Q.  How long would you stay in the pit?
8  A.  Until I got my slip.
9  Q.  And what does that mean?
10  A.  Until you got your slips, you know,
11  you got a tour.
12  Q.  I'm sorry, what was that?
13  A.  The slip has a name on it, that's
14  your tour.  They hand you the slip, then you go
15  out, greet your people.
16  Q.  And who would present you with the
17  slip?
18  A.  Whoever was behind the counter for
19  the day.
20  Q.  Who were the possible people behind
21  the counter?
22  A.  I don't know them by name.  They open
23  the window, pass the slip through and that was
24  that.

---

63

1  Q.  And what would you do when you were
2  in that room?
3  A.  Basically hang out.
4  Q.  Was there any place to sit or any
5  tables?
6  A.  For some there was.
7  Q.  And can you describe what was in the
8  room?
9  A.  Couple of tables, a few chairs and a
10  TV and a water cooler, refrigerator.
11  Q.  Other than hang out, were you
12  required to do anything in the pit?
13  A.  Occasionally the managers would come
14  over and continue training.
15  Q.  And in the case of you, how
16  occasional was this training?
17  A.  It's mandatory that you would attend.
18  Q.  Right.  But you said occasionally
19  this would happen, so I'm wondering did this
20  happen once a week, twice a week?
21  A.  I couldn't tell you.
22  Q.  How long would this training take
23  place?
24  A.  Until you got your slip, until they

---

65

1  Q.  You didn't know any of their names?
2  A.  Not off the top of my head.
3  Q.  Would you just receive one person's
4  name on the slip or a couple or a group of people?
5  A.  It would have whoever's name was
6  meant to come and tour that day and how many
7  number of people were in their party.
8  Q.  Did you have any understanding as to
9  where the source of the names came from?
10  A.  No.
11  Q.  You have no idea?
12  A.  No.
13  Q.  So they just presented you with a
14  slip of paper with a group's name on it or a
15  person's name, then what did you do?
16  A.  Went out and met them.
17  Q.  Where would they be?
18  A.  In the lounge area, I guess you want
19  to call it.
20  Q.  Was there any rhyme or reason or
21  order to who got what slips when?
22  MS. GARROW:  Objection.  You can
23  answer if you know.
24  A.  Just by the name -- I mean how many

---

17 (Pages 62 to 65)

Case 3:04-cv-30091-MAP    Document 137-22    Filed 04/16/2007    Page 5 of 21

Deposition of:                          Roger Martin                        April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

66

1  deals you had, your closing ratio.
2      Q.   And how did the closing ratio affect
3  you, as far as what slips you would get or when
4  you'd get a slip?
5      A.   Moved you up and down the line
6  between sales people. One day you could be on
7  top, next day you could be on the bottom, based on
8  what you did, by your performance.
9      Q.   Who would be on top, the people with
10 the better closing ratio?
11     A.   Right.
12     Q.   You said they changed on a daily
13 basis?
14     A.   Yes.
15     Q.   Were you ever on top of the list?
16     A.   Yes.
17     Q.   How frequently?
18     A.   Consistently on it, in the beginning.
19     Q.   Just to make sure I understand, that
20 meant that you had good closed sales for the
21 preceding day?
22     A.   Yes.
23     Q.   And then at some point you weren't at
24 the top of the list; is that what you're implying?

67

1      A.   Yes.
2      Q.   How did that change or when did that
3  change?
4      A.   I'm not understanding what you're
5  asking me.
6      Q.   You said you were consistently on the
7  top of the list at the beginning of your
8  employment. So I'm inferring, which I might be
9  wrong, that at some point you weren't at the top
10 of the list as frequently; is that correct?
11     A.   Yes.
12     Q.   What prompted that change?
13     A.   Issues with Vacation Village, not
14 focusing on my job.
15     Q.   So you had less closed sales?
16     A.   Yes.
17     Q.   What were these issues?
18     A.   Not getting paid on a regular basis.
19     Q.   Anything else?
20     A.   Just all the mental stuff they put
21 you through there.
22     Q.   Like what?
23     A.   There's overage, there's all kinds of
24 stuff, ways that they can mess with you mentally.

68

1      Q.   And that's what I'm asking you to
2  explain, what ways did they mess with you
3  mentally?
4      A.   By making you sit there all day if
5  there's not a tour for you to take, by placing you
6  on overage, telling you, you can't have a tour,
7  yet you come to work, for some minor infraction.
8      Q.   Anything else?
9      A.   Not that I can recall at this
10 particular moment. I'm sure there's more though.
11     Q.   Can you explain to me what an overage
12 is?
13     A.   Overage is if you come in late,
14 forget to sign the paper, where they tell you that
15 you got to sign in to check in so they make sure
16 you're on property, because they don't have a time
17 clock you punch.
18     Q.   So is it that you got there late or
19 you forgot the paper?
20     A.   If you forgot to sign in, you would
21 go to the bottom of the wheel on overage.
22     Q.   And what's the wheel?
23     A.   The -- where the salesmen are in line
24 by your closing ratio, the line of the salesmen.

69

1      Q.   Is that posted somewhere?
2      A.   Yes.
3      Q.   Where is it posted?
4      A.   It's printed up every day. They put
5  it on the main floor for you to sign in and then
6  one at the counter where the tours check in.
7      Q.   So is it actually posted on the wall
8  anywhere, like in the pit?
9      A.   Not physically. It's just laid on
10 the table.
11     Q.   Are you presented with a copy of it
12 at this morning meeting or anything like that?
13     A.   Just when you sign in, that's all you
14 get.
15     Q.   You get a copy or you just look at
16 it?
17     A.   Just look at it.
18     Q.   So you were saying you can be put on
19 overage when you come in late or forget to sign
20 in, and I still don't know what overage means.
21     A.   Overage means you're going to the
22 bottom of the wheel.
23     Q.   The bottom?
24     A.   The very bottom.

Case 3:04-cv-30091-MAP    Document 137-22    Filed 04/16/2007    Page 6 of 21

**Deposition of:**                          **Roger Martin**                          April 5, 2005
**Wise et al. vs. Patriot Resorts Corp., et al**

70

1    Q.  Anything else that could have
2  resulted in you being put on overage?
3    A.  If you got passed -- if you didn't
4  take the tour that was assigned to you and you got
5  passed, they couldn't find you.
6    Q.  So for some reason you would -- they
7  would have a slip for you to go on a tour and
8  someone wouldn't be available; is that what you're
9  saying?
10    A.  If you were on point, that means
11  you're the next one to go out, and they couldn't
12  find you when they tried to give you that slip of
13  paper, you are placed on overage, you were passed
14  and placed on overage.
15    Q.  What would be the circumstances where
16  someone couldn't find you, specifically?
17    A.  Maybe you were in a rest room.
18    Q.  So they only gave you what?
19    A.  Five minutes, if that.
20    Q.  Did that ever happen to you?
21    A.  Yes.
22    Q.  Where were you?
23    A.  I can't recall.
24    Q.  Were you on the property?

71

1    A.  Yes.
2    Q.  Did it happen to you more than once?
3    A.  As I recall, yes.
4    Q.  Do you know when?
5    A.  No.
6    Q.  Do you have any records that would
7  refresh your recollection?
8    A.  No.
9    Q.  Would you know, when you were in the
10  pit, how many people were ahead of you who had
11  received tours?
12    A.  Yes.
13    Q.  So would you know when it was going
14  to be your turn?
15    A.  Roughly, yes.
16    Q.  How many people would take tours out
17  on a daily basis?
18    A.  As many as the company would bring
19  in.
20    Q.  Did that vary?
21    A.  Yes.
22    Q.  How many on an average day?
23    A.  I can't tell you.
24    Q.  Was there any number of tours that,

72

1  in your mind, that was an initially high number of
2  tours for a day?
3    A.  Never.
4    Q.  Unusually low?
5    A.  Yes.
6    Q.  How many would be unusually low, in
7  your opinion?
8    A.  Six.
9    Q.  What types of things did you do when
10  you were in the pit, other than the training you
11  talked about?
12    A.  Hang out.
13    Q.  Did you socialize with your
14  co-workers?
15    A.  Absolutely.
16    Q.  Did you eat?
17    A.  No.
18    Q.  Did you drink coffee or any
19  beverages?
20    A.  No.
21    Q.  Did you watch TV?
22    A.  Very little.
23    Q.  Did you do any of your own work or
24  business or personal stuff?

73

1    A.  No.
2    Q.  Did you ever bring anything with you
3  in the pit to read or do while you were there?
4    A.  No.
5    Q.  Was that prohibited?
6    A.  Not that I can recall.
7    Q.  Did anyone bring computers or laptops
8  into the pit?
9    A.  I'm not sure.
10    Q.  You don't recall seeing a computer or
11  not?
12    A.  I don't think so but I'm not sure.
13    Q.  Was that prohibited?
14    A.  Not that I can say for sure.
15    Q.  Was there any restrictions on what
16  you could do when you were in the pit?
17    A.  Not that I can recall.
18    Q.  Did you ever leave the pit during the
19  workday to go attend to personal business?
20    A.  Yes.
21    Q.  And when was that?
22    A.  If you didn't have a tour, you could
23  go off property, in between the waves.
24    Q.  In between what?

19 (Pages 70 to 73)

74

1    A.   The waves.
2    Q.   What are the "waves"?
3    A.   The times that the tours were to come
4    in.
5    Q.   What were the tours?
6    A.   I can't recall the wave times.
7    Q.   I'm just making sure that I'm getting
8    this.  So there were some set time during the day
9    that was typically the time that there would be a
10   group coming in, is that correct, the wave time?
11   A.   Yes.
12   Q.   Can you tell me how many wave times
13   there were during the day?
14   A.   I can't recall.
15   Q.   More than one?
16   A.   Yes.
17   Q.   More than five?
18   A.   I can't remember.
19   Q.   Do you have any idea how much time
20   was in between wave times?
21   A.   No, I don't.
22   Q.   Do you have any documents that would
23   refresh your recollection?
24   A.   No, I don't.

75

1    Q.   So am I correct in saying, so the
2    wave would be coming, then certain people would
3    get tours to go on; is that correct?
4    A.   Correct.
5    Q.   And other people would not?
6    A.   Correct.
7    Q.   And then were you free to leave until
8    the next wave time?
9    A.   That would be my understanding, yes.
10   Q.   Was the wave time, if you recall, you
11   know, a certain hour or was it like a general
12   half-hour period where you had to be there?
13   A.   It went in half-hour periods,
14   half-hour, fifteen-minute periods.
15   Q.   Is it fifteen minutes or half hour?
16   A.   It would vary.  It's based on
17   whatever they were bringing in and what times they
18   were scheduled.
19   Q.   So would they tell you in the morning
20   what the wave times were going to be?
21   A.   No.
22   Q.   Would they tell you after the first
23   wave when you had to be back?
24   A.   No.

76

1    Q.   So how would you know when the next
2    wave time was?
3    A.   You would just assume what time the
4    waves generally come, is what time you had to be
5    back.
6    Q.   So it was usually the same time each
7    day?
8    A.   The waves are set at roughly the same
9    time, yes.
10   Q.   What types of things would you do
11   when you weren't required to be in the pit because
12   it was in between wave times?
13   A.   Pay bills.
14   Q.   Anything else?
15   A.   Do other business, personal business.
16   Q.   Did you ever go home?
17   A.   Not that I can recall.
18   Q.   Did you ever attend to any school
19   functions or your son's child care needs?
20   A.   Not that I can recall.
21   Q.   Attend doctor's appointments?
22   A.   Yes.  We had to bring a note back for
23   that though.
24   Q.   Even if you were going during the

77

1    non-wave time?
2    A.   Yes, you always had to have a note,
3    just in case you were passed or anything, that way
4    I wouldn't be penalized.
5    Q.   So if you went to a doctor's
6    appointment and you got passed because of it, you
7    needed a note?
8    A.   You needed a note regardless.
9    Q.   So if the wave time was over, for
10   example, at ten o'clock, and you know the next
11   wave is not till twelve and you went to the doctor
12   in between that time period, you'd still need a
13   note?
14   A.   Yes.
15   Q.   Did you, in any other way, have to
16   account for your whereabouts?
17   A.   No.
18   Q.   So did you return for each wave
19   period on all occasions?
20   A.   Yes, best of my recollection, yes.
21   Q.   Would you give any advance notice to
22   anyone at the company when you were going to be
23   attending a doctor's appointment and therefore
24   might not be available?

20 (Pages 74 to 77)

Case 3:04-cv-30091-MAP    Document 137-22    Filed 04/16/2007    Page 8 of 21

Deposition of:                    Roger Martin                          April 5, 2005
                      Wise et al. vs. Patriot Resorts Corp., et al

78

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Who would you give that notice to? |
| 3 | A. | Your line director. |
| 4 | Q. | Who is that? |
| 5 | A. | Paul Stensland. |
| 6 | Q. | Is your fiancŧe the mother of your |
| 7 | child? | |
| 8 | A. | Yes. |
| 9 | Q. | Do you have any other children? |
| 10 | A. | Yes. |
| 11 | Q. | How many? |
| 12 | A. | One. |
| 13 | Q. | How old is that child? |
| 14 | A. | Fourteen. |
| 15 | Q. | Does he live in Massachusetts? |
| 16 | A. | It's a she. |
| 17 | Q. | I'm sorry. |
| 18 | A. | Yes. |
| 19 | Q. | Did you have to give Paul any other |
| 20 | types of notice if you were going to be gone |
| 21 | during the wave period -- I mean between wave |
| 22 | periods? |
| 23 | A. | Other than verbal, no. |
| 24 | Q. | When you say "verbal," what kind of |

79

1 things would you let him know?
2     A.    You'd let him know that you were
3 leaving property, running down to the store,
4 running down to get gas for your car.
5     Q.    And everyone was required to give him
6 that type of notice?
7     A.    As far as I can recall, yes.
8     Q.    All the sales people and sales
9 managers?
10     A.    Yes, who ever was on his specific
11 team.
12     Q.    Why don't you tell me how the teams
13 were broken up. Were there different lines?
14     A.    Yes.
15     Q.    How is that arranged?
16     A.    They just had two different sales
17 directors and they split the line. They split the
18 sales people.
19     Q.    How many on each team?
20     A.    I can't recall.
21     Q.    More than twenty?
22     A.    Probably less but I'm not sure.
23     Q.    Were you always on the same team?
24     A.    No.

80

1     Q.    Whose teams were you on?
2     A.    I was on Gordon Leete's at first.
3     Q.    Then who?
4     A.    Then Paul Stensland.
5     Q.    And those are the only two people?
6     A.    Those are the only two.
7     Q.    When were you on Gordon's?
8     A.    At the very beginning and about half
9 of my career with Vacation Village.
10     Q.    And then Paul the other half?
11     A.    Yes.
12     Q.    So when you got a slip that you had a
13 tour, you said you would go meet with the people
14 in the lobby, then what would you do?
15     A.    Put them in your car.
16     Q.    What else?
17     A.    Drive them to Greylock.
18     Q.    Can you just describe to me,
19 generally, what you did until you ended with a
20 tour?
21     A.    Brought them to Greylock, told them
22 why they were here, what was to be expected of the
23 tour, brought them back down to another building
24 from the one we picked them up, explained how

81

1 vacation ownership worked and the benefits of it,
2 and then took them -- put them back in your car,
3 took them back up to the Vacation Village
4 property, which was located in Hancock, and showed
5 them the condominium and the property. When
6 you're completed up there, you bring them back and
7 show them the price, ask them to buy.
8     Q.    How long would this whole procedure
9 that you've described take?
10     A.    Anywhere from ninety minutes on.
11     Q.    There's no maximum time?
12     A.    No maximum.
13     Q.    Would you keep reports of how long
14 your tours were?
15     A.    No.
16     Q.    Did the company, to your knowledge?
17     A.    I don't know.
18     Q.    Did you report or sign in anywhere
19 when you left and came back?
20     A.    After you were finished with your
21 tour, you had to sign back in.
22     Q.    Would you sign in and out between the
23 wave periods?
24     A.    No.

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA   01115            (413) 786-7233  FAX (413) 786-0299

82

1    Q.    And what was the purpose of your
2  drive to Greylock, as you understood it?
3    A.    Well, with Vacation Village, you
4  understand that's where you start breaking the
5  pack and doing the marketing offer and field,
6  fell, found, these are steps to the sale.
7    Q.    What types of things would you do?
8    A.    Tell them why they were here. This
9  is a field, fell, found, that's the kind of things
10 you would do.
11   Q.    Can you explain that in non-sales
12 terms?
13   A.    That's where you make it like you're
14 them, I understand, you know, there's a little
15 apprehension here. I was kind of like you, until
16 I find out that it was a great thing, that's
17 field, fell, found. You eliminate some of their
18 apprehension, start breaking what they call the
19 pack.
20   Q.    So is this on the drive?
21   A.    On the drive. When you're sitting up
22 at Greylock looking at this beautiful view, you
23 got them in your car, you turn to them focused and
24 go into the spiel.

83

1    Q.    How long would you -- how long would
2  it take you to get to Greylock?
3    A.    Roughly 3 1/2, four minutes.
4    Q.    And how long would you give the
5  conversation --
6    A.    As long as it needed to be.
7    Q.    When would you know that you had
8  spoken to them long enough?
9    A.    Until they were agreeing with you,
10 you had common ground with them.
11   Q.    And what was the range of time that
12 could take?
13   A.    Anywhere from fifteen minutes,
14 fifteen hours, based on how long you were up
15 there.
16   Q.    Did it ever take you fifteen hours?
17   A.    Never.
18   Q.    What was the longest time it took
19 you?
20   A.    Six. Up there? Not long. Maybe a
21 half hour.
22   Q.    You stated that you then brought them
23 to another building, so you drove back to another
24 building on that same property?

84

1    A.    Yes.
2    Q.    And what happened at that site?
3    A.    That's where you started showing them
4  how vacation ownership works and how it was to
5  benefit them and their lifestyle.
6    Q.    Did you give them any tours of the
7  area at all, other than bringing them to Greylock?
8    A.    Yes.
9    Q.    When did you do that?
10   A.    After you're done showing them the
11 literature side of it and took them back out to go
12 show them the property.
13   Q.    So you bring them to Greylock, then
14 you bring them back to another building, and at
15 that point you talked about vacation ownership?
16   A.    Correct.
17   Q.    Any other things discussed at that
18 time?
19   A.    Just general information.
20   Q.    Like what?
21   A.    What they're doing for their
22 vacation, how many kids are in their family, just
23 that kind of stuff.
24   Q.    Did you share any of your personal

85

1  information?
2    A.    Yes.
3    Q.    How long would that section of the
4  tour take?
5    A.    If everything went according to plan,
6  maybe half hour, forty-five minutes.
7    Q.    Was anyone else present at this --
8  either your trip to Greylock, other than the
9  people that you're taking, obviously, or this
10 half-hour to forty-five minute presentation?
11   A.    No.
12   Q.    Did everyone then continue on to the
13 next phase, Vacation Village, the trip to Vacation
14 Village?
15   A.    Yes.
16   Q.    Was the next phase where you took
17 them to the property; is that what you said?
18   A.    That was part of it, but we took them
19 to other places too.
20   Q.    Where else would you take them?
21   A.    You take them down to Brody Mountain.
22   Q.    Anywhere else?
23   A.    You take them to the Old Gamblers
24 Church, it's called the Gamblers Church.

22 (Pages 82 to 85)

Deposition of:    **Roger Martin**    April 5, 2005
**Wise et al. vs. Patriot Resorts Corp., et al**

86

1    Q.    Where is that?
2    A.    I'm not sure what town it's in, but
3    it's real close to where Vacation Village property
4    is.
5    Q.    Anywhere else that you take them?
6    A.    Jiminy Peak.
7    Q.    And anywhere else?
8    A.    No.
9    Q.    How long would this travel time take
10    before you actually got to Vacation Village?
11    A.    If you cut out some of the steps,
12    take you ten minutes.  If you did them all, take
13    you about another thirty or so.
14    Q.    And was it your decision whether to
15    cut out some of the steps or not?
16    A.    Yes.
17    Q.    How would you decide?  What would you
18    make your decision on, what factors?
19    A.    By asking your questions.
20    Q.    What were the questions?
21    A.    If they liked what they saw, if they
22    wanted to become an owner here today, if it was
23    comfortably affordable, would you do it today?
24    Q.    And you ask those questions once

87

1    you're in the vehicle?
2    A.    Ask them that throughout the whole
3    presentation, after every time you finish
4    something.  If they like it, would they use it?
5    Q.    So if someone responded in the
6    negative, you wouldn't take them on the full tour;
7    is that what you're saying?
8    A.    No, you'd go the extra step with
9    them.
10    Q.    Okay.  And then was there one
11    particular property at Vacation Village that you
12    would show?
13    A.    Yeah, I mean, yes.
14    Q.    There was one time-share?
15    A.    We used one model.
16    Q.    That's what I was looking for, one
17    model.  There was one model.  And is this
18    something you also did, just you and the people
19    that you were touring?
20    A.    Yes.
21    Q.    How long was the tour of the model?
22    A.    Five minutes.
23    Q.    And did you also tour the Vacation
24    Village property?

88

1    A.    Yes.
2    Q.    How long was that?
3    A.    Ten, fifteen minutes total.
4    Q.    What types of things would you show
5    them on the property?
6    A.    The clubhouse, the pool, the parking
7    lot.
8    Q.    Anything else?
9    A.    Wildlife, trees.
10    Q.    Anything else?
11    A.    No.
12    Q.    And what about when you are touring
13    the model?
14    A.    Show them the stove, the microwave,
15    the king-size bed, the hot tub, the pull-out
16    sleeper sofa, the lock-off unit.
17    Q.    Did they have time to walk around by
18    themselves?
19    A.    You never let them walk around by
20    themselves.
21    Q.    Why is that?
22    A.    First off, you have other people on
23    tour.  You don't want them congregating or talking
24    amongst each other.

89

1    Q.    So there would be other people in the
2    same unit?
3    A.    Oh, yes.
4    Q.    Why don't you want them talking?
5    A.    Because everybody is at different
6    stages in their presentation, so you don't want
7    somebody hearing something that you either haven't
8    covered yet or have already covered.
9    Q.    How many other tours could you
10    overlap with in one unit?
11    A.    A lot.  There's no set number.
12    Q.    How many did you overlap with?
13    A.    All the time.  Can't tell you.  There
14    was just somebody going through there all the
15    time.
16    Q.    Would it be one other tour, two other
17    tours, ten other tours?
18    A.    Whatever the wave had.
19    Q.    Wouldn't that be affected though
20    depending on whether people did all these steps
21    you described or not, how many people would be
22    there at once?
23    A.    The time frame is ninety minutes.
24    You try to keep -- we're usually within that, so

23 (Pages 86 to 89)

**COURT REPORTING SERVICES**

Deposition of:                                    Roger Martin                              April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

|  | 90 |  | 92 |
|---|---|---|---|

90

1   all the stages are about the same.
2        Q.    But you said you could be -- your
3   tour, Brody, and the church and Jiminy Peak could
4   be ten minutes to more than thirty minutes. I'm
5   saying, is it possible or probable that people
6   would arrive at the last -- or the viewing of the
7   condo at different times?
8              MS. GARROW: Objection. You can
9   answer.
10      A.    Yeah, I would assume, yes, based on
11  where they were at in their presentation.
12      Q.    So ninety minutes was the general
13  rule of thumb?
14      A.    It had to be ninety minutes, at
15  least.
16      Q.    What types of things would you tell
17  people when they were touring the time-share
18  itself?
19      A.    How they could vacation like this
20  instead of staying in a hotel room.
21      Q.    Anything else?
22      A.    Not really.
23             MS. GARROW: When you're done with
24  this section, can we take a break?

91

1              MS. FABBO: We can stop right now and
2   take a break.
3              (Recess taken from 10:50 a.m. to 11:02
4              a.m.)
5        Q.    Did you ever have multiple tours on
6   one day?
7        A.    Yes.
8        Q.    How frequently was that?
9        A.    Not often.
10       Q.    More than once a week?
11       A.    Yes.
12       Q.    Would you say it was more than twice
13  a week?
14       A.    Yes.
15       Q.    Do you know, approximately, how many
16  times a week on average?
17       A.    No.
18       Q.    Would you ever refuse to take a
19  second tour in a day or a third tour?
20       A.    A third, yes.
21       Q.    Was that more than once or one
22  occasion?
23       A.    Probably more than once.
24       Q.    Was there any particular reason that

92

1   you refused a third tour?
2        A.    Yeah, when we were hired they told us
3   we only had to take two.
4        Q.    Approximately, how many times did you
5   receive a third tour?
6        A.    Maybe twice.
7        Q.    Were third tours offered frequently?
8        A.    No.
9        Q.    Were they only during essential
10  seasons, business seasons?
11       A.    Yes.
12       Q.    What's the business season?
13       A.    I couldn't tell you.
14       Q.    You had no idea?
15       A.    I had no idea.
16       Q.    Was it most of the year that there
17  were only two tours per day?
18       A.    No.
19       Q.    Was it fifty/fifty?
20       A.    No.
21       Q.    Were there occasions where there was
22  only on one tour?
23       A.    Oh, yes.
24       Q.    And how frequently did that occur?

93

1        A.    Off the top of my head, I couldn't
2   tell. I'm not sure.
3        Q.    Do you have any records that would
4   refresh your recollection?
5        A.    No.
6        Q.    Do you keep any records of the tours
7   you did?
8        A.    No.
9        Q.    After you viewed the property and the
10  model, then what happened in the whole process?
11       A.    Then you put them back in your car,
12  drive them back to 20 Old Williamstown Road.
13       Q.    Prior to returning to 20 Old
14  Williamstown Road, had you ever known that someone
15  was going to purchase a time-share, had anyone
16  ever given you that indication?
17       A.    Yes.
18       Q.    Did that happen infrequently?
19       A.    The way the company has it set up,
20  it's designed to happen frequently if you do your
21  job right.
22       Q.    So are you saying -- so through the
23  whole selling process or through the whole process
24  you explained to me, before going back to 20 Old

24 (Pages 90 to 93)

94

1  Williamstown Road, it was all aimed at kind of
2  having the deal made before you got back there?
3      A.   Correct.
4      Q.   Did that frequently happen to you?
5      A.   I would guess, yes.
6      Q.   So then what would happen when you
7  returned?
8      A.   You would sit them back down.
9      Q.   Okay.
10     A.   And show them the money, show them
11  what it would cost.
12     Q.   Was cost discussed at all prior to
13  the return?
14     A.   Never.
15     Q.   When you say you would sit them down,
16  are you talking about literally sit them down
17  somewhere?
18     A.   Literally.
19     Q.   And where would that be?
20     A.   On the sales floor, had a table on
21  the sales floor.
22     Q.   Was it a private area?
23     A.   No.
24     Q.   And how long would that sit-down

95

1  session be?
2      A.   There was no determining the length
3  of time.  It could go on for a while.
4      Q.   Can you give me a range from the
5  shortest to the longest that you can call?
6      A.   Maybe the shortest, an hour, by the
7  time -- if they said yes, by the time they got the
8  paperwork printed out and sent out, three hours,
9  four hours.
10     Q.   Was anyone else involved in that
11  phase of the process?
12     A.   Yes.
13          MS. GARROW:  Let her finish the
14  question.
15     Q.   Who was that?
16     A.   The TO.
17     Q.   Who is the TO?  What does that stand
18  for?
19     A.   The TO stands for takeover.
20     Q.   And what's the takeover?
21     A.   After you show them the original
22  money, if they said no, you would excuse yourself,
23  get a manager, bring them over to the table and
24  they'd show them alternate plans until they said

96

1  yes.
2      Q.   So would there be an occasion where
3  they said no and then you would continue to try to
4  persuade them under the original money?
5      A.   Oh, yes.
6      Q.   And then at what point would you
7  realize that it was futile and that you needed to
8  turn them over to the TO?
9      A.   They said no.
10     Q.   When they said no once, twice?
11     A.   Usually three times, four times.
12     Q.   Other than the TO, was anyone else
13  involved in that phase?
14     A.   Not to my recollection, no.
15     Q.   So who was the TO?
16     A.   Whoever Vacation deemed was a sales
17  manager and whoever was available at the time.
18     Q.   So it could be more than one person,
19  it's not one particular person?
20     A.   Correct.
21     Q.   What's the latest in the evening that
22  you had to work?
23     A.   I've worked till nine, 9:30.
24     Q.   Were you effective, in your opinion,

97

1  in getting people to close the deal without
2  getting the TO involved?
3      A.   In my opinion, yes.
4      Q.   How frequently and what percentage of
5  time would a TO have to get involved?
6      A.   Well, the TO has got to sign off on
7  your paperwork anyway, so every time.
8      Q.   So other than having to sign off on
9  your paperwork, in a situation that you described
10  where they came in and showed an alternate deal,
11  how frequently would you say that occurred in the
12  case of you?
13     A.   Fifty/fifty.
14     Q.   Was your compensation affected
15  whether it was you that completed the deal or
16  whether the TO had to come in and take over?
17     A.   No.
18     Q.   Could you tell me what your
19  compensation plan was, and if that changed at all,
20  could you let me know when and how?
21     A.   Well, in the beginning it was ten
22  percent, that was the initial hiring.
23     Q.   Ten percent commission?
24     A.   Yes.

25 (Pages 94 to 97)

98

1　Q.　Based on what?
2　A.　Based on whatever deal you wrote.
3　Q.　Was that on a net sales price?
4　A.　Yes.
5　Q.　Do you know what came out of the
6　gross to arrive at the net?
7　A.　It was just the structure of the
8　deal, whatever it was, if it was 19.4, you got ten
9　percent of that.
10　Q.　So in the beginning it was ten
11　percent commission based on the net sales price?
12　A.　Based on the sales price, yes, not
13　the net sales price.
14　Q.　Okay.  And for what time period did
15　that continue on?
16　A.　Three months.
17　Q.　Did you receive any other
18　compensation during that three-month period?
19　A.　$300 a week, sign-on bonus, that's
20　what they were calling it.
21　Q.　Mr. Martin, is this the commission
22　structure that you're referring to?
23　A.　Certainly looks like it.
24　Q.　Does that look like your signature?

99

1　A.　It would seem so, yes.
2　MS. FABBO:  Could you mark that,
3　please?
4　(Martin Exhibit 2, Marked for
5　identification.)
6　Q.　Mr. Martin, the document that has
7　been marked as Exhibit 2, is that one of the
8　documents that you referenced before as being the
9　paperwork you signed on or around your first day?
10　A.　It seems to be.
11　Q.　So you were saying your commission is
12　ten percent.  Are you, in fact, adding the base
13　pay and the bonus pay?
14　A.　Yes.
15　Q.　And that occurred till the end of
16　2001?
17　A.　To the best of my recollection, yes.
18　Q.　And you said the base pay -- the base
19　pay says eight percent commission, is that right,
20　and your understanding is that's on gross sales?
21　A.　As far as I'm understanding, yes.
22　Q.　What about the bonus pay?
23　A.　The bonus pay seems to be two
24　percent.

100

1　Q.　And that was based on gross sales as
2　well?
3　A.　Yes.
4　Q.　And then the sign-on bonus of $300
5　per week salary, is that actually paid for ten
6　weeks?
7　A.　As far as I could determine, yes.
8　Q.　And this exhibit, Exhibit 2,
9　indicates that you were eligible for monthly bonus
10　qualification.  Do you remember what that was all
11　about?
12　A.　I don't see the --
13　Q.　Last sentence.
14　A.　Yes, I'm assuming yes.
15　Q.　Do you remember what that was?
16　A.　No, I don't.
17　Q.　Do you remember if you ever got a
18　monthly bonus?
19　A.　I don't believe I did.
20　Q.　And this plan that's outlined on
21　Exhibit 2, that occurred through the rest of 2001?
22　A.　As far as I would say, I mean I can't
23　say for sure, but yes, I would think.
24　Q.　How did your compensation structure

101

1　change after that?
2　A.　Straight eight percent commission.
3　Q.　And that started in the beginning of
4　2002?
5　A.　I would assume, yes.
6　Q.　Was the commission based on gross
7　sales?
8　A.　Yes.
9　Q.　Did your compensation plan change in
10　any other way?
11　A.　I couldn't tell you.
12　Q.　During the first calendar year that
13　you worked at Vacation Village, 2001, did you
14　receive any benefits?
15　A.　I don't think so.  I don't think I
16　signed on there for benefits.
17　Q.　Were you eligible for health
18　insurance?
19　A.　Probably so, I would think.
20　Q.　Dental?
21　A.　I would assume.  Oh, yes, I did take
22　their dental.
23　Q.　What about life insurance, did you
24　have any life insurance?

26 (Pages 98 to 101)

Deposition of:     **Roger Martin**                                    April 5, 2005
**Wise et al. vs. Patriot Resorts Corp., et al**

---

102

1    A.    I can't recall.
2    Q.    Any profit sharing?
3    A.    I can't recall on that.
4    Q.    Stock options, stock ownership?
5    A.    I believe it was an ESOP program,
6    Employee Stock Option.
7    Q.    401K?
8    A.    No, not that I'm aware of.
9    Q.    Did you have any vacation time or
10   holiday time?
11   A.    No.
12   Q.    Sick time?
13   A.    I think you're allowed to take
14   fourteen days a year, I think, personal time, with
15   sick, whatever, the whole thing.
16   Q.    Do you have to give any advance
17   notice of your intent to take that time off?
18   A.    If you were going to take vacation
19   time, yeah.  If you're sick, you just call in that
20   day.  It has to be approved.
21   Q.    What happened if a holiday, for
22   example, Christmas, fell on one of your working
23   days, would you get that off?
24   A.    No.

---

103

1    Q.    So you worked the holidays?
2    A.    If they're open, you worked it.
3    Q.    Were they open on Christmas?
4    A.    I believe Christmas was one of the
5    days they shut.
6    Q.    Do you recall any holidays that they
7    were open?
8    A.    Thanksgiving, Labor Day, you know,
9    most of them.  I think it's just Christmas and New
10   Years they close.
11   Q.    Did you ever look for any alternate
12   employment when you were employed with Vacation
13   Village?
14   A.    No.
15   Q.    Were you happy working there?
16   A.    Initially.
17   Q.    When you were hired, were you aware
18   that the commission structure that's laid out in
19   Exhibit 2 was going to change in 2001?
20   A.    Yes.
21   Q.    Did it change in the way that you had
22   expected?
23   A.    It went to eight percent, like they
24   said.

---

104

1    Q.    Did your benefits change at all in
2    the years following 2001?
3    A.    I couldn't be sure.  I didn't follow
4    closely with those.
5    Q.    Did people ever nap in the pit?
6    A.    I don't know.
7    Q.    You don't remember ever seeing anyone
8    that looked like they were sleeping?
9    A.    I didn't pay much attention to what
10   was going on there.
11   Q.    How many hours per day were you in
12   the pit?
13   A.    For as long as they required you to.
14   Q.    When you say that they cut the line,
15   what does that mean?
16   A.    Got no tours, go home.
17   Q.    Did that ever happen in the morning?
18   A.    Maybe a couple times.  I can't be
19   sure.
20   Q.    Did you ever smoke marijuana during
21   the workday?
22   A.    No.
23   Q.    Did you ever become aware that people
24   had accused you of doing that?

---

105

1    A.    I don't care what people accused me
2    of doing.
3    Q.    Were you aware that people had
4    accused you of doing that?
5    A.    No.
6    Q.    Do you smoke cigarettes?
7    A.    No.
8    Q.    Did you at all during your employment
9    with Vacation Village?
10   A.    No.
11   Q.    When you were employed at Vacation
12   Village, did you socialize with any co-workers
13   outside of work?
14   A.    Maybe one or two.
15   Q.    Who?
16   A.    Joel Heck.
17   Q.    Anyone else?
18   A.    Mike Massaconi occasionally, here and
19   there.
20   Q.    Anyone else?
21   A.    Pete Corbin, that's it.  And one time
22   I had a social gathering at my house, and all the
23   co-workers came, that was it.
24   Q.    What was Mr. Heck's position?

27 (Pages 102 to 105)

Deposition of:    Roger Martin    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

---

106

1    A.    Sales associate.
2    Q.    Is he still employed?
3    A.    No.
4    Q.    And Mr. Massaconi and Mr. Corbin were
5    also sales associates?
6    A.    Correct.
7    Q.    Did they ever hold any other
8    positions, any of these three?
9    A.    Mike Massaconi was a sales manager,
10    that's about it, I believe.
11    Q.    When was the last time you spoke with
12    Mr. Heck?
13    A.    A few weeks ago.
14    Q.    Have you discussed this lawsuit with
15    him at all?
16    A.    No.
17    Q.    Never?
18    A.    Never.
19    Q.    How frequently do you see him?
20    A.    Not often now, not since I moved
21    away.
22    Q.    While you were employed at Vacation
23    Village, how often would you say you associated
24    with him?

---

107

1    A.    Every day.
2    Q.    What would you do together?
3    A.    Just hang out, shoot the breeze,
4    gossip.
5    Q.    When?
6    A.    When we didn't have a tour.
7    Q.    I guess my question, I'm sorry, I'm
8    going back to -- I was asking when you were
9    socializing outside, other than the times that you
10    were at work in the pit?
11    A.    Oh, never.  We hung out very
12    occasionally after work.  I mean if you see
13    somebody for eight hours a day, you don't want to
14    keep hanging out with them.
15    Q.    What about Mr. Massaconi?
16    A.    Very seldom.  Twice I think he
17    stopped by my house.
18    Q.    Have you discussed this lawsuit with
19    him?
20    MS. GARROW:  Objection.  To the
21    extent that any conversations might have occurred
22    that were attorney/client in the presence of
23    counsel.  You can answer it otherwise.
24    A.    No.

---

108

1    Q.    Outside of the presence of your
2    attorney?
3    A.    Absolutely not.
4    Q.    Have you discussed the circumstances
5    related to your separation from employment with
6    Mr. Massaconi or Mr. Heck?
7    MS. GARROW:  I'm going to object as
8    to Mr. Massaconi.  Same objection.  You can answer
9    otherwise and as to Mr. Heck.
10    A.    No.
11    Q.    What about with Mr. Corbin?
12    MS. GARROW:  Same objection.
13    A.    No.
14    Q.    When was last time you saw
15    Mr. Corbin?
16    MS. GARROW:  Objection.  Again, you
17    can talk about -- you can say when you saw him and
18    that's it.
19    A.    December.
20    Q.    When is the last time that you
21    socialized with him?
22    A.    December.
23    Q.    And what was the nature of the
24    socialization?

---

109

1    A.    Siding his barn.
2    Q.    Siding his barn?
3    A.    Yes.
4    Q.    Did Mr. Corbin work at your prior
5    employer as well?
6    A.    Yes.
7    Q.    Have you talked to, other than with
8    your attorney present and other members of the
9    lawsuit also present, have you talked to any
10    current or former employees of Vacation Village
11    since your most recent separation?
12    A.    Yes.
13    Q.    Who?
14    A.    Clifford Alexander.
15    Q.    Anyone else?
16    A.    Not that I can recall.
17    Q.    When did you speak to Mr. Alexander?
18    A.    About three weeks ago, four weeks
19    ago.
20    Q.    What did you discuss?
21    A.    Him buying a house.
22    Q.    Did you run into him somewhere?
23    A.    Called him on the phone.
24    Q.    What was the purpose of your call?

---

28 (Pages 106 to 109)

110

1    A.    Seeing how they were doing.
2    Q.    When you say "they," who are you
3  referring to?
4    A.    He and his girlfriend, I guess,
5  Shauna.
6    Q.    How do you know his girlfriend?
7    A.    From work.
8    Q.    Was Mr. Alexander and Shauna also
9  people who had worked at Bentley?
10   A.    No.
11   Q.    You just met them through Vacation
12 Village?
13   A.    Correct.
14   Q.    Did you ever socialize with them
15 while you were employed at Vacation Village?
16   A.    In general, through the course of the
17 day, absolutely.
18   Q.    What about outside of work?
19   A.    Couple of times.
20   Q.    What's Shauna's last name?
21   A.    Same as mine.
22   Q.    Any relation?
23   A.    No.
24   Q.    Anyone else you can think of that

111

1  you've spoken with?
2          MS. GARROW:  I'm just going to object
3  to the extent that any of the people have joined
4  the lawsuit and have been in the presence of
5  counsel.  You can answer otherwise.
6    A.    No.
7    Q.    Have you asked anyone to join the
8  lawsuit?
9    A.    Yes.
10   Q.    Who?
11   A.    Everybody that's, you know, that I
12 pretty much got on the list here.
13   Q.    On what list?
14   A.    Whatever the list was.  Through my --
15 what was the statement that I had?
16   Q.    The Interrogatories?
17   A.    Yes.
18   Q.    So you contacted each of those
19 people?
20   A.    Oh, no, I didn't contact them.  They
21 came to me.
22   Q.    How did they become aware of your
23 lawsuit, to your knowledge?
24          MS. GARROW:  Again, I'm going to

112

1  object if there were any communications with
2  counsel, otherwise you can answer.
3    A.    I believe through general knowledge.
4    Q.    Did you ask anyone or did you contact
5  anyone with the purpose of having them join your
6  lawsuit?
7    A.    Absolutely not.
8    Q.    When you say "they contacted you,"
9  was that by telephone, mail?
10   A.    By telephone, walking up to me
11 directly while we were on property.
12   Q.    Any other means?
13   A.    No.
14   Q.    Do you have an e-mail account?
15   A.    No.
16   Q.    Did you have access to e-mail at
17 Vacation Village?
18   A.    No.
19   Q.    Have you ever had an e-mail account?
20   A.    No.
21   Q.    Do you use someone else's?
22   A.    No.
23   Q.    Did you ever use someone else's
24 e-mail address to communicate?

113

1    A.    No.
2    Q.    Did you ever communicate via e-mail?
3    A.    I don't do that, no.
4    Q.    You had stated, a little while ago,
5  that initially you were happy with your
6  employment.  When did that change?
7    A.    When they started messing around with
8  the pay.
9    Q.    When was that?
10   A.    I can't recall.
11   Q.    How were they messing around with the
12 pay?
13   A.    They came up with all kinds of
14 pay-line structures, changed the dates when you
15 were getting paid, put a no pack, no pay clause
16 in.
17   Q.    What's a no pack, no pay?
18   A.    If you got all the money down and you
19 didn't get a check that they could take the money
20 directly from their account, you didn't get paid.
21   Q.    Ever?
22   A.    Ninety days or until they send in a
23 pack check.  If they didn't send in a pack check
24 within a certain amount of time, you still didn't

29 (Pages 110 to 113)

**Deposition of:**                    **Roger Martin**                    **April 5, 2005**

**Wise et al. vs. Patriot Resorts Corp., et al**

114

1   get paid.
2        Q.   Until when?
3        A.   Until the deal cleared or what they
4   considered the deal cleared.
5        Q.   And when did they consider the deal
6   cleared, when was that?
7        A.   Whenever they figured there was
8   nothing wrong with it.
9        Q.   There was no parameters to that?
10       A.   There was no parameters.
11       Q.   You don't ever remember reading or
12  hearing that the purchaser had to make three
13  monthly payments?
14       A.   No, they changed the pay, pretty
15  much, indiscriminately.  We went from fourteen to
16  seventeen days, initially.
17       Q.   My question was, you never saw or
18  read anything or heard anything about three
19  monthly payments?
20       A.   No, not until they put it in that
21  pack, no pack, no pay.
22       Q.   And prior to that?
23       A.   No.
24       Q.   I'm questioning you because I looked

115

1   at this, and I'm looking at Exhibit 1, on Page 3
2   it discusses that, and you're telling me that was
3   not in effect?
4        A.   That was not in effect.  We were
5   getting paid on a regular basis.
6        Q.   That was part of your agreement; is
7   that correct?
8        A.   It might have been, but until they
9   put in that no pack, no pay, that was not being
10  enforced.
11       Q.   It was part of the agreement but it
12  was not enforced?
13       A.   Correct.
14       Q.   When did they begin enforcing it?
15       MS. GARROW:  I'm going to object.
16  Can you show us where you're pointing to?  I
17  thought you were pointing to somewhere.
18       MS. FABBO:  Page 3.
19       MS. GARROW:  You're questioning him
20  about something --
21       MS. FABBO:  Earned commission.
22       Q.   The language that you're referring
23  to, that they have to make three timely
24  consecutive monthly payments, I'm asking you if

116

1   you've ever seen that?
2        A.   Let me explain the three timely
3   monthly payments.  Technically, what they're
4   saying is that they were advancing you the money
5   for the deal that you wrote, okay, and if they
6   didn't make the three monthly timely payments,
7   they could take that money back, that had nothing
8   to do with the ninety-day thing, no pack, no pay.
9        Q.   So when did this no pack, no pay come
10  in effect?
11       A.   I couldn't tell you.
12       Q.   No idea?
13       A.   Absolutely none.
14       Q.   Do you have any records that would
15  reflect when it came into effect?
16       A.   Well, they used to stamp your deals
17  no pack, no pay, so whenever I got the first one
18  of those.  Then they quit doing that because they
19  didn't want to leave a paper trail.
20       Q.   Is that pack preauthorized checking?
21       A.   Preauthorized checking.
22       Q.   Were you supposed to get that?
23       A.   Initially, no, they put that in
24  later.  Your main job was to get ten percent with

117

1   the contract money down and a credit card and two
2   driver's licenses.
3        Q.   And that changed, that you had to
4   also get the preauthorized checking?
5        A.   Correct.
6        Q.   And was there a policy issued related
7   to that?
8        A.   Not that I was aware of.  We never
9   got anything in writing.  It was verbally stated.
10       Q.   You sure about that?
11       A.   I can't be sure about it.
12       Q.   Were you supposed to get the
13  preauthorized checking at the day that you made
14  the sale?
15       A.   Yes.
16       Q.   And I think you said there was
17  something, they could send it in later.  Did they
18  have a certain amount of time?
19       A.   At the beginning they had a certain
20  amount of time, it was within a week and then that
21  changed.  If they didn't have it at the time they
22  signed it, you didn't get your money.
23       Q.   Do you know whether it was ever
24  longer than a week they had to get it in?

30 (Pages 114 to 117)

Deposition of:                          Roger Martin                          April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

---

118

1  A.  I don't handle the administration
2  office. I don't know.
3  Q.  Well, I'm not asking you that. In
4  you're experience.
5  A.  I don't know.
6  Q.  No one ever told you; is that
7  correct?
8  A.  Not that I know of, no.
9  Q.  So that was one thing that led to
10  your unhappiness. Were there other things?
11  A.  Absolutely.
12  Q.  What was that?
13  A.  Being forced to sit there all day,
14  not getting a tour and not being paid for it.
15  Q.  Well, you said you could leave
16  between waves, right?
17  A.  Technically, okay. But they required
18  you to be there all day, until they cut the line.
19  Going down to the gas station for ten minutes,
20  okay, is not technically leaving. I never left
21  for any great lengths of time. You are required
22  to be on property, unless you had a doctor's
23  appointment or something else. Getting gas in
24  your car, running down the street for ten minutes,

---

119

1  that was okay, but you were required to be there
2  throughout the whole day, and if you weren't, you
3  were placed on overage the next day.
4  Q.  I thought you had said earlier that
5  you only had to be there when the wave was?
6        MS. GARROW:  Objection.
7  Q.  Is that a misunderstanding?
8  A.  You were misunderstanding.
9  Q.  Did anyone ever say anything to you
10  for having been gone too long in between waves?
11  A.  Yeah.
12  Q.  Who?
13  A.  Paul Stensland.
14  Q.  How would he know how long you'd been
15  gone?
16  A.  They walk around the parking lot and
17  check for your cars and they check for you.
18  Q.  That's what he does during the day?
19  A.  That's his job description, keep
20  track of everything, know where everybody is,
21  who's at the sales table, who's doing what.
22  Q.  Did you see Mr. Stensland walking
23  around the parking lot?
24  A.  All the time.

---

120

1  Q.  Could you see him from the pit?
2  A.  You could see, yeah, there's windows,
3  you could see him from standing on the porch, you
4  could see him from standing over in the other
5  building, you see him at the exit. If you looked,
6  you could see him.
7  Q.  And what was he doing?
8  A.  Moving around.
9  Q.  Doing what?
10  A.  Whatever his duties were.
11  Q.  Walking around the parking lot?
12  A.  I'm assuming, if that was part of his
13  duties.
14  Q.  Did you ever see his job description?
15  A.  Never.
16  Q.  How much time would you say he spent
17  walking around the parking lot daily?
18  A.  I wouldn't even begin to guess.
19  Q.  What did he say to you when you had
20  an issue with this, about not -- about being gone
21  too long in between waves?
22  A.  He'd come back with, you know, just a
23  job description, you got to be here and we'd argue
24  about not being paid, why should I have to be

---

121

1  there if I'm not getting paid.
2  Q.  So you had a job description?
3  A.  Technically.
4  Q.  A written one?
5  A.  Not that I know of. Just a verbal
6  reinforced one. They did a lot of interrogation.
7        MS. GARROW:  You need to slow down.
8  Q.  I'm not following you. What
9  interrogation?
10  A.  You know, where were you, why aren't
11  you here, you're supposed to be here, you know.
12  Q.  And what were you supposed to be
13  doing in between the waves?
14  A.  Just wait.
15  Q.  And were you intimidated by
16  Mr. Stensland?
17  A.  Well, fear of losing your job,
18  absolutely you're intimidated.
19  Q.  Were you physically intimidated?
20  A.  No.
21  Q.  Other than Mr. Stensland, did anyone
22  else ever say anything to you about being gone too
23  long in between waves?
24  A.  Right off the top of my head, I can't

31 (Pages 118 to 121)

122

1  recall.
2      Q.   Do you have any records that would
3  refresh your recollection?
4      A.   No.
5      Q.   Did you keep any notes when you were
6  employed by Vacation Village related to your
7  employment there?
8      A.   No.
9      Q.   Did you keep a journal?
10     A.   No.
11     Q.   Calendar?
12     A.   No.
13     Q.   So how many times would you say
14 Mr. Stensland made some kind of comment to you
15 about being gone too long?
16     A.   I can't recall. Several.
17     Q.   More than once a week?
18     A.   No. Just whenever they feel they
19 needed to get me in trouble.
20     Q.   Who else, to your knowledge, did
21 Mr. Stensland make these comments to?
22     A.   Gordon Leete for his team.
23     Q.   I mean Mr. Stensland, who did he make
24 the comments to?

123

1      A.   To his team.
2      Q.   To his whole team?
3      A.   Yeah, occasionally. You got to be
4  here.
5      Q.   Did you ever hear Mr. Stensland
6  telling someone that they had been gone too long,
7  other than yourself?
8      A.   Sure, when they got passed for a
9  tour.
10     Q.   So they weren't there when the tour
11 was?
12     A.   Correct.
13     Q.   These conversations that you said
14 that you had with Mr. Stensland, were they
15 situations where you had been passed for a tour?
16     A.   Oh, no.
17     Q.   Just other times where --
18     A.   Just in general.
19     Q.   Anything else that contributed to
20 your unhappiness with your work environment and
21 your work?
22     A.   Just the whole general, you know, you
23 got to stay here and not get paid for it, it's a
24 big thing.

124

1      Q.   Anything else?
2      A.   No.
3      Q.   Why did you seek other employment?
4      A.   Well, first off, because, you know,
5  you can't work within 200 miles, okay, or two
6  years, and there's only three resorts in my area,
7  okay. That was one of the main reasons. And, you
8  know, you kept hoping it would get better, like it
9  was in the beginning.
10     Q.   And why did you hope it would get
11 better?
12     A.   Because they kept telling you.
13     Q.   Who's "they"?
14     A.   Management.
15     Q.   And what were they telling you?
16     A.   It will get better, things will
17 change, don't worry about it.
18     Q.   What members of management?
19     A.   Rod Lewis, Stensland, Leete.
20     Q.   What specifically were they telling
21 you would get better?
22     A.   Just the general, tour flow would get
23 better so no one would be sitting around. It was
24 always, Hey, in a couple of months things are

125

1  going to turn around. It never did.
2      Q.   Why was it that you rejected a third
3  tour?
4          MS. GARROW: I object. You can
5  answer.
6      A.   Because they told us we only had to
7  take two. And if you're not paying me, I am not
8  going the extra mile for you.
9      Q.   But it's possible you could have
10 closed a third sale?
11     A.   Nine times out of ten I took that
12 third tour. I refused it maybe once or twice.
13 Most of the time I always took it. I might have
14 pitched a fit but I took it.
15     Q.   You might have what?
16     A.   Pitched a fit and got upset with it.
17     Q.   What would you do when you got upset?
18     A.   Tell them I'm not taking a third
19 tour.
20     Q.   Would you raise your voice?
21     A.   I wouldn't say, per se, raise it, but
22 just as loud as I am.
23     Q.   In an angry tone?
24     A.   Oh, certainly.

32 (Pages 122 to 125)

Deposition of:                    Roger Martin                         April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

---

126

1    Q.    Would you be getting upset with the
2 person who was giving you a slip or who would you
3 express the anger to?
4        MS. GARROW: Objection.
5    A.    Management.
6        MS. FABBO: On what grounds?
7        MS. GARROW: He said he had an angry
8 tone, you're putting words in his mouth.
9    Q.    Were you angry?
10    A.    No.
11    Q.    So you had an angry tone but you
12 wouldn't be angry?
13    A.    I wouldn't say angry, what you might
14 consider angry. I have a very deep voice, so if I
15 start getting loud like this, they think I'm
16 already getting mad and that's not the case.
17    Q.    So you weren't angry?
18    A.    No.
19    Q.    What were you?
20    A.    Mildly upset.
21    Q.    You were mildly upset when you
22 pitched a fit; is that what you called it?
23    A.    Yeah, I would say.
24    Q.    And who would you express this mild

---

127

1 upsetness to?
2    A.    The management, whoever is handling
3 the slip.
4    Q.    Do you remember expressing it to
5 anyone?
6    A.    Gordon Leete, Paul Stensland and
7 those are the managers.
8    Q.    And it was the manager that handed
9 you the slip?
10    A.    When the third tour came around, yes.
11    Q.    Always the manager?
12    A.    Yes, they were always looking for
13 somebody if there was a third tour.
14    Q.    Did Gordon or Paul ever tell you that
15 they thought you had behaved inappropriately, as
16 far as raising your voice or speaking to them, in
17 response to this request to go on a third tour?
18    A.    Not that I recall, but I'm sure there
19 is probably something in there.
20    Q.    Had you made Mr. Leete aware that you
21 had attended anger management classes in the past?
22    A.    I'm sure I did. I have, best of my
23 recall, I probably told him once or twice.
24    Q.    And do you know how that would have

---

128

1 come up?
2    A.    I believe I had a letter sent in from
3 a client, stating that I was a little upset with
4 him.
5    Q.    Could you tell me if this is a copy
6 of the letter you're referring to?
7        MS. GARROW: Do you have a copy for
8 me?
9    A.    Seems to be.
10        MS. FABBO: Would you mark that,
11 please?
12        (Martin Exhibit 3, Marked for
13        identification.)
14    Q.    The document that's been marked as
15 Exhibit 3, was that sent to you at your home?
16    A.    I don't believe it was. I don't
17 think the gentleman had my home address. I think
18 it was sent directly to my work.
19    Q.    Can you tell me the circumstances, as
20 you recall them, related to this Mr. Castle?
21    A.    Absolutely. I showed him the
22 product. He didn't like what I was saying.
23 Through our course of discovery, I found out that
24 he was lying to me, and I called him a layer. He

---

129

1 didn't like what I said, and then when he wanted
2 to shake my hand, I wouldn't shake his hand on the
3 exit, and he got all bent out of shape and I told
4 him I don't shake hands with liars. He was
5 standing right on top of me and I sidestepped him.
6 I asked him to come out outside, let's go outside,
7 get him out of the floor where all the other tours
8 are, because, believe me, the situation was about
9 to get that heated and then it would have been
10 distracted to the rest of the room.
11    Q.    This occurred where?
12    A.    Right on the floor, on the sales
13 floor.
14    Q.    What did he lie to you about?
15    A.    Just the general information that he
16 gave me.
17    Q.    Like what?
18    A.    How much money he was spending on
19 vacation, where he was staying. Stuff that's
20 pertinent to a sale.
21    Q.    So you called him a liar?
22    A.    Oh, absolutely. If you lie to me,
23 I'll call you a liar.
24    Q.    Do you think that's appropriate to

---

33 (Pages 126 to 129)

**Deposition of:**  **Roger Martin**  **April 5, 2005**
Wise et al. vs. Patriot Resorts Corp., et al

---

**130**

1  call a potential customer a liar?
2      A.  He's not a potential customer if he's
3  lying to you, is he?
4      Q.  I don't know.
5      A.  Would you do business with him?
6      Q.  How old was this man?
7      A.  Maybe forty-five, fifty.
8      Q.  He says he's in his mid to late
9  fifties.
10      A.  I don't have a crystal ball.  I
11  couldn't tell you his exact date.
12      Q.  Had you ever been a roofer?
13      A.  Absolutely.
14      Q.  When?
15      A.  Through several periods of my life.
16      Q.  When was that?
17      A.  Several periods of my life.
18      Q.  When?  What years?
19      A.  I can't recall.
20      Q.  Not at all?
21      A.  No, just through the years.
22      Q.  Have you ever roofed since you left
23  Vacation Village the first time?
24      A.  I don't think so.  No.  Maybe one

**131**

1  roof.
2      Q.  Whose was that?
3      A.  Might have been Kenny Flanders.
4      Q.  Did you get paid for that?
5      A.  Yes, I did.
6      Q.  Do you have a roofing business?
7      A.  No.
8      Q.  Would you just do that on the side?
9      A.  Yes.
10      Q.  Anyone else?
11      A.  Anyone else what?
12      Q.  That you roofed for.
13      A.  No.
14      Q.  Were you raising your voice to this
15  individual, Mr. Castle?
16      A.  Again, maybe what he determined that
17  I was raising my voice, could be.
18      Q.  Well, let me ask you, did you feel
19  you were raising your voice?
20      A.  I don't feel I raise my voice ever.
21  I feel I might get a little loud but that's my
22  voice by nature.
23      Q.  Were you upset with Mr. Castle?
24      A.  Absolutely not.  This was a time when

**132**

1  I was on Gordon Leete's line.  Gordon told me if I
2  wasn't getting a letter here and there, that I
3  wasn't doing my job, so I took this as I was doing
4  my job.
5      Q.  Gordon didn't think that was unusual?
6      A.  They talked to me about it. He told
7  me, Don't work about it, Rod, you know.  If you're
8  not getting letters occasionally through your
9  career, then you're not doing your job.
10      Q.  Well, I think you brought this up.  I
11  mean this came up when I asked you if you had told
12  him about your anger management classes.
13      A.  Well, this is because they made me
14  sign and that's when I told him, Yeah, I took
15  anger management and all of that.
16      And they said, Well, just continue to
17  work on what you're doing.
18      And I said, Okay, see you later.
19      Q.  Did you think that was an anger
20  management issue?
21      A.  No, I thought this was a sales issue
22  that a guy got mad because I called him a liar, so
23  he sent a letter.  He didn't like what I said.
24      Q.  Have you ever seen this letter

**133**

1  before?
2      MS. GARROW:  Do you have a copy for
3  me?
4      MS. FABBO:  I'm sorry.  Yes.
5      A.  This is the same letter.  I mean he
6  wrote dual letters.
7      MS. GARROW:  Take your time to look
8  at it.
9      A.  This is the same letter that Gordon
10  told me if I wasn't pushing the people hard
11  enough, that I wasn't doing my job, don't worry
12  about it.
13      Q.  Did you ever see this letter before?
14      A.  Yeah, Gordon kind of showed it to me.
15  I never really read it.
16      Q.  You never read it?
17      A.  No.
18      Q.  He showed it to you, so what did you
19  do with it?
20      A.  I never -- this is it.  I said okay.
21  Here you go.
22      Q.  You didn't read it at all?
23      A.  I wasn't concerned with it.
24      Q.  So did Gordon arrange a meeting with

---

34 (Pages 130 to 133)