**Deposition of:**    Roger Martin    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

---

**134**

1  you to discuss the contents of this letter or the
2  incident?
3      A.   No.  I mean we talked about the
4  letter for all of a minute and a half, two minutes
5  and that was that.
6          MS. FABBO:  Could you mark that,
7  please?
8          (Martin Exhibit 4, Marked for
9          identification.)
10     Q.   So I just want to be clear.
11  Mr. Leete met with you regarding the incident with
12  Mr. Castle?
13     A.   Yes.
14     Q.   Correct?
15     A.   Yes.
16     Q.   Do you remember, approximately, when
17  that was?
18     A.   No.
19     Q.   This letter that's been marked
20  Exhibit 4 is dated -- or it says it's dated
21  10/5/02.  Does that appear to be around the time
22  frame?
23     A.   Could be.
24     Q.   The letter states that you were very

---

**135**

1  good at selling and that you did a good job.
2  Would you agree with that with respect to
3  Mr. Castle?
4      A.   Yeah.
5      Q.   Do you have any record of who
6  attended that presentation?
7      A.   As in?
8      Q.   As in who attended the presentation
9  that you gave Mr. Castle.
10     A.   I'm assuming it was Mr. Castle.
11     Q.   Anyone else?
12     A.   There might have been a wife in
13  there.
14          MS. GARROW:  Listen to her question.
15     Q.   Do you have any record?
16     A.   No.
17     Q.   Would the company, to your knowledge,
18  keep records as to who attended that presentation?
19     A.   They should.  I'm sure they would.
20     Q.   Do you have any recollection of how
21  long the presentation was?
22     A.   It was a full ninety minutes.
23     Q.   And you remember that?
24     A.   At least.  All my tours are that

---

**136**

1  long.
2      Q.   But was it longer?
3      A.   It could have been.
4      Q.   Do you have any idea?
5      A.   No.
6      Q.   On the second page of the letter it
7  says you were shouting.  Do you believe you were
8  shouting?
9      A.   No.
10     Q.   It also says some of the other
11  salesman encouraged you to regain your composure.
12  Do you recall that at all?
13     A.   No.
14     Q.   Do you remember anyone intervening?
15     A.   No.
16     Q.   Is it possible that people
17  intervened?
18     A.   No, not until we were standing toe to
19  toe and we were moving him out the door.  It's my
20  opinion this gentleman got mad because I asked him
21  to buy several times, and then when I discovered
22  he was lying to me he got mad.
23     Q.   When you called him a liar?
24     A.   Oh, yes.

---

**137**

1          MS. GARROW:  Wait for a question.
2      Q.   Do you know anyone who was in the
3  vicinity of this discussion you had with
4  Mr. Castle which he's writing about?
5      A.   No.
6      Q.   Can you tell me if this is the
7  document you referred to a little while ago and
8  that you said you had to sign?
9      A.   I never signed it.
10          MS. GARROW:  Can I see the document,
11  please?
12     A.   This was just put in my paperwork.
13     Q.   So there was a document that you had
14  to sign?
15     A.   No, I don't recall.
16     Q.   What was the document you're
17  referring to a few minutes ago?
18     A.   What document?
19     Q.   You said that you sat with Mr. Leete
20  and you signed a document?
21     A.   I didn't sign a document.  This was
22  the document I was talking about.
23     Q.   So you don't believe you signed
24  anything?

---

35 (Pages 134 to 137)

138

1    A.    Absolutely not.  Do you see my
2  signature on this?  Apparently that's the document
3  you're talking about.
4    Q.    Is there another document?
5    A.    Absolutely not.
6    Q.    Can you read that document?
7    A.    Which one?
8    Q.    The one that's in front of you that's
9  not marked yet.
10    A.    "Gordon Leete sat down and Roger
11  explained to him that it was important to continue
12  his anger management."
13    Q.    I didn't mean to read it out loud.
14  You can read it to yourself, unless you want to
15  read it out loud.
16        MS. FABBO:  Could you mark that,
17  please?
18        (Martin Exhibit 5, Marked for
19        identification.)
20    Q.    The document that's been marked
21  Exhibit 5 purports to be something to do with a
22  meeting between you and Mr. Leete.  It's signed by
23  Mr. Lewis, so I was wondering if you remember him
24  being present in the meeting?

139

1    A.    Absolutely not.
2    Q.    Do you recall meeting with Mr. Leete
3  around the 11th of October, 2002?
4    A.    I believe it might have been
5  somewhere around there.
6    Q.    Where did the meeting take place?
7    A.    Just in the general verification
8  office area.
9    Q.    And it was just yourself and
10  Mr. Leete?
11    A.    Correct.
12    Q.    Does this document reflect the
13  substance of your conversation with Mr. Leete?
14    A.    Absolutely not.  I'm not even sure
15  where this document came from.  I've never seen
16  it.
17    Q.    I'm not asking you that, whether
18  you've seen it.  I'm asking you if this is
19  generally what you talked about?
20    A.    Again, no.
21    Q.    So tell me what you talked about.
22        MS. GARROW:  Objection, asked and
23  answered.  You can answer again if you'd like.
24        MS. FABBO:  I didn't ask it.  He just

140

1  volunteered some information.
2    A.    This letter, that's all we talked
3  about.
4    Q.    What was said by whom?
5    A.    You got a letter Rog.  Okay, what?
6  This guy wrote an angry letter about you.  Okay.
7  That's what we went over.
8    Q.    That's it?
9    A.    That's it.
10    Q.    When did you tell him you had anger
11  management classes?
12    A.    I don't even know where he got that.
13    Q.    I'm not asking where he got that.
14        MS. GARROW:  Listen to her question.
15    Q.    I asked you earlier if Mr. Leete was
16  aware that you had taken anger management, and you
17  said that you had told him in response to an
18  incident, which you later identified to be this
19  incident.  So I'm asking you what you told him,
20  how that came up?
21    A.    I'm not sure.
22    Q.    But you told him you had taken anger
23  management?
24    A.    I told him -- I'm sure I shared with

141

1  him that I had issues with my temper.  I've shared
2  it with him more than once, and I can't tell you
3  what time or when.
4    Q.    I'm not asking you whether you
5  shared -- whether you had issues with your temper.
6  I'm asking you specifically about your anger
7  management classes.
8    A.    And I'm specifically telling you I
9  don't recall.
10    Q.    So you don't remember now whether you
11  discussed that in response to this complaint?
12    A.    No.
13    Q.    Was there another complaint?
14    A.    No.
15    Q.    So when you said before that you had
16  mentioned a response to a complaint, what were you
17  referring to?
18    A.    I don't know.  You have to read that
19  back to me so I can understand the whole thing.
20    Q.    I'll tell you exactly.  I asked you
21  if he was aware of your anger management classes.
22  You responded that you told him, in connection
23  with a complaint, an incident, which you later
24  identified to be this.  Is that inaccurate now?

36 (Pages 138 to 141)

Case 3:04-cv-30091-MAP    Document 137-23    Filed 04/16/2007    Page 3 of 21

Deposition of:                          Roger Martin                         April 5, 2005
                           Wise et al. vs. Patriot Resorts Corp., et al

142

1    A.   I can't be sure of what you're asking
2  me. We have had several meetings about my temper,
3  okay.
4    Q.   Tell me about them.
5    A.   With me and management, having
6  issues, me not playing ball with management.
7    Q.   Why don't you start at the beginning.
8  First when you remember you had a meeting about
9  your temper.
10   A.   I don't remember any specific time in
11 general.
12   Q.   None?
13   A.   None. If you expect me to pull out a
14 day and time, I couldn't tell you.
15   Q.   How about generally what you
16 remember?
17   A.   Generally, we always butted heads.
18   Q.   What do you remember them saying
19 about your temper?
20   A.   You can't do that in front of the
21 sales people. You can't speak up and be loud like
22 that in front of the sales people, it disrupts
23 everybody.
24   Q.   What about, were you ever accused of

143

1  using foul language?
2    A.   Oh, yeah.
3    Q.   Did you ever use foul language?
4    A.   Only when it was used in management
5  from me to them, yes, absolutely.
6    Q.   What words would you use?
7    A.   We've all thrown around fuck yous.
8    Q.   What ones would you use, not all of
9  you?
10   A.   Bullshit. This shit sucks, that kind
11 of stuff.
12   Q.   Did you ever consider going back into
13 automobile sales?
14   A.   No.
15   Q.   What other foul language did you use?
16   A.   That's pretty much it.
17   Q.   Nothing else?
18   A.   No, not really.
19   Q.   How many meetings did you have about
20 your temper?
21   A.   Maybe two.
22   Q.   So several is two?
23   A.   I would think, yes, two, three,
24 maybe, no more than that.

144

1    Q.   Did you ever throw things at work?
2    A.   Yeah, I threw a pad down on the
3  ground and stepped on it.
4    Q.   Did you ever tell Mr. Leete that you
5  would continue anger management counseling?
6    A.   No, I think where your -- with the
7  anger management, that's when I was going to Pat
8  Latono. It wasn't anger management, it was going
9  to Pat Latono, that was the same period.
10   Q.   I thought you had said that was prior
11 to your Vacation Village.
12   A.   No, that was during Vacation Village.
13 I never said prior. You said, Have you ever had
14 any -- did you ever consult.
15   Q.   I misunderstood you.
16   A.   And I said yes.
17   Q.   When was that then, what time frame?
18   A.   That was in 2000, right as I had this
19 job, 2000, beginning of 2001, roughly. The end of
20 2000, that summer.
21   Q.   Did anything at work happen that
22 prompted you to go?
23   A.   No.
24   Q.   Was your fiancTe aware that you were

145

1  going to these classes?
2    A.   Oh, yes.
3    Q.   Did she suggest that you go?
4    A.   No.
5    Q.   Did anyone suggest that you go?
6    A.   No, I took it upon myself to do it.
7    Q.   So as of the incident with Melvin
8  Castle in 2002, were you still going to
9  counseling?
10   A.   No.
11   Q.   Did you tell Mr. Leete that you were?
12   A.   No. He knew I was before that. I
13 think he had just assumed that I would just, you
14 know, continue.
15   Q.   Did you ever agree to change your
16 attitude and not be confrontational to others?
17   A.   Yes, and this was the last letter he
18 ever got from me.
19   Q.   So would you -- are you agreeing that
20 you were confrontational in that situation?
21   A.   I'm certain. When you call somebody
22 a liar, you're confrontational at that point,
23 absolutely I was confrontational.
24   Q.   Did you have any discussion with

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA  01115              (413) 786-7233  FAX (413) 786-0299

146

1    Mr. Leete related to the Marvin Castle incident
2    about your attitude?
3        A.    Yes.
4        Q.    What was the nature of that
5    discussion?
6        A.    He said, You can't get letters like
7    this, Rog. He goes, I understand that, you know,
8    if you don't -- I got a letter wrote on me once
9    too.
10            He said, If you're not getting
11   letters wrote occasionally, you're not doing your
12   job. You're not pushing them enough to get a
13   response.
14       Q.    I guess I was asking about your
15   attitude. What did he say about your attitude?
16       A.    He said, You can't be doing that,
17   Rog.
18       Q.    He didn't say anything in particular
19   about your attitude?
20       A.    He said, You can't be doing that,
21   Rog.
22       Q.    Doing what?
23       A.    This. He had this letter in his hand
24   when he said, Rog, you can't be doing that.

147

1        Q.    Calling a customer a liar?
2        A.    Calling whatever Mr. Castle wrote in
3    his letter, tells me I can't be doing this, Rog,
4    so whatever is in this letter, I can't be doing.
5        Q.    And how did you change your behavior
6    after that?
7        A.    I didn't call them liars. I just let
8    them out.
9        Q.    Let me know how?
10       A.    Let them out. It's not for you, let
11   me get the TO. I would bring a TO over, said this
12   isn't for you. Let the manager say thank you for
13   coming in, and you'll get your gifts and you were
14   done.
15       Q.    And did people lie to you, in your
16   opinion, after the incident with Mr. Castle?
17       A.    Certainly.
18       Q.    Could you let me finish my question?
19       MS. GARROW:  Let her finish her
20   question.
21       A.    Okay.
22       Q.    So you changed your behavior after
23   that and didn't specifically call them a liar?
24       A.    Correct.

148

1            (Off-the-record discussion.)
2            (A luncheon recess was taken at back
3            12:15 p.m. to 12:55 p.m.)
4    BY MS. FABBO:
5        Q.    The incident wherein you said you
6    threw a pad on the floor, is this, do you think, a
7    representation of what happened that day?
8        A.    Well, this is kind of what went on.
9        Q.    Why don't you tell me what happened,
10   in your own words.
11       A.    I threw the legal pad on the floor
12   and stepped on it and walked out and went home.
13       Q.    Were you told to go home?
14       A.    Not that I can recall.
15       Q.    And what time of day was this?
16       A.    First thing in the morning.
17       Q.    What prompted you to throw a legal
18   pad on the floor?
19       A.    Just one -- I just wasn't happy with
20   what I had been told.
21       Q.    What had you been told?
22       A.    Using the back of the paper was no
23   longer acceptable.
24       Q.    The back of the printed form?

149

1        A.    Yes.
2        Q.    Have you ever seen this memo before?
3        A.    No.
4        Q.    Have you ever reviewed your personnel
5    file?
6        A.    Only what they gave me.
7        MS. FABBO:  Could you mark that,
8    please?
9            (Martin Exhibit 6, Marked for
10           identification.)
11       Q.    Do you recall anyone else throwing a
12   legal pad on the floor that day?
13       A.    No.
14       Q.    And the document marked as Exhibit 6
15   says that you said something to the effect of the
16   company was making so much money. Sales people
17   could hardly make it. Did you say that?
18       A.    I don't think so. I can't recall.
19       Q.    Do you remember saying anything?
20       A.    Not to -- no.
21       Q.    Not at all?
22       A.    Not at all to that, no.
23       Q.    So as far as you remember, you threw
24   the pad on the floor, stamped on it and left?

| | 150 |
|---|---|
| 1 | A.   Yep. |
| 2 | Q.   Do you remember anything else that |
| 3 | was said at that meeting? |
| 4 | A.   No. |
| 5 | Q.   Do you have any notes of that |
| 6 | meeting? |
| 7 | A.   No. |
| 8 | Q.   Do you know who was present? |
| 9 | A.   Who was ever supposed to be on the |
| 10 | clock that day. |
| 11 | Q.   Meaning the sales people and the |
| 12 | sales managers? |
| 13 | A.   Yes. |
| 14 | Q.   Do you recall Rod asking you to step |
| 15 | outside or to calm down? |
| 16 | A.   No. |
| 17 | Q.   Would you consider or would you |
| 18 | describe your behavior to have been an emotional |
| 19 | outburst? |
| 20 | A.   I think anything you say is an |
| 21 | emotional outburst. |
| 22 | Q.   You think everything is an |
| 23 | emotional -- |
| 24 | A.   Absolutely, one way or the other. |

| | 151 |
|---|---|
| 1 | Q.   Were you angry at this? |
| 2 | A.   I don't think I was angry at this, |
| 3 | no. |
| 4 | Q.   What was your state of mind that |
| 5 | caused you to throw it on the floor and stamp on |
| 6 | it? |
| 7 | A.   It's one of the many things, one more |
| 8 | thing on the apple cart, let's say. |
| 9 | Q.   So you just had enough? |
| 10 | A.   Oh, yes. |
| 11 | Q.   Did you return to work after that |
| 12 | day? |
| 13 | A.   Yes, I believe I did. |
| 14 | Q.   When? |
| 15 | A.   Probably the next day. |
| 16 | Q.   Were you in any different frame of |
| 17 | mind the next day? |
| 18 | A.   Yeah, I was probably in a better |
| 19 | frame of mind. |
| 20 | Q.   Do you remember receiving a copy of |
| 21 | the employee handbook for sales personnel? |
| 22 | A.   I'm not sure.  Yes, I probably do. |
| 23 | Q.   You do or you don't? |
| 24 | A.   Well, I do, but I'm thinking they |

| | 152 |
|---|---|
| 1 | made a change to it and gave us a new one. |
| 2 | Q.   So did you receive more than one? |
| 3 | A.   Yes, more than one. |
| 4 | Q.   Do you remember what the change was? |
| 5 | A.   No. |
| 6 | Q.   Do you remember when you received |
| 7 | either copy? |
| 8 | A.   No. |
| 9 | Q.   Did you ever read the handbooks? |
| 10 | A.   No. |
| 11 | Q.   Never? |
| 12 | A.   Never. |
| 13 | Q.   Why not? |
| 14 | A.   Because they told us what was in them |
| 15 | and went over it for us, so we just assumed it was |
| 16 | all right. |
| 17 | Q.   When you say "they," who are you |
| 18 | talking about specifically? |
| 19 | A.   Management. |
| 20 | Q.   Who? |
| 21 | A.   Paul Stenslsnd, Gordon Leete, whoever |
| 22 | goes over that stuff, they have a meeting on it. |
| 23 | Q.   Do you have a recollection on that? |
| 24 | A.   No. |

| | 153 |
|---|---|
| 1 | Q.   You never had any occasion to |
| 2 | consultant the handbook for anything? |
| 3 | A.   No. |
| 4 | Q.   Do you have your own copies? |
| 5 | A.   I'm sure we got our own copies, yeah. |
| 6 | Q.   What did you do with your copies? |
| 7 | A.   They're probably in my house |
| 8 | somewhere. |
| 9 | Q.   Do you know that or you're just |
| 10 | guessing? |
| 11 | A.   I'm speculating, for sure. |
| 12 | MS. GARROW:  She's not asking you to |
| 13 | speculate. |
| 14 | A.   I'm guessing. |
| 15 | MS. GARROW:  Or guess.  If you know, |
| 16 | you can answer. |
| 17 | Q.   Did you ever ask anyone any questions |
| 18 | about the handbook? |
| 19 | A.   No. |
| 20 | Q.   Were there any other manuals that you |
| 21 | referred to, sales manuals, anything like that, in |
| 22 | your documents? |
| 23 | A.   No. |
| 24 | Q.   Did you keep any record of the hours |

**COURT REPORTING SERVICES**
P.O. BOX 15272, Springfield, MA   01115                    (413) 786-7233  FAX (413) 786-0299

---

**154**

1  you actually were in the pit?
2      A.   No.
3      Q.   Did you keep any records of hours you
4  worked?
5      A.   No.
6      Q.   Any record of the hours spent on
7  tours?
8      A.   No.
9      Q.   And to your knowledge, did the
10  company spend any -- keep any record of hours
11  worked?
12      A.   Can't tell you.  I don't know.  No.
13      Q.   What about in the pit, did you have
14  to record your time anywhere?
15      A.   No.
16      Q.   Do you have any record indicating any
17  hours that you might have worked that were in
18  excess of forty in one week?
19      A.   Nope.
20      Q.   How many weeks did you work more than
21  forty hours?
22      A.   Probably every one of them.
23      Q.   Every one?
24      A.   Oh, yeah, you know, when you're there

---

**155**

1  for every hour, yes.  It was a full week, yes, I'd
2  say more.
3      Q.   Are you including in this time where
4  you may have went to the gas station or doctor's
5  appointments?  Are you excluding that time or
6  including it?
7      A.   Including.
8      Q.   And you're including time spent in
9  the pit as well as time on tours?
10      A.   Oh, yes, anytime you're on property.
11      Q.   What about time when you're driving
12  your car?
13      A.   I'm usually with a tour or somebody
14  like that.
15      Q.   What?
16      A.   I'm usually driving a tour around.
17      Q.   Right, but you weren't on any
18  property when you were at Greylock or anything.
19  I'm asking if you're including that time?
20      A.   Greylock, I am with a tour.  I don't
21  go to Greylock without a tour.
22          MS. GARROW:  Listen to her question.
23      Q.   Do you not understand my question?
24      A.   I didn't hear it.

---

**156**

1      Q.   You answered that you were including
2  all time spent on property.  I'm asking if you
3  also include time spent at other places, like the
4  church you referenced?
5      A.   Oh, yeah.
6      Q.   You're including that time.
7          Did you have any paper keeping
8  requirements associated with your job, filling out
9  forms?
10      A.   No.
11      Q.   None at all?
12      A.   Other than when they buy, no.
13      Q.   Did you receive any records of sales
14  made by you and others, other than what you told
15  me about at the morning meeting?
16      A.   No.
17      Q.   Do you keep any records of days you
18  took off?
19      A.   No.
20      Q.   What time were you usually -- was the
21  line cut at the end of the day, most frequently?
22      A.   I don't know.  Whenever they said go
23  home, that's when we went home.
24      Q.   Was there usually a morning tour and

---

**157**

1  an afternoon tour?
2      A.   There's waves, yes, all through the
3  day.
4      Q.   There's more than two tours?
5      A.   Oh, yes.
6      Q.   More than three?
7      A.   Per person, is that what you're
8  asking me?
9      Q.   I guess I'm not following what a wave
10  is.  Do they all come at one time?
11      A.   A certain amount, whatever they have
12  booked for that wave comes in, and they go from
13  the top of the line through the salesmen.  If you
14  don't get there, then you wait to the next wave.
15  If you don't do that, you wait for the next wave.
16      Q.   And you have no idea how many waves
17  were during the day?
18      A.   No, whatever they had booked.  We
19  didn't handle that part.
20      Q.   You have no recollection?
21          MS. GARROW:  Audible answer.
22      A.   No.
23      Q.   Did you ever use a Human Resources
24  report form to complain to anyone at corporate or

---

Case 3:04-cv-30091-MAP    Document 137-23    Filed 04/16/2007    Page 7 of 21

Deposition of:                         Roger Martin                    April 5, 2005
                        Wise et al. vs. Patriot Resorts Corp., et al

158

1 anyone in Florida if you had any problems,
2 anything like that?
3    A.   No.
4    Q.   Did you ever make any anonymous
5 complaint?
6    A.   No.
7    Q.   Is there any reason why you didn't?
8    A.   Because I don't feel I have to be
9 anonymous when I make a complaint.
10    Q.   Did you ever make any complaints to
11 anyone who was located in Florida about your
12 employment?
13    A.   Absolutely not.  When we tried that,
14 they told us we have to go through our line
15 director and then our project director, and that's
16 exactly what I did and it stopped there.
17    Q.   Who tried that?  You said, "When we
18 tried that."
19    A.   All the employees, every time there
20 was an issue.
21    Q.   I guess I'm just going to ask you to
22 focus on yourself.  When did you attempt to
23 contact Florida?
24    A.   I never tried to contact Florida.

159

1 When we were told that if we wanted to go above,
2 we had to handle it in-house.  We had to go
3 through our line director first, and then our
4 project director, and then if it was not resolved
5 then, you should go to Florida.
6    Q.   And you never did that?
7    A.   We never got the opportunity,
8 absolutely not.
9    Q.   What would you have needed to give
10 you the opportunity?  I'm not following you.
11    A.   First off, nobody said, Rog, here's a
12 form, contact Florida, never got that opportunity.
13    Q.   Wasn't that part of the handbook?
14    A.   I didn't see it in there.
15    Q.   Well, you didn't read it so how would
16 you know?
17    A.   How do you know I didn't read it?
18    Q.   Because you told me you didn't read
19 it.
20    A.   You asked me do I have it.
21    Q.   So you did read it?
22    A.   I glossed through it.  I never did
23 the thing -- everything that was told was through
24 management.

160

1    Q.   So you did not read anything in the
2 handbook that says you could have anonymously
3 contacted Florida at any point to address your
4 grievances?
5    A.   No, I did not.
6    Q.   When you glossed through it, what did
7 you look at?
8    A.   Not much, really.  Just the chapters
9 and that was about it.
10    Q.   Just what?
11    A.   Just the chapters.
12    Q.   The table of contents?
13    A.   Yes.
14    Q.   Do you regret not reading it now?
15    A.   Absolutely.
16    Q.   What?
17    A.   Yes.
18    Q.   Why is that?
19    A.   I would have known more.
20    Q.   Who told you that you needed to go to
21 your line manager first?
22    A.   Management.
23    Q.   Who?
24    A.   Paul Stensland and Gordon Leete.

161

1    Q.   They both told you that?
2    A.   Yes, I was on both their lines.
3    Q.   When did Paul tell you that?
4    A.   I can't give you a specific time.  I
5 don't recall.
6    Q.   In relation to what incident?
7    A.   Several.  Fighting for your pay.
8    Q.   Anything else?
9    A.   I don't know.  The main issue is
10 always fighting for my money.
11    Q.   What about Gordon, when did he tell
12 you, you needed to go to line?
13    A.   That was, I believe, done in an open
14 meeting in the morning.
15    Q.   In relation to what?
16    A.   Just in general, practices of the,
17 you know, rule of thumb, what you're going to do,
18 what you can do, and what you can't do.
19    Q.   On any other occasion?
20    A.   Not that I recall.
21    Q.   Who would line management be?
22    A.   Paul Stensland, Gordon Leete.
23    Q.   So they were telling you to come to
24 them first with issues?

41 (Pages 158 to 161)

**Deposition of:**                    Roger Martin                    **April 5, 2005**
Wise et al. vs. Patriot Resorts Corp., et al

---

162

1    A.  With any problems.
2    Q.  And then go to the project manager?
3    A.  If it wasn't resolved, go to the
4  project manager.
5    Q.  And who was the project manager?
6    A.  Rod Lewis.
7    Q.  Did you ever bring to the attention
8  any issues, to Paul, that were not resolved?
9    A.  Yes.
10   Q.  What were they?
11   A.  The wheel rotation.
12   Q.  Okay.  What else?
13   A.  Pay.
14   Q.  Anything else?
15   A.  Commission structure, no pack, no
16 pay.
17   Q.  Anything else?
18   A.  No.
19   Q.  What was the problem with the wheel
20 rotation that you brought to Paul's attention?
21   A.  Well, some days, you know, they
22 required you to be to work, some days there's not
23 enough tours for everybody.  And what they would
24 do, next day you come in, they start the wheel all

163

1  over from the beginning, you wouldn't get the
2  opportunity to have a tour, so essentially you
3  were there for free.
4    Q.  And you complained to him about that?
5    A.  Wouldn't you?
6    Q.  Did you ask him -- I'm asking the
7  questions.  Did you ask him to do anything about
8  it?
9    A.  Oh, yeah.
10   Q.  What did you ask him to do?
11   A.  I asked him to start the wheel from
12 where it stopped.
13   Q.  What did he say?
14   A.  That's not management's way.
15   Q.  Was it your opinion that he had some
16 control over that or was it a directive from
17 someone else?
18   A.  It's probably a directive from higher
19 up.
20   Q.  Are you guessing?
21   A.  I'm guessing.
22        MS. GARROW:  Don't guess.
23   Q.  When did you have that conversation
24 with Paul about the wheel rotation?

164

1    A.  Couldn't tell you.
2    Q.  No idea?
3    A.  No idea.
4    Q.  No records?
5    A.  No records.
6    Q.  And then you brought it -- did you
7  then bring it to the attention of Rod?
8    A.  Oh, yeah.
9    Q.  What?
10   A.  Yes.
11   Q.  What did you say to Rod?
12   A.  I said, Rod, it's not fair.
13   Q.  Anything else than "It's not fair"?
14   A.  I don't know.  It was just unfair.
15 He said, Well, that's just the way it is.
16   Q.  And then did you bring it to anyone
17 else's attention?
18   A.  That's when I contacted the District
19 Attorney and filed a complaint with -- and that
20 was it.
21   Q.  With the District Attorney or you
22 mean the Attorney General?
23   A.  The Attorney General, I'm sorry.
24   Q.  Why didn't you pursue it anywhere

165

1  else internally above Rod?
2    A.  It was my opinion that it would have
3  been stopped right there.
4    Q.  And what is that opinion based on?
5    A.  Just from trying to get things
6  changed that never went.
7    Q.  Did you believe that Rod had any
8  decision-making authority, with respect to the
9  wheel and the rotation?
10   A.  Absolutely.
11   Q.  And what led you to believe that?
12   A.  He's the boss.
13   Q.  And you didn't know whether that was
14 a directive coming from somewhere else or you did
15 know?
16   A.  I didn't know.
17   Q.  When did you go to the Attorney
18 General's Office?
19   A.  I can't recall exactly.  Somewhere in
20 2003, 2004, somewhere around there.
21   Q.  Is that after you separated from
22 employment?
23   A.  Oh, no, I did this before.
24   Q.  How did you become aware that that

---

42 (Pages 162 to 165)

Deposition of:                        Roger Martin                        April 5, 2005
                        Wise et al. vs. Patriot Resorts Corp., et al

---

166

1  was an avenue of remedy for you or potential
2  remedy?
3      A.   Well, in the pit they have it posted
4  that you can do that, you can contact the Attorney
5  General's Office if it was unfair labor and stuff,
6  so that's the avenue I pursued.
7      Q.   So how did you contact the AG's
8  office? Did you call? Did you go there?
9      A.   I believe I written a letter first.
10     Q.   Did you keep a copy of that?
11     A.   I don't have it. Susan might have
12  it. I don't know.
13     Q.   I have a letter here, and I just want
14  to ask if that's the letter you're referring to or
15  is there some other letter?
16     A.   No, this is some other letter. No,
17  this was after.
18     Q.   Who did you speak -- well, did the
19  Attorney General's Office contact you after
20  getting your letter?
21     A.   Yes.
22     Q.   Who contacted you?
23     A.   I want to say the Assistant District
24  Attorney, or whatever, one of the guys that handle

---

167

1  that.
2      Q.   Did you contact the Springfield or
3  Boston office?
4      A.   Springfield.
5      Q.   And what happened? What was the
6  outcome of those allegations that you sent to the
7  AG's office?
8      A.   They said, You have every right to
9  pursue this. Okay. But we're not going to go
10  after them because all they got to do is pay a
11  fine and that will be that, so that's what I did.
12     Q.   And this was in relation to the wheel
13  rotation; is that right?
14     A.   It was in relation to the wheel
15  rotation, coming to work, not getting paid,
16  commission structure, the whole thing. The whole
17  thing that we're sitting here for today.
18     Q.   When did you bring it to Paul's
19  attention that you had an issue with the coming to
20  work and not getting paid, as you've described it?
21     A.   Just about every day.
22     Q.   Beginning when?
23     A.   Roughly a year and a half into it, I
24  would assume.

---

168

1      Q.   What prompted it at that time?
2      A.   Not getting paid.
3      Q.   Did you have a problem with it when
4  you were hired?
5      A.   No, because life was okay then. We
6  were getting paid on a regular basis. We were
7  writing deals, the paychecks were within fourteen
8  days, seventeen days, everything was lovely.
9      Q.   So I thought you had said that you
10  were complaining that you were waiting around and
11  not getting paid and that was your complaint?
12     A.   Initially we were getting paid.
13  Okay. Then they stopped paying us. Okay. They
14  started dragging it out. We went from fourteen to
15  seventeen days to twenty-one to twenty-four to
16  almost a month, okay, and then you're not getting
17  anything. Then they put in no pack, no pay. Now
18  you're not getting that. The company is getting
19  their money, they're getting paid, but the sales
20  people aren't, and I think getting my eight
21  percent shouldn't be an issue, if I wrote the
22  deal, just pay me my eight percent and we would
23  have just gone on.
24     Q.   If someone paid cash, would you have

---

169

1  gotten paid quicker?
2      A.   Certainly. If they cashed out the
3  contract, absolutely.
4      Q.   And if someone had given you the
5  pack, would you have gotten paid quicker as well?
6      A.   Yes.
7      Q.   So the real issue was the failure to
8  get the pack delayed it further?
9      A.   No, the real issue was all of a
10  sudden the commission started getting strung out.
11  It didn't matter if there was no pack, no pay.
12  That was just another apple into the cart.
13     Q.   So commissions were taking longer to
14  be paid regardless of whether it was a --
15     A.   Cash deal, finance deal.
16         MS. GARROW: Let her finish her
17  question.
18     Q.   So you said about a year and a half
19  into your employment?
20     A.   Yes.
21     Q.   Where was your paycheck coming from?
22     A.   As far as I knew, Fort Lauderdale.
23     Q.   Did you ever contact anyone there
24  about the issue?

---

43 (Pages 166 to 169)

---

170

1    A.    When you contact Arlene down there,
2    she tells you to contact Faith.
3    Q.    So is that a yes?
4    A.    I guess, yes.
5    Q.    So did you contact Arlene?
6    A.    Yes.
7    Q.    How many times?
8    A.    Twice after I was terminated.
9    Q.    Before you were terminated?
10    A.    Never.
11    Q.    Did you ever discuss this issue with
12    Faith prior to your termination?
13    A.    About getting paid?
14    Q.    Yes.
15    A.    Absolutely.
16    Q.    Just as you described it.  And what
17    was her response?
18    A.    No pack, no pay.  That's the way it
19    is, company policy.
20    Q.    I thought you were saying it's
21    broader than the pack issue.
22    A.    It is.  It's the commission
23    structure.  Once you hear that you just can't get
24    paid, it is what it is, you give up.  You get

171

1    tired of hearing it.
2    Q.    So are you saying that there were
3    cash sales that you were waiting --
4    A.    No, never a cash sale.  If you cashed
5    out the contract, you usually got paid within a
6    21-, 28-day period.
7    Q.    So is the problem only associated
8    with the pack?
9    A.    The problem is that they're not doing
10    it the way Massachusetts law is required them to
11    pay.
12    Q.    I'm not asking that.  I'm asking, the
13    problem --
14    MS. GARROW:  Objection.
15    Q.    The delay --
16    MS. FABBO:  What's your objection?
17    MS. GARROW:  Well, you did ask that,
18    actually.  He was answering your question.
19    MS. FABBO:  Is he an attorney now?
20    MS. GARROW:  He was answering your
21    question.  If you're going to ask him a question,
22    he's going to answer them.
23    MS. FABBO:  We can be here all day if
24    he's --

172

1    THE WITNESS:  Let's be here all day.
2    Q.    You also said before that there was a
3    delay in every method of payment.
4    A.    That's the problem.
5    Q.    And you just said that when there was
6    a cash sale, there was no delay, you got paid?
7    A.    The delay is still 21, to 28 days
8    out, that's the delay, okay.
9    Q.    So there was a delay --
10    A.    Yes.
11    Q.    -- with cash sales?
12    And what law do you think that
13    violates?
14    A.    I would assume Massachusetts
15    Commission Law.
16    Q.    And you have a cite to that?
17    A.    No.
18    Q.    And what makes you think it violates
19    Massachusetts Commission Law?
20    A.    Look by -- the General Laws that I
21    pulled up on the computer, that's all.
22    Q.    When did you do that?
23    A.    I want to say 2002-ish.
24    Q.    Is that your home computer?

173

1    A.    I guess.
2    Q.    Someone else's computer?
3    A.    Yes.
4    Q.    Whose computer?
5    A.    My home computer.
6    Q.    You own it?
7    A.    No.
8    Q.    Whose is it?
9    A.    Michelle's.
10    Q.    And what is your understanding of
11    that law?
12    A.    That they're supposed to pay you
13    within an X amount of time.
14    Q.    What's that amount of time?
15    A.    Seven working days in Massachusetts,
16    ten for New York.
17    Q.    So you brought this issue to Faith's
18    attention, that's what you said?
19    A.    I brought it to Faith's attention.  I
20    brought it to Rod Lewis's attention.  I brought it
21    to Paul Stensland.
22    Q.    And how many times did you speak with
23    Faith on this?
24    A.    Well, once, maybe twice, if that.

44 (Pages 170 to 173)

174

1    Q.   Did she advise you to speak with
2  anyone else about it?
3    A.   No, we just -- we were told not to go
4  to her door anymore.
5    Q.   Did you ever raise your voice to
6  Faith?
7    A.   Oh, yes.
8    Q.   Were you hostile to her?
9    A.   Yeah, I would say.
10   Q.   Who told you not to go to her door?
11   A.   Rod Lewis, Gordon Leete, Paul
12 Stensland.  Everything was supposed to be handled
13 on the floor.
14   Q.   Did you ever intimidate Faith, to
15 your knowledge?
16   A.   No.
17   Q.   What was the point of raising your
18 voice and being hostile to her?
19   A.   You're going to have to understand
20 your idea of hostile.  What do you mean by
21 "hostile"?
22   Q.   I asked you if you were ever hostile
23 and you said yes, so I'll go by whatever you meant
24 by it.

175

1    A.   By what I meant was raising my voice.
2    Q.   That's it?
3    A.   Yeah.
4    Q.   No angry words?
5    A.   Well, yeah, I'm sure there were angry
6  words.
7    Q.   Do you remember anything that you
8  said --
9    A.   I can't recall right off the top of
10 my head.
11   Q.   Can you let me finish my questions,
12 please?
13   A.   Go ahead.
14   Q.   Do you remember anything that you
15 said to Faith?
16   A.   No, I do not.
17   Q.   Did you ever ask her to do anything
18 about the delay in the payment of commissions?
19   A.   I don't think I ever asked her to do
20 anything, no.
21   Q.   So you just went there to complain to
22 her?
23   A.   Yes.
24   Q.   You also mentioned talking to Paul

176

1  and Gordon about the commission structure.  Is
2  this just what we've already talking about, the
3  delay in the commissions or is there something
4  else?
5    A.   Just the delay in the commissions.
6    Q.   So when you said "commission
7  structure," that's what you meant, the delay in
8  the commissions?
9    A.   No, just how they're paying us, the
10 whole pay structure.
11   Q.   Well, what were you upset about with
12 the pay structure?
13   A.   Not getting paid on our deals on a
14 timely fashion, going weeks without a paycheck.
15   Q.   So it was the delay in the payment?
16   A.   Delay in payment.
17   Q.   Anything in addition to the delay in
18 payment?
19   A.   I mean I think that's pretty self...
20   Q.   Can you tell me your conversations
21 with Gordon about the wheel rotation, the problems
22 you had with it?
23   A.   The same thing that I told Paul, that
24 when you cut the line, the two -- you know, it

177

1  should start from where it ended the next day,
2  when the periods are slow.
3    Q.   Anything else?
4    A.   No.
5    Q.   Did you ask Gordon to do anything
6  about it?
7    A.   Yeah.
8    Q.   What did you ask him to do?
9    A.   Fix it.
10   Q.   What did he say?
11   A.   Can't fix it, Rod.  It's the way it
12 is.
13   Q.   Did you believe he could fix it?
14   A.   Yeah.
15   Q.   Who was Gordon's boss?
16   A.   Rod Lewis.
17   Q.   Is that what he called you, Rog?
18   A.   Yeah.
19   Q.   Any other conversations you recall
20 with Gordon about the wheel rotation?
21   A.   No.
22   Q.   Do you recall any conversations with
23 Mr. Lewis about the wheel rotation?
24   A.   Yes.

Deposition of:                          Roger Martin                          April 5, 2005
                              Wise et al. vs. Patriot Resorts Corp., et al

178

1    Q.  What do you remember?
2    A.  I asked him how come.
3    Q.  What did he say?
4    A.  He said that's the way it is.
5    Q.  Did you ask him to do anything about
6    it?
7    A.  Yes.
8    Q.  What did you ask him to do?
9    A.  I asked him to fix it.
10   Q.  He didn't want to fix it, is that
11   what you're saying?
12       MS. GARROW:  Objection.
13   BY MS. FABBO:
14   Q.  He didn't fix it?
15   A.  He couldn't fix it.
16   Q.  Did he say he was not going to fix
17   it?
18   A.  He said, Rog, you don't want to fuck
19   with me.
20   Q.  When you spoke with Mr. Gordon or
21   Paul or Mr. Lewis on this issue related to the
22   wheel rotation, did you raise your voice?
23   A.  Probably.  Initially, no.
24   Q.  Never.  At some point?

179

1    A.  Yes.
2    Q.  And when was that?
3    A.  When they wouldn't fix it.
4    Q.  The wheel rotation?
5    A.  Yes.
6    Q.  Why did you raise your voice at that
7    time?
8    A.  Because I was frustrated at coming to
9    work and not getting a tour, not getting paid, and
10   being told I got to sit there all day.
11   Q.  What did you want to be paid for the
12   time that you were at the pit?  I'm assuming
13   that's what you're referring to when you're saying
14   sit there all day.
15   A.  Yeah.
16   Q.  What did you want to be paid, minimum
17   wage?
18   A.  Whatever, something to justify why I
19   had to sit there.
20   Q.  When did you raise your voice to any
21   of these individuals about the wheel issue?
22   A.  After with the hundredth time of
23   speaking to them about it.
24   Q.  You spoke to them a hundred times?

180

1    A.  I can't tell you for sure, but we
2    spoke several times on it.
3    Q.  Did you think that was going to
4    prompt them to do something about it, the fact
5    that you raised your voice?
6    A.  I think it's just that I was
7    frustrated with getting nowhere.
8    Q.  Did anyone ever tell you that they
9    thought you had aggressive body language?
10   A.  No.
11   Q.  Did you ever meet Ms. Foster before
12   today?
13   A.  Once before.
14   Q.  Where did you meet her?
15   A.  I held her umbrella when it was
16   raining and walked her over to Faith's office.
17   Q.  When was that?
18   A.  A couple years ago.
19   Q.  Did you have any conversation?
20   A.  Not really.
21   Q.  What?
22   A.  Minuscule, Hi, how are you?  That's
23   about it.
24   Q.  Did you ever talk to her other than

181

1    that time you were holding the umbrella?
2    A.  No.
3    Q.  Did you ever attempt to contact her
4    with any of your concerns?
5    A.  Didn't know how.  No.
6    Q.  You didn't know she existed?
7    A.  I don't know how to contact her.
8    Q.  You didn't have the number for her?
9    A.  No.
10   Q.  Did you consider looking at the
11   handbook?
12   A.  No.
13   Q.  Did you ever ask Faith how to contact
14   Becky?
15   A.  No.
16   Q.  Did you ever consider suing Coral
17   Resorts about your employment there?
18   A.  No.
19   Q.  What?
20   A.  No.
21   Q.  What about Berkley?  I'm sorry, your
22   predecessor, Bentley -- was it Bentley?
23   A.  No.
24   Q.  Was there any reason -- weren't you

46 (Pages 178 to 181)

Case 3:04-cv-30091-MAP    Document 137-23    Filed 04/16/2007    Page 13 of 21

Deposition of:                    Roger Martin                    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

182

1  paid on commission at both of those places?
2      A.  Yes.
3      Q.  Was there any reason that that didn't
4  prompt you to sue?
5      A.  They were paying us.
6      Q.  They weren't paying you on an hourly
7  basis, though, were they?
8      A.  No.
9      Q.  Are you the owner of your home?
10     A.  No.
11     Q.  Does your fiancTe own it?
12     A.  No.
13     Q.  Do you rent?
14     A.  No.
15     Q.  Who owns it?
16     A.  I believe her parents.
17     Q.  Did you ever receive any disciplinary
18  action at Vacation Village?
19         MS. GARROW:  Objection.  You can
20  answer if you understand the question.
21     A.  I would think I got -- yeah.  Yes.
22     Q.  How many times?
23     A.  Once that I know of.  That's
24  documented, that I know of.

183

1      Q.  What was that regarding?
2      A.  A suspension for three days.
3      Q.  For what?
4      A.  I forgot.  I don't know.
5      Q.  When was that?
6      A.  2000 and -- I don't know.  I'm not
7  sure.  Should be in the company records though.
8      Q.  You have no recollection of why you
9  got suspended?
10     A.  No.  It was a minor reason.  I
11  forgot.
12     Q.  Did you protest your suspension in
13  any way?
14     A.  I protested everything this company
15  did.
16     Q.  How did you protest your suspension?
17     A.  I told them I wasn't happy with it.
18  They didn't care.
19     Q.  Told who?
20     A.  Bill Rauer, he was the one who
21  suspended me.
22     Q.  Did it have anything to do with your
23  attitude; do you know?
24     A.  It could have.

184

1      Q.  And when did you work with Mr. Rauer?
2      A.  The whole period that I was there.
3      Q.  Did you have some incident with him?
4      A.  No.
5      Q.  Do you know Dennis Clavette?
6      A.  No.
7      Q.  Other than that one disciplinary
8  action that you mentioned, do you know of any
9  other disciplinary action you were involved in?
10     A.  Not to my knowledge, no.
11     Q.  What about verbal warnings?
12     A.  No.  No.
13     Q.  Did you have any conversations with
14  anyone employed by Berkley when you were working
15  for Vacation Village?
16     A.  I don't understand the question.
17  What do you mean?
18     Q.  Did you ever talk to anyone in
19  Florida related to your employment?
20         MS. GARROW:  Objection, asked and
21  answered.  Go ahead and answer.
22     A.  No.
23     Q.  Did you understand that the company
24  could discipline you for inappropriate behavior?

185

1      A.  Yes.
2      Q.  Do you know of anyone else receiving
3  any disciplinary actions?
4      A.  No.
5      Q.  Did you ever -- can you tell me the
6  circumstances that led to your termination in May
7  of 2003?
8      A.  Again, it was the wheel rotation, the
9  beginning of the day, Gordon is giving a meeting,
10  there was, like, eight tours the day before, and
11  they told us that the line was going to start at
12  the beginning, at the -- so the other thirty-five
13  people that were there the day before that didn't
14  get a tour, were not going to get a tour again.
15         So when I questioned Gordon about it,
16  he told me to go to Rod.  So right after the
17  meeting I stepped to Rod.  Now, Rod told me that
18  that's just the way it is.  I showed him -- I went
19  to my car and I pulled out the laws they were
20  breaking and I physically showed them to him.
21         And he said to me, I don't care.
22         And I said, You should care.
23         And he said, Roger, you don't want to
24  fuck with me.

**Deposition of:**                    **Roger Martin**                    **April 5, 2005**
**Wise et al. vs. Patriot Resorts Corp., et al**

---

186

1      And I said, You don't want to fuck
2  with me.
3      And he said, That's it, you're fired.
4      Q.   Did you keep a copy of those laws
5  that you just referenced?
6      A.   Yep.
7      Q.   Did you show them to anyone else who
8  was employed by your employer?
9      A.   Just management.
10     Q.   Who else did you show?
11     A.   Gordon Leete.
12     Q.   Before you showed it to Rod?
13     A.   Yes, days before.
14     Q.   Was anyone present when you were
15 terminated?
16     A.   The whole sales line.
17     Q.   Where did this take place?
18     A.   Right on the floor.
19     Q.   The floor being the --
20     A.   The sales floor.
21     Q.   The morning meeting room, is that the
22 same place?
23     A.   Yes.
24     Q.   What time of day?

187

1      A.   Roughly 8:30-ish.
2      Q.   Did anyone attempt to defend you at
3  that meeting?
4      A.   No.
5      Q.   This document here that I showed you
6  earlier, did you write these notes yourself?  Is
7  that your writing?
8      A.   The first two pages, yes.
9      Q.   And what's the third page?
10     A.   The one is -- the one I wrote out to
11 my girlfriend and she wrote it down for me.  They
12 didn't like my handwriting.
13         MS. FABBO:  Could you mark that,
14 please?
15         (Martin Exhibit 7, Marked for
16          identification.)
17     Q.   Would you take a minute and read
18 through that, please?
19         (Witness reviewing document.)
20     Q.   Can you tell me when you prepared
21 this document?  Was it the same day as your
22 termination?
23     A.   Probably a couple days later, I would
24 think.  I'm almost positive.

188

1      Q.   Was that -- were the first two pages
2  prepared at the same time as the third page?
3      A.   No.
4      Q.   How much time was in between?
5      A.   Maybe a day.  Well, actually this was
6  written on 5/17, so four days, if you want to go
7  by the date here and the date there, roughly four
8  days apart is when I called and asked to get paid
9  for my termination.  You know, she'd have to get
10 back to me, and then I called again later, the
11 same time and asked for my money.
12     Q.   So I guess I'm confused.  Do you not
13 know when you wrote the first two pages or are --
14     A.   It was within this period of time.
15 It could have been a day later, two days later,
16 roughly, no later than that.
17     Q.   Between 5/13 and 5 --
18     A.   5/15.
19     Q.   17?
20     A.   No, these two pages, between 5/13 and
21 5/15.
22     Q.   Are they an accurate representation
23 of what happened?
24     A.   Pretty close.

189

1      Q.   What's inaccurate?
2      A.   I wouldn't say anything.  It's a
3  rough outline of what went on that day.
4      Q.   Is there anything in here that you
5  see that seems inaccurate to you now, the first
6  two pages?
7      A.   No.
8      Q.   There's no reference to your
9  conversation with Gordon prior to your
10 conversation with Rod.  Are you sure that that
11 occurred and he told you to go see Rod?
12     A.   Absolutely.
13     Q.   And there's also no reference to you
14 going out to get the general laws out of your car.
15 Are you sure that occurred?
16     A.   Yep.
17     Q.   You didn't have them with you?
18     A.   No.
19     Q.   And there's also no reference to the
20 swearing that you just referred to.  Is there any
21 reason why you excluded that?
22     A.   No.
23     Q.   How come in here it says that he
24 says, "I don't really care."  I think you said he

---

48 (Pages 186 to 189)

Deposition of:                    Roger Martin                         April 5, 2005
                    Wise et al. vs. Patriot Resorts Corp., et al

190
1  said something much harsher than that.
2            MS. GARROW:  Objection.
3            MS. FABBO:  What's your objection?
4            MS. GARROW:  I think that's not an
5  accurate statement of his testimony.
6            MS. FABBO:  What?
7            MS. GARROW:  I mean -- what you just
8  said, because he did testify that you also said
9  that he didn't care when he showed him the labor
10 laws, so, in fact, he did say that.
11      Q.   I guess is my question, if you aren't
12 clear, you said that he said, You don't want to
13 fuck with me, but that's not in here, and I would
14 think that would be something that you would
15 include.
16      A.   It was very quick that I wrote this
17 out, just what was fresh on memory and I didn't
18 remember everything, apparently.
19      Q.   So you didn't remember the -- you
20 don't want --
21      A.   I thought I had it in here.
22      Q.   Is it possible that you made that up
23 after or that was in relation to another incident?
24      A.   Respectfully, I don't make anything

191
1  up.
2       Q.   Could it have been in relation to
3  another incident?
4       A.   No.
5       Q.   So you're positive it happened in
6  connection with this incident?
7       A.   I'm positive.
8       Q.   And where were you when you dictated
9  these notes to your fiancTe?
10      A.   In my house.
11      Q.   And this was on the day that they're
12 dated or that's another date?
13      A.   Yes, they were on the day they are
14 dated.
15      Q.   Are you maintaining that, as of this
16 point, the company owes you any unpaid
17 commissions?
18      A.   Absolutely.
19      Q.   On which sales?
20      A.   I couldn't recall right off the top
21 of my head.  I'd have to have my sales ledger.
22      Q.   How much?
23      A.   I don't know.
24      Q.   You have no idea?

192
1       A.   None.
2       Q.   Do you have any records?
3       A.   Yes.
4       Q.   And where are your records that
5  indicate what you're owed?
6       A.   At my house.
7       Q.   And how many sales are you talking
8  about?
9       A.   I couldn't tell you.
10      Q.   Did you contact anyone at the company
11 to try to get payment for these?
12      A.   Faith.  She told me ninety days.
13 Well, guess what, it's been longer than ninety.  I
14 still ain't got paid.
15      Q.   Did you contact anyone other than the
16 conversations that are referenced on this document
17 that's part of Exhibit 7?
18      A.   No.
19      Q.   Is there any reason why you didn't
20 contact anyone?
21      A.   She's the Human Resource manager.  I
22 thought that was all I had to contact.
23      Q.   You went back to work there, didn't
24 you?

193
1       A.   Absolutely.
2       Q.   Were you still owed commissions at
3  that time?
4       A.   Yes.
5       Q.   What did you do about it?
6       A.   I talked to her about it, still got
7  no response.
8       Q.   Did you ever say, look, these are the
9  deals that I think are open still?
10      A.   What do you think I'm doing here
11 today?  For the same reason, I went to her, got no
12 response, that's why we're here today.
13      Q.   When you went back -- when did you
14 get rehired by Vacation Village?
15      A.   I don't know.  It was roughly six
16 months after this, so I went back, must have been
17 the end January.
18      Q.   What did you do during those six
19 months?
20      A.   Collected unemployment for the first
21 time for six months.
22      Q.   Did you work at all?
23      A.   No.
24      Q.   Did you do any roofing?

COURT REPORTING SERVICES
P.O. BOX 15272, Springfield, MA  01115          (413) 786-7233  FAX (413) 786-0299

Deposition of:                  **Roger Martin**                  April 5, 2005
**Wise et al. vs. Patriot Resorts Corp., et al**

---

**194**

1   A.   No.
2   Q.   What did you get paid for the roofing
3   job that you said you did?
4   A.   A few thousand dollars.
5   Q.   A few being how many?
6   A.   A few, three.
7   Q.   And it was only one roofing job?
8   A.   Yes.
9   Q.   How did it come about that you got
10  reemployed by Vacation Village?
11  A.   I had a talk with Bill Rauer. I was,
12  supposedly, a talented salesperson, you know.
13  When things were going good, we were great.
14  Q.   When things were going good, you mean
15  when you had a lot of sales?
16  A.   When we were getting paid on a
17  regular basis. Remember, the squeaky wheel gets
18  the grease. If you ain't squeaky, you know,
19  you're getting paid, you're not going to be
20  squeaky. It's when you're not getting paid. If
21  you were doing your job for free, you wouldn't
22  be --
23  Q.   Other than Faith, did you speak to
24  anyone, other than Faith and Bill Rauer, in

---

**195**

1   between your two employments at Vacation Village,
2   did you speak to anyone there?
3   A.   No.
4   Q.   Not a single person?
5   A.   No.
6   Q.   And did Bill Rauer contact you about
7   coming back or did you contact him?
8   A.   I contacted him.
9   Q.   When did you contact him?
10  A.   Six months after, roughly, I was
11  unemployed.
12  Q.   Why?
13  A.   Because I wanted to work.
14  Q.   Did you seek employment at all during
15  that time period?
16  A.   You can't work underneath their
17  contract, they'd tell you, you can't go ahead and
18  seek employment in the area.
19  Q.   Doing time-share sales, right?
20  A.   Right.
21  Q.   Did you seek any other employment?
22  A.   Why would I get away from time-share
23  when that's what I do? It's like you being a
24  lawyer and doing something else.

---

**196**

1   Q.   What about automobiles, what about
2   that?
3   A.   No, I wouldn't do auto sales again.
4   Q.   What about roofing, did you consider
5   going into roofing?
6   A.   No.
7   Q.   So you didn't want to do anything
8   else; is that what you're saying?
9   A.   I didn't want to do anything that I
10  wasn't doing for the last couple of years, that
11  was my career choice at this point, being a
12  time-share salesperson.
13  Q.   What did Bill say when you contacted
14  him about returning?
15  A.   We'd love to have you back, just
16  can't have any more of these outbursts.
17  Q.   And you wanted to go back even though
18  you were aware of the situation, as far as the
19  commissions and the wheel?
20  A.   Yes.
21  Q.   Did he tell you anything had changed
22  since you had left?
23  A.   No.
24  Q.   Did he agree to reemploy you -- was

---

**197**

1   it a telephone conversation?
2   A.   I went in and physically talked to
3   him.
4   Q.   Did he agree to reemploy you when you
5   went to talk to him, or was it I'll have to get
6   back to you?
7   A.   We agreed to me at that point, when
8   we were sitting down.
9   Q.   Did you make any demands of him,
10  being conditions of your reemployment?
11  A.   Absolutely not.
12  Q.   Did you ask him what the rotation of
13  the wheel was at that time and how that occurred?
14  A.   No.
15  Q.   Did you ask him had the commission
16  structure changed at all?
17  A.   No.
18  Q.   Had it changed?
19  A.   I couldn't tell you. Not to my
20  recollection.
21  Q.   When you went back to work, when was
22  that?
23  A.   When I went back to work for him?
24  Q.   Yes.

---

50 (Pages 194 to 197)

198

1    A.    I got to say -- I'm not sure on the
2  date -- roughly February, beginning of February.
3    Q.    Of 2004?
4    A.    Yes.
5    Q.    Who was your direct supervisor at the
6  time?
7    A.    Paul Stensland.
8    Q.    Can you tell me if this is your
9  signature on that document?
10        MS. GARROW:  Can I see the document?
11        MS. FABBO:  Yes, I'm sorry.
12    A.    Looks like my signature.
13        MS. FABBO:  Could you mark, that
14  please?
15        (Martin Exhibit 8, Marked for
16          identification.)
17    Q.    Did you ever read this document
18  before you signed it?
19    A.    I glossed over it, sure did.
20    Q.    What does that mean, "glossed over
21  it"?
22    A.    Means just really quickly read it.
23    Q.    Quickly read it.  Did you ever ask
24  anyone any questions about anything that's in this

199

1  document?
2    A.    No.
3    Q.    Did you feel you understood it when
4  you read it?
5    A.    To the extent, yes.
6    Q.    Is there something you didn't
7  understand?  Is that a no?
8    A.    That's a no.
9    Q.    Do you recall receiving a million
10  dollar ring?
11    A.    Yes.
12    Q.    When did you receive that?
13    A.    The first year that we were there, so
14  whatever the time from August to the first year,
15  at the Christmastime.
16    Q.    Is this your signature?
17    A.    Yes.
18        MS. GARROW:  Do you have another one
19  of those?
20        MS. FABBO:  I don't.  I'm sorry.
21        MS. FABBO:  Could you mark that
22  please?
23        (Martin Exhibit 9, Marked for
24          identification.)

200

1    Q.    Exhibit 9 indicates that you received
2  this in January of 2003.  Does that sound
3  accurate?
4    A.    Yes.
5    Q.    Could that have been when you
6  received your ring?
7    A.    No, we received that, I believe, at
8  the Christmas party.  I don't know when the
9  Christmas party was.
10    Q.    Of the preceding year?
11    A.    Yeah, the first Christmas party is
12  when we got it, so whenever the company held their
13  first Christmas party.
14    Q.    The company's first Christmas party,
15  okay.  What is the million dollar ring?  When you
16  keep saying "we," who are you referring to?
17    A.    Our whole crew, everybody.
18    Q.    What do you get a million dollar ring
19  for?
20    A.    Selling a time-share.
21    Q.    Selling one time-share?
22    A.    I think it's pretty self-explanatory,
23  a million dollars.
24    Q.    Is that what you're wearing today?

201

1    A.    Absolutely correct.
2    Q.    Have you consistently worn it since
3  you received it?
4    A.    Yes.
5    Q.    Did you share your notes that are
6  marked as Exhibit 7 with anyone, excluding other
7  than your attorney?
8    A.    Other than my attorney, no.
9    Q.    Why did you write those notes?
10    A.    Just so I could kind of remember what
11  went on that day.
12    Q.    When did you decide to sue the
13  company?
14        MS. GARROW:  I'm going to object.
15        MS. FABBO:  On what grounds?
16        MS. GARROW:  To the extent that there
17  are any conversations with counsel, you should not
18  answer.  If there's anything unrelated to that,
19  you can answer.
20    A.    I don't think there's anything
21  unrelated to that.
22    Q.    Prior to contacting an attorney, had
23  you considered suing the company?
24    A.    When I contacted the Attorney

51 (Pages 198 to 201)

Deposition of:                          Roger Martin                          April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

---

202

1  General's Office and he told me that's what I
2  should do.
3      Q.  You don't recall when that was?
4      A.  No.
5      Q.  Did you let anyone read the notes
6  that are Exhibit 7, other than you and your
7  girlfriend and counsel?
8      A.  No.
9      Q.  Is that the original draft, as far as
10  the first two pages or did you write it and revise
11  it?
12      A.  I would have to say this is the
13  original draft.  I didn't rewrite anything.
14      Q.  Well, I'm just asking because you
15  said you didn't like your handwriting.  Sometimes
16  people will copy it over.
17      A.  No.
18      Q.  As far as you know, that's the
19  original document?
20      A.  As far as I know.
21      Q.  Did you contact the Attorney
22  General's Office again, after you were separated
23  from employment?
24      A.  No.

---

203

1      Q.  So there was only one contact?
2      A.  No.  There was a couple, but they
3  were all initiated by the original one.
4      Q.  So did you -- so once you were
5  terminated, you don't recall calling again in
6  connection with your termination?
7      A.  Oh, I did call in connection with.
8  We were already on a verbal communication with the
9  guy, and I just asked him about was this fair.
10      Q.  Do you know whether the Attorney
11  General ever contacted, or anyone from that
12  office, contacted your employer to investigate
13  these claims?
14      A.  I'm assuming -- I believe he said he
15  did.  I can't recall for sure.
16          MS. GARROW:  Don't assume or guess.
17  She's asking if you know.
18      A.  No, I can't recall for sure.
19      Q.  Did you ever actually go into the
20  Attorney General's Office to meet with anyone?
21      A.  I went into the Pittsfield office and
22  met with him.
23      Q.  In connection with the same
24  complaint?

---

204

1      A.  Yes.
2      Q.  And who did you meet with?
3      A.  I can't recall his name.
4      Q.  What was the purpose of the meeting?
5      A.  To see what we should do about it.
6  What I could do about it.
7      Q.  Did you initiate the meeting or did
8  they, the Attorney General's Office?
9      A.  Once I filed with them, they opened a
10  complaint and then set up the meeting to come in.
11      Q.  And what was discussed during that
12  meeting?
13      A.  The whole thing, how we were getting
14  paid, being forced to sit at work without, you
15  know, any means of pay at all, being told if you
16  leave you could be fired, da, da, da, you know,
17  that was the whole thing, what we're sitting here
18  today for.
19      Q.  Do you actually remember that or are
20  you just guessing that was the conversation?
21      A.  That was pretty much the
22  conversation.  It might not be word for word, but
23  the context are there.
24      Q.  Other than the conversations you've

---

205

1  already told me about, have you ever had any other
2  conversations with management at Vacation Village
3  related to the payment of wages or commissions?
4      A.  I believe once or twice I called
5  Faith and asked her to get paid on the deals.
6      Q.  Were they specific deals that you
7  were talking to her about?
8      A.  Yes, I left the contract number.  She
9  said she'd check on them and get back to me.
10      Q.  Did she?
11      A.  She did.
12      Q.  And what was her response?
13      A.  Weren't ready to be paid yet.
14      Q.  And did you feel that was accurate or
15  inaccurate?
16      A.  Personally, I thought they were
17  inaccurate.
18      Q.  Did you tell her that?
19      A.  No.
20      Q.  And what were you basing your
21  conclusion that the payment dates were inaccurate?
22      A.  First off, by what Massachusetts law
23  would say, okay, that when you're terminated
24  you're supposed to be paid within an X amount

---

**COURT REPORTING SERVICES**
P.O. BOX 15272, Springfield, MA  01115              (413) 786-7233  FAX (413) 786-0299

Deposition of:                    Roger Martin                    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

206

1  period of time. I wasn't, okay. And also, I
2  still got deals that are beyond the ninety days,
3  and I'm still not getting paid and that's their
4  policy.
5      Q.   So the conversations that you're
6  telling me about now, are the ones that are
7  referenced on Page 3 of Exhibit 8?
8      A.   They're referenced over the whole
9  general -- all of my career at Vacation Village.
10     Q.   So during your employment, you
11 believe you called Faith and left specific
12 contract numbers that you wanted her to look into?
13     A.   Yes.
14     Q.   Did there come a point where you
15 decided you were going to keep track of when these
16 deals closed and when you got paid?
17     A.   You get your sales ledger every day
18 if you want it and that's how you keep track.
19     Q.   Did you get yours every day?
20     A.   I got it mostly -- at the end, all
21 the time.
22     Q.   And beginning when?
23     A.   Toward the end of my career. I had a
24 lot of trust for the company, back in the day.

207

1      Q.   When you're saying toward the end of
2  your career, are you meaning the last month, few
3  months?
4      A.   Last few months, yes.
5      Q.   Is that when you lost trust?
6      A.   I lost trust a long time ago.
7      Q.   Why didn't you request your sales
8  ledger earlier?
9      A.   Because you keeping hope it's going
10 to get better.
11     Q.   Why is that?
12     A.   Because you believe they're going to
13 do the right thing when they tell you they're
14 going to do the right thing.
15     Q.   And you believed them?
16     A.   Of course, I did. They're my
17 employer.
18     Q.   You had no reason to believe that
19 they -- did you have any reason to believe that
20 they weren't telling you the truth?
21     A.   Every day.
22     Q.   And what was the reason?
23     A.   Because every time you'd bring a
24 problem to them, nothing was ever resolved, you

208

1  would get a double-talk issue.
2      Q.   So despite that, you still believed
3  them?
4      A.   Oh, yeah, you always hold on for
5  hope.
6      Q.   I'm not asking you if you had hope.
7      A.   I had hope.
8      Q.   I'm asking you if you believed them
9  or not?
10     A.   And that created belief that they
11 would morally do the right thing.
12     Q.   So you had daily reason not to
13 believe them but you did believe them; is that
14 what you're saying?
15     A.   Yes.
16     Q.   When you say "them" you're referring
17 to who?
18     A.   Management.
19     Q.   Who?
20     A.   Management, whoever is in management
21 in Berkley -- Patriot, whoever makes the policies.
22     Q.   Do you know who makes the policy?
23     A.   Absolutely not.
24     Q.   Did you ever ask anyone to tell you?

209

1      A.   No.
2      Q.   Do you know who Carrie Ann is?
3      A.   Yes.
4      Q.   Who is she?
5      A.   I believe she's Faith's assistant.
6      Q.   Did you ever swear at her?
7      A.   No. To my recollection, no.
8      Q.   Did you ever raise your voice loudly
9  to her?
10     A.   No.
11     Q.   Did you ever threaten her?
12     A.   No.
13     Q.   What about Faith?
14     A.   No.
15     Q.   Do you know who Irena Rosenblum?
16     A.   Oh, yes.
17     Q.   Did you ever call her a bitch?
18     A.   Oh, yes.
19     Q.   Who is she?
20     A.   She's a sale associate.
21     Q.   Why would you have called her a
22 bitch?
23     A.   Because we had an argument.
24     Q.   You resorted to calling her a bitch.

53 (Pages 206 to 209)

210

1   What was the argument over?
2       A.   Personal matters.
3       Q.   What?
4       A.   Personal. Issues that I did. I
5   helped her around her house.
6       Q.   What?
7       A.   I helped her around her house.
8       Q.   And then you called her a bitch
9   because of it?
10      A.   No.
11           MS. GARROW: Objection.
12      Q.   You said -- I asked you why you
13  called her a bitch?
14      A.   And I said personal.
15      Q.   Right. Am I'm asking what they were?
16      A.   We had a personal disagreement.
17      Q.   What was it on?
18           MS. GARROW: She's asking you the
19  basis of the disagreement.
20      A.   A lock.
21      Q.   Can you go into more detail?
22           There was a lock on her garage door.
23           MS. GARROW: He said a lock.
24      Q.   What was the issue with the lock?

212

1       Q.   Did you know her from anywhere other
2   than Vacation Village?
3       A.   Never met her before.
4       Q.   Do you have some training in roofing
5   and construction?
6       A.   It's what I did my whole life.
7       Q.   Did you work for any roofers?
8       A.   Yes.
9       Q.   Who?
10      A.   Caretti.
11      Q.   Where is that?
12      A.   Pittsfield.
13      Q.   When did you do that?
14      A.   Roughly, in between car sales and
15  time-share.
16      Q.   Was that ever your focused career?
17      A.   Yeah, I guess you could say it was
18  probably a focused career before I got into sales.
19      Q.   How many years?
20      A.   Fifteen, ten, fifteen, somewhere in
21  there, off and on.
22      Q.   Was there any reason that you got out
23  of that business?
24      A.   Getting too old for it.

211

1       A.   I lost the key and she got mad. She
2   was screaming at me, wouldn't listen to anything I
3   said.
4       Q.   At work?
5       A.   At work.
6       Q.   And what was your response?
7       A.   After I tried to talk to her for five
8   or six times, that's when I called her, why don't
9   you quit being a bitch and listen to what I got to
10  say. I told her I was going to replace the lock,
11  which I did.
12      Q.   What work did you do at her house?
13      A.   A bunch of work at her house.
14      Q.   Like what?
15      A.   The floors, roof, plumbing, garage
16  door repair.
17      Q.   Did she pay you for this?
18      A.   Yes.
19      Q.   How much?
20      A.   Roughly $11,000.
21      Q.   When was this?
22      A.   I believe it was during my time off.
23  I might have been working for Vacation Village at
24  that time and took a week off to do the job.

213

1       Q.   How old were you when you felt you
2   were getting too old for it?
3       A.   About thirty-six.
4       Q.   Did you always work for that one
5   individual company?
6       A.   No.
7       Q.   Who else did you work for?
8       A.   Several different outfits. Specialty
9   Roofing out in Arizona. Roofing company in
10  Florida, just, you know.
11      Q.   When did you work in Florida?
12      A.   When I was young, eighteen, nineteen,
13  twenty.
14      Q.   How long did you live in Florida?
15      A.   A few years.
16      Q.   Did you ever do any work for any
17  other Vacation Village employees?
18      A.   Kenny Flanders.
19      Q.   Any others than Kenny and Irena?
20      A.   No.
21      Q.   Former employees?
22      A.   No.
23      Q.   Were there any people present when
24  you had this argument with Irena about the lock?

54 (Pages 210 to 213)

Deposition of:                                                    April 5, 2005
                              Roger Martin
                  Wise et al. vs. Patriot Resorts Corp., et al

214

1    A.   Yeah, there were several.
2    Q.   Who?
3    A.   I don't know.
4    Q.   Where did it take place?
5    A.   Right on the front porch of Vacation
6 Village.
7    Q.   What time of day?
8    A.   Before the morning meeting, so
9 roughly about eight-ish.
10   Q.   How long was this conversation or
11 argument?
12   A.   Forty seconds.
13   Q.   Did you ever have any altercations
14 with Mark LaPine?
15   A.   Not really, no.
16   Q.   Arguments?
17   A.   I've had some words with him but no
18 real altercations.
19   Q.   Would you have -- have you had with
20 him -- who is he, first of all?
21   A.   He's a sales manager.
22   Q.   Would you have anything that you
23 would consider to have been an argument?
24   A.   Oh, yeah, sure.

215

1    Q.   More than once?
2    A.   Probably just one.
3    Q.   What was that concerning?
4    A.   I believe it was over the pad that
5 day. Somebody was speaking and he didn't like me
6 trying to overspeak him, so he said something.
7    Q.   Someone was talking -- are you saying
8 you interrupted?
9    A.   I was having a whole separate,
10 different conversation at the time he was talking
11 and he didn't like me talking during him talking
12 so he said something about it, and I pretty much
13 told him I'm sick of his shit.
14   Q.   Were you at a sales meeting?
15   A.   It was before the meeting started.
16   Q.   Where did this take place?
17   A.   In the room that the sales meeting is
18 held in.
19   Q.   Who was he speaking to?
20   A.   I don't know.
21   Q.   Was he speaking to the whole group?
22   A.   I don't know.
23   Q.   Is that all you remember from that
24 incident?

216

1    A.   Pretty much, yes.
2    Q.   Did you ever say, Fuck you Mark, I've
3 had it with your shit?
4    A.   I don't think I said, Fuck you, but I
5 certainly said, I had it with your shit, Mark.
6    Q.   Did you ever spend any time in your
7 vehicle in between tours?
8    A.   Yes.
9    Q.   Doing what?
10   A.   Getting gas, listening to music, that
11 was about it.
12   Q.   What about in your vehicle when it
13 was parked on Vacation Village grounds?
14   A.   No.
15   Q.   Never?
16   A.   No, I didn't sit in my car, it was
17 too hot.
18   Q.   In the winter too?
19   A.   It gets warm in the sun, believe me.
20   Q.   Did anyone ever accuse you of
21 flirting with the younger girls that worked in the
22 office.
23   A.   Not that I know of.
24   Q.   Did you ever do that?

217

1    A.   Oh, I'm sure I probably flirted.
2    Q.   With who?
3    A.   I couldn't tell you, just in general.
4    Q.   Why do you say you're sure?
5    A.   Because I'm sure I would give -- I
6 mean flirting is -- you give a compliment and
7 they're going to constitute that as flirting, so
8 yeah, I probably did that.
9    Q.   What about what you would consider
10 flirting?
11   A.   No.  Other than being nice and
12 telling them they look nice, da, da, da, that's
13 about it.
14   Q.   How were your sales during the period
15 that you had been rehired by Vacation Village?
16   A.   Horrible.
17   Q.   Do you contribute that to anything?
18   A.   Absolutely.
19   Q.   To what?
20   A.   Mental state.
21   Q.   What was your mental state?
22   A.   I couldn't believe I went back to
23 work and the same old stuff was happening again.
24   Q.   No one told you they had changed, did

55 (Pages 214 to 217)