61

1  guest's own schedule, is that correct?
2          MS. FABBO:  Objection.
3          MR. FELDMAN:  If you know?
4          THE WITNESS:  I don't know.
5      Q.  (By Mr. Feldman)  Do you know if there
6  was a time by which the Marketing Department told
7  guests that they should arrive at the Sales
8  Center or at the complex, excuse me?
9      A.  The sales guests are given a tour time
10 by the Marketing Department, yes.
11     Q.  A specific time?
12     A.  Yes.
13     Q.  Do you know the policy by which the
14 Marketing Department assigned people times?
15     A.  No.
16     Q.  Was more than one person assigned a
17 particular time?
18     A.  Yes.
19     Q.  How many people would be assigned a
20 particular time at once?
21     A.  I don't know.
22     Q.  What was the typical time for cutting
23 the line, if there was a typical time?
24     A.  2:30 -- 2:00, 2:30.

62

1      Q.  Prior to the line being cut but after
2  8:30, what was the salesperson supposed to be
3  doing if they didn't have a tour -- strike that.
4  You said sometimes the line was cut before 2:30,
5  but let's say it's a typical day, the line was
6  cut at 2:00 or 2:30.  If a person didn't have a
7  tour that day, what would the company want them
8  to be doing?
9      A.  We provide a lounge for them that has
10 a television set, tables and chairs where they
11 can play board games, they can play cards, they
12 can read, help each other with sales
13 presentations, you know.  There's a refrigerator,
14 microwave, toaster oven.  Typically they'll take
15 turns bringing in food for the group and they
16 have their lunches there, whatever.
17     Q.  Did the company require salespeople to
18 stay on-site while they're waiting for tours?
19     A.  Yes, we like them to stay.
20     Q.  There's a difference between liking
21 them and requiring them.  So I'm wondering
22 whether the company required them to stay
23 on-site.
24     A.  In the event that the salesperson

63

1  chose not to stay on-site and their tour came in
2  and they were passed, then that would result in
3  them being on overage the following day, and they
4  had to deal then with the peer pressure from the
5  other salespeople for -- salespeople are very
6  superstitious, and nobody wants to have them
7  interrupt the flow of the customers because then
8  when their spot comes, that's their customer.  So
9  most of the salespeople stay at the Reception
10 Center or over at the Sales Center, one of the
11 two; and when their customers come in, the
12 Reception Center personnel find them and tell
13 them that it's time for them to go out.
14     Q.  Who set the rules about whether
15 salespeople were required to stay on-site while
16 they waited for tours?
17     A.  It was the company requirement.
18     Q.  What was the company requirement?
19     A.  Just that they be there for their
20 tour.
21     Q.  You were the project director there.
22 Is it your testimony today that salespeople
23 didn't have to be on-site unless they had a tour
24 there for them?

64

1      A.  I'm not sure I understand the
2  question.
3      Q.  Sure.  I guess I'm asking, were
4  salespeople permitted to be off site during the
5  day after the sales meeting and before they had a
6  tour?
7      A.  Salespeople will go to the gas
8  station, get gas.  They've come to work and maybe
9  they didn't have enough gas in their car, and
10 before their tour they might go out and get gas,
11 pick up a sandwich or something, then come back.
12     Q.  I'm trying to get you to articulate
13 the company policy about whether they were
14 required to stay on-site while waiting for a
15 tour.
16     A.  No, they're not absolutely required to
17 stay on-site.
18     Q.  So is it your testimony that a
19 salesperson could be gone every day for a couple
20 of hours if they chose to do it, so long they
21 were there for their tour?
22     A.  We'd like that not to happen.
23     Q.  How would that be communicated to the
24 salesperson?

65

1     A.   We tell them we want them to be there
2  for their tour.
3     Q.   I understood, but what about the time
4  between the sales meeting and the tour?
5     A.   We don't put ankle bracelets on
6  people, okay.  These are adults, and we have
7  certain expectations for them and we hope that
8  they'll behave accordingly.
9     Q.   What does the employee handbook say
10 about whether a salesperson has to be on-site
11 while waiting for a tour?
12    A.   You tell me.
13    Q.   You're the project director, not me.
14    A.   We would like them to be there.
15    Q.   Is there any penalty for a person who
16 was not on-site so long as they didn't miss their
17 tour?
18    A.   No.
19    Q.   Did anyone ever communicate to
20 employees that they needed to remain on-site
21 while they waited for their tour?
22    A.   I'm sure that they have been told that
23 we like them to stay there, because that way we
24 know where they are and we know that they're not

66

1  going to get passed -- because of the uncertainty
2  of the arrival time of the sales guests.
3     Q.   Has anyone during your tenure ever
4  been fired because they were not on-site while
5  waiting for a tour?
6     A.   Not to my knowledge.
7     Q.   Has anyone ever been disciplined for
8  not being on-site while they were waiting for a
9  tour?
10    A.   I don't recall.
11    Q.   Does that mean no, or they might have
12 been and you don't recall?
13    A.   It means that I don't recall.
14    Q.   Your testimony is that you know of no
15 company rule that requires an employee to be
16 on-site while they wait for their tour?
17         MS. FABBO:  Is that a question?
18    Q.   (By Mr. Feldman)  That is.
19    A.   I'm sorry, I thought you were making a
20 statement.  That's a question?
21    Q.   I raised my voice at the end.  If you
22 saw it written down, you'd see a little question
23 mark at the end, I'm sorry.
24    A.   No.

67

1     Q.   Did Mr. Rauer ever tell you that that
2  was company policy?
3     A.   It's certainly procedure.
4     Q.   It is procedure?
5     A.   Yes, most of the salespeople just, you
6  know, stay in the lounge area or they sit outside
7  or they're prepared to go to work and they just
8  sit there and wait for their turn to come.
9     Q.   Were you ever at a general sales
10 meeting where someone told the salespeople that
11 they needed to stay on-site while waiting for
12 their tour?
13    A.   I don't recall.
14    Q.   Did you ever communicate that to the
15 sales directors?
16    A.   I don't recall.
17    Q.   Did you ever overhear a sales director
18 or a sales manager telling a salesperson that
19 they needed to remain on-site while waiting for a
20 tour?
21    A.   If finding them has been a problem and
22 they get passed, I'm sure the managers probably
23 did say to them, Hey, you disrupted the flow; the
24 salespeople are superstitious, they get mad, you

68

1  need to be here for your tour.
2         MR. FELDMAN:  Off the record.
3         (A break was taken)
4         MR. FELDMAN:  Back on the record.
5     Q.   (By Mr. Feldman)  Mr. Lewis, we were
6  talking about whether employees needed to remain
7  on-site while they waited for tours.  Why did
8  they need to come at 8:30?
9     A.   For the morning sales meeting.
10    Q.   That was the only reason, is that
11 right?
12    A.   Yes.
13    Q.   So they would sign in by 8:30, sit for
14 the morning sales meeting, and then they could go
15 home until the tour came, is that your testimony
16 today?
17    A.   No.
18    Q.   Okay, okay, what were they supposed to
19 do after the sales meeting?
20    A.   They go over to the Sales Center --
21 the Reception Center from the Sales Center and
22 wait for their tour.
23    Q.   But you just said that that wasn't
24 required, right?

69

1     A.    No, it's not required, but...

2     Q.    But what?

3     A.    If they wanted to go home, they live

4  close enough that they could get there and come

5  back in time for their tour and not get passed,

6  I'm sure that's happened.

7     Q.    It did happen?

8     A.    I'm sure that it has happened.

9     Q.    If you're sure, who is the person who

10 did that?

11    A.    I don't have any specifics on that.

12    Q.    Why are you sure, then?

13    A.    That was a figure of speech.

14    Q.    Did salespeople -- strike that.  In

15 order to leave the site while waiting for a tour,

16 was a salesperson supposed to get permission from

17 their line director?

18    A.    Yes.  That way we know where they are.

19    Q.    Was that the only reason?

20    A.    For them to leave the resort?

21    Q.    No, no, is that the only reason they

22 had to check in with their line director, so

23 you'd know where they were?

24    A.    Yes.

70

1     Q.    Did they need to get permission

2  because they otherwise were supposed to remain in

3  the sales lounge?

4     A.    In the immediate area.

5     Q.    So they needed permission because they

6  were otherwise supposed to stay in the immediate

7  area of the Sales Center, is that right?

8     A.    Yes, that's what we would like them to

9  do.

10    Q.    How did they know -- the salespeople

11 -- that that's what you would like them to do?

12          MS. FABBO:  Objection.  You can

13          answer.

14          THE WITNESS:  That would be

15          conveyed to them by their sales

16          manager, their sales director.

17    Q.    (By Mr. Feldman)  What documents were

18 salespeople provided when they first started

19 working at Vacation Village?

20    A.    Employee handbook, they're provided

21 with an outline of the sales program,

22 presentation.

23    Q.    I'm going to show you this document

24 we'll mark as an exhibit.

71

1          (Exhibit 1, 2005 Vacation Village

2          Tour Presentation, marked for

3          identification)

4     Q.    (By Mr. Feldman)  Is this a copy of --

5  what is this?  I'm showing you what's been marked

6  as Exhibit 1.

7     A.    This is an outline of the sales

8  presentation for the tour.

9     Q.    Is this what you were just talking

10 about, that they were given a copy of this

11 document?

12    A.    Yes.

13    Q.    What does this document tell the

14 salesperson?

15          MS. FABBO:  Objection.  You can

16          answer.

17          THE WITNESS:  Tells them to --

18    Q.    (By Mr. Feldman)  Let me strike that

19 question.  Why was this document given to

20 salespeople?

21    A.    To give them an outline of our sales

22 presentation, tell them what the expectations are

23 of them, that they need to come to work prepared

24 to go to work.  In order to be successful, they

72

1  need to maintain a very positive attitude.  We

2  feel that success is a function of attitude.

3     Q.    You said the employee handbook was

4  given to salespeople, this document was given to

5  salespeople.  Were there any other documents

6  given to salespeople when they first started

7  working at Vacation Village?

8     A.    I'm not aware of what the Human

9  Resource would give other than the employee

10 handbook.

11    Q.    Now, you said people signed in at 8:30

12 in order to be at the sales meeting, is that

13 correct?

14    A.    That's correct.

15    Q.    So if people were put on overage

16 because they were late, it's because they were

17 late to the sales meeting?

18    A.    That's correct.

19    Q.    Is there any other reason why the

20 overage policy was created so far as you know?

21    A.    The overage -- why the policy was

22 created?

23    Q.    Yes.

24    A.    As a deterrent to being absent or

---

73

1  tardy, I would think.

2      Q.  But you just said before, I thought,

3  so long they didn't miss their tour, they weren't

4  disciplined for not being on-site, right?

5      A.  If they came for the sales meeting in

6  the morning?

7      Q.  Yes.

8      A.  And they were there prior to 8:30 to

9  sign in?

10     Q.  Right.

11     A.  And they attended the meeting and if

12 they didn't miss their tour, they weren't late

13 for their tour, you don't get put on overage for

14 going to get gas or something.

15     Q.  But do you get put on overage for

16 going out for an hour without telling the line

17 director?

18     A.  Not typically, no.

19     Q.  Did it ever happen?

20     A.  I'm not aware of it.  I don't really

21 recall.

22     Q.  You said not typically.  That made me

23 think sometimes it's happened.

24     A.  No, I don't recall it ever happening.

---

74

1          (Exhibit 2, Vacation Village

2           Rotation, marked for

3           identification)

4      Q.  (By Mr. Feldman)  I'm going to show

5  you what's been marked as Exhibit 2, Mr. Lewis.

6  Have you seen this document before?

7      A.  Never.

8      Q.  Do you know anything about this

9  document?

10     A.  This must be a document that's used by

11 the Reception Center staff.

12     Q.  Do you get a copy of the rotation list

13 in the morning?

14     A.  Yes.

15     Q.  The last page of Exhibit 2, that says

16 March 26, '05 -- was that the rotation list as

17 far as you know, from March 26, '05?

18     A.  Yes, I would imagine that that's what

19 it is.

20     Q.  In fact, the first eleven names listed

21 on the last page of Exhibit 2, those are all the

22 names of line directors or sales managers, is

23 that right?

24          MS. FABBO:  Objection.  You can

---

75

1          answer.

2          THE WITNESS:  Yes.

3      Q.  (By Mr. Feldman)  Now, it lists the

4  name of Stensland.  He's a line director, right?

5      A.  Right.

6      Q.  Some of the other names in the first

7  grouping of eleven, those are not line directors,

8  right?

9          MS. FABBO:  Objection.

10         THE WITNESS:  Right.

11     Q.  (By Mr. Feldman)  They are sales

12 managers, right?

13         MS. FABBO:  Objection.

14         THE WITNESS:  Some are.

15     Q.  (By Mr. Feldman)  At the top of this

16 document, it says "Sales Representative Morning

17 Rotation," is that correct?

18     A.  Yes.

19     Q.  Were the line directors on sales

20 rotation?

21     A.  They had the option.

22     Q.  Oh, they did?

23     A.  Yes, of going out in the rotation.

24 Stensland, Mercurio, Campagna -- all three, line

---

76

1  directors.

2      Q.  Did they typically exercise that

3  option?

4          MS. FABBO:  Objection.

5          MR. FELDMAN:  If you know?

6          THE WITNESS:  Frequently.

7      Q.  (By Mr. Feldman)  Do you recognize

8  that second grouping as being the last names of

9  people who were salespeople in March of '05?

10         MS. FABBO:  Objection.

11         THE WITNESS:  Yes.

12     Q.  (By Mr. Feldman)  You had said the

13 company preferred people to remain at the Sales

14 Center; but, in fact, weren't there some

15 occasions where salespeople were required to be

16 at the Sales Center?

17         MS. FABBO:  Objection.

18         THE WITNESS:  In what

19         circumstance are you...

20     Q.  (By Mr. Feldman)  Well, I'm asking you

21 if there were circumstances where people were

22 required to be on-site waiting for a tour?

23     A.  We ask them to be on the site waiting

24 for a tour.

77

1    Q.    I know that.  You use words like
2  "asked," and I'm using words like "required".
3    A.    There is a difference.
4    Q.    I do understand that.  Were there
5  times where salespeople were required to be
6  on-site waiting for a tour?
7    A.    I don't recall.
8    Q.    Wasn't it -- during the time you've
9  been project director, wasn't it the policy that
10  if a salesperson was on overage, they were
11  required to be at the Sales Center the very next
12  day until the line was cut?
13          MS. FABBO:  Objection.
14          THE WITNESS:  Yes, yes, we want
15      them to be there until the line was
16      cut.  We want them to spend the day
17      there.
18    Q.    (By Mr. Feldman)  Mr. Lewis, you
19  really need to listen to my question; you're
20  answering some other question.  The question was,
21  were they required by the company to remain at
22  the center while they were on overage until the
23  line was cut?
24    A.    Yes.

78

1    Q.    Was that a different policy than the
2  policy provided to people who were not on
3  overage, or was it the same?
4    A.    It's a different policy.  It's more of
5  a punitive policy.  These people are on overage;
6  they are on overage for a reason -- because they
7  chose to take an unscheduled day off or they
8  chose to miss their tour and got passed.
9    Q.    Were there salespeople who were on
10  overage for more than a day at a time?
11    A.    If they are, it's only because they
12  put themselves there.
13    Q.    I'm not asking the reason for why.
14    A.    Yes.
15    Q.    I'm just asking if they were, okay?
16    A.    The answer is yes.
17    Q.    What's the longest that you recall any
18  person on overage for a number of consecutive
19  days?
20    A.    I recall someone being on overage for
21  several days, but I don't remember exactly what
22  the number was.
23    Q.    Do you know who that person was?
24    A.    Fellow named Joel Hecht, H-E-C-H-T.

79

1    Q.    Why was he on overage for a number of
2  days?
3    A.    I don't recall the exact reason.  I
4  think that his overage rolled from one day to the
5  next because he would say, Screw it, and leave
6  early.
7    Q.    If a salesperson left the site before
8  the line was cut but didn't miss a tour, what was
9  the policy of Vacation Village as to that person?
10    A.    Left before the line was cut but they
11  didn't miss a tour?
12    Q.    Weren't they put on overage?
13          MS. FABBO:  Objection.
14          THE WITNESS:  It's possible that
15      they were.
16    Q.    (By Mr. Feldman)  Was that the policy
17  of Vacation Village?
18    A.    If they were, then it was.
19    Q.    You're going to have to explain what
20  that means, I'm sorry.
21    A.    It's possible that somebody was put on
22  overage for leaving early, okay.  At this point,
23  the people who leave, if they leave early and
24  they don't get passed, then there's no overage.

80

1    Q.    At this point now?
2    A.    That's correct.
3    Q.    So that's a change of policy, is that
4  right?
5    A.    That would be correct.
6    Q.    When did that policy change?
7    A.    I don't remember.
8    Q.    Was it very recently?
9    A.    No, it's been a while.
10    Q.    Was it more than -- was it changed at
11  the beginning of 2005?
12    A.    I don't recall.  I really don't.
13    Q.    Was it during the year 2004?
14    A.    Probably changed during 2004.
15    Q.    What was the reason for the change?
16    A.    I don't recall.
17    Q.    I'd like you to explain as best you --
18  you're the project director, you're supposed to
19  understand the policy of Vacation Village with
20  regard to salespeople, correct?
21          MS. FABBO:  Objection.
22          THE WITNESS:  Right.
23    Q.    (By Mr. Feldman)  I'd like you to
24  explain the new policy you described and what the

81

```
 1   old policy was.
 2        A.   New policy involves primarily the
 3   director of the Tour Center on assigning overage
 4   and is based on missing a tour or on being late
 5   or being absent.
 6        Q.   Just so I understand, the overage
 7   policy now is that you can get overage if you're
 8   late; that is if you come later than 8:30, is
 9   that right?
10        A.   Yes.
11        Q.   If you miss a tour, is that correct?
12        A.   Yes.
13        Q.   What was the other reason, I'm sorry?
14        A.   If you take an unscheduled day off.
15        Q.   Take an unscheduled day off?
16        A.   You're missing for a day and you don't
17   have a doctor's excuse.
18        Q.   Is there any other reason right now
19   for a person getting overage?
20        A.   I don't believe so.
21        Q.   That's what I'm going to call the
22   changed policy.  What was the policy before that
23   change occurred with regard to overage?
24        A.   If you would leave, it was all of
```

82

```
 1   that, and if you would leave the premises before
 2   the line was cut, then that would result in
 3   overage, or if you were on overage and you left
 4   before the line was cut, that would result in a
 5   continuation of the overage.
 6        Q.   Just so I'm clear, the old policy, you
 7   just said if you left before the line was cut you
 8   got overage.  What did it mean to leave?
 9        A.   To physically leave the premises.
10        Q.   For any reason?
11        A.   No, just to go home, be gone for the
12   day.
13        Q.   What if you left for four hours and
14   then came back right before the line was cut?
15        A.   That would probably result in overage,
16   yes.
17        Q.   But if you were gone for half an hour?
18        A.   No, as long as you didn't get passed.
19        Q.   But what if you were gone for the
20   whole day but managed to get there one minute
21   before your tour happened?
22        A.   Probably overage if you were gone for
23   the whole day.  You couldn't just be gone all day
24   without telling anyone.
```

83

```
 1        Q.   I assume as the project director you
 2   try not to treat people differently with regard
 3   to violations of company policy, is that right?
 4        A.   That's correct.
 5        Q.   You try to treat people similar in
 6   similar situations?
 7        A.   That's correct.
 8        Q.   You've given slightly different
 9   reasons -- strike that.  You said that you would
10   give overage in some circumstances and not in
11   others, and I'm trying to figure out what the
12   rule was for overage.  So can you recite for me
13   what the company policy was that you were
14   supposed to implement for overage?
15             MS. FABBO:  Objection.
16        Q.   (By Mr. Feldman)  Let me back up.
17   Were you supposed to implement the overage
18   policy?
19        A.   I could implement it.
20        Q.   Were you supposed to understand the
21   overage policy?
22        A.   Yes.
23        Q.   Who else was supposed to know the
24   overage policy besides you?
```

84

```
 1        A.   The Reception Center manager, the
 2   sales managers.
 3        Q.   What was the overage policy with
 4   regard to leaving the premises?  I'd like you to
 5   articulate what it was.
 6             MS. FABBO:  Objection.
 7             THE WITNESS:  If you had to leave
 8        the premises, we ask that you notify
 9        your manager, that there be a reason
10        why you had to go, other than, I feel
11        like I want to go take in a movie.  We
12        had some cases people's clothing would
13        tear and, Gosh, I need to go home and
14        change my shirt or put on another pair
15        of trousers or a shirt that I spilled
16        coffee over.  We would say, Okay,
17        hurry on home, but just get back here
18        before you get passed.
19        Q.   (By Mr. Feldman)  You also said if
20   people were gone for a large section of the day
21   and didn't miss their tour, they could still be
22   put on overage.  I'm trying to figure out what
23   policy they violated for being put on overage?
24        A.   Leaving without notice and being gone
```

85

1   for a long period of time.

2       Q.   So any of those reasons would allow

3   you to be put on overage?

4       A.   Yes.

5       Q.   What was the period of time that you

6   could be gone for without being put on overage?

7            MS. FABBO:  Objection.

8            THE WITNESS:  I don't think there

9            was any set period of time.  People

10           would leave to go get gas and come

11           back; and as long as they weren't

12           passed, they didn't get overage.

13      Q.   (By Mr. Feldman)  Did people get a

14  lunch break -- did salespeople get a regular

15  lunch break?

16      A.   No.

17      Q.   If a salesperson asked the line

18  director to go out for half an hour to get lunch,

19  was that something they should have been granted

20  permission under company policy?

21      A.   Based on the circumstances.  For

22  example, we had a lady who is an

23  insulin-dependent diabetic, and she had to eat at

24  a certain time, and so we said, Fine, go ahead

86

1   and do that.

2       Q.   What if a salesperson regularly wanted

3   to have a 12:30 lunch break at the local lunch

4   stop in town; was that permissible?

5       A.   No.

6       Q.   What happened if the person took a

7   lunch break from 12:00 to 12:30 every day; what

8   would be the company policy of that person?

9            MS. FABBO:  Objection.

10           THE WITNESS:  I don't know.  I

11           don't think anybody ever posed that

12           circumstance.

13      Q.   (By Mr. Feldman)  But you said that

14  you understood company policy then.  Was that

15  permissible or not, as you understand it?

16           MS. FABBO:  Objection.

17           THE WITNESS:  It was not

18           permissible.

19      Q.   (By Mr. Feldman)  What violation of

20  the rule would have occurred if you did that?

21      A.   Based on tour times.

22      Q.   Assuming you didn't miss the tour?

23      A.   If the salesman was on tour, typically

24  all the salespeople would go out in the morning,

87

1   and at 12:30 in the afternoon they would be in

2   the middle of their tour.  They couldn't just

3   say, for example, Excuse me; I'm going to lunch,

4   I'll see you in a half an hour.

5       Q.   I understand that, but you said

6   sometimes people didn't get a tour or they had to

7   wait to get a tour.  So why couldn't they go out

8   and get a lunch then?

9       A.   If they had to, they could.  They

10  could run down to McDonalds and get a quick

11  sandwich -- nothing wrong with that.

12      Q.   The way you described it, could they

13  sit at McDonalds half an hour and eat their lunch

14  -- that's the question.  Were they permitted to

15  do that?

16      A.   No.  We encourage the people to buy

17  their lunch.  We provide refrigeration.

18      Q.   I understand that.  I'm happy to have

19  you tell me those things, but that wasn't the

20  question that was asked.  If that want to tell me

21  that --

22      A.   No, that's all, that's all.

23      Q.   What were permissible reasons for

24  being off the premises?

88

1            MS. FABBO:  Objection.

2            THE WITNESS:  There is no list of

3            permissible reasons.

4       Q.   (By Mr. Feldman)  But as you said, you

5   needed permission to be off the premises, is that

6   correct?

7       A.   Yes.

8       Q.   What if you didn't ask for permission

9   to be off the premises and you were discovered to

10  be off the premises?

11      A.   Again, a lot of it would have to do

12  with time.

13      Q.   With how long, you mean?

14      A.   Yes.

15      Q.   When a person left the premises, was

16  there some kind of sign-out sheet that they

17  signed out on and signed in again when they came

18  back from their short visit away from the

19  premises?

20      A.   No.

21      Q.   How long were people given to show up

22  for their tours from the time a tour guest came?

23      A.   Ten minutes.

24      Q.   If they did not show up within ten

**89**

```
1   minutes, what happened?
2      A.   They got passed.
3      Q.   They would then be put on overage, is
4   that correct?
5            MS. FABBO:  Objection.
6            THE WITNESS:  That's correct.
7      Q.   (By Mr. Feldman)  Other than being
8   on-site for the sales meeting and being there for
9   tours, were there other times outside of a normal
10  workday where a salesperson was supposed to show
11  up at the Sales Center?
12           MS. FABBO:  Objection.
13           THE WITNESS:  Not that I can
14           think of.
15     Q.   (By Mr. Feldman)  Were there special
16  training sessions that weren't on work days?
17     A.   If there were, then that would be up
18  to the line director, sales directors.  It's
19  permissible.
20     Q.   I'm sorry, do you mean it could happen
21  or do you mean that -- I'm sorry, I don't know
22  what that means, "it's permissible"?
23     A.   The sales directors, line directors,
24  sales managers can have additional training if
```

**90**

```
1   they feel the people needed them.
2      Q.   Were salespeople required to attend
3   those?
4      A.   They were asked to attend; they
5   weren't required to attend.
6      Q.   Were there any prohibited activities
7   that were not supposed to take place in the pit
8   while they were waiting for tours -- I guess we
9   could list a whole bunch of them, couldn't we.
10  Let me strike that question.  Were there rules
11  about what activities could take place in the
12  pit?
13     A.   No.
14     Q.   As part of their employment contract
15  salespeople signed, were they required to attend
16  trainings or other supervisory meetings?
17           MS. FABBO:  Objection.
18           THE WITNESS:  I'm not sure I
19           understand what you're saying.
20     Q.   (By Mr. Feldman)  Sure.  So far as you
21  understood company policy, were salespeople
22  required to attend training meetings or
23  supervision meetings outside of the regular work
24  hours?
```

**91**

```
1            MS. FABBO:  Objection.
2            THE WITNESS:  No, no.
3      Q.   (By Mr. Feldman)  During -- while you
4   were project director, did you go out with
5   salespeople on their tours as part of your
6   supervisory responsibilities?
7      A.   Yes, yes, I did.
8      Q.   The actual tour, what documents were
9   they provided to instruct them on how to do a
10  tour -- is Exhibit 1 that document?
11     A.   Yes.
12     Q.   In terms of completing a sale, all
13  took place at the Sales Center after the people
14  returned from tours, isn't that right?
15           MS. FABBO:  Objection.
16           THE WITNESS:  That's correct.
17     Q.   (By Mr. Feldman)  And the document
18  signing occurred at the Sales Center?
19           MS. FABBO:  Objection.
20           THE WITNESS:  Yes.
21     Q.   (By Mr. Feldman)  Is there any other
22  place documents were signed to close a sale other
23  than the Sales Center?
24     A.   In and around the Sales Center.
```

**92**

```
1      Q.   Where else would it take place if it
2   wasn't in the Sales Center?
3      A.   Well, we have picnic tables outside.
4      Q.   Was there any other building where
5   sales were completed and documents were signed
6   other than the Sales Center and other than around
7   the Sales Center?
8      A.   There's a satellite building besides
9   the Sales Center where documents are signed in
10  what we call the Exit Department.
11     Q.   What happens at the Exit Department?
12     A.   People have an opportunity to buy a
13  very limited membership for a lesser amount of
14  money.
15     Q.   That's for people who choose not to
16  sign the typical time-share agreement, is that
17  right?
18     A.   Yes.  They would fill out a worksheet
19  and sign it there, then the sales document would
20  be completed in the main sales building.
21     Q.   What was the regular workweek for an
22  employee?
23     A.   Friday through Tuesday.
24     Q.   Were there any days where people were
```

93

1   not supposed to show up at 8:30, once the change
2   occurred from 9:00 to 8:30?
3       A.   No.
4       Q.   By the way, when the time was 9:00
5   that you had to show up, was there also a sign-in
6   sheet for 9:00?
7       A.   Yes.
8       Q.   Was there still a sales meeting after
9   9:00?
10      A.   Yes, from 9:00 to 9:30.
11      Q.   At the time that the line was cut, was
12  it later when people had to show up at 9:00?
13      A.   Yes.
14      Q.   What was the typical time for cutting
15  the line when the time for showing up was 9:00?
16      A.   2:30 or 3:00.
17      Q.   Was that moved back a half an hour
18  along with the time that people were supposed to
19  show up?
20      A.   Yes.
21      Q.   How were employees notified of that?
22      A.   In a general meeting, I'm sure.
23      Q.   Was it anywhere in writing, so far as
24  you know?

94

1       A.   It may have been; I don't recall.
2       Q.   Did you provide a directive to the
3   employees about the change in time?
4       A.   I think I provided a directive to the
5   managers and the directors, and they, in turn,
6   relayed it to the employees.
7       Q.   But you said the Reception Center was
8   responsible for determining whether a line should
9   get cut on a typical day, is that right?
10           MS. FABBO:   Objection.
11           THE WITNESS:   That's correct.
12      Q.   (By Mr. Feldman)  Did you have
13  discussions with the Reception Center about
14  changing the time for cutting the line when the
15  time for showing up changed to half an hour
16  earlier?
17      A.   No, it just backed everything up.
18      Q.   Do you remember getting instructions
19  in writing about the change in time?
20      A.   No, I don't remember getting it, but
21  -- you know, I just don't recall that at all.
22      Q.   Do you know what the rate of pay was
23  for salespeople during your tenure?
24      A.   Yes.

95

1       Q.   What was it?
2       A.   The salespeople worked on a base of
3   eight percent.
4       Q.   When they first started, do you
5   remember that they had an initial compensation
6   that was different than eight percent?
7       A.   Yes.
8       Q.   What was the initial compensation?
9       A.   On the initial compensation, they
10  worked on a salary for five weeks at $300 a week,
11  and if they were a new employee, they got a four
12  percent commission, if they were new to the
13  business.  If they were experienced --
14      Q.   I'm sorry?
15      A.   -- the commission was reduced from
16  eight percent to six percent.
17      Q.   I thought you said if they were new to
18  the business, they got four percent?
19      A.   That's correct.  If they were
20  experienced in the business but new to our
21  company, then they got six percent.
22      Q.   Along with the salary?
23      A.   Along with the salary.
24      Q.   And that was for five weeks?

96

1       A.   For five weeks.
2       Q.   What happened after that?
3       A.   After that, it reverts to straight
4   eight percent.
5       Q.   Recently there's a new compensation
6   system, is that right?
7           MS. FABBO:   Objection.
8           THE WITNESS:   Yes.
9       Q.   (By Mr. Feldman)  What is that new
10  system?
11      A.   It involves a salary and a commission.
12      Q.   What is the new -- give me the
13  parameters of the new compensation; what's the
14  salary, what's the commission?
15      A.   The salary is $400 a week, and the
16  commission is six percent.
17      Q.   So is the commission on top of the
18  $400 a week?
19      A.   Yes.
20      Q.   So salespeople now make $400 a week
21  plus six percent commission?
22      A.   Yes.
23      Q.   Is there any chargeback to the $400 a
24  week if a salesman makes a particularly high

97

1  commission in a particular week?

2      A.    No, not that I'm aware of.

3      Q.    When did that change occur?

4      A.    I was on vacation, and I was told of

5  it several weeks ago.

6      Q.    I'm sorry, you said it occurred while

7  you were on vacation?

8      A.    That's when I was notified of it.

9      Q.    What was the week that you were on

10  vacation or the time period?

11     A.    The third week in May.

12     Q.    Third week in May of 2005?

13     A.    That is correct.

14     Q.    Who notified you of the change?

15     A.    I communicate regularly with the

16  resort and with my sales directors, even while

17  I'm on vacation, and that came up in the

18  conversation.

19     Q.    Who told you?

20     A.    Paul Stensland.

21     Q.    What exactly did he tell you?

22     A.    He told me that there was a new pay

23  program.  He was very excited about it, and when

24  he told me what it was, I thought it was

98

1  terrific.

2      Q.    Why did you think it was terrific?

3      A.    Because it will help us a lot to

4  recruit.

5      Q.    Recruit?

6      A.    Recruit new salespeople.

7      Q.    Who told Paul Stensland about the

8  change?

9              MS. FABBO:  Objection.

10             THE WITNESS:  I don't know.

11     Q.    (By Mr. Feldman)  Have you seen any

12  documents reflecting the change?

13     A.    No.

14     Q.    Did you ask Paul Stensland why the

15  change was implemented?

16     A.    No, I didn't.

17     Q.    Did he tell you why it was

18  implemented?

19     A.    No.

20     Q.    Have you had any conversations with

21  anyone other than Paul Stensland about the change

22  in compensation?

23     A.    With Bill Rauer.

24     Q.    Describe your conversations with Bill

99

1  Rauer about the change in compensation.

2      A.    Bill said, I've got good news; I've

3  brought a new pay program for you.  And I said,

4  Terrific.  I was very pleased.

5      Q.    That's the entire extent of the

6  conversation you had with Bill Rauer?

7      A.    Yes.

8      Q.    How long was that conversation?

9      A.    A minute, two minutes.

10     Q.    Was it by phone?

11     A.    Yes.

12     Q.    When did that occur?

13     A.    I was in South Carolina on vacation.

14  I spoke with him.

15     Q.    Was that after Paul Stensland had told

16  you about the change?

17     A.    Yes.

18     Q.    How long after that did you talk with

19  Bill Rauer?

20     A.    A day or two, I don't recall.

21     Q.    You had Bill Rauer's phone number on

22  vacation?

23     A.    Yes.

24     Q.    Do you know that phone number by

100

1  heart?

2      A.    Yes.

3      Q.    What is the phone number?

4              MS. FABBO:  You can give it to

5  him.

6      A.    Okay.  It's 954-881-1400.

7      Q.    Does he have an extension?

8      A.    No, that's his cell phone.

9      Q.    Oh, it's his cell phone?

10     A.    Um-hum.

11     Q.    That's not his company phone?

12     A.    No, I don't imagine it is.

13     Q.    That's not a land line, is that right?

14     A.    No.

15     Q.    Is that how you communicate with

16  Mr. Rauer, by his cell phone?

17     A.    Most often, yes.

18     Q.    What other ways do you communicate

19  with him by phone?

20     A.    Sometimes I -- well, any time I call

21  him it would be by cell phone.

22     Q.    Is it your cell phone -- do you call

23  on your cell phone to his cell phone?

24     A.    Sometimes.

101

1    Q.   Do you know if that phone call was
2    made from your cell phone to his cell phone?
3         A.   I don't recall.  It may have been the
4    telephone at the condominium where I was staying.
5         Q.   Do you rent that condominium?
6         A.   No, it's a time-share.
7         Q.   Oh, you own that?
8         A.   Yes.
9         Q.   Who pays the phone bill on that?
10        A.   The condominium association.
11        Q.   Are you allowed to make long distance
12   calls from that phone while you're there on a
13   time-share time?
14        A.   If you use a calling card, yes.
15        Q.   If you used that phone to call
16   Mr. Rauer --
17        A.   Then I would have used the calling
18   card.
19        Q.   Who gets the bill for that?
20        A.   It's a pre-paid calling card through
21   MCI.
22        Q.   If it was a cell phone that you used,
23   would that be your personal cell phone?
24        A.   Yes, or it might have been my wife's,

102

1    I'm not sure.
2         Q.   Does your family get the bills for
3    both of those cell phones?
4         A.   Yes.
5         Q.   What company is it with whom you have
6    the cell phone contract?
7         A.   Suncom.
8         Q.   Does your bill reflect how many
9    minutes it takes for you to make a phone call?
10        A.   I don't know.  I never pay it; my wife
11   pays the bills.
12        Q.   So you had one phone call with
13   Mr. Stensland about the change in compensation,
14   correct?
15        A.   Yes.
16        Q.   Was that made to you on your cell
17   phone?
18        A.   It was made from me to him.
19        Q.   Oh, you were checking on --
20        A.   Yes, I was calling his resort.
21        Q.   Do you know how many minutes your call
22   to Mr. Rauer was?
23        A.   I don't recall.
24        Q.   How long was your telephone

103

1    conversation with Mr. Stensland about the
2    compensation change?
3         A.   Not long.  Minutes.  One or two.
4         Q.   Was there anyone else you spoke to
5    about the compensation change other than
6    Mr. Stensland and Mr. Rauer and other than
7    counsel?
8         A.   Yes.
9         Q.   Who else?
10        A.   Jim Lambert.
11        Q.   Who is that?
12        A.   He's Mr. Polansky's boss.
13        Q.   Who is Mr. Rauer's boss?
14        A.   Bruce Polansky.
15        Q.   And Mr. Lambert is Mr. Polansky's
16   boss?
17        A.   Yes.
18        Q.   Do you know his job title?
19        A.   Chairman of the board.
20        Q.   Chairman of the board?
21        A.   Yes.
22        Q.   How often do you talk to him?
23        A.   We've been friends for forty years.
24        Q.   How do you know him?

104

1         A.   We started working together in the
2    late 1960's; we've been friends ever since.
3         Q.   Doing what?
4         A.   Land sales, recreational land sales.
5         Q.   He lives in Florida?
6         A.   Yes.
7         Q.   Describe the phone call you had with
8    him about the compensation change.
9         A.   I just called him and we were talking
10   about his health, which he's had some health
11   issues and I was concerned.  I had been thinking
12   about him a lot, and I called just to say hi and
13   that I had been thinking about him and I hoped he
14   was doing well.  He said something about the new
15   program, and I said I had heard about it and I
16   was excited about it.  I said I thought it would
17   be a terrific aid to us, particularly in
18   recruiting.
19        Q.   During any of these conversations, did
20   anyone provide you with a reason for the change?
21        A.   No.
22        Q.   Have you asked anyone about the reason
23   for the change in compensation?
24        A.   No.

105

```
 1    Q.   Had you received -- during your
 2  tenure, did you receive complaints about not
 3  being paid minimum wage by any employee?
 4    A.   Yes.
 5    Q.   From who?
 6    A.   Roger Martin.
 7    Q.   Anyone else?
 8    A.   No.
 9    Q.   When Mr. --
10    A.   I don't recall.
11    Q.   When Mr. Martin complained to you
12  about not being paid minimum wage, what was your
13  response?
14    A.   I told him that he was a commissioned
15  salesperson, that he had signed an agreement to
16  that effect, and that this industry typically did
17  not pay a minimum wage.
18    Q.   Go ahead.
19    A.   That he was a commission salesman.
20    Q.   What was your understanding of the
21  federal or state law concerning payment of
22  minimum wage, if you had --
23         MS. FABBO:  Objection.
24    Q.   (By Mr. Feldman)  -- if you had an
```

106

```
 1  understanding of what it required?
 2    A.   I had none.
 3    Q.   When you received the complaint by
 4  Mr. Martin, did you talk to anyone; did you talk
 5  to any supervisor of yours about his complaint?
 6    A.   No.
 7    Q.   Were you concerned that the company
 8  might be in violation of the minimum wage law?
 9         MS. FABBO:  Objection.
10         THE WITNESS:  No.
11    Q.   (By Mr. Feldman)  Why not?
12    A.   Because we had a working contract, an
13  employment agreement.
14    Q.   Did you think that perhaps -- I'm
15  sorry, go ahead.
16    A.   And I thought that that had been
17  reviewed by attorneys and approved.
18    Q.   Why did you think that?
19    A.   Because it made sense.
20    Q.   Did you know that?
21    A.   No.
22    Q.   Did you have any concern that there
23  was no way of determining how many hours a week
24  an employee was working?
```

107

```
 1         MS. FABBO:  Objection.
 2         THE WITNESS:  No.
 3    Q.   (By Mr. Feldman)  Did you ever talk to
 4  anyone about creating a record keeping system
 5  where you would know how many hours a person was
 6  working a week?
 7    A.   No.
 8    Q.   So as far as you know, there is no way
 9  of looking back at an employees' work record to
10  determine how many hours they worked a week, is
11  that correct?
12    A.   That's correct.
13    Q.   Do you know if any employee,
14  salesperson, or manager ever worked more than
15  forty hours a week during your tenure?
16    A.   I don't.
17    Q.   Is there any way to determine if any
18  person worked more than forty hours a week, as
19  far as you know?
20    A.   Not as far as I know.
21    Q.   Were any of your people ever paid any
22  overtime during your tenure?
23    A.   Not that I'm aware of.
24    Q.   You testified that salespeople were
```

108

```
 1  paid on a commission basis.  When were
 2  commissions paid to salespeople?
 3    A.   Every Tuesday.
 4    Q.   What would be required before a
 5  salesperson received a commission?
 6    A.   That all the sales documentation be
 7  completed and turned in, that the normal pay
 8  cycle take place, which was about, I don't know,
 9  23 days, something like that.
10    Q.   Why is that the normal pay cycle?
11         MS. FABBO:  Objection.
12         THE WITNESS:  I'm not sure
13         exactly, but it allows for the right
14         of rescission to take place, it allows
15         for the time for us to receive
16         notification, time for us to cut a
17         paycheck if we don't receive
18         notification, and then to get the
19         paycheck to the representative.
20    Q.   (By Mr. Feldman)  Were you aware that
21  there was a requirement that there be three
22  timely payments by the purchaser of a time-share
23  before a commission was earned?
24    A.   Yes.
```

109

1    Q.   What do you know about that policy?
2    A.   Company policy, they feel that that's
3  when the commission has been earned; however,
4  they advance the commission on the basis in the
5  event that the people don't make three timely
6  monthly payments, then the company reserves the
7  right to charge the commission back until such
8  happens.
9    Q.   So were commissions paid before three
10 timely payments were received?
11   A.   Yes.
12   Q.   Was that the regular policy?
13   A.   Yes, they were advanced.
14   Q.   They were advanced?
15   A.   Yes.
16   Q.   Has that been the policy during the
17 time you've been project director?
18   A.   Yes.
19   Q.   How would a chargeback actually take
20 place?
21   A.   We would be notified that the people
22 have not made three timely monthly payments, or
23 we would get a notation on our pay sheets there's
24 a chargeback and such-and-such a name and a

110

1  contract number.
2    Q.   Would that get passed to you at some
3  point?
4    A.   Oh, yes, yes.
5    Q.   Who would give you that information?
6    A.   It comes out on my pay sheet.
7    Q.   Who gives you the pay sheet?
8    A.   Our administrative office.
9    Q.   They're the ones who collect payments,
10 is that correct?
11   A.   No, they administer all the paperwork.
12 They make up payrolls, they submit them to
13 Florida, Florida then sends the payroll to us.
14   Q.   Where did purchasers send their
15 monthly payments, if you know?
16   A.   I have no idea.
17   Q.   But somehow Vacation Village discovers
18 whether they have made the payment or not,
19 correct?
20   A.   Yes.
21   Q.   And that information is conveyed to
22 you through your administrative office, is that
23 correct; is that what you just said?
24   A.   Yes.

111

1    Q.   What does the document look like that
2  you received from the administrative office?
3    A.   Well, when you got your pay sheets,
4  you have a listing of the sales that you're being
5  paid on; and if there are any chargebacks, then
6  you have a listing of that, that that's added to
7  it.
8    Q.   Chargeback was taken out of the pay of
9  salespeople, is that correct?
10   A.   Yes.
11   Q.   So their next commission they earned,
12 there would be some money taken out for money
13 that was advanced, as you said, to the
14 salesperson?
15   A.   Yes.
16   Q.   Did you ever discuss with anyone why
17 there were three timely payments required before
18 they would receive -- before they were entitled
19 to keep the money that was advanced?
20   A.   I've never had a conversation to that
21 effect.
22   Q.   You've worked at other time-share
23 places, is that correct?
24   A.   Yes.

112

1    Q.   Is that a typical policy of the
2  time-share places you've worked?
3    A.   Yes.
4    Q.   That you have to have three timely
5  payments?
6    A.   In some cases more.
7    Q.   Was it the policy that if there were
8  two timely payments made but one untimely payment
9  made that you would have to have three more
10 timely payments after that; is that the policy?
11   A.   That's correct, that's correct.
12   Q.   So is it correct that a purchaser
13 might actually be making their payments and yet
14 the salesperson might not receive a commission
15 for many months?
16   A.   That's correct.
17   Q.   You said the only pay received until
18 the change in compensation was straight
19 commission, other than the initial period we
20 talked about, is that right?
21   A.   That's correct.
22   Q.   Have you seen any document in which
23 it's claimed that somehow Vacation Village or the
24 other defendants in this case were somehow exempt

---

**113**

1  from the minimum wage law?

2  A.  No.

3  Q.  Have you seen any document that would

4  indicate any defendant is exempt from the

5  overtime provisions of the minimum wage or

6  overtime law?

7  MS. FABBO:  Objection.  Answer if

8  you know what he's talking about.

9  THE WITNESS:  No.

10  Q.  (By Mr. Feldman)  Were you involved in

11  the termination of LaCrisha Wise?

12  A.  Yes.

13  Q.  I'd like you to describe your

14  involvement in her termination.

15  A.  Based on the circumstances, I thought

16  that it was the only decision to make.

17  Q.  I'm asking what your involvement was;

18  not why you made that decision, but what was your

19  personal involvement in her termination?

20  A.  I was in agreement with it.

21  Q.  So you were not the one who made the

22  decision to terminate her?

23  A.  I felt like it had to be done, yes.

24  Q.  Who terminated her?

---

**114**

1  A.  Paul Stensland.

2  Q.  Is a line director permitted to

3  terminate salespeople without your approval?

4  A.  Yes, but normally no.  Normally they

5  have my approval.

6  Q.  In what cases -- I'm sorry.

7  A.  In the event that they would terminate

8  somebody without my approval, then we would

9  discuss it.

10  Q.  Why was -- I'd like you to provide all

11  the reasons for why Miss Wise was terminated.

12  A.  I don't know that I can recall all of

13  the reasons why she was terminated.

14  Q.  When was she terminated?

15  A.  Couple years ago.

16  Q.  In 2003?

17  A.  I don't recall the date.

18  Q.  Well, what were the reasons she was

19  terminated?

20  A.  Constant absenteeism, tardiness.  She

21  just felt like she was above the rules for

22  everybody else, they shouldn't pertain to her.

23  Q.  You said absenteeism and tardiness?

24  A.  Absenteeism and tardiness constantly.

---

**115**

1  Q.  You also said she believed she was

2  above the rules.  What rules did she believe she

3  was above other than the absenteeism and

4  tardiness rules?

5  A.  For example, she would park in areas

6  that we would ask the salespeople not to park in;

7  she would constantly do that.  She -- she just

8  was a very, very, very difficult person to

9  manage.

10  Q.  Was she working there when you started

11  working there?

12  A.  Yes.

13  Q.  Do you remember how long she was there

14  -- would that help you -- strike that.  How long

15  was she working there after you had started

16  working there?

17  MS. FABBO:  Objection.

18  Q.  (By Mr. Feldman)  What was the

19  duration of time?

20  A.  I don't recall, I don't remember.  I

21  started there 13th of September, 2002.  I don't

22  recall what date was her final working day.

23  Q.  What was the absenteeism policy of

24  Vacation Village when you first started there?

---

**116**

1  A.  If you were going to be absent from

2  work, you were required to have a doctor's

3  excuse.  You were allowed to have fifteen days

4  off per year.

5  Q.  You were allowed fifteen days off.  In

6  order to take those days, what would you have to

7  do?

8  A.  Either schedule them for vacation time

9  with approval, or if you missed the days, you

10  needed to come in with a doctor's excuse to keep

11  from going on overage.

12  Q.  So if you missed a day and claimed you

13  were ill, you went on overage unless you had a

14  doctor's note?

15  A.  That's correct.

16  Q.  So if you didn't feel well enough to

17  come in but didn't visit a doctor, then you went

18  on overage?

19  A.  Yes.

20  Q.  Was that rule enforced when you first

21  started -- let me back up.  You were allowed

22  fifteen days off of work, is that right?

23  A.  That's correct.

24  Q.  If you took more than fifteen days off

---

117

```
 1   of work, when you first started working at
 2   Vacation Village, what was the policy with regard
 3   to a person who did that?
 4        A.   The policy was liberally administered.
 5        Q.   Meaning what?
 6        A.   That there was a lot of flexibility to
 7   it.  If you missed fifteen, sixteen, seventeen,
 8   eighteen -- whatever the number of days, then,
 9   you know, you would be reminded of the number of
10   days that you had missed and you were told that
11   you shouldn't miss any more time.
12        Q.   Did that policy -- did the liberal
13   policy change at some point?
14        A.   Yes.
15        Q.   When did that change?
16        A.   I don't recall.  I think that I sent a
17   memo to the group about the company's days-off
18   policy and told them that it would be enforced.
19        Q.   Do you remember when you sent that
20   memo?
21        A.   No.
22             (Exhibit 3, 11/3/02 Memo
23             Re: Company Attendance Policy,
24             marked for identification)
```

118

```
 1        Q.   (By Mr. Feldman)  I'm showing you
 2   what's been marked as Exhibit 3.  Is this the
 3   memo you were just describing?
 4        A.   Yes, this is it.
 5        Q.   What led to your producing this memo?
 6        A.   Excessive absenteeism by certain
 7   employees, one of whom was LaCrisha Wise.
 8        Q.   Which other employees were being
 9   excessively absent?
10        A.   I don't recall.
11        Q.   She's the only one you remember?
12        A.   She was the one that I remember.  She
13   was the one who had missed the most time.
14        Q.   Do you remember how many days she
15   missed in 2002?
16        A.   I don't.
17        Q.   If I said 49 days, does that sound
18   right?
19        A.   I wouldn't know without checking the
20   records.  I just remember that it was, I thought,
21   beyond excessive; and so I just tried to bring it
22   to everybody's attention that this is the policy
23   and that we needed to get back to it.
24        Q.   Do you remember the reasons why Miss
```

119

```
 1   Wise was claiming -- what reason she claimed for
 2   her absences in 2002 before this memo came out?
 3        A.   No.
 4        Q.   Did you ever talk to her about her
 5   absenteeism before this memo came out --
 6   Exhibit 3 I'm referring to?
 7        A.   I don't recall.
 8        Q.   How did you know she was absent so
 9   much?
10        A.   Because I got a list of days missed.
11        Q.   How often would you get that?
12        A.   Once a month.  I came in the middle of
13   September; I guess I got it the end of October,
14   and I was just surprised to see how many days,
15   because I had been there for, I don't know,
16   thirty, forty-five days at that point.
17        Q.   Did that document you received
18   describe the absences for the year or just that
19   month?
20        A.   For the year.  That was year-to-date.
21        Q.   So it's a cumulative year-to-date you
22   get?
23        A.   Yes.
24        Q.   And you get that every month?
```

120

```
 1        A.   Yes, or I get some version of it.
 2        Q.   When you saw that Miss Wise had some
 3   number of excessive absences -- and your memory
 4   you don't remember what number that was?
 5        A.   That's correct, just very excessive.
 6        Q.   Did you try to determine why before
 7   you sent the memo out?
 8        A.   I would imagine that I asked her
 9   managers why.
10        Q.   Do you remember what they said?
11        A.   I was given reasons of automobile
12   accidents, illnesses, back problems, family
13   problems -- big-time family problems.
14        Q.   Okay.
15        A.   Seemed like there were a myriad of...
16        Q.   Did you do any investigation to
17   determine whether those reasons were, in fact,
18   true?
19        A.   No, I had no reason not to believe it.
20        Q.   So is it your testimony at that point
21   that you believed it?
22        A.   Yes.
23        Q.   Did Exhibit 3 go to all sales staff,
24   as it said in the "to" line there?
```

---

121

1     A.   Yes.
2     Q.   Did every person on sales staff have
3   to sign that document?
4     A.   I believe so, yes.
5     Q.   Is that what happened; did everyone
6   sign it?
7     A.   Yes.
8     Q.   It says in the document that
9   "Excessive absenteeism and excessive tardiness
10  shall be subject to disciplinary action,
11  including time off or termination"?
12    A.   Yes.
13    Q.   You see that?
14    A.   Yes.
15    Q.   After that memo was issued, who was
16  subjected to disciplinary action because of
17  excessive absenteeism or excessive tardiness?
18    A.   I don't recall.
19    Q.   You don't recall anybody?
20    A.   I'm sure there were.
21    Q.   Do you recall LaCrisha Wise was
22  subject to the policy?
23    A.   I would -- you know, I just don't
24  recall.  Honestly I don't.

---

122

1     Q.   But you testified earlier that you
2   were involved in her termination?
3     A.   Yes.
4     Q.   And you said she was terminated for
5   excessive absenteeism as one of the reasons for
6   her termination?
7     A.   One of the reasons, yes.
8     Q.   So was she subjected to that policy?
9     A.   Yes, I would think so.
10    Q.   I'm just saying, before you were
11  saying no and now -- do you agree that Miss Wise
12  was subjected to that policy?
13    A.   Yes.
14    Q.   Is there anyone else who was
15  disciplined after November 3, 2002 to the present
16  for excessive absenteeism or excessive tardiness?
17    A.   I'm sure, yes, that there have been,
18  but I don't remember the specifics.
19    Q.   Was anyone terminated for excessive
20  absenteeism before LaCrisha Wise was?
21    A.   I don't remember.
22    Q.   How would one -- if you wanted to find
23  out whether someone had been terminated before
24  LaCrisha Wise for excessive absenteeism, how

---

123

1   would you find that out?
2     A.   Through Human Resources.
3     Q.   What would you look for?
4     A.   Just ask on former employees if
5   anybody were terminated for that reason.
6     Q.   Would Faith Lippert have that
7   information?
8     A.   I would think so, yes.
9     Q.   Was anyone terminated for excessive
10  absenteeism or excess tardiness after LaCrisha
11  Wise?
12    A.   People have been disciplined for it,
13  given time off, but I don't think anybody has
14  been terminated -- oh -- no.  Where a guy took
15  eleven days off, then asked for three more weeks,
16  and we told him that it wasn't possible.
17    Q.   Was he terminated?
18    A.   He quit.
19    Q.   He quit?
20    A.   Um-hum.
21    Q.   But was anyone else terminated for
22  excessive absenteeism or excessive tardiness
23  after LaCrisha Wise was terminated?
24    A.   I don't recall.

---

124

1     Q.   Do you remember that she was
2   terminated on June 7, '03?
3          MS. FABBO:  Objection.
4          THE WITNESS:  No.  That could
5          well be, but the date doesn't stick
6          out in my mind.
7          MR. FELDMAN:  Off the record.
8          (A break was taken)
9          (Exhibit 4, Employee Information
10         Form, marked for identification)
11         MR. FELDMAN:  Back on the record.
12    Q.   (By Mr. Feldman)  I was just asking
13  you questions, Mr. Lewis, about how one would
14  determine who else was terminated for excessive
15  absenteeism or tardiness.  Do you remember anyone
16  else who exceeded fifteen absent days during your
17  tenure at Vacation Village other than LaCrisha
18  Wise?
19    A.   There were other people.  I don't
20  recall who they were, but there were other people
21  who did.
22    Q.   Were there other people who did in the
23  years 2003, 2004, or 2005?
24    A.   I am not sure which years, but I'm

---

125

1    sure there were people who during that time

2    period had exceeded the fifteen days.

3        Q.    Were any of those people terminated?

4        A.    I think one was.  I think a fellow by

5    the name of Peter Corbin.  I can't remember

6    exactly, but I think that he was in that

7    quandary.

8        Q.    He was terminated for excessive

9    absenteeism, is that your memory?

10       A.    I think so.

11       Q.    Anyone else?

12       A.    I'd have to go back and look at the

13   files, but that's one that just stands out in my

14   mind.

15                (Exhibit 5, LaCrisha Wise

16                Attendance Detail Report, marked

17                for identification)

18       Q.    (By Mr. Feldman)  Have you seen this

19   document before, Mr. Lewis?

20       A.    Yes.

21       Q.    This is Exhibit 5.  What is it?

22       A.    This is an attendance report.

23       Q.    For which person?

24       A.    For LaCrisha Wise.

126

1        Q.    Now, who generated this?

2        A.    This was generated by the Reception

3    Center.

4        Q.    It looks like it was generated on

5    6/8/2003, is that correct -- looking at the

6    bottom, right?

7        A.    Yes, that's what it would appear to

8    be.

9        Q.    What's the first time you remember

10   seeing this?

11       A.    This exact page?

12       Q.    Yes.

13       A.    Probably on 6/8.

14       Q.    Now, is it true that Miss Wise was

15   terminated on the day of her sixteenth absence?

16             MS. FABBO:  Objection.

17             THE WITNESS:  I don't recall.

18       Q.    (By Mr. Feldman)  Do you want to take

19   a quick look and see?

20       A.    Yes.

21       Q.    Anybody else you know who's been

22   terminated on their sixteenth absence?

23       A.    I don't know.

24       Q.    You were the one who created this

127

1    November 2 -- November 3, 2002 memo that's marked

2    as Exhibit 3, right?

3        A.    Yes.

4        Q.    Was your intent in creating that to

5    implement a policy of termination for any

6    employee who had sixteen absences?

7        A.    For anybody who had excessive

8    tardiness and excessive absences, yes.  To try to

9    get these people to come to work and be at work,

10   because the company spends a lot of money

11   generating the sales quests, and it's important

12   that we have the sales representatives at the

13   project to handle these people.

14       Q.    Since you were the enforcer of this

15   policy that's Exhibit 3, right --

16       A.    Yes -- Exhibit 5.

17       Q.    Exhibit 3.

18       A.    Yes, this memo was from me.

19       Q.    -- did you discuss the content of the

20   memo with anyone before you wrote it?

21             MS. FABBO:  Objection.

22             THE WITNESS:  I don't recall.

23       Q.    (By Mr. Feldman)  Did you check in

24   with the supervisor before you decided to send

128

1    out this memo?

2        A.    I don't recall.

3        Q.    At the time you sent it out, was it

4    your intent that you were going to terminate

5    anyone who was absent more than fifteen times?

6             MS. FABBO:  Objection.

7             THE WITNESS:  No, it was my

8             intent to try and get the people who

9             had been absent a lot to come to work

10            -- try to encourage the people who had

11            multiple absences to come to work more

12            frequently and have less absences.

13       Q.    (By Mr. Feldman)  Did you determine --

14   before you fired -- well, you were the one

15   ultimately who approved her termination, is that

16   correct?

17       A.    Yes.

18       Q.    And Mr. Stimple is the one who noticed

19   Miss Wise of her termination, is that right?

20       A.    Yes.

21       Q.    Did you try to determine whether any

22   of the sick days that Miss Wise had taken were

23   subject to the Family and Medical Leave Act?

24             MS. FABBO:  Objection.

129

```
 1          THE WITNESS:  No.
 2     Q.   (By Mr. Feldman)  Do you know what the
 3   Family Medical Leave Act is?
 4     A.   No.
 5     Q.   Have you ever received any training on
 6   the Family Medical Leave Act?
 7     A.   I'm aware basically what the Family
 8   Medical Leave Act is at this point.
 9     Q.   What is it?
10     A.   It provides for certain circumstances
11   for someone to take time off based on family
12   medical needs.
13     Q.   If someone takes time off for family
14   and medical needs under the Family Medical Leave
15   Act, what is the current policy at Vacation
16   Village about whether those days count against
17   the fifteen absences?
18     A.   I don't know.  You know, that would be
19   a good question for Faith Lippert.
20     Q.   Do you know about the Massachusetts
21   Medical Leave Act?
22     A.   No.
23     Q.   You don't know anything about it?
24     A.   No.
```

131

```
 1          MS. FABBO:  Objection.
 2          THE WITNESS:  The company allows
 3          her fifteen days, okay; and the
 4          specifics of it are in this memo right
 5          here.  And it says for any reason
 6          without exception, includes vacation
 7          days, sick days, emergencies, car
 8          problems, personal problems, whatever.
 9     Q.   (By Mr. Feldman)  Do you know why Miss
10   Wise was terminated on the 7th of June as opposed
11   to any other date?
12     A.   She had exceeded her number of days,
13   would be a good reason.
14     Q.   Do you know if that was the reason?
15     A.   I would think that that probably was
16   the reason why.
17     Q.   Who would know what the reason was?
18     A.   Paul Stensland.  He's the one who
19   notified me.
20     Q.   Right, but he notified you before he
21   notified her, right?
22     A.   Yes.  I was in agreement.
23     Q.   Was your authorization done on June 7?
24     A.   I don't remember the day.
```

130

```
 1          MS. FABBO:  Objection.
 2     Q.   (By Mr. Feldman)  Do you know what it
 3   says?
 4     A.   No.
 5     Q.   Did you determine whether any of the
 6   sick days that Miss Wise took were covered under
 7   the Massachusetts Medical Leave Act?
 8          MS. FABBO:  Objection.  Can we
 9          clarify what you're talking about
10          here.
11          MR. FELDMAN:  If he answers, he
12          understands.
13          THE WITNESS:  I don't know what
14          it is.  I don't have an answer for it.
15     Q.   (By Mr. Feldman)  Have you received
16   any training on the Massachusetts Medical Leave
17   Act?
18     A.   No.
19     Q.   Why was Miss Wise terminated on June 7
20   -- again, looking at Exhibit 5 -- rather than,
21   let's say, May 12 when she was also out sick?
22     A.   I don't know.
23     Q.   Was it because it was her sixteenth
24   day out sick?
```

132

```
 1     Q.   I'm just wondering if Exhibit 5
 2   refreshes your memory?
 3     A.   If that was the day that he called
 4   her, I don't -- I would guess yes, says she was
 5   notified by her line director via telephone.
 6     Q.   Do you remember your conversation with
 7   Mr. Stensland that day?
 8     A.   No.
 9     Q.   You've also said earlier that she was
10   terminated because she was excessively tardy.
11   Has anyone else been terminated because they were
12   excessively tardy during your tenure as project
13   director?
14     A.   I don't think anybody has been as late
15   as often as she has.
16     Q.   Has anyone else been late -- well, is
17   there a number of days you have for being late
18   that's company policy?
19     A.   No.
20     Q.   If you're late, isn't the discipline
21   policy that you're put on overage?
22     A.   Yes.
23     Q.   Is there a certain number of days
24   where if you're late, you can be terminated?
```

133

1     A.   Not specifically, but, you know --
2  selling is attitude.
3     Q.   I know that.  I'm asking what the
4  company policy is.
5     A.   No.
6     Q.   You said that there were -- that she
7  was someone who challenged company policy
8  generally; you said something like that, isn't
9  that right?
10    A.   Yes.
11    Q.   Was that another -- strike that.
12 Other than tardiness and excessive absenteeism,
13 were there any other reasons why she was
14 terminated?
15    A.   Not that I recall.
16    Q.   And the other person who would know
17 why she was terminated was Paul Stensland, is
18 that correct?
19    A.   Yes.
20    Q.   Because he made the request to you to
21 terminate her?
22            MS. FABBO:  Objection.
23            THE WITNESS:  I think that he
24         did.

134

1     Q.   (By Mr. Feldman)  Was anyone else
2  involved in any way in the termination of
3  LaCrisha Wise?
4     A.   I don't recall.  Maybe her manager,
5  John Bourdon.
6     Q.   John Bourdon was her sales manager?
7     A.   Her direct manager, yes.
8     Q.   What do you remember about
9  conversations with him about Miss Wise?
10    A.   I don't remember any specifics.
11    Q.   Do you remember prior to Miss Wise's
12 termination, she reported to a member of
13 management that she felt like she was being
14 discriminated against because of her race?
15            MS. FABBO:  Objection.
16            THE WITNESS:  Who did she mention
17         that to?
18    Q.   (By Mr. Feldman)  I don't know.  I'm
19 asking whether you know that she did?
20    A.   I remember her calling me a cracker.
21    Q.   That's not quite what I'm asking.  I'd
22 be happy to get to her calling you names.  But
23 first, do you know if she reported to anybody
24 that she felt like she was being discriminated

135

1  against because of her race?
2            MS. FABBO:  Objection.
3            THE WITNESS:  I don't recall.
4     Q.   (By Mr. Feldman)  Do you recall before
5  Miss Wise was fired, she had filed a charge of
6  race discrimination at the Mass. Commission
7  Against Discrimination?
8            MS. FABBO:  Objection.
9            THE WITNESS:  No.
10    Q.   (By Mr. Feldman)  Were you aware of
11 that when you fired her?
12    A.   No.
13    Q.   Do you know now whether anyone else
14 was aware of that before she was fired?
15            MS. FABBO:  Objection.
16            THE WITNESS:  I don't recall that
17         anybody was aware of it.
18    Q.   (By Mr. Feldman)  Do you know if she
19 mentioned it to anybody before she was fired?
20    A.   No.
21    Q.   How many black salespeople did you
22 have during the time Miss Wise was employed at
23 Vacation Village?
24    A.   I don't -- I don't -- this is not

136

1  something that I make a notation of.
2     Q.   I'm not asking for a notation; I'm
3  just asking if you remember?
4     A.   Were there others?
5     Q.   Were there others?
6     A.   Yes.
7     Q.   Do you remember the names of -- how
8  many?
9     A.   Several.
10    Q.   Do you remember the names of any of
11 them?
12    A.   Andy Goodness.
13    Q.   What happened to Andy?
14    A.   Andy was terminated.
15    Q.   For what?
16    A.   For misappropriation of funds.
17    Q.   Was that the only reason he was
18 terminated?
19    A.   I think so.
20    Q.   Any other reasons?
21    A.   No.
22    Q.   When was he terminated?
23    A.   I don't remember the date.
24    Q.   Was it before or after Miss Wise?

137

| | | |
|---|---|---|
| 1 | A. | I think it was after. |
| 2 | Q. | Were you involved in her termination? |
| 3 | | MS. FABBO:  Hers? |
| 4 | A. | It's a "he". |
| 5 | Q. | Sorry. |
| 6 | A. | Yes, I was. |
| 7 | Q. | Who was the person who notified him he |
| 8 | was terminated? |
| 9 | A. | I did. |
| 10 | Q. | Did you provide him the reason? |
| 11 | A. | Yes. |
| 12 | Q. | You said it was misappropriation of |
| 13 | funds? |
| 14 | A. | It was not really misappropriation; it |
| 15 | was taking the company's money.  I was trying to |
| 16 | be kind. |
| 17 | Q. | Was there anyone else whose name you |
| 18 | remember who worked for Vacation Village and was |
| 19 | black? |
| 20 | A. | There were several other black |
| 21 | salespeople, yes. |
| 22 | Q. | Who were they? |
| 23 | A. | I don't recall their names, but... |
| 24 | Q. | Do you recall any of their names? |

139

| | | |
|---|---|---|
| 1 | Q. | I'm sorry, were you going to say |
| 2 | something else? |
| 3 | A. | No, it would be pure speculation on my |
| 4 | part. |
| 5 | Q. | Was Mr. Roger Martin terminated from |
| 6 | Vacation Village? |
| 7 | A. | Yes. |
| 8 | Q. | Do you know why he was terminated? |
| 9 | A. | Insubordination, I believe. |
| 10 | Q. | Who was he insubordinate to? |
| 11 | A. | Bill Rauer.  Bill Rauer terminated |
| 12 | him. |
| 13 | Q. | Were you involved in any way in his |
| 14 | termination? |
| 15 | A. | I was involved in a prior termination |
| 16 | of Roger. |
| 17 | Q. | Describe that. |
| 18 | A. | For insubordination, just getting up |
| 19 | in a morning sales meeting and airing his |
| 20 | grievances. |
| 21 | Q. | What were his grievances? |
| 22 | A. | And I asked him to talk to me about it |
| 23 | afterwards, and he was just emphatic about |
| 24 | pushing the point at that point. |

138

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Do you currently have any black |
| 3 | salespeople working for Vacation Village? |
| 4 | A. | Yes. |
| 5 | Q. | Who? |
| 6 | A. | Ed Pratt. |
| 7 | Q. | Anyone else besides Ed Pratt? |
| 8 | A. | Just Ed. |
| 9 | Q. | How many salespeople do you currently |
| 10 | have on staff? |
| 11 | A. | We've got about twenty-four. |
| 12 | Q. | In total? |
| 13 | A. | Around that, yes, about twenty-four, I |
| 14 | think. |
| 15 | Q. | Is that a reduction from a couple of |
| 16 | years ago? |
| 17 | A. | Oh, yes. |
| 18 | Q. | How many did you have a couple years |
| 19 | ago? |
| 20 | A. | Probably had as many as about forty. |
| 21 | Q. | Why are there fewer now? |
| 22 | A. | We have less customers. |
| 23 | Q. | Do you know why that is? |
| 24 | A. | No. |

140

| | | |
|---|---|---|
| 1 | Q. | What was the point? |
| 2 | A. | I don't even remember what the point |
| 3 | was.  I just remember that he just went off, and |
| 4 | I told him that wasn't the time and place for it |
| 5 | and let's talk about it after the meeting.  And |
| 6 | he said, No, no, he insisted that he was going to |
| 7 | do it right there, right there.  I said, Hey, you |
| 8 | know, if that's the way you feel, then... |
| 9 | Q. | He was hired back, though, after that, |
| 10 | wasn't he? |
| 11 | A. | Yes, Bill Rauer hired him back. |
| 12 | Q. | Did Bill Rauer consult with you before |
| 13 | he hired him back? |
| 14 | A. | He just told me he was coming back to |
| 15 | work.  I like Roger; just a little bit of a hot |
| 16 | head. |
| 17 | Q. | Usually the line directors hire the |
| 18 | salespeople, is that correct? |
| 19 | A. | That's correct. |
| 20 | Q. | Why did Mr. Rauer intervene, if you |
| 21 | know? |
| 22 | A. | Our company maintains an open-door |
| 23 | policy, and if any sales rep. feels like they |
| 24 | need to go above any of the managers, then we |

141

```
1    encourage them to do it.  They can go -- if they
2    can't get satisfaction from their manager, they
3    can go to their director; if they can't get
4    satisfaction there, they can go to their project
5    director or to upper management.  This is a
6    conversation that was had between Bill and Roger,
7    and Bill just matter-of-factly told me he was
8    coming back to work, and I said, Fine.  That's my
9    boss, his choice.
10       Q.   Mr. Rauer knew that he had been
11   terminated once?
12       A.   Um-hum.
13       Q.   How did he know that?
14       A.   I'm sure through the office.
15       Q.   Did you communicate with Mr. Rauer
16   about Mr. Martin being terminated the first time?
17       A.   I don't recall the conversation, but
18   I'm sure I did.  We talked frequently.
19       Q.   How did you feel about Mr. Martin
20   coming back to work for Vacation Village?
21       A.   Mixed emotions.  He was, you know, as
22   an individual I liked him, and as a sale
23   representative working for us, he was an
24   excellent salesman.  I just hoped that he would
```

142

```
1    calm down a little bit.
2        Q.   How long after he was hired the second
3    time was he fired?
4        A.   I don't recall.
5        Q.   Why was he fired the second time --
6    you said insubordination.  What particularly?
7        A.   I don't recall the incident.
8    Something happened and Bill went and talked to
9    him, and that was the end.
10       Q.   Bill Rauer went and talked to him?
11       A.   Yes.
12       Q.   Was Bill Rauer on-site when the
13   incident occurred?
14       A.   Yes.
15       Q.   And he observed it?
16       A.   Yes.
17       Q.   And he fired him on the spot?
18       A.   Yes.
19       Q.   You don't remember what it was?
20       A.   No.
21       Q.   Do you recall that Mr. Martin in 2003
22   was complaining about the failure to pay him
23   appropriate wages?
24            MS. FABBO:  Objection.  You can
```

143

```
1             answer.
2             THE WITNESS:  No.  Roger seemed
3             to think that the company was trying
4             to withhold money, and every time that
5             he believed that it was, when we
6             investigated it, that wasn't the case.
7        Q.   (By Mr. Feldman)  Do you recall that
8    he was -- he told members of the defendants that
9    he was going to file a written complaint with the
10   Attorney General?
11            MS. FABBO:  Objection.  You can
12            answer.
13            THE WITNESS:  No.
14       Q.   (By Mr. Feldman)  did he ever tell you
15   that?
16       A.   I thought it was just a lot of talk.
17       Q.   Did he ever tell you that he was going
18   to file a complaint with the Attorney General
19   about wages and hours?
20       A.   He might have said that, he might have
21   said he was going to sue us.  I don't remember.
22   Roger was just 110 percent emotion.
23       Q.   Why do you say he might have said
24   that?
```

144

```
1        A.   Roger said a lot of things when he
2    would get mad.
3        Q.   Do you remember that subject matter
4    coming up?
5        A.   No.
6        Q.   Did any other manager ever tell you
7    that Mr. Martin was complaining about wages and
8    hours with Vacation Village?
9        A.   Roger worked for two different sales
10   directors, and it seemed to me like both of them
11   had said that he was, you know, just constantly
12   complaining.
13       Q.   I'm wondering whether you heard about
14   those particular complaints, about wages and
15   hours?
16       A.   I don't recall.
17       Q.   Who did Roger work directly for?
18       A.   He worked for Gordon Leete, and he
19   worked for Paul Stensland.
20       Q.   He worked for both of them?
21       A.   Yes.
22       Q.   Did he work for one during his first
23   tenure and one during his second; is that how it
24   worked?
```