Case 3:04-cv-30091-MAP    Document 137-25    Filed 04/16/2007    Page 1 of 21

Deposition of:                    **Roger Martin**                    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

218

1  they?
2      A.   No, they didn't.
3      Q.   So why couldn't you believe it?
4      A.   Just because I was hoping.
5      Q.   Was anything else going on in your
6  life at that time that contributed to your mental
7  state?
8      A.   No.
9      Q.   Did you ever slam doors while you
10 were at Vacation Village?
11     A.   I'm sure there was a door or two
12 slammed occasionally, yes, but I can't say slammed
13 because they don't slam. They have those closers,
14 so maybe I opened one or two forcefully.
15     Q.   Why was that?
16     A.   Just frustrated with just constant
17 beating your head against the wall and going
18 nowhere.
19     Q.   How did it come about that you were
20 again separated from employment?
21     A.   I asked Paul Stensland, I told him I
22 didn't want to take a tour for the day. I was
23 going to go home. I didn't feel right about
24 selling this, and I had to reevaluate what I was

220

1      A.   No, I don't.
2      Q.   Is that everything you can recall
3  from that conversation?
4      A.   Yes.
5      Q.   Do you know what time that happened?
6      A.   No.
7      Q.   Was it the morning, afternoon?
8      A.   It was morning.
9      Q.   Had anything happened prior to that
10 that made you feel particularly not in a positive
11 attitude that day?
12     A.   Just coming to work, knowing that I'm
13 not going to get paid again.
14     Q.   Were you actually offered a tour that
15 you passed on or did you just leave?
16     A.   No, I asked Paul to leave and he said
17 leave. That's what they're claiming, that I
18 actually had the tour physically in my hand.
19 That's not the case.
20     Q.   Where were you on the list that day
21 or the wheel?
22     A.   I couldn't tell.
23     Q.   You have no idea?
24     A.   I have no idea.

219

1  going to do. He said, Go home.
2          And the next day I found out that I
3  was fired by Bill Rauer for passing up a tour,
4  missing a tour.
5      Q.   You say you didn't feel right. What
6  did you mean?
7      A.   Emotionally and mentally. Step one
8  is a positive mental attitude when you sell for
9  this company, PMA, and I didn't have it.
10     Q.   Did you ever have it?
11     A.   Oh, yes.
12     Q.   When?
13     A.   All through my first year and a half,
14 two years.
15     Q.   I'm sorry. Did you say you told
16 Paul? Is that yes?
17     A.   Yes.
18     Q.   And he instructed you to go home?
19     A.   He said, Yeah, why don't you go home.
20     Q.   Anyone else present during this
21 conversation?
22     A.   It happened right in the pit, so
23 whoever was in the pit at that time.
24     Q.   Do you remember anyone being there?

221

1      Q.   Has your attitude improved since you
2  are no longer working at Vacation Village?
3      A.   Absolutely.
4      Q.   How did you learn that you had been
5  terminated?
6      A.   Phone call.
7      Q.   From whom?
8      A.   Stensland and my immediate sales
9  manager, which was, I believe at the time, Todd
10 Bendars.
11     Q.   What did they say?
12     A.   They said, You got to talk. You got
13 to give Paul -- Todd left a voice mail on my cell
14 phone and said, You got to give Paul a call.
15 Looks like you've been fired for passing a tour
16 up.
17     Q.   Did you call Paul?
18     A.   Oh, yes.
19     Q.   And what did Paul say?
20     A.   Paul said, You have to talk to Bill
21 Rauer.
22     Q.   Did you call Bill?
23     A.   Yes.
24     Q.   What time did Todd call you and leave

56 (Pages 218 to 221)

Deposition of:                    Roger Martin                    April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

222

1  a voice mail?
2      A.  I couldn't tell you the time.  It was
3  a general voice mail.
4      Q.   What time did you call him back or
5  call Paul?
6      A.   Roughly about two, maybe three
7  o'clock in the afternoon.
8      Q.   The following day?
9      A.   No, the same day.
10     Q.   What time did you speak to Bill?
11     A.   I was to meet with him at 8:30 the
12  following morning.
13     Q.   Did you call him and he told you to
14  meet with him?
15     A.   No, I called Paul and Paul told me to
16  come in at 8:30 in the morning to talk to him.
17     Q.   Did you do that?
18     A.   No.
19     Q.   Why not?
20     A.   I went in at 8:30 and Paul met me at
21  my car door, pretty much told me that I'm going to
22  have to, you know, beg for my job, and I couldn't
23  do it anymore, so I passed up and said, No, I'm
24  not going to do it.  I'm all set.  See you later.

223

1      Q.   Are you happy with that decision?
2      A.   Absolutely.
3      Q.   Did you suffer -- I think you said --
4  I'm sorry.  Your attitude improved after the
5  second separation.  Did you suffer any symptoms of
6  emotional distress after that?
7      A.   You mean after I cut my employment
8  with Vacation Village?
9      Q.   Correct.
10     A.   No, I don't think so.  No, I think I
11  felt a great burden lifted off my shoulders,
12  actually.
13     Q.   When you were employed at Vacation
14  Village, did you ever consider going back to
15  counseling or seeking any type of other
16  counseling?
17     A.   Yes.
18     Q.   And when was that?
19     A.   Just through the whole general thing.
20     Q.   And what were you considering getting
21  counseling on?
22     A.   My attitude.
23     Q.   Did you feel, at any time during your
24  employment, that you needed to attend more anger

224

1  management classes or get counseling on that?
2      A.   No.
3      Q.   Have you ever been diagnosed as
4  depressed?
5      A.   No.
6      Q.   So did you want to improve your
7  attitude or become more positive?
8      A.   I wanted to quit standing in the
9  shower every morning going, I hate my job.  I hate
10  my job, that's what I wanted to do.  I initially
11  loved working for this company.  Okay.  It just
12  went south from there and my attitude went south,
13  and it wasn't fair to my family and everybody
14  around me to deal with it.
15     Q.   How did they have to deal with it?
16     A.   They heard it.  They heard me
17  constantly complaining and crying about my job.
18     Q.   When you say your family, who do you
19  mean?
20     A.   Michelle, my son, my immediate
21  family.
22     Q.   What about your daughter?
23     A.   She doesn't live with me.  She
24  doesn't have to deal with it.

225

1      Q.   Do you ever see her?
2      A.   Yeah, but I wouldn't deal with stuff
3  like that.  If you're not in the household, I'm
4  not going to share that with her.
5      Q.   Anyone else you complained to about
6  not liking your job?
7      A.   Fellow co-workers, that's about it.
8      Q.   Anyone outside of work?
9      A.   Just my family.
10     Q.   And that being Michelle and your son?
11     A.   And my best friend, Michael Webber, I
12  mean he heard me complaining about it all the
13  time.  Other than that, no, I can't really.
14     Q.   Where does he work?
15     A.   He's a -- he works for Scott Shift
16  Mazda.
17     Q.   Do you know him from your days in
18  that business?
19     A.   Yes.
20     Q.   Where is that business?
21     A.   Pittsfield, Massachusetts.
22     Q.   Do you recall seeing this policy
23  before?
24     A.   I don't recall seeing this

57 (Pages 222 to 225)

Deposition of:                    **Roger Martin**                    April 5, 2005
**Wise et al. vs. Patriot Resorts Corp., et al**

---

226

1   physically, no. I recall hearing about this.
2        Q.   Is that a fair representation of what
3   the overage policy was?
4             MS. GARROW: I'm going to object.
5   You can testify if you know.
6        A.   I don't remember if it's surely this
7   way or not.
8        Q.   What was your understanding of the
9   overage policy?
10       A.   If you didn't sign in or you missed
11  your tour, you were on overage. If you're on
12  overage, the rest I don't understand.
13       Q.   What if you leave before the line is
14  cut?
15       A.   Then I'm assuming, as it states here,
16  that you're probably going to continue to be on
17  overage the following day.
18       Q.   You said you didn't see --
19       A.   I haven't seen this.
20       Q.   I'm asking you if you remember.
21       A.   As far as I knew, overage stopped at
22  the end of the day.
23       Q.   Okay. How many days did you take off
24  each year? Did you ever take the maximum days

---

227

1   allowed?
2        A.   I don't think so.
3        Q.   Do you have any records that indicate
4   what days you took off?
5        A.   No.
6        Q.   Did you ever take weeks vacation?
7        A.   Yes.
8        Q.   And how many weeks would you take?
9        A.   One a year.
10       Q.   Why didn't you ever take more than
11  that?
12       A.   Because if you missed any more than
13  your allotted time, you were fired.
14       Q.   What was your allotted time?
15       A.   I think it was fourteen days. I'm
16  not positive on that.
17       Q.   Does this refresh your recollection
18  at all?
19       A.   Yes, I believe this is.
20       Q.   Is that your signature?
21       A.   I believe so.
22            MS. FABBO: Could you mark that,
23  please?
24            (Martin Exhibit 10, Marked for

---

228

1            identification.)
2        Q.   The document that's marked as
3   Exhibit 10, dated November 3, 2002, indicates
4   fifteen personal days. Does that refresh your
5   recollection at all?
6        A.   Roughly, yes.
7        Q.   Did you take your fifteen days per
8   year?
9        A.   I don't think so.
10       Q.   Is there any reason why you didn't
11  take two weeks off per year?
12       A.   Just in case something happened.
13  Besides, I was dedicated. I came to work every
14  day. I was going to work. I was going in to make
15  money. I wasn't going there to take days off.
16       Q.   Did you read a copy of the complaint
17  that was filed in the present lawsuit before it
18  was filed?
19       A.   No.
20            MS. FABBO: I just want to take a
21  quick break. I don't really have much more.
22            MS. GARROW: Okay.
23            (A recess was taken at 2:25 p.m. to
24            2:30 p.m.)

---

229

1        Q.   I only have a couple more questions.
2   Do you take any medications for anything, like
3   blood pressure, anything?
4        A.   No.
5        Q.   Did you at any time during your
6   employment with Vacation Village?
7        A.   No.
8        Q.   Nothing?
9        A.   Nothing.
10            MS. FABBO: I don't have any other
11  questions.
12            MS. GARROW: I've got nothing.
13            (Deposition concluded at 2:45 p.m.)
14
15
16
17
18
19
20
21
22
23
24

---

58 (Pages 226 to 229)

Case 3:04-cv-30091-MAP    Document 137-25    Filed 04/16/2007    Page 4 of 21

Deposition of:                  Roger Martin                          April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

230

1  COMMONWEALTH OF MASSACHUSETTS
   Hampden SS.
2
       I, Sandra A. Deschaine, Registered
3  Professional Reporter and Notary Public within and
   for the Commonwealth of Massachusetts at large, do
4  hereby certify that the deposition of ROGER
   MARTIN, in the matter of Wise, et al. vs. Patriot
5  Resorts Corp., et al., at the Offices of Skoler,
   Abbott & Presser, One Monarch Place, Springfield,
6  Massachusetts, on April 5, was taken and
   transcribed by me; that the witness provided
7  satisfactory evidence of identification as
   prescribed by Executive Order 455 (03-13) issued
8  by the Governor of the Commonwealth of
   Massachusetts; that the transcript produced by me
9  is a true record of the proceedings to the best of
   my ability; that I am neither counsel for, related
10 to, nor employed by any of the parties to the
   action in which this deposition was taken, and
11 further that I am not a relative or employee of
   any attorney or counsel employed by the parties
12 thereto, nor financially or otherwise interested
   in the outcome of the action.
13
14 _____
   Sandra A. Deschaine          DATE
15
   Registered Professional Reporter
16
   My Commission Expires:
17 July 9, 2010
18
19
20
21
22
23
24

232

1              ROGER MARTIN
2      SIGNATURE/PAGE ERRATA SHEET INFORMATION
3  WISE ET AL. VS. PATRIOT RESORTS, CORP., ET AL.
4
5      SIGNATURE INFORMATION FOR COUNSEL
6  The original signature page/errata sheet has been
7  sent to Attorney Garrow to obtain signature from
8  the deponent. When complete, please send original
9  to Attorney Fabbo, a copy of any errata should be
10 sent to each party of record present at the
11 deposition.
12
13         WITNESS INSTRUCTIONS
14 After reading the transcript of your deposition,
15 please note any change or correction and the
16 reason on the errata/signature page. DO NOT make
17 any corrections on the transcript itself. If
18 necessary, continue the format on a separate page.
19
20 PLEASE SIGN AND DATE the errata/signature page
21 (before a notary if requested) and return it to
22 your counsel.
23
24

231

1              ROGER MARTIN
2        SIGNATURE PAGE/ERRATA SHEET
3  PAGE LINE    CHANGE OR CORRECTION AND REASON
4   |____|_____
5   |____|_____
6   |____|_____
7   |____|_____
8   |____|_____
9   |____|_____
10  |____|_____
11  |____|_____
12  |____|_____
13  |____|_____
14
15 I have read the transcript of my deposition taken
16 on April 5, 2005. Except for any corrections
17 or changes noted above, I hereby subscribe to the
18 transcript as an accurate record of the statements
19 made by me.
20
   Signed under the pains and penalties of perjury.
21
22 _____
   ROGER MARTIN          DATE
23
24

59 (Pages 230 to 232)

# EXHIBIT
5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
          Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
          Defendants

DEPOSITION OF RODNEY LEWIS

June 2, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

I N D E X

WITNESS:  RODNEY LEWIS

Direct Examination by Mr. Feldman          5

EXHIBITS

Exhibit 1, 2005 Vacation Village Tour
          Presentation                       71
Exhibit 2, Vacation Village Rotation         74
Exhibit 3, 11/3/02 Memo Re: Attendance      117
Exhibit 4, Employee Information Form        124
Exhibit 5, LaCrisha Wise Attendance Report  125
Exhibit 6, 5/18/03 Memo Re: Dress Code      145
Exhibit 7, Leaders Booklet                  156

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

---

4

1              STIPULATION

2

3          It is agreed by and between the parties

4     that all objections, except as to form of the

5     question, are reserved until the time of trial.

6

7          It is further agreed by and between the

8     parties that all motions to strike unresponsive

9     answers are reserved until the time of trial.

10

11         It is further agreed by and between the

12    parties that the sealing of the original

13    deposition transcript is hereby waived.

14

15         It is further agreed by and between the

16    parties that the notification to all parties of

17    the receipt of the original deposition

18    transcript is hereby waived.

19

20

21

22

23

24

**Page 5**

1  RODNEY LEWIS, Witness, identified via
2  Virginia driver's license and having been duly
3  sworn, states as follows:
4
5     DIRECT EXAMINATION BY MR. FELDMAN:
6     Q.   Good morning, Mr. Lewis.
7     A.   Good morning.
8     Q.   Could you state your name and address
9  for the record, please?
10    A.   Rodney Lewis.  My address is 81 Fox
11 Run, Lee, Massachusetts.
12    Q.   And you've had your deposition taken
13 at the MCAD in this case already, is that
14 correct?
15    A.   Yes.
16    Q.   Because you clearly had a deposition
17 taken before, is that right?
18    A.   Yes.
19    Q.   Have you ever had other depositions
20 taken before of you?
21    A.   Yes.
22    Q.   I'm not going to run through all the
23 instructions I might otherwise give you because
24 you've been deposed before, but I will say this.

**Page 7**

1     A.   Project director.
2     Q.   Of what?
3     A.   For Vacation Village in the
4  Berkshires.
5     Q.   What are your job duties as project
6  director of Vacation Village?
7     A.   To oversee the day-to-day sales
8  programs that exist there.
9     Q.   Are you the highest-ranking manager at
10 the site where sales take place?
11         MS. FABBO:  Objection.  You can
12         answer.
13         THE WITNESS:  In regard to sales,
14         yes.
15    Q.   (By Mr. Feldman)  Is there anyone else
16 within the hierarchy of management on-site at the
17 sales area who's at the same rank you are?
18         MS. FABBO:  Objection.  You can
19         answer.
20         THE WITNESS:  Yes.
21    Q.   (By Mr. Feldman)  Who is that?
22    A.   No, I'm sorry.  I'm confused here.
23 No, I'm the only project director at the resort.
24    Q.   Who is your direct supervisor?

**Page 6**

1  You should wait until I finish my question before
2  you answer the question, okay?
3     A.   Okay.
4     Q.   You have to make sure to make a verbal
5  answer, because otherwise the stenographer can't
6  take it down, all right?
7     A.   Fine.
8     Q.   I will try not to talk over you and
9  you try not to talk over me so the stenographer
10 has only one voice to take down at a time.
11    A.   Fine.
12    Q.   If you want to take a break, consult
13 with your lawyer, or use the bathroom, that's
14 fine, okay?
15    A.   Okay.
16    Q.   The other thing is, if I ask you a
17 question and you answer the question, I'm going
18 to assume you understood it, okay?
19    A.   Okay.
20    Q.   So if you have a question about the
21 question that I'm asking, please ask me to
22 rephrase it.
23    A.   I will.
24    Q.   What is your current job, Mr. Lewis?

**Page 8**

1     A.   Bill Rauer.
2     Q.   Where is he based?
3     A.   Based in Florida.
4     Q.   Is there anyone else you consult with
5  in management on-site for issues that arise with
6  sales representatives?
7     A.   I consult with my sales directors.
8     Q.   But they are beneath you in the
9  hierarchy, is that correct?
10    A.   That's correct.
11    Q.   I'd like you to -- if you could
12 describe all of the job duties that are entailed
13 in being the project director?
14    A.   I will try.  My job involves the
15 overseeing of the daily sales, coordinating the
16 sales effort with the Marketing Department,
17 basically implementing company policy and
18 procedure.  Pretty much it.
19    Q.   What kind of company procedure do you
20 implement?
21    A.   All the procedures that pertain to
22 sales.
23    Q.   How many people do you directly
24 supervise now?

1    A.    Between forty and fifty.
2    Q.    That includes the entire sales staff?
3    A.    That's correct.
4    Q.    And below you, though, you said are
5    sales managers, is that correct?
6    A.    That's correct.
7    Q.    Is there anyone between a sales
8    manager and the project director?
9    A.    Yes, there are sales directors.
10    Q.    How many of them are there?
11    A.    There are three.
12    Q.    Who are they now?
13    A.    They are Paul Stensland, David
14    Mercurio, and Gary Campagna.
15    Q.    How long have those three been the
16    sales directors?
17    A.    Paul has been the sales director for
18    about three years, Gary and David for about seven
19    months.
20    Q.    Who were the sales directors before
21    the last two you mentioned?
22    A.    Gordon Leete.
23    Q.    How long was he sales director for?
24    A.    He was there for several years.

1    same job?
2    A.    Fundamentally, yes.
3    Q.    Are there any job duties that differ
4    among salespeople on a line?
5    A.    No.
6    Q.    How long have you been the project
7    director?
8    A.    For two and a half years.
9    Q.    What were you before you were project
10    director?
11    A.    I was a sales director at another
12    resort.
13    Q.    How did you come to work for Vacation
14    Village?
15    A.    I was offered the job.
16    Q.    By who?
17    A.    By Bruce Polansky.
18    Q.    Who is Bruce Polansky?
19    A.    He was an executive vice president --
20    senior vice president of the Berkley Group.
21    Q.    What are his job duties, if you know?
22    A.    He oversees the entire sales operation
23    at all of the different resorts that the Berkley
24    Group owns and manages.

10

1    Q.    Is he the only person who was a
2    salesperson besides those three in the last five
3    years?
4    A.    Yes.
5    Q.    Are they also called line directors?
6    A.    Yes.
7    Q.    So are there three lines at this
8    point?
9    A.    No, there are two.  One has
10    co-directors.
11    Q.    And before the co-directors, Gordon
12    Leete was the director of that line?
13    A.    That's correct.
14    Q.    Why are they called lines?
15    A.    It's just a terminology that has
16    developed based on a list of salespeople.  If you
17    make a list, then that creates a line down a
18    page.  You list them line-by-line.
19    Q.    I'm sorry, go ahead.
20    A.    That's all.
21    Q.    How many salespeople are in a line?
22    A.    There are approximately sixteen to
23    twenty.
24    Q.    Does each of the salespeople have the

12

1    Q.    But he's not your direct supervisor,
2    is that correct?
3    A.    No, that's not correct.
4    Q.    And who is your direct supervisor
5    again?
6    A.    Bill Rauer.
7    Q.    And is Mr. Rauer directly supervised
8    by Mr. Polansky?
9    A.    Yes, I believe.
10    Q.    Were you involved in any way in the
11    hiring of salespeople as project director?
12    A.    To a very small degree.
13    Q.    What degree was that?
14    A.    That oftentimes I would meet the
15    people and talk with them, but the sales
16    directors themselves and their sales managers
17    hire the vast majority of the salespeople.
18    Q.    How many sales managers have been on a
19    line since you've been there?
20    A.    Four or five, per line.
21    Q.    Is there a set amount?
22    A.    No.
23    Q.    Who determines how many sales managers
24    are on a line?

15

1      A.    It's predicated by the number of
2   salespeople that we have, the number of sales
3   guests that come through the door.  The number of
4   sales guests that come through the door
5   determines the number of salespeople that we
6   have.
7         Q.    That determines the number of
8   salespeople, but how about managers?
9         A.    The number of managers we try to keep
10  at a ratio of three or four to one.
11        Q.    Who do the job duties of a sales
12  manager differ from salesperson?
13        A.    Sales manager has three functions,
14  salesman has one.  Their one function is to sell.
15  Sales manager's function is first to sell;
16  secondly, act as a manager to close sales; and
17  third, to manage salespeople.
18        Q.    So the sales manager sells as well?
19        A.    Correct.
20        Q.    Is there any ratio as to how they
21  perform those three functions?
22        A.    No.
23        Q.    That varies depending upon the needs
24  of the company, is that right?

1               to report half an hour early.
2         Q.    (By Mr. Feldman)  Why was that?
3         A.    To allow us to start the tours at 9:00
4   instead of 9:30.
5         Q.    So tours were to start from 9:00?
6         A.    Yes.
7         Q.    Who made the decision to move the time
8   to report back a half an hour earlier?
9         A.    Bill Rauer.
10        Q.    When did that occur?
11        A.    Late 2002 or early 2003, I think.
12        Q.    How long had you been working there
13  when that occurred?
14        A.    A few months.
15        Q.    Were you privy to the discussions that
16  took place about making that change?
17        A.    No.
18        Q.    Bill Rauer just told you to make the
19  change, is that correct?
20              MS. FABBO:  Objection.  You can
21        answer.
22              THE WITNESS:  Yes.
23        Q.    (By Mr. Feldman)  Did anyone else
24  communicate to you that change?

14

1         A.    Right.
2         Q.    I'd like to go through a salesperson's
3   regular day, if there is such a thing.  When does
4   a salesperson need to report to work?
5         A.    They need to sign in by 8:30 in the
6   morning.
7         Q.    Has that been the policy since you've
8   been a project director?
9         A.    No, initially it was 9:00.
10        Q.    When did that change?
11        A.    Couple years ago; I don't remember
12  exactly when.
13        Q.    When it changed from 9:00 to 8:30, did
14  the time that salespeople were permitted to leave
15  from work change as well, at the end of the day?
16        A.    No, no.
17        Q.    That stayed the same?
18        A.    Yes.
19        Q.    So salespeople were then required,
20  essentially, to work for an extra half an hour a
21  day, is that correct?
22              MS. FABBO:  Objection.  You can
23        answer.
24              THE WITNESS:  They were required

16

1         A.    No.
2         Q.    Did Bill Rauer -- did he tell you why
3   he was making the change?
4         A.    No, but it wasn't my position to
5   question the change.  My job is to get my
6   marching order and march.
7         Q.    But you said you knew the reason for
8   the change earlier, right?
9         A.    I believe it was to facilitate the
10  flow of the sales guests and to allow the
11  salespeople to leave at an earlier hour.
12        Q.    How did you learn that?
13        A.    Because we started a little bit
14  earlier, we would finish a little bit earlier.
15        Q.    Finish the tours a little bit earlier?
16        A.    Yes.
17        Q.    So are you guessing that that was the
18  reason for the change, or did someone actually
19  tell you what the reason for the change was?
20        A.    Speculation on my part.
21        Q.    Since you've been the project
22  director, have you learned from anyone of the
23  reason they believe the change was implemented?
24        A.    No.

19

```
1      Q.   Who told you that you could start
2  tours at 9:00 instead of 9:30?
3      A.   That would have come from above me.
4      Q.   Who was it?
5      A.   From Bill Rauer.
6      Q.   Do you remember him telling you that?
7      A.   No, but that's where the directive
8  would have come from.  It was such an
9  insignificant adjustment that I paid no real
10 attention to it.
11     Q.   Who began scheduling the tours at
12 9:00; was that you?
13     A.   No.
14     Q.   Are you involved in the scheduling of
15 tours?
16     A.   No, that comes from the Marketing
17 Department.
18     Q.   Who communicated to the salespeople
19 that tours were going to be starting at 9:00?
20     A.   Probably the sales directors.
21     Q.   Who communicated to the sales
22 directors that tours would start at 9:00?
23     A.   Probably me.
24     Q.   That means you don't really remember?
```

20

```
1      A.   Bill Rauer.
2      Q.   How often was Bill Rauer on-site
3  rather than Florida when he first started?
4      A.   He initially was there every day for a
5  couple of weeks.
6      Q.   Was that to train you?
7      A.   Yes, yes.  I was taking his position.
8      Q.   Bill Rauer was the project director
9  before you?
10     A.   Prior to my arrival.
11     Q.   What did you review to learn the
12 policies of the company when you first started?
13     A.   The employee handbook, talk with the
14 managers, the directors.
15     Q.   And those were Mr. Stensland and
16 Mr. Leete, is that correct?
17     A.   That is correct.
18     Q.   Did you talk to Mr. Rauer about
19 policies of the company?
20     A.   Yes.
21     Q.   When did he stop being there every
22 day?
23     A.   Several weeks after I arrived.
24     Q.   We were actually going through the day
```

18

```
1      A.   No, it's just such a -- it's such an
2  insignificant happening, you know -- that, and it
3  was several years ago.  I don't remember the
4  exact details.
5      Q.   When salespeople -- when the
6  communication was made to the salespeople that
7  they were to arrive at 8:30 rather than 9:00, did
8  anyone complain about that?
9      A.   I don't recall.
10     Q.   Did anyone say, I'm not getting paid
11 for this extra half an hour; why should I have to
12 come earlier -- something like that?
13     A.   No, I don't recall.
14     Q.   Who told you when you first started
15 working as project director that people were
16 supposed to report in at 9:00?
17     A.   That was the schedule that had been
18 established when I arrived there.
19     Q.   How did you learn of that schedule?
20     A.   We have a management meeting ten
21 minutes before the sales meeting, and I was told
22 to be there at ten minutes to 9:00.
23     Q.   Who told you to be there at ten
24 minutes to 9:00; who is the person who told you?
```

20

```
1  of a salesperson on-site.  You said at some point
2  they were required to be there at 8:30, is that
3  correct?
4      A.   That's correct.
5      Q.   When they arrive what are they
6  supposed to do?
7      A.   They sign in.
8      Q.   As I'm talking about these policies,
9  I'm talking about from the time that you started
10 working there until the present, so if it's
11 changed at any point, please let me know.  Do you
12 understand that?
13     A.   Okay.
14     Q.   So a salesperson arrives at 8:30,
15 they're supposed to sign in?
16     A.   That's correct.
17     Q.   They sign in at the Reception Center
18 or at the Sales Center?
19     A.   At the Sales Center.
20     Q.   Where was the sign-in sheet kept?
21     A.   It was kept on a table at the front
22 door when you walk in the Sales Center.
23     Q.   Was anybody staffing that table?
24     A.   I believe somebody staffed that table
```

23

```
1  periodically.
2      Q.  What happened to the sign-in sheets
3  after they were signed?
4      A.  They would be picked up right after
5  8:30 and taken then over to the Reception Center.
6      Q.  Were they picked up at 8:33 every day,
7  approximately?
8      A.  Approximately.
9      Q.  There's a little grace period for
10 people to come in a little later?
11     A.  A few minutes.
12     Q.  Was there a sign-out sheet at the end
13 of the day?
14     A.  No.
15     Q.  How did you know how long people had
16 worked that day?
17     A.  I didn't.  It was based on the tours
18 for the day.
19     Q.  People signed in at 8:30, correct?
20     A.  That's correct.
21     Q.  And at the end of the day, they never
22 signed out, is that correct?
23     A.  That's correct.
24     Q.  Do you know how long -- how much of a
```

```
1      A.  Yes.
2      Q.  You saw people leave at the end of the
3  day?
4      A.  Yes.
5      Q.  The documents, if I wanted to go back
6  and track -- for example, let's use LaCrisha Wise
7  as an example, since she's a plaintiff in this
8  case.  If I wanted to track how many hours a week
9  LaCrisha worked, what documents would I use to
10 track that?
11     A.  I really don't know, because I don't
12 really get involved in any of the payroll or
13 record keeping for the hours worked.
14     Q.  But you do know some of this, right,
15 Mr. Lewis?
16             MS. FABBO:  Objection.
17     Q.  (By Mr. Feldman)  You know there's a
18 sign-in sheet?
19     A.  I know there's a sign-in sheet.
20     Q.  And you know that there's a sheet they
21 sign when they go out on tour, right?
22     A.  No.  Well, they get a tour slip and
23 they go out on tour.
24     Q.  Why don't you describe what a tour
```

22

```
1  day any salesperson worked over the last period
2  during the period you've been project director?
3      A.  No, I've not tracked that.
4      Q.  Is there any way to track that?
5      A.  Not really.
6      Q.  Are you aware that on everyone's -- on
7  the hourly wage sheet that's kept by the company,
8  that it says everyone worked forty hours a week?
9             MS. FABBO:  Objection.  You can
10            answer.
11            THE WITNESS:  No, I'm not aware
12            of that sheet.
13     Q.  (By Mr. Feldman)  Have you seen any
14 payroll sheets from the company before?
15     A.  No, no, I don't see any payroll
16 sheets.
17     Q.  You were on-site every day during the
18 time you've been project director, is that
19 correct?
20     A.  That's correct.
21     Q.  Did you see people come and go?
22     A.  Yes.
23     Q.  You saw salespeople enter at the
24 beginning of the day?
```

24

```
1  slip is?
2      A.  It's just a slip of paper that has the
3  guest's name on it and their name and the time
4  that they go out.
5      Q.  Who generates that slip?
6      A.  The Reception Center.
7      Q.  That's in a different location than
8  the Sales Center, is that right?
9      A.  That's correct.
10     Q.  They're in two different buildings?
11     A.  That's correct.
12     Q.  Approximately how far apart are they?
13     A.  Probably a hundred yards.
14     Q.  So they generate the tour slip you
15 described?
16     A.  Um-hum.
17     Q.  And when they generate it, what's on
18 that slip?
19     A.  The name of the guest, the name of the
20 sales representative, and space for whoever is
21 the manager that talks to the people, with their
22 initials or signature.
23     Q.  So when they generate it, is that line
24 blank, the one for the salesperson initially?
```

1   A.   Yes -- no, no, that's filled in -- the
2   name of the salesperson is filled in as well as
3   the sales guest.
4       Q.   Who fills that in?
5       A.   The Reception Center.
6       Q.   How do they know which salesperson to
7   put in that line?
8       A.   They have a sales rotation established
9   every day.
10      Q.   Were you part of the establishment of
11  that rotation?
12      A.   No, it's done automatically based on
13  their sales results for the last sixty days.
14      Q.   Were you involved in the creation of
15  that policy?
16      A.   No.
17      Q.   Who was involved in the creation of
18  that policy?
19      A.   I have no idea.
20      Q.   What is the policy -- what's the
21  rotation policy?
22      A.   The rotation policy is based on the
23  past sixty days' sales, and it's their closing
24  ratio from the past sixty days.  Person with the

1   Isn't there a policy that if you get above nine
2   as a sales manager, you can be demoted?
3       A.   There's a company policy that the
4   company would like everybody to stay at one out
5   of 8.999 or better.
6       Q.   Is it one out of 8.999, or is it
7   8.999, because I just want to make sure I'm clear
8   about that.
9       A.   It's 8.99, but that's a ratio; not a
10  percentage.
11      Q.   I understand that, but eighteen
12  divided by two is nine?
13      A.   That's correct.
14      Q.   Two divided by eighteen is not nine;
15  it's .11.
16      A.   Exactly.
17      Q.   Which is the ratio -- .11, or 9?
18           MS. FABBO:  Objection.
19           THE WITNESS:  Yes.  Nine.
20      Q.   (By Mr. Feldman)  So the rotation is
21  based entirely on the sixty-day sale?
22      A.   That's correct.
23      Q.   Unless there is someone on overage?
24      A.   That's correct.

1   highest closing ratio goes out first, and then it
2   goes progressively to the lowest.
3       Q.   It's a simple math equation, isn't it?
4       A.   Yes.
5       Q.   And the ratio equation is simple --
6   number of the tours they've taken divided by the
7   number of sales they've completed?
8       A.   That's correct.
9       Q.   So if you have a high ratio, that
10  means you completed relatively few sales, is that
11  right?
12      A.   Depends on how you define "high".  If
13  it's a large number, yes.  If you have a high
14  closing ratio -- for example, if you're one out
15  of twenty, then that would put you at the bottom.
16  If you're one out of three or four, then that
17  will put you at the top or towards the top.
18      Q.   Let's say there were eighteen tours
19  the person had attended and they closed two of
20  them.  Their closing ratio would be nine, one out
21  of nine?
22      A.   It's two out of eighteen.  You're
23  talking percentage; I'm talking ratio.
24      Q.   I want to make sure I have this right.

1       Q.   Other than the overage and the ratio
2   that you just described, what are the other
3   criteria to determine the rotation?
4       A.   None.
5       Q.   Those are the two variables?
6       A.   Yes.
7       Q.   We were trying to -- I was asking you
8   questions to determine whether we could look back
9   and figure out how many hours a person had been
10  working on a particular day, so we discussed the
11  sign-in sheet, correct?
12      A.   Yes.
13      Q.   We've now just discussed the tour
14  slips?
15      A.   Yes.
16      Q.   Do the tour slips contain the hours
17  worked for a particular tour?
18      A.   No.
19      Q.   Is there a form or something that a
20  sales manager -- a salesperson, excuse me --
21  filled out as they went out to take a tour?
22      A.   No, the salespeople don't fill
23  anything out as they go out to take a tour.
24  Simply take a slip and go meet the people.

```
 1    Q.    Was there a time record kept by the
 2  company that indicated when a person went out on
 3  tour and when they came back?
 4    A.    If there is, it's held by the
 5  reception people and the administration.
 6    Q.    Do you know about such a time sheet?
 7    A.    No.
 8    Q.    Have you heard of it before?
 9    A.    No.
10    Q.    When people are released -- who
11  releases salespeople at the end of a day to go
12  home?
13    A.    Typically it's the Tour Center, the
14  director, the manager of the Tour Center; and
15  it's based on the number of sales guests that we
16  have that remain waiting.  We try to let the
17  salespeople leave as early as possible so they
18  don't have to hang around.
19    Q.    The Tour Center is different than the
20  Reception Center?
21    A.    No, the Reception Center, I'm sorry.
22    Q.    But the salespeople during the day are
23  waiting in a place that they call the pit, but
24  it's actually a sort of lounge?
```

```
 1    A.    For the most part, yes.
 2    Q.    What's not the most part?
 3    A.    Occasionally when we don't have a lot
 4  of tours, the Reception Tour Center manager would
 5  call me and tell me what we had, and I would go
 6  ahead and tell them to cut the line early, let
 7  the people go.
 8    Q.    You would tell them that?
 9    A.    Yes.
10    Q.    So did you make the final decision
11  about cutting the line?
12         MS. FABBO:  Are you asking him in
13         that circumstance?
14    Q.    (By Mr. Feldman)  Just generally since
15  you've been project director, are you the person
16  who makes the call about when the line gets cut?
17    A.    In that circumstance, yes.  Normally
18  it works automatically and it's based on the
19  number of tours and manager at the Tour Center --
20  Reception Center.
21    Q.    Is there some mathematical formula to
22  determine that?
23    A.    No, one-on-one typically.
24    Q.    Who makes that determination?
```

```
                                              30
 1    A.    Salesman lounge.
 2    Q.    Have you heard the term "pit" before?
 3    A.    Yes.
 4    Q.    And that's at the Sales Center?
 5    A.    Yes.
 6    Q.    So when the salespeople are released
 7  at the end of the day, someone from the Reception
 8  Center comes over to the Sales Center and lets
 9  people know that?
10    A.    Tells them that the line has been cut;
11  and if we're waiting for just several people,
12  then we keep several people until an hour after
13  the last scheduled tour time to allow for late
14  arrivals.
15    Q.    What is the last scheduled tour time?
16    A.    Typically it's 2:00.
17    Q.    Now, the policies we've just discussed
18  about sign-in sheet and the tour slips, has that
19  been the same policy during the entire time
20  you've been the project director?
21    A.    To my best knowledge, yes.
22    Q.    And the manner in which salespeople
23  are released, has that been the same policy
24  during the time you've been project director?
```

```
                                              32
 1    A.    Manager at the Reception Center.
 2    Q.    What's his name?
 3    A.    Dennis.
 4    Q.    Has he been the manager since you've
 5  been there?
 6    A.    No, he's been for I don't know how
 7  long.
 8    Q.    Who was before him?
 9    A.    A gal named Bonnie.
10    Q.    Do you know her last name?
11    A.    No.  They don't work for me.
12    Q.    During the time you've been the
13  project director, is it your testimony that the
14  last tour scheduled during a day was at 2:00?
15    A.    Normally, yes.  Sometimes in the
16  summer if we have a heavy flow, they'll have them
17  scheduled as late as 2:30, 3:00.  Doesn't happen
18  frequently.
19    Q.    But it happens sometimes the tours are
20  scheduled at 3:00, is that correct?
21         MS. FABBO:  Objection.  You can
22         answer.
23         THE WITNESS:  I'm sure that it
24         has happened occasionally.  Not
```

33

```
1              frequently, but occasionally.
2         Q.   (By Mr. Feldman)  When you say
3    "occasionally," how many times can you remember
4    since you've been a project director that there's
5    been a tour scheduled at 3:00?
6         A.   I can't even give you a number on
7    that.  It's not large.
8         Q.   It's more than zero?
9         A.   More than zero, yes.
10        Q.   More than five?
11        A.   You know, might have been five or ten
12   times, I don't know.  That's across a period of
13   almost three years.
14        Q.   But you don't know -- your testimony
15   is you don't know?
16        A.   I don't know.
17        Q.   Is there any way to look at a document
18   to determine whether there were tours scheduled
19   at 3:00 in the last two and a half or three
20   years?
21        A.   I don't know what records that the
22   Tour Center keeps.
23        Q.   Who would know that?
24        A.   I would think probably Dennis.
```

34

```
1         Q.   And Bonnie would know that as well for
2    the time she was manager, is that correct?
3         A.   Yes.
4         Q.   During the time you've been project
5    director, have you instructed the salespeople
6    about how long a tour is supposed to take?
7         A.   Yes.
8         Q.   How long is it supposed to take?
9         A.   At least 90 minutes.
10        Q.   Is there any limit to how long it's
11   supposed to take on the longer side rather than
12   the short -- is there a maximum time for a tour?
13        A.   No.
14        Q.   Are you aware of how long a typical
15   tour is, if there is such a thing?
16        A.   No.  You know, I'm not aware of
17   anybody keeping any averages, any numbers.
18   Probably two hours, but that's pure speculation
19   on my part.
20        Q.   Do you know if any tours, during the
21   time you've been project director, took more than
22   two hours?
23        A.   Yes, I'm sure there have been.
24        Q.   Have any tours taken three hours?
```

35

```
1         A.   Probably.
2         Q.   Have any tours been longer than three
3    hours?
4         A.   Yes, probably.
5         Q.   Are salespeople encouraged to take
6    longer tours?
7         A.   Salespeople are encouraged to spend as
8    much time with their customers as is necessary in
9    order to create a sale.
10        Q.   Have you instructed salespeople that
11   if they need to take a longer time to make a
12   sale, they should go ahead and do that?
13        A.   Yes.
14        Q.   Have you instructed salespeople that
15   they shouldn't cut a tour short if they haven't
16   made a sale?
17        A.   Yes.
18        Q.   Do you stay on-site -- during your
19   time as a project director, do you stay on-site
20   until the last person has left the building?
21        A.   Usually, yes.
22        Q.   Who locks up the Sales Center, if that
23   happens, at the end of the day?
24        A.   The cleaning people.
```

36

```
1         Q.   Do you leave before the cleaning
2    people leave?
3         A.   Yes.
4         Q.   When do the cleaning people come?
5         A.   6:00 p.m.
6         Q.   Are you always there when they arrive?
7         A.   Normally.
8         Q.   On a typical day, at 6:00, are there
9    still salespeople out on tour?
10        A.   No.
11        Q.   Has it ever happened that there have
12   been salespeople out on tour at 6:00?
13        A.   Yes.
14        Q.   Are typically salespeople out on a
15   tour after 5:00?
16        A.   No.
17        Q.   When I say "out on a tour," what do
18   you take that to mean; what's "out on a tour"
19   mean?
20        A.   With the guest, the sales guest at the
21   resort or touring the area or actively working in
22   the Sales Center.
23        Q.   So any of those things is considered
24   to be taking a tour, is that right?
```

37

```
 1      A.   Yes.
 2      Q.   So you just listed three areas people
 3 could be if they are on a tour.  One is touring
 4 the area, is that right?
 5      A.   That's right.
 6           MS. FABBO:  Objection.  He just
 7           answered these.
 8           MR. FELDMAN:  I'm sorry?
 9           MS. FABBO:  You need to go
10           through these again?
11           MR. FELDMAN:  I do, yes.
12      Q.   (By Mr. Feldman)  One is out touring
13 the area?
14           MS. FABBO:  Objection.  You can
15           answer unless I tell you not to.
16           THE WITNESS:  Yes.
17      Q.   (By Mr. Feldman)  The second is being
18 at Vacation Village itself, right?
19           MS. FABBO:  Objection.  That's
20           not what he said.
21           THE WITNESS:  Yes.
22      Q.   (By Mr. Feldman)  And the third would
23 be being at the Sales Center finishing up a --
24 trying to close a sale, is that correct?
```

38

```
 1           MS. FABBO:  Objection.  You can
 2           answer.
 3           THE WITNESS:  Yes.
 4      Q.   (By Mr. Feldman)  Given those -- is
 5 there any other place a salesperson could be
 6 while out on tour other than those three areas?
 7      A.   No.
 8      Q.   On a typical tour, how long would a
 9 salesperson take to do any of those three areas
10 you just described?
11      A.   I would have to sit down and analyze
12 it more deeply, but, you know, typically it's
13 going to a take an hour and a half to two hours
14 to do everything.  It's probably a good average,
15 two hours.
16      Q.   You see salespeople leave the Sales
17 Center, right, to go out on tour?
18      A.   Yes.
19      Q.   And you see them come back with guests
20 into the Sales Center?
21      A.   Yes.
22      Q.   Typically how long does that take?
23      A.   I really don't know.  I've never
24 bothered to...
```

39

```
 1      Q.   Typically, how long is a salesperson
 2 with the guest at the Sales Center after they've
 3 toured the area?
 4      A.   30 to 45 minutes.
 5      Q.   Tell me if this is wrong -- you said a
 6 typical tour would be about two hours?
 7      A.   Yes.
 8      Q.   And typically they're then at the
 9 Sales Center for 30 or 45 minutes after they've
10 toured the area?
11      A.   Yes.
12      Q.   So does that mean that typically
13 they'd be out touring the area and the site for
14 an hour and a half or an hour and fifteen
15 minutes, approximately?
16      A.   Yes.
17      Q.   Typically, how many tours does a
18 salesperson take in a day?
19      A.   We try to give them an average of two.
20      Q.   How has that worked out during the
21 time you've been project director?
22      A.   It's worked out well.
23      Q.   So would you say that a salesperson
24 gets two -- on average, two tours a day every day
```

40

```
 1 every time they show up for work?
 2      A.   One to two.
 3      Q.   It's a five-day work week, is that
 4 right?
 5      A.   Yes.
 6      Q.   In an average week, would, then, a
 7 salesperson have between five and ten tours?
 8      A.   Yes, they should.  We -- there might
 9 be a week where we only work a four-day work
10 week; then that number would be reduced.
11      Q.   Now, just getting back to the time
12 that salespeople return, have you seen
13 salespeople return from touring the area and the
14 site between 5:00 and 6:00 p.m.?
15      A.   Very infrequently.
16      Q.   How about 4:00 and 5:00 p.m.?
17      A.   Yes, sometimes.
18      Q.   I take it that salespeople return from
19 tours to the Sales Center between 4:00 and 5:00
20 More frequently than between 5:00 and 6:00, is
21 that right?
22           MS. FABBO:  Objection.
23           THE WITNESS:  Yes, that would be
24           correct.
```

41

```
 1     Q.    (By Mr. Feldman)  When they return
 2  from a tour, that's when they begin closing the
 3  sale process, is that right?
 4           MS. FABBO:  Objection.
 5           THE WITNESS:  Yes.
 6     Q.    (By Mr. Feldman)  I understand they're
 7  trying to close the sale while they're on tour as
 8  well, is that right?
 9           MS. FABBO:  Objection.
10           THE WITNESS:  That's right.
11     Q.    (By Mr. Feldman)  Why don't you
12  describe what happens when a salesperson returns
13  with a guest to the Sales Center after they've
14  been touring the area?
15     A.    They come in and get a seat, ask the
16  family if they'd like to use the restrooms, offer
17  them a cup of coffee, or we have cold drinks as
18  well.  They sit down with them, they explain the
19  pricing to the people; and if the people have a
20  question or an objection to the pricing, then a
21  sales manager will sit down with the people and
22  try to work out the sale details.
23     Q.    Does any of what you just described
24  take place while they give the person a tour of
```

42

```
 1  the area?
 2     A.    Normally no.
 3     Q.    In fact, the policy is that's supposed
 4  to take place after they return to the Sales
 5  Center, is that right?
 6           MS. FABBO:  Objection.
 7           THE WITNESS:  That's correct.
 8     Q.    (By Mr. Feldman)  Has that policy
 9  changed during the time you've been the project
10  director?
11     A.    No.
12     Q.    The details you just described about
13  what a salesman does when he returns to the Sales
14  Center, is he assisted by anybody else in that
15  process?
16     A.    During which period?
17     Q.    During the time when he returns to the
18  Sales Center after touring the area with the
19  guest.
20     A.    Typically he's assisted by one of the
21  sales managers or the sales directors.
22     Q.    Is that called TO?
23     A.    Yes.
24     Q.    TO means "take over"?
```

43

```
 1     A.    That's correct, or "turn over."
 2     Q.    Turn over.  Does that occur every time
 3  a salesperson brings a guest back to the Sales
 4  Center?
 5     A.    Most every time.
 6     Q.    Why would that not occur?
 7     A.    There are some -- some of the
 8  salespeople that are skillful enough that they
 9  can close their own sales.
10     Q.    Who makes that determination?
11     A.    Based on their sales performance and
12  ability and their sales director.
13     Q.    Sales director makes that
14  determination?
15     A.    Yes.
16     Q.    So is it true that there were some
17  salespeople who were not required to have TO --
18           MS. FABBO:  Objection.
19           MR. FELDMAN:  -- for lack of a
20           better term?
21           THE WITNESS:  Yes.
22     Q.    (By Mr. Feldman)  Would a salesperson
23  know that a salesperson was designated that he
24  didn't need a sales manager to come over?
```

44

```
 1     A.    Yes.
 2     Q.    Who would tell him that?
 3     A.    Sales director would tell him.
 4     Q.    Would that sales director check with
 5  you before making that determination?
 6     A.    Yes.
 7     Q.    So again, going back to the
 8  salesperson's regular day, after they've signed
 9  in at 8:30 and before they get a tour, what are
10  they required to do by the company?
11     A.    They attend a morning sales meeting.
12     Q.    What occurs at the morning sales
13  meeting?
14     A.    The morning sales meeting is an
15  opportunity to go over the previous day's sales
16  to discuss the sales that the different
17  salespeople made, to give them some recognition
18  for that.  It also is an opportunity to impart
19  any daily information or instructions.  In
20  addition to that, we typically do some sales
21  training in the meetings and go over some facets,
22  some aspect of our sales presentation.
23     Q.    Anything else that takes place during
24  those morning sales meetings?
```

---

45

1    A.    Normally no.

2    Q.    During the time you've been project

3  director, who ran those meetings?

4    A.    The sales directors for their lines.

5    Q.    So do the lines meet separately or do

6  they meet together?

7    A.    They do both.

8    Q.    Are you involved in the morning sales

9  meeting?

10    A.    As an observer.

11    Q.    Do you go to every morning sales

12  meeting?

13    A.    Yes.

14    Q.    Do you meet with the sales directors

15  before the morning sales meeting?

16    A.    Yes, I do.

17    Q.    Is that before 8:30?

18    A.    Yes.

19    Q.    What time does that take place?

20    A.    8:20.

21    Q.    Do you tell the sales directors what

22  information they're supposed to provide in the

23  sales meeting?

24    A.    If there are any problems that we need

---

46

1  to address, any procedures that need to be more

2  closely adhered to.  For example; parking, just

3  -- you know, just some general operating

4  procedures.

5    Q.    How long does that meeting take?

6    A.    Ten minutes.

7    Q.    Does that meeting start at the time

8  that the sign-out sheet is returned to the

9  location where it's kept?

10    A.    I'm not sure we're talking about the

11  same meeting.  The general sales meeting or the

12  managers meeting?

13    Q.    I'm sorry, the sales meeting; excuse

14  me.

15    A.    Yes, it starts then, and normally the

16  sheet is picked up a minute or two after that.

17    Q.    After that ten-minute meeting -- and I

18  understood it may go longer; it may go shorter

19  than that -- what does a salesperson do next?

20    A.    We have a general sales meeting daily.

21  The manager's meeting is ten minutes, the sales

22  meeting for the salespeople is typically twenty

23  to thirty minutes.

24    Q.    And you've described what gets talked

---

47

1  about at that meeting, so we don't have to go

2  over that again.

3    A.    Yes.

4    Q.    What happens after that general sales

5  meeting is over?

6    A.    It's over at that point; the

7  salespeople and sales managers head to the

8  Reception Center and the sales managers then go

9  out on the first tours.

10    Q.    The sales managers go first?

11    A.    Yes.

12    Q.    Is that regardless of their ratios?

13    A.    It's based on their ratios.

14    Q.    What if the sales manager's ratios are

15  worse than a salesperson's ratios?

16    A.    Then he would go out at the bottom of

17  the sales managers' rotation.

18    Q.    You said there are four or five sales

19  managers on a line typically, is that correct?

20    A.    That's correct, right.

21    Q.    So there would be nine or ten total?

22    A.    That's correct, that's correct.

23    Q.    The way they go out on tours is

24  determined the same way the salespersons go out

---

48

1  on tours?

2    A.    Exactly.

3    Q.    But they're always in the first nine

4  or ten slots?

5    A.    Yes.

6    Q.    How does someone get promoted to be a

7  sales manager?

8    A.    He has to be consistently good over a

9  period of time.

10    Q.    By "good," do you mean good ratios?

11    A.    Yes, saleswise.  Have good work

12  habits, be a person that comes to work on time,

13  not a discipline problem.  Just a person that

14  you'd like to have as a manager.

15    Q.    Do sales managers ever get demoted?

16    A.    Yes.

17    Q.    During your tenure, have sales

18  managers been demoted?

19    A.    Yes.

20    Q.    Who's been demoted?

21    A.    Jerry Stimple, Mike Massaconi.

22    Q.    I'm going to take them one-by-one.

23  Jerry Stimple, why was he demoted?

24    A.    Poor sales performance.

---

49

```
 1      Q.   Is there a specific ratio under which
 2  if a sales manager's below -- strike that.  If a
 3  sales manager falls below a certain ratio, are
 4  they demoted?
 5      A.   They go into a process that can lead
 6  to demotion, yes.
 7      Q.   What is that process?
 8      A.   We go through a notice period.
 9      Q.   Who provides the notice?
10      A.   Company does.
11      Q.   Are you involved in that notice?
12      A.   Yes.
13      Q.   Are you the one who presents the
14  notice to the sales manager?
15      A.   Or to the sales director and he gets
16  it to the sales manager.  I'll present directly,
17  or his boss will present directly to them.  He
18  just puts them on notice that their numbers are
19  in an area that we don't consider to be
20  satisfactory for their position.
21      Q.   Is that lower than 8.999?
22      A.   Yes.  Well, we tell them they have
23  thirty days in which to get their numbers back
24  into one out of 8.999 or better; and if they
```

50

```
 1  don't do that, then at the end of thirty days,
 2  then we have a punitive action where we take
 3  their team members from them for their override.
 4  We temporarily reassign their team members.
 5      Q.   What does "override" mean, I'm sorry?
 6      A.   Each sales manager has a certain group
 7  of salespeople that work for them.  His job is to
 8  manage them, try to motivate them, close their
 9  sales -- that sort of thing.  When these people
10  make a sale, then the sales manager makes a small
11  percentage of the sale.
12      Q.   What percentage is that during your
13  tenure?
14      A.   One and a half percent.
15      Q.   Has that always been the same during
16  your tenure?
17      A.   Yes.
18      Q.   You were describing the procedure of
19  demotion.
20      A.   The notice period is thirty days.  If
21  they don't bring their numbers back within that
22  time period, then they get a situation where they
23  continue in their management role as a sales
24  manager, but their override is taken away from
```

51

```
 1  them and we want them to focus just on their
 2  sales.  We don't want them to try to close sales,
 3  we don't want them to try to manage their people;
 4  we want them just to focus on their own sales and
 5  get the numbers back in line.
 6      Q.   So they retain the title of sales
 7  manager during that period?
 8      A.   Yes.
 9      Q.   But lose the 1.5 percent bonus from
10  the salespeople?
11      A.   That's correct.
12      Q.   Are there any job duties that they
13  maintain during that period that are job duties
14  of a sales manager?
15      A.   No.
16      Q.   That's the 30-day period?
17      A.   Second 30-day period.
18      Q.   What happens after that?
19      A.   After that period, if they have still
20  not gotten their numbers back to one out of
21  8.999, then they lose their title and become just
22  a salesperson.
23      Q.   You were starting to give me a list of
24  people who have been demoted from sales manager
```

52

```
 1  to salesperson during your tenure, and the first
 2  name you said was Jerry Stimple?
 3      A.   Yes.
 4      Q.   What was he demoted for?
 5      A.   For failure to get his numbers back in
 6  line.
 7      Q.   Was the process that you described
 8  used with Jerry Stimple?
 9      A.   Yes.
10      Q.   Does he still work there?
11      A.   Yes.
12      Q.   What is his job title now?
13      A.   Salesman.
14      Q.   Has he been promoted back to sales
15  manager now after he was demoted?
16      A.   No.
17      Q.   The second person you named was
18  Michael Massaconi?
19      A.   Yes.
20      Q.   Was that process you described used
21  for Mike Massaconi?
22      A.   Yes.
23      Q.   Getting back to Jerry for a second,
24  was there any other reason he was demoted other
```

53

1    than his failure to meet the ratios?

2        A.    No.

3        Q.    How about Michael Massaconi; was there

4    any other reason he was demoted other than his

5    failure to meet the sales ratios?

6        A.    No.

7        Q.    The process you described, was that

8    process used with Michael Massaconi?

9        A.    Yes.

10        Q.    Does Michael Massaconi still work for

11    the company?

12        A.    No.

13        Q.    Why not?

14        A.    He chose to quit.

15        Q.    Michael Massaconi quit, is that

16    correct?

17        A.    Yes.

18        Q.    Did he quit after he was demoted back

19    to salesperson?

20        A.    I'm sorry, Michael Massaconi did not

21    quit.  Michael Massaconi was terminated for -- I

22    think Bill Rauer terminated him.

23        Q.    Were you involved in the process of

24    terminating Michael Massaconi?

54

1        A.    No.

2        Q.    Did you provide information to Bill

3    Rauer about whether Mr. Massaconi should be

4    terminated?

5        A.    Not directly.  Probably indirectly.

6        Q.    How did you do it indirectly?

7        A.    We may have had a conversation about

8    his poor sales and his negative attitude.

9        Q.    Let me go back and ask, was

10    Mr. Massaconi demoted to salesperson for any

11    reason other than his poor ratios?

12        A.    No.

13        Q.    But you just said you --

14        A.    I gave him a week off one time for

15    very, very poor decision-making.

16        Q.    Can you describe what his poor

17    decision-making was, please?

18        A.    He cast some very negative dispersions

19    to the salespeople about their future ability to

20    sell at the resort.

21        Q.    I'd like you to describe all the facts

22    you know about what Mr. Massaconi was telling

23    salespeople.

24        A.    He told salespeople that they weren't

55

1    going to have anybody basically to talk to in the

2    month of December.

3        Q.    Do you mean guests?

4        A.    Guests, yes.

5        Q.    For tours?

6        A.    Yes.

7        Q.    How did you learn that?

8        A.    The person that he told it to came to

9    me.

10        Q.    Who was that?

11        A.    I don't recall.

12        Q.    When did that occur -- was it

13    December?

14        A.    Probably in October.

15        Q.    Of '04?

16        A.    Of '04.

17        Q.    Was it a man or a woman who came to

18    you?

19        A.    I don't recall.

20        Q.    Did anyone else besides the person

21    you've mentioned come to you to talk about

22    Mr. Massaconi's negative attitude?

23        A.    That had been an issue previously and

24    I talked to him about it.

56

1        Q.    When was that first an issue?

2        A.    Really I don't recall.

3        Q.    Was it at the beginning of your tenure

4    as project director?

5        A.    No.

6        Q.    Was it when he was a sales manager?

7        A.    Yes.

8        Q.    Do you remember when he first became a

9    sales manager?

10        A.    No, he was a sales manager when I took

11    my position there.  The first person to talk to

12    me about it, I think was Gordon Leete.

13        Q.    What did he say?

14        A.    Just that he was negative.

15        Q.    Did he give you any facts to support

16    the conclusion that he was negative?

17        A.    Oh, I'm sure he did at the time.  I

18    don't recall what they were.

19        Q.    That's the first time you heard about

20    his negative attitude, is that right?

21        A.    Yes.

22        Q.    Then was the second time you heard

23    about it from this person who told you that

24    Mr. Massaconi was telling salespeople there would

59

```
 1   be no guests in December?
 2        A.   No.
 3        Q.   There were --
 4        A.   Numerous other occasions.  I don't
 5   recall any specifics, but it was a frequent --
 6   reasonably frequent occurrence.
 7        Q.   Why wasn't that a reason to demote him
 8   from sales manager to salesperson?
 9        A.   Because I tried not to let that be a
10   factor in the decision-making at that time, give
11   him the benefit of the doubt.
12        Q.   When was Mr. Massaconi terminated?
13        A.   Late 2004, or this is '5 -- yes, '4.
14   I don't remember the date.
15        Q.   What changed between the earlier time
16   when you didn't want to let that get in the way
17   and the time when he was terminated?
18        A.   I don't recall.
19        Q.   Were you aware that Mr. Massaconi had
20   gone to the Attorney General with a complaint
21   about the way he was being paid?
22        A.   No.  He had constant questions about
23   it, and we would resolve his questions.  I would
24   ask him to give me a list of whatever he thought
```

```
 1        Q.   Getting back to the job of a
 2   salesperson, was there ever any reason why a
 3   salesperson was supposed to appear at the Sales
 4   Center before 8:30 on a particular day?
 5        A.   No, unless they had been called in for
 6   an early meeting with their manager or director
 7   or for some training or something, I don't know.
 8        Q.   Do you remember a specific time that
 9   salespeople came in before 8:30?
10        A.   No.
11        Q.   After the sales meeting that you
12   described that takes between twenty and thirty
13   minutes, you said?
14        A.   Yes.
15        Q.   The salesperson would then go out on a
16   tour if a tour was -- if a guest was there for
17   the person, is that correct?
18        A.   That's correct.
19        Q.   What if a tour was not there for a
20   salesperson?
21        A.   Then we would cut the line as early as
22   possible to allow them to leave.
23        Q.   What's the earliest you ever remember
24   the line being cut since you've been project
```

58

```
 1   he was due to be paid on, and then I would give
 2   him a definitive answer on anything he had
 3   questions on.
 4        Q.   Did that have anything to do with
 5   either his demotion or termination, his
 6   questions?
 7        A.   Not whatsoever.
 8        Q.   Did you ever learn before I just
 9   mentioned it that Mr. Massaconi had gone to the
10   Attorney General to complain about his wages?
11        A.   No, that's the first I heard.
12        Q.   Who else was demoted besides
13   Mr. Lambert and Mr. Massaconi?
14        A.   Stimple, not Lambert.
15        Q.   I'm sorry, Stimple.  I don't know
16   where that came from, excuse me.
17        A.   Other managers were demoted
18   temporarily and they got their positions back.
19        Q.   Who were those?
20        A.   They righted theirselves.  Mark Lapine
21   was one.  Bob Campagna, Michael Campagna.  All
22   these people had received notices and had righted
23   theirselves.  Nobody else I can think of right
24   now.
```

```
60

 1   director?
 2        A.   Probably 11:30 in the morning.
 3        Q.   If there was a possibility of a tour
 4   coming in -- strike that.  When would you know
 5   definitively how many tours, guests were coming
 6   in on a particular day?
 7        A.   We never know definitely how many
 8   tours are going to come in on a particular day
 9   until the end of the day, because it's possible
10   unscheduled people will somehow show up.
11        Q.   How often did that happen?
12        A.   Infrequently.
13        Q.   Did you keep salespeople at the center
14   just in case someone might show up on one of
15   these infrequent visits?
16        A.   Once the line has been cut, then
17   typically we keep somebody around for an hour to
18   allow for any of the late arrivals to come in.
19   We just keep the number that are expected.
20        Q.   When the tours come in -- tour guests
21   come in on a typical day, do they come in
22   individually or by bus?
23        A.   Individually.
24        Q.   So they just arrive according to the
```