145

1    A.    I don't remember.  Seemed to me like
2  he got switched from one to the other because
3  they felt like he would be happier working for
4  one than the other or something.  I don't recall
5  the specifics.
6    Q.    The instance of insubordination when
7  Mr. Martin got fired by Mr. Rauer, were you there
8  when that occurred?
9    A.    I was at the resort, yes.
10    Q.    Did you hear what happened -- did you
11  personally hear what happened?
12    A.    I heard what happened, but it doesn't
13  stick out in my mind.
14    Q.    Did you observe it when it happened?
15    A.    No.
16    Q.    Getting back to Miss Wise for one
17  minute...
18              (Exhibit 6, 5/18/03 Memo
19              Re: Dress Code, marked for
20              identification)
21    Q.    (By Mr. Feldman)  Do you recall seeing
22  that exhibit?
23    A.    Yes.
24    Q.    When did you first see it?

146

1    A.    On May the 18th.
2    Q.    You saw it that same day?
3    A.    Yes, same day that it was --
4    Q.    Generated?
5    A.    -- generated, yes.
6    Q.    Have you ever seen anybody else be
7  given a document like this because of
8  inappropriate dress?
9    A.    No, I've seen other people be
10  inappropriately dressed go home -- and be sent
11  home, yes, to change.
12    Q.    But have you ever seen that documented
13  in this manner?
14    A.    Not that I recall.
15    Q.    It says that it's from Faith Lippert
16  and you?
17    A.    Yes.
18    Q.    Did you draft that document?
19    A.    We drafted it together, I'm sure.
20    Q.    Where were you when you did that?
21    A.    In Faith's office.
22    Q.    Why were you there?
23    A.    I have occasion to go there often, you
24  know, numerous times in a day.

147

1    Q.    Had you observed Miss Wise being
2  allegedly inappropriately dressed that day?
3    A.    Yes, yes.
4    Q.    And did you report that to Faith
5  Lippert?
6    A.    Yes, I did, as did her line director.
7  And Faith asked her to come into her office, and
8  I was there when she did.  And she said that she
9  felt like she was appropriately dressed, and
10  Faith said that she thought that she was
11  inappropriately dressed, that our dress code
12  prohibits anything that's daring or revealing or
13  any dresses that have -- that are low-cut or have
14  spaghetti straps.
15    Q.    How many other times have you notified
16  Faith Lippert that someone was inappropriately
17  dressed at Vacation Village?
18    A.    Gosh, she's probably been notified --
19  I couldn't tell you how many times.  Certainly
20  more than one or two.
21    Q.    How many times have you provided a
22  salesperson with a document like this?
23    A.    I don't recall.
24    Q.    Has it ever happened other than with

148

1  LaCrisha Wise?
2    A.    I would think so.
3    Q.    You would think so.  Do you remember
4  any?
5    A.    I don't remember.
6    Q.    Who would have the documents that
7  would show that?
8    A.    Faith Lippert.
9    Q.    Do you keep those documents?
10    A.    No, I don't have an office.
11    Q.    Did you ever withhold a check from
12  Miss Wise --
13    A.    Never.
14    Q.    -- because she didn't have proof of
15  automobile insurance?
16    A.    Never.
17    Q.    Did you ever withhold a check for her
18  failure to have proof of automobile insurance
19  from a Michael Johnson?
20    A.    Never.
21    Q.    Did someone else withhold Miss Wise's
22  check for failure to produce proof of automobile
23  insurance?
24    A.    No.

149

```
 1      Q.   Was her check ever withheld for that
 2  reason?
 3      A.   No.
 4      Q.   Was Miss Wise not permitted to close
 5  out her own sales during her tenure as a
 6  salesperson?
 7      A.   I think she closed some of her sales.
 8      Q.   Did Mr. Leete discuss with you the
 9  fact that Miss Wise should not be allowed to
10  close her own sales?
11      A.   Yes.
12      Q.   Did Mr. Bourdon give Miss Wise
13  permission to close her own sales?
14      A.   Yes.
15      Q.   Was he authorized to do so?
16      A.   Yes.
17      Q.   But Mr. Leete didn't want her to close
18  her own sales?
19      A.   Well, Mr. Leete wanted her to have a
20  manager, and her manager allowed her to do it
21  himself.
22      Q.   Why did Mr. Leete want a manager
23  there?
24      A.   He just felt like she should have one.
```

150

```
 1      Q.   Who knew her work better, Mr. Leete or
 2  Mr. Bourdon?
 3      A.   Mr. Bourdon.
 4      Q.   Did Mr. Leete ever threaten to have
 5  Miss Wise's car towed for being parked in the
 6  wrong area of a parking lot?
 7           MS. FABBO:  Objection.
 8           THE WITNESS:  I don't recall.
 9      Q.   (By Mr. Feldman)  Was Miss Wise ever
10  put on overage because she didn't believe she was
11  going to get a tour and was allowed to leave
12  early by Mr. Bourdon?
13      A.   I think that happened one time.
14      Q.   Do you know why that happened?
15      A.   No.  When we found out that he had
16  approved her early departure, then we changed
17  that.
18      Q.   She was put on overage and she didn't
19  get a tour the next day, right?
20      A.   Right.
21      Q.   Didn't she say that she had been given
22  permission from Mr. Bourdon that day?
23      A.   She did, and we confirmed it; we were
24  wrong.
```

151

```
 1      Q.   Wasn't Mr. Bourdon there that day?
 2      A.   He was, but I think he was on tour at
 3  the time.
 4      Q.   Weren't white employees allowed to
 5  leave early without permission and not put on
 6  overage?
 7      A.   Weren't who?
 8      Q.   White employees?
 9      A.   We don't differentiate.
10      Q.   I'm not asking a differentiation; I'm
11  just asking about whether -- why don't I put it
12  this way.  Were employees supposed to be put on
13  overage if they were released by their manager?
14      A.   No.  If they had permission to leave,
15  then they had permission to leave.
16      Q.   How many days of overage was she given
17  for leaving that day, the day that she had
18  approval from Mr. Bourdon?
19      A.   I don't recall.  I would think one.
20      Q.   Do you know?
21      A.   No.
22      Q.   Were you involved in any way in
23  Mr. Massaconi's termination?
24      A.   Not really, other than approving it.
```

152

```
 1      Q.   Why did you approve it?
 2      A.   His sales numbers were just terrible.
 3      Q.   Is that the only reason?
 4      A.   Yes.
 5      Q.   Do you remember telling anyone that
 6  the company was trying to get rid of people who
 7  were involved with this lawsuit?
 8      A.   I remember saying that, and it was --
 9  that's kind of out of context.
10      Q.   What was the context?
11      A.   In my own misguided efforts to keep
12  people from suing the company, because the
13  company is employee-owned, if they sue the
14  company, they sue me.
15      Q.   You mean through the ESOP, is that
16  right?
17      A.   Through the ESOP, uh-huh.  I stated
18  -- trying to remember exactly how I said it --
19  that it wouldn't surprise me if the company would
20  do that; if I owned the company, I probably would
21  do that.
22      Q.   Who did you say that to?
23      A.   I said it to Mike Massaconi.
24      Q.   Did you say it to anybody else?
```

Wise v Patriot - Rodney Lewis - 6/2/05

153

1    A.    No, I don't think so.  I said I think
2    I said it to him.
3    Q.    Did you ever tell anybody else --
4    A.    No.
5    Q.    You have to let me finish.
6    A.    I'm sorry.
7    Q.    Did you ever tell anybody else on the
8    site at Vacation Village that the company would
9    try to get rid of people who were involved in
10   this lawsuit?
11   A.    No.
12   Q.    Describe the entire conversation with
13   Mr. Massaconi where you made the comment you just
14   described.
15   A.    I don't recall what exactly it was.
16   Something had come up in regards to the lawsuit,
17   and I just told him what -- it was just a guess
18   on my part, strictly.  You know, it wasn't the
19   company's position, you know.  That's all.
20   Q.    When Mr. Massaconi was terminated,
21   were you aware that he had filed this lawsuit?
22   A.    No.
23   Q.    You didn't know about the lawsuit at
24   that point?

154

1    A.    No.  I don't know what the lawsuit is,
2    and I don't know who's a party to it.
3    Q.    But you told Mr. Massaconi that you
4    wouldn't be surprised if the company got rid of
5    people involved with it?
6    A.    I knew of it.  I don't know it
7    specifically.  I was aware that it was out there,
8    yes.
9    Q.    And you knew that Mr. Massaconi was
10   one of the parties to it, right?
11   A.    No.
12   Q.    Why were you talking to Mr. Massaconi
13   about the lawsuit?
14   A.    I don't know.  Maybe it came up in
15   conversation; I don't know.
16   Q.    Did Mr. Massaconi say, I'm involved in
17   this lawsuit?
18   A.    No.
19   Q.    Do you recall what was said right
20   before you said the comment about the company
21   getting rid of people involved?
22   A.    No.
23          MR. FELDMAN:  Off the record.
24          (A break was taken)

155

1          MR. FELDMAN:  Back on the record.
2    Q.    (By Mr. Feldman)  Was Miss Wise making
3    sales while she was working at Vacation Village?
4    A.    Yes.
5    Q.    Was she a good salesperson?
6    A.    Very good.  That probably had a lot to
7    do with our trying to push her to come to work.
8    Q.    Was she making sales in June of 2003?
9    A.    I don't recall.  When she came to
10   work, she normally would sell.
11   Q.    Wasn't that really what being a
12   salesperson is all about, as you said before?
13   A.    Sure.
14   Q.    Is making sales?
15   A.    Um-hum.
16   Q.    So given that she was making sales,
17   why would her absenteeism matter with regard to
18   keeping her on?
19   A.    Simply because it violated the
20   company's ground rules policy.
21   Q.    Even with her absenteeism, was she
22   making more sales than other people were who
23   didn't have the absenteeism problem?
24   A.    Yes, some.  There were some people

156

1    that were better than hers.
2    Q.    She was better than some?
3    A.    Yes, some; and some were better.
4    Q.    Did she have a higher average number
5    of sales than other people did during the year
6    2003, if you know?
7    A.    I don't know.
8          (Exhibit 7, Leaders Booklet,
9          marked for identification)
10   Q.    (By Mr. Feldman)  What's Exhibit 7,
11   Mr. Lewis -- do you know what it is -- I'm
12   sorry, are you looking through it; is that why
13   there's silence?
14   A.    Yes.  I was waiting for the question.
15   Q.    I said, do you know what this is?
16   A.    Yes.
17   Q.    What is it?
18   A.    It's a little management handbook that
19   was put together for the sales managers at the
20   resort.
21   Q.    Was this provided to sales managers
22   upon their becoming a sales manager?
23   A.    Yes.
24   Q.    Was it provided to salespeople?

---

157

```
 1        A.   No, it was for the managers.
 2        Q.   I'd like you to turn to that page
 3   that's numbered 2158 at the upper right corner.
 4        A.   Okay.
 5        Q.   Are you with me?
 6        A.   Yes.
 7        Q.   You had discussed a managers' meeting
 8   and a sales meeting, but after that there's a
 9   daily training, is that correct?
10        A.   Yes.  We tried to keep the salespeople
11   busy prior to their going out on tour by doing
12   some sales training.
13        Q.   Was that mandatory?
14        A.   Yes.
15        Q.   In fact, it says the training is
16   mandatory for everyone that's not on tour at the
17   time, is that correct?
18             MS. FABBO:  Objection.
19             THE WITNESS:  Yes.
20        Q.   (By Mr. Feldman)  Was that enforced?
21        A.   I don't recall whether it was enforced
22   or not.  The training was -- we tried to
23   institute it, but with all of our managers going
24   out on tour so quickly, normally between 9:00 and
```

---

158

```
 1   9:15, then it just created a void where the
 2   people who would do the training weren't
 3   available, so...
 4        Q.   When there was a training, the
 5   salespeople were required to be there, is that
 6   right?
 7        A.   Yes.
 8        Q.   What would happen if a salesperson
 9   wasn't there?
10        A.   Nothing.  The manager would talk to
11   them and say, Hey, we need you over here for
12   this.
13        Q.   What if it happened more than once?
14        A.   I don't know.  No set disciplinary
15   pattern on that.
16        Q.   Actually, I do have a couple more
17   questions about Mr. Massaconi.  When
18   Mr. Massaconi was fired, was he a manager or a
19   salesperson?
20        A.   I believe he was a salesperson.
21        Q.   He had been demoted to that because of
22   his -- the ratios not being met, is that right?
23        A.   Yes, yes.
24        Q.   Then he was fired as a salesperson
```

---

159

```
 1   because he wasn't making enough sales?
 2        A.   I think that was the reason.  I'm not
 3   positive, but I think that was the reason.  Bill
 4   Rauer made that decision.
 5        Q.   Bill Rauer made that decision?
 6        A.   Yes.
 7        Q.   Why did he make that decision instead
 8   of you?
 9        A.   I believe because of the long-standing
10   relationship between Bill and Mike.  Bill was the
11   one who made him a manager.
12        Q.   How would Bill have known about his
13   performance at that point?
14        A.   The salespeople's numbers are
15   published every day.
16        Q.   To Bill Rauer?
17        A.   Yes, he gets a copy of all of our
18   reports.
19        Q.   Were Mr. Massaconi's numbers worse
20   than other people who were not terminated?
21        A.   Probably for a longer period of time,
22   yes.
23        Q.   Do you know that for a fact?
24        A.   No, but I believe that's correct.
```

---

160

```
 1        Q.   Were Mr. Massaconi's wages ever
 2   decreased, as far as you know?
 3        A.   When he went from being a manager to a
 4   salesman, then that cuts back your income.
 5        Q.   When Mr. Massaconi was demoted from
 6   sales manager to salesperson, were there other
 7   sales managers who had worse ratios than he did?
 8        A.   I don't recall.
 9             MR. FELDMAN:  I have nothing
10             further at this point.
11
12             (Deposition concluded at 1:00)
13
14
15
16
17
18
19
20
21
22
23
24
```

---

161

```
 1
 2          COMMONWEALTH OF MASSACHUSETTS
 3     HAMPDEN, SS.
 4              I, Ann A. Preston, a Notary Public in
 5     and for the Commonwealth of Massachusetts, do
       certify that there came before me on June 2,
 6     2005, at the offices of Heisler, Feldman and
       McCormick, PC, 1145 Main Street, Springfield,
 7     Massachusetts, the following named person, to
       wit:  RODNEY LEWIS, who was by me duly sworn to
 8     testify to the truth and nothing but the truth as
       to his knowledge concerning the matters in this
 9     case; that he was examined upon his oath and his
       examination reduced to writing by me; and that
10     the statement is a true record of the testimony
       given by the witness, to the best of my knowledge
11     and ability.
12              I further certify that I am not a relative
       or employee of counsel or attorney for any of the
13     parties, or a relative or employee of such
       counsel or attorney, nor am I financially or
14     otherwise interested in the outcome of the
       action.
15
       WITNESS MY HAND this 27th day of June 2005.
16
17
18
          Ann A. Preston
19
       My commission expires:
20     December 22, 2011
21
22
23
24
```

---

163

```
 1                COMMONWEALTH OF MASSACHUSETTS
 2     Wise v Patriot
       No. 04-CV-30091-MAP
 3
 4              I, RODNEY LEWIS, do hereby certify under
       the pains and penalties of perjury that the
 5     foregoing testimony is true and accurate to the
       best of my knowledge and belief, with the
 6     addition of the following changes/corrections:
 7
 8     Page  Line              Change/Correction
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18
19     Witness my hand this ___ day of _____, 2005.
20
21                              RODNEY LEWIS
22     Orig:  Joel Feldman, Esq.
       Copy:  Marylou Fabbo, Esq.
23
24
```

---

162

```
 1                           June 27, 2005
 2
 3     Marylou Fabbo, Esq.
       Skoler, Abbott and Presser, PC
 4     1414 Main Street
       Springfield, MA  01103
 5
       RE:  Wise v Patriot
 6
       Dear Counselor:
 7
              Enclosed is a copy of the deposition of
 8     Rodney Lewis, taken on June 2, 2005 in the
       above-entitled action.
 9
              According to Rule 30(e) of the
10     Massachusetts Rules of Civil Procedure, the
       deponent has thirty days to sign the deposition
11     from the date of its submission to the deponent,
       which is the above date.
12
              Please have the deponent sign the enclosed
13     Signature Page/Errata Sheet and return it to the
       offices of Joel Feldman, Esq., whereupon it will
14     be attached to the original deposition
       transcript.
15
              Thank you for your cooperation in this
16     matter.
17     Sincerely,
18
       Ann A. Preston
19
20     cc:  Joel Feldman, Esq.
21
22
23
24
```

---

164

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

# EXHIBIT
# 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
        Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
        Defendants

DEPOSITION OF WILLIAM RAUER

June 3, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

**WITNESS:   WILLIAM RAUER**

| | |
|---|---|
| Direct Examination by Mr. Feldman | 5 |
| Cross Examination by Ms. Fabbo | 95 |

### EXHIBITS

Exhibit 1,   Uniform Policy for Sales

            Managers' Sales Performance    75

---

**Page 2**

### APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

---

**Page 4**

1             STIPULATION

2

3      It is agreed by and between the parties

4    that all objections, except as to form of the

5    question, are reserved until the time of trial.

6

7      It is further agreed by and between the

8    parties that all motions to strike unresponsive

9    answers are reserved until the time of trial.

10

11      It is further agreed by and between the

12    parties that the sealing of the original

13    deposition transcript is hereby waived.

14

15      It is further agreed by and between the

16    parties that the notification to all parties of

17    the receipt of the original deposition

18    transcript is hereby waived.

19

20

21

22

23

24

---

**Page 5**

```
 1   Florida driver's license and having been duly
 2   sworn, states as follows:
 3
 4
 5        DIRECT EXAMINATION BY MR. FELDMAN:
 6        Q.   My Rauer, could you state your name
 7   and address for the record, please?
 8        A.   It's William P. Rauer.  My address is
 9   6000 Northwest 63rd Place.  That's in Parkland,
10   Florida.
11        Q.   Mr. Rauer, have you had your
12   deposition taken before?
13        A.   Yes.
14        Q.   So you understand generally what we're
15   doing here today.  I want to give you a few
16   grounds rules for this one.
17        A.   Okay.
18        Q.   First is that if I am talking, you
19   should wait until I finish the question and then
20   you should answer after I've completed the
21   question.  I will also attempt not to interrupt
22   your answer; is that okay?
23        A.   Fair enough.
24        Q.   If you have any questions about what
```

**Page 6**

```
 1   I've asked, please let me know and ask me to
 2   rephrase it if you don't understand it.  If you
 3   do answer my questions, I'm going to assume you
 4   understand it, okay?
 5        A.   Yes, I do.
 6        Q.   If you want a break or discuss
 7   something with your counsel, use the rest room,
 8   please let me know as well.  You should remember
 9   to give a verbal answer every time.  That's hard
10   to remember, but you need to say "yes" or "no"
11   verbally instead of a nod or "um-hum" or "uh-uh,"
12   because it won't show up on the transcript.
13             What's your current job?
14        A.   I'm employed by Tower Resort Realty.
15        Q.   I'm sorry, by who?
16        A.   Tower Resort Realty.
17        Q.   What do you do for Tower Resort
18   Realty?
19        A.   I'm the senior project director for
20   several operations with them.
21        Q.   Which are the several operations?
22        A.   The Weston Resort, the Canada House
23   Resort, the Hollywood Resort, the Breakers
24   Resort, and the Golden Strand Resort.  As well as
```

**Page 7**

```
 2   Resort.
 3        And the name of the Berkshire
 4   Resort is what?
 5        A.   Vacation Village in the Berkshires.
 6        Q.   Who owns Vacation Village?
 7        A.   Patriot Resorts.
 8        Q.   Do you work at all for Patriot
 9   Resorts?
10        A.   No, I do not.
11        Q.   When you receive a check, is it from
12   Tower Resorts Realty?
13        A.   Yes, it is.
14        Q.   And your job title there again?
15        A.   I'm the project director.
16        Q.   What's your relation to Vacation
17   Village?
18        A.   Which Vacation Village?
19        Q.   The one in the Berkshires.
20        A.   Vacation Village in the Berkshires, I
21   oversee that operation.
22        Q.   And that is as part of your position
23   with Tower Resort Realty, not in some other
24   capacity, correct?
```

**Page 8**

```
 1        A.   Correct.
 2        Q.   Who do you directly supervise at the
 3   Vacation Village in the Berkshires?
 4        A.   All the sales personnel.
 5        Q.   Who is the person directly beneath you
 6   in the hierarchy at Vacation Village in the
 7   Berkshires?
 8        A.   That would be Rod Lewis.
 9        Q.   What's his job title?
10        A.   He's the project director of that
11   resort.
12        Q.   But you have ultimate authority over
13   the sales staff at Vacation Village, is that
14   correct?
15        A.   That's correct.
16        Q.   When I'm talking about Vacation
17   Village, for purposes of this deposition I mean
18   the one in the Berkshires.
19        A.   That's correct.
20        Q.   Who would be your direct supervisor?
21        A.   Bruce Polansky.
22        Q.   What's his job title?
23        A.   Senior project director, and also
24   senior vice president of Berkley, I believe.
```

**9**

```
 1       Q.   When it's the Village and Berkley??
 2       A.   Berkley Group, I believe.
 3       Q.   Are you on the Board of Directors of
 4  Berkley Group?
 5       A.   Yes.
 6       Q.   Mr. Polansky, who is he employed by?
 7       A.   I don't know.
 8       Q.   Are you the manager in charge of
 9  policies and procedures for the salespeople at
10  Vacation Village?
11       A.   Yes.
12       Q.   Have you created policies and
13  procedures for salespeople at the Vacation
14  Village?
15       A.   Yes.
16       Q.   Do you implement them as well?
17       A.   Yes.
18       Q.   Do you enforce them?
19       A.   Yes.
20       Q.   Are you the manager who is responsible
21  for the creation of the policy by which
22  salespeople get paid at Vacation Village?
23       A.   No.
24       Q.   Do you know who created the policy for
```

**11**

```
 1       Q.   What did they require you to do then?
 2       A.   Anything that I was required to do
 3  from my boss.
 4       Q.   Who was your boss then?
 5       A.   As I said, Bruce Polansky.
 6       Q.   So Bruce Polansky has remained your
 7  boss even though you were promoted, is that
 8  right?
 9       A.   Yes, sir.
10       Q.   When you were the project director at
11  Vacation Village, was Bruce Polansky in your
12  current job?
13       A.   No.
14       Q.   He's held the same position?
15       A.   That's correct.
16       Q.   So there's an additional layer of
17  management that's been added, is that correct?
18       A.   With regard to Vacation Village in the
19  Berkshires, is that your question?
20       Q.   That's my question.
21       A.   Yes.
22       Q.   When was that, if you know?
23       A.   I don't know.
24       Q.   How long did you hold the job that Rod
```

**10**

```
 1  payment of salespeople?
 2       A.   That would -- that came from Bruce
 3  Polansky, so I don't know where it came from
 4  beyond him.
 5       Q.   How long have you been in this job,
 6  the one you currently hold?
 7       A.   The one I currently hold,
 8  approximately four years.
 9       Q.   Before that, you were project director
10  at Vacation Village in the Berkshires?
11       A.   Well, I've been employed for around
12  fourteen years, if that's your question.
13       Q.   Guess I'm asking the immediate job
14  prior to the one you currently hold.
15       A.   Prior to the one I currently hold, I
16  was the project director at Vacation Village in
17  the Berkshires.  Basically I had -- if this will
18  clarify -- basically I had Rod's job.
19       Q.   That was your full-time job?
20       A.   No, I did other things, but my
21  position was that Rod had as it relates to
22  the Vacation Village in the Berkshires.
23       Q.   But when I asked you if that was your
24  full-time job, you said you do other things.
```

**12**

```
 1  Lewis now has?
 2       A.   Approximately one year.
 3       Q.   What did you do before that?
 4       A.   I worked in Vacation Village at
 5  Weston.
 6       Q.   Weston, Massachusetts?
 7       A.   No, sorry, Weston, Florida.
 8       Q.   W-E-S-T-O-N?
 9       A.   Correct.
10       Q.   Did you move to Massachusetts when you
11  held Rod Lewis's job?
12       A.   No, my residence was always in
13  Florida.
14       Q.   How long did you hold the job in
15  Weston?
16       A.   As I said, that would be my original
17  positions with Tower Resort, and I've been doing
18  that for about fourteen years.
19       Q.   I'm sorry, I thought fourteen years
20  was the total time you've been working for Tower?
21       A.   That's correct.
22       Q.   Four years in your current position?
23       A.   Correct.
24       Q.   One year in Rod Lewis's position?
```

1 well.

3 Q. How long did you work just at the
4 Weston project?

5 A. That would be around nine, ten years.

6 Q. Are the policies that are now in place
7 for how salespeople get paid, are they the same
8 now as they were when you were the project
9 director at Vacation Village, or have they
10 changed?

11 A. They have changed.

12 Q. How have they changed?

13 A. When we first started our operations
14 at Vacation Village in the Berkshires, we started
15 them with a ten percent commission for all sales,
16 all salespeople.

17 Q. Was that an introductory commission
18 for a period of time --

19 A. Yes, that's correct.

20 Q. -- or was that the payment salespeople
21 received for the entire time when they worked
22 there?

23 A. That was an introductory commission.

24 Q. I'm sorry, is that the only change

---

2 Q. Did you change the pay policy of the
3 other resorts as well?

4 A. No.

5 Q. Just Vacation Village in the
6 Berkshires?

7 A. Yes.

8 Q. What's the policy of the other
9 resorts?

10 A. Well, it would vary from resort to
11 resort.

12 Q. What are they, as best you know them?

13 A. I can do go down every one if that's
14 what you want me to do.

15 Q. Sure.

16 A. The Canada House, the Breakers, the
17 Hollywood, and the Golden Strand, the base
18 commissions there are twelve percent for
19 salespeople.

20 Q. As opposed to -- in other words,
21 that's not introductory?

22 A. That's not opposed to anything; that's
23 what they are.

24 Q. Just so I understand, they were eight

---

14

1 that occurred?

2 A. After the introduction, we based
3 everyone at eight percent, and it remained that
4 way until the 1st of June of this year.

5 Q. What happened the 1st of June of this
6 year?

7 A. We restructured the commissions,
8 including a salary as well for all salespeople.

9 Q. Why did you do that?

10 A. I don't know.

11 Q. Who created that policy?

12 A. It came to me from Bruce Polansky.

13 Q. Did you discuss with him why the
14 policy was changing?

15 A. No, I didn't discuss why.

16 Q. Did you talk to any other managers
17 with Tower about why that was changing?

18 A. No.

19 Q. Did you discuss the reasons for the
20 policy change with anyone at all?

21 A. No.

22 Q. You said Tower -- in your current
23 position, you also oversee the operations of
24 other resorts, is that correct?

---

16

1 percent at Vacation Village at the Berkshire and
2 they're twelve percent at these other ones; in
3 other words, that's not introductory?

4 A. No, that is the commission they are
5 getting paid. Now, to finish the answer to your
6 question, Vacation Village in Weston, the base is
7 seven percent.

8 Q. Why are there variations among the
9 resorts?

10 A. I believe -- and I'm not certain, but
11 -- I believe it has something to do with the
12 amount of tours, the type of tours that come
13 through our doors.

14 Q. Why do you believe that makes a
15 difference in what their commissions are?

16 A. Well, for example, we have a few tours
17 that come through the doors at the ones that are
18 getting paid twelve percent; so as a result of
19 that, we compensate the sales staff because they
20 have less opportunity. Whereas at Vacation
21 Village at Weston, there are tours that go
22 through there on a more consistent and higher
23 level. And as I was saying to you, the
24 commissions are based on the amount of tours, at

---

1    leaseless on the side door, closing the

2    the door, in my opinion.

3        Q.   Do you know why the compensation

4    changes were only done at Vacation Village in the

5    Berkshires?

6        A.   No.

7        Q.   Do you know if the change had anything

8    to do with the current lawsuit that you're

9    testifying in?

10       A.   No.

11       Q.   Where is the Breakers Resort?

12       A.   It's in Fort Lauderdale Beach,

13   Florida.

14       Q.   You named four resorts?

15       A.   Correct.  Those four are all beach

16   resorts.

17       Q.   In Florida?

18       A.   In Florida.

19       Q.   What are the required hours for

20   salespeople to work at Vacation Village in the

21   Berkshires currently?

22       A.   They're required to be there at 8:30,

23   I believe, until they're told to leave, until the

24   tours are finished.

---

2    Reception Center on a daily basis?

3        A.   Yes.

4        Q.   Is there anyone else who is

5    responsible for when that decision gets made?

6        A.   Well, the project director would be

7    consulted, but ultimately it's based on the

8    tours; and a lot of the tours come in on that day

9    from their home, so they're driving there.  So

10   sometimes we allow the time -- for example,

11   someone was due in at 2:00 and it's 3:00 and

12   they're not there yet, well, that doesn't

13   necessarily mean they're not going to come; so we

14   wait.  I think they cut the line, as I said, a

15   little later than that just to be certain that

16   anyone that is in transit will arrive.

17       Q.   What is the policy of Vacation Village

18   at the Berkshires with regard to what salespeople

19   are supposed to be doing when they're waiting for

20   tours?

21       A.   They're supposed to remain on-site.

22       Q.   What happens if they don't remain

23   on-site?

24       A.   They're not supposed to do that.

---

18

1        Q.   How does a salesperson know when the

2    tours are finished?

3        A.   Well, the person in charge of the

4    front desk, the Welcome Center, would cut the

5    line given the tours that were due in, if they've

6    come in or if they haven't.  I believe we cut the

7    line at that resort, I believe it's 3:30, could

8    be 4:00; I'm not certain.

9        Q.   Is that what it was when you were

10   project director?

11       A.   Yes.

12       Q.   When you were project director, the

13   time the employees were supposed to arrive was at

14   9:00, is that right?

15       A.   No, I don't believe that's so.  I

16   think they had to come earlier than that.  I

17   could be wrong; it's been a while.

18       Q.   Do you remember a change from sign-in

19   at 9:00 to 8:30 at Vacation Village in the

20   Berkshires?

21       A.   No, I do not.

22       Q.   By "cutting the line," you mean

23   releasing the salespeople?

24       A.   Correct.

---

20

1        Q.   I understand.  But what happens to

2    them if they don't?

3        A.   Well, it depends on what the

4    circumstance is, I would imagine.

5        Q.   Is there a disciplinary procedure in

6    place at Vacation Village for salespeople who

7    don't remain on-site when they're supposed to be

8    there?

9        A.   Again, it depends on the circumstance.

10       Q.   What circumstances do you remember

11   since you've been there?

12       A.   For example, if someone would just not

13   stay and just go, they would probably receive

14   either a suspension or perhaps even be put in at

15   the end of the rotation the following day.

16       Q.   That's called overage, is that right?

17       A.   That's called overage.  As you're

18   asking the question, if someone had to go get gas

19   and asked their director to be able to do that

20   and as a result they left, I don't believe that

21   that would be a problem.

22       Q.   What if they didn't ask the director

23   and went ahead and got gas?

24       A.   That might be a problem.  Or, strike

---

**21**

1  that as well. It could have something to do with
2  them checking with the front desk manager, and
3  that would be okay. As long as the front desk
4  manager knows, that's the main thing.
5      Q.   Just so I understand the policy -- an
6  employee who leaves the site without permission
7  is subject to discipline, is that right?
8      A.   Yes.
9      Q.   Under what circumstances is an
10 employee allowed to leave the site?
11     A.   It has to be a reasonable issue that
12 they have to take care of. Someone is ill, for
13 example, that would be a reasonable issue. If
14 someone just doesn't want to work anymore, that
15 would not be a reasonable issue.
16     Q.   What if they want a hour half an hour,
17 hour break from sitting in the pit, as they call
18 it; is that a reasonable issue?
19     A.   No.
20     Q.   Can someone be terminated for not
21 being on-site over a number of days?
22     A.   I don't follow your question.
23     Q.   I'm sorry, let me rephrase that.
24 Let's say someone shows up for work and they're

**23**

1          MS. FABBO: Objection. You can
2  answer.
3          THE WITNESS: That's correct.
4      Q.   (By Mr. Feldman) If they take their
5  lunch off-site, are they paid for that lunch
6  break?
7      A.   Up until June, everyone was on
8  commission sales; so as a result of that, if they
9  don't get a customer, they obviously will not
10 make a sale.
11     Q.   What's the policy now?
12     A.   Now they get a salary.
13     Q.   But I'm asking about the lunch break.
14     A.   The policy is in place that no one can
15 leave -- now, let me clarify that. The
16 repercussions would be more severe if they got
17 passed. If their name came up for a tour and
18 they got passed, then in that event, our policy
19 now is that they would not get paid that day.
20     Q.   I see. What's the policy now if they
21 were missing but they didn't get passed -- in
22 other words, they weren't on-site when they were
23 supposed to be but they still made it in timely
24 way for the tour?

**22**

1  not late; that is, they sign in at 8:30, and then
2  they decide for three days in a row that they
3  want a half-hour break away from the site and
4  don't receive authorization from their manager.
5  Is that grounds for termination?
6      A.   At the very end of it, yes. I think
7  the first time there would be some repercussions
8  and it would go on from there. As you said,
9  three days in a row doing that tells me just
10 hearing it that that person really doesn't have
11 any interest in working.
12     Q.   And that's the policy as you
13 understand it, is that correct?
14     A.   That's correct.
15     Q.   Now, are employees allowed a lunch
16 break at Vacation Village in the Berkshires?
17     A.   Yes.
18     Q.   Are they allowed to take their lunch
19 break off-site?
20     A.   They're not supposed to without
21 permission.
22     Q.   So in the ordinary course of business,
23 they're supposed to eat their lunch on-site, is
24 that correct?

**24**

1      A.   There would be no action. Although we
2  want our people to stay where they supposed to
3  be. There would be no action if they didn't get
4  passed, but that's the most important concern
5  that we have.
6      Q.   Before the policy got changed --
7  because June 1st is the effective date of the
8  policy change, is that correct?
9      A.   Correct.
10     Q.   Before that, did management
11 communicate to salespeople that they were
12 required to stay on-site during the time that
13 they were working for Vacation Village in the
14 Berkshires?
15     A.   Yes.
16     Q.   The methodology by which salespeople
17 were paid, they were paid commissions after the
18 closing of a sale and then three timely payments,
19 is that correct?
20     A.   You're asking a question with regard
21 to prior to June the 1st?
22     Q.   Yes.
23     A.   So what is your question again?
24     Q.   My question is, salespeople were paid

25

1   after they closed the sale and made timely

2   payments were received by Vacation Village, is

3   that right?

4       A.   Well, the question requires a time

5   frame, because it differed based on when you're

6   asking me, you know, the issue was.

7       Q.   You mean the time period, during what

8   year, is that what you mean?

9       A.   Based on what our policy was.

10      Q.   Tell me what the policy was about when

11  salespeople were actually paid.

12      A.   You had mentioned three timely

13  payments.

14      Q.   Yes.

15      A.   And the only time that one does not

16  get paid until three timely payments would be

17  that there is no pre-authorized checking in place

18  prior to the first payment for the mortgage.

19      Q.   And that's called a PAC, is that

20  right, Pre-authorized Checking, correct?

21      A.   Correct.

22      Q.   If there was no PAC that the

23  salesperson obtained from a customer, then they

24  had to wait until three timely payments were

27

1   the payment for the commission.

2      Q.   Why does it have no relevancy for the

3  commission if there's insufficient funds, but

4  there is relevance if you don't get three timely

5  payments without the PAC check -- isn't it true

6  that the company is still not getting paid?

7      A.   Well, the question that you asked me,

8  I've answered.

9      Q.   I understand.  I'm asking you a new

10  question.

11      A.   What is the new question?

12      Q.   New question is, why was the policy

13  that if you have a PAC in place, then the

14  salesperson gets paid, even though there's a

15  possibility of insufficient funds?

16      A.   Well, there's a possibility of a lot

17  of things, but -- are you asking me -- let me

18  understand the question.

19      Q.   Sure.

20      A.   Are you asking me what if -- or what

21  happened when there was NSF after the PAC was in;

22  is that really your question?

23      Q.   Sure, that's my question.

24      A.   Because if that's your question, I

26

1   received by Vacation Village before they were

2   paid?

3      A.   That's correct.

4      Q.   If there was a PAC, then the three

5   timely payment policy did not apply?

6      A.   That's correct, as long as they were

7   still employed.

8      Q.   Were there situations where a PAC was

9   in place but somehow three timely payments

10  weren't made?

11      A.   That wouldn't be an issue.  As long as

12  the PAC is there within the time frame that it's

13  required, they got paid three weeks after good

14  business, which is the policy.

15      Q.   "Good business" means what?

16      A.   Well, when we process a sale,

17  approximately two weeks after the sale, it

18  becomes good business.  Approximately a month

19  after that, the first mortgage payment is due.

20  As long as the PAC comes in prior to that, then

21  it's good to be paid and they go forward.

22  Whether or not -- if you're asking the question

23  about what if there's an NSF or something like

24  that on the PAC, that has no relevancy for

28

1   don't know the answer to it.

2      Q.   Are you aware of any circumstance

3  where there's been a PAC check and insufficient

4  funds thereafter?

5      A.   No.

6      Q.   Would you know that information; would

7  that be information available to you?

8      A.   It hasn't been brought to my

9  attention, if that's your question.

10      Q.   But so far as you understand the

11  policy, as long as there's a PAC check, even if

12  there's insufficient funds later on, the

13  salesperson still gets paid within the 21 days,

14  the ordinary course of business, is that right?

15      A.   That's right.  I just want to

16  understand that we're on the same page with this.

17      Q.   Sure.

18      A.   There wouldn't be a payment made prior

19  to the person getting their commission check.

20  You recognize that?

21      Q.   Is that true even without the three --

22  in the case where you want three timely payments

23  because there's no PAC check, when does the

24  salesperson get paid in that circumstance; after

**[Page 29]**

```
 2        A.   After, without the PAC check.
 3        Q.   So let's just talk about the situation
 4   where there's no PAC check for a second.
 5        A.   Okay.
 6        Q.   If the customer makes two timely
 7   payments and then makes one untimely payment,
 8   does the clock then start again, so you need
 9   three more consecutive timely payments for the
10   salesperson to get paid?
11        A.   Yes.
12        Q.   So in that situation, Vacation Village
13   is actually getting paid, but the salesperson is
14   not getting paid their commission, is that right?
15        A.   They're not getting paid on a timely
16   basis.
17        Q.   And if that continued for a year, they
18   still wouldn't get paid, is that right?
19             MS. FABBO:  Objection.
20        Q.   (By Mr. Feldman)  In other words, the
21   situation is someone makes two timely payments
22   and an untimely payment; then two more timely
23   payments and an untimely payment.  In that
24   situation, the salesperson doesn't get paid until
```

**[Page 31]**

```
 2   proportionately.  They don't take the whole thing
 3   out.  I believe they do it in portions.
 4        Q.   What's the exact policy, just so I
 5   understand it, about when a chargeback would be
 6   made.  In other words, you said if there's
 7   inconsistent payments -- what is the exact policy
 8   so that a salesperson would understand when a
 9   chargeback might occur to them?
10        A.   You're asking the question with regard
11   to PAC?
12        Q.   I'm just asking generally about
13   chargebacks.  When would a salesperson get a
14   chargeback?  That was the original question.
15        A.   A person would get a chargeback if
16   they got paid for business that was no longer
17   good business.
18        Q.   I'm asking in what circumstances does
19   the company consider it not good business?
20        A.   If they're not getting paid their
21   mortgage payments, then it's no longer good
22   business.
23        Q.   I'm asking what the exact parameters
24   of that policy are.
```

**30**

```
 1   there's three consecutive timely payments, is
 2   that right?
 3        A.   I believe that's true.
 4        Q.   Why is that the policy, if you know?
 5        A.   I don't.
 6        Q.   Now, in what instance would there be
 7   what's called a chargeback to the salesperson?
 8        A.   When that would happen, in the
 9   scenario that you just mentioned where someone,
10   for example, did get a PAC check and got their
11   commission, and within the course of that first
12   year, for example, there was NSF payment on a
13   fairly consistent basis, there would be a
14   chargeback.
15        Q.   What is a chargeback?
16        A.   The chargeback would mean that the
17   commission you were paid would be charged back --
18   you wouldn't get it; you would lose it.
19        Q.   So in other words, for the
20   salesperson's next paycheck, a deduction would be
21   made for the a amount that was already paid, is
22   that right?
23        A.   Not normally the entire amount.
24   Typically when that happens, and it rarely
```

**32**

```
 1        A.   I don't have the answers to that.
 2        Q.   Do you know who would have the answer
 3   to that?
 4        A.   No.
 5        Q.   But you said occasionally a
 6   salesperson would get a chargeback?
 7        A.   Yes, I did.
 8        Q.   That's presumably pursuant to a
 9   policy, is that right?
10             MS. FABBO:  Objection.
11        Q.   (By Mr. Feldman)  You wouldn't do it
12   just as a matter of discretion; no manager would
13   say, I'm taking that money back because I feel
14   like it, right?
15        A.   When it is determined that that sale
16   was no longer a good sale, that commission would
17   then be charged back.
18        Q.   I understand that.  I'm trying to
19   figure out how the company determines whether
20   it's a good sale or not.
21        A.   You'll have to ask someone else that,
22   because I don't have the answer.
23        Q.   Do you know who would have the answer
24   to that?
```

**Page 33**

```
 1        A.  No, I don't know the answer.
 2        Q.  Have there been chargebacks in the
 3   last three or four years at the Vacation Village
 4   at the Berkshires?
 5        A.  I'm not sure.
 6        Q.  How many hours a day was a salesperson
 7   required to work during the time you've held your
 8   current job at Vacation Village?
 9             MS. FABBO:  Objection.  You can
10        answer.
11             THE WITNESS:  I want to
12        understand the question.  When you say
13        "Vacation Village," my position prior
14        to -- prior to four years ago or...
15        Q.  (By Mr. Feldman)  During the time
16   you've held your current position, what was --
17   how many hours a week was a salesperson required
18   to work at Vacation Village?
19        A.  We didn't structure our requirements
20   based on any hours, except for the time that they
21   were to come in, and of course whenever they were
22   cut.  There's no set time frame.  When we're
23   busy, they'll work more than when we're not busy.
24   There are days, for example, when there's no
```

**Page 35**

```
 1   That meant it never an issue.
 2        Q.  What do you mean it "wasn't ever an
 3   issue"?
 4        A.  I didn't track of the hours that any
 5   salesperson put into the position.  There are
 6   days, as I mentioned, where someone will work
 7   longer than other days; so I never took track of
 8   it, because it really didn't matter.
 9        Q.  Were you ever aware of a salesperson
10   who worked more than forty hours in one week?
11        A.  No.  Not to say that that's not
12   possible.  I just wasn't aware of it.  I didn't
13   think of it in those terms.
14        Q.  Did you know how many hours a week a
15   salesperson was working?
16        A.  I actually never thought of it in
17   terms of how many hours anyone works.
18        Q.  I understand you didn't think of it.
19   I'm wondering whether you knew at the time you
20   had Rod Lewis's job whether any salesperson
21   worked more than forty hours a week?
22        A.  No, I didn't.
23        Q.  Since you've had your current job, do
24   you know whether any salesperson has worked more
```

**Page 34**

```
 1   afternoon wave, and therefore someone might come
 2   in in the morning and be out the door by 11:00.
 3   And then there are times when we are busy where
 4   someone would come in in the morning and might
 5   not be out the door until 5:00 or 6:00.
 6        Q.  How often did that happen, the latter
 7   example?
 8        A.  I don't know the answer -- based on
 9   the days that we're busy or not.  It would vary,
10   but both times occur.
11        Q.  Have you seen payroll sheets generated
12   by Human Resources that show the number of hours
13   worked by any particular individual per week?
14        A.  No.
15        Q.  Do you know whether salespeople worked
16   more than forty hours a week in any given week?
17        A.  No.
18        Q.  Who would know that?
19        A.  I really don't know the answer to that
20   because I'm not sure.
21        Q.  When you were project director at
22   Vacation Village, Rod Lewis's current job, did
23   salespeople work more than forty hours a week?
24        A.  I never actually kept track of it.
```

**Page 36**

```
 1   than forty hours a week at Vacation Village?
 2        A.  No, I don't.
 3        Q.  If you wanted to find out whether
 4   someone had during the time you've held your
 5   current job, how would you go about finding that
 6   out?
 7        A.  Well, no one punches a clock in sales.
 8   They have to sign in, and they're required to
 9   sign in at a certain time; but when they leave,
10   they're dismisses based on -- as I mentioned
11   earlier -- the tour flows that's coming through
12   the doors.
13        Q.  Do the salespeople sign out when they
14   leave?
15        A.  No.
16        Q.  When the salespeople go on tours, do
17   they sign the time that they're in and out of
18   their tour?
19        A.  They don't sign their time, but there
20   is a track of the amount of time that they spend
21   on tour.
22        Q.  How is that kept?
23        A.  The slip that they receive when
24   they're first given to meet their guests, there's
```

37

1  a time — that's and then when it's finished,
2  whoever they see at the very end puts a time on
3  that.
4      Q.  When is that second time entered?
5      A.  It should be entered when the manager
6  comes over and signs them out.
7      Q.  Signs the customer out?
8      A.  Signs the guests -- the rep. and the
9  customer out, the tour is done.
10     Q.  Just so -- I want to make sure I
11  understand what a tour is.  The tour starts when
12  the Welcome Center tells the sales person that
13  the guest is there, and then the salesperson then
14  would meet and greet the guest, is that right?
15         MS. FABBO:  Objection.
16         THE WITNESS:  That's correct.
17     Q.  (By Mr. Feldman)  Then describe what
18  the tour is after that.
19     A.  Well, they go through the tour.  It's
20  a process that involves whatever it takes to make
21  a friend and to go through the process of
22  discovering whether or not there is interest in
23  vacationing and how they vacation, and they go
24  through the area and they show, you know, the

39

1  At what point is the time put on that
2  tour slip for the tour being over -- is it when
3  they return to the Sales Center, or is it after a
4  closing occurs or doesn't occur?
5      A.  As I said before, when the manager
6  determines that the tour is finished, they sign
7  out and put the time on it of the end of the
8  tour.
9      Q.  When is a tour finished?
10     A.  When the manager makes that
11  determination.
12     Q.  I understand that.
13     A.  There's no time frame.
14     Q.  No, I understand that.  I'm just
15  trying to figure out where in the process a tour
16  is considered to be finished.  Is that just as
17  the guest is going to their car to leave, or is
18  it sometime before that?
19     A.  When the sales rep. is finished, based
20  on the determination of the manager, that's when
21  the responsibility of the salesperson's job is
22  ended, and therefore they're finished.
23     Q.  That would be after the closing papers
24  have been signed in the case where a closing is

38

1  Berkshires, which is a beautiful area, and they
2  show them how the program with RCI works, how
3  our --
4      Q.  What's RCI?
5      A.  RCI is Resorts Condominiums
6  International, which is the network that
7  facilitates exchanges from Vacation Village in
8  the Berkshires to other resorts that are within
9  their system.  That's gone over, and then we show
10  them the actual resort itself, and we show them
11  the pricing, and either a guest will buy or they
12  wouldn't buy.  And if they buy, they go through a
13  closing, and if they don't buy, they're said
14  goodbye to.
15     Q.  So they're shown the area, you said,
16  and then they're shown the property in question?
17     A.  Correct.
18     Q.  Then they come back to the Sales
19  Center?
20     A.  Yes.
21     Q.  Then at the Sales Center, that's where
22  the closing may or may not occur, depending if
23  the customer is interested?
24     A.  Yes.

40

1  actually signed?
2      A.  Yes.
3      Q.  If a closing is not signed and they're
4  sent on to the Exit building, the tour slip is
5  signed at the end of the Exit building process or
6  before that?
7      A.  The salesperson -- the original
8  salesperson's job is finished when the manager
9  determines that it's finished.
10     Q.  You keep a record of those tour slips,
11  is that right?
12     A.  Yes.
13     Q.  By the tour slips, then, you can
14  determine when a tour was done, but the tour
15  slips have no bearing on how long a salesperson
16  has actually been waiting for tours at the
17  lounge, is that right?
18         MS. FABBO:  Objection.  You can
19         answer.
20         THE WITNESS:  Yes, that's true.
21     Q.  (By Mr. Feldman)  During your tenure
22         in your current position, have any
23         salespeople been paid less than the
24         state minimum wage during any given

A.   So far as I know, no.

Q.   Have you reviewed any payroll sheets or pay stubs of salespeople during your tenure in your current job?

A.   No.

Q.   Who would know whether salespeople have actually been paid state minimum wage or not?

A.   I don't know.

Q.   You don't know who would know that information?

A.   I would imagine the salespeople would know.

Q.   Well, certainly the salespeople.  I'm asking whether other company employees would know.

A.   I'm not sure.

Q.   Is that something you've ever concerned yourself with?

A.   No.

Q.   Have you had discussions with anyone -- I guess starting from when you had Rod Lewis's job to the present -- about whether or not

---

A.   I believe 8:30.

Q.   Was there any grace period given after 8:30?

A.   It depends on the weather.  If there is inclement weather, absolutely.  If there isn't, they're required to be in at a certain time.  That's when our morning meetings start.  They go through a morning meeting.

Q.   That's the first thing that happens after they arrive?

A.   Within a reasonable period of time, yes.

Q.   Who runs the meeting?

A.   Typically it's either the line director or the project director.

Q.   Okay.

A.   Then after their morning meeting, there's typically training that's available.  I don't even believe at that resort we even require them to attend the training, but they are required to remain on-site.

Q.   Is the training mandatory or not?

A.   No, it's not mandatory.  It might be

---

salespeople were lawfully being paid minimum wage or not?

A.   No.

Q.   Have you had any discussions about whether Vacation Village was somehow exempt from the minimum wage state or federal laws?

A.   No.

Q.   What facts do you know of that would show that Vacation Village is somehow exempt from paying minimum wage?

MS. FABBO:   Objection.

THE WITNESS:   I don't.

Q.   (By Mr. Feldman)   What facts do you know that show that Vacation Village is somehow exempt from paying overtime?

MS. FABBO:   Objection.

THE WITNESS:   I don't.

Q.   (By Mr. Feldman)   I'd like you to describe a salesperson's regular work day at Vacation Village, I guess before this June 1 change in the payment procedures.  I'd like you to describe what Vacation Village expected of their salespeople during a regular work day.

A.   To come in with the right attitude.

---

required by people whose numbers are not consistent with what we consider good numbers.

Q.   What are good numbers?

A.   We like to have our sales at least one out of three, but if someone is slipping in the double digits, for example, we would -- I say "we" -- it would be wise for one of the directors to require that that particular salesperson attend training.

Q.   So double digits would mean someone is making fewer than one out of ten sales, is that right?

A.   That's correct.  Then after that, they would wait in the sales lounge until they're called for their tour.  They go through the process of their tour, and they either get a sale -- hopefully they do get a sale -- or not.  For example, if they do get a sale, they say goodbye to their guests -- this is the morning.  Then they sign back in for an afternoon tour.

Q.   By "sign back in," do you mean they ended the first tour?

A.   They have to let -- when there's a sale or not, they have to let the front desk know

---

**Page 45**

1    that they're finished their first tour.

2        Q.    Is there documentation of that?

3        A.    Yes.

4        Q.    Is that a different document than

5    you've described so far?

6        A.    Yes, the same rotation sheet or same

7    type of sheet that they signed in in the morning,

8    they would typically sign in after their first

9    tour just to let the front desk know that they've

10   finished their tour and they're available.

11       Q.    Would there be a time next to their

12   name where they signed?

13       A.    No.

14       Q.    I guess you need to describe a little

15   more about what this document is and where it was

16   kept.

17       A.    At the front desk there's a rotation

18   sheet with everyone's name on it, and when the

19   sales rep. is finished their first tour, they're

20   required to go back and sign in basically to let

21   the front desk know that they're now available to

22   take another tour if needed.

23       Q.    Go ahead, you were describing...

24       A.    So they'll wait in the sales lounge

**Page 47**

2        Q.    Do you know if there were full weeks

3    when salespeople didn't have any tours?

4        A.    Not to my knowledge.

5        Q.    What's the minimum number of tours a

6    salesperson had during any given week, as far as

7    you remember?

8        A.    I can't answer because I honestly

9    don't remember.  There were periods of times that

10   were slower than others, as it's a seasonal area;

11   but I don't recall any particular week where

12   someone got very, very few tours where others

13   might have.  I don't really recall that.

14       Q.    What are the slow times?

15       A.    Typically in the late fall and the

16   springtime, the early springtime.

17       Q.    When is the busiest season?

18       A.    The summer.

19       Q.    Now, there are approximately 24 or so

20   salespeople now at Vacation Village, is that

21   correct?

22       A.    Yes.

23       Q.    And there used to be in the range of

24   40, is that right?

**46**

1    until their next tour, assuming they get a second

2    tour.  They'll do the same process as they did on

3    their first tour.

4        Q.    Could there be a third tour?

5        A.    No.  We don't require a third tour.

6        Q.    I understand that.  During the time

7    you had Rod Lewis's job, did anyone ever take a

8    third tour?

9        A.    Occasionally.  Typically -- it doesn't

10   happen that often, but when we're that busy, we

11   would ask a sales rep. if they're willing to take

12   a third tour, and that would be their call.

13   There would be no repercussions whatsoever if

14   they chose not to take a third tour.

15       Q.    And the requirement there is that --

16   if they're available, that they take at least two

17   tours?

18       A.    Correct.

19       Q.    From the time you had Rod Lewis's job

20   to the present, were there times when salespeople

21   didn't get any tours on a particular day?

22       A.    Yes.

23       Q.    Were there times when salespeople had

24   one tour on a particular day?

**48**

1        A.    Well, in the range of 40 would include

2    the managers, and it would be around that now

3    including the managers.

4        Q.    Oh, is that right?

5        A.    Yes.

6        Q.    So there would be around 40 right now,

7    including the managers?

8        A.    Roughly, yes.

9        Q.    Is that a change from two or three

10   years ago?

11       A.    When we first started, we only had

12   eight to ten salespeople.

13       Q.    When did you first start?

14       A.    I think it was in August 2001,

15   roughly.

16       Q.    I guess I'm asking, 2002 through 2004,

17   was there a time when there were significantly

18   more salespeople than there are now?

19       A.    No, I don't think so.

20       Q.    Have there always been two lines?

21       A.    No.  When we first started, there was

22   half a line.

23       Q.    Have there been three lines?

24       A.    No.

1     Q. You said when employees are signed in
2     there was a meeting at first -- the first thing
3     they do is a meeting, is that right?
4         A. Correct.
5         Q. And they're required to be at that
6     meeting?
7         A. Yes.
8         Q. Then afterwards is there always
9     training available?
10        A. Most always. When I say "most
11    always," there are times when we are that busy
12    that there is nobody available to do the
13    training, so as a result there is no training
14    that day. Everybody is out. And most people are
15    out within the hour after the meeting.
16        Q. Who conducts the training?
17        A. It varies. You had asked that
18    question before, and it varies. You know, either
19    one of the directors typically or perhaps the
20    project director, but typically that's the way it
21    works.
22        Q. So after the initial meeting and
23    whatever training is available, while the
24    salespeople are waiting, are they allowed to be

1     training about how to do a tour?
2         A. Yes.
3         Q. Did you do that in your prior
4     position, which is currently Rod Lewis's
5     position?
6         A. Correct.
7         Q. Have you done it in your current
8     position?
9         A. Train people to do that?
10        Q. Yes.
11        A. No.
12        Q. When you were training people when you
13    had Rod Lewis's position, did you provide them
14    with information about how long a tour was
15    supposed to take?
16        A. Well, we have occasionally had a
17    subject in our morning meeting that has to do
18    with time, if that's your question, yes. Time
19    equals money in sales.
20        Q. What does that mean?
21        A. The more time typically you spend with
22    a guest, the better your chances of making a
23    sale.
24        Q. Was that communicated to salespeople?

50

1     outside the Sales building?
2         A. Yes.
3         Q. How far are they allowed to go before
4     they're required to have asked their supervisor
5     to let them out?
6         A. They're supposed to be on-site.
7     "On-site" could mean outside or inside.
8         Q. If they're outside, how are they
9     notified of the fact that a tour is available?
10        A. Well, they're basically responsible to
11    know approximately when their rotation number
12    would come up. So it would behoove them to be in
13    the sales lounge if they know that they're about
14    to go out. You know, there's no problem if they
15    want to go outside, for example, smoke
16    cigarettes, because there are certain
17    cigarette-smoking areas on-site, and they're
18    close enough where they can do that if they chose
19    and still be close enough to know about their
20    tour if they want to.
21        Q. When the salespeople -- how long is a
22    typical tour of a salesperson?
23        A. Two and a half hours.
24        Q. Did you ever personally provide

52

1         A. Yes.
2         Q. On a typical tour, how long would the
3     salesperson be out doing the tour of the area and
4     the site versus in the Sales Center doing
5     paperwork?
6         A. I would say the majority of their
7     time is spent outside of the sales arena. There
8     are two times during the tour that they're in the
9     sales arena, which would be after they did their
10    warm-up outside. We typically have them go up to
11    Mount Greylock, which is a beautiful area for
12    them to just sit in their car and go over the
13    vacation commitment type of issues; and then they
14    would typically go back into the sales lounge and
15    do, as I mentioned to you before, the program's
16    benefits and how it would work for them. Then
17    they would go out and show them the model.
18        Q. I'm sorry, can I interrupt you for one
19    second. So they go out showing them the area,
20    including Mount Greylock, then come back to the
21    Sales Center?
22        A. Correct.
23        Q. Then they go out a second time?
24        A. Then they would go out a second time

1    after showing them how the program works, then
2    the model; it's in another area. Then come back
3    and do the pricing.
4        Q.   So you say the majority of time,
5    they're actually out and about, is that right?
6        A.   I would say so, yes.
7        Q.   Is it close to fifty/fifty in your
8    view?
9        A.   Well, I believe it depends on the
10   customer. Some people might require more time
11   spent with how the program works, and therefore
12   they might spend more time in the sales arena.
13   And I still feel that they are spending most of
14   their time out of the sales room.
15       Q.   When you were project director, did
16   you actually take out tours?
17       A.   No -- you're asking me a question, but
18   I want to make sure I understand your reason.
19   Are you asking me did I know how they did the
20   tour?
21       Q.   No, I'm asking whether you actually
22   took a tour out.
23       A.   I didn't actually take a tour out; the
24   answer is no.

---

                                              54

1       Q.   Did you ever go with a salesperson to
2   monitor their performance on a tour?
3       A.   Yes, I did.
4       Q.   And when you were monitoring their
5   performance, did you stay with them the entire
6   period of the tour?
7       A.   Yes.
8       Q.   If a salesperson was not available for
9   the guest after they were called to meet the
10   guest, what happened?
11      A.   They would get passed.
12      Q.   Then what was the discipline, if any,
13   if they got passed?
14      A.   Well, if it was their first incident
15   -- what is your question now?
16      Q.   What was the discipline to them if
17   they were passed?
18      A.   If it was their first incident, they
19   would be typically reprimanded and the following
20   day put on the bottom of the rotation.
21      Q.   That's called "overage," right?
22      A.   It's called "overage". Well, that's
23   your terminology. My terminology is they're at
24   the bottom of the rotation.

---

2   company's terminology. Is that right or not?
3       A.   Well, you know, when you're at the
4   bottom, you're at the bottom.
5       Q.   Whatever you call that, okay. So you
6   would be put at the bottom of the list?
7       A.   Correct.
8       Q.   How likely were you to get a tour if
9   you were at the bottom of the list?
10      A.   Depending on the day. If you're busy,
11   then they would certainly get a tour, and maybe
12   two.
13      Q.   If you didn't get a tour that day when
14   you were at the bottom of the list, where were
15   you placed the next day?
16      A.   Back on your normal rotation.
17      Q.   What criteria were used to create the
18   normal rotation?
19      A.   Closing ratios.
20      Q.   But your closing ratios wouldn't have
21   gotten worse, right, if you didn't have a tour?
22      A.   That's correct.
23      Q.   Was that the only criteria used to
24   create the rotation list?

---

                                              56

1       A.   No.
2       Q.   Ratios?
3       A.   No.
4       Q.   What other criteria were used?
5       A.   People that made the sales the day
6   before would always get out right after the
7   managers. That's always been our policy.
8       Q.   If you were on overage, your chances
9   of making a sale were diminished, right?
10           MS. FABBO: Objection.
11           THE WITNESS: No, not at all.
12      Q.   (By Mr. Feldman) Well, if there
13   weren't enough people, you might not get a tour.
14   If there were people ahead of you --
15      A.   If you got a customer, you have the
16   same opportunity to get a sale as someone who is
17   the first one.
18      Q.   You have less of a chance of getting a
19   customer, right?
20      A.   I don't think so.
21      Q.   You don't think if you're at the
22   bottom of the list, you have a less chance of
23   getting a customer?
24      A.   To answer your question, it depends on

---

57

1    the chance of making a sale, but business is
2    whether we're not busy.
3        Q.    What if you're not busy?
4        A.    If we're not busy, then the chances
5    are certainly diminished.
6        Q.    So that means they have less of a
7    chance of making a sale than someone who actually
8    gets a customer, is that right?
9        A.    Based on that question, absolutely.
10       Q.    What other possible reasons would
11   there be for a person being put on overage?
12               MS. FABBO:  Objection.
13       Q.    (By Mr. Feldman)  Or being put at the
14   bottom of the list, excuse me?
15       A.    Well, if they, for example, came in
16   late, that might be a reason.
17       Q.    If an employee came in late; that is,
18   after 8:30 plus the grace period, was the company
19   policy that they were put at the bottom of the
20   list?
21       A.    Yes.
22       Q.    For that day or the next day?
23       A.    Should have been that day.
24       Q.    And they were put at the bottom of the

59

1    some of the names on that list may or may not
2    show up.
3        Q.    How many people would show up if they
4    weren't on the manifest.
5        A.    Oh, that's not -- maybe you didn't
6    understand the way I answered.  There are always
7    those that come in that are on the list, but not
8    everyone on the list necessarily shows up.
9        Q.    I actually did understand that, and
10   I'm asking you a different question.
11       A.    Okay.
12       Q.    How many people showed up who were not
13   on the manifest?
14       A.    None to my knowledge.
15       Q.    So nobody ever just wandered over and
16   wanted to take a tour?
17       A.    You say did it ever happen; it's
18   possible we could have someone that just comes in
19   to see if there's an interest in vacation
20   ownership, but that's a rarity.
21       Q.    When was the manifest provided to the
22   Welcome Center?
23       A.    Typically every morning.

58

1    list for that day regardless of whether they
2    stayed all day or didn't stay all day; they were
3    still put at the bottom of the list?
4               MS. FABBO:  Objection.
5        Q.    (By Mr. Feldman)  Let me rephrase
6    that.  If they showed up late by a minute or two,
7    your testimony was they were put at the bottom of
8    the list, is that right?
9               MS. FABBO:  Objection.
10              THE WITNESS:  You're talking
11              about a grace period now as well?
12       Q.    (By Mr. Feldman)  I'm talking about
13   after the grace period --
14       A.    After the grace period --
15              MS. FABBO:  You both are talking
16              at the same time.
17       A.    To answer your question, they would
18   get put at the bottom of the list that day.
19       Q.    Were they required to stay all day?
20       A.    They were required to stay until
21   they're cut.
22       Q.    What if -- when did the Welcome Center
23   know how many tours were going to be given in a
24   particular day?

60

1        Q.    What time?
2        A.    Generally around 8:00.
3        Q.    So is it fair to say that the number
4    of people on the manifest would be the number of
5    tours that would be given in a particular day?
6        A.    It wouldn't be any more than that; it
7    may be less.
8        Q.    If the Welcome Center saw that the
9    number of people on the manifest was smaller than
10   the number of salespeople you had that day, what
11   would happen?
12       A.    Typically they would get cut.  Those
13   that wouldn't get out would get cut.
14       Q.    Just so I have an example -- if there
15   are 30 salespeople and there are 27 names on the
16   manifest, what happens?
17       A.    The person in charge of the Welcome
18   center Will make a determination whether or not
19   to keep those three remaining people or not.
20       Q.    In a typical day would they be kept or
21   would they not be kept?
22               MS. FABBO:  Objection.
23               THE WITNESS:  Well, we generally
24               like to keep a couple of people just