**Page 61**

1  case that walk-in might occur, so
2  there is somebody available.  Again,
3  that determination -- if, to follow a
4  scenario that's similar but a little
5  different, if there are 30 reps. and
6  let's say there are only 10 or 15
7  scheduled to show, I seriously doubt
8  that the front desk manager would
9  require the people at the bottom of
10  that rotation to stay.  But two or
11  three they might want to keep.
12  Q.  (By Mr. Feldman)  Is that within the
13  discretion of the Welcome Center manager?
14  A.  Yes, but that's pretty much the
15  reasonable way to handle it.
16  Q.  What is the actual policy at Vacation
17  Village?
18  A.  The actual policy is that the front
19  desk manager makes that determination.
20  Q.  I thought you had testified earlier
21  that you thought the earliest the line was cut
22  was at 11:00; is that what you said?
23  MS. FABBO:  Objection.

**Page 63**

1  Q.  Would you communicate that to the
2  salespeople?
3  A.  Rarely.  If we're busy, I might say,
4  We're very busy today; let's get our game face
5  on, let's be ready.  But no, I wouldn't say nor
6  would I advise anybody to tell a salesperson they
7  may not get out that day because of the levels of
8  tours we're doing.
9  Q.  At the Welcome Center, if within the
10  manager's discretion they didn't cut the line,
11  even though there may have been more salespeople
12  than actual tours that day, was the salesperson
13  required to stay on-site?
14  MS. FABBO:  Objection.
15  THE WITNESS:  Yes.
16  MR. FELDMAN:  Off the record.
17  (A break was taken)
18  MR. FELDMAN:  Back on the record.
19  Q.  (By Mr. Feldman)  Mr. Rauer, I have a
20  couple other questions on chargebacks.
21  What is the actual policy of Vacation
22  Village at the Berkshires for charging
23  back monies that are already paid to a
24  salesperson?

**Page 62**

1  MR. FELDMAN:  I thought that's
2  what you said.
3  THE WITNESS:  No, I said that has
4  happened.  There are times where
5  people might leave at around 11:00 if
6  there are no tours.  I think that was
7  my response.  There are times that
8  they might stay as late as 6:00.
9  Q.  (By Mr. Feldman)  I'm just wondering
10  when the earliest time was that you remember that
11  the line was cut?
12  A.  I don't.
13  Q.  Are the salespeople made aware of how
14  many tours are being provided in a given day in
15  the morning?
16  A.  No.
17  Q.  So who has knowledge of how many tours
18  are on the manifest?
19  A.  It should be obviously the front desk
20  manager and the director.
21  Q.  So when you were the project director
22  on-site, you were aware of how many tours would
23  be coming in on a particular day?
24  A.  Yes, I was.

**Page 64**

1  MS. FABBO:  Objection.
2  THE WITNESS:  I don't know, other
3  than what I've already mentioned.
4  Q.  (By Mr. Feldman)  Who actually does
5  the charging back?
6  A.  Comes from bookkeeping, comes from
7  corporate.
8  Q.  Corporate in Florida?
9  A.  Yes.
10  Q.  Do you know who they instruct?
11  A.  No.
12  Q.  Are you familiar with a former
13  employee named LaCrisha Wise who worked at
14  Vacation Village?
15  A.  Yes.
16  Q.  Was she terminated?
17  A.  She's no longer employed.
18  Q.  Why is she no longer employed?
19  A.  I thought she quit.
20  Q.  Were you involved in any way in her
21  separation from work?
22  A.  No.
23  Q.  Are you aware of the circumstances
24  under which she left?

**Page 65**

1    Q.  Believe me, this --

2    Q.  If I said to you she was terminated

3  for excessive absenteeism, does that refresh your

4  recollection?

5    A.  No.

6    Q.  What do you remember about LaCrisha

7  Wise?

8    A.  That she was an employee at one time.

9    Q.  Were you aware that there were any

10  sort of problems with her employment?

11        MS. FABBO:  Objection.  You can

12        answer.

13        THE WITNESS:  As you mention that

14        there was absenteeism, yes; that was

15        an issue with her.  There were times

16        where she did not show up for work,

17        and there were also times when she was

18        late for work.

19    Q.  (By Mr. Feldman)  How did you know

20  about that?

21    A.  During the period of time that I was

22  there, this occurred.

23    Q.  So when you were project director

24  on-site, Miss Wise was working there?

**Page 67**

1  terminated; do you recall Mr. Massaconi from Vacation

2  Village?

3    A.  Yes.

4    Q.  I'd like you to describe your

5  involvement in his termination.

6    A.  Well, I terminated him.

7    Q.  You're the one who personally

8  terminated him?

9    A.  Yes.

10    Q.  Why did you do that?

11    A.  Because he wasn't performing.

12    Q.  What do you mean, "he wasn't

13  performing"?

14    A.  Well, his closing ratio numbers on a

15  consistent basis were in double digits, but far

16  beyond double digits.  When he was terminated, he

17  was one out of thirty or worse.

18    Q.  Did he have the worst ratios of anyone

19  who was working at Vacation Village at the time?

20    A.  When he was terminated, there were two

21  people with very similar numbers.

22    Q.  Who were they?

23    A.  He and a young lady, Bonnie -- I can't

24  remember her last name offhand, but a lady was

**Page 66**

1    A.  Yes.

2    Q.  How did you become aware of her

3  absenteeism or tardiness?

4    A.  I was there.

5    Q.  I understand, but was this

6  communicated to you from a line director or did

7  you observe this; how did you get this

8  information?

9    A.  I observed it.

10    Q.  What action did you take as a result?

11    A.  I don't recall.  It was a while ago.

12    Q.  Was there a policy at the time you

13  were project director of not vigorously enforcing

14  the absenteeism policy?

15    A.  No.

16    Q.  Was there a point at which Vacation

17  Village started enforcing the absenteeism policy

18  in a more vigorous way?

19    A.  No.

20    Q.  As far as you're concerned, the policy

21  has been the same from the time you were there

22  until the present?

23    A.  Yes.

24    Q.  Were you involved in any way in the

**Page 68**

1  also terminated that day.

2    Q.  Why was she terminated?

3    A.  Numbers.

4    Q.  Was there any other reason

5  Mr. Massaconi was terminated other than his

6  numbers?

7    A.  No.

8    Q.  Mr. Massaconi had been a -- was a

9  salesperson at the time, is that right?

10    A.  That's correct.

11    Q.  Before that, he was a sales manager?

12    A.  There was a time he was manager, yes.

13    Q.  Why was he promoted to sales manager?

14    A.  He asked for the opportunity, and I

15  gave it to him.

16    Q.  What criteria did you use when

17  determining whether to promote someone?

18    A.  There was a time when Mr. Massaconi

19  did very well in sales and wanted to be a

20  manager.  He was actually one of the original

21  salespeople at that resort.  As some of the

22  people that were also original salespeople

23  evolved to management, he expressed a desire to

24  do that as well; and I gave him that opportunity.

1    you gave him that opportunity?
2        A.    Yes, I believe I was.
3        Q.    Were there written criteria for you to
4    use when determining whether to make someone a
5    sales manager?
6        A.    No, no written criteria.
7        Q.    Was that within the discretion of the
8    project director?
9        A.    Yes.
10       Q.    Do you know what his ratios were at
11   the time he became a sales manager?
12       A.    Yes, they were very good.  They were
13   better than track average.
14       Q.    What's "track average"?
15       A.    At that time, I wouldn't recall; but
16   whatever they were, sir, he was better than that,
17   or at least as good, I should say.
18       Q.    At what point was he demoted; do you
19   remember?
20       A.    Yes.
21       Q.    When?
22       A.    I don't remember the exact day he was
23   promoted -- demoted, but I can't answer any more

2        A.    Based on their closing ratios.
3        Q.    So the closing ratios for a manager
4    who is TO-ing includes the sales that are not
5    generated by him, is that right; they're
6    initially being created by the salesperson who he
7    supervises?
8        A.    Yes.
9        Q.    Are TO statistics kept differently
10   than the manager's own sales?
11       A.    They're not different; they're just
12   kept.
13       Q.    I guess what I'm asking is -- the
14   manager can go out on tours as well, right?
15       A.    Yes.
16       Q.    And then the manager also may TO on
17   someone else's tour?
18       A.    Correct.
19       Q.    Are those statistics kept in separate
20   places, or are they put together for the
21   manager's sales ratios?
22       A.    We have a personal sales manager --
23   personal sales ratio, and we have a TO ratio.
24       Q.    Is it your testimony that Mr. -- how

**70**

1    than giving you the exact day is something I'm
2    not sure of.
3        Q.    Why was he demoted?
4        A.    For lack of performance.
5        Q.    Was it because of the ratios, his
6    ratios?
7        A.    Once you're a manager, there are
8    certain things other than your own personal sales
9    that you're required to do well.
10       Q.    What was he not doing well?
11       A.    He was not doing his personal sales
12   well, nor was he TO-int well, nor was he training
13   well.
14       Q.    Anything else he wasn't doing well
15   that you remember?
16       A.    Those are the three criteria that are
17   required to do well and to keep a job as manager.
18       Q.    What was "TO-ing"?
19       A.    That's when someone helps the
20   salesperson -- a manager helps a salesperson get
21   a sale.  They take over the table.
22       Q.    "TO" means Take Over?
23       A.    Correct.
24       Q.    How does one determine whether a

**72**

1    were Mr. Massaconi's personal sales ratios and
2    how were his TO sales ratios at the time he was
3    demoted?
4        A.    They were poor.
5        Q.    Do you remember what they were?
6        A.    No, I don't remember what they were.
7        Q.    Was anyone else demoted at the same
8    time as Mr. Massaconi?
9        A.    At the same time?
10       Q.    At or about the same time.
11       A.    No.
12       Q.    Were his personal sales ratios worse
13   than every other manager at that time that he was
14   demoted?
15       A.    Yes.
16       Q.    Were his TO sales ratios worse than
17   every other manager at the time he was demoted?
18       A.    Yes.
19       Q.    You said he wasn't training well.  How
20   did you determine that he wasn't training well?
21       A.    Managers are required to recruit and
22   train new salespeople, and he was not doing that
23   well, either.
24       Q.    Was he not recruiting well or was he

1   not training well.

2      A.  He was not training well.

3      Q.  What do you mean by "he wasn't

4   training well"?

5      A.  When we have salespeople that are new,

6   they require training; and if they're getting

7   trained well, hopefully they'll do well; and if

8   they're not doing well, it's partly a result of

9   the manager who's training them.

10      Q.  Just so I understand it, if

11   salespeople aren't making sales, does the company

12   consider that the manager has not been training

13   well?

14      A.  It's one of the issues, yes.

15      Q.  Which one of the three issues you

16   mentioned was the central reason for his

17   demotion, if you remember?

18          MS. FABBO:  Objection.

19          THE WITNESS:  He wasn't demoted

20          originally when we saw bad numbers in

21          all three of those categories.  What

22          happened with Mr. Massaconi is he was

23          given a warning.  He was given a

24          probationary period to fix primarily

---

1   demotion, is that right?

2      A.  That was before his demotion.  After

3   that period of time and he still wasn't able to

4   get his personal sales numbers back to where they

5   should be, at that time we demoted him, or I

6   demoted him.

7      Q.  Did that demotion occur before or

8   after Mr. Massaconi filed a complaint in this

9   case?

10          MS. FABBO:  Objection.

11          THE WITNESS:  I have no idea.

12          (Exhibit 1, Uniform Policy for

13          Sales Managers' Sales

14          Performance, marked for

15          identification)

16      Q.  (By Mr. Feldman)  Showing you what's

17   been marked as Exhibit 1, Mr. Rauer, do you

18   recognize this document?

19      A.  Yes.

20      Q.  What is it?

21      A.  Says Uniform Policy for Sales

22   Managers' Sales Performance.

23      Q.  Were you involved in the creation of

---

74

1   his personal numbers, and of course we

2   also didn't allow him to go to too

3   many tables because his TO numbers

4   were not that good.  We wanted him to

5   focus on getting his personal numbers

6   back on track where they should be;

7   and we gave him a period of time to

8   accomplish that.

9          During that period of time, he

10   was to focus on getting his own sales.

11   The end of that period of time and he

12   still didn't get his sales back to

13   where they should be, we then took

14   further action not to remove him as a

15   manager but not to give him a team

16   that he had under him, because again,

17   we wanted his focus to be only his own

18   personal sales.  We didn't want any

19   salesperson to suffer because he

20   wasn't able to focus on his own

21   personal sales and take care of his

22   team as well; so we temporarily

23   removed his team from him as the next

24   stage.

---

76

1   this document?

2      A.  Yes, I was.

3      Q.  Why was the document created?

4      A.  I wanted to make the managers aware

5   that I expected performance in all categories.

6      Q.  Why did you decide to create the

7   document at the time you did -- had something

8   happened before that?

9      A.  Not that I recall.  I just think that

10   there were some issues that needed to be put down

11   in writing so everyone was aware of what I

12   considered proper performance standards.

13      Q.  Was this taken from some kind of other

14   handbook, or did you create this on your own?

15      A.  I created this.

16      Q.  Did you get approval from your

17   supervisor to provide this?

18      A.  I don't recall.

19      Q.  Was this created in part because of

20   Mr. Massaconi's personal situation?

21          MS. FABBO:  Objection.

22          THE WITNESS:  No.

23      Q.  (By Mr. Feldman)  Is this a procedure

24   that was provided to Mr. Massaconi, what's

---

1    described this before that, and friends and --
2        A.    Sorry, what was your question?
3        Q.    Was this procedure followed with
4    regard to Mr. Massaconi?
5        A.    Should have been.
6        Q.    Was this procedure put in place before
7    he was demoted?
8        A.    Yes.
9        Q.    So what you first described as the
10   period when Mr. Massaconi was not demoted but he
11   was supposed to get his numbers up, is that
12   what's listed as Number 1 on Page 1 of Exhibit 1?
13       A.    Yes.
14       Q.    Or is that somehow different?
15       A.    Yes, but I can't honestly tell you
16   that this was done prior to him being advised
17   that he had to get his numbers better or not.  I
18   really don't recall.
19       Q.    Now, he was given time to get his
20   personal numbers up, you said.  Was he able to do
21   so?
22       A.    No.
23       Q.    What happened with his numbers?
24       A.    They stayed fairly poor.

---

78

1        Q.    Do you know what they were at the
2    time?
3        A.    I don't know exactly what they were,
4    but they were poor.
5        Q.    At the time that Mr. Massaconi was
6    told to get his personal numbers up, was anyone
7    else put in that same situation?
8        A.    Yes.
9        Q.    Who?
10       A.    I can't recall, but several people.
11   Let me see, maybe this will help me.  Bill Lee is
12   one of them, Melissa McGovern was someone else,
13   Bob Campagna was someone, Mike Campagna was
14   someone.
15       Q.    The people you're naming are people
16   who were given a certain amount of time to get
17   their personal numbers up?
18       A.    Yes.  Over a period of time.  I don't
19   know specifically when it occurred, but looking
20   at the names, I can tell you that these people
21   were also given periods to get their numbers
22   fixed.
23       Q.    What happened to the numbers of those
24   people that you just named?

---

1    Some people fixed them and some people didn't.
2        Q.    Well, of the ones you've named, if you
3    remember, which were the ones who didn't fix
4    their numbers?
5        A.    Bill Lee, Melissa McGovern, and Mike
6    Massaconi.
7        Q.    Other than Mike Massaconi -- we know
8    what happened to him -- what happened to the
9    other two?
10       A.    They were demoted.
11       Q.    Were they demoted at about the same
12   time as Mr. Massaconi?
13       A.    No.  Again, the names that I've
14   mentioned to you, during the course of time have
15   -- during that period of time -- fallen into
16   similar categories that Mr. Massaconi did.
17       Q.    I know; I'm just trying to figure out
18   when...
19       A.    I really couldn't tell you exactly.
20       Q.    When Mr. Massaconi was demoted, what
21   happened after he was demoted?
22             MS. FABBO:  Objection.
23             THE WITNESS:  I don't understand

---

80

1             the question.
2        Q.    (By Mr. Feldman)  Sure.  What happened
3    to his sales ratios after he was demoted?
4             MS. FABBO:  Objection.
5             THE WITNESS:  They still didn't
6             get better.
7        Q.    (By Mr. Feldman)  Did they get worse?
8        A.    When he was terminated, they were
9    pretty bad, yes.
10       Q.    How long was the period between his
11   demotion and his termination, if you remember?
12       A.    I don't really remember, but it was
13   more than a few weeks.
14       Q.    You listed three reasons for his
15   demotion.  How many reasons were there for his
16   termination?
17             MS. FABBO:  Objection.
18             THE WITNESS:  For his termination
19             it was -- he was a salesperson at that
20             time; and I looked at his personal
21             numbers, and his personal numbers were
22             substandard.
23       Q.    (By Mr. Feldman)  Were you aware that
24   Rod Lewis had spoken to Mr. Massaconi at some

81

1 point who said that the company was trying to get
2 rid of people who had filed this lawsuit?
3     A.   No.
4     Q.   Have you ever heard of that before?
5     A.   No.
6     Q.   Before today, you haven't heard of
7 that?
8     A.   No.
9     Q.   You had said Mr. Massaconi and a woman
10 had particularly bad ratios at the time that they
11 were fired. Has anyone since his termination had
12 the same level of bad ratios?
13     A.   No.
14     Q.   What is the ratio that leads to
15 termination at Vacation Village currently?
16     MS. FABBO: Objection.
17     THE WITNESS: Anybody that was
18     terminated based on performance had a
19     consistent period of time of doing
20     poor.
21     Q.   (By Mr. Feldman) I'm trying to define
22 -- using the numbers, I'm trying to define what
23 "doing poor" means.
24     A.   Well, way past track average. That's

83

1 emerged as being especially the ages average?
2     MS. FABBO: Objection.
3     THE WITNESS: No, it would vary,
4     but never in double digits.
5     Q.   (By Mr. Feldman) What were the ranges
6 for track average, if you can remember?
7     A.   I couldn't even answer that, but
8 again, never in double digits.
9     Q.   Is there a company policy about a
10 ratio that would lead to termination?
11     A.   I don't know.
12     Q.   You mentioned double digits a few
13 times?
14     A.   Yes, I did, but there are people who
15 have been in double digits who have gotten fixed
16 and got their numbers back to where they need to
17 be, and there are those who were in double digits
18 who have gotten worse.
19     Q.   What happened to those people?
20     A.   For the most part, they got?
21     Q.   Do you remember anybody besides
22 Mr. Massaconi and the other young woman you
23 mentioned?
24     A.   Yes. I don't remember names

82

1 to say the least, but when someone is in double
2 digits, they need to be fixed one way or another.
3 They need -- when I say "one way or another,"
4 either their manager needs to fix them or they
5 need to be reassigned to another manager.
6 Somehow we need to do the best we can to get
7 these people as good as they can possibly be.
8     And with regard to Mr. Massaconi, he
9 was given opportunities to go on different teams.
10 He was actually, for the most part, refusing to
11 take the training that we required him to take
12 because of his numbers, but he still didn't do
13 it, and didn't really show a sincere effort to
14 get better. And his numbers were the worst,
15 along with this young lady Bonnie -- again, her
16 last name escapes me; but those two people had
17 the worst numbers on the track, and they both
18 showed a lack of desire to get better.
19     Q.   Is there a ratio that you consider to
20 be track average?
21     A.   No, it would depend on what the track
22 average would be.
23     Q.   Since the time you've been there, 2001
24 to the present, is there a number that has

84

1 specifically. If I looked at the roster I might
2 be able to give you that. But yes, that has
3 happened and it's normal. If people do not
4 perform and they're given every opportunity to
5 perform and they still don't perform, then we
6 have to consider this not good for them or for
7 our company to keep giving them customers.
8     Q.   Getting back to absenteeism for a
9 minute, is there anyone else who you remember as
10 being terminated from Vacation Village for
11 absenteeism other than Miss Wise?
12     MS. FABBO: Objection.
13     THE WITNESS: I don't recall that
14     Miss Wise was terminated for that
15     reason. You're telling me that.
16     Q.   (By Mr. Feldman) I'm just saying
17 forget Miss Wise for a minute. Anyone else been
18 terminated for excessive absenteeism?
19     A.   I don't recall.
20     Q.   Has anyone else been terminated for
21 excessive tardiness?
22     A.   I don't recall.
23     Q.   What's the policy at Vacation Village
24 with regard to giving employees time under the

85

1  Family Medical Leave Act and I recall a good attitude meeting that we had
2      A.   That's something that's a Human
3  Resource issue and has nothing to do with sales,
4  so I don't get involved with that.
5      Q.   Who gets involved with that?
6      A.   The Human Resource director.
7      Q.   Were you involved in the termination
8  of Mr. Martin, who is a plaintiff in this case?
9      A.   I think so, yes.
10     Q.   Do you remember Mr. Martin?
11     A.   Yes.
12     Q.   Do you know what his first name was?
13     A.   Roger.
14     Q.   You said "I think so." What makes you
15 not sure?
16     A.   Because I'm not sure. I don't really
17 recall. I certainly know Roger Martin, but I
18 don't recall exactly whether I was involved in
19 his termination or not.
20     Q.   Do you recall a moment of interaction
21 between you and Mr. Martin that was tantamount to
22 insubordination?
23     A.   It's possible.
24     Q.   Do you recall terminating him?

87

1  and I heard a good attitude meeting that we had
2      Q.   Do you recall Mr. Martin specifically
3  complaining about not being paid minimum wage?
4      A.   No.
5      Q.   Were you aware that Mr. Martin had
6  complained to anyone about not being paid minimum
7  wage?
8           MS. FABBO:  Objection.
9           THE WITNESS:  No. I think I
10          answered that question more generally
11          before.
12     Q.   (By Mr. Feldman)  You might have.
13 Were you aware of before the termination of
14 Mr. Massaconi that he had gone to the Attorney
15 General complaining about not being paid wages?
16          MS. FABBO:  Objection.
17          THE WITNESS:  Did he? I didn't
18          know that.
19     Q.   (by Mr. Feldman)  I'm asking whether
20 you're aware.
21     A.   No, I'm not aware.
22     Q.   I'd like you to describe all the
23 reasons why Mr. Martin was terminated from
24 employment.

86

1      A.   A specific incident -- what I recall
2  is that Mr. Martin at one time abruptly left the
3  manager -- the sales meeting and caused a raucous
4  there. I also recall Mr. Martin didn't show up
5  for a tour. I recall Mr. Martin refused a tour.
6  I recall Mr. Martin had several times displayed
7  what I would consider improper behavior. He was
8  occasionally disruptive.
9      Q.   Do you recall the moment of
10 termination with Mr. Martin?
11     A.   No.
12     Q.   Do you recall who terminated him?
13     A.   I don't. Not to say that it perhaps
14 wasn't -- was me; I just don't recall.
15     Q.   Do you recall Mr. Martin ever
16 complaining about his wages?
17     A.   Yes.
18     Q.   What do you recall about that?
19     A.   I recall when Mr. Martin had quit, I
20 was up for a visit and he happened to come in
21 asking about his commissions that were due him;
22 and I recall going over with him our policies.
23 At that time, he was very cordial and receptive
24 to what I had to say and understood our policies,

88

1      A.   As I mentioned to you, he was
2  disruptive, he had a very short temper, and he
3  did cause issues with other salespeople because
4  of his behavior. He refused tours. Other than
5  that, I really can't be more specific because I
6  would have to look at his record, look at his
7  numbers. I still don't recall whether it was me
8  personally that terminated him or I was aware of
9  it. I really don't remember.
10     Q.   Were you aware that he was terminated
11 twice?
12     A.   No, I was aware that he quit and then
13 he was rehired. I allowed him to be rehired.
14 After, again, a successful conversation with him
15 and he came a month or two after that and asked
16 for a job again, I thought, well, he's calmed
17 down. As a matter of fact, he even said that he
18 was taking the wrong medication and he's fine now
19 and he really wants to work. And I gave him the
20 benefit of the doubt and I said okay because I
21 did allow him to come back to work.
22     Q.   Why did he quit the first time?
23     A.   His attitude was that he wasn't making
24 enough money.

89

1     that was communicated to you.

2     A.   Yes.

3     Q.   That's why he said he quit?

4     A.   Yes, I think so.

5     Q.   What was your impression of Mr. Martin

6     as a salesperson at or about the time he quit?

7     A.   Occasionally he was disruptive then as

8     well, but not nearly as he was later on.

9     Q.   Given that was disruptive before, why

10    did you hire him back?

11    A.   Again, I had a good conversation with

12    him, I wanted to give him the benefit of the

13    doubt.  He told me he had some treatment, he was

14    on some medications, and he was good, and he

15    wanted to work.  He's a nice fellow, and I wanted

16    to give him the benefit of the doubt.  I thought,

17    let's try him back again.

18    Q.   Were you aware that Mr. Martin told

19    anyone at Vacation Village that he was going to

20    file a written complaint with the Attorney

21    General about his pay?

22    A.   No.

23    Q.   Is this the first time you're hearing

24    that?

91

2     (A break was taken)

3     MR. FELDMAN:  Back on the

4     record.

5     Q.   (By Mr. Feldman)  I have a couple of

6    questions, then I'm done.  With regard to the way

7    salespeople were paid with commissions and the

8    introductory commission that you described

9    earlier, who is the person who set up that policy

10    -- was that Mr. Polansky, you said?

11    A.   I don't know that he set it up.  I

12    know he told me that's the policy.

13    Q.   Who is the person in charge of making

14    sure that policy got carried out at Vacation

15    Village?

16    A.   Well, it's in the system, you know.

17    If a sale was made and they were on a ten percent

18    commission -- let's say that was the introductory

19    -- the volume of the sale will equal the -- based

20    on the percentage of commission, would be their

21    compensation.

22    Q.   But as to the procedures around three

23    timely payments and a PAC check, is that also

24    programmed into the system; how does that work?

90

1     A.   Yes.

2     Q.   You said Mr. Martin had a meeting with

3    you about not being paid commissions, correct?

4     A.   When he was no longer employed.  After

5    he quit.

6     Q.   After he quit?

7     A.   When he quit, might have been a couple

8    of months or a month or so after that, I happened

9    to be up at the resort, and he walked in to ask

10    about his pay.  You know, he saw me and he asked

11    me; and I said, Come on, let's talk about it.  As

12    a matter of fact, I believe I ran a whole sheet

13    on the outstanding sales that he made so he had a

14    good idea -- I gave it to him so he knew what he

15    had coming to him.

16    Q.   Did he have any conversations with you

17    after he was employed the second time about not

18    being paid wages?

19    A.   No.

20    Q.   Were you aware that he had

21    conversations with anyone during that second

22    period of employment where he complained about

23    his wages?

24    A.   No.

92

1     A.   Very good question.  When we get -- I

2    believe every week they get a sheet that shows

3    what commissions are due the salespeople, and

4    there's a code, for example, with PAC that would

5    have a "P," meaning that the PAC is not in.  So

6    that person will know that they're not going to

7    get paid that commission because there's no PAC.

8    Q.   So that person would have to wait

9    until the three timely payments?

10    A.   That salesperson, as I told you -- the

11    three timely payments criteria will come up with

12    either a person who is no longer employed or

13    someone who is employed but doesn't have the PAC

14    check for that particular sale.

15    Q.   How is that dealt with the

16    computer; in other words -- track...

17    A.   Well, again, there's a code.  There's

18    a "P" for that.  If there's no "P," that's good

19    business and they're going to get paid.

20    Q.   Where would one find the payment

21    policy in the various documents that Vacation

22    Village creates?

23    A.   I believe it's in the handbook.

24    Q.   So the handbook is the place where

1  sales people go, is that right -- that

2  was with regard to payments, is that right?

3      A.   I'm pretty sure that's true.

4      Q.   Is there any other place they could go

5  to?

6      A.   No, but if it's not in the handbook --

7  and I believe it is -- there would be something

8  they would be given at hire that would tell them

9  that.

10     Q.   Would a chargeback ever be implemented

11 with regard to a salesperson if there either was

12 a PAC check or three timely payments were made?

13     A.   What was the question?

14     Q.   Here's the question:  Would Vacation

15 Village ever implement a chargeback to a

16 salesperson in any instance where there was a PAC

17 check or three timely payments were, in fact,

18 made?

19     A.   Only -- I don't believe that that has

20 happened; but if three timely payments are made,

21 for example, and then the next eight payments are

22 not timely within that first year, I believe

23 that's a possible chargeback situation.

24     Q.   What's the basis of your belief?

---

2      A.   They've gotten paid bonuses.

3      Q.   I understand that; but overtime, time

4  and a half?

5      A.   No, they don't get paid by the hour.

6          MS. FABBO:  I just have one or

7          two questions.

8

9  CROSS EXAMINATION BY MS. FABBO:

10     Q.   Since you -- when did you leave the

11 position as project director at Vacation Village?

12     A.   I think August of '02.

13     Q.   And since that time, how frequently do

14 you visit Vacation Village in the Berkshires?

15     A.   About once a month.

16          MS. FABBO:  That's all my

17          questions.

18          Mr. Feldman:  Nothing further.

19          Thank you.

20

21          (Deposition concluded at 11:40)

22

23 COMMONWEALTH OF MASSACHUSETTS

24 HAMPDEN, SS.

---

94

1      A.   Pardon?

2      Q.   What's the basis of your belief?

3      A.   Oh, I think that has happened.  It's

4  so rare that I'm not even certain, but I think

5  within that first year if there is consistently

6  not good payments made, then I believe that

7  there's a chargeback.  Now, when that happens,

8  most of the time there's a re-pay as well,

9  because they get it fixed and people get paid

10 back their commission.  It doesn't happen that

11 often, though.

12     Q.   I understand.  Where would a

13 salesperson go to find out that that was the

14 policy of Vacation Village?

15     A.   Oh, I really don't know how to answer

16 that honestly because I'm not sure; but I'm sure

17 there is a policy in place somewhere.

18     Q.   Has a sales person ever complained to

19 you about a chargeback?

20     A.   I don't really remember at that

21 resort.  At other resorts yes, but I don't know

22 specifically at that resort that that question

23 has come up.  It might have; I'm just not sure.

24     Q.   Has any salesperson at Vacation

---

96

1          I, Ann A. Preston, a Notary Public in

2  and for the Commonwealth of Massachusetts, do

3  certify that there came before me on June 3,

4  2005, at the offices of Heisler, Feldman and

5  McCormick, PC, 1145 Main Street, Springfield,

6  Massachusetts, the following named person, to

7  wit:  WILLIAM RAUER, who was by me duly sworn to

8  testify to the truth and nothing but the truth as

9  to his knowledge concerning the matters in this

10 case; that he was examined upon his oath and his

11 examination reduced to writing by me; and that

12 the statement is a true record of the testimony

13 given by the witness, to the best of my knowledge

14 and ability.

15         I further certify that I am not a relative

16 or employee of counsel or attorney for any of the

17 parties, or a relative or employee of such

18 counsel or attorney, nor am I financially or

19 otherwise interested in the outcome of the

20 action.

21 WITNESS MY HAND this 27th day of June 2005.

22

23

24

15 _____

16     Ann A. Preston

17 My commission expires:
   December 22, 2011

---

June 27, 2005

Marylou Fabbo, Esq.
Skoler, Abbott and Presser, PC
1414 Main Street
Springfield, MA 01103

RE: Wise v Patriot

Dear Counselor:

Enclosed is a copy of the deposition of William Rauer, taken on June 3, 2005 in the above-entitled action.

According to Rule 30(e) of the Massachusetts Rules of Civil Procedure, the deponent has thirty days to sign the deposition from the date of its submission to the deponent, which is the above date.

Please have the deponent sign the enclosed Signature Page/Errata Sheet and return it to the offices of Joel Feldman, Esq., whereupon it will be attached to the original deposition transcript.

Thank you for your cooperation in this matter.

Sincerely,


Ann A. Preston

cc: Joel Feldman, Esq.

---

98

COMMONWEALTH OF MASSACHUSETTS

Wise v Patriot
No. 04-CV-30091-MAP

I, WILLIAM RAUER, do hereby certify under the pains and penalties of perjury that the foregoing testimony is true and accurate to the best of my knowledge and belief, with the addition of the following changes/corrections:


Page  Line                Change/Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____


Witness my hand this ___ day of _____, 2005.

                              _____
                              WILLIAM RAUER
Orig: Joel Feldman, Esq.
Copy: Marylou Fabbo, Esq.

---

# EXHIBIT
# 7

# EMPLOYMENT AGREEMENT -
## SALES REPRESENTATIVE

AGREEMENT made this _6_ day of _August_, 20 _01_, by and between PATRIOT RESORTS CORPORATION, a Florida corporation, its successors, subsidiaries and assigns (hereinafter referred to as "the Company") and _Roger Martin_ residing at _550 South Mountain Rd_ (hereinafter referred to as "Employee"). _P. Hsfield  MA   01201_

## WITNESSETH:

WHEREAS, The Company is engaged in the business of developing, marketing and selling resort recreational properties, including time share interests therein, and may in the future become engaged in other businesses; and

WHEREAS, Employee is desirous of providing sales and marketing services to the Company as an employee upon the terms and conditions hereinafter set forth; and

WHEREAS, in performing [his/her] duties under this Agreement, Employee will be privy to certain confidential and/or proprietary information about the Company and it's business, projects, customers, sales, and marketing and promotion of it's products; and

WHEREAS, the parties hereto agree that, under the circumstances, certain protections restricting the unauthorized disclosure of confidential information, competition, and solicitation are necessary to protect the legitimate business interests of the Company.

NOW, THEREFORE, in consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Employment and Duties: The Company hereby employs Employee and Employee hereby accepts employment upon the terms and conditions hereinafter set forth. (As used throughout this Agreement, "the Company" shall mean and include any and all of its present and future subsidiaries.) Employee warrants that Employee is free to enter into and fully perform this Agreement and is not subject to any employment, confidentiality, non-competition or other agreement that would restrict Employee's performance under this Agreement.

Employee shall devote Employee's full time to the performance of services as a sales representative or to such other services as may from time to time be designated by the Company. During the term of this Agreement, Employee's services shall be completely exclusive to the Company and Employee shall devote Employee's entire time, attention and energies to the business of the Company and the duties to which the Company shall assign him from time to time.

in the purchase agreement, is paid in cash and the balance of the purchase price is financed.

      (v)    Closing - The Closing on a purchase of any Time Share Interest shall be deemed to have occurred:

      (a) In the case of a Cash Sale, when the Company has been provided with all documentation required by it to effectuate the transaction in proper form, the full amount of the purchase price has been paid to the Company, all funds have cleared and all statutory rescission periods have expired without cancellation, and the Company, under applicable law, has the unrestricted use of purchaser's funds.

      (b) In the case of a Financed Sale, when the Company has been provided with all documentation required by it to effectuate the transaction in proper form, the full amount of the deposit has been paid to the Company, all funds have cleared, and all statutory rescission periods have expired without cancellation, and the Company, under applicable law, has the unrestricted use of the purchaser's funds and interest on the transaction has started to accrue to the Company.

      (vi)    Earned Commissions - A commission will be deemed earned upon the Closing of a sale, except that commissions on Financed Sales shall not be deemed earned until the purchaser has made three (3) timely and consecutive monthly payments in accordance with the terms of the purchase money note and mortgage.

      B.  Commission Schedule: The Company shall pay to Employee Earned Commissions based upon a percentage, as stated in the Company's Commission Schedule attached hereto as Exhibit A, of the Net Sales Price of Time Share Interests sold by Employee. The Company reserves the right, in its sole discretion, to modify and amend the Commission Schedule upon advance notice to Employee.

      C.  Date Commissions Payable: Earned Commissions shall be due and payable by the Company within twenty-one (21) days of the date earned, except that the Company will advance to Employee, within twenty-one (21) days of the Closing and subject to charge-back pursuant to Section 2.E. hereof, anticipated commissions on Financed Sales.

      D.  Rejection of Purchasers: The Company shall have the right, without liability or recourse, to reject any potential purchasers, in its sole discretion.

W:\PCLIENTNZ\Patr1020p\Personnel Employment Issues\Sales Representative Agreement - Modified by JBS 9-2-01-.3 non covenant.doc

- 3 -

05/20/03  11:37am  P. 005

purposes of this Agreement, "Confidential Information" shall include, without limitation; any of the materials listed in Section 4 hereof; any Company proprietary information, technical data, trade secrets or know how including, without limitation, market research information; planned products or projects; any plans, specifications, .designs, drawings and engineering information related to existing or planned projects or products; services; customer lists, customer worksheets and customers (including customers of the Company with whom Employee became acquainted during the course of [his/her] employment); lenders, suppliers and vendors; markets; software and hardware configuration and other technology used by the Company; internal processes and procedures; financing techniques, information and strategies; sales and marketing techniques, information and strategies; costs; pricing; and finances or other business information disclosed to Employee by the Company either directly or indirectly in writing, orally or otherwise. Confidential Information shall not include any of the foregoing items that have become publicly known or made generally available through no fault of Employee. All originals and copies of any of the foregoing, however and whenever and by whomsoever produced, shall be the sole property of the Company, not to be removed from the premises or custody of the Company without in each instance first obtaining authorization of the Company, which authorization may be revoked by the Company at any time. Upon the termination of Employee's employment in any manner or for any reason, Employee shall promptly surrender to the Company all copies and originals of any of the foregoing, together with any documents, materials, data, information, keys and equipment belonging to the Company or relating to the Company's business and in Employee's possession, custody or control, and Employee shall not thereafter retain or deliver to any other person any of the foregoing or any copy, duplicate, summary or memorandum thereof.

6.    Non-Competition Covenants:  **IF YOU STAY WITH THE COMPANY FOR MORE THAN 90 DAYS, THIS SECTION MAY AFFECT YOUR RIGHT TO ACCEPT FUTURE EMPLOYMENT WITH OTHER COMPANIES.**

Employee acknowledges that the Company's Confidential Information, and in particular the Company's list of clients and customers, is a valuable and unique business asset and that substantial Company resources have been expended to develop, protect and preserve same. Employee also acknowledges that, in the course of [his/her] employment, [he/she] will be privy to the Company's Confidential Information and will receive valuable training and experience in the marketing, promotion and direct sales of Time Share Interests that, if used in competition with the Company, could adversely affect the legitimate business interests of the Company.

Employee agrees that some restrictions on [his/her] activities during and after [his/her] employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company. Upon termination of employment, Employee is free to seek and accept new engagements or employment wherever Employee wishes, provided that:

A. During the term of employment and for a period of two (2) years after termination of such employment, Employee agrees not to engage or become interested in, directly or indirectly,

W:\PCLIENTNZ\Patr1020p\Personnel Employment Issues\Sales Representative Agreement - Modified by JBS 8-2-01- 3 mos covenant.doc

- 5 -

7.    Non-Solicitation Agreement:  Employee agrees and covenants that Employee will not, unless acting with the Company's express written consent, directly or indirectly, during the term of this Agreement or for a period of two (2) years thereafter, solicit, entice away or interfere with the Company's contractual relationships with any employee, officer, agent, customer, or client of the Company.

8.    Equitable Relief:  Employee acknowledges that any breach of Sections 3 through 7 of this Agreement may give rise to irreparable injury to the Company, which may not be adequately compensated by damages. Moreover, Employee acknowledges that to the extent that any breach of this Agreement may give rise to injury to the Company, which may be adequately compensated by damages, such damages may be difficult or impossible to calculate. Accordingly, in the event of a breach or threatened breach of any of Sections 3 through 7 of this Agreement, the Company shall be entitled in any proceedings, in addition to any remedies it may have at law, to an injunction or other equitable relief to enforce the specific promises hereof and to restrain any further violations. The Company and Employee further agree that the order or injunction of any Court arising out of such proceedings shall, if applicable, extend the time during which Employee will not thereafter compete with the Company by the amount of time that the Employee had so engaged in competition with the Company in violation of the provisions of this Agreement. If in such proceedings Employee is found to have breached any of the terms hereof, Employee shall be liable to pay all of the Company's costs, expenses and reasonable attorney's fees incurred in connection with such proceedings and any appeals therefrom.

9.    Indemnity:  Employee agrees to indemnify and save harmless the Company for any loss or damage, including the reasonable fees of an attorney, which the Company may suffer by reason of any false, fraudulent or misleading statements or omissions of material facts, or violations of State or Federal law made by Employee:

A.    Employee acknowledges that sales of Time Share Interests in the Commonwealth of Massachusetts are governed by the Massachusetts Real Estate Time-Share Act , Massachusetts General Laws Chapter 183B, Section 1,et seq, as same may be amended from time to time, as well as other laws and regulations.

B.    Employee acknowledges that Time Share Interests at Company projects are being sold in reliance upon exemption from registration under the Securities Laws of Massachusetts and under the Securities Act of 1933.  This exemption is available because the Time Share Interests being sold are not structured as a security. Any statement by the Employee to the effect that the purchase of the timeshare interest is an "investment", "can be rented on behalf of the purchaser", or "can be repurchased from the purchaser" could result in the requirement that Time Share Interests be registered. In such event, the Employee will have engaged in a serious violation of federal law, and could be subjected to penalties or fines of $10,000.00 and imprisonment for five years for each offense in addition to civil penalties.  Employee shall engage in no act in

W:\PCLIENT\NZ\Patr1020p\Personnel Employment Issues\Sales Representative Agreement - Modified by JBS 6-2-01- 3 mos covenmt.doc

- 7 -

12.    Indulgences:  In the event the Company shall fail to insist on the strict performance of any of the covenants herein contained and to be performed by the Employee, such failure shall not be construed as a waiver or relinquishment of the Company's right to enforce, at any time thereafter any such provision or condition and such right shall continue in full force and effect.

13.    Construction:  The parties agree that any term, provision, covenant or condition of this Agreement that may be susceptible of two constructions, one of which would render it valid and the other of which would render it invalid or unenforceable, shall be construed in such manner as to render it valid and the invalidity or illegality of any clause or provision herein shall not affect the validity of the remainder of this Agreement which shall remain in full force and effect.

IN WITNESS WHEREOF the parties hereto have signed or caused to be signed, these presents, the day and year first above written.

WITNESS                                      EMPLOYEE

WITNESS                                      PATRIOT RESORTS CORPORATION
                                             BY

# EXHIBIT
# 8

Rodger,                    10-4

It is with concern
for your health and
well being that I
write you. As a victim
of your rage yesterday,
I strongly encourage
you to seek help. I
shutter to think of
your girl friend of
ten years and your
young son Nick if they
were ever to become
victim to your temper
tantrums. Rodger, I
believe that, with help,
you can learn self
control. No salesman

closes every deal, Rodger -
So again, I encourage
you, for your sake as
well as those around
you to get help - now -
today. We both know
by your outburst toward
me - That you are
not a well man - You
made such a fool of yourself
that we were embarrassed
for you - Get help - Grow
up - I do wish you
well, Rodger -

Sympathetically

Mel Cote

P.S. Perhaps you should
go back to roofing -
It was the price and 21,5% that did it

Sir:                                    10-5-02
    I must share my Vacation
Village Experience with you -
Our sales presentation was
given by Roger Martin and
he was very good - He assured
us that he would show us the
resort and explain the program
and there would be no
high pressure - To his credit,
Roger did a good job -
    At the end of his presentation
he explained the today
price and the 21.9% interest.
At that point I lost all
interest. I politely told
Roger that I was not
interested. He then lost it.

he went off - He was
shouting" at me and
he said - "You're a liar. We
are going to talk about
This." He caused a
scene. Some of the tradesmen
encouraged him to regain
his composure and quiet
down. From That point on
he was nasty. My lady
retreated to the car badly
shaken up - Sir: I tell you
This for Your and Rodgers
benefit The man needs help.
You must speak with him
Later, while having dinner
(I thank you for That) we