# EXHIBIT
# 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT,<br>                    Defendants. | :<br>:<br>:<br>:<br>:<br>: DOCKET NO. 04-CV-30091-MAP<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## AFFIDAVIT OF FAITH LIPPERT

I, Faith Lippert, being duly sworn, state as follows:

1. I am over 18 years old and believe in the obligation of an oath. I have personal knowledge of the facts set forth in this affidavit.

2. Since Patriot opened in 2001, I have been the Office Manager and Human Resources Representative of Patriot Resorts Corp. in Lanesborough, MA. I currently remain in that position.

3. Patriot owns and sells timeshare interests at Vacation Village in the Berkshires, which is located in Hancock, Massachusetts ("Vacation Village").

4. The four named Plaintiffs are former Timeshare Salespeople who were headquartered out of Patriot's Lanesborough, Massachusetts offices. In addition to having been a Timeshare Salesperson, Mr. Massaconi also held the position of Sales Manager during his employment with Patriot.

5. The Plaintiffs' dates of employment are as follows: Roger Martin, Salesperson from August 6, 2001 to May 13, 2003, and again, from November 7, 2003 to September 21, 2004; Michael Massaconi,

Salesperson from August 6, 2001 to July 19. 2002; Sales Manager from July 20, 2002 to October 29, 2004 , and Salesperson again from October 30, 2004 to March 5, 2005; Peter Corbin November 24, 2001 – May 10, 2004; and Lacrisha Wise –February 8, 2002 – June 7, 2003.

6. A true and accurate copy of an Employment Agreement-Sales Representative (the "Contract"), is attached hereto as Attachment A.

7. During the majority of their employments with Patriot, Plaintiffs were paid on a commission-only basis for timeshare units sold.

8. The Contract does not provide the commission percentage a salesperson earns. That information is set forth in separate documents and varied among Timeshare Salespeople and Timeshare Sales Managers.

9. Salespersons selling timeshare units, including the Plaintiffs, earned substantial incomes in great excess of minimum wage. As examples, Plaintiff Martin grossed $48,012.53 in 2002; Plaintiff Corbin grossed $40.234.42 in 2003; and Plaintiff Massaconi grossed $60,890 in 2003.

Signed under the pains and penalties of perjury this ___2___ day of April, 2007.

_____
Faith Lippert

Sworn and Subscribed to before me
this __2___ day of April, 2007.

_____
Notary Public
My Commission Expires:_____

> "Notary Public"
> Carrie Ann M. Powrozek
> Commonwealth of Massachusetts
> My Commission Expires on Dec., 11, 2009

# EXHIBIT
# A

## EMPLOYMENT AGREEMENT -
## SALES REPRESENTATIVE

AGREEMENT made this _8_ day of _February_____, 20_02_, by and between PATRIOT RESORTS CORPORATION, a Florida corporation, its successors, subsidiaries and assigns (hereinafter referred to as "the Company") and_Ackisha D. Wise_ residing at_22 Gladstone St. Spfld MA 01107_____ (hereinafter referred to as "Employee").

## WITNESSETH:

WHEREAS, The Company is engaged in the business of developing, marketing and selling resort recreational properties, including time share interests therein; and may in the future become engaged in other businesses; and

WHEREAS, Employee is desirous of providing sales and marketing services to the Company as an employee upon the terms and conditions hereinafter set forth; and

WHEREAS, in performing [his/her] duties under this Agreement, Employee will be privy to certain confidential and/or proprietary information about the Company and it's business, projects, customers, sales, and marketing and promotion of it's products; and

WHEREAS, the parties hereto agree that, under the circumstances, certain protections restricting the unauthorized disclosure of confidential information, competition, and solicitation are necessary to protect the legitimate business interests of the Company.

NOW, THEREFORE, in consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Employment and Duties:

The Company hereby employs Employee and Employee hereby accepts employment upon the terms and conditions hereinafter set forth. (As used throughout this Agreement, "the Company" shall mean and include any and all of its present and future subsidiaries.) Employee warrants that Employee is free to enter into and fully perform this Agreement and is not subject to any employment, confidentiality, non-competition or other agreement that would restrict Employee's performance under this Agreement.

Employee shall devote Employee's full time to the performance of services as a sales representative or to such other services as may from time to time be designated by the Company. During the term of this Agreement, Employee's services shall be completely exclusive to the Company and Employee shall devote Employee's entire time, attention and energies to the business of the Company and the duties to which the Company shall assign him from time to time. Employee agrees to perform Employee's services well and faithfully and to the best of Employee's ability and to carry out the policies and directives of the Company. Employee agrees to take no action prejudicial to the interests of the Company during Employee's employment hereunder.

The Employee shall conduct [himself/herself] in a businesslike, professional and reputable manner and in full compliance with all applicable laws, rules, and regulations.

The Employee shall have no authority to bind the Company by any promise or representation, unless specifically authorized in a particular transaction.

The Employee shall maintain a valid Massachusetts drivers license.

The Employee may from time to time be required to use [his/her] personal automobile in connection with [his/her] employment without reimbursement from the Company for automobile transportation expense including automobile insurance. The Employee shall at all times maintain a policy or policies of automobile insurance with minimum limits of liability in the amount of $250,000.00 per person and $500,000.00 per accident for bodily injuries caused by Employee, or by an uninsured and/or underinsured motorist. The Employee shall provide, at the commencement of employment, and upon the renewal of said policy or policies, appropriate certificates of insurance evidencing said insurance. If said policy or policies are for any reason cancelled, amended or revoked, Employee shall immediately notify the Company.

The Employee has received a copy of and at all times shall comply with the Company's Employee Manual.

2. Compensation:

A. Definitions:  For purposes of this Agreement, the following defined terms shall have the following meanings:

(i)    Time Share Interest - An interest in a project that allows a purchaser to use a unit and the other facilities of a project for a predetermined time period each year.

(ii)    Net Sales Price - Net Sales Price shall be the consideration paid or

to be paid for the purchase of any Time Share Interest, as set forth in the applicable purchase agreement, less any financing charges, fees, discounts, travel allowances, rebates, and the value of any other form of financial inducement given to a purchaser.

      (iii)   Cash Sale – A sale in which the full amount of the purchase price, as specified in the purchase agreement, is paid in cash.

      (iv)   Financed Sale – A sale in which the full amount of the deposit, as specified in the purchase agreement, is paid in cash and the balance of the purchase price is financed..

      (v)   Closing - The Closing on a purchase of any Time Share Interest shall be deemed to have occurred:

      (a) In the case of a Cash Sale, when the Company has been provided with all documentation required by it to effectuate the transaction in proper form, the full amount of the purchase price has been paid to the Company, all funds have cleared and all statutory rescission periods have expired without cancellation, and the Company, under applicable law, has the unrestricted use of purchaser's funds.

      (b) In the case of a Financed Sale, when the Company has been provided with all documentation required by it to effectuate the transaction in proper form, the full amount of the deposit has been paid to the Company, all funds have cleared, and all statutory rescission periods have expired without cancellation, and the Company, under applicable law, has the unrestricted use of the purchaser's funds and interest on the transaction has started to accrue to the Company.

      (vi)   Earned Commissions - A commission will be deemed earned upon the Closing of a sale, except that commissions on Financed Sales shall not be deemed earned until the purchaser has made three (3) timely and consecutive monthly payments in accordance with the terms of the purchase money note and mortgage.

      B. <u>Commission Schedule</u>: The Company shall pay to Employee Earned Commissions based upon a percentage, as stated in the Company's Commission Schedule attached hereto as Exhibit A, of the Net Sales Price of Time Share Interests

sold by Employee. The Company reserves the right, in its sole discretion, to modify and amend the Commission Schedule upon advance notice to Employee.

C. <u>Date Commissions Payable</u>: Earned Commissions shall be due and payable by the Company within twenty-one (21) days of the date earned, except that the Company will advance to Employee, within twenty-one (21) days of the Closing and subject to charge-back pursuant to Section 2.E. hereof, anticipated commissions on Financed Sales.

D. <u>Rejection of Purchasers</u>: The Company shall have the right, without liability or recourse, to reject any potential purchasers, in its sole discretion.

E. <u>Commission Charge-Back</u>: It is acknowledged between the Company and Employee that the Company is, or may be from time to time, required to guaranty to it's lenders and/or investors that purchase money notes and mortgages executed in connection with Financed Sales are valid and free of default for three timely (3) monthly payments from the date the first payments are due (purchase money notes and mortgages that are not valid and free of default as stated aforesaid are hereinafter referred to as "Non-Performing Notes and Mortgages"). Any commissions paid or advanced to Employee for Financed Sales involving Non-Performing Notes and Mortgages are subject to charge-back hereunder. The Employee shall reimburse to the Company out of any future commissions that may become due and owing to Employee the full amount of commissions paid or advanced to Employee by reason of said Financed Sales. Said reimbursement shall be made immediately after the Company receives notice that a purchase money note and mortgage is a Non-Performing Note and Mortgage and the Employee does hereby authorize the Company to offset the appropriate amount from the next available commission due Employee.

3.    <u>Termination:</u>

Either party may terminate this Agreement at any time and for any reason, or for no reason at all, upon twenty-four (24) hours notice. Upon termination for any reason, Employee shall immediately return and/or transfer to the Company all property described in Sections 4 and 5 hereof. Commissions on Closings that occur subsequent to either party's receipt of notice of termination of this Agreement, and commissions on Financed Sales for which Closings occurred prior to notice of termination but for which commissions have not yet been earned, shall be deemed earned, in addition to the requirements of Section 2.A(v) and (vi), only upon the return of all property described in Sections 4 and 5 hereof, and provided there has been no breach, or threatened breach, by the Employee of Sections 5 through 7 hereof. Commissions on said Closings shall not be advanced as provided in Section 2.C. above and same shall be due and payable only when earned as provided in Section 2.A(vi) hereof.

4.    All Business to Be the Property of the Company:

Employee agrees that any and all presently existing business of the Company and any business developed by Employee including without limitation all contracts, fees, commissions, compensation, books, records, manuals, documents, accounts, customer or client lists, customer worksheets, agreements, works of authorship (including computer program files, databases and other electronically stored information wherever stored and by whomsoever produced), and any other incident of any business developed, earned, created or carried on by Employee for the Company is and shall be the exclusive property of the Company, and (where applicable) shall be payable directly to the Company.

5.    Confidentiality:

Except in performance of services for the Company, Employee shall hold in the strictest of confidence and shall not, either during the period of Employee's employment with the Company or thereafter, use for Employee's own benefit or disclose to or use for the benefit of any person or entity, any Confidential Information of the Company, whether Employee has such information in Employee's memory or embodied in writing or other tangible form. For purposes of this Agreement, "Confidential Information" shall include, without limitation; any of the materials listed in Section 4 hereof; any Company proprietary information, technical data, trade secrets or know how including, without limitation, market research information; planned products or projects; any plans, specifications, designs, drawings and engineering information related to existing or planned projects or products; services; customer lists, customer worksheets and customers (including customers of the Company with whom Employee became acquainted during the course of [his/her] employment); lenders, suppliers and vendors; markets; software and hardware configuration and other technology used by the Company; internal processes and procedures; financing techniques, information and strategies; sales and marketing techniques, information and strategies; costs; pricing; and finances or other business information disclosed to Employee by the Company either directly or indirectly in writing, orally or otherwise. Confidential Information shall not include any of the foregoing items that have become publicly known or made generally available through no fault of Employee. All originals and copies of any of the foregoing, however and whenever and by whomsoever produced, shall be the sole property of the Company, not to be removed from the premises or custody of the Company without in each instance first obtaining authorization of the Company, which authorization may be revoked by the Company at any time. Upon the termination of Employee's employment in any manner or for any reason, Employee shall promptly surrender to the Company all copies and originals of any of the foregoing, together with any documents, materials, data, information, keys and equipment belonging to the

Company or relating to the Company's business and in Employee's possession, custody or control, and Employee shall not thereafter retain or deliver to any other person any of the foregoing or any copy, duplicate, summary or memorandum thereof.

6.   Non-Competition Covenants:

(THIS SECTION MAY AFFECT YOUR RIGHT TO ACCEPT EMPLOYMENT WITH OTHER COMPANIES SUBSEQUENT TO YOUR EMPLOYMENT WITH THE COMPANY)

Employee acknowledges that the Company's Confidential Information, and in particular the Company's list of clients and customers, is a valuable and unique business asset and that substantial Company resources have been expended to develop, protect and preserve same. Employee also acknowledges that, in the course of [his/her] employment, [he/she] will be privy to the Company's Confidential Information and will receive valuable training and experience in the marketing, promotion and direct sales of Time Share Interests that, if used in competition with the Company, could adversely affect the legitimate business interests of the Company.

Employee agrees that some restrictions on [his/her] activities during and after [his/her] employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company. Upon termination of employment, Employee is free to seek and accept new engagements or employment wherever Employee wishes, provided that:

A. During the term of employment and for a period of two (2) years after termination of such employment, Employee agrees not to engage or become interested in, directly or indirectly, as employee, owner, consultant, officer, director or partner, through stock ownership, investment of capital, lending of money or property, rendering of services or otherwise, either alone or in association with others in a competing or otherwise similar business to that conducted by the Company at any time during the term hereof within a two hundred (200) mile radius of any project in which the Company is involved.

B. During the term of employment and for a period of two (2) years after termination of such employment, Employee agrees not to engage or become interested in, directly or indirectly, as employee, owner, consultant, officer, director or partner, through stock ownership, investment of capital, lending of money or property, rendering of services or otherwise, either alone or in association with others, in any entity or business which sells or offers services or products, within a two hundred (200) mile radius of any project in which the Company is involved, competitive with or similar to those offered by the Company at any time during the term of this Agreement.

C. If Employee violates any of the covenants or agreements under this Section 6, The Company shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration, or other benefits that Employee directly or indirectly has realized and/or may realize as a result of, growing out of, or in connection with, any such violation. These remedies shall be in addition to, and not in limitation of, any other rights or remedies to which the Company is or may be entitled.

D. It being hereby intended that the restrictions in this Agreement shall be liberally construed in order to protect to the maximum degree the legitimate business interests of the Company, in the event a court of competent jurisdiction shall determine that the restrictions set forth in this Agreement are unreasonable or invalid either as to length of time or geographical area or for any reason, then the parties agree that what shall constitute a reasonable geographical area or reasonable time shall be determined by that court of competent jurisdiction and enforced accordingly.

E. Employee acknowledges that [he/she] has carefully read all the terms herein stated and agrees that the same are necessary for the reasonable and proper protection of the Company, and that the Company has been induced to enter into this Agreement upon the representation of Employee that [he/she] will abide by and be bound by the aforesaid non-competition covenants and restraints and that said covenants and restraints are reasonable with respect to such matters, as length of time, and geographical area described.

7.    Non-Solicitation Agreement:

Employee agrees and covenants that Employee will not, unless acting with the Company's express written consent, directly or indirectly, during the term of this Agreement or for a period of two (2) years thereafter, solicit, entice away or interfere with the Company's contractual relationships with any employee, officer, agent, customer, or client of the Company.

8.    Equitable Relief:

Employee acknowledges that any breach of Sections 3 through 7 of this Agreement may give rise to irreparable injury to the Company, which may not be adequately compensated by damages. Moreover, Employee acknowledges that to the extent that any breach of this Agreement may give rise to injury to the Company, which may be adequately compensated by damages, such damages may be difficult or impossible to calculate. Accordingly, in the event of a breach or threatened breach of any of Sections 3 through 7 of this Agreement, the Company shall be entitled in any proceedings, in addition to any remedies it may have at law, to an injunction or other

equitable relief to enforce the specific promises hereof and to restrain any further violations. The Company and Employee further agree that the order or injunction of any Court arising out of such proceedings shall, if applicable, extend the time during which Employee will not thereafter compete with the Company by the amount of time that the Employee had so engaged in competition with the Company in violation of the provisions of this Agreement. If in such proceedings Employee is found to have breached any of the terms hereof, Employee shall be liable to pay all of the Company's costs, expenses and reasonable attorney's fees incurred in connection with such proceedings and any appeals therefrom.

9.    Indemnity:  Employee agrees to indemnify and save harmless the Company for any loss or damage, including the reasonable fees of an attorney, which the Company may suffer by reason of any false, fraudulent or misleading statements or omissions of material facts, or violations of State or Federal law made by Employee:

A.  Employee acknowledges that sales of Time Share Interests in the Commonwealth of Massachusetts are governed by the Massachusetts Real Estate Time-Share Act , Massachusetts General Laws Chapter 183B, Section 1,et seq, as same may be amended from time to time, as well as other laws and regulations.

B.  Employee acknowledges that Time Share Interests at Company projects are being sold in reliance upon exemption from registration under the Securities Laws of Massachusetts and under the Securities Act of 1933.  This exemption is available because the Time Share Interests being sold are not structured as a security. Any statement by the Employee to the effect that the purchase of the timeshare interest is an "investment", "can be rented on behalf of the purchaser", or "can be repurchased from the purchaser" could result in the requirement that Time Share Interests be registered. In such event, the Employee will have engaged in a serious violation of federal law, and could be subjected to penalties or fines of $10,000.00 and imprisonment for five years for each offense in addition to civil penalties.  Employee shall engage in no act in contravention of the foregoing laws.

C.  Employee acknowledges that Financed Sales of Time Share Interests are governed by certain banking laws and regulations promulgated by the Comptroller of Currency, Federal Reserve Board, FDIC and other agencies. Employee agrees that [he or she] will effect sales according to the representations set out in official project documents, will make no misrepresentations, directly or by omission, and will not change the terms and conditions of any sale orally or in writing.

D. Employee acknowledges that Financed Sales of Time Share Interests are governed by the Federal Truth in Lending Simplification and Reform Act and rules adopted for its

implementation by the Federal Reserve Board under Regulation Z. Employee agrees to follow, and in no respect deviate from, the required disclosure information furnished by The Company.

E. Employee acknowledges that the project is exempt from registration under the Federal Interstate Land Sales Act. No representations other than those contained in the Time Share Instrument and/or Project Instrument filed pursuant to the Massachusetts Real Estate Time-Share Act shall be made by Employee to any purchaser. The promise to any purchaser of future amenities and services not set out in the Time Share Instrument and/or Project Instrument may constitute a violation of law and subject Employee and/or the Company to civil and or criminal penalties.

F. Employee acknowledges that under the various consumer protection acts, rules and regulations administered by the Federal Trade Commission (FTC) as well as under "Little FTC Acts" administered by other Federal administrative agencies, and under the Massachusetts Consumer Protection Act administered by the Attorney General of the Commonwealth of Massachusetts, consumers are protected from unfair, deceptive, fraudulent and/or "smart" business practices. Proscribed practices include false and misleading sales presentations, concealment of material facts, false advertising, oppressive or threatening sales techniques, and misrepresentation of rescission rights.

10.    Entire Agreement:

This agreement supersedes any and all other agreements, either oral or written, between the parties hereto with respect to the association between the Company and Employee and contains all of the covenants and agreements between the parties with respect to such association in any manner whatsoever. This Agreement may not be modified except in writing, such modification to be signed by all parties hereto.

11.    Law Governing:

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

12.    Indulgences:

In the event the Company shall fail to insist on the strict performance of any of the covenants herein contained and to be performed by the Employee, such failure shall not be construed as a waiver or relinquishment of the Company's right to enforce, at any time thereafter any such provision or condition and such right shall continue in full force and effect.

F:\windows\11 MH\Sales Representative Agreement  Modified by JRG 8-5-01 doc

13.   <u>Construction</u>:

.The parties agree that any term, provision, covenant or condition of this Agreement that may be susceptible of two constructions, one of which would render it valid and the other of which would render it invalid or unenforceable, shall be construed in such manner as to render it valid and the invalidity or illegality of any clause or provision herein shall not affect the validity of the remainder of this Agreement which shall remain in full force and effect.

IN WITNESS WHEREOF the parties hereto have signed or caused to be signed, these presents, the day and year first above written.

Signed, Sealed and Delivered in
the presence of

EMPLOYEE

Signed, Sealed and Delivered in
the presence of

PATRIOT RESORTS CORPORATION

By:

# EXHIBIT
## 2

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
            Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
            Defendants

DEPOSITION OF FAITH LIPPERT

May 17, 2005, 10:00

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
     JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
     KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

3

I N D E X

WITNESS:  FAITH LIPPERT

Direct Examination by Ms. Garrow                5

EXHIBITS

Exhibit 1,   Good Business Dates               15
Exhibit 2,   5/24/03 Memo Polansky/Lippert     31
Exhibit 3,   Payroll History of Corbin         41
Exhibit 4,   Payroll History of Massaconi      47
Exhibit 5,   Ten Steps to Success              57
Exhibit 6,   Vacation Village Tour Times       80
Exhibit 7,   12/4/04 Memo to Lewis/Rauer       82
Exhibit 8,   12/21/01 Memo to Lippert/Arnold   87
Exhibit 9,   Vacation Village Rotations        89
Exhibit 10,  Corbin Employment Agreement      104
Exhibit 11,  Martin Employment Agreement      105
Exhibit 12,  Wise Employment Agreement        125
Exhibit 13,  Patriot Employee Handbook        139
Exhibit 14,  5/11/03 Dress Code Memo          145
Exhibit 15,  12/22/04 Memo Re:  New-Hires     148
Exhibit 16,  6/8/03 Memo to Faith from Paul   157
    (continued)

---

4

EXHIBITS (continued)

Exhibit 17,  6/9/03 Memo to Lippert/Foster    167
Exhibit 18,  5/18/03 Memo to Wise from
                 Lippert/Lewis                180
Exhibit 19,  Policy for Sales Managers
                 Sales Performance            186
Exhibit 20,  Wise 2002 Attendance Record      191
Exhibit 21,  Handwritten Notes                204
Exhibit 22,  1/3/03-6/8/03 Typed Notes        215

---

5

1               STIPULATION

2

3       It is agreed by and between the parties

4  that all objections, except as to form of the

5  question, are reserved until the time of trial.

6

7       It is further agreed by and between the

8  parties that all motions to strike unresponsive

9  answers are reserved until the time of trial.

10

11       It is further agreed by and between the

12  parties that the sealing of the original

13  deposition transcript is hereby waived.

14

15       It is further agreed by and between the

16  parties that the notification to all parties of

17  the receipt of the original deposition

18  transcript is hereby waived.

19

20

21

22

23

24

---

6

1     FAITH LIPPERT, Witness, identified via

2  Massachusetts driver's license and having been

3  duly sworn, states as follows:

4

5     DIRECT EXAMINATION BY MS. GARROW:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  As you are already aware, my name is

9  Suzanne Garrow, and I'm the lawyer for Miss Wise,

10  Mr. Massaconi, Mr. Martin, and Peter Corbin, as

11  well as the other individuals who are similarly

12  situated to them, and we're here today to take

13  your deposition.

14    A.  Okay.

15    Q.  That was a very good response.  I'm

16  going to ask you to give audible response --

17  "yes," "no," "okay"; not "uh-huh" or "um-hum,"

18  because there's a court reporter here who's going

19  to take down all of your testimony.  So you need

20  to give an audible response.  Do you understand

21  that?

22    A.  Yes, I do.

23    Q.  I am going to try very hard not to

24  speak over you, and I'm going to ask you to do

---

7

1  the same, again because the court reporter is

2  going to be taking down my questions and your

3  answers, and she can't do that if you start

4  speaking during the question or if I start

5  speaking during your answer.  Do you understand

6  that?

7    A.  Yes, I do.

8    Q.  I'm going to ask you that if you don't

9  understand a question that I've asked, that you

10  ask me to either clarify or rephrase the

11  question, okay?

12    A.  Okay.

13    Q.  If you don't do that, I'm going to

14  assume that you understand the question as it's

15  asked, so it's important that you understand the

16  question that I'm asking, okay?

17    A.  Okay.

18    Q.  Have you taken any medications or any

19  other substances that might impair your ability

20  to testify truthfully and accurately as you sit

21  here today?

22    A.  No.

23    Q.  Will you please state your full name

24  and spell it for the record?

---

8

1    A.  Faith Lippert.  F-A-I-T-H

2  L-I-P-P-E-R-T.

3    Q.  Are you currently employed, Miss

4  Lippert?

5    A.  Yes, I am.

6    Q.  Where are you employed?

7    A.  I'm employed in Lanesborough,

8  Massachusetts.

9    Q.  Who is your employer?

10    A.  Patriot Resorts Corporation.

11    Q.  How long have you been employed by

12  Patriot Resorts Corporation?

13    A.  Since June of 2001 -- July maybe,

14  2001.

15    Q.  And what is your current position with

16  Patriot Resorts?

17    A.  Office Manager and Human Resources

18  Director.

19    Q.  You testified before that you work in

20  Lanesborough.  Are you office manager only as to

21  Patriot Resorts' Lanesborough location?

22    A.  Correct.

23    Q.  Are you human resources director only

24  as to Patriot Resorts' Lanesborough location?

---

9

1    A.    Correct.

2    Q.    Does that Resorts in Lanesborough have

3    any other names; does it go by any other names?

4    A.    Vacation Village in the Berkshires.

5    Q.    Do you know what the legal status of

6    Vacation Village in the Berkshires is; in other

7    words, is it a separate entity, to your

8    knowledge?

9    A.    I'm not sure.

10    Q.    Have you held any other positions

11    other than the positions you are currently

12    holding today for Patriot Resorts?

13    A.    No.

14    Q.    Have you ever worked in any other

15    location other than the Lanesborough location of

16    Patriot Resorts?

17    A.    With Patriot Resorts?

18    Q.    Yes.

19    A.    No.

20    Q.    Have you -- I'm sorry, I believe I

21    asked this, but I just want to clarify.  Have you

22    been working at Patriot Resorts since June 2001;

23    has that been your employer?

24    A.    Yes.

---

10

1    Q.    What are your responsibilities as

2    office manager of the Lanesborough location?

3    A.    I oversee the administration end of it

4    as far as contracts -- sales contracting,

5    payroll, accounts payable.  I work with the

6    attorneys when we do fundings, and I work with

7    escrow.

8    Q.    What do you mean by administer sales

9    contracting; what does that mean?

10    A.    Administration.  I oversee the staff,

11    the administration staff.

12    Q.    What are the general categories of

13    employees of the administration staff?

14    A.    The girls that type up contracts, the

15    reception area.  I oversee it, but I don't manage

16    it.  Basic secretarial work.

17    Q.    So you oversee the individuals who do

18    basic secretarial work?

19    A.    Yes.

20    Q.    How many people do you oversee?

21    A.    There's five in my office, which would

22    be doing the contracting, and there's three out

23    in the Reception Center.

24    Q.    You testified that you did not manage

---

11

1    those three.  Who does?

2    A.    Dennis Clavette.

3    Q.    Where is Mr. Clavette physically

4    located?

5    A.    In Lanesborough in the Reception

6    Center.

7    Q.    Do you happen to know what his job

8    title is?

9    A.    He's the manager of the Reception

10    Center.

11    Q.    That is his job title?

12    A.    Yes.

13    Q.    Does he have any other titles, like

14    you have two that you testified to?

15    A.    No.

16    Q.    Any other duties -- strike that.  You

17    said that you do payroll.  What do you do -- what

18    are your payroll functions?

19    A.    I do the office staff payroll, which

20    are the contracting girls, their payroll; the

21    Reception Center payroll; and I do commissions

22    for the salespeople.

23    Q.    When you say you do it, what do you

24    mean by you do it -- what are your duties?

---

12

1    A.    I gather the information and I print

2    it out to the system and I submit it to Fort

3    Lauderdale, and that is where they issue checks.

4    Q.    Is that the same duties as to the

5    office staff folks, the Reception Center people,

6    and the commissions -- in other words, do you do

7    the same things, those duties you just specified

8    -- do you do the same thing as to all three

9    categories of employees?

10    A.    I'm not sure I get what you're saying.

11    Q.    For the office staff, you gather

12    information relating to their hours worked, is

13    that correct?

14    A.    Yes, they have -- prior to a few

15    months ago, they had a time sheet that they

16    signed in on, and now we have a time clock.

17    Q.    When did you get your time clock?

18    A.    Oh, gosh, I'm not real sure.  I would

19    say maybe six months ago or so.

20    Q.    Who punches the time clock, which

21    employees?

22    A.    Just the office staff, the Reception

23    Center.

24    Q.    Do you gather their hours and input

---

Wissy v Patriot - Faith Lippert - 5/17/05

---

**13**

1    those into the system, the office staff and the

2    Reception Center staff?

3        A.    I don't put them in the system, no.

4        Q.    Who does?

5        A.    All of the information is sent to Fort

6    Lauderdale.

7        Q.    Directly from the time clock, is

8    that...

9        A.    Yes, I figure up the hours on the

10   cards and then I submit copies on a weekly basis

11   down to Fort Lauderdale.

12       Q.    What, if anything, do you do to gather

13   hours worked for sales personnel?

14       A.    I don't, personally do not.

15       Q.    Do you know if somebody does?

16       A.    When they come in in the morning, they

17   sign on a rotation, and that is done by Dennis or

18   his staff.

19       Q.    When you say that, you mean gathering

20   the hours worked?

21       A.    Not necessarily the hours worked; just

22   the rotation, the sign-in rotation.

23       Q.    Do you know who works for

24   Mr. Clavette?

---

**14**

1        A.    Emily Bates and Mallory Bonaville.

2        Q.    So you testified that you print

3    something into the system that's part of your

4    duties.  What do you mean by that -- you say you

5    print into the system?

6        A.    The Good Business Ledger.

7        Q.    Is that --

8        A.    That is what I pay commissions off of.

9        Q.    And that's for salespeople?

10       A.    Yes.

11       Q.    Are there different categories of

12   salespeople, to your knowledge?

13       A.    Yes.

14       Q.    What are the different categories?

15       A.    We have a project director, we have

16   line directors, we have sales managers, and sales

17   representatives.

18       Q.    Is that the complete list of the

19   categories of salespeople?

20       A.    Yes.

21       Q.    Do you have any other duties with

22   relation to payroll other than what you already

23   testified to?

24       A.    No.

---

**15**

1        Q.    You mentioned Good Business Ledger?

2        A.    Um-hum.

3        Q.    I'm going to show you a document.  Can

4    you tell me what that document is?

5        A.    This is a date schedule I go by to do

6    the Good Business Ledger.

7              (Exhibit 1, Good Business Dates,

8              marked for identification)

9        Q.    (By Ms. Garrow)  I'm showing you

10   what's been marked as Exhibit 1.  Now, this is --

11   I understand is not a Good Business Ledger, but

12   can you explain what you use this document for?

13       A.    Yes.  I would take -- in order to do

14   up a Good Business Ledger, what I pay from, I

15   start with the -- it's a closed date begins, and

16   it ends on the sale date ends.  It's a week.

17       Q.    So I'm going to stop you there if you

18   don't mind.

19       A.    Sure.

20       Q.    This says "Sale DT Begins".  Is that

21   sales date begins?

22       A.    It should be closed date begins, not

23   sales date begins.

24       Q.    What does that mean?

---

**16**

1        A.    That means that any of the contracts

2    with the closed date that begins on the first

3    column date and closed date ends on this date,

4    the sales reps. would be paid on the last column

5    date.

6        Q.    The last column date being sales reps.

7    paid 9/3/2001, if we look at the first line of

8    Exhibit 1?

9        A.    Yes.

10       Q.    So let's go through this a little more

11   slowly just so we understand.  Close date begins,

12   so does that mean that a sale that is made

13   between 8/7/2001, if we look at the first line of

14   Exhibit 1, and 8/13/2001, if we look at the

15   second column of the first line of Exhibit 1?

16       A.    Yes.

17       Q.    Does that mean a sale that is made in

18   those dates?

19       A.    No, it means the close date, when the

20   actual contract was closed, when it became Good

21   Business, after rescission.

22       Q.    So explain to me what it means to have

23   a contract closed.

24       A.    The contract is written on a certain

---

Wiser v Patriot – Faith Lippert - 5/17/05

**17**

1  day and comes out of rescission. Once it comes
2  out of rescission, all the monies are good and
3  then we go ahead and we close it.
4      Q.  It doesn't say "closed date" on here,
5  right, it says --
6      A.  That's correct, but since then I have
7  changed the more recent ones to "closed date
8  begins" because it was confusing everyone else
9  who saw it. In the beginning they did not see
10  it.
11      Q.  Who received this Good Business
12  listing or Good Business dates, what we are
13  calling Exhibit 1 -- who would you give this to?
14      A.  In the very beginning, nobody, and it
15  wasn't until probably maybe -- I want to say
16  around two years after one of the sales managers
17  -- line directors came to me and said, Well,
18  Faith, we've got to let these guys know when
19  they're going to be paid, and so I gave him a
20  copy of this and explained to him that any of the
21  deals that were closed from this date to this
22  date and here's the check date.
23      Q.  Who was that?
24      A.  That was Paul Stensland.

**18**

1      Q.  So I notice that on Page 3 of
2  Exhibit 1, Bates Stamp 3402, it's written below
3  Good Business, it says "closed dates". Do you
4  see that?
5      A.  Um-hum.
6      Q.  Is that your handwriting?
7      A.  Yes.
8      Q.  So was it at that point that you claim
9  that you changed what this column was entitled?
10      A.  Probably. I don't recall, you know,
11  the actual date that I put that up there, but it
12  was confusing to people that were not used to
13  seeing this, and basically nobody saw it but me.
14      Q.  Did you do anything differently,
15  change your procedures in any way as a result of
16  changing the name from "sale date" to "close
17  date"?
18      A.  Did I change any procedure or
19  anything?
20      Q.  Yes.
21      A.  No, ma'am.
22      Q.  So explain to me what the third column
23  is, then, if we look at Line 1.
24          MS. FABBO:  On Page 1?

**19**

1      Q.  (By Ms. Garrow)  On Page 1, thank you.
2      A.  Those are the same dates as the closed
3  end date.
4      Q.  What's different about those two
5  columns, just so I understand?
6      A.  Nothing.
7      Q.  What about "Good Business Pulled,"
8  what does that mean -- do you see that? That's
9  the fourth column.
10      A.  Um-hum. I'm not quite sure.
11      Q.  Did you prepare this document?
12      A.  No.
13      Q.  Who did?
14      A.  This was sent from Fort Lauderdale
15  when we first started out. This was a schedule
16  that I was using when I first started there.
17      Q.  Did you get instructions on what this
18  was -- what this document, Exhibit 1, was when
19  you got it?
20      A.  Yes -- yes.
21      Q.  From whom?
22      A.  Andrew Thompson from Fort Lauderdale
23  was the one that sent the schedule to me.
24      Q.  What is his position?

**20**

1      A.  I'm not sure what it is now. He's
2  moved. At the time he was doing commissions, but
3  he's not doing commissions now.
4      Q.  Is he still with the company?
5      A.  Yes.
6      Q.  Does he work for Patriot, to your
7  knowledge, or does he work for Berkley?
8      A.  I'm not sure who he works for, to tell
9  you the truth, but he works down in Fort
10  Lauderdale.
11      Q.  Is it your testimony -- let me strike
12  that. What's the fifth column, if we're looking
13  at the first line. Says "sales reps. paid"?
14      A.  Um-hum.
15      Q.  What does that mean?
16      A.  That would be the check date.
17      Q.  Just so I understand, is it your
18  testimony that if a sale closed between 8/7 and
19  8/13, a sales rep. was supposed to be paid on
20  9/3/2001?
21      A.  Correct.
22      Q.  Can you tell me reasons why if a sale
23  -- strike that. Are there any reasons why if a
24  sale closed between 8/7/2001 and 8/13/2001 that