Wise v. Patriot — Faith Lippert — 5/17/05

**Page 21**

1  the sales rep. would not have been paid?

2      A.   No.

3      Q.   I'm just going to ask you to flip to

4  -- let's go to the third page where we were

5  before, the page that on the first date is

6  1/7/2003.  Do you see that?

7      A.   Um-hum.

8      Q.   Is there any reason why if a sale was

9  made between 1/7/2003 and 1/13/2003 that the

10  sales rep. would not have been paid on

11  February 3, 2003?

12      A.   I'm not sure of the exact date when we

13  started on holding checks, because they didn't

14  receive a PAC check with the contract.  I'm not

15  quite sure of the date that they started that.

16      Q.   What is a PAC check?

17      A.   PAC check is a Pre-Authorized

18  Checking, and we get those from the customer,

19  from the owner -- the new owner -- and they void

20  out a check so that we can get like a sure pay, a

21  monthly sure pay for their mortgage payment.

22      Q.   Is it something --

23      A.   From directly out of their checking

24  account.

**Page 22**

1      Q.   So it's something that gets drafted

2  out of their checking account monthly?

3      A.   Yes.

4      Q.   And when I say "they," I mean the

5  customer?

6      A.   Yes.

7      Q.   You mentioned at some point you

8  started adhering to that policy?

9      A.   Correct.

10      Q.   And you're not sure when it was, is

11  that your testimony?

12      A.   I'm not sure of the exact date.

13      Q.   Do you have a general idea?

14      A.   I wouldn't want to guess.

15      Q.   I'm definitely not asking you to

16  guess.  Do you think it was before January of

17  2003?

18      A.   I believe so, um-hum.

19      Q.   Do you believe it was in the last half

20  of 2002, if you know?

21      A.   I don't recall.

22      Q.   So a salesperson at some point was

23  required to get a voided check from a customer,

24  is that correct?

**Page 23**

1      A.   Yes.

2      Q.   What happened if the salesperson did

3  not do that?

4      A.   Then their earned commissions are due

5  after three consecutive timely monthly payments

6  are made.

7      Q.   How did you learn of that policy?

8      A.   It's in the sales agreement.

9      Q.   So is it your testimony that that was

10  the policy that was adhered to before Patriot

11  started taking PAC checks?

12      A.   It was in the handbook, yes, but they

13  did not follow through with the policy until

14  later.

15      Q.   When you say it was "in the handbook,"

16  what was in the handbook?

17      A.   About explaining the earned

18  commissions with the three consecutive timely

19  monthly payments.

20      Q.   You're saying that policy was not

21  followed at some point?

22      A.   In the very beginning when we first

23  started there.

24      Q.   For how long was that policy not

**Page 24**

1  followed?

2      A.   I'm not quite sure.  I believe it was

3  before 2003, but I'm not sure when they started

4  it.

5      Q.   Well, in looking at Exhibit 1, if we

6  follow any of the lines through, it would appear

7  that a sales rep. was supposed to be paid on a

8  sale within about a month's time of making that

9  sale, is that correct?

10      A.   Around a month.

11      Q.   And that hasn't changed?

12      A.   No.

13      Q.   In fact, we have a printout through

14  2005 and, it looks like that is the -- the dates

15  are the same, that it's about a month's time

16  throughout, is that correct?

17      A.   That's correct.

18      Q.   Are you aware of the hours worked each

19  day by sales representatives?

20      A.   I am aware not of total hours that

21  they work; I am aware that they take out tours.

22      Q.   Are you aware that at times a

23  salesperson could work more than forty hours per

24  week?

Wise v. Patriot - Faith Lippert - 5/17/05

25

1    A.    I'm not aware of that, no.

2    Q.    Are you aware that a sales manager

3    could work more than forty hours per week?

4    A.    No, I'm not aware of that.

5    Q.    Are you generally aware of a

6    salesperson's daily schedule?

7    A.    Not necessarily.  I know that they

8    come in and they take out a tour according to how

9    many tours are coming in.

10    Q.    Are you aware if a salesperson's daily

11    schedule has changed over the last three years?

12    A.    I don't understand what you're asking.

13    Q.    Are you aware generally if salespeople

14    have had a change in what their required hours

15    are over the last three years?

16        MS. FABBO:  Objection.  You can

17        answer.

18        THE WITNESS:  I'm still not sure

19        what you're asking, I'm sorry.

20    Q.    (By Ms. Garrow)  That's all right.

21    Are you aware if there is a particular pay period

22    which constitutes the work week for salespeople

23    at Patriot?

24    A.    Yes, I follow the Good Business

26

1    Ledger.

2    Q.    So that would be the pay period?

3    A.    Yes.

4    Q.    What are charge-backs?

5    A.    There would be a few different

6    charge-backs.  Are you talking about commission

7    charge-backs?

8    Q.    Well, why don't you tell me what the

9    types of charge-backs are?

10    A.    I didn't know whether you meant like a

11    miscellaneous charge-back for sometimes, you

12    know, we give them RCI books and we have to

13    charge them for miscellaneous like $10 to get the

14    RCI book.  Other than that, a commission

15    charge-back would happen if for some reason

16    somebody has gone Good Business and a check has

17    come in back, so we'd have to temporarily

18    charge-back a sales rep. until we get that money

19    back.  A charge-back can occur if people are not

20    making their payments.

21    Q.    Could that happen at any time during

22    the life of the contract, to your knowledge?

23    A.    If they haven't made three consecutive

24    timely monthly payments, yes.

27

1    Q.    At any time during the contract?

2    A.    That's my testimony.

3    Q.    Do you know what happens to the money

4    that has already been collected on that contract

5    if at some point, let's say a year after the

6    contract has been in force -- what happens to the

7    money that's already been collected?

8    A.    No, I don't.

9    Q.    Do you know who would know that?

10    A.    In Fort Lauderdale.  I don't know who.

11    Q.    Do you get paid by commission at all?

12    A.    Me?

13    Q.    Yes.

14    A.    No.

15    Q.    How are you paid?

16    A.    Salary.

17    Q.    What is your salary?

18    A.    1,391 a week.

19    Q.    That's your take-home?

20    A.    No.

21    Q.    So that's gross?

22    A.    Yes.

23    Q.    Is there an hourly wage for people who

24    are employed as salespeople at Patriot in

28

1    Lanesborough?

2    A.    No, ma'am.

3    Q.    Is there an hourly wage for people who

4    are employed as sales managers by Patriot in

5    Lanesborough?

6    A.    No.

7    Q.    Are there any additional sums of money

8    paid to anybody employed as a salesperson other

9    than their commissions to salespeople at Patriot

10    in Lanesborough -- let me give you an example --

11    like vacation pay, sick pay?

12    A.    Everyone is allowed fifteen days

13    personal time during the year, and that could be

14    any of those that you just mentioned.

15    Q.    So those are fifteen paid days?

16    A.    Um, well, they get their commissions

17    if one comes through to be paid, yes, but do we

18    pay like a salary, no.

19    Q.    So there is no sick pay, is that fair

20    to say?

21    A.    That's fair to say.

22    Q.    Is there accrued vacation time at all,

23    vacation pay?

24    A.    Not that I'm aware of, no.

---

**29**

```
1        Q.    Are you aware of any order from the
2   Massachusetts Attorney General or the U.S.
3   Department of Labor relating to how salespeople
4   or sales managers are paid at Patriot in
5   Lanesborough?
6        A.    No.
7        Q.    Are you aware of any ruling or
8   guidance or interpretation that was issued by the
9   Massachusetts Attorney General or the United
10  States Department of Labor relating to how
11  salespeople or sales managers are paid at Patriot
12  in Lanesborough?
13       A.    No.
14       Q.    Do you understand that it is legal to
15  pay salespeople or sales managers at Patriot in
16  Lanesborough straight commission?
17            MS. FABBO:  Objection.
18            MS. GARROW:  You can answer.
19            THE WITNESS:  Can you repeat it,
20       I'm sorry.
21       Q.    (By Ms. Garrow)  Do you understand
22  that paying salespeople or sales managers
23  straight commission is a legal practice?
24            MS. FABBO:  Objection.
```

---

**30**

```
1            THE WITNESS:  Did you say legal
2       or illegal?
3        Q.    (By Ms. Garrow)  I said legal.  Do you
4   understand that to be a legal practice?
5            MS. FABBO:  Objection.
6            THE WITNESS:  I'm not quite sure
7       what you're asking.
8        Q.    (By Ms. Garrow)  Do you believe that
9   it is acceptable under state and federal law to
10  pay a salesperson -- state law being
11  Massachusetts and -- and federal law, to pay a
12  salesperson straight commissions?
13       A.    I'm not aware, I don't know.
14       Q.    You don't know?
15       A.    I don't know.
16       Q.    Have you ever done any independent
17  research to make yourself aware of that?
18       A.    No.
19       Q.    Have you ever asked anybody in Fort
20  Lauderdale if that is a legal practice?
21       A.    No.
22       Q.    Other than your attorney, have you
23  consulted with anyone as to whether paying
24  straight commission is a legal practice?
```

---

**31**

```
1        A.    No.
2        Q.    Have you sought any guidance from the
3   United States Department of Labor or the
4   Massachusetts Attorney General regarding the
5   practice of paying salespeople and sales managers
6   straight commission at Patriot in Lanesborough?
7            MS. FABBO:  Objection.  Go ahead.
8            THE WITNESS:  No.
9        Q.    (By Ms. Garrow)  Do you know if
10  anybody has?
11       A.    I do not know.
12            (Exhibit 2, 5/24/03 Memo to
13            Polansky from Lippert,
14            marked for identification)
15       Q.    (By Ms. Garrow)  I'm showing you
16  what's marked as Exhibit 2.  Do you recognize
17  that document -- do you recognize that?
18       A.    Yes.
19       Q.    What is this document?
20       A.    It's a fax letter that I sent to Bruce
21  Polansky.
22       Q.    A fax or an e-mail, is it?
23       A.    E-mail, sorry.
24       Q.    It looks like there was some
```

---

**32**

```
1   highlighter put on this document.  Although it
2   looks very dark to you, it would be appear to be
3   highlighter?
4        A.    Yes.
5        Q.    Did you put that on here, the
6   highlighter?
7        A.    I don't remember.
8        Q.    So you don't know if you did or if you
9   didn't?
10       A.    Yes, I don't remember.
11       Q.    Under the highlighter, I'm going to
12  represent to you what it says, because I'm the
13  only one who has -- and I think I'm going to have
14  to mark this one as the exhibit.  This one is
15  somewhat legible, so I will read to you what it
16  says and maybe this will help.  It says,
17  "December 1 of last year was when the line was
18  told no PAC/no pay, three timely payments."  This
19  was dated May 24, 2003.  Does that refresh your
20  recollection --
21       A.    Possibly.
22       Q.    -- as to when you started the no
23  PAC/no pay policy?
24       A.    Possibly, um-hum.
```

---

---

**33**

1    Q.   It says here -- and again I will show
2    this to you if you would like, but that this is
3    being done at Massanutten, this no PAC/no pay.
4    What is Massanutten?
5    A.   Massanutten is a resort in Virginia.
6    Q.   In Virginia?
7    A.   Yes.
8    Q.   By the way, does Patriot have any
9    other locations in Massachusetts other than the
10   Lanesborough location?
11   A.   No.
12   Q.   Are all sales of Massachusetts -- let
13   me strike that.  Are they selling Massachusetts
14   property at the Lanesborough location?
15   A.   Yes.
16   Q.   Are all sales of Massachusetts
17   property done through the Lanesborough location?
18   A.   Yes.
19   Q.   And those are sales of Patriot, of
20   course.  Can you tell me why you sent this e-mail
21   to Bruce Polansky?
22   A.   I don't recall off the top of my head.
23   Q.   You want to take a minute to review it
24   and see if it refreshes your recollection?

---

**34**

1        MS. FABBO:  Can you mark that one
2        so she can look at it?
3        MS. GARROW:  Yes.
4    A.   Can you ask me the question again?
5    Q.   Sure.  Do you recall why you sent
6    this?
7    A.   It appears -- I don't remember right
8    off the top, but it appears that I'm answering
9    Bruce's question as to why Joel didn't get his
10   commission on a particular deal, and then I went
11   ahead and I wrote this little note to him
12   explaining why I put a stamp on the worksheet so
13   that the guys would be aware that there was no
14   PAC, that they needed to get it in order to get,
15   you know, their commissions.  That was just a
16   reminder for them.
17   Q.   What was just a reminder?
18   A.   The stamp that I put "no PAC/no pay,
19   three monthly payments".  I put that on the
20   worksheet so when the guys received their copy of
21   the worksheets, the next morning after they had a
22   sale that day, it would remind them that they
23   needed to get a PAC check in order to not hold up
24   their commissions.

---

**35**

1    Q.   You say it was just a reminder, but
2    that, in fact, was the policy at that time, was
3    it not?
4    A.   What was the policy?
5    Q.   No PAC/no pay.
6    A.   Correct.
7    Q.   It says here they have at least three
8    weeks to get this PAC check in.  Is that true?
9    A.   Yes.
10   Q.   So can you tell me what that means?
11   A.   We will accept a PAC check up to
12   fifteen days prior to the first mortgage due
13   date.
14   Q.   Is that still the policy today?
15   A.   Yes.
16   Q.   Has that been the policy as far as you
17   recall since this has been instituted?
18   A.   Yes.
19   Q.   Anyone ever charge on their credit
20   card the entire mortgage for one of these units?
21   A.   Yes.
22   Q.   Anybody ever pay cash for one of these
23   units?
24   A.   Yes.

---

**36**

1    Q.   Anyone ever give you a check for one
2    of these units?
3    A.   Yes.
4    Q.   Give the salesperson a check?
5    A.   Yes.
6    Q.   What happens if -- when does a
7    salesperson get paid on a deal if somebody
8    charged the unit that they purchased?
9    A.   It still goes by the closed date.
10   Q.   What would be the closed date if it
11   was charged?
12   A.   It all depends on where the purchaser
13   resided, whether it be Massachusetts,
14   Connecticut, New Jersey, or New York.
15   Q.   I guess I don't understand.  Can you
16   explain to me what the differential closed dates
17   would be -- if someone came and put a unit on
18   their Visa, would the salesperson get paid?
19   A.   It all depends on whether it's closed.
20   Q.   What I don't understand is what the
21   difference is when was it closed, how do you know
22   when something was closed when somebody put it on
23   a charge card; how do you determine the closed
24   date?

---

37

1    A.  We go by calendar.  It depends on what
2  state, whether they're from Massachusetts,
3  Connecticut, New York, or New Jersey.  They have
4  three days in rescission, or seven days New York,
5  New Jersey.
6    Q.  Well, walk me through.  Let's say
7  somebody lived in Massachusetts who charged this
8  on their Visa card.  Walk me through if I was the
9  salesperson when I would get paid.  Explain that
10  to me.
11    A.  Massachusetts, Connecticut people have
12  three days' rescission, and after they're out of
13  rescission, then we close them.  We don't -- we
14  don't close it the day that we receive the money.
15  We wait until they're out of the rescission
16  period.
17    Q.  And so that would be three days?
18    A.  Yes, in Massachusetts and Connecticut.
19    Q.  So it should close in three days?
20    A.  Yes.
21    Q.  Then when would the salesperson get
22  paid?
23    A.  The same here -- 21 days to a month.
24    Q.  What's the differential in New Jersey

38

1  or New York, just a different rescission period?
2    A.  Yes, days -- seven.
3    Q.  They both are seven days?
4    A.  Yes.
5    Q.  Otherwise it's the same process?
6    A.  Yes.
7    Q.  What about if I came to Vacation
8  Village and I wrote a check for the entire amount
9  of a time-share there, when would that
10  salesperson get paid?
11    A.  The same, based on the closing date.
12    Q.  Also given the three-day rescission if
13  they're in Massachusetts or Connecticut or the
14  seven-day rescission in New Jersey or --
15    A.  New York.
16    Q.  -- New York?
17    A.  Um-hum.
18    Q.  And what about if the person who
19  purchased the time-share paid by cash?
20    A.  Same thing.
21    Q.  In this e-mail to Bruce Polansky.  You
22  said that Joel -- that's Joel Hecht, right?
23    A.  Yes.
24    Q.  "He, to be nice, is a rebel"?

39

1    A.  Yes.
2    Q.  What does that mean?
3    A.  He was, he is.  He was pretty much
4  against any type of a policy.  The one that
5  sticks out in my mind mostly is, albeit a small
6  policy, our smoking policy, and he would always
7  be throwing his cigarette butts down on the
8  ground.  And he just got -- he would get really
9  offensive, you know -- defensive about people
10  trying to tell him, You can't do that, you need
11  to do this, you need to do that.  He was always
12  against any type of authority, I would say.
13    Q.  So he violated the smoking policy?
14    A.  Yes.
15    Q.  And threw his cigarettes down on the
16  ground?
17    A.  Yes.
18    Q.  Did you ever discipline him for that?
19    A.  Yes, yes.
20    Q.  For the smoking policy?
21    A.  Yes.
22    Q.  Did you discipline him for anything
23  else?
24    A.  Off the top of my head, I can't think

40

1  of any other reason that I talked to him in
2  person.  I did talk with managers about him
3  parking over in the Reception Center area.  Sales
4  representatives are not supposed to park over in
5  the reception area.
6    Q.  So he violated the parking policy?
7    A.  Always.  Or a lot.  I wouldn't say
8  always.  A lot.
9    Q.  How often?
10    A.  Oh gosh, quite a bit.
11    Q.  At least once a week?
12    A.  Probably.
13    Q.  Maybe twice a week?
14    A.  Maybe.
15    Q.  What other policies that he did not
16  follow?
17    A.  Being to work on time.  There would be
18  a few times that he would do that.
19    Q.  When you say "a few times," was it as
20  often as once a week that he came late?
21    A.  Possibly.  I'm not quite sure off the
22  top of my head.
23    Q.  But you recall him being late to work
24  regularly?

**41**

1    A.   I don't personally recall.  I heard.

2    Q.   So you have knowledge of it?

3    A.   Yes.

4    Q.   Any other policies you know of that he

5  violated?

6    A.   Not that I can think of at this time.

7    Q.   Now, this e-mail that you sent was in

8  May of 2003.  Do you know how long Joel Hecht had

9  been working there when you sent this e-mail?

10    A.   No.

11    Q.   Any idea?

12    A.   No idea.

13              (Exhibit 3, Payroll History

14               of Peter Corbin, marked

15               for identification)

16    Q.   (By Ms. Garrow)  I'm showing you

17  what's been marked as Plaintiff's Exhibit 3.

18  We'll try and go through this as painlessly as

19  possible here.

20    A.   Okay.

21    Q.   Looks like 12/31/02, this looks like

22  -- why don't you tell me what it is?

23    A.   This appears to be the payroll history

24  of Peter Corbin.

**42**

1    Q.   And it looks like it was for the year

2  2002, is that fair to say, if you look up in the

3  upper right corner?

4    A.   Someone has written in 12/31/02, yes.

5    Q.   These are two consecutive pages, is

6  that correct?

7    A.   Yes.

8    Q.   I'm just going to call your attention

9  to the second quarter, which is on the first page

10  of Exhibit 3, and they have First Quarter Total,

11  and the first column says "check date, 4/15".  Do

12  you see that?

13    A.   4/15, $50?

14    Q.   Yes, do you see that?

15    A.   Um-hum.

16    Q.   That's got a check number, is that

17  correct, that's the next column?

18    A.   Yes.

19    Q.   Then what's that next line, the next

20  column?

21    A.   It shows 40 hours.

22    Q.   Is that the number of hours you

23  understood Mr. Corbin would have been at work?

24    A.   No.

**43**

1    Q.   How many hours do you think he was at

2  work that week?

3    A.   I wouldn't know.  I don't know.

4    Q.   What would you look to if you wanted

5  to see what hours he was there; how would you

6  know that?

7              MS. FABBO:  Objection.  Go ahead.

8         You can answer.

9              THE WITNESS:  I'm not sure if

10         they did it back then or not.  The

11         only time there's ever been any times

12         put on are what we refer to as a TO

13         slip, a little white slip, and the

14         times are written when the people go

15         out on a tour and then their times are

16         written when they come in.

17    Q.   (By Ms. Garrow)  So that's just time

18  for a tour, though, correct?

19    A.   Correct.

20    Q.   So other than times for a tour, would

21  you have any idea how many hours Mr. Corbin was

22  at the Lanesborough facility a day?

23    A.   No.

24    Q.   Or a week?

**44**

1    A.   No.

2    Q.   So let's go to the next column in

3  which there are numbers.  Do you see that -- I

4  think you mentioned it before, $50?

5    A.   Um-hum.

6    Q.   Is that what you understood

7  Mr. Corbin's check to have been for that -- looks

8  like two-week period, or one-week period?

9    A.   It was his check dated April 15.

10    Q.   So that would have been his check that

11  he received that week, correct?

12    A.   Correct.

13    Q.   Now, you'll have to bear with me

14  because these documents that were provided to us

15  are -- the first line is cut off, but if you look

16  behind the first two documents, there's a third

17  document that says Salesman Ledger Report.  Do

18  you see that?

19    A.   Yes.

20    Q.   Then the next document is a Customer

21  Directory.  Do you see that?

22    A.   Yes.

23    Q.   What we're going to need to do is get

24  better copies of these copies, but what I'm going

45

1  to do is I'm going to represent to you that the
2  first three pages are the Customer Directory for
3  2002 for Mr. Corbin -- I'm sorry, not the first
4  page, but the next three pages. Do you see that?
5       A.   Yes.
6       Q.   What are customer directories?
7       A.   That is a list of customers by the
8  date they came in, the date that they toured.
9       Q.   So if somebody actually toured on a
10 certain day or certain week, their name would
11 appear under that date on their customer
12 directory?
13      A.   Correct.
14      Q.   How long do tours generally last?
15      A.   An actual tour?
16      Q.   Yes.
17      A.   90 minutes to -- and it all depends on
18 what their interest would have been -- whether,
19 you know, how much longer it would be.
20      Q.   So 90 minutes --
21      A.   90 minutes is the qualified tour time.
22      Q.   Then it could be longer?
23      A.   It could be longer, depending on
24 interest of people.

46

1       Q.   And salespeople can take out more than
2  one tour a day?
3       A.   Yes.
4       Q.   Do they generally?
5       A.   It all depends on how many tours are
6  coming in.
7       Q.   How are tours -- how do you know how
8  many tours are coming in; how are the tours
9  brought in, I guess is a better question?
10      A.   Through the Marketing Department.
11      Q.   Not through the salespeople?
12      A.   No.
13      Q.   Do they have any responsibility for
14 bringing tours in?
15      A.   No.
16      Q.   What about sales managers, do they
17 have any responsibility for bringing tours in?
18      A.   No.
19      Q.   What is the Marketing Department?
20      A.   The only thing that I can tell you
21 about the Marketing Department is that they're
22 the ones responsible for bringing in our tours at
23 any given day.
24           MS. GARROW:  Let's mark this.

47

1            (Exhibit 4, Payroll History
2             of Michael Massaconi,
3             marked for identification)
4       Q.   (By Ms. Garrow)  I'm showing you
5  what's been marked as Plaintiff's 4.  What is
6  this document?
7       A.   Payroll history for Michael Massaconi.
8       Q.   On the bottom right, it says "Through
9  check 12/31/02".  Am I reading that correctly?
10      A.   That's correct.
11      Q.   I'll call your attention to the last
12 two lines of the fourth quarter, there's a check
13 on 12/23 and a check on 12/30.  Those are weekly
14 checks to Mr. Massaconi, is that correct?
15           MS. FABBO:  Objection.
16           THE WITNESS:  As best to my
17           knowledge.
18      Q.   (By Ms. Garrow)  can you tell if
19 Mr. Massaconi received any other payment that
20 week from Patriot Resorts?
21           MS. FABBO:  Objection.  Which
22           week are you talking about?
23      Q.   (By Ms. Garrow)  Either of those weeks
24 -- 12/23 or 12/30.

48

1       A.   I can't tell by looking at this, no.
2       Q.   Where else would you look to see if he
3  received any other payment?
4       A.   I wouldn't look anywhere else.
5       Q.   So would that show all the payments
6  for Patriot Resorts for each of the weeks he
7  worked there?
8       A.   I would say so, yes.
9       Q.   What were Mr. Massaconi's gross
10 earnings for the week of 12/23/02?
11      A.   $50.
12      Q.   And what were his gross earnings the
13 week of 12/30/02, according to your payroll
14 ledger here?
15      A.   $60.
16      Q.   If you go to the next page in
17 Exhibit 4, again it's cut off, but I'll represent
18 to you it says here from 1/1/02 to 12/30/02.  Do
19 you see that, customer directory?
20      A.   One -- yes, I guess that's a one up
21 there, right, and the 12/30, okay.
22      Q.   I'm going to ask you to just peruse
23 the first column here, and that looks like a date
24 column, is that correct?

49

1     A.    That's correct.

2     Q.    If I represent to you that the last

3  seven entries are from December of 2002, does it

4  appear that Mr. Massaconi had any tours at that

5  time?

6     A.    Yes.

7     Q.    How can you tell that?

8     A.    Under the column where it says "T" is,

9  where the "Y" is, the "Y" stands for yes.

10    Q.    So in other words, he took a tour?

11    A.    He took a tour, yes.

12    Q.    He took a tour at that time?

13    A.    Um-hum.

14    Q.    What is the other number before that,

15 what is that?

16    A.    That is a CAS number, which is a

17 computer number.  You can either bring up a tour

18 name or a tour number.  That's the tour number.

19    Q.    But what does it denote, I guess is

20 what I'm asking?

21    A.    Nothing.

22    Q.    Nothing?

23    A.    No.

24    Q.    Why is it there, do you know?

50

1     A.    To identify the tour.

2     Q.    So it's an identification number?

3     A.    Yes.

4     Q.    What about "ID," what is that?

5     A.    That is what kind of program they came

6  in under.

7     Q.    What does that mean?

8     A.    That's a marketing entry.

9     Q.    So what does "OVNSY" -- do you know

10 what that means?

11    A.    I believe it's an overnight stay from

12 New York.

13    Q.    What about "OVNGR"?

14    A.    Overnight from Grafton office.

15    Q.    That's a marketing office in Grafton?

16    A.    Yes.

17    Q.    And New York is another marketing

18 office?

19    A.    I'm not sure.

20    Q.    What is "CBOX," do you know -- I'm

21 just asking if you know.

22    A.    It's a Chesapeake box, I believe.

23    Q.    What does that mean?

24    A.    It's a marketing program.

51

1     Q.    So these are all different marketing

2  programs?

3     A.    Yes, ma'am.

4     Q.    What is -- what would be constituted

5  in "Other"?

6     A.    A walk-in, somebody that just walks in

7  off the street, something like that.

8     Q.    There are a few other entries here.

9  If you know what they mean, please tell me.

10    A.    "SDVGR," I'm not sure.

11    Q.    "SDR"?

12    A.    I'm not sure.

13    Q.    How about "DAYDK"?

14    A.    They're day drives through another

15 marketing company.

16    Q.    So it's another type of marketing

17 service?

18    A.    Correct.

19    Q.    What about "nonother"?

20    A.    I'm not sure what that is.

21    Q.    Is there any way to tell in here if a

22 sale was made?

23    A.    Yes.

24    Q.    How can we tell that?

52

1     A.    Under the "TranKey Column," all of

2  those that have numbers are sales.

3     Q.    So if these are in December, on

4  12/22,Mr. Massaconi made a sale?

5     A.    Yes.

6     Q.    Who are your supervisors, if you have

7  supervisors?

8     A.    Rebecca Foster.

9     Q.    Anybody else?

10    A.    No.

11    Q.    We talked a lot about your office

12 manager duties.  Are there any other office

13 manager duties that you haven't told me about

14 already that you perform?

15    A.    No.

16    Q.    What about as human resources director

17 -- is that your title?

18    A.    Yes.

19    Q.    Can you tell me your duties as human

20 resources director?

21    A.    When we hire new people, I do the

22 orientation with them.  I go over all the

23 paperwork.

24    Q.    Do you have any responsibility for

53

```
1    hiring people?
2         A.   Just in the office.
3         Q.   Just the administrative staff, or --
4         A.   Correct.
5         Q.   What about the reception staff?
6         A.   Yes, them, too.  I consider them
7    administration, also.
8         Q.   So you can hire for those positions?
9         A.   Yes, ma'am.
10        Q.   Can you fire for those positions as
11   well?
12        A.   Yes.
13        Q.   Do you have any firing authority as to
14   any other positions other than those?
15        A.   I wouldn't say that I have the
16   authority.  I have input.
17        Q.   How often are you consulted?
18        A.   Not often.
19        Q.   For input?
20        A.   Not often.
21        Q.   Do you ever independently give your
22   input relating to hiring or firing for sales
23   positions?
24        A.   The best of my recollection, the only
```

54

```
1    time that I will say something is, let's say
2    somebody leaves and then wants to come back, and
3    if I see if there's a problem, then I would state
4    what that problem would be, my thoughts.
5         Q.   Other human resources duties that you
6    have?
7         A.   Making sure that their paperwork is in
8    order, making sure that their licenses are in
9    order, their insurances are in order -- or
10   insurance, I should say -- are in order.  And
11   basically keeping up with them when they are due
12   to -- when they're eligible to receive benefits
13   as far as health insurance, dental insurance,
14   life insurance.
15        Q.   Are those insurance programs through
16   Fort Lauderdale, or do you have some input in
17   picking who --
18        A.   I don't have input in picking.
19   They're done through Fort Lauderdale.
20        Q.   What is Becky Foster's position?
21        A.   She is president of Patriot Resorts
22   Corporation.
23        Q.   Do you know how long she's been
24   president?
```

55

```
1         A.   With Patriot?
2         Q.   Yes.
3         A.   I'm not sure when they were
4    incorporated, so no.
5         Q.   To your knowledge, has she always been
6    president during the time that you've reported to
7    her?
8         A.   Yes.
9         Q.   You mentioned that salespeople would
10   sign in and out when they take a tour, is that
11   correct?
12        A.   Yes.
13        Q.   Were there any other sign-in
14   procedures that you were aware of, other than
15   signing in and out for a tour, for salespeople?
16        A.   They would sign when they came in to
17   work on a rotation.
18        Q.   Is the same true for sales managers?
19        A.   Yes.
20        Q.   What about signing out; was there any
21   requirement to sign out for the day for
22   salespeople?
23        A.   No.
24        Q.   Sales representatives, no?
```

56

```
1         A.   No.
2         Q.   What about sales managers?
3         A.   No.
4         Q.   Were employees required to be in at a
5    certain time -- sales employees required to be in
6    at a certain time in the morning?
7         A.   Yes.
8         Q.   Was it the same for salespeople and
9    sales managers?
10        A.   Yes.
11        Q.   What time was that?
12        A.   By 8:30.
13        Q.   Has that been for the entire time that
14   you have been with your position at Patriot?
15        A.   Yes.
16        Q.   Are you aware of the general duties
17   and responsibilities of salespeople?
18        A.   General, yes.
19        Q.   What happens when a salesperson comes
20   in in the morning -- what are they required to
21   do, if anything?
22        A.   First thing they need to do when they
23   come in in the morning is to sign in, and then
24   the next thing that happens is -- they do hold a
```

57

1  meeting in the morning, and then from there, they
2  go in to take their tours.
3      Q.   Who holds a meeting?
4      A.   One of the line directors and whoever,
5  you know, they bring in to help them, or
6  periodically I think maybe they let one of the
7  managers hold a meeting.  It all depends.
8      Q.   When you say one of the managers, you
9  mean a sales manager?
10     A.   Yes.
11     Q.   Are all salespeople and sales managers
12 required to be at this morning meeting?
13     A.   Yes.
14              (Exhibit 5, Ten Steps to Success,
15              marked for identification)
16     Q.   (By Ms. Garrow)  Showing you what's
17 been marked as Plaintiff's Exhibit 5, Ten Steps
18 to Success.  Have you seen this before?
19     A.   Yes.
20     Q.   What is it?
21     A.   The sales representatives follow ten
22 steps.  They are trained with the ten steps, and
23 this is a basic breakdown of those ten steps.
24     Q.   So you mentioned the morning meeting.

58

1  That's not on here, is that correct?
2      A.   That's correct.
3      Q.   So that's something in addition to
4  these Ten Steps to Success, the morning meeting,
5  is that correct?
6      A.   Correct.
7              MS. FABBO:  Objection.  Go ahead.
8      Q.   (By Ms. Garrow)  And just so I'm
9  clear, the morning meeting happens every morning,
10 is that true?
11     A.   Yes.
12     Q.   So under Number 1, it talks about
13 pre-tour.  Do you see that?
14     A.   Yes.
15     Q.   And what is "pitch book"?
16     A.   Their pitch book is usually a
17 three-ring binder, and they have miscellaneous,
18 like sales tools in there to help with what
19 they're doing.  Can I let you know that I'm not
20 really all that familiar with the ten steps, so
21 I'll let you know that right up front so you
22 don't go through the whole thing.
23     Q.   That's fine.  But let's get back to
24 the pitch book.  That's a three-ring binder?

59

1      A.   Generally a three-ring binder.
2      Q.   Is that something that is provided to
3  the salespeople by Patriot, or the salesperson is
4  required to bring in their own binder?
5      A.   The salesperson is required to bring
6  in their own binder.
7      Q.   You said generally a three-ring
8  binder.  Do they have to bring that three-ring
9  binder?
10     A.   I don't really know what they're
11 required to do.  You'd have to ask the managers
12 or the directors.
13     Q.   And "credit applications" and
14 "T-pitch," do you know what those are?
15     A.   I know what they are.
16     Q.   What are they?
17     A.   They are different documents that they
18 use during the day to help with their, hopefully,
19 sale.
20     Q.   It says "at your fingertips".  Does
21 each salesperson have a specific location that
22 they work out of?
23     A.   No, all of these are located in a
24 bookcase within the Sales Center, and when they

60

1  need them, they go and get them.
2      Q.   Do they have tables that they work
3  there from, the salespeople?
4      A.   There's tables, yes.
5      Q.   Do they have assigned tables, each
6  salesperson?
7      A.   No.
8      Q.   What about sales managers, do they
9  have assigned tables?
10     A.   They don't have assigned tables, but
11 there is a desk, you know, where the managers sit
12 during the day.
13     Q.   What about the salespeople, do they
14 sit somewhere during the day when they're not on
15 tour?
16     A.   They're in the lounge.
17     Q.   All of them, are they all there?
18     A.   It should be -- they should be.
19     Q.   Are they required to be in the lounge
20 if they're not taking a tour?
21     A.   I don't know.
22     Q.   Your testimony was that you're not
23 completely familiar with these ten steps?
24     A.   Right.

**61**

```
 1        Q.   But have you had an opportunity to
 2   take a look at them?
 3        A.   I haven't looked at this for a long
 4   time.
 5        Q.   Why don't you take a few minutes to
 6   take a look at it.
 7             MS. GARROW:   Why don't we go off
 8        the record.
 9             (A break was taken)
10             MS. GARROW:   Back on the record.
11        Q.   (By Ms. Garrow)  We're back on the
12   record.  Have you had an opportunity to review
13   Exhibit 5?
14        A.   Yes.
15        Q.   Does that generally conform to what
16   you understand the tour -- the flow of the tours
17   to be?
18        A.   Yes.
19        Q.   Is it your understanding that the tour
20   that's set forth here from Number 2, Meet and
21   Greet, that's meet and greet the customer who's
22   coming to view the time-shares, is that correct?
23        A.   Correct.
24        Q.   And it continues through, Show
```

**62**

```
 1   Vacation Home and Welcome Center and Customer
 2   Send-off.  Do you see that?
 3        A.   Yes.
 4        Q.   Is it your understanding that this is
 5   the tour that generally takes 90 minutes?
 6        A.   Yes.
 7        Q.   Are there any after-tour activities
 8   that a salesperson is required to do on a regular
 9   basis?
10        A.   On a regular basis?
11        Q.   Yes.
12        A.   Not that I'm aware of.
13        Q.   What about the paperwork; when does
14   the paperwork get filled out for a sale?
15        A.   Right after they sign the worksheet.
16   They bring it into the office, we send it out,
17   it's closed, and then the people go.
18        Q.   When you say it's 90 minutes for a
19   tour, is that including if there is a sale?
20        A.   No.
21        Q.   How long would it take if there was a
22   sale, to your knowledge?
23        A.   Sometimes I've seen them come in after
24   two hours, sometimes I've seen them five or six
```

**63**

```
 1   hours.
 2        Q.   Why would it take five or six hours to
 3   complete a sale?
 4        A.   It would all depend on the
 5   salesperson, how much time he wanted to put into
 6   it.
 7        Q.   Do certain salespeople generally take
 8   longer than others?
 9        A.   Some do.
10        Q.   Mr. Martin -- Roger Martin, was he
11   somebody who took longer than others?
12        A.   I don't believe so.
13        Q.   What about Mr. Massaconi?
14        A.   Mike, I would assume would be
15   thorough.  Possibly.  There again, I don't know.
16        Q.   He was a sales manager, so he would
17   also take tours even as a sales manager?
18        A.   Yes.
19        Q.   Would he also do what's called TO as
20   well?
21        A.   Yes.
22        Q.   What is TO?
23        A.   Take Over.
24        Q.   What does that mean?
```

**64**

```
 1        A.   To the best of my knowledge, there
 2   again, I am not really involved in that aspect of
 3   it.
 4        Q.   Just to your knowledge.
 5        A.   It would be when a sales rep. brings
 6   their people in to sit at a table, and then the
 7   managers come over and try and help with the
 8   sale.  To what extent, I don't know, but it's a
 9   help.
10        Q.   Would that happen on every tour, do
11   you know?
12        A.   Yes.
13        Q.   Where are these tables located; are
14   they in the Reception Center?
15        A.   No.
16        Q.   Where are they located?
17        A.   They're in the Sales Center.
18        Q.   Are there two separate buildings?
19        A.   Yes.
20        Q.   The Reception Center is the one where
21   you meet the tour, and then the Sales Center is a
22   separate building?
23        A.   Yes, correct.
24        Q.   And are they both located on the
```

65

1  Lanesborough property?
2      A.  Yes.
3      Q.  How far apart are they?
4      A.  Feet.
5      Q.  It appears from the Ten Steps to
6  Success that salespeople, or anybody who takes
7  out tours, are required to take the customer --
8  the potential customer around to other locations
9  in the area, is that true?
10     A.  Correct.
11     Q.  In fact, there are specific
12 instructions here, you go to Greylock but you
13 don't get out of the car, right?
14     A.  Correct.
15     Q.  Do you know why that instruction is
16 there, not to get out of the car?
17     A.  I don't think legally they can, as far
18 as, you know -- they can't talk about selling
19 time-shares there.  I think it has something to
20 do with the state.  I don't know what the actual
21 law is, though.
22     Q.  But nonetheless, they take them around
23 to Brodie and to Jiminy Peak?
24     A.  Correct.

66

1      Q.  And that's expected of all the
2  salespeople or anybody who takes out a tour, is
3  that fair to say?
4      A.  Correct.
5      Q.  When a sales manager comes to do a TO,
6  are they generally seated at the desk that you
7  testified about before -- you said all the
8  managers sit at a desk.  Is that where they
9  generally are?
10     A.  Repeat that?
11     Q.  I apologize.  Where are the sales
12 managers located at the time when salespeople
13 come back -- sales representatives come back from
14 a tour; where are the sales managers?
15     A.  I'm not sure.
16     Q.  Where is your office?
17     A.  I'm in another building.
18     Q.  A third building.
19     A.  A fourth building.
20     Q.  So we have the Reception Center, we
21 have the Sales Center, your building -- does that
22 have a name?
23     A.  Contracting.
24     Q.  And what's the other building?

67

1      A.  Exit.
2      Q.  The Exit Building.  So when you said
3  you're in a fourth building, the first three are
4  all related to tours, is that correct?
5      A.  Yes.
6      Q.  If you can just walk me through where
7  a customer starts their tour.  I assume they
8  start it at the Reception Center, is that fair to
9  say?
10     A.  Yes.
11     Q.  Then what happens?
12     A.  They come into the Sales Center for a
13 short period of time.
14     Q.  Before they go on tour?
15     A.  Yes, just for a very short period of
16 time.
17     Q.  I apologize.  What do they do in that
18 short period of time, to your knowledge?
19     A.  I'm not sure.
20     Q.  Would that be the same if a sales
21 representative took the tour as well as a
22 salesperson manager?
23     A.  Yes.
24     Q.  Same procedure.  They'll spend a

68

1  little bit of time in the Sales Center, and then
2  what happens?
3      A.  They'll take them on their tour to
4  Greylock, various places.  I'm not really sure,
5  but they do go by Greylock and Jiminy Peak.
6      Q.  When you say "they," the sales manager
7  or person who is conducting the tour?
8      A.  Right.
9      Q.  Then what happens?
10     A.  They take them to our resort, they
11 show them the model.
12     Q.  Are they required to show them the
13 model?
14     A.  Yes.
15     Q.  Who requires that?
16     A.  The company.
17     Q.  Fort Lauderdale Patriot Property?
18     A.  Patriot.
19     Q.  What happens after the sales rep. or
20 person shows them the model?
21     A.  Then they come back to the center.
22     Q.  Where is the model?
23     A.  In Hancock across from Jiminy Peak.
24     Q.  How long do they spend there, do you

69

1    know?

2        A.    I don't know.

3        Q.    It's a portion of the tour, is that

4    fair to say?

5        A.    Right, right.

6        Q.    Then after viewing the model, you say

7    they come back to Lanesborough?

8        A.    Uh-huh, the Sales Center.

9        Q.    Do you know what happens then?

10       A.    That's when everybody sits and talks.

11       Q.    Presumably whoever did the tour tries

12   to close the deal?

13       A.    Correct.

14       Q.    And I assume there are times when the

15   salesperson or sales manager who conducted the

16   tour does not close the deal, is that fair to

17   say?

18       A.    I'm not real keen on what happens at

19   that point.

20       Q.    What is the Exit Department?

21       A.    In the Sales Center when the people

22   first get back in, they come into the Sales

23   Center and they're trying to sell them an annual

24   ownership or a bi-yearly ownership.  And if the

70

1    people decide for whatever reason that they don't

2    want to purchase that, then they bring them out,

3    bring the tour out to the Exit Department where

4    they fill out a survey and they are talked into

5    whether or not to try and buy a tri-yearly, and

6    then they are gifted.

7        Q.    Who works in the Exit Department?

8        A.    They have a manager, and I think three

9    representatives.

10       Q.    Are they sales representatives?

11       A.    Yes.

12       Q.    Are they people who regularly work on

13   the line, or are they different sales

14   representatives?

15       A.    No, they're different.

16       Q.    And do you have any oversight over the

17   Exit Department?

18       A.    No.

19       Q.    We were talking a bit before about

20   when a sales rep. or sales manager comes to work,

21   they go to their sales meeting and then they all

22   go to the Sales Center, is that correct, after --

23   after their morning meeting?

24       A.    Um-hum.

71

1        Q.    Sales managers and sales

2    representatives congregate at the Sales Center,

3    is that correct?

4        A.    I'm not really sure.  It's my

5    understanding the sales representatives stay in

6    the lounge area and the managers would be over in

7    the Sales Center at that time.

8        Q.    So the lounge area, is that in the

9    Reception Center?

10       A.    Yes.

11       Q.    Is that where the morning meeting is

12   held -- do you know where the morning meeting is

13   held?

14       A.    No, I'm not sure.

15       Q.    Do you know where the sign-in rotation

16   sheet is located in the mornings?

17       A.    Yes.

18       Q.    Where is that?

19       A.    Sales Center.

20       Q.    So at some point, the sales

21   representatives are required to go to the Sales

22   Center in the morning, is that correct?

23       A.    That's correct.

24       Q.    Is the same true of the sales

72

1    managers?

2        A.    Yes.

3        Q.    Have you ever been to the lounge area

4    when sales representatives were waiting for

5    tours?

6        A.    No.

7        Q.    Never seen a sales rep. waiting for a

8    tour?

9        A.    I've never gone over there in the

10   morning, no.

11       Q.    What about in the afternoon?  I

12   understand there are tours in the afternoon as

13   well.

14       A.    I've gone over there in the afternoon,

15   but not -- I don't hardly ever go into the lounge

16   area.  If I go over there, it's to speak with the

17   Reception Center employees up front at the

18   check-in counter.

19       Q.    Who are the Reception Center

20   employees?  I think you gave me the name of a

21   couple people -- Mallory and Emily?

22       A.    Yes.

23       Q.    And that's it?

24       A.    Yes.

73

1    Q.   Two girls?

2    A.   Two girls and Dennis.

3    Q.   Have you ever been consulted by a

4    sales representative or sales manager who wanted

5    to leave the Lanesborough premises during a day?

6    A.   As in what -- can you be more

7    specific?

8    Q.   Let me rephrase it.  Has a sales

9    representative or sales manager ever expressed an

10   interest to leave the Lanesborough facility

11   during the day when they weren't out on tour,

12   expressed that to you?

13   A.   Not that I can recall, no.

14   Q.   Has anyone ever asked you permission

15   to leave during the day for a period of time?

16   A.   Not that I can recall.

17   Q.   Again, I'm talking about sales

18   representatives or sales managers.

19   A.   Not that I can recall.

20   Q.   Do you have any knowledge -- strike

21   that.  Is there a policy as to what a sales

22   representative or sales manager must do if they

23   want to leave the lounge area other than to take

24   a tour?

74

1    A.   So far as I know, they are allowed to

2    do that, but they have to let somebody know what

3    they're doing.  Like if they leave to go get gas

4    or go to get something to eat, whatever, they

5    have to let somebody know that they're going.

6    Q.   So if somebody wants to go grab a

7    lunch, they would need to say, I'm going to grab

8    a lunch?

9    A.   Yes.

10   Q.   Do they generally eat in the lounge,

11   do you know?

12   A.   I'm not sure, but I know they're

13   allowed to.  There's things there that help them

14   to do -- there's a refrigerator and microwave,

15   things like that.

16   Q.   We were talking before about

17   instituting the no PAC/no pay policy, and I

18   believe you referred to Exhibit 2; that happened

19   sometime around December of 2002, according to

20   that exhibit.  Do you recall that now?

21        MS. FABBO:  Objection.  You can

22        answer.

23        THE WITNESS:  December 1 of last

24        year was when what came into...

75

1    Q.   (By Ms. Garrow)  The no PAC/no pay

2    policy in Lanesborough?

3    A.   That's what I've written here.  It

4    would appear that that would be the time, yes.

5    Q.   So if somebody -- if a customer gave a

6    PAC check at the time that they took a tour,

7    let's say on that day, when would you expect that

8    customer -- once the no PAC/no pay policy was

9    instituted, when would you expect that sales

10   representative who made the sale to get paid?

11   A.   Anywhere from 21 days to a month

12   later.

13   Q.   And that was from the time the no PAC/

14   no pay policy was instituted, is that correct?

15   A.   Yes.

16   Q.   Was there any difference -- what was

17   the policy prior to that time?

18   A.   Whenever they hit Good Business,

19   whenever the deals hit Good Business, the

20   representatives would be paid.

21   Q.   And to hit Good Business?

22   A.   Out of rescission, close.

23   Q.   So in other words, if a sale was

24   written and the rescission period expired, then

76

1    that's when it closed for purposes of Good

2    Business?

3    A.   Correct.

4    Q.   Going back to Exhibit Number 1, you

5    had talked about the -- we had talked a little

6    about the columns.  What does "sale date begins"

7    mean?

8    A.   First of all, it was really closed

9    date, okay, and I changed it later on because

10   this was confusing.  The "closed date begins"

11   would be a Tuesday.

12   Q.   Every Tuesday?

13   A.   Every Tuesday.  Then the close date is

14   every Monday, so the Good Business week is

15   Tuesdays through Mondays.

16   Q.   Every week?

17   A.   Yes.

18   Q.   So prior to the no PAC/no pay rule, if

19   a salesperson wrote business on a Tuesday and the

20   rescission period was up in three days here in

21   Massachusetts, would it then fall within that

22   same week as being the sale date; or in other

23   words, was the closing date considered to be

24   within that week?

77

1    A.    Yes.  There's -- with Massachusetts,
2  Connecticut, I think it's like three days, but
3  they don't count weekends.  There's stipulations
4  there; I'm not sure really which they are.  I
5  think Jersey is the only one that has seven days.
6        Q.    Not business days, just seven straight
7  days?
8        A.    Yes.
9        Q.    But in my example, let's say the sale
10 is written on a Tuesday, so then it's Wednesday,
11 Thursday, Friday -- that date it would then
12 become Good Business?
13       A.    Right.  It would be Good Business on
14 that Saturday.
15       Q.    And so then at that point, when would
16 you expect the salesperson to get paid?
17       A.    I always go by whatever the schedule
18 is reading here.
19       Q.    So that was prior to the no PAC/no pay
20 rule, is that correct?
21       A.    Correct.
22       Q.    Then at that point, they were required
23 -- the salesperson was required to get a PAC
24 check in order to get paid on that same original

78

1  schedule, is that correct?
2        A.    Say that again, I'm sorry?
3        Q.    Let me ask it this way.  What then
4  changed when the no PAC/no pay rule came into
5  effect from the scenario we just discussed in
6  terms of the payment of the salesperson; how was
7  the salesperson's pay date affected by no PAC/no
8  pay?
9        A.    If they didn't have a PAC check, it
10 would hold up payment of their check.
11       Q.    Until three timely payments were made,
12 is that correct?
13       A.    Correct.
14       Q.    Just so I understand, if the customer
15 paid timely two months in a row, let's say they
16 bought a time-share in August and paid timely --
17 are they required to pay August, is that the
18 first timely payment, or are they required to pay
19 September first, do you know?
20       A.    Probably September 1 or 15.
21       Q.    So let's say they paid timely
22 September, paid timely October, and let's say
23 three days late in November payment.  What would
24 happen in terms of the sales representative's

79

1  compensation?
2        A.    I don't know how many dates -- how
3  many days they take into consideration late, like
4  their grace period or whatever, I'm not sure.
5        Q.    Is there a grace period?
6        A.    I'm not sure if there is or not.
7        Q.    So potentially if a customer was
8  several days late, that salesperson would not get
9  paid, is that your testimony?
10       A.    I'm not sure.  That's Fort Lauderdale.
11       Q.    Who would know about that?
12       A.    Lauren Powell.
13       Q.    Would you expect Miss Foster would
14 know about that as well?
15       A.    Possibly.
16       Q.    What is Lauren Powell's position?
17       A.    She is the manager of the Commission
18 Department.  I don't know what her title is.
19       Q.    And she's in Fort Lauderdale, you
20 said?
21       A.    Yes.
22       Q.    After the no PAC/no pay was
23 instituted,was there any change in when a sales
24 representative got paid if the deal was paid in

80

1  cash?
2        A.    If the deal is paid in cash the day of
3  sale, you mean?
4        Q.    Yes.
5        A.    No, it's always been the same.  It's
6  always been the 12 -- comes out of rescission,
7  21 days to a month, whatever the schedule reads
8  here.
9        Q.    So that hasn't changed at all since no
10 PAC/no pay?
11       A.    No.
12       Q.    What about if somebody charges on
13 their credit card -- if someone charges a deal on
14 their credit card on the day of the sale, has
15 that changed in any way?
16       A.    No.
17       Q.    Is the 21-day after rescission, is
18 that a legal policy?
19       A.    I don't know.
20       Q.    To pay at that time?
21       A.    I don't know.
22            (Exhibit 6, Vacation Village
23            Tour Times, marked
24            for identification)

**81**

```
 1        Q.    (By Ms. Garrow)  I'm showing you
 2  what's been marked as Exhibit 6.  Do you know
 3  what this document is?
 4        A.    Yes.
 5        Q.    Have you seen this document before
 6  today?
 7        A.    Yes.
 8        Q.    What is it?
 9        A.    This is a list of our tour times,
10  during certain months.
11        Q.    Do you know, has this been -- have
12  these been the tour times since you have been
13  employed at Patriot in Lanesborough?
14        A.    I'd have to look back.  I'm not sure
15  off the top of my head.  It looks correct, yes.
16        Q.    So at 9:00 in the morning, it says
17  "managers and referrals".  Do you know what that
18  means?
19        A.    No.
20        Q.    What about 10:00, "deal writers and
21  normal rotation".  What's normal rotation?
22        A.    I'm not real sure.
23        Q.    Do you understand that this is when
24  salespeople are required to be in the lounge
```

**82**

```
 1  awaiting tours?
 2        A.    Yes.
 3        Q.    And normal rotation means that a
 4  salesperson is waiting for their rotation?
 5              MS. FABBO:  Objection.
 6        Q.    (By Ms. Garrow)  Or waiting to be
 7  called to do a tour, is that correct?
 8        A.    I'm not real sure what his definitions
 9  are here.
10        Q.    Who authorized this document, to your
11  knowledge?
12        A.    Dennis.
13        Q.    Do you know who received this
14  document, if anybody?
15        A.    I asked him to do this up so that we
16  could have it to give to our attorneys.
17        Q.    Do you know when this was prepared?
18        A.    I don't recall the date, no.
19        Q.    Do you know if this was prepared since
20  the lawsuit has been filed, this particular
21  lawsuit?
22        A.    Yes.
23              (Exhibit 7, 12/4/04 Memo to
24              Lewis, et al, from Rauer
```

**83**

```
 1              marked for identification)
 2        Q.    (By Ms. Garrow)  I'm showing you
 3  what's marked Plaintiff's 7.  Have you seen this
 4  document before?
 5        A.    Yes.
 6        Q.    What is this document?
 7        A.    It's a memo from Bill Rauer to the
 8  directors and the managers.
 9        Q.    And you were copied on this document
10  at the time it was sent, is that true?
11        A.    Yes.
12        Q.    Who is Bill Rauer?
13        A.    I'm not sure what his official title
14  is.  He used to be the project director up here,
15  and now he has -- he's located down in Florida,
16  but he still has activity up here.
17        Q.    At some point, was Rod Lewis the
18  project director of Lanesborough?
19        A.    Rod Lewis is, yes.
20        Q.    Is he currently?
21        A.    Yes.
22        Q.    After Rod Lewis began as project
23  director, at some point was he for an interim not
24  the project director; in other words, after he
```

**84**

```
 1  started as project director, was he ever demoted,
 2  to your knowledge?
 3        A.    No.  Rod Lewis?
 4        Q.    Yes.
 5        A.    No.
 6        Q.    So he's always been project director
 7  since he came to fill that position?
 8        A.    Yes.
 9        Q.    Do you recall when that was?
10        A.    No.
11        Q.    Do you know if Bill Rauer is Rod
12  Lewis' superior?
13        A.    Yes.
14        Q.    Does Rod Lewis report directly to Bill
15  Rauer, to your knowledge?
16        A.    Yes.
17        Q.    This memo is dated December 4, 2004?
18        A.    Um-hum.
19        Q.    I'm going to ask you to take a minute
20  to review it and see if these are new policies
21  that were instituted December 4, 2004, or if
22  these are policies that were already in
23  existence.
24        A.    To the best of my knowledge, this was
```

85

```
 1   all done up in memo form from Bill because these
 2   policies have always been in existence.  It's
 3   just that they've had problems with everybody
 4   doing what they were asked to do -- or were
 5   expected to do, I should say.
 6       Q.   So to your knowledge, from the time
 7   you were employed by Patriot in Lanesborough,
 8   these were the policies?
 9       A.   Yes.
10       Q.   That salespeople were supposed to
11   adhere to, is that correct?
12       A.   Yes.
13       Q.   Were there any specific problems
14   relating to these policies that you can think of
15   as you sit here today on or around the time this
16   memo was authored?
17           MS. FABBO:  Objection.  You can
18           answer.
19           THE WITNESS:  There are a couple
20           of representatives that -- sales
21           representatives that had a problem
22           with some of -- you know, doing some
23           of these things.
24       Q.   (By Ms. Garrow)  Was that around the
```

86

```
 1   end of the year 2004 that you're talking about?
 2       A.   No, I think -- it was an ongoing
 3   thing.  It just basically came to a head at that
 4   time, I believe.
 5       Q.   What were the circumstances that
 6   caused it to come to a head?
 7       A.   They weren't doing these five things.
 8       Q.   How do you know that?
 9       A.   By conversations -- different
10   conversations that I've had.
11       Q.   Conversations with whom?
12       A.   Mostly Dennis.
13       Q.   So what did Dennis tell you
14   specifically that sales representatives weren't
15   doing?
16       A.   They weren't signing back in after
17   their first tour, they're leaving without letting
18   him know, they've gone for the day.  There's a
19   ten-minute rule between tours -- or not between
20   tours, but to pick up a tour.  A tour shouldn't
21   be there any more than ten minutes before they
22   are meet-and-greeted.
23       Q.   How is the sales representative
24   informed that there's a tour that they're
```

87

```
 1   supposed to meet and greet over at the Reception
 2   Center?
 3       A.   I'm not sure of that policy.
 4           (Exhibit 8, 12/21/01 Memo to
 5           Lippert from Arnold,
 6           marked for identification)
 7       Q.   (By Ms. Garrow)  I'll show you what's
 8   been marked as Plaintiff's 8.  What is this
 9   document?
10       A.   This is a memo to me from Barbara
11   Arnold, who is the old manager at the Reception
12   Center, dated December 21 of 2001, in reference
13   to the rotation.
14       Q.   What is this policy?
15       A.   If a sales rep. or manager is out with
16   an excused absence, doctor's note or pre-approved
17   in writing vacation only, they'll be put out in
18   their regular rotation when they return to work.
19       Q.   What if they don't come in with a
20   doctor's note or pre-approved writing of
21   vacation; what's the policy then?
22       A.   They'll be put at the bottom of the
23   line.
24       Q.   This is dated December 21, 2001.  Is
```

88

```
 1   this policy still in effect day?
 2       A.   I'm not quite sure.
 3       Q.   Was there any time that you became
 4   aware that this policy was not in effect?
 5       A.   No.
 6       Q.   Why was Barbara telling you of the
 7   policy?
 8       A.   Because I was the office manager.
 9       Q.   So as office manager, as you sit here
10   today, you don't know if this policy remains in
11   effect?
12       A.   I pretty much don't have anything to
13   do out there with the Reception Center other than
14   Dennis having contact with me in certain areas.
15   He runs that out there.
16       Q.   Has that changed any time; have you
17   had other responsibilities with relationship to
18   the reception area, or have your responsibilities
19   always been the same?
20       A.   No, I just oversee it, always been the
21   same.
22       Q.   Is it possible that somebody could
23   come into work on a day and not get a tour, a
24   sales representative; does that ever happen?
```

89

```
1       A.   Yes.
2       Q.   How often does that happen?
3       A.   I don't know.
4       Q.   Is it possible that a sales manager
5  could not get a tour for a day as well?
6       A.   I don't know.
7            (Exhibit 9, Vacation Village
8                  Rotations, marked for
9                  identification)
10      Q.   (By Ms. Garrow)  I'm showing you
11  what's marked as Plaintiff's 9.  What is that?
12      A.   This is a rotation explanation that
13  Dennis has also typed up.
14      Q.   What is that policy?
15      A.   It explains from the morning sign-in
16  sheet, where it's located, and I believe it
17  continues to explain how rotation is.
18      Q.   It says here "The morning sign-in is
19  picked up from the Sales Building at 8:33 by a
20  member of the reception staff."
21      A.   Right.
22      Q.   So does that mean that everyone is
23  supposed to be in by 8:33?
24      A.   Yes.
```

90

```
1       Q.   It looks like people can come in as
2  early as 8:15, according to this.  That's when
3  the rotation sheet is put out, is that correct?
4       A.   Correct.
5       Q.   Have you ever seen anybody there
6  before 8:15?
7       A.   Yes.
8       Q.   Have you seen sales representatives
9  there before 8:15?
10      A.   No, not the representatives, no.
11      Q.   Have you seen sales managers there
12  before 8:15?
13      A.   Yes.
14      Q.   What does a sales manager do before
15  8:15 in the morning?
16      A.   Drink coffee.
17      Q.   When they're over at work?
18      A.   I don't know.
19      Q.   Have you observed them doing anything
20  in particular?
21      A.   I have come over into the building and
22  they're just sitting there gabbing, drinking
23  coffee.
24      Q.   This is all before the morning
```

91

```
1  meeting, is that correct?
2       A.   Correct.
3       Q.   Do you know if the managers meet
4  before the morning meeting?
5       A.   The managers do have a meeting before.
6       Q.   Is that every morning?
7       A.   Yes.
8       Q.   It says "The rotation is then figured
9  by the managers going out by deals from the day
10  before, then by volume in that day's tour flow."
11  Do you know what that means?
12      A.   Whoever sold the day before, by
13  volume, the highest volume goes out first.
14      Q.   So if you didn't sell something the
15  day before, then you're at the bottom of the
16  rotation, is that the policy?
17      A.   It's not necessarily the bottom of the
18  rotation.  I believe it goes by closing ratio,
19  whatever your numbers are.
20      Q.   So if your closing ratio is low and
21  you didn't sell something the next day, chances
22  are you're going to be at the bottom of the
23  rotation, is that correct?
24      A.   Correct.
```

92

```
1       Q.   And you may not get a tour that day,
2  is that correct?
3       A.   Correct.
4       Q.   Do you know how long you're required
5  to be there, be on the premises?
6       A.   No.  Excuse me can I...
7       Q.   Yes.
8       A.   I believe they have to stay there
9  until the line cuts.  I don't know when they cut
10  the line, though.
11      Q.   What does "until the line cuts" mean?
12      A.   They let anybody go home that doesn't
13  need to be there.
14      Q.   Do you know what criteria are used to
15  cut the line?
16      A.   No.
17      Q.   Who cuts the line?
18      A.   I believe it's Dennis with instruction
19  from one of the directors.
20      Q.   When you say "directors," you mean
21  line directors?
22      A.   Yes.
23      Q.   Can a sales manager cut the line?
24      A.   No.
```

93

1    Q.   Can a line director cut the line?

2    A.   I don't believe so.  I don't know, I'm

3  not sure.

4    Q.   So going back to Exhibit Number 6, the

5  fall through spring tour times and the summer

6  months' tour times, you said you directed Dennis

7  to prepare this?

8    A.   Correct.

9    Q.   What does a 2:00 afternoon rotation

10  mean.  What is that --

11    A.   I'm not sure.

12    Q.   So you didn't review this after Dennis

13  prepared it?

14    A.   No.

15    Q.   Have you observed, let's say this

16  month, May -- have you observed sales

17  representatives at the -- in the lounge area

18  after 3:00?

19    A.   No.

20         MS. FABBO:  Objection.

21         THE WITNESS:  I'm very rarely

22         over there.

23    Q.   (By Ms. Garrow)  So you just haven't

24  had occasion to observe it?

94

1    A.   No.

2    Q.   Have you observed any sales

3  representatives on your side of the office after

4  3:00?

5         MS. FABBO:  Objection.

6    Q.   (By Ms. Garrow)  In the month of May?

7    A.   No.

8    Q.   Would they have occasion to come over

9  to your office at 3:00 in the afternoon?

10    A.   No.

11    Q.   What do you know about the overage

12  policy -- let me ask it a different way.  Do you

13  know what the overage policy is?

14    A.   No.  I know what it is, but I can't

15  explain it to you.

16    Q.   Has the overage policy, to your

17  knowledge, been the same for the entire time

18  you've been working for Patriot in Lanesborough?

19    A.   Yes.

20    Q.   Is it a punishment?

21    A.   If you want to put it that way, I

22  would say, yes.

23    Q.   When is someone put on overage?

24    A.   I don't want to misstate anything, so

95

1  I'd rather not say.

2    Q.   Well, I'm not asking you to guess, but

3  if you know when somebody is put on overage -- I

4  mean, can you think of somebody who has been put

5  on overage specifically?

6    A.   The only thing that comes to my mind

7  is if somebody comes in late and misses his tour,

8  then he would have to go down to the bottom, or

9  --let me see if I can think of something else.

10  Or let's say they didn't sign back in from the

11  day before after their first tour -- they're

12  supposed to sign in.  If they didn't, then the

13  next day they come in, they would be put on

14  overage because they didn't do what they should

15  have done the day before.

16    Q.   Does overage mean being put on the

17  bottom of the list?

18    A.   No, the definition for overage I'm not

19  clear on, so...

20    Q.   Do you know if Joel Hecht was ever put

21  on overage for flicking his cigarette butts in

22  the wrong place?

23    A.   I don't know if it was for flicking

24  cigarettes in the wrong place.  I know he was put

96

1  on overage before, yes.

2    Q.   Do you know why?

3    A.   I believe with Joel it was because he

4  would just, you know, walk out, just leave.

5    Q.   Go ahead.

6    A.   He would just leave.  Any others, I

7  would have to look back to refresh my memory.

8    Q.   When you say he would just leave, he

9  would leave before the end of the day or leave

10  the reception area?

11    A.   He would leave whenever he wanted to.

12  If he got upset, he would leave; or then at the

13  end of the day if he didn't feel like signing in,

14  he would leave -- things like that.

15    Q.   So he would sort of come and go as he

16  pleased, something like that?

17    A.   Pretty much towards the end, prior to

18  him leaving, he was -- yes, he was pretty much

19  doing whatever he wanted to do.

20    Q.   And that wasn't allowed, just coming

21  and going as you pleased, correct?

22    A.   No.

23    Q.   You mentioned before that you had

24  disciplined Mr. Hecht at some point?

97

```
1       A.   I said something to him about his
2  cigarettes.  I generally don't go out and
3  discipline representatives, no.
4       Q.   So when you say discipline, you mean
5  you talked to him?
6       A.   Oh, about the cigarette thing?
7       Q.   Yes.
8       A.   What I recall, I said to him was, Oh
9  -- because I saw him flick it, and I believe I
10 said something to him like, Oh, Joel, I think you
11 dropped your cigarette, or something like that to
12 that.  I mean, I was never poopy or anything, you
13 know.
14      Q.   Let me ask it this way -- you
15 testified that you disciplined him.  What were
16 you talking about when you said that?
17      A.   Did I say I disciplined him?
18      Q.   Earlier, yes, you did.
19      A.   Did I?
20      Q.   Yes.
21      A.   Well, I think I misstated.  That was
22 the only time I can ever remember, you know,
23 saying something to Joel, and I don't know -- I
24 don't believe I said it in a discipline way, you
```

98

```
1  know what I'm saying -- not at all.
2       Q.   So did you ever write him up?
3       A.   Me personally, no.
4       Q.   When I say "write him up," I mean some
5  kind of written reprimand.
6       A.   About the cigarette?
7       Q.   Or about anything?
8       A.   Oh, not me, no.
9       Q.   Has anybody ever written Mr. Hecht up,
10 to your knowledge?
11      A.   Yes.
12      Q.   Who was that?
13      A.   Dennis.
14      Q.   Why was that?
15      A.   That was in reference to him leaving
16 the premises and refusing to take tours and
17 things like that.
18      Q.   Do you know approximately when that
19 was?
20      A.   Approximately within five months'
21 time.
22      Q.   Within the last five months' time?
23      A.   Yes.
24      Q.   Any other discipline of Mr. Hecht that
```

99

```
1  you can think of?
2       A.   Not off the top of my head.
3       Q.   Was he ever disciplined for violating
4  the attendance policy, to your knowledge?
5       A.   Off the top of my head, I don't
6  recall.
7       Q.   Are you familiar with Alexander
8  Hadsagus?
9       A.   I know Alex, um-hum.
10      Q.   Do you know if he was ever disciplined
11 for violating the attendance policy?
12      A.   I don't recall, I don't recall.
13      Q.   You don't recall or you don't know?
14      A.   I don't know.
15      Q.   Did you ever discipline Alexander
16 Hadsagus for violating the attendance policy?
17      A.   Not that I remember, no.
18      Q.   Plaintiff's Exhibit 7, under Number
19 1, it says "All sales representatives need to sign
20 back in after each tour."  We've discussed that.
21 "Each rep. that has signed in will remain
22 available in the sales lounge for their next
23 tour.  Looking for sales representatives, calling
24 next door or cell phone, will not be done."  Do
```

100

```
1  you know what Mr. Rauer meant by that?
2       A.   To the best of my knowledge, it
3  wouldn't be Dennis or the two girls out front --
4  it's not their responsibility to go and find the
5  sales rep.  The sales rep. should be aware of the
6  time frame.  I mean, if it's a tour time, he
7  should be there waiting for the tour to come in.
8  Nobody has to go and search for them.
9       Q.   Do you know what Mr. Rauer was
10 specifically referring to when he said "calling
11 next door"?
12      A.   Calling next door?
13      Q.   Yes.
14      A.   Calling from the Reception Center to
15 the Sales Center, to the managers' table where
16 the managers would sit, they have a phone there.
17      Q.   So there is a land line --
18      A.   Yes.
19      Q.   -- over at the managers' table?
20      A.   Yes.
21      Q.   And why would Dennis or the people in
22 reception have occasion to call the Sales Center
23 looking for representatives?
24      A.   Because they don't go back to the
```

101

```
1    lounge, and sometimes they skip out on their
2    tours, or try to.
3        Q.   It says that "Representatives will be
4    passed after ten minutes"?
5        A.   Um-hum.
6        Q.   That's been the policy throughout your
7    time at Patriot, is that correct?
8        A.   That's correct.
9        Q.   Anybody ever in the rest room and get
10   passed over -- did that ever happen?
11       A.   I don't know.
12       Q.   Just so I'm clear, after the
13   salesperson completes the tour, they're supposed
14   to take the customer to the Sales Center, is that
15   true?
16       A.   After they've been up and shown the
17   resort?
18       Q.   Yes.
19       A.   Then they come back into the Sales
20   Center.
21       Q.   That's what's expected?
22       A.   Yes.
23       Q.   If there is, in fact, a sale, where do
24   they do the paperwork?
```

102

```
1        A.   They do it in the Sales Center.
2        Q.   Where is the paperwork completed?
3        A.   Typed, you mean?
4        Q.   Signed off by the customer -- is that
5    in the Sales Center as well?
6        A.   Yes, yes.
7        Q.   Then what happens after it's signed by
8    the customer?
9        A.   Then as far as I know, they gift them
10   and, you know, send them away.  They're done.
11       Q.   Then what happens to the paperwork?
12       A.   The closing officer brings it back
13   into the contracting office.
14       Q.   What's a closing officer?
15       A.   Closing officer, the people that close
16   the deals, they're notaries.  They sit there and
17   they go over all the paperwork with the new
18   owners, make sure that they understand
19   everything.
20       Q.   Is that the Contract Department, is --
21       A.   No.
22       Q.   They're called closing officers?
23       A.   Closing officers.
24       Q.   Where do they sit?
```

103

```
1        A.   In the Sales Center.
2        Q.   So the salesperson schedules
3    themselves and then a closing officer comes and
4    reviews the paperwork?
5        A.   No, the Sales Center, like
6    three-quarters of it, let's say where the
7    representatives are sitting with their people,
8    and then the other quarter of the people have got
9    cubicles that the closing officers sit in; and
10   that's where they go in and close with their
11   paperwork.
12       Q.   What do they do, to your knowledge,
13   the closing officers?
14       A.   They close deals.
15       Q.   How do they do that?
16       A.   I'm not sure what you're asking.
17       Q.   What are their duties when they're
18   closing a deal; what are they supposed to do?
19       A.   They go over the documents with the
20   people, and if they have any questions, then they
21   help them, and they go ahead and they sign and
22   then they notarize or witness, whatever.
23       Q.   If there's no PAC check, do they try
24   to get a PAC check?
```

104

```
1        A.   Yes, ma'am.
2             (Exhibit 10, Employment Agreement
3             for Peter Corbin, marked
4             for identification)
5        Q.   (By Ms. Garrow)  I'm showing you
6    what's been marked as Plaintiff's Exhibit 10.  I
7    want you to take a minute to review it, or as
8    much time as you need to review it and let me
9    know.  Have you had an opportunity to review
10   that?
11       A.   Yes, I'm ready.
12       Q.   I'm actually going to show you another
13   one, and let me ask you this -- to your
14   knowledge, between August of 2001 and December of
15   2001, did the Employment Agreement for sales
16   representatives change at all?
17       A.   It did change, but I'm not sure of the
18   dates, when the new one came into...
19       Q.   Well, Exhibit 10 is Mr. Corbin's Sales
20   Agreement, is that correct?
21       A.   Yes.
22       Q.   Or Employment Agreement for Sales
23   Representative?
24       A.   Yes.
```