105

1      Q.   And in reviewing it, I assume you
2  notice that it's missing every other page, is
3  that correct?
4      A.   Some of them did, yes, I'm sorry.  I
5  didn't realize that at the time, because when I
6  made the copies I just put all of them in at
7  once.
8      Q.   So we're going to work off of
9  Mr. Martin's.
10          MS. GARROW:  We'll mark that as
11          number 11, please.
12          (Exhibit 11, Employment Agreement
13          for Roger Martin,
14          marked for identification)
15     Q.   (By Ms. Garrow)  I just want you to
16  review it and let me know if, to the best of your
17  recollection, they both signed the same
18  documents?
19     A.   Yes.
20     Q.   Again, looking at Exhibit 11, Page 9,
21  the last page, that is your signature, correct?
22     A.   Yes.
23     Q.   You were the individual from Patriot
24  who signed Mr. Martin's Sales Representative

106

1  Employment Agreement, is that correct?
2      A.   Correct.
3      Q.   Who are the witnesses, by the way?
4      A.   Gordon Leete is for Roger.
5      Q.   Is that the big "G" on top there?
6      A.   Yes.
7      Q.   And then who else?
8      A.   This one here is Bonnie Gardner.
9      Q.   On Roger's?
10     A.   On mine.
11     Q.   I see what you mean for Roger.  So in
12  other words, Gordon Leete witnessed Roger's
13  signature and Bonnie Gardner witnessed your
14  signature?
15     A.   Correct.
16     Q.   Who was Bonnie Gardner?
17     A.   Bonnie Gardner was the old Reception
18  Center manager before Dennis.
19     Q.   Did you review this Employment
20  Agreement before Mr. Martin signed it?
21     A.   No.  I have read it; but did I review
22  it, no.
23     Q.   You have read this Employment
24  Agreement before today?

107

1      A.   I have read it.
2      Q.   Did you ask any questions about it
3  when you first -- let me strike that.  Do you
4  recall when you first reviewed it?
5      A.   Back in 2001.
6      Q.   Was it prior to the first person
7  signing off on it?
8      A.   No, no.
9      Q.   So at some point in 2001?
10     A.   At some point, yes.
11     Q.   Did you ask any questions about it
12  when you reviewed it?
13     A.   No.
14     Q.   Did you call anybody in Fort
15  Lauderdale to inquire at all?
16     A.   No.
17     Q.   Did anybody make any representations
18  to you about this Employment Agreement on or
19  around the first time you reviewed it?
20     A.   What do you mean by "representations"
21  -- I'm not sure.
22     Q.   Anything at all.  How did you come to
23  receive the Employment Agreement for your review?
24     A.   It was one of the required bits of

108

1  paperwork that I had to go over with everybody,
2  or new-hires needed to sign.
3      Q.   At some point, though, you reviewed it
4  on your own, is that correct?
5      A.   I've read it on my own, yes.
6      Q.   What prompted you to do that?
7      A.   Probably when it became really sticky
8  about the PAC issue, I would say, but I don't
9  remember; I don't recall the time.
10     Q.   And did anybody from Fort Lauderdale
11  ever say to you or anybody ever say to you, Miss
12  Lippert, can you take a look at the Sales
13  Representative Employment Agreement -- anybody
14  ever direct you to take a look at it?
15     A.   Not that I recall.
16     Q.   Anybody ever direct you to review it
17  at any time?
18     A.   I think possibly after the new one
19  came out to read over the change.
20     Q.   Do you know why the new one came out;
21  do you have any knowledge?
22     A.   Off the top of my head, I'm thinking
23  that the second one explains the earned
24  commission and the PAC, whereas the first one I

109

1  don't think goes into any type of an explanation
2  about the PAC. I believe that's what it was.
3      Q. Did the automobile insurance policy
4  change at all during the time --
5      A. I don't believe so, no.
6      Q. One of provisions of this Employment
7  Agreement on Page 2 says that "An employee shall
8  maintain a valid Massachusetts driver's license."
9  Is that a requirement of being an employee -- a
10 sales representative at Patriot Resorts in
11 Lanesborough?
12     A. If they're a resident in
13 Massachusetts, yes, but we have representatives
14 that live in New York.
15     Q. Are they allowed to have a New York
16 driver's license?
17     A. Yes.
18     Q. Are you aware of any sales
19 representatives who did not have a valid
20 Massachusetts or New York license during their
21 time as a sales representative at Patriot in
22 Lanesborough?
23     A. Yes.
24     Q. Who was that?

110

1      A. Dave Macurio is one, and I think the
2  other one that comes to mind is Tom Codington,
3  C-O-D-I-N-G-T-O-N.
4      Q. And anybody else?
5      A. Not that I recall.
6      Q. What happened to David Macurio; did he
7  start with a valid license?
8      A. He had a valid license, yes.
9      Q. And then at some point he did not have
10 a valid license?
11     A. Not a Massachusetts license. He
12 always had a valid license.
13     Q. Oh, he did?
14     A. Oh, yes.
15     Q. Are you saying these are the only two
16 people who did not have valid Massachusetts
17 licenses?
18     A. Yes.
19     Q. They had New York licenses?
20     A. No, the New York we already know. The
21 others had, I believe, Hawaii.
22     Q. Is that Tom Codington?
23     A. Yes, and I believe Dave's is Virginia.
24 They were always active; they never expired.

111

1      Q. Are you aware of anybody who had a
2  suspended license during the time they were a
3  representative at Vacation Village in the
4  Berkshires?
5      A. Yes.
6      Q. Who was that?
7      A. One of them was, I believe, Ron
8  Ferrara had problem with his license, Sam Barnes
9  had a problem with his license. Trying to think
10 if anybody else. Those are the two that I
11 recall.
12     Q. What was the problem with Ron
13 Ferrara's license?
14     A. I'm not sure. I'm not sure. They
15 took him -- I'm not sure if he lost it or it
16 expired and he didn't have one. I'm not sure of
17 the particulars with Ron.
18     Q. What happened to him as a result -- or
19 his position as a sales representative as a
20 result of him losing his license?
21     A. They put him into the Exit Department.
22     Q. So he was allowed to continue as an
23 employee?
24     A. Yes.

112

1      Q. What about Mr. Barnes, what happened
2  with him?
3      A. Same with Sam.
4      Q. Do you know what happened to his
5  license?
6      A. No, I'm not sure of what happened. I
7  think he lost it with DUI's, to be perfectly
8  honest, but I didn't see any paperwork.
9      Q. So you're not certain about that?
10     A. Right.
11     Q. But you believe that it was DUI's?
12     A. No -- yes, I believe.
13     Q. Do you know how many?
14     A. A few.
15     Q. Any more specific than a few?
16     A. Three.
17     Q. Three?
18     A. Yes.
19     Q. Maybe more?
20     A. Maybe.
21     Q. Then what happened to his position as
22 a sales representative?
23     A. Sam went away for a while, but when he
24 came back, they put him in the Exit Department.

113

1    Q.   As an employee in the Exit Department,
2  do you have the same opportunities to make sales
3  as if you were a sales representative working on
4  the line?
5    A.   You sell, yes.  They offer the
6  tri-yearly ownership.
7    Q.   Is it the same commission, different
8  commission?
9    A.   It's the same commission, but they
10 don't take the tours out in their cars.
11   Q.   Are they required to be at sales
12 meetings, the sales meeting, the morning meeting?
13   A.   No.  They come in later in the
14 morning.
15   Q.   Do they stay later?
16   A.   Sometimes.
17   Q.   Other than the annual bi-yearly and
18 tri-yearly time-share interests, are there any
19 other products or services sold at Patriot in
20 Lanesborough?
21   A.   No.
22   Q.   I'm going to turn your attention to
23 Page 3.
24          MS. FABBO:  Of Exhibit 11?

114

1    Q.   (By Ms. Garrow)  Of Exhibit 11.  And
2  I'm going to ask you to explain to me in your own
3  words what you understand "(v) Closing" to mean.
4    A.   When the account comes out of
5  rescission and all of the paperwork is fine,
6  we've got all of the monies and everything is
7  clean.
8    Q.   When you say you've got all the
9  monies, how do you get all of the monies?
10   A.   Well, we either get them all that day;
11 or in the case of a pending contract, we'll only
12 get a portion of the payment the day of sale and
13 then they let them make payments for so much so
14 many months until they make a full down payment,
15 and then it goes into closing after rescission.
16   Q.   What is the down payment for an annual
17 sale, an annual time-share?
18   A.   Ten percent.
19   Q.   And is that the same for bi-yearly and
20 tri-yearly?
21   A.   Yes.
22   Q.   It's always ten percent?
23   A.   Yes.
24   Q.   Are the prices different?

115

1    A.   Yes.
2    Q.   Do you know the prices?
3    A.   Low end is 3,590 and high end is
4  22,990.
5    Q.   When you say "low end" and "high
6  end,"are there various grades within each of the
7  annual, bi-yearly, and tri-yearly?
8    A.   Yes.
9    Q.   How many grades within each?
10   A.   That would depend on the season.
11   Q.   So it's not based on the unit; it's
12 based on the week?
13   A.   Correct.
14   Q.   Is it also based on the unit?
15   A.   No.
16   Q.   Are all the units the same size?
17   A.   They're all the same.
18   Q.   I assume this is obvious, but the more
19 popular weeks are the more expensive time-share
20 prices that correspond?
21   A.   Summer weeks, holiday weeks, ski weeks
22 are more popular.
23   Q.   It sounds like from your testimony
24 that it's possible to pay your down payment over

116

1  time if you're a customer, is that true?
2    A.   Yes.
3    Q.   How much time do you give the owner to
4  pay their down payment?
5    A.   All depends who the sales rep. is.
6  Some they'll go a week, sometimes I've seen to
7  eight months.
8          MS. GARROW:  Off the record.
9          (A lunch break was taken)
10         MS. GARROW:  Back on the record.
11   Q.   (By Ms. Garrow)  I'm going to call
12 your attention back to Plaintiff's Exhibit 1, and
13 I'm just trying to get a handle on what this is.
14 And I guess I'm still not clear, so I'm going to
15 ask you to go through it one more time and maybe
16 I can visualize it better with a hypothetical
17 sale.  So presume -- again looking at the first
18 line of Exhibit 1 -- presume that sales
19 representative has an owner and they make a sale
20 on, let's say -- again, looking at the first
21 line, on August 8, 2001, they have the paperwork
22 signed and the sale is a -- let me ask you this.
23 Did you accept PAC checks at that time, in August
24 of 2001?

117

1    A.    I don't recall, I don't recall.  I'm
2  sure we did.
3    Q.    So let's say that this sale was --
4  forget that it's a PAC sale.  Let's say that this
5  sale was a sale that was closed on that date with
6  a full down payment, or a sale that was made on
7  that date with a full down payment, again on
8  August 8 of 2001.  So sale date begins.  What
9  would you do, looking at that, if that sale was
10  made or the paper was written on August 12?
11        MS. FABBO:  Objection.
12        MR. FELDMAN:  8.
13    Q.    (By Ms. Garrow)  August 8.
14    A.    First of all, it's not sale date
15  begins; it's closed date begins.
16    Q.    Okay.
17    A.    And there again, it's that week.
18    Q.    So again, I'm going to stop you.
19  Let's go slowly.  I understand your distinction
20  between closing and sale.  I'm not saying the
21  closing occurred on the 8th; I'm saying that the
22  contract was written on the 8th.
23    A.    Okay.
24    Q.    So then what happens?

118

1    A.    It would all depend on whether it was
2  Massachusetts, Connecticut, Jersey, or New York
3  as to when the rescission date would come up.
4    Q.    I'm going to stop you there.  Let's
5  presume Massachusetts.
6    A.    So it was the 8th.
7    Q.    Take me through on these dates here.
8    A.    Let's say the 8th was a Monday.
9    Q.    The 8th probably wasn't a Monday
10  because this is supposed to be a Tuesday, right
11  -- 8/7/2001?
12    A.    Okay.
13    Q.    So the 8th was a Wednesday.
14    A.    Okay.  Then Thursday, Friday, and then
15  Saturday.  So that would be the 9th, 10th, 11th,
16  so it would be good within that week.
17    Q.    When you say that, what are you
18  looking to to say that it would be good within
19  that week on this?
20    A.    The rescission date.
21    Q.    Are you looking to anything on this
22  document Exhibit 1 to determine that the sale
23  would be good that week?
24    A.    Yes, because it's between 8/7 and

119

1  8/13, so it would be on that Good Business Ledger
2  for that period of time -- closed date beginning
3  8/7, ending 8/13 would be a Good Business Ledger
4  week ending 8/13.
5    Q.    And that's where it says "Good
6  Business week ending date"?
7    A.    Correct.
8    Q.    So what's "Good Business pulled"?
9    A.    "Good business pulled" is the day that
10  we pull it, and then I work on it as far as
11  separating out the different packets that go to
12  the bank, to the attorney, to this one, that one.
13  Then there's a packet that goes to Fort
14  Lauderdale, and it is overnighted to Fort
15  Lauderdale, and then the representatives are paid
16  on this date here.  If you turn it over and look
17  at these, this is exactly what it really needs to
18  be.
19        MS. FABBO:  What page are you
20          referring to?
21    A.    I don't know.  3405.  Because it shows
22  you the Tuesday with the close date begins, close
23  date ends, sent to Fort Lauderdale, overnighted
24  to Fort Lauderdale on that date, and the reps.

120

1  are paid on that date.  That is what those
2  columns are all about.
3    Q.    So if the contract was written later
4  in the week, let's say, again, just looking at
5  this, the date I keep trying to say, the contract
6  was written on the 12th of August --
7        MS. FABBO:  Objection.
8    Q.    (By Ms. Garrow)  -- 2001, then
9  providing a three-day rescission, that would fall
10  into the following week for Good Business, is
11  that correct?
12    A.    That's correct.
13    Q.    Then the processes would be the same
14  thereafter?
15    A.    Correct.
16    Q.    Do you always do the overnight on a
17  Monday to Fort Lauderdale?
18    A.    Yes.
19    Q.    Is that every Monday?
20    A.    Every Monday.  There might have been a
21  couple of nights where the girls forgot to put it
22  up or something like that, but that would just be
23  a fluke.
24    Q.    Then what happens if they forget?

121

1    A.  If they forget, it goes out the next
2  night.
3    Q.  We were discussing before the three
4  timely payments policy, and that's three timely
5  payments plus a down payment in order to get
6  paid; is that true or not true?
7    A.  It all depends on how the deal was
8  written.  If it was -- the money all has to be
9  good; the down payment is part of that.  It's in
10  order for them to have the earned commissions,
11  it's three consecutive timely monthly payments.
12    Q.  What about the down payment, how does
13  that play into that; in other words, would they
14  have to have a full down payment as well to get
15  paid their commission?
16    A.  In order for -- yes, yes.
17    Q.  And that's in every instance?
18    A.  Yes.
19    Q.  If a sale was financed and there was a
20  full down payment and two timely payments were
21  made and the third payment was late -- let's
22  assume that it was after the grace period and it
23  was late -- when would the commission be paid on
24  that sale?

122

1    A.  As soon as three timely consecutive
2  monthly payments were made.
3    Q.  So if the next month the owner was
4  late, would the commission then be paid; in other
5  words, the fourth month?
6    A.  It would have to be three consecutive
7  timely monthly payments.
8    Q.  And if the owner was late past the
9  grace period every month for a year, when would
10  that commission get paid?
11    A.  I'm not sure, because it wouldn't be
12  earned until it's three consecutive timely
13  monthly payments, so I don't know the answer to
14  that.
15    Q.  Do you have any reason to believe that
16  it's --
17    A.  Any different?
18    Q.  Yes, any different?
19    A.  No.
20    Q.  Other than with your attorney, have
21  you had any conversations relating to not paying
22  a minimum wage to the sales representatives and
23  sales managers at Patriot?
24    A.  No.

123

1    Q.  Other than with your attorneys, have
2  you had a conversation relating to not paying
3  overtime to the sales representatives and sales
4  managers at Patriot?
5    A.  A conversation with anybody, no.
6    Q.  Anything other than a conversation?
7    A.  Oh, hold on a minute.  I don't recall
8  who I spoke with, but when this all started --
9  and I don't even know what time frame it was --
10  when anybody would say, You all aren't paying
11  right, or, You guys aren't paying right, my basic
12  answer back to them is, you know, you've signed
13  the Sales Agreement, okay, and you've signed the
14  handbook, but you've signed the Sales Agreement
15  that explains to you how you are to be paid, and
16  we have attorneys that have done this paperwork
17  for us.  I'm sure that if we're doing something
18  wrong, then that's a different issue, but as far
19  as I'm concerned, once you sign this, everything
20  is fine; we're going to put it in the attorneys'
21  hands and let them take care of it, type of
22  thing.  Pretty much to say, you know, worry about
23  sales, you know, instead of getting caught up in
24  the hubbub of what might be right and what might

124

1  be wrong type of thing, very general.
2    Q.  Who have you had that conversation
3  with?
4    A.  I think I mentioned that to LaCrisha,
5  was one, and just like general office staff.  I
6  can't recall anybody else specifically that I've
7  talked to about something like that.
8    Q.  Now, you just said general office
9  staff, but your testimony was you talked about
10  just worry about sales.  Is that the same
11  conversation you had with the office staff -- in
12  other words, they're not selling, so how did that
13  conversation arise?
14    A.  No, because they would overhear
15  something that was going on, and I wanted to, you
16  know, let them understand.  And it wasn't all of
17  the staff; it was probably just my assistant
18  because of the way the office is laid out.
19    Q.  Who is your assistants?
20    A.  Carrie Ann.
21    Q.  Carrie Ann?
22    A.  Um-hum.
23    Q.  What's her last name?
24    A.  Perozak.

125

```
 1        Q.   If a sales representative is not on a
 2   tour, what are they supposed to be doing?
 3        A.   I don't really know.  I don't know the
 4   answer to that.
 5        Q.   If a sales manager is not on a tour,
 6   what are they supposed to be doing?
 7        A.   I don't know the answer to that.  Let
 8   me go back.  The managers are out there probably
 9   TO-ing a table, helping the others.
10        Q.   Okay.  Anything else?
11        A.   No.
12                  (Exhibit 12, Employment Agreement
13                  for LaCrisha Wise, marked
14                  for identification)
15        Q.   (By Ms. Garrow)  Showing you what's
16   been marked as Plaintiff's Exhibit 12, do you
17   recognize this document?
18        A.   Yes.
19        Q.   You had mentioned that at some point,
20   the Employment Agreement for sales
21   representatives changed.  Is this the changed
22   Agreement, to your knowledge?
23        A.   I'm not sure.  I'd have to look at
24   them both to be absolutely sure.
```

126

```
 1        Q.   Why don't you take a minute to do
 2   that.
 3        A.   Do you have one of the newer ones?
 4        Q.   Let me ask you this.  This is
 5   different than Exhibit 11, is that correct --
 6   even just in the type, the type is different,
 7   right, is that fair to say?
 8        A.   Yes.
 9        Q.   And this is dated February 8, 2002.Do
10   you think that there has been a subsequent --
11        A.   No, no, there hasn't been.  There's
12   only been one.
13        Q.   One change?
14        A.   Um-hum.  I don't believe this is the
15   new one.
16             MS. FABBO:  Referring to
17             Exhibit 12?
18             THE WITNESS:  Right.
19        Q.   (By Ms. Garrow)  Do you think Exhibit
20   11 is the new one?
21        A.   No.  I don't believe that this is the
22   new one.
23        Q.   Is there a day of the week that
24   employees' work week at Patriot in the Berkshires
```

127

```
 1   begins; is there a particular day of the week
 2   that's the beginning of the work week?
 3        A.   We have Wednesday and Thursday off, so
 4   we work from Fridays through Tuesdays.
 5        Q.   So the work week begins on a Friday?
 6        A.   Yes.
 7        Q.   Is that true for sales
 8   representatives?
 9        A.   Yes.
10        Q.   Are there any documents, any records
11   kept to reflect the beginning of the work week
12   that reflect the day of the week in which the
13   employees' work week begins?
14        A.   I don't believe there's anything
15   written up other than the sign-in sheets that
16   they sign.
17        Q.   Are there any documents reflecting the
18   starting time and the length of an employee work
19   period?
20        A.   Not that I'm aware of.
21        Q.   Are there any documents that reflect
22   the starting time and length of the sales
23   representatives' work period as a sub-group of
24   employee?
```

128

```
 1        A.   Not that I'm aware of.
 2        Q.   I believe you already testified that
 3   there's no regular hourly rate of pay for a sales
 4   representative, is that true?
 5        A.   That's true.
 6        Q.   And no regular hourly rate of pay for
 7   a sales manager, correct?
 8        A.   Correct.
 9        Q.   Is it fair to say that there are no
10   documents which reflect a regular hourly rate of
11   pay for either a sales representative or a sales
12   manager?
13        A.   Not that I'm aware of.
14        Q.   Well, you are the human resources
15   director, correct?
16        A.   Yes.
17        Q.   Other than the sign-in sheets and the
18   payroll registers that we've discussed as
19   Exhibits 4 and 3, are there any other documents
20   which reflect hours worked each work day or total
21   hours each work week for sales representatives?
22        A.   The TO slips that show when they have
23   a tour.  That's the only forms that I know that
24   have times written on them.
```

---

129

1    Q.   Same question for sales managers.
2    A.   Same.
3    Q.   Same answer?
4    A.   Yes.
5    Q.   What documents, if any, reflect daily
6  or weekly wages due for hours worked?
7    A.   None that I know of.
8    Q.   And that's for sales representatives?
9    A.   Yes.
10   Q.   And what about for sales managers?
11   A.   Same.
12   Q.   What documents reflect total premium
13 pay for overtime hours for sales representatives?
14   A.   Nothing.
15   Q.   What about for sales managers?
16   A.   Same.
17   Q.   Which documents, if any, reflect
18 additions or deductions from wages paid each pay
19 period?
20        MS. FABBO:  Objection.
21        THE WITNESS:  You have to be more
22        specific.  I don't know what you're
23        saying.
24   Q.   (By Ms. Garrow)  What documents, if

---

130

1  any, show deductions from total pay for sales
2  representatives?
3    A.   What are you talking about as
4  deductions?
5    Q.   Let me ask it a different way.  Does
6  Patriot provide health insurance to some of its
7  employees?
8    A.   Yes.
9    Q.   If an employee elects -- if a sales
10 representative elects to carry health insurance
11 and has been there the appropriate amount of
12 time, is that something that Patriot would
13 provide for a sales representative?
14   A.   Yes.
15   Q.   And same answer for a sales manager.
16   A.   Yes.
17   Q.   What documents, if any, would show
18 those types of deductions or other types of
19 deductions from wages for sales representatives
20 or sales managers?
21        MS. FABBO:  Objection.  You can
22        answer.
23        THE WITNESS:  I would assume that
24        their pay stub shows it.  Other than

---

131

1         that, I'm not quite sure what you're
2         saying.  I see deductions here on the
3         Compu-pay, but I don't see these, so I
4         don't know what else you would be
5         looking for.
6    Q.   (Ms. Garrow)  Are you aware of any
7  other documents, then; or to your knowledge,
8  that's it?
9    A.   Yes, to my knowledge.
10   Q.   Any documents that you're aware of
11 that show total wages paid to sales
12 representatives each pay period?
13   A.   Total wages paid -- I print out a
14 summary from the Good Business Ledger and I
15 submit it to Fort Lauderdale, and then there are
16 commission sheets that are attached to their
17 paychecks, but I do not open them up and look at
18 them, no.
19   Q.   So is it your testimony that those
20 reflect total wages paid to each sales
21 representative or that you're not sure, those --
22   A.   Per week.
23   Q.   So those do reflect; you just don't
24 look at them?

---

132

1    A.   Right.
2    Q.   Same with sales managers?
3    A.   Yes.
4    Q.   Have you been involved -- let me
5  strike that.  Other than the named plaintiffs in
6  this case, are you aware if any employees have
7  filed any complaints with the Attorney General
8  regarding wage and hour issues?
9    A.   I have heard, yes, that they did.
10   Q.   Have you been involved in
11 investigating any of those complaints?
12   A.   No.
13   Q.   Were you involved in responding to any
14 of those complaints?
15   A.   No.
16   Q.   Who have you heard have filed
17 complaints?
18   A.   Roger Martin.
19   Q.   I'm asking you other than the named
20 plaintiffs in this case?
21   A.   Oh, I'm sorry.  In believe Tracy Lanue
22 at one time did, and I believe Will Spalding did.
23 That's all I can remember.
24   Q.   You already said you weren't involved

---

Wise v. Patriot    Faith Lippert    5/17/05

133

1  in investigating those complaints?

2       A.    No.

3       Q.    Or responding to those complaints,

4  correct?

5       A.    Correct.

6       Q.    Have you reviewed those complaints?

7       A.    No.

8       Q.    Are you aware of the substance of

9  either of those complaints?

10      A.    I'm aware of Tracy's a·long, long time

11  ago.  She had left her employ and wanted to get

12  her commissions.

13      Q.    So was she alleging she was not paid

14  certain commissions when she left?

15      A.    Right.

16      Q.    Vacation Village?

17      A.    Correct.

18      Q.    Do you know if she was paid?

19      A.    I'm not quite sure if she was or not.

20  I don't recall, and you know what -- in Tracy's I

21  did give our attorneys up in Williamstown

22  information for Tracy's now that I'm recalling

23  that.

24      Q.    So you spoke with the attorneys up in

134

1  Williamstown?

2       A.    Correct.

3       Q.    Do you remember how many times?

4       A.    No.

5       Q.    Do you remember when?

6       A.    It was a long time ago.  No, I don't

7  remember when, what the date was, but it was a

8  while ago.

9       Q.    Are those the only complaints you

10  remember as you sit here today?

11      A.    Those are the only ones that I

12  remember.

13      Q.    Do you have any reason to believe that

14  Patriot in the Berkshires is not subject to the

15  record-keeping requirements of the Fair Labor

16  Standards Act?

17      A.    I don't know anything about those

18  things.  I don't know.

19      Q.    Have you ever received any training on

20  wage and hour issues?

21      A.    No.

22      Q.    Have you ever heard any conversations

23  -- again, excluding with your attorney -- in the

24  workplace relating to this lawsuit?

135

1       A.    This -- I have had short discussions

2  with a couple of people, but nothing extensive.

3  I've never told anybody who is on the lawsuit or

4  anything.  I don't discuss it with people.

5       Q.    You said you had short discussions.

6  With whom have you had short discussions?

7       A.    Like with Rod Lewis, the project

8  director; Bill Rauer I would discuss things with.

9  Like today, I'm in a deposition so I would let my

10  assistant know that I was going so-and-so and

11  what for.  Other than that, I wouldn't discuss

12  something like that with them, no.

13      Q.    With whom?

14      A.    Sales representatives, sales managers,

15  my office staff.

16      Q.    How many discussions did you have with

17  Rod Lewis?

18      A.    Oh gosh, a few.

19      Q.    And when?

20      A.    I don't recall when.

21      Q.    Approximately?

22      A.    Over the past -- well, since we were

23  served with papers, approximately maybe half a

24  dozen times or so.

136

1       Q.    When you say since you were served

2  with papers, are you specifically referring to

3  the federal lawsuit, or are you talking about the

4  initial MCAD complaint by Miss Wise?

5       A.    The initial.

6       Q.    So you've had about six conversations

7  since -- you believe -- since you were first

8  served with Miss Wise's MCAD complaint, with Rod

9  Lewis, is that fair to say?

10      A.    With Rod.

11      Q.    Tell me all you remember of the

12  substance of those conversations.

13      A.    Um...

14      Q.    Do you remember the first

15  conversation?

16      A.    I don't remember the first

17  conversation.  Pretty much, Can you believe it,

18  you know, type of stuff.  Where is this coming

19  from, you know, the not understanding.

20      Q.    Who didn't understand, you or

21  Mr. Lewis?

22      A.    Well, I didn't understand certainly.

23  I don't think that Rod understood, either.

24      Q.    What makes you say that?

137

1    A.   Because he would bob his head when I'm
2   talking to him, like in agreement with me.  I
3   never dove into a deep conversation with anybody
4   about this other than I just don't understand it.
5        Q.   Do you remember anything else about
6   the first conversation?
7        A.   No.  No, it was very short.  Any time
8   I ever spoke with Rod was very short, you know,
9   in reference to it.
10        Q.   You said there were about half a
11   dozen.  Do you remember the next time you talked
12   to Mr. Lewis about the allegations?
13        A.   Pretty much on the same wave.  I
14   didn't want him to know who was on the suit
15   because I didn't want him to form an opinion, you
16   know, about anybody; so as far as I know, he
17   doesn't know who is on the suit.  It was just
18   basically the same type of conversations, not
19   believing, or he might ask me did you have to go
20   to a deposition or something like that, and then
21   I would answer him; but never any great length to
22   discuss what is going on, no.
23        Q.   Do you believe you're the only person
24   at the Lanesborough location who knows who has

138

1   joined this lawsuit?
2        A.   No.
3        Q.   Who else knows?
4        A.   Who else knows?
5        Q.   Yes.
6        A.   I'm sure quite a few of them do,
7   because they've all discussed -- I don't know
8   that for a fact, no.
9        Q.   Do you know if for a fact Mr. Lewis
10   knows who has joined the lawsuit or not?
11        A.   No, I don't know.
12        Q.   Anything else you can remember about
13   any conversations with Mr. Lewis?
14        A.   Not that I can recall right now.
15        Q.   Did he ever tell you that if he finds
16   out who is taking part in the suit, he would
17   retaliate against them?
18        A.   No.
19        Q.   Anybody at all say that to you -- any
20   of the managers, line directors, ever say that
21   they would retaliate against somebody who would
22   join the lawsuit?
23        A.   No.
24        MS. GARROW:  Off the record.

139

1        (A break was taken)
2        MS. GARROW:  Back on the record.
3        Q.   (By Ms. Garrow)  You testified that
4   you had conversations with Bill Rauer.  Do you
5   recall the substance of any of those
6   conversations?
7        A.   Pretty much the same as I did with
8   Rod, you know -- I can't believe it, what's going
9   on?
10        Q.   Anything else, anything else that you
11   remember?
12        A.   No.
13        (Exhibit 13, Patriot Resorts
14        Employee Handbook,
15        marked for identification)
16        Q.   (By Ms. Garrow)  I'm showing you
17   what's marked as Plaintiff's 13.  What is this
18   document?
19        A.   It's our employee handbook.
20        Q.   I notice it's dated June 2004?
21        A.   Yes.
22        Q.   Did you have an employee handbook
23   prior to June 2004?
24        A.   Yes.

140

1        Q.   Was it substantially changed?
2        A.   There weren't a lot of changes made,
3   no.  We have a list of what the changes were.
4   No, there wasn't a lot of changes, no.
5        Q.   What is that, a document that is a
6   list of the changes?
7        A.   When the new handbooks came out, there
8   was a list of the changes that were made from the
9   first one so that our old representatives didn't
10   need to re-sign the new book; all they had to do
11   was sign the list of what the changes were in the
12   new handbook.
13        Q.   So that should be in somebody's
14   personnel file; is that where you maintained
15   those?
16        A.   Correct.  Or I might even have them
17   lumped together.  I'd have to look.
18        Q.   To your knowledge, if you go to Page
19   3of the handbook, 2126 Bates stamp, did the
20   insurance requirement change?
21        A.   It has always been what we needed up
22   here in Massachusetts.
23        Q.   Is that a no, the insurance
24   requirement did not change, to the best of your

141

1    recollection?

2         A.   No, it didn't.

3         Q.   Was there any sales representative or

4    sales manager who did not have the coverages

5    enumerated in this insurance requirement?

6         A.   Yes.

7         Q.   Who were they?

8         A.   I know LaCrisha was one, Sam Barnes, I

9    believe Ron Ferrara.  I'd have to look back on my

10   other records.  I don't recall off the top of my

11   head any others.

12        Q.   What was the problem with LaCrisha's

13   insurance?

14        A.   LaCrisha a lot of times didn't have

15   enough coverage or it wasn't her insurance policy

16   or she was never listed as a driver on somebody

17   else's policy.

18        Q.   What did you do as a result of those?

19        A.   Bring it to the attention of the

20   directors.

21        Q.   Do you know what they did?

22        A.   I don't know -- no, I don't know what

23   they did.

24        Q.   What about Sam Barnes; what was the

142

1    problem with his insurance?

2         A.   I don't recall what it was with his.

3         Q.   Do you know how long he was out -- how

4    long he did not meet the insurance requirement?

5         A.   No, and he had left there for a while,

6    too, so I don't know, I'd have to look back.

7         Q.   Do you recall what you did as a result

8    of finding out that he did not meet the insurance

9    requirement?

10        A.   Yes, when he came back to work for us,

11   he went to the Exit Department where he didn't

12   have to have a license or take people outside in

13   the car; so therefore, he didn't have to have

14   insurance.

15        Q.   Was this when his license was

16   suspended?

17        A.   To the best of my knowledge.  I don't

18   recall; I'd have to look back.

19        Q.   What about Ron Ferrara; what was the

20   problem with his not meeting the insurance

21   requirements?

22        A.   I'd have to look back on Ron's.  I

23   don't know whether it was because he didn't have

24   the insurance or he didn't have the correct

143

1    amount.  I'd have to look back in the records.

2         Q.   What would happen with him as a result

3    of not meeting the insurance requirements?

4         A.   He also went to the Exit Department.

5         Q.   Was Miss Wise, to your knowledge, ever

6    in the Exit Department?

7         A.   Not to my knowledge, no.

8         Q.   In this June 2004 handbook, there is a

9    dress code.  Is that the same as the dress code

10   that was issued on May 11, 2003?

11        A.   It's not exactly the same, I don't

12   believe, but this is one of the changes that was

13   made.  In the original handbook this was not in

14   there.

15        Q.   There was no dress code in the

16   original handbook?

17        A.   Right.  It was all on that sheet of

18   paper.

19        Q.   So is this the first time there was a

20   dress code issued, on May 11, 2003, to your

21   knowledge?

22        A.   There was always a dress code.  It was

23   always just voiced pretty much or a written dress

24   code, that's when I typed one up.

144

1         Q.   Did you personally voice the dress

2    code to anybody?

3         A.   No.

4         Q.   Ever?

5         A.   Not that I recall.

6         Q.   How do you know that there was a

7    voiced, as you said, dress code?

8         A.   Just by, you know, talking, I believe.

9    It was a part of like their managers' meetings

10   and general meetings in the morning and stuff

11   like that, and there was maybe a couple of times

12   that somebody would wear something inappropriate.

13        Q.   So were you present at those meetings

14   where the dress code was spoken?

15        A.   No.

16        Q.   So --

17        A.   I heard about them.

18        Q.   So you heard that somebody spoke the

19   dress code at a meeting?

20        A.   About the dress code at a meeting.

21        Q.   Who did you hear that from?

22        A.   Off the top of my head, I would have

23   to say it would have been one of the directors,

24   either Gordon Leete or Paul Stensland.  I don't

145

1  recall any discussions with anybody in
2  particular.
3      Q.  Do you know who voiced dress codes at
4  the meetings?
5      A.  No.
6      Q.  Do you know how often it was voiced
7  before May 11, 2003?
8      A.  No, I don't.
9      Q.  Do you know for sure it was voiced
10 before May 11, 2003?
11     A.  No, I don't.
12         (Exhibit 14, 5/11/03 Dress Code
13          Memo, marked for identification)
14     Q.  (By Ms. Garrow)  The May 11, 2003
15 dress code that's marked as Exhibit 14 -- am I
16 characterizing that correctly?
17     A.  Yes.
18     Q.  What is the difference between that
19 and the dress code that's in the June 2004
20 handbook?
21     A.  It's pretty much the same thing.
22     Q.  Just so I'm clear, June 2004 is the
23 first time the dress code appeared in any
24 employee handbook relating to Patriot Resorts in

146

1  the Berkshires, is that correct?
2      A.  Written, yes.
3      Q.  This June 2004 handbook says Patriot
4  Resorts Corporation.  Do you know if this
5  handbook was used in other Patriot locations, or
6  was it just particular to Vacation Village in the
7  Berkshires?
8      A.  Vacation Village in the Berkshires.
9      Q.  Is there a corporate employee
10 handbook?
11     A.  These came from corporate.
12     Q.  But you're saying that this was only
13 used in your location; this is not used in other
14 Patriot resorts?
15     A.  Patriot Resorts is Massachusetts only.
16     Q.  I see -- it's a Massachusetts only
17 company?
18     A.  Correct.
19     Q.  Do you know if it's used in other
20 Berkley group locations?
21     A.  No.
22     Q.  No, you don't know?
23     A.  No, I don't know.
24     Q.  So you received this from Fort

147

1  Lauderdale?
2      A.  Yes.
3      Q.  Do you know who drafted the employee
4  handbook?
5      A.  I know Vickie Dockery Ruiz, R-U-I-Z,
6  was instrumental.  Other than that, I don't know
7  who.
8      Q.  What was her position?
9      A.  She is the corporate human resource
10 director.
11     Q.  Do you report to her as well as Miss
12 Foster?
13     A.  I don't report to Vickie, but she -- I
14 call her if I have questions.
15     Q.  Questions about what?
16     A.  Human resource questions.
17     Q.  Have you ever consulted with her
18 regarding any of the allegations in this lawsuit?
19         MS. FABBO:  Objection.  You can
20         answer.
21         THE WITNESS:  I don't recall if
22         I've ever talked with Vickie
23         specifically on this subject, no.
24     Q.  (By Ms. Garrow)  Have you sent her an

148

1  e-mail on any allegations in this lawsuit?
2      A.  I don't believe I have.  Not that I
3  recall.
4      Q.  On Page 5 of the employee handbook,
5  there's a personal leave policy.  My
6  understanding is that sales representatives and
7  sales managers get fifteen unpaid days to use for
8  any reason.  Is that a true statement of the
9  leave policy?
10     A.  Yes.
11     Q.  Did that change at any time during
12 your employment by Patriot?
13     A.  No.
14     Q.  Was this one of the changes in the
15 employee policy -- or policy handbook, or was
16 that always a part of the handbook?
17     A.  I don't recall.
18         (Exhibit 15, 12/22/04 Memo
19          Re: New-Hires, marked for
20          identification)
21     Q.  (By Ms. Garrow)  I'm going to show you
22 what is Exhibit 15.  Have you seen this document
23 before?
24     A.  Yes.

149

```
 1        Q.   It's a memo to you, isn't it, human
 2   resource directors?
 3        A.   Yes.
 4        Q.   It's from Becky Foster and Bruce
 5   Polansky?
 6        A.   Yes.
 7        Q.   Do you understand them to be employed
 8   by the Berkley Group, Becky and --
 9        A.   Becky and Bruce?
10        Q.   Becky and Bruce.
11        A.   Yes.
12        Q.   What about Vickie Ruiz; is she also
13   employed by the Berkley Group?
14        A.   To my knowledge.
15        Q.   Are you employed by the Berkley Group?
16        A.   No.
17        Q.   What about Lauren Powell?
18        A.   I believe she is.
19        Q.   She is what?
20        A.   Employed by the Berkley Group.
21        Q.   This policy here says "Effective
22   January 1, 2005, all new-hires must meet the
23   following criteria in order to work for any of
24   the Berkley development subsidiaries:  A car
```

150

```
 1   suitable for touring our customers, and auto
 2   insurance that meets the company requirements."
 3   Am I reading that correctly?
 4        A.   Yes.
 5        Q.   To your knowledge, was this a change
 6   in policy that was -- does this memo reflect a
 7   change in policy?
 8        A.   I'm not sure.  To my knowledge, it
 9   should have been done the whole time.
10        Q.   Did you understand this policy to
11   apply to Patriot Resorts' Lanesborough location?
12        A.   Yes.
13        Q.   And to your knowledge, this policy was
14   already in place, is that a fair statement?
15        A.   It's fair.
16        Q.   On the Personal Leave Policy back on
17   Exhibit 13, it says "Failure to sign in on the
18   attendance sheet will result in the employee
19   being documented with a personal day off, whether
20   or not the employee was present that day."  Are
21   you aware if that happened at Patriot in the
22   Berkshires?
23        A.   It might have.  I'm not sure whether
24   it did or not; I don't know.
```

151

```
 1        Q.   You have no personal knowledge whether
 2   that ever occurred?
 3        A.   No.
 4        Q.   On Page 6, there's the Safety Policy.
 5   Starts off that employees are expected to wear
 6   shoes at all times and not lift heavy objects and
 7   not use chairs or desks as ladders.  Are you
 8   aware that employees used chairs or desks as
 9   ladders?
10        A.   I have never seen any of them.  Nobody
11   has ever told me that they have, no.
12        Q.   Inserting metal objects into toasters.
13   Did you ever hear that anybody has done that?
14        A.   No.
15        Q.   It says employees are not to do that?
16        A.   No.
17        Q.   Were there toasters and microwaves
18   on-site?
19        A.   I don't know if there is a toaster
20   over there or not, but there was a microwave.
21        Q.   When you say "over there," in the
22   Sales Center?
23        A.   In the lounge.
24        Q.   In the lounge?
```

152

```
 1        A.   Um-hum.
 2        Q.   Says "All electrical equipment must be
 3   turned off when leaving work."  Were any of these
 4   printers, computer terminals, radios, adding
 5   machines -- were any of those over in the Sales
 6   Center?
 7        A.   They have a copier over there, but
 8   they don't have computers.
 9        Q.   Adding machines?
10        A.   Cordless.
11        Q.   Like a calculator?
12        A.   Right.
13        Q.   Those provided by the company?
14        A.   Yes, unless somebody decides to bring
15   in their own.
16        Q.   But there are some over there that the
17   sales representatives and sales managers can use?
18        A.   Right.
19        Q.   All the paperwork that they need to
20   complete a sale, that's all kept over at the
21   Sales Center?
22        A.   The worksheets and the T-pitches and
23   things like that are over there.  All of the
24   documents that go into a contract are in our
```

153

1  offices.

2      Q.    And the worksheets, are those, to your

3  knowledge, what employees or sales

4  representatives will use when presenting a sale

5  to a potential owner?

6      A.    Yes.

7      Q.    So that's all they really need to

8  write on to show the numbers and the

9  calculations?

10     A.    Yes.

11     Q.    What about pens, pencils, general

12 office supplies -- is that kept over in the Sales

13 Center, or are there some in the Reception

14 Center, or where are those kept?

15     A.    We have pencils or pens on top of the

16 check-in counter for our guests to sign in.  As

17 far as representatives, they are responsible for

18 their own tools for the day.

19     Q.    What do you mean?

20     A.    Pens, pencils, whatever they use, and

21 they should be bringing in their own legal pads,

22 also, to do notes on.

23     Q.    But oftentimes they'll just take notes

24 right on the worksheets, right?

154

1      A.    Yes.

2      Q.    Do you understand there to be ongoing

3  training for sales representatives?

4      A.    That's my understanding.

5      Q.    Daily?

6      A.    I don't know how often.

7      Q.    Fair to say regular?

8      A.    I would say regularly.

9      Q.    Who does those trainings?

10     A.    Directors or managers.

11     Q.    Is it done on-site?

12     A.    Yes, ma'am.

13     Q.    Ever off-site?

14     A.    I'm not aware of that.

15     Q.    Do you know if it's mandatory

16 training?

17     A.    I believe that there's been times when

18 it has been.

19     Q.    Do they have a fax machine over at the

20 Sales Center?

21     A.    No.

22     Q.    Do they have any reason to use a fax

23 machine, to your knowledge?

24     A.    No.

155

1      Q.    Page 18 is an Employee Acknowledgment

2  Form, is that correct?

3      A.    Yes.

4      Q.    Other than -- I think you testified

5  that the sales representatives and managers who

6  had been on for a while had already signed an

7  acknowledgment for a previous handbook?

8      A.    Correct.

9      Q.    And they just had to do what -- what

10 did you do with those people to acknowledge this?

11     A.    There was a sheet that came in with

12 all the changes that had been made to the

13 original handbook.

14     Q.    And they signed off on that sheet?

15     A.    Yes.

16     Q.    And the folks who came in after this

17 employee handbook had been published, did they

18 sign this Page 18, Employee Acknowledgement Form?

19     A.    Yes.

20     Q.    Was everybody required to do so?

21     A.    Yes.

22     Q.    Sales representatives?

23     A.    Yes.

24     Q.    Sales managers?

156

1      A.    Anybody coming in new, yes.

2      Q.    People in your department as well?

3      A.    We have a different handbook.  We have

4  an office handbook.

5      Q.    Is it called Employee Handbook?

6      A.    Yes.

7      Q.    Instead of "sales personnel," it says

8  "office personnel"?

9      A.    Yes.  Sales office personnel.

10     Q.    Sales office personnel?

11     A.    Yes.

12     Q.    Were you involved in the decision --

13 let me strike that.  Are you aware that LaCrisha

14 Wise was terminated from her employment with

15 Vacation Village?

16     A.    Yes.

17     Q.    Were you in any way a part of that

18 decision to terminate her employment?

19     A.    No.

20     Q.    Do you know who was?

21     A.    Gordon Leete, Paul Stensland, and Rod

22 Lewis.

23     Q.    How do you know that?

24     A.    They're the directors.

157

```
 1      Q.   So that's your only basis?
 2      A.   They're the directors and they
 3   instructed me that they were letting her go.
 4              (Exhibit 16, 6/8/03 Memo to Faith
 5              from Paul, marked for
 6              identification)
 7      Q.   (By Ms. Garrow)  Have you seen this
 8   document before?
 9      A.   Yes.
10      Q.   What is Plaintiff's 16?
11      A.   When I knew that they had let LaCrisha
12   go, I had typed up on this sheet "to" and "from"
13   "in reference to LaCrisha," and I wanted them to
14   write their decision down below so that we could
15   make it a part of her employee file.
16      Q.   Whose writing is this, if you know?
17      A.   Rod Lewis'.
18      Q.   Had he communicated to you that he
19   intended to terminate or he had terminated
20   LaCrisha employment before writing this document?
21      A.   I believe she was let go prior to
22   that, I believe.  It was either before that or
23   the same day; I don't recall when she was let go.
24   On June 7.
```

158

```
 1      Q.   So you believe that's the day she was
 2   actually let go, June 7?
 3      A.   I think so.
 4              MS. FABBO:  Is that a yes?
 5              THE WITNESS:  Yes.
 6      Q.   (By Ms. Garrow)  From your testimony,
 7   it sounds like you directed Mr. Lewis --
 8   essentially, you had asked him to write this?
 9      A.   I didn't ask Rod to write it.  I think
10   I wanted it to come from Paul because Paul was
11   her line director, and I think once it got out on
12   the floor, probably Rod wrote it down, maybe Paul
13   left for the day.  I don't know why Rod wrote it
14   up, I don't know.
15      Q.   What did you do when you received
16   this?
17      A.   I put it in her file.
18      Q.   Anything else?
19      A.   I don't believe so.
20      Q.   Do you recall communicating with Miss
21   Foster that Miss Wise was let go from Patriot?
22      A.   I don't recall telling her, but I'm
23   sure I did.  I don't recall right off the top of
24   my head what the conversation was, but I'm sure
```

159

```
 1   that I did notify her, yes.
 2      Q.   Why are you sure that you notified
 3   her?
 4      A.   Because I pretty much tell Becky
 5   everything.
 6      Q.   Has anybody been terminated that you
 7   haven't told Miss Foster?
 8      A.   Has there been...
 9      Q.   Has there been an occasion where
10   somebody's been terminated that you haven't
11   communicated that fact to Miss Foster?
12      A.   I'm sure there has, sure.
13      Q.   Is it more often than not that you
14   tell Miss Foster or less often than not that you
15   tell Miss Foster that someone's been terminated?
16      A.   Fort Lauderdale is notified of
17   everybody who is let go, quit, terminates for any
18   reason.
19      Q.   They're notified through paperwork, I
20   assume?
21      A.   Correct.
22      Q.   How often do you have occasion to
23   communicate with the president --
24      A.   Periodically.
```

160

```
 1      Q.   Let me finish the question.  How often
 2   do you have occasion to communicate with the
 3   president of the company that somebody's been
 4   terminated?
 5      A.   Periodically.
 6      Q.   What does that mean?
 7      A.   Every so often.
 8      Q.   Do you speak with her quarterly and
 9   tell her who's been terminated or...
10      A.   No, no, just periodically.
11      Q.   Is there any particular reason why you
12   might tell her that somebody's been terminated
13   -- "her" being Miss Foster?
14      A.   The people that I decide to talk to
15   Becky about would be generally people who have,
16   for one reason or another, been -- I don't know
17   what the word is I'm looking for -- possible
18   problems.
19      Q.   Did you communicate with Miss Foster
20   when Mr. Martin was terminated this -- most
21   recently?
22      A.   I'm sure, yes, I did so.
23      Q.   Did you send her an e-mail?
24      A.   I'm not sure whether I did.
```

161

1    Q.   Is it your normal practice to call her
2  or to e-mail her?
3    A.   Either/or.
4    Q.   It could be one or the other?
5    A.   Exactly.
6    Q.   You don't have a specific practice one
7  way or the other?
8    A.   No.
9    Q.   What about when Mr. Massaconi was
10 terminated; did you communicate with Miss Foster
11 that he had been terminated?
12   A.   Yes.
13   Q.   What did you tell her?
14   A.   Just that he had been terminated.
15   Q.   What did she say?
16   A.   You know what -- I'm going to rephrase
17 that, because I didn't notify her that Mike was
18 let go.
19   Q.   Putting aside that you may not have
20 notified her, did you have a conversation with
21 her about Mr. Massaconi being let go?
22   A.   Not right when it happened.  After the
23 fact I did.
24   Q.   What was that conversation?

162

1    A.   The best that I can recall, I was
2  letting her know how everybody was feeling a lot
3  better now because the negativity that was going
4  on was no longer there.  There was a few times
5  that people wouldn't -- sales representatives
6  would not want to go into the lounge because
7  certain people would be in there being negative.
8  So they would filter out into the lobby area and
9  things like that.  So the whole -- I want to say
10 the sales representatives' demeanors are
11 different now.  Everybody is more relaxed.
12 They're not walking on eggshells, and I expressed
13 to her that it was nice to see.
14   Q.   And this was as a result of
15 Mr. Massaconi being let go, is that what you're
16 saying?
17   A.   No, it was not just Mike Massaconi,
18 okay; it was after Roger had left, okay; it was
19 after Massaconi was gone; it was after Joel Hecht
20 was gone.  All of the negative vibes that
21 happened around there just lifted.
22   Q.   What sort of negative vibes; what was
23 the negativity?
24   A.   From what I'm understanding from a few

163

1  different representatives, it was everything was
2  just negative.  Everything was negative.
3  Everything that we were trying to do there was
4  wrong for whatever reason, I don't know.
5    Q.   Well, Mr. Martin was claiming he
6  wasn't getting paid, correct?
7    A.   That's what he's saying.
8    Q.   And Mr. Massaconi was claiming that
9  there were some violations of the wage and hour
10 status, is that correct?
11        MS. FABBO:  Objection.
12        THE WITNESS:  He didn't say
13        anything to me.  If he was voicing
14        that out and about in the lounge,
15        that's not what was coming back to me.
16        They were upset about not getting paid
17        the commissions and the PAC check and
18        things like that.
19   Q.   (By Ms. Garrow)  And you were aware of
20 that?
21   A.   Yes.
22   Q.   You were aware that they were upset
23 about that?
24   A.   Yes.

164

1    Q.   And Mr. Rauer, to your knowledge was
2  he aware of those complaints as well?
3    A.   So far as I know.
4    Q.   What about Mr. Lewis; was he aware of
5  those as well?
6    A.   I don't know.
7    Q.   The line directors, were they aware of
8  those complaints about the PAC checks and not
9  getting timely paid?
10   A.   Yes.
11   Q.   Again, these are complaints by
12 Mr. Martin, you said, Mr. Massaconi, is that
13 correct?
14   A.   Well, that's what you were saying they
15 were complaining about.  I don't know really
16 basically what they were complaining about.  They
17 were unhappy about not getting their commissions
18 on the PACs, yes.
19   Q.   How did you know that?
20   A.   Just by hearing.
21   Q.   Hearing from them?
22   A.   Well, I heard -- well, a couple of
23 times from Mike, and Mike kept saying, I'm not
24 getting paid, you owe me money, you owe me money.

165

1  And I said to him, I said, Well, you have to give
2  me some names so that I can research them for
3  you.  And he did and I researched them, and most
4  of the ones that he had felt that he wasn't paid
5  on hadn't made three consecutive timely monthly
6  payments or -- and they still had no PAC or there
7  were times when he had already gotten paid on
8  things, even though he would say that he wasn't.
9  Then I'd have to turn around and show him where
10  he had been paid.
11      Q.  How do you research that?
12      A.  I go through Fort Lauderdale and I
13  basically ask the question did Mike get paid on
14  Mr. Jones.
15      Q.  So you use the customer name to
16  track --
17      A.  Right.
18      Q.  -- where the payments have been?
19      A.  Right.
20      Q.  And how payments are made or if
21  payments have been made, is that correct?
22      A.  Right.
23      Q.  Any other way to track that, to your
24  knowledge?

166

1      A.  No.
2      Q.  What about when Mr. Corbin was let go?
3      MS. FABBO:  Objection.
4      Q.  (By Ms. Garrow)  Did you hear anything
5  about Mr. Corbin being let go or if he was
6  complaining about not getting paid?
7      A.  I haven't heard anything about Peter.
8  I didn't even know why he left, okay; and right
9  now I couldn't tell you why he left.
10      Q.  So is it your testimony that you don't
11  know if he was terminated or if he left
12  voluntarily?
13      A.  I'd have to look back, I'd have to
14  look back.
15      Q.  So nobody ever said to you, We're
16  terminating Mr. Corbin, to your recollection?
17      A.  No, I don't recall that.
18      Q.  Do you know who maintains the sign-in
19  sheet for the sales representatives and sales
20  managers -- who maintains them?
21      A.  Dennis.
22      Q.  Where are they maintained?
23      A.  Out in the Reception Center, or
24  they're in storage upstairs in the contracting

167

1  office.
2      Q.  Do you know how long he maintains
3  those documents for, any idea?
4      A.  I believe they go back to 2001; I'm
5  not real sure.
6      Q.  Since the place opened?
7      A.  Yes.
8      Q.  I'm sorry if I asked you this, but I
9  just want to make sure that I did.  Exhibit 16,
10  did you have any discussions with either
11  Mr. Stensland or Mr. Lewis as a result of
12  receiving this document?
13      A.  I would think that I did, but I don't
14  recall exactly what the conversation was.
15      Q.  But you think you did?
16      A.  Possibly.
17          (Exhibit 17, 6/9/03 Memo to
18          Lippert from Foster,
19          marked for identification)
20      Q.  (By Ms. Garrow)  I'm showing you
21  what's marked as Plaintiff's 17.  Do you
22  recognize that document?
23      A.  Yes.
24      Q.  What is this document?

168

1      A.  It was an e-mail to Becky in reference
2  to LaCrisha being let go.
3      Q.  Does Miss Foster work on Sundays, to
4  your knowledge?
5      A.  No.
6      Q.  That's probably one of your regular
7  workdays, though, right?
8      A.  Yes.
9      Q.  What information did you gather to
10  forward to Miss Foster that you reference in this
11  e-mail?
12      A.  I'm sorry, ask that again.
13      Q.  You said that you were gathering up as
14  much written information you can on her and
15  forwarding it to Miss Foster.  What did you send
16  to Miss Foster?
17      A.  I can't remember exactly what I sent.
18  It was a while ago, this was a while ago.
19      Q.  What do you remember as you sit here
20  today?
21      A.  I know that I had asked Bonnie, who is
22  the manager in the Reception Center -- I had
23  asked her to keep up with information on anybody
24  that was having problems out there.

169

```
1       Q.   That's not what it says here, though,
2   right -- it says, "I asked Bonnie to keep a log
3   of problems and comments she says."  So you
4   specifically asked her to keep a log on Miss
5   Wise, is that correct?
6              MS. FABBO:  Objection.
7              MS. GARROW:  You can answer that.
8              THE WITNESS:  Obviously I did.  I
9         don't recall, you know, exactly what
10        it was.
11      Q.   (By Ms. Garrow)  Did you have a chance
12  to review that log that you referred to?
13      A.   I read it, I believe it was during the
14  other deposition I did.
15      Q.   Do you recall if it was typed or
16  written?
17      A.   I believe it was typed.
18      Q.   So is it your testimony that you
19  didn't review the log before you sent it to Miss
20  Foster?
21      A.   I don't recall whether I did or not.
22  Just don't recall.
23      Q.   Do you remember sending the log to
24  Miss Foster?
```

170

```
1       A.   No.
2       Q.   Do you remember what else you sent to
3   her?
4       A.   No.
5       Q.   If anything?
6       A.   No, I don't remember.
7       Q.   You also say that you spoke to Miss
8   Foster previous to this e-mail about Miss Wise's
9   anger problem?
10      A.   Correct.
11      Q.   Do you remember that conversation?
12      A.   I don't remember the exact
13  conversation I had with her, no.
14      Q.   Do you remember how many
15  conversations?
16      A.   No.
17      Q.   Do you remember generally what you
18  said?
19      A.   I don't remember the specifics of what
20  I said.
21      Q.   Do you remember -- I'm asking you
22  generally.  Do you remember generally?
23      A.   Generally, you know, probably just the
24  way LaCrisha came across.  She was a very angry
```

171

```
1   young woman, I believe.
2       Q.   That's your own opinion?
3       A.   That's my own opinion.
4       Q.   You discussed that with Miss Foster,
5   the president of the company, according to this?
6       A.   Well, possibly, but I'm not really
7   sure whether I went into any great detail about,
8   you know, the way I was feeling.  The reason why
9   I was feeling these things is because of things
10  that I had heard.
11      Q.   So you're not sure how you felt, but
12  you know it's because of something you heard?
13      A.   Yes.
14      Q.   From whom?
15      A.   I don't recall who exactly, you know,
16  said, but just in general conversation.  I don't
17  remember who with.  Different things that the
18  girl would do.
19      Q.   Like what?
20      A.   Like she would say that, you know, if
21  Michael -- her boyfriend was going to leave her,
22  that she would make sure that he would -- or she
23  would claim child molestation against him and
24  things like that.  Just basic things, and just
```

172

```
1   the way LaCrisha carried herself.  It's hard to
2   explain.  I can't explain it.
3       Q.   Where did you hear this allegation
4   about her claiming child molestation?
5       A.   Where did I hear it?
6       Q.   Yes, from whom?
7       A.   I heard it from out on the sales line.
8   I don't know whether it was the managers or who
9   it was, to tell you the truth.  I don't even
10  remember who said it.  It was just, Oh, Lord, I
11  can't believe that -- you know, that type of
12  thing.
13      Q.   Did you believe she said that?
14      A.   Did I believe she said it?
15      Q.   Yes.
16      A.   I don't recall whether I believed she
17  said it or not.  Would I put it past her?  No, I
18  wouldn't.
19      Q.   Why do you say that?
20      A.   Just my gut feeling that I have about
21  her.
22      Q.   What is that gut feeling?
23      A.   Um, she was a very intimidating woman.
24  She was very -- I don't know -- now I'm talking
```

173

1    about towards the end.  I wasn't around her out
2    and about, you know, on the sales floor.  Very
3    demanding.  She -- I felt threatened with her
4    personally.
5        Q.   Did she ever personally threaten you?
6        A.   Outright?
7        Q.   Yes.
8        A.   No, no.
9        Q.   But she scared you?
10       A.   Very -- yes, very much so.
11       Q.   She made you nervous?
12       A.   Very much so.
13       Q.   She made you uncomfortable?
14       A.   Very much so.
15       Q.   You say that was more towards the end
16   or that had been building throughout the time she
17   was there?
18       A.   I don't know if that was even after
19   she had gone, because during the time that she
20   was with our employ, I hardly ever saw the woman
21   because of where I was, you know, because I'm in
22   this building over here and she was basically in
23   the other two buildings, you know; so very rarely
24   would I see her.

174

1        Q.   Did her boyfriend make you nervous or
2    uncomfortable?
3        A.   No, not at all.
4        Q.   Just Miss Wise?
5        A.   Just Miss Wise, yes.
6        Q.   Anybody else make you nervous or
7    uncomfortable, anybody you worked with?
8        A.   Every once in a while, Roger would
9    scare me.
10       Q.   Did he threaten you?
11       A.   I don't believe Roger ever threatened
12   me, no, no, not that I recall.  I can't think of
13   anybody else that I felt threatened by or -- oh,
14   yes, there was one.  Bruce Zesserman was this
15   guy's name -- very much so.
16       Q.   When did he work there?
17       A.   I don't know.  I don't recall.
18       Q.   Did he work there for a while?
19       A.   Not for a while, no.  Maybe tops three
20   months, four months.
21       Q.   Was he a sales representative?
22       A.   Yes.
23       Q.   You mention in your e-mail here to
24   Miss Foster that "She was the one" -- meaning

175

1    Miss Wise -- "was the one I spoke to you recently
2    about the dress code problem."  Do you recall
3    that conversation between you and Miss Foster
4    about Miss Wise's dress code problem, according
5    to your words?
6        A.   I believe this is the time when I got
7    a phone call for me to come over to the Sales
8    Center because LaCrisha was wearing spaghetti
9    straps.
10       Q.   So then you called Miss Foster to tell
11   her that?
12       A.   I'm not sure if I called her or how it
13   came up.
14       Q.   But you spoke to her about it,
15   nonetheless?
16       A.   Right, right.
17       Q.   Did you speak to her about the time
18   that Lisa Ferrara wore spaghetti straps?
19           MS. FABBO:  Objection.
20           THE WITNESS:  I don't know.
21       Q.   (By Ms. Garrow)  Do you recall that
22   Lisa wore spaghetti straps?
23       A.   I don't know if she did or not.  Lisa
24   is not one that comes to mind when the dress code

176

1    is being talked about.
2        Q.   Were there any other women who wore
3    dresses with spaghetti straps?
4        A.   I'm not sure about the spaghetti
5    straps.  Nobody said anything to me about it.
6        Q.   So that was not called to your
7    attention?
8        A.   No.
9        Q.   But Miss Wise was?
10       A.   I don't know if anybody else was
11   wearing spaghetti straps or not.
12       Q.   But Miss Wise wearing spaghetti
13   straps --
14       A.   I got a phone call from --
15       Q.   -- was brought to your attention,
16   correct?
17       A.   Yes.
18       Q.   Who brought that to your attention?
19       A.   Gordon Leete.
20       Q.   Just so I'm clear, was anybody else --
21   the wearing of spaghetti straps by any other
22   women ever called to your attention?
23       A.   I know that there was a few times that
24   we have asked people to put sweaters on, but I

177

1  don't recall whether it was spaghetti straps or
2  whether it was cleavage or exactly what the
3  problem was.  There were girls that did button
4  up, there were girls that put sweaters on, there
5  was one that left and went and bought an outfit
6  because of what she was wearing; but I don't
7  recall what they were --
8       Q.   Do you remember --
9       A.   -- specifics were.
10      Q.   Do you remember who the individuals
11 were?
12      A.   One was Tashama Wright.  I believe she
13 was the one that went and got an outfit.  One, I
14 believe, was Debbie Bianci, and I think she was
15 -- I don't know what she was wearing, but I think
16 she was one that was asked to, you know, button
17 up.  I don't recall Lisa.  I don't recall Lisa,
18 and I think there was the other one, Tina Wells
19 comes to mind.  I don't recall specifics, so -- I
20 don't know, but I'm sure that she was one.
21      Q.   Do you know what happened to them as a
22 result of their wearing inappropriate things
23 based on the dress code other than going out and
24 buying outfits; did they get put on overage or

178

1  were they punished in any way?
2       A.   I don't know.
3       Q.   Do you know if they got disciplined in
4  any way?
5       A.   I don't know.
6       Q.   Did you discipline them in any way?
7       A.   No, because they either went and got
8  an outfit or they buttoned up or put a sweater on
9  or fixed the problem.
10      Q.   What is Molari, M-O-L-A-R-I?
11      A.   It's a temporary agency.
12      Q.   You refer to somebody black who you
13 hired in your e-mail from the temp. agency?
14      A.   Yes.
15      Q.   What did you hire her to do?
16      A.   To work eventually in the sales
17 contracting office.  Normally when I hire
18 somebody to work in the sales contracting office,
19 they work in the reception area first so that
20 they know the in's and out's of what happens out
21 there.
22      Q.   And you hired her as a temp.?
23      A.   Yes.
24      Q.   Did she become an employee?

179

1       A.   No.
2       Q.   Why not?
3       A.   She wasn't a good worker.
4       Q.   What was her name?
5       A.   Oh, Lord, I don't remember.  I don't
6  remember her name.
7       Q.   You referred to her in this June 8,
8  2003 memo.  Do you recall about how long she had
9  been working there when you wrote this e-mail?
10      A.   I don't recall how long she had been
11 there, no.
12      Q.   Any estimate?
13      A.   I wouldn't say long.
14      Q.   Month, two?
15      A.   If that.
16      Q.   How does hiring from that temp. agency
17 work, Molari; how do you find out about potential
18 employees or temp. employees -- do they send you
19 a list or...
20      A.   No.
21      Q.   Do you interview anybody?
22      A.   Yes.
23      Q.   How does it work?
24      A.   Or I just call and say send me

180

1  somebody -- either/or.
2       Q.   Is that what happened in this case?
3       A.   Yes.
4       Q.   And they just send somebody out and
5  they do the temp. work?
6       A.   Yes.
7                  (Exhibit 18, 5/18/03 Memo to Wise
8                  from Lippert/Lewis,
9                  marked for identification)
10      Q.   (By Ms. Garrow)  This is from you and
11 Mr. Lewis?
12      A.   Yes.
13      Q.   To Miss Wise?
14      A.   Yes.
15      Q.   Tell me -- did you type this?
16      A.   Yes, I did.
17      Q.   How did you come to type this?
18           MS. FABBO:  Objection.
19           MS. GARROW:  You can answer.
20      Q.   (By Ms. Garrow)  What were the
21 circumstances under which you typed this?
22      A.   I wanted it to be put in our file in
23 case it became a problem at any given time.
24      Q.   In case what became a problem?

Wise v Patriot - Faith Lippert    5/17/05

181

1     A.    Her wearing a spaghetti-strap dress.
2     Q.    Did you show this to her?
3     A.    I'm not sure.  It's addressed to her;
4  I would assume, but I'm not sure.
5     Q.    You don't have a specific recollection
6  as you sit here today?
7     A.    No.
8     Q.    Did you ever have occasion to type up
9  a memo like this to any other employees relating
10 to the dress code?
11    A.    I'd have to look back in people's
12 files, but I can't.
13    Q.    As you sit here today --
14    A.    But I don't recall anybody refusing to
15 put on a top or to cover up or to go home or to
16 go and buy something.  LaCrisha is the only one
17 that comes to mind that totally refused to do
18 anything.  I don't know what she did after it was
19 brought to her attention, either; I don't recall.
20    Q.    So you don't know if after it was
21 brought to her attention if she actually did go
22 and cover up?
23    A.    No, she did not.
24    Q.    You know that?

182

1     A.    I don't believe she did, no.
2     Q.    Do you know that for sure?
3     A.    No, I don't know for sure because I
4  don't recall.
5     Q.    Do you know for sure she didn't go
6  home to Springfield from the Berkshires to
7  change?
8     A.    I don't know for sure, but I don't
9  think she did.
10    Q.    So when you said you didn't know what
11 she did after that, what were you referring to,
12 after?
13    A.    I didn't know whether she just left, I
14 don't know -- I don't know what she did.
15    Q.    Have you heard anything other than
16 from your attorneys relating to the termination
17 of Roger Martin that you haven't told me about
18 today?
19    A.    Have I heard anything?
20    Q.    From anybody relating to Roger
21 Martin's termination that you haven't testified
22 to today?
23    A.    No, I don't believe so.
24    Q.    Do you know who terminated him?

183

1     A.    I'm not sure.
2     Q.    So were you there when he was
3  terminated?
4     A.    I was there that day, yes.
5     Q.    Did you observe the termination?
6     A.    No.
7     Q.    Were you asked to observe the
8  termination?
9     A.    No.
10    Q.    Were are you asked to do anything in
11 relation to the termination?
12    A.    No, other than just to write it up,
13 the change form.
14    Q.    Did you do that?
15    A.    Yes.
16    Q.    Just the Change of Status form?
17    A.    Yes.
18    Q.    Anybody else add any comments to the
19 Change of Status form, to your recollection?
20    A.    I don't recall exactly what was put on
21 there.
22    Q.    What about Mr. Massaconi; did you have
23 any other knowledge relating to his termination
24 that you haven't already told me about?

184

1     A.    That his numbers were bad.
2     Q.    Who terminated him, do you know?
3     A.    I believe it was Bill Rauer.
4     Q.    Was he given any opportunity, to your
5  knowledge, to correct those numbers, to bring
6  them up?
7     A.    I understood that he was, yes.
8     Q.    How did you understand that, through
9  who?
10    A.    Through Bill Rauer.
11    Q.    Did you have any discussions with him?
12    A.    With Mike?
13    Q.    Excuse me, my mistake -- Mr. Rauer
14 relating to Mr. Massaconi's termination?
15    A.    Just that he was going to do it.
16    Q.    So he told you before he did it?
17    A.    Yes.
18    Q.    Did he ask you for advice?
19    A.    No.
20    Q.    Did he ask you for any input as to how
21 to do it, how to terminate him?
22    A.    Yes.
23    Q.    So he just told you he was going to
24 terminate him?

185

```
 1      A.   Yes.
 2      Q.   What did you say?
 3      A.   I probably didn't say too much then.
 4  I probably made a facial, you know, one of these
 5  (indicating).
 6      Q.   Just like a -- I don't even know how
 7  to describe that for the record.
 8      A.   Just a facial expression at the time.
 9      Q.   Did you think it was odd?
10      A.   No, not at all.
11      Q.   Had there been other sales managers
12  terminated for bad numbers?
13      A.   I don't believe that any of the
14  managers were terminated because of bad numbers.
15  They were...
16      Q.   Was Mr. Massaconi a sales manager at
17  the time he was terminated?
18      A.   No.
19      Q.   At some point did he get demoted?
20      A.   Yes.
21      Q.   Do you know who demoted him?
22      A.   I'm not sure who really told him, no.
23      Q.   Do you know who made the decision to
24  demote him?
```

186

```
 1      A.   I believe Bill Rauer.
 2      Q.   Do you know that, or are you guessing?
 3      A.   I'm guessing.
 4      Q.   I'm not asking you to guess.
 5      A.   Okay.
 6      Q.   Do you have any personal knowledge as
 7  to who demoted him?
 8      A.   No.
 9      Q.   Do you have any personal knowledge why
10  he was demoted?
11      A.   Because of his numbers.
12      Q.   Who told you that, or how did you come
13  to know that, I guess, is a better question?
14      A.   There's a procedure, a policy that
15  they go by when their numbers get to be so bad.
16      Q.   What is that policy?
17      A.   Oh, gosh, I'd have to look at it.  I
18  don't know it off the top of my head.  That's
19  it.
20           (Exhibit 19, Policy for Sales
21            Managers Sales Performance,
22            marked for identification)
23      Q.   (By Ms. Garrow)  I'm showing you what
24  is marked as Plaintiff's 19, and it's four pages
```

187

```
 1  that are together here.  Have you seen these four
 2  pages before?
 3      A.   Yes.
 4      Q.   What are they?
 5      A.   It was a policy that was done up for
 6  the sales managers because of their performance.
 7      Q.   That was instituted on July 11, 2004?
 8      A.   Yes.
 9      Q.   According to this?
10      A.   Yes.
11      Q.   Had there ever been a policy for when
12  sales managers' ratios drop prior to that date,
13  to your knowledge?
14      A.   I'm sure there was, but it wasn't
15  written.
16      Q.   So this is the first written policy,
17  to your knowledge?
18      A.   So far as I know.
19      Q.   To your knowledge, were these all the
20  sales managers and line directors who signed this
21  as of -- let me strike that.  The people who
22  signed this, were these all the line directors
23  and sales managers as of July 11, 2004?
24      A.   Yes.
```

188

```
 1      Q.   I'm going to ask you what the last two
 2  pages are, because they're blank other than --
 3  they're not signed, I should say; they're not
 4  blank.  They're undated, there's no "To," and
 5  they're unsigned.  What are these?
 6      A.   Those are form letters.
 7      Q.   If somebody were put on probation for
 8  performance if they were a sales manager, would
 9  you expect these to be in their file?
10      A.   Yes.
11      Q.   To your knowledge, was Mr. Massaconi
12  put on probation?
13      A.   Yes.
14      Q.   Before he was demoted?
15      A.   Yes.
16      Q.   Do you know when that was?
17      A.   No, I don't.  I don't remember.
18      Q.   Has anybody else -- any other sales
19  managers ever been put on probation?
20      A.   I believe so, yes.
21      Q.   I should say have they been given a
22  30-day warning -- to use the language here -- to
23  get your sales ratios --
24      A.   Yes.
```