189

1    Q.   Who was that?

2    A.   I believe Bill Lee was one, Jerry

3    Stimple, Bob Campagne, Mike Campagne.  I believe

4    that's all that I can remember.

5    Q.   Mr. Lee, when was that, do you know?

6    A.   Don't remember.

7    Q.   You don't remember?

8    A.   No.

9    Q.   Do you remember if it was this year,

10   2005?

11   A.   I don't believe it was 2005.

12   Q.   Do you think it was after this policy

13   came into effect in 2004?

14   A.   I'm not even sure of that.

15   Q.   Who else did you say it was -- Bob

16   Campagne?

17   A.   Uh-huh.

18   Q.   Do you know when that was?

19   A.   No, ma'am.

20   Q.   Any idea?

21   A.   No.

22   Q.   Mike Campagne, any idea?

23   A.   No.

24   Q.   The fourth --

---

190

1    A.   Jerry Stimple.

2    Q.   Any idea when he was given a 30-day

3    warning?

4    A.   No.

5    Q.   On the next document, it says that,

6    "As of today's date, this is notification to you

7    that your numbers are above 8.99 or better and

8    that you are off probation."  Do you know if any

9    of those individuals you just named were ever off

10   probation?

11   A.   I know Mike got one of these, and I'm

12   not quite sure about the others.

13   Q.   Do you know when Mike got one of

14   these?

15   A.   No.

16   Q.   And you don't know if the others did

17   or not?

18   A.   I'd have to look; I don't recall.

19   Q.   Were any of the others that you

20   testified to -- the Campagnes, Mr. Stimple, or

21   Mr. Lee -- demoted to sales representative from

22   sales manager?

23   A.   Yes.

24   Q.   Any knowledge when that was?

---

191

1    A.   No.

2    Q.   None at all?

3    A.   No, I don't remember.

4         MS. GARROW:  Off the record.

5         (A break was taken)

6         MS. GARROW:  Back on the record.

7         (Exhibit 20, LaCrisha Wise 2002

8         Attendance Record,

9         marked for identification)

10   Q.   (By Ms. Garrow)  I'm showing you

11   what's been marked as Plaintiff's 20.  Have you

12   seen this document before?

13   A.   Yes.

14   Q.   What is this document?

15   A.   It's a list of -- it's LaCrisha Wise's

16   attendance for 2002.

17   Q.   Do you know who prepared this

18   document?

19   A.   I believe it was Bonnie Gardner.

20   Q.   Do you know why she prepared this

21   document?

22   A.   To show how many days LaCrisha was out

23   or sick or whatever.

24   Q.   In 2002?

---

192

1    A.   In 2002, I'm sorry.

2    Q.   Do you know why Bonnie prepared this

3    document?

4    A.   Right off the top, no.  I would assume

5    that she was asked to do it so that we could show

6    how many days she had been out -- "she" being

7    LaCrisha.

8    Q.   Did you ask her to do it?

9    A.   Possibly.  Do I recall asking her to

10   do it?

11   Q.   Yes.

12   A.   No, but is there a good chance that I

13   did, yes.

14   Q.   Why do you say that?

15   A.   Because I wanted to know how many days

16   that she was out because of the attendance --

17   15-day attendance.

18   Q.   Why were you only interested in -- I

19   guess you're not sure if you directed her to do

20   this; you just say you could have directed her,

21   is that correct?

22   A.   Yes, I could have.

23   Q.   Do you know why this is only for the

24   year 2002?

---

193

1    A.    No.

2    Q.    Do you have any other recollection

3    about this document?

4    A.    No.

5    Q.    I'm sorry if I've asked you this

6    before -- what is Bonnie Gardner's position?

7    A.    Resort Center manager -- the Reception

8    Center manager.

9    Q.    Does she work for Dennis Clavette?

10   A.    No.

11   Q.    Does she work with him?

12   A.    No, Bonnie is no longer with us.

13   Dennis took Bonnie's place.

14   Q.    When did Dennis begin working with

15   you?

16   A.    In 2004, and I'm not quite sure of the

17   date.  I want to say it was May -- no, strike

18   that.  I want to say it was like April of 2004.

19   Q.    April 2004?

20   A.    Yes, for Dennis.

21   Q.    Do you think that's when the changes

22   occurred?

23   A.    That is not when the changes occurred;

24   that's when he started working for us, I believe.

194

1    Q.    When did Bonnie start working for you?

2    A.    I believe it was May 1, 2004.

3    Q.    So there was an overlap?

4    A.    An overlap?

5    Q.    I'm sorry, when did you say

6    Mr. Clavette started working?

7    A.    In April.

8    Q.    So he overlapped with Miss Gardner in

9    her duties; in other words, she was still there

10   when he came on?

11   A.    Correct.

12   Q.    Was she supposed to be training him?

13   A.    No, he was going to be in the work

14   office with me.

15   Q.    And then what happened?

16   A.    Bonnie was let go and they needed a

17   manager out there and I liked what I saw in

18   Dennis, so I requested him if he wanted the

19   position.

20   Q.    Who let Bonnie go?

21   A.    I did.

22   Q.    Why?

23   A.    With instruction from Becky.

24   Q.    Why did she tell you she wanted Bonnie

195

1    let go?

2    A.    The reports that were coming in, I

3    guess the marketing reports and stuff were always

4    off, and Becky just told me it's time to go.

5    Q.    Do you recall where Miss Gardner was

6    living at the time she worked for Patriot, in

7    what town she was living?

8    A.    I think it was North Adams.

9    Q.    You're pretty sure she was in

10   Massachusetts?

11   A.    Oh, yes.

12   Q.    Had she been working there since the

13   Resorts opened?

14   A.    Yes.

15   Q.    Did you let her go personally?

16   A.    Yes, I did.

17   Q.    Do you recall that conversation?

18   A.    Yes.

19   Q.    Can you tell me about it -- what did

20   you say, what did she say?

21   A.    It was very short, and I let her know

22   that, you know, Becky had said that she could no

23   longer work here.  And I believe Bonnie was, Can

24   you tell me why.  And I told her about the

196

1    reports, and she just kind of grinned at me.  And

2    then she said something to the effect of, Oh, I

3    know how this happens, but I'm different.  And I

4    didn't ask her what she meant at the time.

5    Q.    Do you know now what she meant?

6    A.    Yes, I do.

7    Q.    What did she mean?

8    A.    Bonnie stole money from us.

9    Q.    How do you know?

10   A.    I was told.

11   Q.    By whom?

12   A.    Becky.  And nobody knows that, so --

13   nobody in the organization knows that, as far as

14   I know.

15   Q.    So you just let Becky -- you and Becky

16   know, as far as you know?

17   A.    Yes, and possibly a couple of people

18   in the Accounting Department down in Fort

19   Lauderdale.

20   Q.    Bill Rauer doesn't know?

21   A.    I believe Bill does know.

22   Q.    What about Rod Lewis; does he know?

23   A.    No.

24   Q.    Did she have any accomplices, as far

197

```
 1    as you know?
 2        A.   No.
 3        Q.   When did Becky tell you that Miss
 4    Gardner had been stealing money?
 5        A.   I don't remember the date.
 6        Q.   Approximately how long after Miss
 7    Gardner was gone?
 8        A.   Oh, no, I knew she had taken the
 9    money.  I just don't recall from that period to
10    the period where she was let go, I don't recall.
11        Q.   So did you know that she was taking
12    money prior to the time she was let go?
13        A.   Did I know she took money, yes.
14        Q.   Yes?
15        A.   Yes.
16        Q.   Do you know how long she had been
17    taking money?
18        A.   One time.
19        Q.   Just once?
20        A.   Um-hum.
21        Q.   And then did her termination come
22    shortly thereafter?
23        A.   No, no, it was months.  It was months.
24    It was a while.
```

198

```
 1        Q.   I'm sorry, your testimony is that you
 2    knew at the time that she took the money that she
 3    had taken it, or did you learn that after?
 4        A.   I learned it after the fact.  I got
 5    the phone call from Fort Lauderdale letting me
 6    know.
 7        Q.   So it was Miss Foster who told you
 8    that Miss Gardner had been stealing money or
 9    stole money?
10        A.   She did not come out and say, Becky
11    took the money; she brought it to my attention.
12        Q.   You don't mean Becky; you mean Bonnie?
13        A.   Becky brought it to my attention.  She
14    had been looking at a check that was supposed to
15    be issued for, I believe it was a TV, and it was
16    a thousand dollars more than what the check
17    should have been.  And I didn't put two and two
18    together because I had the utmost trust for
19    Bonnie, plus Bonnie and I were friends, and so
20    Becky never said anything to me of who she
21    thought it was, and she goes, Let me talk to
22    Bonnie, and they had a conversation.
23             And then Bonnie came in to me and sat
24    down and she was visibly shaken, and I said -- I
```

199

```
 1    looked at her and I said, Did you talk to Becky,
 2    and she's like, Yes.  And I says, Well, basically
 3    what happened, you know, and I could -- I took
 4    one look at her face and she started in crying
 5    and upset, and I was -- I said, Bonnie, I said,
 6    Tell me you didn't do that.  And she says, I
 7    can't tell you that.  And she started crying and
 8    getting loud, so I told her to shut up and I
 9    said, Get out the back door, because I didn't
10    want everybody to hear.  And so she went out the
11    back way and I went outside and met her.
12        Q.   So this was when Miss Gardner was
13    still working for the organization, correct?
14        A.   This was when Bonnie was still working
15    with us, yes.
16        Q.   How long after that was she
17    terminated?
18        A.   I'm not quite sure.  It was months, it
19    was months.  I'm not sure how many months in it.
20        Q.   Now, I'm assuming because you said
21    that nobody -- I'll let you try and count months.
22        A.   It might have been like seven or eight
23    months.
24        Q.   I'm assuming because you said you
```

200

```
 1    don't think many people in the organization know,
 2    that she was not prosecuted, is that correct?
 3        A.   That's correct.  We tried to deal with
 4    it, you know, in our company.
 5        Q.   What did you do?
 6        A.   I talked to her -- well, I talked to
 7    Becky again and I stood up for Bonnie, and I told
 8    Becky that she was going through a lot of
 9    personal things.  And after I talked to Becky a
10    while, she says, Well, what do you think?  And I
11    said, Well, I think that, you know, we ought to
12    try and keep her.  And then Becky says, Well, she
13    says -- because I had gone into telling Becky why
14    she needed money and da-da-da-da-da.  She said,
15    Well, do you think that we should give her money
16    to help?  And I told her flat out, I said, That
17    would be a good thing, I think, to keep her,
18    because she was a good employee type of thing.
19             And so Becky gave her $1,200 out of
20    her own pocket to help her.  And I get very upset
21    when I talk about this because Bonnie was a very
22    good friend of mine, or I thought so.  So the
23    deal was I would have to take her to the bank and
24    have them issue the checks to the different
```

201

1    places that she needed the money the most, and we
2    did.  And not only that, but we had to find out
3    from Bonnie how much she wanted to repay Becky
4    and how she was going to repay the company.
5         And through my conversation with
6    Becky, Becky really didn't want it to be company
7    known, okay.  So I'm banging my head trying to
8    figure out how we can get the money back from
9    Bonnie to replace what she had taken without
10   everybody knowing about it, because I didn't
11   want -- and neither did Becky -- Becky didn't
12   want anybody to know about it, either.  So it was
13   Bonnie's choice to repay -- I told Becky, I said,
14   Becky, the way you could probably do it is we've
15   got this big old scanning project getting ready
16   to do.  Why don't you pay her so much a contract
17   and then take it back from that thousand dollars.
18   And --
19        Q.   Can you explain to me what you mean,
20   how you -- what she was going to pay her and how
21   she was going to pay her back?  I'm a little
22   confused.
23        A.   If she came in after hours and did the
24   scanning project.

202

1         Q.   A job that needed to be done for the
2    company?
3         A.   Right, right.  Could you, you know,
4    take back that money and apply it towards the
5    thousand dollars that she owed, and she says,
6    Well, I like that idea.
7         Q.   So essentially working off the
8    thousand dollars that she stole?
9         A.   Right, working off the thousand
10   dollars that she stole.  That way we didn't have
11   to do anything, you know.  Bonnie first told me
12   she wanted to pay Becky $50 a week back, and I
13   said, Are you sure; that's a lot of money.  She
14   goes, Well, 25.  I said, Okay.  I said, You're
15   sure?  She says, yes.  So that was that.  And in
16   that however many months it was before -- and she
17   wasn't let go because of owing the money; it was
18   there were things that weren't going on out in
19   the reception area that should have been done.
20        Q.   Other than marketing reports?
21        A.   Marketing reports, the reports were
22   always something wrong with them and there was
23   never any changing, you know; nothing ever
24   changed.  She was very well liked -- very well

203

1    liked, very nice girl.
2         Q.   And she wasn't let go for stealing
3    money?
4         A.   No, no, absolutely not.  So during
5    that period of time, I think Bonnie did -- I want
6    to say -- 29 or 39 contracts.
7         Q.   The scanning job?
8         A.   Yes.  To go towards the thousand
9    dollars.  And I believe that she only paid back
10   Becky $50, so --
11        Q.   Is it because she didn't pay her back
12   or make restitution that she was let go, to your
13   knowledge?
14        A.   No.  No, no, no.  We tried to help
15   Bonnie.  We really tried to help Bonnie.  It was
16   a shame.
17        Q.   Anybody else that you're aware of that
18   Becky's ever told you who's stolen money from the
19   company, to your knowledge?
20        A.   Andy Goodness.
21        Q.   Was he let go for that?
22        A.   I'm not sure what Andy was let go for.
23   I'm sure that that was probably a good part of
24   it, if not the reason.  I would, there again,

204

1    have to go back and look.
2         Q.   He was terminated?
3         A.   He was terminated, yes.
4         Q.   Was he the one who they allowed to say
5    he resigned even though he was terminated; is
6    that your recollection?
7         A.   I believe so, yes, yes.
8         Q.   Anybody else?
9         A.   Those are the only ones that I know
10   that took money.  And again, I hope that you
11   don't say anything to the directors and stuff in
12   reference to Bonnie.  They all just think I'm a
13   bitch.
14             (Exhibit 21, Handwritten Notes,
15              marked for identification)
16        Q.   (By Ms. Garrow)  I apologize -- it's
17   late in the day and I can't remember if we spoke
18   about this document before in the deposition at
19   the MCAD proceedings.  Have you ever seen this
20   document before?
21        A.   Yes, it's a personal ledger that I
22   keep.
23        Q.   And this is your handwriting, correct?
24        A.   Yes.

205

```
1        Q.   This is only one page, it looks like,
2   or two-sided page, correct?
3        A.   Yes.
4        Q.   And these are your personal notes as
5   well as work-related notes?
6        A.   Yes.
7        Q.   2003, I guess is the first dated entry
8   -- 2/5/2003.  That's a personal note, I assume,
9   correct?
10       A.   Right.
11       Q.   2/10, "We let LaCrisha go.  Horrible
12  employee."  Am I reading that correctly?
13       A.   Yes.
14       Q.   And "Erica will be returning anyway."
15  These are just running notes that you made?
16       A.   Right.
17       Q.   Then 2/13, you make a note about the
18  rotation and Andy -- I assume that's Andy
19  Goodness?
20       A.   Yes.
21       Q.   Missing his tour, and then he was put
22  at the bottom of the line, is that correct?
23       A.   Yes.
24       Q.   3/15, it says, "M. Johnson" -- I
```

206

```
1   assume that's Michael Johnson.  Says "Fell,
2   joke."  What does that mean?
3        A.   At the time when I wrote it, I didn't
4   really know if it was believable or not that he
5   did fall.  This was a personal note for my home.
6   It has nothing --
7        Q.   You thought it was a joke?
8        A.   Well, I didn't really feel it was a
9   joke.  These are personal things from my home.
10  This has nothing to do with the company.
11       Q.   But that's not personal; that has to
12  do with the company, right, Michael Johnson --
13  you don't socialize with him?
14       A.   No.
15       Q.   He's not a social friend?
16       A.   No.
17       Q.   He wasn't telling you a joke?
18       A.   No.
19       Q.   So what did you mean by that entry?
20       A.   Because at the time when he fell, I
21  didn't know personally whether or not, you know,
22  it was a real fall.  I had people come around the
23  corner asking if it was true or not, and it was;
24  it was true.
```

207

```
1        Q.   That's all you meant by that; anything
2   else?
3        A.   No, no.
4        Q.   3/28, "Closing costs."  Is that
5   work-related?
6        A.   Yes.
7        Q.   "They went up" -- that's just a note
8   to yourself that they went up?
9        A.   Right.
10       Q.   3/18, looks like a personal note.  And
11  3/28, personal note?
12       A.   Yes.
13       Q.   Except for "Talked to Danielle about
14  her leaving during work hours."  Is that Danielle
15  Moran?
16       A.   No.
17       Q.   Which Danielle is that?
18       A.   What was her last name -- no, it
19  wasn't Danielle Moran.
20       Q.   Let me ask you this -- was it a sales
21  representative?
22       A.   No.
23       Q.   Somebody who worked for you?
24       A.   Yes.
```

208

```
1        Q.   And did she leave during work hours?
2        A.   Yes.
3        Q.   What did you do when -- did you --
4        A.   Didn't pay her.
5        Q.   She was an hourly employee?
6        A.   Yes.
7        Q.   Did you do anything other than speak
8   with her about it?
9        A.   I wouldn't pay her.
10       Q.   Did you make a note in her file?
11       A.   Possibly; I don't recall.
12       Q.   Is that the first time it happened?
13       A.   I don't know if it was the first time.
14  It happened a couple of times.  I don't know if
15  it was the first or not.
16       Q.   How about 4/1, "Spoke to Erica."  Is
17  that somebody who worked for you?
18       A.   Yes.
19       Q.   Do you remember what you spoke about?
20       A.   No.
21       Q.   4/3, somebody called, they wanted to
22  come back to work; is that correct?
23       A.   Yes.
24       Q.   Is that somebody who worked for you as
```

209

1    well, or is that a salesperson?
2        A.   For me.
3        Q.   5/4, "Spoke to Danielle about leaving
4    the office early night before, her work not
5    complete two files.  Left with the closers.  She
6    was late this a.m."  What did you do as a result
7    of that, if anything?
8        A.   I don't recall, I don't recall.
9        Q.   Did you terminate her employment?
10       A.   Not at that time, no.
11       Q.   At some point you did?
12       A.   Yes.
13       Q.   Do you remember when?
14       A.   No, I don't.
15       Q.   Do you remember why?
16       A.   I don't think she was terminated; I
17   think she quit.  I think so.
18       Q.   What was Bonnie Gardner's race?
19       A.   White.
20       Q.   What about Andy Goodness?
21       A.   He was black.
22       Q.   5/5, "David Mercurio gave his tour to
23   Ron.  If Ron sold it, it was to go into Dave's
24   name."  Is that something people did regularly?

210

1        A.   No, not that I was aware of.
2        Q.   Did you think this was an appropriate
3    practice?
4        A.   No.
5        Q.   Why did you make this note?
6        A.   I don't recall.
7        Q.   Do you know if David Mercurio did this
8    more than once?
9        A.   No, I don't know.
10       Q.   You just have no knowledge one way or
11   the other?
12       A.   No.
13       Q.   Could have, maybe not -- don't know?
14       A.   Could have, maybe not -- don't know.
15       Q.   5/10, you make a note about LaCrisha,
16   spaghetti strap, low-cut, short dress the day
17   before the dress code policy, included no hat in
18   policy?
19       A.   Yes.
20       Q.   You made that decision on 5/10; was
21   that your decision -- strike that because I just
22   asked you too many questions at once.  Was it
23   your decision to include a "no hat" in the
24   policy?

211

1        A.   I'm not sure what that note means.  I
2    believe it's in the policy, in one of them.
3    Maybe not for women, but it's in there, I think,
4    under the men.  I'm not sure.
5        Q.   It says, "Prior to this, C.W. -- is
6    that Chelsea Wright?
7        A.   Um-hum.
8        Q.   -- sent home because she was wearing
9    flip flops"?
10       A.   Yes.
11       Q.   What's the next word -- somebody sent
12   home, inappropriate dress?
13       A.   Erica.
14       Q.   Who is Erica?
15       A.   She worked in the front reception
16   area.
17       Q.   5/11, you made that note that the
18   dress code was issued, is that correct; is that
19   what that means?
20       A.   Possibly.
21       Q.   Do you have any recollection as you
22   sit here today?
23       A.   No, no, no.
24       Q.   5/18, "L.W." -- I assume that's

212

1    LaCrisha Wise?
2        A.   LaCrisha Wise.
3        Q.   "Halter, spaghetti strap dress.  Asked
4    her to go home to change.  Refused."  Am I
5    reading that correctly?
6        A.   Yes.
7        Q.   I think you already testified to that?
8        A.   Yes.
9        Q.   When you say "asked," do you mean you
10   asked her?
11       A.   I believe I did.  I don't recall if I
12   did, but I think I did.  I don't recall whether I
13   actually did or not, to tell you the truth.  This
14   reads that I did, though.
15       Q.   Then, "Asked her if she had a sweater
16   or a wrap," and she didn't according to this,
17   correct?
18       A.   Right.
19       Q.   Then "C.W." -- I guess Chelsea Wright
20   again -- "had low cut on.  As soon as she was
21   asked, she buttoned up sweater."  Am I reading
22   that correctly?
23       A.   Yes.
24       Q.   You said you believed that LaCrisha

Wise v Patriot - Faith Lippert - 5/17/05

213

1  Wise was on the phone?

2      A.   Yes.

3      Q.   And she was precise about what she

4  said and how she said it?

5      A.   Yes.

6      Q.   And that Paul said her dress was

7  appropriate and every day her dress was

8  appropriate.  She said that to you?

9      A.   She said that, yes.

10     Q.   Did you ever ask him about that?

11     A.   I don't recall whether I did or not.

12     Q.   You don't recall if you asked him, as

13  you sit here today?

14     A.   Yes, yes, I don't recall.

15     Q.   What's a "W. counter girls offering

16  sweater"?

17     A.   Welcome Center.

18     Q.   Got it.  What does that mean?

19     A.   Offered for her to wear their

20  sweaters, and she said no.

21     Q.   You didn't say that she said no?

22     A.   Up here I believe it said, "Said no"

23  up on the top.

24     Q.   That's if she had a sweater or wrap,

214

1  is that correct?

2      A.   Yes.

3      Q.   Do you have a specific recollection of

4  writing this?

5      A.   No, no.

6      Q.   5/19, "L. was late."  Is that

7  LaCrisha?

8      A.   Yes.

9      Q.   "She was late for work, threats about

10  if she wasn't put in her normal place her

11  attorney would be included."  What does that

12  mean?

13     A.   I guess she wanted to call her

14  attorney and that her attorney would be included

15  in on her not being able to go out in her normal

16  place on the rotation.

17     Q.   According to your notes here, that's

18  the first time, at least you noted down, that she

19  ever mentioned an attorney, correct -- according

20  to your notes?

21     A.   According to the note, yes.

22     Q.   There's nothing in here prior to that

23  time that has her talking about her attorney,

24  correct?

215

1      A.   No.

2      Q.   Here's the note 5/24, "Andy Goodness

3  was let go."  That just confirms that he was let

4  go because he stole money, is that correct?

5      A.   Yes.

6      Q.   But he was allowed to resign given the

7  circumstances?

8      A.   Yes.

9      Q.   Did you ever suggest to anybody that

10  LaCrisha be allowed to resign?

11     A.   No.  Nor did I Andy.

12     Q.   Hum?

13     A.   Nor did I Andy.

14     Q.   Who did?

15     A.   I don't know.

16          (Exhibit 22, 1/3/03-6/8/03 Typed

17          Notes, marked for identification)

18     Q.   (By Ms. Garrow)  I'm showing you

19  Plaintiff's 22, and I think we've talked about

20  these a little bit.  Whose notes are these?

21     A.   Bonnie's.

22     Q.   You directed her to -- did you direct

23  her to compile these notes?

24     A.   I believe the way it went was that

216

1  there were notes and I had probably asked her to

2  put them in, you know, date order; and that's

3  what she did, was list them out this way.

4      Q.   I guess I don't understand.  Is it

5  your testimony this is all based on notes

6  provided to the company?

7      A.   Notes or her remembering -- not to the

8  company.

9      Q.   "Her" being Bonnie?

10     A.   "Her" being Bonnie, yes.

11     Q.   So January 21, 2003, it says "out

12  sick" -- other than at your last deposition, have

13  you had occasion to review this?

14     A.   No.

15     Q.   I think your testimony was that you

16  took this and stuck it in Miss Wise's file?

17     A.   Yes.

18     Q.   When did you do that?

19     A.   I don't recall.

20     Q.   Let me just understand -- starting the

21  beginning of 2003, Bonnie Gardner began to

22  compile these notes, correct?

23     A.   I would assume so.

24     Q.   At any point prior to June 8, 2003,

217

```
1   according to this, the day that Miss Wise was let
2   go -- it was either the 7th or the 8th, depending
3   on which notes you're looking at -- at any point
4   did you ask Miss Gardner to print out the notes
5   that she already had gathered prior -- sometime
6   between January 3, 2003 --
7        A.   I don't believe I did, no.
8        Q.   -- and June 8, 2003?
9        A.   I don't believe so, no.
10       Q.   You never asked her to print it out?
11       A.   I don't recall whether I did or not.
12       Q.   You never asked to review them, or
13  you're not sure?
14       A.   I don't recall.  I don't recall
15  whether I did or not.
16       Q.   So is it that you don't believe that
17  you did, or you just don't recall one way or
18  another?
19       A.   I just don't recall one way or
20  another.
21       Q.   March 11, 2003, it says here, "Late,
22  LaCrisha said we were picking on her and claims
23  discrimination."  Do you recall if at that time,
24  on or around March 11, 2003, Bonnie came to you
```

219

```
1        Q.   And February 1, 2003, Miss Gardner
2   made another note that "We are just picking on
3   her" again, is that fair to say?
4        A.   Yes.
5        MS. GARROW:  We had been seeking
6        documents -- I've had this discussion
7        with Attorney Klimczuk, customer names
8        on sales ledger reports and on
9        customer directors as a way to track
10       payment on contracts, and I had agreed
11       not to take those customer names
12       pending a resolution by the Court.  So
13       we may need Miss Lippert back based on
14       any resolution that we have as a
15       result of seeking the customer names.
16       So I'm going to suspend the deposition
17       at this point.
18       MS. FABBO:  Just for that
19       purpose?
20       MS. GARROW:  Yes, or, I mean,
21       depending on what that might lead to,
22       but certainly anything that flows from
23       that; but otherwise, I'm set.
24       (Deposition suspended at 4:10)
```

218

```
1   and said Miss Wise was claiming discrimination?
2        A.   I don't recall that Bonnie ever did
3   that, no.
4        Q.   According to just reviewing Miss
5   Gardner's notes, that's the first time she makes
6   a note of that sort claiming discrimination or
7   that Miss Wise was claiming discrimination; is
8   that a fair description of what's on Exhibit 22?
9        A.   What is on these notes?
10       Q.   Yes.
11       A.   Yes.
12       Q.   You had testified before that based on
13  your e-mail to Miss Foster, you had said it was
14  later in Miss Wise's employment that you started
15  to have -- that she started to have issues -- is
16  that a fair statement of your testimony before?
17       A.   I don't know at what time, you know,
18  LaCrisha started with her claims of whatever, you
19  know, they were.  I don't recall.
20       Q.   Well, it would at least appear from
21  this note on Plaintiff's 22 that on January 14,
22  2003, according to Miss Gardner, Miss Wise said
23  that the company was picking on her, correct?
24       A.   It says that.
```

220

```
2   COMMONWEALTH OF MASSACHUSETTS
3   HAMPDEN, SS.
4
5        I, Ann A. Preston, a Notary Public in
6   and for the Commonwealth of Massachusetts, do
    certify that there came before me on May 17,
7   2005, at the offices of Heisler, Feldman and
    McCormick, PC, 1145 Main Street, Springfield,
8   Massachusetts, the following named person, to
    wit:  FAITH LIPPERT, who was by me duly sworn to
9   testify to the truth and nothing but the truth as
    to her knowledge concerning the matters in this
10  case; that she was examined upon her oath and her
    examination reduced to writing by me; and that
11  the statement is a true record of the testimony
    given by the witness, to the best of my knowledge
    and ability.
12       I further certify that I am not a relative
13  or employee of counsel or attorney for any of the
    parties, or a relative or employee of such
14  counsel or attorney, nor am I financially or
    otherwise interested in the outcome of the
15  action.
16       WITNESS MY HAND this 17th day of June 2005.
18       _____
19       Ann A. Preston
20  My commission expires:
    December 22, 2011
```

221

```
 1                        June 17, 2005
 2
 3   Marylou Fabbo, Esq.
     Skoler, Abbott and Presser, PC
 4   1414 Main Street
     Springfield, MA  01103
 5
     RE:  Wise v Patriot
 6
     Dear Counselor:
 7
          Enclosed is a copy of the deposition of
 8   Faith Lippert, taken on May 17, 2005 in the
     above-entitled action.
 9
          According to Rule 30(e) of the
10   Massachusetts Rules of Civil Procedure, the
     deponent has thirty days to sign the deposition
11   from the date of its submission to the deponent,
     which is the above date.
12
          Please have the deponent sign the enclosed
13   Signature Page/Errata Sheet and return it to the
     offices of Suzanne Garrow, Esq., whereupon it
14   will be attached to the original deposition
     transcript.
15
          Thank you for your cooperation in this
16   matter.
17   Sincerely,
18
     Ann A. Preston
19
20   cc:  Suzanne Garrow, Esq.
21
22
23
24
```

222

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2    Wise v Patriot
      No. 04-CV-30091-MAP
 3
 4        I, FAITH LIPPERT, do hereby certify under
     the pains and penalties of perjury that the
 5   foregoing testimony is true and accurate to the
     best of my knowledge and belief, with the
 6   addition of the following changes/corrections:
 7
 8    Page   Line         Change/Correction
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18
19    Witness my hand this ___ day of _____, 2005.
20
                          _____
21                            FAITH LIPPERT
22    orig:  Suzanne Garrow, Esq.
      cc:    Marylou Fabbo, Esq.
23
24
```

# EXHIBIT
# 3

Wise v Patriot - R. Foster Campagna  5/23/05

---

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
       Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
       Defendants

DEPOSITION OF REBECCA FOSTER CAMPAGNA

May 23, 2005, 10:10

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

I N D E X

WITNESS:  REBECCA FOSTER CAMPAGNA

Direct Examination by Ms. Garrow

EXHIBITS

Exhibit 1,  Vacation Village Tour Times        51

Exhibit 2,  2004 Employee Handbook             56

Exhibit 3,  2001 Employee Handbook             61

Exhibit 4,  Employment Agreement               68

Exhibit 5,  Commission Structure Forms         84

Exhibit 6,  5/24/03 Memo Re: Hecht Comm.       86

Exhibit 7,  Corbin Commission Report           95

Exhibit 8,  Massaconi Check Stubs             112

Exhibit 9,  5/6/03 Memo Re: ESOP Procedures   125

Exhibit 10, Attendance Detail Report          126

Exhibit 11, 11/3/02 Memo Re: Attendance       127

Exhibit 12, Attendance Detail Report          127

Exhibit 13, Attendance Detail Report          129

Exhibit 14, Letter to ALDA from ESA           148

Exhibit 15, 12/22/04 Memo Re: New-Hires       150

Exhibit 16, 11/21/01 Memo Re: Policies        157

Exhibit 17, 12/21/01 Memo Re: Rotation        161

Exhibit 18, 6/9/03 Memos Re: Ms. Wise         167

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
    KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

4

STIPULATION

1
2
3      It is agreed by and between the parties
4  that all objections, except as to form of the
5  question, are reserved until the time of trial.
6
7      It is further agreed by and between the
8  parties that all motions to strike unresponsive
9  answers are reserved until the time of trial.
10
11     It is further agreed by and between the
12  parties that the sealing of the original
13  deposition transcript is hereby waived.
14
15     It is further agreed by and between the
16  parties that the notification to all parties of
17  the receipt of the original deposition
18  transcript is hereby waived.
19
20
21
22
23
24

Wise v Patriot - R. Foster Campagna  5/23/05

5

1      REBECCA FOSTER CAMPAGNA, Witness, identified
2   via Florida driver's license and having been duly
3   sworn, states as follows:
4
5      DIRECT EXAMINATION BY MS. GARROW:
6      Q.   Good morning, Miss Foster.  I know
7   you've been to a couple of the depositions in
8   this matter.  As you know, I'm Suzanne Garrow,
9   and I am the lawyer for LaCrisha Wise and Mr.
10  Massaconi and Mr. Martin and Mr. Corbin on behalf
11  of themselves and others who are similarly
12  situated.  As you know, they filed a complaint
13  against you and the corporation in federal court.
14  Are you aware of that?
15     A.   Yes, I am aware.
16     Q.   I'm going to take your deposition
17  today, and I'm going to ask you that when I ask
18  you questions, that you give an audible response.
19  If you shake your head or say "uh-uh" or
20  "um-hum," it's not going to look like anything on
21  the transcript.  I need you to give an audible
22  response, a "yes" or "no" or any explanation as
23  necessary.  Is that understood?
24     A.   I understand.

6

1      Q.   The other thing I'm ask you to do is
2   I'll ask you to let me finish my question and I
3   will try to let you do the same, let you finish
4   your answer, so we can have a clear record and so
5   the court reporter can get everything down that
6   you say and that I say, okay?
7      A.   Okay.
8      Q.   If you need a break of any kind, as
9   long as I'm not in the middle of a question or
10  you're not in the middle of an answer, I will
11  certainly accommodate you and you can tell me,
12  tell your lawyer, whatever is most comfortable to
13  you, okay?
14     A.   Okay.
15     Q.   I guess the other thing I'll ask you
16  to do is if you don't understand any question
17  that I've asked, I will ask you to ask me to
18  rephrase the question or to let me know that you
19  don't understand.  The reason for that is if you
20  answer the question, I'm going to assume that you
21  understand the question as I have asked it, and I
22  want to make you make sure that you know what I'm
23  speaking of so that you can give me the most
24  accurate answer to the question possible, okay?

7

1      A.   Okay.
2      Q.   Have you taken any medication or any
3   substance that might impair your ability to
4   testify truthfully or accurately as you sit here
5   today?
6      A.   No, I have not.
7      Q.   Would you please state and spell your
8   full name for the record?
9      A.   My full name is Rebecca, R-E-B-E-C-C-A
10  Foster, F-O-S-T-E-R, Campagna, C-A-M-P-A-G-N-A.
11     Q.   Do you go by Miss Foster or Miss
12  Campagna, just so I know in this context?
13     A.   I go by Becky, but Foster is the name
14  that I use in work situations.
15     Q.   I know there are some Campagnas who
16  work up here in Massachusetts.  Are you a
17  relation to any of those folks?
18     A.   No, I am not.
19     Q.   Who is your employer?
20     A.   Employed by the Berkley Group, Inc.
21     Q.   How long have you been worked for the
22  Berkley Group?
23     A.   Thirty-two years.
24     Q.   Can you give me sort of a general

8

1   summary -- I know thirty-two years is a very
2   solid career, so can you give me a general
3   summary of where you started with the Berkley
4   Group and your position as you sit here today?
5      A.   1973, I began working for a sales and
6   marketing company called Del Marketing -- that's
7   D-E-L Marketing.  They did sales and marketing at
8   a second-home development called Lake Monticello,
9   and that's out of Charlottesville, Virginia.
10     I worked as the number three typist in
11  the sales office and I worked in that position
12  for approximately a year, after which time I
13  traveled from Lake Monticello to other
14  development companies that Del Marketing had
15  sales and marketing contracts with.  And I would
16  set up the sales administrative office, train the
17  personnel; and I did that for probably three or
18  four years.
19     I later relocated with that company to
20  St. Petersburg, Florida under a sales and
21  marketing agreement that we had in St. Petersburg
22  with a hotel that was selling time-sharing.
23     Q.   Did you work -- did you still work for
24  Del Marketing at that time?

Wise v Patriot - R. Foster Campagna  5/23/05

9

1      A.    I worked for Del Marketing at that
2  time.
3      Q.    Were you working on-site at the hotel?
4      A.    Actually, I worked for a while at the
5  hotel to train the employees, and then I moved to
6  the corporate office there in St. Petersburg.
7      Q.    The corporate office of Del Marketing?
8      A.    Del Marketing.
9      Q.    How long did you do that?
10     A.    I stayed there until 1981; and in
11 1981, I moved to the east coast of Florida
12 because the owner of Del Marketing sold his
13 interest in Del Marketing and the
14 company became all -- all the assets of the Del
15 Marketing were sold -- all of the contracts were
16 sold to the remaining partner, who formed the
17 company Del Management.
18           At that time, the marketing contracts
19 became the property of Del Management, and other
20 marketing and sales contracts were procured under
21 Del Management's name.  I continued to work in
22 the corporate office as well as a sales office
23 that was located there in Hollywood, Florida.  I
24 continued to work there until 1986, when the name

10

1  of our company changed to the Berkley Group.
2      Q.    Do you happen to know why the name
3  changed in 1986?
4      A.    We moved our corporate headquarters to
5  an office building in Fort Lauderdale, Florida
6  that is called the Berkley South Condominium.
7  We occupy offices on the first floor, and we
8  decided that the -- we like the name, so we
9  adopted the name.  During the years from 1981
10 until 1994, I was the corporate secretary of the
11 company, and at some point in there, I became
12 vice president, but I don't remember the exact
13 year.
14     Q.    Who was the president when you became
15 vice president?
16     A.    James E. Lambert.
17     Q.    And who was the president when you
18 were corporate secretary?
19     A.    James E. Lambert.
20     Q.    And this is the Berkley Group which is
21 now called -- the Del Marketing which is now
22 called the Berkley Group at this time?
23     A.    Del Management, which was changed to
24 the Berkley Group.

11

1      Q.    I misspoke, thank you, great.
2      A.    In 1994, the president of the company
3  decided to retire, or semi-retire, at which time
4  he sold the company to its employees.  1993,
5  1994.
6      Q.    Approximately how many employees were
7  employed by the Berkley Group at that time?
8      A.    I couldn't say with any degree of
9  accuracy.
10     Q.    Do you think it was more than a
11 hundred?
12     A.    It could have been.
13     Q.    Did everybody have an opportunity to
14 purchase stock in the company at that time -- was
15 it a stock sale?
16     A.    The ESOP is a complicated transaction,
17 and I don't know all of the legalities of it.
18 The employees did not make a conscious
19 decision -- I mean, there was no vote taken among
20 the employees, but everyone was -- everyone's
21 status, of course, as employees did not change.
22 It was just the way that the accounting for the
23 company, the way the company's ownership was
24 structured.  It had to do with structure more

12

1  than anything.  And again, I'm not an expert on
2  that.
3      Q.    Do you know, did anything change with
4  your relationship to the company at that time?
5      A.    In January of 1994, I became the
6  president of the company.
7      Q.    Do you remain in that position today?
8      A.    Yes, I do.
9      Q.    Are you at the same location in the
10 Berkley -- is it Berkley Condominium?
11     A.    The Berkley South Condominiums, yes.
12     Q.    Have your offices grown in any way;
13 have you taken over more square footage or
14 anything, or have you remained in the same
15 location?
16     A.    We've remained in the same location.
17 We have, since the '80s -- we started occupying
18 that building in '86.  We have increased square
19 footage over that time period.
20     Q.    What is the most recent time?
21     A.    I really couldn't say.
22     Q.    Do you own the building?
23     A.    We own only the office suites that are
24 located on the first floor.

13

1    Q.   You occupy the entire first floor?

2    A.   Not the entire.  There are some

3    offices that are owned by others.

4    Q.   So is it fair to say that you own all

5    those office suites which you occupy?

6    A.   That's correct.

7    Q.   Can you name all the corporate

8    officers currently in the Berkley Group?

9    A.   The corporate officers -- myself as

10   president; Bruce Polansky, P-O-L-A-N-S-K-Y, vice

11   president of sales; Larry Hierholzer,

12   H-I-E-R-H-O-L-Z-E-R, vice president of marketing;

13   initials J.P. Ottino, O-T-T-I-N-O, III, vice

14   president of corporate acquisitions; Marc,

15   M-A-R-C, Landau, L-A-N-D-A-U, vice president of

16   finance, or chief financial officer; James E.

17   Lambert is the chairman of the Board.  And that

18   should be six.

19   Q.   Yes.  And you said that Mr. Lambert --

20   on or around the time you assumed the position as

21   president of the company, Mr. Lambert

22   semi-retired.  What was he doing for the company

23   at that time, after semi-retirement?

24   A.   He continues to offer sales and

14

1    marketing expertise to the Board.

2    Q.   Is it your opinion that his position

3    has been relatively unchanged since you assumed

4    the position of president of the company?

5    A.   No, his position has changed since

6    1994.

7    Q.   What has been the change, and when did

8    it occur -- change or changes?

9    A.   Prior to 1994, Mr. Lambert was in

10   charge of the corporate office there in the

11   Berkley South building.  He made all of the daily

12   operational decisions.

13   Q.   I guess my question -- let me be a

14   little clearer.  Since 1994 -- strike that.

15   Those two duties that you just enumerated, I'm

16   assuming that those are part of your duties

17   currently, is that correct?

18   A.   That's correct.

19   Q.   After 1984 when you assumed the

20   position of president and Mr. Lambert assumed the

21   position, basically conceded that position, yet

22   continues to offer sales and marketing, I guess,

23   was your testimony?

24   A.   You said 1984?

15

1    Q.   I'm sorry, 1994.  Since 1994 to the

2    present, since you became president, has Mr.

3    Lambert's position changed in any way after you

4    became president; in other words, in that, let's

5    say, from '95 forward?

6    A.   Mr. Lambert's position diminished to

7    the point that he is only involved in sales and

8    marketing expertise.

9    Q.   Have you ever been deposed before?

10   A.   Yes, I have.

11   Q.   How many times?

12   A.   I don't know that I could give you an

13   accurate number.

14   Q.   Have you been deposed in any actions

15   relating to any -- brought by any employees of

16   the company, the Berkley Group?

17   A.   No.

18   Q.   Any employees of Patriot Resorts, have

19   you been deposed in connection with any claims?

20   A.   Not until today.

21   Q.   Have you been -- let me ask a more

22   general question.  Have you been deposed with

23   regard to any employment claims relating to

24   employment or brought by employees in any matter,

16

1    I guess?

2    A.   I was deposed in Virginia in relation

3    to a sales and marketing contract we have there.

4    One of the employees of Great Eastern Resort

5    Corporation brought an action against Great

6    Eastern.

7    Q.   Were you individually named in that

8    matter?

9    A.   No, I was not.

10   Q.   To the best of your recollection, what

11   was the substance of the claims that employee was

12   making?

13   A.   She was making a claim under A.D.A.

14   Q.   So a disability discrimination suit is

15   your recollection?

16   A.   It grew into an A.D.A. claim.  I'm not

17   sure in the beginning exactly how it was worded,

18   but it really didn't survive much after our

19   depositions.

20   Q.   When you say "it didn't survive," did

21   you resolve the matter or did it get resolved by

22   a judge in any way or a jury?

23   A.   No, it was not resolved by a judge or

24   a jury.  Both parties resolved the matter between

Wise v Patriot - R. Foster Campagna  5/23/05

17

the two.

2      Q.  Is that a confidential settlement, to

3 your recollection?

4      A.  Yes, it is.

5      Q.  What court was that in -- let me ask

6 you this -- do you remember if it was state or

7 federal court?

8      A.  That's what I was trying to recall.  I

9 don't really recall.

10      Q.  Do you remember the name of the

11 employee who brought the matter?

12      A.  Shari Brown.

13      Q.  About how long ago was that?

14      A.  That was probably a year or so ago.

15      Q.  Where in Virginia?

16      A.  Harrisonburg, Virginia.

17      Q.  What's the resort -- was there a

18 resort that was the subject matter as well as the

19 lawsuit?

20      A.  Great Eastern Massanutten Resort.

21      Q.  Any other depositions in relation to

22 any employment matters at any of the resorts?

23      A.  There was a sexual harassment claim in

24 the '90's -- I don't remember what year -- at

18

1 Massanutten Resort.

2      Q.  It sounds like you have not been

3 deposed in relation to any employment matters at

4 the Vacation Village location, is that correct?

5      A.  Vacation Village...

6      Q.  In the Berkshires, I'm sorry.

7      A.  No, I have not.

8      Q.  What about other Vacation Village

9 locations?

10      A.  Not that I can recall.

11      Q.  Can you recall if there have been any

12 claims of violations of the wage and hours

13 status, either state or federal, at any of the

14 locations, any of the resorts that you are

15 responsible for?

16      A.  There have not been any that I am

17 aware of.

18      Q.  I've been trying to choose my words in

19 a certain way, but I'm going to ask you so I can

20 understand the relationship.  Now, your employer

21 is the Berkley Group, and who employs, for

22 instance, Bill Rauer; who is his employer, to

23 your knowledge?

24      A.  Bill Rauer works for Tower Resorts

19

1 Realty.

2      Q.  What about Rod Lewis?

3      A.  Rod Lewis works for Patriot Resorts

4 Corporation.

5      Q.  What about the other corporate

6 officers; everybody work for Berkley Group who

7 are -- I guess those are corporate officers of

8 the Berkley Group I asked, correct?

9      A.  That's correct.

10      Q.  Are they employed by any other entity?

11      A.  Mr. Polansky, because he has a sales

12 -- a Florida sales real estate license, may

13 receive some commission from Tower Resorts

14 Realty, but I don't know that for a fact.

15      Q.  Tower Resorts Realty -- what is Tower

16 Resorts Realty, their relationship to the Berkley

17 Group?

18      A.  Tower Resorts Realty is owned by the

19 Berkley Group.

20      Q.  Are there certain resorts that are run

21 by Tower Resorts Realty?

22      A.  Not really.  Tower Resorts Realty is

23 the brokerage that must employ licensed real

24 estate agents in the State of Florida.

20

1      Q.  Are all the people who sell -- let me

2 strike that.  Do the people who sell time-shares

3 in Florida, do they have real estate licenses?

4      A.  Most of them do.

5      Q.  Are they required to?

6      A.  They are not required to; they are

7 only required -- well, let me start over.  They

8 are required to have a real estate license in

9 order to transact time-share sales, yes.

10      Q.  To my understanding, that's not true

11 in Massachusetts, is that correct?

12      A.  As far as I know, it is not true.

13      Q.  What about the other locations; what

14 are the other states in which -- actually, let me

15 strike that.  Can you tell me the other companies

16 other than Tower Resorts Realty that are owned by

17 the Berkley Group?

18      A.  Berkley Vacation Resorts -- let me

19 make sure I understand your question.

20      Q.  Let me ask it this way.  You testified

21 that Tower Resorts Realty is owned by the Berkley

22 Group?

23      A.  Correct.

24      Q.  Is Patriot Resorts owned by the

Wise v Patriot - R. Foster Campagna   5/23/05

---

21

1   Berkley Group?

2       A.   That is correct.  It's a wholly owned

3   subsidiary.

4       Q.   Now, you made that distinction.  Is

5   the Tower Resorts Realty something other than a

6   wholly owned subsidiary?

7       A.   It is also a wholly owned subsidiary.

8       Q.   What other wholly owned subsidiaries

9   are owned by the Berkley Group?

10      A.   I gave you Berkley Vacation Resorts.

11  Lando Resort Corporation, Hollywood Resorts

12  Corporation, Shoreline Resorts Corporation -- or

13  actually I think that's incorporated.  Key Resort

14  Corporation, Williamsburg Plantation, Inc.,

15  Eldorado Resorts Corporation, East Coast Resorts

16  -- I'm sorry, East Ocean Resorts, Inc., South

17  Coast Resorts, Inc. or Corporation.  When I say

18  corporation, it could be incorporated; I don't

19  remember exactly.

20      Q.   Are these all corporations?

21      A.   They are all corporations.

22      Q.   Do they all, to your knowledge, have

23  the same corporate structure?

24      A.   I'm not sure what you mean by that

---

22

1   question.

2       Q.   Are any of them LLC's or LLP's, or do

3   they all follow the same -- are they

4   S-corporations; I mean, do you know what...

5       A.   I do not know -- I know there are no

6   LLC's that I have named.  I don't know whether

7   it's a sub-S.

8       Q.   South Coast Resorts was the last

9   wholly owned subsidiary that you named.  Can you

10  think of any others?

11      A.   I'm sure there are other small ones,

12  but I can't remember them right now, I'm sorry.

13  There's Lando Resorts Realty.

14      Q.   As opposed to Lando Resorts

15  Corporation?

16      A.   There's two Landos.

17      Q.   So what is the -- what does Tower

18  Resorts Realty do?

19      A.   Tower Resorts Realty is the brokerage

20  company whose salespeople conduct sales for

21  Berkley Vacation Resorts.

22      Q.   Are the salespeople employed by Tower

23  Resorts Realty?

24      A.   Yes, they are.

---

23

1       Q.   Do they have an employment agreement,

2   to your knowledge?

3       A.   Yes.

4       Q.   Are there any employees at Berkley

5   Vacation Resorts?

6       A.   There probably are.  I'm not sure how

7   many.

8       Q.   When you say that, are you -- what are

9   you thinking of; perhaps people who work in the

10  office, might they be employed by Berkley

11  Vacation Resorts?

12      A.   The office staff is generally employed

13  by the development company.

14      Q.   And is Berkley Vacation Resorts the

15  development company?

16      A.   Yes.

17      Q.   Who are the corporate officers of

18  Tower Resorts Realty?

19      A.   J P. Ottino, III, and Marc Landau.

20      Q.   What about Berkley Vacation Resorts?

21      A.   Myself and Marc Landau.

22      Q.   Is Tower Resorts Realty the entity

23  that is responsible for all time-share sales --

24  for your time-share sales in Florida?

---

24

1       A.   No.

2       Q.   Is it only a Florida corporation or --

3   let me strike that.  Are there only time-shares

4   in Florida that are being sold by the folks at

5   Tower Resorts?

6       A.   That's correct.

7       Q.   What locations do they sell?

8       A.   Vacation Village at Weston, Canada

9   House Resort, Hollywood Beach Tower Resort,

10  Golden Strand Resort.

11      Q.   Is that the --

12      A.   I believe that's all of them.

13      Q.   Is Berkley Vacation Resorts the

14  development company for all those locations?

15      A.   No.

16      Q.   Who is or -- let me ask it this way.

17  Berkley Vacation Resorts is the development

18  company for which of those, if any?

19      A.   Vacation Village at Weston.

20      Q.   Is that it?

21      A.   That's it.

22      Q.   Who is the development company for

23  Golden Strand?

24      A.   That would be South Coast Resorts.

Wise v Patriot - R. Foster Campagna  5/23/05

25

1    Q.  Does South Coast -- are they the
2  development company for any other locations?
3    A.  No.
4    Q.  How about the Hollywood Beach Resort;
5  what is the development company for Hollywood
6  Beach Resort?
7    A.  Hollywood Resorts is the development
8  company.  The resort is Hollywood Beach Tower.
9    Q.  So the resort is the development
10  company?
11    A.  No, the resort is the resort.  The
12  development company is the company who owns
13  inventory at that resort.
14    Q.  Is that Hollywood Resorts Corporation?
15    A.  At Hollywood Beach Tower, it is
16  Hollywood Resort, Inc. or Corporation -- I'm not
17  sure which.
18    Q.  I understand.  Does Hollywood Resorts
19  Corporation, are they the development company for
20  any other location?
21    A.  I believe they own some inventory at
22  Costa del Sol, C-O-S-T-A D-E-L S-O-L.
23    Q.  That was a name that you did not
24  mention.  Is that another --

26

1    A.  That is a resort.
2    Q.  So it's not a corporation; that is
3  simply a resort?
4    A.  That's the name of the resort where
5  the inventory is located.
6    Q.  Do you know who owns what corporation,
7  if any own Costa del Sol?
8    A.  The owners' association own the
9  property.
10    Q.  Do you know who is responsible for
11  sales at Costa del Sol?
12    A.  If it's -- if inventory is sold that
13  is owned by Hollywood Resorts Corporation, a
14  Tower Resorts Realty salesperson would sell it.
15    Q.  I believe you mentioned another
16  location, is it Canada House?
17    A.  Canada House Resort, Shoreline Resort
18  is the developer who owns inventory at Canada
19  House Resort.
20    Q.  Who would sell at Canada Resort?
21    A.  Employees of Tower Resorts Realty.
22    Q.  How many locations are there owned by
23  Patriot Resorts?
24    A.  There is one.

27

1    Q.  Is that -- is Patriot the development
2  company?
3    A.  Patriot Resorts owns Vacation Village
4  in the Berkshires.
5    Q.  Does Patriot Resorts have employees?
6    A.  Yes, it does.
7    Q.  Are those the salespeople and sales
8  managers who work at the location?
9    A.  As well as the administrative staff.
10    Q.  You mentioned Lando Resort Realty and
11  Lando Resort Corporation or Incorporated.  Lando
12  Resort Realty, is that a development company?
13    A.  Lando Resort Corporation is the
14  development company, Lando Resort Realty is the
15  real estate brokerage.
16    Q.  When you say "real estate brokerage,"
17  is that -- do they perform a similar function
18  than being the -- are there employees of Lando
19  Resort Realty?
20    A.  Yes.
21    Q.  Among those people are sales people,
22  is that correct?
23    A.  The licensed real estate agents, yes.
24    Q.  Do those licensed real estate agents

28

1  perform essentially the same function for Lando
2  Resorts Corporation as the licensed sales
3  representatives at Tower Resorts do for their
4  various companies, including Vacation Village at
5  Weston?
6    A.  That's correct.  Vacation village at
7  Weston is the resort.  The development company is
8  Berkley Vacation Resort.  And to clarify, Lando
9  Resort is L-A-N-D-O.
10    Q.  Lando Resort in both those instances,
11  realty and corporation?
12    A.  Yes.
13    Q.  Is there a board of directors at
14  Patriot Resorts?
15    A.  Yes, there is.
16    Q.  Who is on the board of Patriot?
17    A.  Myself, Marc Landau, and J.P. Ottino.
18    Q.  Anybody else?
19    A.  No.
20    Q.  What about Lando Resorts Realty; is
21  there a board of directors there?
22    A.  Yes, there is.
23    Q.  Who is on that board?
24    A.  Marc Lando and myself.

29

```
1        Q.   Do the development companies also have
2    board of directors?
3        A.   I'm sorry?
4        Q.   Those are all corporations, the
5    development companies as well, as I think you
6    testified to, correct?
7        A.   Those were the development companies,
8    yes.
9        Q.   And the development companies have
10   boards of directors as well, is that correct?
11       A.   Yes.
12       Q.   So Lando Resort Corporation, who is on
13   the board of Lando Resort?
14       A.   Marc Landau and myself.
15       Q.   Hollywood Resort Corporation, I
16   believe you've already told me who was
17   responsible for sales over there -- that's Tower
18   Resort.  Who is on the board of Hollywood Resort?
19       A.   Myself and Marc Landau.
20       Q.   Shore Line Resort, what is their
21   function?
22       A.   Shore Line Resort owns inventory at
23   Canada House Resort.
24       Q.   And all those are sold by Tower
```

30

```
1    Resort, I believe was your testimony, is that
2    correct?
3        A.   That's correct.
4        Q.   Who is on the board at Shore Line?
5        A.   Marc Landau and myself; possibly J.P.,
6    I can't recall.
7        Q.   Key Resorts Corporation, who is on the
8    board there?
9        A.   Myself and Marc Landau.
10       Q.   What is the function of Key Resorts
11   Corporation?
12       A.   Key Resorts owns inventory at Dover
13   House Resorts.
14       Q.   Where is that?
15       A.   Del Ray Beach, Florida.
16       Q.   Who is the development company -- I'm
17   sorry, that is the development company -- Key
18   Resorts Corporation, correct?
19       A.   That's correct.
20       Q.   Who makes sales at Dover House?
21       A.   Tower Resorts Realty.
22       Q.   Dover House Resorts -- and
23   Williamsburg Plantation, is that correct?
24       A.   Correct.
```

31

```
1        Q.   Where is that?
2        A.   In Williamsburg, Virginia.
3        Q.   And that would be the development
4    company that owns locations in Williamsburg,
5    Virginia, is that fair to say?
6        A.   That's correct.
7        Q.   What is the location there?
8        A.   Williamsburg Plantation.
9        Q.   Who is on the board at Williamsburg
10   Plantation, Inc.?
11       A.   Myself and Marc Landau.
12       Q.   What corporation is responsible for
13   salespeople at Williamsburg Plantation, Inc.?
14       A.   Williamsburg Plantation, Inc.
15       Q.   So they have their own sales staff,
16   similar structure, would you say, to Patriot
17   Resorts?
18       A.   Yes, similar.
19       Q.   What are the similarities, to your
20   best recollection?
21       A.   There is no real estate license
22   requirement.
23       Q.   Eldorado Resort Corporation, what is
24   the function of that company?
```

32

```
1        A.   It's the development company that owns
2    the Cliffs at Peace Canyon and Grand View in Las
3    Vegas.
4        Q.   Is Peace Canyon in Las Vegas as well?
5        A.   It's on the outskirts of Las Vegas.
6        Q.   Does Eldorado Resort Corporation, are
7    they responsible -- sort of a free-standing unit
8    like the Williamsburg Plantation and Patriots
9    Resort; in other words, do they supply their own
10   salespeople?
11       A.   Yes, they supply their own
12   salespeople.
13       Q.   Is there any significant difference
14   between them in the corporate structure between
15   Eldorado and Williamsburg Patriot?
16       A.   They must have a time-share real
17   estate -- time-share license, not real estate.
18       Q.   It's a specific required program that
19   they have to go through?
20       A.   Yes.
21       Q.   And ultimately they get some sort of
22   license at the end of this program?
23       A.   That's correct.
24       Q.   That's everybody who sells there,
```

Wise v Patriot - R. Foster Campagna    5/23/05

33

1    that's a requirement?
2         A.    That's correct.
3         Q.    East Ocean Resort, what is the
4    function of that corporation?
5         A.    East Ocean Resort owns property at
6    Surf Sider Resort.
7         Q.    Is that in Florida?
8         A.    Yes.
9         Q.    And who is responsible for making
10   sales there?
11        A.    Anyone who would make sales there
12   would be working for Tower Resort Realty.
13        Q.    Who is on the board of East Ocean
14   Resort?
15        A.    Myself and Marc Landau, I believe.
16        Q.    What about South Coast resort; what
17   does that corporation do?
18        A.    South coast owns inventory at the
19   Golden Strand Resort.
20        Q.    I believe you testified to that
21   already.  And the Golden Strand is sold by Tower
22   Resort, is that correct?
23        A.    That's correct.
24        Q.    Any other corporations that we --

34

1    those were wholly owned subsidiaries.  Any other
2    wholly owned subsidiaries of the Berkley Group
3    that you can recall at this time?
4         A.    Not that I can recall.
5         Q.    I've heard mention in some of these
6    depositions of a location at Massanutten.  What
7    is the resort at Massanutten?
8         A.    What is the resort?
9         Q.    Yes.  Well, what is the name?
10        A.    Massanutten Resort.
11        Q.    Is that owned by the Berkley Group?
12        A.    No, it is not.
13        Q.    What corporation, if it's a
14   corporation, owns Massanutten Resort?
15        A.    Great Eastern Resort Corporation.
16        Q.    So obviously from your testimony, it
17   would appear that Great Eastern is not a wholly
18   owned subsidiary of the Berkley Group, is that
19   correct?
20        A.    That's correct.
21        Q.    What is its corporate relationship, if
22   any, to the Berkley Group?
23        A.    The Berkley Group has a sales and
24   marketing contract with Great Eastern Resort.

35

1         Q.    Do you happen to know -- Massanutten
2    Resort, do you happen to know if it's a
3    corporation?
4         A.    Great Eastern Resort is a corporation.
5         Q.    Who is on the board of that
6    corporation?
7         A.    C.D -- C as in cat, D as in dog --
8    Hammer, H-A-M-M-E-R; James Lambert; and I'm not
9    sure if there are other officers.  I just know
10   those two.
11        Q.    Have you ever served as a corporate
12   officer of Massanutten Resort?
13        A.    No, I have not.
14        Q.    Have you ever served in any other
15   capacity or had any other responsibilities for
16   Massanutten Resort?
17        A.    Yes.
18        Q.    How so?
19        A.    Administrative and operational for the
20   sales office that sells time-sharing.
21        Q.    So you actually worked on-site at some
22   point in Massanutten?
23        A.    Yes, I did.
24        Q.    For how long?

36

1         A.    Probably a year.
2         Q.    Was that back in the '80's sometime?
3         A.    Actually, that's prior to Berkley
4    Group; that would have been as Del Marketing.
5         Q.    So somewhat earlier in your career you
6    worked on-site there?
7         A.    Yes.
8         Q.    And that's your only -- those were
9    your only responsibilities as to Massanutten at
10   any time?
11        A.    Those responsibilities are ongoing.  I
12   oversee the sales office operation.
13        Q.    As you sit here today?
14        A.    With regard to the contract that we
15   have there, yes.
16        Q.    Pardon me.  As you sit here today, you
17   continue to do that?
18        A.    That's correct.
19        Q.    Other than those corporations we've
20   discussed so far, are there any other -- and the
21   resort that they either own or operate -- are
22   there any other resorts in any way affiliated
23   either by having an individual who works at the
24   Berkley Group have some responsibilities or in

37

1  any other way affiliated with the Berkley Group?
2              MS. FABBO:  Objection.  You can
3        answer.
4              THE WITNESS:  There is a resort
5        in Gatlinburg, Tennessee called
6        Sunrise Ridge Resort, and the name of
7        the corporation is Unique Resort
8        Corporation.
9        Q.    (By Ms. Garrow)  Is Unique Resort the
10  development company?
11       A.    Yes, it owns inventory at that
12  property.
13       Q.    Who is responsible for making sales;
14  what corporation or entity would be responsible
15  for providing sales or salespeople to Gatlinburg
16  Sunrise Unique Resorts?
17       A.    Unique Resorts.
18       Q.    To your knowledge, does Berkley own or
19  have any affiliation with any other resort in
20  Tennessee?
21       A.    Unique Resorts owns some inventory at
22  a resort called Oakmont and at a resort called
23  Treetops.
24       Q.    What is the affiliation between either

38

1  Oakmont or Treetops -- let's take Oakmont first.
2  What is the affiliation between Oakmont and the
3  Berkley Group?
4        A.    There would be none.
5        Q.    Unique Resort Corporation, who is on
6  the board?
7        A.    Myself, Marc Landau, and I believe
8  Ottino.
9        Q.    When you say that there's no
10  affiliation, then, between Unique Resort -- I'm
11  sorry -- between the Berkley Group and Oakmont,
12  yourself, Marc Landau, and J.P. Ottino are on the
13  board of both Unique Resort and the Berkley
14  Group, so there is at least a personal
15  affiliation, is that fair to say?
16       A.    That's fair to say.
17       Q.    Any other locations with any
18  affiliation at all to the Berkley Group that we
19  haven't discussed yet -- resort locations?
20       A.    I can't recall any more at this time.
21       Q.    Approximately what are the yearly
22  sales at Patriot Resorts?
23       A.    I don't know that I can give that
24  figure with any accuracy.

39

1        Q.    More than a million?
2        A.    Volume of sales?
3        Q.    Yes.
4        A.    It would be more than a million.
5        Q.    More than ten million?
6        A.    That I couldn't say.
7        Q.    More than five million?
8        A.    I would be afraid to speculate.
9        Q.    Okay, that's fine.  But you can say
10  with some degree of certainty that it is greater
11  than a million?
12       A.    Yes.
13       Q.    Are you quite certain?
14       A.    Quite certain.
15       Q.    Thank you.  To your knowledge, is
16  there an hourly wage for salespeople who work for
17  Patriot Resorts?
18       A.    No.
19       Q.    There is no hourly wage?
20       A.    No.
21       Q.    How did -- who determined that there
22  would be no hourly wage at Patriot Resorts for
23  salespeople?
24       A.    It would have been determined by the

40

1  board of directors in conjunction with the sales
2  team.
3        Q.    Just so we're clear here, sales
4  managers of Patriot Resorts, is there an hourly
5  wage for them?
6        A.    No, there is not.
7        Q.    Do you recall discussions at board of
8  directors' meetings relating to hourly wage --
9  again, let me take you back in time.  This is not
10  since the pendency of this lawsuit; I'm talking
11  about before Berkley Resorts had any employees,
12  so -- I'm sorry, strike that.  Before Patriot
13  Resorts had employees in the 2001 time frame, do
14  you remember -- do you recall having any
15  discussions relating to hourly wages at board of
16  directors' meetings?
17       A.    I don't recall specific board of
18  directors meetings where it was discussed, but
19  any time there is a question of wage and hour, we
20  refer that to our attorneys.
21       Q.    Do you recall referring any questions
22  relating to wage and hour to your attorney
23  relating to paying hourly wages at Berkshires --
24  in the Berkshires of Patriot Resorts?

Wise v Patriot - R. Foster Campagna  5/23/05

41

```
 1        A.   Yes, I believe we had a conversation
 2   with our attorneys regarding the issue.
 3        Q.   This was back in 2001?
 4        A.   Thereabouts.   It may have been earlier
 5   than 2001.
 6        Q.   But as you were setting up the new
 7   corporation and the new resort, is that fair to
 8   say?
 9        A.   That's correct.
10        Q.   What attorneys did you speak with?
11        A.   We spoke to our local attorneys in
12   Williamstown, and we also spoke with our counsel
13   in Virginia.
14        Q.   I'm not asking for the substance of
15   your discussions with counsel in Virginia, but
16   what was the purpose for you to, or for the board
17   to discuss wages with counsel in Virginia in
18   relation to Patriot Resorts?
19        A.   Because we had discussed the issue
20   with them previously.
21        Q.   Did you have any conversations with
22   any other attorneys at that time other than local
23   attorneys in Massachusetts and counsel in
24   Virginia?
```

42

```
 1             MS. FABBO:  Objection.  You can
 2        answer.
 3             THE WITNESS:  We've spoken to our
 4        attorneys in Nevada.
 5        Q.   (By Ms. Garrow)  Just so I'm clear,
 6   you spoke with your attorneys in Nevada in
 7   relation to setting up, or in relation to the
 8   hourly wage at Patriot Resorts; is that your
 9   testimony?
10        A.   No, I'm sorry.  I thought your
11   question was in relation to wage and hour.
12        Q.   I'm sorry, let me be clearer.  When
13   you were beginning in 2001, Patriot Resorts was
14   up and running sometime in 2001, is that correct?
15        A.   That's correct.
16        Q.   And prior to Patriot Resorts having
17   employees, in particular salespeople and sales
18   managers, did you speak with anyone other than
19   your local Massachusetts attorneys with relation
20   to hourly wage for those salespeople or sales
21   managers at Patriot?
22        A.   We spoke with our Virginia counsel so
23   that they could share information with our
24   Massachusetts law firm.
```

43

```
 1        Q.   Anyone else?
 2        A.   No, not at that time.
 3        Q.   Who were your local attorneys?
 4        A.   In Massachusetts?
 5        Q.   Yes, I'm sorry.
 6        A.   Parese and Sabin.
 7        Q.   And they're in the Berkshires, right?
 8        A.   Williamstown, yes.
 9        Q.   About how many times did you speak
10   with them in relation to hourly wages and wage
11   and hour issues at Patriot Resorts?
12        A.   I don't really recall how many times I
13   may have spoken with them about that.
14        Q.   Did you -- again, this is in the same
15   time frame, and actually, this would be any time
16   subsequent.  Did you ever obtain or seek an order
17   of a Massachusetts attorney general or the U.S.
18   Department of Labor relating to your wage and
19   hour practices at Patriot Resorts?
20        A.   Not for Patriot Resorts, no.
21        Q.   Did you receive an order or ruling for
22   some other location or some other corporation?
23        A.   Our Virginia attorneys requested -- I
24   believe it's an opinion from the Department of
```

44

```
 1   Labor; not directly, but they went through the
 2   American Resort Developers Association, which is
 3   an association of similar developers, time-share
 4   developers; and they requested it of the
 5   Department of Labor.
 6        Q.   The U.S. Department of Labor?
 7        A.   That is correct.
 8        Q.   Do you recall -- have you reviewed
 9   that opinion later?
10        A.   Not recently.
11        Q.   At some point you did?
12        A.   Yes, I did.
13        Q.   Do you recall what that opinion letter
14   said?
15        A.   Basically they did not make a
16   determination.  They felt that -- well, again, I
17   can't say what they said, but our attorney -- our
18   labor attorney --
19        Q.   Again, I'm not going to ask you what
20   your attorney said, but I want to know what the
21   AG said based on the opinion letter, that's all.
22        A.   Well, I don't recall the opinion
23   letter.  That was given to our attorneys.
24        Q.   So at no point -- you didn't review
```