Wise v Patriot - R. Foster Campagna   5/23/05

45

```
1   the opinion letter or did you review it?
2        A.   I may have.
3        Q.   Did you ask to review it at some point
4   in relation to Patriot Resorts?
5        A.   Yes, I believe we had the attorneys
6   confer on that.
7        Q.   At some point, do you recall what the
8   general gist of that opinion was from the United
9   States Department of Labor?
10       A.   We did not have an obligation to pay
11  minimum wage.
12       Q.   Did you understand why?
13       A.   Again, I don't know the specifics.
14  That's between the attorneys.
15       Q.   Do you believe any statutory exemption
16  to payment of minimum wage applies in this
17  particular matter?
18            MS. FABBO:   Objection.
19       Q.   (By Ms. Garrow)  -- in this particular
20  matter that you're here being deposed on today?
21            MS. FABBO:   Objection.  Don't
22            answer as to any discussions with
23            counsel, but if you have any opinion
24            other than what you've learned from
```

46

```
1            your attorneys.
2            THE WITNESS:   I really don't have
3            an opinion other than what the
4            attorneys have said.
5        Q.   (By Ms. Garrow)  I'm really not asking
6   for an opinion.  What I'm asking for is if you're
7   aware of any exemptions that you believe apply
8   here, exemptions to pay minimum wage; not an
9   opinion on that?
10       A.   I'm not really qualified to answer
11  that.
12       Q.   So is it your testimony, then, as you
13  sit here today, you're not personally aware of
14  any exemptions?
15            MS. FABBO:   Objection.  You can
16            answer.
17            THE WITNESS:   Only as it's been
18            related to me from our attorneys.
19       Q.   (By Ms. Garrow)  Do you recall what
20  those were?
21            MS. FABBO:   Objection.  Don't
22            answer to your conversations with
23            counsel.
24       Q.   (By Ms. Garrow)  Do you have anything
```

47

```
1   independent of conversation of counsel?
2        A.   No, I don't.
3        Q.   Knowledge as to what those exemptions
4   are -- counsel in Virginia, let me just go back
5   here and look and see -- is Massanutten -- and
6   again, I apologize for not being able to grasp
7   this as quickly as I should -- but Massanutten,
8   is that your only Great Eastern Corporation and
9   Massanutten Resort, is that your only location in
10  Virginia -- there's a Williamsburg one as well,
11  right?
12       A.   Williamsburg Plantation, yes.
13       Q.   Those are the two Virginia locations?
14       A.   We do have a campground time-share in
15  Fredericksburg, Virginia.  When I say "we," we
16  have a sales and marketing contract at Wilderness
17  Resort.  That's a campground facility in
18  Fredericksburg, Virginia.  It is owned by
19  Presidential Resorts Corporation, I believe.
20       Q.   Is that another corporation that's
21  somehow affiliated with the Berkley Group?
22       A.   No, it is not.  Only through its
23  contract with Berkley.
24       Q.   I'm sure you probably told me who was
```

48

```
1   responsible for making sales at the Williamsburg
2   location, but if you wouldn't mind just telling
3   me again who was responsible for those sales?
4        A.   Williamsburg Plantation.
5        Q.   And then Massanutten is Great Eastern
6   Corporation?
7        A.   Great Eastern Resort Corporation.
8        Q.   Can you please describe Williamsburg
9   Plantation's -- the way in which sales are made
10  there; in other words, are the salespeople there
11  required to work any particular hours?
12       A.   I'm sorry, which resort did you ask?
13       Q.   Williamsburg Plantation.  Do they have
14  certain hours of work, to your knowledge?
15       A.   I'm not sure what time their day
16  begins.  They have a sales meeting in the
17  morning, and then they have customers scheduled
18  during the day.
19       Q.   Who makes those scheduled customer
20  appointments?
21       A.   Those come through the marketing
22  companies.
23       Q.   Is that several marketing companies
24  that might services Williamsburg Plantation?
```

Wise v Patriot - R. Foster Campagna  5/23/05

---

**49**

1    A.    Williamsburg Plantation generates some

2    of its own customers.  I believe they're

3    responsible for most all of their customers.

4        Q.    How do they do that?

5        A.    Either through dropbox locations where

6    they have people that are interested in

7    participating in a drawing for something, put a

8    -- fill a form out and put it in the box, and

9    then they're contacted by Williamsburg to see if

10   they would be interested in taking a tour.

11       Q.    So, for instance, you might go to a

12   fair or something and see a box, fill out your

13   name you can win something-or-other, and that's

14   where you get your leads from from the

15   Williamsburg location?

16       A.    Yes, Williamsburg gets leads in that

17   way.

18       Q.    Who is responsible for following up on

19   those leads that come through the drop boxes?

20       A.    It would be an office in Williamsburg

21   for Williamsburg Plantation.

22       Q.    Do you know if the salespeople are

23   required to make those calls?

24       A.    No, they are not.

---

**50**

1        Q.    There's an office on-site that makes

2    those calls?

3        A.    There is an office in the area.  I'm

4    not exactly sure which location.

5        Q.    Is it fair to say the people who work

6    at that office are employees of Williamsburg

7    Plantation?

8        A.    That's correct.

9        Q.    So we've heard described in other

10   depositions waves of tours.  Do those -- in other

11   words, that tours come at certain times of the

12   day and generally have an ebb and a flow.  Is

13   that a fair assessment of -- let me strike that.

14   We've heard about other tours that sort of ebb

15   and flow.  Would they ebb and flow in this

16   methodology as well, if you had a drop box lead

17   system?

18            MS. FABBO:  Objection.  You can

19            answer.

20            THE WITNESS:  They would have

21            customers at certain times of the day.

22       Q.    (By Ms. Garrow)  They generally

23   schedule tours at certain beginning times,

24   whether it's a 9:00 tour or 10:30 tour or

---

**51**

1    something along those lines, they generally have

2    a starting time that --

3        A.    Yes.

4        Q.    -- is adhered to?

5        A.    Yes, they generally start -- they come

6    in in and around the same time.

7        Q.    Is that at all locations, or are we

8    speaking -- I asked you about Williamsburg.  Is

9    that what you're addressing your answer to?

10       A.    Yes, I'm speaking of Williamsburg.

11            (Exhibit 1, Vacation Village

12             Tour Times, marked

13             for identification)

14       Q.    (By Ms. Garrow)  I'm showing you

15   what's been marked as Plaintiff's Exhibit 1.  I'm

16   just going to ask you to review that.  These are

17   what have been represented as tour times at

18   Vacation Village in the Berkshires.  I'm going to

19   ask you if this is different in any way from the

20   tour times at Williamsburg Plantation?

21       A.    I really don't know.  I have not seen

22   this before.

23       Q.    Do you want take a look at it and tell

24   me if you know after reviewing it?

---

**52**

1        A.    In a general sense, I would say yes.

2        Q.    Other than some office folks

3    generating leads at Williamsburg and the sales

4    folks taking tours -- I assume that salespeople

5    and sales managers take tours, is that correct?

6        A.    At some locations, yes.  Are you

7    speaking of...

8        Q.    In Williamsburg?

9        A.    At Williamsburg, not all of the

10   managers take a customer out.

11       Q.    But all the salespeople should be

12   taking customers out?

13       A.    Correct.

14       Q.    What else does a salesperson do during

15   their day at Williamsburg Plantation?

16       A.    They only tour -- you asked me sales

17   representative?

18       Q.    Yes.

19       A.    They only tour salespeople.  They

20   attend a morning meeting -- I'm sorry, they only

21   tour customers.

22       Q.    What do they do in between tours, to

23   your knowledge?

24       A.    Basically anything they want to.

53

1   Q.   Like what?

2   A.   They could go and get gas in their
3   car, they could go to the drugstore, they could
4   go and have a meal.

5   Q.   How do they -- how do they get called
6   for tours, then, if they're off property?

7   A.   They understand where they are on the
8   rotation when they leave, and they can generally
9   have a very good idea of what time they need to
10  be back in order to take their next customer.

11  Q.   What happens if they happen to come
12  back ten minutes late?

13  A.   Then they'll miss their tour.

14  Q.   Is ten minutes given to them to make
15  it back?

16  A.   They allow a certain amount of time.
17  I'm not sure that I know what it is at
18  Williamsburg.

19  Q.   So your understanding that they can
20  leave the property as long as they come back
21  timely; they can leave and do whatever they want?

22  A.   That's correct.

23  Q.   Do they wear a beeper or anything?

24  A.   Most people have cell phones.

54

1   Q.   Do you know if at Williamsburg -- let
2   me ask you this:  Who is responsible for handing
3   out the tours at Williamsburg?

4   A.   The receptionist that checks in the
5   customers assign those customers to a
6   salesperson.

7   Q.   Do you know if the receptionist would
8   on occasion call a sales rep. that might be
9   coming up on the rotation if they're off property
10  at Williamsburg?

11  A.   I don't know specifically at
12  Williamsburg whether they call them or not.

13  Q.   What about Massanutten; do you know if
14  there's any difference in general policies or
15  procedures relating to the day of the sales
16  representative at Massanutten compared with
17  Williamsburg?

18  A.   They have customers -- they have a
19  morning meeting, they have customers come in.
20  The times may vary to what the times are in
21  Williamsburg, but they pretty much follow the
22  same routine.

23  Q.   Same routine for when they're not
24  touring customers as well?

55

1   A.   Correct.

2   Q.   Do you know any difference to that
3   routine at all?

4   A.   Not that I can think of.

5   Q.   Do you know if employees of the
6   Patriot Resorts ever work more than eight hours
7   in a day?

8   A.   Employees of Patriot Resorts?

9   Q.   Yes.

10  A.   The administrative staff very often
11  works more than eight hours a day.

12  Q.   What about salespeople; do you know if
13  they ever work more than eight hours a day?

14  A.   No, I don't.

15  Q.   No knowledge one way or another?

16  A.   It would be difficult for them to.

17  Q.   Why is that?

18  A.   If they have two customers a day, they
19  would be on tour probably maybe five to six
20  hours.

21  Q.   So your testimony is that a tour is
22  approximately two and a half to three hours per
23  day?

24  A.   That's a pretty extensive tour.

56

1   Q.   So what is the range of tour time?

2   A.   It could be anywhere from 90 minutes
3   to three hours, three and a half hours, depending
4   on if they got a sale.

5   Q.   That would be the range, you would
6   say?

7   A.   Yes, I would say.

8   Q.   Sometimes paperwork can take longer,
9   so they might be with a customer or owner longer
10  than three and a half hours, is that correct?

11  A.   It's possible.

12  Q.   Are you aware of that ever happening?

13  A.   No, I'm not personally aware, no.

14  Q.   Have you ever sold a time-share?

15  A.   No, I have not sold a time-share.

16  Q.   Do you know what time salespeople and
17  sales managers need to report to work at Patriot
18  Resorts?

19  A.   No, I don't know specifically --
20               (Exhibit 2, June 2004 Patriot
21               Resorts Employee Handbook,
22               marked for identification)

23  Q.   (By Ms. Garrow)  I'm showing you
24  what's been marked as Exhibit 2.  Do I recognize

Wise v Patriot - R. Foster Campagna   5/23/05

---

57

1    Exhibit 2?
2        A.   Yes, I do.
3        Q.   Have you seen it before?
4        A.   It looks like the Patriot Resorts
5    Employee Handbook.
6        Q.   Have you seen that before?
7        A.   Yes, I have.
8        Q.   Did you have any involvement in
9    authoring this?
10              MS. FABBO:  Objection.  You can
11          answer if you understand it.
12              THE WITNESS:  I would have had
13          input, yes.
14       Q.   (By Ms. Garrow)  Do you remember --
15   input in certain policies, is that what it would
16   have been?
17       A.   Any general office type policies, yes.
18   Anything that is of a legal nature would have
19   been referred to the attorneys.
20       Q.   Do you recall what input you offered
21   to this particular publication of the handbook?
22       A.   I participated in the dress code.
23       Q.   When was that; when did you give your
24   input to the dress code?  This is marked June

---

58

1    2004.
2        A.   It would have been prior to June 2004.
3        Q.   Was it immediately prior to June 2004,
4    or was it sometime prior to that?
5        A.   I don't recall specifically.  I would
6    have participated in the safety policy, the
7    smoking policy, the cell phone policy, career
8    service, mail policy.
9        Q.   Anything else?
10       A.   I think that's pretty much...
11       Q.   What about attendance; did you have
12   any involvement in the attendance policy?
13       A.   No.
14       Q.   Who did?
15       A.   That would have been a recommendation
16   by Mr. Polansky.
17       Q.   A recommendation to you?
18       A.   Yes.
19       Q.   So did you approve his
20   recommendations?
21       A.   Well, when I say -- he would have told
22   me what to put in as attendance for Patriot
23   Resorts under our sales and marketing contracts.
24       Q.   So then you would have put it in?

---

59

1        A.   Correct.
2        Q.   So for instance, on Page 3 here where
3    it says "attendance policy," you would have put
4    in based on a recommendation by Mr. Polansky that
5    each employee is expected to report promptly on
6    each scheduled workday?
7        A.   Correct.
8        Q.   And the remainder of that policy would
9    have been set by Mr. Polansky, is that your
10   testimony?
11       A.   That is correct.
12       Q.   He refers there, or you refer there to
13   a starting time?
14       A.   That is correct.
15       Q.   Do you recall -- you named off a
16   number of different policies in which you had
17   input.  Do you remember what sort of input you
18   had into each?
19       A.   I would have gone over the policy,
20   read the policy, just generally checked it to
21   make sure that it was okay.
22       Q.   How different is the Patriot Resorts
23   policy from, let's say, the Williamsburg policy
24   handbook -- let me just ask you first, is there a

---

60

1    policy handbook at Williamsburg?
2              MS. FABBO:  Objection.  You can
3          answer.
4              THE WITNESS:  Yes, there is.
5        Q.   (By Ms. Garrow)  How different would
6    this be from that?
7        A.   A lot of the legal issues would be the
8    same.  Insurance requirements may be different.
9    I'm talking about group insurance or life
10   insurance would be different.
11       Q.   Are there different plans, different
12   insurance plans that might have been opted for in
13   the Massachusetts location versus the Virginia
14   locations?
15       A.   Yes, they're all different.
16       Q.   Who chooses those, by the way?
17       A.   It's generally handled by one of the
18   office people in the -- at Patriot Resorts, Faith
19   would actually talk with someone in the Berkley
20   office who would help her have input from an
21   agent there in Massachusetts.
22       Q.   So it would be in conjunction with
23   somebody from Berkley, but it would be done on
24   the local site?

61

1      A.   Right, done for Patriot Resorts.
2      Q.   Anything else; any other input you can
3  think of that you offered?
4      A.   No, not at this time.
5           (Exhibit 3, July 2001 Patriot
6           Resorts Employee Handbook,
7           marked for identification)
8      Q.   (By Ms. Garrow)  I'm showing you
9  what's been marked as Exhibit 3.  Have you seen
10  that document before?
11      A.   Yes, I have.
12      Q.   What is that document?
13      A.   This appears to be the original
14  employee handbook that was authorized in July of
15  2001.
16      Q.   Did you have input into that document
17  as well?
18      A.   Yes.
19      Q.   Do you know if there are any
20  differences between the 2001 handbook and the
21  2004 handbook?
22      A.   I believe that there are.
23      Q.   Do you know what those are -- you can
24  take some time to review it if you'd like.

62

1      A.   The insurance requirement is more
2  detailed in the new version.  The dress code is
3  in the new version.
4      Q.   That was something new?
5      A.   It was something new for the handbook.
6      Q.   Was it -- it was issued independent of
7  the handbook to the sales personnel at Patriot
8  Resorts at some point, is that correct?
9      A.   I believe it may have been, but I
10  don't know that for a fact.  Personal leave seems
11  to be longer than -- the paragraph is longer.
12      Q.   What page are you on?
13      A.   Page 4.  Safety policy has been put
14  into the handbook.  Cell phone policy has been
15  put in the handbook.  The career service and the
16  mail policy was put in.  Harassment policy seems
17  to have been reworded and restructured.  I
18  believe that's it.
19      Q.   If we can go to Exhibit 2, one policy
20  you had mentioned was the personal leave policy.
21  I believe that's on Page 5?
22      A.   Yes.
23      Q.   And I think you testified that it
24  seems to be a longer paragraph.  I'm going to

63

1  have you look at Number 2 at this time and have
2  you answer questions about Number 2.
3      A.   Okay.
4      Q.   Is it your understanding that at the
5  beginning of every year, an employee gets fifteen
6  days essentially to use as sick time or vacation
7  time or any time off that they choose?
8      A.   That's correct.
9      Q.   And that would be fifteen normally
10  scheduled days, correct?
11      A.   Fifteen normally scheduled -- you mean
12  fifteen days that they would be normally
13  scheduled to work?
14      Q.   Yes, exactly.
15      A.   Correct.
16      Q.   Thank you.  That accrues at the
17  beginning of every year?
18      A.   Yes, it does.
19      Q.   Calendar year?
20      A.   Yes.
21      Q.   Do you know if the policy that's set
22  forth here that a failure to sign in on the
23  attendance sheet will result in an employee being
24  docked with a personal day off, do you know if

64

1  that was enforced at Patriot Resorts?
2      A.   If it was enforced at the time that
3  this handbook was distributed?
4      Q.   Yes, after this handbook was
5  distributed.
6      A.   Yes.
7      Q.   It was enforced -- what about before
8  this handbook was distributed?
9      A.   Yes.
10      Q.   When did they start enforcing that
11  policy?
12      A.   It would have been the policy from the
13  beginning of the work starting at Patriot
14  Resorts.
15      Q.   Was it enforced, as far as you know,
16  from the beginning?
17      A.   As far as I know it was.
18      Q.   Was it enforced equally as to
19  everybody, to your knowledge?
20      A.   As far as I know it was.
21      Q.   Were salespeople essentially treated
22  the same, in your opinion, at Patriot Resorts --
23  the same as to each other?
24      A.   Yes.

Wise v Patriot - R. Foster Campagna  5/23/05

65

1    Q.   What do you base that on?

2    A.   I base it on the philosophy of the

3    company.

4    Q.   Do you have any personal knowledge

5    that employees were treated the same as to the

6    policies -- do you have any personal knowledge

7    that people were treated the same as to policies?

8    A.   I don't have any knowledge that they

9    were not.

10   Q.   That was the same between the lines,

11   line directors; you expected them to treat

12   everybody the same and enforce the policies

13   equally?

14   A.   Enforce the policies equally, each

15   manager has his own management style.

16   Q.   What about jury duty, if somebody has

17   jury duty;  is that considered one of the fifteen

18   days at Patriot Resorts?

19   A.   At Patriot, I believe that jury duty

20   is considered time that they're not -- in other

21   words, they're considered that they work when

22   they're at jury duty.

23   Q.   So in other words, you couldn't dock

24   them a day, is that correct?

66

1    A.   Well, they weren't there to earn

2    commissions, but I believe they receive some type

3    of compensation if they are on jury duty.

4    Q.   From Patriot Resorts?

5    A.   I believe so.

6    Q.   Do you know that to be a fact?

7    A.   I believe we had one person who asked

8    for compensation for the day.

9    Q.   Asked you?

10   A.   No, he asked the office manager,

11   Faith.

12   Q.   What did she do at that time; did you

13   consult with you?

14   A.   She did not consult with me; she

15   consulted with the attorneys.

16   Q.   But to your knowledge at some point,

17   he got paid?

18   A.   Yes, he did.

19   Q.   Anybody else ever ask you for pay for

20   jury duty?

21   A.   No one has ever asked me, and I don't

22   know that anyone has asked Faith, but she would

23   know.

24   Q.   Do you know if anyone else ever got

67

1    paid for jury duty?

2    A.   I do not know.

3    Q.   Do you know if the jury duty day gets

4    marked as one of your fifteen days off out of

5    work for the year?

6         MS. FABBO:  Objection, asked and

7         answered.

8         MS. GARROW:  You can answer it.

9         THE WITNESS:  It's not counted

10        against them, no.

11   Q.   (By Ms. Garrow)  Is there a pay period

12   at Patriot Resorts, to your knowledge?

13   A.   I'm not sure what you mean by that.

14   Q.   In other words, is there a set period

15   in which checks are issued; are they issued

16   weekly or biweekly or...

17   A.   Checks are issued each week.

18   Q.   Who set that pay period?

19   A.   I would have set that in the

20   beginning.

21   Q.   Has that changed since the beginning?

22   A.   No, it hasn't.

23   Q.   How many times have you physically

24   been at the Patriot Resorts location since its

68

1    opening?

2    A.   Probably between five and ten times.

3         (Exhibit 4, Employment Agreement

4         - Sales Representative,

5         marked for identification)

6         MS. GARROW:  Off the record.

7         (A break was taken)

8         MS. GARROW:  Back on the record.

9    Q.   (By Ms. Garrow)  I'm showing you

10   what's been marked as Plaintiff's Exhibit 4, and

11   do you recognize this document?

12   A.   Yes.

13   Q.   What is this document?

14   A.   It's the employee agreement for sales

15   representatives at Patriot Resorts.

16   Q.   Is it currently in force?

17   A.   I'm sorry?

18   Q.   Is this the agreement that's currently

19   in force?

20   A.   Yes.

21   Q.   Is it used for all sales

22   representatives?

23   A.   Yes.

24   Q.   At Patriot Resorts?

Wise v Patriot - R. Foster Campagna   5/23/05

---

69

1    A.    As far as I know it is.

2    Q.    Has it been modified at any time?

3    A.    It may have been, but I don't recall.

4    Q.    So your testimony is you have no

5 knowledge of any modifications or...

6    A.    Actually, at the bottom of this it

7 shows it was modified by the attorneys on

8 June 13, '03.

9    Q.    So this was generated by his

10 attorneys; is that what you're saying?

11    A.    That's correct.

12    Q.    Is that Miss Fabbo's firm or the

13 Parisi?

14    A.    Parisi and Sabin.

15    Q.    I'd like to go through the sections

16 that start on Page 2, 3, and 4, generally the

17 commission payment schedules, the commission

18 payment terms, commission payment schedules.  Can

19 you describe for me, starting in or around June

20 or so of 2001, approximately when Patriot Resorts

21 started selling, what the commission plan was for

22 sales representatives at that time?

23    A.    They receive a commission on their

24 sales.  I'm not sure of the exact number.

---

70

1    Q.    How did that go; I mean, they made a

2 sale, and then when did they get paid?

3    A.    If they make a sale today and we

4 receive the full down payment on the transaction

5 today, then it takes ten days from today's date

6 in order for us to generally accept that the

7 payment we received is good; and at that date,

8 depending on what day of the week it is, it's put

9 on a pay ledger for that week ending Sunday.

10 That's transmitted to the pay office on Monday,

11 and they would be paid -- I believe at Patriot

12 Resorts they're paid on a Tuesday, so it would be

13 the Tuesday following.  Not the next day, but the

14 Tuesday a week from that.

15    Q.    Was that true in 2001?

16    A.    Yes, I believe so.

17    Q.    How can an owner pay a down payment;

18 how are they allowed to submit that?

19    A.    They may pay by personal check, they

20 may pay in cash, they may pay by Mastercard,

21 Visa, or American Express.

22    Q.    And that's the down payment; they can

23 pay the down payment?

24    A.    Correct.

---

71

1    Q.    What about -- what if they get

2 financing; how do they finance the sale -- can

3 they finance the sale?

4    A.    Yes, they can.

5    Q.    How could they do that -- is it an

6 internal financing company?

7    A.    Patriot Resorts will accept the

8 financing.  They have agreements with other banks

9 -- or with banks to extend Patriot Resorts the

10 money to finance those receivables.  And the

11 customer makes their payment on a monthly basis.

12    Q.    How can they make that payment, in

13 what form?

14    A.    They make it by preauthorized

15 checking.

16    Q.    That's the only way they are allowed

17 to pay?

18    A.    If they make a higher down payment;

19 the typical down payment amount is ten percent.

20 If they do a 20 percent or greater down payment,

21 then they are relieved of their obligation of

22 paying by preauthorized debit.

23    Q.    So is it your testimony that you will

24 not accept a sale for ten percent down or less

---

72

1 from a customer with any other form of payment

2 other than preauthorized check?

3    A.    We give them time to get those -- that

4 check in.  They are not issued a coupon book.

5 They are given time to get us that document to

6 put them on preauthorized checking.

7    Q.    I guess I'll ask the question again.

8 Is that the only way that somebody is able to pay

9 with a ten percent down payment or less --

10 preauthorized checking, sorry?

11    A.    There may be a time when they've done

12 it on a credit card.

13    Q.    I guess somebody could pay cash for a

14 unit; is that correct or not?

15    A.    We like for them to pay cash.

16    Q.    Doesn't happen often, does it?

17    A.    Not this day and age.

18    Q.    Let's say it was a cash sale.  When

19 would the salesperson get paid?

20    A.    We would go through the same procedure

21 -- wait for the check to clear the ten days, and

22 then on that pay cycle of the week ending Sunday,

23 submit it on Monday, paid Tuesday a week later.

24    Q.    So let me just understand.  Somebody

73

1  gets full payment for a unit, and there's a
2  ten-day period for -- you assumed a check.  Have
3  you ever had a cash sale, somebody come in with
4  twenties?
5      A.   For the entire purchase?
6      Q.   Yes.
7      A.   No.
8      Q.   So it's most likely if they're going
9  to pay in full, they pay by check.  Have you had
10 that happen before?
11     A.   Yes.
12     Q.   So you wait ten days for the check to
13 clear, is that correct?
14     A.   That's correct.
15     Q.   And then if a sale was made, let's say
16 on Friday -- that's a relatively busy day, I
17 assume, is that correct?
18     A.   Friday could be a busy day, yes.
19     Q.   So a sale is made on a Friday, you
20 wait ten days, so that takes us into -- is that
21 Monday?
22     A.   Monday a week.
23     Q.   Right.  Not the following Monday, but
24 the next Monday?

74

1      A.   The next.
2      Q.   We'll say Friday was the 1st, and then
3  Monday would be the 10th.  And then what happens
4  on that Monday; does that automatically get sent
5  in that day on that Monday, or you have to wait
6  an additional week?
7      A.   No, that goes in on the week ending
8  Sunday's date.  So if Monday is the 10th --
9  Monday is the 10th, Sunday is the 16th.  That
10 would be week ending the 16th.  It's sent in for
11 payment on the 17th, and it would be paid.
12     Q.   Not the 18th, but...
13     A.   Not the 18th, but a week from the
14 18th, yes.
15     Q.   25th.  Was there at any time during
16 the course that Patriot Resorts has been selling
17 time-shares that a preauthorized check was not
18 required from a customer?
19     A.   My recollection is in the very
20 beginning, I would say the first few months they
21 did not require it, but they encouraged it and
22 tried to teach the salespeople how to get the
23 preauthorized checking -- authorization from the
24 customer.

75

1      Q.   Was that a Berkley policy that had
2  been in effect before 2001 when Patriot Resorts
3  was -- before Patriot Resorts came into
4  existence?
5      A.   It's a policy that is utilized at some
6  of the Berkley-owned development companies, yes.
7      Q.   Not all?
8      A.   I believe it's all, but I would not --
9  the development companies probably, yes.  I'm
10 thinking of one sales and marketing agreement
11 where it may not be.
12     Q.   Where is that?
13     A.   Wilderness Resort.
14     Q.   That's the campground?
15     A.   Yes.
16     Q.   Under Earned Commissions, that's on
17 Page 3, VI, "A commission is deemed earned upon
18 the closing of a sale," and then it talks about
19 his commission on financed sales and they'll "not
20 be deemed earned until the purchaser has made
21 three timely consecutive monthly payments"?
22     A.   Correct.
23     Q.   That's a policy at Patriot Resorts, is
24 that correct?

76

1      A.   That's correct.
2      Q.   And all the salespeople and sales
3  managers are required to abide by that, is that
4  correct?
5      A.   That's correct.
6      Q.   What about Berkley; is that a
7  Berkley-wide policy?
8          MS. FABBO:  Objection.  You can
9          answer.
10         THE WITNESS:  There is a policy
11         at most development companies where
12         there is a provision for chargeback of
13         commissions that are paid.  Whether it
14         is worded exactly this way or not
15         depends on the particular state and
16         the way that the particular attorney
17         drafted the contract.
18     Q.   (By Ms. Garrow)  What are chargebacks
19 -- commission charge-backs?
20     A.   If a sale is made and the customer
21 does not fulfill the minimum number of payments
22 required for -- according to the salesman's
23 contracts, then the company has the right to take
24 back that commission that was paid because the

Wise v Patriot - R. Foster Campagna  5/23/05

77

1  sale was canceled.
2       Q.   Do the salespeople get taxed on the
3  commission that's paid to them through Patriot
4  Resorts?
5       A.   Yes, they do.
6       Q.   So -- and do they get the tax refunded
7  to them that they paid on those?
8       A.   That is calculated at the end of the
9  year, I believe.
10      Q.   Is that a yes or no?
11      A.   You're saying is it refunded.  We
12 don't refund them.  There are certain taxes that
13 are paid and there's no refund, but I do know
14 that that's something that's calculated at the
15 end of the year with regard to how much income
16 they received.
17      Q.   Well, at the time somebody would
18 receive a check, they have money deducted for
19 taxes based on the commission that they -- you
20 deem they earned during that period, is that
21 correct?
22      A.   Correct.
23      Q.   Then at the end of the year, you issue
24 a W-2 to all of the salespeople and sales

78

1  managers at Patriot Resorts, is that correct?
2       A.   That's correct.
3       Q.   So how do you reconcile money that has
4  already been deducted for tax purposes from the
5  individual salesperson's or sales manager's
6  paycheck for those commissions?
7       A.   I don't do commission -- the actual
8  computation, so I'm not sure -- that's an
9  accounting procedure, and I'm not exactly sure
10 how they do that.
11      Q.   Who would that be; who would I talk to
12 about that?
13      A.   I'm not sure who would -- it's a
14 procedure that's done.  Any salesperson's
15 paycheck would show how that's handled.
16      Q.   Any salesperson's paycheck at any
17 time, or under what circumstances -- I guess I
18 don't understand your answer.  Maybe you can
19 explain what you mean.
20      A.   If they had a chargeback in a
21 particular week and they had a payment of another
22 commission, that would show how that transaction
23 is handled.
24      Q.   Under the same provision, it says

79

1  "three timely consecutive monthly payments in
2  accordance with the terms of the purchase money
3  note and mortgage."  Am I reading that correctly?
4       A.   That's correct.
5       Q.   So let's assume -- assuming there is a
6  preauthorized check, but three months in a row
7  the check comes back insufficient funds -- or
8  actually, let me change that.  For the first six
9  months, no problem -- I'm sorry -- for the first
10 month, no problem; the second month, insufficient
11 funds; third month, no problem.  So in other
12 words, back and forth.  There's no three
13 consecutive timely payments for the first year.
14 What happens then?
15           MS. FABBO:  Objection.
16           MS. GARROW:  What's
17      objectionable?
18           MS. FABBO:  What happens then in
19      terms of what?
20           MS. GARROW:  I think I just asked
21      the question.  Do you understand the
22      question?
23           THE WITNESS:  I'm not sure.
24      Q.   (By Ms. Garrow)  If for the first year

80

1  of a contract, let's say the owner is
2  consistently late in their payments, yet they get
3  paid at some point, but they're consistently
4  late.  Does the salesperson's commission get
5  paid?
6       A.   If a customer has been habitually late
7  for twelve months, then the salesperson would not
8  be qualified to be paid under this contract, no.
9       Q.   And that's even if the money came in,
10 correct?
11      A.   That's correct.
12      Q.   Under what other circumstances -- is
13 that a circumstance where there would be a
14 commission chargeback?
15      A.   Yes.
16      Q.   But the commission never would have
17 actually been accredited?
18      A.   Well, it was not earned, so they would
19 have actually received it as an advance against
20 their commission earned, but it would be taken
21 back because it did not fall into the earned
22 category.
23      Q.   So you would expect that they would
24 have actually gotten paid commission at some

81

1   point and then had it taken back?

2       A.   That's correct.

3       Q.   Is there a circumstance in what I just

4   described where they would never have been paid

5   commission on that transaction at all?

6       A.   If they did not receive the

7   preauthorized checking, they would not have been

8   paid.

9       Q.   Let's say they do receive a

10  preauthorized checking, and for the first twelve

11  months, no timely consecutive payments, although

12  Patriot Resorts gets paid each month, albeit

13  late.  Would that salesperson have ever had the

14  commission paid to them to begin with?

15      A.   As long as he had the preauthorized

16  check authorization and the payments were made by

17  preauthorized check, he would be subject to a

18  chargeback on that particular sale.  In your

19  example, you use twelve months that are

20  consistently late.  If we see a pattern like

21  that, there would probably be an exception made.

22      Q.   Have you made exceptions?

23      A.   I can't tell you specifically at

24  Patriot Resorts.

82

1       Q.   So that as you sit here today, you

2   don't know if any exceptions were made at Patriot

3   Resorts?

4       A.   I don't know for a fact, no.

5       Q.   When you say "exception," what are you

6   talking about; exception to what?

7       A.   To a provision for a chargeback.

8       Q.   I believe your testimony is if the

9   salesperson or sales manager failed to get a PAC

10  check, they never would get paid on that sale

11  until there were three consecutive timely

12  payments?

13      A.   That's correct.

14      Q.   Again, I do know I've asked this, but

15  I want to make sure the record is clear.  If they

16  do receive the preauthorized check -- and let's

17  take the twelve months out of the quotient.  If

18  the owner is consistently late and there were no

19  three consecutive timely payments, at some point

20  that salesperson would get charged back the

21  commission that was advanced to them, is that

22  correct?

23      A.   I believe that's correct.  May I

24  clarify something?

83

1       Q.   Certainly, certainly.

2       A.   If a sale is on preauthorized

3   checking, it would only be NSF, it would never be

4   late; but the only reason it would be late is

5   because it's non-sufficient funds.  We would not

6   have a customer go twelve months non-sufficient

7   funds.  The sale would be canceled because

8   effectively there's no money on the purchase.

9       Q.   My example is a little different,

10  though, because you're getting your money; you're

11  just getting it late.  It's presented

12  insufficient funds, and then it goes back and

13  you're getting your money.  So in that situation,

14  what would occur for the salesperson?

15      A.   In the case he had the preauthorized

16  debit, the preauthorized debit was going

17  non-sufficient funds, and then later the check

18  cleared.

19      Q.   And there's no three consecutive

20  timely payments?

21      A.   If a case like that were brought to my

22  attention for Patriot Resorts, the commission

23  would be paid; but I can't say that it's ever

24  happened at all at Patriot Resorts.

84

1       Q.   But what is the policy?  I'm not

2   asking what you would do.

3       A.   According to the policy, they are not

4   eligible for a commission; they would be charged

5   back their commission.

6       Q.   I was trying to get from you all the

7   different ways that the commission payments or

8   commission structures might have changed over the

9   life of Patriot Resorts.  Have you told me

10  everything about that, or have there been other

11  changes?

12      A.   None that I can recall.

13           (Exhibit 5, Commission Structure

14           Forms, marked for identification)

15      Q.   (By Ms. Garrow)  Showing you what's

16  marked as Plaintiff's 5 -- and it's actually two

17  pages put together, although they are two

18  separate documents, is that correct?

19      A.   Yes, these are two different

20  documents.

21      Q.   What is the first document, the one

22  marked 2028?

23      A.   It appears to be a form that's filled

24  out for experienced salespeople, giving them

Wise v Patriot - R. Foster Campagna  5/23/05

85

1  their commission structure.
2      Q.  Do you know when this was in effect,
3  this commission structure?
4      A.  No, I do not.
5      Q.  Do you know if it's currently in
6  effect?
7      A.  I don't know, not for a fact.
8      Q.  What about 2029, what's that?
9      A.  That is a form for a nonexperienced
10 sales representative with the appropriate
11 commission structure.
12     Q.  Is that what you understand the
13 commission structure to be currently at Patriot
14 Resorts?
15     A.  I really don't know.  I did not review
16 that.
17     Q.  So you don't know if this is in effect
18 or not currently?
19     A.  No, I do not.
20     Q.  Or if at any point it was in effect at
21 Patriot Resorts?
22     A.  I'm not familiar with that paper.
23     Q.  Are there any other times when
24 charge-backs might occur other than what you've

86

1  explained to me so far?
2      A.  Any time a customer stops paying their
3  payment at Patriot Resorts prior to the three
4  payments being made for whatever reason, if they
5  just stop making payments and say they don't want
6  it anymore, they're cancelling their contract, it
7  isn't what they thought it was, they don't want
8  it, and Patriot Resorts agrees to cancel that
9  purchase, then the salesperson would be charged
10 back.
11     Q.  Does that occur sometimes?
12     A.  It does occur sometimes, yes.
13     Q.  Anything else; any other times when
14 there might be a charge back?
15     A.  Not that I can think of.
16              (Exhibit 6, 5/24/03 Memo to
17              Polansky from Lippert,
18              marked for identification)
19     Q.  (By Ms. Garrow)  I'm going to mark
20 this, but I'm going to give this to you because
21 it's more legible, to just make sure that the
22 document that's Exhibit 2 from Faith Lippert's
23 deposition is the same one that I'm showing you
24 there.

87

1      A.  Okay.
2      Q.  Are you satisfied that those are the
3  same document?
4      A.  Yes.
5      Q.  Although one is legible and one is
6  not?
7              MS. FABBO:  Excuse me, the top
8              has some additional stuff on the one
9              from Faith.
10             MS. GARROW:  Yes, that looks like
11             that came from the e-mail.
12             MS. FABBO:  Looks like it was
13             just cut off on this one.  But other
14             than those, I don't see anything.
15     Q.  (By Ms. Garrow)  Great.  So this is an
16 e-mail, is that correct?
17     A.  Yes.
18     Q.  It appears to be from Faith Lippert to
19 Bruce Polansky, is that correct?
20     A.  Yes.
21     Q.  It looks like you were cc'd on it?
22     A.  Yes.
23     Q.  Do you recall receiving this e-mail?
24     A.  I don't remember receiving it, but I

88

1  probably did.
2      Q.  It looks like there was -- it says
3  here, "I understand that you would like me to ask
4  Becky about paying commissions to Joel Hecht."
5  Do you see that on the first line?
6      A.  Okay, yes, I see it.
7      Q.  And do you recall some issue about
8  Mr. Hecht's commissions as you sit here today?
9      A.  No, I'm sorry, I don't.
10     Q.  It looks like there was something
11 related to a timing on a PAC check.  Does that
12 refresh your memory?
13     A.  That seems to be what it's saying.
14     Q.  You don't have a recollection of that
15 as you sit here today?
16     A.  No, I'm sorry, I don't.
17     Q.  It says here under the highlighted
18 portion, "December 1st of last year was when the
19 line was told no PAC/no pay."  So that would have
20 been December 1, 2002.  Does that comport with
21 your memory?
22     A.  Of when the PAC...
23     Q.  The PAC checks were required?
24     A.  It could have been.  I don't really

Wise v Patriot - R. Foster Campagna  5/23/05

89

1  recall, but...

2      Q.   Because you had said originally that
3  you thought that the PAC check was not required
4  in the first few months, is that correct?

5      A.   It was not required for them to be
6  subject to a "no pay" on it.  It was always a
7  preference for the company to get preauthorized
8  checking.  Statistics show that sales that have
9  preauthorized checking are more likely to pay out
10  over the term of the loan; so therefore, we
11  encourage preauthorized checking.  Some
12  salespeople find it very easy to handle that in
13  their presentation; others have a struggle with
14  it.  So we gave them a time to get used to it
15  before we put the policy into effect where they
16  would not be paid commissions unless they got it.

17     Q.   Again, can you tell me, then, what the
18  change in policy was at that time?

19     A.   Prior to that, the salesperson was
20  receiving commissions on a deal that had no PAC.

21     Q.   And --

22     A.   The difference was in payment of
23  commissions.  It was not a difference in the
24  deal; it was a difference in payments of the

90

1  commission on the deal.

2      Q.   At what point did they get paid the
3  commission on the deal prior to the no PAC/no pay
4  rule?

5      A.   They would have been paid in
6  accordance with any other full down payment sale.

7      Q.   At any time; in other words, was there
8  the three timely consecutive payment requirement
9  at that?

10     A.   The three timely consecutive payment
11  requirement is on every sale that a salesman
12  brings.

13     Q.   Starting from the day that Patriot
14  Resorts opened?

15     A.   Correct.  In accordance with their
16  contract.  In accordance with the contract that
17  they signed, the Employment Agreement that we
18  discussed earlier, it has a provision that no
19  commissions are earned until the sale has made
20  three timely monthly payments.

21     Q.   Although we don't know when that
22  particular contract -- the terms of that
23  particular contract came into effect, is that
24  correct?

91

1      A.   This one had a modification, and I
2  don't know that the commission part was what was
3  modified or not, so I can't answer that.

4      Q.   Okay.  And apparently this says here
5  that there was a stamp made up stating "No PAC/no
6  pay three monthly payments".  Were you aware of
7  that?

8      A.   I became aware of that, I believe, in
9  a deposition that I attended.

10     Q.   Where was that deposition -- in this
11  matter, you mean?

12     A.   Yes.

13     Q.   And that was the first time you heard
14  of that?

15     A.   It was the first time I heard of the
16  stamp being used.

17     Q.   Did you know that the stamp was being
18  used at Massanutten?

19     A.   I believe I had heard about a stamp at
20  Massanutten.

21     Q.   And do you believe there is a stamp at
22  Massanutten?

23     A.   Yes, there is one at Massanutten.

24     Q.   Did you direct anyone to make that

92

1  stamp?

2      A.   No, I did not specifically.

3      Q.   Do you know who did -- the one at
4  Patriot Resorts?

5      A.   I really don't know.

6      Q.   Here it says Rod suggested that she
7  have a stamp made -- "she" being Faith.  Does
8  that jog your memory at all?

9      A.   I still would not have known.  Other
10  than what's written on here, if that's what she
11  said, then it must be what happened.

12     Q.   What do you think of that stamp as a
13  policy?

14     A.   I don't really have a feeling about it
15  one way or the other.  I think it's an
16  administrative thing that's done so the
17  salespeople understand to take that particular
18  worksheet and set it aside and keep monitoring to
19  see whether you're going to get paid on it, or
20  call the customer and get the check or do
21  something to get it taken care of.  I think they
22  did it as a reminder.  From a sales standpoint,
23  it could be construed as being negative.

24     Q.   Do you think it was negative?

Wise v Patriot - R. Foster Campagna  5/23/05

93

1      A.    Stamping things are a little -- it
2  seems harsh to me, but I also understand from an
3  administrative standpoint, it's probably a good
4  thing, so...
5      Q.    It said "no PAC/no pay" -- in other
6  words, you did all of this work, you're not
7  getting paid.  Is that something you would
8  construe as being negative?
9           MS. FABBO:  Objection.
10          MS. GARROW:  You can answer that.
11          THE WITNESS:  It's just my
12          personal opinion.
13     Q.    (By Ms. Garrow)  Did you ask any of
14  the salespeople or sales managers at Vacation
15  Village in the Berkshires what their opinion was
16  of it?
17     A.    No.
18     Q.    Never did?
19     A.    I wasn't even aware of it until, as I
20  told you, the deposition where I heard about it.
21     Q.    Did you ask them to stop using the
22  stamp since then?
23     A.    No, I have not asked anyone.  I would
24  not get involved in sales.

94

1      Q.    Did you ask Bruce Polansky to stop
2  them?
3      A.    No, I did not.
4      Q.    The next paragraph here, it says,
5  "When Becky was here in April" -- I guess April
6  2003 -- "and put a stop to me requesting
7  commission be paid because we had received the
8  PAC, I noticed that one of the very next
9  commissions to be held was going to be for Joel."
10  Do you know what Faith meant by that?
11     A.    I'm really not sure.
12     Q.    When you read this, how did you
13  construe it?
14     A.    I'm really not sure what she means by
15  that.
16     Q.    At some point, did you direct Faith or
17  somebody else at Patriot Resorts to stop paying
18  people their commissions?
19     A.    Yes, that was the policy of the
20  company.
21     Q.    When did you do that -- the first
22  time, was that in April?
23     A.    I don't really recall what it is that
24  she's talking about, so I really can't speak to

95

1  the issue, because I really am not familiar with
2  it.
3      Q.    You testified you do remember at some
4  point directing people at Patriot Resorts not to
5  pay commissions anymore?
6      A.    Correct, but I don't know if this was
7  the time frame or that was the circumstance.  I
8  don't personally recall that.  I don't recall it
9  happening in April when I was there.  That I
10  don't know.
11          (Exhibit 7, Corbin Commission
12          Report, marked for
13          identification)
14     Q.    (By Ms. Garrow)  I'm showing you
15  what's marked as Exhibit 7.  It's actually
16  several pages.  The first one is a separate page
17  from the other two.  Can you tell me what these
18  documents are?
19     A.    The top one is a commission report.
20  Appears to be for a period ending December 1,
21  '03.  Peter Corbin, and he earned a $50
22  commission.
23     Q.    That was during that week for the
24  period ending 12/1/03, is that correct?

96

1      A.    Correct.
2      Q.    I believe you did testify before that
3  they get their checks weekly.  Is that what this
4  is?
5      A.    That's correct.
6      Q.    How would you get a $50 commission at
7  Patriot Resorts; what would you have to sell?
8      A.    If someone sold -- if this customer
9  named Bayer was Peter Corbin's customer and he
10  took them through the presentation and they
11  didn't purchase anything, and the exit line --
12  who is the last people that talk to the customer
13  -- did get a sale, I believe that Peter would be
14  eligible for a $50 commission.  Or I don't know
15  if Peter was ever a manager, because 1.25 percent
16  could be an override commission; but I don't have
17  enough information here to tell me.
18     Q.    What's an override commission?
19     A.    If he is a manager and he supervises
20  other salespeople, he would be eligible for a
21  percentage of a commission on their sales.
22     Q.    Then this looks like a stamp on here,
23  says "Gross pay, $50".  What is this, this stamp?
24     A.    Well, that came from the Commission

Wise v Patriot - R. Foster Campagna  5/23/05

97

1  Department.  After this report is run and the
2  taxes are calculated, then the stamp is applied
3  to the report and it shows the breakdown of taxes
4  that were deducted from the $50 and what the
5  check number is that paid those commissions.
6      Q.    Would that be the only check that
7  would have been issued to Mr. Corbin that week?
8      A.    I don't know that because I don't know
9  if there's other -- I don't know if he would have
10 gotten any other type of commission.  If this
11 were on an exit sale, then he may have only
12 received this report for the exit sale.  He may
13 have another one for his own commissions on his
14 own sales or on other overrides that he received,
15 so I don't know that this is complete.
16     Q.    Now, this stamp here reflects a check
17 number?
18     A.    Correct.
19     Q.    Are there occasions when salespeople
20 at Patriot Resorts or sales managers at Patriot
21 Resorts get multiple checks per week; do you know
22 that to have ever happened?
23     A.    I don't know that it does not happen.
24 I don't know exactly.

98

1      Q.    Can you tell me on this next --
2  actually, let's start with this sheet, the first
3  page here.  What is that number under "Purchase,"
4  "308A-20" -- what does that reflect?
5      A.    That is the unit and the week that the
6  purchaser purchased.
7      Q.    308A is the unit?
8      A.    Unit number, and 20 is the week
9  number.
10     Q.    Does that correspond -- what's the
11 first week of the year?
12     A.    At Patriot Resorts, it starts --
13 depending on what building they buy in, it's
14 either triggered by the first Saturday denotes
15 the first week of the year, or first Friday.
16 Depends whether it's a Friday to Friday or
17 Saturday to Saturday or Sunday to Sunday.
18 Whichever one the occupancy weekday is will
19 determine the beginning week number for the year,
20 depending on whether the first Friday actually
21 falls in the first or second week of the year.
22     Q.    How would I know which unit is
23 associated with which week; in other words, you
24 said by building?

99

1      A.    Buildings determine occupancy, and
2  that would be disclosed in the public offering
3  statement.
4      Q.    "Name" is self-explanatory here.  What
5  is the next column?
6      A.    That's a "Contract Number".
7      Q.    An actual number on the purchase and
8  sale, or...
9      A.    Yes.
10     Q.    "Net Price" and Net D Price".  What
11 difference, if any, between those two?
12     A.    If a purchaser purchases and they
13 already own time-sharing, they receive a
14 discount, in which case that discount is taken
15 off the net price to give you a net D price.
16     Q.    "PT", next column?
17     A.    I'm not sure I know what that is.
18     Q.    Date of contract, is that the date it
19 was?
20     A.    The contract was written.
21     Q.    Was actually written?
22     A.    Correct.
23     Q.    Current status, what is that?
24     A.    That means that on November 26, '03,

100

1  the total commission -- the commission has been
2  received, and that was the date that it was
3  closed in order to be in line for payment to the
4  salesperson.
5      Q.    So that's the closing date?
6      A.    The "C" in front of the 11/26/03
7  denotes closed.
8      Q.    I see.  Can there be other letters
9  there?
10     A.    Yes.
11     Q.    Such as?
12     A.    "P" for "pending".  "H" for "hold".
13     Q.    What does "hold" mean?
14     A.    Pending.
15     Q.    Hold means pending?
16     A.    Hold means pending, "P" means pending.
17 It depends on circumstances, depends on what
18 makes it pending.  "S" would be sale that has not
19 closed, and "X" means canceled.
20     Q.    How often do these reports get
21 generated?
22     A.    Once a week.
23     Q.    Who gets them?
24     A.    These are -- actually, they're pulled

Wise v Patriot - R. Foster Campagna  5/23/05

101

1  electronically in the corporate office of Berkley
2  in Fort Lauderdale.
3      Q.   Would the salesperson get this weekly?
4      A.   It would come with his paycheck, yes.
5      Q.   Just so we finish up these columns
6  here, "Commission Pending," what does that mean?
7      A.   Where is that?
8      Q.   The next one after "Earned Date" --
9  I'm sorry, after "Commission Earned"?
10     A.   I don't believe that we use commission
11 pending -- commission chargeback and commission
12 chargeback date we would use, but I don't believe
13 we use those columns unless they're using it for
14 something I'm not aware of.
15     Q.   "Commission Charge-back" is what?
16     A.   If later on the sale were to cancel
17 before it made the three payments, then that
18 commission would be subject to chargeback.
19     Q.   And chargeback date, I assume is
20 self-explanatory?
21     A.   Correct, the date it was actually...
22     Q.   Taken back?
23     A.   Correct.
24     Q.   Just so I have a full understanding of

102

1  the next page, Salesmen Ledger Report -- I assume
2  those two are the same from both reports, is that
3  correct -- "Date Contract" and "Current Status"?
4      A.   Yes.
5      Q.   And "Name" is the same as "Purchaser,"
6  is that correct?
7      A.   Correct.
8      Q.   "Contract Number" would be the same?
9      A.   Yes.
10     Q.   What is "Status"?
11     A.   There are different letters that they
12 put in to denote different types of sales.  The
13 "U" means "upgrade".
14     Q.   And "P"?
15     A.   "P" would mean that there is no PAC
16 check on that.
17     Q.   And "PU"?
18     A.   It means there's no PAC check and it's
19 an upgrade.
20     Q.   So just the combination.
21     A.   I'm not sure, but I think it means
22 "incomplete".
23     Q.   But you're not sure?
24     A.   I'm not sure.

103

1      Q.   "Unit a Week" is self-explanatory.
2  "Occupancy Year," is that the first year of
3  occupancy?
4      A.   Yes, that's the first year that the
5  customer will use the time-share.
6      Q.   The "Net Deal Price," is that correct?
7      A.   Correct.
8      Q.   "Down Payment," that was given on the
9  day of, or would it be over time, or could it be
10 both?
11     A.   These are -- the total down payment
12 that was received at the time of the sale.
13     Q.   Then the "Amount Due" and the "Due
14 Date," I assume are self-explanatory?
15     A.   Yes.
16     Q.   "Customer Number"?
17     A.   "Customer Number" is the number that's
18 assigned to the customer when they check in at
19 the reception desk.
20     Q.   "Sales Manager," that would be --
21 would that be the closer -- I'm sorry, would that
22 be the TO person?
23     A.   Yes.
24     Q.   And then the "Closer," what is that?

104

1      A.   That would be the person that goes
2  over the documentation with the customer, goes
3  over all the legal documents.
4      Q.   What is "Program"?
5      A.   The type of program, the marketing
6  program that brought them to the property.
7      Q.   And "Sub-Program"?
8      A.   It's just a further distinction under
9  the main program; it just helps with determining
10 where the customer came from.
11     Q.   What is a sales ratio?
12     A.   A sales ratio?
13     Q.   Yes.
14     A.   I'm not familiar well that as a term.
15     Q.   Is there an hourly wage paid to any
16 salespeople or sales managers at any resort with
17 an affiliation to the Berkley Group?
18     A.   Can you say that one more time?
19     Q.   Do any resorts or development
20 companies with any sort of affiliation with
21 Berkley pay an hourly wage to their salespeople
22 or sales managers?
23     A.   No, unless they are unlicensed in the
24 State of Florida and they are in training, and

Wise v Patriot - R. Foster Campagna  5/23/05

---

105

1  they are paid a salary during that training time.

2      Q.    Is that only as to the Florida

3  locations; is that your testimony?

4      A.    That would be in Florida.

5      Q.    Do you know the requirements of

6  employers relating to the payment of overtime

7  compensation under the federal -- Fair Labor

8  Standards Act?

9      A.    I don't believe that I could quote it,

10  but I understand that employees who work over

11  forty hours in a week are eligible for overtime.

12      Q.    Do you understand anything else in

13  relation to payment of overtime under the Fair

14  Labor Standards Act?

15          MS. FABBO:  Objection.  You can

16          answer.

17          THE WITNESS:  Anything that I

18          would know with regard to that would

19          be dictated by our attorneys who tell

20          me what we have to pay and who we have

21          to pay it to.

22      Q.    (By Ms. Garrow)  So you have no

23  personal knowledge other than what you've

24  testified to?

---

106

1      A.    Only what I know from the attorneys,

2  what they instruct us to do as far as pay is

3  concerned.

4      Q.    What about the requirements of

5  employers to pay overtime compensation under the

6  Massachusetts Wage and Hour Laws; do you have any

7  knowledge in that regard?

8      A.    Only the knowledge I've obtained from

9  legal counsel.

10      Q.    And you just follow the advice of

11  counsel in that regard?

12      A.    That's correct.

13      Q.    What about the minimum wage

14  requirements under the Fair Labor Standards Act;

15  do you have any knowledge regarding the

16  requirements to pay minimum wage under the

17  Federal Fair Labor Standards Act?

18      A.    That would all be per our attorney's

19  instruction.

20      Q.    So just follow the advice of counsel?

21      A.    That's correct.

22      Q.    What about the requirements under

23  Massachusetts law to pay minimum wage under

24  Massachusetts law; any personal knowledge with

---

107

1  regard to payments of minimum wage in that

2  regard?

3      A.    Only as instructed by the attorneys.

4      Q.    What about timely payments of wages

5  under Massachusetts law; any personal knowledge

6  of the laws in that regard?

7      A.    Only as instructed by counsel.

8          (Exhibit 8, Massaconi Paycheck

9          Stub, marked for identification)

10      Q.    (By Ms. Garrow)  Showing you what's

11  marked as Plaintiff's 8.  Do you recognize those

12  documents?

13      A.    It appears to be a paycheck stub from

14  Patriot Resorts for Michael Massaconi.

15      Q.    Actually two, is that correct?

16      A.    Yes, two separate ones.

17      Q.    Have you seen paycheck stubs from

18  Patriot Resorts previously?

19      A.    Yes.

20      Q.    Does this look like the ones you've

21  seen in the past?

22      A.    Yes.

23      Q.    Can you just explain to me on that

24  first one -- because they are substantially the

---

108

1  same, is that correct, in terms of their

2  deductions and notations?

3      A.    I see deductions made, yes.

4      Q.    If we look at the one on top, the net

5  pay is how much?

6      A.    The net pay is $39.17.

7      Q.    And what's the pay period indicated on

8  that check?

9      A.    The period ending is 10/14/02.

10      Q.    Again, your understanding is that that

11  would have been a weekly paycheck?

12      A.    It very well could be, or it could be

13  in conjunction with another check; I don't know.

14      Q.    According to this document, how many

15  hours did Mr. Massaconi work?

16      A.    Forty.

17      Q.    He received a commission that week,

18  according to this?

19      A.    That's correct.

20      Q.    How much was that?

21      A.    $45.

22      Q.    And other than that, it does not

23  appear that there's any additional payment on

24  this check, is that correct?

Wise v Patriot - R. Foster Campagna  5/23/05

109

1        A.    No, not on this check, no.
2        Q.    If you can look at the other check, is
3   that for the same week or a different week?
4        A.    That is for period ending December 2,
5   '02.
6        Q.    So that would have been a different
7   week than the one on top?
8        A.    Correct.
9        Q.    Was there a commission paid that week?
10       A.    Yes.
11       Q.    How much was that?
12       A.    $50.
13       Q.    And the hours that are indicated that
14  he worked on that check?
15       A.    Well, let me clarify.  The hours does
16  not mean hours worked.  It's a figure that's
17  plugged into the machine in order to print a
18  check.  It can't be left blank.
19       Q.    So how do they keep hours worked at
20  Patriot Resorts; how do they keep track of those?
21       A.    They only record when they go out on a
22  tour and when they come back from tour.  Those
23  are the times that they're working.
24       Q.    Those are the times that are recorded,

110

1   correct?
2        A.    Correct.
3        Q.    What about signing in; do they have to
4   sign in in the morning?
5        A.    They sign in when they report to work
6   before their meeting, yes.
7        Q.    Is that sales managers and salesmen as
8   well -- salespeople?
9        A.    That's everyone, yes.
10       Q.    Do they sign out?
11       A.    They do not sign out.  They complete
12  their final tour, and that's the end of their
13  day.
14       Q.    Then is it your testimony they're
15  allowed to leave if it's their final tour, at the
16  end of their final tour?
17       A.    If there are no other tours expected
18  for that day, yes.
19       Q.    How would they know that?
20       A.    They know how many people are expected
21  generally on a day, whether it's going to be
22  thirty people or twenty people or ten.
23       Q.    There are occasions when a salesperson
24  takes a tour or a sales manager takes a tour and

111

1   comes back and then is required to wait for
2   another tour?
3        A.    If he is in line such that he would
4   be -- have the ability to take another tour, yes.
5   If there are three more people coming in and he's
6   the next person to get a tour, he would be
7   required to stay.
8        Q.    Do you know -- is that the policy that
9   you're testifying to?
10       A.    Yes.
11       Q.    Do you know when, in fact, salespeople
12  or sales managers are allowed to leave on a
13  normal -- a regular basis at Patriot Resorts?
14       A.    Are you asking a sales representative
15  or a sales manager?
16       Q.    Let's start with a sales
17  representative.  Do you have personal knowledge
18  of when a sales representative is allowed to
19  leave at the completion of a day?
20       A.    When there are no more customers that
21  are expected that he would be in line to take on
22  a tour.
23       Q.    Again, is that the policy or is that
24  personal knowledge you know that happens for a

112

1   fact?
2        A.    I know that that's the policy.
3        Q.    You've never been there and observed
4   that, or have you?
5        A.    I have certainly been there, but I
6   wasn't -- and I saw people leaving.  To know
7   whether they stayed for ten minutes after or they
8   left immediately after, I couldn't tell you that.
9   I never asked that question.
10       Q.    Or if somebody had been around for
11  several hours waiting for another tour that never
12  materialized, would you know if that happened?
13       A.    I don't recall seeing that.
14       Q.    Would you know if that happened?
15       A.    If I was there, I would know of it,
16  but I don't recall seeing that happen.
17       Q.    But you've only been there five or ten
18  times?
19       A.    Correct.
20              MS. GARROW:  Off the record.
21              (A lunch break was taken)
22              (Exhibit 9, 5/6/03 Memo to Sales
23              Personnel from Foster Re: ESOP,
24              marked for identification)

113

1    Q.    (By Ms. Garrow)  I'm showing you
2  what's been marked as Exhibit Number 9.  Do you
3  recognize this document?
4    A.    Yes.
5    Q.    Can you describe this document?
6    A.    Something like that a memo that
7  addresses the attendance roster.  And we had had
8  some problems with people failing to sign in or
9  signing in for each other at various properties;
10  and since it was something that seemed to not be
11  clear, I put the memo out to all the properties
12  to let them know that they were to sign the
13  attendance roster; they were to sign only for
14  themselves and not for anyone else.
15    Q.    And the attendance roster, that's the
16  daily rotation sheet; is that what that is?
17    A.    Some resorts print out the rotation,
18  and they sign next to their name.  Others just
19  have a sheet that is like a blank sheet with
20  columns.  I'm not sure what Patriot Resorts uses.
21    Q.    What is your understanding of how it
22  relates to your ESOP program -- and when we say
23  "ESOP," do you know what that stands for?
24    A.    It stands for Employee Stock Ownership

114

1  Plan.
2    Q.    How does this relate to your ESOP
3  program, the signing of attendance sheets?
4    A.    The guidelines in the ESOP require
5  that in order for an employee to be eligible for
6  participation in the plan in any calendar year,
7  they must work a thousand hours in order to
8  qualify.  In the case of a salesperson, they are
9  given credit for 45 hours for any portion of a
10  week that is worked as it attributes to their
11  ESOP.  So we must have them sign the roster so we
12  know when they were there, and that's why I was
13  stressing the importance of it to the ESOP,
14  because, of course, that is their retirement
15  plan.
16    Q.    When do they invest in that ESOP, if
17  at all?
18    A.    They start investing 20 percent in
19  year three, 40 percent in year four, 60 percent
20  in year five, 80 percent in year six, and 100
21  percent in year seven.
22    Q.    That's true for sales -- people on the
23  sales line as well as sales manager?
24    A.    That's correct.

115

1    Q.    What about for any corporate
2  employees; is that the same, corporate employees
3  of the Berkley Group, since that is from where
4  this memo comes?
5    A.    Corporate employees, yes, everyone who
6  is an employee of the Berkley Group or any of its
7  wholly owned subsidiaries as part of the ESOP
8  plan.
9    Q.    And is there one ESOP plan?
10    A.    Yes.
11    Q.    Who administers the plan, to your
12  knowledge?
13    A.    It's administered by a company out of
14  Virginia.  I believe it's called Blueridge.  I
15  believe Blueridge is in the name; I'm not sure
16  exactly.
17    Q.    But it's a third-party administrator?
18    A.    Yes, it's a third-party administrator.
19    Q.    Do you have anybody outside that does
20  administration of the plan?
21    A.    The commission manager and the payroll
22  manager both submit reports from our payroll
23  service to the outside administrator, and they do
24  everything else.

116

1    Q.    You testified before that for any
2  portion of a week a sales salesperson works
3  there, they get credited for 45 hours?
4    A.    That's correct, as far as ESOP is
5  concerned.
6    Q.    Isn't it true if they had only signed
7  in one day of the week, then they'll still meet
8  the ESOP requirements as you stated them?
9    A.    Yes, that's true.
10    Q.    Is it your understanding that people
11  were signing other people's names to rosters?
12    A.    Yes.
13    Q.    Did that occur at Patriot Resorts, to
14  your knowledge?
15    A.    I believe I was told that they did.
16  I'm trying to think of the specific person.  I
17  don't have a recollection that clearly to say the
18  name.
19    Q.    That's okay.  Other than commissions,
20  are there any additional sums paid to any
21  salespeople or sales managers?
22    A.    There is usually a bonus -- monthly
23  bonus plan.
24    Q.    How do you qualify for a monthly bonus

Wise v Patriot - R. Foster Campagna  5/23/05

117

1    plan?

2         A.    It changes from time to time, and I am

3    not sure what is in effect at Patriot Resorts.

4         Q.    Do you have any information as to

5    what's been in effect at Patriot Resorts at any

6    time as you sit here today?

7         A.    I would be reluctant to say exactly

8    what plan they have utilized.

9         Q.    Do you have any role in overseeing the

10   payment of commissions?

11        A.    Yes.

12        Q.    What is your role?

13        A.    My signature is on every commission

14   check for Patriot Resorts, and I oversee the

15   manager of the Commissions Department, whose

16   department prepares those commissions.

17        Q.    Is the manager of the Commission

18   Department -- I'm sure you've told me their name,

19   but if you could tell me again, that would be

20   great.

21        A.    The manager in the corporate office,

22   her name is Lauren, L-A-U-R-E-N, Powell,

23   P-O-W-E-L-L.

24        Q.    And she's a Berkley Group employee?

118

1         A.    Yes.

2         Q.    Is she a direct report of yours?

3         A.    Yes, she is.

4         Q.    Who are your other direct reports?

5         A.    Vicky Dockery.

6         Q.    What is her position?

7         A.    She's the director of Human Resources.

8    Bill Burkert, B-U-R-K-E-R-T; he's in charge of

9    the Escrow Department.  Sue Patton, P-A-T-T-O-N;

10   she's in charge of the Mortgage Receivables

11   Department.  Jackie Williams is in charge of

12   Verification Department.  Carla Simon is in

13   charge of the Refinance Department.  Roger Gopall

14   is in charge of the IT Department.  I believe

15   that's everyone.

16        Q.    Does Bruce Polansky report to you?

17        A.    Ultimately, yes.

18        Q.    Are you not his direct supervisor?

19        A.    I prefer to say that we work together.

20        Q.    But when you say "ultimately," because

21   he's a vice president and you're the president,

22   ultimately you have the final say; is that fair

23   to say?

24        A.    Correct.

119

1         Q.    Vicky Dockery -- does Faith Lippert

2    report to her, or does she report to you?

3         A.    Faith reports to me.

4         Q.    Is that your general practice when you

5    have on-site Human Resources people, to have them

6    report directly to you?

7         A.    Faith Lippert is the office manager/

8    corporate representative for Patriot Resorts.

9    Therefore, she is a direct report to me.  If she

10   has a question with regard to a human resource

11   issue that she's not familiar with, she may

12   contact Vicky Dockery to find out who she should

13   consult.

14        Q.    Would you expect Miss Lippert, if she

15   had an issue or a problem that she could not

16   resolve herself at Patriot Resorts, to consult

17   about that with you?

18        A.    Generally she would, yes.  I left out

19   two direct reports.

20        Q.    Okay.

21        A.    Karen Johnson.

22        Q.    What is Miss Johnson's position?

23        A.    She's in charge of the Accounts

24   Payable Department.  And Joanie Harold,

120

1    H-A-R-O-L-D, payroll supervisor.

2         Q.    What is Bill Rauer's position?

3         A.    Bill Rauer is the project director at

4    Vacation Village at Weston and Vacation Village

5    in the Berkshires.

6         Q.    What about Rod Lewis; what is his

7    position?

8         A.    He's probably the -- they probably

9    refer to him as the general manager or the

10   on-site project manager.

11        Q.    At some point, was Rod Lewis's title

12   officially project director of Vacation Village

13   in the Berkshires?

14        A.    He may be referred to as project

15   director because he's there physically on-site.

16        Q.    Has his position changed at all during

17   his tenure at Vacation Village in the Berkshires?

18        A.    No.

19        Q.    Has he ever been reprimanded for any

20   management decisions that he's made at Vacation

21   Village, to your knowledge?

22        A.    Rod Lewis?

23        Q.    Yes.

24        A.    I'm not aware.  He may have, but I

Wise v Patriot - R. Foster Campagna   5/23/05

121

1   would not have reprimanded him.
2        Q.   Is Mr. Rauer his boss?
3        A.   Yes.
4        Q.   Who is Mr. Rauer's boss?
5        A.   Bruce Polansky.
6        Q.   Who was responsible for any job
7   description relating to sales managers; who would
8   have authored that for Patriot Resorts?
9        A.   It would either be Bill Rauer or Bruce
10  Polansky.  I'm not sure which would have done
11  that.
12       Q.   Did you have any input in job
13  descriptions for sales managers?
14       A.   No.
15       Q.   Did you have any input into job
16  descriptions for sales -- people on the sales
17  line, salespeople?
18       A.   No.
19       Q.   Did you have any input into the
20  organization of the tours at Patriot Resorts
21  Village?
22       A.   I'm not sure what you mean by that.
23       Q.   Let me ask it this way.  Did you have
24  any input into designing the tours from Patriot

122

1   Resorts Village?
2        A.   I don't design them myself, but I know
3   what they are and what the philosophy is of
4   putting those customers in and how we get them.
5   So, I mean, I don't physically do that job, but I
6   know what will be done and how they'll be
7   marketed into the resort.
8        Q.   How does that occur?
9        A.   They are -- the customers, very much
10  the same way as Williamsburg.  They may drop a
11  name in a box or they may be contacted through a
12  phone room from a list of people who live in the
13  area, the target area.
14       Q.   That's through the marketing
15  companies, correct?
16       A.   Correct.  And Patriot Resorts
17  contracts with those marketing companies to do
18  that for them.
19       Q.   Then do you have any knowledge of the
20  physical -- sort of the physical tour that
21  happens once they get there?
22       A.   I have some knowledge of it, yes.
23       Q.   Have you ever observed a tour going
24  on?

123

1        A.   I've not been in the car, no, but I
2   know what they generally do.
3        Q.   What do they generally do?
4        A.   They pick the customer up at the
5   reception center, they take them --
6        Q.   I am going to interrupt you.  "They"
7   being the salesperson?
8        A.   The sales representative.  Drives them
9   in his car to an area called Mount Greylock.
10  They spend some time there talking about
11  vacationing and get them involved in
12  understanding what the concept of time-sharing
13  is.  They drive them around the area.  I don't
14  know the exact route, but show them things of
15  interest in the area, and they bring them back to
16  the sales office, talk to them there briefly
17  about other benefits of the time-share plan.
18            Then they leave the property again and
19  go to the actual location of the resort, and
20  again they look at points of interest along the
21  way to the resort.  When they get to the resort,
22  they tour the model apartment and the clubhouse
23  area, and then they leave the property and come
24  back to the sales office.  And if there is a

124

1   sale, they transact the sale at the sales office.
2        Q.   And the sales office and reception
3   office are at the Lanesborough location, is that
4   correct?
5        A.   There are two different addresses.
6   They're on two different pieces of property.
7        Q.   But they are connected essentially, is
8   that fair to say?
9        A.   I believe you can get to one -- I
10  think you have to go by car to get from one to
11  the other, because I think there's water, there's
12  like a stream or some type of water in between
13  those two areas.
14       Q.   The Sales Center and the Reception
15  center?
16       A.   Correct.
17       Q.   Then there is the resorts that are in
18  Hancock, is that correct?
19       A.   Yes, they're located in Hancock.
20       Q.   But to your knowledge, the salespeople
21  meet folks for potential tours or tours at the
22  Reception Center in Lanesborough and also come
23  back to close the deal in Lanesborough, is that
24  correct?

Wise v Patriot - R. Foster Campagna   5/23/05

125

1    A.   Correct.
2              (Exhibit 10, Patriot Attendance
3              Detail Report, marked for
4              identification)
5    Q.   (By Ms. Garrow)  Are you familiar with
6  this document?
7    A.   It's an attendance -- it appears to be
8  an attendance record.
9    Q.   That's Plaintiff's Exhibit 10 you're
10 looking at now?
11   A.   Yes.
12   Q.   Have you seen an attendance record
13 before for any employees?
14   A.   Yes, I have seen them before.
15   Q.   Does this look generally like the ones
16 you've seen in the past?
17   A.   It looks like a report we used to use,
18 yes.
19   Q.   You don't use this report anymore?
20   A.   No, the report has been changed.  We
21 got a different program.
22   Q.   But do you still keep the same data?
23   A.   Yes.
24   Q.   What is this data?

126

1    A.   It's attendance.  It's any time that
2  someone is on vacation or if they're out sick or
3  if they're on any type of FMLA leave or any
4  reason they're not there.
5    Q.   Have you, in the past, input into the
6  attendance policy?
7    A.   Yes, I'm aware of what our policy is.
8    Q.   What is your policy?
9    A.   That salespeople are allowed to have
10 fifteen days of time off during the calendar
11 year.
12             (Exhibit 11, 11/3/02 Memo to
13             Sales Staff Re: Attendance
14             marked for identification)
15   Q.   (By Ms. Garrow)  If you look at
16 Exhibit 11, is that your policy -- let me ask you
17 this.  Was this the policy that you just spoke of
18 that was in effect on or around November 3, 2002?
19   A.   I'm sorry, what was the question?
20   Q.   Was that the policy that was in
21 effect, Plaintiff's Exhibit 11, on or around
22 November 3, 2002?
23   A.   Correct.
24   Q.   Has it changed at all?

127

1    A.   Not that I'm aware of, no.
2    Q.   Is that the policy as it exists today
3  as well?
4    A.   Yes.
5              (Exhibit 12, Patriot
6              Attendance Report,
7              marked for identification)
8              (Exhibit 13, Patriot
9              Attendance Report,
10             marked for identification)
11   Q.   (By Ms. Garrow)  Showing you what's
12 Exhibit Number 12, if you look at Exhibit Number
13 12 and Exhibit Number 10, would you expect that
14 -- are those employees in compliance with the
15 policy based on these documents or in violation
16 of the policy?
17   A.   It would appear that they may not be,
18 but because of the reference to sick, I don't
19 know if they were afforded FMLA leave for that.
20   Q.   Assuming that they hadn't been on FMLA
21 leave, would they be in violation of the policy?
22   A.   Yes.
23   Q.   Has anyone ever talked to you about
24 either of these individuals being in violation of

128

1  the policy?
2    A.   I do not recognize Jane Engel-Hart's
3  name at all.  I don't know who that is.  Will
4  Steele's name is familiar to me, and I've had
5  conversations about him, but not necessarily
6  attendance, or attendance may have been one of
7  them; but there have been conversations about
8  him, so I recognize the name.
9    Q.   I guess my question is a little more
10 directed.  Do you have a recollection whether
11 anybody brought his attendance to your attention?
12   A.   I don't recall attendance being an
13 issue.
14   Q.   We were talking before about jury duty
15 and jury duty in Massachusetts; and if you
16 notice, I've given you another attendance detail
17 report, is that correct?
18   A.   Correct.
19   Q.   If you go down about a third of the
20 way through the absence reason, it notes jury
21 duty?
22   A.   Yes.
23   Q.   It says that's unpaid.  Do you have
24 any recollection about the issue of jury duty