129

1   with relation to Mr. Lee?
2       A.   I don't know his name; I'm not
3   familiar with him.  I don't know if he was the
4   one that was questioned before; I don't know.
5       Q.   What does "unpaid" mean in this
6   context?
7       A.   I really don't know.
8       Q.   Did Miss Lippert ever call you about
9   Mr. Lee, to your knowledge?
10          MS. GARROW:  Off the record.
11          (Off record conference)
12          MS. GARROW:  Back on the record.
13          THE WITNESS:  I forgot it.
14      Q.   (By Ms. Garrow)  Did Miss Lippert ever
15  call you in relation to Mr. Lee?
16      A.   No.
17          MS. GARROW:  Off the record.
18          (A break was taken)
19          MS. GARROW:  Back on the record.
20          (Exhibit 14, Letter to ALDA from
21          ESA, marked for identification)
22      Q.   (By Ms. Garrow)  Showing you what's
23  marked as Exhibit 14, I believe we discussed this
24  earlier.  Do you recognize this document --

130

1   actually, let me stop you.  You had said earlier
2   that you relied on an opinion letter that you had
3   received in relation to Virginia, is that
4   correct?
5       A.   Yes, I believe that the Virginia --
6   our Virginia counsel are the ones that relied on
7   this letter.  I'm not sure that I -- I may have
8   seen this letter, but I don't remember it.  This
9   was a long time ago.
10      Q.   Let me ask you this:  You had
11  testified before that there was no hourly wage
12  for the salespeople at Vacation Village, is that
13  true?
14      A.   That's correct.
15      Q.   And they were only paid by commission?
16      A.   That's correct.
17      Q.   And same with the sales managers?
18      A.   That's correct.
19      Q.   And you had mentioned that you were
20  aware that there was an opinion letter in
21  relation to that issue for Virginia, is that
22  correct?
23      A.   I think it was more than just
24  Virginia.

131

1       Q.   Would you review this document, and
2   I'm going to tell you that your lawyer who sent
3   this over apologized for the blurriness of it, so
4   I think this is the best we have.  Take a look at
5   this and tell me if this is the letter that you
6   relied on.  Take your time to review it.
7       A.   From what I can read, I understand
8   what it's saying, and this is probably the
9   letter.
10      Q.   Were there any other letters, to your
11  knowledge?
12      A.   The date is 1985.  I thought there was
13  one that was even more recent, but perhaps this
14  is the only one.  I really don't know.
15      Q.   We've requested all those letters.
16  Did you provide everything to your lawyer that
17  you had?
18      A.   Yes, we requested everything.
19      Q.   And did you provide everything that
20  was requested of you by your lawyer?
21      A.   Yes, yes.
22      Q.   You have nothing else that you held
23  back?
24      A.   Not that I'm aware of.

132

1       Q.   So you said this was a 1985 letter?
2       A.   Correct, this is 1985.
3       Q.   Were the Virginia locations -- was
4   Massanutten up and running at that time?
5       A.   Yes.
6       Q.   Was Williamsburg?
7       A.   No.
8       Q.   Obviously Patriot Resorts wasn't up
9   and running at that time, correct?
10      A.   No.
11      Q.   So can you show me the portions of
12  this letter -- can you point to the portions of
13  the letter that you relied on for your
14  determination that it was acceptable to pay your
15  salespeople and sales manager at Patriot Resorts
16  on a commission-only basis?
17          MS. FABBO:  Objection.
18          MS. GARROW:  You can answer.
19          THE WITNESS:  I did not rely on
20          this letter.  This letter went to our
21          attorney, and our attorney sent us an
22          opinion letter after he received this
23          from the Land Development Association.
24      Q.   (By Ms. Garrow)  So did you rely on

133

1  the advice of your counsel?
2      A.  Yes, we did.
3      Q.  What was in that letter that your
4  lawyer told you that you relied on?
5          MS. FABBO:  Objection.  Don't
6          answer.
7          MS. GARROW:  Are you instructing
8          her not to answer?
9          MS. FABBO:  I said don't answer,
10         yes.
11     Q.  (By Ms. Garrow)  Did you have any
12 verbal communications with your lawyer that you
13 relied on for advice?
14         MS. FABBO:  Objection.  Don't
15         answer.
16         MS. GARROW:  First I just asked
17         her if she had any verbal
18         communications, and I believe you can
19         answer that question.
20         THE WITNESS:  With the attorney.
21     Q.  (By Ms. Garrow)  Just so we're clear,
22 you had an attorney that you got advice from and
23 made a determination based on reliance on that
24 advice, is that correct?

134

1      A.  Correct.
2      Q.  So that attorney, that's the lawyer
3  I'm talking about.  You want to tell me the name
4  of that attorney so we don't have to in --
5      A.  Peebles, P-E-E-B-L-E-S, Harrison.
6      Q.  That's the law firm or that's a
7  person?
8      A.  That's a person.
9      Q.  And his or her law firm -- it's a him,
10 right?
11     A.  It's a man.  His law firm is Gladden
12 -- let me see, I think he just changed partners,
13 so I'm not sure.  I believe it's Rose and
14 Harrison.
15     Q.  Gladden?
16     A.  I don't think it's Gladden anymore.  I
17 think it's just Rose and Harrison.
18     Q.  And where are they located?
19     A.  They are currently located in
20 Nagshead, North Carolina.
21     Q.  Did you have any verbal communications
22 with Peebles Harrison about your determination to
23 not pay salespeople or sales managers an hourly
24 rate and only pay them commission?

135

1      A.  I don't really recall what
2  conversations we had because it was a while ago.
3      Q.  Do you know if you did have any
4  conversations?
5      A.  I'm not sure whether we did or not.
6      Q.  So the only thing you can testify to
7  for certain is that he wrote you an opinion
8  letter, correct?
9      A.  That's correct.
10     Q.  And that you relied on that opinion
11 letter for the determination not to pay
12 commission -- or not to pay salespeople and sales
13 managers anything other than commission at
14 Patriot Resorts, is that true?
15     A.  That's correct.
16     Q.  Is there anything in this document
17 that I have before you today, Exhibit 14, that
18 would support that reliance?
19     A.  I couldn't answer that.
20     Q.  I want you to read it again, then, and
21 let me know where it says that.
22     A.  What do you mean?
23     Q.  Take another look at the document and
24 let me know where in this document it says that

136

1  it is acceptable to pay time-share salespeople
2  and sales managers on a commission-only basis.
3      A.  Well, when I read this, there's a lot
4  of sections and parts that are talked about that
5  I'm not familiar with.  I'm not an attorney.
6      Q.  Let me ask you again, then.  It says
7  here, "We agree with your statement" -- this is
8  on the page marked 3398 -- "that the primary
9  determination to be made is whether the
10 salesperson in question" -- "-persons in question
11 are customarily and regularly engaged away from
12 their employer's place of business and not the
13 character of their sales activities."
14         Is there anything in that statement
15 that you relied on as you sit here today for a
16 determination not to pay your salespeople and
17 sales managers at Patriot Resorts anything other
18 than commission?
19         MS. FABBO:  Objection.  You can
20         answer if you understand.
21         THE WITNESS:  I didn't rely on
22         this.  I relied on the opinion of an
23         attorney.
24     Q.  (By Ms. Garrow)  Again, that was just

137

1   the letter from Mr. Harrison, correct?
2          MS. FABBO:  Objection.  She
3          already answered that fully this
4          morning.
5          MS. GARROW:  You can answer.
6          THE WITNESS:  It definitely is
7          the opinion letter.  I don't recall
8          conversations at that time.  I can't
9          recall them at this point.
10      Q.  (By Ms. Garrow)  Do you still have
11  that opinion letter in your possession?
12      A.  Yes.
13      Q.  You had said it was a long time ago
14  that you had these discussions with Mr. Harrison,
15  so perhaps contemporaneous or somewhere
16  contemporaneous near the letter that's
17  Exhibit 14, is that correct?
18      A.  I have conversations with Mr. Harrison
19  all the time, so it's hard for me to say what
20  time and place we discussed this particular
21  instance.
22      Q.  Let's talk about Patriot Resorts,
23  then.  Have you had any communications
24  specifically about Patriot Resorts with

139

1      Q.  Would they have been prior to opening
2   Patriot Resorts in the Berkshires?
3      A.  Yes.
4      Q.  Do you remember how many discussions
5   you had with him?
6      A.  No, I don't.
7      Q.  What were the substance of those
8   discussions?
9          MS. FABBO:  Objection.  Don't
10         answer.
11      Q.  (By Ms. Garrow)  Counsel is
12  instructing you not to answer.  And did you rely
13  on the advice of counsel, then, to make your
14  determinations as to whether you were going to
15  pay commissions only or pay an hourly wage, a
16  minimum wage or an hourly wage to the salespeople
17  or sales managers at Patriot Resorts?
18      A.  I don't understand your question.
19      Q.  Was it on reliance of advice of
20  counsel that you made the determination to pay
21  commission only to the salespeople and sales
22  managers?
23      A.  Yes, it was.
24      Q.  At Patriot Resorts?

138

1   Mr. Harrison about your decision not to pay the
2   people at Patriot Resorts other than a commission
3   -- the "people" being salespeople and sales
4   managers -- other than on a commission basis?
5      A.  Yes.
6      Q.  When were those discussions?
7      A.  As I said, they were a while back.  I
8   don't remember specifically when they were.
9      Q.  But they were discussions?
10      A.  We had discussions based on the
11  opinion letter that he had written and we had
12  discussions about Patriot Resorts.
13      Q.  Was the opinion letter directed to
14  Virginia or was it directed towards Patriot
15  Resorts specifically?
16      A.  It was directed towards Virginia.
17      Q.  So then you've had -- if I understand
18  you, you've the general discussion after the
19  letter with Mr. Harrison specifically about
20  Patriot Resorts, correct?
21      A.  Correct.
22      Q.  And you're telling me you don't know
23  when those were, correct?
24      A.  No, I can't tell you a date.

140

1      A.  Yes.
2      Q.  You had testified earlier that you
3   didn't recall what exemptions you were relying on
4   to make that determination not to pay individuals
5   who were salespeople or sales managers at Patriot
6   Resorts other than only commission.  Do you
7   remember that you said you didn't remember what
8   exemption it was?
9      A.  Correct.
10      Q.  Does reading this letter refresh your
11  recollection?
12      A.  I read what this letter says, yes.
13      Q.  Does it refresh your recollection as
14  to what exemptions you were relying on in your
15  determination not to pay salespeople and sales
16  manager other than commission only at Patriot
17  Resorts?
18      A.  I would not venture a guess on that
19  because, as I said, I relied on the attorney
20  instructing me what to do.
21      Q.  And that was Mr. Harrison?
22      A.  Correct.
23      Q.  Do you recall if the opinion letter
24  contained other discussion -- discussion of other

Wise v Patriot - R. Foster Campagna  5/23/05

141

1  exemptions other than the outside salesmen
2  exemption?
3      A.   No, I don't recall.
4      Q.   When I say "the opinion letter," I
5  don't mean this opinion letter that's sitting
6  before you; I mean the opinion letter of Mr.
7  Harrison -- do you know if he discussed any other
8  exemptions?
9      A.   No, I don't recall.
10     Q.   You don't recall if he did, or you
11  don't recall?
12     A.   I don't recall.
13     Q.   So other than the opinion letter of
14  counsel which your counsel here has instructed
15  you not to answer questions on, did you rely on
16  any other documents for making a determination
17  not to pay salespeople or sales managers at
18  Patriot Resorts anything other than commission?
19     A.   I did not rely on anything other than
20  the attorney's advice.
21     Q.   Did you know -- as you read here
22  today, you see that it says here in -- let's go
23  to the middle of 3398 where it says here, "We
24  note that the Department's regulations provide

142

1  that characteristically the outside salesman is
2  one who makes his sales at his customer's place
3  of business."  Is this something that you
4  remember hearing about previously, or is this
5  something that you really have no recollection
6  of?
7      A.   No, I don't remember this.
8      Q.   In this letter here, it says, "The
9  Department intends to publish an advance notice
10  of proposed rule-making regarding the regulations
11  in the federal register, referring specifically
12  to these regulations and the application of the
13  exemption being the outside sales exemption to
14  time-share salesperson."  And it says that's
15  among the issues that the Department intends to
16  consider in the rule-making process.  Are you
17  aware of that -- before today, were you aware of
18  that?
19     A.   I don't recall.  I'm not aware of
20  them -- are you saying have they done anything
21  or...
22     Q.   If you were aware that the Department
23  of Labor published or was going to publish an
24  advanced notice of proposed rule-making and

143

1  promulgate rules relating to the outside sales
2  exemption; are you aware of that?
3      A.   No, I'm not.
4      Q.   Your lawyer never told you that?
5      A.   He may or may not have; I don't
6  recall.
7      Q.   You just don't know if he did -- he
8  might have?
9      A.   He may have.  I don't remember.
10     Q.   Did you do anything to try and follow
11  the rules of the Department of Labor -- do
12  anything in relation to commenting on those rules
13  relating to time-share salespeople?
14     A.   I would not have.
15     Q.   Why not?
16     A.   Our attorney would have done that.
17     Q.   So that's something that you just were
18  not going to be involved in at all?
19     A.   That's correct.
20     Q.   You chose not to be involved in it?
21     A.   I'm not really qualified to be
22  involved in it.  It would require an attorney to
23  look at it and translate how that applies to our
24  business.

144

1      Q.   But you didn't take any affirmative
2  steps to see how it would apply to your business,
3  did you?
4      A.   Well, I can't say that because that
5  was years ago, so I don't really know.
6      Q.   Well, tell me what you did, then, if
7  anything?
8          MS. FABBO:  Objection.
9          MS. GARROW:  You can answer that.
10         THE WITNESS:  I can't tell you
11     what I may or may not have done at
12     that time because I don't remember.
13     Q.   (By Ms. Garrow)  What have you done
14  since -- first of all, you have already testified
15  you don't know when you read this, so we're not
16  talking about a specific time frame; but how
17  about recently, what have you done -- have you
18  checked on the rule-making process in the federal
19  register for time-share sales?
20     A.   I have not checked.
21     Q.   Have you done any research or asked
22  anyone to do any research since this time as to
23  the outside sales exemption and how it applies to
24  time-share salespeople?

145

```
 1        A.   I have not specifically asked anyone,
 2   but I'm sure that our attorneys would notify us
 3   if there was any change that would affect our
 4   business.
 5        Q.   But you never asked anybody to do
 6   that, did you?
 7        A.   We have attorneys on retainer that I
 8   am sure would bring to our attention if there was
 9   a change that would affect our business.
10        Q.   That's not my question, Miss Foster.
11   Please answer my question, which is have you ever
12   asked anyone to do that, as you sit her?
13        A.   I can't recall.  I'm sure there could
14   have been times and there may not have been
15   times.  I can't tell you specifically.  I can't
16   tell you yes or no specifically.
17        Q.   I want to know what you did after you
18   received the opinion letter of Peebles Harrison
19   to follow up on his letter.  What, if anything,
20   did you do?
21        A.   I can't tell you because I don't
22   recall.
23        Q.   As you sit here today, you have no
24   recollection of what you did when you received
```

146

```
 1   his letter?
 2        A.   I really don't.
 3        Q.   What about after this lawsuit was
 4   filed; did you ever look into it again -- and
 5   when I say "it," I mean did you ever look into
 6   the fact that people were concerned that they
 7   were not getting paid an hourly wage and many
 8   weeks made less than minimum wage; did that
 9   concern you?
10        A.   I don't know of anyone complaining to
11   me about minimum wage.
12        Q.   Have you seen the lawsuit in this
13   matter?
14        A.   I saw the lawsuit.
15        Q.   You saw you were named defendant when
16   it was first filed, were you not?
17        A.   Yes, I did.
18        Q.   What did you do after that to try and
19   research or ask someone to research the FMLA
20   issue, minimum wage issue -- what did you do?
21        A.   We turned the lawsuit over to our
22   attorneys to handle it.
23        Q.   Did you do anything affirmatively; did
24   you do anything on your own?
```

147

```
 1        A.   No.
 2        Q.   Did you ask them for more opinion
 3   letters at that point in time?
 4        A.   I don't recall that I did.
 5        Q.   Not since the lawsuit?
 6        A.   Correct.
 7        Q.   Did you do anything since this lawsuit
 8   to see if the outside exemption applied or not to
 9   the time-share salespeople at Patriot Resorts?
10        A.   I would not do that.  I would leave
11   that up to the attorneys.
12        Q.   So is that a no?
13        A.   I can't tell you whether I said
14   anything specific or not, so that it would be
15   hard to remember what was said.
16        Q.   Did you seek any additional advice at
17   that time relating to time-share sales and
18   salespeople in the outside sales exemption
19   application?
20        A.   No.  Outside of what our attorneys had
21   told us, no.
22        Q.   Did you have additional conversations
23   at that time?
24        A.   With our attorneys that are handling
```

148

```
 1   the lawsuit.
 2        Q.   Other than in relation to the
 3   litigation, but about the outside sales
 4   exemptions, did you seek specific advice as to
 5   the outside salesperson exemption at that time?
 6        A.   Not that I can recall at that time.
 7        Q.   Is there daily training at Patriot
 8   Resorts, to your knowledge?
 9        A.   I don't know.
10        Q.   That would be something more in the
11   purview of Mr. Polansky?
12        A.   Mr. Polansky would know whether they
13   do or not.
14             (Exhibit 15, 12/22/04 Memo
15             Re:  New Hires, marked
16             for identification)
17        Q.   (By Ms. Garrow)  This is a memo to all
18   project directors and office managers.  Did this
19   go to Patriot Resorts, to your knowledge?
20        A.   Yes, it did.
21        Q.   And it says "To:  Office Managers/
22   Human Resource Directors.  Would this have gone
23   directly to Miss Lippert at Patriot Resorts?
24        A.   No.  It would have gone into that
```

149

1  office.  I don't know that it would have gone to
2  Faith's attention.
3      Q.   Why don't you tell me what this is --
4  what is this?
5      A.   It's a reminder that anyone who goes
6  to work for our company needs to have a car
7  that's large enough to put customers in --
8  generally more than a two-seater car.  And
9  automobile insurance that meets company
10  requirements.
11      Q.   That was sort of left specifically
12  open, I would guess, because there are different
13  requirements per state, correct?
14      A.   That's correct.
15      Q.   You wanted somebody to have a car that
16  was bigger than a two-seater, presumably because
17  people would come with their family to look at
18  time-shares?
19      A.   Correct.
20      Q.   And that would be your expectation?
21      A.   Correct.
22      Q.   It says here "Effective January 1,
23  2005."  So what was the difference in this policy
24  and the older policy that was effective until

150

1  that date?
2      A.   Well, it wasn't really a new policy;
3  it was just reiterating, because it was the 1st
4  of the year, to remind everyone, because I guess
5  some salespeople in Orlando were buying sports
6  cars that were difficult to get customers in and
7  out of.  So that kind of generated the memo, just
8  to remind them that it was important.
9      Q.   That was the impetus for this memo at
10  that time?
11      A.   Correct.
12              (Exhibit 16, 11/21/01 Memo
13              Re: Policies, marked
14              for identification)
15      Q.   (By Ms. Garrow)  This is Exhibit 16,
16  and this is a memo from you, correct, a Berkley
17  Group memo?
18      A.   Yes.
19      Q.   And it's dated November 21, 2001, am I
20  correct on that?
21      A.   November 21, yes.
22      Q.   "Commissions payable after
23  termination" -- what is that policy, just so I
24  understand what you have written here?

151

1      A.   Once a salesperson leaves our employ,
2  any commissions that are due to be paid for him
3  are held in an accounts payable account to be
4  paid out after all risks of chargeback is
5  diminished.
6      Q.   What does that mean; how long --
7  what's the least amount of time you might hold
8  somebody's money, the shortest risk time?
9      A.   It would be -- the shortest would be
10  three months -- his most recent sale making three
11  timely monthly payments, which would probably be
12  90 days plus 45 days would be the soonest
13  commissions would be paid out, because it would
14  be the most recent sale.  He may have another
15  sale in the pipeline that might be two weeks
16  older than that, but because it's terminated, it
17  would be put in accounts payable.  So it could be
18  120 days before he would receive a check.
19      Q.   I think what you just testified to was
20  the shortest time was 135 days, because you said
21  45 and 90?
22      A.   Correct, so about 135.
23      Q.   So that would be the soonest they
24  could get their money?

152

1      A.   That could be the soonest, unless
2  someone, let's say he only had one commission to
3  be paid and the customer paid cash in full, he
4  would get his commission in thirty days.
5      Q.   So thirty days if cash, but if it was
6  commission, about 135 would be the soonest?
7      A.   I would say that's approximately the
8  soonest.
9      Q.   In the scenario, especially back then,
10  November 21, 2001, prerequirement of PAC check,
11  there would be a scenario possibly where there
12  wouldn't be three timely payments at any time,
13  correct?
14              MS. FABBO:  Objection.  You can
15      answer.
16      Q.   (By Ms. Garrow)  Or three consecutive
17  timely payments at any time in the life of a
18  contract, is that fair to say?
19      A.   Well, that doesn't just have to do
20  with preauthorized checking.
21      Q.   I understand that, but let's take that
22  out of the mix here.  What's the longest period
23  of time that anyone has ever waited to get paid
24  post-termination on a sale?

Wise v Patriot - R. Foster Campagna  5/23/05

---

153

1  A.  I couldn't tell you that.  That would
2  be too -- there are too many salespeople.  I
3  wouldn't be able to say how long.
4  Q.  How about talk specifics.  Peter
5  Corbin, who is a plaintiff in this matter -- he
6  just got paid on a sale -- he hadn't worked for
7  the company for a year plus.  He got paid on a
8  couple of sales, or actually several sales.  Why
9  would somebody wait a year plus after termination
10 for payment on a sale?
11 A.  I would have to look at the particular
12 sales and see what their pay history was in order
13 to tell you that.
14 Q.  How would you determine that?
15 A.  Look at a history of payments on the
16 particular accounts to see if they made their
17 payments every month as they were supposed to.
18 Q.  Would you do that by customer name, or
19 is there another way to identify those people?
20 A.  Customer name.
21 Q.  That's the only way you could do it?
22 A.  Well, a contract number or customer
23 name.
24 Q.  So there were contract numbers as well

---

154

1  for all of those?
2  A.  In most cases, yes, yes, yes -- yes.
3  Q.  Is there any time there wouldn't be
4  one?
5  A.  No, they would have to have a number
6  associated with their name, so either way you
7  could generate that information.
8  Q.  As the president of the company, I
9  guess I'm going to ask you this question again,
10 and maybe I'll try to phrase it a little
11 differently so you can answer it.  I want to know
12 the scenario that could occur that would enable
13 somebody to wait over a year for a full payment
14 once they're terminated -- just a list of
15 scenarios.
16 A.  If their customers did not make three
17 timely consecutive monthly payments.
18 Q.  That would be it; that would be the
19 whole list?
20 A.  It is possible -- and I can't say
21 specifically at Patriot Resorts -- but if a
22 customer came to us six months, eight months,
23 even a year after the sale and presented us with
24 some type of documentation that a salesperson

---

155

1  gave them that is contrary to the plan and would
2  be grounds for voiding of the contract, then that
3  would subject the salesperson to a chargeback.
4  Q.  What about what happened at Patriot
5  Resorts, as far as I understand -- and maybe you
6  can correct me if I'm wrong -- I understand there
7  was supposed to be a clubhouse and certain
8  amenities that never got built at Patriot
9  Resorts.  Is that true?
10 A.  That's incorrect.
11 Q.  Was there never supposed to be a
12 clubhouse, or did it get built?
13 A.  Everything that is in the public
14 offering statement and is in the offering
15 statement today has been built, and all amenities
16 are there.
17 Q.  Is there a clubhouse -- let me ask you
18 that question?
19 A.  Yes, there is.
20 Q.  When was that built?
21 A.  Several years ago.  I don't remember
22 the exact date.
23 Q.  So it's been around for a while?
24 A.  Yes.

---

156

1  Q.  But let's take the specific example
2  out of the mix here and just talk about it
3  generally.  Would that be the kind of thing, if
4  amenities were promised in the initial offering
5  or promised as part of a sales proposal that was
6  authorized by the company and the customer came
7  to you later and said these things never happened
8  -- would that be the basis for possibly
9  cancelling the sale?
10 A.  Anything that the company would have
11 promised by public offering statement would be a
12 matter of fact in the documents, and the
13 customers are not to rely on anything other than
14 those legal documentation.
15 Q.  How do they know that, the customers?
16 A.  It's on the notice -- it's on the
17 documentation that they sign before they leave
18 the property.
19 Q.  So it says it right there, everything
20 is listed in our public offering and those are
21 the documents on which you're supposed to rely?
22 A.  Correct, something along those lines.
23 I don't remember it specifically.
24 Q.  But that's the general gist of it?

---

157

1    A.    Correct.
2    Q.    And that's what you understand it to
3  mean?
4    A.    Yes.
5    Q.    Let's go back to the three consecutive
6  timely payments.  If eighteen months have gone by
7  and there haven't been three consecutive timely
8  payments, is it possible that post-termination a
9  salesperson has not yet been paid?
10    A.    If they have not made those payments,
11  it is possible he has not been paid, yes.
12    Q.    What about somebody who is working for
13  the company; is it possible that person who is
14  still working for the company, if there have not
15  been three consecutive timely payments after
16  eighteen months, is it possible that person has
17  not gotten paid?
18    A.    It's possible, yes.
19    Q.    Have you ever spoken with Miss Lippert
20  or anybody else from Patriot Resorts about
21  somebody named Sam Barnes?
22    A.    The name is not familiar to me.
23        (Exhibit 17, 12/21/01 Memo
24        Re: Rotation, marked for

158

1        identification)
2    Q.    (By Ms. Garrow)  Showing you what's
3  been marked as Plaintiff's 17, this is from
4  Barbara Arnold.  Who is Barbara Arnold?
5    A.    Barbara was the original receptionist
6  that worked at Patriot Resorts.
7    Q.    This is something called a rotation
8  policy.  Are you familiar with this policy?
9    A.    It's not unheard of -- yes, I'm aware
10  that the rotation could be done that way.
11    Q.    It says this is a Berkley company
12  policy.  Do you understand this to be a Berkley
13  company policy?
14    A.    It has a policy that we have used from
15  time to time.
16    Q.    Do you understand it to still be the
17  policy at Patriot Resorts?
18    A.    I don't know that it is.  I'm not sure
19  what type of rotation they're running right now.
20    Q.    Who would know that?
21    A.    Bill Rauer.
22    Q.    Do you remember speaking with Faith on
23  occasion about LaCrisha Wise?
24    A.    Yes, I do.

159

1    Q.    About how many times did you talk to
2  her about LaCrisha Wise?
3    A.    Once or twice maybe.  I can remember
4  one in particular.  There may have been another.
5  I don't remember.
6    Q.    When was that -- you said you remember
7  one in particular?
8    A.    It was a conversation that had to do
9  with dress code.  I don't remember specifically
10  what date it was.
11    Q.    But to your knowledge, was it when she
12  was still working there, she was still employed?
13    A.    Yes, she was working there.
14    Q.    Who called whom; did Miss Lippert call
15  you?
16    A.    I don't remember if she called me or
17  if it was during the course of a conversation --
18  I don't remember.
19    Q.    What do you remember about the
20  conversation -- tell me everything that you
21  remember Miss Lippert said and everything that
22  you remember saying.
23    A.    Well, I just remember there was a
24  question that LaCrisha seemed to be concerned

160

1  about having been reprimanded in accordance with
2  the dress code; and I'm not sure who reprimanded
3  her or asked her to dress more appropriately,
4  but apparently she was not happy about it, and
5  Faith mentioned it to me.
6    Q.    And that's all she said; that's what
7  your recollection is?
8    A.    That's all I recall.
9    Q.    Do you remember if she talked to you
10  about discrimination, that LaCrisha thought it
11  was due to discrimination?
12    A.    No, I don't remember that.
13    Q.    Do you remember any discussions with
14  Miss Lippert about Miss Wise charging the company
15  with race discrimination while she was still
16  working there?
17    A.    No, not during her employment.
18    Q.    If somebody were to file a complaint
19  with a state agency -- for instance, in
20  Massachusetts we have Massachusetts Commission
21  Against Discrimination -- would you expect that
22  to be reported to you?
23    A.    Yes.
24    Q.    So whenever they had knowledge of

161

1   that, that would be reported to you, or you would
2   expect that would be reported to you?
3        A.  Generally it would be, yes.
4        Q.  At some point, did you hear from Miss
5   Lippert that Miss Wise had charged the company
6   with race discrimination?
7        A.  I recall that, but I don't recall that
8   during her employ.  I recall that after her
9   termination; but again, I'm not sure.
10             (Exhibit 18, 6/8/03, 6/9/03
11             Memos Re: Ms. Wise,
12             marked for identification)
13        Q.  (By Ms. Garrow)  Showing you what's
14   marked as Plaintiff's 18, this appears to be an
15   e-mail from -- I guess it's a string of e-mails.
16   The first one is from Miss Lippert to you and the
17   second one is your response.  Do you recall
18   receiving this e-mail?
19        A.  I don't recall receiving it, but it's
20   the right format, so...
21        Q.  It appears here that Miss Lippert was
22   informing you that she thought that Miss Wise was
23   going to be trouble.  Did you ever have a
24   conversation with her as to what she meant by

162

1   that?
2        A.  I recall after LaCrisha left, she had
3   made some threatening remarks to Faith, and Faith
4   was a little intimidated and scared by her, and I
5   had Faith call local authorities to have an
6   off-duty police officer come and stay at the
7   resort until Faith felt comfortable that LaCrisha
8   was not going to come there and cause a problem
9   with her.
10        Q.  But this was the first thing the day
11   after she -- Miss Wise -- got terminated; so
12   she's not talking about that here, is she,
13   because you said it was after her termination?
14             MS. FABBO:  Objection.  You can
15             answer.
16             THE WITNESS:  I'm telling you
17             what I recall.
18        Q.  (By Ms. Garrow)  I'm asking you if you
19   recall having any conversations with her about
20   what she meant in this e-mail, "She is going to
21   be trouble."  If I understand your testimony,
22   these alleged threats happened after this e-mail
23   was written, so it couldn't have been that.
24        A.  Well, along with her termination, I

163

1   think she was there causing a problem.
2        Q.  What was that?
3        A.  I know she was loud and she was -- she
4   scared our employee.
5        Q.  You said when she was terminated that
6   happened?
7        A.  It was after her termination.  She was
8   terminated, I believe, at night, and then I
9   believe she came in -- I'm not sure whether it
10   was the next day, the next afternoon -- I'm not
11   sure when it was, but Faith's contact with her
12   was one that scared her, and that is -- I think
13   that, to my understanding, that is what Faith
14   meant as trouble, because she scared Faith and we
15   were afraid that she would come on the property
16   and create a disturbance.
17        Q.  When you say that she scared Faith,
18   are you relating what Faith told you?
19        A.  Faith was scared of the girl.
20        Q.  Did you ever observe her making
21   threats?
22        A.  No, I'm in Florida.
23        Q.  So this is only from what you
24   understood Faith told you; is that how you

164

1   understood this?
2        A.  Knowing Faith for thirty years, I know
3   when she's afraid, and she was scared of this
4   employee.  She was physically afraid of the
5   woman, and she said that to me on occasion on the
6   phone, that I am afraid of her.  And when you
7   asked me to read this and she said she is going
8   to be trouble, that tells me that Faith was
9   scared of her.
10        Q.  So had she related that she was afraid
11   of her prior to the termination?
12        A.  Faith had told me she was a very
13   intimidating woman.
14        Q.  That she made her nervous and --
15        A.  Yes.
16        Q.  -- and uncomfortable?
17        A.  Yes.
18        Q.  Did she tell you that about anybody
19   else?
20        A.  Roger Martin tended to become angry
21   over situations.
22        Q.  I'm not asking you if Mr. Martin
23   became angry over situations.  I'm asking you if
24   Faith told you anything about anybody other than

165

1   LaCrisha.

2       A.   Situations that were contrary to what
3   Faith may be telling him, if he did not like the
4   response Faith gave him, then he became angry at
5   Faith; and Faith, in turn, would tell me, He
6   makes me uncomfortable.

7       Q.   I'm going to break this down here.
8   You said that Mr. Martin would become angry at
9   Faith.  You don't know what Mr. Martin was
10  thinking, obviously; is that correct?

11      A.   Loud voice, angry appearance,
12  intimidating appearance, overbearing is what I
13  would define as anger in the workplace.

14      Q.   Did you ever observe that yourself of
15  Mr. Martin?

16      A.   No, I did not.

17      Q.   How did you hear about this?

18      A.   I didn't observe this with my eyes.  I
19  heard him over the telephone.

20      Q.   You heard him speaking loudly over the
21  phone?

22      A.      To Faith.

23      Q.   And other than that, have you heard or
24  seen anything else with relation to Mr. Martin?

166

1       A.   No, other than in his deposition.

2       Q.   Did you understand -- or did you
3   question, I should say -- Miss Lippert as to what
4   she meant in this e-mail when she said "She is
5   the girl I have spoken to you about with an anger
6   problem and everything" -- bold face -- "is done
7   to her because of discrimination."  Did you
8   question her about that; "her" being Miss
9   Lippert?

10      A.   Yes, and as I recall, LaCrisha had had
11  some problems, I think, with police situations;
12  and I guess she didn't say this to Faith, but she
13  said it to other people there in the workplace,
14  that it was because she was black that people
15  were discriminating against her.  Faith did not
16  indicate to me that it was because of something
17  we had done.  Everything that she seemed to be
18  involved in was because of the fact that if it
19  went negatively towards her, it's because people
20  were discriminating against her.

21      Q.   Who did you hear this from?

22      A.   I heard it from Faith.

23      Q.   But you heard it from Faith who heard
24  it from somebody else?

167

1       A.   Correct.

2       Q.   This says here, "Her boyfriend is
3   Michael Johnson, the one I understand is going to
4   sue us because he slipped and fell."  And she
5   says "Ho-ho-hum."  What did she mean by that?

6          MS. FABBO:  Objection.

7       Q.   (By Ms. Garrow)  Do you know what she
8   meant by that?

9       A.   Not really.

10      Q.   What did you mean by your response,
11  "Sounds like another day with the Berkley Group"?

12      A.   Well, anytime you have a lot of
13  employees, there's always gossip going around and
14  situations coming up.

15      Q.   So that's what this was, gossip and
16  situations; that's what you meant?

17      A.   Yes, because nothing here is really a
18  -- it's not a complaint; it's just things that
19  have been overheard and really gossip is what it
20  boils down to.

21      Q.   Had Miss Lippert conveyed to you that
22  Miss Wise had complained previously about
23  discrimination at the workplace?

24      A.   About discrimination by our company?

168

1       Q.   Yes.

2       A.   No.

3       Q.   Discrimination of Patriot Resorts?

4       A.   No.

5       Q.   She never reported that to you?

6       A.   No, she did not.

7       Q.   Not in March of 2003?

8       A.   Was that after her termination?

9       Q.   Before her termination.

10      A.   No.

11      Q.   Not in May of 2003, never reported
12  that to you?

13      A.   No.

14      Q.   Is that something you would expect her
15  to report to you if there was such a complaint?

16      A.   I would expect that we would be
17  notified in our offices, and the only thing I
18  recall, if I recall anything, is I recall the
19  lawsuit.  I don't recall anything from the MCAD.

20      Q.   So you never saw anything from the
21  MCAD?

22      A.   Not that I can recall.

23      Q.   Would you expect that somebody would
24  alert you that that happened, that there was a

169

1   suit?

2       A.   I would expect I would remember if I

3   did.  I don't recall that I did.

4       Q.   But would you expect somebody who

5   worked for you to report to you that there's been

6   a complaint of discrimination filed at the MCAD?

7       A.   Correct, if the company knew about it.

8   That's why I would think I would know about it

9   before she would, because most anything is sent

10  to corporate headquarters in Florida.

11      Q.   I think you've already testified to

12  people signing in at the beginning of the day and

13  signing in and out on tours, correct?

14      A.   Correct.  They don't physically sign

15  in and out of tours.  They take tours and the

16  receptionist signs them out and in.

17      Q.   And that's on a document, a specific

18  tour sheet, correct?

19      A.   Correct.

20      Q.   Are there any documents which reflect

21  the starting time that you're aware of -- the

22  starting time and the length of each employee's

23  work period?

24      A.   I'm not -- the employee signs in prior

170

1   to attending the meeting and they are signed out

2   with a tour and back in with a tour.

3       Q.   But there's nothing that signs them on

4   it at the end of the day?

5       A.   Their last tour would show their last

6   time that they were on a tour.  Their last tour

7   time.  So if they came back, then two hours went

8   out again, there would be a new time out and a

9   new time in at the end of that.

10      Q.   So that's it; there's nothing other

11  than that?

12      A.   Not that I'm aware of.

13      Q.   You've already testified there is no

14  regular hour rate of payment.  Are there any

15  documents that show some rate of pay by which

16  overtime compensation would be figured?

17      A.   No.

18      Q.   What about any other ways of

19  determining -- any other documents which show how

20  overtime -- how much overtime compensation might

21  be due?

22      A.   No.

23      Q.   Any documents which show total daily

24  or weekly straight time earnings or wages due for

171

1   hours worked during the workday or workweek

2   exclusive of overtime?

3       A.   You're asking me are there any

4   documents?

5       Q.   Yes, do you keep any records of that?

6       A.   No.

7       Q.   How about any records of -- everything

8   we're talking about is for Patriot Resorts.

9   Total premium pay for overtime hours, any records

10  kept of that?

11      A.   No.

12      Q.   Do you keep a record of total

13  additions or deductions from wages paid each pay

14  period, including employee purchase orders --

15  employee wage assignments, anything like that;

16  any documents showing wage assignments?

17          MS. FABBO:  Objection.  You can

18      answer.

19          THE WITNESS:  I don't really know

20      what that means.

21      Q.   (By Ms. Garrow)  Let me ask you this

22  way.  Any individual employee records that show

23  the dates, amounts, and nature of additions or

24  deductions to each employee's pay -- these are

172

1   salespeople and sales managers actually at

2   Patriot Resorts.  Any documents?

3       A.   Any documents that show additions or

4   deductions from their pay?

5       Q.   Yes.

6       A.   You mean for insurance?

7       Q.   For anything.

8       A.   That's on their pay stub.

9       Q.   That would be on their pay stub?

10      A.   Correct.

11      Q.   Any other documents that would reflect

12  that?

13      A.   The pay sheet that accompanies their

14  check has a stamp on it, and that shows any

15  deduction for taxes.

16      Q.   Anything else?

17      A.   I can't think of anything.

18      Q.   What documents, if any, do you have

19  that show total wages paid each pay period?

20      A.   It would be those same documents, the

21  check stub and the backup for the commission.

22      Q.   When we talk about wages, again, we're

23  just talking about salespeople and sales managers

24  at Patriot Resorts, just commission, correct?

Wise v Patriot - R. Foster Campagna  5/23/05

173

1       A.      Correct.

2       Q.      Any documents that show the date of

3   payment and the pay period covered by each

4   payment made for salespeople and sales managers

5   at Patriot Resorts?

6       A.      I'm sorry, could you repeat that?

7       Q.      Are there any documents which reflect

8   the date of payment and the pay period covered by

9   each payment made to salespeople or sales

10  managers at Patriot Resorts?

11      A.      The check stub shows the period of

12  time.

13      Q.      Anything else?

14      A.      I don't think so.  The backup sheet

15  does show the period of time, yes.

16      Q.      Do you maintain that the sales

17  managers and sales representatives at Patriot

18  Resorts work a fixed schedule, or do you believe

19  it's a variable schedule?

20      A.      By what definition?

21      Q.      I'll clarify.  I think you've already

22  testified that everybody has to come in at a

23  certain predetermined time every day, correct?

24      A.      Correct.

174

1       Q.      Is their schedule then fixed from that

2   point forward for the day, or is it variable?

3       A.      It could vary.

4       Q.      In what ways?

5       A.      If there are customers only to satisfy

6   ten salespeople and there are twenty salespeople,

7   ten may be told, You can go home; there's no need

8   to stay at all.

9       Q.      As you sit here today, do you have any

10  specific knowledge how often that happens at

11  Patriot Resorts?

12      A.      I couldn't tell you how often.

13      Q.      Or when that happens at Patriot

14  Resorts -- when that has happened at Patriot

15  Resorts?  Again, I mean specific knowledge as you

16  sit here; I'm not asking you to guess.

17      A.      There are slower seasons of the year

18  than others, so that's when it's most likely for

19  something like that to happen.

20      Q.      In those days or weeks where a sales

21  representative or sales manager might work less

22  than anticipated hours, are there any documents

23  that show the exact numbers they were there on

24  those days that they were cut early?

175

1       A.      They would still be shown on the

2   attendance record.

3       Q.      As coming to work?

4       A.      Correct.

5       Q.      Do you contend that any of the

6   defendants are not subject to the Fair Labor

7   Standards Act record-keeping requirements?

8       A.      I don't follow what you're asking me.

9       Q.      Is it your position that any of the

10  defendants are exempt from the record-keeping

11  requirements that are required by federal law?

12      A.      I wouldn't be able to answer that

13  question.

14      Q.      Why not?

15      A.      An attorney would have to answer that

16  for me.

17      Q.      Well, I'm asking you.

18      A.      If we don't keep the records that are

19  necessary, it's because we've been directed not

20  to.

21      Q.      So you've been directed by counsel?

22      A.      Yes.

23      Q.      Would that have been Mr. Harrison?

24      A.      Yes.

176

1       Q.      Any other lawyers tell you not to?

2           MS. FABBO:  Objection.

3           THE WITNESS:  I've never had one

4       tell me that I needed to.

5       Q.      (By Ms. Garrow)  Have you ever

6   inquired about record-keeping requirements under

7   the Federal Fair Labor Act?

8       A.      Any inquiry would be made at the time

9   of starting up a resort in a particular state,

10  and we would inquire of the attorneys who were

11  putting the documentation together to let us know

12  if there was anything we needed to be concerned

13  with.

14      Q.      So would that have been Parisi here in

15  Massachusetts?

16      A.      Yes.

17      Q.      Did you inquire of Attorney Parisi

18  or -- Sabin and --

19      A.      Parisi and Sabin.

20      Q.      Is it just the two of them, or is it a

21  bigger firm?

22      A.      I don't know if there's any other

23  attorneys.

24      Q.      Did you inquire of any attorney at

177

1   Parisi and Sabin as to what the record-keeping
2   requirements were to the Federal Fair Labor
3   Standards Act?
4       A.   We would have met with the attorneys
5   early on in the process and asked what we needed
6   to be concerned with in the State of
7   Massachusetts from any point of the law.
8       Q.   Federal or state compliance?
9       A.   Correct.
10      Q.   You have a recollection of doing that
11  with attorneys from Parisi and Sabin?
12      A.   That is our normal procedure, yes.
13      Q.   Did you ask for advice of counsel in
14  that regard?
15      A.   Yes.
16      Q.   Did you have communications with them
17  about that?
18      A.   We had discussions about it, yes.
19      Q.   What did you discuss?
20          MS. FABBO:  Objection.  You may
21          answer.
22      Q.   (By Ms. Garrow)  Counsel has
23  instructed you not to answer regarding advice of
24  counsel as to your Federal Fair Labor Standard

178

1   Act requirement.  I think you testified that
2   there were some discussions about Massachusetts
3   record-keeping requirements as well?
4          MS. FABBO:  Objection.  You can
5          answer if that was your testimony.
6          THE WITNESS:  Yes, that's what I
7          said earlier.
8       Q.   (By Ms. Garrow)  Did you have any
9   involvement in the termination of Mr. Massaconi?
10      A.   No, I did not.
11      Q.   Were you consulted about his
12  termination prior to his termination?
13      A.   Not that I recall.
14      Q.   Did you recommend his termination?
15      A.   No.
16      Q.   What about Mr. Martin; were you
17  consulted prior to his termination?
18      A.   No.
19      Q.   Did you recommend his termination at
20  any time?
21      A.   No, I did not.
22      Q.   What about Miss Wise; were you
23  consulted regarding her termination prior to her
24  termination?

179

1       A.   No.
2       Q.   The first you heard about it was that
3   e-mail, correct?
4       A.   Correct.
5       Q.   At any point did you recommend her
6   termination, Miss Wise's?
7       A.   No.
8          MS. GARROW:  Off the record.
9          (A break was taken)
10         MS. GARROW:  Back on the record.
11      Q.   (By Ms. Garrow)  Do you know if any
12  sales representatives or sales managers go to
13  potential owner's homes to try to sell them
14  time-shares at Patriot Resorts?
15      A.   Not that I'm aware of.
16      Q.   That's not the policy of Patriot
17  Resorts, is it?
18      A.   No, it isn't.
19      Q.   All the sales get done on the property
20  in Lanesborough, correct?
21      A.   Correct.  It's not unheard of that a
22  salesperson could follow a customer home, if they
23  live within a short distance, to get a check or
24  to get a credit card number or something like

180

1   that, but not to transact the sale.
2       Q.   Pretty much to grab some information,
3   grab the PAC check or something?
4       A.   Correct.
5       Q.   Because for some reason, they came to
6   buy a time-share without a check, correct?
7       A.   Correct, they didn't intend...
8       Q.   The same --
9       A.   Before we get started, can I clarify
10  something?
11      Q.   Sure.
12      A.   Because you asked me about the opinion
13  letter, and I think I was focusing more on that
14  time frame than I was your question; and after
15  the lawsuit was filed, I did, of course, talk to
16  Skoler Abbot law firm about the way we were
17  paying our salespeople.
18      Q.   So before you testified that you
19  retained them to pursue the lawsuit?
20      A.   Correct, but in conjunction with that,
21  of course we had to discuss our current situation
22  and what we were doing and what was their opinion
23  of the situation.
24      Q.   Did they give you an opinion?

Wise v Patriot - R. Foster Campagna  5/23/05

---

181

```
1        A.   Yes.
2        Q.   What was that opinion?
3             MS. FABBO:  Don't answer.
4             Objection.
5        Q.   (By Ms. Garrow)  You relied on their
6    opinion, though, at that point to do what you
7    were doing; in other words, you didn't change
8    your policy at all, did you?
9        A.   No.
10       Q.   Since the filing of the lawsuit, you
11   still don't pay overtime to sales
12   representatives, correct?
13       A.   No.
14       Q.   You still don't pay them an hourly
15   wage, correct?
16       A.   No.
17       Q.   Is it your testimony that you relied
18   on the advice of counsel to continue or -- to
19   continue doing what you had previously been
20   doing?
21       A.   I will say that we have discussed some
22   type of a living allowance or allowance so that
23   salespeople could make -- meet their living
24   expenses, insurance requirements, gas for their
```

---

182

```
1    automobiles, that type of thing.
2        Q.   But you have not instituted it?
3        A.   We have not done anything at this
4    point.
5        Q.   Just so I'm clear, those discussions
6    that you just shared with me, those are
7    discussions you had internally at Patriot
8    Resorts, or are those discussions with counsel
9    that your --
10       A.   Discussions with counsel.
11       Q.   My question is a little different.
12   Are you relying on the advice of counsel
13   currently to maintain the practices and policies
14   that you currently have?
15            MS. FABBO:  Objection.  You can
16            answer.
17            THE WITNESS:  I'm not sure
18            that...
19       Q.   (By Ms. Garrow)  Let me ask it this
20   way.  You haven't changed your policies or
21   practices since Patriot Resorts was up and
22   running here in Massachusetts, correct, in terms
23   of minimum wage and overtime?
24       A.   No.
```

---

183

```
1        Q.   You never paid an hourly wage after
2    maybe the 300 -- I know there's $300 that people
3    get paid in the first few weeks; but after that,
4    you never paid an hourly wage to sales managers
5    or sales representatives?
6        A.   Correct.
7        Q.   And you still are not paying an hourly
8    wage, correct?
9        A.   No, we are not at this time.
10       Q.   Why not?
11       A.   Because we are relying on the opinion
12   that we got.
13       Q.   What specific factors did you consider
14   in making the determination not to pay hourly
15   wages to your salespeople and sales managers?
16       A.   Only opinions from legal counsel.
17       Q.   Did you rely on any specific facts of
18   the job?
19       A.   I would rely on advice from legal
20   counsel.
21       Q.   What about facts gathered; did you
22   gather or communicate any facts about Patriot
23   Resorts to counsel prior to getting a
24   determination that you were not required to pay
```

---

184

```
1    anything but commission to your sales
2    representatives and sales managers?
3            MS. FABBO:  Objection to the
4            extent any attorney asked you to
5            gather information, you wouldn't be
6            disclosing that.  You can answer if
7            you understand the question.
8        Q.   (By Ms. Garrow)  Did you communicate
9    any facts to your lawyer?
10       A.   We've communicated a lot of facts
11   during the course of this lawsuit.
12       Q.   I'm asking a very narrow question,
13   though.  Did you communicate any facts relating
14   to the jobs or anything done at Patriot Resorts
15   in order to get a determination that led you to
16   continue not to pay a minimum wage or overtime
17   wages to sales representatives and sales
18   managers?
19            MS. FABBO:  Objection.  You can
20            answer excluding anything that you
21            were asked by counsel to provide.
22            THE WITNESS:  Then there's really
23            nothing that I can add.
24       Q.   (By Ms. Garrow)  So you didn't
```

185

1  independently offer any facts to counsel; is that
2  your testimony?
3      A.   Only in relation to responding to
4  questions asked.
5      Q.   Again, that was all seeking advice of
6  counsel at that time?
7      A.   That was during the course of the
8  lawsuit.
9      Q.   Were you seeking specific advice on
10 the legality of your practices at that time --
11 and when I say "your practices," of course I mean
12 not paying minimum wage, not paying overtime
13 wages?
14     A.   We were discussing information that
15 had to do with the lawsuit, in conjunction with
16 the lawsuit.
17     Q.   So were you independently seeking a
18 determination on the legality of your practices,
19 or was it all in conjunction with the lawsuit?
20     A.   Well, the lawsuit is about minimum
21 wage requirements, so yes.
22     Q.   Yes what?
23     A.   Yes, we were discussing the lawsuit,
24 and we were discussing minimum wage requirements.

186

1      Q.   Sorry to sound like I'm splitting
2  hairs here, but just so I'm clear.  On the advice
3  of counsel, you did not change your practices, is
4  that your testimony?
5          MS. FABBO:  Objection.
6          THE WITNESS:  I would say that we
7          have not determined what will be done
8          at this time.
9      Q.   (By Ms. Garrow)  When do you expect to
10 determine what will be done?
11     A.   Soon.
12     Q.   When you say "what will be done," if
13 you're going to start paying some kind of wage to
14 salespeople and sales representatives?
15     A.   Some type of a weekly expense or a per
16 diem.
17     Q.   How many marketing companies service
18 Patriot Resorts?
19     A.   I'm not sure.
20     Q.   But the salespeople don't go out and
21 solicit new business, right?
22     A.   No.
23     Q.   That's all solicited through the
24 marketing companies?

187

1      A.   They do not solicit new customers.
2  They may know somebody who is interested in
3  buying new time-shares and they may bring them to
4  the office, but that's unusual.
5      Q.   And that's not the customary manner of
6  how new customers are made referrals of Patriot
7  Resorts, correct?
8      A.   Correct.
9          MS. GARROW:  I think I have
10         nothing further here.  We had an issue
11         regarding some documents that were
12         provided to me that I understand have
13         customer identifications on them that
14         we may need at some point to question
15         regarding -- I know we're not getting
16         customer identification.
17         MS. FABBO:  You're not getting
18         the names, but you've got the contract
19         number.  I think -- did you say there
20         was a -- is the contract number the
21         number they get when they come in?
22         THE WITNESS:  There's a CAS
23         number, customer number when they come
24         in, then a customer number when they

188

1  purchase.
2          MS. GARROW:  That doesn't match
3          necessarily.  We may have to suspend
4          just based on those documents; but
5          otherwise, you are free to go.
6          MS. FABBO:  Maybe we can clarify.
7          Does the customer number -- could you
8          then identify the customer from the
9          customer number?
10         THE WITNESS:  Customer number can
11         identify the customer, yes.
12         MS. FABBO:  So what do you need
13         the specific name for?
14     Q.   (By Ms. Garrow)  I think we're talking
15 about different things here.  When somebody
16 basically comes in from the marketing companies,
17 they are assigned a number or not, when they're a
18 lead basically going on tour?
19     A.   They may have a number at that point,
20 but we don't use that number.  The number that's
21 assigned to them when they check in at the
22 resort, that's the customer identification
23 number.  Then if they purchase, then there's a
24 contract number; but there are many more customer

189

1   numbers than contract numbers.
2       Q.   There's a list at the beginning of the
3   day -- I think it goes daily rather than by
4   salesperson.  There's a list of people touring
5   the facility.  Do those people have any number
6   that then tracks them through the entire sales
7   process?
8       A.   Not that I'm aware of.
9            MS. FABBO:  So the people that
10           were touring the facility aren't the
11           people that check in?
12           THE WITNESS:  Yes, they are.  In
13           other words, the marketing company
14           sends a manifest that says there's
15           thirty-five or forty people expected
16           today; these are their names.  I don't
17           believe that there's a number.  Even
18           if there is a number, it's not in our
19           system.  Our system, the computer
20           automatically attaches a number to
21           that customer when they're registered.
22           MS. FABBO:  Why would you need
23           people that didn't register?  I don't
24           understand.

190

1            MS. GARROW:  We don't want the
2   name; we want the number to be able to
3   track somebody from Point A --
4            MS. FABBO:  Point A?
5            MS. GARROW:  Coming in on tour.
6            MS. FABBO:  As soon as they come
7   in, don't they get a number?
8       Q.   (By Ms. Garrow)  I've seen the number.
9   There's no -- correct me if I'm wrong --
10  identifies somebody from the tour status to a
11  contract; there's nothing that follows them along
12  all the way that doesn't have a name on it.
13      A.   The customer name is in the system
14  along with the contract number.  Those two
15  numbers, if they purchase, then the customer
16  number will be put into the file with the
17  contract.  The customer number and the contract
18  number will be on the same document; you'll have
19  both numbers to look at.
20      Q.   When do they get the customer number?
21      A.   When they come in the door.
22      Q.   Come in the door?
23      A.   At Patriot Resorts to come on tour.
24  When they were registered, typed into the

191

1   computer, the computer automatically types in a
2   number and puts it with their name.  Later on --
3   and they go by according to their customer number
4   -- that contract is attached to that customer and
5   that customer number.
6       Q.   Unfortunately, the new documents we
7   have here are not that first document, but maybe
8   we can do it from these documents.
9       A.   You had one there that had the
10  customer number and the contract number.
11      Q.   I see Exhibit Number 7, if you can
12  find something that tracks them all the way
13  through?
14      A.   Little, who is the purchaser contact
15  number 7895, but customer number over further to
16  the right, and you'll see those numbers are
17  almost in -- well, this a salesman ledger.  If we
18  looked at the numbers for all the customers of
19  the day, they would be a few digits off.  In
20  other words, 327 may be 329; 333, 336 -- a few
21  numbers apart, and all your customer numbers
22  would go in that order.  Then your contract
23  number over here would pretty much do the same
24  thing except a different range, but those two

192

1   would be attached to each other in the customer
2   file.
3       Q.   That's good.  One more question, then.
4   What if Peter Corbin or another salesperson took
5   somebody out on tour and that person didn't buy,
6   so they spent two, three hours with that person.
7   Where can I find identifying information on that
8   person; in other words, where can I find out that
9   Peter Corbin was on tour other than by looking at
10  what he sold?
11      A.   You would know that by -- it would be
12  a report similar to this.  I'm not sure what they
13  call it, but we run it by the salesmen's name and
14  a particular date, and it should run off all of
15  the customers.  I don't know what that is titled,
16  but that would be detailed to show if he had two
17  customers a day for ten days, there would be a
18  print out of twenty customers.
19      Q.   Is this one sheet, though; you think
20  there's a sheet that has a listing of all
21  customer numbers but -- so all tours taken by a
22  salesperson, whether they sold or not?
23      A.   I don't know that it's a report that
24  we run at this time, but the information is there

---

**193**

1   on the report.  Should be able to be generated.

2        Q.   Okay.  I mean, that's fine.  A number

3   suffices if there's some way to track all the

4   tours.

5              (Deposition suspended at 3:50)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

**195**

1                              June 25, 2005

2

3   Marylou Fabbo, Esq.
    Skoler, Abbott and Presser, PC

4   1414 Main Street
    Springfield, MA  01103

5   RE:  Wise v Patriot

6

7   Dear Counselor:

8        Enclosed is a copy of the deposition of
    Rebecca Foster Campagna, taken on May 23, 2005 in
    the above-entitled action.

9

10        According to Rule 30(e) of the
    Massachusetts Rules of Civil Procedure, the

11   deponent has thirty days to sign the deposition
    from the date of its submission to the deponent,
    which is the above date.

12

13        Please have the deponent sign the enclosed
    Signature Page/Errata Sheet and return it to the

14   offices of Suzanne Garrow, Esq., whereupon it
    will be attached to the original deposition
    transcript.

15

16        Thank you for your cooperation in this
    matter.

17   Sincerely,

18

19   Ann A. Preston

20   cc:  Suzanne Garrow, Esq.

21

22

23

24

---

**194**

1

2   COMMONWEALTH OF MASSACHUSETTS

3   HAMPDEN, SS.

4             I, Ann A. Preston, a Notary Public in
    and for the Commonwealth of Massachusetts, do

5   certify that there came before me on May 23,
    2005, at the offices of Heisler, Feldman and

6   McCormick, PC, 1145 Main Street, Springfield,
    Massachusetts, the following named person, to

7   wit:  REBECCA FOSTER CAMPAGNA, who was by me duly
    sworn to testify to the truth and nothing but the

8   truth as to her knowledge concerning the matters
    in this case; that she was examined upon her oath

9   and her examination reduced to writing by me; and
    that the statement is a true record of the

10   testimony given by the witness, to the best of my
    knowledge and ability.

11

12        I further certify that I am not a relative
    or employee of counsel or attorney for any of the

13   parties, or a relative or employee of such
    counsel or attorney, nor am I financially or

14   otherwise interested in the outcome of the
    action.

15   WITNESS MY HAND this 25th day of June 2005.

16

17

18        Ann A. Preston

19   My commission expires:
    December 22, 2011

20

21

22

23

24

---

**196**

1            COMMONWEALTH OF MASSACHUSETTS

2   Wise v Patriot

3   No. 04-CV-30091-MAP

4        I, REBECCA FOSTER CAMPAGNA, do hereby
    certify under the pains and penalties of perjury

5   that the foregoing testimony is true and accurate
    to the best of my knowledge and belief, with the

6   addition of the following changes/corrections:

7

8   Page  Line              Change/Correction

9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

19   Witness my hand this ___ day of _____, 2005.

20

21              REBECCA FOSTER CAMPAGNA
    Orig:  Suzanne Garrow, Esq.

22   Copy:  Marylou Fabbo, Esq.

23

24

Wise v Patriot - R. Foster Campagna  5/23/05

197

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT
## 4

Page 1

Vol. I, 136 Pgs.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-CV-30091-MAP

---

LACRISHA WISE, MICHAEL MASSACONI,      )
ROGER MARTIN and PETER CORBIN, on      )
behalf of themselves and on behalf     )
of others who are similarly situated.  )
              Plaintiffs              )
                               )
vs.                                    )
                               )
PATRIOT RESORTS CORP., THE BERKLEY     )
GROUP, INC., MARC J. LANDAU, J.P.      )
OTTINO, III, REBECCA A. FOSTER, and    )
JAMES E. LAMBERT                       )
              Defendants              )

------------------------------------

DEPOSITION OF MICHAEL V. MASSACONI

Friday, May 20, 2005

1:30 p.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144

- - - Denise D. Harper-Forde, RPR, LCR - - -

COURT REPORTING SERVICES

P.O. Box 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

Page 2

1  APPEARANCES:
2  HEISLER, FELDMAN & MCCORMICK, P.C.
      Joel Feldman, Esquire
3      1145 Main Street
       Suite 508
4      Springfield, Massachusetts  01103
       (413) 788-7988
5      on behalf of Plaintiff
6  SKOLER, ABBOTT & PRESSER, P.C.
      Marylou Fabbo, Esquire
7      One Monarch Place
       Suite 2000
8      Springfield, Massachusetts  01144
       (413) 737-4753
9      on behalf of Defendants
10 ALSO PRESENT:  Faith Lippert
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1          I N D E X
2  -----------------------------------------
   WITNESSES:                  PAGE
3  -----------------------------------------
4  Michael V. Massaconi
5    By Ms. Fabbo
6  -----------------------------------------
   EXHIBITS:                   PAGE
7  -----------------------------------------
8  Defendant's Exhibit 1, Pay Schedule
9  Defendant's Exhibit 2, Employment
      Agreement
10
   Defendant's Exhibit 3, Sales
11 Performance Memo
12 Defendant's Exhibit 4, Sales
      Performance Memo
13
   Defendant's Exhibit 5, Harassment
14 Complaint Procedure
15 Defendant's Exhibit 6, 2nd Amended
      Complaint & Demand for a Jury Trial
16
17
18
19
20
21
22
23
24

Page 4

1       MICHAEL V. MASSACONI, Deponent, having
2  first been satisfactorily identified by the
3  production of his driver's license and duly
4  sworn by the Notary Public, was examined and
5  testified as follows:
6
7       MS. FABBO:  Good afternoon, Mr.
8  Massaconi.
9       THE WITNESS:  Good Afternoon.
10      MS. FABBO:  We met earlier, but
11      formally I will introduce myself as
12      Marylou Fabbo.  I represent your
13      former employer and the Defendant in
14      this lawsuit.
15 DIRECT EXAMINATION BY MS. FABBO:
16      Q.   Could you state your full name
17 for the record, please.
18      A.   My full name is Michael V.
19 Massaconi.
20      Q.   Have you ever had your deposition
21 taken before, sir?
22      A.   No.
23      MS. FABBO:  Okay.  So then before
24      we get started, I just want to give

Page 5

1  you some of the background of what
2  is going to be going on.  I'm going
3  to asking you a series of questions.
4       You need to wait until I finish
5  my question before you begin your
6  answer, so that the Court Reporter
7  who is taking down what both of us
8  are saying can get what each person
9  is saying, rather than us both
10 talking at the same time.
11   I'm going to assume that you
12 understand my questions unless you
13 tell me otherwise.  Is that okay?
14 THE WITNESS:  Yes.
15 MS. FABBO:  And you must answer
16 verbally and not by shakes and nods,
17 because the Court Reporter can't
18 take those down.
19 THE WITNESS:  Okay.
20 MS. FABBO:  If you need to take a
21 break at any time that's fine.  Just
22 let me know.  Okay?
23 THE WITNESS:  Okay.
24 (BY MS. FABBO):