1    Q.    What is your date of birth?
2    A.    1-25-47.
3    Q.    And your current address?
4    A.    My current mailing address or
5  living address?
6    Q.    Where do you live?
7    A.    I live in West Lebanon, New York.
8  My P.O. Box is 728.  New Lebanon, New York.
9  The zip is 12125.
10   Q.    Okay.  How long have you been at
11 that address?
12   A.    Going on ten years.
13   Q.    When did you first become
14 employed by Patriot Resorts Corporation?
15   A.    July, 2001.
16   Q.    Who hired you at Patriot?
17   A.    Bruce Polansky.
18   Q.    What was his position at the
19 time?
20   A.    Vice President of Sales.
21   Q.    What position were you hired for?
22   A.    Sales.
23   Q.    Prior to becoming employed with
24 Patriot, had you ever sold time shares?

1    A.    I worked with Bentley Brook.
2    Q.    And when had you worked at
3  Bentley Brook?
4    A.    1999 until employed by Vacation
5  Village.
6    Q.    Who was your supervisor at
7  Bentley Brook?
8    A.    Tony O'Grady.
9    Q.    What was your position there?
10   A.    Sales.
11   Q.    So you left Bentley Brook to work
12 at Patriot Resorts?
13   A.    That's correct.
14   Q.    How did you learn that there was
15 a potential opening at Patriot?
16   A.    We were recruited.
17   Q.    By whom?
18   A.    I'm assuming Bruce Polansky.
19   Q.    Why do you say you're assuming?
20   A.    Because our whole line came over.
21   Q.    Who would that include?
22   A.    The would include the first 12
23 people that worked there.  It would include
24 Gary Campagna, Robert Campagna, Roger Martin,

1  Sue McKnight, Rebecca -- I'm trying to think
2  of Rebecca's last name.  Let's see, it would
3  be Slater, Will Durant, Ned Abbott, Chris
4  Belcher, Tracy LaNoue.  It's been awhile.  How
5  many is that?
6    Q.    I think that's ten, including
7  yourself?
8    A.    Okay.  Can I come back to that?
9          MS. FABBO:  Sure.  If you think
10         of any of the other people during
11         the course of the deposition, just
12         let me know.
13         (BY MS. FABBO):
14   Q.    Okay.  Was there any particular
15 reason you were interested in leaving Bentley
16 Brook and going to work for Patriot Resorts?
17   A.    The main reason we were all
18 leaving to go there was our line director, Mr.
19 O'Grady, was supposed to be coming with us.
20   Q.    And that did not happen?
21   A.    No.  They offered Mr. O'Grady
22 more money, so he stayed with Equifest.
23   Q.    And Equifest is?
24   A.    Is the name of the company that

1  took over Bentley Brook when I left.
2    Q.    Did Mr. O'Grady play any role in
3  attempting to persuade you to go work at
4  Patriot Resorts?
5    A.    Definitely.
6    Q.    Prior to beginning at Patriot,
7  did you speak with any other Patriot employee?
8    A.    No.
9    Q.    Other than Mr. Polansky?
10   A.    No.
11   Q.    Anyone that was employed -- did
12 you speak with anyone that was employed with
13 the Berkley Group prior to beginning
14 employment with Patriot?
15   A.    No.
16   Q.    Was there any difference in the
17 method that you would be compensated at
18 Bentley Brook as opposed to Patriot Resorts?
19         MR. FELDMAN:  Objection.  Go
20         ahead.
21         THE WITNESS:  We were being paid
22         every 14 to 21 days.
23         (BY MS. FABBO):
24   Q.    How were you paid at Bentley

Page 10

```
 1  Brook?
 2     A.    Commissions.
 3     Q.    100 percent commission?
 4     A.    Yes.
 5     Q.    And you were selling time shares
 6  as well; is that correct?
 7     A.    Yes.
 8     Q.    And what was the time span
 9  between when you would sell a time share, and
10  you would receive payment for that time share?
11     A.    From the time I sold it until the
12  time did I receive --
13     Q.    -- the commission?
14     A.    Commission?  At which place,
15  Bentley Brook?
16     Q.    At Bentley Brook?
17     A.    Two weeks to three weeks.
18     Q.    Okay.  What was your pay
19  structure when you began at Patriot Resorts?
20     A.    $300 a week, plus 10 percent.
21     Q.    10 percent commission?
22     A.    Yes.
23     Q.    And was there a point in time
24  when you became a Sales Manager at Patriot?
```

Page 11

```
 1     A.    Yes.
 2     Q.    When was that?
 3     A.    I think it was April or -- May or
 4  June of 2002.
 5     Q.    Who was your supervisor when you
 6  were a sales person?
 7     A.    My immediate supervisor was
 8  Gordon Leete.
 9     Q.    What was his position?
10     A.    He was a Line Director.
11     Q.    Did anyone other than Mr. Leete
12  supervise you at any time?
13     A.    Mr. Leete supervised us for the
14  first I want to say 90 days.  Then Mr. William
15  Rauer came in, and we were told that he was
16  the Director.
17     Q.    And he supervised you?
18     A.    He supervised Gordon, and Gordon
19  supervised us.
20     Q.    When you say "us", are you
21  referring to those initial people?
22     A.    There were only 12 of us.  So we
23  were all in one group at that time.
24     Q.    Is the group referred to as "The
```

Page 12

```
 1  Line"?
 2     A.    Yes.
 3     Q.    And were you in anyone else's
 4  line at any time?  And by that I mean, did you
 5  report --
 6     A.    -- underneath Gordon?
 7     Q.    Yes?
 8     A.    No, I was always under Gordon.
 9     Q.    Always under Gordon.  When was
10  your last day of the employment at Patriot?
11     A.    I want to say February 28, 2005.
12     Q.    Was the change in position from
13  Sales Representative to Sales Manager
14  considered a promotion in your view?
15     A.    Yes.
16     Q.    Okay.  And who made the decision,
17  if you know, to promote you?
18     A.    Bill Rauer.
19     Q.    Did Mr. Rauer speak to you prior
20  to promoting you to determine whether you were
21  interested in becoming a Sales Manager?
22     A.    Yes.
23     Q.    And do you remember what the
24  nature of that conversation was?
```

Page 13

```
 1     A.    No.  The first time he approached
 2  me, I turned it down.
 3     Q.    And when was the first time he
 4  approached you?
 5     A.    I want to say April.
 6     Q.    2002?
 7     A.    Of 2002.
 8     Q.    And what do you recall from that
 9  conversation?
10     A.    Well, I refused the position
11  based on there wasn't enough tours coming in.
12     Q.    Is that what you told Mr. Rauer?
13     A.    Yes.
14     Q.    And regarding the initial time he
15  approached you to promote you.  Did you have
16  any conversations with anyone else about that?
17     A.    Gordon.
18     Q.    What were your conversations with
19  Gordon?
20     A.    I explained to him the same thing
21  I explained to Mr. Rauer.  At that point in
22  time there wasn't enough tours for the number
23  of T.O.s to sit in different tables.
24     Q.    And what's a T.O.?
```

Page 14

1    A.    A T.O. is a Manager or Closer, as
2  they would like to be known as.
3    Q.    And you suggested that Mr. Rauer
4  approached you a second time to become a Sales
5  Manager?
6    A.    From the first time he approached
7  me to the second time it was probably two
8  months, and then they hired outside Managers.
9    Q.    In the two-month span?
10   A.    Yes.
11   Q.    Who were the outside Managers
12  hired?
13   A.    They brought in John Bourden, and
14  then they brought up a gentleman from
15  Virginia.  He was there for a couple of days
16  and left.  That would have been Dave Mercurio.
17   Q.    Going back for a minute to the
18  first time that Mr. Rauer approached you about
19  becoming a Sales Manager.
20        You stated that you spoke with
21  Mr. Leete and Mr. Rauer.  Was there anyone
22  else you spoke with about becoming a Sales
23  Manager at that time?
24   A.    No.

Page 15

1    Q.    Okay.  And was Mr. Bourden and
2  Mr. Mercurio the only two Sales Managers that
3  were hired from the outside during that
4  two-month time frame?
5    A.    No.  I think they promoted one
6  other person.
7    Q.    Okay.  But as far as hired from
8  the outside, though?
9    A.    In other words, they would hire
10  someone from the outside, and tell them work a
11  month and then you're a Manager.
12   Q.    So who was the other person that
13  was promoted?
14   A.    I think it was Kenneth Flanders,
15  and Gary Campagna.
16   Q.    Could you tell me about your
17  second conversation with Mr. Rauer about
18  possibly becoming a Sales Manager?
19   A.    I told him I was interested in
20  that position.
21   Q.    So at the second instance you
22  approached him?
23   A.    Yes.
24   Q.    What prompted you to do that?

Page 16

1    A.    Seeing people come into Vacation
2  Village with less experience than I had, and
3  make money than me.
4    Q.    How did you know they were making
5  more money than you?
6    A.    Because they get a -- I'm trying
7  to figure out the term.  They get a percentage
8  of what I would close on.  In other words, if
9  I sold a 10,990 deal.  They were the Manager,
10  and they would get one percent of that.  One
11  and a half percent.
12   Q.    Okay.  You explained to me
13  earlier what your pay structure was when you
14  began.  Prior to the time you became a Sales
15  Manager, did that pay structure change at all?
16   A.    Yes.  It decreased.  When we
17  started we were getting six months with the
18  $300.  And then we went down to just straight
19  commissions.  We went from ten percent to
20  eight percent.
21        MS. FABBO:  Could you mark that,
22    please?
23        (Whereupon, Defendant's Exhibit
24        1, Pay Schedule dated 8-6-01,

Page 17

1        marked for identification)
2        (BY MS. FABBO):
3    Q.    Mr. Massaconi, the document that
4  has been marked Exhibit one and is in front of
5  you indicates that it was signed by you on
6  August 6, 2001.  Is that your signature, sir?
7    A.    Yes, it is.
8    Q.    And was August 6th your start
9  date?  Or do you believe you started before
10  that?
11   A.    No.  We had a meeting prior to
12  that.  Everyone down there.  Then they told us
13  we would come back and start on this date.  So
14  we did meet with them earlier.
15   Q.    Okay.  So your first actual day
16  of active employment was August 6th?
17   A.    Right.
18   Q.    Okay.  Is the pay schedule that's
19  reflected in here, the pay schedule or the way
20  you were paid, the method of payment, at the
21  beginning of your employment?
22   A.    That's correct.
23   Q.    And it suggests that you would be
24  receiving a bonus pay until the end of 2001.

Page 18

1  Did that in fact happen?
2      A.    Yes.
3      Q.    And did you receive $300 per week
4  for ten weeks as well?
5      A.    Yes.
6      Q.    Okay.  After that time, did you
7  then only receive the base pay of eight
8  percent commission?
9      A.    That's correct.
10     Q.    Okay.  And did that change at any
11 time, prior to the time you became Sales
12 Manager?
13     A.    No.
14     Q.    When you became Sales Manager,
15 did your pay structure change again?
16     A.    Did if change again?
17     Q.    Yes?
18     A.    I received one and a half percent
19 more by sitting on tables and closing deals.
20     Q.    Tell me what you -- what the job
21 duties of a Sales Manager are.
22         MR. FELDMAN:  Objection.  Go
23     ahead.
24         THE WITNESS:  A Sales Manager was

Page 19

1          to train people.  To take them out
2          and explain to them the area.
3          Explain the ten steps, and get them
4          graduated so that they could go out
5          on their own.
6         (BY MS. FABBO):
7      Q.    How long does it typically take
8  to graduate?  Does it depend on the person?
9      A.    Yes.
10     Q.    What's the average, if there is
11 one?
12     A.    I would say three weeks to a
13 month.
14     Q.    Are there any other duties?
15     A.    Well, other duties are you know
16 we have to be aware of the customer's needs
17 and wants.  Explain the directions.  Deal with
18 complaints from customers.  Who to direct them
19 to.
20     Q.    Anything else?
21     A.    Take care of the needs of the
22 people that were under you.  Once you received
23 a team, train that group of people.
24     Q.    Any other duties?

Page 20

1      A.    Check on deals, and make sure
2  people were being paid.
3      Q.    Anything else?
4      A.    Take concerns and issues of the
5  people to my supervisor, and sit down and try
6  to iron them out.
7      Q.    And who was your supervisor?
8      A.    At that time it was Gordon.
9      Q.    Anything else?
10     A.    To make sure that the sales
11 people were all on the same page, and doing
12 the exact same thing with the steps and with
13 the customers.
14     Q.    Okay.  You mentioned the takeover
15 duties.  Could you explain what that is?
16     A.    Take over duties?
17     Q.    The T.O.?
18     A.    As a sales person, my job is to
19 take the individual out and get them to want
20 the product.  Once they are to a certain point
21 where they want it, a Manager is then called
22 upon to come in and explain the back end of
23 what is going to be presented.
24     Q.    Okay.

Page 21

1      A.    Meaning the money and the usage
2  of the product.
3      Q.    Okay.  Anything else?
4      A.    And he's the one to ask if they
5  want to be involved in the program or not.
6  And then he explains how much money it would
7  cost today, and what they could afford, and
8  different payment programs.
9      Q.    Anything else?
10     A.    Not off the top of my head.
11     Q.    As a Sales Manager, did you also
12 take people on tours?
13     A.    Yes, I did.
14     Q.    How much time would be spent
15 taking people on tours when you were a Sales
16 Manager?
17     A.    Two to four hours, sometimes
18 longer.
19     Q.    Per tour or per day?
20     A.    Per tour.
21     Q.    Did you have a team assigned to
22 you?
23     A.    Partial teams.
24     Q.    And who was on your team?

Page 22

1    A.    It varied at times.  Jud Kuzia,
2 Steve Alibozek, Beth Torra, John Rutherford,
3 Owen Broch.  That's just about all that I can
4 remember right now.  Oh, there were some that
5 came and left as soon as they came like Will
6 Spaulding, John Wills.
7    Q.    Was there an average number of
8 people on your team at any particular time?
9    A.    I would say two, and then four.
10    Q.    Two or four full-time people?
11    A.    Yes.
12    Q.    And when you said -- you said you
13 oversaw your team or something to that effect.
14 Can you tell me what types of things you would
15 oversee?
16    A.    Whatever my boss would tell me in
17 the Manager's meeting, I would have to relate
18 to the team.  Pertaining to what they were
19 looking for for that week or that day.  In
20 sales or in conduct and attitude.
21    Q.    You stated that you were
22 responsible for checking on deals.  What does
23 that mean?
24    A.    If I or one of the people that

Page 23

1 were working for me closed a deal today.  And
2 in 14 or 21 days later they do not receive a
3 paycheck, I would go see the young lady
4 sitting next to you?
5    Q.    Ms. Lippert?
6    A.    Yes.  And I would try to find out
7 why they weren't receiving their money.
8    Q.    And can you recall any employees
9 that you did that for?
10    A.    I would say Jud, Owen, Beth,
11 myself.  Almost everyone at one point in time.
12    Q.    And was Ms. Lippert able to
13 provide you with the information?  Or research
14 it and get back to you?
15    A.    At times.  Or the corporate
16 office was closed, because she was dealing
17 with the corporate office.  So we had to wait
18 until we get back to work.  Then she would
19 usually contact that individual herself.
20    Q.    What individual?
21    A.    Whoever I went to check on.
22    Q.    Okay.  So you would come on
23 behalf of one of your employees, and Ms.
24 Lippert would get back to the employee

Page 24

1 directly?
2    A.    Right.
3    Q.    Can you think of any instances
4 where she did not respond to an inquiry?
5    A.    Maybe she was overwhelmed at
6 times from corporate, where things got tucked
7 away for a couple of days.  But the process
8 changed several times.
9    Q.    Okay.
10    A.    And the last one was we couldn't
11 go to her.  We had to go to the head
12 receptionist, which was Dennis, to find out if
13 we had cancellations.
14    And then they would post a pay
15 sheet telling us who was getting paid in the
16 sales lounge or the pit.  However you want to
17 describe it.
18    Q.    How frequently would that list be
19 posted?
20    A.    It was posted weekly.  And there
21 were some omissions where it wasn't posted.
22    Q.    Can you think of any reason that
23 it was not posted?
24    A.    I couldn't tell you the reasons,

Page 25

1 but I know there were several times that it
2 wasn't posted.  It was either left on Ron
3 Lewis desk or one of our closing officers.
4 But there times when it wasn't posted at all.
5    Q.    And when it was not posted, did
6 you do anything to find out why it was not
7 posted?
8    A.    Yes, we would.  We would go
9 through our supervisors, through the chain of
10 command to find out how come it wasn't posted.
11 Usually it was corrected right away.
12    Q.    You mentioned that one of your
13 responsibilities was bringing employee issues
14 to Mr. Leete's attention.  Could you tell me
15 when you had occasion to do that?  On what
16 issues?
17    A.    Issues where other people were
18 late from the other line.  And they didn't
19 attend the meetings, but yet were put right
20 out in regular rotation ahead of the people
21 who had attended the meetings.  They were put
22 on overage.
23    Q.    Can you think of anyone who was
24 one of those employees that was late and put

Page 26

1  on regular rotation?
2      A.    I'm sure I have a list some
3  place.  I would say Lisa Ferreira for one.
4      Q.    Lisa Ferreira?
5      A.    Yes.
6      Q.    Anyone else?
7      A.    I'm sure Jud Kuzia.  I'm sure
8  Joel Hecht.
9      Q.    They were all put in regular
10  rotation?
11     A.    Yes.
12     Q.    Anyone else?
13     A.    I'm sure there were many more
14  than that, but those are the ones that I can
15  remember.
16     Q.    What about Lacrisha Wise?  Was
17  she one of the employees that come to mind?
18     A.    Lacrisha usually came in with
19  some type of doctor's note.
20     Q.    And would that allow someone to
21  come in late?
22     A.    Yes, it would.  That was the only
23  thing that was allowed.
24     Q.    Was she late frequently?

Page 27

1      A.    I couldn't tell you, other than
2  she was there.
3      Q.    Well, did people complain about
4  her being late?
5      A.    Yes, at times.
6      Q.    Who?
7      A.    It would be mostly the Managers.
8      Q.    No one in your group?
9      A.    Probably Gordon, Tony Campagna,
10  Gary Campagna.  Those are all Managers that
11  were in my group that would bring it to
12  Gordon.  Gordon would meet with Paul, and Paul
13  would meet with either Bill or Ron Lewis.
14     Q.    And whose Paul?
15     A.    Paul Stenslind.
16     Q.    Did the fact that these people
17  were coming in late and being put in regular
18  rotation rather than overage contribute to low
19  moral in your group?
20           MR. FELDMAN:  Objection.
21           THE WITNESS:  Yes.
22           (BY MS. FABBO):
23     Q.    Yes?
24     A.    Yes.

Page 28

1      Q.    Did you have any other -- strike
2  that.  Was Mr. Stenslind's, in your opinion,
3  his method of management more laid back than
4  Mr. Leete?
5           MR. FELDMAN:  Objection.  Go
6           ahead.
7           THE WITNESS:  No.
8           (BY MS. FABBO):
9      Q.    Did Mr. Leete enforce the
10  attendance policy?
11     A.    Yes, he did.
12     Q.    Okay.  And Mr. Stenslind did not?
13     A.    That's correct.
14     Q.    Anything else Mr. Stenslind
15  allowed his employees maybe get around the
16  policy on that Mr. Leete did not?
17           MR. FELDMAN:  Objection.  Go
18           ahead.
19           THE WITNESS:  He would allow them
20           to leave the area, meaning the
21           grounds.  He would spiff them.
22           (BY MS. FABBO):
23     Q.    What is that?
24     A.    Spiffing them is when in his

Page 29

1  meeting he would tell people that the first
2  one to make a sale today, I will give them 50
3  bucks.  If you get two sales today, I will
4  give you $100.
5           In the beginning we were told we
6  couldn't do that.  And then when we found out
7  about it, they legalized it.
8      Q.    Okay.  Anything else?
9      A.    It made for bad feelings between
10  the two lines.  Because if you were out on a
11  sale and you knew you had a sale committed to
12  you that day.  You could go and get Paul to
13  come sit on your table, and Paul would give
14  you the money right afterwards.  Give you the
15  50 bucks or 100 bucks or whatever.  If he
16  called me to the table, I couldn't give them
17  anything but the ink and the pen.
18     Q.    Okay.  What was Mr. Stenslind's
19  position?
20     A.    He was Line Director.
21     Q.    And Mr. Leete was the other Line
22  Director?
23     A.    Yes.
24     Q.    And there were only two lines at

Page 30

1  that time?
2      A.    Yes.
3      Q.    And you said that they were
4  allowed to leave the grounds.  What was the
5  rule on Mr. Leete's team?
6      A.    You couldn't leave the grounds.
7      Q.    At all?
8      A.    Those were the rules.
9      Q.    Were you allowed to leave if you
10 got permission from Mr. Leete?
11     A.    Yes.  In the beginning it was
12 from Mr. Leete, and then it went to Faith.
13 Then it went to Dennis.  It changed
14 periodically.
15         They had to know where you were,
16 and you had to know your position in the line.
17 Otherwise you went to the bottom of the line.
18     Q.    Okay.  And Mr. Stenslind, to your
19 knowledge, did not require people to tell him
20 where they were going to be?
21     A.    No.
22     Q.    He did not?
23     A.    No.  Anything else that was
24 different between Mr. Stenslind and Mr. Leete

Page 31

1  that may have contributed to what you
2  described as bad feeling between the two
3  lines?
4         MR. FELDMAN:  Objection.  Go
5         ahead.
6         THE WITNESS:  Policies are
7         written to be guidelines.  When
8         people who work in the same group of
9         people don't abide by those
10        guidelines, there is chaos.  And
11        that's what took place 90 percent of
12        the time.
13        (BY MS. FABBO):
14     Q.    Okay.  Are you saying Mr.
15 Stenslind was loose on enforcing policy, and
16 Mr. Leete was not?
17     A.    That's correct.
18     Q.    Can you think of some of the
19 other policies other than the ones you've
20 mentioned where they differed?
21     A.    Tardiness, taking tours out.  Mr.
22 Stenslind would sign for them himself, and
23 give that person a free ride.  Or he would
24 sign his name on my sheets.

Page 32

1      Q.    What does that mean?
2      A.    In other words, after 2002 we
3  were supervised on numbers.  Meaning numbers
4  of tours.  Numbers of times I sat at different
5  people's tables and I didn't close deals.
6         Mr. Stenslind got caught writing
7  my name on slips of paper where I was the one
8  that was underlined for sitting on that table
9  or taking a tour.
10     Q.    And how would that impact you?
11     A.    Well, I will give you an example.
12     Q.    Okay.  That's great.
13     A.    If I had two tours today, and I
14 did not sell any of them.  Mr. Stenslind would
15 put me down for another tour which I never saw
16 or never took.  So it would mean three.
17        So come the end of the week, my
18 boss would come up to me and say Michael
19 you've had eight tours for the week, and you
20 only sold two people.  And I would write my
21 tours down in a book every single day, and the
22 numbers were never ever the same.
23     Q.    Did you bring that to Mr. Leete's
24 attention?

Page 33

1      A.    I brought it to Mr. Leete's
2  attention.  I brought it to Mr. Rauer's
3  attention.  I brought it to Mr. Lewis' attention.
4  On occasions they caught it at the front desk
5  and changed it, but they would never tell me
6  how it got there.
7      Q.    Did you provide them with a copy
8  of the tours you had in the book?
9      A.    Oh, yes.
10     Q.    And do you still have that book?
11     A.    Yes, I do.
12     Q.    Okay.  Do you have any -- did Mr.
13 Stenslind ever inform you as to why he was
14 doing this?
15     A.    No.  All he did was apologize for
16 it when they caught him.
17     Q.    Apologize to you or to someone
18 else?
19     A.    No.  He apologized to me prior to
20 me getting into my car.
21     Q.    And when was that?
22     A.    I would say some time in 2003.  I
23 was unaware of it until it was brought to my
24 attention.

1    Q.    Who brought it to your attention?
2    A.    Mr. Leete and Mr. Ned Abbott.
3    Q.    I'm confused, because I thought
4 you had said that -- and please clarify. That
5 you knew because of the different number of
6 tours in your book?
7    A.    Right. But how they found out
8 about it was my signature is like this.
9 People would try to imitate it, and there
10 would be a slip that had to be turned into the
11 exit program. And they compared signatures,
12 and I never sat on that individual's table nor
13 did I take a tour.
14    Q.    Did you ever come to learn
15 whether Mr. Stenslind wrote anyone else's
16 name?
17    A.    No, I did not.
18    Q.    You said that Mr. Stenslind
19 differed from Mr. Leete with respect to the
20 tardiness policy. Could you tell me how they
21 differed?
22        MR. FELDMAN: Objection. Go
23    ahead.
24        THE WITNESS: Mr. Stenslind would

1    usually make some type of excuse up,
2    but Gordon wouldn't.
3        (BY MS. FABBO):
4    Q.    Would the excuse allow someone
5 not to go on overage?
6    A.    Yes.
7    Q.    And how did they vary with
8 respect to taking tours?
9        MR. FELDMAN: Objection. Go
10    ahead.
11        THE WITNESS: Well, to my
12    knowledge neither was directed to
13    take tours. If they decided not to,
14    they didn't have to.
15        But if they went out and sold,
16    they got more money than all of us.
17    So it was to their benefit to take a
18    tour if they wished.
19        (BY MS. FABBO):
20    Q.    And so Mr. Stenslind took tours?
21    A.    Mr. Stenslind took tours. If we
22 had more tours than we had sales people, then
23 Mr. Leete would take a tour. Some of the V.O.
24 officers would take tours. The exit people

1 would take tours.
2    Q.    Any other policies that you can
3 think of that Mr. Stenslind did not enforce in
4 the same manner as Mr. Leete?
5    A.    Driver's licenses.
6    Q.    Can you explain that?
7    A.    In order for me to work at
8 Vacation Village in the Berkshires, I had to
9 produce a valid driver's license and a car,
10 and a certain amount of insurance. Mr.
11 Stenslind would hire people with no license,
12 no car, and no insurance.
13    Q.    Can you identify who those people
14 were?
15    A.    We will start with Dave Mercurio
16 who to this date doesn't have a vehicle, and
17 was just promoted to Line Director; or
18 insurance. He has a car that's underneath
19 another person's name and insurance.
20    Q.    How do you know that?
21    A.    I have some connections in law
22 enforcement.
23    Q.    So what did you have someone
24 check on him?

1    A.    Yes. I would get pulled over and
2 they would ask me to check on him. What was
3 he doing? Like Sam Barnes would be another
4 one.
5    Q.    What was the situation with Sam
6 Barnes?
7    A.    Sam Barnes, too many DWI's. He
8 had to come up with almost four or $5,000 from
9 Paul Stenslind. A loan from Paul Stenslind to
10 get his license in Rhode Island, because he
11 couldn't get it in Massachusetts.
12    Q.    Anyone else that Mr. Stenslind
13 hired that didn't have a license, a car or
14 insurance?
15    A.    Well, Dave Mercurio, Sam Barnes.
16    Q.    Right. Other than the ones
17 you've already mentioned?
18    A.    There has been several, but I
19 can't remember their names. They all came
20 from one resort up in Spruce. I am sure I got
21 it written down some place.
22    Q.    What about Ms. wise?
23    A.    No. She had a license and a car.
24    Q.    Do you know whether she had

Page 38

```
 1  insurance?
 2      A.    No, I do not.  The young lady
 3  next to you would know.
 4      Q.    I'm asking you whether you know?
 5      A.    No, Ma'am.
 6      Q.    Okay.  Anyone else you can think
 7  of?
 8      A.    Yes.  Andy Goodness.
 9      Q.    What was the issue with him?
10      A.    DWI's.
11      Q.    So he had no license?
12      A.    Yes.
13      Q.    How do you know that?
14      A.    Because he told me.
15      Q.    And he was hired with no license?
16  Is that what you're saying?
17      A.    Several of them were.
18      Q.    Who else?
19      A.    Sam I know didn't have a license,
20  but he was hired without one.
21      Q.    Other than the people you've
22  already mentioned?
23      A.    There were two other gentlemen,
24  but I cannot remember their names at this
```

Page 39

```
 1  moment.
 2      Q.    And Mr. Leete would require the
 3  license, the car, and the insurance?
 4      A.    Yes, Ma'am.
 5      Q.    Did you ever have an occasion to
 6  observe Mr. Leete and Mr. Stenslind
 7  interacting?
 8      A.    Could you repeat the question,
 9  please.
10      Q.    Did you ever have an occasion to
11  observe Mr. Stenslind and Mr. Leete engaging
12  in any kind of interaction?
13      A.    Hyper interaction?
14      Q.    Just talking and speaking to
15  each other?
16      A.    Oh, yes.
17      Q.    What do you mean by hyper
18  interaction?
19      A.    Well, maybe their tone of voice
20  was higher than normal.
21      Q.    Did you see them arguing?
22      A.    Yes.
23      Q.    And on more than one occasion?
24      A.    Several.
```

Page 40

```
 1      Q.    Do you know what they were
 2  arguing about on any of those occasions?
 3      A.    Policies.
 4      Q.    Any in particular?
 5      A.    Not offhand.
 6      Q.    Anything else they argued about?
 7      A.    I would say steeling people from
 8  one team to the other.
 9      Q.    Anything else?
10      A.    Not at the present.
11      Q.    You mentioned that you received
12  one and a half percent more by sitting on
13  tables and closing deals; is that correct?
14      A.    If they were not on my team, yes
15  that's correct.
16      Q.    So can you tell me how that
17  works, if they were not on your team?
18      A.    Okay.  If I sat on Robert
19  Campagna's table, who was not on my team.  And
20  he sold a $10,990 deal.  I would get one and a
21  half percent of that money in an override is
22  what it's called.
23          It would be given to me when he
24  got paid.  If they were a member of my team
```

Page 41

```
 1  and I had the opportunity to sit on their
 2  table, I would get three percent on whatever
 3  they sold.
 4      Q.    Okay.  And so did you usually --
 5  or how frequently did you get an override?
 6      A.    When I became a Manager for the
 7  first year and a half, every week for a year
 8  and a half.
 9      Q.    And then what happened?
10      A.    My team dwindled down.  Tours
11  stopped coming in.  And I was supervised for
12  not sitting on enough tables.  Only 19 tables
13  in a month.
14      Q.    Okay.
15      A.    And it's an open floor.  Meaning
16  that you can pick a Manager to sit on your
17  table.
18      Q.    So the sales person picks the
19  Manager?
20      A.    Yes, Ma'am.
21      Q.    And the first year and a half,
22  what were your overrides?  Was there an
23  average amount?
24      A.    I would want to say between 15
```

Page 42

1  and 25,000.
2    Q.    For the 18 month period?
3    A.    Yes.
4    Q.    So do you know why -- did anyone
5  express to you why you had a decrease in
6  requests to sit at tables?
7    A.    No.
8    Q.    Did you have any suspicion as to
9  why?
10   A.    I wasn't Spiffing people.
11   Q.    Okay.  Was there a time that you
12 were allowed to spiff people?
13   A.    A time when I was allowed?
14   Q.    Yes?
15   A.    Maybe six months.  The first six
16 months that I became a Manager, but I didn't
17 have any money to give to other people.
18   Q.    After the six-month period, was
19 Spiffing stopped all together?
20   A.    No.  It still continues until
21 today.
22   Q.    Was there any time that you did
23 spiff people?
24   A.    No.

Page 43

1    Q.    Is there any reason?
2          MR. FELDMAN:  Objection.  Go
3      ahead.
4          THE WITNESS:  No money.
5          (BY MS. FABBO):
6    Q.    You didn't have any money?
7    A.    No.
8    Q.    The spiff comes out of --
9    A.    -- the Manager's pocket.
10   Q.    And who were the Managers that
11 did spiff people?
12   A.    Paul Stenslind, Dave Mercurio,
13 Kenny Flanders.
14   Q.    Anyone else?
15   A.    Not to my knowledge.
16   Q.    Could you take a look at this
17 document, sir.  And let me know if this is the
18 employment agreement that you signed at the
19 beginning of your employment or around the
20 beginning of your employment with Patriot?
21   A.    That's my signature.
22         MS. FABBO:  Could you mark that,
23     please.
24         (Whereupon, Defendant's Exhibit

Page 44

1      2, Employment Agreement, marked
2      for identification)
3      (BY MS. FABBO):
4    Q.    Do you recall who from Patriot
5  Resorts presented you with this agreement?
6    A.    Excuse me?
7    Q.    Do you recall who from Patriot
8  Resorts presented you with this agreement?
9    A.    No, I do not.
10   Q.    Did you read it before you signed
11 it?
12   A.    Yes, I did.
13   Q.    Did you sign it at the same time
14 you received it?
15   A.    Excuse me?
16   Q.    Did you sign it on the same day
17 you received it?
18   A.    I think I did.
19         MR. FELDMAN:  Can I go off the
20     record for a minute.
21         (Off the record)
22         (Back on the record)
23         (BY MS. FABBO):
24   Q.    Are you currently employed?

Page 45

1    A.    No, I'm not.
2    Q.    Have you been employed at all
3  since your separation from Patriot?
4    A.    No, I have not.
5    Q.    Are you receiving unemployment?
6    A.    Am I getting unemployment?
7    Q.    Yes?
8    A.    Yes.
9    Q.    How much?
10   A.    $528.
11   Q.    Per week?
12   A.    Yes.
13   Q.    And how long have you been
14 receiving that?  Since when?
15   A.    March sometime.
16   Q.    March of 2005?
17   A.    Yes.
18   Q.    Are you looking for a job?
19   A.    Yes.
20   Q.    You were demoted from Sales
21 Manager; is that correct?
22   A.    Yes, I was.
23   Q.    And when was that?
24   A.    September.

Page 46

```
 1    Q.    2004?
 2    A.    2005 -- 2004, excuse me.
 3    Q.    And other than the demotion, did
 4 you ever receive any written disciplinary
 5 action from Patriot Resorts?
 6    A.    Written disciplinary action?
 7    Q.    Yes?
 8    A.    Did I sign?
 9    Q.    Did you get any?
10    A.    I received them, but I never
11 received anything other than the probation
12 period that I got in July of 2004.
13    Q.    And what was that for?
14    A.    My numbers went above ten.
15    Q.    What does that mean?
16    A.    It means that I was put on
17 probation.
18    Q.    What does above ten mean?
19    A.    It's a number that the company
20 comes up with for sales.  It's like a batting
21 average.  If it goes over ten, I'm not allowed
22 to sit on tables.
23          And I was put on probation, and
24 at the end of that same day I sold two deals
```

Page 47

```
 1 and came off probation that same day in July.
 2 I was never put on probation other than '04
 3 when Bill Rauer put me on it.
 4    Q.    You said the numbers above ten.
 5 Does that mean if you're only making one sale
 6 out of ten?
 7    A.    It could be if you had 50 tours
 8 or only had one tour, and you only sold one,
 9 because it was a 60 day rotation.  They put in
10 the changes everyday.  So you lose deals and
11 you lose tours everyday.
12    Q.    Okay.  But I'm trying to figure
13 out in layman's terms what above ten means?
14    A.    Okay.  If I go above ten as a
15 Manager, I was told I could not sit on tables
16 to close deals.
17    Q.    But I don't know what ten is.
18 What does ten represent?
19    A.    It's an average.
20    Q.    An average of how many you close?
21    A.    No.  Just an average of my sales.
22    Q.    Would that mean out of ten?
23    A.    It could be one out of ten;
24 correct.  Or it could be zero out of ten.
```

Page 48

```
 1    Q.    Okay.  Is this the July, '04
 2 probation that you referenced?  Is this
 3 documentation of it?
 4    A.    Yes.
 5          MS. FABBO:  Could you mark that,
 6    please.
 7          THE WITNESS:  I was put on and
 8    taken off the same day.
 9          (Whereupon, Defendant's Exhibit
10          3, Sales Performance Letter,
11          dated 7-11-04, marked for
12          identification)
13          (Whereupon, Defendant's Exhibit
14          4, Sales Performance Letter,
15          dated 7-12-04, marked for
16          identification)
17          (BY MS. FABBO):
18    Q.    The document that has been marked
19 as Exhibit 3.  Is that your signature on it?
20 Dated July 11, 2004?
21    A.    Yes, it is.
22    Q.    Okay.  And I just want to make
23 sure I understand this ten number.  Because on
24 here it says you need to get your sales ratios
```

Page 49

```
 1 back into acceptable limits of 8.99 or better.
 2 Do you know what that means?
 3    A.    It means when you hit 8.99,
 4 you're going to be going into probation.  At
 5 ten you're not allowed to sit on tables.
 6    Q.    Okay.  So you were notified of
 7 this on July 11th; is that correct?
 8    A.    That's correct.
 9    Q.    And the next Exhibit, Exhibit 4,
10 is dated July 12th.  Did you receive
11 notification on July 12th that you were off
12 probation?
13    A.    I received it the same day.
14    Q.    Okay.
15    A.    On the 11th in the afternoon.  I
16 was given this in the morning.
17    Q.    But it is dated July 12th;
18 correct?  Is it possible you just put the
19 wrong date on the first one?
20    A.    No.
21    Q.    Okay.  You signed the second one?
22    A.    Yes, I did.
23    Q.    And it's dated July 12th, would
24 you agree?
```

Page 50

1    A.    Would I say I signed it?  It
2  doesn't quite look my signature.  Some of it
3  is unique and some of it isn't.  I don't know
4  if that is my signature or not.
5    Q.    Do you have any recollection of
6  signing it?
7    A.    I remember Gordon giving it to
8  me.
9    Q.    And you recall that was the same
10  day?
11    A.    It was the same day; correct.
12    Q.    Okay.  And then were you ever put
13  on probation again for your sales numbers?  Or
14  your sales ratio, I should say?
15    A.    No.
16    Q.    Were you ever aware -- did anyone
17  bring to your attention any complaints that
18  your co-workers had about you?
19    A.    No.
20    Q.    Did anyone bring to your
21  attention any complaints that customers or
22  potential customers had about you?
23    A.    No.
24    Q.    Who informed you that you were

Page 51

1  demoted from Sales Manager?
2    A.    Bill Rauer.
3    Q.    And what did he say?
4    A.    He told me exactly that I was
5  demoted, and I get 30 days to get my numbers
6  up or I would lose my team.
7    Q.    And what were your numbers at the
8  time, do you know?
9    A.    No.  I can't recall.
10    Q.    Were they -- did you feel that
11  your numbers were sufficient at that time?
12        MR. FELDMAN:  Objection.  Go
13  ahead.
14        THE WITNESS:  No.
15        (BY MS. FABBO):
16    Q.    Are you aware of any complaints
17  -- or complaints made by Gary Campagna about
18  you or your attitude?
19    A.    No.
20    Q.    Do you know of anyone else who
21  was demoted because of their sales ratio or
22  their sales numbers?
23    A.    Mark Lapine, Kenny Flanders, and
24  Bill Lee.

Page 52

1    Q.    Did you protest your demotion to
2  anyone at Patriot Resorts?
3    A.    At that time it was Mr. Campagna.
4  He just got promoted the last time I got --
5  when Mr. Rauer put me on probation, they just
6  made him Line Director that day.
7    Q.    You protested to him?  Is that
8  what you are saying?
9    A.    Yes.
10    Q.    What did you say to him?
11    A.    That there were other Managers in
12  the same category as I was where the numbers
13  were low.  More than ten.
14    Q.    Okay.  And what did he say?
15    A.    He would look into it.
16    Q.    And who are the other Managers?
17    A.    I would say I think there may
18  have been three or four of them.  Gary
19  Campagna, Mike Campagna, Kenny Flanders.  I am
20  trying to think who else.
21    Q.    And you're telling this to which
22  Campagna?
23    A.    Gary.
24    Q.    And you felt that he had the same

Page 53

1  numbers as you?
2    A.    They are posted.
3    Q.    Okay.  And Kenny did, and Mike
4  did as well?
5    A.    I can't recall which one of them,
6  but they were all posted.  There were people
7  in the same position as me.
8    Q.    What was your ratio at the time?
9    A.    I couldn't recall.
10    Q.    Was it worse than the other three
11  that you mentioned?
12    A.    2 for 24 I think or something
13  like that.
14    Q.    Was your ratio worse than the
15  others that you mentioned?
16    A.    No.
17    Q.    It was the same?
18    A.    Yes.
19    Q.    When was Mr. Flanders demoted?
20    A.    January or February of '04 or
21  '03.  One of them.  One of those times.  I
22  can't recall.
23    Q.    Prior to you?
24    A.    Yes, prior to me.  Mark Lapine.

1    Q.    What about Mark Lapine?
2    A.    They were demoted on the same
3 day.
4    Q.    As you?
5    A.    No, together.  The two of them.
6 You asked who were the others that were
7 demoted.
8    Q.    And were they promoted after that
9 back to Sales Manager?
10    A.    Yes.
11    Q.    Do you know by whom?
12    A.    Mr. Rauer and Mr. Stenslind.
13    Q.    Did Mr. Leete have any role to
14 your knowledge in your demotion?
15    A.    Mr. Leete wasn't there.
16    Q.    Who was your direct supervisor at
17 the time?
18    A.    It would have been Gary Campagna
19 and Dave Mercurio.
20    Q.    They were both Line Directors?
21    A.    Yes.  They shared the line.
22    Q.    And when did that start?
23    A.    The same day they fired Gordon.
24    Q.    And that was the same day you

1 were demoted?
2    A.    Yes.
3    Q.    Any other personnel changes that
4 day?
5    A.    Not that I can recall.
6    Q.    Do you know why Mr. Leete was
7 terminated?
8    A.    No, I do not.
9    Q.    Other than to Mr. Campagna, did
10 you complain about your demotion to anyone
11 else?
12    A.    Robert Campagna.
13    Q.    And what was his position at the
14 time?
15    A.    Manager.
16    Q.    Did you complain to him about it
17 hoping he would do something about it?
18    A.    No.
19    Q.    Did you complain to anyone in
20 Human Resources about the demotion?
21    A.    No.
22    Q.    Did you call anyone at the
23 Berkley Group about the demotion?
24    A.    No.

1    Q.    Have you ever spoken to Becky
2 Foster?
3    A.    No.
4    Q.    Do you know who she is?
5    A.    President of the company.
6    Q.    Have you ever seen her?
7    A.    Walking through.
8    Q.    Have you been employed at all
9 since your separation from Patriot Resorts?
10    A.    No.
11    Q.    Who notified you of your
12 termination?
13    A.    Mr. Rauer.
14    Q.    Was anyone else present when he
15 notified you?
16    A.    Dave Mercurio.
17    Q.    Anyone else?
18    A.    Not to my knowledge.
19    Q.    Where did the termination take
20 place?
21    A.    Sales office.
22    Q.    Can you tell me what was said by
23 whom?
24    A.    I need to see you.  Have a seat.

1    Q.    Who said that?
2    A.    Mr. Rauer.  You're fired.
3    Q.    Anything else?
4    A.    Your numbers.
5    Q.    He didn't say anything about your
6 numbers?  He just said your numbers?
7    A.    Yes.
8    Q.    And did Mr. Mercurio say anything
9 during this?
10    A.    No.  Choked on his coffee; ice
11 coffee.
12    Q.    Did he say anything?
13    A.    No.
14    Q.    Did you say anything?
15    A.    See you in court.
16    Q.    And why did you say that?
17    A.    Because that's where we are
18 going.
19    Q.    Did you say anything other than
20 see you in court?
21    A.    No.
22    Q.    Did you protest your termination
23 to anyone?
24    A.    Excuse me?

Page 58

1    Q.    Did you protest your termination
2  to anyone?
3    A.    No.
4    Q.    Did you call -- did you contact
5  -- strike that.  How were your numbers at the
6  time of your termination?
7    A.    I had just made them $20,000.  I
8  made two sales.
9    Q.    Okay.  But how were your overall
10 numbers?  You said there was a 60 day window;
11 is that correct?
12   A.    One out of -- let's see.  Every
13 6th or 7th person I was selling.
14   Q.    So what would that make your
15 sales ratio; do you know?
16   A.    About 6.5, 7.
17   Q.    You're positive of that?
18   A.    Yes.
19   Q.    Do you have a record of that?
20   A.    Yes.
21   Q.    And how were your numbers, if you
22 know, compared to others?  Where did you fall?
23   A.    In the middle.
24   Q.    In the middle.  Who had a worse

Page 59

1  record than you at that time that was a sales
2  person?
3    A.    That was a sales person?
4    Q.    You were a sales person at the
5  time of your termination?
6    A.    Yes.  Let's see, Bonnie Ecklund,
7  who was terminated the same day.
8    Q.    She was terminated the same day?
9    A.    Yes.
10   Q.    Anyone else terminated that day?
11   A.    Not to my knowledge.
12   Q.    Anyone with a worse record than
13 you and Bonnie; sales person?
14   A.    No.
15   Q.    Did you have any discussions with
16 Bonnie regarding her termination?
17   A.    No.
18   Q.    Did you have any discussions with
19 Bonnie regarding your termination?
20   A.    No.
21   Q.    Have you talked to her since your
22 termination?
23   A.    Yes.
24   Q.    And when did you talk to her?

Page 60

1    A.    Maybe a month ago.
2    Q.    What was the nature of that
3  conversation?
4    A.    She told me she got her job.
5    Q.    How did you learn she had been
6  terminated?
7    A.    She told me.
8    Q.    When?
9    A.    The same day.
10   Q.    What did she say?
11   A.    She was fired.
12   Q.    Did she tell you why?
13   A.    No.
14   Q.    And what did you say?
15   A.    I was with a customer.
16   Q.    Was she fired before you were?
17   A.    Yes.
18   Q.    Have you asked her to join this
19 lawsuit?
20   A.    No.
21   Q.    Have you spoken to any -- other
22 than Bonnie, any current or "X" Patriot
23 Resorts employees since your separation from
24 employment?

Page 61

1    A.    Yes.
2    Q.    Who?
3    A.    Names?
4    Q.    That would be helpful, yes.
5    A.    Phil Symonds, Ned Abbott, Kimmie
6  and Tom McArdle, Gary Campagna, Mike Campagna,
7  Bob Campagna, John Gordon.  Mostly the line.
8  Mostly everyone there, except for the office
9  people.
10   Q.    Did you go back into the office
11 at all?
12   A.    I have not stepped on the grounds
13 of Vacation Village since that day.
14   Q.    How did you come to speak to John
15 Gordon?
16   A.    In a restaurant.
17   Q.    You ran into him?
18   A.    Yes.
19   Q.    Were you there together?
20   A.    No.
21   Q.    What was your conversation with
22 him?
23   A.    He asked me how I was doing, and
24 I said I was doing fine.  And he just said I

16  (Pages 58 to 61)

1 hope you get them.
2    Q.    And what did you take that to
3 mean?
4         MR. FELDMAN:  Objection.  Go
5 ahead.
6         THE WITNESS:  Well, win the
7 lawsuit.
8         (BY MR. FABBO):
9    Q.    Do you know if Mr. Gordon ever
10 made any complaints about you having a
11 negative attitude to anyone at Patriot?
12    A.    No.
13    Q.    Did any of the employees in your
14 line complain about the lack of enforcement of
15 the dress code on the other line?
16    A.    Yes.
17    Q.    Who complained?
18    A.    The whole line.
19    Q.    Do you remember who they were
20 complaining about?
21    A.    Lisa Ferreira, Jane Engleheart.
22 There were several others, but I can't recall
23 their names at the moment.
24    Q.    Did you ever complain about

1 Lacrisha Wise regarding anything while you
2 were at Patriot Resorts?
3    A.    Tardiness.
4    Q.    Anything else?
5    A.    No.
6    Q.    What was the problem with Lisa
7 Ferreira's dress?
8    A.    Well, eight inches above her knee
9 standing up.
10    Q.    Short skirts you're saying?
11    A.    Yes.
12    Q.    Is that a "yes"?
13    A.    Yes, Ma'am.
14    Q.    What about Jane?
15    A.    The same.
16    Q.    And those are the only two you
17 can think of?
18    A.    For females.
19    Q.    What about males?
20    A.    Well, Dwayne Johnson, Mark
21 Silloway.  They have a policy that they do not
22 enforce.
23    Q.    What's the policy?
24    A.    Men can't wear hats.  Women can't

1 wear dresses two inches above their knee with
2 slits on the side.  Loose tops, tank tops,
3 sandals, and it goes on.
4    Q.    Okay.  And you're saying that the
5 other line was allowed to get away with this
6 dress, violating the code?
7    A.    Yes.
8    Q.    And Mr. Leete wanted you guys to
9 adhere to this dress code?
10    A.    That's correct.
11    Q.    Okay.  The males that you
12 mentioned, Dwayne and Mark.  What was the
13 issue with their dress code?
14    A.    Dwayne was fired for his hat.
15    Q.    He was fired for it?
16    A.    Yes.
17    Q.    You're not supposed to wear a
18 hat?
19    A.    That's correct.
20    Q.    And what about Mark?
21    A.    Mark was sent home for the same
22 thing.
23    Q.    For wearing a hat?
24    A.    Yes.

1    Q.    What type of hats were these?
2    A.    A typical hat that you would
3 wear.
4    Q.    Baseball cap?
5    A.    No.
6    Q.    A rain hat?
7    A.    It would be like a dress hat,
8 like a Stetson hat Mark would wear.  Dwayne
9 would wear a stylish jacket or an outfit with
10 a red hat with a feather sticking out of it.
11         While Paul's line could do a
12 wrinkled up hat with leather with a bird
13 hanging off the side or baseball cap, and
14 nothing happened.
15    Q.    Okay.  So Dwayne was in your
16 line?
17    A.    No.
18    Q.    Was Dwayne or Mark in your line?
19    A.    No.
20    Q.    So they were on the other line?
21    A.    Yes.
22    Q.    And Dwayne was actually
23 terminated ultimately for that?
24    A.    Yes.

Page 66

1    Q.    And was that in any way as a
2  result of people complaining that the dress
3  code wasn't being enforced in Mr. Stenslind's
4  line?
5    A.    I have no clue.
6    Q.    When was he terminated?
7    A.    Some time in 2002.
8    Q.    What was Mark's last name?
9    A.    Mark Silloway.
10   Q.    When you were a sales person
11 prior to being a Sales Manager, what hours of
12 work did you work?
13   A.    In the beginning, 9:00 to 4:00.
14   Q.    And then did that change at some
15 point in time?
16   A.    About nine months later Ms.
17 Foster came up.  Ripped the sign down, and
18 said you will tour people at any time.  And we
19 started coming in at 8:30.
20   Q.    And then what happened?
21   A.    It's still 8:30.
22   Q.    And what time would you get home?
23   A.    Sometimes 8:00 or 9:00 o'clock at
24 night.

Page 67

1    Q.    And other times?
2    A.    At other times, 3:30, 4:00
3  o'clock.
4    Q.    Do you have a record of which
5  days were which?
6    A.    On occasions I do.
7    Q.    Prior to being Sales Manager and
8  after the nine months you referenced, how many
9  hours did you average per week?
10   A.    How many hours did I average?
11   Q.    Working?
12   A.    Our paychecks are always 40
13 hours.
14   Q.    That's not what I'm asking.  I'm
15 asking how many you worked, not what your
16 paycheck said.
17   A.    I was there from 8:30 I would say
18 until 5:00 o'clock or 4:00 o'clock or until
19 they sent me home.
20   Q.    Did you ever work less than 40
21 hours per week?
22   A.    No.
23   Q.    Never?
24   A.    What do you mean?  Did I work

Page 68

1  less than 40 hours per week.
2    Q.    Yes?
3    A.    As a sales person?
4    Q.    Yes?
5    A.    When we didn't get tours, yes.
6    Q.    And did you ever work more than
7  40 hours per week?
8    A.    Yes.
9    Q.    When was that?
10   A.    Summer time, winter time, and a
11 couple of days in the fall.
12   Q.    If you could just explain -- you
13 suggested that you weren't getting tours or
14 they didn't have tours, and that that was an
15 issue at some point; is that correct?
16   A.    It's been an issue from six
17 months into the program.
18   Q.    So then why were you working more
19 than 40 hours per week?
20   A.    Because they would send me out at
21 4:00 o'clock in the afternoon to do a
22 four-hour tour.  I was there at 8:30 in the
23 morning.
24   Q.    And you stayed there all day?

Page 69

1    A.    Yes, Ma'am.
2    Q.    And what would you do during the
3  day?
4    A.    Sit down in the lounge or the pit
5  as it's called or walk outside and walk back
6  in.
7    Q.    Did you ever leave to go get gas
8  or do errands?
9    A.    Once.
10   Q.    Only one time?
11   A.    Only one time.
12   Q.    Did others?
13   A.    I'm assuming they did.
14   Q.    Well, did you ever see anyone
15 leave and then come back before the next wave?
16   A.    I seen people leave, but I don't
17 know if they came back.
18   Q.    But did you say earlier that Mr.
19 Stenslind's team was allowed to leave?
20   A.    Mr. Stenslind's team does
21 anything they want.
22   Q.    Okay.  And Mr. Leete's team could
23 only leave with permission?
24   A.    That's correct.

Page 70

1    Q.    Did Mr. Leete ever refuse you
2  permission?
3    A.    Yes.
4    Q.    How many times?
5    A.    I would say a couple of times a
6  week people would ask and he would --
7    Q.    -- no, I'm asking about you?
8    A.    Oh, you're talking specifically
9  about me?  I never asked.
10    Q.    Did you ever arrive at work late?
11    A.    Yes.
12    Q.    Did you have a doctor's note?
13    A.    No.
14    Q.    How many times would you say you
15  were late?
16    A.    In the three and a half years
17  that I was there, twice.
18    Q.    Were you put on overage as a
19  result of that?
20    A.    Yes.
21    Q.    Can you tell me what overage is?
22    A.    Overage is, according to the
23  policy, if I come in late without a doctor's
24  note I would go and sit in the pit all day.

Page 71

1         And if I am missing out of the
2  pit or if I leave to go home, it went over to
3  the next day so I don't take a tour.
4         You're not allowed to take a tour
5  unless they are an overflowing tour, and you
6  have to wait so many minutes.
7    Q.    Does overage mean you go to the
8  bottom of the list?
9    A.    No, you're at the bottom of the
10  list.
11    Q.    What?
12    A.    You are the bottom of the list.
13    Q.    That's what I'm asking.
14    A.    Yes.
15    Q.    So you would only then get a tour
16  if there were enough tours to provide for
17  everyone ahead of you?
18    A.    Yes.
19    Q.    Did you ever write to anyone at
20  Berkley?
21    A.    No.
22    Q.    Did you ever file a complaint
23  with the Attorney General's Office regarding
24  your employment at Patriot?

Page 72

1    A.    Yes.
2    Q.    When was that?
3    A.    Some time this year, last year.
4    Q.    And what happened as a result of
5  that complaint?
6    A.    I was sent a letter stating under
7  such and such code, the best thing to do was
8  to get my own lawyer and take them to court.
9    Q.    Okay.  And was your lawsuit
10  already pending at that time?
11    A.    Not to my knowledge.
12    Q.    Could you tell me, sir, if that
13  is your signature on this document?
14    A.    Yes, it is.
15         MS. FABBO:  Could you mark that,
16         please.
17         (Whereupon, Defendant's Exhibit 5
18         Harassment Complaint Procedure,
19         marked for identification)
20         (BY MS. FABBO):
21    Q.    Mr. Massaconi, under the
22  Communications Grievance Procedure in the
23  third paragraph, it states that you could
24  contact corporate headquarters anonymously to

Page 73

1  raise any concerns that you had.  Did you ever
2  do that?
3    A.    No, I did not.
4    Q.    Were you aware that you could do
5  that?
6    A.    Yes, I was.
7    Q.    And why did you not do that?
8    A.    Because a directive came down
9  from Bill Rauer not to call corporate.
10    Q.    And do you have a copy of that
11  directive?
12    A.    No, it was verbal.
13    Q.    And what was Mr. Rauer's position
14  at the time when he issued that directive?
15    A.    He got a promotion to Regional
16  something or another for five or six different
17  resorts.  He came up and made the statement to
18  everyone that was there.  Managers and sales
19  people.
20    Q.    And when was this?
21    A.    I think it was a written memo
22  that went out too.  I would say it's June.
23  May or June of last year.
24    Q.    Prior to that, had you had any

Page 74

1 reason to contact corporate headquarters?
2     A.    Myself?
3     Q.    Yes?
4     A.    No.
5     Q.    Did you have any concerns about
6 your compensation prior to this directive that
7 you referred to?
8     A.    I brought concerns to both Bill
9 Rauer and Ron Lewis, and I was told thank you
10 for your time.
11     Q.    Okay.  Tell me the concerns you
12 brought to Mr. Lewis' attention, and when that
13 was?
14     A.    To Mr. Lewis?
15     Q.    Yes, sir?
16     A.    It would have been '04, some
17 time.  I had some concerns about the tour
18 flow, and we were losing good people.
19     Q.    Losing good employees?
20     A.    Yes.
21     Q.    Okay.
22     A.    And I basically told them to buy
23 a book.  "You're Rights In The Work Place".
24 And then he told me after an hour of talking

Page 75

1 with him, thank you very much buddy for your
2 concerns.
3     Q.    Let me just make sure I have this
4 right.  You went to -- first of all, who was
5 Mr. Lewis at the time?
6     A.    He was the Program Director at
7 the time.
8     Q.    The Project Director or Program?
9     A.    Yes, the Project Director.
10     Q.    At Patriot Resorts?
11     A.    Yes.
12     Q.    Did you go to his office?
13     A.    We met in his sales office.
14     Q.    And did you arrange that meeting?
15     A.    Actually, Gordon did.
16         (Off the record)
17         (Back on the record)
18         (BY MS. FABBO):
19     Q.    Tell me how Gordon became
20 involved?
21     A.    Well, I went to Gordon and
22 expressed my concerns, and Gordon got Ron when
23 he wasn't busy.  Then they asked me to go over
24 and sit in.

Page 76

1     Q.    What were your concerns that you
2 expressed to Gordon?
3     A.    Basically, the negativity in the
4 pit, because we were having people sit there
5 all day and no tours were coming in.
6     Q.    Okay.  And was Mr. Leete
7 responsive to your concerns?
8     A.    He said I understand.  I will
9 take that up with Mr. Lewis.
10     Q.    And how long between the time you
11 spoke with Mr. Leete and Mr. Lewis?
12     A.    Between the two?
13     Q.    Yes?
14     A.    Three or four hours.
15     Q.    Okay.  You said you spent
16 approximately an hour with Mr. Lewis?
17     A.    That's correct.
18     Q.    And tell me what you discussed
19 with him?
20     A.    I discussed Data King is a
21 marketing company that we were told we would
22 never have to work for.  And they just gave
23 them a contract.
24         That we needed to have more tours

Page 77

1 and less sales people.  Because the people
2 that were there -- we were up 48 to 50 sales
3 people, and we weren't getting 20 tours a day
4 in the door.
5         So the way it worked was that if
6 I sold today and I went out, I would go out
7 tomorrow.  And if you two were there waiting,
8 you wouldn't go out.
9     Q.    So the person who made the sale?
10     A.    Would go out the next day ahead
11 of everybody else who did not go out.  And I
12 thought that was unfair to the people who they
13 signed up to make this work.  It didn't give
14 everyone a fair opportunity to make money.
15     Q.    Okay.  Anything else you
16 mentioned to him?
17     A.    That was part of it.  And them
18 not giving us letters of cancellation.  When
19 customers would cancel, we weren't given
20 letters.  We were in the beginning for a year
21 and a half, and then that stopped.
22         So you would expect your paycheck
23 and to see your name on the pay sheet, and
24 your name wouldn't be there.  You would have

Page 78

1  to run around or go see Faith or the Human
2  Resources Director to find out what was going
3  on, and that is when we went told well they
4  canceled and we weren't notified.
5      So it brought the moral down when
6  you were expecting $1,000 or $2,000 check, and
7  there is nothing.
8      Q.   Okay.  And anything else that you
9  discussed with Mr. Lewis?
10     A.   That's all I can recall at this
11 time.
12     Q.   Did you make any notes of that
13 conversation?
14     A.   Yes, I did.
15     Q.   And do you still have those?
16     A.   Yes, I do.
17     Q.   When was that conversation,
18 approximately?
19     A.   I would say some time in '04 or
20 the end of '03.
21     Q.   And did Mr. Lewis say anything to
22 you during the conversation other than what
23 you already told me?
24     A.   No.  He just told me thank you

Page 79

1  for your concerns.
2      Q.   Okay.  Did you ever have occasion
3  to meet with Mr. Lewis on any other issues
4  where you had a concern?
5      A.   I was brought in with the rest of
6  the Managers in July, and was told that he was
7  not -- contrary to the rumor, they were not
8  trying to fire the people that signed onto the
9  lawsuit.
10     Q.   Had you heard that rumor?
11     A.   Yes.
12     Q.   And who did you hear that from?
13     A.   People in the pit.
14     Q.   Who?
15     A.   Mostly the women that were there
16 were afraid of being terminated.
17     Q.   And who were the women?
18     A.   Deana McCormick, Martin.  I don't
19 know her first name.  Burnham, and I don't
20 know her first name.  F. Torra, Judd Kuzia was
21 in there.  Steve Alibozek was in there.
22     Q.   Did anyone identify what the
23 source of this rumor was?
24     A.   Not to my knowledge.

Page 80

1      Q.   It was just the employees talking
2  amongst themselves?
3      A.   Yes.
4      Q.   Was there anything more than
5  speculation, to your knowledge?
6          MR. FELDMAN:  Objection.  Go
7      ahead.
8          THE WITNESS:  I just thought it
9      was people just talking.
10         (BY MS. FABBO):
11     Q.   Okay.  So that was a meeting
12 arranged by Mr. Lewis to inform you that they
13 weren't trying to fire people in the lawsuit?
14     A.   That's correct.
15     Q.   And was anything else discussed
16 in that meeting?
17     A.   No.
18     Q.   How long did it take place?
19     A.   It took place in Kathy Redmon's
20 office.
21     Q.   Mr. Massaconi, I'm going to show
22 you a copy of the Second Amended Complaint and
23 Demand For A Jury Trial that was filed in this
24 action.  And ask you if you have ever seen

Page 81

1  this document before?
2      A.   Yes.
3          MS. FABBO:  Could you mark that,
4      please.
5          (Whereupon, Defendant's Exhibit
6          6, Second Amended Complaint and
7          Demand for a Jury Trial, marked
8          for identification)
9          (BY MS. FABBO):
10     Q.   Could you please turn to
11 paragraph 67, and tell me whether that
12 statement -- I'll give you a chance to read
13 it.  Have you had a chance to read it?
14     A.   Yes.
15     Q.   Okay.  Is that statement the
16 conversation you just referred to with Mr.
17 Lewis where he called the Managers in?
18     A.   No.
19     Q.   That's some other time?
20     A.   Yes.
21     Q.   When did Mr. Lewis make the
22 statement referred to in that paragraph?
23     A.   I can't recall the time, but I
24 spoke to Mr. Lewis about reprising.  And I

Page 82

1 told him what they were doing to me was
2 discrimination, and it was because I filed the
3 lawsuit. And his answer to me was you're
4 correct.
5     Q.    That's not what the statement
6 says, though is it?
7     A.    No, but you're asking me when it
8 took place.
9     Q.    He said that they were
10 retaliating against you because of the
11 lawsuit?
12     A.    I had told him it was because of
13 reprisal, okay? The way I was being treated.
14 And he looked at me right in my eyes and told
15 me yes, and that was between him and I.
16     Q.    And who was discriminating
17 against you because of the lawsuit?
18     A.    The company.
19     Q.    Who?
20     A.    It would be Bill Rauer.
21     Q.    And what was his position?
22     A.    He's above Ron Lewis.
23     Q.    Do you know what his position was
24 at the time you made this statement?

Page 83

1     A.    No.
2     Q.    How do you know that Mr. Rauer
3 knew anything about the lawsuit?
4     A.    Because Mr. Rauer came up within
5 two weeks, and he had a talk with Mr. Lewis.
6     Q.    How do you know that?
7     A.    I was there when they took Mr.
8 Lewis aside. And then I was asked by Mr.
9 Rauer that it was up to Mr. Lewis. It had
10 nothing to do with him. And I said well, Mr.
11 Lewis said it was you.
12     Q.    What was you?
13     A.    About the position of a Manager.
14 They were shoveling it back and forth from
15 Orlando to up here.
16     Q.    I'm confused. I'm asking you how
17 did you know that Mr. Rauer -- did Mr. Rauer
18 tell you he was aware of your lawsuit?
19     A.    Yes.
20     Q.    He told you that?
21     A.    Yes.
22     Q.    And what did he say?
23     A.    He said he was aware of what was
24 going on.

Page 84

1     Q.    And those were his exact words?
2     A.    Yes.
3     Q.    Okay. And you took that to mean
4 that he was aware that you had participated in
5 a lawsuit?
6     A.    It was printed in the newspaper.
7     Q.    Did he tell you he had read it?
8 The newspaper article?
9     A.    They had it posted all over the
10 resort when I came to work.
11     Q.    Who had it posted?
12     A.    I don't know who.
13     Q.    Where was it posted?
14     A.    It was in the sales office and in
15 the pit.
16     Q.    And what makes you think Mr.
17 Rauer read this?
18     A.    Mr. Rauer reads everything.
19     Q.    Okay. You're just guessing.
20         MR. FELDMAN: Objection. Go
21 ahead.
22         (BY MS. FABBO):
23     Q.    Do you know that for a fact that
24 he reads everything?

Page 85

1     A.    It seems to be that way.
2     Q.    Did you ever see him reading this
3 newspaper article?
4     A.    Not that newspaper article, no.
5     Q.    And did he tell you I know that
6 you are participating in a lawsuit?
7     A.    Yes.
8     Q.    In those words?
9     A.    Yes.
10     Q.    So he didn't just say he knew
11 what you were up to or something to that
12 effect?
13         MR. FELDMAN: Objection. Go
14 ahead.
15         THE WITNESS: Right.
16         (BY MS. FABBO):
17     Q.    And did he say anything other
18 than that?
19     A.    No.
20     Q.    And what did you say in response?
21     A.    I just walked away.
22     Q.    When did this happen?
23     A.    September, '04.
24     Q.    Okay. And when was your lawsuit

Page 86

1 filed?
2    A.    I don't know.
3    Q.    Do you know when it was
4 originally filed?
5    A.    No, I do not.
6    Q.    And what exactly -- when you said
7 they were doing this to you because of your
8 lawsuit, and you said that Mr. Lewis agreed
9 with you.  What were you referring to?
10    A.    Becoming a Manager again.
11    Q.    You wanted to become a manager
12 again?
13    A.    Yes.
14    Q.    And when did you want to become
15 Manager again?
16    A.    As soon as my numbers were
17 brought back up to where they were, and they
18 were on point.
19    Q.    And what were those number?
20    A.    9.2.
21    Q.    Does that mean you would make two
22 sales out of every nine?
23    A.    That's correct.
24    Q.    And when did you have your

Page 87

1 numbers at 9.2 again?
2    A.    October, '04.
3    Q.    Did you ever -- were you ever
4 suspended from employment?
5    A.    Was I suspended?
6    Q.    Yes?
7    A.    Yes.
8    Q.    When was that?
9    A.    I was asked not to come in
10 November or December.  The end of November
11 first of December.  Gary Campagna called me
12 up.
13    Q.    And did he tell you why?
14    A.    He told me Bill Rauer found out
15 that I knew about the number of tours coming
16 in for December, and that I was not to come to
17 work Sunday, Monday, Tuesday and to come in on
18 Saturday.
19    Q.    Is that all he told you?
20    A.    Yes.
21    Q.    Did he mention whether anyone had
22 complained about you -- your negativity
23 relating to the number of tours?
24    A.    No.

Page 88

1    Q.    Were you a Sales Manager at the
2 time or a sales person?
3    A.    I was a sales person.
4    Q.    Did he tell you how he became
5 aware that you knew about the number of tours?
6    A.    I had two customers complain to
7 me the same day about not wanting to be at the
8 Resort in November.  They wished to come up in
9 December.
10       So after I had one tour and they
11 complained to me, I go to my immediate
12 supervisor.  Which is Mr. Campagna, Gary.  I
13 told him what happened.  He said well, here's
14 another tour for you.  Go take it.  So I took
15 that tour, and it was like a repeat of the
16 first one.
17       So I came back from the tour, and
18 didn't sell either one.  Came back from the
19 tour and I asked him if I may go over and see
20 Dennis, who runs the reception center.  When I
21 walked in, Dennis was on the phone.  As I
22 approached the table, he had his hand up.  He
23 told me to stay away.
24       So after he got done with the

Page 89

1 phone, I asked him what was going on.  He said
2 what do you mean?  I said I had two customers
3 complain saying that they wished to be here in
4 December not November.  They were told by our
5 marketing company in Virginia that the Resort
6 is closed from December on.
7       So he said that's funny, because
8 I just got off a phone with a customer who
9 wished to come here and purchase the first two
10 weeks of December, but did not want to talk to
11 a sales person.  And I just got off the phone
12 now with Virginia, and they told me they were
13 closed.
14    Q.    So when you say Virginia?
15    A.    That's where the marketing
16 company is located.
17    Q.    And what's the name of the
18 marketing company?
19    A.    I have no idea.  There are
20 several of them down there.  I don't know
21 which one.
22    Q.    And are these companies that
23 attempt to get by various means patrons -- can
24 I finish my question, please.  Companies that