1  try to get customers to come to the Resort and
2  tour?
3      A.   Yes.
4      Q.   And is it your understanding that
5  Patriot has a variety of companies that it
6  works with on --
7      A.   -- this is one that they own.
8           MS. FABBO:  Can you let me
9        finish, because she can't write two
10       things at once.
11          (BY MS. FABBO):
12     Q.   This is one that they own?
13     A.   Yes.
14     Q.   Okay.  You don't know the name of
15  it?
16     A.   No.
17     Q.   Patriot owns the company in
18  Virginia you're saying?
19     A.   Yes, the marketing company.
20     Q.   And how do you know that?
21     A.   We were told that.
22     Q.   By whom?
23     A.   Bill Rauer, Bruce Polansky, Paul
24  Stenslind, and Dennis.

1      Q.   So go on with your story.
2      A.   He called up to try and get the
3  people in here, and they told him they were
4  closed.  So I said well that was my question
5  that I wanted to ask you.
6           I walked outside to go over and
7  report to Mr. Campagna, whose my boss.  Dennis
8  came walking out, and he had a manifest with
9  him.  And he says here, this is what we have
10  for December.  And there were nine tours
11  scheduled for each day.  And I said yes, I
12  hope that changes.  I had walked across the
13  bridge to see Mr. Campagna to tell him what I
14  found out.
15          What was told to me later by Mr.
16  Campagna was that Deana McCormick overheard
17  the conversation about the number of tours.
18  So Mr. Campagna and Ms. McCormick were on the
19  deck of the sales office center talking, and
20  Mr. Stenslind overheard the conversation
21  between Deana McCormick and Gary Campagna on
22  how I found out that there were only nine
23  tours scheduled for each day of December for
24  the Resort.

1           And Deana McCormick stated to
2  Paul that she couldn't work there if that was
3  the case.  She would have to get another job.
4  Paul Stenslind overheard the conversation.  I
5  got a phone call from Gary Campagna.
6      Q.   And this is Gary telling you all
7  of this?
8      A.   Yes.
9      Q.   Okay.  Go ahead.
10     A.   And I was suspended.  I don't
11  think that was negative.  I was reporting what
12  I wanted to find out to my boss, and I was
13  suspended for that.
14     Q.   Okay.  And that's the whole story
15  as you know it?
16     A.   That's the whole story.
17     Q.   And so how many tours were there
18  in December?
19     A.   Not many.
20     Q.   Did you know how many?
21     A.   No, I do not.
22     Q.   Did you keep track?
23     A.   I keep track of my own tours.  On
24  occasion I write down the number of tours.

1      Q.   I guess I'm confused.  Why would
2  Patriot -- do you know why Patriot would want
3  to decrease the number of tours?
4      A.   To flush people out.
5      Q.   Flush who out?
6      A.   Force people to quit who aren't
7  making any money.  In other words, if you're
8  at the bottom of the wheel or mid way and
9  there are 40 people on the list, and they only
10  bring in or schedule 20 tours.  That means 18
11  people will not go out.
12          If 10 of those people sell that
13  day, they go out before the other 18 people
14  the next day.  So that's two days you are not
15  making any money or you did not have an
16  attempt to make any money.
17     Q.   So are you saying they purposely
18  tried to reduce tours to get people to quit?
19     A.   That's correct.
20     Q.   Wouldn't that negatively effect
21  their cash flow, though?
22     A.   Not necessarily.  That's one
23  department.
24     Q.   Is there any reason they

1  couldn't, to your knowledge, just terminate
2  people at the bottom of the list?
3      A.     Then they can collect
4  unemployment?
5      Q.     Right?
6      A.     I don't know.
7      Q.     So were you ever happy with your
8  job at Patriot Resorts?
9      A.     I was happy right up until the
10 day they fired me.
11     Q.     Even though you were making less
12 than you wanted to make?
13     A.     I go to work everyday to make
14 money.  I made the money, and I was fired.
15     Q.     Are you married?
16     A.     Yes.
17     Q.     Is your wife employed?
18     A.     Yes.
19     Q.     Where is she employed?
20     A.     She's employed for Hematology
21 Oncology as a Financial Coordinator.
22     Q.     Is that in New York?
23     A.     No, in Massachusetts.
24     Q.     Where is it?

1      A.     It's located in the Berkshires.
2      Q.     Have you ever been involved in
3  any other lawsuits that related to your
4  employment?
5      A.     Yes.
6      Q.     What lawsuits were those?
7      A.     A lawsuit on discrimination.
8      Q.     Who was your employer at the
9  time?
10     A.     Berkshire Farm & Services For
11 Youth.
12     Q.     Could you say that again, please.
13     A.     Berkshire Farm & Services for
14 Youth; New Canaan, New York.
15     Q.     Any other lawsuits related to
16 your employment?
17     A.     No.
18     Q.     Can you tell me what your
19 involvement was in that lawsuit?
20     A.     I was a Manager of a residential
21 group of 30 clients and 11 staff.  And a new
22 CEO came in and fired everyone with the last
23 letter ending in "I" or "O".
24     Q.     And what was your role in that

1  lawsuit?
2      A.     I filed a lawsuit with other
3  people under discrimination.
4      Q.     What kind of discrimination?
5      A.     Reverse.
6      Q.     And what was the reverse
7  discrimination?
8      A.     Hiring people with less
9  qualifications, paying them more money.
10     Q.     And what was the particular
11 classification you alleged it to be?
12     A.     I can't recall.
13     Q.     So there were more people
14 involved in that lawsuit?
15     A.     Yes.
16     Q.     Who were the other people?
17     A.     I don't recall.
18     Q.     Who was your attorney?
19     A.     Joseph P. McGovern.  Albany, New
20 York.
21     Q.     What was the outcome?
22     A.     As far as I know they won two,
23 and it's still continuing.
24     Q.     They won two?

1      A.     Yes.
2      Q.     Were these separate lawsuits?
3      A.     Yes.
4      Q.     What happened to your lawsuit?
5      A.     I have no clue.
6      Q.     When was this?
7      A.     1995.
8      Q.     That's when you filed it?
9      A.     Yes.
10     Q.     Where was it filed?
11     A.     You York State.
12     Q.     So it's been ten years, and as
13 far as you know it's still pending?
14     A.     Yes.
15     Q.     Have you been called as a witness
16 to testify in that lawsuit?
17     A.     No.
18     Q.     Have you had a trial of any sort?
19     A.     No.
20     Q.     Have you participated in any
21 court proceedings?
22     A.     No.
23     Q.     When is the last time you checked
24 on status of that case?

Page 98

1    A.    Four months ago.
2    Q.    Is that when you learned it was
3  still pending?
4    A.    I couldn't contact the lawyer. I
5  couldn't get ahold of him. I'm assuming it's
6  still pending. I haven't heard anything
7  other.
8    Q.    When is the last time you
9  actually confirmed the status of the lawsuit?
10        MR. FELDMAN:  Without saying
11        anything that you and your lawyer
12        talked about.
13        THE WITNESS:  Two years ago.
14        (BY MS. FABBO):
15    Q.    Has your wife been involved in
16  any lawsuits relating to her employment?
17    A.    No.
18    Q.    Do you have any children?
19    A.    Two.
20    Q.    What are their names?
21    A.    Monique and Matthew.
22    Q.    Same last name?
23    A.    My son has the same last name.
24  My daughter's last name is Grozs; G-R-O-Z-S.

Page 99

1    Q.    Either one of them an attorney?
2    A.    No.
3    Q.    Either one been involved in any
4  lawsuits related to their employment?
5    A.    No.
6    Q.    Have you told me about all your
7  conversations with Mr. Rauer related to issues
8  you have with Patriot?
9        MR. FELDMAN:  Objection. Go
10        ahead.
11        THE WITNESS:  I have had I think
12        three conversations with Mr. Rauer.
13        (BY MS. FABBO):
14    Q.    Is that it?
15    A.    Other than the ones I have
16  mentioned.
17    Q.    What are the other three?
18    A.    I met with Mr. Rauer on concerns
19  in 2001, in 2002. Over safety issues and
20  chemicals.
21    Q.    On both of those occasions?
22    A.    What was it?
23    Q.    It was safety issues and
24  chemicals in 2001 and 2002?

Page 100

1    A.    Yes.
2    Q.    Anything else?
3    A.    Tour flow.
4    Q.    In what year?
5    A.    In what year?
6    Q.    Yes?
7    A.    Both.
8    Q.    So what about tour flow?
9    A.    We were all guaranteed two trips
10  a day. Guaranteed and promised two trips a
11  day. And that the people that we would be
12  seeing would be coming in with credit cards,
13  and no one comes here without a job. They are
14  prequalified.
15    Q.    That wasn't part of your
16  employment contract, though, was it?
17    A.    Not written, verbal.
18    Q.    Who promised you that?
19    A.    Bruce Polansky, Bill Rauer.
20    Q.    Is there any reason why you
21  didn't demand that they put that in writing?
22    A.    Not at the time, because we
23  thought they were an honest organization.
24    Q.    Any other conversations with Mr.

Page 101

1  Rauer? You said three. Are those the three?
2    A.    I was asked to go in and talk
3  with Mr. Rauer by the sales people pertaining
4  to hiring practices, insurance, and the wheel.
5  And when I was in there, they sent a letter to
6  corporate I found out afterwards.
7    Q.    Okay. And that was one
8  conversation about hiring practices,
9  insurance, and the wheel?
10    A.    Yes.
11    Q.    When was that?
12    A.    2001, 2002. When he was in
13  charge.
14    Q.    What was the letter that you
15  referred to?
16    A.    It pertained to one of the
17  gentleman. The grievance procedure. I did
18  not know they sent a letter out.
19    Q.    Whose "they"?
20    A.    "They", the "sales people" that
21  were there.
22    Q.    Did you see a copy of this
23  letter?
24    A.    I never saw a copy of it. I know

Page 102

1  it was going to James Lambert, Becky Foster,
2  and Ottino.
3      Q.   So someone told you that a letter
4  was sent?
5      A.   Yes.
6      Q.   And what was the letter about?
7      A.   Pertaining to what was promised
8  us, and what we were receiving.
9      Q.   And what was promised to you?
10     A.   Two tours a day, and qualified
11 tours.
12     Q.   Anything else that was in that
13 letter that you heard of?
14     A.   I did not read the letter, but I
15 know those items were in there.
16     Q.   They didn't ask to join in on the
17 letter?
18     A.   No, Ma'am.
19     Q.   Okay.  When you went to see Mr.
20 Rauer about this issue, what did you say about
21 the insurance portion of the conversation?
22 With respect to the insurance portion?
23     A.   They were hiring people with no
24 cars.  And they were forcing people to come to

Page 103

1  work there to up their insurance in order to
2  obtain the job.
3      Q.   That was the company's policy
4  that you had to have a certain amount of
5  insurance?
6      A.   Yes.
7      Q.   And there was an issue with that?
8      A.   There was an issue that they were
9  hiring people with no cars, no license, and no
10 insurance.
11     Q.   And when you say "they", you are
12 talking about Mr. Stenslind's line?
13     A.   Yes.  Everything goes through Mr.
14 Rauer.
15     Q.   What about the issue with the
16 wheel?
17     A.   The issue with the wheel was
18 offering to let the people go out.  If ten of
19 us went out on Monday, and two people sold.
20 Then the line should let the two people go out
21 that sold, and let the rest of the line follow
22 at the end to go out the next day to make it
23 fair.  Because the people that didn't go out,
24 wouldn't have to sit there for two days.

Page 104

1      Q.   Okay.  So there was a complaint
2  about the way the rotation worked; is that
3  right?
4      A.   Yes.
5      Q.   And what did Mr. Rauer say during
6  that conversation?
7      A.   He said he would make some phone
8  calls.
9      Q.   Do you know whether he did or did
10 not?
11     A.   I don't know if he made any phone
12 calls, but the next day I got called into his
13 office again and was asked about the letter.
14     Q.   Was he one that told you about
15 the letter or was it a co-worker?
16     A.   Both.  Almost one right after the
17 other.
18     Q.   And other than him asking you
19 about the letter the following day, did you
20 have any further conversation with him about
21 those subjects that you mentioned?
22     A.   Maybe a year later.
23     Q.   So you didn't go back and
24 follow-up between during that one-year period?

Page 105

1      A.   Yes.  He just brushed me off.
2      Q.   You did go back?
3      A.   Yes.  He brushed me off.
4      Q.   When?
5      A.   About a week later.
6      Q.   And what did you say?
7      A.   He says policy.
8      Q.   No, I asked what did you say?
9      A.   I asked if it was going to get
10 clarified.
11     Q.   And he said that that was the
12 company's policy?
13     A.   He said that was policy.
14     Q.   Any other attempts to discuss it
15 with him?
16     A.   No.
17     Q.   And when you say about a year
18 later, What happened about a year later?
19     A.   The same format.  Except they
20 didn't send a letter out.  Several different
21 people went to speak to him, and then it ended
22 up with me again.
23     Q.   People underneath your
24 supervision?

1    A.    My peers or people who were
2  Managers who were afraid to talk to Bill or to
3  confront Bill.
4    Q.    They came to you, and you were
5  comfortable going to Mr. Rauer?
6    A.    Right.
7    Q.    Was Mr. Rauer on the premises?
8    A.    Yes.  For the first year and a
9  half he was on the premises.
10   Q.    Okay.  And then where was he, do
11 you know?
12   A.    Somewhere in Florida.
13   Q.    You ever hear Ron Lewis swear?
14   A.    Twice maybe.
15   Q.    Can you tell me about those
16 swears that you heard?
17   A.    It was a conversation that he was
18 having with someone, and he walked away
19 cussing.  That was about it.
20   Q.    Like what language would he use
21 or did he use?
22   A.    Well, the "S" word.
23   Q.    Shit?
24   A.    Yes.

1    Q.    Fuck?
2    A.    Yes.
3    Q.    And you heard that twice you
4  said?
5    A.    The only two times I think I've
6  seen him get mad.
7    Q.    Do you know what prompted that
8  language?
9    A.    No, I do not.
10   Q.    When you were Sales Manager, what
11 part of your job was different from when you
12 were a sales person?  Your job duties?
13   A.    My job duties as a sales person
14 is to get the person to want it.
15   Q.    To want the time share?
16   A.    To want the time share.  As a
17 Sales Manager, your job is to go in and
18 solidify certain aspects of what the sales
19 person says.  Then show them the two programs
20 that are available, and the pricing.
21   Q.    Okay.  And then you also referred
22 to other responsibilities, and I just want to
23 understand whether you had any of these
24 responsibilities when you were also a sales

1  person.
2         You mentioned training and
3  getting people through the graduating program.
4  Was that something you only did as a Manager?
5    A.    Yes.
6    Q.    Bringing concerns of your
7  subordinates I would guess was only when you
8  were a Manager; is that correct?
9    A.    Yes.
10   Q.    Anything else you did as a
11 Manager that you did not do as a sales person?
12   A.    Contact other departments.
13   Q.    Okay.  What about customer
14 complaints?  Was that something that you as a
15 Manager were responsible for?
16   A.    Customer complaints, I would tell
17 them where to go.  Direct them who to go to to
18 get a complaint form.  Or I would go get the
19 complaint form, and they would fill it out.
20 Then I would submit it to the person that it
21 was supposed to be submitted to.
22   Q.    And that was in your role as a
23 Manager only?
24   A.    Yes.

1    Q.    When you were a sales person, did
2  you ever check on your co-workers' deals to
3  see if they closed?  Or did you just do that
4  as a Sales Manager?
5    A.    Just as a Sales Manager.
6    Q.    Okay.  What did you -- I believe
7  you said this, but if I'm wrong please correct
8  me.  You said you spent two to four hours when
9  you did a tour; is that correct?
10   A.    That's correct.
11   Q.    Okay.  What did you do during the
12 rest of the day when you were just a sales
13 person?
14   A.    Tours would come in at different
15 times of the day.  And you were scheduled to
16 be -- if you didn't go out, you were in this
17 room about the size of this.  Waiting for
18 someone to come through the door or say
19 Massaconi go out.
20        In the morning you had five
21 minutes to get the slip.  Go out and see a
22 customer.  Introduce yourself to the customer.
23 And in the afternoon you had ten minutes.
24        When we came back, usually during

Page 110

1  the busy time you walked right over and picked
2  up another tour. If there wasn't another
3  tour, you would go back over to the pit until
4  they told you the line was cut.
5      Q.    I guess I'm curious as to what
6  you did in the pit during the waiting time?
7      A.    You could read.
8      Q.    What did you do?
9      A.    What did I do personally?
10     Q.    Yes?
11     A.    I usually would open up my RCI
12  Directory or I would read something on time
13  shares or sales pertaining to making the
14  sales.
15     Q.    Anything else?
16     A.    Have a cup of coffee.
17     Q.    Did you eat lunch there?
18     A.    No.
19     Q.    Where did you eat lunch?
20     A.    I didn't. Very seldom.
21     Q.    Did you watch TV?
22     A.    No.
23     Q.    Were people allowed to watch TV?
24     A.    On occasions.

Page 111

1      Q.    Was the TV on?
2      A.    When they put it on. I mean
3  sometimes they put it on depending on what was
4  on, and some people didn't want to see it and
5  it caused problems at times. So they went
6  outside.
7      Q.    You were allowed to go outside?
8      A.    Yes. You were allowed to go
9  outside and sit on the deck towards the back
10  of the building. Cold days you were allowed
11  to go out by the fire place.
12     Q.    Were there restrictions on what
13  you could or could not do in the pit?
14     A.    Yes, I would way.
15     Q.    And what were some of the things
16  you were not to do?
17     A.    You had to be quiet. You
18  couldn't be noisy obviously if you had people
19  in the other room. Sometimes people would
20  play cards while they were waiting.
21     Q.    Okay.
22     Q.    Anything else you saw people do
23  while they were waiting?
24     A.    People that smoked went outside.

Page 112

1  You know, that's about it.
2      Q.    Did you smoke?
3      A.    No. I never smoked.
4      Q.    Okay. And did people ever bring
5  computers or lap tops into the pit?
6      A.    I think I have seen it once.
7  Will Steele would have a computer, and he
8  would have on the computer the different
9  places you could go.
10         Kathy Redmon would have a lap top
11  in her office to take pictures of where she
12  took a vacation when they were doing closings.
13  They would borrow that to show different
14  people. But those are the only two people
15  I've seen with lap tops.
16     Q.    What about cell phones? Could
17  you talk on the cell phone in the pit?
18     A.    In the pit you could. Other than
19  that, you couldn't have it on. You were
20  directed to have your cell phone off while you
21  were there.
22     Q.    What if you were outside? Could
23  you talk on the cell phone when you were
24  outside?

Page 113

1      A.    I assume. I have seen people do
2  that, yes.
3      Q.    Were there any issues, to your
4  knowledge, about complaints about where sales
5  people parked?
6      A.    Definitely.
7      Q.    Tell me what you know?
8      A.    When we first started, we were
9  parked in the front within the white lines.
10     Q.    The front of which building?
11     A.    The front of the sales building.
12  There was no other building.
13     Q.    Okay.
14     A.    And there was a little snack bar,
15  miniature golf course, go cart track. You
16  know, there was a little arcade and baseball
17  complex for hitting the balls. So we had to
18  park up against the building.
19         Then we were told we could only
20  park around back of the building. Then when
21  they built the new building, that new building
22  was just for sales customers coming in to take
23  tours. No one else was supposed to park over
24  there.

Page 114

1    Q.    Is that the building referred to
2  as the reception center?
3    A.    Reception center; correct. And
4  we as sales people were not allowed to leave
5  our cars over there, so when we picked up the
6  tour we could walk them out to the car.
7          We had to walk over a bridge. Go
8  over to our cars. Either take the customers
9  with us or you could leave them there,
10  depending on the weather. And then ride back
11  around and pick them up at the reception
12  center, and then do the ten steps.
13    Q.    Okay. My question originally was
14  were there complaints about where people
15  parked?
16    A.    Oh, yes definitely.
17    Q.    And what were the complaints?
18    A.    You're not supposed to be parking
19  over there.
20    Q.    At the reception center?
21    A.    Yes.
22    Q.    And who parked at the reception
23  center against policy?
24    A.    Consistently?

Page 115

1    Q.    Yes?
2    A.    Lisa Ferreira, John Gordon, Mark
3  Silloway, Jud Kuzia, Linda Bernum. There were
4  four or five of them that were consistently.
5  You could tell who was over there.
6    Q.    Were these people on Paul
7  Stenslind's line?
8    A.    Yes.
9    Q.    Anyone on Gordon Leete's Line?
10    A.    Yes, one.
11    Q.    Who?
12    A.    Jud.
13    Q.    Did Mr. Leete, to your knowledge,
14  enforce the policy?
15    A.    Yes.
16    Q.    What about Mr. Stenslind?
17    A.    I don't know. The cars were
18  right there the next day.
19    Q.    What about Lacrisha Wise? Did
20  you ever see her parked over there?
21    A.    No.
22    Q.    Did you ever see her sleeping in
23  her vehicle?
24    A.    No.

Page 116

1    Q.    Did you ever see her sitting in
2  her vehicle?
3    A.    Yes.
4    Q.    Okay. Were you allowed to sit in
5  your vehicle between tours?
6    A.    To warm them up.
7    Q.    Just warm up your car?
8    A.    Yes.
9    Q.    Could you sit in your vehicle for
10  extended periods, to your knowledge?
11    A.    As long as the Manager knew where
12  you were.
13    Q.    And that was applicable to your
14  line as well as the other line?
15    A.    That's correct.
16    Q.    In your complaint you have
17  alleged that your wages were decreased. Is
18  that in reference to your change in position
19  from Sales Manager to sales person?
20    A.    Yes.
21    Q.    Is it in reference to anything
22  else?
23    A.    No.
24    Q.    Are you alleging that you

Page 117

1  suffered emotional distress as a result of
2  Patriot's actions?
3    A.    Yes.
4    Q.    Can you describe that for me,
5  please?
6    A.    Well, when I got fired I was
7  tempted to just get in the car and keep going
8  and not confront my wife. And then confront
9  the bill collectors, and you know everything
10  was going through my mind at the time.
11    Q.    That's when you were terminated
12  you said?
13    A.    Yes.
14    Q.    Okay. Go on. I'm sorry.
15    A.    And you know, my wife is a highly
16  emotional woman, like most women are when the
17  money isn't coming into the house. And what
18  are you going to do next? And you're
19  answering 18 different questions.
20          And the car payment is due. The
21  lease on the car is due. The mortgage is due.
22  The electric is due, and you don't sleep. And
23  you're trying to call friends up. People you
24  know in different businesses to get jobs, and

Page 118

1 nobody's hiring.
2       Q.    I guess I'm asking you what
3 symptoms of stress did you have?
4       A.    I had a sleeping disorder for
5 about a month and a half where I couldn't go
6 to bed. I was wound up all the time. I
7 couldn't consume any food at certain times in
8 the morning and in the afternoon normally.
9 The way I normally would eat. I was throwing
10 up.
11          I would go to work things out in
12 the barn or around the house or go jogging.
13 To try and get myself back, and my mental
14 state back where I could deal with my wife and
15 the phone ringing and the bill collectors.
16       Q.    What was your approximate
17 earnings in your last month of employment at
18 Patriot?
19       A.    My last month of earnings?
20       Q.    Yes? Let me make it a little
21 easier, hopefully. In the last few months,
22 what would you say your average earnings were
23 per month?
24       A.    I would have to look and see what

Page 119

1 I have written down. I will take a guess. I
2 will say $1500 to $2,000.
3       Q.    A month?
4       A.    A month.
5       Q.    Any other symptoms of emotional
6 distress that you suffered?
7       A.    Just can't shut your brain off.
8 It's always thinking when your eyes are
9 closed.
10      Q.    Okay. And you said that your
11 eating changed. How did you eat prior to the
12 termination?
13      A.    Well, prior to the termination I
14 would go home and make dinner or make my wife
15 breakfast before she left, and we have a
16 little breakfast together. I just couldn't
17 eat. I would be too nervous, and wake up with
18 hives and sweats.
19      Q.    Other than running and working
20 out in the barn, did you do anything to reduce
21 your emotional state or your emotional stress?
22      A.    Just some breathing techniques
23 that I learned through the years.
24      Q.    Did you see anyone?

Page 120

1       A.    No.
2       Q.    Did you take any medications?
3       A.    No.
4       Q.    And when did this situation
5 improve?
6       A.    About three and a half weeks ago.
7       Q.    And when was your termination?
8 I'm sorry.
9       A.    In February.
10      Q.    Do you know when in February?
11      A.    At the end.
12      Q.    Any other symptoms of emotional
13 distress as a result of Patriot's actions?
14      A.    No.
15      Q.    Have you seen any health care
16 professionals for any reason since your
17 separation from employment?
18      A.    No.
19      Q.    Have you had any income from any
20 other source other than unemployment since
21 your separation?
22      A.    No.
23      Q.    Do you believe that you're still
24 owed any commissions from Patriot?

Page 121

1       A.    I know I am.
2       Q.    Do you know which accounts?
3       A.    I have them home.
4       Q.    Do you believe the payments have
5 been made or do you have reason to believe?
6          MR. FELDMAN: Objection.
7          THE WITNESS: No.
8          (BY MS. FABBO):
9       Q.    Would you expect them to have
10 been paid by now?
11      A.    I would. If they were following
12 the law, I would.
13      Q.    I guess my question is, were
14 these sales that were made right before you
15 were terminated?
16      A.    Yes.
17      Q.    Okay. So it's possible that that
18 could be the three timely monthly payments
19 situation?
20      A.    A couple of them were fold down
21 deals, and there were five penders. Anywhere
22 between $6,000 and $10,000 owed.
23      Q.    Have you contacted anyone to try
24 to obtain this money?

Page 122

1    A.    No.
2    Q.    You have a list of who they are
3  for?
4    A.    Yes.
5    Q.    Did you tell anyone you were
6  coming here for a deposition today?
7    A.    My wife.
8    Q.    Anyone other than your wife?
9    A.    No.
10   Q.    Have you reviewed any of the
11 deposition transcripts from other depositions,
12 such as Ms. Wise or Mr. Martin?
13   A.    Yes.
14   Q.    Who?
15   A.    Questions from Roger.
16   Q.    I'm sorry?
17   A.    Questions from Roger.
18   Q.    Oh, you spoke with Roger?
19   A.    I spoke with Roger.
20   Q.    Did you read his deposition
21 transcript?
22   A.    No.
23   Q.    And what were the questions from
24 Roger?

Page 123

1    A.    He just told me how nice you
2  were.
3    Q.    Are you kidding me? Anything
4  else? What were the questions? That's not a
5  question.
6    A.    He just told me to go in. I
7  asked him how he did. He basically said just
8  go in and just tell the truth. And expect
9  Becky Foster to be there, because she was
10 there. And the Attorney was very nice, except
11 for a couple of occasions.
12   Q.    But you mentioned questions.
13 What were the questions? Did you ask him what
14 to expect?
15   A.    Yes.
16   Q.    Okay.
17   A.    He says a lot of questions. He
18 said he was here for seven hours.
19   Q.    Did you have any benefits when
20 you were you employed at Patriot Resorts?
21   A.    None.
22   Q.    None?
23   A.    No.
24   Q.    What about ESOP? Were you

Page 124

1  involved in the ESOP program?
2    A.    Yes. That was given for one of
3  the reasons to go to work there.
4    Q.    And do you know whether you
5  invested?
6    A.    I think I invested 20 percent of
7  between 70 and $100,000.
8    Q.    Did you play any role in the
9  morning meetings other than being a
10 participant?
11   A.    Which morning meetings? There
12 are two as a Manager.
13   Q.    Okay. Tell me what the two are
14 as a Manager?
15   A.    As a Manager they go in and tell
16 us how good or how negative we did the day
17 before. To have a better day, and to try and
18 promote good attitude with the sales reps.
19        On occasions they would ask for
20 my input. On many occasions they would ask
21 for my input. For directions on how to go
22 from one place to the other, for people who
23 were loss over the phone.
24        For information for different art

Page 125

1  exhibits or hunting licenses. Or anything
2  that had to do with the outdoors. I would
3  have to go and sit on tables at the end with
4  customers. Or I would explain to the sales
5  people in the morning meeting where everything
6  was, and not to over exaggerate things.
7    Q.    Okay. So you would have a
8  management meeting before?
9    A.    Before the regular meeting.
10   Q.    And what time did the management
11 meeting take place?
12   A.    We had to be to work for 8:20.
13 The meeting started at 8:30.
14   Q.    And who conducted them?
15   A.    Ron Lewis, most of them. And
16 Paul Stenslind when Ron wasn't there.
17   Q.    What about Gordon, did he ever
18 conduct any?
19   A.    Gordon would step in when Paul
20 wasn't around.
21   Q.    And then what happened at the
22 regular daily meeting after that?
23   A.    The regular daily meeting would
24 go -- they usually start off the day well

Page 126

1  yesterday is gone. And here are the deals
2  with people who made money yesterday, and they
3  would call their name off.
4      Q.    Who is "they"?
5      A.    They would pick different
6  Managers to do it or it would be the Line
7  Director.
8      Q.    Did you ever do it?
9      A.    Yes, I did.
10     Q.    I guess my question is, what role
11 would you have? What kind of things did you
12 do at that morning meeting, other than just
13 sit there and listen?
14     A.    They would go around the room and
15 ask what we could do to improve. What we
16 could do to help other people out. Say like
17 we go around the room like at this table and
18 ask one question and one answer from each
19 person on how to get to the same direction or
20 same place in time.
21         So we would like, you know, role
22 model a little bit. It was all pick and
23 choose. Whoever Mr. Lewis decided to pick on.
24     Q.    Did you have some sort of

Page 127

1  specialty in outdoor activities and
2  directions?
3      A.    I grew up in New England and the
4  Berkshires. So I could tell you all the good
5  places to go eat, and all the ones to stay
6  away from. And I could tell you how to get to
7  the Berkshires from about 500 miles away in
8  any direction.
9         And people would look for the
10 best place to eat, the customers. Especially
11 when they became owners. Or they wanted to
12 know a shorter way to go home. Virginia would
13 send them the map and get them loss in
14 Sturbridge.
15         And they would put me on the
16 phone and I would tell them that the
17 directions, throw them out the window. You
18 are two and half hours away from us, and
19 people would kind of panic a little bit.
20     Q.    I bet.
21     A.    Yes.
22     Q.    Did you keep any record of days
23 taken off?
24     A.    Personally?

Page 128

1      Q.    Yes?
2      A.    Yes.
3      Q.    Did you utilize your -- was it 15
4  days you got per year?
5      A.    Yes. I come close. Yes,
6  sometimes. I think last year I gave a couple
7  back. I didn't use them. But I tried to get
8  to 15 when it's allowed.
9      Q.    Have you had any conversations
10 with Ms. Wise regarding her deposition?
11     A.    No.
12     Q.    Have you had any conversations
13 with her about this lawsuit?
14     A.    No.
15     Q.    Do you socialize with Mr. Martin?
16     A.    No.
17     Q.    Did you at any time?
18     A.    When he was working with us.
19     Q.    And what kind of things would you
20 do with him?
21     A.    Show him how to build his deck.
22 Show him how to fix his car. Tell him where
23 he could take his son fishing. We have a
24 company dinner, and we are at the dinner or

Page 129

1  the reception; whatever you call it.
2      Q.    I'm sorry. What was that?
3      A.    I said we would have a company
4  dinner or a party to try to motivate the
5  people. We would have parties that the
6  Managers would pay for out of our pocket.
7      Q.    And you have held some of those?
8      A.    We paid for them.
9      Q.    Who is "we"?
10     A.    The Managers.
11     Q.    And where did you have them?
12     A.    We tried to give them at
13 different locations. One of the woman that
14 worked with us owns a place, and a couple of
15 times we have had it at her place.
16     Q.    Who is that?
17     A.    Mary Birch.
18     Q.    Is that her name?
19     A.    Yes.
20     Q.    Where is the place?
21     A.    The place would be over in
22 Canaan, New York off of 295.
23     Q.    What is the name of it?
24     A.    You had to ask me that question.

Page 130

1  It slips my mind at the moment.
2      Q.   Is it a restaurant?
3      A.   Yes.
4      Q.   Is this someone you knew before
5  you were employed at Patriot?
6      A.   Yes. I recommended her.
7      Q.   Did you ever go out to dinner
8  with Mr. Martin?
9      A.   Mr. Martin came over with us from
10 Bentley Brook.
11     Q.   Did you ever go out to dinner
12 with him? Just you and your wives?
13     A.   No. Other than the company
14 party, no.
15     Q.   And you have been to his house;
16 is that what you said?
17     A.   Yes.
18     Q.   Did he ever do any construction
19 work for you?
20     A.   Who Roger?
21     Q.   Yes?
22     A.   No.
23     Q.   Are you aware of him doing
24 construction work for other employees?

Page 131

1      A.   I know he does some type of work
2  on the side.
3      Q.   Do you know the employees that he
4  worked for?
5      A.   No, I do not. I think he worked
6  for himself.
7      Q.   No, I mean doing work at their
8  homes. I guess I was not clear.
9      A.   I think he did some work at Irene
10 Rosenblyum's.
11     Q.   Did you ever hear of an incident
12 between the two them as a result of that work?
13     A.   No.
14     Q.   Anyone else you can think of
15 whose house he did work on; an employee?
16     A.   No.
17     Q.   Do you take any medications on a
18 regular basis?
19     A.   Never.
20     Q.   Nothing for your heart or
21 cholesterol?
22     A.   No.
23     Q.   Do you exercise regularly?
24     A.   Yes.

Page 132

1          MS. FABBO: I'm going to suspend
2  the deposition now. I'm not sure
3  whether I will even bring him back.
4  But I thought that I would go to
5  4:30, and then go through a few
6  documents with him next time.
7      I thought it would take a little
8  longer. I don't really have
9  anything other than some documents
10 that I didn't copy yet.
11         MR. FELDMAN: Okay. If you did
12 that right now, you wouldn't finish
13 before 4:30?
14         MS. FABBO: No. We will start
15 that next time. And there is a
16 possibility that I won't even do
17 that.
18         MR. FELDMAN: Okay. Well, given
19 that we may not come back, can I ask
20 a question then? Or do you want me
21 to wait?
22         (Off the record)
23         (Back on the record)
24 CROSS EXAMINATION BY MR. FELDMAN:

Page 133

1      Q.   Mr. Massaconi, you looked at what
2  was marked as Exhibit two. You want to pull
3  that for a minute. Do you see that?
4      A.   Yes.
5      Q.   And you were asked whether that
6  was an employment agreement that you signed;
7  is that correct?
8      A.   Yes.
9      Q.   Is that the complete employment
10 agreement that you signed?
11     A.   Page two is missing, four, six.
12 There are several pages missing.
13         MR. FELDMAN: Okay. Nothing
14 further.
15         (Whereupon, the deposition
16 adjourned at 4:15 P.M.)
17
18
19
20
21
22
23
24

Page 134

1    COMMONWEALTH OF MASSACHUSETTS
     Hampden, ss.
2

3    I, Denise D. Harper-Forde, Registered
     Professional Reporter and Notary Public within
     and for the Commonwealth of Massachusetts at
4    large, do hereby certify that the deposition
     of MICHAEL V. MASSACONI, in the matter of
5    LACRISHA WISE ET AL VS. PATRIOT RESORTS CORP.,
     ET AL, at the offices of SKOLER, ABBOTT &
6    PRESSER, P.C., One Monarch Place, Springfield,
     Massachusetts on May 20, 2005, was taken and
7    transcribed by me; that the witness provided
     satisfactory evidence of identification as
8    prescribed by Executive Order 455 (03-13)
     issued by the Governor of the Commonwealth of
9    Massachusetts; that the transcript produced by
     me is a true record of the proceedings to the
10   best of my ability; that I am neither counsel
     for, related to, nor employed by any of the
11   parties to the action in which this deposition
     was taken, and further that I am not a
12   relative or employee of any attorney or
     counsel employed by the parties thereto, nor
13   financially or otherwise interested in the
     outcome of the action.
14

15   _____  DATE
     Denise D. Harper-Forde
     Registered Professional Reporter
16

     My Commission Expires:
17   December 31, 2008
18
19
20
21
22
23
24

Page 135

1           MICHAEL V. MASSACONI
2          SIGNATURE PAGE/ERRATA SHEET
3    PAGE LINE    CHANGE OR CORRECTION AND REASON
4    ___|____|_____
5    ___|____|_____
6    ___|____|_____
7    ___|____|_____
8    ___|____|_____
9    ___|____|_____
10   ___|____|_____
11   ___|____|_____
12   ___|____|_____
13   ___|____|_____
14   ___|____|_____
15   I have read the transcript of my deposition
     taken on May 20, 2005. Except for any
16   corrections or changes noted above, I hereby
     subscribe to the transcript as an accurate
17   record of the statements made by me.
18   Signed under the pains and penalties of
     perjury.
19
20   _____
     MICHAEL V. MASSACONI         DATE
21
22
23
24

Page 136

1           MICHAEL V. MASSACONI
2    SIGNATURE/PAGE ERRATA SHEET INFORMATION
3         LACRISHA WISE ET AL VS.
4        PATRIOT RESORTS CORP., ET AL
5

     SIGNATURE INFORMATION FOR COUNSEL

6

     The original signature page/errata sheet has
7    been sent to Attorney Feldman to obtain
     signature from the deponent. When complete,
8    please send original to Attorney Fabbo, a copy
     of any errata should be sent to each party of
9    record present at the deposition.
10

         WITNESS INSTRUCTIONS

11

     After reading the transcript of your
12   deposition, please note any change or
     correction and the reason on the
13   errata/signature page. DO NOT make any
     corrections on the transcript itself. If
14   necessary, continue the format on a separate
     page.
15

16   PLEASE SIGN AND DATE the errata/signature page

     (before a notary if requested) and return it
17   to your counsel.
18
19
20
21
22
23
24

# EXHIBIT
# 5

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
        Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
        Defendants

DEPOSITION OF WILLIAM RAUER

June 3, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

3

I N D E X

WITNESS:  WILLIAM RAUER

Direct Examination by Mr. Feldman        5

Cross Examination by Ms. Fabbo           95

EXHIBITS

Exhibit 1,  Uniform Policy for Sales

            Managers' Sales Performance   75

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

---

4

1             STIPULATION

2

3        It is agreed by and between the parties

4   that all objections, except as to form of the

5   question, are reserved until the time of trial.

6

7        It is further agreed by and between the

8   parties that all motions to strike unresponsive

9   answers are reserved until the time of trial.

10

11        It is further agreed by and between the

12   parties that the sealing of the original

13   deposition transcript is hereby waived.

14

15        It is further agreed by and between the

16   parties that the notification to all parties of

17   the receipt of the original deposition

18   transcript is hereby waived.

19

20

21

22

23

24

5

1  WILLIAM RAUER, Witness, identified via

2  Florida driver's license and having been duly

3  sworn, states as follows:

4

5  DIRECT EXAMINATION BY MR. FELDMAN:

6  Q.  My Rauer, could you state your name

7  and address for the record, please?

8  A.  It's William P. Rauer.  My address is

9  6000 Northwest 63rd Place.  That's in Parkland,

10  Florida.

11  Q.  Mr. Rauer, have you had your

12  deposition taken before?

13  A.  Yes.

14  Q.  So you understand generally what we're

15  doing here today.  I want to give you a few

16  grounds rules for this one.

17  A.  Okay.

18  Q.  First is that if I am talking, you

19  should wait until I finish the question and then

20  you should answer after I've completed the

21  question.  I will also attempt not to interrupt

22  your answer; is that okay?

23  A.  Fair enough.

24  Q.  If you have any questions about what

7

1  overseeing the operations at the Berkshire

2  Resort.

3  Q.  And the name of the Berkshire

4  Resort is what?

5  A.  Vacation Village in the Berkshires.

6  Q.  Who owns Vacation Village?

7  A.  Patriot Resorts.

8  Q.  Do you work at all for Patriot

9  Resorts?

10  A.  No, I do not.

11  Q.  When you receive a check, is it from

12  Tower Resorts Realty?

13  A.  Yes, it is.

14  Q.  And your job title there again?

15  A.  I'm the project director.

16  Q.  What's your relation to Vacation

17  Village?

18  A.  Which Vacation Village?

19  Q.  The one in the Berkshires.

20  A.  Vacation Village in the Berkshires, I

21  oversee that operation.

22  Q.  And that is as part of your position

23  with Tower Resort Realty, not in some other

24  capacity, correct?

6

1  I've asked, please let me know and ask me to

2  rephrase it if you don't understand it.  If you

3  do answer my questions, I'm going to assume you

4  understand it, okay?

5  A.  Yes, I do.

6  Q.  If you want a break or discuss

7  something with your counsel, use the rest room,

8  please let me know as well.  You should remember

9  to give a verbal answer every time.  That's hard

10  to remember, but you need to say "yes" or "no"

11  verbally instead of a nod or "um-hum" or "uh-uh,"

12  because it won't show up on the transcript.

13  What's your current job?

14  A.  I'm employed by Tower Resort Realty.

15  Q.  I'm sorry, by who?

16  A.  Tower Resort Realty.

17  Q.  What do you do for Tower Resort

18  Realty?

19  A.  I'm the senior project director for

20  several operations with them.

21  Q.  Which are the several operations?

22  A.  The Weston Resort, the Canada House

23  Resort, the Hollywood Resort, the Breakers

24  Resort, and the Golden Strand Resort.  As well as

8

1  A.  Correct.

2  Q.  Who do you directly supervise at the

3  Vacation Village in the Berkshires?

4  A.  All the sales personnel.

5  Q.  Who is the person directly beneath you

6  in the hierarchy at Vacation Village in the

7  Berkshires?

8  A.  That would be Rod Lewis.

9  Q.  What's his job title?

10  A.  He's the project director of that

11  resort.

12  Q.  But you have ultimate authority over

13  the sales staff at Vacation Village, is that

14  correct?

15  A.  That's correct.

16  Q.  When I'm talking about Vacation

17  Village, for purposes of this deposition I mean

18  the one in the Berkshires.

19  A.  That's correct.

20  Q.  Who would be your direct supervisor?

21  A.  Bruce Polansky.

22  Q.  What's his job title?

23  A.  Senior project director, and also

24  senior vice president of Berkley, I believe.

9

```
 1     Q.   What's the full name of Berkley?
 2     A.   Berkley Group, I believe.
 3     Q.   Are you on the Board of Directors of
 4   Berkley Group?
 5     A.   Yes.
 6     Q.   Mr. Polansky, who is he employed by?
 7     A.   I don't know.
 8     Q.   Are you the manager in charge of
 9   policies and procedures for the salespeople at
10   Vacation Village?
11     A.   Yes.
12     Q.   Have you created policies and
13   procedures for salespeople at the Vacation
14   Village?
15     A.   Yes.
16     Q.   Do you implement them as well?
17     A.   Yes.
18     Q.   Do you enforce them?
19     A.   Yes.
20     Q.   Are you the manager who is responsible
21   for the creation of the policy by which
22   salespeople get paid at Vacation Village?
23     A.   No.
24     Q.   Do you know who created the policy for
```

11

```
 1   What other things were you doing, then?
 2     A.   Anything that I was required to do
 3   from my boss.
 4     Q.   Who was your boss then?
 5     A.   As I said, Bruce Polansky.
 6     Q.   So Bruce Polansky has remained your
 7   boss even though you were promoted, is that
 8   right?
 9     A.   Yes, sir.
10     Q.   When you were the project director at
11   Vacation Village, was Bruce Polansky in your
12   current job?
13     A.   No.
14     Q.   He's held the same position?
15     A.   That's correct.
16     Q.   So there's an additional layer of
17   management that's been added, is that correct?
18     A.   With regard to Vacation Village in the
19   Berkshires, is that your question?
20     Q.   That's my question.
21     A.   Yes.
22     Q.   When was that, if you know?
23     A.   I don't know.
24     Q.   How long did you hold the job that Rod
```

10

```
 1   payment of salespeople?
 2     A.   That would -- that came from Bruce
 3   Polansky, so I don't know where it came from
 4   beyond him.
 5     Q.   How long have you been in this job,
 6   the one you currently hold?
 7     A.   The one I currently hold,
 8   approximately four years.
 9     Q.   Before that, you were project director
10   at Vacation Village in the Berkshires?
11     A.   Well, I've been employed for around
12   fourteen years, if that's your question.
13     Q.   Guess I'm asking the immediate job
14   prior to the one you currently hold.
15     A.   Prior to the one I currently hold, I
16   was the project director at Vacation Village in
17   the Berkshires.  Basically I had -- if this will
18   clarify -- basically I had Rod's job.
19     Q.   That was your full-time job?
20     A.   No, I did other things, but my
21   position was that Rod had as it relates to
22   the Vacation Village in the Berkshires.
23     Q.   But when I asked you if that was your
24   full-time job, you said you do other things.
```

12

```
 1   Lewis now has?
 2     A.   Approximately one year.
 3     Q.   What did you do before that?
 4     A.   I worked in Vacation Village at
 5   Weston.
 6     Q.   Weston, Massachusetts?
 7     A.   No, sorry, Weston, Florida.
 8     Q.   W-E-S-T-O-N?
 9     A.   Correct.
10     Q.   Did you move to Massachusetts when you
11   held Rod Lewis's job?
12     A.   No, my residence was always in
13   Florida.
14     Q.   How long did you hold the job in
15   Weston?
16     A.   As I said, that would be my original
17   positions with Tower Resort, and I've been doing
18   that for about fourteen years.
19     Q.   I'm sorry, I thought fourteen years
20   was the total time you've been working for Tower?
21     A.   That's correct.
22     Q.   Four years in your current position?
23     A.   Correct.
24     Q.   One year in Rod Lewis's position?
```

13

```
1    A.    Prior to that, I worked at Weston as
2    well.
3    Q.    How long did you work just at the
4    Weston project?
5    A.    That would be around nine, ten years.
6    Q.    Are the policies that are now in place
7    for how salespeople get paid, are they the same
8    now as they were when you were the project
9    director at Vacation Village, or have they
10   changed?
11   A.    They have changed.
12   Q.    How have they changed?
13   A.    When we first started our operations
14   at Vacation Village in the Berkshires, we started
15   them with a ten percent commission for all sales,
16   all salespeople.
17   Q.    Was that an introductory commission
18   for a period of time --
19   A.    Yes, that's correct.
20   Q.    -- or was that the payment salespeople
21   received for the entire time when they worked
22   there?
23   A.    That was an introductory commission.
24   Q.    I'm sorry, is that the only change
```

14

```
1    that occurred?
2    A.    After the introduction, we based
3    everyone at eight percent, and it remained that
4    way until the 1st of June of this year.
5    Q.    What happened the 1st of June of this
6    year?
7    A.    We restructured the commissions,
8    including a salary as well for all salespeople.
9    Q.    Why did you do that?
10   A.    I don't know.
11   Q.    Who created that policy?
12   A.    It came to me from Bruce Polansky.
13   Q.    Did you discuss with him why the
14   policy was changing?
15   A.    No, I didn't discuss why.
16   Q.    Did you talk to any other managers
17   with Tower about why that was changing?
18   A.    No.
19   Q.    Did you discuss the reasons for the
20   policy change with anyone at all?
21   A.    No.
22   Q.    You said Tower -- in your current
23   position, you also oversee the operations of
24   other resorts, is that correct?
```

15

```
1    A.    That is correct.
2    Q.    Did you change the pay policy of the
3    other resorts as well?
4    A.    No.
5    Q.    Just Vacation Village in the
6    Berkshires?
7    A.    Yes.
8    Q.    What's the policy of the other
9    resorts?
10   A.    Well, it would vary from resort to
11   resort.
12   Q.    What are they, as best you know them?
13   A.    I can do go down every one if that's
14   what you want me to do.
15   Q.    Sure.
16   A.    The Canada House, the Breakers, the
17   Hollywood, and the Golden Strand, the base
18   commissions there are twelve percent for
19   salespeople.
20   Q.    As opposed to -- in other words,
21   that's not introductory?
22   A.    That's not opposed to anything; that's
23   what they are.
24   Q.    Just so I understand, they were eight
```

16

```
1    percent at Vacation Village at the Berkshire and
2    they're twelve percent at these other ones; in
3    other words, that's not introductory?
4    A.    No, that is the commission they are
5    getting paid.  Now, to finish the answer to your
6    question, Vacation Village in Weston, the base is
7    seven percent.
8    Q.    Why are there variations among the
9    resorts?
10   A.    I believe -- and I'm not certain, but
11   -- I believe it has something to do with the
12   amount of tours, the type of tours that come
13   through our doors.
14   Q.    Why do you believe that makes a
15   difference in what their commissions are?
16   A.    Well, for example, we have a few tours
17   that come through the doors at the ones that are
18   getting paid twelve percent; so as a result of
19   that, we compensate the sales staff because they
20   have less opportunity.  Whereas at Vacation
21   Village at Weston, there are tours that go
22   through there on a more consistent and higher
23   level.  And as I was saying to you, the
24   commissions are based on the amount of tours, at
```

17

1   least at those resorts, that are coming through

2   the door, in my opinion.

3       Q.   Do you know why the compensation

4   changes were only done at Vacation Village in the

5   Berkshires?

6       A.   No.

7       Q.   Do you know if the change had anything

8   to do with the current lawsuit that you're

9   testifying in?

10      A.   No.

11      Q.   Where is the Breakers Resort?

12      A.   It's in Fort Lauderdale Beach,

13  Florida.

14      Q.   You named four resorts?

15      A.   Correct.  Those four are all beach

16  resorts.

17      Q.   In Florida?

18      A.   In Florida.

19      Q.   What are the required hours for

20  salespeople to work at Vacation Village in the

21  Berkshires currently?

22      A.   They're required to be there at 8:30,

23  I believe, until they're told to leave, until the

24  tours are finished.

18

1       Q.   How does a salesperson know when the

2   tours are finished?

3       A.   Well, the person in charge of the

4   front desk, the Welcome Center, would cut the

5   line given the tours that were due in, if they've

6   come in or if they haven't.  I believe we cut the

7   line at that resort, I believe it's 3:30, could

8   be 4:00; I'm not certain.

9       Q.   Is that what it was when you were

10  project director?

11      A.   Yes.

12      Q.   When you were project director, the

13  time the employees were supposed to arrive was at

14  9:00, is that right?

15      A.   No, I don't believe that's so.  I

16  think they had to come earlier than that.  I

17  could be wrong; it's been a while.

18      Q.   Do you remember a change from sign-in

19  at 9:00 to 8:30 at Vacation Village in the

20  Berkshires?

21      A.   No, I do not.

22      Q.   By "cutting the line," you mean

23  releasing the salespeople?

24      A.   Correct.

19

1       Q.   Is that decision made just at the

2   Reception Center on a daily basis?

3       A.   Yes.

4       Q.   Is there anyone else who is

5   responsible for when that decision gets made?

6       A.   Well, the project director would be

7   consulted, but ultimately it's based on the

8   tours; and a lot of the tours come in on that day

9   from their home, so they're driving there.  So

10  sometimes we allow the time -- for example,

11  someone was due in at 2:00 and it's 3:00 and

12  they're not there yet, well, that doesn't

13  necessarily mean they're not going to come; so we

14  wait.  I think they cut the line, as I said, a

15  little later than that just to be certain that

16  anyone that is in transit will arrive.

17      Q.   What is the policy of Vacation Village

18  at the Berkshires with regard to what salespeople

19  are supposed to be doing when they're waiting for

20  tours?

21      A.   They're supposed to remain on-site.

22      Q.   What happens if they don't remain

23  on-site?

24      A.   They're not supposed to do that.

20

1       Q.   I understand.  But what happens to

2   them if they don't?

3       A.   Well, it depends on what the

4   circumstance is, I would imagine.

5       Q.   Is there a disciplinary procedure in

6   place at Vacation Village for salespeople who

7   don't remain on-site when they're supposed to be

8   there?

9       A.   Again, it depends on the circumstance.

10      Q.   What circumstances do you remember

11  since you've been there?

12      A.   For example, if someone would just not

13  stay and just go, they would probably receive

14  either a suspension or perhaps even be put in at

15  the end of the rotation the following day.

16      Q.   That's called overage, is that right?

17      A.   That's called overage.  As you're

18  asking the question, if someone had to go get gas

19  and asked their director to be able to do that

20  and as a result they left, I don't believe that

21  that would be a problem.

22      Q.   What if they didn't ask the director

23  and went ahead and got gas?

24      A.   That might be a problem.  Or, strike

**21**

1    that as well.  It could have something to do with

2    them checking with the front desk manager, and

3    that would be okay.  As long as the front desk

4    manager knows, that's the main thing.

5         Q.    Just so I understand the policy -- an

6    employee who leaves the site without permission

7    is subject to discipline, is that right?

8         A.    Yes.

9         Q.    Under what circumstances is an

10   employee allowed to leave the site?

11        A.    It has to be a reasonable issue that

12   they have to take care of.  Someone is ill, for

13   example, that would be a reasonable issue.  If

14   someone just doesn't want to work anymore, that

15   would not be a reasonable issue.

16        Q.    What if they want a hour half an hour,

17   hour break from sitting in the pit, as they call

18   it; is that a reasonable issue?

19        A.    No.

20        Q.    Can someone be terminated for not

21   being on-site over a number of days?

22        A.    I don't follow your question.

23        Q.    I'm sorry, let me rephrase that.

24   Let's say someone shows up for work and they're

**23**

1         MS. FABBO:  Objection.  You can

2         answer.

3         THE WITNESS:  That's correct.

4         Q.    (By Mr. Feldman)  If they take their

5    lunch off-site, are they paid for that lunch

6    break?

7         A.    Up until June, everyone was on

8    commission sales; so as a result of that, if they

9    don't get a customer, they obviously will not

10   make a sale.

11        Q.    What's the policy now?

12        A.    Now they get a salary.

13        Q.    But I'm asking about the lunch break.

14        A.    The policy is in place that no one can

15   leave -- now, let me clarify that.  The

16   repercussions would be more severe if they got

17   passed.  If their name came up for a tour and

18   they got passed, then in that event, our policy

19   now is that they would not get paid that day.

20        Q.    I see.  What's the policy now if they

21   were missing but they didn't get passed -- in

22   other words, they weren't on-site when they were

23   supposed to be but they still made it in timely

24   way for the tour?

**22**

1    not late; that is, they sign in at 8:30, and then

2    they decide for three days in a row that they

3    want a half-hour break away from the site and

4    don't receive authorization from their manager.

5    Is that grounds for termination?

6         A.    At the very end of it, yes.  I think

7    the first time there would be some repercussions

8    and it would go on from there.  As you said,

9    three days in a row doing that tells me just

10   hearing it that that person really doesn't have

11   any interest in working.

12        Q.    And that's the policy as you

13   understand it, is that correct?

14        A.    That's correct.

15        Q.    Now, are employees allowed a lunch

16   break at Vacation Village in the Berkshires?

17        A.    Yes.

18        Q.    Are they allowed to take their lunch

19   break off-site?

20        A.    They're not supposed to without

21   permission.

22        Q.    So in the ordinary course of business,

23   they're supposed to eat their lunch on-site, is

24   that correct?

**24**

1         A.    There would be no action.  Although we

2    want our people to stay where they supposed to

3    be.  There would be no action if they didn't get

4    passed, but that's the most important concern

5    that we have.

6         Q.    Before the policy got changed --

7    because June 1st is the effective date of the

8    policy change, is that correct?

9         A.    Correct.

10        Q.    Before that, did management

11   communicate to salespeople that they were

12   required to stay on-site during the time that

13   they were working for Vacation Village in the

14   Berkshires?

15        A.    Yes.

16        Q.    The methodology by which salespeople

17   were paid, they were paid commissions after the

18   closing of a sale and then three timely payments,

19   is that correct?

20        A.    You're asking a question with regard

21   to prior to June the 1st?

22        Q.    Yes.

23        A.    So what is your question again?

24        Q.    My question is, salespeople were paid

25

1 after they closed the sale and three timely

2 payments were received by Vacation Village, is

3 that right?

4     A.  Well, the question requires a time

5 frame, because it differed based on when you're

6 asking me, you know, the issue was.

7     Q.  You mean the time period, during what

8 year, is that what you mean?

9     A.  Based on what our policy was.

10     Q.  Tell me what the policy was about when

11 salespeople were actually paid.

12     A.  You had mentioned three timely

13 payments.

14     Q.  Yes.

15     A.  And the only time that one does not

16 get paid until three timely payments would be

17 that there is no pre-authorized checking in place

18 prior to the first payment for the mortgage.

19     Q.  And that's called a PAC, is that

20 right, Pre-authorized Checking, correct?

21     A.  Correct.

22     Q.  If there was no PAC that the

23 salesperson obtained from a customer, then they

24 had to wait until three timely payments were

26

1 received by Vacation Village before they were

2 paid?

3     A.  That's correct.

4     Q.  If there was a PAC, then the three

5 timely payment policy did not apply?

6     A.  That's correct, as long as they were

7 still employed.

8     Q.  Were there situations where a PAC was

9 in place but somehow three timely payments

10 weren't made?

11     A.  That wouldn't be an issue. As long as

12 the PAC is there within the time frame that it's

13 required, they got paid three weeks after good

14 business, which is the policy.

15     Q.  "Good business" means what?

16     A.  Well, when we process a sale,

17 approximately two weeks after the sale, it

18 becomes good business. Approximately a month

19 after that, the first mortgage payment is due.

20 As long as the PAC comes in prior to that, then

21 it's good to be paid and they go forward.

22 Whether or not -- if you're asking the question

23 about what if there's an NSF or something like

24 that on the PAC, that has no relevancy for

27

1 the payment, for the commission.

2     Q.  Why does it have no relevancy for the

3 commission if there's insufficient funds, but

4 there is relevance if you don't get three timely

5 payments without the PAC check -- isn't it true

6 that the company is still not getting paid?

7     A.  Well, the question that you asked me,

8 I've answered.

9     Q.  I understand. I'm asking you a new

10 question.

11     A.  What is the new question?

12     Q.  New question is, why was the policy

13 that if you have a PAC in place, then the

14 salesperson gets paid, even though there's a

15 possibility of insufficient funds?

16     A.  Well, there's a possibility of a lot

17 of things, but -- are you asking me -- let me

18 understand the question.

19     Q.  Sure.

20     A.  Are you asking me what if -- or what

21 happened when there was NSF after the PAC was in;

22 is that really your question?

23     Q.  Sure, that's my question.

24     A.  Because if that's your question, I

28

1 don't know the answer to it.

2     Q.  Are you aware of any circumstance

3 where there's been a PAC check and insufficient

4 funds thereafter?

5     A.  No.

6     Q.  Would you know that information; would

7 that be information available to you?

8     A.  It hasn't been brought to my

9 attention, if that's your question.

10     Q.  But so far as you understand the

11 policy, as long as there's a PAC check, even if

12 there's insufficient funds later on, the

13 salesperson still gets paid within the 21 days,

14 the ordinary course of business, is that right?

15     A.  That's right. I just want to

16 understand that we're on the same page with this.

17     Q.  Sure.

18     A.  There wouldn't be a payment made prior

19 to the person getting their commission check.

20 You recognize that?

21     Q.  Is that true even without the three --

22 in the case where you want three timely payments

23 because there's no PAC check, when does the

24 salesperson get paid in that circumstance; after

29

1  the three timely payments are received or before?

2      A.  After, without the PAC check.

3      Q.  So let's just talk about the situation

4  where there's no PAC check for a second.

5      A.  Okay.

6      Q.  If the customer makes two timely

7  payments and then makes one untimely payment,

8  does the clock then start again, so you need

9  three more consecutive timely payments for the

10  salesperson to get paid?

11      A.  Yes.

12      Q.  So in that situation, Vacation Village

13  is actually getting paid, but the salesperson is

14  not getting paid their commission, is that right?

15      A.  They're not getting paid on a timely

16  basis.

17      Q.  And if that continued for a year, they

18  still wouldn't get paid, is that right?

19      MS. FABBO:  Objection.

20      Q.  (By Mr. Feldman)  In other words, the

21  situation is someone makes two timely payments

22  and an untimely payment; then two more timely

23  payments and an untimely payment.  In that

24  situation, the salesperson doesn't get paid until

30

1  there's three consecutive timely payments, is

2  that right?

3      A.  I believe that's true.

4      Q.  Why is that the policy, if you know?

5      A.  I don't.

6      Q.  Now, in what instance would there be

7  what's called a chargeback to the salesperson?

8      A.  When that would happen, in the

9  scenario that you just mentioned where someone,

10  for example, did get a PAC check and got their

11  commission, and within the course of that first

12  year, for example, there was NSF payment on a

13  fairly consistent basis, there would be a

14  chargeback.

15      Q.  What is a chargeback?

16      A.  The chargeback would mean that the

17  commission you were paid would be charged back --

18  you wouldn't get it; you would lose it.

19      Q.  So in other words, for the

20  salesperson's next paycheck, a deduction would be

21  made for the a amount that was already paid, is

22  that right?

23      A.  Not normally the entire amount.

24  Typically when that happens, and it rarely

31

1  happens, but occasionally; they get charged

2  proportionately.  They don't take the whole thing

3  out.  I believe they do it in portions.

4      Q.  What's the exact policy, just so I

5  understand it, about when a chargeback would be

6  made.  In other words, you said if there's

7  inconsistent payments -- what is the exact policy

8  so that a salesperson would understand when a

9  chargeback might occur to them?

10      A.  You're asking the question with regard

11  to PAC?

12      Q.  I'm just asking generally about

13  chargebacks.  When would a salesperson get a

14  chargeback?  That was the original question.

15      A.  A person would get a chargeback if

16  they got paid for business that was no longer

17  good business.

18      Q.  I'm asking in what circumstances does

19  the company consider it not good business?

20      A.  If they're not getting paid their

21  mortgage payments, then it's no longer good

22  business.

23      Q.  I'm asking what the exact parameters

24  of that policy are.

32

1      A.  I don't have the answers to that.

2      Q.  Do you know who would have the answer

3  to that?

4      A.  No.

5      Q.  But you said occasionally a

6  salesperson would get a chargeback?

7      A.  Yes, I did.

8      Q.  That's presumably pursuant to a

9  policy, is that right?

10      MS. FABBO:  Objection.

11      Q.  (By Mr. Feldman)  You wouldn't do it

12  just as a matter of discretion; no manager would

13  say, I'm taking that money back because I feel

14  like it, right?

15      A.  When it is determined that that sale

16  was no longer a good sale, that commission would

17  then be charged back.

18      Q.  I understand that.  I'm trying to

19  figure out how the company determines whether

20  it's a good sale or not.

21      A.  You'll have to ask someone else that,

22  because I don't have the answer.

23      Q.  Do you know who would have the answer

24  to that?