33

1   A.   No, I don't have the answer.
2   Q.   Have there been chargebacks in the
3 last three or four years at the Vacation Village
4 at the Berkshires?
5   A.   I'm not sure.
6   Q.   How many hours a day was a salesperson
7 required to work during the time you've held your
8 current job at Vacation Village?
9        MS. FABBO:  Objection.  You can
10       answer.
11       THE WITNESS:  I want to
12       understand the question.  When you say
13       "Vacation Village," my position prior
14       to -- prior to four years ago or...
15  Q.   (By Mr. Feldman)  During the time
16 you've held your current position, what was --
17 how many hours a week was a salesperson required
18 to work at Vacation Village?
19  A.   We didn't structure our requirements
20 based on any hours, except for the time that they
21 were to come in, and of course whenever they were
22 cut.  There's no set time frame.  When we're
23 busy, they'll work more than when we're not busy.
24 There are days, for example, when there's no

34

1 afternoon wave, and therefore someone might come
2 in in the morning and be out the door by 11:00.
3 And then there are times when we are busy where
4 someone would come in in the morning and might
5 not be out the door until 5:00 or 6:00.
6   Q.   How often did that happen, the latter
7 example?
8   A.   I don't know the answer -- based on
9 the days that we're busy or not.  It would vary,
10 but both times occur.
11  Q.   Have you seen payroll sheets generated
12 by Human Resources that show the number of hours
13 worked by any particular individual per week?
14  A.   No.
15  Q.   Do you know whether salespeople worked
16 more than forty hours a week in any given week?
17  A.   No.
18  Q.   Who would know that?
19  A.   I really don't know the answer to that
20 because I'm not sure.
21  Q.   When you were project director at
22 Vacation Village, Rod Lewis's current job, did
23 salespeople work more than forty hours a week?
24  A.   I never actually kept track of it.

35

1 That wasn't ever an issue.
2   Q.   What do you mean it "wasn't ever an
3 issue"?
4   A.   I didn't track of the hours that any
5 salesperson put into the position.  There are
6 days, as I mentioned, where someone will work
7 longer than other days; so I never took track of
8 it, because it really didn't matter.
9   Q.   Were you ever aware of a salesperson
10 who worked more than forty hours in one week?
11  A.   No.  Not to say that that's not
12 possible.  I just wasn't aware of it.  I didn't
13 think of it in those terms.
14  Q.   Did you know how many hours a week a
15 salesperson was working?
16  A.   I actually never thought of it in
17 terms of how many hours anyone works.
18  Q.   I understand you didn't think of it.
19 I'm wondering whether you knew at the time you
20 had Rod Lewis's job whether any salesperson
21 worked more than forty hours a week?
22  A.   No, I didn't.
23  Q.   Since you've had your current job, do
24 you know whether any salesperson has worked more

36

1 than forty hours a week at Vacation Village?
2   A.   No, I don't.
3   Q.   If you wanted to find out whether
4 someone had during the time you've held your
5 current job, how would you go about finding that
6 out?
7   A.   Well, no one punches a clock in sales.
8 They have to sign in, and they're required to
9 sign in at a certain time; but when they leave,
10 they're dismisses based on -- as I mentioned
11 earlier -- the tour flows that's coming through
12 the doors.
13  Q.   Do the salespeople sign out when they
14 leave?
15  A.   No.
16  Q.   When the salespeople go on tours, do
17 they sign the time that they're in and out of
18 their tour?
19  A.   They don't sign their time, but there
20 is a track of the amount of time that they spend
21 on tour.
22  Q.   How is that kept?
23  A.   The slip that they receive when
24 they're first given to meet their guests, there's

37

1  a time on that; and then when it's finished,
2  whoever they see at the very end puts a time on
3  that.
4      Q.   When is that second time entered?
5      A.   It should be entered when the manager
6  comes over and signs them out.
7      Q.   Signs the customer out?
8      A.   Signs the guests -- the rep. and the
9  customer out, the tour is done.
10     Q.   Just so -- I want to make sure I
11 understand what a tour is. The tour starts when
12 the Welcome Center tells the sales person that
13 the guest is there, and then the salesperson then
14 would meet and greet the guest, is that right?
15          MS. FABBO:  Objection.
16          THE WITNESS:  That's correct.
17     Q.   (By Mr. Feldman) Then describe what
18 the tour is after that.
19     A.   Well, they go through the tour. It's
20 a process that involves whatever it takes to make
21 a friend and to go through the process of
22 discovering whether or not there is interest in
23 vacationing and how they vacation, and they go
24 through the area and they show, you know, the

38

1  Berkshires, which is a beautiful area, and they
2  show them how the program with RCI works, how
3  our --
4      Q.   What's RCI?
5      A.   RCI is Resorts Condominiums
6  International, which is the network that
7  facilitates exchanges from Vacation Village in
8  the Berkshires to other resorts that are within
9  their system. That's gone over, and then we show
10 them the actual resort itself, and we show them
11 the pricing, and either a guest will buy or they
12 wouldn't buy. And if they buy, they go through a
13 closing, and if they don't buy, they're said
14 goodbye to.
15     Q.   So they're shown the area, you said,
16 and then they're shown the property in question?
17     A.   Correct.
18     Q.   Then they come back to the Sales
19 Center?
20     A.   Yes.
21     Q.   Then at the Sales Center, that's where
22 the closing may or may not occur, depending if
23 the customer is interested?
24     A.   Yes.

39

1      Q.   At what point is the time put on that
2  tour slip for the tour being over -- is it when
3  they return to the Sales Center, or is it after a
4  closing occurs or doesn't occur?
5      A.   As I said before, when the manager
6  determines that the tour is finished, they sign
7  out and put the time on it of the end of the
8  tour.
9      Q.   When is a tour finished?
10     A.   When the manager makes that
11 determination.
12     Q.   I understand that.
13     A.   There's no time frame.
14     Q.   No, I understand that. I'm just
15 trying to figure out where in the process a tour
16 is considered to be finished. Is that just as
17 the guest is going to their car to leave, or is
18 it sometime before that?
19     A.   When the sales rep. is finished, based
20 on the determination of the manager, that's when
21 the responsibility of the salesperson's job is
22 ended, and therefore they're finished.
23     Q.   That would be after the closing papers
24 have been signed in the case where a closing is

40

1  actually signed?
2      A.   Yes.
3      Q.   If a closing is not signed and they're
4  sent on to the Exit building, the tour slip is
5  signed at the end of the Exit building process or
6  before that?
7      A.   The salesperson -- the original
8  salesperson's job is finished when the manager
9  determines that it's finished.
10     Q.   You keep a record of those tour slips,
11 is that right?
12     A.   Yes.
13     Q.   By the tour slips, then, you can
14 determine when a tour was done, but the tour
15 slips have no bearing on how long a salesperson
16 has actually been waiting for tours at the
17 lounge, is that right?
18          MS. FABBO:  Objection. You can
19          answer.
20          THE WITNESS:  Yes, that's true.
21     Q.   (By Mr. Feldman) During your tenure
22     in your current position, have any
23     salespeople been paid less than the
24     state minimum wage during any given

41

```
 1    week, so far as you know?
 2         A.   So far as I know, no.
 3         Q.   Have you reviewed any payroll sheets
 4    or pay stubs of salespeople during your tenure in
 5    your current job?
 6         A.   No.
 7         Q.   Who would know whether salespeople
 8    have actually been paid state minimum wage or
 9    not?
10         A.   I don't know.
11         Q.   You don't know who would know that
12    information?
13         A.   I would imagine the salespeople would
14    know.
15         Q.   Well, certainly the salespeople.  I'm
16    asking whether other company employees would
17    know.
18         A.   I'm not sure.
19         Q.   Is that something you've ever
20    concerned yourself with?
21         A.   No.
22         Q.   Have you had discussions with anyone
23    -- I guess starting from when you had Rod Lewis's
24    job to the present -- about whether or not
```

42

```
 1    salespeople were lawfully being paid minimum wage
 2    or not?
 3         A.   No.
 4         Q.   Have you had any discussions about
 5    whether Vacation Village was somehow exempt from
 6    the minimum wage state or federal laws?
 7         A.   No.
 8         Q.   What facts do you know of that would
 9    show that Vacation Village is somehow exempt from
10    paying minimum wage?
11              MS. FABBO:  Objection.
12              THE WITNESS:  I don't.
13         Q.   (By Mr. Feldman)  What facts do you
14    know that show that Vacation Village is somehow
15    exempt from paying overtime?
16              MS. FABBO:  Objection.
17              THE WITNESS:  I don't.
18         Q.   (By Mr. Feldman)  I'd like you to
19    describe a salesperson's regular work day at
20    Vacation Village, I guess before this June 1
21    change in the payment procedures.  I'd like you
22    to describe what Vacation Village expected of
23    their salespeople during a regular work day.
24         A.   To come in with the right attitude.
```

43

```
 1         Q.   What time did they have to come in by?
 2         A.   I believe 8:30.
 3         Q.   Was there any grace period given after
 4    8:30?
 5         A.   It depends on the weather.  If there
 6    is inclement weather, absolutely.  If there
 7    isn't, they're required to be in at a certain
 8    time.  That's when our morning meetings start.
 9    They go through a morning meeting.
10         Q.   That's the first thing that happens
11    after they arrive?
12         A.   Within a reasonable period of time,
13    yes.
14         Q.   Who runs the meeting?
15         A.   Typically it's either the line
16    director or the project director.
17         Q.   Okay.
18         A.   Then after their morning meeting,
19    there's typically training that's available.  I
20    don't even believe at that resort we even require
21    them to attend the training, but they are
22    required to remain on-site.
23         Q.   Is the training mandatory or not?
24         A.   No, it's not mandatory.  It might be
```

44

```
 1    required by people whose numbers are not
 2    consistent with what we consider good numbers.
 3         Q.   What are good numbers?
 4         A.   We like to have our sales at least one
 5    out of three, but if someone is slipping in the
 6    double digits, for example, we would -- I say
 7    "we" -- it would be wise for one of the directors
 8    to require that that particular salesperson
 9    attend training.
10         Q.   So double digits would mean someone is
11    making fewer than one out of ten sales, is that
12    right?
13         A.   That's correct.  Then after that, they
14    would wait in the sales lounge until they're
15    called for their tour.  They go through the
16    process of their tour, and they either get a
17    sale -- hopefully they do get a sale -- or not.
18    For example, if they do get a sale, they say
19    goodbye to their guests -- this is the morning.
20    Then they sign back in for an afternoon tour.
21         Q.   By "sign back in," do you mean they
22    ended the first tour?
23         A.   They have to let -- when there's a
24    sale or not, they have to let the front desk know
```

45

1 that they're finished their tour.
2    Q.  Is there documentation of that?
3    A.  Yes.
4    Q.  Is that a different document than
5 you've described so far?
6    A.  Yes, the same rotation sheet or same
7 type of sheet that they signed in in the morning,
8 they would typically sign in after their first
9 tour just to let the front desk know that they've
10 finished their tour and they're available.
11   Q.  Would there be a time next to their
12 name where they signed?
13   A.  No.
14   Q.  I guess you need to describe a little
15 more about what this document is and where it was
16 kept.
17   A.  At the front desk there's a rotation
18 sheet with everyone's name on it, and when the
19 sales rep. is finished their first tour, they're
20 required to go back and sign in basically to let
21 the front desk know that they're now available to
22 take another tour if needed.
23   Q.  Go ahead, you were describing...
24   A.  So they'll wait in the sales lounge

46

1 until their next tour, assuming they get a second
2 tour.  They'll do the same process as they did on
3 their first tour.
4    Q.  Could there be a third tour?
5    A.  No.  We don't require a third tour.
6    Q.  I understand that.  During the time
7 you had Rod Lewis's job, did anyone ever take a
8 third tour?
9    A.  Occasionally.  Typically -- it doesn't
10 happen that often, but when we're that busy, we
11 would ask a sales rep. if they're willing to take
12 a third tour, and that would be their call.
13 There would be no repercussions whatsoever if
14 they chose not to take a third tour.
15   Q.  And the requirement there is that --
16 if they're available, that they take at least two
17 tours?
18   A.  Correct.
19   Q.  From the time you had Rod Lewis's job
20 to the present, were there times when salespeople
21 didn't get any tours on a particular day?
22   A.  Yes.
23   Q.  Were there times when salespeople had
24 one tour on a particular day?

47

1    A.  Yes.
2    Q.  Do you know if there were full weeks
3 when salespeople didn't have any tours?
4    A.  Not to my knowledge.
5    Q.  What's the minimum number of tours a
6 salesperson had during any given week, as far as
7 you remember?
8    A.  I can't answer because I honestly
9 don't remember.  There were periods of times that
10 were slower than others, as it's a seasonal area;
11 but I don't recall any particular week where
12 someone got very, very few tours where others
13 might have.  I don't really recall that.
14   Q.  What are the slow times?
15   A.  Typically in the late fall and the
16 springtime, the early springtime.
17   Q.  When is the busiest season?
18   A.  The summer.
19   Q.  Now, there are approximately 24 or so
20 salespeople now at Vacation Village, is that
21 correct?
22   A.  Yes.
23   Q.  And there used to be in the range of
24 40, is that right?

48

1    A.  Well, in the range of 40 would include
2 the managers, and it would be around that now
3 including the managers.
4    Q.  Oh, is that right?
5    A.  Yes.
6    Q.  So there would be around 40 right now,
7 including the managers?
8    A.  Roughly, yes.
9    Q.  Is that a change from two or three
10 years ago?
11   A.  When we first started, we only had
12 eight to ten salespeople.
13   Q.  When did you first start?
14   A.  I think it was in August 2001,
15 roughly.
16   Q.  I guess I'm asking, 2002 through 2004,
17 was there a time when there were significantly
18 more salespeople than there are now?
19   A.  No, I don't think so.
20   Q.  Have there always been two lines?
21   A.  No.  When we first started, there was
22 half a line.
23   Q.  Have there been three lines?
24   A.  No.

49

```
 1      Q.   You said when employees signed in,
 2  there was a meeting at first -- the first thing
 3  they do is a meeting, is that right?
 4      A.   Correct.
 5      Q.   And they're required to be at that
 6  meeting?
 7      A.   Yes.
 8      Q.   Then afterwards is there always
 9  training available?
10      A.   Most always.  When I say "most
11  always," there are times when we are that busy
12  that there is nobody available to do the
13  training, so as a result there is no training
14  that day.  Everybody is out.  And most people are
15  out within the hour after the meeting.
16      Q.   Who conducts the training?
17      A.   It varies.  You had asked that
18  question before, and it varies.  You know, either
19  one of the directors typically or perhaps the
20  project director, but typically that's the way it
21  works.
22      Q.   So after the initial meeting and
23  whatever training is available, while the
24  salespeople are waiting, are they allowed to be
```

50

```
 1  outside the Sales building?
 2      A.   Yes.
 3      Q.   How far are they allowed to go before
 4  they're required to have asked their supervisor
 5  to let them out?
 6      A.   They're supposed to be on-site.
 7  "On-site" could mean outside or inside.
 8      Q.   If they're outside, how are they
 9  notified of the fact that a tour is available?
10      A.   Well, they're basically responsible to
11  know approximately when their rotation number
12  would come up.  So it would behoove them to be in
13  the sales lounge if they know that they're about
14  to go out.  You know, there's no problem if they
15  want to go outside, for example, smoke
16  cigarettes, because there are certain
17  cigarette-smoking areas on-site, and they're
18  close enough where they can do that if they chose
19  and still be close enough to know about their
20  tour if they want to.
21      Q.   When the salespeople -- how long is a
22  typical tour of a salesperson?
23      A.   Two and a half hours.
24      Q.   Did you ever personally provide
```

51

```
 1  training about how to do a tour?
 2      A.   Yes.
 3      Q.   Did you do that in your prior
 4  position, which is currently Rod Lewis's
 5  position?
 6      A.   Correct.
 7      Q.   Have you done it in your current
 8  position?
 9      A.   Train people to do that?
10      Q.   Yes.
11      A.   No.
12      Q.   When you were training people when you
13  had Rod Lewis's position, did you provide them
14  with information about how long a tour was
15  supposed to take?
16      A.   Well, we have occasionally had a
17  subject in our morning meeting that has to do
18  with time, if that's your question, yes.  Time
19  equals money in sales.
20      Q.   What does that mean?
21      A.   The more time typically you spend with
22  a guest, the better your chances of making a
23  sale.
24      Q.   Was that communicated to salespeople?
```

52

```
 1      A.   Yes.
 2      Q.   On a typical tour, how long would the
 3  salesperson be out doing the tour of the area and
 4  the site versus in the Sales Center doing
 5  paperwork?
 6      A.   I would say the majority of their
 7  time is spent outside of the sales arena.  There
 8  are two times during the tour that they're in the
 9  sales arena, which would be after they did their
10  warm-up outside.  We typically have them go up to
11  Mount Greylock, which is a beautiful area for
12  them to just sit in their car and go over the
13  vacation commitment type of issues; and then they
14  would typically go back into the sales lounge and
15  do, as I mentioned to you before, the program's
16  benefits and how it would work for them.  Then
17  they would go out and show them the model.
18      Q.   I'm sorry, can I interrupt you for one
19  second.  So they go out showing them the area,
20  including Mount Greylock, then come back to the
21  Sales Center?
22      A.   Correct.
23      Q.   Then they go out a second time?
24      A.   Then they would go out a second time
```

## Page 53

1  after showing them how RCI works and show them
2  the model; it's in another area. Then come back
3  and do the pricing.
4      Q.  So you say the majority of time,
5  they're actually out and about, is that right?
6      A.  I would say so, yes.
7      Q.  Is it close to fifty/fifty in your
8  view?
9      A.  Well, I believe it depends on the
10 customer. Some people might require more time
11 spent with how the program works, and therefore
12 they might spend more time in the sales arena.
13 And I still feel that they are spending most of
14 their time out of the sales room.
15     Q.  When you were project director, did
16 you actually take out tours?
17     A.  No -- you're asking me a question, but
18 I want to make sure I understand your reason.
19 Are you asking me did I know how they did the
20 tour?
21     Q.  No, I'm asking whether you actually
22 took a tour out.
23     A.  I didn't actually take a tour out; the
24 answer is no.

## Page 54

1      Q.  Did you ever go with a salesperson to
2  monitor their performance on a tour?
3      A.  Yes, I did.
4      Q.  And when you were monitoring their
5  performance, did you stay with them the entire
6  period of the tour?
7      A.  Yes.
8      Q.  If a salesperson was not available for
9  the guest after they were called to meet the
10 guest, what happened?
11     A.  They would get passed.
12     Q.  Then what was the discipline, if any,
13 if they got passed?
14     A.  Well, if it was their first incident
15 -- what is your question now?
16     Q.  What was the discipline to them if
17 they were passed?
18     A.  If it was their first incident, they
19 would be typically reprimanded and the following
20 day put on the bottom of the rotation.
21     Q.  That's called "overage," right?
22     A.  It's called "overage". Well, that's
23 your terminology. My terminology is they're at
24 the bottom of the rotation.

## Page 55

1      Q.  I'm sorry, I thought that was the
2  company's terminology. Is that right or not?
3      A.  Well, you know, when you're at the
4  bottom, you're at the bottom.
5      Q.  Whatever you call that, okay. So you
6  would be put at the bottom of the list?
7      A.  Correct.
8      Q.  How likely were you to get a tour if
9  you were at the bottom of the list?
10     A.  Depending on the day. If you're busy,
11 then they would certainly get a tour, and maybe
12 two.
13     Q.  If you didn't get a tour that day when
14 you were at the bottom of the list, where were
15 you placed the next day?
16     A.  Back on your normal rotation.
17     Q.  What criteria were used to create the
18 normal rotation?
19     A.  Closing ratios.
20     Q.  But your closing ratios wouldn't have
21 gotten worse, right, if you didn't have a tour?
22     A.  That's correct.
23     Q.  Was that the only criteria used to
24 create the rotation list?

## Page 56

1      A.  No.
2      Q.  Ratios?
3      A.  No.
4      Q.  What other criteria were used?
5      A.  People that made the sales the day
6  before would always get out right after the
7  managers. That's always been our policy.
8      Q.  If you were on overage, your chances
9  of making a sale were diminished, right?
10         MS. FABBO:  Objection.
11         THE WITNESS:  No, not at all.
12     Q.  (By Mr. Feldman) Well, if there
13 weren't enough people, you might not get a tour.
14 If there were people ahead of you --
15     A.  If you got a customer, you have the
16 same opportunity to get a sale as someone who is
17 the first one.
18     Q.  You have less of a chance of getting a
19 customer, right?
20     A.  I don't think so.
21     Q.  You don't think if you're at the
22 bottom of the list, you have a less chance of
23 getting a customer?
24     A.  To answer your question, it depends on

Page 57

```
 1   the day. It depends on whether we're busy or
 2   whether we're not busy.
 3       Q.   What if you're not busy?
 4       A.   If we're not busy, then the chances
 5   are certainly diminished.
 6       Q.   So that means they have less of a
 7   chance of making a sale than someone who actually
 8   gets a customer, is that right?
 9       A.   Based on that question, absolutely.
10       Q.   What other possible reasons would
11   there be for a person being put on overage?
12            MS. FABBO: Objection.
13       Q.   (By Mr. Feldman) Or being put at the
14   bottom of the list, excuse me?
15       A.   Well, if they, for example, came in
16   late, that might be a reason.
17       Q.   If an employee came in late; that is,
18   after 8:30 plus the grace period, was the company
19   policy that they were put at the bottom of the
20   list?
21       A.   Yes.
22       Q.   For that day or the next day?
23       A.   Should have been that day.
24       Q.   And they were put at the bottom of the
```

Page 58

```
 1   list for that day regardless of whether they
 2   stayed all day or didn't stay all day; they were
 3   still put at the bottom of the list?
 4            MS. FABBO: Objection.
 5       Q.   (By Mr. Feldman) Let me rephrase
 6   that. If they showed up late by a minute or two,
 7   your testimony was they were put at the bottom of
 8   the list, is that right?
 9            MS. FABBO: Objection.
10            THE WITNESS: You're talking
11            about a grace period now as well?
12       Q.   (By Mr. Feldman) I'm talking about
13   after the grace period --
14       A.   After the grace period --
15            MS. FABBO: You both are talking
16            at the same time.
17       A.   To answer your question, they would
18   get put at the bottom of the list that day.
19       Q.   Were they required to stay all day?
20       A.   They were required to stay until
21   they're cut.
22       Q.   What if -- when did the Welcome Center
23   know how many tours were going to be given in a
24   particular day?
```

Page 59

```
 1       A.   We get a manifest every morning, but
 2   some of the names on that list may or may not
 3   show up.
 4       Q.   How many people would show up if they
 5   weren't on the manifest.
 6       A.   Oh, that's not -- maybe you didn't
 7   understand the way I answered. There are always
 8   those that come in that are on the list, but not
 9   everyone on the list necessarily shows up.
10       Q.   I actually did understand that, and
11   I'm asking you a different question.
12       A.   Okay.
13       Q.   How many people showed up who were not
14   on the manifest?
15       A.   None to my knowledge.
16       Q.   So nobody ever just wandered over and
17   wanted to take a tour?
18       A.   You say did it ever happen; it's
19   possible we could have someone that just comes in
20   to see if there's an interest in vacation
21   ownership, but that's a rarity.
22       Q.   When was the manifest provided to the
23   Welcome Center?
24       A.   Typically every morning.
```

Page 60

```
 1       Q.   What time?
 2       A.   Generally around 8:00.
 3       Q.   So is it fair to say that the number
 4   of people on the manifest would be the number of
 5   tours that would be given in a particular day?
 6       A.   It wouldn't be any more than that; it
 7   may be less.
 8       Q.   If the Welcome Center saw that the
 9   number of people on the manifest was smaller than
10   the number of salespeople you had that day, what
11   would happen?
12       A.   Typically they would get cut. Those
13   that wouldn't get out would get cut.
14       Q.   Just so I have an example -- if there
15   are 30 salespeople and there are 27 names on the
16   manifest, what happens?
17       A.   The person in charge of the Welcome
18   center will make a determination whether or not
19   to keep those three remaining people or not.
20       Q.   In a typical day would they be kept or
21   would they not be kept?
22            MS. FABBO: Objection.
23            THE WITNESS: Well, we generally
24            like to keep a couple of people just
```

Page 61

1  in case there is a mistake and just in
2  case that walk-in might occur, so
3  there is somebody available. Again,
4  that determination -- if, to follow a
5  scenario that's similar but a little
6  different, if there are 30 reps. and
7  let's say there are only 10 or 15
8  scheduled to show, I seriously doubt
9  that the front desk manager would
10 require the people at the bottom of
11 that rotation to stay. But two or
12 three they might want to keep.
13 Q.  (By Mr. Feldman) Is that within the
14 discretion of the Welcome Center manager?
15 A.  Yes, but that's pretty much the
16 reasonable way to handle it.
17 Q.  What is the actual policy at Vacation
18 Village?
19 A.  The actual policy is that the front
20 desk manager makes that determination.
21 Q.  I thought you had testified earlier
22 that you thought the earliest the line was cut
23 was at 11:00; is that what you said?
24       MS. FABBO:  Objection.

Page 62

1       MR. FELDMAN:  I thought that's
2  what you said.
3       THE WITNESS:  No, I said that has
4  happened. There are times where
5  people might leave at around 11:00 if
6  there are no tours. I think that was
7  my response. There are times that
8  they might stay as late as 6:00.
9  Q.  (By Mr. Feldman) I'm just wondering
10 when the earliest time was that you remember that
11 the line was cut?
12 A.  I don't.
13 Q.  Are the salespeople made aware of how
14 many tours are being provided in a given day in
15 the morning?
16 A.  No.
17 Q.  So who has knowledge of how many tours
18 are on the manifest?
19 A.  It should be obviously the front desk
20 manager and the director.
21 Q.  So when you were the project director
22 on-site, you were aware of how many tours would
23 be coming in on a particular day?
24 A.  Yes, I was.

Page 63

1  Q.  Would you communicate that to the
2  salespeople?
3  A.  Rarely. If we're busy, I might say,
4  We're very busy today; let's get our game face
5  on, let's be ready. But no, I wouldn't say nor
6  would I advise anybody to tell a salesperson they
7  may not get out that day because of the levels of
8  tours we're doing.
9  Q.  At the Welcome Center, if within the
10 manager's discretion they didn't cut the line,
11 even though there may have been more salespeople
12 than actual tours that day, was the salesperson
13 required to stay on-site?
14      MS. FABBO:  Objection.
15      THE WITNESS:  Yes.
16      MR. FELDMAN:  Off the record.
17      (A break was taken)
18      MR. FELDMAN:  Back on the record.
19 Q.  (By Mr. Feldman) Mr. Rauer, I have a
20 couple other questions on chargebacks.
21 What is the actual policy of Vacation
22 Village at the Berkshires for charging
23 back monies that are already paid to a
24 salesperson?

Page 64

1       MS. FABBO:  Objection.
2       THE WITNESS:  I don't know, other
3  than what I've already mentioned.
4  Q.  (By Mr. Feldman) Who actually does
5  the charging back?
6  A.  Comes from bookkeeping, comes from
7  corporate.
8  Q.  Corporate in Florida?
9  A.  Yes.
10 Q.  Do you know who they instruct?
11 A.  No.
12 Q.  Are you familiar with a former
13 employee named LaCrisha Wise who worked at
14 Vacation Village?
15 A.  Yes.
16 Q.  Was she terminated?
17 A.  She's no longer employed.
18 Q.  Why is she no longer employed?
19 A.  I thought she quit.
20 Q.  Were you involved in any way in her
21 separation from work?
22 A.  No.
23 Q.  Are you aware of the circumstances
24 under which she left?

65

1  A. I believe she quit.
2  Q. If I said to you she was terminated
3  for excessive absenteeism, does that refresh your
4  recollection?
5  A. No.
6  Q. What do you remember about LaCrisha
7  Wise?
8  A. That she was an employee at one time.
9  Q. Were you aware that there were any
10 sort of problems with her employment?
11         MS. FABBO: Objection. You can
12         answer.
13         THE WITNESS: As you mention that
14         there was absenteeism, yes; that was
15         an issue with her. There were times
16         where she did not show up for work,
17         and there were also times when she was
18         late for work.
19 Q. (By Mr. Feldman) How did you know
20 about that?
21 A. During the period of time that I was
22 there, this occurred.
23 Q. So when you were project director
24 on-site, Miss Wise was working there?

66

1  A. Yes.
2  Q. How did you become aware of her
3  absenteeism or tardiness?
4  A. I was there.
5  Q. I understand, but was this
6  communicated to you from a line director or did
7  you observe this; how did you get this
8  information?
9  A. I observed it.
10 Q. What action did you take as a result?
11 A. I don't recall. It was a while ago.
12 Q. Was there a policy at the time you
13 were project director of not vigorously enforcing
14 the absenteeism policy?
15 A. No.
16 Q. Was there a point at which Vacation
17 Village started enforcing the absenteeism policy
18 in a more vigorous way?
19 A. No.
20 Q. As far as you're concerned, the policy
21 has been the same from the time you were there
22 until the present?
23 A. Yes.
24 Q. Were you involved in any way in the

67

1  termination of Mr. Massaconi from Vacation
2  Village?
3  A. Yes.
4  Q. I'd like you to describe your
5  involvement in his termination.
6  A. Well, I terminated him.
7  Q. You're the one who personally
8  terminated him?
9  A. Yes.
10 Q. Why did you do that?
11 A. Because he wasn't performing.
12 Q. What do you mean, "he wasn't
13 performing"?
14 A. Well, his closing ratio numbers on a
15 consistent basis were in double digits, but far
16 beyond double digits. When he was terminated, he
17 was one out of thirty or worse.
18 Q. Did he have the worst ratios of anyone
19 who was working at Vacation Village at the time?
20 A. When he was terminated, there were two
21 people with very similar numbers.
22 Q. Who were they?
23 A. He and a young lady, Bonnie -- I can't
24 remember her last name offhand, but a lady was

68

1  also terminated that day.
2  Q. Why was she terminated?
3  A. Numbers.
4  Q. Was there any other reason
5  Mr. Massaconi was terminated other than his
6  numbers?
7  A. No.
8  Q. Mr. Massaconi had been a -- was a
9  salesperson at the time, is that right?
10 A. That's correct.
11 Q. Before that, he was a sales manager?
12 A. There was a time he was manager, yes.
13 Q. Why was he promoted to sales manager?
14 A. He asked for the opportunity, and I
15 gave it to him.
16 Q. What criteria did you use when
17 determining whether to promote someone?
18 A. There was a time when Mr. Massaconi
19 did very well in sales and wanted to be a
20 manager. He was actually one of the original
21 salespeople at that resort. As some of the
22 people that were also original salespeople
23 evolved to management, he expressed a desire to
24 do that as well; and I gave him that opportunity.

69

1  Q. Were you project director on-site when
2  you gave him that opportunity?
3  A. Yes, I believe I was.
4  Q. Were there written criteria for you to
5  use when determining whether to make someone a
6  sales manager?
7  A. No, no written criteria.
8  Q. Was that within the discretion of the
9  project director?
10  A. Yes.
11  Q. Do you know what his ratios were at
12  the time he became a sales manager?
13  A. Yes, they were very good. They were
14  better than track average.
15  Q. What's "track average"?
16  A. At that time, I wouldn't recall; but
17  whatever they were, sir, he was better than that,
18  or at least as good, I should say.
19  Q. At what point was he demoted; do you
20  remember?
21  A. Yes.
22  Q. When?
23  A. I don't remember the exact day he was
24  promoted -- demoted, but I can't answer any more

70

1  than giving you the exact day is something I'm
2  not sure of.
3  Q. Why was he demoted?
4  A. For lack of performance.
5  Q. Was it because of the ratios, his
6  ratios?
7  A. Once you're a manager, there are
8  certain things other than your own personal sales
9  that you're required to do well.
10  Q. What was he not doing well?
11  A. He was not doing his personal sales
12  well, nor was he TO-int well, nor was he training
13  well.
14  Q. Anything else he wasn't doing well
15  that you remember?
16  A. Those are the three criteria that are
17  required to do well and to keep a job as manager.
18  Q. What was "TO-ing"?
19  A. That's when someone helps the
20  salesperson -- a manager helps a salesperson get
21  a sale. They take over the table.
22  Q. "TO" means Take Over?
23  A. Correct.
24  Q. How does one determine whether a

71

1  manager is TO-ing well?
2  A. Based on their closing ratios.
3  Q. So the closing ratios for a manager
4  who is TO-ing includes the sales that are not
5  generated by him, is that right; they're
6  initially being created by the salesperson who he
7  supervises?
8  A. Yes.
9  Q. Are TO statistics kept differently
10  than the manager's own sales?
11  A. They're not different; they're just
12  kept.
13  Q. I guess what I'm asking is -- the
14  manager can go out on tours as well, right?
15  A. Yes.
16  Q. And then the manager also may TO on
17  someone else's tour?
18  A. Correct.
19  Q. Are those statistics kept in separate
20  places, or are they put together for the
21  manager's sales ratios?
22  A. We have a personal sales manager --
23  personal sales ratio, and we have a TO ratio.
24  Q. Is it your testimony that Mr. -- how

72

1  were Mr. Massaconi's personal sales ratios and
2  how were his TO sales ratios at the time he was
3  demoted?
4  A. They were poor.
5  Q. Do you remember what they were?
6  A. No, I don't remember what they were.
7  Q. Was anyone else demoted at the same
8  time as Mr. Massaconi?
9  A. At the same time?
10  Q. At or about the same time.
11  A. No.
12  Q. Were his personal sales ratios worse
13  than every other manager at that time that he was
14  demoted?
15  A. Yes.
16  Q. Were his TO sales ratios worse than
17  every other manager at the time he was demoted?
18  A. Yes.
19  Q. You said he wasn't training well. How
20  did you determine that he wasn't training well?
21  A. Managers are required to recruit and
22  train new salespeople, and he was not doing that
23  well, either.
24  Q. Was he not recruiting well or was he

Page 73

```
 1  not training well?
 2     A.  He was not training well.
 3     Q.  What do you mean by "he wasn't
 4  training well"?
 5     A.  When we have salespeople that are new,
 6  they require training; and if they're getting
 7  trained well, hopefully they'll do well; and if
 8  they're not doing well, it's partly a result of
 9  the manager who's training them.
10     Q.  Just so I understand it, if
11  salespeople aren't making sales, does the company
12  consider that the manager has not been training
13  well?
14     A.  It's one of the issues, yes.
15     Q.  Which one of the three issues you
16  mentioned was the central reason for his
17  demotion, if you remember?
18         MS. FABBO:  Objection.
19         THE WITNESS:  He wasn't demoted
20      originally when we saw bad numbers in
21      all three of those categories.  What
22      happened with Mr. Massaconi is he was
23      given a warning.  He was given a
24      probationary period to fix primarily
```

Page 74

```
 1      his personal numbers, and of course we
 2      also didn't allow him to go to too
 3      many tables because his TO numbers
 4      were not that good.  We wanted him to
 5      focus on getting his personal numbers
 6      back on track where they should be;
 7      and we gave him a period of time to
 8      accomplish that.
 9          During that period of time, he
10      was to focus on getting his own sales.
11      The end of that period of time and he
12      still didn't get his sales back to
13      where they should be, we then took
14      further action not to remove him as a
15      manager but not to give him a team
16      that he had under him, because again,
17      we wanted his focus to be only his own
18      personal sales.  We didn't want any
19      salespeople to suffer because he
20      wasn't able to focus on his own
21      personal sales and take care of his
22      team as well; so we temporarily
23      removed his team from him as the next
24      stage.
```

Page 75

```
 1     Q.  (By Mr. Feldman)  That was before
 2  demotion, is that right?
 3     A.  That was before his demotion.  After
 4  that period of time and he still wasn't able to
 5  get his personal sales numbers back to where they
 6  should be, at that time we demoted him, or I
 7  demoted him.
 8     Q.  Did that demotion occur before or
 9  after Mr. Massaconi filed a complaint in this
10  case?
11         MS. FABBO:  Objection.
12         THE WITNESS:  I have no idea.
13         (Exhibit 1, Uniform Policy for
14          Sales Managers' Sales
15          Performance, marked for
16          identification)
17     Q.  (By Mr. Feldman)  Showing you what's
18  been marked as Exhibit 1, Mr. Rauer, do you
19  recognize this document?
20     A.  Yes.
21     Q.  What is it?
22     A.  Says Uniform Policy for Sales
23  Managers' Sales Performance.
24     Q.  Were you involved in the creation of
```

Page 76

```
 1  this document?
 2     A.  Yes, I was.
 3     Q.  Why was the document created?
 4     A.  I wanted to make the managers aware
 5  that I expected performance in all categories.
 6     Q.  Why did you decide to create the
 7  document at the time you did -- had something
 8  happened before that?
 9     A.  Not that I recall.  I just think that
10  there were some issues that needed to be put down
11  in writing so everyone was aware of what I
12  considered proper performance standards.
13     Q.  Was this taken from some kind of other
14  handbook, or did you create this on your own?
15     A.  I created this.
16     Q.  Did you get approval from your
17  supervisor to provide this?
18     A.  I don't recall.
19     Q.  Was this created in part because of
20  Mr. Massaconi's personal situation?
21         MS. FABBO:  Objection.
22         THE WITNESS:  No.
23     Q.  (By Mr. Feldman)  Is this a procedure
24  that was provided to Mr. Massaconi, what's
```

## Page 77

1  described on Page 1?
2      A.  Sorry, what was your question?
3      Q.  Was this procedure followed with
4  regard to Mr. Massaconi?
5      A.  Should have been.
6      Q.  Was this procedure put in place before
7  he was demoted?
8      A.  Yes.
9      Q.  So what you first described as the
10 period when Mr. Massaconi was not demoted but he
11 was supposed to get his numbers up, is that
12 what's listed as Number 1 on Page 1 of Exhibit 1?
13     A.  Yes.
14     Q.  Or is that somehow different?
15     A.  Yes, but I can't honestly tell you
16 that this was done prior to him being advised
17 that he had to get his numbers better or not.  I
18 really don't recall.
19     Q.  Now, he was given time to get his
20 personal numbers up, you said.  Was he able to do
21 so?
22     A.  No.
23     Q.  What happened with his numbers?
24     A.  They stayed fairly poor.

## Page 78

1      Q.  Do you know what they were at the
2  time?
3      A.  I don't know exactly what they were,
4  but they were poor.
5      Q.  At the time that Mr. Massaconi was
6  told to get his personal numbers up, was anyone
7  else put in that same situation?
8      A.  Yes.
9      Q.  Who?
10     A.  I can't recall, but several people.
11 Let me see, maybe this will help me.  Bill Lee is
12 one of them, Melissa McGovern was someone else,
13 Bob Campagna was someone, Mike Campagna was
14 someone.
15     Q.  The people you're naming are people
16 who were given a certain amount of time to get
17 their personal numbers up?
18     A.  Yes.  Over a period of time.  I don't
19 know specifically when it occurred, but looking
20 at the names, I can tell you that these people
21 were also given periods to get their numbers
22 fixed.
23     Q.  What happened to the numbers of those
24 people that you just named?

## Page 79

1      A.  Well, it depends on who they were.
2  Some people fixed them and some people didn't.
3      Q.  Well, of the ones you've named, if you
4  remember, which were the ones who didn't fix
5  their numbers?
6      A.  Bill Lee, Melissa McGovern, and Mike
7  Massaconi.
8      Q.  Other than Mike Massaconi -- we know
9  what happened to him -- what happened to the
10 other two?
11     A.  They were demoted.
12     Q.  Were they demoted at about the same
13 time as Mr. Massaconi?
14     A.  No.  Again, the names that I've
15 mentioned to you, during the course of time have
16 -- during that period of time -- fallen into
17 similar categories that Mr. Massaconi did.
18     Q.  I know; I'm just trying to figure out
19 when...
20     A.  I really couldn't tell you exactly.
21     Q.  When Mr. Massaconi was demoted, what
22 happened after he was demoted?
23         MS. FABBO:  Objection.
24         THE WITNESS:  I don't understand

## Page 80

1         the question.
2      Q.  (By Mr. Feldman)  Sure.  What happened
3  to his sales ratios after he was demoted?
4         MS. FABBO:  Objection.
5         THE WITNESS:  They still didn't
6         get better.
7      Q.  (By Mr. Feldman)  Did they get worse?
8      A.  When he was terminated, they were
9  pretty bad, yes.
10     Q.  How long was the period between his
11 demotion and his termination, if you remember?
12     A.  I don't really remember, but it was
13 more than a few weeks.
14     Q.  You listed three reasons for his
15 demotion.  How many reasons were there for his
16 termination?
17         MS. FABBO:  Objection.
18         THE WITNESS:  For his termination
19         it was -- he was a salesperson at that
20         time; and I looked at his personal
21         numbers, and his personal numbers were
22         substandard.
23     Q.  (By Mr. Feldman)  Were you aware that
24 Rod Lewis had spoken to Mr. Massaconi at some

81

1 point and said that the company was trying to get
2 rid of people who had filed this lawsuit?
3   A.  No.
4   Q.  Have you ever heard of that before?
5   A.  No.
6   Q.  Before today, you haven't heard of
7 that?
8   A.  No.
9   Q.  You had said Mr. Massaconi and a woman
10 had particularly bad ratios at the time that they
11 were fired. Has anyone since his termination had
12 the same level of bad ratios?
13   A.  No.
14   Q.  What is the ratio that leads to
15 termination at Vacation Village currently?
16       MS. FABBO: Objection.
17       THE WITNESS: Anybody that was
18         terminated based on performance had a
19         consistent period of time of doing
20         poor.
21   Q.  (By Mr. Feldman) I'm trying to define
22 -- using the numbers, I'm trying to define what
23 "doing poor" means.
24   A.  Well, way past track average. That's

82

1 to say the least, but when someone is in double
2 digits, they need to be fixed one way or another.
3 They need -- when I say "one way or another,"
4 either their manager needs to fix them or they
5 need to be reassigned to another manager.
6 Somehow we need to do the best we can to get
7 these people as good as they can possibly be.
8       And with regard to Mr. Massaconi, he
9 was given opportunities to go on different teams.
10 He was actually, for the most part, refusing to
11 take the training that we required him to take
12 because of his numbers, but he still didn't do
13 it, and didn't really show a sincere effort to
14 get better. And his numbers were the worst,
15 along with this young lady Bonnie -- again, her
16 last name escapes me; but those two people had
17 the worst numbers on the track, and they both
18 showed a lack of desire to get better.
19   Q.  Is there a ratio that you consider to
20 be track average?
21   A.  No, it would depend on what the track
22 average would be.
23   Q.  Since the time you've been there, 2001
24 to the present, is there a number that has

83

1 emerged as being typically the track average?
2       MS. FABBO: Objection.
3       THE WITNESS: No, it would vary,
4         but never in double digits.
5   Q.  (By Mr. Feldman) What were the ranges
6 for track average, if you can remember?
7   A.  I couldn't even answer that, but
8 again, never in double digits.
9   Q.  Is there a company policy about a
10 ratio that would lead to termination?
11   A.  I don't know.
12   Q.  You mentioned double digits a few
13 times?
14   A.  Yes, I did, but there are people who
15 have been in double digits who have gotten fixed
16 and got their numbers back to where they need to
17 be, and there are those who were in double digits
18 who have gotten worse.
19   Q.  What happened to those people?
20   A.  For the most part, they got?
21   Q.  Do you remember anybody besides
22 Mr. Massaconi and the other young woman you
23 mentioned?
24   A.  Yes. I don't remember names

84

1 specifically. If I looked at the roster I might
2 be able to give you that. But yes, that has
3 happened and it's normal. If people do not
4 perform and they're given every opportunity to
5 perform and they still don't perform, then we
6 have to consider this not good for them or for
7 our company to keep giving them customers.
8   Q.  Getting back to absenteeism for a
9 minute, is there anyone else who you remember as
10 being terminated from Vacation Village for
11 absenteeism other than Miss Wise?
12       MS. FABBO: Objection.
13       THE WITNESS: I don't recall that
14         Miss Wise was terminated for that
15         reason. You're telling me that.
16   Q.  (By Mr. Feldman) I'm just saying
17 forget Miss Wise for a minute. Anyone else been
18 terminated for excessive absenteeism?
19   A.  I don't recall.
20   Q.  Has anyone else been terminated for
21 excessive tardiness?
22   A.  I don't recall.
23   Q.  What's the policy at Vacation Village
24 with regard to giving employees time under the

85

1  Family Medical Leave Act?
2      A.   That's something that's a Human
3  Resource issue and has nothing to do with sales,
4  so I don't get involved with that.
5      Q.   Who gets involved with that?
6      A.   The Human Resource director.
7      Q.   Were you involved in the termination
8  of Mr. Martin, who is a plaintiff in this case?
9      A.   I think so, yes.
10     Q.   Do you remember Mr. Martin?
11     A.   Yes.
12     Q.   Do you know what his first name was?
13     A.   Roger.
14     Q.   You said "I think so." What makes you
15  not sure?
16     A.   Because I'm not sure. I don't really
17  recall. I certainly know Roger Martin, but I
18  don't recall exactly whether I was involved in
19  his termination or not.
20     Q.   Do you recall a moment of interaction
21  between you and Mr. Martin that was tantamount to
22  insubordination?
23     A.   It's possible.
24     Q.   Do you recall terminating him?

86

1      A.   A specific incident -- what I recall
2  is that Mr. Martin at one time abruptly left the
3  manager -- the sales meeting and caused a raucous
4  there. I also recall Mr. Martin didn't show up
5  for a tour. I recall Mr. Martin refused a tour.
6  I recall Mr. Martin had several times displayed
7  what I would consider improper behavior. He was
8  occasionally disruptive.
9      Q.   Do you recall the moment of
10  termination with Mr. Martin?
11     A.   No.
12     Q.   Do you recall who terminated him?
13     A.   I don't. Not to say that it perhaps
14  wasn't -- was me; I just don't recall.
15     Q.   Do you recall Mr. Martin ever
16  complaining about his wages?
17     A.   Yes.
18     Q.   What do you recall about that?
19     A.   I recall when Mr. Martin had quit, I
20  was up for a visit and he happened to come in
21  asking about his commissions that were due him;
22  and I recall going over with him our policies.
23  At that time, he was very cordial and receptive
24  to what I had to say and understood our policies,

87

1  and it was a good little meeting that we had.
2      Q.   Do you recall Mr. Martin specifically
3  complaining about not being paid minimum wage?
4      A.   No.
5      Q.   Were you aware that Mr. Martin had
6  complained to anyone about not being paid minimum
7  wage?
8           MS. FABBO:  Objection.
9           THE WITNESS:  No. I think I
10          answered that question more generally
11          before.
12     Q.   (By Mr. Feldman) You might have.
13  Were you aware of before the termination of
14  Mr. Massaconi that he had gone to the Attorney
15  General complaining about not being paid wages?
16          MS. FABBO:  Objection.
17          THE WITNESS:  Did he? I didn't
18          know that.
19     Q.   (by Mr. Feldman) I'm asking whether
20  you're aware.
21     A.   No, I'm not aware.
22     Q.   I'd like you to describe all the
23  reasons why Mr. Martin was terminated from
24  employment.

88

1      A.   As I mentioned to you, he was
2  disruptive, he had a very short temper, and he
3  did cause issues with other salespeople because
4  of his behavior. He refused tours. Other than
5  that, I really can't be more specific because I
6  would have to look at his record, look at his
7  numbers. I still don't recall whether it was me
8  personally that terminated him or I was aware of
9  it. I really don't remember.
10     Q.   Were you aware that he was terminated
11  twice?
12     A.   No, I was aware that he quit and then
13  he was rehired. I allowed him to be rehired.
14  After, again, a successful conversation with him
15  and he came a month or two after that and asked
16  for a job again, I thought, well, he's calmed
17  down. As a matter of fact, he even said that he
18  was taking the wrong medication and he's fine now
19  and he really wants to work. And I gave him the
20  benefit of the doubt and I said okay because I
21  did allow him to come back to work.
22     Q.   Why did he quit the first time?
23     A.   His attitude was that he wasn't making
24  enough money.

## Page 89

1  Q. Is that what he communicated to you?
2  A. Yes.
3  Q. That's why he said he quit?
4  A. Yes, I think so.
5  Q. What was your impression of Mr. Martin
6  as a salesperson at or about the time he quit?
7  A. Occasionally he was disruptive then as
8  well, but not nearly as he was later on.
9  Q. Given that was disruptive before, why
10 did you hire him back?
11 A. Again, I had a good conversation with
12 him, I wanted to give him the benefit of the
13 doubt. He told me he had some treatment, he was
14 on some medications, and he was good, and he
15 wanted to work. He's a nice fellow, and I wanted
16 to give him the benefit of the doubt. I thought,
17 let's try him back again.
18 Q. Were you aware that Mr. Martin told
19 anyone at Vacation Village that he was going to
20 file a written complaint with the Attorney
21 General about his pay?
22 A. No.
23 Q. Is this the first time you're hearing
24 that?

## Page 90

1  A. Yes.
2  Q. You said Mr. Martin had a meeting with
3  you about not being paid commissions, correct?
4  A. When he was no longer employed. After
5  he quit.
6  Q. After he quit?
7  A. When he quit, might have been a couple
8  of months or a month or so after that, I happened
9  to be up at the resort, and he walked in to ask
10 about his pay. You know, he saw me and he asked
11 me; and I said, Come on, let's talk about it. As
12 a matter of fact, I believe I ran a whole sheet
13 on the outstanding sales that he made so he had a
14 good idea -- I gave it to him so he knew what he
15 had coming to him.
16 Q. Did he have any conversations with you
17 after he was employed the second time about not
18 being paid wages?
19 A. No.
20 Q. Were you aware that he had
21 conversations with anyone during that second
22 period of employment where he complained about
23 his wages?
24 A. No.

## Page 91

1  MR. FELDMAN: Off the record.
2  (A break was taken)
3  MR. FELDMAN: Back on the
4  record.
5  Q. (By Mr. Feldman) I have a couple of
6  questions, then I'm done. With regard to the way
7  salespeople were paid with commissions and the
8  introductory commission that you described
9  earlier, who is the person who set up that policy
10 -- was that Mr. Polansky, you said?
11 A. I don't know that he set it up. I
12 know he told me that's the policy.
13 Q. Who is the person in charge of making
14 sure that policy got carried out at Vacation
15 Village?
16 A. Well, it's in the system, you know.
17 If a sale was made and they were on a ten percent
18 commission -- let's say that was the introductory
19 -- the volume of the sale will equal the -- based
20 on the percentage of commission, would be their
21 compensation.
22 Q. But as to the procedures around three
23 timely payments and a PAC check, is that also
24 programmed into the system; how does that work?

## Page 92

1  A. Very good question. When we get -- I
2  believe every week they get a sheet that shows
3  what commissions are due the salespeople, and
4  there's a code, for example, with PAC that would
5  have a "P," meaning that the PAC is not in. So
6  that person will know that they're not going to
7  get paid that commission because there's no PAC.
8  Q. So that person would have to wait
9  until the three timely payments?
10 A. That salesperson, as I told you -- the
11 three timely payments criteria will come up with
12 either a person who is no longer employed or
13 someone who is employed but doesn't have the PAC
14 check for that particular sale.
15 Q. How is that dealt with with the
16 computer; in other words -- track...
17 A. Well, again, there's a code. There's
18 a "P" for that. If there's no "P," that's good
19 business and they're going to get paid.
20 Q. Where would one find the payment
21 policy in the various documents that Vacation
22 Village creates?
23 A. I believe it's in the handbook.
24 Q. So the handbook is the place where