# EXHIBIT 2



Not Reported in N.E.2d										Page 1
Not Reported in N.E.2d, 2000 WL 33170935 (Mass.Super.)
**(Cite as: 2000 WL 33170935 (Mass.Super.))**

C
Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
John A. MURRAY,
v.
SHARP AIR FREIGHT SERVICES, INC. et al.
[FN1]

FN1. Jaishri Singh and William D. Patterson, MD.

No. 975878J.

Dec. 5, 2000.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANT WILLIAM PATTERSON, M.D.'s SECOND MOTION FOR SUMMARY JUDGMENT

FREMONT-SMITH.

*1 Plaintiff alleges that his employer, Sharp Air Freight Services, Inc. ("Sharp") refused to reinstate him to his position as a truck driver because he was previously injured on the job and had received workers' compensation benefits, and that Sharp's refusal to reinstate him constituted discrimination based on handicap and age, in violation of G.L.c. 151B. as well as an unlawful refusal to reinstate an employee who has received workers' compensation benefits in violation of G.L.c. 152, § 75A. Plaintiff further contends that Dr. William Patterson ("Patterson") aided and abetted this unlawful discrimination by unreasonably withholding, at Sharp's direction, medical approval to return to work, and that Patterson's actions also constituted intentional interference with his advantageous business relationship as an employee of Sharp. [FN2] Defendant Patterson now moves for summary judgment. After hearing, for the reasons set forth below, defendant's motion is *DENIED* in part and *ALLOWED* in part.

FN2. An additional count against Patterson for intentional infliction of emotional distress was waived at the hearing.

BACKGROUND
Plaintiff was a truck driver employed by defendant Sharp. On November 27, 1996, the plaintiff sustained an injury to his back while on the job and was out of work on workers' compensation for about eight months. During that time, plaintiff was under the care of Dr. John J. Walsh ("Walsh") and a physical therapist, James J. Leonardo, M.S.P.T. ("Leonardo").

Plaintiff submits sworn testimony that in June 1997, defendant Jaishri Singh ("Singh"), president of Sharp, called him on the phone and told him that he and three other employees would not be allowed to come back to work because they had been injured and had been out of work collecting workers' compensation. Singh denies that he ever made any such statement.

On June 23, 1997, a medical examiner for the workers' compensation insurer, Dr. James J. Hewson ("Hewson"), examined the plaintiff and cleared him to return to work following an additional month of physical therapy. On July 3, 1997, plaintiff passed a Department of Transportation physical which was required to maintain his commercial driver's license. On or about July 25, 1997, plaintiff, having received clearance to return to work as a truck driver from Walsh and Leonardo, sought reinstatement to his former position. Plaintiff presented his request to Singh, who told plaintiff that before he could be considered for reinstatement he had to undergo an examination by Patterson. Defendants contend that this was an independent medical evaluation ("IME") and that Patterson was neither an employee

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                                   Page 2
Not Reported in N.E.2d, 2000 WL 33170935 (Mass.Super.)
(Cite as: 2000 WL 33170935 (Mass.Super.))

nor an agent of Sharp, though he had performed numerous employee examinations at Sharp's request in the past.

On July 31, 1997, plaintiff went to Patterson's office where he was examined by Patterson's partner, Dr. Thomas Gassert ("Gassert"). According to the plaintiff, Gassert told the plaintiff that he had passed the physical, but that he needed to confer with Patterson. Plaintiff contends that Gassert then spoke briefly with Patterson, after which Patterson entered the examination room and introduced himself to the plaintiff. Plaintiff claims that Patterson informed him that additional tests would be required before he could give authorization to return to work, but never examined the plaintiff. Gassert wrote a report stating "my initial impression leads me to believe that the patient can return to work safely. However, I lack the benefit of previous medical records and I will ask him to supply this to us from his orthopedist so that we can know specifically what diagnosis he was given and what his treatment was."

*2 On August 1, 1997, Patterson sent letters to Sharp and the plaintiff. The letter to Sharp requested a job description for plaintiff's position. The letter to the plaintiff included a Work Tolerance Evaluation Form which Patterson indicated needed to be completed by a physician along with a narrative report from a board-certified physician or orthopedist or neurosurgeon. Patterson further indicated that if any additional tests were necessary to complete his assessment of the plaintiff, they would have to be undertaken at the plaintiff's own expense.

On August 5, 1997, plaintiff submitted the requested form, which had been completed by Walsh, to Patterson. Walsh submitted an additional letter to Patterson the same day which described his treatment of the plaintiff. Defendants maintain that Walsh's letter was incomplete and did not respond to many of Patterson's concerns. Plaintiff asserts under oath that when Patterson informed the plaintiff that additional testing would be required before he would give his approval for plaintiff to return to work, he asked why additional testing was necessary, and Patterson replied that he (Patterson) worked for Sharp and had to look out for Sharp's interest. Patterson denies ever making this remark.

Sharp submitted the job description on August 5, 1997 as Patterson had requested. On August 19, 1997, Sharp also sent a report regarding the plaintiff's previous back injuries and his time out on workers' compensation, and indicated that the report set forth "all of his previous medical history regarding his back. I believe you will find this report helpful." Plaintiff consented to Patterson's request for additional testing and underwent a second physical examination by Walsh on September 2, 1997. Walsh determined that plaintiff could return to work without limitations and so stated in a letter to Patterson. Patterson replied by letter to Walsh dated September 3, 1997 in which he identified himself as "Occupational Medicine Consultant to Sharp Air Freight." In the letter Patterson indicated that he had examined the plaintiff, reviewed an "impartial" examination performed on June 23, 1997 (Hewson's examination), reviewed the plaintiff's medical history and the literature regarding back injuries and still was concerned that the plaintiff was at a "non-speculative, substantially increased risk of future back injury which would be of material health impairment." He went on to say he would not clear the plaintiff to return to work until Walsh commented further on plaintiff's condition.

On September 22, 1997, Patterson sent a letter to plaintiff indicating that he had consulted with "several qualified back surgeons and occupational medicine specialists in Massachusetts" and that the "clear consensus" was that plaintiff was at "significant increased risk" of back injury if he returned to his former duties. He suggested that plaintiff undergo a "functional capacity assessment" at Occupational Health and Rehabilitation, Inc. ("OH+R") in Boston and that based on the results, "we may wish [sic] to seek a consultation with a physical medicine specialist." He went on to tell plaintiff, "I appreciate your frustration at the delay in this, which is occasioned by the complexity of your case, the difficult clinical issues raised and my desire to ensure that you are medically qualified to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the demanding duties required at Sharp Air Freight."

*3 On October 2, 1997, plaintiff's attorney sent letters to Sharp and Patterson protesting the long delay in reinstating plaintiff and claiming that both Sharp and Patterson were in violation of the Americans with Disabilities Act. The letter also indicated that plaintiff would not undergo a functional capacity assessment at OH+R because it was unnecessary given Walsh's two examinations, and further objected to Patterson's requiring a test at an organization in which Patterson had a financial interest, especially since he had already indicated that any further testing would be at the plaintiff's expense. [FN3]

> FN3. OH+R was an affiliate of Patterson's office, New England Health Center. Patterson acknowledged in his letter to Sharp dated October 10, 1997, that this might appear to be conflict of interest.

In response to this letter, Dr. Patterson wrote to Ms. Jean Humphrey at Sharp Air Freight on October 10, 1997 regarding Sharp's options regarding the plaintiff. In this letter Patterson stated:
> In the practice of occupational medicine, there are often disputes between *physicians representing employers* and patients' private, treating physicians in their interpretation of the medical literature and their professional opinions. (emphasis added).

He continued:
> One option which Sharp Air Freight may wish to consider is seeking a third opinion. OSHA and various labor management agreements have permitted the *employer's physician* and the patient's physician to mutually agree on a third physician who will offer an independent opinion. (Emphasis added.)

Patterson finally went on to explain that the additional tests which he required to complete an assessment of plaintiff were reasonable because, "the ADA *specifically permits employers* to give follow-up tests where the initial examination indicates that further information is needed, as is the situation here." (Emphasis added.)

Patterson testified at his deposition that at some point between August 5, 1997 and September 29, 1997 (he could not recall when precisely) he had a conversation with an agent of Sharp Air Freight in which the agent informed Patterson that they did not think the plaintiff should return to work.

In addition, plaintiff claims that Sharp engaged in the same pattern of discrimination, and Patterson engaged in the same pattern of aiding and abetting, against another Sharp truck driver, Jacques St. Amant, who was one of the three employees who Singh indicated he would not hire back, unless he was cleared by Patterson, because they had collected workers' compensation.

On November 19, 1997, after a hearing, Judge Botsford granted plaintiff's request for preliminary injunctive relief and ordered Sharp immediately to reinstate plaintiff to his former position as a truck driver at his full regular salary and benefits. Sharp did not attend this hearing, but at a subsequent hearing on November 26, 1997, Judge Botsford denied Sharp's motion for reconsideration of the injunctive relief.

## DISCUSSION

This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. *Cassesso v. Commissioner of Correctio,* 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553, 340 N.E.2d 877 (1976); Mass.R .Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. *Pederson v. Time Inc.,* 404 Mass. 14, 17, 532 N.E.2d 1211 (1989). If the moving establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of material fact. *Id.* at 17, 532 N.E.2d 1211. Summary judgment, where appropriate, may be entered against the moving party, or may be entered as to certain issues and not others which may present a genuine issue of material fact. *Community Nat'l Bank, supra,* at 553, 340 N.E.2d 877.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                       Page 4
Not Reported in N.E.2d, 2000 WL 33170935 (Mass.Super.)
**(Cite as: 2000 WL 33170935 (Mass.Super.))**

Count V--Violation of M.G.L.c. 151B, § 4(5)
(Aiding and Abetting)

*4 It is clear that an individual who actively perpetrates or assists another in the acts forbidden by c. 151B can be held separately liable as an aider and abettor. *Beaupre v. Smith and Associates,* 2000 Mass.App. Lexis 990, fn. 18 (2000). Here, there exists a dispute of fact as to whether Sharp discriminated against plaintiff, as well as whether Patterson aided and abetted any such discrimination.

As to whether Sharp discriminated, plaintiff contends in his complaint, sworn deposition and answers to interrogatories, that Sharp president Jaishri Singh contacted plaintiff in June 1997 and informed him that he refused to rehire him because plaintiff had been injured and had received workers' compensation. This alone, if true, could constitute a violation of both M.G.L.c. 151B, § 4(16) (discrimination on the basis of handicap) and M.G.L.c. 152, § 75A (the Workers' Compensation Hiring Preference statute). Additionally, there is evidence that Patterson had a conversation with an agent of Sharp in which the agent expressed Sharp's preference for Patterson's finding plaintiff medically unfit to return to work. Further, plaintiff asserts that Singh identified three other Sharp employees who were out on workers' compensation who Singh would not rehire. According to plaintiff, one of those employees, Jacques St. Amant, was similarly told by Singh of his refusal to rehire him because of his being injured and receiving workers' compensation. Plaintiff alleges that St. Amant was then sent to Dr. Patterson for a lengthy evaluation resulting in St. Amant not being rehired. [FN4]

> FN4. Whether the evidence as to these other instances of alleged discrimination will be admissible at trial is a matter best left to the trial judge.

While in *Ryan v. Town of Lunenberg,* 11 MDLR 1215 (1989), and its progeny the MCAD has indicated that an employer's good faith reliance on an independent and properly conducted medical examination can constitute a defense to a discrimination claim, it is disputed here whether Sharp's reliance on Patterson was truly in good faith and whether Patterson's examination, even if thorough, was truly independent and properly conducted (see discussion below). Thus, the cited cases are not determinative in the situation alleged here.

Since this is a motion for summary judgment, the evidence must be viewed with an indulgence in the opposing party's favor. *Beal v. Board of Selectmen of Hingham,* 419 Mass. 535, 539, 646 N.E.2d 131 (1995). Taken together, and considered in a light most favorable to the nonmoving party, there is sufficient evidence upon which a reasonable jury could return a verdict for the plaintiff against Sharp on the discrimination claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This being the case, it must then be determined whether there is sufficient evidence for a reasonable jury to determine that Patterson aided and abetted in any unlawful discrimination. M.G.L.c. 151B, § 5 makes it unlawful for "any person, ... to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." In *Harmon v. Malden Hospital,* 96 BEM 1146 (1997) (cited with approval in *Beaupre, supra*) the Massachusetts Commission Against Discrimination ("MCAD") established the standard for determining liability for aiding and abetting discrimination under the statue. [FN5] The *Harmon* standard is: "The wrong must be separate and distinct from the claim in main ... Further, the complaint must provide credible evidence that the aider and abettor shared an intent to discriminate not unlike that of the alleged principal offender, and that the aider and abettor knew of his or her supporting role in an enterprise designed to deprive an individual of a right guaranteed him or her under G.L.c. 151B."

> FN5. See *Beaupre, supra,* (identifying *Harmon* as the most notable case concerning aiding and abetting liability of individuals, not directly employed by the principal offender, but who nonetheless actively perpetrate or assist in the acts forbidden by M.G.L. 151B). In addition,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                   Page 5
Not Reported in N.E.2d, 2000 WL 33170935 (Mass.Super.)
(Cite as: 2000 WL 33170935 (Mass.Super.))

the SJC accords deference to the MCAD to interpret and implement the state's anti-discrimination laws. See *College Town v. MCAD,* 400 Mass. 156, 508 N.E.2d 587 (1987).

*5 Here, Patterson's alleged actions are separate and distinct from the claim in main. Patterson was not in a position to hire or refuse to rehire plaintiff (a decision which could only be made by Sharp) but *was* in a position to perform separate and distinct acts in furtherance of Sharp's decision.

Here, plaintiff has provided sufficient evidence upon which a reasonable jury could conclude that Patterson "shared an intent to discriminate not unlike that of the alleged principal offender and that he knew of his supporting role in an enterprise designed to deprive an individual of a right guaranteed to him under M.G.L.c. 151B." While Patterson maintains that he performed an independent medical evaluation, plaintiff has testified that Patterson indicated that he was sending plaintiff for additional testing because he (Patterson) worked for Sharp and had to look out for its interests. Patterson's denial of making this remark raises a dispute of material fact.

In addition, Patterson identified himself in several letters as "representing" the employer; as the "employer's physician"; and as the "Occupational Medicine Consultant to Sharp Air Freight"; and distinguished future examinations of the plaintiff to be made by another physician as being "independent." He also justified his requiring the plaintiff to undergo prolonged testing before giving a final approval to return to work on the basis that "the ADA specifically permits *employers* to give follow-up tests where the initial examination indicates that further information is needed, as is the situation here." (Emphasis added.) Patterson also further admitted to being in communication with one of Sharp's agents during Patterson's deliberations and that the agent told Patterson that they did not want plaintiff to return to work.

Thus, regardless of his legal status as an "independent contractor" rather than an employee of Sharp, a reasonable jury could conclude that Patterson was not acting completely independently from the employer, with no agenda other than to provide an IME. Viewed as a whole, and in a light most favorable to the nonmoving party, there is sufficient evidence upon which a reasonable jury could conclude that Patterson's actions satisfied the *Harmon* standard, so that summary judgment is inappropriate.

Defendant also relies on an unreported MCAD decision, *Wynn v. Department of Correction and Health Resources Corp.,* 89-BEM-0821, 89-BEM-0822, for the position that a physician performing an IME cannot, as a matter of law, be held liable as an aider and abettor to discrimination. In *Wynn,* however, an MCAD Hearing Officer granted summary judgment for a physician because there were no facts suggesting he had performed anything other than a neutral examination. *Wynn* is therefore not applicable to the present case since the plaintiff has put forth sufficient evidence from which a reasonable jury could conclude that Patterson's examination was not neutral.

Count VI--Intentional Interference with
Advantageous Relations

*6 To recover in an action at law for intentional interference with advantageous relations, the plaintiff must prove (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such a relationship; (3) that the defendant, with an improper motive or an improper means, induced the other person to break or disrupt that relationship; (4) the plaintiff's loss of advantage directly resulted from the defendant's conduct. *United Truck Leasing Co., v. Geltman,* 26 Mass.App.Ct. 847, 533 N.E.2d 647 (1989).

There is no dispute as to elements 1, 2 and 4. The only question is whether Patterson, with an improper motive or means, induced Sharp to interfere with plaintiff's employment relationship with Sharp. Patterson maintains that plaintiff has no reasonable expectation of proving that Patterson acted other than with a legitimate purpose, entitling him to summary judgment on this count. See *Boothby v. Textron, Inc.,* 414 Mass. 468, 487, 608

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:04-cv-30091-MAP    Document 143-24    Filed 04/16/2007    Page 10 of 10

Not Reported in N.E.2d                                                                                          Page 6
Not Reported in N.E.2d, 2000 WL 33170935 (Mass.Super.)
**(Cite as: 2000 WL 33170935 (Mass.Super.))**

N.E.2d 1028 (1993). But as the above analysis regarding aiding and abetting demonstrates, there is sufficient evidence upon which a reasonable jury could conclude that he did not act independently and with a legitimate business or medical purpose. [FN6]

> FN6. As this count is based on proof of the same illegal intent as is required for Count V, it may be determined at trial to be redundant. It is difficult to conceive of how a verdict either way on Count VI could alter the result of a verdict either way on Count V (which, of course, unlike Count VI, provides for possible punitive damages and attorney fees).

Accordingly, defendant's motion for summary judgment as to this count is denied. [FN7]

> FN7. Judge Neel reached the same result on an earlier motion which was, however, unlike the present motion, prior to the close of discovery. See Denial of Defendant's First Motion for Summary Judgment, July 26, 1998.

### ORDER

For the foregoing reasons it is hereby ordered that defendant's motion for summary judgment is *DENIED* as to Count V (Aiding and Abetting) and Count VI (Intentional Interference with Advantageous Relations), and *ALLOWED* (by agreement) as to Count VIII (Intentional Infliction of Emotional Distress).

Not Reported in N.E.2d, 2000 WL 33170935 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.