# EXHIBIT
# 2

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
Defendants

DEPOSITION OF FAITH LIPPERT

May 17, 2005, 10:00

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

3

I N D E X

WITNESS:  FAITH LIPPERT

Direct Examination by Ms. Garrow          5

EXHIBITS

Exhibit 1,  Good Business Dates                   15
Exhibit 2,  5/24/03 Memo Polansky/Lippert         31
Exhibit 3,  Payroll History of Corbin             41
Exhibit 4,  Payroll History of Massaconi          47
Exhibit 5,  Ten Steps to Success                  57
Exhibit 6,  Vacation Village Tour Times           80
Exhibit 7,  12/4/04 Memo to Lewis/Rauer           82
Exhibit 8,  12/21/01 Memo to Lippert/Arnold       87
Exhibit 9,  Vacation Village Rotations            89
Exhibit 10, Corbin Employment Agreement          104
Exhibit 11, Martin Employment Agreement          105
Exhibit 12, Wise Employment Agreement            125
Exhibit 13, Patriot Employee Handbook            139
Exhibit 14, 5/11/03 Dress Code Memo              145
Exhibit 15, 12/22/04 Memo Re:  New-Hires         148
Exhibit 16, 6/8/03 Memo to Faith from Paul       157
            (continued)

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
     JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
     KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

4

EXHIBITS (continued)

Exhibit 17, 6/9/03 Memo to Lippert/Foster        167
Exhibit 18, 5/18/03 Memo to Wise from
            Lippert/Lewis                        180
Exhibit 19, Policy for Sales Managers
            Sales Performance                    186
Exhibit 20, Wise 2002 Attendance Record          191
Exhibit 21, Handwritten Notes                    204
Exhibit 22, 1/3/03-6/8/03 Typed Notes            215

5

1                STIPULATION

2

3      It is agreed by and between the parties

4  that all objections, except as to form of the

5  question, are reserved until the time of trial.

6

7      It is further agreed by and between the

8  parties that all motions to strike unresponsive

9  answers are reserved until the time of trial.

10

11     It is further agreed by and between the

12  parties that the sealing of the original

13  deposition transcript is hereby waived.

14

15     It is further agreed by and between the

16  parties that the notification to all parties of

17  the receipt of the original deposition

18  transcript is hereby waived.

19

20

21

22

23

24

---

6

1     FAITH LIPPERT, Witness, identified via

2  Massachusetts driver's license and having been

3  duly sworn, states as follows:

4

5     DIRECT EXAMINATION BY MS. GARROW:

6     Q.   Good morning.

7     A.   Good morning.

8     Q.   As you are already aware, my name is

9  Suzanne Garrow, and I'm the lawyer for Miss Wise,

10  Mr. Massaconi, Mr. Martin, and Peter Corbin, as

11  well as the other individuals who are similarly

12  situated to them, and we're here today to take

13  your deposition.

14     A.   Okay.

15     Q.   That was a very good response.  I'm

16  going to ask you to give audible response --

17  "yes," "no," "okay"; not "uh-huh" or "um-hum,"

18  because there's a court reporter here who's going

19  to take down all of your testimony.  So you need

20  to give an audible response.  Do you understand

21  that?

22     A.   Yes, I do.

23     Q.   I am going to try very hard not to

24  speak over you, and I'm going to ask you to do

---

7

1  the same, again because the court reporter is

2  going to be taking down my questions and your

3  answers, and she can't do that if you start

4  speaking during the question or if I start

5  speaking during your answer.  Do you understand

6  that?

7     A.   Yes, I do.

8     Q.   I'm going to ask you that if you don't

9  understand a question that I've asked, that you

10  ask me to either clarify or rephrase the

11  question, okay?

12     A.   Okay.

13     Q.   If you don't do that, I'm going to

14  assume that you understand the question as it's

15  asked, so it's important that you understand the

16  question that I'm asking, okay?

17     A.   Okay.

18     Q.   Have you taken any medications or any

19  other substances that might impair your ability

20  to testify truthfully and accurately as you sit

21  here today?

22     A.   No.

23     Q.   Will you please state your full name

24  and spell it for the record?

---

8

1     A.   Faith Lippert.  F-A-I-T-H

2  L-I-P-P-E-R-T.

3     Q.   Are you currently employed, Miss

4  Lippert?

5     A.   Yes, I am.

6     Q.   Where are you employed?

7     A.   I'm employed in Lanesborough,

8  Massachusetts.

9     Q.   Who is your employer?

10     A.   Patriot Resorts Corporation.

11     Q.   How long have you been employed by

12  Patriot Resorts Corporation?

13     A.   Since June of 2001 -- July maybe,

14  2001.

15     Q.   And what is your current position with

16  Patriot Resorts?

17     A.   Office Manager and Human Resources

18  Director.

19     Q.   You testified before that you work in

20  Lanesborough.  Are you office manager only as to

21  Patriot Resorts' Lanesborough location?

22     A.   Correct.

23     Q.   Are you human resources director only

24  as to Patriot Resorts' Lanesborough location?

---

9

1      A.    Correct.

2      Q.    Does that Resorts in Lanesborough have

3    any other names; does it go by any other names?

4      A.    Vacation Village in the Berkshires.

5      Q.    Do you know what the legal status of

6    Vacation Village in the Berkshires is; in other

7    words, is it a separate entity, to your

8    knowledge?

9      A.    I'm not sure.

10     Q.    Have you held any other positions

11   other than the positions you are currently

12   holding today for Patriot Resorts?

13     A.    No.

14     Q.    Have you ever worked in any other

15   location other than the Lanesborough location of

16   Patriot Resorts?

17     A.    With Patriot Resorts?

18     Q.    Yes.

19     A.    No.

20     Q.    Have you -- I'm sorry, I believe I

21   asked this, but I just want to clarify.  Have you

22   been working at Patriot Resorts since June 2001;

23   has that been your employer?

24     A.    Yes.

10

1      Q.    What are your responsibllities as

2    office manager of the Lanesborough location?

3      A.    I oversee the administration end of it

4    as far as contracts -- sales contracting,

5    payroll, accounts payable.  I work with the

6    attorneys when we do fundings, and I work with

7    escrow.

8      Q.    What do you mean by administer sales

9    contracting; what does that mean?

10     A.    Administration.  I oversee the staff,

11   the administration staff.

12     Q.    What are the general categories of

13   employees of the administration staff?

14     A.    The girls that type up contracts, the

15   reception area.  I oversee it, but I don't manage

16   it.  Basic secretarial work.

17     Q.    So you oversee the individuals who do

18   basic secretarial work?

19     A.    Yes.

20     Q.    How many people do you oversee?

21     A.    There's five in my office, which would

22   be doing the contracting, and there's three out

23   in the Reception Center.

24     Q.    You testified that you did not manage

11

1    those three.  Who does?

2      A.    Dennis Clavette.

3      Q.    Where is Mr. Clavette physically

4    located?

5      A.    In Lanesborough in the Reception

6    Center.

7      Q.    Do you happen to know what his job

8    title is?

9      A.    He's the manager of the Reception

10   Center.

11     Q.    That is his job title?

12     A.    Yes.

13     Q.    Does he have any other titles, like

14   you have two that you testified to?

15     A.    No.

16     Q.    Any other duties -- strike that.  You

17   said that you do payroll.  What do you do -- what

18   are your payroll functions?

19     A.    I do the office staff payroll, which

20   are the contracting girls, their payroll; the

21   Reception Center payroll; and I do commissions

22   for the salespeople.

23     Q.    When you say you do it, what do you

24   mean by you do it -- what are your duties?

12

1      A.    I gather the information and I send

2    it out to the system and I submit it to Fort

3    Lauderdale, and that is where they issue checks.

4      Q.    Is that the same duties as to the

5    office staff folks, the Reception Center people,

6    and the commissions -- in other words, do you do

7    the same things, those duties you just specified

8    -- do you do the same thing as to all three

9    categories of employees?

10     A.    I'm not sure I get what you're saying.

11     Q.    For the office staff, you gather

12   information relating to their hours worked, is

13   that correct?

14     A.    Yes, they have -- prior to a few

15   months ago, they had a time sheet that they

16   signed in on, and now we have a time clock.

17     Q.    When did you get your time clock?

18     A.    Oh, gosh, I'm not real sure.  I would

19   say maybe six months ago or so.

20     Q.    Who punches the time clock, which

21   employees?

22     A.    Just the office staff, the Reception

23   Center.

24     Q.    Do you gather their hours and input

109

1  don't think goes into any type of an explanation
2  about the PAC. I believe that's what it was.
3      Q.   Did the automobile insurance policy
4  change at all during the time --
5      A.   I don't believe so, no.
6      Q.   One of provisions of this Employment
7  Agreement on Page 2 says that "An employee shall
8  maintain a valid Massachusetts driver's license."
9  Is that a requirement of being an employee -- a
10 sales representative at Patriot Resorts in
11 Lanesborough?
12     A.   If they're a resident in
13 Massachusetts, yes, but we have representatives
14 that live in New York.
15     Q.   Are they allowed to have a New York
16 driver's license?
17     A.   Yes.
18     Q.   Are you aware of any sales
19 representatives who did not have a valid
20 Massachusetts or New York license during their
21 time as a sales representative at Patriot in
22 Lanesborough?
23     A.   Yes.
24     Q.   Who was that?

110

1      A.   Dave Macurio is one, and I think the
2  other one that comes to mind is Tom Codington,
3  C-O-D-I-N-G-T-O-N.
4      Q.   And anybody else?
5      A.   Not that I recall.
6      Q.   What happened to David Macurio; did he
7  start with a valid license?
8      A.   He had a valid license, yes.
9      Q.   And then at some point he did not have
10 a valid license?
11     A.   Not a Massachusetts license. He
12 always had a valid license.
13     Q.   Oh, he did?
14     A.   Oh, yes.
15     Q.   Are you saying these are the only two
16 people who did not have valid Massachusetts
17 licenses?
18     A.   Yes.
19     Q.   They had New York licenses?
20     A.   No, the New York we already know. The
21 others had, I believe, Hawaii.
22     Q.   Is that Tom Codington?
23     A.   Yes, and I believe Dave's is Virginia.
24 They were always active; they never expired.

111

1      Q.   Are you aware of anybody who had a
2  suspended license during the time they were a
3  representative at Vacation Village in the
4  Berkshires?
5      A.   Yes.
6      Q.   Who was that?
7      A.   One of them was, I believe, Ron
8  Ferrara had problem with his license, Sam Barnes
9  had a problem with his license. Trying to think
10 if anybody else. Those are the two that I
11 recall.
12     Q.   What was the problem with Ron
13 Ferrara's license?
14     A.   I'm not sure. I'm not sure. They
15 took him -- I'm not sure if he lost it or it
16 expired and he didn't have one. I'm not sure of
17 the particulars with Ron.
18     Q.   What happened to him as a result -- or
19 his position as a sales representative as a
20 result of him losing his license?
21     A.   They put him into the Exit Department.
22     Q.   So he was allowed to continue as an
23 employee?
24     A.   Yes.

112

1      Q.   What about Mr. Barnes, what happened
2  with him?
3      A.   Same with Sam.
4      Q.   Do you know what happened to his
5  license?
6      A.   No, I'm not sure of what happened. I
7  think he lost it with DUI's, to be perfectly
8  honest, but I didn't see any paperwork.
9      Q.   So you're not certain about that?
10     A.   Right.
11     Q.   But you believe that it was DUI's?
12     A.   No -- yes, I believe.
13     Q.   Do you know how many?
14     A.   A few.
15     Q.   Any more specific than a few?
16     A.   Three.
17     Q.   Three?
18     A.   Yes.
19     Q.   Maybe more?
20     A.   Maybe.
21     Q.   Then what happened to his position as
22 a sales representative?
23     A.   Sam went away for a while, but when he
24 came back, they put him in the Exit Department.

---

113

1     Q.   As an employee in the Exit Department,
2 do you have the same opportunities to make sales
3 as if you were a sales representative working on
4 the line?
5     A.   You sell, yes.  They offer the
6 tri-yearly ownership.
7     Q.   Is it the same commission, different
8 commission?
9     A.   It's the same commission, but they
10 don't take the tours out in their cars.
11    Q.   Are they required to be at sales
12 meetings, the sales meeting, the morning meeting?
13    A.   No.  They come in later in the
14 morning.
15    Q.   Do they stay later?
16    A.   Sometimes.
17    Q.   Other than the annual bi-yearly and
18 tri-yearly time-share interests, are there any
19 other products or services sold at Patriot in
20 Lanesborough?
21    A.   No.
22    Q.   I'm going to turn your attention to
23 Page 3.
24          MS. FABBO:  Of Exhibit 11?

---

114

1     Q.   (By Ms. Garrow)  Of Exhibit 11.  And
2 I'm going to ask you to explain to me in your own
3 words what you understand "(v) Closing" to mean.
4     A.   When the account comes out of
5 rescission and all of the paperwork is fine,
6 we've got all of the monies and everything is
7 clean.
8     Q.   When you say you've got all the
9 monies, how do you get all of the monies?
10    A.   Well, we either get them all that day;
11 or in the case of a pending contract, we'll only
12 get a portion of the payment the day of sale and
13 then they let them make payments for so much so
14 many months until they make a full down payment,
15 and then it goes into closing after rescission.
16    Q.   What is the down payment for an annual
17 sale, an annual time-share?
18    A.   Ten percent.
19    Q.   And is that the same for bi-yearly and
20 tri-yearly?
21    A.   Yes.
22    Q.   It's always ten percent?
23    A.   Yes.
24    Q.   Are the prices different?

---

115

1     A.   Yes.
2     Q.   Do you know the prices?
3     A.   Low end is 3,590 and high end is
4 22,990.
5     Q.   When you say "low end" and "high
6 end,"are there various grades within each of the
7 annual, bi-yearly, and tri-yearly?
8     A.   Yes.
9     Q.   How many grades within each?
10    A.   That would depend on the season.
11    Q.   So it's not based on the unit; it's
12 based on the week?
13    A.   Correct.
14    Q.   Is it also based on the unit?
15    A.   No.
16    Q.   Are all the units the same size?
17    A.   They're all the same.
18    Q.   I assume this is obvious, but the more
19 popular weeks are the more expensive time-share
20 prices that correspond?
21    A.   Summer weeks, holiday weeks, ski weeks
22 are more popular.
23    Q.   It sounds like from your testimony
24 that it's possible to pay your down payment over

---

116

1 time if you're a customer, is that true?
2     A.   Yes.
3     Q.   How much time do you give the owner to
4 pay their down payment?
5     A.   All depends who the sales rep. is.
6 Some they'll go a week, sometimes I've seen to
7 eight months.
8          MS. GARROW:  Off the record.
9          (A lunch break was taken)
10         MS. GARROW:  Back on the record.
11    Q.   (By Ms. Garrow)  I'm going to call
12 your attention back to Plaintiff's Exhibit 1, and
13 I'm just trying to get a handle on what this is.
14 And I guess I'm still not clear, so I'm going to
15 ask you to go through it one more time and maybe
16 I can visualize it better with a hypothetical
17 sale.  So presume -- again looking at the first
18 line of Exhibit 1 -- presume that sales
19 representative has an owner and they make a sale
20 on, let's say -- again, looking at the first
21 line, on August 8, 2001, they have the paperwork
22 signed and the sale is a -- let me ask you this.
23 Did you accept PAC checks at that time, in August
24 of 2001?

---

173

1  about towards the end. I wasn't around her out
2  and about, you know, on the sales floor. Very
3  demanding. She -- I felt threatened with her
4  personally.
5      Q.   Did she ever personally threaten you?
6      A.   Outright?
7      Q.   Yes.
8      A.   No, no.
9      Q.   But she scared you?
10     A.   Very -- yes, very much so.
11     Q.   She made you nervous?
12     A.   Very much so.
13     Q.   She made you uncomfortable?
14     A.   Very much so.
15     Q.   You say that was more towards the end
16 or that had been building throughout the time she
17 was there?
18     A.   I don't know if that was even after
19 she had gone, because during the time that she
20 was with our employ, I hardly ever saw the woman
21 because of where I was, you know, because I'm in
22 this building over here and she was basically in
23 the other two buildings, you know; so very rarely
24 would I see her.

174

1      Q.   Did her boyfriend make you nervous or
2  uncomfortable?
3      A.   No, not at all.
4      Q.   Just Miss Wise?
5      A.   Just Miss Wise, yes.
6      Q.   Anybody else make you nervous or
7  uncomfortable, anybody you worked with?
8      A.   Every once in a while, Roger would
9  scare me.
10     Q.   Did he threaten you?
11     A.   I don't believe Roger ever threatened
12 me, no, no, not that I recall. I can't think of
13 anybody else that I felt threatened by or -- oh,
14 yes, there was one. Bruce Zesserman was this
15 guy's name -- very much so.
16     Q.   When did he work there?
17     A.   I don't know. I don't recall.
18     Q.   Did he work there for a while?
19     A.   Not for a while, no. Maybe tops three
20 months, four months.
21     Q.   Was he a sales representative?
22     A.   Yes.
23     Q.   You mention in your e-mail here to
24 Miss Foster that "She was the one" -- meaning

175

1  Miss Wise -- "was the one I spoke to you recently
2  about the dress code problem." Do you recall
3  that conversation between you and Miss Foster
4  about Miss Wise's dress code problem, according
5  to your words?
6      A.   I believe this is the time when I got
7  a phone call for me to come over to the Sales
8  Center because LaCrisha was wearing spaghetti
9  straps.
10     Q.   So then you called Miss Foster to tell
11 her that?
12     A.   I'm not sure if I called her or how it
13 came up.
14     Q.   But you spoke to her about it,
15 nonetheless?
16     A.   Right, right.
17     Q.   Did you speak to her about the time
18 that Lisa Ferrara wore spaghetti straps?
19          MS. FABBO:  Objection.
20          THE WITNESS:  I don't know.
21     Q.   (By Ms. Garrow)  Do you recall that
22 Lisa wore spaghetti straps?
23     A.   I don't know if she did or not. Lisa
24 is not one that comes to mind when the dress code

176

1  is being talked about.
2      Q.   Were there any other women who wore
3  dresses with spaghetti straps?
4      A.   I'm not sure about the spaghetti
5  straps. Nobody said anything to me about it.
6      Q.   So that was not called to your
7  attention?
8      A.   No.
9      Q.   But Miss Wise was?
10     A.   I don't know if anybody else was
11 wearing spaghetti straps or not.
12     Q.   But Miss Wise wearing spaghetti
13 straps --
14     A.   I got a phone call from --
15     Q.   -- was brought to your attention,
16 correct?
17     A.   Yes.
18     Q.   Who brought that to your attention?
19     A.   Gordon Leete.
20     Q.   Just so I'm clear, was anybody else --
21 the wearing of spaghetti straps by any other
22 women ever called to your attention?
23     A.   I know that there was a few times that
24 we have asked people to put sweaters on, but I

**209**

1  well, or is that a salesperson?
2       A.   For me.
3       Q.   5/4, "Spoke to Danielle about leaving
4  the office early night before, her work not
5  complete two files. Left with the closers. She
6  was late this a.m." What did you do as a result
7  of that, if anything?
8       A.   I don't recall, I don't recall.
9       Q.   Did you terminate her employment?
10      A.   Not at that time, no.
11      Q.   At some point you did?
12      A.   Yes.
13      Q.   Do you remember when?
14      A.   No, I don't.
15      Q.   Do you remember why?
16      A.   I don't think she was terminated; I
17  think she quit. I think so.
18      Q.   What was Bonnie Gardner's race?
19      A.   White.
20      Q.   What about Andy Goodness?
21      A.   He was black.
22      Q.   5/5, "David Mercurio gave his tour to
23  Ron. If Ron sold it, it was to go into Dave's
24  name." Is that something people did regularly?

**210**

1       A.   No, not that I was aware of.
2       Q.   Did you think this was an appropriate
3  practice?
4       A.   No.
5       Q.   Why did you make this note?
6       A.   I don't recall.
7       Q.   Do you know if David Mercurio did this
8  more than once?
9       A.   No, I don't know.
10      Q.   You just have no knowledge one way or
11  the other?
12      A.   No.
13      Q.   Could have, maybe not -- don't know?
14      A.   Could have, maybe not -- don't know.
15      Q.   5/10, you make a note about LaCrisha,
16  spaghetti strap, low-cut, short dress the day
17  before the dress code policy, included no hat in
18  policy?
19      A.   Yes.
20      Q.   You made that decision on 5/10; was
21  that your decision -- strike that because I just
22  asked you too many questions at once. Was it
23  your decision to include a "no hat" in the
24  policy?

**211**

1       A.   I'm not sure what that note means. I
2  believe it's in the policy, in one of them.
3  Maybe not for women, but it's in there, I think,
4  under the men. I'm not sure.
5       Q.   It says, "Prior to this, C.W. -- is
6  that Chelsea Wright?
7       A.   Um-hum.
8       Q.   -- "sent home because she was wearing
9  flip flops"?
10      A.   Yes.
11      Q.   What's the next word -- somebody sent
12  home, inappropriate dress?
13      A.   Erica.
14      Q.   Who is Erica?
15      A.   She worked in the front reception
16  area.
17      Q.   5/11, you made that note that the
18  dress code was issued, is that correct; is that
19  what that means?
20      A.   Possibly.
21      Q.   Do you have any recollection as you
22  sit here today?
23      A.   No, no, no.
24      Q.   5/18, "L.W." -- I assume that's

**212**

1  LaCrisha Wise?
2       A.   LaCrisha Wise.
3       Q.   "Halter, spaghetti strap dress. Asked
4  her to go home to change. Refused." Am I
5  reading that correctly?
6       A.   Yes.
7       Q.   I think you already testified to that?
8       A.   Yes.
9       Q.   When you say "asked," do you mean you
10  asked her?
11      A.   I believe I did. I don't recall if I
12  did, but I think I did. I don't recall whether I
13  actually did or not, to tell you the truth. This
14  reads that I did, though.
15      Q.   Then, "Asked her if she had a sweater
16  or a wrap," and she didn't according to this,
17  correct?
18      A.   Right.
19      Q.   Then "C.W." -- I guess Chelsea Wright
20  again -- "had low cut on. As soon as she was
21  asked, she buttoned up sweater." Am I reading
22  that correctly?
23      A.   Yes.
24      Q.   You said you believed that LaCrisha

213

1   Wise was on the phone?

2       A.   Yes.

3       Q.   And she was precise about what she

4   said and how she said it?

5       A.   Yes.

6       Q.   And that Paul said her dress was

7   appropriate and every day her dress was

8   appropriate.  She said that to you?

9       A.   She said that, yes.

10      Q.   Did you ever ask him about that?

11      A.   I don't recall whether I did or not.

12      Q.   You don't recall if you asked him, as

13  you sit here today?

14      A.   Yes, yes, I don't recall.

15      Q.   What's a "W. counter girls offering

16  sweater"?

17      A.   Welcome Center.

18      Q.   Got it.  What does that mean?

19      A.   Offered for her to wear their

20  sweaters, and she said no.

21      Q.   You didn't say that she said no?

22      A.   Up here I believe it said, "Said no"

23  up on the top.

24      Q.   That's if she had a sweater or wrap,

214

1   is that correct?

2       A.   Yes.

3       Q.   Do you have a specific recollection of

4   writing this?

5       A.   No, no.

6       Q.   5/19, "L. was late."  Is that

7   LaCrisha?

8       A.   Yes.

9       Q.   "She was late for work, threats about

10  if she wasn't put in her normal place her

11  attorney would be included."  What does that

12  mean?

13      A.   I guess she wanted to call her

14  attorney and that her attorney would be included

15  in on her not being able to go out in her normal

16  place on the rotation.

17      Q.   According to your notes here, that's

18  the first time, at least you noted down, that she

19  ever mentioned an attorney, correct -- according

20  to your notes?

21      A.   According to the note, yes.

22      Q.   There's nothing in here prior to that

23  time that has her talking about her attorney,

24  correct?

215

1       A.   No.

2       Q.   Here's the note 5/24, "Andy Goodness

3   was let go."  That just confirms that he was let

4   go because he stole money, is that correct?

5       A.   Yes.

6       Q.   But he was allowed to resign given the

7   circumstances?

8       A.   Yes.

9       Q.   Did you ever suggest to anybody that

10  LaCrisha be allowed to resign?

11      A.   No.  Nor did I Andy.

12      Q.   Hum?

13      A.   Nor did I Andy.

14      Q.   Who did?

15      A.   I don't know.

16              (Exhibit 22, 1/3/03-6/8/03 Typed

17              Notes, marked for identification)

18      Q.   (By Ms. Garrow)  I'm showing you

19  Plaintiff's 22, and I think we've talked about

20  these a little bit.  Whose notes are these?

21      A.   Bonnie's.

22      Q.   You directed her to -- did you direct

23  her to compile these notes?

24      A.   I believe the way it went was that

216

1   there were notes and I had probably asked her to

2   put them in, you know, date order; and that's

3   what she did, was list them out this way.

4       Q.   I guess I don't understand.  Is it

5   your testimony this is all based on notes

6   provided to the company?

7       A.   Notes or her remembering -- not to the

8   company.

9       Q.   "Her" being Bonnie?

10      A.   "Her" being Bonnie, yes.

11      Q.   So January 21, 2003, it says "out

12  sick" -- other than at your last deposition, have

13  you had occasion to review this?

14      A.   No.

15      Q.   I think your testimony was that you

16  took this and stuck it in Miss Wise's file?

17      A.   Yes.

18      Q.   When did you do that?

19      A.   I don't recall.

20      Q.   Let me just understand -- starting the

21  beginning of 2003, Bonnie Gardner began to

22  compile these notes, correct?

23      A.   I would assume so.

24      Q.   At any point prior to June 8, 2003,

1  according to this, the day that Miss Wise was let
2  go -- it was either the 7th or the 8th, depending
3  on which notes you're looking at -- at any point
4  did you ask Miss Gardner to print out the notes
5  that she already had gathered prior -- sometime
6  between January 3, 2003 --
7       A.   I don't believe I did, no.
8       Q.   -- and June 8, 2003?
9       A.   I don't believe so, no.
10      Q.   You never asked her to print it out?
11      A.   I don't recall whether I did or not.
12      Q.   You never asked to review them, or
13  you're not sure?
14      A.   I don't recall.  I don't recall
15  whether I did or not.
16      Q.   So is it that you don't believe that
17  you did, or you just don't recall one way or
18  another?
19      A.   I just don't recall one way or
20  another.
21      Q.   March 11, 2003, it says here, "Late,
22  LaCrisha said we were picking on her and claims
23  discrimination."  Do you recall if at that time,
24  on or around March 11, 2003, Bonnie came to you

---

1       Q.   And February 1, 2003, Miss Gardner
2  made another note that "We are just picking on
3  her" again, is that fair to say?
4       A.   Yes.
5            MS. GARROW:  We had been seeking
6            documents -- I've had this discussion
7            with Attorney Klimczuk, customer names
8            on sales ledger reports and on
9            customer directors as a way to track
10           payment on contracts, and I had agreed
11           not to take those customer names
12           pending a resolution by the Court.  So
13           we may need Miss Lippert back based on
14           any resolution that we have as a
15           result of seeking the customer names.
16           So I'm going to suspend the deposition
17           at this point.
18           MS. FABBO:  Just for that
19           purpose?
20           MS. GARROW:  Yes, or, I mean,
21           depending on what that might lead to,
22           but certainly anything that flows from
23           that; but otherwise, I'm set.
24           (Deposition suspended at 4:10)

---

218

1  and said Miss Wise was claiming discrimination?
2       A.   I don't recall that Bonnie ever did
3  that, no.
4       Q.   According to just reviewing Miss
5  Gardner's notes, that's the first time she makes
6  a note of that sort claiming discrimination or
7  that Miss Wise was claiming discrimination; is
8  that a fair description of what's on Exhibit 22?
9       A.   What is on these notes?
10      Q.   Yes.
11      A.   Yes.
12      Q.   You had testified before that based on
13  your e-mail to Miss Foster, you had said it was
14  later in Miss Wise's employment that you started
15  to have -- that she started to have issues -- is
16  that a fair statement of your testimony before?
17      A.   I don't know at what time, you know,
18  LaCrisha started with her claims of whatever, you
19  know, they were.  I don't recall.
20      Q.   Well, it would at least appear from
21  this note on Plaintiff's 22 that on January 14,
22  2003, according to Miss Gardner, Miss Wise said
23  that the company was picking on her, correct?
24      A.   It says that.

---

220

1
2  COMMONWEALTH OF MASSACHUSETTS
3  HAMPDEN, SS.
4
5       I, Ann A. Preston, a Notary Public in
6  and for the Commonwealth of Massachusetts, do
   certify that there came before me on May 17,
7  2005, at the offices of Heisler, Feldman and
   McCormick, PC, 1145 Main Street, Springfield,
8  Massachusetts, the following named person, to
   wit:  FAITH LIPPERT, who was by me duly sworn to
9  testify to the truth and nothing but the truth as
   to her knowledge concerning the matters in this
10 case; that she was examined upon her oath and her
   examination reduced to writing by me; and that
11 the statement is a true record of the testimony
   given by the witness, to the best of my knowledge
   and ability.
12
13      I further certify that I am not a relative
   or employee of counsel or attorney for any of the
   parties, or a relative or employee of such
14 counsel or attorney, nor am I financially or
   otherwise interested in the outcome of the
15 action.
16      WITNESS MY HAND this 17th day of June 2005.
17
18
19      Ann A. Preston
20 My commission expires:
   December 22, 2011
21
22
23
24

---

# EXHIBIT
# 3

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
            Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
            Defendants

DEPOSITION OF RODNEY LEWIS

June 2, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

2

## APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

---

3

### I N D E X

WITNESS:  RODNEY LEWIS

Direct Examination by Mr. Feldman          5

### EXHIBITS

Exhibit 1, 2005 Vacation Village Tour
          Presentation                      71
Exhibit 2, Vacation Village Rotation        74
Exhibit 3, 11/3/02 Memo Re: Attendance     117
Exhibit 4, Employee Information Form       124
Exhibit 5, LaCrisha Wise Attendance Report 125
Exhibit 6, 5/18/03 Memo Re: Dress Code     145
Exhibit 7, Leaders Booklet                 156

---

4

###### STIPULATION

1

2

3      It is agreed by and between the parties

4  that all objections, except as to form of the

5  question, are reserved until the time of trial.

6

7      It is further agreed by and between the

8  parties that all motions to strike unresponsive

9  answers are reserved until the time of trial.

10

11      It is further agreed by and between the

12  parties that the sealing of the original

13  deposition transcript is hereby waived.

14

15      It is further agreed by and between the

16  parties that the notification to all parties of

17  the receipt of the original deposition

18  transcript is hereby waived.

19

20

21

22

23

24

**Page 5**

1  RODNEY LEWIS, Witness, identified via
2  Virginia driver's license and having been duly
3  sworn, states as follows:
4
5  DIRECT EXAMINATION BY MR. FELDMAN:
6  Q.  Good morning, Mr. Lewis.
7  A.  Good morning.
8  Q.  Could you state your name and address
9  for the record, please?
10  A.  Rodney Lewis.  My address is 81 Fox
11  Run, Lee, Massachusetts.
12  Q.  And you've had your deposition taken
13  at the MCAD in this case already, is that
14  correct?
15  A.  Yes.
16  Q.  Because you clearly had a deposition
17  taken before, is that right?
18  A.  Yes.
19  Q.  Have you ever had other depositions
20  taken before of you?
21  A.  Yes.
22  Q.  I'm not going to run through all the
23  instructions I might otherwise give you because
24  you've been deposed before, but I will say this.

**Page 6**

1  You should wait until I finish my question before
2  you answer the question, okay?
3  A.  Okay.
4  Q.  You have to make sure to make a verbal
5  answer, because otherwise the stenographer can't
6  take it down, all right?
7  A.  Fine.
8  Q.  I will try not to talk over you and
9  you try not to talk over me so the stenographer
10  has only one voice to take down at a time.
11  A.  Fine.
12  Q.  If you want to take a break, consult
13  with your lawyer, or use the bathroom, that's
14  fine, okay?
15  A.  Okay.
16  Q.  The other thing is, if I ask you a
17  question and you answer the question, I'm going
18  to assume you understood it, okay?
19  A.  Okay.
20  Q.  So if you have a question about the
21  question that I'm asking, please ask me to
22  rephrase it.
23  A.  I will.
24  Q.  What is your current job, Mr. Lewis?

**Page 7**

1  A.  Project director.
2  Q.  Of what?
3  A.  For Vacation Village in the
4  Berkshires.
5  Q.  What are your job duties as project
6  director of Vacation Village?
7  A.  To oversee the day-to-day sales
8  programs that exist there.
9  Q.  Are you the highest-ranking manager at
10  the site where sales take place?
11  MS. FABBO:  Objection.  You can
12  answer.
13  THE WITNESS:  In regard to sales,
14  yes.
15  Q.  (By Mr. Feldman)  Is there anyone else
16  within the hierarchy of management on-site at the
17  sales area who's at the same rank you are?
18  MS. FABBO:  Objection.  You can
19  answer.
20  THE WITNESS:  Yes.
21  Q.  (By Mr. Feldman)  Who is that?
22  A.  No, I'm sorry.  I'm confused here.
23  No, I'm the only project director at the resort.
24  Q.  Who is your direct supervisor?

**Page 8**

1  A.  Bill Rauer.
2  Q.  Where is he based?
3  A.  Based in Florida.
4  Q.  Is there anyone else you consult with
5  in management on-site for issues that arise with
6  sales representatives?
7  A.  I consult with my sales directors.
8  Q.  But they are beneath you in the
9  hierarchy, is that correct?
10  A.  That's correct.
11  Q.  I'd like you to -- if you could
12  describe all of the job duties that are entailed
13  in being the project director?
14  A.  I will try.  My job involves the
15  overseeing of the daily sales, coordinating the
16  sales effort with the Marketing Department,
17  basically implementing company policy and
18  procedure.  Pretty much it.
19  Q.  What kind of company procedure do you
20  implement?
21  A.  All the procedures that pertain to
22  sales.
23  Q.  How many people do you directly
24  supervise now?

113

1   from the minimum wage law?

2       A.   No.

3       Q.   Have you seen any document that would

4   indicate any defendant is exempt from the

5   overtime provisions of the minimum wage or

6   overtime law?

7            MS. FABBO:  Objection.  Answer if

8            you know what he's talking about.

9            THE WITNESS:  No.

10      Q.   (By Mr. Feldman)  Were you involved in

11  the termination of LaCrisha Wise?

12      A.   Yes.

13      Q.   I'd like you to describe your

14  involvement in her termination.

15      A.   Based on the circumstances, I thought

16  that it was the only decision to make.

17      Q.   I'm asking what your involvement was;

18  not why you made that decision, but what was your

19  personal involvement in her termination?

20      A.   I was in agreement with it.

21      Q.   So you were not the one who made the

22  decision to terminate her?

23      A.   I felt like it had to be done, yes.

24      Q.   Who terminated her?

114

1       A.   Paul Stensland.

2       Q.   Is a line director permitted to

3   terminate salespeople without your approval?

4       A.   Yes, but normally no.  Normally they

5   have my approval.

6       Q.   In what cases -- I'm sorry.

7       A.   In the event that they would terminate

8   somebody without my approval, then we would

9   discuss it.

10      Q.   Why was -- I'd like you to provide all

11  the reasons for why Miss Wise was terminated.

12      A.   I don't know that I can recall all of

13  the reasons why she was terminated.

14      Q.   When was she terminated?

15      A.   Couple years ago.

16      Q.   In 2003?

17      A.   I don't recall the date.

18      Q.   Well, what were the reasons she was

19  terminated?

20      A.   Constant absenteeism, tardiness.  She

21  just felt like she was above the rules for

22  everybody else, they shouldn't pertain to her.

23      Q.   You said absenteeism and tardiness?

24      A.   Absenteeism and tardiness constantly.

115

1       Q.   You also said she believed she was

2   above the rules.  What rules did she believe she

3   was above other than the absenteeism and

4   tardiness rules?

5       A.   For example, she would park in areas

6   that we would ask the salespeople not to park in;

7   she would constantly do that.  She -- she just

8   was a very, very, very difficult person to

9   manage.

10      Q.   Was she working there when you started

11  working there?

12      A.   Yes.

13      Q.   Do you remember how long she was there

14  -- would that help you -- strike that.  How long

15  was she working there after you had started

16  working there?

17           MS. FABBO:  Objection.

18      Q.   (By Mr. Feldman)  What was the

19  duration of time?

20      A.   I don't recall, I don't remember.  I

21  started there 13th of September, 2002.  I don't

22  recall what date was her final working day.

23      Q.   What was the absenteeism policy of

24  Vacation Village when you first started there?

116

1       A.   If you were going to be absent from

2   work, you were required to have a doctor's

3   excuse.  You were allowed to have fifteen days

4   off per year.

5       Q.   You were allowed fifteen days off.  In

6   order to take those days, what would you have to

7   do?

8       A.   Either schedule them for vacation time

9   with approval, or if you missed the days, you

10  needed to come in with a doctor's excuse to keep

11  from going on overage.

12      Q.   So if you missed a day and claimed you

13  were ill, you went on overage unless you had a

14  doctor's note?

15      A.   That's correct.

16      Q.   So if you didn't feel well enough to

17  come in but didn't visit a doctor, then you went

18  on overage?

19      A.   Yes.

20      Q.   Was that rule enforced when you first

21  started -- let me back up.  You were allowed

22  fifteen days off of work, is that right?

23      A.   That's correct.

24      Q.   If you took more than fifteen days off

117

1   of work, when you first started working at
2   Vacation Village, what was the policy with regard
3   to a person who did that?
4        A.   The policy was liberally administered.
5        Q.   Meaning what?
6        A.   That there was a lot of flexibility to
7   it.  If you missed fifteen, sixteen, seventeen,
8   eighteen -- whatever the number of days, then,
9   you know, you would be reminded of the number of
10  days that you had missed and you were told that
11  you shouldn't miss any more time.
12       Q.   Did that policy -- did the liberal
13  policy change at some point?
14       A.   Yes.
15       Q.   When did that change?
16       A.   I don't recall.  I think that I sent a
17  memo to the group about the company's days-off
18  policy and told them that it would be enforced.
19       Q.   Do you remember when you sent that
20  memo?
21       A.   No.
22                (Exhibit 3, 11/3/02 Memo
23                Re: Company Attendance Policy,
24                marked for identification)

118

1        Q.   (By Mr. Feldman)  I'm showing you
2   what's been marked as Exhibit 3.  Is this the
3   memo you were just describing?
4        A.   Yes, this is it.
5        Q.   What led to your producing this memo?
6        A.   Excessive absenteeism by certain
7   employees, one of whom was LaCrisha Wise.
8        Q.   Which other employees were being
9   excessively absent?
10       A.   I don't recall.
11       Q.   She's the only one you remember?
12       A.   She was the one that I remember.  She
13  was the one who had missed the most time.
14       Q.   Do you remember how many days she
15  missed in 2002?
16       A.   I don't.
17       Q.   If I said 49 days, does that sound
18  right?
19       A.   I wouldn't know without checking the
20  records.  I just remember that it was, I thought,
21  beyond excessive; and so I just tried to bring it
22  to everybody's attention that this is the policy
23  and that we needed to get back to it.
24       Q.   Do you remember the reasons why Miss

119

1   Wise was claiming -- what reason she claimed for
2   her absences in 2002 before this memo came out?
3        A.   No.
4        Q.   Did you ever talk to her about her
5   absenteeism before this memo came out --
6   Exhibit 3 I'm referring to?
7        A.   I don't recall.
8        Q.   How did you know she was absent so
9   much?
10       A.   Because I got a list of days missed.
11       Q.   How often would you get that?
12       A.   Once a month.  I came in the middle of
13  September; I guess I got it the end of October,
14  and I was just surprised to see how many days,
15  because I had been there for, I don't know,
16  thirty, forty-five days at that point.
17       Q.   Did that document you received
18  describe the absences for the year or just that
19  month?
20       A.   For the year.  That was year-to-date.
21       Q.   So it's a cumulative year-to-date you
22  get?
23       A.   Yes.
24       Q.   And you get that every month?

120

1        A.   Yes, or I get some version of it.
2        Q.   When you saw that Miss Wise had some
3   number of excessive absences -- and your memory
4   you don't remember what number that was?
5        A.   That's correct, just very excessive.
6        Q.   Did you try to determine why before
7   you sent the memo out?
8        A.   I would imagine that I asked her
9   managers why.
10       Q.   Do you remember what they said?
11       A.   I was given reasons of automobile
12  accidents, illnesses, back problems, family
13  problems -- big-time family problems.
14       Q.   Okay.
15       A.   Seemed like there were a myriad of...
16       Q.   Did you do any investigation to
17  determine whether those reasons were, in fact,
18  true?
19       A.   No, I had no reason not to believe it.
20       Q.   So is it your testimony at that point
21  that you believed it?
22       A.   Yes.
23       Q.   Did Exhibit 3 go to all sales staff,
24  as it said in the "to" line there?

125

1    sure there were people who during that time
2    period had exceeded the fifteen days.
3        Q.   Were any of those people terminated?
4        A.   I think one was.  I think a fellow by
5    the name of Peter Corbin.  I can't remember
6    exactly, but I think that he was in that
7    quandary.
8        Q.   He was terminated for excessive
9    absenteeism, is that your memory?
10       A.   I think so.
11       Q.   Anyone else?
12       A.   I'd have to go back and look at the
13   files, but that's one that just stands out in my
14   mind.
15                   (Exhibit 5, LaCrisha Wise
16                    Attendance Detail Report, marked
17                    for identification)
18       Q.   (By Mr. Feldman)  Have you seen this
19   document before, Mr. Lewis?
20       A.   Yes.
21       Q.   This is Exhibit 5.  What is it?
22       A.   This is an attendance report.
23       Q.   For which person?
24       A.   For LaCrisha Wise.

126

1        Q.   Now, who generated this?
2        A.   This was generated by the Reception
3    Center.
4        Q.   It looks like it was generated on
5    6/8/2003, is that correct -- looking at the
6    bottom, right?
7        A.   Yes, that's what it would appear to
8    be.
9        Q.   What's the first time you remember
10   seeing this?
11       A.   This exact page?
12       Q.   Yes.
13       A.   Probably on 6/8.
14       Q.   Now, is it true that Miss Wise was
15   terminated on the day of her sixteenth absence?
16            MS. FABBO:  Objection.
17            THE WITNESS:  I don't recall.
18       Q.   (By Mr. Feldman)  Do you want to take
19   a quick look and see?
20       A.   Yes.
21       Q.   Anybody else you know who's been
22   terminated on their sixteenth absence?
23       A.   I don't know.
24       Q.   You were the one who created this

127

1    November 2 -- November 3, 2002 memo that's marked
2    as Exhibit 3, right?
3        A.   Yes.
4        Q.   Was your intent in creating that to
5    implement a policy of termination for any
6    employee who had sixteen absences?
7        A.   For anybody who had excessive
8    tardiness and excessive absences, yes.  To try to
9    get these people to come to work and be at work,
10   because the company spends a lot of money
11   generating the sales guests, and it's important
12   that we have the sales representatives at the
13   project to handle these people.
14       Q.   Since you were the enforcer of this
15   policy that's Exhibit 3, right --
16       A.   Yes -- Exhibit 5.
17       Q.   Exhibit 3.
18       A.   Yes, this memo was from me.
19       Q.   -- did you discuss the content of the
20   memo with anyone before you wrote it?
21            MS. FABBO:  Objection.
22            THE WITNESS:  I don't recall.
23       Q.   (By Mr. Feldman)  Did you check in
24   with the supervisor before you decided to send

128

1    out this memo?
2        A.   I don't recall.
3        Q.   At the time you sent it out, was it
4    your intent that you were going to terminate
5    anyone who was absent more than fifteen times?
6            MS. FABBO:  Objection.
7            THE WITNESS:  No, it was my
8            intent to try and get the people who
9            had been absent a lot to come to work
10           -- try to encourage the people who had
11           multiple absences to come to work more
12           frequently and have less absences.
13       Q.   (By Mr. Feldman)  Did you determine --
14   before you fired -- well, you were the one
15   ultimately who approved her termination, is that
16   correct?
17       A.   Yes.
18       Q.   And Mr. Stimple is the one who noticed
19   Miss Wise of her termination, is that right?
20       A.   Yes.
21       Q.   Did you try to determine whether any
22   of the sick days that Miss Wise had taken were
23   subject to the Family and Medical Leave Act?
24            MS. FABBO:  Objection.

133

```
1        A.   Not specifically, but, you know --
2    selling is attitude.
3        Q.   I know that.  I'm asking what the
4    company policy is.
5        A.   No.
6        Q.   You said that there were -- that she
7    was someone who challenged company policy
8    generally; you said something like that, isn't
9    that right?
10       A.   Yes.
11       Q.   Was that another -- strike that.
12   Other than tardiness and excessive absenteeism,
13   were there any other reasons why she was
14   terminated?
15       A.   Not that I recall.
16       Q.   And the other person who would know
17   why she was terminated was Paul Stensland, is
18   that correct?
19       A.   Yes.
20       Q.   Because he made the request to you to
21   terminate her?
22            MS. FABBO:  Objection.
23            THE WITNESS:  I think that he
24       did.
```

134

```
1        Q.   (By Mr. Feldman)  Was anyone else
2    involved in any way in the termination of
3    LaCrisha Wise?
4        A.   I don't recall.  Maybe her manager,
5    John Bourdon.
6        Q.   John Bourdon was her sales manager?
7        A.   Her direct manager, yes.
8        Q.   What do you remember about
9    conversations with him about Miss Wise?
10       A.   I don't remember any specifics.
11       Q.   Do you remember prior to Miss Wise's
12   termination, she reported to a member of
13   management that she felt like she was being
14   discriminated against because of her race?
15            MS. FABBO:  Objection.
16            THE WITNESS:  Who did she mention
17       that to?
18       Q.   (By Mr. Feldman)  I don't know.  I'm
19   asking whether you know that she did?
20       A.   I remember her calling me a cracker.
21       Q.   That's not quite what I'm asking.  I'd
22   be happy to get to her calling you names.  But
23   first, do you know if she reported to anybody
24   that she felt like she was being discriminated
```

135

```
1    against because of her race?
2            MS. FABBO:  Objection.
3            THE WITNESS:  I don't recall.
4        Q.   (By Mr. Feldman)  Do you recall before
5    Miss Wise was fired, she had filed a charge of
6    race discrimination at the Mass. Commission
7    Against Discrimination?
8            MS. FABBO:  Objection.
9            THE WITNESS:  No.
10       Q.   (By Mr. Feldman)  Were you aware of
11   that when you fired her?
12       A.   No.
13       Q.   Do you know now whether anyone else
14   was aware of that before she was fired?
15            MS. FABBO:  Objection.
16            THE WITNESS:  I don't recall that
17       anybody was aware of it.
18       Q.   (By Mr. Feldman)  Do you know if she
19   mentioned it to anybody before she was fired?
20       A.   No.
21       Q.   How many black salespeople did you
22   have during the time Miss Wise was employed at
23   Vacation Village?
24       A.   I don't -- I don't -- this is not
```

136

```
1    something that I make a notation of.
2        Q.   I'm not asking for a notation; I'm
3    just asking if you remember?
4        A.   Were there others?
5        Q.   Were there others?
6        A.   Yes.
7        Q.   Do you remember the names of -- how
8    many?
9        A.   Several.
10       Q.   Do you remember the names of any of
11   them?
12       A.   Andy Goodness.
13       Q.   What happened to Andy?
14       A.   Andy was terminated.
15       Q.   For what?
16       A.   For misappropriation of funds.
17       Q.   Was that the only reason he was
18   terminated?
19       A.   I think so.
20       Q.   Any other reasons?
21       A.   No.
22       Q.   When was he terminated?
23       A.   I don't remember the date.
24       Q.   Was it before or after Miss Wise?
```

---

**161**

```
 1
 2        COMMONWEALTH OF MASSACHUSETTS
 3        HAMPDEN, SS.
 4
 5             I, Ann A. Preston, a Notary Public in
          and for the Commonwealth of Massachusetts, do
 6        certify that there came before me on June 2,
          2005, at the offices of Heisler, Feldman and
 7        McCormick, PC, 1145 Main Street, Springfield,
          Massachusetts, the following named person, to
 8        wit:  RODNEY LEWIS, who was by me duly sworn to
          testify to the truth and nothing but the truth as
 9        to his knowledge concerning the matters in this
          case; that he was examined upon his oath and his
10        examination reduced to writing by me; and that
          the statement is a true record of the testimony
11        given by the witness, to the best of my knowledge
          and ability.
12
               I further certify that I am not a relative
13        or employee of counsel or attorney for any of the
          parties, or a relative or employee of such
14        counsel or attorney, nor am I financially or
          otherwise interested in the outcome of the
15        action.
16             WITNESS MY HAND this 27th day of June 2005.
17
18        _____
19          Ann A. Preston
          My commission expires:
20        December 22, 2011
21
22
23
24
```

---

**163**

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2        Wise v Patriot
          No. 04-CV-30091-MAP
 3
 4             I, RODNEY LEWIS, do hereby certify under
          the pains and penalties of perjury that the
 5        foregoing testimony is true and accurate to the
          best of my knowledge and belief, with the
 6        addition of the following changes/corrections:
 7
 8        Page  Line              Change/Correction
 9        _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16        _____
17        _____
18
19        Witness my hand this ___ day of _____, 2005.
20
21                              _____
                                      RODNEY LEWIS
22        Orig:  Joel Feldman, Esq.
          Copy:  Marylou Fabbo, Esq.
23
24
```

---

**162**

```
 1
 2                      June 27, 2005
 3        Marylou Fabbo, Esq.
          Skoler, Abbott and Presser, PC
 4        1414 Main Street
          Springfield, MA  01103
 5
          RE:  Wise v Patriot
 6
          Dear Counselor:
 7
               Enclosed is a copy of the deposition of
 8        Rodney Lewis, taken on June 2, 2005 in the
          above-entitled action.
 9
               According to Rule 30(e) of the
10        Massachusetts Rules of Civil Procedure, the
          deponent has thirty days to sign the deposition
11        from the date of its submission to the deponent,
          which is the above date.
12
               Please have the deponent sign the enclosed
13        Signature Page/Errata Sheet and return it to the
          offices of Joel Feldman, Esq., whereupon it will
14        be attached to the original deposition
          transcript.
15
               Thank you for your cooperation in this
16        matter.
17        Sincerely,
18
          Ann A. Preston
19
20        cc:  Joel Feldman, Esq.
21
22
23
24
```

---

**164**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

# EXHIBIT
# 4

## Wise v Patriot - R. Foster Campagna   5/23/05

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
          Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
          Defendants

DEPOSITION OF REBECCA FOSTER CAMPAGNA

May 23, 2005, 10:10

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

I N D E X

WITNESS:  REBECCA FOSTER CAMPAGNA

Direct Examination by Ms. Garrow


EXHIBITS

Exhibit 1,  Vacation Village Tour Times        51

Exhibit 2,  2004 Employee Handbook             56

Exhibit 3,  2001 Employee Handbook             61

Exhibit 4,  Employment Agreement               68

Exhibit 5,  Commission Structure Forms         84

Exhibit 6,  5/24/03 Memo Re: Hecht Comm.       86

Exhibit 7,  Corbin Commission Report           95

Exhibit 8,  Massaconi Check Stubs             112

Exhibit 9,  5/6/03 Memo Re: ESOP Procedures   125

Exhibit 10, Attendance Detail Report          126

Exhibit 11, 11/3/02 Memo Re: Attendance       127

Exhibit 12, Attendance Detail Report          127

Exhibit 13, Attendance Detail Report          129

Exhibit 14, Letter to ALDA from ESA           148

Exhibit 15, 12/22/04 Memo Re: New-Hires       150

Exhibit 16, 11/21/01 Memo Re: Policies        157

Exhibit 17, 12/21/01 Memo Re: Rotation        161

Exhibit 18, 6/9/03 Memos Re: Ms. Wise         167

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
     KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

4

1              STIPULATION
2
3          It is agreed by and between the parties
4     that all objections, except as to form of the
5     question, are reserved until the time of trial.
6
7          It is further agreed by and between the
8     parties that all motions to strike unresponsive
9     answers are reserved until the time of trial.
10
11         It is further agreed by and between the
12    parties that the sealing of the original
13    deposition transcript is hereby waived.
14
15         It is further agreed by and between the
16    parties that the notification to all parties of
17    the receipt of the original deposition
18    transcript is hereby waived.
19
20
21
22
23
24