5

1       REBECCA FOSTER CAMPAGNA, Witness, identified

2   via Florida driver's license and having been duly

3   sworn, states as follows:

4

5       DIRECT EXAMINATION BY MS. GARROW:

6       Q.   Good morning, Miss Foster.  I know

7   you've been to a couple of the depositions in

8   this matter.  As you know, I'm Suzanne Garrow,

9   and I am the lawyer for LaCrisha Wise and Mr.

10  Massaconi and Mr. Martin and Mr. Corbin on behalf

11  of themselves and others who are similarly

12  situated.  As you know, they filed a complaint

13  against you and the corporation in federal court.

14  Are you aware of that?

15      A.   Yes, I am aware.

16      Q.   I'm going to take your deposition

17  today, and I'm going to ask you that when I ask

18  you questions, that you give an audible response.

19  If you shake your head or say "uh-uh" or

20  "um-hum," it's not going to look like anything on

21  the transcript.  I need you to give me an audible

22  response, a "yes" or "no" or any explanation as

23  necessary.  Is that understood?

24      A.   I understand.

6

1       Q.   The other thing I'm ask you to do is

2   I'll ask you to let me finish my question and I

3   will try to let you do the same, let you finish

4   your answer, so we can have a clear record and so

5   the court reporter can get everything down that

6   you say and that I say, okay?

7       A.   Okay.

8       Q.   If you need a break of any kind, as

9   long as I'm not in the middle of a question or

10  you're not in the middle of an answer, I will

11  certainly accommodate you and you can tell me,

12  tell your lawyer, whatever is most comfortable to

13  you, okay?

14      A.   Okay.

15      Q.   I guess the other thing I'll ask you

16  to do is if you don't understand any question

17  that I've asked, I will ask you to ask me to

18  rephrase the question or to let me know that you

19  don't understand.  The reason for that is if you

20  answer the question, I'm going to assume that you

21  understand the question as I have asked it, and I

22  want to make you make sure that you know what I'm

23  speaking of so that you can give me the most

24  accurate answer to the question possible, okay?

7

1       A.   Okay.

2       Q.   Have you taken any medication or any

3   substance that might impair your ability to

4   testify truthfully or accurately as you sit here

5   today?

6       A.   No, I have not.

7       Q.   Would you please state and spell your

8   full name for the record?

9       A.   My full name is Rebecca, R-E-B-E-C-C-A

10  Foster, F-O-S-T-E-R, Campagna, C-A-M-P-A-G-N-A.

11      Q.   Do you go by Miss Foster or Miss

12  Campagna, just so I know in this context?

13      A.   I go by Becky, but Foster is the name

14  that I use in work situations.

15      Q.   I know there are some Campagnas who

16  work up here in Massachusetts.  Are you a

17  relation to any of those folks?

18      A.   No, I am not.

19      Q.   Who is your employer?

20      A.   Employed by the Berkley Group, Inc.

21      Q.   How long have you been worked for the

22  Berkley Group?

23      A.   Thirty-two years.

24      Q.   Can you give me sort of a general

8

1   summary -- I know thirty-two years is a very

2   solid career, so can you give me a general

3   summary of where you started with the Berkley

4   Group and your position as you sit here today?

5       A.   1973, I began working for a sales and

6   marketing company called Del Marketing -- that's

7   D-E-L Marketing.  They did sales and marketing at

8   a second-home development called Lake Monticello,

9   and that's out of Charlottesville, Virginia.

10      I worked as the number three typist in

11  the sales office and I worked in that position

12  for approximately a year, after which time I

13  traveled from Lake Monticello to other

14  development companies that Del Marketing had

15  sales and marketing contracts with.  And I would

16  set up the sales administrative office, train the

17  personnel; and I did that for probably three or

18  four years.

19      I later relocated with that company to

20  St. Petersburg, Florida under a sales and

21  marketing agreement that we had in St. Petersburg

22  with a hotel that was selling time-sharing.

23      Q.   Did you work -- did you still work for

24  Del Marketing at that time?

Wise v Patriot - R. Foster Campagna   5/23/05

9

1      A.   I worked for Del Marketing at that
2  time.
3      Q.   Were you working on-site at the hotel?
4      A.   Actually, I worked for a while at the
5  hotel to train the employees, and then I moved to
6  the corporate office there in St. Petersburg.
7      Q.   The corporate office of Del Marketing?
8      A.   Del Marketing.
9      Q.   How long did you do that?
10      A.   I stayed there until 1981; and in
11  1981, I moved to the east coast of Florida
12  because the owner of Del Marketing sold his
13  interest to his partner in Del Marketing and the
14  company became all -- all the assets of the Del
15  Marketing were sold -- all of the contracts were
16  sold to the remaining partner, who formed the
17  company Del Management.
18      At that time, the marketing contracts
19  became the property of Del Management, and other
20  marketing and sales contracts were procured under
21  Del Management's name.  I continued to work in
22  the corporate office as well as a sales office
23  that was located there in Hollywood, Florida.  I
24  continued to work there until 1986, when the name

10

1  of our company changed to the Berkley Group.
2      Q.   Do you happen to know why the name
3  changed in 1986?
4      A.   We moved our corporate headquarters to
5  an office building in Fort Lauderdale, Florida
6  that is called the Berkley South Condominium.
7  We occupy offices on the first floor, and we
8  decided that the -- we like the name, so we
9  adopted the name.  During the years from 1981
10  until 1994, I was the corporate secretary of the
11  company, and at some point in there, I became
12  vice president, but I don't remember the exact
13  year.
14      Q.   Who was the president when you became
15  vice president?
16      A.   James E. Lambert.
17      Q.   And who was the president when you
18  were corporate secretary?
19      A.   James E. Lambert.
20      Q.   And this is the Berkley Group which is
21  now called -- the Del Marketing which is now
22  called the Berkley Group at this time?
23      A.   Del Management, which was changed to
24  the Berkley Group.

11

1      Q.   I misspoke, thank you, great.
2      A.   In 1994, the president of the company
3  decided to retire, or semi-retire, at which time
4  he sold the company to its employees.  1993,
5  1994.
6      Q.   Approximately how many employees were
7  employed by the Berkley Group at that time?
8      A.   I couldn't say with any degree of
9  accuracy.
10      Q.   Do you think it was more than a
11  hundred?
12      A.   It could have been.
13      Q.   Did everybody have an opportunity to
14  purchase stock in the company at that time -- was
15  it a stock sale?
16      A.   The ESOP is a complicated transaction,
17  and I don't know all of the legalities of it.
18  The employees did not make a conscious
19  decision -- I mean, there was no vote taken among
20  the employees, but everyone was -- everyone's
21  status, of course, as employees did not change.
22  It was just the way that the accounting for the
23  company, the way the company's ownership was
24  structured.  It had to do with structure more

12

1  than anything.  And again, I'm not an expert on
2  that.
3      Q.   Do you know, did anything change with
4  your relationship to the company at that time?
5      A.   In January of 1994, I became the
6  president of the company.
7      Q.   Do you remain in that position today?
8      A.   Yes, I do.
9      Q.   Are you at the same location in the
10  Berkley -- is it Berkley Condominium?
11      A.   The Berkley South Condominiums, yes.
12      Q.   Have your offices grown in any way;
13  have you taken over more square footage or
14  anything, or have you remained in the same
15  location?
16      A.   We've remained in the same location.
17  We have, since the '80s -- we started occupying
18  that building in '86.  We have increased square
19  footage over that time period.
20      Q.   What is the most recent time?
21      A.   I really couldn't say.
22      Q.   Do you own the building?
23      A.   We own only the office suites that are
24  located on the first floor.

13

1    Q.    You occupy the entire first floor?

2    A.    Not the entire.  There are some

3    offices that are owned by others.

4    Q.    So is it fair to say that you own all

5    those office suites which you occupy?

6    A.    That's correct.

7    Q.    Can you name all the corporate

8    officers currently in the Berkley Group?

9    A.    The corporate officers -- myself as

10   president; Bruce Polansky, P-O-L-A-N-S-K-Y, vice

11   president of sales; Larry Hierholzer,

12   H-I-E-R-H-O-L-Z-E-R, vice president of marketing;

13   initials J.P. Ottino, O-T-T-I-N-O, III, vice

14   president of corporate acquisitions; Marc,

15   M-A-R-C, Landau, L-A-N-D-A-U, vice president of

16   finance, or chief financial officer; James E.

17   Lambert is the chairman of the Board.  And that

18   should be six.

19   Q.    Yes.  And you said that Mr. Lambert --

20   on or around the time you assumed the position as

21   president of the company, Mr. Lambert

22   semi-retired.  What was he doing for the company

23   at that time, after semi-retirement?

24   A.    He continues to offer sales and

14

1    marketing expertise to the Board.

2    Q.    Is it your opinion that his position

3    has been relatively unchanged since you assumed

4    the position of president of the company?

5    A.    No, his position has changed since

6    1994.

7    Q.    What has been the change, and when did

8    it occur -- change or changes?

9    A.    Prior to 1994, Mr. Lambert was in

10   charge of the corporate office there in the

11   Berkley South building.  He made all of the daily

12   operational decisions.

13   Q.    I guess my question -- let me be a

14   little clearer.  Since 1994 -- strike that.

15   Those two duties that you just enumerated, I'm

16   assuming that those are part of your duties

17   currently, is that correct?

18   A.    That's correct.

19   Q.    After 1984 when you assumed the

20   position of president and Mr. Lambert assumed the

21   position, basically conceded that position, yet

22   continues to offer sales and marketing, I guess,

23   was your testimony?

24   A.    You said 1984?

15

1    Q.    I'm sorry, 1994.  Since 1994 to the

2    present, since you became president, has Mr.

3    Lambert's position changed in any way after you

4    became president; in other words, in that, let's

5    say, from '95 forward?

6    A.    Mr. Lambert's position diminished to

7    the point that he is only involved in sales and

8    marketing expertise.

9    Q.    Have you ever been deposed before?

10   A.    Yes, I have.

11   Q.    How many times?

12   A.    I don't know that I could give you an

13   accurate number.

14   Q.    Have you been deposed in any actions

15   relating to any -- brought by any employees of

16   the company, the Berkley Group?

17   A.    No.

18   Q.    Any employees of Patriot Resorts, have

19   you been deposed in connection with any claims?

20   A.    Not until today.

21   Q.    Have you been -- let me ask a more

22   general question.  Have you been deposed with

23   regard to any employment claims relating to

24   employment or brought by employees in any matter,

16

1    I guess?

2    A.    I was deposed in Virginia in relation

3    to a sales and marketing contract we have there.

4    One of the employees of Great Eastern Resort

5    Corporation brought an action against Great

6    Eastern.

7    Q.    Were you individually named in that

8    matter?

9    A.    No, I was not.

10   Q.    To the best of your recollection, what

11   was the substance of the claims that employee was

12   making?

13   A.    She was making a claim under A.D.A.

14   Q.    So a disability discrimination suit is

15   your recollection?

16   A.    It grew into an A.D.A. claim.  I'm not

17   sure in the beginning exactly how it was worded,

18   but it really didn't survive much after our

19   depositions.

20   Q.    When you say "it didn't survive," did

21   you resolve the matter or did it get resolved by

22   a judge in any way or a jury?

23   A.    No, it was not resolved by a judge or

24   a jury.  Both parties resolved the matter between

17

```
        the two.
   2        Q.   Is that a confidential settlement, to
   3    your recollection?
   4        A.   Yes, it is.
   5        Q.   What court was that in -- let me ask
   6    you this -- do you remember if it was state or
   7    federal court?
   8        A.   That's what I was trying to recall.  I
   9    don't really recall.
  10        Q.   Do you remember the name of the
  11    employee who brought the matter?
  12        A.   Shari Brown.
  13        Q.   About how long ago was that?
  14        A.   That was probably a year or so ago.
  15        Q.   Where in Virginia?
  16        A.   Harrisonburg, Virginia.
  17        Q.   What's the resort -- was there a
  18    resort that was the subject matter as well as the
  19    lawsuit?
  20        A.   Great Eastern Massanutten Resort.
  21        Q.   Any other depositions in relation to
  22    any employment matters at any of the resorts?
  23        A.   There was a sexual harassment claim in
  24    the '90's -- I don't remember what year -- at
```

18

```
   1    Massanutten Resort.
   2        Q.   It sounds like you have not been
   3    deposed in relation to any employment matters at
   4    the Vacation Village location, is that correct?
   5        A.   Vacation Village...
   6        Q.   In the Berkshires, I'm sorry.
   7        A.   No, I have not.
   8        Q.   What about other Vacation Village
   9    locations?
  10        A.   Not that I can recall.
  11        Q.   Can you recall if there have been any
  12    claims of violations of the wage and hours
  13    status, either state or federal, at any of the
  14    locations, any of the resorts that you are
  15    responsible for?
  16        A.   There have not been any that I am
  17    aware of.
  18        Q.   I've been trying to choose my words in
  19    a certain way, but I'm going to ask you so I can
  20    understand the relationship.  Now, your employer
  21    is the Berkley Group, and who employs, for
  22    instance, Bill Rauer; who is his employer, to
  23    your knowledge?
  24        A.   Bill Rauer works for Tower Resorts
```

19

```
   1    Realty.
   2        Q.   What about Rod Lewis?
   3        A.   Rod Lewis works for Patriot Resorts
   4    Corporation.
   5        Q.   What about the other corporate
   6    officers; everybody work for Berkley Group who
   7    are -- I guess those are corporate officers of
   8    the Berkley Group I asked, correct?
   9        A.   That's correct.
  10        Q.   Are they employed by any other entity?
  11        A.   Mr. Polansky, because he has a sales
  12    -- a Florida sales real estate license, may
  13    receive some commission from Tower Resorts
  14    Realty, but I don't know that for a fact.
  15        Q.   Tower Resorts Realty -- what is Tower
  16    Resorts Realty, their relationship to the Berkley
  17    Group?
  18        A.   Tower Resorts Realty is owned by the
  19    Berkley Group.
  20        Q.   Are there certain resorts that are run
  21    by Tower Resorts Realty?
  22        A.   Not really.  Tower Resorts Realty is
  23    the brokerage that must employ licensed real
  24    estate agents in the State of Florida.
```

20

```
   1        Q.   Are all the people who sell -- let me
   2    strike that.  Do the people who sell time-shares
   3    in Florida, do they have real estate licenses?
   4        A.   Most of them do.
   5        Q.   Are they required to?
   6        A.   They are not required to; they are
   7    only required -- well, let me start over.  They
   8    are required to have a real estate license in
   9    order to transact time-share sales, yes.
  10        Q.   To my understanding, that's not true
  11    in Massachusetts, is that correct?
  12        A.   As far as I know, it is not true.
  13        Q.   What about the other locations; what
  14    are the other states in which -- actually, let me
  15    strike that.  Can you tell me the other companies
  16    other than Tower Resorts Realty that are owned by
  17    the Berkley Group?
  18        A.   Berkley Vacation Resorts -- let me
  19    make sure I understand your question.
  20        Q.   Let me ask it this way.  You testified
  21    that Tower Resorts Realty is owned by the Berkley
  22    Group?
  23        A.   Correct.
  24        Q.   Is Patriot Resorts owned by the
```

Wise v Patriot - R. Foster Campagna  5/23/05

21

1  Berkley Group?

2      A.    That is correct.  It's a wholly owned

3  subsidiary.

4      Q.    Now, you made that distinction.  Is

5  the Tower Resorts Realty something other than a

6  wholly owned subsidiary?

7      A.    It is also a wholly owned subsidiary.

8      Q.    What other wholly owned subsidiaries

9  are owned by the Berkley Group?

10     A.    I gave you Berkley Vacation Resorts.

11 Lando Resort Corporation, Hollywood Resorts

12 Corporation, Shoreline Resorts Corporation -- or

13 actually I think that's incorporated.  Key Resort

14 Corporation, Williamsburg Plantation, Inc.,

15 Eldorado Resorts Corporation, East Coast Resorts

16 -- I'm sorry, East Ocean Resorts, Inc., South

17 Coast Resorts, Inc. or Corporation.  When I say

18 corporation, it could be incorporated; I don't

19 remember exactly.

20     Q.    Are these all corporations?

21     A.    They are all corporations.

22     Q.    Do they all, to your knowledge, have

23 the same corporate structure?

24     A.    I'm not sure what you mean by that

22

1  question.

2      Q.    Are any of them LLC's or LLP's, or do

3  they all follow the same -- are they

4  S-corporations; I mean, do you know what...

5      A.    I do not know -- I know there are no

6  LLC's that I have named.  I don't know whether

7  it's a sub-S.

8      Q.    South Coast Resorts was the last

9  wholly owned subsidiary that you named.  Can you

10 think of any others?

11     A.    I'm sure there are other small ones,

12 but I can't remember them right now, I'm sorry.

13 There's Lando Resorts Realty.

14     Q.    As opposed to Lando Resorts

15 Corporation?

16     A.    There's two Landos.

17     Q.    So what is the -- what does Tower

18 Resorts Realty do?

19     A.    Tower Resorts Realty is the brokerage

20 company whose salespeople conduct sales for

21 Berkley Vacation Resorts.

22     Q.    Are the salespeople employed by Tower

23 Resorts Realty?

24     A.    Yes, they are.

23

1      Q.    Do they have an employment agreement,

2  to your knowledge?

3      A.    Yes.

4      Q.    Are there any employees at Berkley

5  Vacation Resorts?

6      A.    There probably are.  I'm not sure how

7  many.

8      Q.    When you say that, are you -- what are

9  you thinking of; perhaps people who work in the

10 office, might they be employed by Berkley

11 Vacation Resorts?

12     A.    The office staff is generally employed

13 by the development company.

14     Q.    And is Berkley Vacation Resorts the

15 development company?

16     A.    Yes.

17     Q.    Who are the corporate officers of

18 Tower Resorts Realty?

19     A.    J P. Ottino, III, and Marc Landau.

20     Q.    What about Berkley Vacation Resorts?

21     A.    Myself and Marc Landau.

22     Q.    Is Tower Resorts Realty the entity

23 that is responsible for all time-share sales --

24 for your time-share sales in Florida?

24

1      A.    No.

2      Q.    Is it only a Florida corporation or --

3  let me strike that.  Are there only time-shares

4  in Florida that are being sold by the folks at

5  Tower Resorts?

6      A.    That's correct.

7      Q.    What locations do they sell?

8      A.    Vacation Village at Weston, Canada

9  House Resort, Hollywood Beach Tower Resort,

10 Golden Strand Resort.

11     Q.    Is that the --

12     A.    I believe that's all of them.

13     Q.    Is Berkley Vacation Resorts the

14 development company for all those locations?

15     A.    No.

16     Q.    Who is or -- let me ask it this way.

17 Berkley Vacation Resorts is the development

18 company for which of those, if any?

19     A.    Vacation Village at Weston.

20     Q.    Is that it?

21     A.    That's it.

22     Q.    Who is the development company for

23 Golden Strand?

24     A.    That would be South Coast Resorts.

Wise v Patriot - R. Foster Campagna  5/23/05

---

**25**

```
1        Q.   Does South Coast -- are they the
2   development company for any other locations?
3        A.   No.
4        Q.   How about the Hollywood Beach Resort;
5   what is the development company for Hollywood
6   Beach Resort?
7        A.   Hollywood Resorts is the development
8   company.  The resort is Hollywood Beach Tower.
9        Q.   So the resort is the development
10  company?
11       A.   No, the resort is the resort.  The
12  development company is the company who owns
13  inventory at that resort.
14       Q.   Is that Hollywood Resorts Corporation?
15       A.   At Hollywood Beach Tower, it is
16  Hollywood Resort, Inc. or Corporation -- I'm not
17  sure which.
18       Q.   I understand.  Does Hollywood Resorts
19  Corporation, are they the development company for
20  any other location?
21       A.   I believe they own some inventory at
22  Costa del Sol, C-O-S-T-A D-E-L S-O-L.
23       Q.   That was a name that you did not
24  mention.  Is that another --
```

**26**

```
1        A.   That is a resort.
2        Q.   So it's not a corporation; that is
3   simply a resort?
4        A.   That's the name of the resort where
5   the inventory is located.
6        Q.   Do you know who owns what corporation,
7   if any own Costa del Sol?
8        A.   The owners' association own the
9   property.
10       Q.   Do you know who is responsible for
11  sales at Costa del Sol?
12       A.   If it's -- if inventory is sold that
13  is owned by Hollywood Resorts Corporation, a
14  Tower Resorts Realty salesperson would sell it.
15       Q.   I believe you mentioned another
16  location, is it Canada House?
17       A.   Canada House Resort, Shoreline Resort
18  is the developer who owns inventory at Canada
19  House Resort.
20       Q.   Who would sell at Canada Resort?
21       A.   Employees of Tower Resorts Realty.
22       Q.   How many locations are there owned by
23  Patriot Resorts?
24       A.   There is one.
```

**27**

```
1        Q.   Is that -- is Patriot the development
2   company?
3        A.   Patriot Resorts owns Vacation Village
4   in the Berkshires.
5        Q.   Does Patriot Resorts have employees?
6        A.   Yes, it does.
7        Q.   Are those the salespeople and sales
8   managers who work at the location?
9        A.   As well as the administrative staff.
10       Q.   You mentioned Lando Resort Realty and
11  Lando Resort Corporation or Incorporated.  Lando
12  Resort Realty, is that a development company?
13       A.   Lando Resort Corporation is the
14  development company, Lando Resort Realty is the
15  real estate brokerage.
16       Q.   When you say "real estate brokerage,"
17  is that -- do they perform a similar function
18  than being the -- are there employees of Lando
19  Resort Realty?
20       A.   Yes.
21       Q.   Among those people are sales people,
22  is that correct?
23       A.   The licensed real estate agents, yes.
24       Q.   Do those licensed real estate agents
```

**28**

```
1   perform essentially the same function for Lando
2   Resorts Corporation as the licensed sales
3   representatives at Tower Resorts do for their
4   various companies, including Vacation Village at
5   Weston?
6        A.   That's correct.  Vacation village at
7   Weston is the resort.  The development company is
8   Berkley Vacation Resort.  And to clarify, Lando
9   Resort is L-A-N-D-O.
10       Q.   Lando Resort in both those instances,
11  realty and corporation?
12       A.   Yes.
13       Q.   Is there a board of directors at
14  Patriot Resorts?
15       A.   Yes, there is.
16       Q.   Who is on the board of Patriot?
17       A.   Myself, Marc Landau, and J.P. Ottino.
18       Q.   Anybody else?
19       A.   No.
20       Q.   What about Lando Resorts Realty; is
21  there a board of directors there?
22       A.   Yes, there is.
23       Q.   Who is on that board?
24       A.   Marc Lando and myself.
```

Wise v Patriot - R. Foster Campagna  5/23/05

157

1      A.    Correct.

2      Q.    And that's what you understand it to

3  mean?

4      A.    Yes.

5      Q.    Let's go back to the three consecutive

6  timely payments.  If eighteen months have gone by

7  and there haven't been three consecutive timely

8  payments, is it possible that post-termination a

9  salesperson has not yet been paid?

10      A.    If they have not made those payments,

11  it is possible he has not been paid, yes.

12      Q.    What about somebody who is working for

13  the company; is it possible that person who is

14  still working for the company, if there have not

15  been three consecutive timely payments after

16  eighteen months, is it possible that person has

17  not gotten paid?

18      A.    It's possible, yes.

19      Q.    Have you ever spoken with Miss Lippert

20  or anybody else from Patriot Resorts about

21  somebody named Sam Barnes?

22      A.    The name is not familiar to me.

23           (Exhibit 17, 12/21/01 Memo

24           Re: Rotation, marked for

158

1           identification)

2      Q.    (By Ms. Garrow)  Showing you what's

3  been marked as Plaintiff's 17, this is from

4  Barbara Arnold.  Who is Barbara Arnold?

5      A.    Barbara was the original receptionist

6  that worked at Patriot Resorts.

7      Q.    This is something called a rotation

8  policy.  Are you familiar with this policy?

9      A.    It's not unheard of -- yes, I'm aware

10  that the rotation could be done that way.

11      Q.    It says this is a Berkley company

12  policy.  Do you understand this to be a Berkley

13  company policy?

14      A.    It has a policy that we have used from

15  time to time.

16      Q.    Do you understand it to still be the

17  policy at Patriot Resorts?

18      A.    I don't know that it is.  I'm not sure

19  what type of rotation they're running right now.

20      Q.    Who would know that?

21      A.    Bill Rauer.

22      Q.    Do you remember speaking with Faith on

23  occasion about LaCrisha Wise?

24      A.    Yes, I do.

159

1      Q.    About how many times did you talk to

2  her about LaCrisha Wise?

3      A.    Once or twice maybe.  I can remember

4  one in particular.  There may have been another.

5  I don't remember.

6      Q.    When was that -- you said you remember

7  one in particular?

8      A.    It was a conversation that had to do

9  with dress code.  I don't remember specifically

10  what date it was.

11      Q.    But to your knowledge, was it when she

12  was still working there, she was still employed?

13      A.    Yes, she was working there.

14      Q.    Who called whom; did Miss Lippert call

15  you?

16      A.    I don't remember if she called me or

17  if it was during the course of a conversation --

18  I don't remember.

19      Q.    What do you remember about the

20  conversation -- tell me everything that you

21  remember Miss Lippert said and everything that

22  you remember saying.

23      A.    Well, I just remember there was a

24  question that LaCrisha seemed to be concerned

160

1  about having been reprimanded in accordance with

2  the dress code; and I'm not sure who reprimanded

3  her or asked her to dress more appropriately,

4  but apparently she was not happy about it, and

5  Faith mentioned it to me.

6      Q.    And that's all she said; that's what

7  your recollection is?

8      A.    That's all I recall.

9      Q.    Do you remember if she talked to you

10  about discrimination, that LaCrisha thought it

11  was due to discrimination?

12      A.    No, I don't remember that.

13      Q.    Do you remember any discussions with

14  Miss Lippert about Miss Wise charging the company

15  with race discrimination while she was still

16  working there?

17      A.    No, not during her employment.

18      Q.    If somebody were to file a complaint

19  with a state agency -- for instance, in

20  Massachusetts we have Massachusetts Commission

21  Against Discrimination -- would you expect that

22  to be reported to you?

23      A.    Yes.

24      Q.    So whenever they had knowledge of

Wise v Patriot - R. Foster Campagna   5/23/05

161

1  that, that would be reported to you, or you would
2  expect that would be reported to you?
3     . A.   Generally it would be, yes.
4     Q.   At some point, did you hear from Miss
5  Lippert that Miss Wise had charged the company
6  with race discrimination?
7     A.   I recall that, but I don't recall that
8  during her employ.  I recall that after her
9  termination; but again, I'm not sure.
10        (Exhibit 18, 6/8/03, 6/9/03
11        Memos Re: Ms. Wise,
12        marked for identification)
13     Q.   (By Ms. Garrow)  Showing you what's
14  marked as Plaintiff's 18, this appears to be an
15  e-mail from -- I guess it's a string of e-mails.
16  The first one is from Miss Lippert to you and the
17  second one is your response.  Do you recall
18  receiving this e-mail?
19     A.   I don't recall receiving it, but it's
20  the right format, so...
21     Q.   It appears here that Miss Lippert was
22  informing you that she thought that Miss Wise was
23  going to be trouble.  Did you ever have a
24  conversation with her as to what she meant by

162

1  that?
2     A.   I recall after LaCrisha left, she had
3  made some threatening remarks to Faith, and Faith
4  was a little intimidated and scared by her, and I
5  had Faith call local authorities to have an
6  off-duty police officer come and stay at the
7  resort until Faith felt comfortable that LaCrisha
8  was not going to come there and cause a problem
9  with her.
10     Q.   But this was the first thing the day
11  after she -- Miss Wise -- got terminated; so
12  she's not talking about that here, is she,
13  because you said it was after her termination?
14        MS. FABBO:  Objection.  You can
15        answer.
16        THE WITNESS:  I'm telling you
17        what I recall.
18     Q.   (By Ms. Garrow)  I'm asking you if you
19  recall having any conversations with her about
20  what she meant in this e-mail, "She is going to
21  be trouble."  If I understand your testimony,
22  these alleged threats happened after this e-mail
23  was written, so it couldn't have been that.
24     A.   Well, along with her termination, I

163

1  think she was there causing a problem.
2     Q.   What was that?
3     A.   I know she was loud and she was -- she
4  scared our employee.
5     Q.   You said when she was terminated that
6  happened?
7     A.   It was after her termination.  She was
8  terminated, I believe, at night, and then I
9  believe she came in -- I'm not sure whether it
10  was the next day, the next afternoon -- I'm not
11  sure when it was, but Faith's contact with her
12  was one that scared her, and that is -- I think
13  that, to my understanding, that is what Faith
14  meant as trouble, because she scared Faith and we
15  were afraid that she would come on the property
16  and create a disturbance.
17     Q.   When you say that she scared Faith,
18  are you relating what Faith told you?
19     A.   Faith was scared of the girl.
20     Q.   Did you ever observe her making
21  threats?
22     A.   No, I'm in Florida.
23     Q.   So this is only from what you
24  understood Faith told you; is that how you

164

1  understood this?
2     A.   Knowing Faith for thirty years, I know
3  when she's afraid, and she was scared of this
4  employee.  She was physically afraid of the
5  woman, and she said that to me on occasion on the
6  phone, that I am afraid of her.  And when you
7  asked me to read this and she said she is going
8  to be trouble, that tells me that Faith was
9  scared of her.
10     Q.   So had she related that she was afraid
11  of her prior to the termination?
12     A.   Faith had told me she was a very
13  intimidating woman.
14     Q.   That she made her nervous and --
15     A.   Yes.
16     Q.   -- and uncomfortable?
17     A.   Yes.
18     Q.   Did she tell you that about anybody
19  else?
20     A.   Roger Martin tended to become angry
21  over situations.
22     Q.   I'm not asking you if Mr. Martin
23  became angry over situations.  I'm asking you if
24  Faith told you anything about anybody other than

177

1    Parisi and Sabin as to what the record-keeping
2    requirements were to the Federal Fair Labor
3    Standards Act?
4        A.    We would have met with the attorneys
5    early on in the process and asked what we needed
6    to be concerned with in the State of
7    Massachusetts from any point of the law.
8        Q.    Federal or state compliance?
9        A.    Correct.
10       Q.    You have a recollection of doing that
11   with attorneys from Parisi and Sabin?
12       A.    That is our normal procedure, yes.
13       Q.    Did you ask for advice of counsel in
14   that regard?
15       A.    Yes.
16       Q.    Did you have communications with them
17   about that?
18       A.    We had discussions about it, yes.
19       Q.    What did you discuss?
20             MS. FABBO:  Objection.  You may
21             answer.
22       Q.    (By Ms. Garrow)  Counsel has
23   instructed you not to answer regarding advice of
24   counsel as to your Federal Fair Labor Standard

178

1    Act requirement.  I think you testified that
2    there were some discussions about Massachusetts
3    record-keeping requirements as well?
4             MS. FABBO:  Objection.  You can
5             answer if that was your testimony.
6             THE WITNESS:  Yes, that's what I
7             said earlier.
8        Q.    (By Ms. Garrow)  Did you have any
9    involvement in the termination of Mr. Massaconi?
10       A.    No, I did not.
11       Q.    Were you consulted about his
12   termination prior to his termination?
13       A.    Not that I recall.
14       Q.    Did you recommend his termination?
15       A.    No.
16       Q.    What about Mr. Martin; were you
17   consulted prior to his termination?
18       A.    No.
19       Q.    Did you recommend his termination at
20   any time?
21       A.    No, I did not.
22       Q.    What about Miss Wise; were you
23   consulted regarding her termination prior to her
24   termination?

179

1        A.    No.
2        Q.    The first you heard about it was that
3    e-mail, correct?
4        A.    Correct.
5        Q.    At any point did you recommend her
6    termination, Miss Wise's?
7        A.    No.
8             MS. GARROW:  Off the record.
9             (A break was taken)
10             MS. GARROW:  Back on the record.
11       Q.    (By Ms. Garrow)  Do you know if any
12   sales representatives or sales managers go to
13   potential owner's homes to try to sell them
14   time-shares at Patriot Resorts?
15       A.    Not that I'm aware of.
16       Q.    That's not the policy of Patriot
17   Resorts, is it?
18       A.    No, it isn't.
19       Q.    All the sales get done on the property
20   in Lanesborough, correct?
21       A.    Correct.  It's not unheard of that a
22   salesperson could follow a customer home, if they
23   live within a short distance, to get a check or
24   to get a credit card number or something like

180

1    that, but not to transact the sale.
2        Q.    Pretty much to grab some information,
3    grab the PAC check or something?
4        A.    Correct.
5        Q.    Because for some reason, they came to
6    buy a time-share without a check, correct?
7        A.    Correct, they didn't intend...
8        Q.    The same --
9        A.    Before we get started, can I clarify
10   something?
11       Q.    Sure.
12       A.    Because you asked me about the opinion
13   letter, and I think I was focusing more on that
14   time frame than I was your question; and after
15   the lawsuit was filed, I did, of course, talk to
16   Skoler Abbot law firm about the way we were
17   paying our salespeople.
18       Q.    So before you testified that you
19   retained them to pursue the lawsuit?
20       A.    Correct, but in conjunction with that,
21   of course we had to discuss our current situation
22   and what we were doing and what was their opinion
23   of the situation.
24       Q.    Did they give you an opinion?

196

```
1                COMMONWEALTH OF MASSACHUSETTS

2       Wise v Patriot
        No. 04-CV-30091-MAP
3

4           I, REBECCA FOSTER CAMPAGNA, do hereby
        certify under the pains and penalties of perjury
5       that the foregoing testimony is true and accurate
        to the best of my knowledge and belief, with the
6       addition of the following changes/corrections:

7

8       Page  Line                Change/Correction

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18

19      Witness my hand this ___ day of _____, 2005.

20
                            _____
21                          REBECCA FOSTER CAMPAGNA
        Orig:  Suzanne Garrow, Esq.
22      Copy:  Marylou Fabbo, Esq.

23

24
```

# EXHIBIT
# 5

Vol. I, Pgs. 1-175

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 04-CV-30091-MAP

- - - - - - - - - - - - - - - - - - - - - - - - - -

)

WISE, ET AL.,                    )

        Plaintiffs    )

)

vs.                              )

)

PATRIOT RESORTS CORP., )

ET AL.                           )

        Defendant     )

)

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LACRISHA D. WISE

Tuesday, April 26, 2005

9:30 a.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144

- - - - - - Sandra A. Deschaine, RPR - - - - - - -

COURT REPORTING SERVICES

P.O. BOX 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

70

1   hourly wage while on tour, as well as commission,
2   bonus and S.P.I.F.
3       Q.   What was the hourly rate?
4       A.   I don't remember.
5       Q.   Would you have an approximate idea?
6       A.   No.
7       Q.   And what was the commission?
8       A.   I don't remember.
9       Q.   Did it vary, the percentage, the
10  percentage of commission?
11      A.   Yes.
12      Q.   Based on what?
13      A.   Whether I closed my own deal or not.
14      Q.   Would you receive a higher percentage
15  if you closed your own deal?
16      A.   Yes.
17      Q.   And what was your bonus based upon?
18  And again, I'm talking about the time that you
19  were employed there for the second time.
20      A.   The same as the first, it was based
21  on volume, volume of tours taken and the
22  minimum -- there's a minimum tour qualification.
23      Q.   And this S.P.I.F., is that paid on a
24  daily basis, did you say?

71

1       A.   No, it's earned on a daily basis.
2       Q.   How is it paid out?
3       A.   Cash.
4       Q.   How frequently?
5       A.   As often as it's earned.
6       Q.   Is that cash amount an amount that
7   you would include in your income taxes?
8       A.   Yes.
9       Q.   Could you tell me approximately how
10  much you earned at Oak 'N Spruce during your
11  second employment there?
12      A.   I don't remember at this time.
13      Q.   Since your separation from Vacation
14  Village, did you ever receive unemployment
15  compensation?
16      A.   Yes.
17      Q.   Do you know for how long?
18      A.   I don't. I don't recall.
19      Q.   Do you know the amount?
20      A.   I don't remember.
21      Q.   How did your second employment or why
22  did your second employment at Oak 'N Spruce end?
23      A.   I chose not to return.
24      Q.   Can you tell me the factors that led

72

1   you to make that choice?
2       A.   I just wasn't ready to work.
3       Q.   I'm sorry.
4       A.   I wasn't ready to be back in that
5   work environment. I was having anxiety attacks,
6   and I was really paranoid and uncomfortable and
7   very uncomfortable in the sales pit, which is
8   where all the sales are being done at. It's an
9   emotional job and emotionally I wasn't prepared to
10  be back in that type of environment.
11      Q.   So you quit that employment?
12      A.   Yes.
13      Q.   Who was your supervisor there the
14  second time you worked there?
15      A.   Laura Wood Johnson.
16      Q.   When you were employed at
17  Oak 'N Spruce in the fall of 2003, did anyone
18  bring to your attention any problems with your
19  performance?
20      A.   I don't recall.
21      Q.   Did anyone inform you that there had
22  been any complaints made about you by employees or
23  potential customers?
24      A.   I don't remember any of that.

73

1       Q.   Did you receive any disciplinary
2   action during your second employment?
3       A.   Not that I remember.
4       Q.   How long did you work there before
5   you came to the conclusion that you weren't ready
6   to return?
7       A.   Roughly two months.
8       Q.   When did you begin employment with
9   Vacation Village?
10      A.   On or around February 8th of 2002.
11      Q.   Do you know when you were terminated?
12      A.   On or around June 6th of 2003.
13      Q.   How did you learn of an employment
14  opportunity at Vacation Village?
15      A.   Duane Johnson.
16      Q.   How did he communicate that to you?
17      A.   He came to my house.
18      Q.   What did he say?
19      A.   I beg your pardon.
20      Q.   What did he say when he came to your
21  house?
22      A.   He said that he had been looking for
23  me, because I had moved, and trying to find out
24  where I had lived at, and he said that there was a

19 (Pages 70 to 73)

Deposition of:    LaCrisha D. Wise    April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

---

98

1 car with a driver's license and some insurance.
2     Q.    And did you ever verify whether you
3 had the correct dollar amount of the property and
4 personal injury coverage or bodily injury
5 coverage?
6     A.    I don't remember.  I remember that I
7 had what Massachusetts state require that I have.
8     Q.    What was the cost to you of your car
9 insurance?
10     A.    I don't remember.
11     Q.    Did anyone at Vacation Village ever
12 raise the issue with you or ask you or suggest
13 that you didn't have adequate coverage, car
14 insurance coverage?
15     A.    Yes.
16     Q.    Who was that?
17     A.    Rod Lewis.
18     Q.    Anyone else?
19     A.    Yes, but I'm not sure at this time
20 who it was.
21     Q.    Do you have any documents that would
22 refresh your recollection as to who else might
23 have brought this up with you?
24     A.    I don't think so.

---

99

1     Q.    What did Mr. Lewis say to you about
2 the car insurance coverage?
3     A.    He said that unless I could give him
4 a copy of the policy with proof of the coverages,
5 I, one, wasn't getting paid, two, wasn't being
6 sent on tour and three, was being sent home
7 immediately.
8     Q.    And when was this conversation?
9     A.    I don't recall the date.
10     Q.    Was it just one conversation you just
11 referred to?
12     A.    That was one single conversation,
13 yes.
14     Q.    Did you ever discuss this with
15 Mr. Lewis again?
16     A.    I know there was another conversation
17 that we had, and I'm not sure that it was with
18 Mr. Lewis, but it was in reference to car
19 insurance, automobile insurance policy that was
20 transferred to another insurance agency.
21     Q.    So that's two conversations that
22 you're talking about so far?
23     A.    Yes.
24     Q.    Any other conversations on that

---

100

1 topic, that you can think of?
2     A.    Yes.  There was another conversation
3 with Rod Lewis and my then manager Jon Borden.  My
4 automobile was in the shop getting repaired, and I
5 was driving my father's car, and Rod noticed that
6 I was driving a car that was different from the
7 car that I normally drive, and he called myself
8 and John aside and asked me to prove insurance on
9 that vehicle, asked whose vehicle it was, and I
10 told him it was my father's vehicle.
11         And he asked was I -- what was my
12 father's coverages.  He asked what my father's
13 coverages were.  He also asked if I was listed on
14 my father's insurance as a driver, and if I had
15 brought in a copy of the insurance policy for him.
16 I told him that I hadn't, that I -- I told him
17 that I hadn't brought in a copy of the insurance
18 policy, but I did know that the car was fully
19 covered and had met Massachusetts requirements for
20 insurance, that I was not -- that I was not listed
21 on his insurance policy, and because I don't live
22 with my father and I don't use his car frequently,
23 the Massachusetts state says that I don't have to
24 be listed on his policy.  And he disagreed and he

---

101

1 said that --
2     Q.    Is "he" Mr. Lewis?
3     A.    Yes.  Rod Lewis disagreed, and he
4 said that we need to provide him with proof of
5 that.  It was on a Saturday, Jon Borden and myself
6 and Mr. Lewis were in a cubicle and he told me to
7 call my insurance company.  And I called my
8 father, and I asked him what his insurance company
9 was, and he told me and I called the insurance
10 company and they were closed.
11         Mr. Lewis said unless I could provide
12 that proof or documentation, that I needed to
13 leave immediately, and I asked him was I the only
14 one, because I see other representatives standing
15 right here who are on tour who don't even have a
16 car, and they're using other people's car, never
17 mind insurance.  He said don't worry about it,
18 just worry about yourself and get the verification
19 or you need to go home.
20         So I then called my father back and I
21 asked him if he had or could pull out the
22 insurance policy, because one of my options was to
23 either just go home, or go home, get the policy
24 and then drive all the way back and bring the

---

26 (Pages 98 to 101)

154

1    A.    I'm not sure how many times it was.
2    I just know that there were several times.
3    Q.    Were there any other African American
4    employees on your team or line, however you refer
5    to it?
6    A.    Michael Johnson and at one point
7    Charles Harrigan, Duane Johnson, again, when I
8    first -- when he first hired me.
9    Q.    Did you say Charles something?
10   A.    Charles Harrigan.
11   Q.    Anyone else?
12   A.    Duane Johnson, Michael Johnson,
13   Charles Harrigan, myself.  That was it, throughout
14   my employment there at Vacation Village.
15   Q.    They were all under the same
16   management as you were?
17   A.    Under the same line.
18   Q.    Were there any other African
19   Americans on the other line?  There was one line
20   or --
21   A.    Yes.
22   Q.    Were there any on that line?
23   A.    No.
24   Q.    After the incident that we were

155

1    talking about where Mr. Stensland asked you to
2    sign a document that you didn't want to sign, what
3    was the next thing that comes to mind where you
4    felt you were being discriminated against?
5            MS. GARROW:  I'm going to object to
6    the form but you can answer.
7    A.    I can't tell you what was next.
8    There was a lot.  I can't tell you what was next.
9    Q.    And so what's another incident you
10   can think of, if you can't put it in any order?
11   A.    Dress code.  I was -- the weather was
12   beautiful out.  I had just went and purchased a
13   beautiful orange long sun dress with spaghetti
14   strap across the back, and it was beautiful, and I
15   received a lot of compliments from my colleagues
16   on it.  And then we signed a dress code, a dress
17   code paper maybe a week or so after that.
18           And I was on the phone, I was on the
19   telephone with -- I actually had a conference call
20   going on, my father was on the line, Michael was
21   on the line and my daughter was on the phone.  I
22   was on the phone with them, and Paul came up --
23   Paul Stensland came up to me and when he asked me
24   to -- when he gave me the papers to sign, he said,

156

1    you know, don't worry about it, because I asked
2    him about the hats, about the spaghetti straps, or
3    what have you, and the sleeveless tops.  I asked
4    him about the open toe shoes or sandals, and he
5    said not to worry about it, because I'm one of the
6    best dressed people that are there, and I've never
7    dressed inappropriately, so, you know, just be
8    aware that that's, you know, that I haven't worn
9    anything inappropriately yet, and so I did.
10           And then just like a week later or so
11   I wore the same dress again and now this time I
12   either had to drive back to Springfield to change
13   my clothes, wear someone's old, dirty sweater that
14   was left behind from cold weather or go to the
15   mall and buy a new outfit because that exact dress
16   was no longer acceptable.  However, Lisa Ferreria,
17   Tishana Wright, Chelsea Wright, and Hannah Blais
18   were -- those are the names that I can think of
19   off the top of my head.
20           Those are also women who wore
21   spaghetti straps and spaghetti strap dresses and
22   shirts and things of that nature, on a regular
23   basis, without any reprimand or any disciplinary
24   actions.

157

1            And I remember Sam Barnes, Ron
2    Ferreria, and several of my other colleagues, when
3    I ended up being sent home, being pretty upset
4    about it.  I found out about it the next day,
5    because it was an hour and a half drive home.
6    They said go home, and I went home and when I went
7    in the next day, they were really upset about it
8    and they said she wore this two weeks ago and now
9    she wears it again and you send her home and make
10   her wear her old clothes, I'm listening, you keep
11   picking on her every day and every other day this
12   and that.  Gosh, I didn't want to ask that, but
13   you know what, you're right, what's the gig, so
14   that helped me more to establish that, you know
15   what, there is something going on.
16   Q.    You don't know whether anyone else
17   was disciplined in any way, though, do you?
18   A.    Yes, I do.  I spoke with them.
19   Q.    And they denied it?
20   A.    They told my exactly, some of the
21   notes are right in here, on the dates that I spoke
22   with them, that when they've told me that, no one
23   has ever said anything to them or -- in one case,
24   Tishana, she had worn -- this was after I'd been

Deposition of:                           LaCrisha D. Wise                           April 26, 2005
Wise, et al. vs. Patriot Resorts, Corp., et al.

174

1       LACRISHA D. WISE
2       SIGNATURE PAGE/ERRATA SHEET
3   PAGE LINE    CHANGE OR CORRECTION AND REASON
4
5
6
7
8
9
10
11
12
13
14
15   I have read the transcript of my deposition taken
16   on April 26, 2005, except for any corrections
17   or changes noted above, I hereby subscribe to the
18   transcript as an accurate record of the statements
19   made by me.
20
     Signed under the pains and penalties of perjury.
21
22   LACRISHA D. WISE         DATE
23
24

175

1       LACRISHA D. WISE
2       SIGNATURE/PAGE ERRATA SHEET INFORMATION
3   WISE ET AL. VS. PATRIOT RESORTS, CORP., ET AL.
4
5       SIGNATURE INFORMATION FOR COUNSEL
6   The original signature page/errata sheet has been
7   sent to Attorney Garrow to obtain signature from
8   the deponent.  When complete, please send original
9   to Attorney Fabbo, a copy of any errata should be
10   sent to each party of record present at the
11   deposition.
12
13       WITNESS INSTRUCTIONS
14   After reading the transcript of your deposition,
15   please note any change or correction and the
16   reason on the errata/signature page.  DO NOT make
17   any corrections on the transcript itself.  If
18   necessary, continue the format on a separate page.
19
20
21
22
23
24

45 (Pages 174 to 175)

# EXHIBIT
# 6

PAUL STENSLAND
November 20, 2003

1          COMMONWEALTH OF MASSACHUSETTS

2         Commission Against Discrimination

3                  Docket No. 03-SEM-01388

4

5    * * * * * * * * * * * * * * * * * * * * * * * * * * * *

6    LACRISHA WISE,                              *

7                        Complainant    *

8    vs.                                         *

9    PATRIOT RESORTS CORP. d/b/a VACATION  *

10   VILLAGE IN THE BERKSHIRES,             *

11                        Respondent    *

12   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

13

14        DEPOSITION OF:  PAUL STENSLAND

15        HEISLER, FELDMAN & McCORMICK, P.C.

16              1145 Main Street

17           Springfield, Massachusetts

18        November 20, 2003    1:36 p.m.

19

20

21

22

23              Lisa M. Cronin

24      Certified Shorthand Reporter - 1068S94

61

1          (Exhibit 5, 11/3/02 Memo

2          Re:  Attendance Policy,

3          marked for identification)

4     Q.   (By Ms. Garrow)  I'm showing you

5 another policy, Exhibit 5.  Do you recognize this

6 policy?

7     A.   Fifteen-day policy -- do I recognize

8 it.  Yes, we all had to sign one.

9     Q.   You signed one as well?

10    A.   Correct.

11    Q.   Are you aware of anyone other than

12 Miss Wise who was absent for more than fifteen

13 days after this policy was signed who was not

14 terminated?

15    A.   Who was not terminated?

16    Q.   Yes.

17    A.   In the year 2002?

18    Q.   After this was signed.

19    A.   After this was signed...

20    Q.   November 3, 2002.

21    A.   Okay.  So...

22    Q.   That was the date of the policy, do we

23 agree on that?

24    A.   Right, so it came out around that

---

62

1 time.

2     Q.   Let's say that was the date of the

3 policy, because we don't know when this was

4 signed.

5     A.   Everybody has to sign this.  I thought

6 it was the beginning of December.  Everybody had

7 to sign it.  We had a meeting about it that we

8 were going to enforce this.  So for the year

9 2002, fifteen days, and that was it.  That

10 included everybody.  Myself, everybody.

11    Q.   Are you aware of anybody who exceeded

12 fifteen days who was not terminated after this

13 policy came into effect?

14    A.   No.

15    Q.   No, you're not aware?

16    A.   No, I'm not aware of anybody that was

17 over fifteen days that was not terminated.

18    Q.   You don't know if it's true or not, is

19 that correct?

20    A.   Correct.

21    Q.   Have you ever heard of any salesperson

22 being put on overage because they're in the

23 bathroom?

24    A.   No.

---

63

1     Q.   Is it possible that a salesperson

2 could get passed over if they're in the bathroom

3 -- let me ask it differently -- has anybody ever

4 been passed over, to your knowledge?

5     A.   Not to my knowledge.

6     Q.   Is every sales representative and

7 sales manager required to come to the daily

8 meetings?

9     A.   Yes.

10    Q.   When do they sign in; before or after

11 that meeting?

12    A.   Before.

13    Q.   If you wanted to go and discover

14 where -- what time somebody left for the day,

15 where would you go and look?

16         MS. FABBO:  Objection.  You can

17         answer.

18    Q.   (By Ms. Garrow)  How would you find

19 that information?

20    A.   If somebody left for the day?

21    Q.   Just on a typical day -- let me ask it

22 differently.  Do you believe that there are any

23 documents that exist that show when an individual

24 ends their work day at Patriot -- either a sales

---

64

1 representative or sales manager ends their day at

2 Patriot Resorts?

3     A.   Is there any way to know?

4     Q.   Yes.

5     A.   A sales rep -- his or her day would

6 end usually at 3:00, or earlier than that if they

7 don't have an opportunity to take out another

8 client.

9     Q.   Is there any document that you would

10 go and consult if you wanted to know for sure

11 when a salesperson ended their day?

12    A.   Not to my knowledge.

13    Q.   To your knowledge, did a Mickie

14 P-L-E-U-I --

15    A.   Pleui.

16    Q.   Was he somebody who worked for you?

17    A.   She.

18    Q.   Was she somebody that worked for you?

19    A.   Correct.

20    Q.   Did she ever have any issues with her

21 car insurance -- insufficient insurance or didn't

22 have a car?

23    A.   Correct.

24    Q.   What was -- which one?

---

69

1          (Exhibit 6, 6/8/03 Memo
2          Re: LaCrisha Wise, marked
3          for identification)
4     Q.   (By Ms. Garrow)  I'm showing you
5  what's been marked as Exhibit 6.  It's dated
6  June 8, 2003, is that correct?
7     A.   Correct.
8     Q.   It says "To:  Faith, From:  Paul" --
9  Faith being Faith Lippert, correct?
10    A.   Correct.
11    Q.   And Paul being you, correct?
12    A.   Correct.
13    Q.   That's not your handwriting, though,
14 is it?
15    A.   No, it's not.
16    Q.   You didn't write that, did you?
17    A.   No, I didn't.
18    Q.   Have you seen this before?
19    A.   Last time I was here.
20    Q.   And according to this -- first let me
21 ask you this.  Do you know whose writing this is?
22    A.   No, I don't.
23    Q.   Are you familiar with Rod Lewis's
24 handwriting?

---

70

1     A.   Not really.
2     Q.   Do you recall if somebody spoke with
3  you on the 7th and told you it was obvious that
4  LaCrisha coming to work on time was going to be a
5  problem?
6     A.   I don't recall.
7     Q.   It appears from this -- and correct me
8  if I'm wrong -- that somebody told you to fire
9  LaCrisha, is that correct?
10    A.   Was that the date that she was
11 terminated?
12    Q.   On June 7, correct?
13    A.   I didn't know the date.
14    Q.   You made a phone call to her and told
15 her she was fired?
16    A.   Yes, on the way home.  I was asked to
17 fire her by Rod, and that's the last thing I
18 wanted because she still owed me money.  She owed
19 me approximately $1,300.  Previous December of
20 2002, I lent her $1,192 for Christmas presents
21 for her children, and she said she'd paid me back
22 probably within by the end of January, because
23 she had another lawsuit going on that she was
24 going to get some money from and that it would be

---

71

1  no problem.  I was concerned with her paying me
2  back quickly because she's borrowed money from me
3  before, up to $600, and she paid me back all but
4  a hundred.
5          It was an ongoing thing -- I need
6  medication for the kids or gas or food, whatever,
7  cable bill.  She used my credit card to book a
8  vacation in February of 2003, but she paid me
9  back.  But this $1,192 didn't go away, so this is
10 the last thing that I wanted to do, to terminate
11 her, because once a rep. leaves, you're just not
12 going to see that money again.  She wasn't the
13 only one I lent money to.  I lent money to
14 salespeople to keep them up because they were
15 going good, knowing I was going to get the money
16 back or make money off of them selling.
17         That's the last thing I wanted to
18 happen to her.  When the policy came out, I'm
19 going to come back to work everyday.  Mike
20 Johnson and -- my boyfriend -- and I are good,
21 I'm going to commit, all the problems are behind
22 us, the kids are healthy, we've got vehicles,
23 let's go.  But when this happened, this is the
24 last thing I wanted to do, was call her up on the

---

72

1  way home, because I knew I was out $1,300.
2     Q.   But he told you to tell her --
3     A.   I had no choice.  I did what he told
4  me to do.
5     Q.   Who is Danielle Moran?
6     A.   Sales rep. that used to work for us.
7     Q.   Did she work on your line?
8     A.   At the end.
9     Q.   Has she charged you with
10 discrimination?
11    A.   Yes.
12    Q.   She filed something at the MCAD?
13    A.   Yes.
14    Q.   Has she brought any civil actions
15 against you?
16    A.   I don't know the terminology of all
17 these lawsuits.  What would civil be?
18         MS. FABBO:  Just answer if you
19 know.
20    A.   I don't know.
21    Q.   Have there been any criminal charges
22 in relation to Miss Moran?
23    A.   Against me?
24    Q.   Yes.

---

73

```
 1        A.  I believe so.
 2        Q.  Have folks at Vacation Village been
 3   asked to testify on your behalf?
 4        A.  On my behalf?
 5        Q.  Yes -- has there been a trial?
 6        A.  No.
 7        Q.  Is there going to be a trial?
 8        A.  Some day.
 9        Q.  Have you asked people to testify on
10   your behalf, to stand up for you from Vacation
11   Village?
12        A.  A few.
13        Q.  Do you know if other folks have been
14   subpoenaed to testify on behalf of the District
15   Attorney?
16        A.  Yes.
17        Q.  Do you know the charges that were
18   brought against you?
19        A.  Sexual harassment.
20        Q.  Those are the charges?
21        A.  I believe so.  I'm not sure.
22            MS. GARROW:  Thank you.
23
24            (Deposition concluded at 3:30)
```

75

```
 1                            June 25, 2005
 2
 3   Marylou Fabbo, Esq.
 4   Skoler, Abbott and Presser, PC
     1414 Main Street
 5   Springfield, MA  01103
 6   RE:  Wise v Patriot
 7   Dear Counselor:
          Enclosed is a copy of the deposition of
 8   Paul Stensland, taken on June 2, 2005 in the
     above-entitled action.
 9
          According to Rule 30(e) of the
10   Massachusetts Rules of Civil Procedure, the
     deponent has thirty days to sign the deposition
11   from the date of its submission to the deponent,
     which is the above date.
12
          Please have the deponent sign the enclosed
13   Signature Page/Errata Sheet and return it to the
     offices of Suzanne Garrow, Esq., whereupon it
14   will be attached to the original deposition
     transcript.
15
          Thank you for your cooperation in this
16   matter.
17   Sincerely,
18
19   Ann A. Preston
20   cc:  Suzanne Garrow, Esq.
21
22
23
24
```

74

```
 1
 2   COMMONWEALTH OF MASSACHUSETTS
 3   HAMPDEN, SS.
 4        I, Ann A. Preston, a Notary Public in
     and for the Commonwealth of Massachusetts, do
 5   certify that there came before me on June 2,
     2005, at the offices of Heisler, Feldman and
 6   McCormick, PC, 1145 Main Street, Springfield,
     Massachusetts, the following named person, to
 7   wit:  PAUL STENSLAND, who was by me duly sworn to
     testify to the truth and nothing but the truth as
 8   to his knowledge concerning the matters in this
     case; that he was examined upon his oath and his
 9   examination reduced to writing by me; and that
     the statement is a true record of the testimony
10   given by the witness, to the best of my knowledge
     and ability.
11
12        I further certify that I am not a relative
     or employee of counsel or attorney for any of the
13   parties, or a relative or employee of such
     counsel or attorney, nor am I financially or
14   otherwise interested in the outcome of the
     action.
15
     WITNESS MY HAND this 25th day of June 2005.
16
17
18   _____
19        Ann A. Preston
     My commission expires:
20   December 22, 2011
21
22
23
24
```

76

```
 1            COMMONWEALTH OF MASSACHUSETTS
 2   Wise v Patriot
     No. 04-CV-30091-MAP
 3
 4        I, PAUL STENSLAND, do hereby certify under
     the pains and penalties of perjury that the
 5   foregoing testimony is true and accurate to the
     best of my knowledge and belief, with the
 6   addition of the following changes/corrections:
 7
 8   Page  Line          Change/Correction
 9        _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16        _____
17        _____
18
19   Witness my hand this ___ day of _____, 2005.
20
21                       _____
                                PAUL STENSLAND
22   Orig:  Suzanne Garrow, Esq.
23   Copy:  Marylou Fabbo, Esq.
24
```