# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LACRISHA WISE, MICHAEL
MASSACONI, ROGER MARTIN and
PETER CORBIN, on behalf of
themselves and on behalf of others
who are similarly situated,

   Plaintiffs,

v.

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO, III
REBECCA A FOSTER. and JAMES E.
LAMBERT,

   Defendants.

DOCKET NO. 04-CV-30091-MAP

## AFFIDAVIT OF FAITH LIPPERT

I, Faith Lippert, being duly sworn, state as follows:

1. I am over 18 years old and believe in the obligation of an oath. I have personal knowledge of the facts set forth in this affidavit.

2. Since Patriot opened in 2001, I have been the Office Manager and Human Resources Representative of Patriot Resorts Corp. in Lanesborough, MA. I currently remain in that position.

3. Patriot owns and sells timeshare interests at Vacation Village in the Berkshires, which is located in Hancock, Massachusetts ("Vacation Village").

4. Plaintiff Michael Massaconi was a Timeshare Sales Representative for Patriot, who sold timeshare interests at Vacation Village in the Berkshires. He was employed by Patriot from August 6, 2001 to March 5, 2005. From July 20, 2002 to October 29, 2004, Michael Massaconi held the position of Sales Manager.

5. During Massaconi's employment, Rodney Lewis was Patriot's Project Director. Gordon Leete, a Line Director at Patriot, reported to Rodney Lewis.

6. Patriot has no recollection of receiving a complaint on Massaconi's behalf from the Office of the Attorney General that involved a claim for retaliation in violation of the Massachusetts Wage Act.

7. Bonnie Ecklund, a Timeshare Sales Representative for Patriot, who sold timeshare interests at Vacation Village in the Berkshires, was terminated from employment on March 4, 2005.

8. Exhibit A to this Affidavit is a true and accurate copy of Patriot's Uniform Policy for Sales Managers Sales Performance.

9. Exhibit B to this Affidavit is a true and accurate copy of the Probation notice issued to Michael Massaconi on July 11, 2004.

10. Exhibit C to this Affidavit is a true and accurate copy of the notice issued to Michael Massaconi on July 12, 2004 that he was no longer on Probation.

Signed under the pains and penalties of perjury this 13TH day of April, 2007.

_____
Faith Lippert

Sworn and Subscribed to before me
this 13 day of April, 2007.

_____
Notary Public
My Commission Expires: _____

"Notary Public"
Carrie Ann M. Powrozek
Commonwealth of Massachusetts
My Commission Expires on Dec., 11, 2009

# EXHIBIT A

## UNIFORM POLICY FOR SALES MANAGERS SALES PERFORMANCE

### WHEN MANAGER'S SALES RATIOS DROP (60 DAY ROTATION):

1.) 9.0 - Overage situation. Manager will get a written 30 day warning, placed in file. Manager must get personal sales ratio out of overage. **Can not hire, train, or graduate during this time.**

2.) 15.0 - Manager's right to do a T.O. is suspended until out of overage. Can only tour. Must tour twice a day when possible (tour flow permits).

3.) Should the situation not be righted by the end of the 30 day warning, then manager is to be placed on a 30 day probation period. No T.O.ing, and sales reps on his/her team will be temporarily assigned to other managers. Probation notice is to be placed in employee file.

4.) After 60 days without resolution, manager is to revert to sales representative status. The sales representatives on their team will be permanently reassigned to another manager.

Please initial and print name-thank you.

_[signatures]_
PAul Stensland
DAVID MERCURIO
Bill Lee
_[illegible]_
_[illegible]_
Michael _[illegible]_
William _[illegible]_
_[illegible]_
_[illegible]_
BOB CAMPAGNA
Mike _[illegible]_ Gary
mike

Date: July 11, 2004

# EXHIBIT B

**DATE:**

**TO:**    Michael Massaconi

**FROM:** Rod Lewis

**Re:**    **Manager's Sales Performance**

***********************************************************************************

This is notification to you that you are hereby given a 30 day warning to get your sales ratios on a 60 day basis back into acceptable limits (8.99 or better).

If your numbers continue to deteriorate further, additional action may become necessary (see Uniform Policy For Sales Managers Sales Performance).

_____  7/11/04
Sales Manager

cc: Bill Rauer
    employee file

0000043

# EXHIBIT C

DATE:   12-Jul-04

TO:   Michael Massaconi

FROM:   Rod Lewis

Re:   Manager's Sales Performance

*****************************************************************************

As of todays date, this is notification to you that your numbers are above 8.99 or better and that you are off of probation.

Congratulations….keep up the good work!

*[signature: Michael V. Massaconi]*
Sales Manager

cc: Bill Rauer
    employee file

0000041

# EXHIBIT
# 2

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
      Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
      Defendants

DEPOSITION OF FAITH LIPPERT

May 17, 2005, 10:00

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA 01103
BY: SUZANNE GARROW, ESQ.
    JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA 01103
BY: MARYLOU FABBO, ESQ.
    KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

3

I N D E X

WITNESS: FAITH LIPPERT

Direct Examination by Ms. Garrow    5

EXHIBITS

| | | |
|---|---|---|
| Exhibit 1, | Good Business Dates | 15 |
| Exhibit 2, | 5/24/03 Memo Polansky/Lippert | 31 |
| Exhibit 3, | Payroll History of Corbin | 41 |
| Exhibit 4, | Payroll History of Massaconi | 47 |
| Exhibit 5, | Ten Steps to Success | 57 |
| Exhibit 6, | Vacation Village Tour Times | 80 |
| Exhibit 7, | 12/4/04 Memo to Lewis/Rauer | 82 |
| Exhibit 8, | 12/21/01 Memo to Lippert/Arnold | 87 |
| Exhibit 9, | Vacation Village Rotations | 89 |
| Exhibit 10, | Corbin Employment Agreement | 104 |
| Exhibit 11, | Martin Employment Agreement | 105 |
| Exhibit 12, | Wise Employment Agreement | 125 |
| Exhibit 13, | Patriot Employee Handbook | 139 |
| Exhibit 14, | 5/11/03 Dress Code Memo | 145 |
| Exhibit 15, | 12/22/04 Memo Re: New-Hires | 148 |
| Exhibit 16, | 6/8/03 Memo to Faith from Paul | 157 |

(continued)

4

EXHIBITS (continued)

| | | |
|---|---|---|
| Exhibit 17, | 6/9/03 Memo to Lippert/Foster | 167 |
| Exhibit 18, | 5/18/03 Memo to Wise from Lippert/Lewis | 180 |
| Exhibit 19, | Policy for Sales Managers Sales Performance | 186 |
| Exhibit 20, | Wise 2002 Attendance Record | 191 |
| Exhibit 21, | Handwritten Notes | 204 |
| Exhibit 22, | 1/3/03-6/8/03 Typed Notes | 215 |

5

STIPULATION

It is agreed by and between the parties that all objections, except as to form of the question, are reserved until the time of trial.

It is further agreed by and between the parties that all motions to strike unresponsive answers are reserved until the time of trial.

It is further agreed by and between the parties that the sealing of the original deposition transcript is hereby waived.

It is further agreed by and between the parties that the notification to all parties of the receipt of the original deposition transcript is hereby waived.

6

FAITH LIPPERT, Witness, identified via Massachusetts driver's license and having been duly sworn, states as follows:

DIRECT EXAMINATION BY MS. GARROW:

Q. Good morning.
A. Good morning.
Q. As you are already aware, my name is Suzanne Garrow, and I'm the lawyer for Miss Wise, Mr. Massaconi, Mr. Martin, and Peter Corbin, as well as the other individuals who are similarly situated to them, and we're here today to take your deposition.
A. Okay.
Q. That was a very good response. I'm going to ask you to give audible response -- "yes," "no," "okay"; not "uh-huh" or "um-hum," because there's a court reporter here who's going to take down all of your testimony. So you need to give an audible response. Do you understand that?
A. Yes, I do.
Q. I am going to try very hard not to speak over you, and I'm going to ask you to do

7

the same, again because the court reporter is going to be taking down my questions and your answers, and she can't do that if you start speaking during the question or if I start speaking during your answer. Do you understand that?
A. Yes, I do.
Q. I'm going to ask you that if you don't understand a question that I've asked, that you ask me to either clarify or rephrase the question, okay?
A. Okay.
Q. If you don't do that, I'm going to assume that you understand the question as it's asked, so it's important that you understand the question that I'm asking, okay?
A. Okay.
Q. Have you taken any medications or any other substances that might impair your ability to testify truthfully and accurately as you sit here today?
A. No.
Q. Will you please state your full name and spell it for the record?

8

A. Faith Lippert. F-A-I-T-H L-I-P-P-E-R-T.
Q. Are you currently employed, Miss Lippert?
A. Yes, I am.
Q. Where are you employed?
A. I'm employed in Lanesborough, Massachusetts.
Q. Who is your employer?
A. Patriot Resorts Corporation.
Q. How long have you been employed by Patriot Resorts Corporation?
A. Since June of 2001 -- July maybe, 2001.
Q. And what is your current position with Patriot Resorts?
A. Office Manager and Human Resources Director.
Q. You testified before that you work in Lanesborough. Are you office manager only as to Patriot Resorts' Lanesborough location?
A. Correct.
Q. Are you human resources director only as to Patriot Resorts' Lanesborough location?

### Page 9

1  A. Correct.
2  Q. Does that Resorts in Lanesborough have
3  any other names; does it go by any other names?
4  A. Vacation Village in the Berkshires.
5  Q. Do you know what the legal status of
6  Vacation Village in the Berkshires is; in other
7  words, is it a separate entity, to your
8  knowledge?
9  A. I'm not sure.
10 Q. Have you held any other positions
11 other than the positions you are currently
12 holding today for Patriot Resorts?
13 A. No.
14 Q. Have you ever worked in any other
15 location other than the Lanesborough location of
16 Patriot Resorts?
17 A. With Patriot Resorts?
18 Q. Yes.
19 A. No.
20 Q. Have you -- I'm sorry, I believe I
21 asked this, but I just want to clarify. Have you
22 been working at Patriot Resorts since June 2001;
23 has that been your employer?
24 A. Yes.

### Page 10

1  Q. What are your responsibilities as
2  office manager of the Lanesborough location?
3  A. I oversee the administration end of it
4  as far as contracts -- sales contracting,
5  payroll, accounts payable. I work with the
6  attorneys when we do fundings, and I work with
7  escrow.
8  Q. What do you mean by administer sales
9  contracting; what does that mean?
10 A. Administration. I oversee the staff,
11 the administration staff.
12 Q. What are the general categories of
13 employees of the administration staff?
14 A. The girls that type up contracts, the
15 reception area. I oversee it, but I don't manage
16 it. Basic secretarial work.
17 Q. So you oversee the individuals who do
18 basic secretarial work?
19 A. Yes.
20 Q. How many people do you oversee?
21 A. There's five in my office, which would
22 be doing the contracting, and there's three out
23 in the Reception Center.
24 Q. You testified that you did not manage

### Page 11

1  those three. Who does?
2  A. Dennis Clavette.
3  Q. Where is Mr. Clavette physically
4  located?
5  A. In Lanesborough in the Reception
6  Center.
7  Q. Do you happen to know what his job
8  title is?
9  A. He's the manager of the Reception
10 Center.
11 Q. That is his job title?
12 A. Yes.
13 Q. Does he have any other titles, like
14 you have two that you testified to?
15 A. No.
16 Q. Any other duties -- strike that. You
17 said that you do payroll. What do you do -- what
18 are your payroll functions?
19 A. I do the office staff payroll, which
20 are the contracting girls, their payroll; the
21 Reception Center payroll; and I do commissions
22 for the salespeople.
23 Q. When you say you do it, what do you
24 mean by you do it -- what are your duties?

### Page 12

1  A. I gather the information and I print
2  it out to the system and I submit it to Fort
3  Lauderdale, and that is where they issue checks.
4  Q. Is that the same duties as to the
5  office staff folks, the Reception Center people,
6  and the commissions -- in other words, do you do
7  the same things, those duties you just specified
8  -- do you do the same thing as to all three
9  categories of employees?
10 A. I'm not sure I get what you're saying.
11 Q. For the office staff, you gather
12 information relating to their hours worked, is
13 that correct?
14 A. Yes, they have -- prior to a few
15 months ago, they had a time sheet that they
16 signed in on, and now we have a time clock.
17 Q. When did you get your time clock?
18 A. Oh, gosh, I'm not real sure. I would
19 say maybe six months ago or so.
20 Q. Who punches the time clock, which
21 employees?
22 A. Just the office staff, the Reception
23 Center.
24 Q. Do you gather their hours and input

# EXHIBIT 3

---

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
             Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
             Defendants

DEPOSITION OF REBECCA FOSTER CAMPAGNA

May 23, 2005, 10:10

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

3

INDEX

WITNESS:  REBECCA FOSTER CAMPAGNA

Direct Examination by Ms. Garrow

EXHIBITS

Exhibit 1,  Vacation Village Tour Times        51
Exhibit 2,  2004 Employee Handbook             56
Exhibit 3,  2001 Employee Handbook             61
Exhibit 4,  Employment Agreement               68
Exhibit 5,  Commission Structure Forms         84
Exhibit 6,  5/24/03 Memo Re: Hecht Comm.       86
Exhibit 7,  Corbin Commission Report           95
Exhibit 8,  Massaconi Check Stubs             112
Exhibit 9,  5/6/03 Memo Re: ESOP Procedures   125
Exhibit 10, Attendance Detail Report          126
Exhibit 11, 11/3/02 Memo Re: Attendance       127
Exhibit 12, Attendance Detail Report          127
Exhibit 13, Attendance Detail Report          129
Exhibit 14, Letter to ALDA from ESA           148
Exhibit 15, 12/22/04 Memo Re: New-Hires       150
Exhibit 16, 11/21/01 Memo Re: Policies        157
Exhibit 17, 12/21/01 Memo Re: Rotation        161
Exhibit 18, 6/9/03 Memos Re: Ms. Wise         167

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiffs


SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
     KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

4

1                    STIPULATION
2
3        It is agreed by and between the parties
4   that all objections, except as to form of the
5   question, are reserved until the time of trial.
6
7        It is further agreed by and between the
8   parties that all motions to strike unresponsive
9   answers are reserved until the time of trial.
10
11       It is further agreed by and between the
12  parties that the sealing of the original
13  deposition transcript is hereby waived.
14
15       It is further agreed by and between the
16  parties that the notification to all parties of
17  the receipt of the original deposition
18  transcript is hereby waived.
19
20
21
22
23
24

**Page 5**

1  REBECCA FOSTER CAMPAGNA, Witness, identified
2  via Florida driver's license and having been duly
3  sworn, states as follows:
4
5  DIRECT EXAMINATION BY MS. GARROW:
6   Q. Good morning, Miss Foster. I know
7  you've been to a couple of the depositions in
8  this matter. As you know, I'm Suzanne Garrow,
9  and I am the lawyer for LaCrisha Wise and Mr.
10 Massaconi and Mr. Martin and Mr. Corbin on behalf
11 of themselves and others who are similarly
12 situated. As you know, they filed a complaint
13 against you and the corporation in federal court.
14 Are you aware of that?
15  A. Yes, I am aware.
16  Q. I'm going to take your deposition
17 today, and I'm going to ask you that when I ask
18 you questions, that you give an audible response.
19 If you shake your head or say "uh-uh" or
20 "um-hum," it's not going to look like anything on
21 the transcript. I need you to give an audible
22 response, a "yes" or "no" or any explanation as
23 necessary. Is that understood?
24  A. I understand.

**Page 6**

1  Q. The other thing I'm ask you to do is
2  I'll ask you to let me finish my question and I
3  will try to let you do the same, let you finish
4  your answer, so we can have a clear record and so
5  the court reporter can get everything down that
6  you say and that I say, okay?
7   A. Okay.
8   Q. If you need a break of any kind, as
9  long as I'm not in the middle of a question or
10 you're not in the middle of an answer, I will
11 certainly accommodate you and you can tell me,
12 tell your lawyer, whatever is most comfortable to
13 you, okay?
14  A. Okay.
15  Q. I guess the other thing I'll ask you
16 to do is if you don't understand any question
17 that I've asked, I will ask you to ask me to
18 rephrase the question or to let me know that you
19 don't understand. The reason for that is if you
20 answer the question, I'm going to assume that you
21 understand the question as I have asked it, and I
22 want to make you make sure that you know what I'm
23 speaking of so that you can give me the most
24 accurate answer to the question possible, okay?

**Page 7**

1  A. Okay.
2  Q. Have you taken any medication or any
3  substance that might impair your ability to
4  testify truthfully or accurately as you sit here
5  today?
6  A. No, I have not.
7  Q. Would you please state and spell your
8  full name for the record?
9  A. My full name is Rebecca, R-E-B-E-C-C-A
10 Foster, F-O-S-T-E-R, Campagna, C-A-M-P-A-G-N-A.
11  Q. Do you go by Miss Foster or Miss
12 Campagna, just so I know in this context?
13  A. I go by Becky, but Foster is the name
14 that I use in work situations.
15  Q. I know there are some Campagnas who
16 work up here in Massachusetts. Are you a
17 relation to any of those folks?
18  A. No, I am not.
19  Q. Who is your employer?
20  A. Employed by the Berkley Group, Inc.
21  Q. How long have you been worked for the
22 Berkley Group?
23  A. Thirty-two years.
24  Q. Can you give me sort of a general

**Page 8**

1  summary -- I know thirty-two years is a very
2  solid career, so can you give me a general
3  summary of where you started with the Berkley
4  Group and your position as you sit here today?
5   A. 1973, I began working for a sales and
6  marketing company called Del Marketing -- that's
7  D-E-L Marketing. They did sales and marketing at
8  a second-home development called Lake Monticello,
9  and that's out of Charlottesville, Virginia.
10     I worked as the number three typist in
11 the sales office and I worked in that position
12 for approximately a year, after which time I
13 traveled from Lake Monticello to other
14 development companies that Del Marketing had
15 sales and marketing contracts with. And I would
16 set up the sales administrative office, train the
17 personnel; and I did that for probably three or
18 four years.
19     I later relocated with that company to
20 St. Petersburg, Florida under a sales and
21 marketing agreement that we had in St. Petersburg
22 with a hotel that was selling time-sharing.
23  Q. Did you work -- did you still work for
24 Del Marketing at that time?

**Page 9**

1   A.   I worked for Del Marketing at that
2   time.
3   Q.   Were you working on-site at the hotel?
4   A.   Actually, I worked for a while at the
5   hotel to train the employees, and then I moved to
6   the corporate office there in St. Petersburg.
7   Q.   The corporate office of Del Marketing?
8   A.   Del Marketing.
9   Q.   How long did you do that?
10  A.   I stayed there until 1981; and in
11  1981, I moved to the east coast of Florida
12  because the owner of Del Marketing sold his
13  interest to his partner in Del Marketing and the
14  company became all -- all the assets of the Del
15  Marketing were sold -- all of the contracts were
16  sold to the remaining partner, who formed the
17  company Del Management.
18       At that time, the marketing contracts
19  became the property of Del Management, and other
20  marketing and sales contracts were procured under
21  Del Management's name.  I continued to work in
22  the corporate office as well as a sales office
23  that was located there in Hollywood, Florida.  I
24  continued to work there until 1986, when the name

**Page 10**

1   of our company changed to the Berkley Group.
2   Q.   Do you happen to know why the name
3   changed in 1986?
4   A.   We moved our corporate headquarters to
5   an office building in Fort Lauderdale, Florida
6   that is called the Berkley South Condominium.
7   We occupy offices on the first floor, and we
8   decided that the -- we like the name, so we
9   adopted the name.  During the years from 1981
10  until 1994, I was the corporate secretary of the
11  company, and at some point in there, I became
12  vice president, but I don't remember the exact
13  year.
14  Q.   Who was the president when you became
15  vice president?
16  A.   James E. Lambert.
17  Q.   And who was the president when you
18  were corporate secretary?
19  A.   James E. Lambert.
20  Q.   And this is the Berkley Group which is
21  now called -- the Del Marketing which is now
22  called the Berkley Group at this time?
23  A.   Del Management, which was changed to
24  the Berkley Group.

**Page 11**

1   Q.   I misspoke, thank you, great.
2   A.   In 1994, the president of the company
3   decided to retire, or semi-retire, at which time
4   he sold the company to its employees.  1993,
5   1994.
6   Q.   Approximately how many employees were
7   employed by the Berkley Group at that time?
8   A.   I couldn't say with any degree of
9   accuracy.
10  Q.   Do you think it was more than a
11  hundred?
12  A.   It could have been.
13  Q.   Did everybody have an opportunity to
14  purchase stock in the company at that time -- was
15  it a stock sale?
16  A.   The ESOP is a complicated transaction,
17  and I don't know all of the legalities of it.
18  The employees did not make a conscious
19  decision -- I mean, there was no vote taken among
20  the employees, but everyone was -- everyone's
21  status, of course, as employees did not change.
22  It was just the way that the accounting for the
23  company, the way the company's ownership was
24  structured.  It had to do with structure more

**Page 12**

1   than anything.  And again, I'm not an expert on
2   that.
3   Q.   Do you know, did anything change with
4   your relationship to the company at that time?
5   A.   In January of 1994, I became the
6   president of the company.
7   Q.   Do you remain in that position today?
8   A.   Yes, I do.
9   Q.   Are you at the same location in the
10  Berkley -- is it Berkley Condominium?
11  A.   The Berkley South Condominiums, yes.
12  Q.   Have your offices grown in any way;
13  have you taken over more square footage or
14  anything, or have you remained in the same
15  location?
16  A.   We've remained in the same location.
17  We have, since the '80s -- we started occupying
18  that building in '86.  We have increased square
19  footage over that time period.
20  Q.   What is the most recent time?
21  A.   I really couldn't say.
22  Q.   Do you own the building?
23  A.   We own only the office suites that are
24  located on the first floor.

Page 13

```
 1      Q.  You occupy the entire first floor?
 2      A.  Not the entire.  There are some
 3  offices that are owned by others.
 4      Q.  So is it fair to say that you own all
 5  those office suites which you occupy?
 6      A.  That's correct.
 7      Q.  Can you name all the corporate
 8  officers currently in the Berkley Group?
 9      A.  The corporate officers -- myself as
10  president; Bruce Polansky, P-O-L-A-N-S-K-Y, vice
11  president of sales; Larry Hierholzer,
12  H-I-E-R-H-O-L-Z-E-R, vice president of marketing;
13  initials J.P. Ottino, O-T-T-I-N-O, III, vice
14  president of corporate acquisitions; Marc,
15  M-A-R-C, Landau, L-A-N-D-A-U, vice president of
16  finance, or chief financial officer; James E.
17  Lambert is the chairman of the Board.  And that
18  should be six.
19      Q.  Yes.  And you said that Mr. Lambert --
20  on or around the time you assumed the position as
21  president of the company, Mr. Lambert
22  semi-retired.  What was he doing for the company
23  at that time, after semi-retirement?
24      A.  He continues to offer sales and
```

Page 14

```
 1  marketing expertise to the Board.
 2      Q.  Is it your opinion that his position
 3  has been relatively unchanged since you assumed
 4  the position of president of the company?
 5      A.  No, his position has changed since
 6  1994.
 7      Q.  What has been the change, and when did
 8  it occur -- change or changes?
 9      A.  Prior to 1994, Mr. Lambert was in
10  charge of the corporate office there in the
11  Berkley South building.  He made all of the daily
12  operational decisions.
13      Q.  I guess my question -- let me be a
14  little clearer.  Since 1994 -- strike that.
15  Those two duties that you just enumerated, I'm
16  assuming that those are part of your duties
17  currently, is that correct?
18      A.  That's correct.
19      Q.  After 1984 when you assumed the
20  position of president and Mr. Lambert assumed the
21  position, basically conceded that position, yet
22  continues to offer sales and marketing, I guess,
23  was your testimony?
24      A.  You said 1984?
```

Page 15

```
 1      Q.  I'm sorry, 1994.  Since 1994 to the
 2  present, since you became president, has Mr.
 3  Lambert's position changed in any way after you
 4  became president; in other words, in that, let's
 5  say, from '95 forward?
 6      A.  Mr. Lambert's position diminished to
 7  the point that he is only involved in sales and
 8  marketing expertise.
 9      Q.  Have you ever been deposed before?
10      A.  Yes, I have.
11      Q.  How many times?
12      A.  I don't know that I could give you an
13  accurate number.
14      Q.  Have you been deposed in any actions
15  relating to any -- brought by any employees of
16  the company, the Berkley Group?
17      A.  No.
18      Q.  Any employees of Patriot Resorts, have
19  you been deposed in connection with any claims?
20      A.  Not until today.
21      Q.  Have you been -- let me ask a more
22  general question.  Have you been deposed with
23  regard to any employment claims relating to
24  employment or brought by employees in any matter,
```

Page 16

```
 1  I guess?
 2      A.  I was deposed in Virginia in relation
 3  to a sales and marketing contract we have there.
 4  One of the employees of Great Eastern Resort
 5  Corporation brought an action against Great
 6  Eastern.
 7      Q.  Were you individually named in that
 8  matter?
 9      A.  No, I was not.
10      Q.  To the best of your recollection, what
11  was the substance of the claims that employee was
12  making?
13      A.  She was making a claim under A.D.A.
14      Q.  So a disability discrimination suit is
15  your recollection?
16      A.  It grew into an A.D.A. claim.  I'm not
17  sure in the beginning exactly how it was worded,
18  but it really didn't survive much after our
19  depositions.
20      Q.  When you say "it didn't survive," did
21  you resolve the matter or did it get resolved by
22  a judge in any way or a jury?
23      A.  No, it was not resolved by a judge or
24  a jury.  Both parties resolved the matter between
```

```
                                    17
     the two.
 2      Q.  Is that a confidential settlement, to
 3   your recollection?
 4      A.  Yes, it is.
 5      Q.  What court was that in -- let me ask
 6   you this -- do you remember if it was state or
 7   federal court?
 8      A.  That's what I was trying to recall.  I
 9   don't really recall.
10      Q.  Do you remember the name of the
11   employee who brought the matter?
12      A.  Shari Brown.
13      Q.  About how long ago was that?
14      A.  That was probably a year or so ago.
15      Q.  Where in Virginia?
16      A.  Harrisonburg, Virginia.
17      Q.  What's the resort -- was there a
18   resort that was the subject matter as well as the
19   lawsuit?
20      A.  Great Eastern Massanutten Resort.
21      Q.  Any other depositions in relation to
22   any employment matters at any of the resorts?
23      A.  There was a sexual harassment claim in
24   the '90's -- I don't remember what year -- at
```

```
                                    18
 1   Massanutten Resort.
 2      Q.  It sounds like you have not been
 3   deposed in relation to any employment matters at
 4   the Vacation Village location, is that correct?
 5      A.  Vacation Village...
 6      Q.  In the Berkshires, I'm sorry.
 7      A.  No, I have not.
 8      Q.  What about other Vacation Village
 9   locations?
10      A.  Not that I can recall.
11      Q.  Can you recall if there have been any
12   claims of violations of the wage and hours
13   status, either state or federal, at any of the
14   locations, any of the resorts that you are
15   responsible for?
16      A.  There have not been any that I am
17   aware of.
18      Q.  I've been trying to choose my words in
19   a certain way, but I'm going to ask you so I can
20   understand the relationship.  Now, your employer
21   is the Berkley Group, and who employs, for
22   instance, Bill Rauer; who is his employer, to
23   your knowledge?
24      A.  Bill Rauer works for Tower Resorts
```

```
                                    19
 1   Realty.
 2      Q.  What about Rod Lewis?
 3      A.  Rod Lewis works for Patriot Resorts
 4   Corporation.
 5      Q.  What about the other corporate
 6   officers; everybody work for Berkley Group who
 7   are -- I guess those are corporate officers of
 8   the Berkley Group I asked, correct?
 9      A.  That's correct.
10      Q.  Are they employed by any other entity?
11      A.  Mr. Polansky, because he has a sales
12   -- a Florida sales real estate license, may
13   receive some commission from Tower Resorts
14   Realty, but I don't know that for a fact.
15      Q.  Tower Resorts Realty -- what is Tower
16   Resorts Realty, their relationship to the Berkley
17   Group?
18      A.  Tower Resorts Realty is owned by the
19   Berkley Group.
20      Q.  Are there certain resorts that are run
21   by Tower Resorts Realty?
22      A.  Not really.  Tower Resorts Realty is
23   the brokerage that must employ licensed real
24   estate agents in the State of Florida.
```

```
                                    20
 1      Q.  Are all the people who sell -- let me
 2   strike that.  Do the people who sell time-shares
 3   in Florida, do they have real estate licenses?
 4      A.  Most of them do.
 5      Q.  Are they required to?
 6      A.  They are not required to; they are
 7   only required -- well, let me start over.  They
 8   are required to have a real estate license in
 9   order to transact time-share sales, yes.
10      Q.  To my understanding, that's not true
11   in Massachusetts, is that correct?
12      A.  As far as I know, it is not true.
13      Q.  What about the other locations; what
14   are the other states in which -- actually, let me
15   strike that.  Can you tell me the other companies
16   other than Tower Resorts Realty that are owned by
17   the Berkley Group?
18      A.  Berkley Vacation Resorts -- let me
19   make sure I understand your question.
20      Q.  Let me ask it this way.  You testified
21   that Tower Resorts Realty is owned by the Berkley
22   Group?
23      A.  Correct.
24      Q.  Is Patriot Resorts owned by the
```

Page 21

1  Berkley Group?
2     A.  That is correct. It's a wholly owned
3  subsidiary.
4     Q.  Now, you made that distinction. Is
5  the Tower Resorts Realty something other than a
6  wholly owned subsidiary?
7     A.  It is also a wholly owned subsidiary.
8     Q.  What other wholly owned subsidiaries
9  are owned by the Berkley Group?
10    A.  I gave you Berkley Vacation Resorts.
11 Lando Resort Corporation, Hollywood Resorts
12 Corporation, Shoreline Resorts Corporation -- or
13 actually I think that's incorporated. Key Resort
14 Corporation, Williamsburg Plantation, Inc.,
15 Eldorado Resorts Corporation, East Coast Resorts
16 -- I'm sorry, East Ocean Resorts, Inc., South
17 Coast Resorts, Inc. or Corporation. When I say
18 corporation, it could be incorporated; I don't
19 remember exactly.
20    Q.  Are these all corporations?
21    A.  They are all corporations.
22    Q.  Do they all, to your knowledge, have
23 the same corporate structure?
24    A.  I'm not sure what you mean by that

Page 22

1  question.
2     Q.  Are any of them LLC's or LLP's, or do
3  they all follow the same -- are they
4  S-corporations; I mean, do you know what...
5     A.  I do not know -- I know there are no
6  LLC's that I have named. I don't know whether
7  it's a sub-S.
8     Q.  South Coast Resorts was the last
9  wholly owned subsidiary that you named. Can you
10 think of any others?
11    A.  I'm sure there are other small ones,
12 but I can't remember them right now, I'm sorry.
13 There's Lando Resorts Realty.
14    Q.  As opposed to Lando Resorts
15 Corporation?
16    A.  There's two Landos.
17    Q.  So what is the -- what does Tower
18 Resorts Realty do?
19    A.  Tower Resorts Realty is the brokerage
20 company whose salespeople conduct sales for
21 Berkley Vacation Resorts.
22    Q.  Are the salespeople employed by Tower
23 Resorts Realty?
24    A.  Yes, they are.

Page 23

1     Q.  Do they have an employment agreement,
2  to your knowledge?
3     A.  Yes.
4     Q.  Are there any employees at Berkley
5  Vacation Resorts?
6     A.  There probably are. I'm not sure how
7  many.
8     Q.  When you say that, are you -- what are
9  you thinking of; perhaps people who work in the
10 office, might they be employed by Berkley
11 Vacation Resorts?
12    A.  The office staff is generally employed
13 by the development company.
14    Q.  And is Berkley Vacation Resorts the
15 development company?
16    A.  Yes.
17    Q.  Who are the corporate officers of
18 Tower Resorts Realty?
19    A.  J P. Ottino, III, and Marc Landau.
20    Q.  What about Berkley Vacation Resorts?
21    A.  Myself and Marc Landau.
22    Q.  Is Tower Resorts Realty the entity
23 that is responsible for all time-share sales --
24 for your time-share sales in Florida?

Page 24

1     A.  No.
2     Q.  Is it only a Florida corporation or --
3  let me strike that. Are there only time-shares
4  in Florida that are being sold by the folks at
5  Tower Resorts?
6     A.  That's correct.
7     Q.  What locations do they sell?
8     A.  Vacation Village at Weston, Canada
9  House Resort, Hollywood Beach Tower Resort,
10 Golden Strand Resort.
11    Q.  Is that the --
12    A.  I believe that's all of them.
13    Q.  Is Berkley Vacation Resorts the
14 development company for all those locations?
15    A.  No.
16    Q.  Who is or -- let me ask it this way.
17 Berkley Vacation Resorts is the development
18 company for which of those, if any?
19    A.  Vacation Village at Weston.
20    Q.  Is that it?
21    A.  That's it.
22    Q.  Who is the development company for
23 Golden Strand?
24    A.  That would be South Coast Resorts.