25

1    Q.    Does South Coast -- are they the
2    development company for any other locations?
3    A.    No.
4    Q.    How about the Hollywood Beach Resort;
5    what is the development company for Hollywood
6    Beach Resort?
7    A.    Hollywood Resorts is the development
8    company.  The resort is Hollywood Beach Tower.
9    Q.    So the resort is the development
10    company?
11    A.    No, the resort is the resort.  The
12    development company is the company who owns
13    inventory at that resort.
14    Q.    Is that Hollywood Resorts Corporation?
15    A.    At Hollywood Beach Tower, it is
16    Hollywood Resort, Inc. or Corporation -- I'm not
17    sure which.
18    Q.    I understand.  Does Hollywood Resorts
19    Corporation, are they the development company for
20    any other location?
21    A.    I believe they own some inventory at
22    Costa del Sol, C-O-S-T-A D-E-L S-O-L.
23    Q.    That was a name that you did not
24    mention.  Is that another --

26

1    A.    That is a resort.
2    Q.    So it's not a corporation; that is
3    simply a resort?
4    A.    That's the name of the resort where
5    the inventory is located.
6    Q.    Do you know who owns what corporation,
7    if any own Costa del Sol?
8    A.    The owners' association own the
9    property.
10    Q.    Do you know who is responsible for
11    sales at Costa del Sol?
12    A.    If it's -- if inventory is sold that
13    is owned by Hollywood Resorts Corporation, a
14    Tower Resorts Realty salesperson would sell it.
15    Q.    I believe you mentioned another
16    location, is it Canada House?
17    A.    Canada House Resort, Shoreline Resort
18    is the developer who owns inventory at Canada
19    House Resort.
20    Q.    Who would sell at Canada Resort?
21    A.    Employees of Tower Resorts Realty.
22    Q.    How many locations are there owned by
23    Patriot Resorts?
24    A.    There is one.

27

1    Q.    Is that -- is Patriot the development
2    company?
3    A.    Patriot Resorts owns Vacation Village
4    in the Berkshires.
5    Q.    Does Patriot Resorts have employees?
6    A.    Yes, it does.
7    Q.    Are those the salespeople and sales
8    managers who work at the location?
9    A.    As well as the administrative staff.
10    Q.    You mentioned Lando Resort Realty and
11    Lando Resort Corporation or Incorporated.  Lando
12    Resort Realty, is that a development company?
13    A.    Lando Resort Corporation is the
14    development company, Lando Resort Realty is the
15    real estate brokerage.
16    Q.    When you say "real estate brokerage,"
17    is that -- do they perform a similar function
18    than being the -- are there employees of Lando
19    Resort Realty?
20    A.    Yes.
21    Q.    Among those people are sales people,
22    is that correct?
23    A.    The licensed real estate agents, yes.
24    Q.    Do those licensed real estate agents

28

1    perform essentially the same function for Lando
2    Resorts Corporation as the licensed sales
3    representatives at Tower Resorts do for their
4    various companies, including Vacation Village at
5    Weston?
6    A.    That's correct.  Vacation village at
7    Weston is the resort.  The development company is
8    Berkley Vacation Resort.  And to clarify, Lando
9    Resort is L-A-N-D-O.
10    Q.    Lando Resort in both those instances,
11    realty and corporation?
12    A.    Yes.
13    Q.    Is there a board of directors at
14    Patriot Resorts?
15    A.    Yes, there is.
16    Q.    Who is on the board of Patriot?
17    A.    Myself, Marc Landau, and J.P. Ottino.
18    Q.    Anybody else?
19    A.    No.
20    Q.    What about Lando Resorts Realty; is
21    there a board of directors there?
22    A.    Yes, there is.
23    Q.    Who is on that board?
24    A.    Marc Lando and myself.

125

```
1     A.   Correct.
2              (Exhibit 10, Patriot Attendance
3              Detail Report, marked for
4              identification)
5     Q.   (By Ms. Garrow)  Are you familiar with
6  this document?
7     A.   It's an attendance -- it appears to be
8  an attendance record.
9     Q.   That's Plaintiff's Exhibit 10 you're
10 looking at now?
11    A.   Yes.
12    Q.   Have you seen an attendance record
13 before for any employees?
14    A.   Yes, I have seen them before.
15    Q.   Does this look generally like the ones
16 you've seen in the past?
17    A.   It looks like a report we used to use,
18 yes.
19    Q.   You don't use this report anymore?
20    A.   No, the report has been changed.  We
21 got a different program.
22    Q.   But do you still keep the same data?
23    A.   Yes.
24    Q.   What is this data?
```

126

```
1     A.   It's attendance.  It's any time that
2  someone is on vacation or if they're out sick or
3  if they're on any type of FMLA leave or any
4  reason they're not there.
5     Q.   Have you, in the past, input into the
6  attendance policy?
7     A.   Yes, I'm aware of what our policy is.
8     Q.   What is your policy?
9     A.   That salespeople are allowed to have
10 fifteen days of time off during the calendar
11 year.
12             (Exhibit 11, 11/3/02 Memo to
13             Sales Staff Re: Attendance
14             marked for identification)
15    Q.   (By Ms. Garrow)  If you look at
16 Exhibit 11, is that your policy -- let me ask you
17 this.  Was this the policy that you just spoke of
18 that was in effect on or around November 3, 2002?
19    A.   I'm sorry, what was the question?
20    Q.   Was that the policy that was in
21 effect, Plaintiff's Exhibit 11, on or around
22 November 3, 2002?
23    A.   Correct.
24    Q.   Has it changed at all?
```

127

```
1     A.   Not that I'm aware of, no.
2     Q.   Is that the policy as it exists today
3  as well?
4     A.   Yes.
5             (Exhibit 12, Patriot
6             Attendance Report,
7             marked for identification)
8             (Exhibit 13, Patriot
9             Attendance Report,
10             marked for identification)
11    Q.   (By Ms. Garrow)  Showing you what's
12 Exhibit Number 12, if you look at Exhibit Number
13 12 and Exhibit Number 10, would you expect that
14 -- are those employees in compliance with the
15 policy based on these documents or in violation
16 of the policy?
17    A.   It would appear that they may not be,
18 but because of the reference to sick, I don't
19 know if they were afforded FMLA leave for that.
20    Q.   Assuming that they hadn't been on FMLA
21 leave, would they be in violation of the policy?
22    A.   Yes.
23    Q.   Has anyone ever talked to you about
24 either of these individuals being in violation of
```

128

```
1  the policy?
2     A.   I do not recognize Jane Engel-Hart's
3  name at all.  I don't know who that is.  Will
4  Steele's name is familiar to me, and I've had
5  conversations about him, but not necessarily
6  attendance, or attendance may have been one of
7  them; but there have been conversations about
8  him, so I recognize the name.
9     Q.   I guess my question is a little more
10 directed.  Do you have a recollection whether
11 anybody brought his attendance to your attention?
12    A.   I don't recall attendance being an
13 issue.
14    Q.   We were talking before about jury duty
15 and jury duty in Massachusetts; and if you
16 notice, I've given you another attendance detail
17 report, is that correct?
18    A.   Correct.
19    Q.   If you go down about a third of the
20 way through the absence reason, it notes jury
21 duty?
22    A.   Yes.
23    Q.   It says that's unpaid.  Do you have
24 any recollection about the issue of jury duty
```

# EXHIBIT
4

Vol. I, 136 Pgs.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-CV-30091-MAP

```
_____

LACRISHA WISE, MICHAEL MASSACONI,       )
ROGER MARTIN and PETER CORBIN, on       )
behalf of themselves and on behalf      )
of others who are similarly situated.   )
              Plaintiffs                )
vs.                                     )
                                        )
PATRIOT RESORTS CORP., THE BERKLEY      )
GROUP, INC., MARC J. LANDAU, J.P.       )
OTTINO, III, REBECCA A. FOSTER, and     )
JAMES E. LAMBERT                        )
              Defendants                )
-------------------------------------
```

DEPOSITION OF MICHAEL V. MASSACONI

Friday, May 20, 2005

1:30 p.m.

SKOLER, ABBOTT & PRESSER, P.C.

One Monarch Place

Springfield, Massachusetts  01144

- - - Denise D. Harper-Forde, RPR, LCR - - -

COURT REPORTING SERVICES

P.O. Box 15272

Springfield, Massachusetts  01115

(413) 786-7233  FAX (413) 786-0299

Page 14

1    A.    A T.O. is a Manager or Closer, as
2  they would like to be known as.
3    Q.    And you suggested that Mr. Rauer
4  approached you a second time to become a Sales
5  Manager?
6    A.    From the first time he approached
7  me to the second time it was probably two
8  months, and then they hired outside Managers.
9    Q.    In the two-month span?
10    A.    Yes.
11    Q.    Who were the outside Managers
12  hired?
13    A.    They brought in John Bourden, and
14  then they brought up a gentleman from
15  Virginia.  He was there for a couple of days
16  and left.  That would have been Dave Mercurio.
17    Q.    Going back for a minute to the
18  first time that Mr. Rauer approached you about
19  becoming a Sales Manager.
20        You stated that you spoke with
21  Mr. Leete and Mr. Rauer.  Was there anyone
22  else you spoke with about becoming a Sales
23  Manager at that time?
24    A.    No.

Page 15

1    Q.    Okay.  And was Mr. Bourden and
2  Mr. Mercurio the only two Sales Managers that
3  were hired from the outside during that
4  two-month time frame?
5    A.    No.  I think they promoted one
6  other person.
7    Q.    Okay.  But as far as hired from
8  the outside, though?
9    A.    In other words, they would hire
10  someone from the outside, and tell them work a
11  month and then you're a Manager.
12    Q.    So who was the other person that
13  was promoted?
14    A.    I think it was Kenneth Flanders,
15  and Gary Campagna.
16    Q.    Could you tell me about your
17  second conversation with Mr. Rauer about
18  possibly becoming a Sales Manager?
19    A.    I told him I was interested in
20  that position.
21    Q.    So at the second instance you
22  approached him?
23    A.    Yes.
24    Q.    What prompted you to do that?

Page 16

1    A.    Seeing people come into Vacation
2  Village with less experience than I had, and
3  make more money than me.
4    Q.    How did you know they were making
5  more money than you?
6    A.    Because they get a -- I'm trying
7  to figure out the term.  They get a percentage
8  of what I would close on.  In other words, if
9  I sold a 10,990 deal.  They were the Manager,
10  and they would get one percent of that.  One
11  and a half percent.
12    Q.    Okay.  You explained to me
13  earlier what your pay structure was when you
14  began.  Prior to the time you became a Sales
15  Manager, did that pay structure change at all?
16    A.    Yes.  It decreased.  When we
17  started we were getting six months with the
18  $300.  And then we went down to just straight
19  commissions.  We went from ten percent to
20  eight percent.
21        MS. FABBO:  Could you mark that,
22    please?
23        (Whereupon, Defendant's Exhibit
24    1, Pay Schedule dated 8-6-01,

Page 17

1        marked for identification)
2        (BY MS. FABBO):
3    Q.    Mr. Massaconi, the document that
4  has been marked Exhibit one and is in front of
5  you indicates that it was signed by you on
6  August 6, 2001.  Is that your signature, sir?
7    A.    Yes, it is.
8    Q.    And was August 6th your start
9  date?  Or do you believe you started before
10  that?
11    A.    No.  We had a meeting prior to
12  that.  Everyone down there.  Then they told us
13  we would come back and start on this date.  So
14  we did meet with them earlier.
15    Q.    Okay.  So your first actual day
16  of active employment was August 6th?
17    A.    Right.
18    Q.    Okay.  Is the pay schedule that's
19  reflected in here, the pay schedule or the way
20  you were paid, the method of payment, at the
21  beginning of your employment?
22    A.    That's correct.
23    Q.    And it suggests that you would be
24  receiving a bonus pay until the end of 2001.

1    A.    It varied at times. Jud Kuzia,
2  Steve Alibozek, Beth Torra, John Rutherford,
3  Owen Broch. That's just about all that I can
4  remember right now. Oh, there were some that
5  came and left as soon as they came like Will
6  Spaulding, John Wills.
7    Q.    Was there an average number of
8  people on your team at any particular time?
9    A.    I would say two, and then four.
10   Q.    Two or four full-time people?
11   A.    Yes.
12   Q.    And when you said -- you said you
13 oversaw your team or something to that effect.
14 Can you tell me what types of things you would
15 oversee?
16   A.    Whatever my boss would tell me in
17 the Manager's meeting, I would have to relate
18 to the team. Pertaining to what they were
19 looking for that week or that day. In
20 sales or in conduct and attitude.
21   Q.    You stated that you were
22 responsible for checking on deals. What does
23 that mean?
24   A.    If I or one of the people that

1  were working for me closed a deal today. And
2  in 14 or 21 days later they do not receive a
3  paycheck, I would go see the young lady
4  sitting next to you?
5    Q.    Ms. Lippert?
6    A.    Yes. And I would try to find out
7  why they weren't receiving their money.
8    Q.    And can you recall any employees
9  that you did that for?
10   A.    I would say Jud, Owen, Beth,
11 myself. Almost everyone at one point in time.
12   Q.    And was Ms. Lippert able to
13 provide you with the information? Or research
14 it and get back to you?
15   A.    At times. Or the corporate
16 office was closed, because she was dealing
17 with the corporate office. So we had to wait
18 until we get back to work. Then she would
19 usually contact that individual herself.
20   Q.    What individual?
21   A.    Whoever I went to check on.
22   Q.    Okay. So you would come on
23 behalf of one of your employees, and Ms.
24 Lippert would get back to the employee

1  directly?
2    A.    Right.
3    Q.    Can you think of any instances
4  where she did not respond to an inquiry?
5    A.    Maybe she was overwhelmed at
6  times from corporate, where things got tucked
7  away for a couple of days. But the process
8  changed several times.
9    Q.    Okay.
10   A.    And the last one was we couldn't
11 go to her. We had to go to the head
12 receptionist, which was Dennis, to find out if
13 we had cancellations.
14       And then they would post a pay
15 sheet telling us who was getting paid in the
16 sales lounge or the pit. However you want to
17 describe it.
18   Q.    How frequently would that list be
19 posted?
20   A.    It was posted weekly. And there
21 were some omissions where it wasn't posted.
22   Q.    Can you think of any reason that
23 it was not posted?
24   A.    I couldn't tell you the reasons,

1  but I know there were several times that it
2  wasn't posted. It was either left on Ron
3  Lewis desk or one of our closing officers.
4  But there times when it wasn't posted at all.
5    Q.    And when it was not posted, did
6  you do anything to find out why it was not
7  posted?
8    A.    Yes, we would. We would go
9  through our supervisors, through the chain of
10 command to find out how come it wasn't posted.
11 Usually it was corrected right away.
12   Q.    You mentioned that one of your
13 responsibilities was bringing employee issues
14 to Mr. Leete's attention. Could you tell me
15 when you had occasion to do that? On what
16 issues?
17   A.    Issues where other people were
18 late from the other line. And they didn't
19 attend the meetings, but yet were put right
20 out in regular rotation ahead of the people
21 who had attended the meetings. They were put
22 on overage.
23   Q.    Can you think of anyone who was
24 one of those employees that was late and put

1  that time?
2      A.    Yes.
3      Q.    And you said that they were
4  allowed to leave the grounds.  What was the
5  rule on Mr. Leete's team?
6      A.    You couldn't leave the grounds.
7      Q.    At all?
8      A.    Those were the rules.
9      Q.    Were you allowed to leave if you
10 got permission from Mr. Leete?
11     A.    Yes.  In the beginning it was
12 from Mr. Leete, and then it went to Faith.
13 Then it went to Dennis.  It changed
14 periodically.
15         They had to know where you were,
16 and you had to know your position in the line.
17 Otherwise you went to the bottom of the line.
18     Q.    Okay.  And Mr. Stenslind, to your
19 knowledge, did not require people to tell him
20 where they were going to be?
21     A.    No.
22     Q.    He did not?
23     A.    No.  Anything else that was
24 different between Mr. Stenslind and Mr. Leete

1  that may have contributed to what you
2  described as bad feeling between the two
3  lines?
4         MR. FELDMAN:  Objection.  Go
5      ahead.
6         THE WITNESS:  Policies are
7      written to be guidelines.  When
8      people who work in the same group of
9      people don't abide by those
10     guidelines, there is chaos.  And
11     that's what took place 90 percent of
12     the time.
13     (BY MS. FABBO):
14     Q.    Okay.  Are you saying Mr.
15 Stenslind was loose on enforcing policy, and
16 Mr. Leete was not?
17     A.    That's correct.
18     Q.    Can you think of some of the
19 other policies other than the ones you've
20 mentioned where they differed?
21     A.    Tardiness, taking tours out.  Mr.
22 Stenslind would sign for them himself, and
23 give that person a free ride.  Or he would
24 sign his name on my sheets.

1      Q.    What does that mean?
2      A.    In other words, after 2002 we
3  were supervised on numbers.  Meaning numbers
4  of tours.  Numbers of times I sat at different
5  people's tables and I didn't close deals.
6         Mr. Stenslind got caught writing
7  my name on slips of paper where I was the one
8  that was underlined for sitting on that table
9  or taking a tour.
10     Q.    And how would that impact you?
11     A.    Well, I will give you an example.
12     Q.    Okay.  That's great.
13     A.    If I had two tours today, and I
14 did not sell any of them.  Mr. Stenslind would
15 put me down for another tour which I never saw
16 or never took.  So it would mean three.
17         So come the end of the week, my
18 boss would come up to me and say Michael
19 you've had eight tours for the week, and you
20 only sold two people.  And I would write my
21 tours down in a book every single day, and the
22 numbers were never ever the same.
23     Q.    Did you bring that to Mr. Leete's
24 attention?

1      A.    I brought it to Mr. Leete's
2  attention.  I brought it to Mr. Rauer's
3  attention.  I brought it to Mr. Lewis' attention.
4  On occasions they caught it at the front desk
5  and changed it, but they would never tell me
6  how it got there.
7      Q.    Did you provide them with a copy
8  of the tours you had in the book?
9      A.    Oh, yes.
10     Q.    And do you still have that book?
11     A.    Yes, I do.
12     Q.    Okay.  Do you have any -- did Mr.
13 Stenslind ever inform you as to why he was
14 doing this?
15     A.    No.  All he did was apologize for
16 it when they caught him.
17     Q.    Apologize to you or to someone
18 else?
19     A.    No.  He apologized to me prior to
20 me getting into my car.
21     Q.    And when was that?
22     A.    I would say some time in 2003.  I
23 was unaware of it until it was brought to my
24 attention.

Page 42

```
 1   and 25,000.
 2       Q.   For the 18 month period?
 3       A.   Yes.
 4       Q.   So do you know why -- did anyone
 5   express to you why you had a decrease in
 6   requests to sit at tables?
 7       A.   No.
 8       Q.   Did you have any suspicion as to
 9   why?
10       A.   I wasn't Spiffing people.
11       Q.   Okay.  Was there a time that you
12   were allowed to spiff people?
13       A.   A time when I was allowed?
14       Q.   Yes?
15       A.   Maybe six months.  The first six
16   months that I became a Manager, but I didn't
17   have any money to give to other people.
18       Q.   After the six-month period, was
19   Spiffing stopped all together?
20       A.   No.  It still continues until
21   today.
22       Q.   Was there any time that you did
23   spiff people?
24       A.   No.
```

Page 43

```
 1       Q.   Is there any reason?
 2            MR. FELDMAN:  Objection.  Go
 3       ahead.
 4            THE WITNESS:  No money.
 5            (BY MS. FABBO):
 6       Q.   You didn't have any money?
 7       A.   No.
 8       Q.   The spiff comes out of --
 9       A.   -- the Manager's pocket.
10       Q.   And who were the Managers that
11   did spiff people?
12       A.   Paul Stenslind, Dave Mercurio,
13   Kenny Flanders.
14       Q.   Anyone else?
15       A.   Not to my knowledge.
16       Q.   Could you take a look at this
17   document, sir.  And let me know if this is the
18   employment agreement that you signed at the
19   beginning of your employment or around the
20   beginning of your employment with Patriot?
21       A.   That's my signature.
22            MS. FABBO:  Could you mark that,
23       please.
24            (Whereupon, Defendant's Exhibit
```

Page 44

```
 1            2, Employment Agreement, marked
 2       for identification)
 3            (BY MS. FABBO):
 4       Q.   Do you recall who from Patriot
 5   Resorts presented you with this agreement?
 6       A.   Excuse me?
 7       Q.   Do you recall who from Patriot
 8   Resorts presented you with this agreement?
 9       A.   No, I do not.
10       Q.   Did you read it before you signed
11   it?
12       A.   Yes, I did.
13       Q.   Did you sign it at the same time
14   you received it?
15       A.   Excuse me?
16       Q.   Did you sign it on the same day
17   you received it?
18       A.   I think I did.
19            MR. FELDMAN:  Can I go off the
20       record for a minute.
21            (Off the record)
22            (Back on the record)
23            (BY MS. FABBO):
24       Q.   Are you currently employed?
```

Page 45

```
 1       A.   No, I'm not.
 2       Q.   Have you been employed at all
 3   since your separation from Patriot?
 4       A.   No, I have not.
 5       Q.   Are you receiving unemployment?
 6       A.   Am I getting unemployment?
 7       Q.   Yes?
 8       A.   Yes.
 9       Q.   How much?
10       A.   $528.
11       Q.   Per week?
12       A.   Yes.
13       Q.   And how long have you been
14   receiving that?  Since when?
15       A.   March sometime.
16       Q.   March of 2005?
17       A.   Yes.
18       Q.   Are you looking for a job?
19       A.   Yes.
20       Q.   You were demoted from Sales
21   Manager; is that correct?
22       A.   Yes, I was.
23       Q.   And when was that?
24       A.   September.
```

Page 46

```
 1    Q.   2004?
 2    A.   2005 -- 2004, excuse me.
 3    Q.   And other than the demotion, did
 4  you ever receive any written disciplinary
 5  action from Patriot Resorts?
 6    A.   Written disciplinary action?
 7    Q.   Yes?
 8    A.   Did I sign?
 9    Q.   Did you get any?
10    A.   I received them, but I never
11  received anything other than the probation
12  period that I got in July of 2004.
13    Q.   And what was that for?
14    A.   My numbers went above ten.
15    Q.   What does that mean?
16    A.   It means that I was put on
17  probation.
18    Q.   What does above ten mean?
19    A.   It's a number that the company
20  comes up with for sales. It's like a batting
21  average. If it goes over ten, I'm not allowed
22  to sit on tables.
23         And I was put on probation, and
24  at the end of that same day I sold two deals
```

Page 47

```
 1  and came off probation that same day in July.
 2  I was never put on probation other than '04
 3  when Bill Rauer put me on it.
 4    Q.   You said the numbers above ten.
 5  Does that mean if you're only making one sale
 6  out of ten?
 7    A.   It could be if you had 50 tours
 8  or only had one tour, and you only sold one,
 9  because it was a 60 day rotation. They put in
10  the changes everyday. So you lose deals and
11  you lose tours everyday.
12    Q.   Okay. But I'm trying to figure
13  out in layman's terms what above ten means?
14    A.   Okay. If I go above ten as a
15  Manager, I was told I could not sit on tables
16  to close deals.
17    Q.   But I don't know what ten is.
18  What does ten represent?
19    A.   It's an average.
20    Q.   An average of how many you close?
21    A.   No. Just an average of my sales.
22    Q.   Would that mean out of ten?
23    A.   It could be one out of ten;
24  correct. Or it could be zero out of ten.
```

Page 48

```
 1    Q.   Okay. Is this the July, '04
 2  probation that you referenced? Is this
 3  documentation of it?
 4    A.   Yes.
 5         MS. FABBO: Could you mark that,
 6    please.
 7         THE WITNESS: I was put on and
 8    taken off the same day.
 9         (Whereupon, Defendant's Exhibit
10    3, Sales Performance Letter,
11    dated 7-11-04, marked for
12    identification)
13         (Whereupon, Defendant's Exhibit
14    4, Sales Performance Letter,
15    dated 7-12-04, marked for
16    identification)
17         (BY MS. FABBO):
18    Q.   The document that has been marked
19  as Exhibit 3. Is that your signature on it?
20  Dated July 11, 2004?
21    A.   Yes, it is.
22    Q.   Okay. And I just want to make
23  sure I understand this ten number. Because on
24  here it says you need to get your sales ratios
```

Page 49

```
 1  back into acceptable limits of 8.99 or better.
 2  Do you know what that means?
 3    A.   It means when you hit 8.99,
 4  you're going to be going on probation. At
 5  ten you're not allowed to sit on tables.
 6    Q.   Okay. So you were notified of
 7  this on July 11th; is that correct?
 8    A.   That's correct.
 9    Q.   And the next Exhibit, Exhibit 4,
10  is dated July 12th. Did you receive
11  notification on July 12th that you were off
12  probation?
13    A.   I received it the same day.
14    Q.   Okay.
15    A.   On the 11th in the afternoon. I
16  was given this in the morning.
17    Q.   But it is dated July 12th;
18  correct? Is it possible you just put the
19  wrong date on the first one?
20    A.   No.
21    Q.   Okay. You signed the second one?
22    A.   Yes, I did.
23    Q.   And it's dated July 12th, would
24  you agree?
```

Page 50

1    A.    Would I say I signed it?  It
2  doesn't quite look my signature.  Some of it
3  is unique and some of it isn't.  I don't know
4  if that is my signature or not.
5    Q.    Do you have any recollection of
6  signing it?
7    A.    I remember Gordon giving it to
8  me.
9    Q.    And you recall that was the same
10 day?
11   A.    It was the same day; correct.
12   Q.    Okay.  And then were you ever put
13 on probation again for your sales numbers?  Or
14 your sales ratio, I should say?
15   A.    No.
16   Q.    Were you ever aware -- did anyone
17 bring to your attention any complaints that
18 your co-workers had about you?
19   A.    No.
20   Q.    Did anyone bring to your
21 attention any complaints that customers or
22 potential customers had about you?
23   A.    No.
24   Q.    Who informed you that you were

Page 51

1  demoted from Sales Manager?
2    A.    Bill Rauer.
3    Q.    And what did he say?
4    A.    He told me exactly that I was
5  demoted, and I get 30 days to get my numbers
6  up or I would lose my team.
7    Q.    And what were your numbers at the
8  time, do you know?
9    A.    No.  I can't recall.
10   Q.    Were they -- did you feel that
11 your numbers were sufficient at that time?
12        MR. FELDMAN:  Objection.  Go
13 ahead.
14        THE WITNESS:  No.
15        (BY MS. FABBO):
16   Q.    Are you aware of any complaints
17 -- or complaints made by Gary Campagna about
18 you or your attitude?
19   A.    No.
20   Q.    Do you know of anyone else who
21 was demoted because of their sales ratio or
22 their sales numbers?
23   A.    Mark Lapine, Kenny Flanders, and
24 Bill Lee.

Page 52

1    Q.    Did you protest your demotion to
2  anyone at Patriot Resorts?
3    A.    At that time it was Mr. Campagna.
4  He just got promoted the last time I got --
5  when Mr. Rauer put me on probation, they just
6  made him Line Director that day.
7    Q.    You protested to him?  Is that
8  what you are saying?
9    A.    Yes.
10   Q.    What did you say to him?
11   A.    That there were other Managers in
12 the same category as I was where the numbers
13 were low.  More than ten.
14   Q.    Okay.  And what did he say?
15   A.    He would look into it.
16   Q.    And who are the other Managers?
17   A.    I would say I think there may
18 have been three or four of them.  Gary
19 Campagna, Mike Campagna, Kenny Flanders.  I am
20 trying to think who else.
21   Q.    And you're telling this to which
22 Campagna?
23   A.    Gary.
24   Q.    And you felt that he had the same

Page 53

1  numbers as you?
2    A.    They are posted.
3    Q.    Okay.  And Kenny did, and Mike
4  did as well?
5    A.    I can't recall which one of them,
6  but they were all posted.  There were people
7  in the same position as me.
8    Q.    What was your ratio at the time?
9    A.    I couldn't recall.
10   Q.    Was it worse than the other three
11 that you mentioned?
12   A.    2 for 24 I think or something
13 like that.
14   Q.    Was your ratio worse than the
15 others that you mentioned?
16   A.    No.
17   Q.    It was the same?
18   A.    Yes.
19   Q.    When was Mr. Flanders demoted?
20   A.    January or February of '04 or
21 '03.  One of them.  One of those times.  I
22 can't recall.
23   Q.    Prior to you?
24   A.    Yes, prior to me.  Mark Lapine.

Page 54

1   Q.   What about Mark Lapine?
2   A.   They were demoted on the same
3 day.
4   Q.   As you?
5   A.   No, together. The two of them.
6 You asked who were the others that were
7 demoted.
8   Q.   And were they promoted after that
9 back to Sales Manager?
10  A.   Yes.
11  Q.   Do you know by whom?
12  A.   Mr. Rauer and Mr. Stenslind.
13  Q.   Did Mr. Leete have any role to
14 your knowledge in your demotion?
15  A.   Mr. Leete wasn't there.
16  Q.   Who was your direct supervisor at
17 the time?
18  A.   It would have been Gary Campagna
19 and Dave Mercurio.
20  Q.   They were both Line Directors?
21  A.   Yes. They shared the line.
22  Q.   And when did that start?
23  A.   The same day they fired Gordon.
24  Q.   And that was the same day you

Page 55

1 were demoted?
2   A.   Yes.
3   Q.   Any other personnel changes that
4 day?
5   A.   Not that I can recall.
6   Q.   Do you know why Mr. Leete was
7 terminated?
8   A.   No, I do not.
9   Q.   Other than to Mr. Campagna, did
10 you complain about your demotion to anyone
11 else?
12  A.   Robert Campagna.
13  Q.   And what was his position at the
14 time?
15  A.   Manager.
16  Q.   Did you complain to him about it
17 hoping he would do something about it?
18  A.   No.
19  Q.   Did you complain to anyone in
20 Human Resources about the demotion?
21  A.   No.
22  Q.   Did you call anyone at the
23 Berkley Group about the demotion?
24  A.   No.

Page 56

1   Q.   Have you ever spoken to Becky
2 Foster?
3   A.   No.
4   Q.   Do you know who she is?
5   A.   President of the company.
6   Q.   Have you ever seen her?
7   A.   Walking through.
8   Q.   Have you been employed at all
9 since your separation from Patriot Resorts?
10  A.   No.
11  Q.   Who notified you of your
12 termination?
13  A.   Mr. Rauer.
14  Q.   Was anyone else present when he
15 notified you?
16  A.   Dave Mercurio.
17  Q.   Anyone else?
18  A.   Not to my knowledge.
19  Q.   Where did the termination take
20 place?
21  A.   Sales office.
22  Q.   Can you tell me what was said by
23 whom?
24  A.   I need to see you. Have a seat.

Page 57

1   Q.   Who said that?
2   A.   Mr. Rauer. You're fired.
3   Q.   Anything else?
4   A.   Your numbers.
5   Q.   He didn't say anything about your
6 numbers? He just said your numbers?
7   A.   Yes.
8   Q.   And did Mr. Mercurio say anything
9 during this?
10  A.   No. Choked on his coffee; ice
11 coffee.
12  Q.   Did he say anything?
13  A.   No.
14  Q.   Did you say anything?
15  A.   See you in court.
16  Q.   And why did you say that?
17  A.   Because that's where we are
18 going.
19  Q.   Did you say anything other than
20 see you in court?
21  A.   No.
22  Q.   Did you protest your termination
23 to anyone?
24  A.   Excuse me?

Page 58

1   Q.   Did you protest your termination
2   to anyone?
3   A.   No.
4   Q.   Did you call -- did you contact
5   -- strike that. How were your numbers at the
6   time of your termination?
7   A.   I had just made them $20,000. I
8   made two sales.
9   Q.   Okay. But how were your overall
10  numbers? You said there was a 60 day window;
11  is that correct?
12  A.   One out of -- let's see. Every
13  6th or 7th person I was selling.
14  Q.   So what would that make your
15  sales ratio; do you know?
16  A.   About 6.5, 7.
17  Q.   You're positive of that?
18  A.   Yes.
19  Q.   Do you have a record of that?
20  A.   Yes.
21  Q.   And how were your numbers, if you
22  know, compared to others? Where did you fall?
23  A.   In the middle.
24  Q.   In the middle. Who had a worse

Page 59

1   record than you at that time that was a sales
2   person?
3   A.   That was a sales person?
4   Q.   You were a sales person at the
5   time of your termination?
6   A.   Yes. Let's see, Bonnie Ecklund,
7   who was terminated the same day.
8   Q.   She was terminated the same day?
9   A.   Yes.
10  Q.   Anyone else terminated that day?
11  A.   Not to my knowledge.
12  Q.   Anyone with a worse record than
13  you and Bonnie; sales person?
14  A.   No.
15  Q.   Did you have any discussions with
16  Bonnie regarding her termination?
17  A.   No.
18  Q.   Did you have any discussions with
19  Bonnie regarding your termination?
20  A.   No.
21  Q.   Have you talked to her since your
22  termination?
23  A.   Yes.
24  Q.   And when did you talk to her?

Page 60

1   A.   Maybe a month ago.
2   Q.   What was the nature of that
3   conversation?
4   A.   She told me she got her job.
5   Q.   How did you learn she had been
6   terminated?
7   A.   She told me.
8   Q.   When?
9   A.   The same day.
10  Q.   What did she say?
11  A.   She was fired.
12  Q.   Did she tell you why?
13  A.   No.
14  Q.   And what did you say?
15  A.   I was with a customer.
16  Q.   Was she fired before you were?
17  A.   Yes.
18  Q.   Have you asked her to join this
19  lawsuit?
20  A.   No.
21  Q.   Have you spoken to any -- other
22  than Bonnie, any current or "X" Patriot
23  Resorts employees since your separation from
24  employment?

Page 61

1   A.   Yes.
2   Q.   Who?
3   A.   Names?
4   Q.   That would be helpful, yes.
5   A.   Phil Symonds, Ned Abbott, Kimmie
6   and Tom McArdle, Gary Campagna, Mike Campagna,
7   Bob Campagna, John Gordon. Mostly the line.
8   Mostly everyone there, except for the office
9   people.
10  Q.   Did you go back into the office
11  at all?
12  A.   I have not stepped on the grounds
13  of Vacation Village since that day.
14  Q.   How did you come to speak to John
15  Gordon?
16  A.   In a restaurant.
17  Q.   You ran into him?
18  A.   Yes.
19  Q.   Were you there together?
20  A.   No.
21  Q.   What was your conversation with
22  him?
23  A.   He asked me how I was doing, and
24  I said I was doing fine. And he just said I

1    Q.    Did Mr. Leete ever refuse you
2  permission?
3    A.    Yes.
4    Q.    How many times?
5    A.    I would say a couple of times a
6  week people would ask and he would --
7    Q.    -- no, I'm asking about you?
8    A.    Oh, you're talking specifically
9  about me?  I never asked.
10    Q.    Did you ever arrive at work late?
11    A.    Yes.
12    Q.    Did you have a doctor's note?
13    A.    No.
14    Q.    How many times would you say you
15  were late?
16    A.    In the three and a half years
17  that I was there, twice.
18    Q.    Were you put on overage as a
19  result of that?
20    A.    Yes.
21    Q.    Can you tell me what overage is?
22    A.    Overage is, according to the
23  policy, if I come in late without a doctor's
24  note I would go and sit in the pit all day.

1        And if I am missing out of the
2  pit or if I leave to go home, it went over to
3  the next day so I don't take a tour.
4        You're not allowed to take a tour
5  unless they are an overflowing tour, and you
6  have to wait so many minutes.
7    Q.    Does overage mean you go to the
8  bottom of the list?
9    A.    No, you're at the bottom of the
10  list.
11    Q.    What?
12    A.    You are the bottom of the list.
13    Q.    That's what I'm asking.
14    A.    Yes.
15    Q.    So you would only then get a tour
16  if there were enough tours to provide for
17  everyone ahead of you?
18    A.    Yes.
19    Q.    Did you ever write to anyone at
20  Berkley?
21    A.    No.
22    Q.    Did you ever file a complaint
23  with the Attorney General's Office regarding
24  your employment at Patriot?

1    A.    Yes.
2    Q.    When was that?
3    A.    Some time this year, last year.
4    Q.    And what happened as a result of
5  that complaint?
6    A.    I was sent a letter stating under
7  such and such code, the best thing to do was
8  to get my own lawyer and take them to court.
9    Q.    Okay.  And was your lawsuit
10  already pending at that time?
11    A.    Not to my knowledge.
12    Q.    Could you tell me, sir, if that
13  is your signature on this document?
14    A.    Yes, it is.
15        MS. FABBO:  Could you mark that,
16      please.
17        (Whereupon, Defendant's Exhibit 5
18        Harassment Complaint Procedure,
19        marked for identification)
20        (BY MS. FABBO):
21    Q.    Mr. Massaconi, under the
22  Communications Grievance Procedure in the
23  third paragraph, it states that you could
24  contact corporate headquarters anonymously to

1  raise any concerns that you had.  Did you ever
2  do that?
3    A.    No, I did not.
4    Q.    Were you aware that you could do
5  that?
6    A.    Yes, I was.
7    Q.    And why did you not do that?
8    A.    Because a directive came down
9  from Bill Rauer not to call corporate.
10    Q.    And do you have a copy of that
11  directive?
12    A.    No, it was verbal.
13    Q.    And what was Mr. Rauer's position
14  at the time when he issued that directive?
15    A.    He got a promotion to Regional
16  something or another for five or six different
17  resorts.  He came up and made the statement to
18  everyone that was there.  Managers and sales
19  people.
20    Q.    And when was this?
21    A.    I think it was a written memo
22  that went out too.  I would say it's June.
23  May or June of last year.
24    Q.    Prior to that, had you had any

Page 74

1  reason to contact corporate headquarters?
2      A.    Myself?
3      Q.    Yes?
4      A.    No.
5      Q.    Did you have any concerns about
6  your compensation prior to this directive that
7  you referred to?
8      A.    I brought concerns to both Bill
9  Rauer and Ron Lewis, and I was told thank you
10  for your time.
11      Q.    Okay.  Tell me the concerns you
12  brought to Mr. Lewis' attention, and when that
13  was?
14      A.    To Mr. Lewis?
15      Q.    Yes, sir?
16      A.    It would have been '04, some
17  time.  I had some concerns about the tour
18  flow, and we were losing good people.
19      Q.    Losing good employees?
20      A.    Yes.
21      Q.    Okay.
22      A.    And I basically told them to buy
23  a book.  "You're Rights In The Work Place".
24  And then he told me after an hour of talking

Page 75

1  with him, thank you very much buddy for your
2  concerns.
3      Q.    Let me just make sure I have this
4  right.  You went to -- first of all, who was
5  Mr. Lewis at the time?
6      A.    He was the Program Director at
7  the time.
8      Q.    The Project Director or Program?
9      A.    Yes, the Project Director.
10      Q.    At Patriot Resorts?
11      A.    Yes.
12      Q.    Did you go to his office?
13      A.    We met in his sales office.
14      Q.    And did you arrange that meeting?
15      A.    Actually, Gordon did.
16          (Off the record)
17          (Back on the record)
18          (BY MS. FABBO):
19      Q.    Tell me how Gordon became
20  involved?
21      A.    Well, I went to Gordon and
22  expressed my concerns, and Gordon got Ron when
23  he wasn't busy.  Then they asked me to go over
24  and sit in.

Page 76

1      Q.    What were your concerns that you
2  expressed to Gordon?
3      A.    Basically, the negativity in the
4  pit, because we were having people sit there
5  all day and no tours were coming in.
6      Q.    Okay.  And was Mr. Leete
7  responsive to your concerns?
8      A.    He said I understand.  I will
9  take that up with Mr. Lewis.
10      Q.    And how long between the time you
11  spoke with Mr. Leete and Mr. Lewis?
12      A.    Between the two?
13      Q.    Yes?
14      A.    Three or four hours.
15      Q.    Okay.  You said you spent
16  approximately an hour with Mr. Lewis?
17      A.    That's correct.
18      Q.    And tell me what you discussed
19  with him?
20      A.    I discussed Data King is a
21  marketing company that we were told we would
22  never have to work for.  And they just gave
23  them a contract.
24          That we needed to have more tours

Page 77

1  and less sales people.  Because the people
2  that were there -- we were up 48 to 50 sales
3  people, and we weren't getting 20 tours a day
4  in the door.
5          So the way it worked was that if
6  I sold today and I went out, I would go out
7  tomorrow.  And if you two were there waiting,
8  you wouldn't go out.
9      Q.    So the person who made the sale?
10      A.    Would go out the next day ahead
11  of everybody else who did not go out.  And I
12  thought that was unfair to the people who they
13  signed up to make this work.  It didn't give
14  everyone a fair opportunity to make money.
15      Q.    Okay.  Anything else you
16  mentioned to him?
17      A.    That was part of it.  And them
18  not giving us letters of cancellation.  When
19  customers would cancel, we weren't given
20  letters.  We were in the beginning for a year
21  and a half, and then that stopped.
22          So you would expect your paycheck
23  and to see your name on the pay sheet, and
24  your name wouldn't be there.  You would have

# EXHIBIT
# 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
          Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
          Defendants

DEPOSITION OF RODNEY LEWIS

June 2, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

I N D E X

WITNESS:  RODNEY LEWIS

Direct Examination by Mr. Feldman          5

EXHIBITS

Exhibit 1, 2005 Vacation Village Tour
          Presentation                      71
Exhibit 2, Vacation Village Rotation        74
Exhibit 3, 11/3/02 Memo Re: Attendance     117
Exhibit 4, Employee Information Form        124
Exhibit 5, LaCrisha Wise Attendance Report 125
Exhibit 6, 5/18/03 Memo Re: Dress Code     145
Exhibit 7, Leaders Booklet                 156

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

---

4

STIPULATION

3    It is agreed by and between the parties

4  that all objections, except as to form of the

5  question, are reserved until the time of trial.

7    It is further agreed by and between the

8  parties that all motions to strike unresponsive

9  answers are reserved until the time of trial.

11   It is further agreed by and between the

12  parties that the sealing of the original

13  deposition transcript is hereby waived.

15   It is further agreed by and between the

16  parties that the notification to all parties of

17  the receipt of the original deposition

18  transcript is hereby waived.

1  RODNEY LEWIS, Witness, identified via
2  Virginia driver's license and having been duly
3  sworn, states as follows:
4
5  DIRECT EXAMINATION BY MR. FELDMAN:
6      Q.   Good morning, Mr. Lewis.
7      A.   Good morning.
8      Q.   Could you state your name and address
9  for the record, please?
10     A.   Rodney Lewis.  My address is 81 Fox
11 Run, Lee, Massachusetts.
12     Q.   And you've had your deposition taken
13 at the MCAD in this case already, is that
14 correct?
15     A.   Yes.
16     Q.   Because you clearly had a deposition
17 taken before, is that right?
18     A.   Yes.
19     Q.   Have you ever had other depositions
20 taken before of you?
21     A.   Yes.
22     Q.   I'm not going to run through all the
23 instructions I might otherwise give you because
24 you've been deposed before, but I will say this.

---

1      A.   Project director.
2      Q.   Of what?
3      A.   For Vacation Village in the
4  Berkshires.
5      Q.   What are your job duties as project
6  director of Vacation Village?
7      A.   To oversee the day-to-day sales
8  programs that exist there.
9      Q.   Are you the highest-ranking manager at
10 the site where sales take place?
11          MS. FABBO:  Objection.  You can
12          answer.
13          THE WITNESS:  In regard to sales,
14          yes.
15     Q.   (By Mr. Feldman)  Is there anyone else
16 within the hierarchy of management on-site at the
17 sales area who's at the same rank you are?
18          MS. FABBO:  Objection.  You can
19          answer.
20          THE WITNESS:  Yes.
21     Q.   (By Mr. Feldman)  Who is that?
22     A.   No, I'm sorry.  I'm confused here.
23 No, I'm the only project director at the resort.
24     Q.   Who is your direct supervisor?

---

6

1  You should wait until I finish my question before
2  you answer the question, okay?
3      A.   Okay.
4      Q.   You have to make sure to make a verbal
5  answer, because otherwise the stenographer can't
6  take it down, all right?
7      A.   Fine.
8      Q.   I will try not to talk over you and
9  you try not to talk over me so the stenographer
10 has only one voice to take down at a time.
11     A.   Fine.
12     Q.   If you want to take a break, consult
13 with your lawyer, or use the bathroom, that's
14 fine, okay?
15     A.   Okay.
16     Q.   The other thing is, if I ask you a
17 question and you answer the question, I'm going
18 to assume you understood it, okay?
19     A.   Okay.
20     Q.   So if you have a question about the
21 question that I'm asking, please ask me to
22 rephrase it.
23     A.   I will.
24     Q.   What is your current job, Mr. Lewis?

---

8

1      A.   Bill Rauer.
2      Q.   Where is he based?
3      A.   Based in Florida.
4      Q.   Is there anyone else you consult with
5  in management on-site for issues that arise with
6  sales representatives?
7      A.   I consult with my sales directors.
8      Q.   But they are beneath you in the
9  hierarchy, is that correct?
10     A.   That's correct.
11     Q.   I'd like you to -- if you could
12 describe all of the job duties that are entailed
13 in being the project director?
14     A.   I will try.  My job involves the
15 overseeing of the daily sales, coordinating the
16 sales effort with the Marketing Department,
17 basically implementing company policy and
18 procedure.  Pretty much it.
19     Q.   What kind of company procedure do you
20 implement?
21     A.   All the procedures that pertain to
22 sales.
23     Q.   How many people do you directly
24 supervise now?

---

53

1    than his failure to meet the ratios?

2        A.    No.

3        Q.    How about Michael Massaconi; was there

4    any other reason he was demoted other than his

5    failure to meet the sales ratios?

6        A.    No.

7        Q.    The process you described, was that

8    process used with Michael Massaconi?

9        A.    Yes.

10       Q.    Does Michael Massaconi still work for

11   the company?

12       A.    No.

13       Q.    Why not?

14       A.    He chose to quit.

15       Q.    Michael Massaconi quit, is that

16   correct?

17       A.    Yes.

18       Q.    Did he quit after he was demoted back

19   to salesperson?

20       A.    I'm sorry, Michael Massaconi did not

21   quit.  Michael Massaconi was terminated for -- I

22   think Bill Rauer terminated him.

23       Q.    Were you involved in the process of

24   terminating Michael Massaconi?

---

54

1        A.    No.

2        Q.    Did you provide information to Bill

3    Rauer about whether Mr. Massaconi should be

4    terminated?

5        A.    Not directly.  Probably indirectly.

6        Q.    How did you do it indirectly?

7        A.    We may have had a conversation about

8    his poor sales and his negative attitude.

9        Q.    Let me go back and ask, was

10   Mr. Massaconi demoted to salesperson for any

11   reason other than his poor ratios?

12       A.    No.

13       Q.    But you just said you --

14       A.    I gave him a week off one time for

15   very, very poor decision-making.

16       Q.    Can you describe what his poor

17   decision-making was, please?

18       A.    He cast some very negative dispersions

19   to the salespeople about their future ability to

20   sell at the resort.

21       Q.    I'd like you to describe all the facts

22   you know about what Mr. Massaconi was telling

23   salespeople.

24       A.    He told salespeople that they weren't

---

55

1    going to have anybody basically to talk to in the

2    month of December.

3        Q.    Do you mean guests?

4        A.    Guests, yes.

5        Q.    For tours?

6        A.    Yes.

7        Q.    How did you learn that?

8        A.    The person that he told it to came to

9    me.

10       Q.    Who was that?

11       A.    I don't recall.

12       Q.    When did that occur -- was it

13   December?

14       A.    Probably in October.

15       Q.    Of '04?

16       A.    Of '04.

17       Q.    Was it a man or a woman who came to

18   you?

19       A.    I don't recall.

20       Q.    Did anyone else besides the person

21   you've mentioned come to you to talk about

22   Mr. Massaconi's negative attitude?

23       A.    That had been an issue previously and

24   I talked to him about it.

---

56

1        Q.    When was that first an issue?

2        A.    Really I don't recall.

3        Q.    Was it at the beginning of your tenure

4    as project director?

5        A.    No.

6        Q.    Was it when he was a sales manager?

7        A.    Yes.

8        Q.    Do you remember when he first became a

9    sales manager?

10       A.    No, he was a sales manager when I took

11   my position there.  The first person to talk to

12   me about it, I think was Gordon Leete.

13       Q.    What did he say?

14       A.    Just that he was negative.

15       Q.    Did he give you any facts to support

16   the conclusion that he was negative?

17       A.    Oh, I'm sure he did at the time.  I

18   don't recall what they were.

19       Q.    That's the first time you heard about

20   his negative attitude, is that right?

21       A.    Yes.

22       Q.    Then was the second time you heard

23   about it from this person who told you that

24   Mr. Massaconi was telling salespeople there would

---

1    be no guests in December?
2       A.   No.
3       Q.   There were --
4       A.   Numerous other occasions.  I don't
5    recall any specifics, but it was a frequent --
6    reasonably frequent occurrence.
7       Q.   Why wasn't that a reason to demote him
8    from sales manager to salesperson?
9       A.   Because I tried not to let that be a
10   factor in the decision-making at that time, give
11   him the benefit of the doubt.
12      Q.   When was Mr. Massaconi terminated?
13      A.   Late 2004, or this is '5 -- yes, '4.
14   I don't remember the date.
15      Q.   What changed between the earlier time
16   when you didn't want to let that get in the way
17   and the time when he was terminated?
18      A.   I don't recall.
19      Q.   Were you aware that Mr. Massaconi had
20   gone to the Attorney General with a complaint
21   about the way he was being paid?
22      A.   No.  He had constant questions about
23   it, and we would resolve his questions.  I would
24   ask him to give me a list of whatever he thought

---

1       Q.   Getting back to the job of a
2    salesperson, was there ever any reason why a
3    salesperson was supposed to appear at the Sales
4    Center before 8:30 on a particular day?
5       A.   No, unless they had been called in for
6    an early meeting with their manager or director
7    or for some training or something, I don't know.
8       Q.   Do you remember a specific time that
9    salespeople came in before 8:30?
10      A.   No.
11      Q.   After the sales meeting that you
12   described that takes between twenty and thirty
13   minutes, you said?
14      A.   Yes.
15      Q.   The salesperson would then go out on a
16   tour if a tour was -- if a guest was there for
17   the person, is that correct?
18      A.   That's correct.
19      Q.   What if a tour was not there for a
20   salesperson?
21      A.   Then we would cut the line as early as
22   possible to allow them to leave.
23      Q.   What's the earliest you ever remember
24   the line being cut since you've been project

---

1    he was due to be paid on, and then I would give
2    him a definitive answer on anything he had
3    questions on.
4       Q.   Did that have anything to do with
5    either his demotion or termination, his
6    questions?
7       A.   Not whatsoever.
8       Q.   Did you ever learn before I just
9    mentioned it that Mr. Massaconi had gone to the
10   Attorney General to complain about his wages?
11      A.   No, that's the first I heard.
12      Q.   Who else was demoted besides
13   Mr. Lambert and Mr. Massaconi?
14      A.   Stimple, not Lambert.
15      Q.   I'm sorry, Stimple.  I don't know
16   where that came from, excuse me.
17      A.   Other managers were demoted
18   temporarily and they got their positions back.
19      Q.   Who were those?
20      A.   They righted theirselves.  Mark Lapine
21   was one.  Bob Campagna, Michael Campagna.  All
22   these people had received notices and had righted
23   theirselves.  Nobody else I can think of right
24   now.

---

1    director?
2       A.   Probably 11:30 in the morning.
3       Q.   If there was a possibility of a tour
4    coming in -- strike that.  When would you know
5    definitely how many tours, guests were coming
6    in on a particular day?
7       A.   We never know definitely how many
8    tours are going to come in on a particular day
9    until the end of the day, because it's possible
10   unscheduled people will somehow show up.
11      Q.   How often did that happen?
12      A.   Infrequently.
13      Q.   Did you keep salespeople at the center
14   just in case someone might show up on one of
15   these infrequent visits?
16      A.   Once the line has been cut, then
17   typically we keep somebody around for an hour to
18   allow for any of the late arrivals to come in.
19   We just keep the number that are expected.
20      Q.   When the tours come in -- tour guests
21   come in on a typical day, do they come in
22   individually or by bus?
23      A.   Individually.
24      Q.   So they just arrive according to the

---

153

```
 1      A.   No, I don't think so.  I said I think
 2  I said it to him.
 3      Q.   Did you ever tell anybody else --
 4      A.   No.
 5      Q.   You have to let me finish.
 6      A.   I'm sorry.
 7      Q.   Did you ever tell anybody else on the
 8  site at Vacation Village that the company would
 9  try to get rid of people who were involved in
10  this lawsuit?
11      A.   No.
12      Q.   Describe the entire conversation with
13  Mr. Massaconi where you made the comment you just
14  described.
15      A.   I don't recall what exactly it was.
16  Something had come up in regards to the lawsuit,
17  and I just told him what -- it was just a guess
18  on my part, strictly.  You know, it wasn't the
19  company's position, you know.  That's all.
20      Q.   When Mr. Massaconi was terminated,
21  were you aware that he had filed this lawsuit?
22      A.   No.
23      Q.   You didn't know about the lawsuit at
24  that point?
```

154

```
 1      A.   No.  I don't know what the lawsuit is,
 2  and I don't know who's a party to it.
 3      Q.   But you told Mr. Massaconi that you
 4  wouldn't be surprised if the company got rid of
 5  people involved with it?
 6      A.   I knew of it.  I don't know it
 7  specifically.  I was aware that it was out there,
 8  yes.
 9      Q.   And you knew that Mr. Massaconi was
10  one of the parties to it, right?
11      A.   No.
12      Q.   Why were you talking to Mr. Massaconi
13  about the lawsuit?
14      A.   I don't know.  Maybe it came up in
15  conversation; I don't know.
16      Q.   Did Mr. Massaconi say, I'm involved in
17  this lawsuit?
18      A.   No.
19      Q.   Do you recall what was said right
20  before you said the comment about the company
21  getting rid of people involved?
22      A.   No.
23           MR. FELDMAN:  Off the record.
24           (A break was taken)
```

155

```
 1           MR. FELDMAN:  Back on the record.
 2      Q.   (By Mr. Feldman)  Was Miss Wise making
 3  sales while she was working at Vacation Village?
 4      A.   Yes.
 5      Q.   Was she a good salesperson?
 6      A.   Very good.  That probably had a lot to
 7  do with our trying to push her to come to work.
 8      Q.   Was she making sales in June of 2003?
 9      A.   I don't recall.  When she came to
10  work, she normally would sell.
11      Q.   Wasn't that really what being a
12  salesperson is all about, as you said before?
13      A.   Sure.
14      Q.   Is making sales?
15      A.   Um-hum.
16      Q.   So given that she was making sales,
17  why would her absenteeism matter with regard to
18  keeping her on?
19      A.   Simply because it violated the
20  company's ground rules policy.
21      Q.   Even with her absenteeism, was she
22  making more sales than other people were who
23  didn't have the absenteeism problem?
24      A.   Yes, some.  There were some people
```

156

```
 1  that were better than hers.
 2      Q.   She was better than some?
 3      A.   Yes, some; and some were better.
 4      Q.   Did she have a higher average number
 5  of sales than other people did during the year
 6  2003, if you know?
 7      A.   I don't know.
 8           (Exhibit 7, Leaders Booklet,
 9            marked for identification)
10      Q.   (By Mr. Feldman)  What's Exhibit 7,
11  Mr. Lewis -- do you know what it is -- I'm
12  sorry, are you looking through it; is that why
13  there's silence?
14      A.   Yes.  I was waiting for the question.
15      Q.   I said, do you know what this is?
16      A.   Yes.
17      Q.   What is it?
18      A.   It's a little management handbook that
19  was put together for the sales managers at the
20  resort.
21      Q.   Was this provided to sales managers
22  upon their becoming a sales manager?
23      A.   Yes.
24      Q.   Was it provided to salespeople?
```

# EXHIBIT
# 6