UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
                    Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
                    Defendants

DEPOSITION OF WILLIAM RAUER

June 3, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

INDEX

WITNESS: WILLIAM RAUER

Direct Examination by Mr. Feldman     5
Cross Examination by Ms. Fabbo        95

EXHIBITS

Exhibit 1,  Uniform Policy for Sales
            Managers' Sales Performance   75

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA 01103
BY: JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA 01103
BY: MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

---

4

STIPULATION

   It is agreed by and between the parties
that all objections, except as to form of the
question, are reserved until the time of trial.

   It is further agreed by and between the
parties that all motions to strike unresponsive
answers are reserved until the time of trial.

   It is further agreed by and between the
parties that the sealing of the original
deposition transcript is hereby waived.

   It is further agreed by and between the
parties that the notification to all parties of
the receipt of the original deposition
transcript is hereby waived.

```
 1   WILLIAM RAUER, witness identified via
 2   Florida driver's license and having been duly
 3   sworn, states as follows:
 4
 5           DIRECT EXAMINATION BY MR. FELDMAN:
 6       Q.   My Rauer, could you state your name
 7   and address for the record, please?
 8       A.   It's William P. Rauer. My address is
 9   6000 Northwest 63rd Place. That's in Parkland,
10   Florida.
11       Q.   Mr. Rauer, have you had your
12   deposition taken before?
13       A.   Yes.
14       Q.   So you understand generally what we're
15   doing here today. I want to give you a few
16   grounds rules for this one.
17       A.   Okay.
18       Q.   First is that if I am talking, you
19   should wait until I finish the question and then
20   you should answer after I've completed the
21   question. I will also attempt not to interrupt
22   your answer; is that okay?
23       A.   Fair enough.
24       Q.   If you have any questions about what
```

```
                                                      6
 1   I've asked, please let me know and ask me to
 2   rephrase it if you don't understand it. If you
 3   do answer my questions, I'm going to assume you
 4   understand it, okay?
 5       A.   Yes, I do.
 6       Q.   If you want a break or discuss
 7   something with your counsel, use the rest room,
 8   please let me know as well. You should remember
 9   to give a verbal answer every time. That's hard
10   to remember, but you need to say "yes" or "no"
11   verbally instead of a nod or "um-hum" or "uh-uh,"
12   because it won't show up on the transcript.
13           What's your current job?
14       A.   I'm employed by Tower Resort Realty.
15       Q.   I'm sorry, by who?
16       A.   Tower Resort Realty.
17       Q.   What do you do for Tower Resort
18   Realty?
19       A.   I'm the senior project director for
20   several operations with them.
21       Q.   Which are the several operations?
22       A.   The Weston Resort, the Canada House
23   Resort, the Hollywood Resort, the Breakers
24   Resort, and the Golden Strand Resort. As well as
```

```
                                                      7
 1   overseeing the operation at the Berkshire
 2   Resort.
 3       Q.   And the name of the Berkshire
 4   Resort is what?
 5       A.   Vacation Village in the Berkshires.
 6       Q.   Who owns Vacation Village?
 7       A.   Patriot Resorts.
 8       Q.   Do you work at all for Patriot
 9   Resorts?
10       A.   No, I do not.
11       Q.   When you receive a check, is it from
12   Tower Resorts Realty?
13       A.   Yes, it is.
14       Q.   And your job title there again?
15       A.   I'm the project director.
16       Q.   What's your relation to Vacation
17   Village?
18       A.   Which Vacation Village?
19       Q.   The one in the Berkshires.
20       A.   Vacation Village in the Berkshires, I
21   oversee that operation.
22       Q.   And that is as part of your position
23   with Tower Resort Realty, not in some other
24   capacity, correct?
```

```
                                                      8
 1       A.   Correct.
 2       Q.   Who do you directly supervise at the
 3   Vacation Village in the Berkshires?
 4       A.   All the sales personnel.
 5       Q.   Who is the person directly beneath you
 6   in the hierarchy at Vacation Village in the
 7   Berkshires?
 8       A.   That would be Rod Lewis.
 9       Q.   What's his job title?
10       A.   He's the project director of that
11   resort.
12       Q.   But you have ultimate authority over
13   the sales staff at Vacation Village, is that
14   correct?
15       A.   That's correct.
16       Q.   When I'm talking about Vacation
17   Village, for purposes of this deposition I mean
18   the one in the Berkshires.
19       A.   That's correct.
20       Q.   Who would be your direct supervisor?
21       A.   Bruce Polansky.
22       Q.   What's his job title?
23       A.   Senior project director, and also
24   senior vice president of Berkley, I believe.
```

65

1 A. I believe she was terminated from Vacation
2 Q. If I said to you she was terminated
3 for excessive absenteeism, does that refresh your
4 recollection?
5 A. No.
6 Q. What do you remember about LaCrisha
7 Wise?
8 A. That she was an employee at one time.
9 Q. Were you aware that there were any
10 sort of problems with her employment?
11    MS. FABBO: Objection. You can
12    answer.
13    THE WITNESS: As you mention that
14    there was absenteeism, yes; that was
15    an issue with her. There were times
16    where she did not show up for work,
17    and there were also times when she was
18    late for work.
19 Q. (By Mr. Feldman) How did you know
20 about that?
21 A. During the period of time that I was
22 there, this occurred.
23 Q. So when you were project director
24 on-site, Miss Wise was working there?

67

1 Village?
2 A. Yes.
3 Q. I'd like you to describe your
4 involvement in his termination.
5 A. Well, I terminated him.
6 Q. You're the one who personally
7 terminated him?
8 A. Yes.
9 Q. Why did you do that?
10 A. Because he wasn't performing.
11 Q. What do you mean, "he wasn't
12 performing"?
13 A. Well, his closing ratio numbers on a
14 consistent basis were in double digits, but far
15 beyond double digits. When he was terminated, he
16 was one out of thirty or worse.
17 Q. Did he have the worst ratios of anyone
18 who was working at Vacation Village at the time?
19 A. When he was terminated, there were two
20 people with very similar numbers.
21 Q. Who were they?
22 A. He and a young lady, Bonnie -- I can't
23 remember her last name offhand, but a lady was

66

1 A. Yes.
2 Q. How did you become aware of her
3 absenteeism or tardiness?
4 A. I was there.
5 Q. I understand, but was this
6 communicated to you from a line director or did
7 you observe this; how did you get this
8 information?
9 A. I observed it.
10 Q. What action did you take as a result?
11 A. I don't recall. It was a while ago.
12 Q. Was there a policy at the time you
13 were project director of not vigorously enforcing
14 the absenteeism policy?
15 A. No.
16 Q. Was there a point at which Vacation
17 Village started enforcing the absenteeism policy
18 in a more vigorous way?
19 A. No.
20 Q. As far as you're concerned, the policy
21 has been the same from the time you were there
22 until the present?
23 A. Yes.
24 Q. Were you involved in any way in the

68

1 also terminated that day.
2 Q. Why was she terminated?
3 A. Numbers.
4 Q. Was there any other reason
5 Mr. Massaconi was terminated other than his
6 numbers?
7 A. No.
8 Q. Mr. Massaconi had been a -- was a
9 salesperson at the time, is that right?
10 A. That's correct.
11 Q. Before that, he was a sales manager?
12 A. There was a time he was manager, yes.
13 Q. Why was he promoted to sales manager?
14 A. He asked for the opportunity, and I
15 gave it to him.
16 Q. What criteria did you use when
17 determining whether to promote someone?
18 A. There was a time when Mr. Massaconi
19 did very well in sales and wanted to be a
20 manager. He was actually one of the original
21 salespeople at that resort. As some of the
22 people that were also original salespeople
23 evolved to management, he expressed a desire to
24 do that as well; and I gave him that opportunity.

**Page 69**

1  Q.  Were you project director on-site when
2  you gave him that opportunity?
3  A.  Yes, I believe I was.
4  Q.  Were there written criteria for you to
5  use when determining whether to make someone a
6  sales manager?
7  A.  No, no written criteria.
8  Q.  Was that within the discretion of the
9  project director?
10 A.  Yes.
11 Q.  Do you know what his ratios were at
12 the time he became a sales manager?
13 A.  Yes, they were very good.  They were
14 better than track average.
15 Q.  What's "track average"?
16 A.  At that time, I wouldn't recall; but
17 whatever they were, sir, he was better than that,
18 or at least as good, I should say.
19 Q.  At what point was he demoted; do you
20 remember?
21 A.  Yes.
22 Q.  When?
23 A.  I don't remember the exact day he was
24 promoted -- demoted, but I can't answer any more

**Page 71**

1  manager is TO-ing well?
2  A.  Based on their closing ratios.
3  Q.  So the closing ratios for a manager
4  who is TO-ing includes the sales that are not
5  generated by him, is that right; they're
6  initially being created by the salesperson who he
7  supervises?
8  A.  Yes.
9  Q.  Are TO statistics kept differently
10 than the manager's own sales?
11 A.  They're not different; they're just
12 kept.
13 Q.  I guess what I'm asking is -- the
14 manager can go out on tours as well, right?
15 A.  Yes.
16 Q.  And then the manager also may TO on
17 someone else's tour?
18 A.  Correct.
19 Q.  Are those statistics kept in separate
20 places, or are they put together for the
21 manager's sales ratios?
22 A.  We have a personal sales manager --
23 personal sales ratio, and we have a TO ratio.
24 Q.  Is it your testimony that Mr. -- how

**Page 70**

1  than giving you the exact day is something I'm
2  not sure of.
3  Q.  Why was he demoted?
4  A.  For lack of performance.
5  Q.  Was it because of the ratios, his
6  ratios?
7  A.  Once you're a manager, there are
8  certain things other than your own personal sales
9  that you're required to do well.
10 Q.  What was he not doing well?
11 A.  He was not doing his personal sales
12 well, nor was he TO-int well, nor was he training
13 well.
14 Q.  Anything else he wasn't doing well
15 that you remember?
16 A.  Those are the three criteria that are
17 required to do well and to keep a job as manager.
18 Q.  What was "TO-ing"?
19 A.  That's when someone helps the
20 salesperson -- a manager helps a salesperson get
21 a sale.  They take over the table.
22 Q.  "TO" means Take Over?
23 A.  Correct.
24 Q.  How does one determine whether a

**Page 72**

1  were Mr. Massaconi's personal sales ratios and
2  how were his TO sales ratios at the time he was
3  demoted?
4  A.  They were poor.
5  Q.  Do you remember what they were?
6  A.  No, I don't remember what they were.
7  Q.  Was anyone else demoted at the same
8  time as Mr. Massaconi?
9  A.  At the same time?
10 Q.  At or about the same time.
11 A.  No.
12 Q.  Were his personal sales ratios worse
13 than every other manager at that time that he was
14 demoted?
15 A.  Yes.
16 Q.  Were his TO sales ratios worse than
17 every other manager at the time he was demoted?
18 A.  Yes.
19 Q.  You said he wasn't training well.  How
20 did you determine that he wasn't training well?
21 A.  Managers are required to recruit and
22 train new salespeople, and he was not doing that
23 well, either.
24 Q.  Was he not recruiting well or was he

```
 1  not training well.
 2       A.   He was not training well.
 3       Q.   What do you mean by "he wasn't
 4  training well"?
 5       A.   When we have salespeople that are new,
 6  they require training; and if they're getting
 7  trained well, hopefully they'll do well; and if
 8  they're not doing well, it's partly a result of
 9  the manager who's training them.
10       Q.   Just so I understand it, if
11  salespeople aren't making sales, does the company
12  consider that the manager has not been training
13  well?
14       A.   It's one of the issues, yes.
15       Q.   Which one of the three issues you
16  mentioned was the central reason for his
17  demotion, if you remember?
18            MS. FABBO:  Objection.
19            THE WITNESS:  He wasn't demoted
20       originally when we saw bad numbers in
21       all three of those categories.  What
22       happened with Mr. Massaconi is he was
23       given a warning.  He was given a
24       probationary period to fix primarily
```

```
                                              74
 1       his personal numbers, and of course we
 2       also didn't allow him to go to too
 3       many tables because his TO numbers
 4       were not that good.  We wanted him to
 5       focus on getting his personal numbers
 6       back on track where they should be;
 7       and we gave him a period of time to
 8       accomplish that.
 9            During that period of time, he
10       was to focus on getting his own sales.
11       The end of that period of time and he
12       still didn't get his sales back to
13       where they should be, we then took
14       further action not to remove him as a
15       manager but not to give him a team
16       that he had under him, because again,
17       we wanted his focus to be only his own
18       personal sales.  We didn't want any
19       salespeople to suffer because he
20       wasn't able to focus on his own
21       personal sales and take care of his
22       team as well; so we temporarily
23       removed his team from him as the next
24       stage.
```

```
 1       Q.   (By Mr. Feldman)  That was before
 2  demotion, is that right?
 3       A.   That was before his demotion.  After
 4  that period of time and he still wasn't able to
 5  get his personal sales numbers back to where they
 6  should be, at that time we demoted him, or I
 7  demoted him.
 8       Q.   Did that demotion occur before or
 9  after Mr. Massaconi filed a complaint in this
10  case?
11            MS. FABBO:  Objection.
12            THE WITNESS:  I have no idea.
13            (Exhibit 1, Uniform Policy for
14            Sales Managers' Sales
15            Performance, marked for
16            identification)
17       Q.   (By Mr. Feldman)  Showing you what's
18  been marked as Exhibit 1, Mr. Rauer, do you
19  recognize this document?
20       A.   Yes.
21       Q.   What is it?
22       A.   Says Uniform Policy for Sales
23  Managers' Sales Performance.
24       Q.   Were you involved in the creation of
```

```
                                              76
 1  this document?
 2       A.   Yes, I was.
 3       Q.   Why was the document created?
 4       A.   I wanted to make the managers aware
 5  that I expected performance in all categories.
 6       Q.   Why did you decide to create the
 7  document at the time you did -- had something
 8  happened before that?
 9       A.   Not that I recall.  I just think that
10  there were some issues that needed to be put down
11  in writing so everyone was aware of what I
12  considered proper performance standards.
13       Q.   Was this taken from some kind of other
14  handbook, or did you create this on your own?
15       A.   I created this.
16       Q.   Did you get approval from your
17  supervisor to provide this?
18       A.   I don't recall.
19       Q.   Was this created in part because of
20  Mr. Massaconi's personal situation?
21            MS. FABBO:  Objection.
22            THE WITNESS:  No.
23       Q.   (By Mr. Feldman)  Is this a procedure
24  that was provided to Mr. Massaconi, what's
```

1  described on Page 1?
2      A.  Sorry, what was your question?
3      Q.  Was this procedure followed with
4  regard to Mr. Massaconi?
5      A.  Should have been.
6      Q.  Was this procedure put in place before
7  he was demoted?
8      A.  Yes.
9      Q.  So what you first described as the
10 period when Mr. Massaconi was not demoted but he
11 was supposed to get his numbers up, is that
12 what's listed as Number 1 on Page 1 of Exhibit 1?
13     A.  Yes.
14     Q.  Or is that somehow different?
15     A.  Yes, but I can't honestly tell you
16 that this was done prior to him being advised
17 that he had to get his numbers better or not.  I
18 really don't recall.
19     Q.  Now, he was given time to get his
20 personal numbers up, you said.  Was he able to do
21 so?
22     A.  No.
23     Q.  What happened with his numbers?
24     A.  They stayed fairly poor.

1      A.  Well, it depends on who they were.
2  Some people fixed them and some people didn't.
3      Q.  Well, of the ones you've named, if you
4  remember, which were the ones who didn't fix
5  their numbers?
6      A.  Bill Lee, Melissa McGovern, and Mike
7  Massaconi.
8      Q.  Other than Mike Massaconi -- we know
9  what happened to him -- what happened to the
10 other two?
11     A.  They were demoted.
12     Q.  Were they demoted at about the same
13 time as Mr. Massaconi?
14     A.  No.  Again, the names that I've
15 mentioned to you, during the course of time have
16 -- during that period of time -- fallen into
17 similar categories that Mr. Massaconi did.
18     Q.  I know; I'm just trying to figure out
19 when...
20     A.  I really couldn't tell you exactly.
21     Q.  When Mr. Massaconi was demoted, what
22 happened after he was demoted?
23             MS. FABBO:  Objection.
24             THE WITNESS:  I don't understand

                                              78
1      Q.  Do you know what they were at the
2  time?
3      A.  I don't know exactly what they were,
4  but they were poor.
5      Q.  At the time that Mr. Massaconi was
6  told to get his personal numbers up, was anyone
7  else put in that same situation?
8      A.  Yes.
9      Q.  Who?
10     A.  I can't recall, but several people.
11 Let me see, maybe this will help me.  Bill Lee is
12 one of them, Melissa McGovern was someone else,
13 Bob Campagna was someone, Mike Campagna was
14 someone.
15     Q.  The people you're naming are people
16 who were given a certain amount of time to get
17 their personal numbers up?
18     A.  Yes.  Over a period of time.  I don't
19 know specifically when it occurred, but looking
20 at the names, I can tell you that these people
21 were also given periods to get their numbers
22 fixed.
23     Q.  What happened to the numbers of those
24 people that you just named?

                                              80
1          the question.
2      Q.  (By Mr. Feldman)  Sure.  What happened
3  to his sales ratios after he was demoted?
4             MS. FABBO:  Objection.
5             THE WITNESS:  They still didn't
6          get better.
7      Q.  (By Mr. Feldman)  Did they get worse?
8      A.  When he was terminated, they were
9  pretty bad, yes.
10     Q.  How long was the period between his
11 demotion and his termination, if you remember?
12     A.  I don't really remember, but it was
13 more than a few weeks.
14     Q.  You listed three reasons for his
15 demotion.  How many reasons were there for his
16 termination?
17            MS. FABBO:  Objection.
18            THE WITNESS:  For his termination
19         it was -- he was a salesperson at that
20         time; and I looked at his personal
21         numbers, and his personal numbers were
22         substandard.
23     Q.  (By Mr. Feldman)  Were you aware that
24 Rod Lewis had spoken to Mr. Massaconi at some

```
 1  point and said that the company was trying to get
 2  rid of people who had filed this lawsuit?
 3      A.  No.
 4      Q.  Have you ever heard of that before?
 5      A.  No.
 6      Q.  Before today, you haven't heard of
 7  that?
 8      A.  No.
 9      Q.  You had said Mr. Massaconi and a woman
10  had particularly bad ratios at the time that they
11  were fired.  Has anyone since his termination had
12  the same level of bad ratios?
13      A.  No.
14      Q.  What is the ratio that leads to
15  termination at Vacation Village currently?
16          MS. FABBO:  Objection.
17          THE WITNESS:  Anybody that was
18              terminated based on performance had a
19              consistent period of time of doing
20              poor.
21      Q.  (By Mr. Feldman)  I'm trying to define
22  -- using the numbers, I'm trying to define what
23  "doing poor" means.
24      A.  Well, way past track average.  That's
```

```
                                                  83
 1  emerged as being typically the track average?
 2          MS. FABBO:  Objection.
 3          THE WITNESS:  No, it would vary,
 4              but never in double digits.
 5      Q.  (By Mr. Feldman)  What were the ranges
 6  for track average, if you can remember?
 7      A.  I couldn't even answer that, but
 8  again, never in double digits.
 9      Q.  Is there a company policy about a
10  ratio that would lead to termination?
11      A.  I don't know.
12      Q.  You mentioned double digits a few
13  times?
14      A.  Yes, I did, but there are people who
15  have been in double digits who have gotten fixed
16  and got their numbers back to where they need to
17  be, and there are those who were in double digits
18  who have gotten worse.
19      Q.  What happened to those people?
20      A.  For the most part, they got?
21      Q.  Do you remember anybody besides
22  Mr. Massaconi and the other young woman you
23  mentioned?
24      A.  Yes.  I don't remember names
```

```
                                                  82
 1  to say the least, but when someone is in double
 2  digits, they need to be fixed one way or another.
 3  They need -- when I say "one way or another,"
 4  either their manager needs to fix them or they
 5  need to be reassigned to another manager.
 6  Somehow we need to do the best we can to get
 7  these people as good as they can possibly be.
 8          And with regard to Mr. Massaconi, he
 9  was given opportunities to go on different teams.
10  He was actually, for the most part, refusing to
11  take the training that we required him to take
12  because of his numbers, but he still didn't do
13  it, and didn't really show a sincere effort to
14  get better.  And his numbers were the worst,
15  along with this young lady Bonnie -- again, her
16  last name escapes me; but those two people had
17  the worst numbers on the track, and they both
18  showed a lack of desire to get better.
19      Q.  Is there a ratio that you consider to
20  be track average?
21      A.  No, it would depend on what the track
22  average would be.
23      Q.  Since the time you've been there, 2001
24  to the present, is there a number that has
```

```
                                                  84
 1  specifically.  If I looked at the roster I might
 2  be able to give you that.  But yes, that has
 3  happened and it's normal.  If people do not
 4  perform and they're given every opportunity to
 5  perform and they still don't perform, then we
 6  have to consider this not good for them or for
 7  our company to keep giving them customers.
 8      Q.  Getting back to absenteeism for a
 9  minute, is there anyone else who you remember as
10  being terminated from Vacation Village for
11  absenteeism other than Miss Wise?
12          MS. FABBO:  Objection.
13          THE WITNESS:  I don't recall that
14              Miss Wise was terminated for that
15              reason.  You're telling me that.
16      Q.  (By Mr. Feldman)  I'm just saying
17  forget Miss Wise for a minute.  Anyone else been
18  terminated for excessive absenteeism?
19      A.  I don't recall.
20      Q.  Has anyone else been terminated for
21  excessive tardiness?
22      A.  I don't recall.
23      Q.  What's the policy at Vacation Village
24  with regard to giving employees time under the
```