UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-CV-30091-MAP

|  |  |
|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated, | : : : : : : : |
| Plaintiffs, | : : |
| v. | : : |
| PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT, | : : : : : |
| Defendants. | : : |

STATEMENT OF MATERIAL FACTS IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1. The plaintiffs all worked for defendant Patriot Resorts Corporation ("Patriot") between 2001 and 2004. *See*, Affidavits of LaCrisha Wise, Peter Corbin, Michael Massaconi and Roger Martin (hereinafter "Affidavit of named plaintiffs") previously filed and appended to Plaintiffs Motion for Authorization to Send Notice and for Class Certification ("Plaintiff's Motion for Class Certification"). For reference, the court has designated the Affidavit of LaCrisha Wise as Document 71 in this case; Affidavit of Peter Corbin, Document 72; Affidavit of Michael Massaconi, Document 73 and Affidavit of Roger Martin, Document 74.

2. Patriot was and is a seller of time share interests ("time shares") in what they refer

to as "resort recreational properties." Affidavit of Joel Feldman, Exhibit 1, Defendants' Answers to Plaintiffs' First Set of Interrogatories, Answer 7 previously filed and appended to Plaintiffs' Motion for Class Certification. The Affidavit of Joel Feldman and Exhibits have been designated by this court in this case as Document 70.

3. One of Patriot's holdings is a property known as Vacation Village in the Berkshires. *Id*., at Answer 6.

4. The plaintiffs were all employed by Patriot to sell time shares at Vacation Village. *Id.*, at Answer 3.

5. Ms. Wise, Mr. Martin and Mr. Corbin were Timeshare Salespersons; Mr. Massaconi was a Timeshare Salesperson and Sales Manager. Affidavits of named plaintiffs, Documents 71-74.

6. During the course of their employment, the plaintiffs were all subject to the same payment of commission policies concerning the payment of wages. After a multi-week introductory period where the defendants paid some salary to sales personnel, sales representatives and managers were paid commissions on sales made, and were paid no hourly or weekly wages other than commissions. See, e.g., Affidavits of named plaintiffs, Documents 71-74; Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna, pp. 39, 183, Document 70.

7. As of June 1, 2005, many months after the filing of this lawsuit, the defendants changed their policy and began paying a salary of $400 per week and a six percent commission to sales representatives and sales managers. Affidavit of Joel Feldman, Exhibit 3, Deposition transcript of Rod Lewis, p. 96, Document 70.

8. In general, the commissions paid by Patriot were considered earned by the sales person upon the "Closing" of a sale.1 Affidavit of LaCrisha Wise, Exhibit 2, previously filed as Document 71.

9. An exception to this rule was that commissions on financed sales were **not** earned "until the purchaser…made three (3) timely and consecutive monthly payments in accordance with the terms of the purchase money note and mortgage." *Id.*

10. In other words, a sales representative was not actually paid a commission on a "closed" financed sale *if the purchaser did not make three consecutive and timely payments*. Affidavit of Joel Feldman, Exhibit 4, Deposition transcript of William Rauer, pp. 29-30, Document 70. Affidavit of Joel Feldman, Exhibit 2, Deposition transcript of Rebecca Foster Campagna, pp.80-84, Document 70.

11. If a purchaser made two timely and consecutive payments, but was late on the third payment, the commission would not yet be paid by the defendants, even if twelve months had passed from the time of the sale of the time share. *Id.*

12. In a circumstance where *untimely* payments were consistently made for a matter of months, although the defendants would receive all of the money owed by the customer, the sales person would not be paid commissions. *Id.*

13. As a result of this policy, the four named plaintiffs, and many other employees, were not paid some commissions on "closed" sales for months, or even years after the closing. Affidavits of named plaintiffs, Documents 71-74; *see also*, Affidavit of Joel Feldman, Exhibit 2,

---

1 A cash sale was "closed" when the full purchase price was paid, the funds had been cleared and statutory rescission periods had expired, among other conditions. A financed sale was "closed" when the deposit was paid, funds cleared, statutory rescission periods expired, and interest began accruing.

Deposition transcript of Rebecca Foster Campagna, pp. 80-86, Document 70. *See also*, Affidavit of Joel Feldman, Exhibit 5, sample payment of commissions for named plaintiffs, Document 70.

14. For example, Mr. Massaconi sold a time share to a purchaser on August 30, 2003, for which he was to receive a $149.85 commission for his work, but he only received his payment eight months after the sale, after April 30, 2004. Supplemental Affidavit of Michael Massaconi, ¶¶ 10-11.

15. On at least three other occasions, Mr. Massaconi received a check from the defendants more than two hundred days after sale of a time share, and on nine other occasions, received a check from the defendants more than six months after a sale. *Id.* at 12.

16. Other class members received payments from sales which were made months later than the sale of the time-share. As an example, class member Mary Birch sold a time-share on January 17, 2003, but was ultimately only paid her commission of $416.95 on August 11, 2003. Affidavit of Joel Feldman, Exhibit 6, sample payment of commissions for class members, Document 70.

17. Ms. Birch's record shows that her "earn date" for the commission was on July 18, 2003 but that the commission was paid twenty-four days later, indicating that the defendants still waited an extra month to pay sales persons even when rescission dates had long past, and a customer had made at least six payments. *Id.*

18. Class member Edward Abbott Jr. sold a time share on October 26, 2002, but was only paid his $479.20 commission on June 16, 2003, approximately two hundred and twenty two (222) days after the sale. *Id.*

19. The defendants also made Mr. Abbott wait additional weeks to receive the commission after it was "earned" on May 26, 2003, according to his sales record. *Id.*

20. The remainder of the named plaintiffs had similar experiences. Plaintiff Lacrisha Wise "earned" her commission on a May 24, 2002 sale only on January 10, 2003, well over two hundred days (200) later with a presumed payment date twenty-four days later, on February 3, 2002. *See* Affidavit of Joel Feldman, Exhibit 5, sample payment of commissions for class members, Document 70.

21. Similarly, Plaintiff Martin earned a commission some time six months after the contract date. *Id.*

22. Plaintiff Peter Corbin made a sale to a buyer where the sale occurred on April 16, 2002, but Mr. Corbin was paid his commission after February 28, 2003, more than three hundred eighteen (318) days later. Supplemental Affidavit of Peter Corbin, ¶ 12, Exhibit 2.

23. Mr. Corbin separated from his job at Vacation Village in May, 2004, but he received a commission check from the defendants last year in 2006, well over a year after he sold the time share at issue. Supplemental Affidavit of Peter Corbin, ¶ 13.

24. Plaintiff Michael Massaconi separated from his job at Vacation Village in February, 2005, but he also received a check from the defendants last year, some time after February, 2006, in the amount of $110, more than one year after the sale of the time share. Supplemental Affidavit of Michael Massaconi, ¶ 13

25. The named plaintiffs also were subject to the "twenty-four day rule" even when purchaser's purchase occurred months earlier, and no longer had any bearing to rescission or the other rationales for delaying payments, as Michael Massaconi contracted for a sale on July 2,

2004, "earned" the commission on January 21, 2005 and was paid the commission on February 14, 2005. *Id.*

26.    The defendants regularly garnished commissions during the employment of class members, through a process they called a "commission charge-back". Supplemental Affidavit of Michael Massaconi, ¶14.

27.    A "charge-back" could occur, according to the class members' employment contract with the defendants, when a buyer failed to make "three timely monthly payments from the date the first payments [were] due," and the mortgage/notes of the buyer were considered "non-performing". *Id.* at ¶ 15. *See also*, Affidavit of LaCrisha Wise, Exhibit 2, previously filed as Document 71

28.    The defendants would then reimburse themselves from future commissions owed to salespersons. *Id.* at ¶ 16.

29.    The company promised that they would make the reimbursements "immediately after the Company receive[d] notice" of the lack of these first three timely payments by a purchaser, according to the contract. *Id.* at ¶ 17. *See also*, Affidavit of LaCrisha Wise, Exhibit 2, previously filed as Document 71

30.    Despite this promise, the named plaintiffs and class members were charged back on commissions that they had already received and on which they had paid taxes, years after the closing. *Id.* at ¶ 18.

31.    For example, Michael Massaconi closed a deal on *February 22, 2002* for which he earned an eight percent commission of $872, but the defendants "charged back" the commission on *November 22, 2004*. *Id.* at ¶ 19.

32. On November 16, 2004, Mr. Massaconi was charged back $632 on an eight percent commission for a sale closed on March 30, 2002, over two and a half years after he had earned it, and years after he had paid taxes on this commission. *Id.* at ¶ 20

33. On or about November 20, 2004, in total, Mr. Massaconi was charged back over $3000 on eleven deals which were closed from February, 2002 through December, 2003. *Id.* at ¶ 21.

34. The defendants engaged in charge backs even earlier than 2002, as on September 4, 2003, Mr. Massaconi was charged back $50 in commissions on a closing which occurred almost two years earlier, on December 16, 2001. *Id.* at ¶ 22.

35. On not a single charge back was Mr. Massaconi ever told whether the purchase was in default, why the defendants waited to charge back Mr. Massaconi months or years after the closing or whether the payments had all been made, albeit some of them late. *Id.* at ¶ 23.

36. To this day, Mr. Massaconi has no idea why the charge backs occurred at all and whether they were really justified under the law or under my contract, because he was never been provided any proof that the charge backs complied with either the law or the contract with time share salespersons of the defendants. *Id*. at ¶ 24.

37. Mr. Massaconi was not the only salesperson subject to charge backs, as the policy of the defendants was implemented routinely. See, Supplemental Affidavit of Joel Feldman in Support of Plaintiffs' Motion for Partial Summary Judgment ("Supplemental Affidavit of Joel Feldman").

38. For example, William A. Steele sold a time share on September 23, 2001 for which he received a ten percent commission of $890, but the company took the money back in a

charge back levied November 22, 2004, over three years later. Supplemental Affidavit of Joel Feldman, Exhibit 1.

39. By way of further example, on December 20, 2004, the defendants charged back Susan McKnight $750 on a ten percent commission for a time share sold on September 16, 2001. Supplemental Affidavit of Joel Feldman, Exhibit 2.

40. On December 20, 2004, the defendants charged back Mark J. Lepine over $2000 worth of commissions on sales which were made between December 6, 2001 and June 9, 2002. Supplemental Affidavit of Joel Feldman, Exhibit 3.

41. As noted above, many commissions were charged back in November and December of 2004 on sales made in 2001 and 2002, but without any explanation to any sales person about why the charge backs were carried out. Supplemental Affidavit of Joel Feldman, ¶ 5.

42. In discovery, although the defendants were asked to provide the reasons for each and every chargeback made to the plaintiff class, they provided no reason, citing solely documents which contain no grounds for any individual charge backs. Supplemental Affidavit of Joel Feldman ¶ 5.

43. The defendants have still not paid all commissions owed to plaintiff class members years after the sale of a time share, as for example, Michael Massaconi is owed approximately $900 in commissions for sales of times shares completed between 2003 and 2005. Supplemental Affidavit of Michael Massaconi, ¶ 26.

44. Additionally, class members such as Phillip Symonds were charged back on sales that they had made, even when Mr. Symonds knew that a customer still owned the time share

and Mr. Symonds had received no word of late or missing customer payments. Affidavit of

Phillip Symonds, ¶ 6.

45. In March, 2005, Mr. Symonds was also "charged back" a commission simply because a customer purchased an upgrade of his or her time share, not because of cancellation or late payment. Affidavit of Phillip Symonds, ¶ 9.

|  |  |
|---|---|
|  | THE PLAINTIFFS<br>By their attorneys, |
| I hereby certify that a<br>true copy of the above<br>was served upon the<br>defendants by electronic<br>mail on 4/16/07 | _/s/ Joel Feldman_____<br>Joel Feldman<br>BBO # 552963<br>Suzanne Garrow<br>BBO# 636548<br>Heisler, Feldman,<br>    McCormick & Garrow, P.C.<br>1145 Main Street, Suite 508<br>Springfield MA  01103<br>(413)788-7988 |
| ___/s/Joel Feldman_____ | (413)788-7996 (fax) |

Dated: April 16, 2007