UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-cv-30091-MAP

| | |
|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated, | |
| Plaintiffs, | |
| v. | PLAINTIFFS' MEMORANDUM IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT ON CLASS CLAIM OF UNTIMELY PAYMENT OF COMMISSIONS |
| PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT, | |
| Defendants. | |

## I.   INTRODUCTION

The plaintiffs, Lacrisha Wise, Michael Massaconi, Roger Martin and Peter Corbin, former time share salespersons at Vacation Village in the Berkshires, filed this class action lawsuit against the defendants for failing to adhere to state and federal wage statutes. This court ruled that the plaintiffs' case could proceed as a class action against the owners and executives of Vacation Village for failure to pay the plaintiffs the minimum wage and overtime payments allegedly due them, and for failing to pay the plaintiffs in a timely manner. The parties settled the minimum wage and overtime compensation claims some months ago.

The parties have not resolved the plaintiffs' class action claims pursuant to Massachusetts General Laws c. 149, namely that the defendants failed to make timely

payments of commissions to class members after they sold time shares to purchasers. The plaintiffs now move for summary judgment on this remaining class claim.

## II.  STATEMENT OF FACTS

The plaintiffs' facts are contained in the Statement of Material Facts in Support of the Plaintiffs' Motion for Partial Summary Judgment ("Statement of Facts") filed in conjunction with the plaintiffs' Motion for Partial Summary Judgment.

## III.  ARGUMENT

### A.  THE DEFENDANTS HAVE VIOLATED M.G.L. C. 149 § 148 BY FAILING TO PAY COMMISSIONS TO THE PLAINTIFF CLASS IN A TIMELY MANNER

#### 1.  STANDARD FOR GRANTING SUMMARY JUDGMENT

Under the Federal Rules of Civil Procedure, summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial burden of proving that no genuine issues of material fact exist for trial. *Sands v. Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir. 2000). *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Sands, 212 F. 3d at 660, quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Under the standard set forth in *Celotex,* summary judgment is appropriate against "a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the party will bear the burden of proof at trial." The *Celotex* Court went on to explain:

> In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

477 U.S. at 323-324.  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Upon the moving party making this showing, the burden is then shifted to the nonmoving party "to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997).

    2.    THE PAYMENT POLICY OF THE DEFENDANTS, AS IMPLEMENTED, VIOLATED M.G.L. C. 149

The defendants sold time shares as "inside salesmen" at a "resort" known as Vacation Village in the Berkshires.[1]  See, Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("Statement of Facts"), ¶¶ 1-5.  From 2001 until June, 2005, the defendants paid salespersons commissions only, without the payment of any weekly wages.  In 2005, months after the filing of this lawsuit for failure to pay the minimum wage, the defendants began paying some salary to salespersons in addition to commissions. Statement of Facts, ¶¶ 6-7.

The defendants' pre-2005 employment contract noted that a salesperson, in general, would be paid a commission within twenty-one days of the sale of a timeshare. Statement of Facts, ¶ 8.  The defendants created two major exceptions to this general policy payment policy:  first, for a financed sale of a time share, the salesperson would

---

[1] *See also*, Document 85 filed in this case, Plaintiffs' Reply Memorandum to Defendants' Opposition to Plaintiffs' Motion for Authorization to Send Notice and for Class Certification, for the basis of Plaintiffs' claim that they were inside salespersons and employees of the defendants.

3

not be paid a commission until the purchaser made three consecutive timely monthly payments and second, a commission which had been paid could be taken back by the defendants through a "chargeback", or deduction, of a future commission if the purchaser made a late payment during the first three months of a loan.  Statement of Facts, seriatim.

In practice, the defendants have routinely paid commissions in many instances only after some two hundred days have elapsed from the sale of a timeshare by a buyer. Statement of Facts, ¶¶ 14-21.  The defendants paid plaintiff Peter Corbin one commission over three hundred days after the sale, and paid Mr. Corbin and Mr. Massaconi commissions well over a year after they had already left Vacation Village.  Statement of Facts, ¶¶ 22-25.  The defendants still have not paid Mr. Massaconi all of the commissions due him deriving from time share sales he made during a period between 2003 and 2005.  Statement of Facts, ¶ 43.  As to "charge backs", in practice, the defendants have taken commissions from the plaintiffs and class members more than three years after the commissions had been paid to salespersons for completed sales.

In these examples of delayed payments, lack of payment and charge backs, the defendants violated the state law mandating timely payments of commissions, M.G.L. c. 149 § 148. Under c. 149 § 148, an employee is to be paid weekly or bi-weekly for wages earned during a work week.  The Supreme Judicial Court concluded that in passing the Massachusetts State Payment of Wages Act, the Legislature intended to "limit[] the interval between the completion of a work week and the payday on which the wages earned in that week will be paid." *American Mutual Liability Insurance Company v. Commissioner of Labor and Industries*,  340 Mass. 144, 145  (1959).  The Court went on to note that:

4

> Doubtless the legislation in its early form was enacted primarily to prevent unreasonable detention of wages. See Governor Robinson, address to the Legislature (Legislative Documents, Senate, 1885, No. 1, pp. 37-38; Commonwealth v. New York Cent. & H. R. R.R. 206 Mass. 417, 423-424 ("prompt payment of their wages").

*Id*. at 147. The primary purpose of the legislation, then, was to insure that employers did not abuse their workers by holding back, or failing to pay, their compensation. The rule passed by the Legislature meant that employers were to pay promptly the wages already earned by the worker. Succinctly put, "the purpose of the wage law is clear: to prevent the unreasonable detention of wages." *Boston Police Patrolmen's Association, Inc. v. City of Boston*, 435 Mass. 718, 720 (2002).

In 1943, the Wage Act (as it is known) was amended to include the payment of commissions (St. 1943 c. 467, approved June 7, 1943):

> This section shall apply, so far as apt, to the payment of commissions when the amount of commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty [the statute permitting civil actions to recover damages].[2]

G.L. c. 149 § 148. A commission, then, must be paid when (1) it has been definitely determined and (2) has become due and payable, under this amendment.

The clear language of the statute encompasses within its reach employees who receive commissions as a major part of their wages. "From the caption to [the] act and from the placement of the provision in the weekly payment statute, one infers a Legislative purpose to assist employees who would ordinarily be paid on a weekly basis,

---

[2] Any worker aggrieved by a violation of M.G.L. c. 149 § 148 may bring a civil action for injunctive relief and any damages incurred against his/her employer, including treble damages for any loss of wages and other benefits. A prevailing party is also entitled to an award of the costs of the litigation and reasonable attorney fees. M.G.L. c. 149 § 150.

5

such as retail salespeople, and for whom commissions constitute a significant part of weekly income."[3] *Commonwealth v. Savage*, 31 Mass. App. Ct. 714, 716 (1991). Equally important, the legislation requiring prompt payment of commissions was placed in the section of c. 149 which was enacted primarily to prevent delay in paying wages. The Legislature intended to, "so far as apt" according to the legislative language, insure that commissions were paid in a timely manner as well.

Based upon this background, the only issue in determining whether summary judgment should issue to the plaintiffs on this claim, is: did the defendants unreasonably detain the commissions which were due to the plaintiff class of timeshare salespersons and sales managers, thereby violating c. 149? Given that there are no factual disputes as to the payment policies of the defendants, the answer to this question, is that the defendants, as a matter of stated policy, did unreasonably detain the commissions of the sales persons included in this class action.

    a.    <u>The Wage Act Prohibits Unreasonable Detention of Commissions , and the Defendants Have Withheld Commissions Routinely for More Than Six Months</u>

The defendants' position appears to be that as a matter of law "due and payable" under c. 149, means whatever the defendants insert into their employment contracts with their sales persons.[4] In this case, the contract notes that:

> 2A(iv). Earned Commissions-A commission will be deemed earned upon the Closing of a sale, except that commissions on Financed Sales shall not be deemed earned until the purchaser has made three (3) timely and consecutive monthly payments in accordance with the terms of the purchase money note and mortgage.

---

[3] The payments to the class meet exactly the test laid out in *Savage*. The class received only commissions until June 1, 2005, and the commissions therefore constituted the only income received by the class members up until that date. Statement of Facts, ¶¶ 6-7.
[4] The commission payment due were clearly "definitely determined" based upon the contractual rates listed in the contracts and the Statement of Facts.

6

Affidavit of Lacrisha Wise, Exhibit 2.  Rebecca Foster Campagna, President of defendant The Berkeley Group, Inc., testified that this provision meant that a sales person would not receive payment even if a year had passed from the time of sale, when the purchaser routinely paid all the money she owed Vacation Village but was chronically late in making payments.  Statement of Facts, ¶¶ 10-12.

     As a result, the defendants paid plaintiff Peter Corbin more than ten months after he sold a time share because the purchaser had not made three consecutive timely payments. Statement of Facts, ¶ 22.  In the instances noted by Mr. Massaconi, Mr. Corbin, Ms. Wise, Mr. Abbott and Ms. Birch, the defendants often paid commissions to sales persons after two hundred or three hundred days had passed from the time of a sale. Statement of Facts, ¶¶ 14-24. The defendants have claimed for themselves the right to delay and detain commission payments to a sales person when a purchaser makes chronic late payments, even if it occurs every third month, and even if a few days late. Statement of Facts, ¶¶ 10-12.

     The only possible ground for the delay of a commission payment is that the owners were making late payments to the defendants.  The deal was not cancelled:  if it was, under the payment rules of the defendants, the sales persons would not have been paid even ten months after a sale.  The fact of payments meant that in the three months prior to the payment, the purchaser had made three consecutive timely payments.  The salespersons then were penalized not because of their own actions, and not because a deal was canceled and arguably never really "sold", but solely because of a few late payments of a purchaser within eight or nine months.

7

By claiming that this is lawful under the Wage Act, the defendants permitted themselves the right to hold Mr. Massaconi and Mr. Corbin's commissions for more than one year after they stopped working at the defendants' offices. Statement of Facts, ¶¶ 23-24. They have also steadfastly refused to pay some commissions *at all* to sales persons after completed sales, even years after the consummation of the sale. As noted above, Mr. Massaconi has not been paid hundreds of dollars of commissions based upon sales he completed between the years 2003 and 2005. Statement of Facts, ¶ 43. And in every case of charge backs undertaken years after a sale, a sales person has not been paid commission on that sale.

The Wage Act must be read to prohibit this kind of detention of commissions. The Legislature could never have intended to allow an employer to determine unilaterally when a commission was "due and payable"; instead, the purpose and intent of the statute should govern and inform the analysis of these three words. If this were not the frame of the analysis, employers could easily give to themselves the sole right to determine what is "unreasonable detention" of wages, as there would be absolutely no limitation on "due and payable" other than the imagination of an employer. For example, under the defendants' theory, the defendants could have lawfully dictated that a purchaser must make thirty-six timely payments consecutively for an employee to earn his/her commission. Or the defendants could have claimed a right to charge back an employee's commissions for ten years if a purchaser made a single late payment during the ten year span.

Holding the commissions for ten years, or three years, without any connection to the contingency which yields the commission, namely the sale of a time share, must

violate the law's mandate of timely payment of commissions. This is so because the statute must be interpreted broadly and according to its purpose. The purpose of the statute has been widely cited as "the prevent[tion] of the evil of the "'unreasonable detention of wages [by an employer]'". *Newton v. Commissioner of the Department of Youth Services*, 62 Mass. App. Ct. 343, 345 (2004) *quoting Boston Police Patrolmen's Association, Inc. v. Boston*, 435 Mass. 718, 720 (2002). The cases addressing issues under c. 149 have uniformly found that this is the main purpose of the statute. "The statute was intended and designed to protect wage earners from the long-term detention of wages by unscrupulous employers…" *Cumpata v. Blue Cross Blue Shield of Mass., Inc.* 113 F. Supp. 2d. 164, 167 (D. Mass. 2000).

Like every other statute, the Wage Act should be "interpreted in the light of its purpose, and so far as may be, to promote the accomplishment of its beneficent design." *Young v. Duncan*, 218 Mass. 346, 349 (1914) *cited with approval in Neff v. Commissioner of the Department of Industrial Accidents*, 421 Mass. 70,73 (1994). The Wage Act is a remedial statute, designed in its "beneficence" to insure that compensation is timely paid. *See, e.g., Allen v. Local 254*, Docket No. 002722A, Suffolk Superior Court (2003), attached (The legislature set out in c. 149 § 148 and related statutes "the comprehensive remedial statute"). Remedial statutes such as the Wage Act "should be given a broad interpretation." *Panasuk's Case*, 217 Mass. 589, 592 (1914).

Given the statute's purpose, the term "due and payable", the central term in this case, must be interpreted to mean that commissions are owed to a salesman close in time to the event which creates the commission. Just as wages are specifically owed to wage workers within a week or two under the statute, commissions are owed to salespersons

9

with a relatively short time after the event yielding the commission has occurred. In this case, the defendants agreed to pay the class of salespersons within three weeks of the sale of a time share, plus three days or so until a consumer's rescission rights have expired. This payment provision would most likely pass muster under the statute's purpose and broad interpretation.

But the provision in the contract which allows for payment of commissions over three hundred days, or even years, after a sale and for the "charge back" of commissions over one thousand days after a sale are an "unreasonable detention" of the commissions covered under c. 149. This court need not determine the outside limit for "due and payable" in general; rather, the court should determine whether the three hundred eighteen day payout to Mr. Corbin, the more than one-year, post-termination payments to Mr. Corbin and Mr. Massaconi, and the failure to pay Mr. Massaconi and others years after a sale, could have possibly been deemed permissible by the Legislature when they added commissions to the timely payment statute. Statement of Facts, ¶¶ 14 – 24, 42.

The central and only event leading to the payment of a commission in this case is the sale of a time share by a sales person. Once that sale occurs, the salesman has no control over the timeliness of a payment of a note or mortgage by the consumer. It is certainly arguable that if a sale fails shortly after a contract is signed because of the non-payment of the purchaser, the salesman has not really "sold" the time share and has not really earned a commission. Because of this, arguably, a commission may be withheld until payments have begun. But the statute should be read to prohibit an employer from withholding payment of a commission because of a procrastinating purchaser, who in month three, six and nine of a mortgage makes a payment late.

10

Those are the facts of this case. A salesperson sells a time share. The salesperson gets signatures on all of the relevant papers. The salesperson waits until rescission periods expire, and the buyer begins making payments. All of this seems to comply with "due and payable"—the salesperson is being paid for actually making a sale, that is the contingency yielding the commission. But the salesperson is then held hostage to the buyer's timely payments. As Ms. Campagna notes, that salesperson will not be paid for twelve months if the buyer simply makes late payments during the first year of his mortgage. Statement of Facts, ¶¶ 10-12. The company will have use of the salesperson's commission for months, while the sales person waits, hoping against hope that a buyer can make three timely payments in a row, to prevent the commission payment clock from being reset. Class members could remain unpaid if a buyer routinely paid two months on time, and then made untimely payments in the third month, in a pattern which lasted ad infinitum. Statement of Facts, ¶ 10.

Should the court permit an employer to hold commission payments for one year after the contingency creating the commission (here, the sale of a time share), the provision that commissions are covered and must be paid timely under M.G.L. c.149 § 148 would effectively be nullified. Without any limitation on "unreasonable detentions", the statute's "due and payable" language will simply be the terms imposed upon an employee by an employer in an unnegotiated, unregulated version of a "contract of adhesion" . The hypothetical thirty-six consecutive monthly payment contingency described above would allow commissions to be paid three years after the contingent event. An employer could dictate that a commission will be paid after a sale, but would be subject to "charge back" for ten years if a buyer makes an untimely payment. This

simply cannot be what the Legislature anticipated when it added commissions to the language of c. 149 §148 and noted that the section applied "as apt" to commissions.

This court should assume that the Legislature acted to *limit* the time that may pass after a contingency producing a commission has occurred, as courts must "assume the Legislature intended to act reasonably". *Attorney General v. School Committee of Essex*, 387 Mass. 326, 336 (1982). The notion that "anything goes" with regard to employer-imposed detention of compensation, so long as an employee signed a contract, would lead to the absurd results noted above—years late commissions, dependent on the year-later future behavior of a purchaser. This court should not interpret "due and payable" to have no outward limit, creating a result which would have to be considered an absurd consequence of a statute intended to protect employees. *Id.*

Instead this court should find that plaintiff Corbin's more than three hundred day late commission was unlawful. It should find that payments made over two hundred days to the plaintiffs and class members noted above after a sale were unlawful. Statement of Facts, ¶¶ 14 – 24. It should find the payments made a year after employees left the company unlawful. It should require the immediate payment of commissions due Mr. Massaconi from years ago. "Due and payable" must be interpreted to prevent the "unreasonable detention" of the commissions at issue in this case. *Newton v. Commissioner of the Department of Youth Services*, 62 Mass. App. Ct. 343, 345 (2004) *quoting Boston Police Patrolmen's Association, Inc. v. Boston*, 435 Mass. 718, 720 (2002). Unreasonable detention in this case should mean that when the company begins receiving monthly payments, the salesperson should be paid for having completed the contingency required, the sale of a time share. Any late payment by a purchaser to a

defendant has no impact on whether a time share has been sold, and this contingency should be determined unlawful and having no impact on whether the commission is due and payable.

Accordingly, the class requests that this court find all commission payments which were made after the third month elapsed from the sale date to have been "due and payable" and to therefore violate M.G.L. c. 149 § 148 and §150 if the commission were not paid immediately thereafter.

> b. <u>The Defendants Illegally Recouped Already Paid Commissions to Timeshare Salespersons.</u>

The defendants routinely "charged back" commissions which accrued from sales consummated two and three years earlier. Statement of Facts, ¶¶ 26-42. The purported legal basis for taking back previously paid commissions is found in the relevant employee contracts of Vacation Village sales persons:

> 3E   Commission Charge-Back: It is acknowledged between the Company and Employee that the Company is, or may be from time to time, required to guaranty to it's [sic] lenders and/or investors that purchase money notes and mortgages executed in connection with Financed Sales are ***valid and free of default for three timely (3) monthly payments from the date that first payments are due*** (purchase money notes and mortgages that are not valid and free of default as stated aforesaid are hereinafter referred to as "Non-Performing Notes and Mortgages"). Any commissions paid or advanced to Employees for Financed Sales involving Non-Performing Notes and Mortgages are subject to charge-back hereunder. The Employee shall reimburse to the Company out of any future commissions that may be due and owing to Employee the full amount of commissions paid or advanced to Employee by reason of said Financed Sales. ***Said reimbursement shall be made immediately after the Company receives notice that a purchase money note and mortgage is a Non-Performing Note and Mortgage and the Employee does hereby authorize the Company to offset the appropriate amount from the next available commission due Employee.***

Affidavit of Lacrisha Wise, Exhibit 2 (emphasis added), Document 71.

13

The contract, to the extent this court determines that it does not violate c. 149 § 148 on its face, says the following: the defendants reserve for themselves the right to take back commissions "paid" to sales persons when the defendants have notice that a purchaser has made a late payment, or no payment, during the first three months of the loan. The company *must* reimburse itself from the next commission earned by a sales person after it is on notice of the late or non-payment in the first three months.

This written "charge back" policy was honored in the breach by the defendants during the employment of class members. The contractually correct manner for "charging back" a commission would be to take a commission from a sales person in the first, second, third or fourth month of a contract, as the defendants had immediate notice of whether a loan was paid late or not paid at all during this period—they were certainly aware of whether a purchaser was making timely payments after a sale.

But this contractually correct manner was not adhered to by the defendants. Instead, the defendants routinely charged back sales persons *years* after the purchase of a time share. One named plaintiff, Michael Massaconi, was charged back multiple times, on one occasion more than two and a half years after the purchase of the time share by a buyer. Statement of Facts, ¶ 32. On that occasion, Mr. Massaconi had sold a time share to a buyer on March 30, 2002, and was entitled to his eight percent commission, then worth $632, which was paid to him. But on November 14, 2004, two years and eight months later, the defendants took the commission back through a deduction from another commission paid on that date. *Id.*

This scenario was anything but anomalous. Each of the named plaintiffs was repeatedly charged back during the course of their employment. See the Affidavits of the

named plaintiffs, Documents 71-74. The class also experienced late charge backs. As relatively random examples, salespersons William Steele, Susan McKnight and Mark J. Lepine all were subjected to "charge-backs" by the defendants approximately three years after the salespersons sold time shares. Statement of Facts, ¶¶ 38-41. The charge backs occurred in very late 2004, while the sale of the time share occurred in 2001. Mr. Lepine alone was charged back $2000 on five separate sales which originally occurred in the period two to three years before the date of the charge back. Statement of Facts, ¶ 40. Mr. Steele sold a time share to a buyer on September 23, 2001, receiving an $890 commission payment. The defendants took back that commission from a subsequent commission payment in November 22, 2004, *almost thirty-nine months later*, without explanation, directly contravening the contractual language. Statement of Facts, ¶ 38.

Although the defendants apparently determined to "charge back" thousands of dollars in November and December, 2004, they never notified the salespersons of the reasons for the charge backs.[5] From the time of his multiple "charge backs" until this moment, Mr. Massaconi and Mr. Corbin have never been told by the defendants whether the buyer had made late payments, no payments or whether a foreclosure of the buyer's mortgage had occurred. Statement of Facts, ¶¶ 35-36; Supplemental Affidavit of Peter Corbin, ¶¶ 20-21. Class members such as Phillip Symonds also were never notified of

---

[5] The defendants have provided no rationale for these 2004 charge backs or any other years-late charge back. Although the plaintiffs requested in initial Interrogatories in this case that the defendants "list any charge back" made against a potential class member and "the reasons why it was made", the only response to the request from the defendants was that the documents provided to the plaintiffs included "the information responsive to this Interrogatory". Affidavit of Joel Feldman, Exhibit 1, Defendants Answers to Plaintiffs' First Set of Interrogatories, Answer 24 previously filed and appended to Plaintiffs' Motion for Class Certification, Docket 70; see also, Supplemental Affidavit of Joel Feldman, ¶ 5. Plaintiffs' counsel has received no information providing any explicit rationale for any individual charge back. The plaintiffs made this same request for specific information in its Document Request 41, and received no documentation explaining why any single "charge back" was implemented by the defendants. *Id.*

customer problems when the defendants charged Mr. Symonds back. Affidavit of Phillip Symonds, ¶¶ 6, 9.[6]

If the defendants' theory under this claim is that the employer may dictate the terms of what "due and payable" means under the statute, the defendants' own actions show a violation of their legal position. Every charge back initiated five months after a sale and thereafter was initially a commission paid to a sales person who completed a sale and waited the appropriate period. According to the contract language, the company reserved the right to charge that commission back, but only in the first three (or possibly four) months and then only if a purchaser made a late payment. Yet the company repeatedly waited one year, two years and even three years to charge back a commission, after it had promised in its contracts to charge back the funds when it first had notice of the "default", which occurred at some point close in time to a late or failed payment.[7] This left each salesperson unpaid on a sale made by that person years or months before, on which the person had paid taxes years or months before, and which was "due and payable" under the defendants' own employment contracts.

This is precisely the scenario prohibited by the Legislature when it included commissions in the Wage Statute. The Legislature required payment of commissions earned by employees in a timely manner. The defendants have at this point failed to pay

---

[6] Additionally, class members were charged back simply because a customer upgraded to a more expensive time share—the sale had been "good" and no contractual grounds existed for a charge back. This policy appears to have been implemented in violation of the defendants' own contracts. See, e.g., Affidavit of Phillip Symonds, ¶ 9.

[7] The defendants should be held strictly to the language used in their employment contracts. The contracts themselves are form documents which are not negotiated. See, e.g. Affidavit of Lacrisha Wise, Exhibit 2, Document 71. They therefore have some aspect in common with "contracts of adhesion". *See, e.g. Kroger v. Stop and Shop Companies, Inc*. 13 Mass. App. Ct. 310, 318 (1982). As such, this court should strictly construe the agreement against the defendants, the drafters of the contract, to the extent the defendants may argue that they should be permitted to "charge back" commissions at times other than those permitted under the contract. *See, Lechmere Tire & Sales, Co., v. Burwick*, 360 Mass. 718, 720-721 (1972).

salespersons who were owed commissions as "due and payable" because they recouped sales commissions three years after the sale of the time shares. This practice straightforwardly violates the defendants' contracts and therefore their own determination of when a commission was "due and payable" and when it could be charged back. Under the agreement between the parties, the salespersons satisfied every part of their obligation to the company—they sold the timeshare, waited twenty four days after rescission periods expired, and they passed the three month mark in which payments were made by the purchaser. Yet their commissions were taken away months and years later, without explication, never to have been paid.

The class of salespeople in this case never received any commission in late "charge back" instances although the commissions were then contractually promised to them. The defendants' attempt to recoup commissions beyond the contractual four months permissible under the contract, is a direct violation of the statute's prohibition against failing to pay commissions when due and payable in a timely manner. The court should therefore enter summary judgment against the defendants on the plaintiffs' claim of illegal charge backs.

## IV. CONCLUSION

Under M.G.L. c. 149 § 148, the defendants have violated the rights of the plaintiff class by failing to pay commissions in a timely manner. The defendants paid commissions to the plaintiff class months and months after a sale of a time share and after all payments had been received by the defendants. Some of these commissions have still not been paid to this date.

The defendants also "charged back" commissions paid to sales persons two and three years after the payments were made and years after they were permissibly allowed under their own contracts to engage in charge backs. These commissions are now unpaid although they were due and payable years ago.

In both of these instances the defendants have violated Massachusetts wage law and judgment should be entered against the defendants on this class action claim.

|  |  |
|---|---|
|  | THE PLAINTIFFS<br>By their attorneys, |
| I hereby certify that a<br>true copy of the above<br>was served upon the<br>defendants by electronic<br>mail on 4/16/07 | /s/ Joel Feldman_____<br>Joel Feldman<br>BBO # 552963<br>Suzanne Garrow<br>BBO# 636548<br>Heisler, Feldman,<br>   McCormick & Garrow, P.C.<br>1145 Main Street, Suite 508<br>Springfield MA  01103<br>(413)788-7988 |
| ___/s/Joel Feldman_____ | (413)788-7996 (fax) |

Dated: April 16, 2007