UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-CV-30091-MAP

|  |  |
|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT,<br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

SUPPLEMENTAL AFFIDAVIT OF PETER CORBIN

1. My name is Peter Corbin and I am one of the plaintiffs in this case.

2. From approximately December, 2001 through May, 2004, I worked for the named defendants in this case (the named defendants collectively will be referred to as "Patriot Resorts Corporation").

3. While I worked for Patriot Resorts Corporation, I was employed as a sales person, selling time shares at the resort known as Vacation Village in the Berkshires ("Vacation Village").

4. During my employment at Vacation Village, I was paid at a rate of eight percent commissions. I was paid some weekly wages for my first few weeks and I was also paid an additional bonus. After that introductory period of wages and bonus pay, I

was paid eight percent commission on my "closed sales", and I was paid no weekly wages other than those commissions.

     5.    According to my contract with Vacation Village, I earned my commission upon the closing of a sale.

     6.    A "closing" occurred in the case of financed sales, when a customer had made her/his deposit, the rescission periods had passed, and the company began to have access to the customer's funds and interest.

     7.    Patriot Resorts had an exception to payment of commissions after a financed sale "closing" occurred—a commission for a salesperson was not considered "earned" until the customer had made three consecutive and timely payments after the closing.

     8.    This meant that a sales person would not be paid their commission when, for example, a customer made two timely payments, but then made an untimely payment in the third month, and continued making payments in this pattern (two timely payments, one untimely) for many months.

     9.    On some of my sales, I did not receive a commission from Patriot Resorts until more than eight to ten months had passed after I had sold a time share to a customer, rather than the twenty-four (24) day delay I expected under the standard Patriot Resort policy.

     10.    For example, I sold a time share to a purchaser on April 12, 2003, and I was to receive a commission of $799.20 for my work.

11. However, I received my payment at least two hundred fifty-two (252) days after the sale, after December 20, 2003. A redacted copy of my commission report showing the April 12, 2003 sale is attached as Exhibit 1 to this Affidavit.

12. I received commissions paid more than two hundred days after a sale on two other occasions, including a sale which occurred on April 16, 2002, but I was paid my commission after February 28, 2003, more than three hundred eighteen (318) days later. A redacted copy of my commission report showing the April 16, 2002 sale is attached as Exhibit 2 to this Affidavit.

13. As noted above, I separated from my job at Vacation Village in May, 2004, but I received a commission check from the defendants last year in 2006, well over a year after I sold the time-share.

14. Patriot Resorts has garnished my commissions during my employment, through a process they called a "commission charge-back".

15. A "charge-back" could occur, according to my employment contract, when a buyer did not make "three timely monthly payments from the date the first payments [were] due," and the mortgage/notes of the buyer were considered "non-performing".

16. Patriot Resorts would then pay themselves back from future commissions owed to me.

17. The company promised that they would make the reimbursements "immediately after the Company receive[d] notice" of the lack of these first three timely payments by a purchaser, according to the contract.

18. Despite this promise, I was charged back commissions that I had received many, many months after the sale of the time share.

19. For example, I sold a times share to a purchaser on September 27, 2002 for which I earned a commission of $240, but the defendants charged back my commission on October 17, 2004, over two years later. I was never paid this commission again so I have not received payment on a sale made in 2002. A redacted copy of my commission report showing the September 27, 2002 sale is attached as Exhibit 3 to this Affidavit.

20. In addition to the September 27, 2002 sale, I was also charged back on five other sales on October 17, 2004 in the total amount of $3197.60, including two other sales from 2002. *Id.*

20. On not a single charge back was I ever told whether the purchaser was in default, why the defendants waited to charge me back months or years after the purchase date, or whether the payments had all been made, even if some of them were late.

21. To this day, I have no idea why the charge backs occurred at all and whether they were really justified under the law or under my contract, because I have never been provided any proof that the charge backs complied with either the law or my contract.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS DAY

DATE: 4/16/07                               /s/ Peter Corbin
                                            PETER CORBIN