## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
        Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
        Defendants

DEPOSITION OF RODNEY LEWIS

June 2, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

## Page 2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA 01103
BY: JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA 01103
BY: MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

## Page 3

INDEX

WITNESS: RODNEY LEWIS

Direct Examination by Mr. Feldman    5

EXHIBITS

Exhibit 1, 2005 Vacation Village Tour
   Presentation    71
Exhibit 2, Vacation Village Rotation    74
Exhibit 3, 11/3/02 Memo Re: Attendance    117
Exhibit 4, Employee Information Form    124
Exhibit 5, LaCrisha Wise Attendance Report    125
Exhibit 6, 5/18/03 Memo Re: Dress Code    145
Exhibit 7, Leaders Booklet    156

## Page 4

                STIPULATION

    It is agreed by and between the parties that all objections, except as to form of the question, are reserved until the time of trial.

    It is further agreed by and between the parties that all motions to strike unresponsive answers are reserved until the time of trial.

    It is further agreed by and between the parties that the sealing of the original deposition transcript is hereby waived.

    It is further agreed by and between the parties that the notification to all parties of the receipt of the original deposition transcript is hereby waived.

**Page 57**

1  be no guests in December?
2  A. No.
3  Q. There were --
4  A. Numerous other occasions. I don't
5  recall any specifics, but it was a frequent --
6  reasonably frequent occurrence.
7  Q. Why wasn't that a reason to demote him
8  from sales manager to salesperson?
9  A. Because I tried not to let that be a
10 factor in the decision-making at that time, give
11 him the benefit of the doubt.
12 Q. When was Mr. Massaconi terminated?
13 A. Late 2004, or this is '5 -- yes, '4.
14 I don't remember the date.
15 Q. What changed between the earlier time
16 when you didn't want to let that get in the way
17 and the time when he was terminated?
18 A. I don't recall.
19 Q. Were you aware that Mr. Massaconi had
20 gone to the Attorney General with a complaint
21 about the way he was being paid?
22 A. No. He had constant questions about
23 it, and we would resolve his questions. I would
24 ask him to give me a list of whatever he thought

**Page 58**

1  he was due to be paid on, and then I would give
2  him a definitive answer on anything he had
3  questions on.
4  Q. Did that have anything to do with
5  either his demotion or termination, his
6  questions?
7  A. Not whatsoever.
8  Q. Did you ever learn before I just
9  mentioned it that Mr. Massaconi had gone to the
10 Attorney General to complain about his wages?
11 A. No, that's the first I heard.
12 Q. Who else was demoted besides
13 Mr. Lambert and Mr. Massaconi?
14 A. Stimple, not Lambert.
15 Q. I'm sorry, Stimple. I don't know
16 where that came from, excuse me.
17 A. Other managers were demoted
18 temporarily and they got their positions back.
19 Q. Who were those?
20 A. They righted theirselves. Mark Lapine
21 was one. Bob Campagna, Michael Campagna. All
22 these people had received notices and had righted
23 theirselves. Nobody else I can think of right
24 now.

**Page 59**

1  Q. Getting back to the job of a
2  salesperson, was there ever any reason why a
3  salesperson was supposed to appear at the Sales
4  Center before 8:30 on a particular day?
5  A. No, unless they had been called in for
6  an early meeting with their manager or director
7  or for some training or something, I don't know.
8  Q. Do you remember a specific time that
9  salespeople came in before 8:30?
10 A. No.
11 Q. After the sales meeting that you
12 described that takes between twenty and thirty
13 minutes, you said?
14 A. Yes.
15 Q. The salesperson would then go out on a
16 tour if a tour was -- if a guest was there for
17 the person, is that correct?
18 A. That's correct.
19 Q. What if a tour was not there for a
20 salesperson?
21 A. Then we would cut the line as early as
22 possible to allow them to leave.
23 Q. What's the earliest you ever remember
24 the line being cut since you've been project

**Page 60**

1  director?
2  A. Probably 11:30 in the morning.
3  Q. If there was a possibility of a tour
4  coming in -- strike that. When would you know
5  definitively how many tours, guests were coming
6  in on a particular day?
7  A. We never know definitely how many
8  tours are going to come in on a particular day
9  until the end of the day, because it's possible
10 unscheduled people will somehow show up.
11 Q. How often did that happen?
12 A. Infrequently.
13 Q. Did you keep salespeople at the center
14 just in case someone might show up on one of
15 these infrequent visits?
16 A. Once the line has been cut, then
17 typically we keep somebody around for an hour to
18 allow for any of the late arrivals to come in.
19 We just keep the number that are expected.
20 Q. When the tours come in -- tour guests
21 come in on a typical day, do they come in
22 individually or by bus?
23 A. Individually.
24 Q. So they just arrive according to the

149

1  Q. Was her check ever withheld for that
2  reason?
3  A. No.
4  Q. Was Miss Wise not permitted to close
5  out her own sales during her tenure as a
6  salesperson?
7  A. I think she closed some of her sales.
8  Q. Did Mr. Leete discuss with you the
9  fact that Miss Wise should not be allowed to
10 close her own sales?
11 A. Yes.
12 Q. Did Mr. Bourdon give Miss Wise
13 permission to close her own sales?
14 A. Yes.
15 Q. Was he authorized to do so?
16 A. Yes.
17 Q. But Mr. Leete didn't want her to close
18 her own sales?
19 A. Well, Mr. Leete wanted her to have a
20 manager, and her manager allowed her to do it
21 himself.
22 Q. Why did Mr. Leete want a manager
23 there?
24 A. He just felt like she should have one.

150

1  Q. Who knew her work better, Mr. Leete or
2  Mr. Bourdon?
3  A. Mr. Bourdon.
4  Q. Did Mr. Leete ever threaten to have
5  Miss Wise's car towed for being parked in the
6  wrong area of a parking lot?
7         MS. FABBO: Objection.
8         THE WITNESS: I don't recall.
9  Q. (By Mr. Feldman) Was Miss Wise ever
10 put on overage because she didn't believe she was
11 going to get a tour and was allowed to leave
12 early by Mr. Bourdon?
13 A. I think that happened one time.
14 Q. Do you know why that happened?
15 A. No. When we found out that he had
16 approved her early departure, then we changed
17 that.
18 Q. She was put on overage and she didn't
19 get a tour the next day, right?
20 A. Right.
21 Q. Didn't she say that she had been given
22 permission from Mr. Bourdon that day?
23 A. She did, and we confirmed it; we were
24 wrong.

151

1  Q. Wasn't Mr. Bourdon there that day?
2  A. He was, but I think he was on tour at
3  the time.
4  Q. Weren't white employees allowed to
5  leave early without permission and not put on
6  overage?
7  A. Weren't who?
8  Q. White employees?
9  A. We don't differentiate.
10 Q. I'm not asking a differentiation; I'm
11 just asking about whether -- why don't I put it
12 this way. Were employees supposed to be put on
13 overage if they were released by their manager?
14 A. No. If they had permission to leave,
15 then they had permission to leave.
16 Q. How many days of overage was she given
17 for leaving that day, the day that she had
18 approval from Mr. Bourdon?
19 A. I don't recall. I would think one.
20 Q. Do you know?
21 A. No.
22 Q. Were you involved in any way in
23 Mr. Massaconi's termination?
24 A. Not really, other than approving it.

152

1  Q. Why did you approve it?
2  A. His sales numbers were just terrible.
3  Q. Is that the only reason?
4  A. Yes.
5  Q. Do you remember telling anyone that
6  the company was trying to get rid of people who
7  were involved with this lawsuit?
8  A. I remember saying that, and it was --
9  that's kind of out of context.
10 Q. What was the context?
11 A. In my own misguided efforts to keep
12 people from suing the company, because the
13 company is employee-owned, if they sue the
14 company, they sue me.
15 Q. You mean through the ESOP, is that
16 right?
17 A. Through the ESOP, uh-huh. I stated
18 -- trying to remember exactly how I said it --
19 that it wouldn't surprise me if the company would
20 do that; if I owned the company, I probably would
21 do that.
22 Q. Who did you say that to?
23 A. I said it to Mike Massaconi.
24 Q. Did you say it to anybody else?

## Page 153

1  A.  No, I don't think so.  I said I think
2  I said it to him.
3  Q.  Did you ever tell anybody else --
4  A.  No.
5  Q.  You have to let me finish.
6  A.  I'm sorry.
7  Q.  Did you ever tell anybody else on the
8  site at Vacation Village that the company would
9  try to get rid of people who were involved in
10 this lawsuit?
11 A.  No.
12 Q.  Describe the entire conversation with
13 Mr. Massaconi where you made the comment you just
14 described.
15 A.  I don't recall what exactly it was.
16 Something had come up in regards to the lawsuit,
17 and I just told him what -- it was just a guess
18 on my part, strictly.  You know, it wasn't the
19 company's position, you know.  That's all.
20 Q.  When Mr. Massaconi was terminated,
21 were you aware that he had filed this lawsuit?
22 A.  No.
23 Q.  You didn't know about the lawsuit at
24 that point?

## Page 154

1  A.  No.  I don't know what the lawsuit is,
2  and I don't know who's a party to it.
3  Q.  But you told Mr. Massaconi that you
4  wouldn't be surprised if the company got rid of
5  people involved with it?
6  A.  I knew of it.  I don't know it
7  specifically.  I was aware that it was out there,
8  yes.
9  Q.  And you knew that Mr. Massaconi was
10 one of the parties to it, right?
11 A.  No.
12 Q.  Why were you talking to Mr. Massaconi
13 about the lawsuit?
14 A.  I don't know.  Maybe it came up in
15 conversation; I don't know.
16 Q.  Did Mr. Massaconi say, I'm involved in
17 this lawsuit?
18 A.  No.
19 Q.  Do you recall what was said right
20 before you said the comment about the company
21 getting rid of people involved?
22 A.  No.
23       MR. FELDMAN:  Off the record.
24       (A break was taken)

## Page 155

1       MR. FELDMAN:  Back on the record.
2  Q.  (By Mr. Feldman)  Was Miss Wise making
3  sales while she was working at Vacation Village?
4  A.  Yes.
5  Q.  Was she a good salesperson?
6  A.  Very good.  That probably had a lot to
7  do with our trying to push her to come to work.
8  Q.  Was she making sales in June of 2003?
9  A.  I don't recall.  When she came to
10 work, she normally would sell.
11 Q.  Wasn't that really what being a
12 salesperson is all about, as you said before?
13 A.  Sure.
14 Q.  Is making sales?
15 A.  Um-hum.
16 Q.  So given that she was making sales,
17 why would her absenteeism matter with regard to
18 keeping her on?
19 A.  Simply because it violated the
20 company's ground rules policy.
21 Q.  Even with her absenteeism, was she
22 making more sales than other people were who
23 didn't have the absenteeism problem?
24 A.  Yes, some.  There were some people

## Page 156

1  that were better than hers.
2  Q.  She was better than some?
3  A.  Yes, some; and some were better.
4  Q.  Did she have a higher average number
5  of sales than other people did during the year
6  2003, if you know?
7  A.  I don't know.
8       (Exhibit 7, Leaders Booklet,
9       marked for identification)
10 Q.  (By Mr. Feldman)  What's Exhibit 7,
11 Mr. Lewis -- do you know what it is -- I'm
12 sorry, are you looking through it; is that why
13 there's silence?
14 A.  Yes.  I was waiting for the question.
15 Q.  I said, do you know what this is?
16 A.  Yes.
17 Q.  What is it?
18 A.  It's a little management handbook that
19 was put together for the sales managers at the
20 resort.
21 Q.  Was this provided to sales managers
22 upon their becoming a sales manager?
23 A.  Yes.
24 Q.  Was it provided to salespeople?