## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 04-CV-30091-MAP

LACRISHA MISE, MICHAEL MASSACONI
ROGER MARTIN AND PETER CORBIN,
ON BEHALF OF THEMSELVES AND ON
BEHALF OF OTHERS WHO ARE
SIMILARLY SITUATED,
    Plaintiffs
VS.
PATRIOT RESORT CORP., THE BERKLEY
GROUP, INC., MARC J. LANDAU,
J.P. OTTINO, III, REBECCA A.
FOSTER AND JAMES E. LAMBERT,
    Defendants

DEPOSITION OF GORDON LEETE, taken before Debra Vance, Notary Public Stenographer, pursuant to the provisions of Rule 30 of the Massachusetts Rules of Civil Procedure, at the offices of SKOLER, ABBOTT & PRESSER, P.C., 1414 Main Street, Suite 2000, Springfield, Massachusetts on July 27, 2005, commencing at 9:00 a.m.

APPEARANCES: (See Page 2)

Debra A. Vance
Notary Public Stenographer

## Page 2

FOR GORDON LEETE:

KATZ SASSON HOOSE & TURNBULL
1145 Main Street
Springfield, Massachusetts 01103
413-732-1939
    BY: CYNTHIA J. TURNBULL, ESQ.

FOR THE PLAINTIFF:

HEISLER, FELDMAN & MCCORMICK, P.C.
1145 Main Street, Suite 508
Springfield, Massachusetts 01103
413-788-7988
    BY: SUZANNE GARROW, ESQ.

FOR PATRIOT RESORT CORP., ET ALS:

SKOLER, ABBOTT & PRESSER, P.C.
1414 Main Street, Suite 2000
Springfield, Massachusetts 01144
413-737-4753
    BY: MARY LOU FABBO, ESQ.

ALSO PRESENT:

Faith Lippert
Rebecca Foster, via speakerphone

## Page 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Gordon Leete | *4 | **65 | *75 | |

* By Ms. Fabbo
** By Ms. Garrow

EXHIBITS:                                             PAGE:

(None Marked)

## Page 4

STIPULATIONS

It is agreed by and between the parties that all objections, except objections as to the form of the questions, and all motions to strike unresponsive answers are reserved and may be raised at the time of trial for the first time.

It is further agreed by and between the parties that the sealing and the notification to all parties of the receipt of the original deposition transcript is hereby waived.

GORDON LEETE, Deponent, having been satisfactorily identified and duly sworn, deposes and states as follows:

DIRECT EXAMINATION BY MS. FABBO:
    Q.    Good morning.
    A.    Good morning.
    Q.    My name is Mary Lou Fabbo, and I represent the defendants in this lawsuit that Lacrisha Wise, Mr. Corbin, Mr. Massaconi, and

1  Mr. Martin have filed against your former
2  employer. Are you familiar with that lawsuit?
3     A.   Yes.
4     Q.   Could you just speak loud enough
5  today so that we can all hear you and so the
6  court reporter doesn't have any trouble taking
7  down what you have to say?
8     A.   Yes.
9     Q.   Could you please state your name for
10 the record?
11    A.   Gordon Leete.
12    Q.   And I'm aware that you have had your
13 deposition taken before, correct?
14    A.   Yes, ma'am.
15    Q.   But if you've forgotten any of the
16 guidelines, if at any time you need to take a
17 break, I'll certainly allow that. I just ask
18 that you finish responding to any question I've
19 posed, okay?
20    A.   Fine.
21    Q.   And you also have to answer verbally,
22 and I'll remind you of that, because the court
23 reporter is writing down what you have to say.
24    A.   Right.

1     Q.   Is this a company that you started?
2     A.   No.
3     Q.   Are there other employees to this
4  company?
5     A.   Yes.
6     Q.   How long have you been employed by
7  New England Merchants?
8     A.   Two to three months.
9     Q.   Did you learn of an opening at New
10 England Merchants?
11    A.   I was getting ready to refinance, and
12 I talked with a person I'd done many mortgages
13 with before. And he had offered me a job when he
14 found out my situation.
15    Q.   Okay. And prior to becoming employed
16 at New England Merchants, were you employed
17 anywhere else since your separation from Patriot
18 Resort?
19    A.   No.
20    Q.   Could you tell me, sir, when you
21 became aware of the fact that Lacrisha Wise and
22 the other gentlemen that I had mentioned earlier
23 filed a lawsuit regarding their wages against
24 Patriot Resort?

6

1     Q.   And you also will need to let me
2  finish my question completely before you respond,
3  so that the court reporter does not have to write
4  what we're both saying at the same time, okay?
5     A.   Fair enough.
6     Q.   If at any time you have any questions
7  or you don't understand what I'm asking you,
8  please ask me to rephrase it. Otherwise, I will
9  assume you understand what I'm asking you, okay?
10    A.   Okay.
11    Q.   Are you currently employed?
12    A.   Yes.
13    Q.   Where are you employed?
14    A.   Pardon me?
15    Q.   Where are you employed?
16    A.   At my home.
17    Q.   What is your business?
18    A.   Finance.
19    Q.   What's the name of your employer?
20    A.   New England Merchant.
21    Q.   And what does New England Merchant
22 do?
23    A.   Finds mortgages for refinancing,
24 purchases, et cetera, et cetera.

8

1     A.   When they had filed or when --
2     Q.   When did you learn about it, that
3  they had filed?
4     A.   Probably when I got "depositioned" by
5  Ms. Garrow.
6     Q.   Prior to that, did you have any
7  knowledge that Ms. Wise had filed a claim against
8  the company?
9     A.   I believe we all had talked about it.
10 Ms. Lippert, Mr. Rauer, Mr. Stensland, Rod Lewis,
11 and myself talked about the possibility of it
12 being filed or something like that.
13    Q.   Did you play any role in Ms. Wise's
14 termination from Patriot Resort?
15    A.   No.
16    Q.   Did you ever supervise her?
17    A.   No, not directly.
18    Q.   Indirectly?
19    A.   No, not really.
20    Q.   Did you ever supervise Mr. Corbin,
21 Mr. Martin, or Mr. Massaconi?
22    A.   All three of them.
23    Q.   You did?
24    A.   Yes.

## Page 9

```
 1   Q.   What was your position at Patriot
 2  Resort, your most recent position?
 3   A.   Assistant line director, line
 4  director, manager, sales representative, and TO.
 5   Q.   So all those positions kind of
 6  combined into one?
 7   A.   Well, ultimately you're a sales
 8  representative.
 9   Q.   Had you ever held any other positions
10  at Patriot Resort?
11   A.   Than the ones I just mentioned?
12   Q.   Yes.
13   A.   No.
14   Q.   At any time, were you just a sales
15  manager?
16   A.   Yes.
17   Q.   And when was that?
18   A.   It was for another division of the
19  company, Great Eastern Resorts.
20   Q.   Where were you located?
21   A.   Massanutten, Virginia.
22   Q.   And how long were you at Massanutten?
23   A.   Three, four, or five months.
24   Q.   What did you at Massanutten?
```

## Page 10

```
 1   A.   I was a sales representative. It was
 2  basically my training ground to come up to the
 3  Berkshires.
 4   Q.   When you started at Massanutten, were
 5  you aware that you would be moving to the
 6  Berkshires?
 7   A.   Absolutely.
 8   Q.   And when did you start at
 9  Massanutten?
10   A.   In early 2001.
11   Q.   Did you have any role in the
12  separation of Mr. Martin from employment with
13  Patriot?
14   A.   I'm not understanding that question.
15   Q.   Sure. Mr. Martin is no longer
16  employed by Patriot. You said you supervised
17  him, correct?
18   A.   Well, Mr. Martin worked for Patriot
19  Resort a couple of times.
20   Q.   Either time, did you have a role in
21  his separation?
22   A.   No.
23   Q.   What?
24   A.   No.
```

## Page 11

```
 1   Q.   What about Mr. Corbin, did you have
 2  any role in his separation from Patriot Resort?
 3   A.   No.
 4   Q.   What about Mr. Massaconi, any role in
 5  his separation?
 6   A.   No.
 7   Q.   Did you ever have a discussion with
 8  anyone at Patriot or Berkley Group regarding --
 9        MS. FABBO:   Off the record for a
10  minute.
11        (Off record discussion)
12        MS. FABBO:   Where did I leave off?
13        (The last question was read.)
14   Q.   (By Ms. Fabbo) Regarding the failure
15  to pay minimum wage to the sales staff?
16   A.   Did I have a conversation or did they
17  come to me? I'm not understanding your question.
18   Q.   Did you participate in any
19  conversation with anyone at Patriot Resort
20  regarding the failure to pay minimum wages?
21   A.   Yes.
22   Q.   And who was that or who were they?
23   A.   Let's say who wasn't it.
24   Q.   Tell me who you remember you
```

## Page 12

```
 1  discussed that subject with, minimum wage.
 2   A.   Probably the entire sales force.
 3   Q.   Who do you specifically remember?
 4   A.   Mike Massaconi, Peter Corbin, Roger
 5  Martin, Barry Hollister. If I had an employee
 6  list, I'd be able to tell you. I'd go down the
 7  list.
 8   Q.   And what was your conversation with
 9  Mike Massaconi about minimum wage?
10   A.   I told him I'm not familiar with
11  this, that I would bring it up to my boss.
12   Q.   Did he say something to you about
13  minimum wage?
14   A.   "He" meaning who?
15   Q.   Mr. Massaconi.
16   A.   He said that we should be getting
17  paid minimum wage.
18   Q.   Did he say anything other than that?
19   A.   Not to my knowledge.
20   Q.   What about Mr. Corbin, what did he
21  say to you about minimum wage?
22   A.   It was all the same general thing.
23  There were times it would come up in my morning
24  meeting. You know, when you've got a family and
```

15

you've got children and wives and people to feed
and you're supposed to be giving them a
motivational meeting and somebody hasn't got paid
in a month, it gets a little frustrating for that
person. So oftentimes it would turn into a
situation because of that.
    Q.    Did you ever bring any specific
complaints to the attention of any of your
supervisors?
    A.    Yes.
    Q.    When was that?
    A.    Many times throughout the term of my
employment.
    Q.    Do you remember any of the occasions?
    A.    In 2001, possibly 2002, Peter Corbin
sent a letter to, I believe, the board of
directors in reference to some issues. Around
the same time, I had also spoke with Mr. Rauer
about the issues, with Mike Massaconi, Peter
Corbin and other individuals. It was an ongoing
thing.
    Q.    How did you become aware of the
letter that Mr. Corbin had sent?
    A.    It got circled through the office.

    A.    Define good friend. I've had good
friends die. What is a good friend to you?
    Q.    I'm asking in your opinion was he a
good friend?
    A.    He's a good friend.
    Q.    Are you still in touch with him?
    A.    Yes.
    Q.    When is the last time you spoke to
him?
    A.    Yesterday.
    Q.    Did you discuss his lawsuit?
    A.    No.
    Q.    Have you ever discussed the lawsuit
with him, his lawsuit?
    A.    Not really.
    Q.    Is that no or possibly?
    A.    Well, we talk about getting
"depositioned" by you and other things like that,
but we don't talk about the specifics.
    Q.    You mentioned Mr. Rauer. Who in
addition to Mr. Rauer have you spoken to about
salespersons' complaints about not being paid
minimum wage, if anyone?
    A.    Mr. Rauer, Mr. Lewis, Ms. Lippert.

14

All the salespeople had signed it.
    Q.    And you saw it before it was sent or
after it was sent?
    A.    After the fact.
    Q.    Who gave you a copy?
    A.    I believe Mr. Corbin did.
    Q.    Did you encourage him to send this
letter?
    A.    Not at all.
    Q.    Did you encourage him to file a
lawsuit against the company?
    A.    Not at all.
    Q.    Did you suggest to anyone employed by
Patriot Resort or formerly employed by Patriot to
bring a lawsuit against the company?
    A.    Not at all.
    Q.    Did you socialize with Mr. Corbin
outside work?
    A.    Yes.
    Q.    Frequently?
    A.    Yes.
    Q.    Would you have considered him, during
the term of his employment, to have been a good
friend of yours?

16

    Q.    Anyone else?
    A.    Maybe Bruce Polansky.
    Q.    Could you tell me what your
discussions with Mr. Rauer were concerning the
failure to pay minimum wage?
    A.    The salespeople were very unhappy and
that we needed to address the issue.
    Q.    Did Mr. Rauer say anything in
response?
    A.    Just sort of shuffled it off.
    Q.    Did he say anything?
    A.    Something in the realm of the company
has been doing this for a while, that's the way
it is.
    Q.    And by saying "doing this," do you
know what he meant by that, "the company has been
doing this for a while"?
    A.    Timeshare, running resorts.
    Q.    Was that just one discussion you had
with Mr. Rauer?
    A.    Yes.
    Q.    And do you know when that was?
    A.    2002, 2003, 2004, I don't know,
probably all three.

```
 1       Q.   Was it one discussion or more than
 2  one discussion?
 3       A.   More than one. You said at that
 4  time.
 5       Q.   Okay. So tell me about your other
 6  discussions with him then.
 7       A.   Generally the same basis.
 8       Q.   Did you ever say anything differently
 9  than what you've told me to Mr. Rauer?
10       A.   No.
11       Q.   Did Mr. Rauer ever indicate to you
12  that the company was going to make any changes in
13  the way it paid salespeople?
14       A.   No.
15       Q.   What were your discussions with
16  Mr. Lewis regarding the failure to pay minimum
17  wage?
18       A.   "It's out of my hands."
19       Q.   Were those his exact words?
20       A.   Yup.
21       Q.   Was that a yes?
22       A.   Yes.
23       Q.   How many conversations did you have
24  with Mr. Lewis?
```

Accurate Court Reporting          1500 Main Street, Suite 1412
                                   Springfield, MA 01115
                                   413-747-1806

18

```
 1       A.   Just as many as I had with Mr. Rauer.
 2       Q.   Can you give me an estimate of how
 3  many you had?
 4       A.   During what time frame?
 5       Q.   Forever, regarding this topic,
 6  failure to pay minimum wages.
 7       A.   Seven to ten times.
 8       Q.   What was your purpose in repeating
 9  the same thing to Mr. Lewis if he was telling you
10  it was out of his hands?
11       A.   Because I would push him to push
12  Bill.
13       Q.   And what would you say to push him?
14       A.   That the salespeople are upset, that
15  they're not getting paid regularly on time,
16  they've got families to feed, you know, insurance
17  was an issue.
18       Q.   Was it your understanding that the
19  salespeople -- strike that.
20            Do you remember Mr. Lewis saying
21  anything other than it was out of his hands at
22  any time regarding the failure to pay minimum
23  wage?
24       A.   He said that the company has been
```

Accurate Court Reporting          1500 Main Street, Suite 1412
                                   Springfield, MA 01115
                                   413-747-1806

```
 1  doing this for a long time and knows what they're
 2  doing. And if they were doing something wrong,
 3  they've got attorneys that would be able to
 4  handle it.
 5       Q.   Anything else you recall him saying
 6  ever about this subject?
 7       A.   No.
 8       Q.   Do you have any idea when you had
 9  these conversations with Mr. Lewis?
10       A.   During daylight hours.
11       Q.   Were they over the phone or in
12  person?
13       A.   In person and over the phone.
14       Q.   What about with Mr. Rauer, were they
15  in person or over the phone?
16       A.   Both.
17       Q.   What about Ms. Lippert, what were
18  your conversations with her regarding the failure
19  to pay minimum wage?
20       A.   The same general thing. Oftentimes I
21  would bring my managers or employees in there and
22  discuss pay issues with her.
23       Q.   Why would you do that?
24       A.   As I said previously, when you have a
```

Accurate Court Reporting          1500 Main Street, Suite 1412
                                   Springfield, MA 01115
                                   413-747-1806

20

```
 1  family and you have to put food on the table and
 2  somebody is owed money or feels that they're owed
 3  money and I don't have an answer for them, I go
 4  to the next level.
 5       Q.   Why would you bring employees, your
 6  subordinate employees with you to Ms. Lippert's
 7  office?
 8       A.   Because the answers, they wanted to
 9  hear them for themselves.
10       Q.   And who did you bring with you?
11       A.   At one point probably every
12  salesperson, or close to it.
13       Q.   How many times did you speak with
14  Ms. Lippert about the failure to pay minimum
15  wage?
16       A.   I don't know.
17       Q.   Do you have any idea --
18       A.   Seven to ten.
19       Q.   Do you have any idea when these
20  conversations took place?
21       A.   During business hours.
22       Q.   Any dates?
23       A.   I can't remember specifics at this
24  time.
```

Accurate Court Reporting          1500 Main Street, Suite 1412
                                   Springfield, MA 01115
                                   413-747-1806