---

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
　　　　　Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
　　　　　Defendants

DEPOSITION OF REBECCA FOSTER CAMPAGNA

May 23, 2005, 10:10

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

**Page 2**

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA 01103
BY:  SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA 01103
BY:  MARYLOU FABBO, ESQ.
　　　KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

**Page 3**

INDEX

WITNESS: REBECCA FOSTER CAMPAGNA

Direct Examination by Ms. Garrow　　　5

EXHIBITS

| | | |
|---|---|---|
| Exhibit 1, | Vacation Village Tour Times | 51 |
| Exhibit 2, | 2004 Employee Handbook | 56 |
| Exhibit 3, | 2001 Employee Handbook | 61 |
| Exhibit 4, | Employment Agreement | 68 |
| Exhibit 5, | Commission Structure Forms | 84 |
| Exhibit 6, | 5/24/03 Memo Re: Hecht Comm. | 86 |
| Exhibit 7, | Corbin Commission Report | 95 |
| Exhibit 8, | Massaconi Check Stubs | 112 |
| Exhibit 9, | 5/6/03 Memo Re: ESOP Procedures | 125 |
| Exhibit 10, | Attendance Detail Report | 126 |
| Exhibit 11, | 11/3/02 Memo Re: Attendance | 127 |
| Exhibit 12, | Attendance Detail Report | 127 |
| Exhibit 13, | Attendance Detail Report | 129 |
| Exhibit 14, | Letter to ALDA from ESA | 148 |
| Exhibit 15, | 12/22/04 Memo Re: New-Hires | 150 |
| Exhibit 16, | 11/21/01 Memo Re: Policies | 157 |
| Exhibit 17, | 12/21/01 Memo Re: Rotation | 161 |
| Exhibit 18, | 6/9/03 Memos Re: Ms. Wise | 167 |

---

**Page 4**

STIPULATION

1  
2  
3　　It is agreed by and between the parties  
4　that all objections, except as to form of the  
5　question, are reserved until the time of trial.  
6  
7　　It is further agreed by and between the  
8　parties that all motions to strike unresponsive  
9　answers are reserved until the time of trial.  
10  
11　　It is further agreed by and between the  
12　parties that the sealing of the original  
13　deposition transcript is hereby waived.  
14  
15　　It is further agreed by and between the  
16　parties that the notification to all parties of  
17　the receipt of the original deposition  
18　transcript is hereby waived.  
19  
20  
21  
22  
23  
24

Page 77

```
 1  sale was canceled.
 2      Q.  Do the salespeople get taxed on the
 3  commission that's paid to them through Patriot
 4  Resorts?
 5      A.  Yes, they do.
 6      Q.  So -- and do they get the tax refunded
 7  to them that they paid on those?
 8      A.  That is calculated at the end of the
 9  year, I believe.
10      Q.  Is that a yes or no?
11      A.  You're saying is it refunded.  We
12  don't refund them.  There are certain taxes that
13  are paid and there's no refund, but I do know
14  that that's something that's calculated at the
15  end of the year with regard to how much income
16  they received.
17      Q.  Well, at the time somebody would
18  receive a check, they have money deducted for
19  taxes based on the commission that they -- you
20  deem they earned during that period, is that
21  correct?
22      A.  Correct.
23      Q.  Then at the end of the year, you issue
24  a W-2 to all of the salespeople and sales
```

Page 78

```
 1  managers at Patriot Resorts, is that correct?
 2      A.  That's correct.
 3      Q.  So how do you reconcile money that has
 4  already been deducted for tax purposes from the
 5  individual salesperson's or sales manager's
 6  paycheck for those commissions?
 7      A.  I don't do commission -- the actual
 8  computation, so I'm not sure -- that's an
 9  accounting procedure, and I'm not exactly sure
10  how they do that.
11      Q.  Who would that be; who would I talk to
12  about that?
13      A.  I'm not sure who would -- it's a
14  procedure that's done.  Any salesperson's
15  paycheck would show how that's handled.
16      Q.  Any salesperson's paycheck at any
17  time, or under what circumstances -- I guess I
18  don't understand your answer.  Maybe you can
19  explain what you mean.
20      A.  If they had a chargeback in a
21  particular week and they had a payment of another
22  commission, that would show how that transaction
23  is handled.
24      Q.  Under the same provision, it says
```

Page 79

```
 1  "three timely consecutive monthly payments in
 2  accordance with the terms of the purchase money
 3  note and mortgage."  Am I reading that correctly?
 4      A.  That's correct.
 5      Q.  So let's assume -- assuming there is a
 6  preauthorized check, but three months in a row
 7  the check comes back insufficient funds -- or
 8  actually, let me change that.  For the first six
 9  months, no problem -- I'm sorry -- for the first
10  month, no problem; the second month, insufficient
11  funds; third month, no problem.  So in other
12  words, back and forth.  There's no three
13  consecutive timely payments for the first year.
14  What happens then?
15          MS. FABBO:  Objection.
16          MS. GARROW:  What's
17      objectionable?
18          MS. FABBO:  What happens then in
19      terms of what?
20          MS. GARROW:  I think I just asked
21      the question.  Do you understand the
22      question?
23          THE WITNESS:  I'm not sure.
24      Q.  (By Ms. Garrow)  If for the first year
```

Page 80

```
 1  of a contract, let's say the owner is
 2  consistently late in their payments, yet they get
 3  paid at some point, but they're consistently
 4  late.  Does the salesperson's commission get
 5  paid?
 6      A.  If a customer has been habitually late
 7  for twelve months, then the salesperson would not
 8  be qualified to be paid under this contract, no.
 9      Q.  And that's even if the money came in,
10  correct?
11      A.  That's correct.
12      Q.  Under what other circumstances -- is
13  that a circumstance where there would be a
14  commission chargeback?
15      A.  Yes.
16      Q.  But the commission never would have
17  actually been accredited?
18      A.  Well, it was not earned, so they would
19  have actually received it as an advance against
20  their commission earned, but it would be taken
21  back because it did not fall into the earned
22  category.
23      Q.  So you would expect that they would
24  have actually gotten paid commission at some
```

### 153

1  A.  I couldn't tell you that.  That would
2  be too -- there are too many salespeople.  I
3  wouldn't be able to say how long.
4  Q.  How about talk specifics.  Peter
5  Corbin, who is a plaintiff in this matter -- he
6  just got paid on a sale -- he hadn't worked for
7  the company for a year plus.  He got paid on a
8  couple of sales, or actually several sales.  Why
9  would somebody wait a year plus after termination
10 for payment on a sale?
11 A.  I would have to look at the particular
12 sales and see what their pay history was in order
13 to tell you that.
14 Q.  How would you determine that?
15 A.  Look at a history of payments on the
16 particular accounts to see if they made their
17 payments every month as they were supposed to.
18 Q.  Would you do that by customer name, or
19 is there another way to identify those people?
20 A.  Customer name.
21 Q.  That's the only way you could do it?
22 A.  Well, a contract number or customer
23 name.
24 Q.  So there were contract numbers as well

### 154

1  for all of those?
2  A.  In most cases, yes, yes, yes -- yes.
3  Q.  Is there any time there wouldn't be
4  one?
5  A.  No, they would have to have a number
6  associated with their name, so either way you
7  could generate that information.
8  Q.  As the president of the company, I
9  guess I'm going to ask you this question again,
10 and maybe I'll try to phrase it a little
11 differently so you can answer it.  I want to know
12 the scenario that could occur that would enable
13 somebody to wait over a year for a full payment
14 once they're terminated -- just a list of
15 scenarios.
16 A.  If their customers did not make three
17 timely consecutive monthly payments.
18 Q.  That would be it; that would be the
19 whole list?
20 A.  It is possible -- and I can't say
21 specifically at Patriot Resorts -- but if a
22 customer came to us six months, eight months,
23 even a year after the sale and presented us with
24 some type of documentation that a salesperson

### 155

1  gave them that is contrary to the plan and would
2  be grounds for voiding of the contract, then that
3  would subject the salesperson to a chargeback.
4  Q.  What about what happened at Patriot
5  Resorts, as far as I understand -- and maybe you
6  can correct me if I'm wrong -- I understand there
7  was supposed to be a clubhouse and certain
8  amenities that never got built at Patriot
9  Resorts.  Is that true?
10 A.  That's incorrect.
11 Q.  Was there never supposed to be a
12 clubhouse, or did it get built?
13 A.  Everything that is in the public
14 offering statement and is in the offering
15 statement today has been built, and all amenities
16 are there.
17 Q.  Is there a clubhouse -- let me ask you
18 that question?
19 A.  Yes, there is.
20 Q.  When was that built?
21 A.  Several years ago.  I don't remember
22 the exact date.
23 Q.  So it's been around for a while?
24 A.  Yes.

### 156

1  Q.  But let's take the specific example
2  out of the mix here and just talk about it
3  generally.  Would that be the kind of thing, if
4  amenities were promised in the initial offering
5  or promised as part of a sales proposal that was
6  authorized by the company and the customer came
7  to you later and said these things never happened
8  -- would that be the basis for possibly
9  cancelling the sale?
10 A.  Anything that the company would have
11 promised by public offering statement would be a
12 matter of fact in the documents, and the
13 customers are not to rely on anything other than
14 those legal documentation.
15 Q.  How do they know that, the customers?
16 A.  It's on the notice -- it's on the
17 documentation that they sign before they leave
18 the property.
19 Q.  So it says it right there, everything
20 is listed in our public offering and those are
21 the documents on which you're supposed to rely?
22 A.  Correct, something along those lines.
23 I don't remember it specifically.
24 Q.  But that's the general gist of it?