UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
          Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
          Defendants

DEPOSITION OF RODNEY LEWIS

June 2, 2005, 9:50

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

INDEX

WITNESS:  RODNEY LEWIS

Direct Examination by Mr. Feldman           5

EXHIBITS

Exhibit 1, 2005 Vacation Village Tour
           Presentation                    71
Exhibit 2, Vacation Village Rotation       74
Exhibit 3, 11/3/02 Memo Re: Attendance    117
Exhibit 4, Employee Information Form       124
Exhibit 5, LaCrisha Wise Attendance Report 125
Exhibit 6, 5/18/03 Memo Re: Dress Code     145
Exhibit 7, Leaders Booklet                 156

---

2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants

---

4

1                STIPULATION
2
3          It is agreed by and between the parties
4     that all objections, except as to form of the
5     question, are reserved until the time of trial.
6
7          It is further agreed by and between the
8     parties that all motions to strike unresponsive
9     answers are reserved until the time of trial.
10
11         It is further agreed by and between the
12    parties that the sealing of the original
13    deposition transcript is hereby waived.
14
15         It is further agreed by and between the
16    parties that the notification to all parties of
17    the receipt of the original deposition
18    transcript is hereby waived.
19
20
21
22
23
24

1   Q.   What do you know about that policy?

2   A.   Company policy, they feel that that's

3   when the commission has been earned; however,

4   they advance the commission on the basis in the

5   event that the people don't make three timely

6   monthly payments, then the company reserves the

7   right to charge the commission back until such

8   happens.

9   Q.   So were commissions paid before three

10  timely payments were received?

11  A.   Yes.

12  Q.   Was that the regular policy?

13  A.   Yes, they were advanced.

14  Q.   They were advanced?

15  A.   Yes.

16  Q.   Has that been the policy during the

17  time you've been project director?

18  A.   Yes.

19  Q.   How would a chargeback actually take

20  place?

21  A.   We would be notified that the people

22  have not made three timely monthly payments, or

23  we would get a notation on our pay sheets there's

24  a chargeback and such-and-such a name and a

---

1   Q.   What does the document look like that

2   you received from the administrative office?

3   A.   Well, when you got your pay sheets,

4   you have a listing of the sales that you're being

5   paid on; and if there are any chargebacks, then

6   you have a listing of that, that that's added to

7   it.

8   Q.   Chargeback was taken out of the pay of

9   salespeople, is that correct?

10  A.   Yes.

11  Q.   So their next commission they earned,

12  there would be some money taken out for money

13  that was advanced, as you said, to the

14  salesperson?

15  A.   Yes.

16  Q.   Did you ever discuss with anyone why

17  there were three timely payments required before

18  they would receive -- before they were entitled

19  to keep the money that was advanced?

20  A.   I've never had a conversation to that

21  effect.

22  Q.   You've worked at other time-share

23  places, is that correct?

24  A.   Yes.

---

110

1   contract number.

2   Q.   Would that get passed to you at some

3   point?

4   A.   Oh, yes, yes.

5   Q.   Who would give you that information?

6   A.   It comes out on my pay sheet.

7   Q.   Who gives you the pay sheet?

8   A.   Our administrative office.

9   Q.   They're the ones who collect payments,

10  is that correct?

11  A.   No, they administer all the paperwork.

12  They make up payrolls, they submit them to

13  Florida, Florida then sends the payroll to us.

14  Q.   Where did purchasers send their

15  monthly payments, if you know?

16  A.   I have no idea.

17  Q.   But somehow Vacation Village discovers

18  whether they have made the payment or not,

19  correct?

20  A.   Yes.

21  Q.   And that information is conveyed to

22  you through your administrative office, is that

23  correct; is that what you just said?

24  A.   Yes.

---

112

1   Q.   Is that a typical policy of the

2   time-share places you've worked?

3   A.   Yes.

4   Q.   That you have to have three timely

5   payments?

6   A.   In some cases more.

7   Q.   Was it the policy that if there were

8   two timely payments made but one untimely payment

9   made that you would have to have three more

10  timely payments after that; is that the policy?

11  A.   That's correct, that's correct.

12  Q.   So is it correct that a purchaser

13  might actually be making their payments and yet

14  the salesperson might not receive a commission

15  for many months?

16  A.   That's correct.

17  Q.   You said the only pay received until

18  the change in compensation was straight

19  commission, other than the initial period we

20  talked about, is that right?

21  A.   That's correct.

22  Q.   Have you seen any document in which

23  it's claimed that somehow Vacation Village or the

24  other defendants in this case were somehow exempt