UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated, | : : : : : : : | DOCKET NO. 04-cv-30091-MAP |
| Plaintiffs, | : : | |
| v. | : : | PLAINTIFF WISE'S MEMORANDUM IN OPPOSITION TO DEFEDANTS' MOTION FOR SUMMARY JUDGMENT |
| PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT, | : : : : : : | |
| Defendants. | : : | |

## I.  **INTRODUCTION**

In this class and individual matter Plaintiff LaCrisha Wise, a former timeshare salesperson for the defendants in the Berkshires, brings claims on her own behalf for equitable relief and compensatory and punitive damages against defendants under Title VII of the Civil Rights Act and Chapter 151B of the Massachusetts laws against discrimination for acts of discrimination against her on the basis of her race and for acts of retaliation because she complained of such discrimination. Beginning from at least late 2002, when Rodney Lewis became Ms. Wise's project director at her timeshare sales position, until she was terminated from her employment on or about June 7, 2003, Ms. Wise was subjected to discriminatory and retaliatory actions and omissions by Mr. Lewis and other members of management.

The Defendants have moved for summary judgment on all individual claims asserted by Ms. Wise, Counts I-IV.  For the reasons set forth below, the Defendants are not entitled to an award of summary judgment.

## II.     FACTUAL BACKGROUND

The Plaintiff has prepared a Statement of Material Facts as to which there Exists a Genuine Dispute to be Tried (hereafter "SOF") which she has submitted in support of her opposition to the Defendants' Motion for Summary Judgment, and the Plaintiff incorporates those facts into this Memorandum of Law by reference.

## III.     SUMMARY JUDGMENT STANDARD IN DISCRIMINATION CASES

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995). All reasonable inferences which may be drawn from the record before the court are to be indulged in favor of the nonmoving party. Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988).

The movant bears the initial burden of proving that no genuine issues of material fact exist for trial.  Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000).  See, Celotex Corp. v. Catrett, 477 U.S. 317, 323 -324 (1986). The First Circuit has defined a "genuine issue of material fact" as that which "might affect the outcome of the suit under the governing law." In deciding a motion for summary judgment, "the court must ask 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" Lipsett v. University of Puerto Rico, 864 F.2d 881, 894 (1st Cir. 1988), *quoting,* Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 252, 91

L.Ed.2d 202, 106 S.Ct. 2505 (1986) (internal quotations omitted).  In other words, "[a]n issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Oliver, 846 F.2d at 105 (citations omitted).

In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination.  Discrimination cases often involve issues of motivation and intent which can only be proved through reliance on circumstantial evidence. Such determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the jury. See eg., LeBlanc v. Great American Ins. Co., 6 F.3d 836, 840 (1st Cir. 1993), cert. denied, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); Waltman v. International Paper Co., 875 F.2d 468 (5th Cir. 1989). Thus, courts should exercise particular caution before granting summary judgment for employers on such issues of pretext, motive and intent. Santiago-Ramos v. Centennial P,R, Wireless Corp., 217 F. 3d 46, 54 (1st Cir. 2000). The reason for this caution is "because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent."  Hodgens v. General Dynamics Corp., 144 F.2d 151, 167 (1st Cir. 1998).

## IV.    LEGAL ARGUMENT

### A.    A REASONABLE JURY COULD CONCLUDE FROM THE EVIDENCE THAT LACRISHA WISE WAS SUBJECTED TO DISPARATE TREATMENT WITH RESPECT TO THE TERMS AND CONDITIONS OF HER EMPLOYMENT AND HER TERMINATION FROM EMPLOYMENT WITH THE DEFENDANTS, AND THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.

#### 1.    Legal Standard in Disparate Treatment Cases

Plaintiff LaCrisha Wise contends she was subjected to disparate treatment in that she was more harshly scrutinized, disciplined and was terminated on account of her race.  Title VII of the 1964 Civil Rights Act provides in relevant part that it is unlawful for an employer:

(1) to . . . discriminate against any individual with respect to . . . **t**erms, conditions**,** or privileges of employment, because of [her] race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify . . . employees . . . in any way which would . . . tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee, because of [her] race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (emphasis added). The Massachusetts laws against discrimination

similarly provide that it is an unlawful employment practice:

For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation, … or ancestry of any individual … to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

M.G.L. c. 151B, § 4(1) (emphasis added).

A plaintiff asserting a claim of disparate treatment must establish that the employer

intended to discriminate against her due to her membership in a particular protected group. An

inference of intentional discrimination may be drawn from circumstantial evidence through

application of the familiar burden-shifting paradigm first enunciated in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the McDonnell

Douglas formulation, the plaintiff has the initial burden of establishing a *prima facie* case of

discrimination.

In order to establish a *prima facie* case of race discrimination the plaintiff must show

that: (a) she is a member of a protected group because of her race; (b) she was adequately

performing the essential duties of his position; (c) she suffered an adverse employment action;

and (d) she was treated differently than were similarly situated employees who are not in the

same protected group. See eg., Alexander v. Fulton County, 207 F.3d 1303, 1344 (11th Cir.

2000); Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 441 (1995).  The

prima facie case "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection," Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981), thereby creating a presumption of discrimination. Contrary to assertions by the Defendant in its pending summary judgment motion, a plaintiff need not show as part of his *prima facie* case that the employer treated similarly situated non-minority employees more favorably. Fernandes v. Costa Brothers Masonry, 199 F.3d 572, 584 (1st Cir.1999).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for its adverse employment action. See, McDonnell Douglas, 411 U.S. at 802. "[A]n employer must not only give a lawful reason or reasons for its employment decision but also must produce credible evidence to show that the reason or reasons advanced were the real reasons." Wheelock College v. MCAD, 371, Mass. 130, 138 (1976). If the employer satisfies this burden, the initial presumption of discrimination is removed, and it falls upon the employee to "present sufficient evidence to show both that the employer's articulated reason . . . is a pretext and that the true reason is discriminatory." Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999), cert. denied, 120 S. Ct. 1174 (2000); see also, Santiago-Ramos, 217 F. 3d at 54.

The standard for satisfying the requirements of a *prima facie* case is "not onerous," Burdine, 450 U.S. at 253, and Officer Garcia has presented more than enough evidence to establish a *prima facie* case.

### a.    Ms. Wise is a member of a protected group.

Ms. Wise is African American and there is no dispute that she is a member of a class of people who are protected under both federal and state anti-discrimination laws.

   **b.** **Ms. Wise was a highly competent sales person and she was
adequately performing the essential duties of her position at all
times relevant to this case.**

   The Defendant does not challenge Ms. Wise's good performance as a salesperson.  Ms.
Wise did all that was required of her as a timeshare salesperson and got good results.  (SOF 29,
30)  Ms. Wise began as a sales representative selling time shares for the defendants at their
Berkshire location, Vacation Village in the Berkshires, on or around the beginning of February,
2002.  (SOF ¶ 1)  She was recruited to work for the defendants by Duane Johnson, a sales
manager and African American man.  (SOF ¶ 3) Mr. Johnson was recruited by and worked under
Paul Stensland, who was Mr. Johnson's line director, and was hired by the defendants to work at
Vacation Village when William Rauer was the project director. (SOF ¶¶ 2,3, 4) This was almost
seven months prior to the time that Rodney Lewis began as the project director of the location.
(SOF ¶ 4)

   As a timeshare sales person, Ms. Wise's job was to sell timeshares to customers that
came to the location as a result of the marketing efforts of a separate company.  She would take
the people on a tour of the property and the area and then return to the sales center to close the
sale.  (SOF ¶¶ 4-24)  To do so she would wait in the sales lounge for her name to come up on the
"wheel" or assignment and would receive notification that she had a tour.  (SOF ¶¶ 6, 7)  Ms.
Wise would then prepare, both by gathering the tools she needed to make a sale and prepare
mentally to take that group on a tour.  (SOF ¶ 8)  There were ten steps set forth by the defendants
for a timeshare sales person to follow when giving a tour and Ms. Wise would follow those ten
steps process when giving the tour to potential time share purchasers. (SOF ¶ 9)

   As part of her performance of her duties Ms. Wise would first get her car, and then gather
the paperwork necessary to complete a sale.  (SOF ¶ 10)  Ms. Wise would then greet the family

that she was taking on tour. (SOF ¶ 11)  She would make conversation with them and discuss generally how they like the Berkshires, and other things of that nature.  (SOF ¶ 12)  She would also share with them the steps of the tour letting them know where they were going and what they would be doing.  (SOF ¶ 13)  The next step required by the defendants was for Ms. Wise to then take the people she was touring for a ride to Mount Greylock and show them the view. (SOF ¶¶ After returning from Mt. Greylock, Ms. Wise would bring the people on her tour to the sales center, and would make them comfortable and would then explain to them what Vacation Village was.  (SOF ¶ 16)  She would explain the features and benefits of the timeshare program and how it worked.  (SOF ¶ 17)  As part of her sales method Ms. Wise would then discuss with the people she was touring what their vacation habits were, where they had gone on vacation in the past, how they enjoyed their trips, what was their most memorable vacation and would inquire of them regarding the costs of those vacations.   (SOF ¶ 18)  Ms. Wise would also discuss with them places they dreamed of going.  (SOF ¶ 19)  After the discussion at the sales center, Ms. Wise would take the people she was touring to Brody Mountain, or Jiminy Peak, and then to the Vacation Village property. (SOF ¶ 20)  They would all then return to the sales center and Ms. Wise would discuss with the people she had on tour the advantages of having a time share condominium at a resort over a hotel room. (SOF ¶ 21)  Ms. Wise would explain how they could trade their space for others in other places in the country and throughout the world. (SOF ¶ 22)  The whole tour would take about three hours. (SOF ¶ 23)  After she completed her tours and attempted to close the sale Ms Wise would sign back in at the registration area, the original place where she picked up her tours and wait for another tour.  (SOF ¶ 24)

Ms. Wise was a successful sales person.  William Rauer, the former project director who became Mr. Lewis' boss when Mr. Lewis became project director, told Ms. Wise that she was a

top business writer and a good sales person.  (SOF ¶¶ 29, 30) It generally takes a sales person

who is doing well with the defendants up to two years to achieve the status of a million dollar

ring.  (SOF ¶ 30)  That is the ring that is given to a sales person who achieves the success

benchmark of a million dollars in business.   (SOF ¶ 30)  Ms. Wise excelled at her job as a

salesperson and attained this coveted distinction in little over a year. (SOF ¶ 30)  Prior to Mr.

Lewis beginning as project director Ms. Wise loved and excelled at her job.  (SOF ¶¶ 29, 30, 106)

 Unable to assail her ability, the defendants argue that Ms. Wise cannot make a *prima*

*facie* case because she was not qualified by virtue of her being absent from work.  The

defendants claim that Ms. Wise was absent forty-nine times in 2002.  Many, if not all, of Ms.

Wise absences were excused, either by her manager, Mr. Bourdon or by the then project director,

Mr. Rauer.  (SOF ¶¶ 26-29)   Most of Ms. Wise's absences in 2002 were as a result of two car

accidents of which defendants were aware. (Id.)    As a result of these accidents she had seven

surgeries and needed extensive rehabilitation.  Many of the days she took off she desired and

offered to work part of the day. (Id.)   Former Project Director Bill Rauer instructed her to take

those days off to attend her numerous doctor and therapy appointments.  (Id.)

 The defendants do not argue that Ms. Wise's absences were unexcused, just that her

absences continued when they purportedly started to strictly enforce their attendance policy in

late 2002 and 2003 when Mr. Lewis became Ms. Wise's project director. However, in 2002,

there were a number of white sales people with the same or similar number of absences or tardys

including Lisa Ferreria, Sam Barnes, Alex Hadzagas William Steele, Peggy Jeffers, Mickie Pleu,

Nancy Shepherd and Brenda Durant. (SOF ¶ 46)  Despite the other white similarly situated sales

people having the same number of days out of work at the time, only she and her fiancée (also

African American and the only other African American employee at the Berkshire location and

8

under Mr. Lewis's supervision) were asked to sign a memorandum stating that they would be fired if they were late or absent one more time.  (SOF ¶ 44)

Significant here is that based on their own testimony, (SOF ¶ 91), the defendants maintain on page six of their Memorandum in Support of summary judgment that,  "On June 7, 2003, Wise was terminated for exceeding the maximum amount of absences allowed under Patriot's policy.  Wise's failure to abide by her attendance policy renders her unable to establish she was performing her job at an acceptable level." Thus, by their own admission, Ms. Wise was terminated exclusively for exceeding the 15-day per year absent policy in 2003.

However, there were a number of individuals who were absent over 15 days and were not terminated in or around the same time and when the policy was purportedly strictly enforced.[1] Those individuals who had more absences than the supposed 15 day maximum allowed in 2003 were:

Samuel Barnes (18 absences)
Mary Birch (22 absences)
Michael Campagna (19 absences)
Karen Church (17 absences)
Peter Corbin (26 in 8 months)
Brenda Durant (16 absences)
Jayne Engleheart(24 absences)
Ronald Ferreira(22 absences)
Bonnie Keough (18 absences)
Nancy Shepherd (22 days by the time Ms. Wise was terminated for being absent a sixteenth day; 56 days by the end of July 2003.)
William Steele (41 absences)
Jerry Stimple (31 absences)
Shammi Talreja (17 absences) (SOF ¶ 45)

---

[1] Individuals out of work on FMLA or extended medical leave are so noted on the defendants Attendance Detail Reports.(SOF ¶ 54)

Kathy Redmon had 19 absences in five months thereby exceeding the number of absences in a

shorter time frame than by Ms. Wise in 2003. (SOF ¶ 46)  Even Rodney Lewis exceeded 15 days

absent in 2003.  (SOF ¶ 49)

There were also salespeople who exceeded 15 days absent in 2004, after the defendant

claims it began to strictly enforce its fifteen-day absent per year policy.  Those people were:

Seth Alden  (16 absences in 7 months)
Margaret Apkin (18 absences in 4 months)
Samuel Barnes (24 absences in 5 months)
Linda Burnham (23 absences)
Eric Chabot (20 absences)
Jesse Dimitropolis(21 absences in 5 months)
Brenda Durant (26 absences)
Jayne Engleheart (34 absences in 5 months)
Ronald Ferreira (18 absences in 7 months)
Dudley Johnson (20 absences in 5 ½ months)
Galyna Karpenski (18 absences in 2 months)
Judd Kuzia (22 absences)
Tracy Lanoue (18 absences)
Jarrett Lenett (28 absences)
Mark LePine (17 absences)
Deanna McCormick (20 absences)
Charles Messina (18 absences)
Karl Mirke (18 absences)
Danielle Moran (18 absences)
Rebecca O'Brien (19 absences in 5 months)
William Spaulding(18 absences)
William Steele (19 absences) (SOF ¶ 4_)

Tina Welz had 26 days absent in just 5 months of employment in 2003, far exceeding the number

of absences by Ms. Wise in 6 months of 2003. (SOF ¶ 4_)  All of the individuals who had greater

than 15 days absent in the years 2003 and 2004 and were allowed to continue working despite

the policy are Caucasian.  (SOF ¶ 55)

By their own definition, as of the day Ms. Wise was terminated she was then at least as, if

not more, qualified for her job as sales person than Nancy Shepherd, who had at least 4 more

absences than Ms. Wise on the day Ms. Wise was fired in 2003.  (SOF ¶ 45)  Indeed, Mr. Lewis

testified that as of the beginning of 2003, Ms. Wise was given a clean slate with regard to her absences and her absences in 2002 should have been discounted entirely. (SOF ¶ 56) Many other similarly situated white sales people had many absences and failed to abide by the so-called policy, and were allowed to keep working past 15 days absent once the policy was supposedly strictly enforced. (SOF ¶¶ 46-53) Ms. Wise being absent 15 times simply does not render her less qualified than a number of her colleagues. Ms. Wise was qualified based on the defendants' own definition and easily satisfies the second prong of her *prima facie* burden.

### c.    Termination and the stricter enforcement of policies constitutes adverse employment actions.

The Defendants do not dispute the third prong of Ms. Wise's *prima facie* case that Ms. Wise suffered an adverse employment action when she was treated more harshly in the terms and conditions of her employment and terminated from her employment on or around June 7, 2003.

### d.    Ms. Wise can show that but for her race she would not have been terminated and that she was treated differently than similarly situated white sales people.

In arguing that Ms. Wise cannot prove that her race motivated her adverse treatment including her termination the defendants focus exclusively on her attendance. However, her claim of disparate treatment encompasses the poor treatment and selective enforcement of not only the attendance policy but of the various other policies of the defendants, as discussed more fully below at pages 14-19. In addition, Mr. Lewis also never hired an African American salesperson and terminated Ms. Wise, the only African American he had in his employment when he began as the project director of Vacation Village. (SOF pp105, 108) [2]

### 2.    There Is Overwhelming Evidence that the Reasons Offered By the Defendant for its Adverse Actions against Ms. Wise are Mere Pretext,

---

[2] Ms. Wise's then fiancée, who was hired before Mr. Lewis began working at the defendants' Berkshire location, went out on workers' compensation leave shortly after Mr. Lewis began, around the beginning of January 2003.

**and that Discriminatory Animus was the Real Reason Underlying these Adverse Actions.**

At the third stage of the <u>McDonnell-Douglas</u> burden-shifting analysis, it falls upon the employee to "present sufficient evidence to show both that the employer's articulated reason . . . is a pretext and that the true reason is discriminatory." <u>Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999)</u>, cert. denied, 120 S. Ct. 1174 (2000) (internal quotations and citations omitted); <u>see also</u>, <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "Plaintiffs may use the same evidence to support both conclusions, provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." <u>Thomas</u>, 183 F.3d at 57 (internal quotations and citations omitted).

### a. Evidence of Pretext

The Supreme Court has found that discriminatory intent may be inferred from the simple showing of pretext. "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 120 S.Ct. 2097, 2109 (2000). The Court similarly observed in <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L. Ed.2d 407 (1993) that "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." Consequently, because a jury may find illegal discrimination upon nothing more than a *prima facie* case and pretext, such a showing at the summary judgment stage is sufficient to get the case to the jury. <u>Randle v. City of Aurora</u>, 69 F.3d 441, 451-52 (10th Cir. 1995).[3]

---

[3] This is coextensive with the standard for claims under M.G.L. c. 151B <u>Lipchitz v. Raytheon</u>, 434 Mass. 493, 505-06(2001).

One way a plaintiff can establish pretext is by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a factfinder could "infer that the employer did not act for the asserted non-discriminatory reasons." Santiago-Ramos, 217 F.2d at 56. In the present case, the reason offered by defendants for Ms. Wise's termination that "On June 7, 2003, Wise was terminated for exceeding the maximum amount of absences allowed under Patriot's policy" is so lacking in substance that it only serves to highlight the pretextual nature of these explanations.

As to Ms. Wise's termination allegedly due to the attendance policy, much of the disparate treatment is described at pages 8 to 11 above and the unequal application of the 15 day absent policy plainly demonstrates pretext. Ms. Wise was terminated for exceeding 15 days absent. As fully set forth above, numerous other Caucasian employees exceeded 15 days absent after the 15 day policy was alleged to be strictly enforced and were not terminated pursuant to the alleged company policy for which Ms. Wise was terminated.

The other claim that Ms. Wise was somehow *more* absent than others as defendants argue on page 8 of their Memorandum, footnote 3, having 65 days absent in her almost year and a half tenure is simply untrue and, at the same time, proves too much. That claim is untrue because while Ms. Wise had 49 days absent in 11 months of 2002, due to excused absences by the then project director Mr. Rauer and before the policy was supposedly strictly enforced. In contrast, Nancy Shepherd had 56 days absent in 6 months in 2003 – this was at a time when the 15 days absent policy was allegedly strictly enforced under Mr. Lewis's regime. This disparity plainly demonstrates pretext.

The claim also proves too much. A claim that Ms. Wise somehow violated the attendance policy *more* than a white employee who also violated the allegedly unequivocal,

bright-line policy demonstrates that Ms. Wise was under stricter scrutiny by Mr. Lewis. This

claim is especially specious given that the majority of Ms. Wise's days out of work were excused

due to two disabling accidents and to care for a family member with a severe impairment and

should have been charged as Family and Medical Leave Act or Massachusetts Medical Leave

Act time, but was not.

Mr. Lewis also maintained that Ms. Wise was given a clean slate regarding her

attendance as of the beginning of 2003. He testified with regard to her attendance:

> Q: But you know it was in December. Why do you know it was in December?
>
> A: Because that's when we were finishing the year out. We're going to start off the new year, start with a clean slate.

Deposition of Rodney Lewis dated November 20, 2003, page 90, attached to the Affidavit of

Suzanne Garrow as Exhibit 6. Despite this claim that Ms. Wise had a clean slate as of the new

year, the defendants assert somewhat incoherently that she was more absent in the aggregate

throughout her tenure more than other white employees. This feeble attempt merely

demonstrates the pretextual nature of the defendants' proffered reason for Ms. Wise's disparate

treatment and summary judgment should be denied on this basis.

### b.     Other Evidence of Discriminatory Motive

In proving discriminatory intent, a direct showing that similarly situated white

employees were treated differently than members of a protected class is one of the most

probative means of establishing that a defendant was motivated by discriminatory animus.

Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 686 N.E.2d 1303, 1309 (1997).

Pagano v. Frank, 983 F.2d 343, 348 (1st Cir.1993) (pretext argument hinges on whether

particular employment policy "was not applied to other, similarly situated, non-[minority]

employees in the same way"). The First Circuit has held that "the time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality *vel non* of the employer's articulated reason for having acted adversely to the plaintiff's interests." Conward v. Cambridge School Comm., 171 F.3d 12, 19 (1st Cir. 1999). Thus, one way in which a plaintiff can show illegal discrimination is by showing evidence of comparative treatment of employees that are not in the protected class.

There is considerable evidence that white salespeople were treated more favorably than Ms. Wise. Evidence contrasting the treatment of Ms. Wise with that of similarly situated white employees regarding the attendance policy is set forth above in at pages 8 to 14 of this Memorandum, and it applies here with equal force. Mr. Lewis and others at his direction treated Ms. Wise unfavorably and with stricter scrutiny as compared with similarly situated white employees in other respects as well. For example, Mr. Lewis and others treated Ms. Wise less favorably with regard to such policies for example as the car and car insurance policies and the dress code.

From at least August of 2001, until after Ms. Wise's termination, the defendants had the same car and car insurance policy. (SOF ¶ 57) Salespeople were required to have a valid driver's license and a car to be employed by the defendants. (SOF ¶ 59) Salespeople were also required to provide proof of automobile insurance to work at the defendants. (SOF ¶ 58)

Ms. Wise had a valid drivers' license when she was hired and throughout her employment with defendants. (SOF ¶ 60) At the time she became employed at Vacation Village, Ms. Wise had a car and car insurance with full coverage as required by the Commonwealth of Massachusetts. (SOF ¶ 61) Ms. Wise drove several different vehicles when she was employed by the defendants and with each car or change in insurance she provided any updated insurance

information. (SOF ¶ 62)  Despite having adequate coverage under Massachusetts law and more coverage then certain similarly situated white employees, Mr. Lewis erroneously reprimanded Ms. Wise for having inadequate car insurance coverage on more than one occasion. (SOF ¶ 63)

On one occasion Mr. Lewis withheld Ms. Wise's paycheck and that of her (African American ) fiancée claiming that they did not have an insurance policy on file, telling them they would not be paid until they gave defendants information regarding their insurance policy.  (SOF ¶ 64)  At the same time, Mr. Lewis told Ms. Wise that she wasn't being sent on tour and was being sent home immediately. (SOF ¶ 65)  Only Ms. Wise and her fiancée ever had their checks withheld for such reason.  (SOF ¶¶ 70-81)

On another occasion, Ms. Wise's automobile was in the shop getting repaired and so she was driving her father's car.  Mr. Lewis took her and her then manager Jon Borden aside and asked Ms. Wise to prove that she had insurance on the vehicle she was driving. (SOF ¶ 66)  Ms. Wise explained that the car was her father's and met Massachusetts requirements for insurance. (SOF ¶¶ 66, 67)  Nevertheless, Mr. Lewis pulled her off the line and her tour was given to someone else, and Ms. Wise wasn't allowed to take a tour because she was driving a different car that day, and was told that she needed to show proof of the coverages on the car to make sure that she was driving a car that met Patriot Resorts' requirement for coverage.  (SOF ¶ 68)  Mr. Lewis said unless Ms. Wise could provide that proof that she needed to leave work immediately. (SOF ¶ 69)

Perhaps most troubling is that Mr. Lewis was treating Mw. Wise harshly and charging her with non-adherence to a policy that did not exist.  There was no such policy that employees bring proof of his or her insurance coverage if he or she were driving various different cars during their tenure.  The defendants' policy throughout Ms. Wise's tenure was that an employee

was required to report on their insurance coverage one time per year and update any coverage information at that time -- which she did.  (SOF ¶ 72)

White employees were allowed to flagrantly violate the policy that was in place -- that each salesperson carry automobile insurance. There were other sales representatives (Caucasian) being allowed to take tours who did not even have cars, and had to borrow other sales people's cars and did not have any insurance.  (SOF ¶ 73) Ronald Ferraro, white, had no license, no car, and no car insurance at the time that Ms. Wise was not allowed to take tours due to her alleged and unsubstantiated violation of the car insurance policy.  Mr. Ferraro was routinely allowed to take tours and was not sent home. (SOF ¶¶ 74, 75)  Sam Barnes, white, did not have a car or insurance at the same time and was allowed to take tours and was not sent home.  (SOF ¶ 76)  At some point Mr. Barnes was moved to a department where he did not need a car.  This option was not offered to Ms. Wise.  (SOF ¶ 77)  Andrew Goodness, white, did not have a car or insurance at the same time and was allowed to take tours and was not sent home.  (SOF ¶ 78)  David Mercurio, white, did not have a car or insurance at the time and was allowed to take tours and was not sent home, in fact, he was promoted to the position of lime director.  (SOF ¶ 79)  Brenda Durant, white, got rid of her car and had no car insurance for monetary reasons while she was working at Vacation Village and was allowed to continue working as a sales associate without car insurance and using other people's car.  (SOF ¶ 80)  Mickie Pleu, Caucasian, had no car and no insurance at the time. (SOF ¶ 81)   Mr. Lewis was aware that white sales people did not comply with insurance policy.  (SOF ¶¶ 82, 83)  The white sales representatives who did not have a vehicle, or insurance were allowed to take tours by using cars of colleagues and management and did not get disciplined for their failure to adhere to the company policy. (SOF ¶ 84)

The defendants also treated Ms. Wise differently in their enforcement of the dress code. On or around May 11, 2003, a dress code was instituted and it was thereafter only enforced as to Wise. (SOF ¶ 85) At the time she was presented with the dress code Ms. Wise understood from her line director Mr. Stensland that she dressed appropriately under the dress code. (SOF ¶ 86) When Mr. Stensland had Ms. Wise sign that she received the dress code she understood from him that the company was just updating the policy because of the weather was starting to get nice and so the company was reiterating, and reminding people how to dress. (SOF ¶ 87) On one day just a week after the dress code was issued, Ms. Wise was reprimanded for wearing a long orange sundress with spaghetti straps that was not particularly revealing. (SOF ¶ 88) She was told that she had to either drive home from Lanesboro, Massachusetts in the Berkshires to Springfield to change or wear someone's old, dirty sweater. (SOF ¶ 89) Lisa Ferreira, Tishana Wright, Chelsea Wright, and Hannah Blais (all Caucasian) also wore spaghetti strap dresses and shirts on a regular basis, and were not reprimanded or disciplined. (SOF ¶ 90)

During this same time period, Ms. Wise was also treated harshly by Line Director, Gordon Leete. Mr. Leete criticized Ms. Wise regularly and treated her unfavorably. (SOF ¶ 93) He did so, despite the fact that he was not Ms. Wise's supervisor, nor in her chain of command. (SOF ¶ 94) One example of his poor treatment of her was his criticism that she should not close out her own sales. (SOF ¶ 95) He harshly criticized her for having the privilege of closing her own sales despite his being aware that she had the permission and encouragement of her immediate supervisor, Jon Borden, to do so. (Id.) Ironically, Mr. Leete treated Ms. Wise harshly for taking initiative and excelling in her position. Other poor treatment by Mr. Leete included his regular censure of her and her work, despite not having any supervisory role over her. For example, Mr. Leete threatened to have Ms. Wise's car towed for being parked in the wrong area

of the parking lot. (SOF ¶ 96)  Mr. Leete made this threat despite the fact that Ms. Wise's car was parked next to and in the same area as the cars of other white employees.  (SOF ¶ 97)

After Mr. Lewis took over from Mr. Rauer as project director Ms. Wise was also treated unfavorably by members of management when they put her or allowed her to be put on "overage".  Overage is a punitive practice used by defendants when a salesperson comes in late or leaves work early without excuse.  (SOF ¶¶ 98, 103)  Such practice effectively puts the salesperson at the bottom of the list to take a tour, denies the salesperson the chance to make a sale and unfavorably impacts their livelihood.  Being put on overage often means that the salesperson will not be sent out on a tour that day.  (SOF ¶ 104)  Ms. Wise was routinely and often unjustifiably put on overage. (SOF ¶ 98)   For example, on a very slow tour day she was allowed to leave early by her then sales manager John Borden. (SOF ¶ 99)   The following day she was put on overage. (SOF ¶ 99)   A similarly situated white sales person was also allowed to leave early on that same day. (SOF ¶ 100)  She too was put on overage but then removed from overage when she explained that she left early with an excuse. (Id.)   Despite Mr. Borden explaining to other members of management that he allowed Ms. Wise to leave early, she was kept on overage.  (SOF ¶ 101)  On subsequent days, contrary to policy she was again put on overage relating to that same incident.   (SOF ¶ 102)  Being put on overage for the same incident more than once is a violation of the defendants' own overage policy and demonstrates unfavorable and disparate treatment as to Ms. Wise.  (SOF ¶¶ 102, 105)

The evidence of record supports the conclusion that white employees who engaged in conduct similar to that of Ms. Wise did not suffer similar adverse employment actions and a reasonable jury could conclude from this and the pretextual nature of the proffered reasons for

defendants' actions that Ms. Wise was discriminated against on account of her race and summary judgment should be denied on that basis.

> **B.    A REASONABLE JURY COULD CONCLUDE THAT MS. WISE'S TERMINATION CAUSED THE DEFENDANTS TO RETALIATE AGAINST MS WISE FOR HER MULTIPLE COMPLAINTS OF DISCRIMINATION, AND THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.**

> **1.    Legal Standard in Retaliation Cases**

A plaintiff asserting a claim of retaliation must make out a *prima facie* case demonstrating that: (1) he engaged in a protected activity, known to the employer; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment actions. Ramos v. Roche Products, Inc., 936 F.2d 43, 48 (1st Cir. 1991), *cert. denied*, Rossy v. Roche Products, Inc., 502 U.S. 941, 116 L. Ed. 2d 330, 112 S. Ct. 379.  The First Circuit has described this initial stage as placing a "relatively light burden" on the plaintiff. Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995).  In cases such as this one, an employee has satisfied the first element of the *prima facie* case where he complains of alleged national origin-based discrimination and he reasonably believes his allegations to have some foundation. See, Holland v. Jefferson National Life Ins. Co., 883 F.2d 1307, 1314 (7th Cir. 1989) (where complainant reasonably believes that employer's conduct is discriminatory, a complaint of discrimination is a protected activity under Title VII). Under the second element, it is enough to show that the employment action "disadvantages" the person engaging in protected activity. Petitti v. New England Telephone and Telegraph Co., 909 F.2d 28, 33 (1st Cir.1990).  With respect to the third element ," [a] showing of [an adverse employment action] soon after the employee engages in an activity specifically protected by section 704(a) of Title VII  is indirect proof of a causal connection between the [adverse

employment action] and the activity because it is strongly suggestive of retaliation." <u>Oliver v. Digital Equipment Corp.</u>, 846 F.2d 103, 110 (1st Cir. 1988).

A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for the adverse employment decision. <u>Raniola v. Police Commissioner</u>, 243 F. 3d 610, 625 (2d Cir. 2001). The evidence need only show that retaliation was "at least a 'substantial' or 'motivating' factor" behind the adverse action." <u>Mt. Healthy City School District Board of Education v. Doyle</u>, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977). A plaintiff may prove that retaliation was a "substantial" or "motivating" factor behind an adverse employment action either "(1) indirectly, by showing that the protected activity was followed closely by retaliatory treatment, or through other circumstantial evidence such as differential treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." <u>Gordon v. New York City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000). Retaliatory intent may also be shown, in conjunction with the plaintiff's *prima facie* case, by sufficient proof to rebut the employer's proffered reason for the adverse employment action which is alleged to be retaliatory. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 120 S.Ct. 2097, 2109 (2000); <u>see also</u>, <u>Raniola</u>, 243 F.3d at 625.

2.      **Prima Facie evidence**

There is no dispute that Ms. Wise repeatedly engaged in conduct that is protected under both federal and state anti-discrimination laws. Nor is there any dispute that Ms. Wise was disciplined in a variety of ways during her employment and then fired by Mr. Lewis on or around June 7, 2003. The defendants challenge the third prong of the *prima facie* analysis and claim that Mr. Lewis was not aware of Ms. Wise complaints of race discrimination. However,

Mr. Lewis testified that he was aware that Ms. Wise made a number of complaints about race discrimination in the workplace after he began in late 2002-2003. (SOF ¶ 39)  Mr. Lewis was also aware of complaints by Ms. Wise of the disparate treatment in the workplace regarding the various policies and that Ms. Wise believed she was being singled out relative to her coworkers. (Id.)  Ms. Wise was observed by others making such complaints to Mr. Lewis within a month before her termination.  (SOF ¶ 40) In a mangers' meeting at around the same time immediately prior to Ms. Wise's termination, Mr. Lewis told the managers that he had heard that Ms. Wise had filed a complaint with the Massachusetts Commission Against Discrimination. (Id.)

In addition, Ms Lippert who was the only on site Human Resources representative received complaint from Ms. Wise that she was being discriminated against as of May 2003. (SOF ¶¶ 31, 33)   While she did not remember reporting this complaint to Mr. Lewis, Ms. Lippert testified generally that she reported all personnel issues to Mr. Lewis (SOF ¶ 102)  Ms. Lippert also reported personnel issues to the president of Patriot and Berkley, Rebecca Foster and had told Ms Foster that Ms. Wise had complained about discrimination prior to Ms. Wise's termination.  (SOF ¶¶ 34, 35)

These facts taken together provide a sufficient evidence to demonstrate that Mr. Lewis and the defendants were aware that Ms. Wise was asserting her rights under the anti-discrimination laws and survive summary judgment.

### 3.      There Is Overwhelming Evidence that the Reasons Offered By the Defendant for its Adverse Actions against Ms. Wise are Mere Pretext, and that Retaliation was Real Reason Underlying these Adverse Actions.

The defendants argue that they had a non-retaliatory reason for terminating Ms. Wise, relying once again on her attendance.  The evidence that similarly situated individuals who were white and did not complain of race discrimination were treated more favorably is legion and Ms.

Wise incorporates the arguments and evidence set forth above. As with so many evidentiary issues which are common to the analysis of Ms. Wise's disparate treatment and retaliation claims, the pretextual nature of the reason given by Mr. Lewis for termination of Ms. Wise in light of the failure to terminate others for the same reason of absenteeism is fully discussed earlier in this Memorandum at pages 8 - 14. If the pretextual reason proffered by Mr. Lewis is discounted as it should be, then the poor treatement and termination of Ms. Wise stands in stark contrast to the experience of white salespeople who were allowed to work past being absent for 15 days.  And, in the case of Nancy Shepherd who were allowed to exceed number of days absent than Ms. Wise and continue working for the defendants.   Evidence of the other differential treatment that Ms. Wise was subjected to has also been recounted earlier in this Memorandum on pages 14-19.  It was only after Mr. Lewis became the project and director and Ms. Wise complained of discrimination that this treatment continued to escalate.

Finally, the timing of Ms. Wise's termination is telling.  Her termination follows closely on the heels of her complaints of discrimination to Mr. Lewis, Ms. Lippert and the filing of her MCAD complaint. Within about a month of Ms. Wise making her complaints of which Mr. Lewis was aware Ms. Wise was terminated for a pretextual reason.  Such "[a] showing of [an adverse employment action] soon after the employee engages in an activity specifically protected by section 704(a) of Title VII  is indirect proof of a causal connection between the [adverse employment action] and the activity because it is strongly suggestive of retaliation." Oliver v. Digital Equipment Corp., 846 F.2d 103, 110 (1st Cir. 1988).  Accordingly, the Defendant's motion for summary judgment on Ms. Wise's claim of retaliation should be denied.

### C.    Summary Judgment for Berkley on Ms. Wise's Claims is not Appropriate[4]

---

[4] Ms. Wise does not challenge that the individual defendants are not liable under the anti-discrimination law.

Defendants argue that summary judgment for Berkley Group is appropriate because Berkley is merely Patriot Resort's parent corporation and nothing more, despite the fact that Patriot Resort is a wholly owned subsidiary of Berkley Group. However, defendants fail to show under the integrated-enterprise test how Berkley could avoid liability.

The First Circuit adopted the integrated-enterprise test in Romano, examining four factors: 1. interrelation of operations; 2. common management, 3. centralized control of labor relations; and 4. common ownership (Romano v. U-Haul International, 233 F. 3d 665, 662 (1st Cir. 2000)), or common financial control. Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 135, 1240 (2nd Cir. 1995). While the Romano court acknowledged and agreed with the circuits that had adopted the view that "control of labor operations, i.e., control of employment decisions, is the most important of the four factors," the court refused to apply the most stringent reading of this test. Id. at 666. Rather, the court followed the more "flexible" approach adopted by the Second Circuit, "which focuses on employment decisions, but only to the extent that the parent exerts 'an amount of participation that is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions. Id. (citing Cook, 69 F.3d at 1240.)

In Cook, the court applied the integrated-enterprise test to determine whether a parent corporation was responsible for the actions of its subsidiary. There, the court focused on the second factor, that of centralized control of labor relations. In that case, the court denied summary judgment for the parent of a wholly owned subsidiary. It based its conclusion on the fact that there was substantial evidence of an interrelation of operations between the two companies because the parent ran the subsidiary in a "direct, hands-on fashion, establishing operating practices and management practices" of the subsidiary. Cook, 69 F.3d at 1241.

Berkley runs Patriot in a "direct, hands-on fashion, establishing operating practices and management practices" for Patriot.  In her deposition, Rebecca Foster acknowledged that she set employment policies and procedures for employees of Vacation Village, including sales techniques, retirement plans, and attendance issues.  Plaintiff's SODF, ¶ 8.

Second, the court concluded that there was a common management structure evidenced by the fact that the president of the subsidiary operated out of one of the parent company's offices.  Id.  Rebecca Foster is the president of both Patriot Resorts and of the Berkley Group. (Pl. SOF ¶112) Several of her colleagues at the Berkley Group also participate in the management of Patriot Resorts.  According to the defendants J.P. Ottino is the vice president of corporate acquisitions of the Berkley Group and he is director and vice president of Patriot Resorts.  Defendants admit that Mark J. Landau is the treasurer of both Patriot Resorts and the Berkley Group and chief financial officer of the Berkley Group.  These individuals are involved in the management of both the parent company, the Berkley Group, and of the wholly owned subsidiary, Patriot Resorts.

Third, the parent here maintains control of labor relations at the subsidiary.  As with Cook, the subsidiary in this case consulted on employment decisions with the parent. See Cook, 69 F.3d at 1241.  During all relevant times, Rebecca Foster of the Berkley Group was Faith Lippert's supervisor. (Pl. SOF ¶113)   Ms. Lippert was the only human resource personnel at the Berkshire location. (Pl. SOF ¶113)   Furthermore, Ms. Foster was kept apprised by Ms. Lippert regarding LaCrisha Wise's complaints of discrimination and her termination from the company. (Plaintiff's SOF ¶ 34)  She consulted regularly with Faith Lippert, who was responsible for oversight of human resources issues at Vacation Village.  (Id.)

Such a supervisory relationship involved Ms. Foster's oversight of Ms. Lippert and personnel at Vacation Village and control of labor relations. Ms. Foster supervised Ms. Lippert in her additional responsibilities of administration of the sales contracts for time share sales including escrow accounts, and the payment of commissions to time share sales persons at Vacation Village. (Pl. SOF ¶ 114) Ms. Foster also created the "Ten Steps to Success," which employees of Vacation Village were required to follow. (Pl. SOF ¶ 115) Ms. Foster created and distributed office policies for all sales personnel regarding attendance and retirement plans. (Pl. SOF ¶ 116) These plans provided for disciplinary action, as well. (Pl. SOF ¶ 117) The Berkley Group distributed sales awards to sales employees at Vacation Village. (Pl. SOF ¶ 120)

Finally, Ms. Foster was involved in benefits provided to sales people through the Berkley Group Employee Stock Ownership Plan. (Pl. SOF ¶ 118) Individuals eligible for the Berkley Group Employee Stock Ownership Plan included employees at Vacation Village in the Berkshires. (Pl. SOF ¶ 119)

As such, the two companies were not separate entities, and defendants' claims that Berkley was "simply . . . [Patriot Resorts'] parent corporation" are not credible when examining the integration between the two corporations. The two companies had interrelation of operations and the parent company exercised a great deal of control over employment concerns at Vacation Village. These facts support a denial of summary judgment for the Berkley Group because a factfinder could conclude that the companies are an integrated-enterpris. Summary Judgment for the Berkley Group should not be granted because there are sufficient facts to show that the Berkley Group is significantly involved in the daily operations of Patriot Resorts.

## V.     **CONCLUSION**

For all the reasons set forth above, the Defendant's Motion for Summary Judgment should be denied.

May 18, 2007                          Respectfully submitted,

                                     PLAINTIFF LACRISHA WISE
                                     By her Attorneys,

                                     /s/ Suzanne Garrow
                                     Suzanne Garrow, Esq.
                                     BBO#  636548
                                     Heisler, Feldman, McCormick &
                                             Garrow, P.C.
                                     1145 Main Street, Suite 508
                                     Springfield, MA 01103
                                     (413) 788-7988


CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).


                                     _____/s/ Suzanne Garrow_____
                                     Suzanne Garrow