UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT,<br>    Defendants. | DOCKET NO. 04-cv-30091-MAP<br><br>PLAINTIFF WISE'S STATEMENT OF DISPUTED FACTS PURSUANT TO LOCAL RULE 56.1 |

**A. Background**

1. LaCrisha Wise began as a sales representative selling time shares for the defendants on or around the beginning of February, 2002. (Deposition of Faith Lippert dated November 20, 2003, (hereafter "Lippert 2003 Dep.") page 62, attached to the Affidavit of Suzanne Garrow as Exhibit 1.)

2. When she began the project director was William Rauer. (Deposition of Paul Stensland dated November 20, 2003, (hereafter "Stensland 2003 Dep.") page 7, attached to the Affidavit of Suzanne Garrow as Exhibit 2; Deposition of William Rauer dated June 3, 2005, (hereafter "Rauer Dep.") page 10, 12-13, attached to the Affidavit of Suzanne Garrow as Exhibit 3.)

3. Ms. Wise was recruited to work for the defendants by Duane Johnson, a sales manager and African American man, and the only African American working for the defendants at the time Ms. Wise was hired. (Deposition of LaCrisha Wise dated April 26,

2005, (hereafter "Wise April 26, 2005 Dep.") page 75, attached to the Affidavit of Suzanne Garrow as Exhibit 4.)

    4.    Mr. Johnson was recruited by and worked under Paul Stensland and was hired by the defendants to work at Vacation Village prior to the time that Rodney Lewis began as the project director of the location. (Stensland 2003 Dep., Exh. 2 pages 8-9, 13, 14.)

    5.    Paul Stensland was Mr. Johnson's line director and then for Ms. Wise when she was recruited by Mr. Johnson. (Stensland 2003 Dep. Exh. 2 pages 13, 14.)

    6.    General protocol was that a sales person would sit in the sales lounge in the sales center and wait for a tour. (Wise April 26, 2005 Dep. Exh. 4 page 166.)

    7.    As a timeshare sales person Ms. Wise would wait for her name to come up on the "wheel" or assignment and would receive notification that she had a tour. (Id.)

    8.    Ms. Wise would then prepare both by gathering the tools she needed to make a sale and prepare mentally to take that group on a tour. (Id.)

    9.    There were ten steps set forth for a timeshare sales person to follow when giving a tour and Ms. Wise would follow those ten steps process when giving the tour to potential time share purchasers. (Id. page 193.)

    10.    She would first get her car, and then gather the paperwork necessary to complete a sale. (Deposition of LaCrisha Wise dated June 5, 2005, (hereafter "Wise June 5, 2005 Dep.") page 186, attached to the Affidavit of Suzanne Garrow at Exhibit 5.)

    11.    Ms. Wise would then greet the family that she was taking on tour. (Id.)

    12.    She would make conversation with them and discuss generally how they like the Berkshires, and other things of that nature. (Id.)

    13.    She would also share with them the steps of the tour letting them know where they were going and what they would be doing. (Id. pages 186, 187.)

    14.    Ms. Wise would then take the people she was touring for a ride to Mount Greylock as was required by the defendants as a part of the tour. (Id. page 186.)

15. She would show them the view and explain to them what they were looking at. (Id. pages 186, 187.)

16. After returning from Mt. Greylock, Ms. Wise would bring the people on her tour to the sales center, and would make them comfortable by offering them beverages and the lavatory, she would then explain to them what Vacation Village was. (Id. pages 187-88.)

17. She would explain the features and benefits of the timeshare program and how it worked. (Id. page 188.)

18. As part of her sales method Ms. Wise would then discuss with the people she was touring what their vacation habits were, where they had gone on vacation in the past, how they enjoyed their trips, what was their most memorable vacation and would inquire of them regarding the costs of those vacations. (Id. pages 189, 190.)

19. Ms. Wise would also discuss with them places they dreamed of going. (Id. page 189.)

20. After the discussion at the sales center, Ms. Wise would take the people she was touring to Brody Mountain, or Jiminy Peak, and then to the Vacation Village property. (Id. page 198.)

21. Ms. Wise and her tour would return to the sales center and Ms. Wise would discuss with the people she had on tour the advantages of having a time share condominium at a resort over a hotel room. (Id. pages 192, 194-96.)

22. Ms. Wise would explain how they could trade their space for others in other places in the country and throughout the world. (Id. pages 192, 194-96.)

23. The whole tour would take about three hours. (Id. pages 192-93.)

24. After she completed her tours Ms Wise would sign back in at the registration area, the original place where she picked up her tours and wait for another tour. (Id. page 200.)

25. The numbers of tour she could have in a day would range from zero to three or four. (Id. page 201.)

26. During the year 2002 while working at Vacation Village, Ms. Wise had seven surgeries for her lower back, these were as a result of two car accidents. (Id. page 228.)

27. She discussed this condition with Mr. Rauer while he was still the project director, and got excused from work because of her need for physical therapy and other medical care. (Wise June 5, 2005 Dep. pages 228-29; Documents of excused absences, attached to the Affidavit of Suzanne Garrow at Exhibit 15.)

28. He told her that she should just let him know when she has an appointment, and he would let her go and do what she had to do. (Id. pages 228-29.)

29. He told her that she was a top writer and that the company was essentially willing to work around her schedule. (Id. page 229.)

30. Ms. Wise was a fine salesperson. It generally takes someone doing well up to two years to achieve the million dollar ring whereas she received her ring in little over a year (Deposition of Rodney Lewis dated November 20, 2003, (hereafter "Lewis 2003 Dep.") page 60, attached to the Affidavit of Suzanne Garrow as Exhibit 6.) A million dollar ring is a ring that is given by the Berkley Group to a sales person to recognize a sales person when they write a million dollars in business. (Id.)

**B.    Ms. Wise's Complaints of Discrimination**

31. At all times relevant to this matter, Faith Lippert was the local human resource administrator. (Lippert 2003 Dep., Exh. 1 page 38, Lewis 2003 Dep., Exh. 6 pages 16, 18, 19.)

32. On or around March 2003, Ms. Wise reported to a the person in reception, bonnie Gardner who was a member of management that she believed she was being discriminated against and at some point thereafter Bonnie Gardner, Ms. Lippert's direct

report, reported to Ms. Lippert that Ms. Wise had complained of discrimination. (Lippert 2003 Dep., Exh. 1, page 61.)

33.  At least as of May 19, 2003, Ms. Lippert was aware that Ms. Wise made claims that defendants were discriminating against her. (Lippert 2003 Dep., Exh. 1, pages 23-24 and Exhibit 2.)

34.  Ms. Lippert had also apprised Ms. Foster, the president of Patriot Resorts Corporation and the Berkley Group that Ms. Wise had complained of discrimination at work prior to Ms. Wise's termination from employment and was apprised of the termination. (Email from Faith Lippert to Rebecca Foster dated June 9, 2003, attached to the Affidavit of Suzanne Garrow at Exhibit 17; Lippert 2003 Dep., Exh. 1, pages 77, 78.)

35.  Ms. Lippert directed her direct report Bonnie Gardner, who was also a manager for defendants, to keep a log regarding Ms. Wise documenting various negative personnel issues. (Email from Faith Lippert to Rebecca Foster dated June 9, 2003, Exh. 17; Lippert 2003 Dep., Exh. 1, pages 89, 90.)

36.  Ms. Lippert does not recall asking for such a log to be kept regarding any other employees of the defendants. (Lippert 2003 Dep., Exh. 1, pages 89, 90, 91.)

37.  At no point after learning that Ms. Wise complained of discrimination did her employer engage into an investigation of her allegations. (Lippert 2003 Dep., Exh. 1, pages 25, 26.)

38.  Ms. Lippert was required to investigate complaints of harassment and discrimination immediately upon their making and all complaints were to go to her as the only human resources representative at the Berkshire location. (Lippert 2003 Dep., Exh. 1, pages 54, 56, Lewis 2003 Dep., Exh. 6, page 19.)

39.  In or around May 2003, Ms. Wise complained to Mr. Lewis that she was being discriminated against by being treated differently than white employees in the terms and conditions of her employment. (Affidavit of Michael Massaconi, (hereafter "Massaconi

5

Aff.") ¶ 20, attached to the Affidavit of Suzanne Garrow at Exh. 7; Lewis 2003 Dep. pages 118-19.)

40. Within approximately a month before Ms. Wise's termination, Mr. Massaconi was in a managers' meeting and recalls Rod Lewis telling the managers at the meeting that he was aware that Ms. Wise had filed a complaint with the Massachusetts Commission Against Discrimination. (Massaconi Aff., Exh. 7 ¶ 22.)

**C.    Defendants' Attendance Policy**

41. From at least August 2001, through Ms. Wise employment, there was the same attendance policy. (Lewis 2003 Dep., Exh. 6, page 58.)

42. The company policy was that employees could not have more than 15 days out of work. (Stensland 2003 Dep., Exh. 2 pages 28, 30)

43. In or around the time that Rodney Lewis began as project director of the Berkshire location, in November 2002 the defendants reissued the policy that an employee cannot have more than 15 days absent in a year. (Company Attendance Policy, attached to the Affidavit of Suzanne Garrow at Exhibit 16.)

44. Prior to that time, in the late Fall 2002, Ms. Wise and her fiancée, Michael Johnson who was also African American, were asked to sign a paper regarding the attendance policy and no other employee was asked to do so. (Wise April 26, 2005 Dep. pages 140-41, 146)

45. She refused to sign the papers when she was asked to do so. (Id. page 141)

46. In the fall of 2002, there were a number of people with the same or similar number of absences or tardys Lisa Ferreria, Sam Barnes, Alex Hadzagas William Steele, Peggy Jeffers, Mickie Pleu, Nancy Shepherd and Brenda Durant. (Wise April 26, 2005 Dep., Exh. 4, pages 150, 153; Massaconi Aff. Exh. 7 ¶ 5.)

47. Those individuals who had more absences than the supposed 15 day maximum in 2003 were:

Samuel Barnes (18 absences)
Mary Birch (22 absences)
Michael Campagna (19 absences)
Karen Church (17 absences)
Peter Corbin (26 in 8 months)
Brenda Durant (16 absences)
Jayne Engleheart (24 absences)
Ronald Ferreira (22 absences)
Bonnie Keough (18 absences)
Nancy Shepherd (22 days by the time Ms. Wise was terminated for being absent a sixteenth day; 56 days by the end of July 2003.)
William Steele (41 absences)
Jerry Stimple (31 absences)
Shammi Talreja (17 absences)

(Patriot Resorts Attendance Detail Sheets, (hereafter "Detail Sheets") attached to the Affidavit of Suzanne Garrow at Exhibit 8.)

48. Kathy Redmon had 19 in five months thereby exceeding the number of absences by Ms. Wise in 2003. (Detail Sheets, Exh. 8.)

49. Even Rodney Lewis exceeded 15 days absent in 2003. (Id.)

50. Those individuals who exceeded 15 days absent in 2004 were:

Seth Alden (16 absences in 7 months)
Margaret Apkin (18 absences in 4 months)
Samuel Barnes (24 absences in 5 months)
Linda Burnham (23 absences)
Eric Chabot (20 absences)
Jesse Dimitropolis (21 absences in 5 months)
Brenda Durant (26 absences)
Jayne Engleheart (34 absences in 5 months)
Ronald Ferreira (18 absences in 7 months)
Dudley Johnson (20 absences in 5 ½ months)
Galyna Karpenski (18 absences in 2 months)
Judd Kuzia (22 absences)
Tracy Lanoue (18 absences)
Jarrett Lenett (28 absences)
Mark LePine (17 absences)
Deanna McCormick (20 absences)
Charles Messina (18 absences)
Karl Mirke (18 absences)
Danielle Moran (18 absences)
Rebecca O'Brien (19 absences in 5 months)
William Spaulding (18 absences)
William Steele (19 absences)

(Id.)

51. Tina Welz had 26 days absent in just 5 months of employment in 2004, far exceeding the number of absences by Ms. Wise in 6 months of 2003. (Id.)

52. In addition to exceeding the number of days absent supposedly allowed by the defendants, Judd Kuzia also had 20 tardys in 2004 (Id.)

53. Alex Hadzagas was a white employee who was allowed to take a six-week vacation while Ms. Wise worked for the defendants. (Massaconi Aff., Exh. 7, ¶ 5; Wise June 5, 2005 Dep. Exh. 5 page 230.)

54. The only individual who had extended medical leave was Tatjana Klein, white. (Detail Sheets, Exh. 8.)

55. All of the individuals named in paragraphs 46 through 54 are Caucasian. (Massaconi Aff., Exh. 7, ¶ 23.)

56. Mr. Lewis gave Ms. Wise what he called a "clean slate" regarding her attendance starting in the beginning of 2003. (Lewis November 20, 2003 Dep., Exh. 6, page 89-90.)

**D.      Defendants' Car and Car Insurance Policies**

57. From at least August of 2001 until after Ms. Wise's termination, the defendants had the same car and car insurance policy. (Lippert November 20, 2003 Dep., Exh. 1, page 42.)

58. Salespeople were required to provide proof of automobile insurance to work at the defendants. (Id. page 43)

59. Salespeople were also required to have a valid driver's license to be employed by the defendants. (Id.)

60. Ms. Wise had a valid drivers license when she was hired and throughout her employment with defendants. (Wise April 25, 2005 Dep. Exh. 4, page 81.)

61. At the time she became employed at Vacation Village, Ms. Wise had a car and car insurance with full coverage required by Massachusetts. (Id. pages 93-95.)

62. Ms. Wise drove several different vehicles when she was employed by the defendants and with each car or change in insurance she always provided her updated insurance information. (Id. pages 121.)

63. Despite having adequate coverage under Massachusetts law and more coverage then certain similarly situated white employees, Mr. Lewis reprimanded Ms. Wise for having inadequate car insurance coverage. (Id. page 98.)

64. On one occasion he told her that she did not have a policy on file with the company and withheld her paycheck and that of her fiancée telling them they would not be paid until they gave defendants their insurance policy. (Id. page 119.)

65. At the same time he told me that I wasn't being sent on tour and was being sent home immediately. (Id. page 99.)

66. On another occasion, Ms. Wise's automobile was in the shop getting repaired, and she was driving her father's car. In front of her then manager Jon Borden Mr. Lewis noticed that took her and her manager aside and asked her to prove that she had insurance on that vehicle, asked whose vehicle it was. (Id. page 100.)

67. Ms. Wise explained that the car was fully covered and had met Massachusetts requirements for insurance. (Id.)

68. Mr. Lewis pulled her off the line and her tour was given to someone else, and wasn't allowed to take a tour because Mr. Lewis said that she was driving a different car that day, and needed to show proof of the coverages on the car to make sure that they met Patriot Resorts' requirement for coverage. (Id.)

69. Mr. Lewis said unless Ms. Wise could provide that proof or documentation, that she needed to leave immediately. (Id.)

70. Ms. Wise asked Mr. Lewis if she was the only one, because there were other sales representatives being allowed to take tours who did not even have cars, and had to borrow other sales people's cars and did not have insurance. (Id. page 101.)

71. He told me not to worry about other people and to worry about myself and either get verification or go home. (Id.)

72. The defendants policy throughout the time Ms. Wise was employed was that an employee report on their insurance coverage only once per year and there was no policy that required salespeople to update insurance information other than at one time per year. (Massaconi Aff., Exh. 7, ¶6.)

73. Throughout the time Ms. Wise was employed by the defendants there were sales representatives (Caucasian) being allowed to take tours who did not even have cars, and had to borrow other sales people's cars and did not have any insurance, of which the company was aware. (Id. ¶7.)

74. Ronald Ferraro, white, had no license, no car, and no car insurance for at least one and a half months at the time and was allowed to take tours and was not sent home. (Lewis 2003 Dep., Exh. 6, pages 69, 70; Massaconi Aff., Exh. 7, ¶ 8.)

75. Mr. Ferraro was routinely allowed to take tours and was not sent home for these reasons. (Massaconi Aff., Exh. 7, ¶ 9.)

76. Sam Barnes, white did not have a drivers' license, car or insurance at the time for about a year and a half while he was a sales person and was allowed to take tours and was not sent home. (Wise June 5, 2005 Dep., Exh. 5, pages 234-24; Massaconi Aff., Exh. 7, ¶ 10.)

77. At some point, Mr. Barnes was moved to a department where he did not need a car. This option was not offered to Ms. Wise. (Massaconi Aff., Exh. 7, ¶ 11; Stensland 2003 Dep., Exh. 2, pages 51-52)

78.     Andrew Goodness, white, did not have a car or insurance for the entire time he was a sales person and was allowed to take tours and was not sent home. (Wise April 25, 2005 Dep., Exh. 4, page 105; Massaconi Aff., Exh. 7, ¶ 12.)

79.     David Mercurio, white, did not have a car or insurance for about a year while he was a sales manager and was allowed to take tours and was not sent home, in fact, he was promoted to the position of line director. (Wise April 25, 2005 Dep., Exh. 4, page 105; Massaconi Aff., Exh. 7, ¶ 12.)

80.     Brenda Durant got rid of her car and had no car insurance for monetary reasons while she was working at Vacation Village and was allowed to continue working as a sales associate using other people's car. (Wise April 25, 2005 Dep. Exh. 4 pages 114-16.)

81.     Mickie Pleu, Caucasian, had no car and no insurance. (Id. page 116.)

82.     The sales managers received notification that these people were without car, insurance and licenses. (Massaconi Aff., Exh. 7, ¶¶ 6-7.)

83.     Mr. Lewis was aware that white sales people did not comply with the policy that each sales person and sales manager was required to have a car, a Massachusetts license and car insurance. (Massaconi Aff., Exh. 7, ¶ 14.)

84.     Mr. Lewis was aware that white sales representatives violated the company policies and did not have a license, or a vehicle, or insurance and were allowed to take tours by on occasion using cars of colleagues and more often that of the line director and did not get disciplined for their failure to adhere to the company policy. (Massaconi Aff., Exh. 7, ¶ 15; Lewis 2003 Dep., Exh. 6 pages 76-77.)

**E.     Defendants' Dress Code**

85.     On or around May 11, 2003, a dress code was instituted and it was thereafter selectively enforced as against Wise. (Dress Code dated May 11, 2003, attached to the Affidavit of Suzanne Garrow at Exhibit 9; Reprimand to LaCrisha Wise dated May 18, 2003 attached to the Affidavit of Suzanne Garrow at Exhibit 10; Wise April 25, 2005 Dep., Exh. 4,

11

pages 156, 158; Massaconi Aff., Exh. 7, ¶ 16; Affidavit of Lisa Ferreira (hereafter "Ferreira Aff."), attached to the Affidavit of Suzanne Garrow at Exhibit 11.)

86. At the time she was presented with the dress code Ms. Wise understood from Mr. Stensland that she dressed appropriately under the dress code. (Wise April 25, 2005 Dep., Exh. 4, pages 156, 161.)

87. When Mr. Stensland had Ms. Wise sign that she received the dress code she understood from him that the company was just updating the policy because of the weather was starting to get nice and so the company was reiterating, and reminding people how to dress. (Id. 160)

88. On one day Ms. Wise wore a long orange sundress with spaghetti straps that was not particularly revealing. (Id. 156, 158)

89. She was written up and told that she had to either drive home from Lanesboro, Ma to Springfield to change or wear someone's old, dirty sweater. (Id. 156, 158; See also May 18, 2003 Memorandum to LaCrisha Wise, attached to the Affidavit of Suzanne Garrow at Exh. 16)

90. Lisa Ferreria, Tishana Wright, Chelsea Wright, and Hannah Blais (all Caucasian) also wore spaghetti strap dresses and shirts on a regular basis, and were not reprimanded or disciplined. (Wise April 25, 2005 Dep., Exh. 4, pages 156, 158; Ferreira Aff., Exh. 10; Massaconi Aff., Exh. 7 ¶ 16.)

### F. OTHER DISPUTED MATERIAL FACTS

91. On or around June 7, 2003, Ms. Wise was absent from work and Mr. Stensland called her and told her that the rule was fifteen days absent, and he said that she had reached that fifteen-day mark and was terminated. (Wise June 5, 2005 Dep., Exh. 5, page 204)

12

92. Ms. Wise never in any way threatened Ms. Lippert nonetheless, Ms. Lippert testified that Ms. Wise made her "nervous" and "uncomfortable" to be around. (Faith Lippert Deposition dated May 17, 2005, (hereafter "Lippert 2005 Dep.", Exh 12, page 173.)

93. When Mr. Lewis was the project director, Ms. Wise was often treated harshly by Line Director, Gordon Leete. (Wise Affidavit in Support of Charge of Discrimination, attached to the Affidavit of Suzanne Garrow at Exhibit 13.)

94. Mr. Leete criticized her regularly and treated her unfavorably despite the fact that he was not her supervisor, nor in her chain of command. (Id.)

95. One example of his poor treatment of Ms. Wise was his criticism that she should not close out her own sales despite his being unaware that she had the permission and encouragement of her supervisor, Jon Borden, to do so. (Id.)

96. Mr. Leete threatened to have her car towed for being parked in the wrong area of the parking lot. (Id.)

97. Mr. Leete made this threat despite the fact that her car was parked next to and in the same area as the cars of white employees. (Id.)

98. Ms. Wise was routinely and often unjustifiably put on overage, which meant she was punished by being put at the end of the "wheel" which is the bottom of the list for taking a tour, allegedly for being late or missing work. (Id.)

99. For example, one day when Ms. Wise was not going to get a tour that day she was allowed to leave early by her manager Jon Borden yet, the following day, she was put on overage. (Id.)

100. A white employee who was also allowed to leave early on that same day for the same reason was also put on overage but was then removed from overage by management when she explained that she left early with an excuse. (Id.)

101.    Despite Mr. Borden explaining to management that he allowed Ms. Wise to leave early on that same day for the same reason as the other white employee, she was kept on overage by management. (Id.)

102.    On subsequent days Ms. Wise was again put on overage relating to that exact same incident, which she understood to be contrary to policy, i.e that one could not be put on overage twice for the same alleged absent or lateness. (Id.)

103.    Overage is a punitive practice used by Patriot when a salesperson comes in late or leaves work early without excuse or permission. (Massaconi Aff, Exh 7, ¶ 17.)

104.    Such practice effectively puts the salesperson at the bottom of the list to take a tour, and could deny the salesperson the chance to make a sale. (Massaconi Aff, Exh 7, ¶ 18.)

105.    Being put on overage often means that the salesperson will not be sent out on a tour that day. (Massaconi Aff, Exh 7, ¶ 19.)

106.    Prior to the time Mr. Lewis began as the project director Ms. Wise loved work but things changed when he began his employment there. (Wise June 5, 2005 Dep., Exh. 5, page 226)

107.    As a result of the repeated reprimands by Mr. Lewis and others at his direction, Ms. Wise began to spend the time in between tours in her car as she no longer could stand to be in the sales lounge (Wise June 5, 2005 Dep., Exh. 5, page 214, 216 217, 223-24.)

108.    When Mr. Lewis was project director and Ms. Wise was working at Vacation Village, no African American employees were hired at Vacation Village (Wise 154, Massaconi Aff., Exh. 7, ¶ 23.)

109.    Ms. Lippert reported personnel issues to Mr. Lewis (Lippert 2003 Dep. Exh 1, page 29)

110.    The project director has the final authority for hiring and firing sales people and it was Mr. Lewis who made the decision to fire Ms. Wise. (Deposition of Gordon Leete

dated November 20, 2003, attached at Exhibit 14 to the Affidavit of Suzanne Garrow page 26; Stensland 2003 Dep., Exh. 2, page 41.)

111.  Mr. Lewis treated Ms. Wise differently and more harshly and applying different rules to Ms. Wise than white sales people on a number of occasions. (Massaconi Aff, Exh 7, ¶¶ 5-16, 21.)

112.  Rebecca Foster is the president of Patriot Resorts and of the Berkley Group. (Lippert 2005 Dep., Exh 12 pages 8, 9.)

113.  Ms. Lippert reports to Rebecca Foster, who is her supervisor.  (Id. 52).

114.  Ms. Lippert is responsible for administration of the sales contracts for time share sales including escrow accounts, and the payment of commissions to time share sales persons at Vacation Village. (Lippert 2003 Dep., Exh. 1, page 9-11.)

115.  The Berkley Group created a document called the "Ten Steps to Success," for use by employees of Vacation Village.  (Lippert 2005 Dep., Exh. 12 page 57; Ten Steps. Attached to the Affidavit of Suzanne Garrow at 19.)

116.  Ms. Foster also created and distributed office policies for all sales personnel regarding attendance and retirement plans.  (Deposition of Rebecca Foster Campagna (hereafter "Foster Dep.") dated May 23, 2005, page 113, attached to the Affidavit of Suzanne Garrow at Exhibit 18)

117.  These plans provided for disciplinary action, as well.  (Id.; Berkley Group Discipline Memorandum, Attached to the Affidavit of Suzanne Garrow at Exhibit 20.)

118.  Ms. Foster was involved in ensuring that employee qualified for the Berkley Employee Stock Ownership Plan.  (Foster Dep. Exh. 18 pages 113-114.)

119.  Individuals eligible for the Berkley Group Employee Stock Ownership Plan included employees at Vacation Village in the Berkshires. (Employee Stock Option Plan attached to the Affidavit of Suzanne Garrow at Exhibit 21; Relevant Handbook portion; attached to the Affidavit of Suzanne Garrow at Exhibit 22.)

120. The Berkley Group distributed sales awards to sales employees at Vacation Village. (Lewis 2003 Dep., Exh. 6 page 60; Million Dollar Ring request, attached to the Affidavit of Suzanne Garrow at Exhibit 23.)

                PLAINTIFF LACRISHA WISE

                By:

                /s/ Suzanne Garrow_____
                Her attorney
                Suzanne Garrow BBO# 636548
                Heisler, Feldman, McCormick & Garrow, PC
                1145 Main Street, Ste. 508
                Springfield, MA  01103
                Phone (413) 788-7988

Dated:  May 18, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

                __/s/ Suzanne Garrow_____
                Suzanne Garrow