UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LACRISHA WISE, MICHAEL MASSACONI, ROGER MARTIN and PETER CORBIN, on behalf of themselves and on behalf of others who are similarly situated, | : : : : : : : | DOCKET NO. 04-CV-30091-MAP |
| Plaintiffs, | : | |
| vs. | : : | |
| PATRIOT RESORTS CORP., THE BERKLEY GROUP, INC., MARC J. LANDAU, J.P. OTTINO, III REBECCA A FOSTER. and JAMES E. LAMBERT, | : : : : : | |
| Defendants. | : : | |

**PLAINTIFF'S CORRECTED MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT V
(MARTIN'S INDIVIDUAL CLAIM FOR RELIEF:
RETALIATION IN VOLATION OF M.G.L. CH. 149 § 148A)**

## I.  INTRODUCTION

In this class and individual matter, in Count V, plaintiff Roger Martin has brought

this individual action for equitable relief and compensatory and treble damages against

defendants Patriot Resorts Corp, the Berkley Group, Inc., Mark J. Landau, J.P. Ottino,

III, Rebecca A. Foster, and James E. Lambert (collectively "the defendants) for

retaliation based upon his complaints about defendants' failure to pay him and

specifically to make timely payments of his earned commissions under the state wage and

hour statute.

Roger Martin was hired by the defendants in August of 2001 to sell time shares for the resort Vacation Village in the Berkshires.  Plaintiff's SODF, ¶ 1.  Patriot Resorts owns Vacation Village, and Patriot Resorts is a wholly owned subsidiary of the Berkley Group.  Plaintiff's SODF, ¶ 2.

Mr. Martin proved to be a successful timeshare salesman.  Plaintiff's SODF, ¶ 16.  He was a top seller, and he received the company's "Million Dollar Ring" for selling a million dollars worth of timeshares.  Plaintiff's SODF, ¶ 16.  He was frustrated by the defendants' failure to make timely payment of his earned commissions, and their failure to pay minimum wage and overtime, and he complained to his supervisors.  Plaintiff's SODF, ¶¶ 17-19.  He was fired in 2003 for complaining about untimely payment of commissions, and, at that time contacted the Office of the Attorney General regarding untimely payments of commissions and he received a letter from the office authorizing him to bring a private suit against defendants.  Plaintiff's SODF, ¶¶ 20-21.

Six months after he was first terminated, Mr. Martin approached Bill Rauer, the project director and sales-personnel manager at Vacation Village.  Plaintiff's SODF, ¶ 9.  Mr. Martin wanted to talk with Mr. Rauer about returning to Vacation Village as a timeshare salesman. Plaintiff's SODF, ¶ 22.  He was rehired because defendants represented to him that he was a valuable member of the team, and that they would "love to have him back." Plaintiff's SODF, ¶ 22.  Hoping things would change for the better, Mr. Martin returned to work for defendants, but encountered the same problems.  Plaintiff's SODF, ¶ 24.  Upon his return to Vacation Village, Mr. Martin soon realized that he was not going to be

2

able to rely on the promises made by the defendants regarding his compensation and that he would be timely paid wages and commissions.  Plaintiff's SODF, ¶ 25.  Mr. Martin believed that defendant's failure to pay him on his commissions earned and on minimum wage and overtime payments was illegal.  Id.  Mr. Martin once again complained to his supervisors and other managers about the illegality of not being paid on a regular basis for sales that he had booked and closed.  Plaintiff's SODF, ¶ 26.

On September 21, 2004, Mr. Martin approached Mr. Stensland in the pit, where all of the sales employees gathered prior to taking a tour, regarding the continued untimely payments of his commission and the utter failure of the defendants to pay him minimum wage and overtime payments.  Plaintiff's SODF, ¶ 28.  At the end of the conversation where Mr. Martin asserted his rights to be paid under the state wage payment statute, Mr. Stensland told Mr. Martin to go home.  Plaintiff's SODF, ¶ 28.  Mr. Martin received a voicemail from Paul Stensland a few hours later informing him that Bill Rauer fired him for not taking a tour.  Plaintiff's SODF, ¶ 29.  Mr. Martin called Mr. Stensland back, and was told that he was fired but that he should come in the next day and speak to Mr. Rauer.  Plaintiff's SODF, ¶ 29.  Understanding that he had already been fired, when Mr. Martin went to the office the next day, he was met by Mr. Stensland, who told him that he was going to have to "beg for his job."  Plaintiff's SODF, ¶ 29.  After returning to work for the defendants with the hope that he would be timely paid money he earned and then working nine months of not being paid minimum wage, overtime and commissions earned in violation of Mr. Martin's understanding of the wage statute, this

3

was not something Mr. Martin was prepared to do.  Plaintiff's SODF, ¶ 29.

Defendants have moved for summary judgment on Mr. Martin's individual retaliation clam.  For the reasons set forth below, defendants are not entitled to an award of summary judgment.

## II.    FACTUAL BACKGROUND

The plaintiff has prepared a Statement of Material Facts as to which there Exists a Genuine Dispute to be Tried (hereafter "Plaintiff's SODF") which has been submitted in support of the opposition to the defendant's Motion for Summary Judgment, and the plaintiff incorporates those facts into this Memorandum of Law by reference.

## III.    SUMMARY JUDMENT STANDARD ON RETALIATION CASES

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995). All reasonable inferences which may be drawn from the record before the court are to be indulged in favor of the nonmoving party. Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988).

The movant bears the initial burden of proving that no genuine issues of material fact exist for trial.  Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000).  See, Celotex Corp. v. Catrett, 477 U.S. 317, 323 -324 (1986). The First Circuit has defined a "genuine issue of material fact" as that which "might affect the outcome of the suit under

4

the governing law." In deciding a motion for summary judgment, "the court must ask 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" Lipsett v. University of Puerto Rico, 864 F.2d 881, 894 (1st Cir. 1988), *quoting,* Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986) (internal quotations omitted).  In other words, "[a]n issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Oliver, 846 F.2d at 105 (citations omitted).

In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination.  Discrimination cases often involve issues of motivation and intent which can only be proved through reliance on circumstantial evidence. Such determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the jury. See e.g., LeBlanc v. Great American Ins. Co., 6 F.3d 836, 840 (1st Cir. 1993), *cert. denied*, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); Waltman v. International Paper Co., 875 F.2d 468 (5th Cir. 1989). Thus, courts should exercise particular caution before granting summary judgment for employers on such issues of pretext, motive and intent. Santiago-Ramos v. Centennial P,R, Wireless Corp., 217 F. 3d 46, 54 (1st Cir. 2000). The reason for this caution is "because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent."  Hodgens v. General Dynamics Corp., 144 F.2d 151, 167 (1st Cir. 1998).

# IV.    LEGAL ARGUMENT

### A.    A Reasonable Jury Could Conclude from the Evidence that Roger Martin was Retaliated Against After Complaining About Violations of the Massachusetts Wage Statute

The wage statute retaliation claim follows the well known burden shifting paradigm used in other matters of inferential proof.  *See* Samantha Smith and others vs. Winter Place, LLC and others, 447 Mass. 363, 369 fn 4 (2006).  As with other burden shifting claims a plaintiff asserting a claim of retaliation must make out a *prima facie* case demonstrating that: (1) he engaged in a protected activity, known to the employer; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment actions.  Ramos v. Roche Products, Inc., 936 F.2d 43, 48 (1st Cir. 1991), *cert. denied*, Rossy v. Roche Products, Inc., 502 U.S. 941, 116 L. Ed. 2d 330, 112 S. Ct. 379.  The First Circuit has described this initial stage as placing a "relatively light burden" on the plaintiff. Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995).

With respect to the third element ," [a] showing of [an adverse employment action] soon after the employee engages in [protected] activity. . . is indirect proof of a causal connection between the [adverse employment action] and the activity because it is strongly suggestive of retaliation." Oliver v. Digital Equipment Corp., 846 F.2d 103, 110 (1st Cir. 1988).

Retaliatory intent may also be shown, in conjunction with the plaintiff's *prima facie* case, by sufficient proof to show pretext and rebut the employer's proffered reason

6

for the adverse employment action which is alleged to be retaliatory. <u>Reeves v.</u>

<u>Sanderson Plumbing Products, Inc.</u>, 120 S.Ct. 2097, 2109 (2000); <u>see also</u>, <u>Raniola</u>, 243

F.3d at 625.

     In order to sufficiently rebut defendants' "legitimate, non-retaliatory reason" for

his dismissal, the plaintiff must show that this reason was not the real reason but in fact

the real reason was retaliatory.  The plaintiff can make such a showing by offering proof

of another motive for the adverse action.  *See* <u>Connell v. Bank of Boston</u>, 924 F.2d 1169,

1182 (1st Cir. 1991) (interpreting a case to mean that the plaintiff's *prima facie* case plus

proof of pretext in employer's articulated reason for discrimination sufficient to avoid

summary judgment).

     1.     Roger Martin Engaged in Activity Protected under M.G.L. ch. 149, §
          148A

Roger Martin repeatedly engaged in conduct which is protected under the

Commonwealth laws regarding timely payments of compensation to employees.

Plaintiff's SODF, ¶ 26.

     Mr. Martin was fired initially for asserting his rights under the wage statute but

was rehired to work for defendants six moths later.  Plaintiff's SODF, ¶ 23.  He returned,

hoping things would improve and that he would, at last, be timely paid his commissions.

Plaintiff's SODF, ¶ 24.  He soon discovered that the compensation practices of

defendants had not changed since he had been employed there previously.  Plaintiff's

SODF, ¶ 25.  Mr. Martin was simply looking to receive regular compensation in the form

of commissions for the selling of timeshares. Plaintiff's SODF, ¶ 25. He also sought minimum wage and overtime payments as he was required to be at work on a regular basis and, at times over 40 hours per week. Plaintiff's SODF, ¶ 25. He made his concerns known to his supervisors after he came back to work in 2004. Plaintiff's SODF, ¶ 26.

Mr. Martin complained about the untimely payment of commissions and overtime payments to his line directors, Gordon Leete and Paul Stensland, as well as to Bill Rauer, the project director at Vacation Village. Plaintiff's SODF, ¶ 26. He also complained to Rodney Lewis and Faith Lippert about untimely payment of wages. Id.

Mr. Martin reasonably believed that the untimely payment of commissions was illegal. Plaintiff's SODF, ¶ 25. He reasonably believed he was not receiving his earned commission payments within the timeframe set forth in the wage statute. Id. He was not being paid minimum wage and overtime which he reasonably believed he was entitled to under that statute. Id. Believing these practices were illegal, based upon his reading of the law, he attempted to resolve this issue by talking to his supervisors and other managers at Vacation Village. Plaintiff's SODF, ¶ 26. Such activity, complaining to supervisors about non-payment of earned wages, is protected in Massachusetts, as a means by which employees are authorized to enforce their rights. Smith, 447 Mass. at 367.

In an attempt to obfuscate Mr. Martin's plainly protected activity, Defendants claim that Mr. Martin had "temper-control" issues, and that he "complained about

8

everything his employer did." Defendants also dispute that Mr. Martin was in good faith asserting his rights under the Wage Act but was rather just someone who had a hostile and threatening attitude toward his coworkers and superiors. Such claims are insufficient to defeat the fact that Mr. Martin's activities were protected under the wage statute. These claims do not address the fact that throughout Mr. Martin's employment with defendants, Mr. Martin reasonably believed was not being paid for the commissions he had earned and wages that he was entitled to be paid. Plaintiff's SODF, ¶ 25. When Mr. Martin returned to work for defendants in 2004, Mr. Martin complained about these violations of the wage act. Plaintiff's SODF, ¶ 26. Complaints by an employee where the employee reasonably believes his employer violated the wage act are protected, despite any ancillary and unrelated issues defendants may raise. *See* Smith, 447 Mass. at 367.

Mr. Martin was frustrated by the defendants' failure to make timely payments. Plaintiff's SODF, ¶ 25. He reasonably believed that such actions were illegal and made his legally protected complaints to his supervisors. Plaintiff's SODF, ¶ 25. Mr. Martin clearly raised the issue of untimely payment with Mr. Stensland and Mr. Rauer. Plaintiff's SODF, ¶¶ 26, 28. He asserted his right to be paid timely for deals he had written, and a jury could certainly find that such actions were more than mere "abstract grumbling." As a result of asserting his rights, he was sent home from work by Mr. Stensland and then fired by Mr. Rauer within hours, ostensibly for refusing to take a tour. Plaintiff's SODF, ¶ 29. Whether or not his delivery was palatable to defendants, a

9

reasonable jury could nevertheless conclude that he was asserting his rights in good faith. A jury could find that Mr. Martin was seeking to enforce rights he reasonably believed he was entitled to under the Massachusetts wage Act which protects employees from retaliation for asserting those rights.

      2.      Defendants took an adverse action against Mr. Martin when he was fired in September 2004

While defendants claim that Mr. Martin was not fired but that he quit, Mr. Martin presents record evidence that he was fired by Mr. Rauer on September 21, 2004. Plaintiff's SODF, ¶ 28. Defendants argue that Mr. Martin quit his employment at Vacation Village because he no longer wanted to work there, but in direct contrast Mr. Martin testified at his deposition that immediately after he complained to his supervisor Paul Stensland about not getting paid he was sent home. Id. A few hours later he received a voicemail saying he was fired by Mr. Rauer for passing up a tour. Plaintiff's SODF, ¶ 29.

On September 21, 2004, Mr. Martin was upset about not being paid on commissions he had earned. Plaintiff's SODF, ¶ 28. He went into the pit and approached his supervisor, Paul Stensland, and complained to him that he was upset about not getting paid and that he wanted to get paid his commissions for selling timeshares. Id. Mr. Stensland told him to go home, which Mr. Martin did. Id. Later that afternoon, Mr. Martin received a voicemail from Mr. Stensland informing him that he had been fired by Bill Rauer for passing up a tour. Plaintiff's SODF, ¶ 29. Mr. Martin

called him back and was told he was fired but that he needed to go to work and talk to

Mr. Rauer the next morning at 8:30.  Id.  Understanding that he had already been fired,

when Mr. Martin arrived at the office, Mr. Stensland met him at his car and told him that

he was going to have to "beg for his job."  Id.

There is clearly a material dispute.  Viewing the evidence in the light most

favorable to the non-moving party, Mr. Martin's statement that he was fired should be

credited.  At bottom, this dispute of fact is material to the outcome of the case and should

be a presented to the finder of fact at trial, and summary judgment should be denied.

3.      But for Mr. Martin's assertion of his rights under the Wage Statute, he
        would not have been fired by defendants in September of 2004

Here, a reasonable finder of fact could conclude that but for Mr. Martin's

complaint to Mr. Stensland regarding the untimely payment of wages, Mr. Martin would

not have been terminated from employment at Vacation Village by Bill Rauer.

Mr. Martin complained based upon his good faith belief that he was not being

paid, and that such non-payment violated the Wage Laws.  Plaintiff's SODF, ¶¶ 26, 28.

Hours after he made those complaints, he was informed that he was fired.  Plaintiff's

SODF, ¶¶ 28-29.  Specifically, Mr. Martin was terminated by Mr. Stensland's boss's

supervisor the same day Mr. Martin complained to Mr. Stensland that he was not being

paid for the work he was doing.  Plaintiff's SODF, ¶¶ 28-29.

Defendants claim that Mr. Rauer lacked knowledge of Mr. Martin's complaints

on the date that he was fired is not persuasive based on their own admissions.  On

September 21, 2004, Mr. Stensland communicated to Mr. Martin that Mr. Rauer fired him on that date.  <u>Id</u>.  Mr. Stensland called and told him that he was fired by Mr. Rauer immediately after Mr. Martin's conversation with Mr. Stensland.  <u>Id</u>.  based on Mr. Stensland's phone message and conversation with Mr. Martin, a finder of fact could conclude that Mr. Rauer was well aware of Mr. Martin's complaints, and fired him because of them and summary judgment should be denied on that basis.

Furthermore, temporal proximity between the protected activity and the adverse action is sufficient to infer retaliation.  <u>Oliver</u>, 846 F.2d at 110.  As mentioned above, Mr. Martin was informed in a voicemail from Mr. Stensland, literally hours after he complained about non-payment of wages that he was fired.  Plaintiff's SODF, ¶ 29.  Mr. Martin then called Mr. Stensland after Mr. Martin had already been fired, but was told to talk to Mr. Rauer in person the next day.  Plaintiff's SODF, ¶ 29.  When he came in the next day, he was abruptly met in the parking lot by Mr. Stensland.  Plaintiff's SODF, ¶ 29.  Mr. Martin understood at that time that he had already been fired.  Plaintiff's SODF, ¶ 29.  Mr. Stensland told Mr. Martin that if he wanted his job back, he'd have to beg for his job, and after coming back to work for the defendants with the hopes of being paid for work performed and then nine months of not being paid, this was not something he was prepared to do.  Plaintiff's SODF, ¶ 29.

Because Mr. Martin can establish causation through indirect proof, his claim should survive at this juncture.

12

4.    Defendants assertion that Mr. Martin voluntarily quit is pretext for retaliation

Defendants argue that Mr. Martin was not fired but that he resigned his employment with defendants.  Their statement contravenes Mr. Martin's testimony that he was fired on September 21, 2004, and is merely a pretext to obscure the fact that Mr. Martin was fired because he made complaints about not being paid for the work he had done for defendants.

Furthermore, despite the fact that defendants contest Mr. Martin's testimony that he was fired, defendants also seem to argue that even if Mr. Martin were fired, it would have been for legitimate reasons, namely that he did not take a tour on the day he was fired.

Mr. Martin disputes the fact that he had been assigned a tour that he refused to take. Mr. Martin had not been assigned a tour prior to or during his conversation with Mr. Stensland, Mr. Martin was not given a tour slip, which is the way the defendants initiated a tour with their sales people, nor was Mr. martin aware that he was on the rotation list for taking tours that day.  Plaintiff's SODF, ¶ 30. Rather, he was sent home by Mr. Stensland, and later fired from his job at Vacation Village, Mr. Martin claims, because he was raising complaints under the state wage statute to Mr. Stensland..  Plaintiff's SODF, ¶¶ 28, 29.

Here, Mr. Martin provides sufficient proof to avoid summary judgment by rebutting defendants' purported legitimate reason for his dismissal.  Furthermore, based

on Mr. Martin's contention that he was fired and that there was no tour offered to him, it

is appropriate to pose the question to a finder of fact – was the claim that Mr. Martin quit

and was not fired a pretext for retaliation?  The "availability of seemingly neutral

rationales under which an employer can hide its discriminatory intent."  Hodgens, 144

F.2d at 167.  As such, summary judgment for defendants on the issue of whether

defendants retaliated against Mr. Martin is inappropriate because there is a genuine issue

of material fact as to whether defendants fired Mr. Martin and if so, whether the firing

was motivated by unlawful intent.

    B.  <u>Defendant's Argument that Mr. Martin Failed to meet the Statutory Prerequisite
to Filing a Civil Action is not supported by the facts</u>

Defendants argue that they are entitled to summary judgment on Mr. Martin's

retaliation claim because he did not first present that claim to the Office of the Attorney

General (hereinafter the "OAG").  However, Mr. Martin met the condition precedent for

filing a suit against defendants and has   complied with all of the prerequisites for filing

this suit.  He filed a complaint with the OAG and was given an authorization letter to

initiate a private suit against the defendants.  Plaintiff's SODF, ¶ 20.  In that complaint,

he was seeking to enforce the Massachusetts Wage and Hour laws.  Plaintiff's SODF, ¶

20. Mr. Martin also made his concerns known to his employer.  Plaintiff's SODF, ¶¶ 17-

19.  During his second term of employment with Vacation Village, he sought to enforce

his rights to be paid according to the law.  Plaintiff's SODF, ¶ 26.  As a result of making

such complaints, Mr. Martin was fired.  Plaintiff's SODF, ¶ 29.  Even if the Court were

somehow to find that Mr. Martin needed to file another complaint with the attorney

general for the second set of complaints made in his second term with the defendants  Mr.

Martin is not out of time to do so.  Such requirement could be met as Mr. Martin could

file before September 2007 and still timely file his retaliation claim within the three year

limitations period prescribed by the statute.  Therefore, based on judicial efficiency and

economy, Mr. Martin should not be required to bring his claim which has been fully

developed over an almost three year period a second time when it can be adjudicated in

this matter most efficiently.

C.    Summary Judgment for Individual Defendants Foster and Landau is not
Appropriate[1]

Defendants argue that the retaliation portion of the Massachusetts Weekly

Payment of Wages law does not apply to the individual defendants Foster and Landau

because section 148A does not define employer.  This argument is based upon misguided

statutory construction.  It is axiomatic that adopting differing interpretations of identical

language "is contrary to the basic canon of statutory construction that identical terms

---

[1] Plaintiff does not dispute defendants' assertions that Mr. Ottino and Mr. Lambert should be dismissed
pursuant to the Massachusetts Weekly Payment of Wages laws.  Mr. Martin also relies on the arguments set
forth in Ms. Wise's Opposition to Summary Judgment regarding his claim against the individual
defendants.

within an Act bear the same meaning." <u>State of Cowart v. Nicklos Drilling Co</u>., 505 U.S. 469, 479 (1992) (citing <u>Sullivan v. Stroop</u>, 496 U.S. 478, 484 (1990)).

Here, employer is defined in the first portion of the statute as the "president and treasurer of a corporation and any officers or agents having the management of such corporation . . ." M.G.L. ch. 149, § 148. The anti-retaliation section prohibits an employer for penalizing an employee who is seeking to enforce his or her rights "under the wages and hours provisions of this chapter." M.G.L. ch. 149, § 148A. The defendants advocate for a different meaning of employer under M.G.L. c. 148A than the one 148 in an attempt to insulate the president and treasurer of the corporation from liability for retaliatory acts on the part of the corporation. This would lead to the absurd result that while an employer, as defined within the meaning of the statute, cannot unlawfully retain wages owed to an employee, an employer who does so and then retaliates against an employee who is attempting to enforce his or her rights would not be liable for any possible retaliation against such an employee.[2] This result certainly could

---

[2] Furthermore, in <u>Smith</u>, the Supreme Judicial Court allowed a lawsuit to go forward against Winter Place, LLC and others, including Paul Licari and Lydia Shire, principals of Locke-Ober Company, the restaurant where plaintiffs worked. <u>Smith</u>, 447 Mass. at 363. Plaintiffs were allowed to sue defendants for retaliation and while the court did not specifically address whether the individual defendants were liable, it implicitly permitted suit against them when it did not dismiss the individual defendants from the case.

not have been contemplated by the Legislature.

Rebecca Foster is the president of both the Berkley Group and of Patriot Resorts. Plaintiff's SODF, ¶ 3. Similarly, Mark Landau is the Treasurer of both Patriot Resorts and of Berkley Group. Plaintiff's SODF, ¶ 5. The Weekly Payment of Wages Statute applies to employers, including the president and treasurer of the corporation. M.G.L. ch. 149, § 148. As president of the corporation, Ms. Foster is an employer within the meaning of the statute. As treasurer of the corporation, Mr. Landau is an employer within the meaning of the statute. Summary judgment for these individual defendants is not appropriate.

      D.    <u>Summary Judgment for Berkley on Martin's Retaliation Claim is not Appropriate</u>

Defendants argue that summary judgment for the Berkley Group is appropriate because Berkley is merely Patriot Resort's parent corporation and nothing more, despite the fact that Patriot Resort is a wholly owned subsidiary of Berkley Group. However, defendants fail to show under the integrated-enterprise test how Berkley could avoid liability.

The First Circuit adopted the integrated-enterprise test in <u>Romano</u> to determine whether a parent corporation is liable for the acts of a wholly owned subsidiary by examining four factors: 1. interrelation of operations; 2. common management, 3. centralized control of labor relations; and 4. common ownership (<u>Romano v. U-Haul International</u>, 233 F. 3d 665, 662 (1st Cir. 2000)), or common financial control. <u>Cook v.</u>

17

Arrowsmith Shelburne, Inc., 69 F.3d 135, 1240 (2nd Cir. 1995).  While the Romano court acknowledged and agreed with the circuits that had adopted the view that "control of labor operations, i.e., control of employment decisions, is the most important of the four factors," the court refused to apply the most stringent reading of this test.  Id. at 666. Rather, the court followed the more "flexible" approach adopted by the Second Circuit, "which focuses on employment decisions, but only to the extent that the parent exerts 'an amount of participation that is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions.'"  Id. (citing Cook, 69 F.3d at 1240.)

In Cook, the court applied the integrated-enterprise test to determine whether a parent corporation was responsible for the actions of its subsidiary.  There, the court focused on the second factor, that of centralized control of labor relations.  In that case, the court denied summary judgment for the parent of a wholly owned subsidiary.  It based its conclusion on the fact that there was substantial evidence of an interrelation of operations between the two companies because the parent ran the subsidiary in a "direct, hands-on fashion, establishing operating practices and management practices" of the subsidiary.  Cook, 69 F.3d at 1241.

Similarly, summary judgment for Berkley must be denied under the integrated-enterprise test because there are sufficient facts to show that the Berkley Group is liable for the acts of the wholly owned subsidiary, Patriot Resorts.  First, there is an interrelation of operations between Patriot Resorts and the Berkley Group because

18

Berkley runs Patriot in a "direct, hands-on fashion, establishing operating practices and management practices" for Patriot.  In her deposition, Rebecca Foster acknowledged that she set employment policies and procedures for employees of Vacation Village, including sales techniques, retirement plans, and attendance issues.  Plaintiff's SODF, ¶ 8.

Second, the <u>Cook</u> Court concluded that there was a common management structure evidenced by the fact that the president of the subsidiary operated out of one of the parent company's offices.  <u>Cook</u>, 69 F.3d at 1241.  There is common management structure between Patriot and Berkley.  Rebecca Foster is the president of both Patriot Resorts and of the Berkley Group.  Several of her colleagues at the Berkley Group also participate in the management of Patriot Resorts.  J.P. Ottino is the vice president of corporate acquisitions of the Berkley Group and he is director and vice president of Patriot Resorts.  Plaintiff's SODF, ¶ 6.  Mark J. Landau is the treasurer of both Patriot Resorts and the Berkley Group and was chief financial officer of the Berkley Group.  Plaintiff's SODF, ¶ 5.  These individuals are involved in the management of both the parent company, the Berkley Group, and of the wholly owned subsidiary, Patriot Resorts.  Plaintiff's SODF, ¶ 2.

In <u>Cook</u>, the parent maintained control of labor relations at the subsidiary, evidenced by the fact that applications for employment with the subsidiary were processed by the parent, all personnel status reports were approved by the parent, and that the subsidiary cleared all major employment decisions with the parent.  <u>Cook</u>, 69 F.3d at 1241.  Likewise, the Berkley Group maintains control of much of the labor relations of

19

Patriot Resorts. During all relevant times, Rebecca Foster was the direct supervisor of Faith Lippert, the human resources manager at Vacation Village. Plaintiff's SODF, ¶ 4. Ms. Lippert is responsible for the administration of sales contracts for time share sales, and the payment of commissions to time share sales persons at Vacation Village. Id. Furthermore, Ms. Lippert kept Ms. Foster apprised of personnel matters and discussed personnel-related concerns with Ms. Lippert. Plaintiff's SODF, ¶ 7. Ms. Foster promulgated policy guidelines for the sales personnel at Patriot Resorts that included attendance concerns and disciplinary actions. Plaintiff's SODF, ¶ 8.

As such, the two companies were not separate entities, and defendants' claims that Berkley was "simply . . . [Patriot Resorts'] parent corporation" are not credible when examining the integration between the two corporations. These facts support a denial of summary judgment for the Berkley Group because they show that there is a reasonable likelihood that the integrated-enterprise test has been satisfied, and as such, the Berkley Group is much more than simply the parent of Patriot Resorts.

## V.     CONCLUSION

For all the reasons set forth above, the Defendant's Motion for Summary Judgment should be denied.

PLAINTIFF ROGER MARTIN
By:

 /s/Suzanne Garrow
His attorney
Suzanne Garrow BBO# 636548
Heisler, Feldman, McCormick
& Garrow, PC
1145 Main Street, Ste. 508
Springfield, MA  01103
sgarrow@comcast.net
Phone (413) 788-7988

Dated:  May 22, 2007

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic File
(NEF).

 /s/ Suzanne Garrow
Suzanne Garrow