# EXHIBIT 1

Wise v Patriot - William Rauer - 6/3/05

---

**Page 1**

```
              UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

                              No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
              Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
              Defendants


         DEPOSITION OF WILLIAM RAUER

              June 3, 2005, 9:50

         Heisler, Feldman and McCormick, PC

              1145 Main Street

            Springfield, Massachusetts










                    Ann A. Preston
              Certified Shorthand Reporter
```

---

**Page 2**

```
                   APPEARANCES


HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA  01103
BY:  JOEL FELDMAN, ESQ.
(413) 788-7988
Representing the Plaintiffs


SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA  01103
BY:  MARYLOU FABBO, ESQ.
(413) 737-4753
Representing the Defendants
```

---

**Page 3**

```
                      I N D E X

WITNESS:  WILLIAM RAUER

Direct Examination by Mr. Feldman         5

Cross Examination by Ms. Fabbo           95


                     EXHIBITS

Exhibit 1,  Uniform Policy for Sales
            Managers' Sales Performance  75
```

---

**Page 4**

                        STIPULATION

1
2
3      It is agreed by and between the parties
4  that all objections, except as to form of the
5  question, are reserved until the time of trial.
6
7      It is further agreed by and between the
8  parties that all motions to strike unresponsive
9  answers are reserved until the time of trial.
10
11     It is further agreed by and between the
12 parties that the sealing of the original
13 deposition transcript is hereby waived.
14
15     It is further agreed by and between the
16 parties that the notification to all parties of
17 the receipt of the original deposition
18 transcript is hereby waived.

---

**Wise v Patriot - William Rauer - 6/3/05**

Page 5

1  WILLIAM RAUER, Witness, identified via
2  Florida driver's license and having been duly
3  sworn, states as follows:
4
5     DIRECT EXAMINATION BY MR. FELDMAN:
6     Q.  Mr. Rauer, could you state your name
7  and address for the record, please?
8     A.  It's William P. Rauer.  My address is
9  6000 Northwest 63rd Place.  That's in Parkland,
10 Florida.
11    Q.  Mr. Rauer, have you had your
12 deposition taken before?
13    A.  Yes.
14    Q.  So you understand generally what we're
15 doing here today.  I want to give you a few
16 grounds rules for this one.
17    A.  Okay.
18    Q.  First is that if I am talking, you
19 should wait until I finish the question and then
20 you should answer after I've completed the
21 question.  I will also attempt not to interrupt
22 your answer; is that okay?
23    A.  Fair enough.
24    Q.  If you have any questions about what

Page 6

1  I've asked, please let me know and ask me to
2  rephrase it if you don't understand it.  If you
3  do answer my questions, I'm going to assume you
4  understand it, okay?
5     A.  Yes, I do.
6     Q.  If you want a break or discuss
7  something with your counsel, use the rest room,
8  please let me know as well.  You should remember
9  to give a verbal answer every time.  That's hard
10 to remember, but you need to say "yes" or "no"
11 verbally instead of a nod or "um-hum" or "uh-uh,"
12 because it won't show up on the transcript.
13       What's your current job?
14    A.  I'm employed by Tower Resort Realty.
15    Q.  I'm sorry, by who?
16    A.  Tower Resort Realty.
17    Q.  What do you do for Tower Resort
18 Realty?
19    A.  I'm the senior project director for
20 several operations with them.
21    Q.  Which are the several operations?
22    A.  The Weston Resort, the Canada House
23 Resort, the Hollywood Resort, the Breakers
24 Resort, and the Golden Strand Resort.  As well as

Page 7

1  overseeing the operations at the Berkshire
2  Resort.
3     Q.  And the name of the Berkshire
4  Resort is what?
5     A.  Vacation Village in the Berkshires.
6     Q.  Who owns Vacation Village?
7     A.  Patriot Resorts.
8     Q.  Do you work at all for Patriot
9  Resorts?
10    A.  No, I do not.
11    Q.  When you receive a check, is it from
12 Tower Resorts Realty?
13    A.  Yes, it is.
14    Q.  And your job title there again?
15    A.  I'm the project director.
16    Q.  What's your relation to Vacation
17 Village?
18    A.  Which Vacation Village?
19    Q.  The one in the Berkshires.
20    A.  Vacation Village in the Berkshires, I
21 oversee that operation.
22    Q.  And that is as part of your position
23 with Tower Resort Realty, not in some other
24 capacity, correct?

Page 8

1     A.  Correct.
2     Q.  Who do you directly supervise at the
3  Vacation Village in the Berkshires?
4     A.  All the sales personnel.
5     Q.  Who is the person directly beneath you
6  in the hierarchy at Vacation Village in the
7  Berkshires?
8     A.  That would be Rod Lewis.
9     Q.  What's his job title?
10    A.  He's the project director of that
11 resort.
12    Q.  But you have ultimate authority over
13 the sales staff at Vacation Village, is that
14 correct?
15    A.  That's correct.
16    Q.  When I'm talking about Vacation
17 Village, for purposes of this deposition I mean
18 the one in the Berkshires.
19    A.  That's correct.
20    Q.  Who would be your direct supervisor?
21    A.  Bruce Polansky.
22    Q.  What's his job title?
23    A.  Senior project director, and also
24 senior vice president of Berkley, I believe.

```
                         v Patriot - William Rauer - 6/3/05
         Case 3:04-cv-30091-MAP   Document 182-2   Filed 05/29/2007   Page 5 of 11
```

                                                 25
 1   after they closed the sale and three timely
 2   payments were received by Vacation Village, is
 3   that right?
 4        A.   Well, the question requires a time
 5   frame, because it differed based on when you're
 6   asking me, you know, the issue was.
 7        Q.   You mean the time period, during what
 8   year, is that what you mean?
 9        A.   Based on what our policy was.
10        Q.   Tell me what the policy was about when
11   salespeople were actually paid.
12        A.   You had mentioned three timely
13   payments.
14        Q.   Yes.
15        A.   And the only time that one does not
16   get paid until three timely payments would be
17   that there is no pre-authorized checking in place
18   prior to the first payment for the mortgage.
19        Q.   And that's called a PAC, is that
20   right, Pre-authorized Checking, correct?
21        A.   Correct.
22        Q.   If there was no PAC that the
23   salesperson obtained from a customer, then they
24   had to wait until three timely payments were

                                                 26
 1   received by Vacation Village before they were
 2   paid?
 3        A.   That's correct.
 4        Q.   If there was a PAC, then the three
 5   timely payment policy did not apply?
 6        A.   That's correct, as long as they were
 7   still employed.
 8        Q.   Were there situations where a PAC was
 9   in place but somehow three timely payments
10   weren't made?
11        A.   That wouldn't be an issue. As long as
12   the PAC is there within the time frame that it's
13   required, they got paid three weeks after good
14   business, which is the policy.
15        Q.   "Good business" means what?
16        A.   Well, when we process a sale,
17   approximately two weeks after the sale, it
18   becomes good business. Approximately a month
19   after that, the first mortgage payment is due.
20   As long as the PAC comes in prior to that, then
21   it's good to be paid and they go forward.
22   Whether or not -- if you're asking the question
23   about what if there's an NSF or something like
24   that on the PAC, that has no relevancy for

                                                 27
 1   the payment, for the commission.
 2        Q.   Why does it have no relevancy for the
 3   commission if there's insufficient funds, but
 4   there is relevance if you don't get three timely
 5   payments without the PAC check -- isn't it true
 6   that the company is still not getting paid?
 7        A.   Well, the question that you asked me,
 8   I've answered.
 9        Q.   I understand. I'm asking you a new
10   question.
11        A.   What is the new question?
12        Q.   New question is, why was the policy
13   that if you have a PAC in place, then the
14   salesperson gets paid, even though there's a
15   possibility of insufficient funds?
16        A.   Well, there's a possibility of a lot
17   of things, but -- are you asking me -- let me
18   understand the question.
19        Q.   Sure.
20        A.   Are you asking me what if -- or what
21   happened when there was NSF after the PAC was in;
22   is that really your question?
23        Q.   Sure, that's my question.
24        A.   Because if that's your question, I

                                                 28
 1   don't know the answer to it.
 2        Q.   Are you aware of any circumstance
 3   where there's been a PAC check and insufficient
 4   funds thereafter?
 5        A.   No.
 6        Q.   Would you know that information; would
 7   that be information available to you?
 8        A.   It hasn't been brought to my
 9   attention, if that's your question.
10        Q.   But so far as you understand the
11   policy, as long as there's a PAC check, even if
12   there's insufficient funds later on, the
13   salesperson still gets paid within the 21 days,
14   the ordinary course of business, is that right?
15        A.   That's right. I just want to
16   understand that we're on the same page with this.
17        Q.   Sure.
18        A.   There wouldn't be a payment made prior
19   to the person getting their commission check.
20   You recognize that?
21        Q.   Is that true even without the three --
22   in the case where you want three timely payments
23   because there's no PAC check, when does the
24   salesperson get paid in that circumstance; after

W.     v Patriot - William Rauer - 6/3/05
Case 3:04-cv-30091-MAP    Document 182-2    Filed 05/29/2007    Page 6 of 11

### Page 29

```
 1   the three timely payments are received or before?
 2        A.   After, without the PAC check.
 3        Q.   So let's just talk about the situation
 4   where there's no PAC check for a second.
 5        A.   Okay.
 6        Q.   If the customer makes two timely
 7   payments and then makes one untimely payment,
 8   does the clock then start again, so you need
 9   three more consecutive timely payments for the
10   salesperson to get paid?
11        A.   Yes.
12        Q.   So in that situation, Vacation Village
13   is actually getting paid, but the salesperson is
14   not getting paid their commission, is that right?
15        A.   They're not getting paid on a timely
16   basis.
17        Q.   And if that continued for a year, they
18   still wouldn't get paid, is that right?
19             MS. FABBO:  Objection.
20        Q.   (By Mr. Feldman)  In other words, the
21   situation is someone makes two timely payments
22   and an untimely payment; then two more timely
23   payments and an untimely payment.  In that
24   situation, the salesperson doesn't get paid until
```

### Page 30

```
 1   there's three consecutive timely payments, is
 2   that right?
 3        A.   I believe that's true.
 4        Q.   Why is that the policy, if you know?
 5        A.   I don't.
 6        Q.   Now, in what instance would there be
 7   what's called a chargeback to the salesperson?
 8        A.   When that would happen, in the
 9   scenario that you just mentioned where someone,
10   for example, did get a PAC check and got their
11   commission, and within the course of that first
12   year, for example, there was NSF payment on a
13   fairly consistent basis, there would be a
14   chargeback.
15        Q.   What is a chargeback?
16        A.   The chargeback would mean that the
17   commission you were paid would be charged back --
18   you wouldn't get it; you would lose it.
19        Q.   So in other words, for the
20   salesperson's next paycheck, a deduction would be
21   made for the a amount that was already paid, is
22   that right?
23        A.   Not normally the entire amount.
24   Typically when that happens, and it rarely
```

### Page 31

```
 1   happens, but occasionally; they get charged
 2   proportionately.  They don't take the whole thing
 3   out.  I believe they do it in portions.
 4        Q.   What's the exact policy, just so I
 5   understand it, about when a chargeback would be
 6   made.  In other words, you said if there's
 7   inconsistent payments -- what is the exact policy
 8   so that a salesperson would understand when a
 9   chargeback might occur to them?
10        A.   You're asking the question with regard
11   to PAC?
12        Q.   I'm just asking generally about
13   chargebacks.  When would a salesperson get a
14   chargeback?  That was the original question.
15        A.   A person would get a chargeback if
16   they got paid for business that was no longer
17   good business.
18        Q.   I'm asking in what circumstances does
19   the company consider it not good business?
20        A.   If they're not getting paid their
21   mortgage payments, then it's no longer good
22   business.
23        Q.   I'm asking what the exact parameters
24   of that policy are.
```

### Page 32

```
 1        A.   I don't have the answers to that.
 2        Q.   Do you know who would have the answer
 3   to that?
 4        A.   No.
 5        Q.   But you said occasionally a
 6   salesperson would get a chargeback?
 7        A.   Yes, I did.
 8        Q.   That's presumably pursuant to a
 9   policy, is that right?
10             MS. FABBO:  Objection.
11        Q.   (By Mr. Feldman)  You wouldn't do it
12   just as a matter of discretion; no manager would
13   say, I'm taking that money back because I feel
14   like it, right?
15        A.   When it is determined that that sale
16   was no longer a good sale, that commission would
17   then be charged back.
18        Q.   I understand that.  I'm trying to
19   figure out how the company determines whether
20   it's a good sale or not.
21        A.   You'll have to ask someone else that,
22   because I don't have the answer.
23        Q.   Do you know who would have the answer
24   to that?
```

## Page 93

```
            salespeople could go to find out what the policy
            was with regard to payments, is that right?
    A.      I'm pretty sure that's true.
    Q.      Is there any other place they could go
            to?
    A.      No, but if it's not in the handbook --
            and I believe it is -- there would be something
            they would be given at hire that would tell them
            that.
    Q.      Would a chargeback ever be implemented
            with regard to a salesperson if there either was
            a PAC check or three timely payments were made?
    A.      What was the question?
    Q.      Here's the question: Would Vacation
            Village ever implement a chargeback to a
            salesperson in any instance where there was a PAC
            check or three timely payments were, in fact,
            made?
    A.      Only -- I don't believe that that has
            happened; but if three timely payments are made,
            for example, and then the next eight payments are
            not timely within that first year, I believe
            that's a possible chargeback situation.
    Q.      What's the basis of your belief?
```

## Page 94

```
 1      A.      Pardon?
 2      Q.      What's the basis of your belief?
 3      A.      Oh, I think that has happened.  It's
 4              so rare that I'm not even certain, but I think
 5              within that first year if there is consistently
 6              not good payments made, then I believe that
 7              there's a chargeback.  Now, when that happens,
 8              most of the time there's a re-pay as well,
 9              because they get it fixed and people get paid
10              back their commission.  It doesn't happen that
11              often, though.
12      Q.      I understand.  Where would a
13              salesperson go to find out that that was the
14              policy of Vacation Village?
15      A.      Oh, I really don't know how to answer
16              that honestly because I'm not sure; but I'm sure
17              there is a policy in place somewhere.
18      Q.      Has a sales person ever complained to
19              you about a chargeback?
20      A.      I don't really remember at that
21              resort.  At other resorts yes, but I don't know
22              specifically at that resort that that question
23              has come up.  It might have; I'm just not sure.
24      Q.      Has any salesperson at Vacation
```

## Page 95

```
 1              Village ever been paid overtime?
 2      A.      They've gotten paid bonuses.
 3      Q.      I understand that; but overtime, time
 4              and a half?
 5      A.      No, they don't get paid by the hour.
 6              MS. FABBO:  I just have one or
 7              two questions.

 9      CROSS EXAMINATION BY MS. FABBO:
10      Q.      Since you -- when did you leave the
11              position as project director at Vacation Village?
12      A.      I think August of '02.
13      Q.      And since that time, how frequently do
14              you visit Vacation Village in the Berkshires?
15      A.      About once a month.
16              MS. FABBO:  That's all my
17              questions.
18              Mr. Feldman:  Nothing further.
19              Thank you.

21              (Deposition concluded at 11:40)

23      COMMONWEALTH OF MASSACHUSETTS
24      HAMPDEN, SS.
```

## Page 96

```
        I, Ann A. Preston, a Notary Public in
and for the Commonwealth of Massachusetts, do
certify that there came before me on June 3,
2005, at the offices of Heisler, Feldman and
McCormick, PC, 1145 Main Street, Springfield,
Massachusetts, the following named person, to
wit:  WILLIAM RAUER, who was by me duly sworn to
testify to the truth and nothing but the truth as
to his knowledge concerning the matters in this
case; that he was examined upon his oath and his
examination reduced to writing by me; and that
the statement is a true record of the testimony
given by the witness, to the best of my knowledge
and ability.

        I further certify that I am not a relative
or employee of counsel or attorney for any of the
parties, or a relative or employee of such
counsel or attorney, nor am I financially or
otherwise interested in the outcome of the
action.

WITNESS MY HAND this 27th day of June 2005.


_____
Ann A. Preston

My commission expires:
December 22, 2011
```