# EXHIBIT 2

Wise v Patriot - R. Foster Campagna - 5/23/05

---

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-CV-30091-MAP

LACRISHA WISE, MICHAEL MASSACONI,
ROGER MARTIN, and PETER CORBIN, on
behalf of themselves and on behalf
of others who are similarly situated
            Plaintiffs

vs

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO III,
REBECCA A. FOSTER, and
JAMES E. LAMBERT
            Defendants

DEPOSITION OF REBECCA FOSTER CAMPAGNA

May 23, 2005, 10:10

Heisler, Feldman and McCormick, PC

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

---

**Page 2**

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK, PC
1145 Main Street
Springfield, MA 01103
BY: SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiffs

SKOLER, ABBOTT AND PRESSER, PC
1414 Main Street
Springfield, MA 01103
BY: MARYLOU FABBO, ESQ.
    KIMBERLY A. KLIMCZUK, ESQ.
(413) 737-4753
Representing the Defendants

---

**Page 3**

INDEX

WITNESS: REBECCA FOSTER CAMPAGNA

Direct Examination by Ms. Garrow           5

EXHIBITS

Exhibit 1,  Vacation Village Tour Times         51
Exhibit 2,  2004 Employee Handbook              56
Exhibit 3,  2001 Employee Handbook              61
Exhibit 4,  Employment Agreement                68
Exhibit 5,  Commission Structure Forms          84
Exhibit 6,  5/24/03 Memo Re: Hecht Comm.        86
Exhibit 7,  Corbin Commission Report            95
Exhibit 8,  Massaconi Check Stubs              112
Exhibit 9,  5/6/03 Memo Re: ESOP Procedures    125
Exhibit 10, Attendance Detail Report           126
Exhibit 11, 11/3/02 Memo Re: Attendance        127
Exhibit 12, Attendance Detail Report           127
Exhibit 13, Attendance Detail Report           129
Exhibit 14, Letter to ALDA from ESA            148
Exhibit 15, 12/22/04 Memo Re: New-Hires        150
Exhibit 16, 11/21/01 Memo Re: Policies         157
Exhibit 17, 12/21/01 Memo Re: Rotation         161
Exhibit 18, 6/9/03 Memos Re: Ms. Wise          167

---

**Page 4**

STIPULATION

   It is agreed by and between the parties
that all objections, except as to form of the
question, are reserved until the time of trial.

   It is further agreed by and between the
parties that all motions to strike unresponsive
answers are reserved until the time of trial.

   It is further agreed by and between the
parties that the sealing of the original
deposition transcript is hereby waived.

   It is further agreed by and between the
parties that the notification to all parties of
the receipt of the original deposition
transcript is hereby waived.

Wise v Patriot - R. Foster Campagna    5/23/05

---

Page 73

1  gets full payment for a unit, and there's a
2  ten-day period for -- you assumed a check. Have
3  you ever had a cash sale, somebody come in with
4  twenties?
5      A.  For the entire purchase?
6      Q.  Yes.
7      A.  No.
8      Q.  So it's most likely if they're going
9  to pay in full, they pay by check. Have you had
10 that happen before?
11     A.  Yes.
12     Q.  So you wait ten days for the check to
13 clear, is that correct?
14     A.  That's correct.
15     Q.  And then if a sale was made, let's say
16 on Friday -- that's a relatively busy day, I
17 assume, is that correct?
18     A.  Friday could be a busy day, yes.
19     Q.  So a sale is made on a Friday, you
20 wait ten days, so that takes us into -- is that
21 Monday?
22     A.  Monday a week.
23     Q.  Right. Not the following Monday, but
24 the next Monday?

---

Page 74

1      A.  The next.
2      Q.  We'll say Friday was the 1st, and then
3  Monday would be the 10th. And then what happens
4  on that Monday; does that automatically get sent
5  in that day on that Monday, or you have to wait
6  an additional week?
7      A.  No, that goes in on the week ending
8  Sunday's date. So if Monday is the 10th --
9  Monday is the 10th, Sunday is the 16th. That
10 would be week ending the 16th. It's sent in for
11 payment on the 17th, and it would be paid.
12     Q.  Not the 18th, but...
13     A.  Not the 18th, but a week from the
14 18th, yes.
15     Q.  25th. Was there at any time during
16 the course that Patriot Resorts has been selling
17 time-shares that a preauthorized check was not
18 required from a customer?
19     A.  My recollection is in the very
20 beginning, I would say the first few months they
21 did not require it, but they encouraged it and
22 tried to teach the salespeople how to get the
23 preauthorized checking -- authorization from the
24 customer.

---

Page 75

1      Q.  Was that a Berkley policy that had
2  been in effect before 2001 when Patriot Resorts
3  was -- before Patriot Resorts came into
4  existence?
5      A.  It's a policy that is utilized at some
6  of the Berkley-owned development companies, yes.
7      Q.  Not all?
8      A.  I believe it's all, but I would not --
9  the development companies probably, yes. I'm
10 thinking of one sales and marketing agreement
11 where it may not be.
12     Q.  Where is that?
13     A.  Wilderness Resort.
14     Q.  That's the campground?
15     A.  Yes.
16     Q.  Under Earned Commissions, that's on
17 Page 3, VI, "A commission is deemed earned upon
18 the closing of a sale," and then it talks about
19 his commission on financed sales and they'll "not
20 be deemed earned until the purchaser has made
21 three timely consecutive monthly payments"?
22     A.  Correct.
23     Q.  That's a policy at Patriot Resorts, is
24 that correct?

---

Page 76

1      A.  That's correct.
2      Q.  And all the salespeople and sales
3  managers are required to abide by that, is that
4  correct?
5      A.  That's correct.
6      Q.  What about Berkley; is that a
7  Berkley-wide policy?
8          MS. FABBO:  Objection. You can
9      answer.
10         THE WITNESS:  There is a policy
11     at most development companies where
12     there is a provision for chargeback of
13     commissions that are paid. Whether it
14     is worded exactly this way or not
15     depends on the particular state and
16     the way that the particular attorney
17     drafted the contract.
18     Q.  (By Ms. Garrow)  What are chargebacks
19 -- commission charge-backs?
20     A.  If a sale is made and the customer
21 does not fulfill the minimum number of payments
22 required for -- according to the salesman's
23 contracts, then the company has the right to take
24 back that commission that was paid because the

---

Wise v Patriot - R. Foster campagna 5/23/05

**Page 85**

1 their commission structure.
2  Q. Do you know when this was in effect,
3 this commission structure?
4  A. No, I do not.
5  Q. Do you know if it's currently in
6 effect?
7  A. I don't know, not for a fact.
8  Q. What about 2029, what's that?
9  A. That is a form for a nonexperienced
10 sales representative with the appropriate
11 commission structure.
12  Q. Is that what you understand the
13 commission structure to be currently at Patriot
14 Resorts?
15  A. I really don't know. I did not review
16 that.
17  Q. So you don't know if this is in effect
18 or not currently?
19  A. No, I do not.
20  Q. Or if at any point it was in effect at
21 Patriot Resorts?
22  A. I'm not familiar with that paper.
23  Q. Are there any other times when
24 charge-backs might occur other than what you've

**Page 86**

1 explained to me so far?
2  A. Any time a customer stops paying their
3 payment at Patriot Resorts prior to the three
4 payments being made for whatever reason, if they
5 just stop making payments and say they don't want
6 it anymore, they're cancelling their contract, it
7 isn't what they thought it was, they don't want
8 it, and Patriot Resorts agrees to cancel that
9 purchase, then the salesperson would be charged
10 back.
11  Q. Does that occur sometimes?
12  A. It does occur sometimes, yes.
13  Q. Anything else; any other times when
14 there might be a charge back?
15  A. Not that I can think of.
16      (Exhibit 6, 5/24/03 Memo to
17       Polansky from Lippert,
18       marked for identification)
19  Q. (By Ms. Garrow) I'm going to mark
20 this, but I'm going to give this to you because
21 it's more legible, to just make sure that the
22 document that's Exhibit 2 from Faith Lippert's
23 deposition is the same one that I'm showing you
24 there.

**Page 87**

1  A. Okay.
2  Q. Are you satisfied that those are the
3 same document?
4  A. Yes.
5  Q. Although one is legible and one is
6 not?
7      MS. FABBO: Excuse me, the top
8      has some additional stuff on the one
9      from Faith.
10     MS. GARROW: Yes, that looks like
11     that came from the e-mail.
12     MS. FABBO: Looks like it was
13     just cut off on this one. But other
14     than those, I don't see anything.
15  Q. (By Ms. Garrow) Great. So this is an
16 e-mail, is that correct?
17  A. Yes.
18  Q. It appears to be from Faith Lippert to
19 Bruce Polansky, is that correct?
20  A. Yes.
21  Q. It looks like you were cc'd on it?
22  A. Yes.
23  Q. Do you recall receiving this e-mail?
24  A. I don't remember receiving it, but I

**Page 88**

1 probably did.
2  Q. It looks like there was -- it says
3 here, "I understand that you would like me to ask
4 Becky about paying commissions to Joel Hecht."
5 Do you see that on the first line?
6  A. Okay, yes, I see it.
7  Q. And do you recall some issue about
8 Mr. Hecht's commissions as you sit here today?
9  A. No, I'm sorry, I don't.
10  Q. It looks like there was something
11 related to a timing on a PAC check. Does that
12 refresh your memory?
13  A. That seems to be what it's saying.
14  Q. You don't have a recollection of that
15 as you sit here today?
16  A. No, I'm sorry, I don't.
17  Q. It says here under the highlighted
18 portion, "December 1st of last year was when the
19 line was told no PAC/no pay." So that would have
20 been December 1, 2002. Does that comport with
21 your memory?
22  A. Of when the PAC...
23  Q. The PAC checks were required?
24  A. It could have been. I don't really

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LACRISHA WISE, MICHAEL
MASSACONI, ROGER MARTIN and
PETER CORBIN, on behalf of
themselves and on behalf of others
who are similarly situated,

:
:
:
:
:
:
: DOCKET NO. 04-CV-30091-MAP

        Plaintiffs,

v.

PATRIOT RESORTS CORP.,
THE BERKLEY GROUP, INC.,
MARC J. LANDAU, J.P. OTTINO, III
REBECCA A FOSTER. and JAMES E.
LAMBERT,
        Defendants.

## AFFIDAVIT OF LAUREN POWELL

I, Lauren Powell, being duly sworn, state as follows:

1. I am over 18 years old and believe in the obligation of an oath. I have personal knowledge of the facts set forth in this affidavit.

2. I have been the Director of Sales and Administration for The Berkley Group ("Berkley") since 2003. I currently remain in that position.

3. As Director of Sales and Administration, I oversee the implementation of Patriot's commissions policies and procedures.

4. Patriot's Detailed Salesman Commission Reports ("Reports") reflect the status of a salesperson's current sales.

5. Anytime a sale is canceled, negative amounts automatically appear on these Reports to indicate that the sale has been canceled.

6. The negative amounts reflected on these Reports do not in any way indicate that Patriot has initiated, or will initiate, a chargeback on the commission earned from that sale.

7. Negative amounts will appear on a Report any time a sale is canceled – even if the sale is canceled after the purchaser made three timely monthly payments, meaning that the commission on the sale cannot be charged back unless the sale is canceled due to a misrepresentation by the salesperson.

8. According to Patriot's company policy, Patriot will not initiate chargebacks on any commissions advanced over a year prior to the prospective chargeback date.

9. Over the course of Michael Massaconi's entire career with Patriot, Patriot charged back only 14 commissions from Mr. Massaconi, totaling $1,593.82.

10. Over the course of Mark Lepine's entire career with Patriot, Patriot charged back only 10 commissions from Mr. Lepine, totaling $1,603.26.

11. Exhibit A to this affidavit is a true and correct copy of the Patriot Commissions Totals report for Michael Massaconi, which shows the total number and amount of all chargebacks recovered from Mr. Massaconi's commissions from August 4, 2001 to the present.

12. Exhibit B to this affidavit is a true and correct copy of the Patriot Commissions Totals report for William Steele, which shows the total number and amount of all chargebacks recovered from Mr. Steele's commissions from August 13, 2001 to the present.

13. Exhibit C to this affidavit is a true and correct copy of the Patriot Commissions Totals report for Mark Lepine, which shows the total number and amount of all chargebacks recovered from Mr. Lepine's commissions from September 19, 2001 to the present.

Signed under the pains and penalties of perjury this ____ day of May, 2007.

_____
Lauren Powell

Sworn and Subscribed to before me this day of May, 2007.

_____
Notary Public
My Commission Expires:_____