# EXHIBIT 1

Case 3:04-cv-30091-MAP   Document 184-2   Filed 05/31/2007   Page 2 of 8
Deposition of:                        Roger Martin                        April 5, 2005
               Wise et al. vs. Patriot Resorts Corp., et al

```
                                        Vol. I, Pgs. 232
            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
                        Docket No. 04-CV-30091-MAP
------------------------------
                              )
WISE ET AL,                   )
            Plaintiffs        )
                              )
vs.                           )
                              )
PATRIOT RESORTS CORP.,        )
ET AL.                        )
            Defendant         )
                              )
------------------------------

         DEPOSITION OF ROGER MARTIN
           Tuesday, April 5, 2005
                 9:10 a.m.
        SKOLER, ABBOTT & PRESSER, P.C.
              One Monarch Place
       Springfield, Massachusetts 01144
- - - - - - Sandra A. Deschaine, RPR - - - - - -
           COURT REPORTING SERVICES
               P.O. BOX 15272
       Springfield, Massachusetts 01115
         (413) 786-7233  FAX (413) 786-0299
```

Case 3:04-cv-30091-MAP   Document 184-2   Filed 05/31/2007   Page 3 of 8

Deposition of: Roger Martin — April 5, 2005
Wise et al. vs. Patriot Resorts Corp., et al

**154**

1  you actually were in the pit?
2  A. No.
3  Q. Did you keep any records of hours you
4  worked?
5  A. No.
6  Q. Any record of the hours spent on
7  tours?
8  A. No.
9  Q. And to your knowledge, did the
10 company spend any -- keep any record of hours
11 worked?
12 A. Can't tell you. I don't know. No.
13 Q. What about in the pit, did you have
14 to record your time anywhere?
15 A. No.
16 Q. Do you have any record indicating any
17 hours that you might have worked that were in
18 excess of forty in one week?
19 A. Nope.
20 Q. How many weeks did you work more than
21 forty hours?
22 A. Probably every one of them.
23 Q. Every one?
24 A. Oh, yeah, you know, when you're there

**155**

1  for every hour, yes. It was a full week, yes, I'd
2  say more.
3  Q. Are you including in this time where
4  you may have went to the gas station or doctor's
5  appointments? Are you excluding that time or
6  including it?
7  A. Including.
8  Q. And you're including time spent in
9  the pit as well as time on tours?
10 A. Oh, yes, anytime you're on property.
11 Q. What about time when you're driving
12 your car?
13 A. I'm usually with a tour or somebody
14 like that.
15 Q. What?
16 A. I'm usually driving a tour around.
17 Q. Right, but you weren't on any
18 property when you were at Greylock or anything.
19 I'm asking if you're including that time?
20 A. Greylock, I am with a tour. I don't
21 go to Greylock without a tour.
22     MS. GARROW: Listen to her question.
23 Q. Do you not understand my question?
24 A. I didn't hear it.

**156**

1  Q. You answered that you were including
2  all time spent on property. I'm asking if you
3  also include time spent at other places, like the
4  church you referenced?
5  A. Oh, yeah.
6  Q. You're including that time.
7     Did you have any paper keeping
8  requirements associated with your job, filling out
9  forms?
10 A. No.
11 Q. None at all?
12 A. Other than when they buy, no.
13 Q. Did you receive any records of sales
14 made by you and others, other than what you told
15 me about at the morning meeting?
16 A. No.
17 Q. Do you keep any records of days you
18 took off?
19 A. No.
20 Q. What time were you usually -- was the
21 line cut at the end of the day, most frequently?
22 A. I don't know. Whenever they said go
23 home, that's when we went home.
24 Q. Was there usually a morning tour and

**157**

1  an afternoon tour?
2  A. There's waves, yes, all through the
3  day.
4  Q. There's more than two tours?
5  A. Oh, yes.
6  Q. More than three?
7  A. Per person, is that what you're
8  asking me?
9  Q. I guess I'm not following what a wave
10 is. Do they all come at one time?
11 A. A certain amount, whatever they have
12 booked for that wave comes in, and they go from
13 the top of the line through the salesmen. If you
14 don't get there, then you wait to the next wave.
15 If you don't do that, you wait for the next wave.
16 Q. And you have no idea how many waves
17 were during the day?
18 A. No, whatever they had booked. We
19 didn't handle that part.
20 Q. You have no recollection?
21     MS. GARROW: Audible answer.
22 A. No.
23 Q. Did you ever use a Human Resources
24 report form to complain to anyone at corporate or

Case 3:04-cv-30091-MAP   Document 184-2   Filed 05/31/2007   Page 4 of 8

Deposition of: Roger Martin — Wise et al. vs. Patriot Resorts Corp., et al — April 5, 2005

Page 162

1  A. With any problems.
2  Q. And then go to the project manager?
3  A. If it wasn't resolved, go to the
4  project manager.
5  Q. And who was the project manager?
6  A. Rod Lewis.
7  Q. Did you ever bring to the attention
8  any issues, to Paul, that were not resolved?
9  A. Yes.
10 Q. What were they?
11 A. The wheel rotation.
12 Q. Okay. What else?
13 A. Pay.
14 Q. Anything else?
15 A. Commission structure, no pack, no
16 pay.
17 Q. Anything else?
18 A. No.
19 Q. What was the problem with the wheel
20 rotation that you brought to Paul's attention?
21 A. Well, some days, you know, they
22 required you to be to work, some days there's not
23 enough tours for everybody. And what they would
24 do, next day you come in, they start the wheel all

Page 163

1  over from the beginning, you wouldn't get the
2  opportunity to have a tour, so essentially you
3  were there for free.
4  Q. And you complained to him about that?
5  A. Wouldn't you?
6  Q. Did you ask him -- I'm asking the
7  questions. Did you ask him to do anything about
8  it?
9  A. Oh, yeah.
10 Q. What did you ask him to do?
11 A. I asked him to start the wheel from
12 where it stopped.
13 Q. What did he say?
14 A. That's not management's way.
15 Q. Was it your opinion that he had some
16 control over that or was it a directive from
17 someone else?
18 A. It's probably a directive from higher
19 up.
20 Q. Are you guessing?
21 A. I'm guessing.
22    MS. GARROW: Don't guess.
23 Q. When did you have that conversation
24 with Paul about the wheel rotation?

Page 164

1  A. Couldn't tell you.
2  Q. No idea?
3  A. No idea.
4  Q. No records?
5  A. No records.
6  Q. And then you brought it -- did you
7  then bring it to the attention of Rod?
8  A. Oh, yeah.
9  Q. What?
10 A. Yes.
11 Q. What did you say to Rod?
12 A. I said, Rod, it's not fair.
13 Q. Anything else than "It's not fair"?
14 A. I don't know. It was just unfair.
15 He said, Well, that's just the way it is.
16 Q. And then did you bring it to anyone
17 else's attention?
18 A. That's when I contacted the District
19 Attorney and filed a complaint with -- and that
20 was it.
21 Q. With the District Attorney or you
22 mean the Attorney General?
23 A. The Attorney General, I'm sorry.
24 Q. Why didn't you pursue it anywhere

Page 165

1  else internally above Rod?
2  A. It was my opinion that it would have
3  been stopped right there.
4  Q. And what is that opinion based on?
5  A. Just from trying to get things
6  changed that never went.
7  Q. Did you believe that Rod had any
8  decision-making authority, with respect to the
9  wheel and the rotation?
10 A. Absolutely.
11 Q. And what led you to believe that?
12 A. He's the boss.
13 Q. And you didn't know whether that was
14 a directive coming from somewhere else or you did
15 know?
16 A. I didn't know.
17 Q. When did you go to the Attorney
18 General's Office?
19 A. I can't recall exactly. Somewhere in
20 2003, 2004, somewhere around there.
21 Q. Is that after you separated from
22 employment?
23 A. Oh, no, I did this before.
24 Q. How did you become aware that that

42 (Pages 162 to 165)

Case 3:04-cv-30091-MAP   Document 184-2   Filed 05/31/2007   Page 5 of 8

Deposition of: Roger Martin
Wise et al. vs. Patriot Resorts Corp., et al
April 5, 2005

**Page 178**

1  Q. What do you remember?
2  A. I asked him how come.
3  Q. What did he say?
4  A. He said that's the way it is.
5  Q. Did you ask him to do anything about
6  it?
7  A. Yes.
8  Q. What did you ask him to do?
9  A. I asked him to fix it.
10 Q. He didn't want to fix it, is that
11 what you're saying?
12       MS. GARROW: Objection.
13 BY MS. FABBO:
14 Q. He didn't fix it?
15 A. He couldn't fix it.
16 Q. Did he say he was not going to fix
17 it?
18 A. He said, Rog, you don't want to fuck
19 with me.
20 Q. When you spoke with Mr. Gordon or
21 Paul or Mr. Lewis on this issue related to the
22 wheel rotation, did you raise your voice?
23 A. Probably. Initially, no.
24 Q. Never. At some point?

**Page 179**

1  A. Yes.
2  Q. And when was that?
3  A. When they wouldn't fix it.
4  Q. The wheel rotation?
5  A. Yes.
6  Q. Why did you raise your voice at that
7  time?
8  A. Because I was frustrated at coming to
9  work and not getting a tour, not getting paid, and
10 being told I got to sit there all day.
11 Q. What did you want to be paid for the
12 time that you were at the pit? I'm assuming
13 that's what you're referring to when you're saying
14 sit there all day.
15 A. Yeah.
16 Q. What did you want to be paid, minimum
17 wage?
18 A. Whatever, something to justify why I
19 had to sit there.
20 Q. When did you raise your voice to any
21 of these individuals about the wheel issue?
22 A. After with the hundredth time of
23 speaking to them about it.
24 Q. You spoke to them a hundred times?

**Page 180**

1  A. I can't tell you for sure, but we
2  spoke several times on it.
3  Q. Did you think that was going to
4  prompt them to do something about it, the fact
5  that you raised your voice?
6  A. I think it's just that I was
7  frustrated with getting nowhere.
8  Q. Did anyone ever tell you that they
9  thought you had aggressive body language?
10 A. No.
11 Q. Did you ever meet Ms. Foster before
12 today?
13 A. Once before.
14 Q. Where did you meet her?
15 A. I held her umbrella when it was
16 raining and walked her over to Faith's office.
17 Q. When was that?
18 A. A couple years ago.
19 Q. Did you have any conversation?
20 A. Not really.
21 Q. What?
22 A. Minuscule, Hi, how are you? That's
23 about it.
24 Q. Did you ever talk to her other than

**Page 181**

1  that time you were holding the umbrella?
2  A. No.
3  Q. Did you ever attempt to contact her
4  with any of your concerns?
5  A. Didn't know how. No.
6  Q. You didn't know she existed?
7  A. I don't know how to contact her.
8  Q. You didn't have the number for her?
9  A. No.
10 Q. Did you consider looking at the
11 handbook?
12 A. No.
13 Q. Did you ever ask Faith how to contact
14 Becky?
15 A. No.
16 Q. Did you ever consider suing Coral
17 Resorts about your employment there?
18 A. No.
19 Q. What?
20 A. No.
21 Q. What about Berkley? I'm sorry, your
22 predecessor, Bentley -- was it Bentley?
23 A. No.
24 Q. Was there any reason -- weren't you

Case 3:04-cv-30091-MAP   Document 184-2   Filed 05/31/2007   Page 6 of 8

Deposition of: Roger Martin
Wise et al. vs. Patriot Resorts Corp., et al
April 5, 2005

**182**

1 paid on commission at both of those places?
2  A. Yes.
3  Q. Was there any reason that that didn't
4 prompt you to sue?
5  A. They were paying us.
6  Q. They weren't paying you on an hourly
7 basis, though, were they?
8  A. No.
9  Q. Are you the owner of your home?
10  A. No.
11  Q. Does your fiancTe own it?
12  A. No.
13  Q. Do you rent?
14  A. No.
15  Q. Who owns it?
16  A. I believe her parents.
17  Q. Did you ever receive any disciplinary
18 action at Vacation Village?
19      MS. GARROW: Objection. You can
20 answer if you understand the question.
21  A. I would think I got -- yeah. Yes.
22  Q. How many times?
23  A. Once that I know of. That's
24 documented, that I know of.

**183**

1  Q. What was that regarding?
2  A. A suspension for three days.
3  Q. For what?
4  A. I forgot. I don't know.
5  Q. When was that?
6  A. 2000 and -- I don't know. I'm not
7 sure. Should be in the company records though.
8  Q. You have no recollection of why you
9 got suspended?
10  A. No. It was a minor reason. I
11 forgot.
12  Q. Did you protest your suspension in
13 any way?
14  A. I protested everything this company
15 did.
16  Q. How did you protest your suspension?
17  A. I told them I wasn't happy with it.
18 They didn't care.
19  Q. Told who?
20  A. Bill Rauer, he was the one who
21 suspended me.
22  Q. Did it have anything to do with your
23 attitude; do you know?
24  A. It could have.

**184**

1  Q. And when did you work with Mr. Rauer?
2  A. The whole period that I was there.
3  Q. Did you have some incident with him?
4  A. No.
5  Q. Do you know Dennis Clavette?
6  A. No.
7  Q. Other than that one disciplinary
8 action that you mentioned, do you know of any
9 other disciplinary action you were involved in?
10  A. Not to my knowledge, no.
11  Q. What about verbal warnings?
12  A. No. No.
13  Q. Did you have any conversations with
14 anyone employed by Berkley when you were working
15 for Vacation Village?
16  A. I don't understand the question.
17 What do you mean?
18  Q. Did you ever talk to anyone in
19 Florida related to your employment?
20      MS. GARROW: Objection, asked and
21 answered. Go ahead and answer.
22  A. No.
23  Q. Did you understand that the company
24 could discipline you for inappropriate behavior?

**185**

1  A. Yes.
2  Q. Do you know of anyone else receiving
3 any disciplinary actions?
4  A. No.
5  Q. Did you ever -- can you tell me the
6 circumstances that led to your termination in May
7 of 2003?
8  A. Again, it was the wheel rotation, the
9 beginning of the day, Gordon is giving a meeting,
10 there was, like, eight tours the day before, and
11 they told us that the line was going to start at
12 the beginning, at the -- so the other thirty-five
13 people that were there the day before that didn't
14 get a tour, were not going to get a tour again.
15      So when I questioned Gordon about it,
16 he told me to go to Rod. So right after the
17 meeting I stepped to Rod. Now, Rod told me that
18 that's just the way it is. I showed him -- I went
19 to my car and I pulled out the laws they were
20 breaking and I physically showed them to him.
21      And he said to me, I don't care.
22      And I said, You should care.
23      And he said, Roger, you don't want to
24 fuck with me.

47 (Pages 182 to 185)

Case 3:04-cv-30091-MAP   Document 184-2   Filed 05/31/2007   Page 7 of 8

Deposition of: Roger Martin
Wise et al. vs. Patriot Resorts Corp., et al
April 5, 2005

194

1   A. No.
2   Q. What did you get paid for the roofing
3   job that you said you did?
4   A. A few thousand dollars.
5   Q. A few being how many?
6   A. A few, three.
7   Q. And it was only one roofing job?
8   A. Yes.
9   Q. How did it come about that you got
10  reemployed by Vacation Village?
11  A. I had a talk with Bill Rauer. I was,
12  supposedly, a talented salesperson, you know.
13  When things were going good, we were great.
14  Q. When things were going good, you mean
15  when you had a lot of sales?
16  A. When we were getting paid on a
17  regular basis. Remember, the squeaky wheel gets
18  the grease. If you ain't squeaky, you know,
19  you're getting paid, you're not going to be
20  squeaky. It's when you're not getting paid. If
21  you were doing your job for free, you wouldn't
22  be --
23  Q. Other than Faith, did you speak to
24  anyone, other than Faith and Bill Rauer, in

195

1   between your two employments at Vacation Village,
2   did you speak to anyone there?
3   A. No.
4   Q. Not a single person?
5   A. No.
6   Q. And did Bill Rauer contact you about
7   coming back or did you contact him?
8   A. I contacted him.
9   Q. When did you contact him?
10  A. Six months after, roughly, I was
11  unemployed.
12  Q. Why?
13  A. Because I wanted to work.
14  Q. Did you seek employment at all during
15  that time period?
16  A. You can't work underneath their
17  contract, they'd tell you, you can't go ahead and
18  seek employment in the area.
19  Q. Doing time-share sales, right?
20  A. Right.
21  Q. Did you seek any other employment?
22  A. Why would I get away from time-share
23  when that's what I do? It's like you being a
24  lawyer and doing something else.

196

1   Q. What about automobiles, what about
2   that?
3   A. No, I wouldn't do auto sales again.
4   Q. What about roofing, did you consider
5   going into roofing?
6   A. No.
7   Q. So you didn't want to do anything
8   else; is that what you're saying?
9   A. I didn't want to do anything that I
10  wasn't doing for the last couple of years, that
11  was my career choice at this point, being a
12  time-share salesperson.
13  Q. What did Bill say when you contacted
14  him about returning?
15  A. We'd love to have you back, just
16  can't have any more of these outbursts.
17  Q. And you wanted to go back even though
18  you were aware of the situation, as far as the
19  commissions and the wheel?
20  A. Yes.
21  Q. Did he tell you anything had changed
22  since you had left?
23  A. No.
24  Q. Did he agree to reemploy you -- was

197

1   it a telephone conversation?
2   A. I went in and physically talked to
3   him.
4   Q. Did he agree to reemploy you when you
5   went to talk to him, or was it I'll have to get
6   back to you?
7   A. We agreed to me at that point, when
8   we were sitting down.
9   Q. Did you make any demands of him,
10  being conditions of your reemployment?
11  A. Absolutely not.
12  Q. Did you ask him what the rotation of
13  the wheel was at that time and how that occurred?
14  A. No.
15  Q. Did you ask him had the commission
16  structure changed at all?
17  A. No.
18  Q. Had it changed?
19  A. I couldn't tell you. Not to my
20  recollection.
21  Q. When you went back to work, when was
22  that?
23  A. When I went back to work for him?
24  Q. Yes.

Case 3:04-cv-30091-MAP   Document 184-2   Filed 05/31/2007   Page 8 of 8

Deposition of: Roger Martin
Wise et al. vs. Patriot Resorts Corp., et al
April 5, 2005

**Page 218**

1 they?
2   A.  No, they didn't.
3   Q.  So why couldn't you believe it?
4   A.  Just because I was hoping.
5   Q.  Was anything else going on in your
6 life at that time that contributed to your mental
7 state?
8   A.  No.
9   Q.  Did you ever slam doors while you
10 were at Vacation Village?
11   A.  I'm sure there was a door or two
12 slammed occasionally, yes, but I can't say slammed
13 because they don't slam. They have those closers,
14 so maybe I opened one or two forcefully.
15   Q.  Why was that?
16   A.  Just frustrated with just constant
17 beating your head against the wall and going
18 nowhere.
19   Q.  How did it come about that you were
20 again separated from employment?
21   A.  I asked Paul Stensland, I told him I
22 didn't want to take a tour for the day. I was
23 going to go home. I didn't feel right about
24 selling this, and I had to reevaluate what I was

**Page 219**

1 going to do. He said, Go home.
2       And the next day I found out that I
3 was fired by Bill Rauer for passing up a tour,
4 missing a tour.
5   Q.  You say you didn't feel right. What
6 did you mean?
7   A.  Emotionally and mentally. Step one
8 is a positive mental attitude when you sell for
9 this company, PMA, and I didn't have it.
10   Q.  Did you ever have it?
11   A.  Oh, yes.
12   Q.  When?
13   A.  All through my first year and a half,
14 two years.
15   Q.  I'm sorry. Did you say you told
16 Paul? Is that yes?
17   A.  Yes.
18   Q.  And he instructed you to go home?
19   A.  He said, Yeah, why don't you go home.
20   Q.  Anyone else present during this
21 conversation?
22   A.  It happened right in the pit, so
23 whoever was in the pit at that time.
24   Q.  Do you remember anyone being there?

**Page 220**

1   A.  No, I don't.
2   Q.  Is that everything you can recall
3 from that conversation?
4   A.  Yes.
5   Q.  Do you know what time that happened?
6   A.  No.
7   Q.  Was it the morning, afternoon?
8   A.  It was morning.
9   Q.  Had anything happened prior to that
10 that made you feel particularly not in a positive
11 attitude that day?
12   A.  Just coming to work, knowing that I'm
13 not going to get paid again.
14   Q.  Were you actually offered a tour that
15 you passed on or did you just leave?
16   A.  No, I asked Paul to leave and he said
17 leave. That's what they're claiming, that I
18 actually had the tour physically in my hand.
19 That's not the case.
20   Q.  Where were you on the list that day
21 or the wheel?
22   A.  I couldn't tell.
23   Q.  You have no idea?
24   A.  I have no idea.

**Page 221**

1   Q.  Has your attitude improved since you
2 are no longer working at Vacation Village?
3   A.  Absolutely.
4   Q.  How did you learn that you had been
5 terminated?
6   A.  Phone call.
7   Q.  From whom?
8   A.  Stensland and my immediate sales
9 manager, which was, I believe at the time, Todd
10 Bendars.
11   Q.  What did they say?
12   A.  They said, You got to talk. You got
13 to give Paul -- Todd left a voice mail on my cell
14 phone and said, You got to give Paul a call.
15 Looks like you've been fired for passing a tour
16 up.
17   Q.  Did you call Paul?
18   A.  Oh, yes.
19   Q.  And what did Paul say?
20   A.  Paul said, You have to talk to Bill
21 Rauer.
22   Q.  Did you call Bill?
23   A.  Yes.
24   Q.  What time did Todd call you and leave